DEBRA W. YANG
United States Attorney
STEVEN D. CLYMER
Special Assistant United States Attorney
Chief, Criminal Division
STEPHEN G. WOLFE (Cal. Bar No. 116400)
Assistant United States Attorney
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-7408
     Facsimile: (213) 894-3713

Attorneys for Plaintiff
United States of America

FILED
CLERK, U.S. DISTRICT COURT

OCT 2 3 2003

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY


UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 02-938-GHK |
| Plaintiff, | JOINT BRIEF RE: IMPACT OF CONDITIONS OF CONFINEMENT UPON DEFENDANT'S EFFECTIVE SELF-REPRESENTATION |
| v. | |
| MICHAEL PATRICK MCELHINEY, | |
| Defendant. | |

    Plaintiff United States of America hereby files a joint
submission prepared by the parties on issues concerning
defendant McElhiney's self-representation.

Dated: October 23, 2003      Respectfully submitted,

                             DEBRA W. YANG
                             United States Attorney
                             STEVEN D. CLYMER
                             Special Assistant U. S. Attorney
                             Chief, Criminal Division


                             STEPHEN G. WOLFE
                             Assistant United States Attorney
                             Attorneys for Plaintiff
                             United States of America

ENTER ON ICMS

OCT 2 4 2003

MICHAEL PATRICK McELHINEY
#0301343349 (5F-12)
West Valley Detention Center
9500 N. Etiwanda Avenue
Rancho Cucamonga, CA 91739
<u>pro se</u> defendant

AUSA STEPHEN WOLFE
1500 U.S. Courthouse
312 N. Spring Street
Los Angeles, CA 90012

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### (WESTERN DIVISION)

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>Plaintiff,<br><br>vs.<br><br>**MICHAEL PATRICK McELHINEY,**<br>Defendant. | Case No. **CR 02-938-GHK**<br><br>**<u>JOINT BRIEF RE: IMPACT OF<br>CONDITIONS OF CONFINEMENT<br>UPON DEFENDANT'S EFFECTIVE<br>SELF-REPRESENTATION.</u>**<br><br>**<u>DEATH PENALTY CASE</u>** |

Defendant, Michael P. McElhiney, appearing *pro se* in the above-captioned proceedings, and Stephen Wolfe, Assistant United States Attorney, hereby file their Joint Brief with regard to the Impact of Conditions of Confinement Upon Defendant's Effective Self-Representation.

DATED:<u>October 14, 2003</u>

Respectfully Submitted,

MICHAEL PATRICK McELHINEY

10/23/03

STEPHEN WOLFE

<u>Defendant's Position</u> –

# I. INTRODUCTION

On August 5, 2003, defendant filed his "Motion for Evidentiary Hearing to Assess Impact of Conditions of Confinement Upon Ability for Effective Self-Representation"; apparently, this Court struck the motion as untimely due to defendant's inability to select a proper date for hearing in accord with the Local Rules of Court.

On August 6, 2003, this Court issued an Order directing the parties to Meet and Confer; the parties did this, adhering to the specific timeline as instructed.

On August 25, 2003, an incident occurred at WVDC involving the unwarranted intrusion into areas of privilege and work product; that this incident occurred *after* the first Meet & Confer (of August 15, 2003) seems to be the source of some confusion.

In any event, the parties were ordered to Meet & Confer again, in good faith and attempt to resolve all issues prior to resorting to this Court for the sought-after Evidentiary Hearing. This took place on October 2, 2003, in accord with all instructions and timelines set by this Court.

As has been stated previously, there is a fundamental disagreement between the parties concerning what rules govern a Federal RICO defendant's conditions of confinement during Capital procedings: The Code of Federal Regulations versus Title 15, Division 1.

Succinctly put, defendant insists that simply because the government brought forth this indictment which caused the U.S. Marshal's Service to transport him to this District to face the allegations therein, that does not relieve the government of its obligations as specified in Title 28 CFR 500.1 et seq.; *nor does this action suspend defendant's rights to the protections afforded by these regulations.*

The government insists that defendant, in the custody of the U.S. Marshals Service, enjoys no such protections because the regulations define only custody while in the Bureau of Prisons.

*1*

1    <u>Government's position</u> – Most or all of defendant's arguments

2    suffer from two basic flaws.  First, defendant consistently fails

3    to show that the situations complained of have a substantial

4    effect on his ability to represent himself.  Many of defendant's

5    points, without regard to whether they might be found to have

6    some merit under the relevant legal and factual analysis, have

7    little or no bearing on whether defendant is being denied his

8    ability to represent himself.  Defendant often says that all

9    these matters affect his mental state and consequently his

10   ability to represent himself.  However, defendant only has a

11   right of reasonable access to the means of self-representation.

12   Defendant's failure to avail himself of reasonable access because

13   he instead concentrates on collateral matters is not a

14   deprivation of his rights.

15       Second, defendant mistakenly insists that his conditions of

16   confinement are controlled by regulations adopted by the Bureau

17   of Prisons ("BOP") and published in the Code of Federal

18   Regulations.  While awaiting trial in this case, defendant is in

19   the custody of the United States Marshals Service ("USMS"), not

20   that of the Bureau of Prisons.  This underlying fact is

21   implicitly conceded by defendant's repeated references to the

22   influence of the U.S. Marshal over the West Valley Detention

23   Center, because of a contract between the Marshals Service and

24   the San Bernardino Sheriff's Department.  The BOP regulations

25   undoubtedly govern the conduct of BOP personnel, but the USMS has

26   not adopted similar regulations, and the case law which governs

27   defendant's conditions of confinement while in the custody of the

28   USMS simply does not require the particular regulations which the

BOP has adopted for the conduct of its mission.

## II. ISSUES DISCUSSED AT THE MEET & CONFER

The below-listed issues discussed during the Meet & Confer can be summed up in the following categories:

**A) Legal Privilege    B) Living Conditions    C) Diet/Nutrition    D) Medical Care**

Each Category discussed included the following subcategories:

**A) Attorney/Client Privilege & Work Product Doctrine**
1) Monitoring & Recording Of Legal Calls
2) "Scanning" Of Incoming/Outgoing Legal Mail
3) Confiscation Of Legal Materials
4) Searching Of Privileged Legal Materials & Computer Files
5) WVDC Intrusion With Legal Relationships & Visitation

**B) General Conditions of Confinement**
1) Outdoor Recreation
2) Procedural Due Process
3) Access To Clean Clothing
4) Access To Proper Bedding
5) Access To Basic Necessities

**C) RDA Diet & Food Prepration**
1) Inadequate Servings
2) Below-Average Food Preparation
3) Meals Served Cold

**D) Medical Treatment At WVDC**
1) Access To Competent Health Care
2) Undue Delay Between Schedule Appointments
3) Excessive Delay Issuance Of Medication

Section III. will take each category *in seriatim*, with defendant stating his position first, followed by the government's position. Section IV. will explain why defendant finds it necessary to have an Evidentiary Hearing, with witnesses and evidence subpoenaed, in order to properly resolve these issues.

Defendant's Position –

## III.

### A) Legal Privilege: Attorney/Client Privilege & Work Product Doctrine

### 1) Monitoring & Recording Of Legal Calls.

It is "Policy" at WVDC to Monitor & Record all telephone calls at WVDC. Defendant has fixated upon this issue since arrival on January 24, 2003: it has been the subject of Grievances, Complaints, Motions, Status Conference Hearings, and an attempt to involve the Ninth Circuit via the extraordinary remedy of mandamus. All to no avail/satisfaction of this pro se capital defendant whom, in all good conscious cannot find it within his means to trust in the government when it declares that no use will be made of these taped legal calls in its capital prosecution, either in the guilt or penalty phase of these proceedings. Defendant finds himself "chilled" into inaction (regarding the preparation of preauthorization mitigation defense) and refers to the recently-cited case (in the government's opposition to codefendant Griffin's Motion To Dismiss) *United States v. DiDomenico*, 78 F.3d 294, 299-300 (CA7 1996), wherein Judge Posner stated:

"We put to the government at oral argument the following example. The government adopts and announces a policy of taping all conversations between criminal defendants and their lawyers. It does not turn the tapes over to the prosecutors. It merely stores them in the National Archives. The government's lawyer took the position that none of the defendants could complain about such conduct because none could be harmed by it, provided the prosecutors never got their hands on the tapes. We are inclined to disagree, although for a reason that will become apparent shortly we need not attempt to resolve the issue definitively. The hypothetical practice that we have described would, because of its pervasiveness and publicity, greatly undermine the freedom of communication between defendants and their lawyers and with it the efficacy of the right to counsel, because knowledge that a permanent record was being made of the conversations between the defendants and their lawyers would make the defendants reluctant to make candid disclosures. (Totalitarian-style continuous surveillance must surely be a great inhibitor of communication.) And yet it would be impossible in any given case to show that the outcome had been changed by the practice." See, e.g., *Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir.1995); *United States v. Perry*, 857 F.2d 1346, 1349-50 (9th Cir.1988).

It was somewhat confusing (for defendant) as to why the government cited this case when it seems so perfectly on point with the defense; yet, upon further examination it became clear

4

because of the repetitive use of the phrase "ad hoc" {3 times by the AUSA, once by Lt. Wellott

in his Declaration attached to the government's opposition).

Judge Posner further stated the following:

"At the other extreme are cases of *ad hoc* governmental intrusion into the relation between a criminal defendant and his lawyer, falling far short of continuous surveillance. In such cases harm to the defense must be shown because the bare fact of the intrusion does not create a high probability that communication between lawyer and client or between client and lawyer was disrupted. *United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981); *Weatherford v. Bursey*, 429 U.S. 545, 554 n. 4, 558, 97 S.Ct. 837, 843 n. 4, 845, 51 L.Ed.2d 30 (1977); *United States v. Castor*, 937 F.2d 293, 297-98 (7th Cir.1991); Clark v. Wood, 823 F.2d 1241, 1249-50 (8th Cir.1987); *Sinclair v. Schriber*, 916 F.2d 1109, 1113 (6th Cir.1990).

Id., 78 F.3d @ 299-300.(emphasis added).

What the government has tried to do is mold the WVDC situation into the one defined by

Judge Posner in *DiDomenico* so as to defeat the motion to dismiss, but, such manipulation fails

as will be shown below in #2).

Finally it must be noted that this is an issue only because the government chose to house

defendant in a County Facility which does not recognize 28 CFR 540.102.

<u>Government's position</u> - The government submits that this issue has been mooted by the Court's orders concerning this subject, particularly the Court's order on October 6, 2003 concerning the denial of defendant Griffin's Motion to Dismiss the Indictment. Defendant's additional argument does not seem sufficient to call for reconsideration of the Court's order.

**2)  "Scanning" Of Incoming/Outgoing Legal Mail.**

<u>Defendant's position</u> -

Defendant did not have the opportunity to address the government's opposition to Griffin's

Motion To Dismiss (his joinder was submitted prior to his receipt of it in the mail); because of

the narrowly constricted time frame in which to reply, Advisory Counsel had scheduled to visit

with defendant following   Moot & Conf 884 with AUSA Wolfe, w   2 a reply would be drafted
and filed with this Court. This did not occur, as will be noted below in #5).

Defendant is aware of this Court's ruling on this issue but takes this occasion to point out
that which he was prevented from addressing by WVDC "Policy"; namely that this Court, in its
reliance upon Lt. Wellott's Declaration, has grounded its findings regarding "scanning" on faulty
(if not perjurious) misinformation.

This Court (on p. 3 of its Order) referenced defendant's failure to rebut government
evidence (Lt. Wellott's Declaration) which declares that the practice of "scanning" was an *ad hoc*
instance of misguided Deputies, that such was not a policy at WVDC.

Defendant proffers into evidence Sgt William DeBord's Grievance Response from August
13, 2003, which states that scanning is a policy at WVDC. (Attachment JB1), and AUSA Wolfe's
letter of September 3, 2003, confirming the fact (Attachment JB2)

Since this official document predates the Wellott declaration, and, it is presumed that all
Deputies adhere to official policy at WVDC, then Wellott's declaration obviously contains false
information.

In recognition of this misrepresentation of the facts at WVDC, the entire document must
be rendered useless as a basis to deny Griffin's motion (and defendant's joinder). It should further
be noted that the government's attempt to ameliorate the harm suffered by noting that defendants
had recently arrived from CDC in May is not to be applied to this defendant who has been at
WVDC since January.

In sum, the practice of scanning  all legal mail has violated defendant's attorney/client
privilege as set forth in *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d
584; See also, *Gomez v. Vernon*, 255 F.3d 1118, 1131 (CA9 2001) (As the Supreme Court has
held, the inmates' First Amendment and other rights pertaining to privileged correspondence are
"not inconsistent with [their] status as ... prisoners or with the legitimate penological objectives

1   of the correctional system." *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d

2   495(1974).

3       Absent governmental insistence to the contrary, if defendant were housed in a Federal

4   Facility, then [28 CFR 540.10 thru 540.19] would be in effect.

5   <u>Government's position</u> - The government submits that this issue

6   has been mooted by the Court's orders concerning this subject,

7   particularly the Court's order on October 6, 2003 concerning the

8   denial of defendant Griffin's Motion to Dismiss the Indictment.

9   Defendant argues that inconsistent representations have been made

10  concerning whether WVDC had a policy of "scanning" inmates' legal

11  mail.  The government submits that this confusion arises from

12  imprecision over which policy is being discussed.  Lt. Wellott

13  pointed out that WVDC has a policy approving the scanning of

14  inmate mail.  That policy should have made an explicit exception

15  for legal mail, but it did not.  For that reason, the record

16  contains references to a policy of scanning legal mail.  There

17  was not such an official policy, since such scanning would be

18  improper.  However, the lack of an official exception to the

19  inmate mail policy for legal mail meant that deputies might well

20  understand that they were allowed or even encouraged to scan

21  legal mail.  This imprecision was cured by the Court's order, and

22  by the Detention Center when the problem was brought to its

23  attention by defendants.  The government submits that no further

24  action is apparently required to prevent improper intrusion into

25  inmate legal mail.

26

27

28

3) **Confiscation Of Legal Materials**

<u>Defendant's position</u> –

Defendant has suffered a number of prejudicial (and arbitrary) confiscations of legal materials while housed at WVDC. On July 2, 2003, Defendant's paralegal brought a CDRom which had been sent to him by attorneys associated with the Death Penalty Information Center containing motions, strategies, potential mitigation defenses, etc. WVDC allowed Ms. Van Hoepen to bring it in, and allowed defendant to store it in the Satellite Law Library--- only to confiscate it the very next day (before defendant could download it to his computer files). Lt. Wellott stated that since he had not previewed the disk (for potential terroristic instructions and/or pornography) it could not be in defendant's possession.

