ORIGINAL

1  DEBRA WONG YANG
   United States Attorney
2  THOMAS P. O'BRIEN
   Assistant United States Attorney
3  Chief, Criminal Division
   JOEY L. BLANCH (Cal. Bar No. 186487)
4  Assistant United States Attorney
       1500 United States Courthouse
5      312 North Spring Street
       Los Angeles, California 90012
6      Telephone: (213) 894-3315
       Facsimile: (213) 894-3713
7      E-mail: Joey.Blanch@usdoj.gov

8  Attorneys for Plaintiff
   United States of America
9
                    UNITED STATES DISTRICT COURT
10
               FOR THE CENTRAL DISTRICT OF CALIFORNIA
11
   UNITED STATES OF AMERICA,    )   No. CR 02-938-R
12                              )
              Plaintiff,        )   Trial Stipulation Re: Proposed
13                              )   Testimony of Barry Shaw
         v.                     )
14                              )   Date: September 26, 2006
   STEVE LOREN SCOTT,           )   Time: 9:00 a.m.
15                              )
              Defendant.        )
16                              )
                                )
17 _____)

18

19       Plaintiff United States of America, by and through its

20 counsel of record, the United States Attorney for the Central

21 District of California, and defendant Steve Loren Scott,

22 individually and through his counsel of record, Amy Jacks, hereby

23 AGREE AND STIPULATE AS FOLLOWS:

24      1.  Correctional officer Barry Dwyane Shaw died on February

25 25, 2005 at Springfield, Missouri; thus he is unavailable to

26 testify as a witness in this proceeding.

27

28



FILED 2006 SEP 22 PM 3:51 CLERK U.S. DISTRICT COURT CENTRAL DIST. OF CALIF. LOS ANGELES

1  2. Mr. Shaw previously testified in the case of <u>United States v. Steven Loren Scott</u>, United States District Court, Western District of Missouri, Case No. 01-3027-01-CR-S-SOW.

3. Mr. Shaw's testimony in that case on September 23, 2002, as attached as Exhibit 1 to this stipulation, may be read into the record.

IT IS SO STIPULATED.
On Behalf of Plaintiff United States of America:

DEBRA WONG YANG
United States Attorney

_/s/ Joey L. Blanch_      9·22·06
JOEY L. BLANCH           Date
Assistant United States Attorney


On Behalf of Defendant Steve Loren Scott:

_/s/ Steve Lon Scott_    9-18-06
STEVE LOREN SCOTT       Date
Defendant

_/s/ Amy Jacks_          9/21/06
AMY JACKS                Date
Counsel for Steve Loren Scott

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. 02-3027-01-CR-S-SOW |
| ) | |
| Plaintiff, ) | Springfield, Missouri |
| ) | September 23, 2002 |
| v. ) | |
| ) | |
| STEVEN LOREN SCOTT, ) | |
| ) | |
| Defendant. ) | |

VOLUME I
PARTIAL TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE SCOTT O. WRIGHT
UNITED STATES DISTRICT JUDGE and a JURY

APPEARANCES:

For the Plaintiff:  Michael A. Jones, Esq.
                    AUSA
                    901 St. Louis St., Ste. 500
                    Springfield, MO  65806
                    (417) 831-4406

For the Defendant:  Shane Cantin, Esq.
                    Dan Murrie, Esq.
                    1524 E. Primrose, Ste. C
                    Springfield, MO  65804
                    (417) 883-9505

Court Audio Operator:  Ms. April L. Mason

Transcribed by:     Rapid Transcript
                    Lissa C. Whittaker
                    1001 West 65th Street
                    Kansas City, MO  64113
                    (816) 822-3653

