JOSEPH F. WALSH
Attorney at Law
California Bar No. 67930
316 West Second St., Suite 1200
Los Angeles, CA 90012
Tel: (213) 627-1793
Fax: (213) 489-4700
Email: Attyjoewalsh@aol.com

MICHAEL M. CRAIN
Attorney at Law
California Bar No. 45083
Post Office Box 3730
Santa Monica, CA 90408
Tel: (310) 571-3324
Fax: (310) 571-3354
Email: Michaelmcrain@aol.com

Attorneys for Defendant
ROBERT LEE GRIFFIN

FILED

2006 SEP 29 PM 12: 26

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No.   CR-02-938-RGK |
| Plaintiff, ) | **NOTICE OF MOTION AND MOTION IN LIMINE TO EXCLUDE EVIDENCE; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. ) | |
| ROBERT LEE GRIFFIN, ) | Date:   To Be Assigned |
| Defendant. ) | Time:   To Be Assigned |
| ) | Ctrm:   850 |

TO THE UNITED STATES ATTORNEY:

PLEASE TAKE NOTICE that on a date to be assigned, the Defendant, ROBERT LEE GRIFFIN, will move the Court to exclude evidence of uncharged crimes under Fed. R. Evid. Rules 404 and 403, to exclude prejudicial photographs of homicide victims under Fed. R. Evid. Rule 403, and to exclude the testimony of any witness not disclosed three days before trial as required by 18

DOCKETED ON CM

OCT 4 2006

BY _____ 01172

1

390 00

U.S.C. §3432.

The grounds for this motion are set forth in the attached Memorandum of Points and Authorities and the motion is submitted based upon these authorities and any further argument or evidence presented at the hearing on the motion.

Dated:    September 29, 2006

JOSEPH F. WALSH

MICHAEL M. CRAIN

Attorneys for Defendant
ROBERT LEE GRIFFIN

## MEMORANDUM OF POINTS AND AUTHORITIES

### STATEMENT OF FACTS

Robert Griffin is charged in the indictment with participation in a RICO conspiracy (Count 2) and with two VICAR counts alleging the murders of Arthur Ruffo (Count 4) and Aaron Marsh (Count 5).  The government filed a notice of intent to seek the death penalty.  In addition to the murders of Arthur Ruffo and Aaron Marsh, the RICO conspiracy alleges Mr. Griffin's involvement in the murders of Richard Barnes, Thomas Lamb, Steven Clark, Richard Andreason, and the attempted murders of Jeffrey Barnett, Jimmy Lee Inman, and Joel Burkett, and the conspiracy to murder Frank Ruopoli.

The government has given notice of an intent to offer evidence of uncharged crimes.  Mr. Griffin objects to the admission of all of the uncharged crimes evidence.  He also objects to evidence of the numerous criminal acts alleged in the indictment that do not involve Mr. Griffin, or the co-defendants John Stinson and David Chance.  He requests that in addition to excluding the evidence, that the indictment be redacted to remove reference to those criminal acts.  Finally, Mr. Griffin objects to the admission of gruesome photographs of homicide victims and to the testimony of any witness not disclosed three days before trial as required by 18 U.S.C. §3432.

**ARGUMENT**

I

**THE COURT SHOULD EXCLUDE EVIDENCE OF THE 1980 STEVEN "T-BONE" GIBSON MURDER BECAUSE ROBERT GRIFFIN WAS FOUND NOT GUILTY OF THIS MURDER**

The Government has provided Defense Counsel with notice of evidence of uncharged crimes it intends to introduce at trial. (Exhibit A).  The notice states "In 1980, the AB approved the murder of "T-Bone" Gibson by Robert Griffin and Junior Snyder. Griffin sliced the throat of Steven Gibson in 1980 at the California Institute of Men, Chino, California ("C.I.M.")." (Id., at 2)  After 19 years of litigation including three trials and three appeals, Robert Griffin was found not guilty of the murder of Steven "T-Bone" Gibson on August 20, 1999.  (Exhibit C).  Mr. Griffin now moves to exclude evidence of the Gibson murder and to exclude evidence that Mr. Griffin was charged with the murder.

The Government's notice also states its theory of relevancy.  The notice states "In or around December 1982, Steven Barnes testified against Griffin in the murder trial of Gibson. As a result of Steven Barnes testifying against Griffin, Richard Barnes, the father of Steven Barnes, was murdered by Curtis Price at the home of Richard Barnes located in Temple City, California. (Id., at 2).  Count Two of the indictment alleges that Stinson, Terflinger, Griffin, and Slocum arranged for Curtis Price to murder Richard Barnes, the father of Steven Barnes, because Steven Barnes had testified against a member of the Aryan

1  Brotherhood.  (Indictment, Para. 54-63.)  The indictment does not

2  allege the murder of Steven "T-Bone" Gibson as a racketeering

3  act.  Furthermore, Steven Barnes had not only testified against

4  Robert Griffin.  He had also testified against Richard Terflinger

5  and Robert Crane.  Furthermore, Steven Barnes had implicated and

6  was prepared to testify in the impending murder trials of a

7  member of the Mexican Mafia and of the Hillside Strangler Angelo

8  Bono.

9        The only relevant fact relating to the Gibson trial is

10  the fact that Steven Barnes was a prosecution witness against

11  Robert Griffin in a criminal trial in the San Bernardino County

12  Superior Court.  That fact alone is sufficient to establish the

13  Government's theory that Robert Griffin had a motive to harm

14  Steven Barnes or his family.  The subject matter of Steven

15  Barnes's testimony, the fact that Robert Griffin was charged with

16  murder, and the underlying facts of the Gibson murder are all

17  irrelevant to Mr. Griffin's current RICO conspiracy and VICAR

18  charges.  Furthermore, evidence that Griffin murdered Gibson

19  would be highly prejudicial and would deprive Mr. Griffin of his

20  constitutional right to due process and to a fair trial.

21        Federal Rules of Evidence, Rule 404(a) states that

22  "Evidence of a person's character or a trait of character is not

23  admissible for the purpose of proving action in conformity

24  therewith on a particular occasion."  Evidence of a defendant's

25  bad character or his propensity to commit crime in general is not

26  excluded because it is irrelevant.  Rather, "it is said to weigh

27  too much with the jury and to so overpersuade them as to prejudge

28  one with a bad general record and deny him a fair opportunity to

1  defend against a particular charge." <u>Michaelson v. United</u>

2  <u>States</u>, 335 U.S. 469, 475-476 (1948).  Convicting a defendant of

3  a crime based solely on evidence that he had committed some other

4  crime and was a person of general bad character would be a

5  violation of the defendant's constitutional right to due process

6  of law.  See, <u>Estelle v. McGuire</u>, 502 U.S. 62, 70 (1991); <u>Spencer</u>

7  <u>v. Texas</u>, 385 U.S. 554, 563-564 (1967); <u>McKinney v. Rees</u>, 993

8  F.2d 1378 (9th Cir. 1993).

9         Federal Rules of Evidence, Rule 404(b) states that

10  "Evidence of other crimes, wrongs, or acts is not admissible to

11  prove the character of a person in order to show action in

12  conformity therewith.  It may, however, be admissible for other

13  purposes, such as proof of motive, opportunity, intent,

14  preparation, plan, knowledge, identity, or absence of mistake or

15  accident."  If the evidence is relevant, the other crimes

16  evidence may still be excluded pursuant to Rule 403 which

17  provides that "Although relevant, evidence may be excluded if its

18  probative value is substantially outweighed by the danger of

19  unfair prejudice, confusion of the issues, or misleading the

20  jury, or by considerations of undue delay, waste of time, or

21  needless presentation of cumulative evidence."  See, <u>United</u>

22  <u>States v. Ellis</u>, 147 F.3d 1131, 1134-1136 (9th Cir. 1998); <u>United</u>

23  <u>States v. Green</u>, 648 F.2d 587, 592-593 (9th Cir. 1981).