On July 24, 2003, defendant prepared a Declaration from codefendant Burnett (for the purpose of attachment to his original motion seeking an evidentiary hearing) concerning the issue of "Bagging" (which was determined at a Hearing before Judge Carter). It being necessary to have Burnett's signature, as well as to make 19 copies for all codefendants to send a copy to their respective counsel in accordance with the Joint Defense Agreement, defendant had to seek WVDC Staff assistance to accomplish this (because of the physical layout of WVDC and the separation of codefendants in two segments).

As a result of this request, defendant was threatened with disciplinary action because Sgt. DeBord considered it to be a violation of pro per policy at WVDC; additionally, the 19 copies of the declaration were confiscated as contraband, and it never got filed. See 28 CFR 543.10, and 543.11; *Armstrong v. Davis*, 275 F.3d 849,861 (CA9 2001).

On August 25, 2003, defendant's paralegal was illegally detained, abused, threatened and had privileged legal materials seized (Attachment JB3) because policy at WVDC subjects visitors to a questionable drug testing process performed by untrained personnel.

The confiscation of privileged materials has damaged defendant's confidence in the ability to prepare his mitigation defense. See, e.g., _Williams v. Taylor_, 529 U.S. 362, 364, 120 S.Ct. 1495, 1498, 146 L.Ed.2d 389 (2000).

Government's position - The government submits that no additional remedy is required as to this subject.  First, as to the confiscated CDRom of death penalty materials, the government submits that it was reasonable to seize the disk, since the physical object can be broken and used to harm another person, and since inspection of the physical object cannot establish whether its contents are as described or include contraband. WVDC has agreed to allow copying of a replacement disk, to be sent sealed from the Death Penalty Information Center, on to defendant's computer, and that the copying can be done by defendant's standby counsel to avoid any compromise of the material.  (It is not clear that the material, obtained from a third party, is actually privileged).  This suggestion was made to defendant's standby counsel, and no objection was made, although defendant's right to pursue different or greater relief in this proceeding was preserved.

Second, the seizure of the declaration of defendant Burnett could well have been a mistake.   The deputies apparently did not appreciate that the Burnett declaration might have been relevant to defendant's case (in which case it was proper pro per work by defendant), rather than being relevant only in defendant Burnett's case (in which case it was a violation of WVDC's rule that inmates not work on the cases of other inmates without permission).   However, no prejudice arose from the seizure.   The

9

1  same or an equivalent declaration was filed in defendant
2  Burnett's papers concerning the hooding issue.  There was no
3  prejudice to defendant because there is nothing in the joint
4  brief to suggest that Judge Carter's order on the masks or hoods
5  would have been different if the seized declaration had been
6  filed and defendant had appeared at the hearing on the matter.
7  Moreover, by defendant's own account, defendant was not
8  disciplined for apparently violating the rule on pro per legal
9  work, but simply informed of the rule and warned of the
10  possibility of discipline.

11      Finally, the seizure of documents from paralegal Ms. Van
12  Hoepen does not call for any remedial action.  The documents have
13  been returned.  Ms. Van Hoepen's visitation rights have been
14  restored (although she has not made another visit).  While
15  defendant is critical of the device used by WVDC to screen
16  documents coming into the facility for possible drug
17  contamination, there were no positive results in all the months
18  prior to July, only one in July and two in August, and none
19  since.

20      Temporary seizure of contaminated documents is a reasonable
21  response while further investigation determines whether the
22  positive result indicates a smuggling attempt.  All the documents
23  in question have been returned.  No apparent compromise of
24  privileged materials has taken place, and two of the paralegals
25  who were barred from the facility have returned to visiting.
26  (Only Ms. Van Hoepen has not).  No prejudice came about from
27  these instances, and defendant says only that they have "damaged
28  defendant's confidence in the ability to prepare his mitigation

1  defense."   Such a loss of confidence does not suggest any clear

2  remedy.   Nor is it clear how these events have unreasonably

3  affected defendant's ability to conduct self-representation.

4     **4) Searching Of Privileged Legal Materials & Computer Files**

5  Defendant's position    -

6     On October 17, 2002, in collusion with the unsealing of the instant indictment, the ATF

7  executed some (65) search warrants in nine different states across the nation; defendant's legal

8  materials were seized and then turned over to a Special Master (Julie Fox Blackshaw) for her

9  determination of what was privileged vs. nonprivileged.

10

11     Sometime in July (7) boxes of legal materials were returned to defendant at WVDC which

12  were determined to be privileged (as they were compiled during defendant's three previous trials

13  in Topeka in which he also represented himself).

14     No less than (18) overt acts and (2) predicate acts stemming from the charges in Topeka

15  form the basis of the allegations (against defendant) in this indictment. Those legal materials

16  have been deemed privileged by the court-appointed Special Master; yet WVDC refuses to

17  recognize any such privilege and routinely searches these boxes at least once a week, if not more

18
   often.
19

20     Additionally, Deputy Winegar permits inmate workers inside the Satellite Law Library

21  (where the boxes have been stored since arrival) to clean/mop, etc. Defendant is nothing against

22  cleanliness --- only against such inmates (and Deputies) being permitted access to said legal

23
   materials outside of his presence. The searching is violative of the Work Product Privilege as
24
   set forth in _United States v. Nobles_, 420 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975).
25

26     Furthermore, when defendant filed a Grievance about the constant searching of his

27  computer files he was told that the Satellite Law Library was not sovereign terrain, and that it

28  would continue because of WVDC policy (Attachment ~~JB4~~ A-24).

Government's position – The government submits that it is
appropriate to physically search legal materials for possible
contraband.   Defendant does not state that more than that is
being done.   Defendant simply does not trust that WVDC officials
are not abusing their power of physical search of legal
materials.   Unlike the scanning of legal mail, there is no
showing that legal materials are read or scanned in any way.
Certainly there is no policy which would permit such reading or
scanning, and WVDC officials have reiterated that no such policy
exists.   In the absence of some showing of abuse, as opposed to
the mere possibility of abuse, the government submits that no
additional steps to prevent potential abuse are called for in the
circumstances.

### 5) WVDC Intrusion With Legal Relationships & Visitation

<u>Defendant's Position</u> –

As noted above, defendant's paralegal had been illegally detained (subjected to vicious threats and mistreatment by Sgt. Richard Hahn, who has been the subject of previous complaints from the Federal RICO defendants, as well as several citizen complaints of excessive force and intimidation).

As a direct consequence of the actions taken by Sgt. Hahn, defendant no longer has Ms. Van Hoepen as a legal assistant. Additionally, the other paralegals (whom have some sort of network amongst themselves) are unwilling to brave the inherent risks of the appointment if it involves subjecting themselves to WVDC harassment. See 28 CFR 543.16.

Furthermore, it should be noted, that besides defendant's Advisory Counsel's well-founded fears regarding coming to WVDC to visit a Federal RICO defendant, the other attorneys have expressed similar fears and are reluctant to visit *alone* (the attorneys have taken to forming a "buddy-system" like operation) and especially do not bring any documents or materials with them to visit (to reduce the possibility of being falsely accused/wrongfully detained by Gestapo-like Officials at WVDC). This atmosphere of fear and paranoia certainly hinders any effective counsel in this, the largest single group of death-eligible defendants ever indicted by a civilized nation.

Having lost the paralegal, defendant has relied on Advisory Counsel for access to the Court --- yet even that is not beyond WVDC's ability to compromise. On October 2, 2003, Ms. Ricker had scheduled to continue the visit for two more hours --- this following the Meet & Confer with AUSA Wolfe. The purpose being to compose a quick reply disputing the govern-ment opposition to Griffin's Motion to Dismiss (defendant did not receive this in time to submit

a reply earlier).

The Meet & Confer proceeded as scheduled; AUSA Wolfe had another appointment to attend and Ms. Ricker was to proceed with the planned visit as scheduled (in accordance with this WVDC 24 hour advance notice rule). When Mr. Wolfe tried to leave, and Ms. Ricker stay, WVDC Staff said that was not allowable. Either both people had to leave, or both stay. Since Mr. Wolfe could not stay (and the planned defense meeting was privileged) Ms. Ricker had to leave (Attachment JB5).    *JB*

The two most important elements for the purpose of defining Sixth Amendment rights seem to be the level of government intrusion, and the extent to which a defendant has been exposed to prejudice resulting from the disclosure of privileged information. See, _United States v. Morrison_, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564(1981). At this stage of the pre-trial proceedings it is impossible to gauge (with any accuracy) just what prejudice overall, but, it is simple to note that defendant, due to WVDC obstructions, has been precluded from participating in the hearing before Judge Carter on August 27, 2003, as well as filing pleadings for this Court's consideration in the Griffin motion. Defendant was also stopped from participating in the Joint Defense Meeting held at the Federal Public Defender's Office in Los Angeles on August 16th.

Other demonstrable prejudice of Sixth Amendment violations by WVDC involve bogus drug testing procedures and intimidation of female legal defense team members; all harassment (amounting to assault) is directed solely at women. As a result, defendant has lost his paralegal and cannot locate another to take her place (while he is in WVDC); no one wishes to brave the hazards, nor subject themselves to such experiences. Even the attorneys are frightened to visit at WVDC without an escort, nor are they willing to bring confidential documents for fear that they too will test (falsely) positive for drugs and be confiscated (as has occurred twice now).

1    Government's position - The government submits that it is
2    reasonable for WVDC to adopt means of screening documents
3    entering the institution for the possibility of concealed
4    contraband.   It is also reasonable to respond to a positive
5    screening result with further investigation, and even temporary
6    seizure of the documents.   Only one positive result was obtained
7    in July, and two in August, with none since.   All such documents
8    have been returned after investigation.   No apparent compromise
9    of privileged material has taken place.   If reasonable responses
10   were applied excessively in any individual instance, that is
11   surely a civil matter between the interested parties.   There is
12   no showing of deliberate intrusion into defendant's ability to
13   represent himself.

14        Defendant concedes in the joint brief that it is impossible
15   to gauge what overall prejudice has arisen.   The government
16   submits that no cognizable prejudice exists.   There can be no
17   showing that the result of Judge Carter's hearing on the hooding
18   issue, or this Court's ruling on defendant Griffin's motion to
19   dismiss would have differed in any material respect if the events
20   complained of had not taken place.   Defendant may not be aware
21   that, having validly waived his right to counsel, he does not
22   have an absolute right to standby counsel.   Locks v. Sumner, 703
23   F.2d 403, 407-08 (9th Cir.), cert. denied, 464 U.S. 933 (1983).

24        Of course, no deliberate interference with standby counsel
25   can be proper after the Court has decided to afford defendant
26   that assistance.   Still, occasional events which unintentionally
27   burden standby counsel's assistance to some extent do not seem to
28   require any remedial measures to assure that defendant is

*15*

afforded his right to self-representation.

## B)  General Conditions Of Confinement

### 1)  Outdoor Recreation

Defendant's position -

The Court has ordered that defendant be provided with outdoor recreation consistent with BOP Standards; the bare minimum provisions by the BOP for such are five (1) hour periods on five different days of the week. So the Court has ordered. 28 CFR 541.21(6).

WVDC has yet to comply with this Court's order in this regard (although to be honest, it appears as of the date of this writing that it intends to be in compliance) but, what it cannot seem to accept is that BOP Standards mean bare minimum access to outdoor recreation cannot be used as a form of punishment for disciplinary violations. In that regard, WVDC is not in compliance.

Government's position - Defendant does not provide details of his assertion that WVDC has not complied with the Court's order. Even defendant states that it appears to him as of the date of his writing (approximately October 14), that WVDC intends to be in compliance.  In fact, WVDC intends to follow the Court's order and believes that it has been in compliance, although WVDC has asked the government to request that the Court allow more flexibility in providing the time in a smaller number of longer periods, as set out in the Government's Status Report Pursuant to the Court's Order of August 15, 2003.

The government submits that WVDC must have some ability to discipline defendant if necessary for violations of institution rules, and that precluding restriction of recreation time is

1  unwise, so long as proper discipline does not become improper

2  retaliation.[1]

3

4  **2) Procedural Due Process**

5  Defendant's position -

6      When subjected to punishment such as the loss of Good Time Credits, loss of outdoor

7  recreation, and meals being restricted, Due Process demands the right to present evidence and/

8  or witnesses in one's behalf as defense to the charges, as well as the right to a hearing before an

9  impartial Hearing Officer. Access to an appellate process is to be expected also.

10

11      The arbitrary and capricious manner in which Disciplinaries are issued, and such punish-

12  ments exacted, defies Supreme Court precedent. See, e.g., _Wolff v. McDonnell_, 418 U.S. 539, 94

13  S.Ct. 2963, 41 L.Ed.2d 935 (1974); _Bell v. Wolfish_, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447

14  (1979); _Block v. Rutherford_, 468 U.S. 576, 104 S.Ct.3227, 82 L.Ed.2d 438 (1984); _McCarthy v._

15  _Madigan_, 503 U.S. 140, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992).

16      Defendant has been "punished" in the form of loss of all "privileges" (outside recreation,

17  restricted diet, loss of commissary, loss of telephone and visits, as well as Good/Work Time

18  Credits [an issue wholly unto itself in that this County Facility presumes the right to forfeit this

19  prisoner's Federal Good/Work Time Credits]) because of allegations that he has abused the

20  Grievance System at WVDC.  J B 2 - A

21

22      That WVDC presumes to be able to punish a prisoner for filing a grievance/seeking

23  redress of wrongs is astonishing. Such a presumption flies in the face of established Supreme

24  Court and Ninth Circuit case law. See, e.g., _Bradley v. Hall_, 64 F.3d 1276, 1282 (CA9 1995);

25

26      [1] It appears that defendant was once disciplined for abusive language in a grievance, a ground for discipline which the Ninth Circuit has forbidden.  That resulted in loss of recreation time

27  for several days.  WVDC has since learned of the Ninth Circuit law that they may not discipline defendant for his use of

28  insulting or abusive language in grievances.

_17_

_Hargis v. Foster_, 312 F.3d 404, 409 (CA9 2002)(A prisoner retains those First Amendment rights that are "not inconsistent with his status as a prisoner or the legitimate penological object- ives of the corrections system." _Prison Legal News v. Cook_, 238 F.3d 1145, 1149 (CA9 2001) (quoting _Jones v. North Carolina Prisoner's Labor Union, Inc._, 433 U.S. 119, 129, 97 S.Ct. 2532 53 L.Ed.2d 629 (1977)).

Determinations by WVDC County personnel that the content of a Grievance is not proper or subject to complaint and/or is an abuse of the process at WVDC, by Sgt. DeBord or Lt. Nicassio, or any other WVDC Staff are merely pretextual; such reasoning being employed as a means to cloak the real motive --- retaliation. This retaliation is based on the arrogant response to this Court's orders regarding conditions of confinement at WVDC, in addition to resentment towards defendant's litigious nature.

As a final note in this dirge, the WVDC policy to which defendant has been subjected re discipline/punishment are vague and overbroad as applied. See, e.g., _Shaw v. Murphy_, 532 U.S. 223, 233, 121 S.Ct. 1475, 1480, 149 L.Ed.2d 420 (2001).