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

COPY

011324

1  [redacted]
2  [redacted]
3  [redacted]
4  [redacted]
5  [redacted]
6  [redacted]
7  [redacted]
8  [redacted]
9           MR. JONES:  Barry Shaw.  She'll swear you in, Barry,
10 and there's a seat right around there.
11          BARRY SHAW, PLAINTIFF'S WITNESS, SWORN
12                    DIRECT EXAMINATION
13 BY MR. JONES:
14 Q.  Would you state your full name for the Court and the
15 jury?
16 A.  Barry Dwayne Shaw.
17 Q.  And, Officer Shaw, you're obviously a correctional
18 officer, just like the others who've testified?
19 A.  Correct.
20 Q.  You're employed with the Federal Bureau of Prisons, is
21 that right?
22 A.  Yes.
23 Q.  Is your duty, among other things, to protect inmates and
24 help protect other officers, correct?
25 A.  Yes, sir.

```
                        Shaw - Direct                      I-126
```

1 Q. You're bound by that, right?
2 A. Yes, sir.
3 Q. How long have you been employed with the Bureau of
4 Prisons?
5 A. Sixteen years.
6 Q. And how long at the Medical Center?
7 A. Sixteen years.
8 Q. Were you on duty on the day after Thanksgiving, November
9 the 24th of 2000?
10 A. Yes, sir.
11 Q. And were you assigned to Unit 2-1-East shown on that
12 diagram?
13 A. Yes, sir.
14 Q. What was your function, what was your position?
15 A. My function was I was the midnight to 8 a.m. officer.
16 Q. So, you were just about to go off?
17 A. Yes.
18 Q. Okay. And you were in charge -- as the officer, were you
19 in charge of the --
20 A. I would be considered the number one officer, yes.
21 Q. All right. Who else was working it?
22 A. Todd Whitescarver and Richard Conard.
23 Q. At about 6:50 a.m., did you hear cries for help, calls
24 for help?
25 A. Yes, I did. I heard a disturbance on the unit.

Shaw - Direct                                          I-127

1  Q. Okay. I want to tell the Court and jury what -- where
2  you were when you heard that and what you did?
3  A. I was in the staff bathroom at the time.
4  Q. And do you want to -- would I be right in saying that
5  that's somewhere right along in here? You can step down
6  here, if you need to.
7  A. Sure.
8  Q. I've got it turned away from you, I'm sorry. That would
9  be right along in there or where is it? And why don't you
10 stand out of the way for -- over here so the jury can -- they
11 can't see through you. I know that diagram is kind of odd,
12 but --
13 A. Yes, it would be right in here.
14 Q. Okay. So, you're in the restroom there and you hear some
15 calls for help. What do you hear, do you remember?
16 A. No, just noises and footsteps, a lot of footsteps.
17 Q. Okay. What did you do?
18 A. I immediately exited the bathroom and came around to this
19 area here.
20 Q. Okay. Now, I want you to speak up so everybody can hear
21 you. As you came out of here and came down to this area that
22 you've indicated, what did --
23 A. Right here.
24 Q. Yeah. What'd you see? Tell the jury what'd you see?
25 A. Well, I couldn't see anything at first. I heard, "He's

Shaw - Direct                                                I-128

1  got a knife," and as I turned around, I saw Inmate Conard or
2  Inmate Scott being held by Inmate Conard.
3  Q.  You mean Guard Conard?
4  A.  Correct.
5  Q.  I know you're nervous.  Just relax.
6  A.  Okay.
7  Q.  Okay.
8  A.  Richard.
9  Q.  Richard, the correctional officer, was holding?
10 A.  Inmate Scott.
11 Q.  All right.  And you heard, "He's got a knife"?
12 A.  Yes.
13 Q.  Okay.  What did you do?
14 A.  As I turned around, I saw Inmate Scott holding a metal
15 object like this and Officer Conard had a hold of him, and as
16 I turned around, he thrust it towards me and as I moved out
17 of the way, he kept thrusting at every direction I went to.
18 Q.  How did Conard have a hold of him?
19 A.  He had him by the right arm.
20 Q.  Was he struggling hard with him?
21 A.  Yes, he was.
22 Q.  Any doubt in your mind that he was trying to stab you?
23 A.  No doubt in my mind at all.
24 Q.  Were you able to get around him and help?
25 A.  Yes.  Finally I got around to this area here.  I got