24         In <u>Dowling v. United States</u>, 493 U.S. 342 (1990), the

25  Supreme Court held that the Double Jeopardy Clause does not bar

26  the admissibility of evidence of an uncharged crime that the

27  defendant had previously been acquitted of committing when the

28  evidence is offered under Rule 404(b) of the Federal Rules of

1    Evidence.   The Court stated that an acquittal in a criminal case
2    does not preclude the Government from re-litigating an issue when
3    it is presented in a subsequent action governed by a lower
4    standard of proof.   The Court noted that when the District Court
5    in Dowling permitted the introduction of the testimony of the
6    uncharged crime, the Court twice instructed the jury about
7    Dowling's acquittal and the limited purpose for which the
8    testimony was being admitted.

9         In Dowling, the uncharged crime evidence was admitted
10   under Rule 404(b) on the issue of identity.   Dowling was charged
11   with bank robbery.   At an earlier trial, Dowling had been found
12   not guilty of the robbery of Vena Henry.   The government offered
13   Henry's testimony at the bank robbery trial in order to establish
14   that Henry's description of Dowling's mask and gun were similar
15   to the mask and gun worn during the bank robbery, thus
16   strengthening the government's identification of Dowling as the
17   bank robber.   Second, Delroy Christian accompanied Dowling when
18   he entered Henry's home to commit the robbery.   Christian had
19   been linked to the bank robbery as the getaway driver.   Thus,
20   Dowling's association with Christian during the Henry robbery was
21   further evidence connecting Dowling to the bank robbery based
22   upon his association with Christian.

23        The Dowling decision does not support the Government's
24   argument that the Gibson murder evidence is admissible.   The
25   murder of Steven "T-Bone" Gibson is not charged in the
26   indictment.   The evidence is not relevant to establish any of the
27   issues under Rule 404(b).   The only relevant aspect of the Steven
28   Gibson murder is the fact that Steven Barnes testified against

1  Robert Griffin at a trial where Mr. Griffin was charged with
2  murdering Steven Gibson.  The fact that Steven Barnes testified
3  against Robert Griffin is relevant to the issue of a possible
4  motive to kill Richard Barnes, the father of Steven Barnes.  This
5  motive existed regardless of the criminal charge against Robert
6  Griffin at the time of the testimony.  Furthermore, evidence that
7  Robert Griffin killed Steven Gibson is entirely irrelevant on any
8  issue related to the murder of Richard Barnes.

9      The Government argues that the evidence is both
10  relevant and admissible in order to prove the elements of the
11  charged RICO offense and that such evidence is inextricably
12  intertwined with the proof establishing the Aryan Brotherhood
13  enterprise.  <u>United States v. Diaz</u>, 176 F.3d 52, 79-80 (2d Cir.
14  1999).  Mr. Griffin urges the Court to exclude the evidence under
15  Federal Rules of Evidence, Rule 403 on the grounds that "its
16  probative value is outweighed by unfair prejudice."  <u>United
17  States v. Ellis</u>, 147 F.3d 1131, 1135 (9th Cir. 1998).  "Unfair
18  prejudice refers to an undue tendency to suggest decision on an
19  improper basis, commonly, though not necessarily, an emotional
20  one or evidence designed to elicit a response from the jurors
21  that is not justified by the evidence."  <u>United States v. Ellis</u>,
22  supra at 1135.

23      The Steven "T-Bone" Gibson murder evidence is improper
24  character evidence.  It would encourage the jury to convict Mr.
25  Griffin of the charged murders on the basis of an improper
26  inference that if he did it before, he must have done it this
27  time.  The Gibson murder evidence is extremely remote.  The crime
28  occurred in 1980.  Mr. Griffin was tried three times on the

1  Gibson murder and the case was also appealed three times.

2  Ultimately, on August 20, 1999, Robert Griffin was found not

3  guilty of the murder of Steven "T-Bone" Gibson.

4          The Gibson murder is not alleged in the indictment.

5  Allowing the Government to introduce evidence concerning the

6  Gibson murder would add to both the complexity of the trial and

7  the length of the trial.  Records of 19 years of litigation on

8  the Gibson murder would now become relevant in this case.

9  Ultimately, however, the Court should exclude evidence concerning

10  the Gibson murder because of the serious risk that the jury may

11  misuse the evidence and convict Mr. Griffin "not by evidence

12  relevant to the particular offense being tried, but rather by

13  evidence that was wholly unrelated to those offenses." United

14  States v. Ellis, supra at 1136; see also, United States v. Brown,

15  880 F.2d 1012 (9th Cir. 1989) [Murder conviction reversed based

16  upon the erroneous admission of evidence of the defendant's two

17  prior wrongful acts.].

18

19                              II

20       **THE COURT SHOULD EXCLUDE EVIDENCE OF THE**

21       **MURDER OF DEPUTY SHERIFF FRANK TREJO BY**

22       **ROBERT SCULLY BECAUSE IT IS UNRELATED**

23       **TO THIS CASE AND IS HIGHLY PREJUDICIAL**

24

25          The Government's list of other crimes evidence includes

26  "Robert Scully's murder of Sonoma County Sheriff Deputy Frank

27  Trejo."  This is listed on page 5 of the Government's notice

28  letter under "Other Activities of AB."  The Government cites

1    United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999) which

2    states that an act alleged to have been done in furtherance of

3    the conspiracy is not an "other" act within the meaning of Rule

4    404(b), rather it is "admissible as direct evidence of the

5    conspiracy itself."

6         Mr. Griffin objects to evidence concerning the murder

7    of Deputy Sheriff Frank Trejo on the grounds that the evidence

8    should be excluded under Federal Rules of Evidence, Rule 403.

9    Rule 403 requires the exclusion of evidence if "its probative

10   value is substantially outweighed by the danger of unfair

11   prejudice, confusion of the issues, or misleading the jury, or by

12   considerations of undue delay, waste of time, or needless

13   presentation of cumulative evidence."  United States v. Ellis,

14   147 F.3d 1131, 1134-1136 (9th Cir. 1998).

15        The murder of Sonoma County Deputy Frank Trejo was a

16   racketeering act alleged against current Government witness Paul

17   Schneider in the Government's RICO indictment against Schneider

18   in San Francisco.  United States v. James Pendleton, et al., CR-

19   01-0319-WHA.  Deputy Trejo was shot and killed by Robert Scully

20   while Scully was preparing to commit a robbery at the direction

21   of Paul Schneider.  Robert Scully was convicted of first degree

22   murder and sentenced to death.  His case is currently pending in

23   the California Supreme Court.  People v. Scully, No. S062259.

24   The Scully case involved a lengthy trial.  Scully is represented

25   on appeal by the California State Public Defender's Office who

26   has advised that the record on appeal is approximately 35,000

27   pages.

28        On March 29, 1995, Deputy Frank Trejo drove into the

1  parking lot of a business at 11:30 P.M. to investigate a

2  suspicious pickup truck.  The driver of the truck was Brenda

3  Moore.  The passenger was Robert Scully.  When Deputy Trejo went

4  to question the passenger, Robert Scully produced a shotgun and

5  ordered Deputy Trejo to get on his knees with his hands behind

6  his head.  Robert Scully then executed Deputy Trejo by shooting

7  him in the face with a shotgun.  Scully stole Trejo's gun and gun

8  belt.  He then fled the scene with Brenda Moore.