Government's position - Defendant does not explain how this matter has any direct affect on his ability to represent himself. Nor does he give any details of how he has been denied procedural due process in disciplinary procedures.  Certainly the disciplinary forms which defendant attaches to the joint brief indicate that several levels of review exist for disciplinary findings within WVDC.  (Jt. Brief Attachment 11).  Moreover, there is no sign that defendant has been foreclosed from litigating his dissatisfaction in the California courts.

It is not true that defendant has ever lost good time credit against his federal sentence, even if some preprinted forms may suggest that.  Defendant is a presentence prisoner with respect to WVDC, and cannot lose good time or work time credits except on a San Bernardino County sentence, which he does not have.

1  Nothing about this matter suggests that the Court should or must
2  take action to preserve defendant's ability to represent himself
3  in this case.

4
5     **3)  Access To Clean Clothing**

6  Defendant's position –

7       In this *Detention* Center, where average length of stay per prisoner is weeks to months,

8  such design and funding designated for temporary detention until release or sent elsewhere, the

9  everyday amenities of incarcerated life are far below the Federal Regulatory scheme.

10      Defendant is afforded access to two clothing exchanges per week, Tuesday and Thursday

11  which means that he has the same socks/T-shirt and underwear for at least 5 days (in certain

12  instances longer, like when the Laundry Machines breakdown --- once, for 8 days). WVDC

13  Policy disallows possession by a prisoner of more than one pair of socks, etc. To do so results in

14  disciplinary action. The same for the 1 Khaki Shirt and 1 Khaki Pants which are exchanged once

15  per week. As well for 1 towel per week.

16
17  Government's position – Defendant does not explain how this
18  matter has any direct affect on his ability to represent himself.
19  Exchange of clothing twice per week does not appear on its face
20  to amount to a Constitutional deprivation, either in general or
21  for inmates representing themselves in legal actions.  Nor does
22  it appear that defendant is treated less well than the 3000 other
23  inmates at WVDC.

24
25     **4)  Access To Proper Bedding**

26  Defendant's position –

27      WVDC permits possession of 1 threadbare sheet and 1 blanket. There are no pillowcases

28  since Policy disallows pillows.

*19*

1  <u>Government's position</u> - Defendant does not explain how this

2  matter has any direct affect on his ability to represent himself.

3  Nor does he explain why WVDC's policy on bedding is improper.

4  The regular provision of one sheet and one blanket does not,

5  without more, appear to amount to a Constitutional deprivation,

6  either in general or for inmates representing themselves in legal

7  actions.   Nor does it appear that defendant is treated less well

8  than the 3000 other inmates at WVDC.

9      **5) Access To Basic Necessities**

10  <u>Defendant's position</u> -

11     WVDC provides nothing whatsoever to its prisoners (i.e., Soap, Toothbrush, Toothpaste,

12  Comb, Washcloth, Paper, Pen/Pencil, Envelope, Stamp, Cleaning Supplies) nothing except for

13  toilet paper.

14  <u>Government's position</u> - Defendant does not explain how this

15  matter has any direct affect on his ability to represent himself.

16  Nor does he provide any basis for concluding that the WVDC policy

17  is improper.   It does not appear that defendant is treated less

18  well than the 3000 or more additional inmates at WVDC.

19      **C)  RDA Diet & Food Preparation**

20     **1)  Inadequate Servings.**

21  <u>Defendant's position</u> -

22     The average daily caloric servings is estimated to be around 2000 per diem. (This is based

23  upon an Expert Opinion after detailed descriptions provided; defendant has kept a Daily Meal

24  Log since arrival).

25     Often the Federal RICO prisoners are served their meals on Styrofoam trays. This is done

26  by inmate workers whom transfer the food from a plastic tray to the Styrofoam. Not being the

27  most conscientious of creatures performing their jailhouse duties (for .37 cents per diem), the

28  result is loss of portions.

1   <u>Government's position</u> - The quantity and nutritional quality of

2   meals at WVDC is supervised by a qualified dietitian to assure

3   its sufficiency and healthfulness.  Defendant informed the

4   government during the meet and confer process that another of the

5   defendants in this case was placed on a double ration of food,

6   because that defendant had lost so much weight.  Defendant stated

7   that he did not now want to be placed on a double ration himself.

8   It does appear that defendant's ration would be increased if it

9   appeared to have become a health issue.  Moreover, the WVDC has

10   agreed to have defendant interviewed soon by a dietitian to deal

11   with other issues raised by defendant during the meet and confer

12   process.

13      **2) Below-Average Food Preparation**

14   <u>Defendant's position</u> -

15      The food is bland and tasteless, with a monotonous regularity to the meals. The bread is

16   perpetually stale (if not actually moldy, it falls apart upon handling). Defendant filed Grievances

17   on these issues only to be treated with contempt and sarcasm, as well as threatened with charges

18   of Abuse of the Prisoner Grievance System.

19

20      The lack of variety combined with low-grade meats and tastelessly boiled food leaves a

21   prisoner hungry with nothing to look forward to.

22   <u>Government's position</u> - It would seem inevitable that

23   institutional food which must be provided to more than 3000

24   inmates at each meal will lack variety and piquancy when compared

25   to civilian food choices.  The government's reading of the

26   grievance exchange which defendant found contemptuous and

27   sarcastic does not bear out that description.  (Jt. Brief

28   Attachment 22).  It appears that defendant, perhaps inevitably,

has little sympathy for the difficulties of serving more than 3000 meals to inmates, particularly as to those inmates whose meals must be served in their cells.  These food preparation issues do not seem, individually or cumulatively, to have a direct or significant effect on defendant's ability to represent himself.

### 3) Meals Served Cold

Defendant's position –

Food is sent from the Chow Hall by Food Carts, that appear to have the capacity for heating. By defendant's reckoning he has received three hot meals in his (9) months at WVDC. The food may arrive hot from the Kitchen to Unit 5 --- but it is not served to the Federal RICO prisoners hot.

The food at CDC, according to codefendants reports, was served hot with adequate-sized portions and tasted good; WVDC can lay claim to none of these boasts.

Government's position - County health officials inspect the food service at the WVDC several times per year, and one of the items monitored is whether the temperature at which food is served in cells is unhealthful.  Defendant has not made a record which would support a finding of interference with his ability to represent himself on this issue.

Defendant's Position –

### D) Medical Treatment At WVDC

Defendant has covered the issue of "Bagging" in his other motion seeking permanent stay of the Court's order regarding transport to Medical Appointments away from WVDC. Careful not to request any medical care that could foreseeably subject him to forced transportation, defendant's area of discussion with AUSA Wolfe centered upon the Dietitian.

Defendant has been scheduled to be interviewed by the Dietitian at WVDC since May; J. Heary, the RN Supervisor has informed Advisory Counsel that he would attend to the matter some weeks ago --- still nothing is being done.

Defendant has a document (some 20+ years) medical condition commonly referred to as Irritable Bowel Syndrome, with lactose intolerance a side effect. In normal conditions of confine ment this is manageable with access to alternative diet trays; WVDC is anything but normal.

A large portion of the protein intake in a regular tray at WVDC is milk, twice a day. Since defendant cannot drink milk, his source of protein is severely reduced.

Compounding the problem is defendant's recent diagnosis of Erosive Lichen Planus, an incurable gum disease. The most that can be hoped for in treatment is lessening the pain.

And there is the fact of Hepatitis C. Defendant's viral count being well over (7) million. A recognized aspect of Hepatitis C being necessary to eat several (5 to 6) reduced meals a day.

The gum disease makes the physical act of eating very painful when the symptoms are in full flare; a Dietitian could recommend access to Fruit & Vegetable Juice as well as a Protein Drink.

12   Government's position – The WVDC has agreed to have defendant

13   interviewed soon by a dietitian to deal with these issues.

14

23

Defendant's Position –

## IV  SUMMARY

Defendant has focused his entire legal effort these past (9) months seeking to involve this Court's, and its inherent supervisory powers, to bring WVDC into Federal compliance. For such a simple problem there seems to be no simple (acceptable) solution.

Defendant would point out something he has brought to this Court's attention previously (in Status Conference Hearings) and that is the obvious conflict of interest the U.S. Attorney's Office labors under when it is directed to "Meet & Confer" with a pro se Federal RICO capital defendant. It is that Office's duty to successfully execute defendant. It is demanding to much of any human being, whose primary duty is to arrange for another's execution --- and then to expect that human to stop in the middle of his murderous process and find it within himself to care whether is intended victim is receiving a hot meal and/or getting needed exercise.

This is not a diatribe against Mr. Wolfe, rather against this Court's insistence that parties locked in a battle of life and death should be expected to negotiate over such matters during the battle. If such meetings are absolutely necessary, they should first be between the actual parties who can effect change (in this instance, U.S. Marshal Adam N. Torres who wields financial power through 18 USC 4002).

If this Court finds it absolutely necessary to involve the U.S. Attorney's Office then it could have directed the matter to a "Privileged AUSA" (for wont of a more precise description) so as to avoid the appearance of impropriety which naturally adheres to the current method.

Time and again, defendant draws attention to the simple fact that this entire problem has been because of governmental action: the decision to remove Federally sentenced prisoners from actual Federal custody while forced to undergo prosecution for Federal RICO charges which could ultimately result in the imposition of the Federal Death Penalty.

24

1    Government's position - Defendant's position is instructive, and
2    flawed, in several respects.  Defendant acknowledges that his
3    entire focus for nine months has been on urging the Court to
4    impose BOP regulations on the operation of WVDC.  It bears
5    repeating that defendant is not in BOP custody while he awaits
6    trial in this matter.  While the BOP has adopted detailed
7    regulations for its operations, the Marshals Service has not.
8    The BOP cannot, and does not purport to, bind the Marshals
9    Service to BOP regulations.  Defendant's conditions of
10   confinement while in USMS custody are ruled by case law
11   requirements, and not BOP regulations.  Little or nothing that
12   defendant litigates in this joint brief amounts to a violation of
13   case law, or to a material interference with defendant's
14   undoubted right to conditions affording him a reasonable ability
15   to represent himself.

16        The government also disputes that the U.S. Attorney's Office
17   is unable to prosecute defendant, even seek to impose the death
18   penalty if that is authorized, while at the same time dealing
19   fairly with defendant about matters concerning his self-
20   representation.  Defendant is mistaken in his statement of the
21   "primary duty" of this Office.  It is not to arrange for
22   defendant's execution, but to seek justice.  It has already been
23   determined that seeking justice in this case does not involve
24   seeking the death penalty for defendant Hicklin.  That question
25   has not been resolved with respect to defendant.  Nevertheless,
26   the government is committed to prosecuting defendant fairly, and
27   to dealing with him fairly with respect to any issues raised by
28   his self-representation.

1      Finally, defendant is mistaken when he asserts that "this

2 entire problem has been because of governmental action."  This

3 case is a governmental response to the actions of the Aryan

4 Brotherhood, a prison gang alleged to have operated as a

5 racketeering enterprise.  Governmental action is partly

6 responsible for "this entire problem," but, given that there is

7 probable cause to believe the accuracy of the indictment's

8 charges, so is a racketeering enterprise run by the Aryan

9 Brotherhood.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## V. DEFENDANT'S REQUEST FOR EVIDENTIARY HEARING

The Court's August 6, 2003, Order stated that after the meet and confer process was completed, either party may request an evidentiary hearing. Such request was to contain a statement of the witness whose testimony is sought and succinct reason for such testimony.

### 1) U.S. Marshal Adam N. Torres who is to bring the Intergovernmental Agreement (the Contract) between San Bernardino County and the Marshals Service.

#### § 4002. Federal prisoners in State institutions; employment

For the purpose of providing suitable quarters for the safekeeping, care, and subsistence of all persons held under authority of any enactment of Congress, the Attorney General may contract, for a period not exceeding three years, with the proper authorities of any State, Territory, or political subdivision thereof, for the imprisonment, subsistence, care, and proper employment of such persons.

Such Federal prisoners shall be employed only in the manufacture of articles for, the production of supplies for, the construction of public works for, and the maintenance and care of the institutions of, the State or political subdivision in which they are imprisoned.

*The rates to be paid for the care and custody of said persons shall take into consideration the character of the quarters furnished, sanitary conditions, and quality of subsistence and may be such as will permit and encourage the proper authorities to provide reasonably decent, sanitary, and healthful quarters and subsistence for such persons.*

Testimony is required to explain why the U.S. Marshal for the Central District, whom is in legal contract with San Bernardino County, does not use the statutory authority as his disposal to resolve these complaints.

It should be noted, that the CDC (Rialto) facility, which housed ten RICO defendants and whom were moved to WVDC because of this Court's Order regarding Legal Visitation, has much improved quality of living conditions (Food Preparation & Access Outdoor Recreation, T.V.'s, etc.) because of the Federal contract to house the Immigration prisoners.

Testimony would be elicited regarding Marshal Torres' knowledge of Federal Regulations (i.e., Legal Calls not taped or monitored; Legal Mail sealed by the prisoner; Legal Materials not subjected to search outside prisoners' presence; BOP Personnel do not carry tape recorders to try and gather evidence for use in potential penalty phase proceedings; Legal Visitors are not "drug swabbed" or subjected to harassment, threats, and intimidation; Legal Documents are not confiscated; Law Books are not destroyed (covers ripped off rendering them subject to wear and tear); Prisoners are not arbitrarily deprived of their right to outside recreation; Prisoners' food is not used as a weapon of punishment, etc.)

**2) Lt. Wellott who is to bring WVDC Policy which permits the monitoring and recordation of all legal telephone calls.**

Can be expected to testify to how such determinations are made (that the call is actually to an attorney); what is the process? Is the person monitoring knowledgeable as to each RICO defendant's voice, as well as that of his counsel? Absent periodic self-identification by the attorney or other legal defense team member, just how does the monitor arrive at his/her conclusion that it is a legal call? Are there specific WVDC Guidelines for this procedure? Who else (besides the monitoring deputy) has access to these taped legal calls? How long are such tapes kept in storage?

**3) Lt. Nicassio; Sgt. DeBord; Deputy Rice; Deputy Solario.**

These individuals can be expected to testify to enforcement of punishment/discipline for defendant's filing of Grievances. Their professed attitudes that WVDC Policy trumps the Federal Court's Orders and that established Ninth Circuit precedent does not apply shall be examined as well.

**4) Sgt. Richarcd S. Hahn.**

The main focus is his treatment of paralegals whom visit Federal RICO defendants and his confiscation of privileged legal materials (especially of the document FILED EX PARTE UNDER SEAL with this Court). Additionally, his use of the Drug Test Itomizer, the training (if any) he and/or his Deputies have underwent to operate this procedure.

Furthermore, Hahn is expected to explain why WVDC allows him to direct an Officer to issue a disciplinary (that the Officer neither witnessed nor had part in) two days after the alleged incident; that Hahn signed off on the punishment; and that Hahn then responded to the Grievance on the issue.