1  around to his right side there and Richard told me to grab
2  his feet and we took him down to the ground, or down to the
3  floor.
4  Q. Okay. And that would have been just in that area right
5  in there?
6  A. Right in here, yes.
7  Q. Okay. And what happened as -- after you got him down on
8  the floor?
9  A. Richard tried to get the knife from him and he wouldn't
10 give it up, and I secured his feet and his lower body, and
11 finally Richard struggled with him and got him to give the
12 knife up.
13 Q. Okay. You had a hold of his feet. Was he struggling
14 hard with you?
15 A. Yes, he was.
16 Q. But Richard finally got the knife away from him?
17 A. Yes.
18 Q. What did he do with the knife?
19 A. He tossed it into the utility closet right here.
20 Q. All right. Is that the knife?
21 A. Yes, sir.
22 Q. Your name is on there?
23 A. Yes, sir.
24 Q. Barry, I don't think I have any -- excuse me just as
25 second.

Shaw - Cross                                                    I-130

1       MR. JONES: I have no further questions. You can
2   take your seat again. Thanks.
3       MR. CANTIN: Well, actually, Officer, --
4       MR. JONES: Oh, did you want to keep him down there?
5       MR. CANTIN: Yeah.
6       THE COURT: Now, he needs to --
7       MR. JONES: I'll pass the baton.
8       MR. CANTIN: While we've got you here.
9               CROSS-EXAMINATION
10  BY MR. CANTIN:
11  Q. Officer Shaw, you said that when you first heard this
12  disturbance, the loud footsteps, you're down here by the
13  officer in back?
14  A. Correct.
15  Q. Correct? And then you come around this corner and point
16  out in the hallway, at what spot are you to the best of your
17  memory when you first see Officer Conard struggling with Mr.
18  Scott?
19  A. Right about here I heard, "He's got a knife," and I
20  turned at that point and that's where I saw him.
21  Q. Okay. And just so the jury understands, there's an X
22  marks the spot here basically in the middle of that
23  intersection?
24  A. Correct.
25  Q. And there have been some measurements by Agent Mitchell

011453

Shaw - Cross                                    I-131

1   and the measurement at least from this door to the X is about
2   32 feet, 31½?
3   A. Correct.
4   Q. And that door from the bathroom is about halfway, so
5   about 15 feet from the intersection, is that right?
6   A. Correct.
7   Q. All right. So, you say that you hear a disturbance and
8   you come down and you're right at this area, and you see
9   Conard and --
10  A. They were kind of backed up against this angle wall here.
11  Q. Okay.
12  A. So I would have been about right here.
13  Q. So, they were backed up against the wall?
14  A. Correct.
15  Q. You didn't have a wall behind you?
16  A. No.
17  Q. You see Officer Conard has a hold of Mr. Scott?
18  A. Correct.
19  Q. And you at that point are going to assist, I assume, is
20  that right?
21  A. Yes.
22  Q. And you described Mr. Scott as having the weapon in both
23  hands up by his right shoulder?
24  A. I believe he had it in his right hand, and -- but he was
25  holding his hands together as he was cuffed.

Shaw - Cross                                                    I-132

1  Q. Okay. And how far away from Mr. Scott are you when you
2  see this?
3  A. Too close for comfort.
4  Q. Did he touch you?
5  A. No, he didn't.
6  Q. You didn't have anything behind you to block your
7  retreat, is that right?
8  A. No, I didn't.
9  Q. You can go ahead and have a seat, Officer. Thank you. I
10 understand it was your job that morning to assist Officer
11 Conard in securing Mr. Scott, correct?
12 A. Yes, sir.
13 Q. But as far as Officer Conard goes, did it appear when you
14 saw him that he had a good hold or had control of Mr. Scott?
15 A. He had a good hold of him, but Scott was still struggling
16 to try to break free.
17 Q. Okay. And Officer Conard is somewhat to his rear at this
18 point, correct?
19 A. Correct.
20 Q. And has a hold of Mr. Scott's right arm or right arm and
21 wrist area, is that right?
22 A. Correct.
23 Q. And Mr. Scott is struggling in the opposite direction
24 obviously of where Officer Conard is?
25 A. Right.