9         There is no evidence that any of the three defendants

10  on trial authorized or encouraged this murder.  The robbery and

11  murder scheme was the criminal act of Robert Scully, current

12  government witness Paul Schneider, and Brenda Moore.  The murder

13  of Deputy Trejo is not related to any issue in the case currently

14  before this court.  The main issues in the case now before this

15  court is whether any of the three defendants aided and abetted in

16  the capital murders of Arthur Ruffo and Aaron Marsh, inmates at

17  Pelican Bay State Prison who were each strangled in their cells.

18  The murder of Deputy Trejo is not relevant to those criminal

19  charges.

20         On the other hand, the murder of a police officer would

21  be highly prejudicial evidence if offered in this case.  In

22  United States v. Ellis, supra, at 1135, the Court stated that

23  "Unfair prejudice refers to an undue tendency to suggest a

24  decision on an improper basis, commonly, though not necessarily,

25  an emotional one or evidence designed to elicit a response from

26  the jurors that is not justified by the evidence."  The murder of

27  Deputy Trejo was a gruesome and shocking crime.  The jury in

28  Sonoma County was so appalled that they sentenced Robert Scully

1  to death.   There is no connection between the Trejo murder and

2  the three defendants on trial in this case.   Allowing the

3  Government to introduce evidence of the Trejo murder would be

4  extremely prejudicial and would deny the defendants their right

5  to a fair trial.   Therefore, the Court should exclude all

6  evidence concerning the murder of Deputy Sheriff Frank Trejo.

7

8                              **III**

9      **THE COURT SHOULD EXCLUDE ALL EVIDENCE OF OTHER**

10     **CRIMES LISTED IN THE GOVERNMENT'S FIRST NOTICE**

11

12         In addition to the murder of Steven "T-Bone" Gibson and

13  the murder of Deputy Sheriff Frank Trejo, the government also has

14  given notice of additional uncharged crimes evidence that it

15  intends to introduce during the course of the trial.   The

16  Government should not be allowed to offer evidence of additional

17  crimes not alleged in the indictment.   The indictment is 142

18  pages long.   It contains allegations of 16 murders and 16

19  attempted murders.   There is no reason to go beyond the charges

20  in the indictment.   Mr. Griffin objects to the admission of this

21  evidence under Federal Rules of Evidence, Rule 403, on the

22  grounds that the evidence is unduly prejudicial, and involves the

23  "needless presentation of cumulative evidence."   Mr. Griffin also

24  objects to the admissibility of these uncharged crimes on the

25  grounds that the admission of this evidence would violate his

26  right to a fair trial as guaranteed by the Due Process Clause.

27  McKinney v. Rees, 993 F.2d 1378, 1380 (9th Cir. 1993).

28         The Government's letter is attached as Exhibit A.   In

1    addition to objecting to the Gibson and Trejo murders, Mr.

2    Griffin also objects to the following uncharged crimes evidence

3    on the basis of Rule 403, the right to a fair trial guaranteed by

4    the Due Process Clause, and for the reasons which follow:

5              1.    Evidence of the "Warlock Decision"

6              which is described as Brian Healy and Eddie

7              Burnett organizing a hit on a child molester

8              by Jim Kelly at Chino State Prison in the

9              early 1990's.  Jim Kelly's nickname is

10             "Warlock." Whatever relevance there may be to

11             evidence that the term "Warlock" became a

12             codeword for strangling a cell mate, as the

13             government claims, there is no justification

14             for allowing evidence of an uncharged murder

15             planned by current government witness Brian

16             Healy and another person not on trial here.

17             2.    Evidence of "Anthony Likai and

18             Scott Grizzle attack Black Inmates at PBSP

19             visiting (1993)."  Anthony Likai will testify

20             that he received permission from John Stinson

21             and others to assault Black inmates.

22             Thereafter, Scott Grizzle and Anthony Likai

23             attacked Black inmates in the visiting room

24             at the prison with knives.

25             3.    The evidence that "Stinson

26             Solicited Likai To Kill White Inmates."

27             Likai will testify that John Stinson ordered

28             him to arrange to have a White inmate killed

13

in his cell in order to teach the White
inmates at the prison a lesson about the AB
being in charge. This item and the previous
item (#2) involve uncharged crimes which have
no basis for admission unless unduly
lengthening the present trial is deemed a
valid reason for allowing such evidence.

    4.   The evidence of "Solicitations To
Murder Gavin Shine at PBSP." The government
appears to seek to introduce evidence not
only that Aaron Marsh was marked for death by
the Aryan Brotherhood Commission for failure
to carry out an order to kill Shine, but so
were Joey Hayes and Anthony Likai for the
same reason. The fact that a defendant might
have had a reason to want Marsh killed can be
presented without a detailed mini-trial into
the history of the plan to kill Shine.
Moreover, there is no justification for
allowing evidence of uncharged crimes against
Hayes and Likai.

    5.   The evidence of "Paul Schneider
Providing Weapons To Defendant Chance."  Paul
Schneider will testify that he provided
weapons to David Chance to be used in
stabbing inmates at the prison in the mid-
1990's and Chance directed another inmate to
stab Brian Seabourne. The murder of Seabourne

1    is not charged in the indictment, and

2    evidence of it is prejudicial, irrelevant to

3    the charges and would unduly lengthen the

4    trial.

5          6.    The evidence of "Solicitation To

6    Kill Kenny Lou Costa."  This evidence

7    consists of Billy Boyd being directed by

8    defendants Chance and Littrell to kill Kenny

9    Lou Costa in the early 1990's. Again,

10   evidence of this uncharged crime has no valid

11   basis for admissibility and would

12   unnecessarily prolong the trial.

13         7.    Evidence of "Other Activities of

14   AB."  Here the government seeks to introduce:

15         (a) the murder of Deputy Trejo by Robert

16   Scully, discussed above.

17         (b) AB members subpoenaing other AB

18   members for trial in order to facilitate

19   communication. This may or may not be

20   admissible, depending on how it is offered.

21         (c) "Conspiracies approved by the AB as

22   explained by Brian Healy in Bates Nos.

23   120280-120383. Also, during the 1990's

24   defendants Stinson and Terflinger discussion

25   at Pelican Bay State Prison with Brian Healy

26   killing correctional officers." (sic)

27         As to the discussion of killing

28   correctional officers, evidence of this

1    highly prejudicial uncharged crime should be

2    excluded for the same reasons set forth

3    previously in the discussion about the murder

4    of Sheriff's Deputy Trejo.

5        As for the other conspiracies allegedly

6    explained by Healy, the government does not

7    identify them for the court or opposing

8    counsel, except to refer to 103 pages of

9    discovery. An examination of these pages

10    shows that the government's plan is to have

11    Healy testify about an enormous number of

12    uncharged crimes. These include, for example,

13    conspiracies to kill CDC officials inside and

14    outside prison, to track down and kill

15    informants who are out of prison (including

16    James Redenbaugh, Frank Fragione and Jr.

17    Snyder), to commit armed robberies, to

18    recruit skinheads and Nazi Lowriders to

19    commit crimes for the AB, to kill police

20    officers, to kill informants at Pelican Bay

21    State Prison (including Gavin Shine, Joey

22    Hayes, "J.T.," John (redacted from released

23    discovery), Joey(redacted),Steve(redacted)and

24    Robert Scully)), to supply AB members and

25    associates with handcuff keys to facilitate

26    the murder of "cops," to make war on the

27    Northern Mexicans, and murders, attempted

28    murders and conspiracies to commit murders in

1    which Healy played a role (murder of "Solo"

2    at Palm Hall in 1990, attempts to kill black

3    inmates at New Folsom in 1993, a plan for

4    Robert Scully to kill prison guards and

5    police officers upon being paroled in 1994, a

6    murder perpetrated by Joseph Lowery in 1997,

7    a murder of John Asbury at Chino in 1988 and

8    a conspiracy to kill Kenny Costa in 1996.)