Finally, the use of prisoners' meals as a weapon of punishment; and failure to provide Due Process notice of the fact.

**5) Officer Rice.**

Can be expected to testify about the procedure known as "scanning" of legal mail; To how long he had been doing so; Who directed him to do so; How long this Policy has been in effect at WVDC? And to explain how one may "scan" a document without actually reading it?

Furthermore, since WVDC has this Policy, and he has abided by it, has he, or any other Deputy at WVDC, made any form of Report on the process? or on t he contents of any legal mail so as to determine the extent of any potential actual prejudice suffered by defendant.

**6) Codefendants Scott, Terflinger, Griffin.**

Can be expected to testify to WVDC and its deliberate mistreatment of legal defense team

members as well as confiscation of privileged legal materials; this provides proof of an ongoing and systematic campaign resulting in gross Sixth Amendment violations (demonstrable evidence pursuant to the *Morrison* criteria)

### 7) Terry Rearick (Federal Public Defender's Office Investigator)

Can be expected to testify in the assumed role of an Expert Witness. Mr. Rearick has over (20) years criminal experience; and has particular experience with the BOP and its designation of prisoners as A.B.

It could prove useful to this Court to have some balance to the government's presentation of "facts" (i.e., AUSA Jessner's relaying of MDCLA's Warden and his concerns regarding the housing of A.B. prisoners while some 6 other prisoners labeled as NLR are in residence).

Mr. Rearick could testify to the conditions of confinement at Terminal Island as well to the fact that several codefendants, whom all have the same security designations as defendant, have been housed at T.I. with no untoward incidents or special security concerns beyond the norm.

14    <u>Government's position</u> - The government submits that no

15    evidentiary hearing is required.  While many of the factual

16    issues defendant says would be addressed at the hearing are in

17    dispute, none are material to the issues before the court.

18    Whether BOP regulations control defendant's conditions of

19    confinement while in the custody of the USMS is a legal issue.

20    The other factual questions which defendant suggests could be

21    resolved by hearing are not material to the primary issue before

22    the Court: whether any of defendant's complaints amount to an

23    unreasonable interference with defendant's ability to represent

24    himself in this action.  For these reasons, no evidentiary

25    hearing is needed.

JB

JB

FILED

2003 OCT -3  PM 1:48

                                              . . . . . . . . . CALIF.
                                              LOS A . . . .

1   DARLENE M. RICKER (SBN 151653)
    29170 Heathercliff Road, Ste. 4
2   Malibu, California 90265
    Tel. (310) 457-8600
3   Fax (310) 457-8602
    email: dmricker@aol.com
4
    Standby Counsel for *pro se* defendant
5   MICHAEL PATRICK McELHINEY

6

7

8                        UNITED STATES DISTRICT COURT

9                        CENTRAL DISTRICT OF CALIFORNIA

10                              WESTERN DIVISION

11

12   UNITED STATES OF AMERICA,         )    NO. CR 02-938-GHK-008
                                       )
13                 Plaintiff,          )    **SUPPLEMENTAL DECLARATION**
                                       )    **OF STANDBY COUNSEL [DARLENE**
14          v.                         )    **RICKER] IN SUPPORT OF**
                                       )    **DEFENDANT McELHINEY'S**
15   MICHAEL PATRICK McELHINEY         )    **JOINDER IN DEFENDANT**
                                       )    **GRIFFIN'S MOTION TO DISMISS**
16                 Defendant           )    **INDICTMENT BASED ON ONGOING**
                                       )    **VIOLATIONS OF DEFENDANT'S**
17   _____)    **SIXTH AMENDMENT RIGHTS**

18

19        Darlene M. Ricker, standby counsel for *pro se* defendant MICHAEL PATRICK

20   McELHINEY, hereby files her Supplemental Declaration in Support of McElhiney's Joinder in

21   Defendant Robert Lee Griffin's Motion to Dismiss Indictment Based on Ongoing Violations of

22   Sixth Amendment. The attached declaration, which reflects events subsequent to the previously

23   filed Ricker Declaration in support of McElhiney's joinder, is being filed to supplement those

24   previous statements.

25

26   October 3, 2003                         Respectfully submitted,

27                                           _DMRicker_____

28                                           DARLENE M. RICKER
                                             Standby Counsel for *pro se* defendant
                                             MICHAEL PATRICK McELHINEY

## DECLARATION OF STANDBY COUNSEL
## [DARLENE M. RICKER]

I, DARLENE M. RICKER, state and declare as follows:

1.    I am an attorney duly licensed to practice law before the bar of this Court. I am appointed standby counsel for *pro se* defendant MICHAEL PATRICK McELHINEY ("Mr. McElhiney") in the above-captioned case.

2.    All of the facts stated herein are true of my personal knowledge or upon information and belief, and if called upon to testify thereto, I could and would do so competently.

3.    This supplemental declaration is made in support of Defendant McElhiney's previously filed Joinder in Defendant Griffin's Motion to Dismiss Indictment Based on Ongoing Violations of Defendant's Sixth Amendment Rights (the "McElhiney Joinder").

4.    This supplemental declaration is being filed to inform the Court of additional ongoing violations of Mr. McElhiney's Sixth Amendment and *Faretta* rights, the legal standards for which were previously set forth in the McElhiney Joinder.

5.    On October 1, 2003, I telephoned West Valley Detention Center ("WVDC") to schedule a meeting with Mr. McElhiney. By prior arrangement with Asst. United States Attorney Stephen Wolfe, I had agreed to attend a meeting with Mr. Wolfe and Mr. McElhiney at WVDC on October 2, 2003 from 9:00 to 11:00 a.m. as part of the meet and confer process previously ordered by the Court. In my Oct. 1 phone conversation with the legal visits section of WVDC, I explained that I needed to continue the visit alone with Mr. McElhiney for two hours (from 11:00 am to 1:00 pm) after Mr. Wolfe's planned departure at 11:00 a.m. The visiting section stated that I would be allowed to do so, that my extended visit was confirmed, and that the visiting room had been reserved for me until 2:00 p.m. on October 2, 2003.

6.    I needed to remain with Mr. McElhiney for the extra time stated above in para. 5 because Mr. McElhiney had informed me by telephone that he was preparing a Reply to the Government's Opposition to Griffin's Motion to Dismiss. The Griffin Motion (which Mr. McElhiney had joined) was scheduled for a hearing on Monday, October 6, 2003. In order to timely prepare and file Mr. McElhiney's reply as planned on October 3, 2003, I needed to obtain

1

1 | the draft from him at the Oct. 2 meeting at WVDC.

2 | Moreover, I needed to consult with Mr. McElhiney alone after Mr. Wolfe's departure from

3 | the meeting that day to assist Mr. McElhiney with procedural matters regarding the Reply, as well

4 | as to help him revise and finalize the Reply.  In addition, I needed to meet with Mr. McElhiney to

5 | help him prepare another pleading due by Order of this Court no later than October 13, 2003

6 | (regarding the temporary stay on his medical transport order).  Because of my commitments on

7 | other matters next week (including filing deadlines and oral argument in the Ninth Circuit), the

8 | only date I had available to meet with Mr. McElhiney was October 2, 2003.  These matters are too

9 | complex to be handled over the phone.

10 | 7.    On October 2, 2003, Mr. Wolfe and I met with Mr. McElhiney from 9:15 to 11:15

11 | a.m.  At 11:15 a.m., Mr. Wolfe informed the guards at WVDC that he had completed his visit.

12 | Several deputies arrived at the visiting room.  One of them, Deputy E. Trujillo, stated that both Mr.

13 | Wolfe and I "had to end the visit at the same time."  I explained to the deputy the arrangements I

14 | had made with WVDC (as stated above in para. 5).  Deputy Trujillo stated that it was WVDC

15 | policy that if one visitor left, both must do so contemporaneously.  I asked to speak with Lt. Robert

16 | Wellott.  Deputy Trujillo stated that Lt. Wellott had instituted the policy.  I asked again to speak to

17 | Lt. Wellott, in hopes that by explaining the situation to him, he may offer an appropriate

18 | accommodation, given my compelling circumstances.  Deputy Trujillo and AUSA Wolfe stated

19 | that Lt. Wellott "was in San Diego this week."  Deputy Trujillo insisted that either I leave or Mr.

20 | Wolfe stay.

21 | 8.    Mr. Wolfe, as he had told me in advance, stated that he was unable to stay because he

22 | was required to attend a meeting at his office in Los Angeles at noon that day.  I explained to

23 | Deputy Trujillo that I needed to meet with my client alone to discuss confidential legal matters.

24 | Dep. Trujillo again stated that if Mr. Wolfe left, I had to leave at the same time.  I asked if I could

25 | leave with Mr. Wolfe, sign out, and then sign back in for my pre-arranged appointment alone with

26 | Mr. McElhiney from 11:00 a.m. to 1:00 p.m.  Dep. Trujillo refused my request.  Mr. Wolfe

27 | suggested that I reschedule another appointment on a different day.  I explained (in the presence of

28 | Mr. Wolfe and Dep. Trujillo) that I could not do so because of my schedule and that even if I could

1   have done so, today (Oct. 2)  was the last day I could obtain Mr. McElhiney's Reply to the Griffin

2   Motion to Dismiss and timely file it on Friday, October 3, 2003 (the last Court day before the

3   scheduled hearing on the motion on Monday, October 6, 2003).

4        9.    Having no alternative, I left WVDC. As I processed out at the front desk, I explained

5   to Deputy Thorp what had happened. Dep. Thorp was extremely pleasant and sympathetic.

6   However, because he is not assigned to Unit 5 (where Mr. McElhiney is housed and where the

7   incident happened), Dep. Thorp was not able to provide any further information at that time. Dep.

8   Thorp offered to look into the situation with other deputies who work in Unit 5, and stated that if

9   he subsequently learned anything about the policy stated by Dep. Trujillo, he would let me know.

10       10.   After I returned to my office that afternoon (Oct. 2, 2003), I left a voice mail message

11  for Lt. Wellott. I stated that I had encountered a problem while visiting Mr. McElhiney at WVDC,

12  that I intended to file papers with the Court regarding same that next day, and that I would like to

13  discuss the matter with Lt. Wellott in hopes it could be resolved. As of the time of this filing

14  (12:00 p.m. on October 3, 2003), I have not received a return call from Lt. Wellott.

15       11.   As described above in para. 6, WVDC's refusal to allow me to meet alone with Mr.

16  McElhiney on Oct. 2, 2003, prejudiced Mr. McElhiney's constitutional right to effective self-

17  representation in that it prevented him from timely filing his Reply to the Griffin Motion to

18  Dismiss. I had previously discussed the planned contents of the Reply with Mr. McElhiney by

19  telephone. Based upon that conversation and my examination of at least one exhibit he planned to

20  attach to the Reply, it is my legal opinion that Mr. McElhiney would have presented competent and

21  persuasive evidence to counter certain assertions made in the Government's Opposition to the

22  Griffin Motion to Dismiss and the supporting declarations attached to the Opposition. WVDC's

23  misconduct on Oct. 2, 2003 prevented Mr. McElhiney from timely filing his Reply and prevented

24  me from properly assisting him with this filing.

25       12.   If WVDC has such a policy as recited by Dep. Trujillo (see para.7 above) that

26  multiple visitors must leave at the same time, it is in direct contradiction to the standard practice of

27  the U.S. Marshals Service. On numerous occasions I have, in the presence of a paralegal,

28  investigator, or co-counsel, visited clients in federal custody at the Marshals' lockup (both in the

1  Roybal Federal Building and in the Main Street federal courthouse).  It has often been the case that

2  either myself or the other visitor would need to depart the meeting early, thus leaving only one of

3  us to continue meeting with the client.  Never have the Marshals refused to allow me to continue

4  such a meeting with my client after the other visitor left.  The Oct. 2, 2003 incident at WVDC is

5  yet another example of how Mr. McElhiney's housing in a county detention facility falls below

6  federal standards and impedes his ability to effectively represent himself.

7        13.    Based on the foregoing, in addition to the information provided in my previously

8  filed declaration in support of the McElhiney Joinder, the indictment against Mr. McElhiney

9  should be dismissed based on WVDC's ongoing violations of his constitutional right to effective

10  self-representation.

12       I declare under penalty of perjury under the laws of the United States that the foregoing is

13  true and correct to the best of my knowledge and belief.

14       This declaration was executed at Malibu, California, on October 3, 2003.

17  DARLENE M. RICKER

4

# PROOF OF SERVICE

I, Karen Van Hoepen, declare that: I am employed in Los Angeles County, California; my business address is 29170 Heathercliff Road #4, Malibu, California 90265; I am over the age of eighteen years; I am not a party to the above-entitled action; I am employed by a member of the Bar of the United States District Court for the Central District of California, and at whose direction I served a copy of the attached:

**SUPPLEMENTAL DECLARATION OF DARLENE RICKER IN SUPPORT OF DEFENDANT McELHINEY'S JOINDER IN DEFENDANT GRIFFIN'S MOTION TO DISMISS BASED ON ONGOING SIXTH AMENDMENT VIOLATIONS**

on the following individual(s), addressed as follows, by placing same in a sealed envelope for collection and mailing via the United States Post Office at Malibu, California, with sufficient first-class postage attached, on October 3, 2003:

## SEE ATTACHED SERVICE LIST

This proof of service is executed at Malibu, California, on October 3, 2003.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

KAREN VAN HOEPEN

JB 1

JB1



San Bernardino County Sheriff's Department
# INMATE GRIEVANCE FORM

Summary

| Grievance Number: |
| **08-03-078** |
| Date: |
| **08-13-03** |

Inmates Name  **Michael McElhiney**    Booking Number  **0301343349**

Investigation Conducted by  **W. De Bord, Sergeant**    Emp Number  **D0536**

Summary of Complaint and Findings

**COMPLAINT:**
**Inmate McElhiney is complaining about deputy sheriffs scanning mail0.  He complains that this is a violation of law and that we have no right to scan the mail.**

**McElhiney also suggests the facility read the transcripts for January 8, 2003 Status Conference Hearing prior to enacting procedures or policies that maintain or enhance the security of the facility.**

**FINDINGS:**

**The facility does not receive the Status Conference Hearing transcripts.**

**The provisions for inmates receiving legal mail are contained within the policies/procedures of the facility.  Employees are required to scan the mail being sent out and received.   Employees are scanning the mail for contraband items that may be sent or received.   Employees also look for indicators that, if continued or carried out, would compromise the security of the facility or present safety concerns to employees or inmates.  Employees are not permitted to arbitrarily read inmate mail.**

Action Taken

**Grievance answered.**

Reviewed by _____ Duty Lt.    Approved _____    Facility Administrator

Inmate given a written reply on _____    At _____    By _____
                                    Date            Time              Print Name

This complaint has been discussed with me and I have been advised of the findings

_____
Inmates Signature

Original: Inmate's Booking Jacket        Yellow Copy: Inmate        Photocopy: Administration File



#113

**San Bernardino County Sheriff's Department**
*INMATE GRIEVANCE FORM*

| Grievance Number: |
| Date: |
| Assigned to: |

NAME _Michael McElhiney_ BOOKING# _0301343349_

HOUSING LOCATION _5F-12_ LOCATION OF OCCURRENCE _WVDC_

DATE/TIME OF OCCURRENCE _CURRENT_ DATE OF COMPLAINT _08/12/03_

**EXPLAIN YOUR COMPLAINT. INCLUDE DATES, TIMES, AND NAMES OF PERSONS INVOLVED.**

"Policy re Scaning of Legal Mail"

Deputy Rice appeared to be reading my legal mail prior to "sealing & signing" - when I asked what he thought he was doing he told me the Facility Policy is to scan incoming/outgoing legal mail for [Key/Trigger Phrases]

When I informed him that Federal case law forbids such action he told me to take it to his Captain [Nobles] Who is responsible for setting Facility policy.