011455

Shaw - Cross                                                    I-133

1  Q. In the opposite direction of where Officer Conard is at
2  that point is yourself?
3  A. In the direction of me, yes.
4  Q. Okay. And you are the senior officer on that floor that
5  morning?
6  A. Yes.
7  Q. And you've been with the Medical Center for 16 years?
8  A. Correct.
9  Q. As the senior officer on that floor, what job duties did
10 you have that a regular officer did not?
11 A. I basically maintained all the unit logs and all the
12 routine daily paper.
13 Q. And Inmate Bond had been in that unit since around mid-
14 August of that year, is that right, or do you recall?
15 A. I don't recall.
16 Q. Do you recall that Mr. Scott had been in that unit since
17 approximately June of that year?
18 A. Yes.
19 Q. Okay. You were familiar then with Mr. Scott being
20 classified as a maximum-security inmate from ADX Florence?
21 A. Yes.
22 Q. And you're familiar with Bond having also been classified
23 as a maximum-security precautions from USP Marion, Illinois?
24 A. Yes.
25 Q. Were you familiar that both Mr. Scott and Mr. Bond were

011456

1  CIM classifications?
2  A. No.
3  Q. You were not? Are you familiar with what CIM
4  classification means?
5  A. Yes.
6  Q. Are you familiar with the phrase separatee?
7  A. Yes.
8  Q. Do both of those terms, CIM and separatee, have to do
9  with how an inmate is handled and what exposure that inmate
10 has to other inmates?
11 A. Yes.
12 Q. So, those classifications are probably pretty important
13 when it comes to security procedures for the movement of any
14 given inmate?
15 A. Yes.
16 Q. As the senior officer in -- well, let me ask this. 2-1-
17 East is a maximum-security unit?
18 A. It's an administrative detention unit.
19 Q. That houses maximum-security inmates?
20 A. Correct.
21 Q. And there are other units within the facility that also
22 house those kinds of inmates?
23 A. Yes.
24 Q. Okay. And those were the kinds of inmates being housed
25 in 2-1-East on November 24, 2000?

Shaw - Cross                                               I-135

1  A.  Yes.
2  Q.  How is it that you as the senior officer in the unit are
3  not aware of the CIM or separatee classification for two of
4  the inmates?
5  A.  I was confused with your using the term CIM, which isn't
6  used out there --
7  Q.  Okay.
8  A.  -- on a daily basis.
9  Q.  Okay.  Let's just use separatee.
10 A.  Thank you.
11 Q.  That means an inmate is not supposed to be exposed or in
12 the company of other inmates?
13 A.  Correct.
14 Q.  How can you, as the number one officer in 2-1-East, not
15 be aware that Bond and Mr. Scott had separatee
16 classifications?
17 A.  They would be separatees from all inmates being that one
18 was Florence and the other was Marion.
19 Q.  Okay.
20 A.  I was not aware that they were separatees from each
21 other.
22 Q.  And there were other maximum-security inmates in that
23 unit that morning?
24 A.  Correct.
25 Q.  Other inmates who also had separatee information in their

1  files?
2  A. Correct.
3  Q. I'll show you what's previously been marked and admitted
4  as Defendant's Exhibit #7. Do you recognize that?
5  A. Yes, that's what we'd call a seg sheet.
6  Q. Okay. And does your signature appear on there?
7  A. No.
8  Q. Okay. There is a line, however, for a OIC's signature,
9  is that right?
10 A. Correct.
11 Q. OIC means what?
12 A. Officer in charge.
13 Q. Okay. Why on November 24th would you not have signed out
14 that sheet?
15 A. Probably because I was busy writing memos concerning the
16 incident that occurred.
17 Q. Okay. So, there is one blank line here on that signature
18 column that is blank. It was probably for your signature?
19 A. Probably for my signature, yes.
20 Q. Is it your duty or your job, part of your job as the
21 number one officer, to make sure that the other officers on
22 the floor are aware of the security precautions for any given
23 inmate?
24 A. Yes.
25 Q. And did you make sure that Officer Whitescarver and