9         Plainly, this prejudicial and

10   practically limitless evidence of uncharged

11   crimes, which if allowed would substantially

12   lengthen the trial of this case, should be ex

13   excluded.

14        8.    Evidence of "AB Reorganizing With

15   the NLR."  This evidence consists of Stinson

16   and Terflinger discussing with the Nazi Low

17   Riders about allowing some members of this

18   gang to become AB members. A number of Nazi

19   Lowriders have been charged in a large

20   separate indictment, <u>United States v Joey</u>

21   <u>Hayes</u>, in this District and some members

22   await trial before Judge Schiavelli. The

23   evidence proposed for admission by the

24   government adds little to the case, would be

25   unduly time-consuming and if not excluded

26   under Rule 404(b) should be barred under Rule

27   403.

28

## IV

## THE COURT SHOULD EXCLUDE ALL EVIDENCE OF OTHER

## CRIMES LISTED IN THE GOVERNMENT'S SECOND NOTICE

While Defense Counsel were preparing objections to the Government's first notice of uncharged crimes evidence (Exhibit A), the Government served a second notice of uncharged crimes. (Exhibit B)  The uncharged crimes in the second notice refer to new crimes about which defense counsel were unaware.  Four years after the indictment, the Government is, on the eve of trial and for the first time, providing defense counsel with discovery relating to these uncharged crimes.  The second notice and the accompanying discovery are being disclosed one week prior to the start of trial. According to the dates on the documents, much of this discovery has been in the government's possession or available to it for one to four years.

Mr. Griffin has already set forth his objections and his case authority in connection with first Government notice. He now objects to the admission of evidence of all of the uncharged crimes listed in the second Government notice on the same grounds.  He adds one additional objection.  The last minutes notice of all these uncharged crimes will necessary result in Mr. Griffin proceeding to trial without a reasonable opportunity to investigate the uncharged crimes.  Thus, Mr. Griffin objects to the admission of evidence of uncharged crimes in this case on the grounds that it will deny Mr. Griffin his constitutional right to due process of law and his right to a trial that is fundamentally fair.  See, <u>Gideon v. Wainwright</u>, 372

1 | U.S. 335, 342 (1963); <u>McKinney v. Rees</u>, 993 F.3d 1378, 1380 (9th
2 | Cir. 1993).

3 | Based upon these objections, Mr. Griffin moves to
4 | exclude the following evidence listed in the Government's second
5 | notice of uncharged crimes evidence:

6 | 1. The evidence of the "Stabbing of
7 | Black Inmate Johnny Miles." According to the
8 | Government's notice, James Prescott stabbed
9 | Johnny Miles on September 5, 1998 on orders of
10 | Robert Griffin. This evidence was available to
11 | the government in 2005.

12 | 2. The evidence of "Robert Griffin's
13 | Contacts with David Griffin." David Griffin
14 | said that in 2002 Robert Griffin wanted Lawless
15 | murdered because he ratted on Robert Griffin.
16 | David said Robert threaten to kill him and his
17 | family if he gave information to law
18 | enforcement. David claims Robert tries to make
19 | people think he retired from the AB but he did
20 | not. This evidence was obtained by the
21 | government in 2003.

22 | 3. The evidence of "Activities of Carl
23 | Carter." According to the notice, Carl Carter
24 | sent drugs to several AB members and claims
25 | Robert Griffin solicited him to kill Roger
26 | Wiersma who may have been a witness against
27 | Griffin. This evidence was available to the
28 | government in 2002.

4. The evidence that "Robert Griffin Solicited the Murder of Jack Hickey." According to the notice, Hickey testified against Griffin and in 1997 Griffin asked James Allen to kill Hickey. It should be noted that the government has not provided any discovery at all which relates to this alleged uncharged crime.

5. The evidence of "Robert Griffin Contacts With Maurice Matthews." According to the notice, in 1999 at Chino, Robert Griffin had contact with Maurice Matthews regarding Matthew's involvement in the "FTB" movement, an anti-AB faction. It cannot be determined from the released discovery how long the government has possessed this evidence.

6. The evidence of "John Stinson and Robert Griffin Contacts with Anthony Turner." This involves Stinson and Griffin discussing AB business with Turner. This evidence was available to the government in 2002.

7. The evidence of "Robert Rowland Contact with David Chance and Richard Terflinger." This involves Rowland testifying that David Chance discussed drug trafficking; that David Chance asked him to testify as a defense witness in the Curtis Price trial to discredit prosecution AB dropout witnesses

1    Michael Thompson and Clifford Smith; and that

2    Chance told him the AB kills outsiders if an AB

3    member breaks the rules. The government has not

4    yet provided discovery on this matter.

5        8.    The evidence of "Jason Glaza Contacts

6    with Stinson and Terflinger."  Terflinger and

7    Stinson discussed various AB business with

8    Jason Glaza, including efforts to kill Gavin

9    Shine, Janet Meyers, CDC staff and politicians.

10   This evidence was available to the government

11   in 2003.

12       9.    The evidence of "Contacts John

13   'Turtle' Harper."  This evidence was obtained

14   by the government on May 31, 2006 and August

15   10, 2006.

16       Mr. Griffin objects to Harper's testimony

17   that Griffin was still on the AB Commission

18   around the time of Aaron Marsh's murder.  The

19   testimony is hearsay as it is not based on

20   personal knowledge.  Mr. Griffin objects to

21   Harper testifying that Stinson and Terflinger

22   said Ruffo was killed because of bad blood

23   between Griffin and Ruffo.  Mr. Griffin objects

24   to Harper testifying that Todd Asker said

25   Griffin had been lobbying to have Ruffo killed.

26   These are not co-conspirator statements because

27   Robert Griffin had withdrawn from the AB and

28   was no longer a member of any conspiracy at the

time the statements were made.  Bourjaily v. United States, 483 U.S. 171 (1987).  The hearsay statements violate the Confrontation Clause.  Crawford v. Washington, 541 U.S. 36 (2004).

10.  The evidence of "Littrell Schooling Others How to Choke."  Gary Littrell wrote a letter telling another inmate how to kill by choking.

V

**THE COURT SHOULD EXCLUDE EVIDENCE OF OTHER CRIMES LISTED IN THE INDICTMENT THAT DO NOT ALLEGE THE INVOLVEMENT OF THE DEFENDANTS**

The 142 page indictment in this case originally charged 40 defendants.  Judge King ordered the case severed into smaller groups of three or four defendants.  The case was divided into groups where all of the defendants in any given group were alleged to have committed the same crimes or racketeering acts. The Defendants, Stinson, Griffin, and Chance, were grouped together because they were all charged with racketeering acts occurring in state prison, such as the murders or Ruffo and Marsh.  The Defendants, Mills, Bingham, Hevle, and Gibson, were joined in a separate group because they were all charged with murders and racketeering acts occurring in federal prison.  The severance was intended to make the case more manageable, more easily understood by the jury, and so the trials would not go on

forever.  Allowing the Government to introduce evidence
concerning murders committed in federal prison in this case would
defeat the purpose of the severance orders.