For your information not even the U.S. Patriot Act [as ridiculously written as that is] provides for mere County Police to enact/enforce County Policy that would trump Federal law.

I challenge you [if you persist in breaking Federal law] to present your intent on the issue to Judge King (I suggest you read the transcripts from the Jan 8, 2003 Status Conference Hearing first).

**ATTACH ADDITIONAL PAGES IF NEEDED**

_Michael McElhiney_
Inmate's Signature

Received by: _M. MARTIN_   Date: _8-12-03_ Time: _0900_
Employee's Name ( Please Print )

Original: Inmate's Booking Jacket        Yellow Copy: Inmate        Photocopy: Administration File

Rev. 12/99                                                                                              GHRC P.S.# 1003

JB 2

JB 2



**U. S. Department of Justice**

**United States Attorney**
**Central District of California**

Stephen G. Wolfe
Assistant United States Attorney
Terrorism & Organized Crime Section
(213) 894-7408

1500 United States Courthouse
312 North Spring Street
Los Angeles, California 90012

September 3, 2003                    <u>By fax to (310) 215-6581 and mail</u>

Mark E. Overland, Esq.
Overland & Borenstein LLP
6060 Center Drive, 7th Floor
Los Angeles, CA  90045

Re:   <u>United States v. Barry Byron Mills</u>
      No. CR 02-938-GHK

Dear Mr. Overland:

I am writing in response to your letter to me of even date.

1. <u>Visiting</u> — b) The further details that I believe would be useful in determining whether these inconveniences are unreasonable include, how many such delays there have been in relation to the number of visits, how long the delays were, the days and times when the delays have taken place, whether there were other legal visits taking place at the same time, and the like. It may be that there are worse times or days that could be identified and remedied, or at least avoided.

3. <u>Searches of counsel and investigators</u> — I believe that our failure to understand one another about this stems from the question of whether any searches have been improper. I have heard several complaints about searches. All appear to have involved a positive drug test on swabs taken from various documents intended to be brought into the Detention Center. The suspicions aroused in the deputies by the positive tests apparently lead to the detention for some period of time, and to treatment with suspicion, of the persons whose documents gave the positive test. I have no doubt that that experience is very unpleasant for the people detained, and I am sympathetic to their feelings. At the same time, the deputies must surely react with seriousness to the positive tests, after months of testing with no such incidents. The officials at the Detention Center are seeking to determine through more precise testing just what the facts of these instances have been. In the meantime, the officials at the Detention Center have assured me that the seized

materials are being treated with appropriate concern for their
privileged nature.

4. <u>Scanning of outgoing legal mail</u> — Your letter misstates
my own prior letter slightly, perhaps in haste. I would agree
that it is elementary that reading legal mail is a violation of
the privilege. I merely stated that the case you cited,
involving as it did the wholesale copying and reading of
privileged material despite official ethics advice not to do so,
did not seem to immediately resolve this issue, which involves
scanning rather than reading and copying. I informed officials
of the Detention Center of the Court's order, and I have been
told that they have consulted their County counsel, and are
reviewing their policy on scanning outgoing legal mail. I will
inform you as soon as that review is complete.

Please do not hesitate to contact me if you have any other
questions about these matters.

Very truly yours,

DEBRA W. YANG
United States Attorney

STEPHEN G. WOLFE
Assistant United States Attorney

2

JB - 2A

JB - 2A

# III.  DECLARATION OF MICHAEL PATRICK McELHINEY

I, Michael Patrick McElhiney, hereby state and declare the following:

1.  Upon return to my cell Tuesday morning (July 8, 2003) I discovered a letter which contained a Money Order in it sent to me by a family friend.  WVDC policy mandates all such funds received in this manner must be removed and immediately placed on a prisoner's Trust Fund Account.

2.  As a result of Staff error, I missed the weekly Commissary purchase (which occurs on Tuesday mornings for Unit 5); if Staff had correctly lodged my funds in the Trust Fund Account I would not have suffered adverse consequences.

3.  I filed a Grievance [#96] to this effect  on July 8, 2003 {Please Reference Attachment #8 [A-8]}.

4.  On July 9, 2003, Staff filed Grievance Response [#07-03-071, C. Newland, Emp. #N0363]{Please Reference Attachment #9 [A-9]}.

5.  Upon perusal of this Staff response, coupled with my prior experience with this particular individual, I decided it was nothing more than a specious attempt---mere written lip service to the Grievance System process; accordingly, I responded with a follow-up Grievance [#97] which not only reiterated my problem, the proposed solution, but pointed out this C. Newland's obvious lack of mental acuity.  At no time did I resort to profanity, vulgarity, or abusive threats. {Please Reference Attachment #10 [A-10]}.

6.  On July 15, 2003, at about 10:00 pm, Sgt. Hahn conducted a purportedly "random" cell search on my codefendant's (Cleo Roy) cell.  Sgt. Hahn's personal antipathy for Federal prisoners (and Federal Court Orders) has been made abundantly clear.  Defendant yelled at Sgt. Hahn (made necessary due to the excessively loud T.V. noise---turned up by Sgt. Hahn as provocation) attempting to have the T.V. turned down, as well as the bright lights.

7.  It is Facility policy that Lights are put on dim and T.V. turned off at 10:00 pm;  Sgt. Hahn obviously chose to do the random cell search at this time as means of further harassment and provocation.

8.  On the morning of July 17, 2003, Deputy Ades brought me a Disciplinary Report for Cursing Staff;  When I pointed out that the alleged statements were erroneous, he informed me that he did not hear the alleged exchange.  When I asked why he could write the report without any knowledge of the events he replied that Sgt. Hahn ordered him to write it up on his account. When I asked Deputy Ades how there could be a signature and a date in the Review column put dowdn for July 16th, and this in fact was the 17th, he expressed confusion and had no answer.  I pointed out to him that the Report should have been issued within 24 hours, and Review is to be done in my presence---he stated he would not lie about these facts brought to his attention. {Please Reference Attachment #11 [A-11]}.

5

9. Following this encounter with Deputy Ades I immediately filed a Grievance [#100] about the alleged conduct and failure to abide with the dictates of Due Process (proper notice and investigation){Please Reference Attachment #12 [A-12]}.

10. On the evening of July 17, 2003, Sgt. Hahn (Emp.#H0066) filed Grievance Response [#07-03-106] in the typically arrogant manner most Grievances are answered in. {Please Reference Attachment #13 [A-13]}.

11. I then filed Grievance [#101] concerning the apparent Falsification of Documents re: the wrong date in the Review column of my Disciplinary. {Please Reference Attachment #14 [A-14]}.

12. On July 18, 2003, Sgt. W. DeBord (Emp.#D0536) filed Grievance Response [#07-03-086] concerning my allegations of C. Newland's professional incompetence and basic ignorance of Grievance Response procedures. {Please Reference Attachment #15 [A-15]}.

13. Later that day, July 18th, Deputy Rice issued me a Disciplinary Report for Disrespect Towards Staff; Sgt. DeBord instructed Deputy Rice to do this. {Please Reference Attachment #16 [A-16]}.

14. On the morning of July 19, 2003, without warning or advance notice of any kind, I was denied the meal issue [Coffee, Regular Tray, Milk & Fruit] and instead told that I was on Restricted Diet; when I objected to this action, on the basis of no prior notice the Deputy (Roberts) told me to "file another Grievance".

15. The Restricted Diet consists of some dog-food like substance and 2 slices of bread twice a day; no meal is served during lunch time.

16. On July 19, 2003, I filed Grievance [#102] objecting to being punished for what amounts to expressing my opinion in Grievance format while attempting to avail myself of the only possible, legal, remedy at WVDC for a prisoner with a complaint. I also objected to the violation of Federal statutes and California's Title 15 regarding the use of food as a weapon in punishment for minor infraction(s) of the rules. {Please Reference Attachment #17 [A-17]}.

17. On July 24, 2003, Lt. Nicassio (Emp.#N00353) filed Grievance Response[07-03-179] claiming the Restricted Diet was for the previous discipline of Cursing Staff on July 15, 2003. {Please Reference Attachment #18 [A-18]}.

18. On July 24, 2003, my codefendant, Edward Tyler Burnett (whom is housed in the same Unit 5 as I, only he is in Segment A while I am housed in Segment F) sent me a three page handwritten Declaration. This Declaration consisted of Mr. Burnett's awful experience in being transported "bagged" to a medical appointment. Mr. Burnett was providing me an exhibit to use in support of my Reply to the Government's Opposition to my Motion for Order To Show Cause re Contempt. Mr. Burnett wanted my assistance in putting it into "proper format". I proceeded to type the Declaration, then made 18 copies of it for return to Mr. Burnett to sign, along with a one-page list of instructions and the original.

19. The purpose of the copies was to be in compliance with the Joint Defense Agreement signed by me and my 18 codefendants here at WVDC; upon receipt of the signed Declaration each codefendant was to send it to their respective counsel.

20. Later on that day (the 24th) I was informed by Deputies that everything to do with Mr. Burnett's Declaration had been confiscated pursuant to the instructions of Sgt. DeBord. I was then given a "warning" concerning the alleged abuse of my pro per privileges and what amounts to being threatened with further disciplinary punishment. {Please Reference Attachment #19 [A-19]}.

21. On July 25, 2003, I filed Grievance [#103] which explained in detail how ignorant I found SCA J. Lopez's input regarding this Facility's so-called ability to take my pro per privilege and Sgt. DeBord's equally culpable lack of intelligence for actually obstructing my efforts in the litigation of my case. {Please Reference Attachment #20 [A-20]}.

22. Also on July 25, 2003, I received another Disciplinary Report that was once again issued by Deputy Rice pursuant to Sgt. DeBord's instructions; this disciplinary was entitled as "Abuse of the Grievance System" and is a result of my filing Grievance [#103]. {Please Reference Attachment #21 [A-21]}.

23. Although the Prisoner Grievance System is supposed to be in place for prisoners whom have complaints concerning, inter alia, conditions of confinement, it is not taken very seriously by Staff at WVDC. For example, we receive 2 slices of bread on certain meals. This bread is always stale due to overlong exposure on the trays. Stale bread is inedible so I sought to propose a solution. The proposal has been ignored because the problem still exists. {Please Reference Attachment #22[A-22]}.

24. On July 11, 2003, I was scheduled for an MRI, a much-needed and long overdue medical appointment. After placement in the transport vehicle, and already mired down in all the usual security accoutrements (handcuffs, chains, shackles, black-boxed and seatbelted in) I was told there was a new security measure implemented called "Bagging". This involves placement of a canvas bag with velcro straps to be put over a prisoners head---with no visible holes to see or breathe out of. (This narration is delivered amid much chuckling and knee-slapping as the Deputies find it quite hilarious to inflict humiliation and discomfort upon us Federal RICO prisoners). I of course refused to wear the bag over my head and therefore missed my medical appointment; when I say of course, it is to accentuate the obvious: WVDC Staff knew that such a new security procedure would evoke such a negative reaction from me and it was deliberately instituted in order to elicit just such a refusal. {Please Reference Attachment #23 {A-23]}.

25. Since utilization of the Satellite Law Library it has been subjected to searches by WVDC Staff. As this is a normal consequence of existence in prison I merely noticed the fact but, since the return of my legal materials from the Special Master some (4) weeks ago, I have been concerned about unauthorized access to privileged/confidential legal documents. Then I discovered that not only were my boxes of legal materials being searched, but that my computer had also been searched. I am aware of the fact that I do not "own" this computer: but it is to be

used by no other prisoners but me.  And it contains privileged work product in many files, as well as letters I have written to other codefendants' counsel, here and in Pennsylvania and in Illinois.  When I complained to Sgt. DeBord that no search should be made of the material stored in memory on my computer outside of my presence I was ignored. {Please Reference Attachment #24 [A-24]}.

26.  Additionally, I was sent a CDRom from the Death Penalty Information Center which my paralegal brought to me some (4) weeks ago along with instructions for how to download the information onto my computer.  After out visit, I placed the CDRom in my Law Library along with copies of my C-File the government had just disclosed, intending to download the material the next day.  Upon arrival in the Law Library (the next day) I discovered (after some 10 minutes of searching) that the disk was missing.  I then asked Staff if they had it to which they said yes, and that it had been confiscated pursuant to instructions of Sgt. DeBord and Lt. Wellott.  The reason given is because it could be used as a weapon, or contain instructions on terrorist activity, or have pornographic material hidden in it. When I explained that it merely contained privileged legal materials concerning strategy/tactics on development of mitigation defense(s) to capital cases...I was not believed.

I swear the foregoing is true and correct to the best of my knowledge and experience

under penalty of perjury.  Executed on July 31, 2003, at the West Valley Detention Center.

/s/ *Michael P. Elhiney*
Michael Patrick McElhiney, pro se

8

JB 3

JB 3

## DECLARATION OF STANDBY COUNSEL

### [DARLENE M. RICKER]

I, DARLENE M. RICKER, state and declare as follows:

1.    I am an attorney duly licensed to practice law before the bar of this Court.  I am appointed standby counsel for *pro se* defendant MICHAEL PATRICK McELHINEY ("Mr. McElhiney") in the above-captioned case.

2.    All of the facts stated herein are true of my personal knowledge or upon information and belief, and if called upon to testify thereto, I could and would do so competently.

3.    This declaration is made in support of Defendant McElhiney's Motion for Order: (1) Granting Evidentiary Hearing to Determine Violations of McElhiney's Constitutional Right to Prepare a Defense; (2) Transferring McElhiney to MDC-LA; and (3) Directing West Valley Detention Center to Return All Seized Legal Materials.