011459

Shaw - Cross                                        I-137

1  Officer Conard were familiar with the security precautions
2  for these inmates?
3  A.  No, sir.
4  Q.  Okay.  Are you aware that Officer Whitescarver's and
5  Officer Conard's movement of these two particular inmates on
6  that morning violated security procedures for the Medical
7  Center?
8  A.  Yes.
9  Q.  Were you aware at that time that they were moving these
10 inmates?
11 A.  No, I wasn't.
12 Q.  Why?
13 A.  Because I was in the bathroom at the time, --
14 Q.  But you were getting ready to start your --
15 A.  -- and I was also beginning to do the seg sheets, like
16 the one you just pointed out.
17 Q.  But you all were getting ready to start showers that
18 morning?
19 A.  Correct.
20 Q.  Was it routine for officers to move maximum-security
21 inmates two at a time in the hallway?
22 A.  Yes.
23 Q.  Were there other inmates in the hallway that morning
24 going to showers with Mr. Scott and Mr. Bond?
25 A.  No.

011460

Case 2:02-cr-00938-R  Document 3881   Filed 09/22/06   Page 17 of 20   Page ID
#:54832

Shaw - Cross                                    I-138

1  Q. Were there other inmates in the showers that morning?
2  A. I believe there was one other inmate in the shower.
3  Q. Okay. What shower had you placed that inmate into?
4  A. I did not place the inmate in a shower.
5  Q. Okay. Who did?
6  A. I don't know.
7  Q. There's only three officers in the unit that morning,
8  correct?
9  A. Correct.
10 Q. And you don't know if it was Officer Conard or Officer
11 Whitescarver?
12 A. No.
13 Q. But it wasn't you?
14 A. It wasn't me.
15 Q. Do you know what shower that inmate was placed into?
16 A. As I recall he would have been placed in the shower that
17 would have been facing the middle of the hall there.
18 Q. The three showers right here. Can you see that?
19 A. It would be the one with just one shower.
20 Q. That one?
21 A. Yes.
22 Q. Is there another shower that you all use in this unit?
23 A. I don't believe so.
24 Q. Is there a fourth shower down here that's used in the
25 morning sometimes to speed up the process?

011461

Shaw - Cross                                             I-139

1   A.   I don't know about that.
2   Q.   Since you've worked in 2-1-East and been the number one
3   officer, were you aware that the other officers were using
4   this shower to speed up the shower process in the morning?
5   A.   I believe it has been used, yes.
6   Q.   For that reason?
7   A.   I don't know if it's to speed up or just to --
8   Q.   As the number one officer on the floor, having now
9   recognized that there was a violation of the Medical Center's
10  security policy or security procedure, have you been
11  disciplined in any way?
12  A.   No, sir.
13  Q.   How about Officer Conard?
14  A.   I don't know, sir.
15  Q.   Are part of your duties as the number one officer in that
16  unit when this happened to make a recommendation in that
17  regard, --
18  A.   No, sir.
19  Q.   -- discipline of an officer?
20  A.   No, sir.
21  Q.   Okay.  Do you know if Officer Whitescarver has been
22  disciplined in any way?
23  A.   No, sir.
24           MR. CANTIN:  If I could have just a moment, Judge?
25           THE COURT:  All right.

Jones - Direct                                           I-140

1       MR. CANTIN: I have nothing else, Your Honor.
2       MR. JONES: I have no further questions, Your Honor.
3       THE COURT: Does the jury have any questions? Okay.
4  All right. Well, you may step down. You're excused.



[Lines 5-25 redacted]

011463

CERTIFICATE OF SERVICE

I, Tonia L. Johnson, declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy of:

**TRIAL STIPULATION RE: PROPOSED TESTIMONY OF BARRY SHAW**
service was:

[ ] Placed in a closed envelope, for collection and interoffice delivery addressed as follows:

[X] Placed in a sealed envelope for collection and mailing via United States Mail, addressed as follows:

**AMY E. JACKS**
**1717 FOURTH STREET, STE 300**
**SANTA MONICA, CA 90401**

[ ] By hand delivery addressed as follows:

[ ] By facsimile as follows:

[ ] By messenger as follows:

[ ] By federal express as follows:

This Certificate is executed on **September 22, 2006**, at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.

TONIA L. JOHNSON