The Defendants, Stinson, Griffin, and Chance are charge
in Count Two with participating in six murders, three attempted
murders, and one conspiracy to commit murder.  The Government's
evidence at trial should be limited to these ten crimes.  The
crimes are:

1.   The Murder of Richard Barnes.  Overt acts 54-63.

2.   The Murder of Thomas Lamb.  Overt acts 64-68.

3.   The Murder of Steven Clark.  Overt acts 69-74.

4.   The Murder of Richard Andreasen.  Overt acts 75-
     80.

5.   The Attempted Murder of Jeffrey Barnett.  Overt
     acts 81-86.

6.   The Attempted Murder of Jimmy Lee Inman.  Overt
     acts 92-100.

7.   The Attempted Murder of Joel Burkett.  Overt acts
     101-110.

8.   The Murder of Arthur Ruffo.  Overt acts 135-140.

9.   The Conspiracy to Murder Frank Ruopoli.  Overt
     acts 141-146.

10.  The Murder of Aaron Marsh.  Overt acts 309-313.


The Court should exclude evidence concerning the
remaining racketeering acts, many of which involve murders
occurring in federal prison.  The Defendants Griffin, Stinson,
and Chance, are not alleged as being involved in these

racketeering acts of murder occurring in federal prison.
Evidence of these "federal prison" racketeering acts was
presented in the separate trial of Mills, Bingham, Hevle, and
Gibson.   These racketeering acts are:

      1.   The Murder of John Marzloff.  Overt acts 46-50.

      2.   The Murder of Robert Hogan.  Overt acts 51-53.

      3.   The Murder of Gregory Keefer.  Overt acts 87-91.

      4.   The Conspiracy involving John Stinson (but not
Griffin and Chance) to bring narcotics into the
Los Angeles County Jail.  Overt acts 111-126.

      5.   The Murder of Arva Lee Ray.  Overt acts 127-134.

      6.   The Conspiracy to Distribute Narcotics at USP
Leavenworth.  Overt Acts 147-205.

      7.   The Attempted Murder of Ismael Benitez-Mendez.
Overt Acts 206-207.

      8.   The Murder of William McKinney.  Overt Acts 208-
211.

      9.   The Attempted Murder of David Newman.  Overt acts
212-213.

      10.   The Conspiracy to Murder Chris Cecil, alleging
the involvement of Stinson and Chance (but not
Griffin).  Overt acts 214-218.

      11.   The Murder of Charles Leger.  Overt acts 219-227.

      12.   The Distribution of Proceeds of Narcotics
Transactions.  Overt acts 228-239.

      13.   The Conspiracy to Murder Walter Johnson.  Overt
acts 240-248.

      14.   The Race War with Black Inmates.  Overt acts 249-

1    308.

2        15.   The Attempted Murder of Michael Nevergall.  Overt

3             acts 314-318.

4        16.   The Murder of Mark Kulikov.  Overt acts 319-320.

5        17.   The Solicitation of Murder of Jason Butler.  Overt

6             acts 321-322.

7        18.   The use of the mail by other co-defendants not

8             joined in this trial.  Overt acts 323-337.

9        19.   The use of the telephone by other co-defendants

10            not joined in this trial.  Overt acts 374-392.

11   All of this evidence should be excluded pursuant to

12   Federal Rules of Evidence, Rule 403.  The probative value of the

13   evidence is substantially outweighed by the prejudicial effect,

14   the undue consumption of time in presenting the evidence, and the

15   danger that the evidence may confuse the jury or be misused by

16   the jury in this case.  The Court has inherent power to control

17   the proceedings in order to ensure that the defendants are given

18   a fair trial. Old Chief v United States, 519 U.S. 172 (1997). If

19   the government is permitted to introduce evidence concerning all

20   of the racketeering acts of the other co-defendants that are not

21   a part of this trial, it would undo any benefit from Judge King's

22   severance order in this case.  Therefore, these other

23   racketeering acts should be excluded.

24

25

26

27

28

**VI**

**THE COURT SHOULD EXCLUDE THE TESTIMONY OF ANY**

**WITNESS WHO IS NOT DISCLOSED THREE DAYS BEFORE**

**COMMENCEMENT OF TRIAL OR BAR THE DEATH PENALTY.**

In a capital case, the defendant is entitled to notice of the witnesses three days before the commencement of the trial. 18 U.S.C. §3432.  The purpose of the witness list right "is to reduce the chance that an innocent defendant might be put to death by providing a pretrial safeguard not available in non-capital criminal prosecutions." United States v. Steel, 759 F.2d 706, 709-710 (9th Cir. 1985).  Section 3432 provides as follows:

> A person charged with treason or other capital offense shall at least three entire days before commencement of trial be furnished with a copy of the indictment and a list of the veniremen, and of the witnesses to be produced on the trial for proving the indictment, stating the place of abode of each venireman and witness, except that such list of the veniremen and witnesses need not be furnished if the court finds by preponderance of the evidence that providing the list may jeopardize the life or safety of any person.

The Government has filed a list of its witnesses.  Mr. Griffin objects to the testimony of any witness at trial who is not named on the Government's pretrial list of witnesses.  The trial is currently scheduled to start on Wednesday, October 4, 2006.  Three days before the start of the trial is Sunday, October 1, 2006.  Any witness not listed by that date should not be allowed to testify at the trial if the Government intends on seeking the death penalty.  If the court allows any witness not so named three days before trial, then the Court should bar the

1   death penalty in this case.

2

3                              **VII**

4       **THE COURT SHOULD EXCLUDE GRUESOME PHOTOGRAPHS**

5          **OF THE HOMICIDE VICTIMS AS UNDULY PREJUDICIAL.**

6

7          The Government has provided defense counsel with copies

8   of photographs of several homicide victims.  If the Government

9   intends to offer any such photos, Mr. Griffin urges the Court to

10  exclude this evidence as being too prejudicial.  Federal Rules of

11  Evidence, Rule 403 provides that relevant evidence may be

12  excluded "if its probative value is substantially outweighed by

13  the danger of unfair prejudice."  <u>United States v. Layton</u>, 767

14  F.2d 549, 553 (9th Cir. 1985).  "Unfair prejudice" in the context

15  of balancing evidence means "an undue tendency to suggest

16  decision on an improper basis, commonly, though not necessarily,

17  an emotional one."  Federal Rules of Evidence, Rule 403, Notes of

18  Advisory Committee.  Gruesome photographs in a murder case must

19  be excluded from evidence if introduction of the photographs

20  would lead to a trial that is not "fundamentally fair."  <u>McKinney</u>

21  <u>v. Rees</u>, 993 F.2d 1378, 1380 (9th Cir. 1993).