Interference With Mr. McElhiney's Right to Prepare a Defense

4.    I believe that West Valley Detention Center ("WVDC") has intentionally interfered with Mr. McElhiney's ability to prepare his *pro se* guilt and penalty defenses in this capital-eligible case.  This interference appears to be part of a pattern and practice at WVDC of harassing and intimidating female legal support staff on the case of *United States v. Barry Byron Mills, et al* (CR-02-938-GHK) (the *"Mills* case").  My belief is based upon the following events:

(a)    On August 25, 2003, I directed Mr. McElhiney's Court-appointed paralegal, Karen Van Hoepen, to meet with Mr. McElhiney at WVDC in order to bring him work product documents and to interview him about factual information needed to complete his declaration in a Court filing.

1

1    On that date, WVDC officials accused Ms. Van Hoepen of bringing

2    cocaine-tainted documents to Mr. McElhiney, held her in handcuffs for at

3    least 3 hours, told her she was under arrest, and otherwise intimidated and

4    harassed her. [*See*, Declaration of Karen Van Hoepen, attached herewith

5    ("Van Hoepen Decl.")];

6    (b)    On September 1, 2003, Cynthia Parker-Shea, paralegal for codefendant

7    Richard Terflinger, informed me that on August 28, 2003, WVDC accused

8    her of attempting to bring cocaine-tainted documents to Mr. Terflinger and

9    refused to let her meet with her client. Ms. Parker-Shea further stated to

10    me that her entire folder, which contained confidential and sensitive legal

11    work product documents, was seized and not returned; and

12    (c)    I am informed that a female mitigation specialist for codefendant Steve

13    Loren Scott was similarly accused by WVDC earlier this summer of

14    bringing drug-tainted documents or files to a client meeting at WVDC.

15    5.    I recognize that WVDC has the right to ensure that contraband is not brought into

16    the jail. However, the egregious and illegal manner in which WVDC officials

17    conducted themselves with regard to Ms. Van Hoepen on August 25, 2003 far

18    exceeds any reasonable bounds. [*See,* Van Hoepen Decl.] Such conduct by

19    WVDC was clearly designed to intimidate legal professionals, support staff and

20    specialists (in particular, females) and thereby deter them from meeting with

21    defendants in the *Mills* case. As set forth below, WVDC's conduct has had

22    precisely that effect with regard to Mr. McElhiney. It immediately chilled Mr.

23    McElhiney's ability to prepare his guilt and penalty defenses, as follows:

24    (a)    Ms. Van Hoepen informed me that she was so traumatized by the events of

25    August 25, 2003 at WVDC that even if she were allowed to return to

26    WVDC, she would not do so under any circumstances;

27

28                                          2

(b)    Because Ms. Van Hoepen will likely have to be replaced on this case, I contacted two other experienced capital case paralegals who were formerly appointed on my capital-eligible federal cases and capital appeals. On September 1, 2003, both paralegals (Carol Cataldo-Ramirez and Dayna Allen) independently informed me that they were unwilling to work on Mr. McElhiney's case unless he is transferred from WVDC to a facility where they will not be subjected to the treatment undergone by Ms. Van Hoepen. Ms. Ramirez and Ms. Allen have routinely visited my capital clients at MDC-LA and at death row in San Quentin. Never has either of them refused to meet with a client because of fear of mistreatment by jail or prison staff. If these two highly experienced capital case paralegals are too fearful to enter WVDC, it stands to reason that experienced death penalty paralegals in general will also reject offers to work on this case. Thus, Mr. McElhiney will remain without assistance from a paralegal for the duration of the instant case (which is expected to last several more years);

(c)    Since the incident on August 25, 2003, I have been unwilling to enter WVDC alone, for fear that I may also be falsely accused and mistreated. Simply put, if it could happen to Ms. Van Hoepen, it could happen to me. On August 26 and 27, 2003, I raised this concern in separate conversations with Asst. United States Attorney Steve Wolfe and Lt. Robert Wellott of WVDC. Both of them replied in kind, stating essentially: "If you do not bring contraband into the jail, you have nothing to worry about." In my opinion, these remarks demonstrate a shocking indifference to the situation, and either an unwillingness or inability to recognize its constitutional implications, thus requiring the intervention of this Court;

(d)    The last time I met with Mr. McElhiney was on August 22, 2003. Since the Van Hoepen incident on August 25, 2003, I was unable (until today) to find anyone on the approved WVDC visitors list for the *Mills* case who could accompany me to a meeting with Mr. McElhiney. I have a scheduled meeting today with Mr. McElhiney in the company of an investigator for a codefendant. However, the value of the meeting will be severely limited because it will be conducted in the presence of a third party who is not a member of Mr. McElhiney's defense team.

Until I am able to replace Ms. Van Hoepen, I will need to be accompanied by another professional who is on the *Mills* case, but this also means that my meetings with Mr. McElhiney will not cover anywhere near the range of confidential, strategic subject matters that Ms. Van Hoepen, either alone or together with me, had covered during client meetings prior to the incident last week. For this reason, in regard to today's planned meeting, I will be unable to discuss sensitive defense and penalty matters with Mr. McElhiney in the presence of the investigator. Moreover, I am not willing to bring <u>any</u> documents or materials to WVDC, for fear of false accusations that they may be drug-tainted. Without so much as a notepad and inkpen with which to take notes, I cannot properly function as standby counsel;

(e)    Even though I have not yet been subjected to the mistreatment Ms. Van Hoepen experienced, I am so fearful of having such an experience that I cannot go into WVDC alone and also cannot take the risk of bringing any documents in with me. This has significantly reduced my ability to assist Mr. McElhiney, particularly in regard to my fear that I will be next in line for such outrageous harassment. Thus, the conduct of the WVDC staff has

4

1   had a damaging effect on the defense not only in regard to those already

2   subjected to this misconduct, but to those like myself who fear that it will

3   happen to them. Another female attorney on the *Mills* case informed me on

4   August 27, 2003 that in light of the incidents detailed in para. 4 (a)-( )

5   above, she is afraid and unwilling to meet alone with her client at WVDC.

6   Viewed from this perspective, the conduct of the jail staff has inflicted a

7   very serious chilling effect on the defense of this case. Accordingly, a

8   hearing must be scheduled by this Court in order to bring a stop to it; and

9   (f)    Because I am fearful of bringing any documents into WVDC, I am now

10  forced to mail them to Mr. McElhiney. The jail mail system is notoriously

11  slow and unreliable. Many items (including an entire box of legal

12  documents) I mailed to Mr. McElhiney in the past, and legal documents he

13  has mailed to me, have been delayed as much as 2 weeks or in some

14  instances never even arrived. This makes it impossible for Mr. McElhiney

15  to timely file documents with the Court and has prejudiced his right to

16  prepare and present a *pro se* defense, as set forth below.

17  Seizure of Legal Materials and Resultant Prejudice

18  6.    Among the legal documents seized on August 25, 2003 was a draft of Mr.

19  McElhiney's declaration, which was to be filed in support of his Joinder in

20  Defendant Edward Burnett's Motion to Preclude Use of Hoods in Transporting

21  Defendants from WVDC (the "hood motion"). I had sent this draft with Ms. Van

22  Hoepen and had instructed her to assist Mr. McElhiney in filling in needed factual

23  information, for which I had left blank spaces. Ms. Van Hoepen and Mr.

24  McElhiney subsequently informed me that they were in the process of completing

25  the declaration when WVDC guards removed Ms. Van Hoepen from the meeting

26  room and seized the declaration and other documents. The seizure prevented me

27

28                                                              5

1    from timely filing Mr. McElhiney's Joinder in the hood motion. Although the

2    Court deemed all defendants to have joined in the hood motion, only those

3    defendants with Joinders on file were transported to and allowed to present their

4    cases at the August 27, 2003 motion hearing. Therefore, the seizure prevented Mr.

5    McElhiney from being heard and preserving for the record his individual position

6    with regard to the hood issue.

7    7.    The seizure detailed above in para. 6 also violated Mr. McElhiney's work product

8    privilege. Since August 25, 2003, the draft of Mr. McElhiney's hood joinder and

9    declaration, which were joint legal products of Mr. McElhiney and myself, have

10    improperly been in the hands of jail officials. The same applies to the defense

11    portion of a Joint Statement regarding disputed issues on conditions of

12    confinement, which the Court ordered Mr. McElhiney and the Government to file

13    by September 5, 2003. The defense draft of the joint statement (another combined

14    work product of Mr. McElhiney and myself) was also seized by WVDC on August

15    25, 2003. On August 26, 2003, I so informed Asst. United States Attorney Steve

16    Wolfe and advised him that it prevented me from providing the document to the

17    Government on that date, as had been previously agreed.

18    Because I have been unable to obtain this document from Mr. McElhiney (I

19    expect to do so later today when I go to WVDC), and will need time to review and

20    finalize it, it is unlikely that a timely filing of the Joint Statement can be

21    accomplished, as the Government will also need time to insert its response to the

22    defense position. Therefore, I anticipate that the seizure will force the parties to

23    request an extension of time in which to file the Joint Statement.

24    8.    The seizures of legal work product on August 25, 2003 are not the first in this case.

25    Earlier this summer, my office provided a copy of a CD-rom containing sample

26    penalty-related motions and legal research to Mr. McElhiney. The original CD-

27

28                                                    6

rom was obtained from a national death penalty resource center. WVDC officials

allowed Ms. Van Hoepen to give the CD-rom to Mr. McElhiney but later seized it

from Mr. McElhiney's cell. When I requested its return, Lt. Wellott declined to do

so and stated that the CD-rom could be a weapon. I then suggested that the files on

the CD-rom could be loaded onto Mr. McElhiney's computer and the CD-rom

returned to me. Lt. Wellott said he was unwilling to allow Mr. McElhiney access

to the materials on the CD-rom unless he or jail officials were allowed to view the

contents of the disk because he was concerned it may contain pornography or

terrorist materials. Understandably, Mr. McElhiney declined to permit WVDC

officials to view the privileged legal materials on the disk. I am still negotiating

for the return of the CD-rom, as will be fully detailed in the Joint Statement *re:*

Meet and Confer. In the interim, however, Mr. McElhiney has been denied access

to the legal materials on the disk, which I have personally reviewed and consider

necessary to the preparation of a penalty defense. Therefore, the seizure of the CD-

rom has impeded and delayed Mr. McElhiney's ability to prepare his *pro se* penalty

defense.

Transfer of Mr. McElhiney From WVDC

9.    Because WVDC's mistreatment of Ms. Van Hoepen on August 25, 2003 has left

Mr. McElhiney without a paralegal, I must immediately assume the paralegal

duties on this case. Because Ms. Van Hoepen's compensation rate is $35/hour and

mine is $90/hour, the result will be an added $55/hour cost to the Court for such

services. Because of Mr. McElhiney's unique *pro se* needs, Ms. Van Hoepen has

been billing 100 to 130 hours per month on this case, all of which was legitimate

billable time necessary to the preparation of Mr. McElhiney's defense. Therefore,

the lack of a paralegal will add $5,500 to $7,150 per month to the Court's costs.

This could be avoided by transferring Mr. McElhiney to MDC-LA (or to the Santa

1    Ana jail, which has a contract with the U.S. Marshals Service to house federal

2    inmates), where I can likely find a qualified paralegal who will be willing to meet

3    with Mr. McElhiney as needed.

4    10.    Because I am now afraid to bring any documents into WVDC, I will incur

5    substantial mailing costs which will be billed on CJA vouchers. I had purposely

6    conserved such costs by bringing (or having Ms. Van Hoepen bring) a stack of

7    heavy documents to Mr. McElhiney at each weekly meeting at WVDC. Normally

8    at each visit, my office provided one or two 5-inch-thick Redweld folders of legal

9    documents to Mr. McElhiney. We periodically brought one to three banker's

10   boxes of discovery to Mr. McElhiney, as the cost to mail them would be

11   exorbitant. This expense could be avoided by transferring Mr. McElhiney to

12   MDC-LA or to the Santa Ana jail, where I and legal para-professionals would feel

13   comfortable bringing documents in person.

14   11.    Mr. McElhiney's incarceration at WVDC has further rendered him unable to

15   conduct his *pro se* defense because he needs reading glasses and is without a

16   current eyeglass prescription. On August 16, 2003, the Court ordered that Mr.

17   McElhiney be examined by an optometrist and provided with eyeglasses. To date,

18   that Order has not been carried out. Mr. McElhiney will now remain without

19   reading glasses because he is concurrently filing a request that his motion for

20   optometry treatment be withdraw and the Order rescinded. This request is a

21   function of Mr. McElhiney's confinement at WVDC, which has to transport

22   inmates to a civilian facility to receive eye examinations.

23           On August 27, 2003, the Hon. David O. Carter ordered that WVDC is to

24   execute all Court orders for off-premises medical treatment by blindfolding or

25   masking the inmate. The Court further ruled that if an inmate refuses to wear the

26   blindfold, WVDC is to place a hood over his head, forcibly if necessary, and that

27

28                                        8

1  inmates will not be allowed to refuse such transportation for Court-ordered medical

2  appointments. Because he is unwilling to wear a mask and because he fears being

3  injured by forcible enforcement of the Order by WVDC staff, Mr. McElhiney has

4  asked that his ordered optometrist examination be vacated.

5       Therefore, Mr. McElhiney has been (since at least April 16, 2003) and will

6  remain unable to read with visual acuity. This renders him unable to prepare and

7  present his defense. This could be avoided by transferring Mr. McElhiney to MDC-

8  LA or to the Santa Ana jail, where such forcible-transport orders are not in effect.

9  12.  In summary, WVDC's interference with Mr. McElhiney's constitutional right to

10  prepare his defense in this capital-eligible case has risen to such a level that it has

11  paralyzed Mr. McElhiney's *pro se* efforts. Therefore, I respectfully request (based

12  upon consent I received today from Mr. McElhiney) that:

13  (a)  Mr. McElhiney be immediately transferred to MDC-LA or to the Santa Ana

14       jail;

15  (b)  that an evidentiary hearing be held to determine whether WVDC violated

16       Mr. McElhiney's constitutional right to prepare a defense; and

17  (c)  that WVDC be Ordered to return all original documents seized from Ms.

18       Van Hoepen on August 25, 2003 and any photocopies that were made of

19       such documents after their seizure, along with the CD-rom containing

20       penalty pleadings and research previously seized from Mr. McElhiney.

21

22       I declare under penalty of perjury under the laws of the United States that the foregoing is

23  true and correct to the best of my knowledge and belief. This declaration was executed at Malibu,

24  California, on September 2, 2003.

25                                    DARLENE M. RICKER

26

27

28                                    9

# DECLARATION OF KAREN VAN HOEPEN

I, KAREN VAN HOEPEN, state and declare as follows:

1.  I am a paralegal appointed by this Court to assist *pro se* defendant MICHAEL
PATRICK McELHINEY ("Mr. McElhiney") in the above-captioned case.

2.  All of the facts stated herein are of my personal knowledge or upon
information and belief, and if called upon to testify thereto, I could and would do
so competently.

3.  This declaration is made in support of Defendant McElhiney's Motion for Order:
(1) Granting Evidentiary Hearing to Determine Violations of McElhiney's
Constitutional Right to Prepare a Defense; (2) Transferring McElhiney to MDC-
LA; and (3) Directing West Valley Detention Center to Return All Seized
Documents and Legal Materials.