22
    Dated: September 29, 2006                _Joseph F. Walsh_____
23                                            JOSEPH F. WALSH

24

25                                            _Michael M. Crain by JW_____
26                                            MICHAEL M. CRAIN

27                                            Attorneys for Defendant
                                             ROBERT LEE GRIFFIN
28

SEP-08-2006  12:44    ATTORNEYS OFFICE    213 894 0142    P.01/06



**U. S. Department of Justice**

*United States Attorney*
*Central District of California*

J. Mark Childs
Assistant United States Attorney
(213) 894-2433
(213) 894-0142 (facsimile)

312 North Spring Street
Los Angeles, CA 90012

September 8, 2006

**Via Mail**

SEE ATTACHED LIST

Re:    U.S. v. John Stinson et al., No. 02-938-GHK

Dear Counsel:

Pursuant the Court's Order dated August 14, 2006 re: Defendant Stinson's Motion to Limit Evidence Pursuant to FRE §§ 403 and 404(b) ("Motion"), the government hereby provides advance notice of evidence of uncharged crimes or misconduct it intends to introduce at trial that is not specifically referenced in the indictment. The government intends to introduce the below stated evidence of uncharged crimes or misconduct pursuant to applicable RICO law, 18 U.S.C. § 1961, et seq. Such evidence is direct proof of the charged racketeering conspiracy (Count Two) and VICAR counts (Counts Four and Five). Such evidence is both relevant and admissible and properly included in the government's case-in-chief to prove the elements of the charged RICO offenses. United States v. Diaz, 176 F.3d 52, 79-80 (2nd Cir. 1999)(approving admission of "evidence of prior uncharged crimes and other bad acts that were committed by defendants-appellants and government witnesses."). Further, such evidence is inextricably intertwined with the evidence of the charged offense, as it serves to explain how the witnesses came to become members of the Aryan Brotherhood and maintained their membership and were able to further the goals of the enterprise. It is relevant both to establish each defendant's knowledge and intent. As such, the government maintains that this evidence is not Rule 404(b) evidence. Without waiving its objections to defendant's Motion, the government provides the following notice pursuant to the Court's Order regarding Rule 404(b) evidence.

**Organization and Enterprise Evidence**

In order to establish the existence, organizational structure, policies and procedures of the Aryan Brotherhood ("AB"), each cooperating witness, who was a former member or associate of the AB, federal and/or state factions, will potentially testify about (1) being schooled about the AB organization; (2) sponsors and sponsorship process of the AB; (3) the practices, policies, procedures and organizational structure of the AB; (4) the identities and responsibilities of AB members and associates; (5) the identities and responsibilities of AB commission and counsel members; (6) the former AB member's or associate's blood in for the AB; (7) methods of communication between AB members and associates; (8) manufacturing and passing of weapons by the AB; (9) the AB's use of third parties and attorneys for communication;

(10) AB symbols; (11) receiving and/or transmitting orders to kill on behalf of the AB; and
(12) AB criminal activity approved or sanctioned by the AB. This information has been
produced in discovery, including in the various reports and transcripts of witnesses. (See e.g.,
Bates 113619-115259; 117319-117524; 117537-545; 117886-973; 117988-118022; 120256-
120316).

### Frank Ruopoli

In the late 1970's Frank Ruopoli committed crimes with defendant Stinson . Ruopoli also
associated for criminal purposes with defendant Terflinger and AB member Bobby "New York"
Crane. During this time, while out of prison, defendant Stinson called Ruopoli about a crime
Stinson committed without Ruopoli present. Later, Ruopoli helped defendant Stinson bury a
veteran member of the AB, Jack Mahone, on behalf of Shirelle Crane. Ruopoli believes he was
placed in the hat (marked for death) for these actions and was later shot at when he went to buy
some drugs at the house of a biker. This shooting motivated Ruopoli, in part, to cooperate with
law enforcement. Also, in October 1981, Frank Ruopoli testified against defendant Stinson in
Los Angeles Superior Court regarding murder of Alfred Armijo for which Stinson received life
without parole. The AB, including defendants, have approved the killing of Ruopoli. (See e.g.,
Bates 114180-114210).

### Murder of Steven "T-Bone" Gibson

In 1980, the AB approved the murder of T-Bone Gibson by Robert Griffin and Junior
Synder. Griffin sliced the throat of Steven Gibson in 1980 at the California Institute of Men,
Chino, California ("CIM").

In 1980, prior to the murder of T-Bone Gibson at CIM, Masterson told defendants
Griffin and Terflinger that Gibson was talking trash about Mexicans in the visiting room. Griffin
and Terflinger shook their heads, like this was the straw the broke the camel's back. AB member
Eddie Burnett told Masterson that T-Bone had to go. On the morning of the murder, defendant
Terflinger told Masterson to wear old clothes because there was going to be a lot of blood.
Masterson went to the yard. Defendant Griffin, Junior Synder and other AB members were in
the yard. Defendant Griffin kept a knife in his jacket. Defendant Griffin explained the plan to
kill T-Bone. Junior Synder was to hit Gibson in the back. During the attack, Masterson was
playing basketball and the blood of Gibson hit Masterson's arm. Masterson did not see Gibson
get stabbed. Masterson saw T-Bone dying. Masterson showered in the yard and got rid of the
shorts he was wearing and another inmate (Ernesto Roybal) gave Masterson the inmate's shorts.
Later, Masterson and defendant Griffin discussed blood on Griffin. Defendant Griffin and AB
member Wendell "Blue" Norris stated that if Masterson wanted into the AB he could join but it
was up to Masterson. Masterson agreed to be put up. Defendant Griffin and  Masterson
discussed Masterson being put up for membership in the AB.

Defendant Griffin solicited Michael Masterson to commit perjury during the trial of
People v. Robert Griffin (T-Bone Gibson killing). In or around December 1982, Steven Barnes
testified against Griffin in the murder trial of Gibson. As a result of Steven Barnes testifying
against Griffin, Richard Barnes, the father of Steven Barnes, was murdered by Curtis Price at the
home of Richard Barnes located in Temple City, California.

Michael Masterson committed perjury during the trial of <u>People v. Robert Griffin</u> on behalf of defendant Griffin.

### "Warlock" Decision

Brian Healy and Eddie Burnett organizing the hit on a child molester by Jim Kelly at Chino State Prison in the early 1990's. Jim Kelly's nickname was "Warlock." The term "Warlock" became a codeword among the AB for strangling a cell mate. For example, defendant Terflinger used the term "Warlock" in ordering Healy to kill Arthur Ruffo.

### Anthony Likai and Scott Grizzle Attack Black Inmates at PBSP Visiting (1993)

In early 1993, while at Pelican Bay State Prison ("PBSP"), before Likai was released to B-Facility, Stinson gave a kite to Likai. Stinson told Likai to read the kite and give it to Aaron Marsh personally when Likai arrived at the mainline. The kite indicated that Marsh needed to do something to get back into the SHU, put in some AB work, and follow Likai's lead as Likai was up for the AB. Also, around the same time, Gavin Shine provided Likai with a second kite and similar instructions.

Shortly thereafter, Likai met up w/ Scott Grizzle who was housed in the same facility. Grizzle said he came from the same facility as Stinson, Dale Bretches, Bobby Crane and Marvin "Chunky" Stanton. Grizzle said that Grizzle told these AB members that he would kill a black on St. Patrick's day. Likai agreed to help Grizzle kill blacks on St. Patrick's day. Likai agreed because two AB commissioners were notified about the attack and Likai wanted to get his "blood in" for the AB.

Later, on Likai's way to a visit, Likai met up w/ Aaron Marsh who was on the yard and gave Marsh the kites. Likai told Marsh to read the kites. Likai watched Marsh read the kites. Likai said he already read the kites. Likai indicated to Marsh to watch what happened and to Likai's actions. Marsh said he would take care of it.

However, the plan for an attack on St. Patrick's day was foiled because there was an attack between black and white inmates on the mainline, resulting in segregation.