4.  On August 25, 2003, at the request of attorney Darlene Ricker, I went to West
Valley Detention Center ("WVDC") in Rancho Cucamonga, California, for a
scheduled two-hour meeting with Mr. McElhiney. The purpose of my visit was:

    (a)    to bring Mr. McElhiney various legal documents, legal research, and legal
work product materials from Ms. Ricker's office; and

    (b)    to interview Mr. McElhiney with regard to pleadings Ms. Ricker had
drafted for him and to assist him in completing the blank spaces left in
same for factual information needed from Mr. McElhiney.

5.  On August 25, 2003, I arrived at WVDC at approximately 3:00 p.m. WVDC
guards Nerey and New were present in the sign-in area. Deputy New searched the
documents I had brought for the meeting, swabbed them and the folder they were
in for a drug test, and inserted them into a machine in my presence. Deputy New
then said I was "cleared to go." I proceeded to the client meeting.

1

6.   Approximately 10 minutes later, two guards appeared at the room where I was
meeting with Mr. McElhiney.  One guard asked which documents I had brought to
the jail that day, seized them, and escorted me from the meeting room.  I was
returned to the desk area of WVDC, where I had signed in and gone through the
initial drug-testing procedure.  Another drug swab test was performed.  The guards
present included: Sgt. Hahn and officers New, Nerey, Wilson, in addition to a
female guard and several other guards.

7.   The following events then transpired on August 25, 2003 at WVDC:

(a)   Sgt. Hahn told me that traces of cocaine had allegedly been found on my
files.  He asked if I knew where the alleged cocaine came from and I
repeatedly said no.  I immediately asked to telephone a lawyer.  Sgt. Hahn
said I would not be allowed to call a lawyer until after I was booked.  Over
the next 3 hours while I was detained at WVDC, I asked 2 or 3 more times
to call a lawyer.  Each time my request for counsel was refused.  I was
isolated and  never allowed to contact a lawyer the entire time I was in
custody at WVDC, although it was clear to me that I was not free to leave;

(b)   Sgt. Hahn falsely implied I was a drug-user and that I associated with drug-
users.  He asked if there was cocaine in my car (which was a rental car that
day, as my car was in for repairs).  I said no.  Sgt. Hahn replied, "You are
under arrest";

(c)   Sgt. Hahn escorted me into a public hallway, where a woman guard
searched me and had me remove my shoes.  I was required to remain
barefoot from that point on;

(d)   Sgt. Hahn returned, read me my *Miranda* rights, and said, "Now what do
you want to say?"  I said I did not wish to speak.  Sgt. Hahn continued to
question and taunt me.  During this questioning, I was standing with my

2

1    back against the wall. Sgt. Hahn's face was a few inches away from mine

2    as he continued to question me in a menacing and intimidating manner;

3    (e)    Sgt. Hahn instructed a woman guard to handcuff me. She did so, placing

4    my hands behind my back. I was required to remain in handcuffs from that

5    moment until my release several hours later;

6    (f)    The woman guard and Sgt. Hahn ordered me to sit on a bench in the

7    hallway. I complied. Sgt. Hahn left briefly, then returned and sat on the

8    bench beside me. He was very angry. He told me the following: that I was

9    facing a federal offense that carried a 25-year prison term; that I would be

10    booked, strip-searched, and kept overnight in a cell at WVDC; and that I

11    could not make any phone calls until after I was booked. Sgt. Hahn

12    continued questioning me and asked, among other things, "Is there anything

13    you want to tell me?" I again said no;

14    (g)    Sgt. Hahn then left me alone on the bench for about an hour. I was later

15    brought to wait in a chair in the front desk area. I saw Deputy New take my

16    car key and go into the parking lot with Sgt. Hahn, where a handler with a

17    drug dog had arrived. After a time the officers re-entered WVDC with the

18    dog and had the dog sniff the items that had been seized from me;

19    (h)    Sgt. Hahn left for a short time and then returned. He told me that I was free

20    to go but stated that there was "an open investigation" against me. He

21    further stated that I was subject to arrest and could be placed in jail "at any

22    time pending this investigation." I was then fingerprinted, at which time

23    the handcuffs were removed; and

24    (i)    I asked for my personal belongings (shoes and wristwatch) and legal files

25    back. The officers returned only my wristwatch but refused to return the

26    other items.

27

28

8.   At approximately 6:30 p.m. on August 25, 2003, I was released from WVDC
without my shoes, which the guards said were being kept as evidence. I was forced
to walk barefoot through the jail and had to drive home without shoes. The only
alternative offered to me was to wear a pair of prison shoes, which the guards said
were not new and had been previously worn by others. For sanitation reasons, I
declined to wear the prison shoes.

9.   I was and am extremely distraught over my treatment by WVDC. Since the events
of August 25, 2003, as set forth above in para. 5-8 ("the incident"), I have been
unable to concentrate sufficiently to work on Mr. McElhiney's case. Prior to the
incident, I had been performing approximately 100 hours per month of paralegal
services on this case, much of which involved weekly client meetings and frequent
phone interviews with Mr. McElhiney (performed at Ms. Ricker's request).

10.  On August 27, 2003, Ms. Ricker informed me that Lt. Robert Wellott of WVDC
told her that my visiting privileges at WVDC had been suspended and that WVDC
had an "open investigation" on me.

11.  Because of the incident, and because of WVDC's investigation of me, I am no
longer in a position to perform the key paralegal functions for which I was
appointed – i.e., to meet with Mr. McElhiney on behalf of Ms. Ricker. I am a legal
resident alien of the United States and am in the final steps of the naturalization
process for United States citizenship. Upon the advice of my immigration attorney,
Thomas Joy of Los Angeles, I will not return to WVDC while Mr. McElhiney
remains incarcerated there, even if my visiting privileges are reinstated.

I declare under penalty of perjury under the laws of the United States that the foregoing is
true and correct to the best of my knowledge and belief. This declaration was executed at Malibu,
California, on September 1, 2003.

KAREN VAN HOEPEN

4

ATTACHMENTS
TO JOINT BRIEF

## ATTACHMENT #8 [A-8]

### {Prisoner Grievance #96: Filed on July 8, 2003}

ATT 8

#96



### San Bernardino County Sheriff's Department
### _INMATE GRIEVANCE FORM_

Grievance Number:

Date:

Assigned to:

NAME _Michael McElhiney_ BOOKING# _0301343349_

HOUSING LOCATION _5 F-12_ LOCATION OF OCCURRENCE _WVDC_

DATE/TIME OF OCCURRENCE _07/02/03_ DATE OF COMPLAINT _07/08/03_

**EXPLAIN YOUR COMPLAINT. INCLUDE DATES, TIMES, AND NAMES OF PERSONS INVOLVED.**

COMMISSARY # MAIL ROOM

My Money Order was posted from Fresno on
July 3.
  The letter (with the Money order) was
slid under my door this am

At a result of Mailroom error I missed
Commissary draw

I'd like to submit another list to
Commissary.

I should not be penalized a week's
loss of Commissary because of Staff
error

**ATTACH ADDITIONAL PAGES IF NEEDED**

_M Elhiney_
Inmate's Signature

Received by: _DELD_ Date: _07/08/03_ Time: _1520_
Employee's Name ( Please Print )

Original: Inmate's Booking Jacket   Yellow Copy: Inmate   Photocopy: Administration File

**ATTACHMENT #9 [A-9]**

**{Grievance Response #07-03-071: Filed July 9, 2003}**

#96



## San Bernardino County Sheriff's Department
# INMATE GRIEVANCE FORM

Summary

| Grievance Number: |
|---|
| **07-03-071** |
| Date: |
| **07/09/03** |

Inmates Name  **McElhiney, Michael**

Booking Number  **0301343349**

Investigation Conducted by  **C. Newland**

Emp Number  **N0363**

Summary of Complaint and Findings

**COMPLAINT:**

Inmate McElhiney states a letter (money order) postdated July 3, 2003 sent from Fresno, California was not deposited into his account until July 8, 2003 causing him to miss commissary.

Inmate McElhiney wants to submit a late commissary slip because he feels it was facility error that caused him to miss commissary.

**FINDINGS:**

West Valley Detention Center has no control on how long a letter takes to arrive here from Fresno, California. Any money order received through the mail is deposited into the inmate's account within 24 hours of receiving it at the facility, unless it arrives on a weekend. If a money order arrives on the weekend, it is deposited the first following Monday.

Inmate should make arrangements with family and friends to mail money orders in plenty of time to meet the facility's commissary schedule.

Action Taken

**None**

Reviewed by _____  Duty Lt.    Approved _____  Facility Administrator

Inmate given a written reply on _____  At _____  By _____
                                          Date              Time                    Print Name

This complaint has been discussed with me and I have been advised of the findings

_____
Inmates Signature

Photocopy: Administration File

# ATTACHMENT #10 [A-10]

## {Prisoner Grievance #97: Filed on July 11, 2003}

#97

**San Bernardino County Sheriff's Department**
**INMATE GRIEVANCE FORM**

Grievance Number:

Date:

Assigned to:

NAME _Michael McElhiney_ BOOKING# _0301343349_

HOUSING LOCATION _5F-12_ LOCATION OF OCCURRENCE _WVDC_

DATE/TIME OF OCCURRENCE _07/09/03_ DATE OF COMPLAINT _07/11/03_

EXPLAIN YOUR COMPLAINT, INCLUDE DATES, TIMES, AND NAMES OF PERSONS INVOLVED.

re: GRIEVANCE RESPONSE #07-03-071

I filed a Grievance clearly delineating a problem and a solution.

Some person, C. Newland [N0363] apparently unable to grasp such simple explanation chose to employ the most obtuse rationale I have yet to come across.

If C. Newland is not being deliberately ignorant then this person needs to be sent back to school (preferably in the little Van wearing a football helmet so as to avoid any further brain damage)

The money order was delivered to my cell. Policy mandates facility staff remove the money order and place it on a prisoner's account before delivery of the letter; ergo, staff screwed up. As a result of staff error my money was placed on my books after commissary delivery.

**ATTACH ADDITIONAL PAGES IF NEEDED**

_McElhiney_
Inmate's Signature

Received by: _BENNETT_ Date: _071103_ Time: _0750_
Employee's Name ( Please Print )

Original: Inmate's  Booking Jacket        Yellow Copy: Inmate        Photocopy: Administration File

GHRC P.S.# 1003

## ATTACHMENT #11 [A-11]

{Disciplinary Report: "Cursing Staff"; July 17, 2003}

ATT 11



# SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT
# BUREAU OF DETENTIONS AND CORRECTIONS
# INMATE DISCIPLINE REPORT

| W.V.D.C.: | ☒ |
| G.H.R.C.: | ☐ |
| C.D.C.: | ☐ |
| OTHER: | ☐ |

Page 1 of   01

## INMATE INFORMATION

| NAME: LAST, FIRST, MIDDLE | ASSIGNED HOUSING LOCATION | BOOKING NUMBER |
|---|---|---|
| ☒ Pre-Sentenced   ☐ Sentenced    **McElhiney, Michael** | **5F12** | **0301343349** |

| JDR VIOLATION    **Cursing an Employee** | | JDR NUMBER |
|---|---|---|
| ☐ 12/2520. Offense against a person   ☒ 12/2530. Facility tranquility<br>☐ 12/2550. Administrative offenses   ☐ 12/2520. Security violations | ☐ 12/2540. Property offenses    **(MAXIMUM RECOMMENDATION)**<br>**JDR RECOMMENDATION:**    Days: **7**    G&W: **20** | **071611** |

| NEW HOUSING LOC. | LOCATION OF INMATE'S PROPERTY | PRIOR DISCIPLINE RECORD (LOCKDOWNS, ETC.): |
|---|---|---|
| **Same** . | **N/A** | **Five prior disciplines** |

## INCIDENT INFORMATION

| DATE/TIME OF INCIDENT: | LOCATION OF INCIDENT: | ATTACHED STATEMENT(S) BY: |
|---|---|---|
| **071503/2155hrs** | **Unit 05** | ☐ Deputy    ☐ Inmate Witness & Info.<br>☐ Staff    ☐ None    ☐ Other |

DETAILED SYNOPSIS OF INCIDENT:

**At 2155 hrs. on 071503, while conducting a random cell search of Inmate Roy's cell, Inmate McElhiney started to yell down form his cell. McElhiney told Sgt. Hahn and Deputy Tolbert they could "Fuck off!" and to"Come stroke his dick!" McElhiney continued to curse at Sgt. Hahn and Tolbert throughout the duration of the cell search.**

INMATE STATEMENTS: **None**

| REPORTING OFFICER/ID #: | COPY GIVEN TO INMATE BY: | REP. OFFICER ASSIGNMENT: | DEPUTY DISCIPLINE RECOMMENDATION |
|---|---|---|---|
| **Ades/B5840** | **Ades** | **Unit 05** | DAYS **7**    G&W TIME: **0** |

## SUPERVISOR'S REVIEW

| REVIEWED BY: | DATE REVIEWED | DISCIPLINE RECOMMENDATION: |
|---|---|---|
| | **7-16-03** | ☒ Discipline approved per JDR recommendation.<br>☐ Modify discipline as follows: |

## DISCIPLINE REVIEW

WAIVED 24 HR LIMIT.   ☐ YES   ☐ NO   ☐ N/A

ADDITIONAL INMATE STATEMENTS:

| REVIEWED BY: | DATE REVIEWED | DISCIPLINARY ACTION<br>☐ Discipline approved as recommended above.<br>☐ Modify discipline as follows: | |
|---|---|---|---|
| SPEC. DIET APP. BY LT.: | (MAX: 6 Meals over 3 days)<br>BEGINS: | DISCIPLINARY ACTION BASED ON:<br>☐ Synopsis Above    ☐ Disciplinary History<br>☐ Attached Statements   ☐ Other: | DISCIPLINE OUT DATE: |

## FACILITY MANAGER'S REVIEW

| FACILITY MANAGER: | COMMENTS: | ☐ (Spec. Diet over 72 hours) |
|---|---|---|

## DISTRIBUTION

| ☒ (Original) Administrative File ☒ Inmate's Jacket ☒ Classification Board ☒ Inmate ☐Special Services ☐ Culinary | DELIVERED BY:<br>**Dep. Ades** | DATE:<br>**071503** |
|---|---|---|

ASU#000402 eff. 6/2000

# ATTACHMENT #12 [A-12]

## {Prisoner Grievance #100: Filed on July 17, 2003}

#100



**San Bernardino County Sheriff's Department**

## INMATE GRIEVANCE FORM

| Grievance Number: |
|---|
| Date: |
| Assigned to: |

NAME _Michael McElhiney_          BOOKING# _0301343349_

HOUSING LOCATION _5F-R_          LOCATION OF OCCURRENCE _MVDC_

DATE/TIME OF OCCURRENCE _This am_          DATE OF COMPLAINT _07/17/03_

**EXPLAIN YOUR COMPLAINT. INCLUDE DATES, TIMES, AND NAMES OF PERSONS INVOLVED.**

SGT DeBORA

Another Sgt just 'interviewed' me about a Discipline (cursing staff) occurring on Tues Evening?