Likai requested approval to kill blacks in the PBSP visiting room from John Stinson, Gavin Shine and an EME leader. Likai communicated through a third party who contacted Debra Stinson, Leanne Shine, and the wife of the EME leader. In response, Likai received a letter in John Stinson's handwriting (that was sent to Likai by a third party in the mail) that indicated that Stinson did not care where Likai dealt with the killing of the black inmates, but do it yesterday.

Likai was also told verbally from a third party that Gavin Shine and the EME leader approved hitting black inmates the visiting room.

Shortly thereafter, Grizzle and Likai attacked black inmates in the visiting room with knives.

A few months after the attack, at the PBSP visiting room, Stinson, Terflinger, Gavin
Shine, Likai, Grizzle, and other AB members attended a meeting. At this meeting,
Stinson indicated that Likai did a great job in stabbing the black inmates. Stinson indicated that
Likai and Grizzle did their blood in and were set for AB membership and it was a matter of
finishing the probation time. Stinson and another AB member raised their hand for Grizzle's
membership. Likai asked Terflinger to raise his hand for Likai. Shine said would raise his hand
for Likai. Terflinger said AB member Parrot raised his hand for Likai. Likai told Terflinger that
Likai wanted Terflinger to sponsor him (as opposed to Shine), and Terflinger said he had Likai's
back. Shine also indicated that Likai would be moving in with Shine.

Likai told Stinson, Terflinger and the other members that Likai handed the kites to Aaron
Marsh and personally told Marsh that Marsh had to follow suit. Likai told Stinson and Terflinger
that Marsh said he would.

### Stinson Solicited Likai to Kill White Inmates

In the law library, not long after Likai's and Grizzle's attack on the black inmates
(approximately 1993), Stinson asked Likai if any whites were in Likai's building. Likai said yes.
Stinson told Likai to pick the white inmate that Likai liked the best and have that white inmate
kill his cell mate. Stinson added that if the chosen white inmate would not kill his cell mate then
have the cell mate kill the originally chosen white inmate. Stinson indicated he needed to teach
white inmates a lesson about the AB being in charge. Likai asked Stinson about what happens if
both inmates are good. Stinson replied that sometimes you have to make sacrifices. Stinson
glared at Likai for challenging his authority.

### Solicitations to Murder Gavin Shine at PBSP

The AB commission approved Gavin Shine to be killed by, at least, the mid-1990's.
Various members of the AB (including, Joey Hayes, Aaron Marsh, and Anthony Likai) were
instructed by the AB to specifically kill Shine. These same members were later marked for death
by the AB because, among other reasons, they failed to kill Gavin Shine. The leaders of the AB
(namely, Stinson, Terflinger, Griffin and Chance) approved that Shine and Shine's would-be
assassins were marked for death.

For instance, Brian Healy communicated with Joey Hayes through Steve Olivares that
Joey Hayes was to kill Gavin Shine pursuant to Rick Terflinger's instructions.

In the PBSP SHU visiting room (legal visit), while Likai was celled with Shine, Stinson
and Terflinger instructed Likai to kill Shine. Terflinger told Likai to cut Shine's heart out and
flush it down the toilet to let every know Shine was a heartless bastard. Schneider told Likai that
Schneider would send a knife to Likai.

### Paul Schneider Providing Weapons to Defendant Chance

Paul Schneider provided weapons to David Chance on which Schneider etched "AB" and
shamrocks that were to be used to stab inmates at PBSP in the mid-1990's (particularly Chance
directing Walter Farmer to stab Brian Seabourne on 8/31/96). (See Bates 117917, 117924).

**Solicitation to Kill Kenny Lou Costa**

Billy Boyd being directed by defendants Chance and Litrell to kill Kenny Lou Costa in the early 1990's. (Bates 117899).

**Other Activities of AB**

Robert Scully's murder of Sonoma County Sheriff Deputy Frank Trejo. (Bates Nos. 117895-97; 120347-120409).

AB members subpoenaing other AB members for trial in order to facilitate communication between AB members, including at the trial of <u>People v. Healy</u> and <u>People v. Littrell and Grizzle</u> and as referenced throughout the discovery.

Conspiracies approved by the AB as explained by Brian Healy in Bates Nos. 120280-120383. Also, during the 1990's, defendants Stinson and Terflinger discussion at Pelican Bay State Prison with Brian Healy killing correctional officers.

**AB Reorganizing With the NLR**

During peace talks at PBSP in and around the year 2000, Stinson and Terflinger discussed with Nazi Low Riders ("NLR") that the AB would allow two NLR members on the AB council and a few NLR members to become AB members.

Very truly yours,

DEBRA WONG YANG
United States Attorney

J. MARK CHILDS
Assistant United States Attorney

Enclosures

-5-



**U. S. Department of Justice**

*United States Attorney*
*Central District of California*

*J. Mark Childs*
*Assistant United States Attorney*
*(213) 894-2433*
*(213) 894-0142 (facsimile)*

*312 North Spring Street*
*Los Angeles, CA  90012*

September 23, 2006

<u>**Letter Via E-Mail (9/23/06) and attachments by Overnight Mail (9/25/06)**</u>

SEE ATTACHED LIST

      Re:    <u>U.S. v.  John Stinson et al., No. 02-938-GHK</u> (404(b): Second Letter)

Dear Counsel:

      Pursuant the Court's Order dated August 14, 2006 re: Defendant Stinson's Motion to Limit Evidence Pursuant to FRE §§ 403 and 404(b) ("Motion"), the government hereby provides advance notice of evidence of uncharged crimes or misconduct  it intends to introduce at trial that is not specifically referenced in the indictment.  The government intends to introduce the below stated evidence of uncharged crimes or misconduct pursuant to applicable RICO law, 18 U.S.C. § 1961, et seq.  Such evidence is direct proof of the charged racketeering conspiracy (Count Two) and VICAR counts (Counts Four and Five).  Such evidence is both relevant and admissible and properly included in the government's case-in-chief to prove the elements of the charged RICO offenses.  <u>United States v. Diaz,</u> 176 F.3d 52, 79-80 (2nd Cir. 1999)(approving admission of "evidence of prior uncharged crimes and other bad acts that were committed by defendants-appellants and government witnesses.").  Further, such evidence is inextricably intertwined with the evidence of the charged offense, as it serves to explain how the witnesses came to become members of the Aryan Brotherhood and maintained their membership and were able to further the goals of the enterprise.  It is relevant both to establish each defendant's and witness's knowledge and intent.  As such, the government maintains that this evidence is not  Rule 404(b) evidence.  Without waiving its objections to defendant's Motion, the government provides the following notice pursuant to the Court's Order regarding Rule 404(b) evidence.

<u>Stabbing of Black Inmate Johnny Miles</u>

      James Prescott stabbed black inmate Johnny Miles at West Valley Detention Center on September 5, 1998 on orders from Robert Griffin.  (See attached FBI 302 of Prescott interview on June 17, 2005.  Additional 302 to follow.  (See Bates 122543-47).

<u>Robert Griffin Contacts with David Griffin</u>

      Robert Griffin had contact with David Griffin (no relation) in June 2002 at Pelican Bay State Prison and again at CCI Chino during 1999.  The contacts included discussions about, among other things, negative implications of "dropping out" of gang involvement, limiting discussions of gang activity, and Robert Griffin's purported gang "retirement."  (See Bates

122548-559, report of investigation re David Griffin dated January 14, 2003; interview report of David Griffin dated May 17, 2002; interview report of David Griffin dated March 25, 2003; CDC visiting information logs for David Griffin and Robert Griffin and Bates 122562-66).