I did not receive a copy of the Disciplinary Report within 24 hours

I was not notified of it is existence.

Your Facility has once again failed to follow it own rules — any 'punishment' implement is a violation of due process which I will follow up on pursuant to civil law. You think you're tired of me now?! I will litigate these issues for years — they are your rules your laws — Sgt Hahn accuses us of "hiding behind the law" (Ha! the irony in that statement beyond description) this ain't 'hiding' its in Your face (figuratively speaking of course).

**ATTACH ADDITIONAL PAGES IF NEEDED**

_Michael McElhiney_
Inmate's Signature

Received by: _ADES_          Date: _7/17/03_  Time: _0712_
Employee's Name ( Please Print )

Original: Inmate's  Booking Jacket          Yellow Copy: Inmate          Photocopy: Administration File

GHRC P.S.# 1003

**ATTACHMENT #13 [A-13]**

**{Grievance Response #07-03-122 : Filed on July 17, 2003}**



## San Bernardino County Sheriff's Department
## __INMATE GRIEVANCE FORM__

Summary

| | |
|---|---|
| Grievance Number: | **07-03-122** |
| Date: | **7-17-03** |

Inmates Name   **Michael McElhiney**

Booking Number   **0301343349**

Investigation Conducted by   **Richard S. Hahn**

Emp Number   **H0066**

---

Summary of Complaint and Findings

__Complaint:__ I/M McElhiney alleges he did not receive a disciplinary report within twenty-four hours.

__Findings:__  Discipline report given to I/M McElhiney in a timely manner.

Action Taken

**No further action.**

Reviewed by _____ Duty Lt.   Approved _____ Facility Administrator

Inmate given a written reply on _____    At _____   By _____
                              Date              Time                    Print Name

This complaint has been discussed with me and I have been advised of the findings

_____
Inmates Signature

Photocopy: Administration File

# ATTACHMENT #14 [A-14]

## {Prisoner Grievance #101: Filed on July 17, 2003}

ATT 14



#101

**San Bernardino County Sheriff's Department**

**_INMATE GRIEVANCE FORM_**

| Grievance Number: |
| Date: |
| Assigned to: |

NAME _Michael McElhiney_   BOOKING# _0301343349_

HOUSING LOCATION _5F-12_   LOCATION OF OCCURRENCE _WVDC_

DATE/TIME OF OCCURRENCE _07/17/03 7:45 am_   DATE OF COMPLAINT _07/17/03_

**EXPLAIN YOUR COMPLAINT. INCLUDE DATES, TIMES, AND NAMES OF PERSONS INVOLVED.**

Sgt DeBoal   Follow-up to #100 re Due Process Violation

Deputy Ades just provided me with a copy of my disciplinary from the evening of 07/15/03.

In the first instance, Deputy Ades wrote the disciplinary on the word of Sgt Hahn / Dep Tolbert — Deputy Ades did not hear / witness the alleged event.

Secondly, the date reviewed states 07/16/03 when Review clearly took place before Sgt Cunningham at around 6:00 am this morning 7/17/03

So we have falsification of documents in addition to a Due Process violation. What kind of crap is this? Merely because Sgt Hahn is incapable of dealing with the federal RICO prisoner on a basis of respect.

Such feelings of psychological inferiority should not be allowed to dictate discipline / policy and procedure.

If you dispute my version of events speak to Deputy Ade

he said he won't lie.   **ATTACH ADDITIONAL PAGES IF NEEDED**

_Michael McElhiney_
Inmate's Signature

Received by: _R. HANSEN_   Date: _7-17-03_ Time: _0853_
Employee's Name ( Please Print )

Original: Inmate's  Booking Jacket      Yellow Copy: Inmate      Photocopy: Administration File

GHRC P.S.# 1003

# ATTACHMENT #15 [A-15]

## {Grievance Response #07-03-086}

Att. 15

#97



## San Bernardino County Sheriff's Department
# INMATE GRIEVANCE FORM

Summary

| | |
|---|---|
| Grievance Number: | **07-03-086** |
| Date: | **07/18/03** |

Inmates Name     **Michael McElhiney**

Investigation Conducted by     **W. De Bord, Sergeant**

Booking Number     **0301343349**

Emp Number     **D0536**

---

Summary of Complaint and Findings

**COMPLAINT:**

**This inmate is complaining about the processing of a money order that came in the mail. He disagreed with how the money order was credited to his account. The inmate appears to have filed a grievance on how the money order was processed and he did not like the response.**

**The inmate responsed by writing this grievance in which he indicated that the employee that made the original response was ignorant and brain damaged. He further suggested the employee return to school "in the little van wearing a football helmet so as to avoid any further brain damage".**

**FINDINGS:**

**Grievances are not intended to be used as a means to insult and/or riducule staff members. This was disrespectful and will be addressed as such.**

**Staff make every effor to insure they are complying with the rule and regulations. If an error was made, the error will be addressed. This type of grievance will not be tolerated.**

---

Action Taken

**Grievance answered.**

---

Reviewed by _____ Duty Lt.     Approved _____ By _____ Facility Administrator

Inmate given a written reply on _____ At _____ By _____

                                         Date            Time                    Print Name

This complaint has been discussed with me and I have been advised of the findings

                                                                 Inmates Signature

Yellow Copy: Inmate                              Photocopy: Administration File

## ATTACHMENT #16 [A-16]

### {Disciplinary Report: "Disrespect Towards Staff"}
### [July 18, 2003]

## SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT
## BUREAU OF DETENTIONS AND CORRECTIONS
# INMATE DISCIPLINE REPORT

| | |
|---|---|
| W.V.D.C.: | ☒ |
| G.H.R.C.: | ☐ |
| C.D.C.: | ☐ |
| OTHER: | ☐ |

Page 1 of   1

## INMATE INFORMATION

| NAME: LAST, FIRST, MIDDLE<br>☒ Pre-Sentenced<br>☐ Sentenced   McElhiney, Michael | ASSIGNED HOUSING LOCATION<br>Unit 5 F 12 | BOOKING NUMBER<br>0301343349 |
|---|---|---|

| JDR VIOLATION     **Disrespect toward staff member** | | JDR NUMBER |
|---|---|---|
| ☐ 12/2520. Offense against a person   ☒ 12/2530. Facility tranquilty   ☐ 12/2540. Property offenses   **(MAXIMUM RECOMMENDATION)**<br>☐ 12/2550. Administrative offenses   ☐ 12/2520. Security violations   JDR RECOMMENDATION:   Days: **7**   G&W: **10** | | **071808** |

| NEW HOUSING LOC.<br>**Same** | LOCATION OF INMATE'S PROPERTY<br>**None Taken** | PRIOR DISCIPLINE RECORD (LOCKDOWNS, ETC.):<br>**Disrespect, Cursing an employee, Poss. of tobacco, Refuse a direct order.** |
|---|---|---|

## INCIDENT INFORMATION

| DATE/TIME OF INCIDENT:<br>**07/18/03 17:30** | LOCATION OF INCIDENT:<br>**Unit 5 Inmate Grievance form** | ATTACHED STATEMENT(S) BY:<br>☐ Deputy   ☐ Inmate Witness & Info.<br>☐ Staff   ☒ None   ☐ Other |
|---|---|---|

DETAILED SYNOPSIS OF INCIDENT:
On 07/11/03 Inmate McElhiney filed an inmate grievance form complaining of how a money order was prossesed by West Valley Detention Center.  McElhiney was issued a written response to his grievance which he was apparently unhappy with.  McElhiney filed another grievance against the response suggesting the employee responding should return to school in the little van wearing a football helmet so as to avoid any further brain damage.

Grievances are not intended to be used as a means to insult staff, I recommend the maximum JDR.

INMATE STATEMENTS: **None**

| REPORTING OFFICER/ID #:<br>Rice B6731 | COPY GIVEN TO INMATE BY:<br>Rice | REP. OFFICER ASSIGNMENT:<br>**Unit 5 Deputy** | DEPUTY DISCIPLINE RECOMMENDATION<br>DAYS **7**   G&W TIME: **10** |
|---|---|---|---|

## SUPERVISOR'S REVIEW

| REVIEWED BY | DATE REVIEWED<br>**07/18/03** | DISCIPLINE RECOMMENDATION:<br>☒ Discipline approved per JDR recommendation.<br>☐ Modify discipline as follows: |
|---|---|---|

## DISCIPLINE REVIEW

WAIVED 24 HR LIMIT.   ☐ YES   ☐ NO   ☐ N/A

ADDITIONAL INMATE STATEMENTS:

| REVIEWED BY: | DATE REVIEWED | DISCIPLINARY ACTION<br>☐ Discipline approved as recommended above.<br>☐ Modify discipline as follows: | |
|---|---|---|---|
| SPEC. DIET APP. BY LT.: | (MAX: 6 Meals over 3 days)<br>BEGINS: | DISCIPLINARY ACTION BASED ON:<br>☐ Synopsis Above   ☐ Disciplinary History<br>☐ Attached Statements   ☐ Other: | DISCIPLINE OUT DATE: |

## FACILITY MANAGER'S REVIEW

| FACILITY MANAGER: | COMMENTS: | ☐ (Spec. Diet over 72 hours) |
|---|---|---|

## DISTRIBUTION

| ☒ (Original) Administrative File  ☒ Inmate's Jacket  ☒ Classification Board  ☒ Inmate  ☐ Special Services  ☐ Culinary | DELIVERED BY:<br>**Rice** | DATE:<br>**07/18/03** |
|---|---|---|

ASU#000402 eff. 6/2000

ATTACHMENT #17 [A-17]

{Prisoner Grievance #102: Filed on July 19, 2003}



#102

**San Bernardino County Sheriff's Department**
**INMATE GRIEVANCE FORM**

Grievance Number:

Date:

Assigned to:

NAME _Michael McElhiney_ BOOKING# _0301343349_

HOUSING LOCATION _5F-12_ LOCATION OF OCCURRENCE _WVDC_

DATE/TIME OF OCCURRENCE _07/19/03  5:00 M_ DATE OF COMPLAINT _07/19/03_

EXPLAIN YOUR COMPLAINT. INCLUDE DATES, TIMES, AND NAMES OF PERSONS INVOLVED.

This morning I was not allowed coffee or regular diet
tray. Deputy Doss informed me I was on Restricted Diet
for (3) days as a result of the Disciplinary I received
yesterday. [ Insulting Staff via Grievance Procedure]

First off, this Facility, and in particular Sgt. DeBord
(whom told Deputy Rice to issue the disciplinary) are
in violation of established 9TH Circuit precedent; you
may not punish prisoners for using disrespectful language
in a Grievance even if that language is Hostile Sexual
Abusive or Threatening see Bradley v. Hall 64 F.3d
1276 (CA9 1995). See also Poocha v. U.S. 259
F.3d 1077 (CA9 2001)

Furthermore, your own CCR Title 15 §1083
(f) & (g) mandate use of disciplinary diet for
major violations of institutional rules. Merely
because I pointed out the obvious fact of C.
Newlands brain damage (or deliberate obtuseness)
does not qualify as a major violation; if you, Sgt
DeBord, cannot discern the difference you might
consider donning protective headgear as well (to
prevent any further loss of what little common sense
you still retain). Most Dis-respectfully meant

ATTACH ADDITIONAL PAGES IF NEEDED

_M Elhiney_
Inmate's Signature

Received by: _DEP. WIERDT_
Employee's Name ( Please Print )

Date: _7-19-03_ Time: _1000 HRS_

Original: Inmate's Booking Jacket        Yellow Copy: Inmate        Photocopy: Administration File

Rev. 12/99

GHRC P.S.# 1003

## ATTACHMENT #18 [A-18]

{Grievance Response #07-03-179: Filed on July 24, 2003}
[Lt. Nicassio---Emp. #N00353]

i02



San Bernardino County Sheriff's Department
# INMATE GRIEVANCE FORM

Summary

| Grievance Number: |
| **07-03-179** |
| Date: |
| **July 24, 2003** |

Inmates Name  **Michael McElhiney**

Booking Number  **0301343349**

Investigation Conducted by  **T.A. Nicassio, Lieutenant**

Emp Number  **N0353**

Summary of Complaint and Findings

**Inmate contends that he was placed on a disciplinary diet because of disparaging remarks he made about an employee in a previous grievance.**

Action Taken

**Inmate McElhiney is mistaken about why he was placed on a disciplinary diet. The disciplinary diet was approved because of the inmate's threats and challenges towards Sergeant Hahn, not because of his written disparagement of an employee. There was apparently a delay in the implementation of the disciplinary diet, for which I apologize. Regarding the inmate's assertion that he has some inherent right to demean and disparage staff in a grievance, my contention is that the use of a grievance form for that purpose constitutes a misuse of the grievance process, which in itself is cause for discipline.**

Reviewed by _____ Duty Lt.   Approved _____   Facility Administrator

Inmate given a written reply on _____ At _____ By _____
                                    Date         Time              Print Name

This complaint has been discussed with me and I have been advised of the findings

_____
Inmates Signature

Original: Inmate's Booking Jacket          Yellow Copy: Inmate          Photocopy: Administration File

ATTACHMENT #19 [A-19]

{Prisoner Warning re: "Abuse of Pro Per Privileges"}
[Filed July 24, 2003]

# INTEROFFICE MEMO



PHONE

**DATE**  July 24, 2003
**FROM**  **W. DEBORD**
  SERGEANT
**TO**  **INMATE: MCELHINEY, MICHAEL**
  Booking # 03013343349

---

**SUBJECT**  **VIOLATION OF PRO PER POLICY MEMORANDUM RULE #6 PARAGRAPH 5**

---

This is to inform you it has been brought to my attention you have violated the "PRO PER Policy Memorandum" according to rule #6 ¶5:

> **"The use of the library is restricted to legal research and telephone calls directly related to an inmate's case.** Inmates violating this section will be verbally warned and may be summarily removed from the library for the balance of the particular session. The verbal warning shall be documented. Repeated violations shall result in further disciplinary action and possible loss of Pro Per status or Pro Per privileges".

It has been shown you have used the resources of the satellite Law Library to do legal work for another inmate. Pro Per supplies/materials are to be used for your law purposes only. If you should violate the rules according to the memorandum, there will be an attempt to revoke your Pro Per status.

*The legal work I did today (including Burnetti Declaration) is part of an ongoing Motion I have filed in Court Right Now entitled Order Shod Cause re Contempt — it needs to be filed now. it is on record pending Judge King's ruling McElhiney*

*07/24/03*

**ATTACHMENT #20 [A-20]**

**{Prisoner Grievance #103: Filed on July 25, 2003]**