Activities of Karl Carter

Karl Carter sent drugs to AB members T.D. Bingham, Ronnie Harper, and other AB members. Robert Griffin solicited Carter to kill Roger Wiersma who may have been a witness against Griffin. (See Bates 122560-61).

Robert Griffin Solicited Murder of Jack Hickey

Hickey testified against Griffin. In 1997, Griffin asked NLR member James "Mylo" Allen to "whack" Hickey.

Robert Griffin Contacts with Maurice Matthews

At CCI Chino in 1999, Robert Griffin had contact with inmate Maurice Matthews regarding Matthews' involvement in the "FTB" movement. (See Bates 122608-09).

John Stinson and Robert Griffin Contacts with Anthony Turner.

At Pelican Bay State Prison, Stinson and Griffin had contact with Anthony Turner regarding AB matters and activities. (Bates 122567-83).

Robert Rowland Contacts with David Chance and Richard Terflinger

Rowland was housed at San Quentin Adjustment Center (SQ) from about January 1983 to 1986, then sent to New Folsom. He was housed at SQ with David Chance during the same time. He was on the same tier as Chance and was on the yard with Chance two to three times a week for a few hours. Chance would talk to him about how to bring drugs into prison and how to control drug trafficking inside and outside of prison. In 1985 and 1986, Richard Terflinger was also at SQ. Terflinger would come up with AB business ideas and wanted the AB to collect money and to expand outside of prison and "not just be a bunch of thugs in prison."

During his time with Chance, Chance told Rowland that Rowland needed to testify to discredit the testimony of Michael Thompson in the case against Curtis Price, for killing Richard Barnes. Chance told Rowland to kick as much dirt on Thompson as possible. Chance also told Rowland to testify to discredit the testimony of Clifford Smith. Rowland believed that as to orders from AB seniors, "you had to do what they tell you to do" and Chance was senior to Rowland in the AB and was on the Council. Chance also told Rowland that, regarding killing outsiders because AB members had broken AB rules, "that's the policy."

Rowland was sponsored into the AB by Connley. Art Ruffo also raised his hand for Rowland to be made an AB member. David Chance also raised his hand for Rowland. Bobby Crane, John Stinson and Richard Terflinger voted Rowland into the AB. They were on the Council at the time, which was mid-1985, after Clifford Smith "pc'd up." (Interview report to



follow.)

<u>Jason Glaza Contacts with Stinson and Terflinger</u>

At Pelican Bay in about 2000, learned of Richard Miley's effort to become an AB member and a member of the AB council, through contacts with Stinson and Terflinger. Glaza knew about the "FTB" movement and how Terflinger and other AB members were unhappy with the FTB movement. Terflinger discussed AB business with Glaza. Terflinger told Glaza that he (Terflinger) was furious with AB member Joey Hayes' failure to kill Gavin Shine and how as a matter of AB business Hayes would have to make up for it. Terflinger discussed AB sponsorship and membership processes with Glaza. Terflinger told Glaza about suggested AB hit targets including Janet Meyers and CDC staff or politicians. (The foregoing is merely a summary of the contacts, greater details of which are provided in the attached interview report excerpt, Bates nos. 122584-607)

<u>Contacts John "Turtle" Harper</u>

Harper has been involved in AB activities in the state or federal system, and on the streets, since about the early 1980's. He knew AB members T.D. Bingham, Ronnie Slocum, John Greschner and William McKinney. He was instructed to commit crimes after release from custody on behalf of the AB. He knew AB members Stinson, Griffin, Terflinger, and Chance, among others, at Pelican Bay. He is familiar with AB rules including so-called "blood in, blood out." He provided money to AB members while he was out of custody. In about 1999, Harper was at CIM Palm Hall when Robert Griffin was also housed there. Harper intended to hand the "keys" to Palm Hall to Griffin because he believed Griffin was still in good standing near the top of the AB. Griffin told him to continue handling matters.

Harper was present in Pelican Bay when Stinson and Terflinger discussed hitting Marsh. Harper had the role of continuing to "put Marsh to sleep." Griffin was still on the commission at the time.

Regarding the Ruffo murder, in or about November or December 1999, at CIM, Harper and Griffin "laughed" that Ruffo's larynx was in a bag as an exhibit at Healy's trial. Griffin said, "fuck him— I'm glad he's gone" or words to that effect. At Pelican Bay in 1996, Stinson and Terflinger told Harper that Ruffo needed to be killed because there was bad blood between Griffin and Ruffo. In about early 1993, Todd Ashker told Harper that Griffin had been lobbying to have Ruffo killed.

In 1990, Bingham appointed Harper to the AB council at Leavenworth.  (See Bates 122608-613).

Littrell Schooling Others How to Choke

After Marsh murder, AB member (and Marsh murderer), Gary Littrell, providing written instructions to another AB associate on how to kill by choking (Kite and memo re: kite previously produced in discovery).

Very truly yours,

DEBRA WONG YANG
United States Attorney


_____

J. MARK CHILDS
Assistant United States Attorney

Enclosures via mail only.

EXHIBIT   C

1  JOHN M. POLAKOVIC
   Attorney at Law
2  State Bar No: 48482
   8459 White Oak Avenue, Suite 102
3  Rancho Cucamonga, CA  91730
   (909) 980-0604
4  (909) 980-6360

5  Attorney for Defendant
6  ROBERT LEE GRIFFIN

7

8          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9          FOR THE COUNTY OF SAN BERNARDINO, WEST DISTRICT

10

11 PEOPLE OF THE STATE OF CALIFORNIA  )      Case No: OCR 7980
                                      )
12              Plaintiff             )      ORDER VACATING
                                      )      ABSTRACT(S)
13 vs                                 )
                                      )
14 ROBERT LEE GRIFFIN                 )
                                      )
15              Defendant             )
                                      )
16 ─────────────────────────────────────

17 GOOD CAUSE HAVING BEEN HERETOFORE SHOWN, IT IS HEREBY ORDERED:

18 1.   That all abstracts of Judgement issued in this matter are vacated Nunc Pro
19      Tunc and are null and void to August 20, 1999;

20 2.   That the transcript of the proceedings dated August 20, 1999, clearly shows
21      that the Defendant Griffin was found not guilty as to count 1, PC 187 and
22      guilty as to Count 2, PC 32;

23 3.   Further, that the Defendant Griffin was sentenced to two (2) years state prison
24      suspended, and given 30 days conditional and revocable release on probation.

25 4.   Further, that the Defendant Griffin has successfully completed his probation
26      and this case is concluded.

27 Date:
        NOV  8 2001                    INGRID A. UHLER
28                                     Judge of the Superior Court

People vs Griffin OCR 7980
Order Vacating Abstract(s)

10

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

 I am employed in the County of Los Angeles, State of California.

 I am over the age of 18 and not a party to the within action; my business address is 316 West Second Street, Suite 1200, Los Angeles, California 90012.

 On September 29, 2006, I served the foregoing document described as **NOTICE OF MOTION AND MOTION IN LIMINTE TO EXCLUDE EVIDENCE; MEMORANDUM OF POINTS AND AUTHORITIES** on interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

MARK CHILDS
ASSISTANT U.S. ATTORNEY
1400 UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA 90012

 I am readily familiar with the firm's practice of collection and processing of correspondence for mailing.  Under that practice, it is deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date on the envelope is more than one day after date of deposit for mailing contained in the affidavit.

 I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

 Executed on September 29, 2006, Los Angeles, California.


_____
CANDACE PARK