1  DEBRA WONG YANG
   United States Attorney
2  THOMAS P. O'BRIEN
   Assistant United States Attorney
3  Chief, Criminal Division
   J. MARK CHILDS (Cal. Bar No. 162684)
4  MARK AVEIS (Cal. Bar No. 107881)
   Assistant United States Attorneys
5  Organized Crime & Terrorism Section
   1500 United States Courthouse
6  312 North Spring Street
   Los Angeles, California 90012
7  Telephone:  (213) 894-4477
   Facsimile:  (213) 894-3713
8  Email: mark.aveis@usdoj.gov
   Attorneys for Plaintiff
9  UNITED STATES OF AMERICA



10              UNITED STATES DISTRICT COURT

11        FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  UNITED STATES OF AMERICA,      )    No. CR 02-938(E)-RGK
                                   )
13              Plaintiff,         )    GOVERNMENT'S OPPOSITION TO
                                   )    DEFENDANT GRIFFIN'S MOTION IN
14              v.                 )    LIMINE RE FED. R. EVID §§
                                   )    404(b) AND 403; MEMORANDUM OF
15  ROBERT GRIFFIN, et al.,        )    POINTS AND AUTHORITIES
                                   )
16              Defendants.        )    Date: TBD
    _____    )    Time: TBD

17

18        The government opposes defendant Griffin's motion to exclude

19  evidence under Fed. R. Evid. §§ 404(b) and 403 on the grounds

20  that the motion incorrectly seeks to exclude defendant Griffin's

21  incriminating admissions and that granting the motion would

22  deprive the trier of fact of hearing relevant and admissible

23  evidence of defendant's role in running the Aryan Brotherhood

24  racketeering enterprise.

25        The government's opposition is based on the attached

26  memorandum of points and authorities, the Court file, the

27                          U.S. v.Griffin, et al., CR 02-983(E)-RGK
                            Government's Opposition to Griffin's Motion re Rule
28                          404(b)

DOCKETED ON CM

OCT  5 2006

BY _____  172

3920

1  government's pending motions in limine, and on such other

2  evidence or argument as the Court may consider.

3  Dated: October 3, 2006          Respectfully submitted,

4                                  DEBRA WONG YANG
                                   United States Attorney
5
                                   THOMAS P. O'BRIEN
6                                  Assistant United States Attorney
                                   Chief, Criminal Division
7
8                                  _____
                                   J. MARK CHILDS
9                                  MARK AVEIS
                                   Assistant United States Attorneys
10                                 Attorneys for Plaintiff
                                   United States of America
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                 U.S. v.Griffin, et al., CR 02-983(E)-RGK

28                          2      Government's Opposition to Griffin's Motion re Rule
                                   404(b)

# TABLE OF CONTENTS

**DESCRIPTION**                                                                    **PAGE**

TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . . . .  iv

I.  SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.  The Motion Seeks To Exclude Highly Relevant
        Evidence, Well-Known to Defendant, of the
        Racketeering Conspiracy and Defendant's Role
        in It . . . . . . . . . . . . . . . . . . . . . 3

    B.  The Government's Disclosures Are Timely, Based on
        Defendant's Own Recent Litigation Strategy, and
        Defendant Cannot Reasonably Be Permitted to Create
        His Own Prejudice By Seeking Exclusion of Evidence
        Designed to Counter His Defenses or Attacks on the
        Government's Case . . . . . . . . . . . . . . . 5

II.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . 8

    A.  Even Under a Rule 404(b) Analysis, the Proffered
        Evidence Is Relevant and Admissible . . . . . . . 8

        1.  The Ninth Circuit Permits the Introduction of
            Uncharged Acts That Are Inextricably
            Intertwined with Charged Offenses, Even
            Outside of RICO Law . . . . . . . . . . . 8

        2.  Rule 404(b) Permits the Proffered Uncharged
            Acts . . . . . . . . . . . . . . . . . . . 9

        3.  All of the Proffered Evidence Is Relevant and
            Admissible, Whether by a RICO, "Inextricably
            Intertwined," or Rule 404(b) Analysis, and Is
            More Probative than Prejudicial as it "Clearly
            Show[s] [Defendant's] Intent, Method, and
            Plan" and [Is] "Closely Involved with the
            Larger Conspiracy." . . . . . . . . . . . 12

            a.  T-Bone Gibson Was Killed as a Matter of
                AB Business Because He Disrespected The
                AB; Defendant Griffin Suborned Perjury As
                Part of AB Business . . . . . . . . . 12

            b.  The Murder of Deputy Trejo Is Relevant And
                 Admissible Evidence of AB Business and
                Impeachment Evidence Against Government
                Witness Schneider . . . . . . . . . . 15

**TABLE OF CONTENTS(CONT.'D)**

**DESCRIPTION**                                                     **PAGE**

c.    All Other Evidence in the Government's
      First Notice (Motion, Exhibit A) Should
      Be Admitted Over a Rule 403 Objection or
      on "Due Process" Grounds . . . . . . . .    17

      1)    "Warlock" Decision . . . . . . . . .    18

      2)    Likai/Grizzle Attack Black Inmates .    18

      3)    Likai Ordered by Stinson to Kill
            White Inmate . . . . . . . . . . . .    19

      4)    Solicitations to Kill AB Member
            Shine . . . . . . . . . . . . . . .    19

      5)    Schneider Gave Weapons to Defendant
            Chance . . . . . . . . . . . . . . .    20

      6)    Solicitation to Kill Costa . . . .    20

      7)    Other Activities of AB . . . . . .    20

      8)    AB Reorganizing with the NLR . . . .    21

d.    All Other Evidence in the Government's
      Second Notice (Motion, Exhibit B) Should
      Be Admitted Over a Rule 403 Objection or
      on "Due Process" Grounds . . . . . . . .    22

      1)    Stabbing of Inmate Miles . . . . . .    23

      2)    Defendant's Contacts with David
            Griffin . . . . . . . . . . . . . .    25

      3)    Activities of Karl Carter . . . . .    26

      4)    Griffin Solicited Murder of Hickey .    28

      5)    Griffin Contacts with Maurice
            Matthews . . . . . . . . . . . . . .    28

      6)    Contacts with Anthony Turner . . . .    29

      7)    Robert Rowland Contact with David
            Chance and Richard Terflinger  . . .    29

U.S. v.Griffin, et al., CR 02-983(E)-RGK
Government's Opposition to Griffin's Motion re Rule
404(b)

ii

# TABLE OF CONTENTS(CONT.'D)

**DESCRIPTION**                                                                 **PAGE**

8)    Jason Glaza Contacts . . . . . . . .    31

9)    Contacts with John "Turtle" Harper .    31

B.    The Court Should Permit the Government to
Introduce Evidence of Charged Offenses Committed
in Furtherance of the AB Racketeering Conspiracy .    33

C.    No Witnesses Are Subject to Exclusion Under
18 U.S.C. § 3432. . . . . . . . . . . . . . . . .    34

D.    The Government Requests a Preliminary Hearing Under
Rule 104 as to Murder, Crime Scene, and Related
Photographs . . . . . . . . . . . . . . . . .    35

III.  CONCLUSION . . . . . . . . . . . . . . . . . . . .    35

1

# TABLE OF AUTHORITIES

2  **DESCRIPTION**                                                      **PAGE(S)**

3  **CASES**

4  <u>United States v. Allen</u>,
        425 F.3d 1231 (9th Cir. 2005) . . . . . . . . . . .    33
5
   <u>United States v. Bibo-Rodriguez</u>,
6        922 F.2d 1398 (9th Cir. 1991) . . . . . . . . . .    10

7  <u>United States v. Curtin</u>,
        443 F.3d 1084 (9th Cir. 2006) . . . . . . . . . .    11
8
   <u>United States v. DeGeorge</u>,
9        380 F.3d 1203 (9th Cir. 2004) . . . . . . . . . .    8, 31

10 <u>United States v. Diaz</u>,
        176 F.3d 52 (2nd Cir. 1999) . . . . . . . . . . .    8
11
   <u>United States v. Houser</u>,
12       929 F.3d 1369 (9th Cir. 1990) . . . . . . . . .    10, 11

13 <u>United States v. Melvin</u>,
        91 F.3d 1218 (9th Cir. 1996) . . . . . . . .    9, 27, 30
14
   <u>United States v. Montgomery</u>, ,
15       384 F.3d 1050 (9th Cir. 2004) . . . . . . . . . .    8, 9

16 <u>United States v. Sanders</u>,
        928 F.2d 940 (10th Cir. 1991) . . . . . . . . .    32
17
   <u>United States v. Valdez-Soto</u>,
18       31 F.3d 1467 (9th Cir. 1994) . . . . . . . . . .    33

19 **STATUTES**

20 18 U.S.C. 1962(d) . . . . . . . . . . . . . . . .    3

21 18 U.S.C. § 3432 . . . . . . . . . . . . . . . .    34

22 **RULES**

23 Fed. R. Crim. Proc. 16   . . . . . . . . . . . . .    23, 26

24 Fed. R. Evid. 403 . . . . . . . . . . . . .    1, 7, 17, 22

25 Fed. R. Evid. 404(b) . . . . . . . . . . . . . .    PASSIM

26 Fed. R. Evid. 801(d)(2)  . . . . . . . . . . . . .    32, 33

27

28

I.

SUMMARY

A.    The Motion Seeks To Exclude Highly Relevant Evidence, Well-
      Known to Defendant, of the Racketeering Conspiracy and
      Defendant's Role in It

Defendant Griffin seeks to exclude highly relevant evidence of which he has been aware for years but which was only recently brought to the government's attention by Griffin's own litigation strategy. The government must establish as a matter of law that defendant, and his co-defendants, agreed to operate a continuing racketeering enterprise and that members of the enterprise would carry out specific criminal acts as part of a pattern of racketeering activity. The evidence which is the subject of this motion, and which consists mainly of defendant's own admissions, directly proves defendant's role in, and the elements of, the first and foremost charge he faces: racketeering conspiracy (Count Two).[1] Defendant's motion should be denied because every reasonable construction of applicable law supports the introduction of such evidence as proof of each element of _each_ of the charged offenses, especially the racketeering conspiracy.

Here, the government will show that defendants agreed to operate the Aryan Brotherhood prison gang ("AB") according to specific rules. Indictment, ¶¶ 1-15. The rules included that members who "snitched" – cooperated with law enforcement and

---

[1] 18 U.S.C. 1962(d), as alleged in Count Two of the First Superseding Indictment filed August 28, 2002.

testified against other members – would be killed.  Another rule was that, if the AB could not find or get to a member who had been marked for death, the members' family members would be a fair substitute.  Another rule was that law enforcement personnel could be targeted for murder to send the message that the AB was not to be fooled with.  Finally, defendants and others agreed that the AB was to be operated, and rule violations were to be determined, by a central management body, known from time to time as the "Commission" or "Council."  The management body consisted of senior members of the AB.  The AB operated in both California and federal prisons according to the same rules, policies, and governing body.  Indictment, ¶ 4.  The two factions of the AB used runners, go-betweens, and surreptitious communications (e.g., "kites") to communicate AB business and orders between the two factions.  There was, however, by all accounts but "one" Aryan Brotherhood.

The government will show that defendants in the present case – John Stinson, Robert Griffin, and David Chance – were members of AB management.  The government has charged that, in connection with their AB management duties, defendants authorized and ordered the killings of several AB members.  Indictment, Counts Four, Five.

All of the evidence which is the subject of this motion directly shows that defendant Griffin was a member of the AB; was part of AB management; was well aware of the foregoing and other AB "rules" or policy; that defendant employed those rules and

1  policy; that defendant ordered others to carry out those rules or

2  policy; and that defendant continued to enforce and abide by

3  those rules or policy well into the time frame alleged in the

4  indictment.

5  B.    The Government's Disclosures Are Timely, Based on

6         Defendant's Own Recent Litigation Strategy, and Defendant

7         Cannot Reasonably Be Permitted to Create His Own Prejudice

8         By Seeking Exclusion of Evidence Designed to Counter His

9         Defenses or Attacks on the Government's Case

10      The government's disclosures have been timely, especially

11  given defendant Griffin's own litigation strategy.  First, at the

12  end of June 2006, defendant Griffin filed a motion to dismiss

13  based on the statute of limitations.  See Exhibit A attached

14  hereto.  In his motion, defendant Griffin argued two theories:

15  (1) that the statute of limitations had run because he was not

16  involved in any AB conduct which occurred within five years

17  preceding the date of the indictment, and (2) that he had

18  withdrawn from the AB conspiracy in 1985.  See Exhibit A, pages

19  3-5.  Defendant expressly stated that he "withdrew from

20  participation in the Aryan Brotherhood in 1985" and would "raise

21  the statute of limitations as an affirmative defense at trial."

22  Exhibit A, 6:8-9, 7:1-3.[2]

23      Thus, by his own motion filed a mere two months ago,

24  defendant Griffin placed at issue at least two theories of

25

26  ───────────────

27      [2]   Defendant's motion stands submitted.

28                                5

U.S. v.Griffin, et al., CR 02-983(E)-RGK
Government's Opposition to Griffin's Motion re Rule 404(b)

defense or attack which, of course, set the government's wheels in motion to counter.[3]  Furthermore, on April 26, 2006, defendant Griffin subpoenaed numerous "debrief" and other confidential inmate files from the California Department of Corrections and Rehabilitation ("CDC").  CDC moved to quash the subpoenas.  On July 17, 2006 (Docket Entry 3382), this Court ordered that the government take possession of the files and produce documents connected to the government's witnesses and which constituted Brady and Giglio evidence.  This Court ordered that CDC begin production of those documents by July 31, 2006.  Between August 1 and up until mid-September 2006, a mere two weeks ago, CDC produced to the government approximately 13,000 such documents pursuant to defendants' subpoenas and this Court's July 17 order. The government promptly began its review and redacting process. In the course of reviewing those thousands of pages, which has taken several government lawyers several weeks, the government has identified witnesses whose statements appeared to rebut defendant Griffin's defenses and attacks which he had only recently set forth in his June 2006 motion to dismiss (Exhibit A attached hereto).

---

[3] Indeed, as a matter of law, the government must prove beyond a reasonable doubt that the defendant did not withdraw from the conspiracy.  See Ninth Circuit Model Jury Instr. 8/19 (2003 Ed.).  It would, therefore, be grossly unfair and unreasonable for the defendant, who occasioned the recent investigation of his defenses, to claim he was prejudiced by the government's diligent response in order to fulfill the government's burden of proof.

1   Thus, against the backdrop of defendant Griffin's very
2   recent announcement of his defenses and attacks, and the
3   government's very recently completed review of thousands of
4   documents, the government has pursued further investigation to
5   counter defendant Griffin's defenses.  Moreover, in a situation
6   of "be careful what you wish for," defendant Griffin's recently
7   announced affirmative defense and attack on the government's case
8   has caused the government to reconsider several pieces of
9   evidence not previously believed to lend materiality to the
10  government's case.

11  The sum total of evidence proffered in the government's
12  disclosures which are the subject of this Motion is minimal in
13  light of the over 122,000 pages of produced discovery.  It
14  consists of the statements of approximately 10 witnesses, one of
15  whom is dead (and whose statement will likely not be introduced
16  through other means).

17  Moreover, this small amount of evidence is highly relevant
18  and admissible under several theories.  It is not excludable
19  under Rule 403.  It should be received and defendant's motion
20  should be denied.

21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27
28

U.S. v.Griffin, et al., CR 02-983(E)-RGK
Government's Opposition to Griffin's Motion re Rule 404(b)

7

II.

ARGUMENT

A.    Even Under a Rule 404(b) Analysis, the Proffered Evidence Is Relevant and Admissible

    1.    The Ninth Circuit Permits the Introduction of Uncharged Acts That Are Inextricably Intertwined with Charged Offenses, Even Outside of RICO Law

       This Court has ordered that the government give notice of its intent to introduce uncharged acts in response to defendant Stinson's motion to exclude Fed. R. Evid. 404(b) evidence. Exhibit B, attached hereto.  The government has respectfully disagreed with the Court's order and has maintained that the admissibility of evidence of uncharged acts is controlled by RICO law, not Rule 404(b), which permits the government to prove the elements of RICO by uncharged acts.  See United States v. Diaz, 176 F.3d 52, 79-80 (2nd Cir. 1999) (RICO law permits introduction of uncharged acts to prove elements of RICO conspiracy).  Thus, the government has maintained that no 404(b) notice is required.

       However, even outside of RICO law, the Ninth Circuit has clearly held that, where the government has charged conspiracy, any uncharged acts that prove the conspiracy are "inextricably intertwined" with proof of charged conduct and Rule 404(b) does not apply.  United States v. DeGeorge, 380 F.3d 1203, 1219 (9th Cir. 2004) (evidence of uncharged acts may be admitted if the evidence "constitutes a part of the transaction that serves as the basis for the criminal charge"); United States v. Montgomery,

1  384 F.3d 1050, 1062 (9th Cir. 2004) (Rule 404(b) <u>does not apply</u>

2  to uncharged acts "inextricably intertwined" with underlying

3  charged conspiracy if the acts themselves comprise the

4  conspiracy).

5      2.   <u>Rule 404(b) Permits the Proffered Uncharged Acts</u>

6      Even under a Rule 404(b) analysis, the evidence which is the

7  subject of defendant's Motion is clearly relevant and admissible

8  according to recent Ninth Circuit law.  In <u>United States v.</u>

9  <u>Melvin</u>, 91 F.3d 1218 (9th Cir. 1996), defendant was charged with

10  RICO conspiracy for operating a "get rich quick" enterprise.  The

11  conspiracy operated over 80 separate schemes which solicited

12  funds from investors based on "useless or illegal information."

13  91 F.3d at 1221.  "Each scheme was operated under a different

14  name, with the profits going to different back accounts."  <u>Id.</u>

15  Defendant "was responsible for devising at least three schemes"

16  and assisting in "carrying out several others."  <u>Id.</u>

17      Yet, against the backdrop of defendant's role in devising

18  only three of over 80 separate schemes, and merely "assisting" in

19  carrying out others, the trial court overruled defendant's 404(b)

20  objection and admitted evidence of enterprise schemes "not listed

21  on the indictment."  <u>Id.</u> at 1222.

22      <u>Melvin</u> is particularly useful to the present case because

23  the district court there conducted the same analysis as this

24  Court.  Namely, in <u>Melvin</u>, defendant objected at trial to the

25

26

27

28                               9

1    introduction of uncharged schemes under 404(b).[4]  The district

2    court overruled defendant's objection, allowed evidence of

3    uncharged schemes, and the Ninth Circuit affirmed.  The Ninth

4    Circuit stated that Rule 404(b) evidence of uncharged acts is

5    admissible where the evidence: (1) is based on sufficient

6    evidence; (2) is not too remote in time from charged crimes; (3)

7    bears some similarity to the charged acts; and (4) proves an

8    essential element of the charged offense.  Id., at 1222-23,

9    citing United States v. Houser, 929 F.3d 1369, 1373 (9th Cir.

10   1990); United States v. Bibo-Rodriquez, 922 F.2d 1398, 1400 (9th

11   Cir.), cert. denied, 501 U.S. 1234 (1991).

12        The Melvin court applied the four-part test of Houser and

13   found that:

14        There was sufficient proof of the other schemes because

15        Melvin's co-conspirators had already pled guilty to

16        them.  The other schemes were not too remote, because

17        they were taking place at the same time, and executed

18        in a similar manner to the charged schemes.  The

19        uncharged schemes were similar in nature to the get-

20        rich-quick schemes for which Melvin was charged.

21        Finally, these other schemes were admitted to show

22        intent, motive, and method of operation of the

---

25        [4] Apparently, although it cannot be determined from the
     reported decision, the government in Melvin did not argue at
26   trial or on appeal that the proffered uncharged conduct was
     admissible under RICO law and that 404(b) did not apply at all.

27                              U.S. v.Griffin, et al., CR 02-983(E)-RGK
                                Government's Opposition to Griffin's Motion re Rule
28                      10      404(b)

1  conspiracy.  We therefore find the evidence admissible

2  under Rule 404(b).

3  91 F.3d at 1223.  <u>See also</u> <u>United States v. Curtin</u>, 443 F.3d

4  1084, 1091 (9th Cir. 2006) (applying four-part Rule 404(b) test

5  as in <u>Houser</u>).

6      The Ninth Circuit further held that the probative value of

7  the uncharged evidence outweighed any prejudice because "the

8  evidence clearly showed Melvin's intent, method, and plan" and

9  was "closely involved with the larger conspiracy."  <u>Id.</u>

10     Finally, the Ninth Circuit found that any confusion to the

11 jury caused by the introduction of uncharged schemes was avoided

12 by a limiting instruction whereby "the jurors were expressly told

13 that Melvin needed to be found guilty of the substantive counts

14 in order to be convicted of the racketeering and racketeering

15 conspiracy counts."  <u>Id.</u>

16     As will be shown below, all of the proffered evidence meets

17 the <u>Melvin</u> test for admissibility as Rule 404(b) evidence.  The

18 proffered evidence should also be received as RICO evidence

19 and as inextricably intertwined with the racketeering conspiracy

20 and, therefore, not subject to Rule 404(b) notice requirements.

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27

28

1      3.    <u>All of the Proffered Evidence Is Relevant and</u>

2            <u>Admissible, Whether by a RICO, "Inextricably</u>

3            <u>Intertwined," or Rule 404(b) Analysis, and Is More</u>

4            <u>Probative than Prejudicial as it "Clearly Show[s]</u>

5            <u>[Defendant's] Intent, Method, and Plan" and [Is]</u>

6            <u>"Closely Involved with the Larger Conspiracy."</u>

7     No matter how the Court may analyze the proffered evidence,

8 it is relevant and admissible evidence of the AB racketeering

9 conspiracy and of defendant's role in it and, no less, comes

10 directly from defendant's own admissions.

11        a.    <u>T-Bone Gibson Was Killed as a Matter of AB</u>

12            <u>Business Because He Disrespected The AB;</u>

13            <u>Defendant Griffin Suborned Perjury As Part of AB</u>

14            <u>Business</u>

15     The government intends to prove the AB RICO conspiracy and

16 defendant's role in it by, among other things, introducing

17 evidence that defendant (1) participated in the AB-orchestrated

18 murder of Steven "T-Bone" Gibson and (2) encouraged another AB

19 member to commit perjury at defendant's trial for that murder.

20 Thus, the government has offered a very limited amount of

21 evidence that tends to show defendant's role and intent in the

22 present RICO conspiracy and will not result in a "retrial" of

23 that underlying offense.[5]

24 _____

25    [5] Defendant's argument that the Gibson killing is relevant
only to show defendant's motive to kill Richard Barnes because
26 his son, AB member Steven Barnes, testified against Griffin in
the Gibson murder trial (Motion, 8:2-5) entirely misses the point

27                             <u>U.S. v.Griffin, et al.</u>, CR 02-983(E)-RGK

1    As stated in the government's disclosure (Motion, Exhibit A,

2    page 2), Gibson was murdered because he disrespected the AB, a

3    violation of AB rules and cause for death.  Defendant Griffin

4    explained the plan to kill Gibson to another AB member

5    (Masterson).  Later, at defendant Griffin's trial, Griffin

6    solicited Masterson to commit perjury to support Griffin's

7    defense.

8    Applying Melvin, supra, the proffered evidence should be

9    received because it "is based on sufficient evidence" as

10    Masterson will testify first-hand as to what Griffin told him

11    about the plan to kill Gibson and that Griffin suborned his

12    perjury.  Griffin's conduct is "not too remote in time from

13    charged crimes" because it occurred at the same time that

14    defendant Griffin and other defendants formed the AB "commission"

15    and "council" in prison at the "Palm Hall" wing of the California

16    Institute for Men ("CIM") at Chino.  This is about the same time

17    (1982) and at the same place (CIM Chino) that the defendant and

18    others carried out the charged killing of Steven Clark

19    (Indictment, Overt Acts 69-74).  The killing of Gibson bears more

20    than "some similarity to the charged acts."  It was strikingly

21

22

23    of the proffered evidence.  The evidence of the Gibson murder
described above proves defendant Griffin's role in the AB

24    conspiracy, the conspiratorial action (killing Gibson), and
defendant's knowledge and employment of AB rules.  The later

25    murder of Steven Barnes' father, because Steven Barnes testified
against Griffin in the Gibson trial, is relevant for a different

26    reason.  Namely, to prove that Griffin endorsed the AB motive and
plan to kill AB members (or their family) if the member testified
against the AB.

27    U.S. v.Griffin, et al., CR 02-983(E)-RGK
Government's Opposition to Griffin's Motion re Rule
404(b)

28

similar because Gibson was killed, like every other AB killing in the indictment, because he broke an AB rule, because there was an orchestrated cover-up planned for the killing, and because defendant, like other AB defendants, suborned perjury of another AB member in support of his defense in an underlying case. Virtually every government witness in this case who was formerly a member of the AB will testify that AB rules included committing perjury in favor of an AB member. Finally, defendant's plotting to kill Gibson and suborning perjury proves an essential element of the charged offense, namely, that AB members agreed to engage in a pattern of racketeering activity by conspiring to kill and killing AB rule violators and then covering up their crimes by suborning perjury.

The proffered evidence is certainly more probative than prejudicial, and is not confusing. The evidence shows Griffin was a high-ranking AB member at the same time as other charged conduct (e.g., Clark killing, Barnes killing, 1982-83) and that Griffin himself followed the AB rule to suborn perjury. No "mini-trial" will result regarding the Gibson killing because Griffin was convicted of Cal. Pen. C. 32, accessory to murder, in connection with that killing. Thus, the jury will see the beginning, middle, and end to the entire Gibson murder as it relates to Griffin, without the threatened "retrial" suggested by defendant.

b.    The Murder of Deputy Trejo Is Relevant And

Admissible Evidence of AB Business and Impeachment

Evidence Against Government Witness Schneider

Government witness and former AB member Paul Schneider will
testify that in 1995 AB member Robert Scully was soon to parole
and intended to carry out robberies for the benefit of the AB.
According to Schneider, Scully expressed to AB managers that he
would "go out shooting" or words to that effect if he were
detained by law enforcement, as he would be facing a "third
strike."  Schneider will testify that Scully's plan was ratified
by AB management.  Upon parole, and in course of preparing for
the AB-commissioned robberies, Scully executed Sonoma County
Deputy Frank Trejo after Trejo stopped Scully and AB associate
Brenda Moore for a traffic infraction.  Scully was convicted of
first degree murder and received the death penalty.

Thus, Schneider's testimony about the facts of the AB's
decision to order Scully to commit robberies and ratification of
his plan to murder Trejo is the subject of this proffer.  The
proffered evidence "is based on sufficient evidence" because
Schneider was a percipient witness to meetings of the AB
"commission" regarding planning and ordering the robberies, and
because defendant Griffin was a member of the commission.  The
evidence "is not too remote in time from charged crimes."  In
fact, Scully's parole date and Trejo's killing fell squarely at
the time defendant and his co-defendants were at Pelican Bay
State Prison, conducting AB business, and just prior to the

U.S. v.Griffin, et al., CR 02-983(E)-RGK
Government's Opposition to Griffin's Motion re Rule
404(b)

15

1  charged murders of Arthur Ruffo (Count Four, February 1996) and

2  Aaron Marsh (Count Five, July 1997). The order to Scully to

3  commit robberies and ratification of his plan to murder a law

4  enforcement officer "bears some similarity to the charged acts"

5  as there will be substantial evidence that paroled AB members

6  were required as a matter of AB rules to commit crimes on the

7  "outside" to fund prison AB business. Nearly every government

8  witness will testify that AB members who paroled kept in contact

9  with AB member-inmates and supported the AB's mandate of ensuring

10 the AB's perpetual existence through outside crime. See Exhibit

11 B attached hereto, which was received during the Santa Ana trial

12 and which will be introduced here. Furthermore, the order to

13 commit the robberies and ratification of the murder of Deputy

14 Trejo "proves an essential element of the charged offense," i.e.,

15 RICO conspiracy. The evidence shows the AB continued from the

16 early 1980's to well into the 1990's to orchestrate its survival

17 by engaging in criminal activity both in and out of prison.

18     Additionally, the evidence is more probative than

19 prejudicial. Schneider was convicted of racketeering involving

20 the same conduct to which he will testify. The weight of his

21 testimony will thus be colored by his conviction. Scully was

22 convicted of the killing; no "retrial" will occur.

23     Finally, a word about the defendant's contention that "there

24 is no evidence that any of the three defendants on trial

25 authorized or encouraged this murder." Motion, 11:9-10. That is

26 entirely a matter of proof. The indictment alleges the existence

27

28

U.S. v.Griffin, et al., CR 02-983(E)-RGK
Government's Opposition to Griffin's Motion re Rule
404(b)

16

1  of a closed-knit group of well-organized criminals who followed a

2  set of guidelines and rules to carry out their criminal

3  enterprise.    Each of these defendants have been charged with

4  conducting that conspiracy.    They are responsible for all

5  criminal acts <u>foreseeably</u> committed in furtherance of that

6  conspiracy.    <u>See</u> Ninth Circuit Model Jury Instr. 8.20

7  ("Conspiracy – <u>Pinkerton</u> Charge).    The proffered evidence, and

8  all other evidence, both charged and uncharged, is intended to

9  prove the existence of the criminal conspiracy and defendants'

10  responsibility for foreseeable criminal conduct.    It does not

11  take any stretch of the imagination to conclude that a robbery

12  ordered to be committed by a recent AB parolee will result in

13  violence or death, and that the conspiracy's members knew it.

14           c.    <u>All Other Evidence in the Government's First</u>

15                 <u>Notice (Motion, Exhibit A) Should Be Admitted Over</u>

16                 <u>a Rule 403 Objection or on "Due Process" Grounds</u>

17       Defendant has made a catch-all objection under Rule 403 and

18  on "Due Process" grounds[6] to all other evidence described in the

19  government's notice as required by the Court's August 14, 2006

20  ruling.    Motion, Exhibit A.    Defendant has not otherwise

21  contended that the evidence is irrelevant.    The government

22  submits that all of the evidence described therein is relevant

23

24  ───────────────

25       [6] Defendant has not cited any authority for objecting to any
    of the proffered evidence on "due process" grounds.    This
26  objection is so vague and over broad as to be meaningless.    The
    government therefore will address the evidence in this section as
    a matter of admissibility under Fed. R. Evid. 403.

27                                    <u>U.S. v.Griffin, et al.</u>, CR 02-983(E)-RGK
                                      Government's Opposition to Griffin's Motion re Rule
28                         17         404(b)

1    and admissible under any of the grounds stated above, and because

2    defendants have largely misconstrued the purpose of the proffered

3    evidence.

4              1)    "Warlock" Decision

5         Government witness Brian Healy will testify that the

6    "Warlock" decision was AB code for killing an inmate in his cell.

7    The code was based on a case in which an inmate strangled his

8    cellmate, and co-defendant Terflinger told Ruffo murderer Brian

9    Healy to carry out the Ruffo killing in the same way.

10        Contrary to defendant's contention, this evidence does not

11   relate to an "uncharged murder planned by [Healy] and another

12   person not on trial here." Motion, 13:13-16.  Instead, it

13   directly relates to Healy's accepting the order to kill Arthur

14   Ruffo, for which defendant Griffin is charged in Count Four.

15             2)    Likai/Grizzle Attack Black Inmates

16        Government witness and former AB member Anthony Likai will

17   support the government's theory that defendant Stinson was a

18   ranking AB member because Stinson ordered Likai to "hit" black

19   inmates.  Thus, Likai's testimony will prove the AB hierarchy.

20   Furthermore, government witness Allan Benton, who testified in

21   the Santa Ana Mills trial, will testify that the AB was at war

22   with black inmates and that he carried out an AB order to "hit"

23   black inmates.  Thus, this evidence is more probative than

24   prejudicial in proving the existence of the AB hierarchy and AB

25   motives.

26   ///

27

U.S. v.Griffin, et al., CR 02-983(E)-RGK
Government's Opposition to Griffin's Motion re Rule
404(b)

18

28

3)   Likai Ordered by Stinson to Kill White Inmate

Likai will testify that he was required to follow orders from AB senior, defendant Stinson, to "hit" a white inmate in order to send the AB's message of supremacy among white inmates. Again, this evidence is inextricably intertwined, and more probative than prejudicial, to prove how and why the AB conspiracy operated.   The evidence will consist of Likai's testimony of statements made to him by a defendant, Stinson.   It is highly probative and non-prejudicial evidence of conspiratorial intent, plan, and motive.

4)   Solicitations to Kill AB Member Shine

Nearly all of the government's cooperator witnesses will testify that, as part of AB business, members were tasked with carrying out orders to "hit" or kill offending AB members. Refusal to carry out an AB order of this nature was itself grounds for a death sentence.   Thus, government witness and former AB member Brian Healy will simply testify that the motive behind the murder of Aaron Marsh (Count Five) was the commission's perception that Marsh failed to carry out the commission's order to kill AB member Shine.   Thus, this is hardly venturing into a "detailed mini-trial."   It is simply a single statement by a government witness that serves as direct evidence to explain the motive for killing the victim in a charged count (Count Five).   It is therefore more probative than prejudicial.

///

///

5)    <u>Schneider Gave Weapons to Defendant Chance</u>

Government witness Schneider will testify that, as part of AB business, he gave weapons (knives) to defendant Chance and that Schneider heard Chance order another AB member to kill yet another AB member.  This evidence is relevant and admissible to prove Chance's role in the AB, as a high-ranking member and one responsible for ordering murders.  The indictment expressly alleges that the AB had a hierarchy, and that Chance was part of it as a senior member.  <u>See</u> Indictment, ¶¶ 1-15.  Moreover, Chance's statements to Schneider are direct, relevant, and admissible evidence, as party admissions, that Chance was aware of the AB, of its purpose and rules, and of his role.  Such evidence cannot reasonable be deemed more prejudicial than probative.

6)    <u>Solicitation to Kill Costa</u>

Again, the government intends to call numerous AB cooperators to prove that the AB had a hierarchy which was responsible for ordering "hits" or murders, and that defendants were high-up in the AB hierarchy.  Thus, any evidence that a defendant acted consistent with such rank would be relevant and admissible and direct proof of the existence of the AB enterprise and each defendants' role.

7)    <u>Other Activities of AB</u>

Defendants have wholesale objected to this information.  However, when each item is separately examined, it should be clear that each item is admissible as direct proof of the

existence of the AB enterprise and the pattern of racketeering

activity.  Furthermore, each item is far more probative than

prejudicial.

        (a)  Deputy Trejo murder: this item was previously

addressed.

        (b)  AB members issuing subpoenas for each other

in order to facilitate AB communication: numerous government

witnesses will testify that the AB routinely subpoenaed other

members under the guise of providing testimony in order to

communicate AB business and allow AB members to be housed

together.  This evidence is direct proof of the AB enterprise and

how it conducted its pattern of racketeering activity, as well as

how the AB abused legal processes to carry out its business.

        (c)  AB discussions about killing correctional

officers and other evidence of AB rules or enforcement:

government witness Healy will testify that AB rules included

harassment or murder of correctional and other law enforcement

officers.  Uniform AB rules, and how they were enforced, however

heinous, is direct proof of the existence of the AB enterprise

and the pattern of racketeering activity.  There is no showing by

the defendants that the mere mention by Healy of such rule(s) is

more prejudicial than probative.

        8)  <u>AB Reorganizing with the NLR</u>

The government would seek to introduce evidence that, fairly

recently, the AB has sought to continue its existence by

soliciting another prison gang to carry out AB business.  Namely,

<u>U.S. v.Griffin, et al.</u>, CR 02-983(E)-RGK
Government's Opposition to Griffin's Motion re Rule
404(b)

21

1  the AB has solicited the help of the Nazi Low Riders ("NLR").

2  Government prison expert witnesses will testify that the AB has

3  sought to perpetuate its existence and control over white prison

4  inmates through the NLR whose members have not suffered under the

5  same "lock down" status and, hence, are better able to carry out

6  AB business.  Contrary to defendant's assertion, such evidence

7  does more than "add little" to the case.  Instead, it shows the

8  AB is a continuing enterprise, which is elemental RICO law.  It

9  further shows that AB managers Stinson and Terflinger attempted

10  to exert their influence over other prisoners, which is

11  consistent with the operation of the AB throughout the past 20

12  plus years of its existence.  The jury should absolutely be

13  entitled to hear that the AB is not simply a piece of history but

14  is, instead, a continuing criminal enterprise.  Such evidence

15  cannot reasonably be considered more prejudicial than probative

16  given that such evidence is direct proof of the existence of the

17  continuing racketeering enterprise.

18          d.    All Other Evidence in the Government's Second

19                Notice (Motion, Exhibit B) Should Be Admitted Over

20                a Rule 403 Objection or on "Due Process" Grounds

21      Defendant has again proposed a catch-all objection under

22  Rule 403 and on "Due Process" grounds[7] to all other evidence

---

23

24      [7] Defendant has not cited any authority for objecting to any

25  of the proffered evidence on "due process" grounds.  This
   objection is so vague and over broad as to be meaningless.  The

26  government therefore will address the evidence in this section as
   a matter of admissibility under Fed. R. Evid. 403.

27                              U.S. v.Griffin, et al., CR 02-983(E)-RGK
                                Government's Opposition to Griffin's Motion re Rule
28                              404(b)

                        22

1  described in the government's notice as required by the Court's

2  August 14, 2006 ruling.  Motion, Exhibit B.  The government

3  submits that all of the evidence described therein is admissible

4  under any of the grounds stated above, and because defendants

5  have again largely misconstrued the purpose of the proffered

6  evidence.

7              1)    Stabbing of Inmate Miles

8          As stated above, on June 30, 2006, in connection with the

9  flurry of pretrial motions in this case, defendant Griffin filed

10  a motion to dismiss based upon the expiration of the statute of

11  limitations.  Griffin argued that he had not been actively

12  involved in the AB since 1985 and that the indictment did not

13  otherwise contain evidence of his involvement within five years

14  preceding the date of the indictment.  Nonetheless, in

15  anticipation that defendant Griffin would seek to introduce

16  evidence of expiration of the statute of limitations and that he

17  had withdrawn years ago from the AB conspiracy, the government

18  sought to identify evidence to show the contrary.[8]  The

19

20          [8] Defendant Griffin recently underscored his intent to
21  defend the charges on these grounds.  Two weeks ago, he provided
   his first disclosure of discovery to the government.  The
22  evidence, approximately one-inch thick, primarily consists of
   defendant Griffin's communications and litigation with the
23  California Department of Corrections on his contention that he
   "dropped out" of the AB in 1985.  To emphasize his intent to
24  introduce this evidence at trial as an affirmative defense, his
   attorney's cover letter to the government stated, "Pursuant to
25  Fed. Crim. Proc. Rule 16, Counsel for defendant Robert Lee
   Griffin are hereby providing copies of documents that may be used
26  in the defendant's case in chief."  See highlighted portion of
   Exhibit C attached hereto.

27                                        U.S. v.Griffin, et al., CR 02-983(E)-RGK
                                          Government's Opposition to Griffin's Motion re Rule
28                          23            404(b)

government received during the past three months approximately 13,000 pages of "debriefs" from the CDC as well as other evidence previously considered either cumulative or not material.  Based upon defendant Griffin's statute of limitations and conspiracy withdrawal claims, the government identified several documents that tended to show defendant Griffin was in fact active in the AB as late as 1998 and 1999 (well within five years before the indictment which was filed on August 28, 2002).  Those documents included evidence from an unrelated case that identified James Prescott's stabbing of black inmate Johnny Miles[9] while defendant Griffin was the senior AB member at the same prison facility. The government promptly reviewed those documents and provided notice as soon as was practicable regarding the affect on Griffin's case.

It should be noted that the sum total of the evidence regarding Griffin, Prescott, and the Miles stabbing amounted to a single sentence buried on page two of a five-page, single spaced FBI report from another unrelated case.  The sentence read, "Lowery told Bridge to "Hit" (kill) inmate Miles in his section at WVDC per AB shot caller Blinky (NFI)."  Government Discovery,

---

[9] The fact that Prescott pleaded guilty to stabbing Miles in the unrelated NLR case before Judge Schiavelli, United States v. Hayes, et al. is irrelevant.  In that case, Prescott pleaded guilty to stabbing Miles and admitted he was ordered to so by co-defendants Joe Lowery and Michael Bridge as part of NLR business. The AB connection to that "hit" was not relevant at the time Prescott pleaded guilty.  Nothing in Prescott's plea agreement mentions defendant Griffin.  The plea agreement is under seal and will be provided to this Court under seal and in camera if so requested.

1  page 122544, attached hereto as Exhibit D.  It would be unfair

2  and unreasonable to deny the government an opportunity to call

3  this single witness (Prescott) to testify to a single event,

4  especially in light of the defendant's own very recent

5  disclosures to the government regarding his "retirement" at a

6  time directly rebutted by witness Prescott.

7        In summary, the evidence of Prescott's involvement in the

8  Miles stabbing is direct evidence of defendant Griffin's recent

9  AB activity as a "shotcaller" or high-ranking member.  The

10  evidence is direct evidence of the continued racketeering

11  enterprise and defendant's role in it.  The evidence is not more

12  prejudicial than probative, especially as defendant has placed

13  his role at issue.

14              2)    Defendant's Contacts with David Griffin

15        Again, given defendant's very recent claim that he

16  "withdrew" from the AB conspiracy, the government has reviewed

17  the case evidence to counter this claim and bolster the

18  government's case in chief to show defendant's ongoing AB

19  activity.  Thus, a statement earlier obtained from former NLR

20  member (not AB member) David Griffin (no relation to defendant)

21  has become highly relevant, as has this witness' "debrief" which

22  was recently received as part of the over 13,000 pages of

23  discovery ordered by this Court in connection with the CDC

24  subpoena litigation.  This witness' testimony will consist of

25  defendant Griffin's very recent (2002) statements about his AB

26  involvement and philosophy including that defendant's "motto" was

27

28                          25

1    "three people constitutes a conspiracy" so defendant "was careful

2    to never do that," Government's Discovery, page 122554, attached

3    hereto as Exhibit E, and that defendant Griffin did not want any

4    gang-related activity to occur while he was present so as to

5    avoid implicating him in AB activity.  Government's Discovery,

6    page 122555, attached hereto as Exhibit F.  This evidence clearly

7    shows defendant Griffin was held in such stature as an AB senior

8    that he could actually control prison gang activity.  Other

9    statements made to this witness by defendant Griffin include

10   defendant Griffin "rocking a member to sleep," which the

11   government will prove was the AB modus operandi for lulling a

12   person into a false sense of security just prior to killing them

13   as AB business.  <u>Id.</u>

14        Thus, this evidence is highly probative of defendant's

15   intent and the AB's methods of operation, both proof of the

16   continuing enterprise and not more prejudicial than probative.

17             3)   <u>Activities of Karl Carter</u>

18        Again, pursuant to <u>defendant's</u> subpoena to the CDC issued in

19   April 2006, and pursuant to this Court's order, the government

20   received approximately 13,000 pages of "debrief" and similar

21   documents.  Among those documents was the debrief of inmate Karl

22   Carter.  Carter had stated to CDC in 2002 (not to the government)

23   that defendant Griffin in 1981, while they were housed at Palm

24   Hall CIM Chino, "asked him about how he felt about performing a

25   killing for the AB."  The solicitation to murder referred to an

26

27                              <u>U.S. v.Griffin, et al.</u>, CR 02-983(E)-RGK
                                Government's Opposition to Griffin's Motion re Rule
28                  26          404(b)

1  AB "dropout" named Roger Wiersma.  Government's Discovery, page

2  122561, Exhibit G attached hereto.

3       This information clearly meets the test of <u>Melvin</u>.  First,

4  it is based on sufficient evidence, namely, the proposed

5  testimony of a person, inmate Carter, with percipient knowledge

6  of Griffin's statement.  The government will corroborate the

7  statement with CDC records showing the two were in fact housed

8  together at Palm Hall at the time the statement was made.  This

9  statement is typical of the type of evidence the government will

10 introduce in this case and is no more nor less substantial that

11 any other inmate statement.  Next, Carter's testimony is not too

12 remote in time from charged crimes.  In fact, it falls squarely

13 within the time defendant Griffin was most active in the AB and

14 when the AB was plotting the charged murders of Steven Clark and

15 Richard Barnes (1982-83).  Next, the proposed testimony bears

16 more than "some similarity to the charged acts" as it shows

17 defendant Griffin's subscribing to the AB philosophy of killing

18 AB dropouts, especially those who might testify against AB

19 members.  Next, the proposed testimony proves an essential

20 element of the charged offense, namely, conducting AB business

21 through a pattern of racketeering activity (witness intimidation,

22 murder).  Finally, the evidence is more probative than

23 prejudicial.  As in <u>Melvin</u>, where the Court overruled a 403

24 objection, the evidence "clearly show[s] [defendant's] intent,

25 method, and plan" and [is] "closely involved with the larger

26 conspiracy."  <u>Melvin</u>, 91 F.3d at 1222-23.  The evidence consists

27

28                                27

1  of a single witness' testimony on a very limited but highly

2  relevant and admissible point.  As with all of the proposed

3  evidence which is the subject of this motion, it would be

4  unreasonable and inconsistent with applicable law to exclude as

5  prejudicial any admission against interest made by any defendant.

6  Thus, Carter's testimony should be received.

7        4)    Griffin Solicited Murder of Hickey

8        The government has been unable to find sufficient evidence

9  at this time and subject to further investigation does not intend

10  to introduce such evidence.

11        5)    Griffin Contacts with Maurice Matthews

12        In connection with the government's attempts to counter

13  defendant Griffin's recently announced statute of limitations and

14  conspiracy withdrawal claims, and in the government's recent

15  review of CDC "debriefs" which were subpoenaed by the defendants,

16  the government recently identified an additional witness.  The

17  witness, former NLR member Maurice Matthews, talked to defendant

18  Griffin in 1999 while housed with Griffin at Palm Hall CIM Chino.

19  There, Griffin and Matthews discussed an insurgent NLR movement

20  called "Fuck the Brand" or "FTB."  Other government cooperators

21  and experts will testify that FTB members were marked for death

22  by the AB (also known as the "Brand") for disrespecting the

23  AB/NLR chain of command.  Obviously, from defendant's Griffin's

24  statements to Matthews, Griffin, like any other AB senior, was

25  concerned about the rift because he agreed to intervene on

26  Matthews' behalf and talk to another AB member (Harper) to "give

27

28                        28

U.S. v.Griffin, et al., CR 02-983(E)-RGK
Government's Opposition to Griffin's Motion re Rule
404(b)

1  a pass" (commute Matthews' death sentence for disrespecting the

2  AB).    Thus, as with all other recent admissions by defendant

3  Griffin, this evidence is based on percipient witness testimony

4  to a defendant's own admissions; is close in time to charged

5  conduct; is similar to charged conduct, namely, actions tending

6  to show the AB hierarchy in action; and proves an essential

7  element of the charged conduct, here the continuing operation of

8  the AB racketeering enterprise.    The evidence is more probative

9  than prejudicial for the same reasons stated above.

10              6)    Contacts with Anthony Turner

11      The government recently learned that Turner died.    The

12  government is pursuing a different means to introduce this

13  evidence but at this time does not intend to do so.

14              7)    Robert Rowland Contact with David Chance and

15                    Richard Terflinger

16      Again, as part of the government's recent court-ordered

17  review of some 13,000 CDC "debriefs" and related documents

18  subpoenaed by the defense, the government recently learned that

19  AB dropout Rowland had debriefed.    The government had earlier

20  contacted Rowland but not on the issues only recently made

21  relevant through defendant Griffin's last-minute defenses.

22  Rowland was re-interviewed (his interview report was recently

23  provided) and implicated defendants Chance and Terflinger.    His

24  interview statements were summarized in the government's

25  disclosure (Motion, Exhibit B).    Rowland's statements are <u>very</u>

26  relevant and very narrow in scope.    AB dropout Rowland will

27

28                              29

U.S. v.Griffin, et al., CR 02-983(E)-RGK
Government's Opposition to Griffin's Motion re Rule
404(b)

1  testify that he too was solicited to commit perjury to support
2  the defense of an AB member.  This time the subornation of
3  perjury was by defendant Chance.  <u>The subornation of perjury</u>
4  <u>related to the charged act involving the AB-orchestrated murder</u>
5  <u>of Richard Barnes (Overt Acts 69-74)</u>.  In regard to justifying
6  Barnes' murder, Chance told Rowland, "that's the [AB] policy."

7      The proffered evidence clearly meets the Rule 404(b) test
8  described herein as well as every other RICO or "inextricably
9  intertwined" test.  The evidence is "sufficient" because it is a
10  party's (defendant Chance) admission, corroborated by inmate
11  housing records.  It is not too remote, as Chance's statements to
12  Rowland were made between 1983 and 1985, a period of numerous
13  charged offenses.  Next, the evidence bears more than "some
14  similarity" to all other relevant evidence of the AB's rule of
15  suborning perjury and killing snitches or their family members.
16  Finally, the statement proves the continuing enterprise and
17  pattern of racketeering activity elements of the RICO conspiracy
18  charge (Count Two).  As with the "Karl Carter" statement above,
19  and as in <u>Melvin</u>, where the Court overruled a 403 objection, the
20  evidence "clearly show[s] [defendant's] intent, method, and plan"
21  and [is] "closely involved with the larger conspiracy."  <u>Melvin</u>,
22  91 F.3d at 1222-23.  Once again, the evidence consists of a
23  single witness' testimony on a very limited but highly relevant
24  and admissible point.
25  ///
26  ///
27
28

<u>U.S. v.Griffin, et al.</u>, CR 02-983(E)-RGK
Government's Opposition to Griffin's Motion re Rule 404(b)

8)    <u>Jason Glaza Contacts</u>

Again, the government first identified Glaza as a potential witness during the government's recent review of the debriefs, noted above.  Glaza is a percipient witness to recent (2000) statements about AB business by defendants Stinson and Terflinger, including conducting business "on the street" and the FTB movement.  For all of the reasons noted above, recent (2000) statements by defendants about conducting the AB are not only clearly "inextricably intertwined" as proof of the conspiracy; they are the conspiracy.  <u>See</u> <u>DeGeorge</u>, supra.

9)    <u>Contacts with John "Turtle" Harper</u>

As mentioned in defendant's Motion, the government obtained John "Turtle" Harper's statements as recently as August 10, 2006 regarding defendant Griffin's attempt to "withdraw" from the AB conspiracy.  The government acted in good faith by providing notice of Harper's testimony in connection with the notice required by the Court, as Harper's testimony relates to charged offenses and should not be construed as Rule 404(b) evidence. His testimony directly proves defendant Griffin's (and defendant Stinson's) membership in the AB (Count Two) and their involvement in the charged murder of Arthur Ruffo (Count Four).  Harper, a 20-plus year member of the AB in both the federal and state prison systems, knows Griffin well and is well acquainted with AB business, rules, and policy.  Harper was affiliated with the AB in the early 1980's with members T.D. Bingham (recently found guilty of RICO, RICO conspiracy, and VICAR charges in Santa Ana,

based on the same indictment), Ronnie Slocum (the federal-state
"go-between" for the AB), and AB members/killers John Greschner
and William McKinney. Harper, pursuant to AB rules and orders,
committed crimes on the street just after his parole. As with
several other witnesses mentioned above, Harper talked to
defendant Griffin as recently as 1999, when they were housed
together at Palm Hall CIM Chino. In 1996, Harper was housed with
defendant Griffin and defendants Stinson, Terflinger, and Chance,
at Pelican Bay State Prison where, among other things, Stinson
and Terflinger told him that Arthur Ruffo was an AB target
because of bad blood between Ruffo and Griffin.

In light of the direct connection between Harper's testimony
and underlined charged conduct, no reasonable 404(b) or "indirect"
evidentiary argument can be made. Furthermore, such evidence is
clearly more probative than prejudicial because it established
the AB plan, scheme, design and defendants' motive and intent.

Furthermore, Harper's testimony is not excludable on any
other ground advanced by defendant Griffin. First, it is
relevant to Griffin's continued membership in the conspiracy.[10]
Next, defendant's statements were "in furtherance" of the
conspiracy and admissible under Rule 801(d)(2)(E)  (see

_____

[10] Defendant cannot exclude evidence of his continued role
in the conspiracy where he has mounted a "withdrawal" claim as
such claim is purely a question of fact for the jury. See United
States v. Sanders, 928 F.2d 940 (10th Cir. 1991), cert. denied,
502 U.S. 845 (issue of continuing membership in RICO enterprise
is fact question for jury).

U.S. v.Griffin, et al., CR 02-983(E)-RGK
Government's Opposition to Griffin's Motion re Rule
404(b)

32

government's pending motion in limine no. 4).[11]  Next, and
contrary to defendant's Motion and order of this Court, co-
conspirator statements are <u>not</u> excludable under <u>Crawford</u>.  <u>See</u>
<u>United States v. Allen</u>, 425 F.3d 1231, 1235 (9th Cir. 2005),
<u>cert. denied</u>, 126 S. Ct. 1487 (March 6, 2006) (court confirmed
that "co-conspirators statements are not testimonial and
therefore beyond the compass of <u>Crawford's</u> holding."); Docket
Entry 3623, August 17, 2006 order denying Stinson's motion to
exclude 801(d)(2)(E) statements pursuant to <u>Crawford</u>.  Finally,
there is no "confrontation clause" issue here because the
witnesses will be present for cross-examination.  <u>United States</u>
<u>v. Valdez-Soto</u>, 31 F.3d 1467, 1470 (9th Cir. 1994) ("[w]e are
aware of no Supreme Court case, or any other case, which holds
that the introduction of hearsay evidence can violate the
Confrontation Clause where the putative declarant is in court,
and the defendants are able to cross-examine him.").

B.   <u>The Court Should Permit the Government to Introduce Evidence</u>
     <u>of Charged Offenses Committed in Furtherance of the AB</u>
     <u>Racketeering Conspiracy</u>

     Defendant Griffin next seeks to exclude evidence of certain
<u>charged</u> offenses on the ground that Judge King severed this case
from a larger group on the basis that the present defendants
"were all charged with racketeering acts occurring in state
prison . . ."  Motion, 22:21-23.  Defendant's argument is

---

[11]  The government will lay the proper foundation for co-
conspirator statements at the time it calls each witness.

1   fundamentally incorrect because the district court's grouping and

2   severance for court convenience has nothing to do with proof of

3   the charges.  <u>All</u> defendants have been charged with RICO

4   conspiracy and all evidence of the conspiracy, wherever and

5   whenever occurring, should be admissible, especially as the

6   indictment specifically alleges that the AB operated in two

7   prison systems.  Indictment, ¶ 4.  Evidence of the existence and

8   operation of the AB as a wide-ranging prison gang in California

9   and federal prisons was amply alleged and is a basic theme of the

10  government's case.

11      Thus, this argument is fundamentally flawed.  The government

12  especially objects to this argument as what appears to be an

13  unreasonable effort to "smoke" out the government's litigation

14  strategy and work-product.

15      Nonetheless, the government respectfully reserves the right

16  to supplement its opposition to this argument if the Court

17  believes further briefing or supporting evidence is required.

18  C.  <u>No Witnesses Are Subject to Exclusion Under 18 U.S.C.</u>

19      <u>§ 3432.</u>

20      The government's motion in limine no. 2, regarding delaying

21  disclosure of witnesses under § 3432, stands submitted.  The

22  government takes the position that any disclosure requirements of

23  that section are, therefore, tolled.  Out of an abundance of

24  caution, the government recently filed an ex parte application

25  seeking a ruling on that motion.  The application is pending.

26  The government otherwise hereby incorporates herein by reference

27

28                          34

1  its pending motion in limine no. 2 and the related ex parte

2  application.

3  D.    The Government Requests a Preliminary Hearing Under Rule 104

4        as to Murder, Crime Scene, and Related Photographs

5        The government believes the question of admissibility of

6  murder and related (e.g., crime scene, autopsy) photographs

7  should be addressed by the Court, outside of the jury's presence,

8  by way of a preliminary hearing under Rule 104 during breaks in

9  jury presentation.  The government is in the process of

10 streamlining its case and identifying specific photographs.  The

11 government assures the Court that such a hearing will be brief

12 and will not unduly lengthen the trial.  The government reserves

13 until such hearing or further order of Court its position on the

14 admissibility of such evidence.

15                              III.

16                           CONCLUSION

17       For each of the reasons set forth herein, the government

18 respectfully requests that defendant's Motion be denied.

19

20

21

22

23

24

25

26

27                              U.S. v.Griffin, et al., CR 02-983(E)-RGK

                                Government's Opposition to Griffin's Motion re Rule
28                      35      404(b)

1   JOSEPH F. WALSH
    Attorney at Law
2   California Bar No. 67930
    316 West Second St., Suite 1200
3   Los Angeles, CA 90012
    Tel: (213) 627-1793
4   Fax: (213) 489-4700
    Email: Attyjoewalsh@aol.com
5
    MICHAEL M. CRAIN
6   Attorney at Law
    California Bar No. 45083
7   Post Office Box 3730
    Santa Monica, CA 90408
8   Tel: (310) 571-3324
    Fax: (310) 571-3354
9   Email: Michaelmcrain@aol.com
10  Attorneys for Defendant
    ROBERT LEE GRIFFIN
11

12

13                  UNITED STATES DISTRICT COURT

14                 CENTRAL DISTRICT OF CALIFORNIA

15

16  UNITED STATES OF AMERICA,      )   Case No.   CR-02-938-RGK
                                   )
17              Plaintiff,         )   **NOTICE OF MOTION AND MOTION TO**
                                   )   **DISMISS COUNT TWO BASED ON THE**
18        v.                       )   **STATUTE OF LIMITATIONS;**
                                   )   **MEMORANDUM OF POINTS AND**
19  ROBERT LEE GRIFFIN,            )   **AUTHORITIES**
                                   )
20              Defendant.         )
                                   )   Date:      July 24, 2006
21  _____  )   Time:      1:30 P.M.
                                       Ctrm:      850
22

23  TO THE UNITED STATES ATTORNEY:

24        PLEASE TAKE NOTICE that on July 24, 2006 at 1:30 p.m.

25  or as soon thereafter as counsel may be heard, the Defendant,

26  ROBERT LEE GRIFFIN, will move the Court for an order dismissing

27  Count Two based on the statute of limitations.

28        This motion is based upon the attached memorandum of

                                  46        1        EXHIBIT A

1  points and authorities and any further argument or evidence
2  presented at the hearing on the motion.

3  Dated:       June 23, 2006

4                                                *Joseph F. Walsh*
                                                JOSEPH F. WALSH

5

6                                                *Michael M. Crain*
7                                                MICHAEL M. CRAIN

8                                                Attorneys for Defendant
                                                 ROBERT LEE GRIFFIN
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## STATEMENT OF THE FACTS

Robert Lee Griffin is charged in Count 2 of the indictment with the crime of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C. §1962(d). The indictment was returned on October 16, 2002. Mr. Griffin moves to dismiss Count 2 on the grounds that it is now barred by the five year statute of limitations. 18 U.S.C. §3282.

Count 2 alleges that on a date unknown and continuing to at least July 25, 2002, Robert Lee Griffin and various co-defendants conspired to operate the Aryan Brotherhood, a RICO enterprise, through a pattern of racketeering activity. It alleges that the Aryan Brotherhood is a prison gang operating in the California state prison system. Robert Griffin is alleged to be a member of the California Commission of the Aryan Brotherhood. Mr. Griffin is said to have participated indirectly in the commission of six murders and three attempted murders, all occurring more than five years before the return of the indictment in this case.

The murders and attempted murders are alleged to have occurred on the following dates: July 3, 1982, the murder of Steven Clark; February 13, 1983, the murder of Richard Barnes; October 6, 1983, the murder of Richard Andreason; October 15, 1988, the murder of Thomas Lamb; March 13, 1990, the attempted murder of Jeffrey Barnett; September 30, 1993, the attempted murder of Jimmy Lee Inman; March 1, 1992, the attempted murder of Joel Burkett; February 7, 1996, the murder of Arthur Ruffo; and

38

3

1  July 25, 1997, the murder of Aaron Marsh.

2       Robert Griffin withdrew from and dropped out of the
3  Aryan Brotherhood in 1985.  He married an attorney, Pamela
4  Griffin.  Since 1985, Mr. Griffin, with the help of his attorney-
5  wife, has tried to secure a transfer from the high security
6  Segregated Housing Unit (SHU) at Pelican Bay State Prison, where
7  suspected gang members are housed in solitary confinement.  In an
8  unpublished opinion of the United States Court of Appeals for the
9  Ninth Circuit, the Court summarized Mr. Griffin's efforts to be
10 transferred out of the SHU at Pelican Bay State Prison.  Griffin
11 v. Gomez, 1998 U.S.App. LEXIS 3152. (Exhibit A).  The Opinion
12 notes that Mr. Griffin filed a petition for writ of habeas corpus
13 in the United States District Court in March of 1992, alleging
14 that his indefinite solitary confinement in the SHU at Pelican
15 Bay violated the Due Process Clause and the Eighth Amendment.
16 The habeas petition based his legal claims on the fact that Mr.
17 Griffin was no longer a member of the Aryan Brotherhood. Ibid.

18      The indictment charging Mr. Griffin with participation
19 in a RICO conspiracy was returned on October 17, 2002.  The five
20 year statute of limitations began running in 1985 when Robert
21 Griffin withdrew from participation in the Aryan Brotherhood.
22 The statute of limitations expired five years later in 1990 and
23 now bars any RICO conspiracy charge.

24      In March of 1992, Robert Griffin filed a petition for
25 writ of habeas corpus challenging his confinement in the SHU.  As
26 of that date, the court action made it clear that Mr. Griffin had
27 withdrawn from the Aryan Brotherhood.  If the statute of
28 limitations began running from the March 1992 date of the court

39       4

1  action, it would bar any RICO conspiracy indictments after March
2  of 1997.

3       The last racketeering act alleging Mr. Griffin's
4  participation in the RICO conspiracy is the July 25, 1997 Aaron
5  Marsh murder.  Five years after this last racketeering act would
6  be July 25, 2002 and the five year statute of limitations will
7  bar any indictment of Mr. Griffin on the RICO conspiracy charge
8  after July 25, 2002.  Since the indictment was returned three
9  months later on October 17, 2002,  Count 2 alleging the RICO
10  conspiracy must be dismissed under the statute of limitations.

11
12                           **ARGUMENT**
13                              I
14       **COUNT 2 CHARGING A RICO CONSPIRACY SHOULD BE**
15       **DISMISSED BASED ON THE STATUTE OF LIMITATIONS**
16

17       The RICO statute contains no express statute of
18  limitations for criminal prosecutions.  However, the United
19  States Supreme Court has held that the five year statute of
20  limitations set forth in 18 U.S.C. §3282 for non-capital federal
21  offenses is the applicable statute of limitations for criminal
22  RICO offenses.  Agency Holding Corp. v. Malley-Duff and Assoc.,
23  483 U.S. 143, 155 (1987).  Section 3282 provides:  "Except as
24  otherwise expressly provided by law, no person shall be
25  prosecuted, tried, or punished for any offense, not capital,
26  unless the indictment is found or the information is instituted
27  within five years next after such offense shall have been
28  committed."

1    The limitations period is measured from the point at
2  which the crime is completed.  See, <u>Toussie v. United States</u>, 397
3  U.S. 112, 115 (1970).  Because the RICO conspiracy statute does
4  not require proof of an overt act, "the crime of RICO conspiracy
5  is not complete until the purposes of the conspiracy either have
6  been accomplished or abandoned."  <u>United States v. Persico</u>, 832
7  F.2d 705, 713 (2nd Cir. 1987).

8    In the case of Robert Griffin, he withdrew from
9  participation in the Aryan Brotherhood in 1985.  He married his
10 wife, Pamela Griffin, an attorney.  With the help of his
11 attorney-wife, Robert Griffin separated himself from the Aryan
12 Brotherhood worked toward his release from solitary confinement
13 in the Segregated Housing Unit (SHU) at Pelican Bay State Prison.

14    In March of 1992, Mr. Griffin filed a petition for writ
15 of habeas corpus in the United States District Court in the
16 Northern District of California alleging that he was no longer a
17 member of the Aryan Brotherhood.  He asked the District Court to
18 order his release from indefinite solitary confinement in the
19 SHU.  (Exhibit A)

20    The last racketeering act in the indictment alleging
21 Mr. Griffin's involvement in the RICO conspiracy in Count 2 is
22 the July 25, 1997 Aaron Marsh murder. Whether the Court accepts
23 1985, 1992, or July 25, 1997 as the point in time when Mr.
24 Griffin withdrew from the Aryan Brotherhood, an indictment
25 returned on October 17, 2002 is more than five years later.
26 Therefore, the five year statute of limitations bars Mr.
27 Griffin's prosecution on the RICO conspiracy and the Court should
28 dismiss Count 2 of the indictment.

If the Court denies a motion to dismiss Count 2 of the indictment, Mr. Griffin will raise the statute of limitations as an affirmative defense at trial. See, United States v. Carlson, 235 F.3d 466, 469 (9th Cir. 2000).   A defendant in a criminal case is entitled to have the jury instructed that it may not convict the defendant unless his conduct fell within the five year statute of limitations.  See, Yates v. United States, 354 U.S. 298, 312 (1957); United States v. Montgomery, 384 F.3d 1050, 1063 (9th Cir. 2004); United States v. Fuchs, 218 F.3d 957, 961-962 (9th Cir. 2000); United States v. Carlson, supra, at 471. Thus, if a pretrial motion under Rule 12 to dismiss the indictment based on the statute of limitations is denied, Mr. Griffin will raise this defense at trial and will request jury instructions on the statute of limitations defense.

Dated:     June 23, 2006

JOSEPH F. WALSH

MICHAEL M. CRAIN
Attorney for Defendant
ROBERT LEE GRIFFIN

42    7

# EXHIBIT A

43

LEXSEE 1998 U.S. APP. LEXIS 3152

**ROBERT LEE GRIFFIN**, Petitioner - Appellant, v. **JAMES GOMEZ**, Director; **CHARLES D. MARSHALL**, Warden, Respondents - Appellees.

No. 95-16684

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

*1998 U.S. App. LEXIS 3152*

June 11, 1996, Argued and Submitted, San Francisco, California
February 24, 1998, Filed

**NOTICE:** [*1] RULES OF THE NINTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *1998 U.S. App. LEXIS 11428.*

**PRIOR HISTORY:** Appeal from the United States District Court for the Northern District of California. D.C. CV-92-01236-EFL. Eugene F. Lynch, District Judge, Presiding.

**DISPOSITION:** AFFIRMED IN PART AND REMANDED.

**COUNSEL:** For ROBERT LEE GRIFFIN, Petitioner - Appellant: Pamela Griffin, Omaha, NE.

For JAMES H. GOMEZ, CHARLES D. MARSHALL, Respondents - Appellees: Bruce M. Slavin, Dep. Atty. General, Morris Lenk, AAG, ATTORNEY GENERAL'S OFFICE, San Francisco, CA.

**JUDGES:** Before: HUG, Chief Judge, SCHROEDER, and HAWKINS, Circuit Judges.

**OPINION:**

MEMORANDUM *

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3.

Robert Lee Griffin ("Griffin"), who is serving a life sentence for a 1974 assault on another inmate, filed a habeas petition challenging his indefinite confinement in the [*2] Segregated Housing Unit ("SHU") at Pelican Bay State Prison. He contends that his indefinite confinement, which is based on his alleged membership in the Aryan Brotherhood prison gang, violates the Due Process Clause and the Eighth Amendment. He also claims that the "debriefing requirement" violates the Due Process Clause, as well as the Fifth and Eighth Amendments. The district court denied his petition. We have jurisdiction pursuant to *28 U.S.C. § 2253*, and we affirm in part and remand for reconsideration in light of intervening authorities.

Griffin filed this habeas petition in March 1992. In December 1993, the district court held that Griffin's claims were properly brought in a habeas petition; stayed his Fifth Amendment challenge to the debriefing process pending the completion of the Madrid litigation, *Madrid v. Gomez, 889 F. Supp. 1146 (N.D. Cal. 1995);* held that as a member of the then-pending Madrid class action, Griffin was precluded from challenging on due process grounds the gang-member segregation and debriefing policies; and dismissed his Eighth Amendment claim. The district court allowed Griffin's individual due process claim addressing his personal indeterminate [*3] retention in SHU to go forward. In August 1994, the district court granted respondents' motion for summary judgment, concluding that the procedures used for Griffin's placement and detention satisfied due process. The district court also found that "some evidence" supported the decision to segregate and retain Griffin in the SHU.

In June 1995, following the completion of the Madrid class action, the district court addressed Griffin's remaining Fifth Amendment claim and granted respondents' supplemental motion for summary judgment. The district court held that the debriefing process did not violate Griffin's Fifth Amendment privilege.

I. Section 1983 Complaint v. Habeas Petition

Respondents contend that Griffin's habeas petition challenges the conditions rather than the legality or duration of confinement, and thus should have been construed by the district court as a § 1983 civil rights claim. See *Crawford v. Bell, 599 F.2d 890, 891 (9th Cir. 1979)* (limiting the scope of habeas petitions to "attacks upon the legality or duration of confinement"). Respondents' argument is foreclosed by *Bostic v. Carlson, 884 F.2d 1267 (9th Cir. 1989),* in which we held that [*4] "habeas corpus jurisdiction is also available for a prisoner's claims that he has been subjected to greater restrictions of his liberty, such as disciplinary segregation, without due process of law." *Id at 1269.* n1 Thus, Griffin's claim that he is being subjected to a heightened level of confinement in violation of due process was properly brought as a habeas petition.

n1 In support of this proposition, Bostic cited *McCollum v. Miller, 695 F.2d 1044, 1046 (7th Cir. 1982),* which held that "habeas corpus can be used to get from a more to a less restrictive custody," in that case from disciplinary confinement in a "Control Unit" to confinement with the general prison population. Although the McCollum holding was refined somewhat in *Graham v. Broglin, 922 F.2d 379, 381 (7th Cir. 1991)* (holding that McCollum rule applies whenever prisoner seeks "a quantum change in the level of custody"), the notion that habeas is the appropriate form of relief for a prisoner seeking a change in custody level has been expressly reaffirmed by the Seventh Circuit. See, e.g., *Graham, 922 F.2d at 381* (noting that one example of a "quantum change in the level of custody" is release to the general prison population from solitary confinement); *Jackson v. Carlson, 707 F.2d 943, 946 (7th Cir. 1983)* (citing McCollum for proposition that "habeas corpus is the proper remedy for getting from a more to a less restrictive custody.").

[*5]

## II. Res Judicata/Collateral Estoppel

Respondents next argue that even if Griffin's claims were properly brought in a habeas petition, res judicata principles preclude Griffin from litigating any claims addressed in Madrid. Res judicata and collateral estoppel, however, do not apply to habeas proceedings. See, e.g., *Clifton v. Attorney General, 997 F.2d 660, 663 n.3 (9th Cir. 1993); Burnside v. White, 760 F.2d 217, 219 (8th Cir. 1985)* ("While a plaintiff in a § 1983 action may, in a proper case, be bound by a determination on the merits

by another court, a decision in another case is not res judicata as to a habeas proceeding.") (quotations and citation omitted); *Hardwick v. Doolittle, 558 F.2d 292, 295 (5th Cir. 1977)* ("The doctrines of res judicata and collateral estoppel are not applicable in habeas proceedings."). In a case with a similar procedural posture, the Seventh Circuit rejected the state's argument that an inmate should be barred by res judicata from bringing a habeas claim that was substantially similar to a claim that inmate brought earlier as a § 1983 action. See *Heirens v. Mizell, 729 F.2d 449, 456 (7th Cir. 1984).* The court disposed [*6] of the state's argument by noting that "a decision in another case is not res judicata as to a habeas proceeding.'" Id. (quoting *Warren v. McCall, 709 F.2d 1183, 1184 n.4 (7th Cir. 1983)).* Because the Madrid class action has no preclusive effect in habeas proceedings, we reject respondents' res judicata argument.

## III. Indefinite Confinement in the SHU and Due Process

The threshold question for purposes of Griffin's due process claims is whether Griffin has a state-created liberty interest in remaining free from administrative segregation. At the time Griffin's petition was denied by the district court, it was well established in this circuit that a prisoner has a cognizable liberty interest in remaining free from confinement in the SHU. See, e.g., *Cato v. Rushen, 824 F.2d 703, 704 (9th Cir. 1987).* Nevertheless, because *Sandin v. Conner, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995),* issued after the district court denied Griffin's petition, substantially altered the contours of state-created liberty interests in the prison disciplinary context, we remand for a review of the record in light of Sandin, including consideration [*7] of whether the "atypical and significant hardship" standard announced in Sandin extinguishes the previously-recognized liberty interest in remaining free from administrative segregation.

## IV. Debriefing and the Fifth Amendment

Petitioner argues that the debriefing requirement violates his Fifth Amendment right against self-incrimination. The state does not contend that Griffin will not be required to divulge information regarding criminal activity, but argues that (1) the Fifth Amendment does not apply to the debriefing process, and (2) even if it does apply, Griffin's rights have not been violated.

The standard for evaluating whether an individual has a legitimate Fifth Amendment claim is well established. The Fifth Amendment "'can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures which the witness reasonably

believes could be used in a criminal prosecution or could lead to other evidence that might be so used.'" *United States v. Bodwell*, 66 F.3d 1000, 1001 (9th Cir. 1995) (quoting *Kastigar v. United States*, 406 U.S. 441, 444-45, 32 L. Ed. 2d 212, 92 S. Ct. [*8] 1653 (1972)); *see also NLRB v. Trans Ocean Export Packing, Inc.*, 473 F.2d 612, 617 (9th Cir. 1973) (noting that Fifth Amendment does not apply "if, under the circumstances, the witness may not reasonably apprehend that the disclosures he is called upon to make could be used against him in a criminal prosecution or could lead to other evidence that might be so used"). Because Griffin does not satisfy this standard, we reject his Fifth Amendment claim.

Griffin does not have a reasonable belief that disclosures made during debriefing could be used against him in a criminal proceeding. n2 It is uncontroverted in the record that "an inmate who debriefs need not necessarily provide information about his criminal activities, if any. It is sufficient for purposes of testing his sincerity if he provides information about the identities and criminal activities of other inmates affiliated with the prison gang." Moreover, nothing in the record indicates that information gained from debriefing has ever been used in any criminal proceeding. Cf. *Baxter*, 425 U.S. 308 at 317, 47 L. Ed. 2d 810, 96 S. Ct. 1551 ("The state has not . . . sought to make evidentiary use of his silence at the disciplinary hearing in any criminal proceeding."). [*9] Rather, the information is used to verify an inmate's abandonment of a prison gang. In sum, while indefinite SHU confinement undoubtedly places immense pressure on gang-validated inmates to debrief, nothing in the record establishes that Griffin has a reasonable belief that the information gained during debriefing could be used against him in a future criminal proceeding. We therefore reject petitioner's Fifth Amendment claim and uphold the district court's decision on this issue.

n2 The state argues that two cases, *Baxter v. Palmigiano*, 425 U.S. 308, 47 L. Ed. 2d 810, 96 S. Ct. 1551 (1976), and *Taylor v. Best*, 746 F.2d 220 (4th Cir. 1984), dispose of Griffin's Fifth Amendment claim. We agree with petitioner that both are distinguishable. While each indicates that the Fifth Amendment has a relatively limited

reach when inmates are questioned for prison administrative purposes, neither controls whether Griffin has a reasonable belief that information gained during debriefing will be used in a future criminal proceeding.

[*10]

## V. Indefinite Confinement in the SHU Pending Debriefing and the Eighth Amendment

Griffin contends that his indeterminate segregation in the SHU, coupled with the debriefing requirement, which Griffin argues requires him to "jeopardize his personal safety and the safety of his family" in order to gain release from the SHU, constitutes cruel and unusual punishment in violation of the Eighth Amendment. We remand Griffin's Eighth Amendment claims for reconsideration in light of *Madrid*, 889 F. Supp. at 1146, issued after the district court denied his petition. The Madrid class action addressed in detail the factual and legal issues raised in Griffin's Eighth Amendment claim, n3 and its effect on the analysis of the record in this case should be determined in the first instance by the district court.

n3 Griffin was a member of the Madrid class, which included "all prisoners who are, or will be, incarcerated by the State of California Department of Corrections at Pelican Bay State Prison." *Madrid*, 889 F. Supp. at 1155.

[*11]

## VI. Griffin's Other Claims

On remand, the district court, in the course of integrating Sandin and Madrid into its decision, may, but is not required to, review again its determinations with respect to the other issues raised by Griffin. When the district court's review is complete, it should include all of its determinations in a final appealable order.

AFFIRMED IN PART AND REMANDED.

## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California.

I am over the age of 18 and not a party to the within action; my business address is 316 West Second Street, Suite 1200, Los Angeles, California 90012.

On June 23, 2006, I served the foregoing document described as **NOTICE OF MOTION AND MOTION TO DISMISS COUNT TWO BASED ON THE STATUTE OF LIMITATIONS; MEMORANDUM OF POINTS AND AUTHORITIES** on interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

MARK CHILDS
ASSISTANT U.S. ATTORNEY
1400 UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA 90012

I am readily familiar with the firm's practice of collection and processing of correspondence for mailing. Under that practice, it is deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date on the envelope is more than one day after date of deposit for mailing contained in the affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 23, 2006, Los Angeles, California.

_____
CANDACE PARK

41    8

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

Priority ✓
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

Case No.   CR 02-938(A)-RGK                                        Date   AUG 1 4 2006

Present: The Honorable   R. GARY KLAUSNER, UNITED STATES DISTRICT COURT JUDGE

Interpreter   N/A

| Sharon L. Williams | Not Reported | Not Present |
|---|---|---|
| Deputy Clerk | Court Reporter/Recorder, Tape No. | Assistant U.S. Attorney |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| ROBERT LEE GRIFFIN | N | X | | J. Walsh, M. Crain | N | X | |
| JOHN WILLIAM STINSON | N | X | | P. Potter, T. Bennett | N | X | |
| DAVID ALLEN CHANCE | N | X | | J. Cotsirilos, K. Johnson | N | X | |
| RICHARD LLOYD TERFLINGER | N | X | | S. Perlo, M. Lombard | N | X | |

Proceedings:   **(IN CHAMBERS) ORDER RE: DEFENDANT STINSON'S MOTION TO LIMIT EVIDENCE PURSUANT TO F.R.E. §§ 403 & 404(b) (DE 3220)**

On June 22, 2006, Defendant John William Stinson ("Defendant") filed the present Motion to Limit Evidence Pursuant to F.R.E. §§ 403 & 404(b). In his Motion, Defendant seeks an Order from the Court requiring the Government to specify any evidence of uncharged crimes that the Government intends to introduce pursuant to Fed. R. Evid. 404(b) and to exclude any such evidence that may be more prejudicial than probative pursuant to Fed. R. Evid. 403.

Upon consideration of Defendant's arguments, the Court **grants in part** Defendant's Motion. The Government may not offer evidence as to any acts that are unrelated to the Aryan Brotherhood as alleged in the indictment, unless they provide pre-trial, advance notice.

**IT IS SO ORDERED.**



DOCKETED ON CM
AUG 1 5 2006
BY _____ 172

Initials of Deputy   stw
Clerk

3597

cc:

48


EXHIBIT B

JOSEPH F. WALSH

ATTORNEY AT LAW

316 WEST SECOND STREET, SUITE 1200

LOS ANGELES, CALIFORNIA 90012

CERTIFIED SPECIALIST
CRIMINAL LAW

AREA CODE 213
TELEPHONE 627-1793
627-1736
FAX 489-4700

September 15, 2006

Mark Childs, Assistant U.S. Attorney
Mark Aveis, Assistant U.S. Attorney
312 North Spring Street
Los Angeles, California 90012

Dear Mr. Childs and Mr. Aveis,

Pursuant to Fed. Crim. Proc. Rule 16, Counsel for defendant Robert Lee Griffin are hereby providing copies of documents that may be used in the defendant's case in chief. The documents are:

1. Mr. Griffin's Petition for Writ of Habeas Corpus filed in the U.S. District Court in San Jose.

2. The District Court's order directing the C.D.C. to release Mr. Griffin from confinement in the SHU at Pelican Bay State Prison.

3. Court records from the San Bernardino County Superior Court showing that Mr. Griffin was found not guilty of the murder of Steven T-Bone Gibson.

4. A subpoena returned from the West Valley Detention Center, San Bernardino County Jail, with the declaration of Sergeant Jay Blankenship showing no records of gang activity or taped conversations involving Mr. Griffin at WVDC.

5. Letter from Deputy District Attorney James Fallman.

6. Letter from Ron Forbush, Private Investigator.

7. C.D.C. appeal records related to Mr. Griffin's request to remove tattoos.

8. C.D.C. appeal records related to Mr. Griffin's declaration stating his desire to separate himself from

EXHIBIT C

all gang members.

9.    C.D.C. records from the Central File of Arthur Ruffo relating to his enemies list.

Counsel for Mr. Griffin also intend to use several documents from Mr. Griffin's C.D.C. Central File.  Since we received a copy of Mr. Griffin's Central File from Assistant United States Attorney Gregory Jessner as a part of the discovery provided by the Government, there is no need for defense counsel to provide copies back to the Government.  In an effort to comply with the Court's September 15, 2006 compliance date, we are at this point designating all of the documents in Mr. Griffin's Central File as Defense Rule 16 documents.

As we get closer to trial we will select a smaller number of documents out of the Central File to be used as evidence.  Because of the complexity of the case, and the continuing nature of our trial preparation, we have not made a decision at the present time which documents from the Central File we will be using.  Once we have made a decision we will prepare exhibit books and provide the Government with copies of our exhibits.

                    Sincerely,

                    JOSEPH F. WALSH

**Childs, Mark (USACAC)**

| | |
|---|---|
| **From:** | Childs, Mark (USACAC) |
| **Sent:** | Saturday, September 23, 2006 8:25 PM |
| **To:** | 'pepsquire@earthlink.net' |
| **Cc:** | Terry Bennett; Michael Crain; Joe Walsh; John Cotsirilos; Knut S.Johnson; Aveis, Mark (USACAC) |
| **Subject:** | 404(b) Disclosure (2nd Letter) |

**Attachments:** Discovery Letter re 404 b (No. 2 FINAL) .wpd

Attachments will be sent by overnight mail on Monday, September 25, 2006.

J. Mark Childs
Organized Crime Drug Enforcement Task Force
United States Attorney's Office -- CDC
312 N. Spring St., 14th Floor
Los Angeles, California 90012
(213) 894-2433 (direct)
(213) 894-0142 (fax)
Mark.Childs@usdoj.gov

51

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of transcription ___06/23/2005___

On 6/17/2005, James Aaron Prescott, aka Irish, date of birth ▮▮▮▮▮▮, FBI number ▮▮▮▮▮▮▮, Social Security number ▮▮▮▮, a member of the Nazi Low Riders (NLR) prison gang, was interviewed during a Proffer at the Los Angeles United States Attorney's Office (LAFO), 312 North Spring Street, Los Angeles, California.  Present during the proffer were Assistant United States Attorneys (AUSA) Adam Kamenstein and Kevin Lally, and Prescott's defense attorney ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  After being advised of the identity of the interviewing agents and the nature of the interview, Prescott provided the following information:

Prescott decided to proffer with the government regarding his RICO charges for family reasons and he is "Tired of it." Prescott and all of his co-defendants are "In the hat" (targeted for murder) as a result of this case.  Co-defendant and Aryan Brotherhood (AB) member Joey Hayes put everybody in the hat.  Hayes used to write to Prescott regarding the case because he trusted Prescott.  Approximately eight months ago, Hayes just stopped writing to him.



In 1998, Prescott came down from Pelican Bay State Prison (PBSP) to the West Valley Detention Center (WVDC) on a possession case.  Prescott was housed in unit 5D at WVDC.  NLR shot caller Joseph Lowery, aka Blue, was at WVDC at the time and housed in unit 5PIM (problem inmate).  Lowery gave the "Keys" (control) to unit 5D.  Lowery was given the "Keys" to all of unit 5 from Hayes.

NLR member Michael Mesa, aka Thumper, came into unit 5D on a parole violation.  Mesa was "Spun out" (high on drugs) and had hickies all over his neck.  Prescott knew Mesa was "In the hat" for

Investigation on ___6/17/2005___ at Los Angeles, California

File # ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮       Date dictated _____

by  SA David A. Volk
    SA Stacy K. Muldoon

**Confidential**

52

122543

FD-302a (Rev. 10-6-95)





Continuation of FD-302 of ___James Aaron Prescott___  .On 6/17/2005  . Page ___2___

not "Earning his letters" ("NLR" tattoo earned by putting in work for the gang). Prescott sent Lowery a "Kite" (surreptitious prison letter) regarding Mesa being "In the hat."

While Lowery was on the telephone on the recreation yard, he used sign language to tell Prescott to "Wack" (kill) Mesa by motioning with his finger across his neck.

Prescott went to NLR member Carl Davis, aka German, and told him to make a weapon. Davis was scared to help. Prescott then went to a visit with his mom. When he came back, he went to Davis' cell. All the cell doors were open after the count. Davis, however, had his door closed and slid the weapon under the door.

Prescott took the weapon to Mesa's cell and sliced Mesa in the neck. Davis was not in the cell during the time of the assault. During the assault, Prescott cut his own wrist on accident. Mesa punched Prescott in the face after Prescott sliced Mesa's neck. Prescott was so caught up in the assault that he left Mesa's cell with the knife instead of flushing it. Prescott gave the knife to his cell mate (not further identified - NFI) who flushed it down the toilet for him.

At first, Mesa did not leave his cell. Prescott and Davis went to Mesa's cell and told him to get out or they will kill him. Only then did Mesa hit his emergency button to alert deputies that he was injured.

Davis was only with Prescott after the assault to warn Mesa to leave. Davis did not take part in the actual assault. Prescott's intention was to kill Mesa.

A short time after Prescott assaulted Mesa, Prescott moved into a cell with NLR shot caller Michael Bridge, aka Snake. One day, Lowery and Bridge went to court together. Lowery told Bridge to "Hit" (kill) inmate Miles in his section at WVDC per AB shot caller Blinky (NFI). Miles was a black inmate in jail for rape. Bridge told Prescott that he was going to do the hit on Miles.

A couple of days later, Lowery kicked on the door to Prescott's unit from the recreation yard and told him to kill Miles, not just scratch him. Lowery told Prescott that they want Miles dead. Lowery also told Prescott that he was doing a good job and doing this hit for AB is a big honor.

**Confidential**

53

122544

D-302a (Rev. 10-6-95)

 

Continuation of FD-302 of _____ James Aaron Prescott _____ , On 6/17/2005 . Page 3

Prescott got a knife from Ontario Black Angels (OBA) gang member Hook (NFI). Hook was told to give the knife to the NLR by Mondo ▓▓▓▓▓▓. The "Piece" (weapon) was a piece of metal from the shower. Prescott put the handle on the knife himself. Prescott also made a razor weapon to cut himself with and throw down to make it look like Miles had a weapon too so he could argue self defense.

Bridge told inmate Ronnie Coyle, an NLR associate, to help Prescott with the assault. Prescott hid in the shower and waited for Coyle to tell him to go.

Coyle opened the shower door and told Prescott to go. Prescott came out of the shower and stabbed Miles while he was turned away.

Prescott heard deputies yelling for Prescott to drop the knife. Prescott dropped the knife and saw Miles go for it. Prescott kicked the knife away and Miles punched him in the face. Prescott and Miles fought until the deputies broke it up with pepper spray. Prescott got down and saw Miles coming to kick him. Deputies forced Miles to the ground.

Prescott was sent to the barber shop which was connected to where Lowery was by the air vent. Lowery yelled through the vent to Prescott telling him he did a good job. After about forty minutes in the barber shop, Prescott was sent to unit 7PIM where Richie was housed at the time.



While in 7PIM, Prescott was given a hacksaw blade by inmate Art (NFI). Prescott began to use the hacksaw blade to cut the metal in his cell for making weapons. After about week in 7PIM, Prescott was sent back to unit 5A. Prescott was not able to finish cutting the metal before he was transferred but was able to sneak the hacksaw blade with him.

Approximately two days after transferring to unit 5A, Bridge sent Prescott a "Kite" telling him he did a good job and that he was now in the "Circle of the chosen few."

Confidential

54

EXHIBIT D   122545

D-302a (Rev. 10-6-95)




continuation of FD-302 of __James Aaron Prescott__ _____ . On 6/17/2005 . Page 4

Three or four days after his move to 5A, Prescott gave the blade to a southsider named Flaco (NFI). Prescott told Flaco to give the blade to Lowery.



After committing the assaults at WVDC, Prescott was sent to the California Institution For Men (CIM) in Chino, California, and then to Corcoran State Prison (CSP) in Corcoran, California. Before getting sent to PBSP, Prescott was sent back down to the Presley Detention Center (PDC) in Riverside, California, to face charges of Penal Code 245a; Assault With A Deadly Weapon.

Prescott met NLR member Matthew Nall, aka Auto, in unit A2. Nall was living with Youngster from San Fernando Valley (NFI). Donny Trout and Billy Austin were also at PDC for a murder charge.

While at PDC, Youngster disrespected Austin. As a result, Austin told Prescott to tell Nall to "Hit" (kill) his cell mate.



At that same time, NLR member Sean Greenblatt, aka Spanky, came in from CIM spouting "Fuck The Brand" (FTB) politics (a movement within NLR to separate from AB). Prescott invited Greenblatt to move in with him to handle it since Prescott supported the AB and not FTB. Greenblatt was with ▉▉▉▉ at the time. Prescott sent Greenblatt a "Kite" ordering him to handle ▉▉▉. Instead, Greenblatt showed ▉▉▉ the "Kite."

A short time later, Prescott was sent to Delano State Prison (DSP) where he met up with AB member Micky ▉▉▉▉. Soon after, Nall transferred to DSP and asked Prescott to move in with him to handle their business. They moved in together and Nall told Prescott he wants to "Clean it up." Prescott said okay.

Confidential                                      55                                      122546

FD-302a (Rev. 10-6-95)





Continuation of FD-302 of ____James Aaron Prescott_____ , On 6/17/2005 , Page    5

        Johnny Boy from Big Bear (NFI), who was "In the hat," was transferred to DSP.  Nall wanted to "Hit" Johnny Boy to "Clean up."

        Mickey sent Prescott a weapon packaged in some cookies to use on ▮▮▮▮.  Nall opened the cookies and found the weapon. Instead of giving the weapon to Prescott, Nall "Took it to the hoop" (put it in his rectum).

        Prescott told Micky through sign language that Nall had the weapon.  Micky told Prescott to get it back from Nall. Prescott told Micky to send Nall a bogus "Kite" about giving the weapon to Prescott.  Micky sent Nall the bogus "Kite" and Nall gave Prescott the weapon.

        Prescott told Nall to stand guard while he (Prescott) "Took it to the hoop."  While Nall's back was turned, Prescott stabbed him.  Prescott flushed the knife and told the guards to get Nall out of the cell.

        During a cell search, guards found a nail hidden behind the air vent.  The nail was not used in the assault.

Confidential

56

122547



### REPORT OF INTERVIEW

With David Griffin on January 14, 2003, with
Special Agent Michael Halualani, and Special
Agent Daniel Smith, California Department of
Corrections - Special Services Unit, Sacramento,
California. Mr. Griffin stated the following:

Griffin stated that he is a former member of the Nazi
Lowrider prison gang.  In 1999, while incarcerated at Palm
Hall in the California Correctional Institution in Chino,
California, he began associating with members of the Aryan
Brotherhood prison gang. He further stated that he was in
Palm Hall from January 1999 until December 1999, and Aryan
Brotherhood members Robert Griffin, John Harper, Joey
Hayes, and William Petersen were present at one time or
another with him during that time frame.  Griffin added
that while he was incarcerated at Palm Hall he was one of
the ranking members of the Nazi Lowriders and was "given
the keys" by the Aryan Brotherhood members to "run" the
criminal activities of white inmates in Palm Hall.

During his incarceration in Palm Hall, he met California
commission member Robert Griffin and spoke with him on
numerous occasions.  Robert Griffin told him that no
murders or assaults were to occur while Robert Griffin was
being held in Palm Hall but upon his departure from Palm
Hall, Griffin was ordered to murder or arrange the murders
of Maurice Matthews, Mike Hykes (sic.), "Kimo", "Lefty"
Hack, and "Ocean Blue" (████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████)
Furthermore, Robert Griffin told him that he wanted
"Lawless" murdered because "Lawless" had "ratted out"
Robert Griffin while Robert Griffin was in the San
Bernardino County Jail.

Also, while incarcerated in Palm Hall, he was told by Aryan
Brotherhood members John Harper and Joey Hayes to murder
his cellmate, Timothy Shriver.  Griffin stated that he
attempted to murder Shriver but was unable to complete the
murder because the knife he was using bent while he was
stabbing Shriver.

57

Prior to his release from custody, he was told by Aryan Brotherhood members Mark Glass and Gary Littrell to begin manufacturing and trafficking in methamphetamine. Furthermore, he was instructed to provide a percentage of the proceeds of the narcotics trafficking to Glass' point person in Lancaster, California, and that if she was unavailable, he should contact Littrell's wife in Ventura, California.  He was provided the address and telephone numbers of both individuals.  He stated that while on parole, he provided narcotics to Aryan Brotherhood member Danny Christiansen.  Furthermore, he was later told that Simone Lawrence was a point person for the Aryan Brotherhood and would relay messages and orders for the Aryan Brotherhood.

Finally, on July 18, 2002, he spoke with Robert Griffin in the Visiting Room at Pelican Bay State Prison in Crescent City, California.  Robert Griffin told him that if he provided information to law enforcement regarding Robert Griffin's activities at the California Correctional Institute in Chino, California, he would have Griffin's family murdered by the Aryan Brotherhood.

Confidential

58

122549



## REPORT OF INTERVIEW

With David Griffin on March 25, 2003, with
Special Agent Michael Halualani, and Special
Agent Daniel Smith, California Department of
Corrections - Special Services Unit, Sacramento,
California. Mr. Wilson stated the following:

He first came into contact with members of the Aryan
Brotherhood while incarcerated in the California Institute
for Men in Chino, California, in 1997.  Mr. ███████ added
that in 1999 while incarcerated at Corcoran State Prison in
Corcoran, California, he met with Aryan Brotherhood members
Gary Littrell and Mark Glass.  At this time, Glass told him
that when he was released from custody he was to begin
smuggling illegal narcotics into Corcoran for the Aryan
Brotherhood to sell and use.  Furthermore, Littrell told
him that he had placed "Pig Pen", Danny Shores (sic.),
"Mylo", "Wicked" and "Cowboy", "in the hat" for failing to
follow the orders of the Aryan Brotherhood.

In 2000, he was again incarcerated in the California
Institute for Men in Chino, California.  At this time, he
was housed with California commission member Robert Griffin
and Aryan Brotherhood member John Harper.  While in the
California Institute for Men, Griffin and Harper approved
the murder of Nazi Lowrider member "Buckethead".
Furthermore, "Thrasher" from Long Beach attempted to murder
"Buckethead" on the recreation yard at the California
Institute for Men after approval was received from Griffin
and Harper.  Finally, other members of the Nazi Lowriders
told him that no crimes were to be committed at the
California Institute for Men unless specifically approved
by Griffin because Griffin did not want any crimes
occurring while he was at the California Institute for Men.
They also told him that at that time, Richard Terflinger
and John Stinson were in charge of the Aryan Brotherhood.

59

State of California

# Memorandum

**CONFIDENTIAL**

103

attest that it accurately relates the information I provided. The original document
appear on any attached written statement.

*David Griffin*  5/17/02
Name                    Date

**Date**     May 17, 2002

**Approved for Confidential**

Signature     Date

**To**      Mark D. Castellaw
Investigative Captain
Investigative Services Unit

**From**    Department of Corrections
Pelican Bay State Prison, P. O. Box 7000, Crescent City, CA 95532-7000

**Subject**  DEBRIEFING OF DAVID GRIFFIN, *(SUBJECT)*, █████ AKA "BUCKETHEAD FROM
SAN GABRIEL VALLEY," VALIDATED MEMBER OF THE NAZI LOW RIDER *(NLR)*,
CII █████████ DOB █████

**Confidentiality:** This report is confidential in accordance with the California Code of
Regulations *(CCR)*, Title 15, Division 3, Subchapter 4, Article 5, and Section 3321 *(a) (1 & 2)*.
In that other confidential informants are named within this report for the purpose of
corroborating Subject's information, portions of this report are deemed confidential to him as
well. *Information in Italics is supplied by staff.*

On February 15, and May 16, 2002, I interviewed inmate **David GRIFFIN**, █████, **AKA
"Buckethead from San Gabriel Valley,"** a validated member of the Nazi Low Rider *(NLR)*
prison gang. The interview was relevant to his request to disassociate from the Nazi Low Rider
& the Aryan Brotherhood *(AB)* prison gangs.

GRIFFIN decided to disassociate from the NLR due to being tired of the lies and threats made
by the gang. He does not really agree with their goals and objectives or their use of threats and
intimidation to get others to further the gang's power. He now realizes that the gang is not
fighting for the betterment of the White inmates as he had first thought, but is actually using the
White inmates to gain more power for the individual high-ranking gang members. He does not
wish to be involved with the NLR any longer and just wants to be able to do his own time.

**Interview and written summary:** GRIFFIN relates that the first NLR activities began before
1997, however nothing notable occurred until November 1995, when GRIFFIN was on parole
and was arrested for guns found in a search of his residence. He was sent to the California
Institution for Men and housed in the West facility. There he met **"Lil Joe from La Puente"**
*(Joel AGENBROAD,* █████████ *)* AGENBROAD was NLR. Also on the yard were
**"Jimbo from Norwalk"** *(unable to further identify),* **"Boots from Orange County"** *(unable to
further identify),* **"Egor"** who claimed Peni *(Skinhead) (Shane DAVIS,* █████████
*"Egor"),* and **"Lippy from Costa Mesa"** *(Steven SHELEY,* █████████ *AKA "Lippy").*
GRIFFIN recalls that **"Squeek"** or **"Tweek from Orange County"** *(unable to further identify)*
was admitted into the NLR without having to do anything. **"Lil Joe"** AGENBROAD raised his
hand for GRIFFIN to become a NLR member and tattooed the letters NLR on his *(GRIFFIN's)*
neck. GRIFFIN recalls that up until that time the only other NLR he met was **"Shadow Orange
County"** *(unable to further identify)*

**CONFIDENTIAL**     **CONFIDENTIAL**

Mark D. Castellaw
Confidential Interview of GRIFFIN, ████
May 17, 2002
Page 2



GRIFFIN reports that he paroled soon after being made a member of the NLR. He did not meet up with any NLR on the streets until he was approached by "Termite from San Gabriel Valley" *(unable to further identify)*, who had a stolen car and wanted GRIFFIN to give him a ride from where he dumped the car. GRIFFIN was arrested March 5, 1997, for "Manufacture of a Controlled Substance" and went to the San Bernardino County Jail/West Valley. GRIFFIN recalls the only NLR in his section was Mike MESA *(Michael MESA,* ████ *AKA "Thumper from San Gabriel Valley")*. Joe LOWERY *(Joseph LOWERY,* ████*, AKA "Blue")* was across the way in another section. GRIFFIN remained there 35 or 36 days until he transferred to the California Correctional Institution *(CCI)* for reception. While there at CCI Jimmy MORGAN from Orange County *(James MORGAN,* ████ *AKA "Jimmy")* raised his hand for "Billy GARCIA from Norwalk *(unable to further identify)*, who had been prospecting *(being looked at and doing things for the gang)*, to become a member

From CCI GRIFFIN transferred to Ironwood State Prison *(ISP)*. Billy GARCIA was transferred with GRIFFIN. GRIFFIN recalls the following NLR there at ISP, ████



*(requested Protective Custody)* when GRIFFIN arrived at ISP. GRIFFIN related that ████ who "checked in" ████ thought he was going to be stabbed so he "checked in." GRIFFIN states that the NLR and the Blacks got into a race riot and most of them went to the Administrative Segregation Unit *(ASU)* over the incident. While there the Gang Investigation Unit held "Peace Talks" with the inmates and asked GRIFFIN to represent the Whites. GRIFFIN agreed and a deal was made to allow only five or six of the seventy-five inmates locked up over the incident-to be released to the main line. GRIFFIN took Lonnie Ray SCOTT to the yard with him to quell the tension between the Blacks and Whites.

GRIFFIN stated that his participating in the staff's "Peace Talks" came back to haunt him when a couple of months later when out of the blue he was moved from the Facility C Yard to the Facility D Yard and celled with the Facility Captain's clerk. GRIFFIN was only housed with

Reviewed by ████

David Griffin, E-79594

CONFIDENTIAL

Confidential

61

122552



Mark D. Castellaw
Confidential Interview of GRIFFIN, E███████
May 17, 2002
Page 3

the Captain's clerk seventeen days when he was placed in the Administrative Segregation Unit (ASU) and charged with running an institution wide extortion ring and ordering inmates assaulted and stabbed. GRIFFIN relates that he ordered **"Hillbilly from San Gabriel Valley"** *(unable to further identify)* to beat up his cellmate but that "Hillbilly refused to do it. GRIFFIN was issued a CDC-115 *(Rules Violation Report)* for this along with four other inmates. He was convicted of the charge and appealed it with an attorney and beat the CDC-115. He later learned that the CDC-115 had been fabricated. GRIFFIN was released to the Facility D Yard.

GRIFFIN was housed on Facility D Yard approximately 32 days until he was issued a CDC-115 for "Assault on Staff." He appealed the CDC-115 and won and was released to Facility C Yard where he remained until he paroled a couple months later on October 6, 1998.

After GRIFFIN paroled he began cooking dope and hooked up with several NLR on the street. The ones he could remember were ████████████████████████████████

████████████████████████████████████
█████████████████████████ **GRIFFIN** took dope to **"Parrot's from South Bay"** ████████house for him to get it to Lonnie Ray SCOTT and Wigmo who were still housed in Ironwood State Prison *(ISP)*. GRIFFIN also took dope to a Mexican's house in San Gabriel, who he did not know by name, who would get the dope to "Snake" MCCOY and "Trojan" SMITH. GRIFFIN did mail outs for "Wigmo" █████████████████████ ████). GRIFFIN was arrested for "Possession for Sale" on January 17, 1999.

GRIFFIN was sent to the California Institution for Men *(CIM)* in January and remained there through December of 1999. GRIFFIN relates that he had personal knowledge of NLR & AB prison gang activities from when he was housed in the California Institution for Men *(CIM)* and Palm Hall. He stated that it might be relevant to the RICO case the Federal Bureau of Investigation *(FBI)* unit was doing against AB & NLR gang members/associates. He related that he was housed in CIM Central on January 20th or 21st of 1999. On January 27, 1999, GRIFFIN was moved to the East Yard, which lasted only a couple days. On January 29, 1999, he and all the other NLR were moved to Palm Hall. He was released from Palm Hall on February 4, 1999. GRIFFIN was involved in an assault of a Skin, **"JR. from Ontario"** *(unable to further identify)* for running his mouth about the "Ride" *(NLR)* and was moved from Madrone Hall to Cypress Hall. "JR" ended up getting sliced for talking bad about Mikey Hikes *(Michael HIKES,*████████*, "Mikey")*. GRIFFIN recalls that the "FTB" *(Fuck The Brand)* faction of the NLR was very strong at CIM at this time. GRIFFIN, "Zak" Zak E. NEUBERT, ████████, **"Lil Hoss from San Diego"** *(*█████████████████████████ *(both NLR members)* received CDC-115's, Rule Violation Reports, *(verified by RFR # C-0047 dated 3-8-99)* for assaults on Black inmates. The shot caller for the "Bloods" *(*██████████████████████*)* disrespected

Reviewed by

David Griffin, E-79592



Mark D. Castellaw
Confidential Interview of GRIFFIN, ████
May 17, 2002
Page 4

some NLR members, who were housed in the Administrative Segregation Unit *(ASU)*. ████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

GRIFFIN went back to Palm Hall for this CDC-115. He remembers the following inmates were leaders of the FTB at that time; "Gangster from Norco-Inland Empire" *(Maurice MATHEWS, ████, AKA "Gangster")*; "Lefty from Anaheim-Orange County" *(Eric J. MACK, ████, AKA "Lefty")*; "Mikey from Anaheim-Orange County" *(Michael HIKES, ████, AKA "Mikey")*; "Foot from Westminster-Orange County" *(Mark MOEN, ████, AKA "Foot")*; "Bam Bam from Bell Gardens" *(Timothy SCHRIBER, AKA "Bam Bam")*; "Face from Orange County" *(William G. WRIGHT, ████, AKA "Face")*; and "Kemo from San Bernardino-Inland Empire" *(Mark CRAVER, ████, AKA "Kemo")*. "Gangster" MATHEWS had the "keys" *(White authorization)* to run CIM when GRIFFIN and he fought (████████. ████ "Big Hoss from Tustin-Orange County" *(James Anthony LAMBERT, ████, AKA "Big Hoss")*, and "Skully from Pamona-Inland Empire" *(Brian ROBERGS, ████. AKA "Skully)*, took the "keys" when "Gangster" MATHEWS was removed from the yard and placed on walk alone status. After this incident the NLR were split up. West Side Palm Hall, 3rd tier was for FTB. East Side was other NLR.

The "Brand" *(Aryan Brotherhood prison gang members)* who were there were "Joey" Joseph HAYES, D-05432; "Jodi" Joseph Howard LAMBERT, ████; "Blinky" Robert Lee GRIFFIN, B-26484; "Turtle" John Henry HARPER, ████ and "Hillbilly" Robert Allen PETERSON, ████ The Brand was in the process of trying to get their "Shit" together, kind of like the Mexican Mafia *(EME)* prison gang does, stop the gang banging. It's all about organized crime. "Hillbilly" PETERSON was putting together a crew for up North. "Turtle" HARPER asked GRIFFIN to help put it together and to manufacture speed for the Brand. "Turtle" HARPER told GRIFFIN he wanted to take him *(GRIFFIN)* to the top of the organization with him. After "Turtle" HARPER paroled he stayed in close contact with GRIFFIN through the mail, until he was violated. When GRIFFIN paroled he contacted him *(HARPER)* briefly, but stayed in close contact with ████████████████ ████ GRIFFIN sent money to ████ for "Turtle" HARPER.

GRIFFIN related that "Blinky" GRIFFIN tries to make everyone think that he is retired from the Brand, but he isn't. After "Turtle" HARPER left on parole he gave GRIFFIN *(Subject)* the "keys." Then around August of 1999, "Blinky" GRIFFIN drove up and would advise GRIFFIN *(Subject)* on a one to one basis. "Blinky" GRIFFIN's motto is three *(3)* people constitutes a conspiracy so he was careful to never do that. GRIFFIN *(Subject)* related that "Blinky" GRIFFIN would give people a pass if they asked for it, but once he *("Blinky" GRIFFIN)* leaves,

Reviewed by



David Griffin, E-79594

Confidential

63

EXHIBIT E 122554

Mark D. Castellaw
Confidential Interview of GRIFFIN,
May 17, 2002
Page 5



the passes were no good. "Blinky" GRIFFIN just did not want anything to happen while he was around, as this would implicate him in gang activity. "Blinky" GRIFFIN asked GRIFFIN (Subject) to talk to Correctional Lieutenant Maldanado to get "Gangster" MATHEWS re-assigned to their yard. GRIFFIN (Subject) stated that shortly after this conversation, sometime between August 25, 1999, and October 4, 1999, he overheard "Blinky" GRIFFIN tell "Turtle" HARPER, face to face, to tell "Gangster" MATHEWS he (HARPER) would raise his hand for him becoming a Brand member. This was a ploy to maneuver "Gangster" MATHEWS into a position to where the Brand could kill him at a later date, after "Blinky" GRIFFIN had left the prison. This ploy almost worked except the guy that was supposed to kill "Gangster" MATHEWS got scared once he got "Gangster" in his cell. GRIFFIN (Subject) could only remember that the guy who was supposed to kill "Gangster" MATHEWS went by the AKA of "Grumpy" (unable to further identify).

GRIFFIN relates that "Blue" Joseph LOWERY, ▮▮▮▮▮, personally told him that during the "Peace Talks" at Pelican Bay State Prison (PBSP), "Blinky" GRIFFIN told John William STINSON, C-40154, that he ("Blue" LOWERY) could and should be a Brand member. GRIFFIN (Subject) knew that "Joey" HAYES was raising his hand for him (LOWERY) to become a Brand member, but does not know who the second Brand member was that raised their hand for LOWERY. "Turtle" HARPER and "Joey" HAYES gave GRIFFIN (Subject) a "Green Light" to stab "Bam Bam" Timothy SCHRIBER. "Turtle" HARPER made the knife to stab "Bam Bam" ▮▮▮▮▮▮▮▮.

While housed at the California State Prison at Corcoran, "Buzz" Mark Anthony GLASS, C-38781, and Gary Joe LITTRELL, C-45888, told GRIFFIN (Subject) that they were in the process of organizing crime. This was the same thing "Turtle" HARPER and "Hillbilly" PETERSON was trying to do. GRIFFIN (Subject) told "Buzz" GLASS that "Turtle" HARPER had already asked him if he would be part of the organization and "Buzz" said fine and good. "Buzz" GLASS then gave GRIFFIN his wife's address, which was in ▮▮▮▮▮▮▮▮▮▮ "Buzz" told GRIFFIN that if he ever needed help, to get a hold of her and she would contact him. "Gary" LITTRELL gave GRIFFIN his wife's address and told him that if he ever needed help to get at her. GRIFFIN thinks the address was in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

GRIFFIN related that "Buzz" GLASS made it known that he really wants "Snake from Ontario" Michael BRIDGE, ▮▮▮▮▮, dead. "Snake" BRIDGE made numerous promises to "Buzz" GLASS and then did not follow through with his promises. "Buzz" GLASS never heard anything back from "Snake" BRIDGE and felt disrespected and that's why he wanted "Snake" BRIDGE hit.

Reviewed by

David Griffin, E-79594

EXHIBIT F    122555

Mark D. Castellaw
Confidential Interview of GRIFFIN,
May 17, 2002
Page 6



GRIFFIN was transferred to Pelican Bay State Prison *(PBSP)* and was housed in the same pod as "Blue" LOWERY  GRIFFIN knew "Blue" LOWERY briefly from the past and when he talked with "Blue," he ("Blue" LOWERY) told him he was on his way out to court for a case involving a southsider *(southern Hispanic)* named "Pelon." GRIFFIN told "Blue" LOWERY that "Pelon" had been charged with a murder while housed in the San Bernardino County Jail *(unable to further identify).* "Blue" LOWERY told GRIFFIN that he was going to try to get "Pelon" to pull "Joey" HAYES down to the trial also and wanted GRIFFIN and "Joey" HAYES to help them escape. "Blue" LOWERY told GRIFFIN that when someone goes out to court in Rancho Cucamonga there are only ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ when they ▮▮▮▮▮▮▮▮▮▮▮▮ "Blue" LOWERY informed GRIFFIN that the escape plan involved ▮▮▮▮▮▮▮▮▮ and a handcuff key ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ). "Blue" LOWERY told GRIFFIN that they would have the clothing and shoes delivered ▮▮▮▮▮▮▮▮▮▮▮ "Blue" LOWERY told GRIFFIN that "Pelon" might not get to pull him down to his trial but asked GRIFFIN if he would get the gun and handcuff key so if he gets pulled down at a later date he will have the items ready. GRIFFIN did not do what "Blue" LOWERY asked.

The following list reflects the identification of persons known to GRIFFIN through his association with the NLR, as gang members, gang associates, or victims of gang-related criminal activity   The names noted with an asterisk *(*)* are persons GRIFFIN and/or the Institutional Gang Investigations Unit *(IGI)* staff have identified as his enemies.  The noted "Gang Status" of each person is as given by the GRIFFIN at the time of this report and may not correspond with other official CDC records.

<u>NOTE:</u> The following is a code list used to decipher the gang codes utilized in the name lists below.

| CODE | MEANING | | CODE | MEANING |
|------|---------|---|------|---------|
| 0001 | BLACK GUERRILLA FAMILY | | B | ASSOCIATE |
| 0002 | MEXICAN MAFIA | | C | MEMBER |
| 0003 | NUESTRA FAMILIA | | D | DROPOUT |
| 0004 | ARYAN BROTHERHOOD | | F | SAFETY CONCERN |
| 0006 | TEXAS SYNDICATE | | | |
| 0007 | NORTHERN STRUCTURE | | | |
| 4043 | NAZI LOW RIDER | | | |

| INMATE NAME | ALIAS | CDC # | DOB | CII # | HOMETOWN | GANG |
|-------------|-------|-------|-----|-------|----------|------|
| ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | | | | | | |

Reviewed by

David Griffin, E-79594

Confidential

105

122556

Mark D. Castellaw
Confidential Interview of GRIFFIN,
May 17, 2002
Page 7





GRIFFIN was unable to supply sufficient information regarding the following persons to complete an accurate identification of each: although he claims each is known to him through his association with the NLR and believes the "Gang Status" classification to be accurate.



Reviewed by

David Griffin, E-79594

66

Mark D. Castellaw
Confidential Interview of GRIFFIN, 
May 17, 2002
Page 8

| NAME | ALIAS | CDC # | DOB | CII # | HOMETOWN | |
|------|-------|-------|-----|-------|----------|--|
| Parm | | | | | | |



GRIFFIN has indicated he is willing to participate in a polygraph examination to corroborate the truthfulness and sincerity of the information he has provided.

GRIFFIN has indicated he is willing to testify in a court of law, if necessary, regarding this information. He says he has concerns regarding his personal safety.



## CONCLUSION:



Reviewed by

David Griffin, E-79594

Confidential

67

122558

Mark D. Castellaw
Confidential Interview of GRIFFIN
May 17, 2002
Page 9



GARY H WISE
Correctional Lieutenant
Institutional Gang Investigations

NOTED/APPROVED BY:                    NOTED/APPROVED BY:

MARK D. CASTELLAW
Investigative Captain
Investigative Services Unit

Reviewed by

David Griffin, E-79594

Confidential                                    CONFIDENTIAL

122559

b8

CONFIDENTIAL

# Memorandum

**Date :** June 11, 1992

**To :** T. Jenkins, Correctional Captain
Security & Investigations Unit

**From :** ~~Department of Corrections~~

**Subject :** DEBRIEFING INTERVIEW WITH

This report is deemed confidential in accordance with California Code of Regulations, Title 15, Division 3, Subchapter 4, Article 5, section 3321 (a) (1 and 2). In that other confidential sources were referenced for the purpose of corroborating the information, it is also confidential to Subject.

On June 11, 1992, this unit interviewed ████████████ ████████████ evant to his request to debrief and disassociate himself from the Aryan Brotherhood prison gang. ████████ is an admitted and validated associate of that gang. Subject stated that the reason he wishes to disassociate himself from that gang is because: (1) he is no longer interested in the gang; (2) he has no more respect for the gang; (3) he wishes to improve his conditions of confinement; and (4) he no longer agrees with the actions of the AB (currently nor historically).

Subject stated that he first became aware of the AB in 1975, when he was incarcerated at Y.T.S. (California Youth Authority-Youth Training School) with "Richie" Richard CRANE (████████ "S" related that CRANE's brother, "New York" Robert CRANE (C32455) was a member of the AB and corresponded with Richard CRANE from San Quentin. ████████ said that he considered himself as a "Nazi", and had great respect for the AB.

████████ related that he was incarcerated at SQ in 1978. He said that "Rob" Robin LATHAM (B86845) directed him to gather and move weapons to North Block - Max B. He added that these weapons were used by "Donnie" PARRISH ████████ , "Baby Dave" ELLIOTT ████████ ,"Steve" RUPOLI ████████ , and Steven BARNES (B69188) to assault and murder some Bikers on the yard (members of the Satans Few). Concerning the incident, CARTER stated that the Satans Few rivaled the AB, when "Vic" (MAURUS ████████ ) wrote a note intended for delivery to other Satans Few members which said that the AB was no longer controlling anything. According to "S", MAURUS requested "Whitey" (unable to ID), a block worker, to deliver the note to the other bikers on the yard. "S" said that "Whitey" delivered the note to AB member, "Harpo"

CONFIDENTIAL

Confidential

122560

CONFIDENTIAL



DEBRIEFING OF ███████████
June 11, 1992
Page 2

Ronnie HARPER (████); and the ABs responded by killing MAURUS and "Coyote" (Ronald HENDERSON B08310) on the yard (on 2-22-79)

█████also admitted to sending drugs to "T.D." BINGHAM (B17741), HARPER (█████), and other AB members. ████ stated that he collected the drugs from white inmates who were required to provide a percentage of their profits to the AB. As an additional note, █████ said that LATHAM, who was a cousin to "Terrible Tommy" SILVERSTEIN (B68720, Fed# ██████████, died from a drug overdose in Orange County Jail. (This occurred on 8-20-85).

According to █████, he was transferred to C.I.M. - Palm Hall in 1981. He stated that he requested to be placed on the affiliated yard where the AB members were housed. He stated that "Blinky" (Robert GRIFFIN B26484) asked him how he felt about performing a killing for the AB; specifically of "Bullet" (Roger WIERSMA C05777), who was an AB dropout living in San Bernardino. "S" stated that he never received all of the information about how to find WIERSMA, except that he was testifying against GRIFFIN in court. █████ related that because of not receiving enough information about WIERSMA, he did not do the murder when he paroled.

█████admitted to participating in a plan at Folsom to assault an inmate that was suspected of being a child molester (██████████████████████████. Subject explained that "Rudy" from Santa Monica (Rudy DUARTE ██████) reported to him and "Pirate" (Thomas CLARK ██████) that ████ was a child molester. "S" related that he delivered a knife to "Lancaster" (Phillip LANCASTER ██████) so that he would take it to the yard. █████ said that he planned on retrieving the weapon from LANCASTER; and then using it to stab ALBERTSON. He added that instead, LANCASTER gave the weapon to staff. (This occurred on 8-27-88).



According to subject, while he was on the mainline at New Folsom - B Facility, he, CLARK, "Cal" (Calvin NICHOLS ██████, and "RJ" (Ronald JOSEPH E76275) manufactured weapons and delivered them to B Facility - SHU. He specifically identified "Irish" Gaven SHINE (██████) and "Blue" Wendell NORRIS (C05302) as recipients.

CONFIDENTIAL

70

EXHIBIT G          122561



VISITING INFORMATION FOR INMATE
DAVID TROY GRIFFIN

09/22/2006        California Dept. of Corrections C.01S        PAGE   1

CDC#    INST VISITOR    VISITOR NAME    RELATION    HISTORICAL
        PSP

```
VISITING INFORMATION FOR INMATE
B26484 ROBERT LEE GRIFFIN

09/22/2006        California Dept. of Corrections C.015        PAGE    1

CDC#    INST  VISITOR#        VISITOR NAME   RELATION   HISTORICAL
        PSP                   G▓▓▓▓,D▓▓▓               20020609122055
                                                       20020609122144
                                                       20000716085731
                                                       20000715121355
                                                       19971102085430
                                                       19971102084936
                                                       19971101084816
                                                      *19950921085706

                              G▓▓▓,L▓▓▓               00000000000000
                              G▓▓▓,M▓▓▓               19931010090246
                              G▓▓▓,M▓▓▓               00000000000000
                              G▓▓▓,M▓▓▓               00000000000000
                              L▓▓,D▓▓▓                00000000000000
                              R▓▓▓,L▓▓▓               00000000000000
                              GRIFFIN,PAMELA WIFE      20020608122136
                                                       20020608084545
                                                       20020413084710
                                                       20011005153927
                                                       20001118085237
                                                       20001007084220
                                                       20000920090636
                                                       20000716085718
                                                       20000715083835
                                                       20000610084626
                                                       20000402085631
                                                       20000401085710
                                                       20000219085217
                                                       20000115093735
                                                       19991211085439
                                                       19991031085018
                                                       19991030084904
                                                       19971101084934
                                                       19970726084451

                              L▓▓,M▓▓▓▓L              00000000000000
        GRIFFIN               GRIFFIN,PAMELA WIFE/ATTY.20021102083202
                                                       20021101132132
                                                       20020302084405
                                                       20020118120302
```

Confidential                    72                    122563

VISITING INFORMATION FOR INMATE
B26484 ROBERT LEE GRIFFIN

09/22/2006        California Dept. of Corrections 0.015        PAGE   2

| CDC# | INST | VISITOR# | VISITOR NAME | RELATION | HISTORICAL |
|------|------|----------|--------------|----------|------------|
| | PSP | GRIFFIN | GRIFFIN, PAMELA | WIFE/ATTY. | 20011215085023 |
| | | | | | 20011030132023 |
| | | | | | 20011006084959 |
| | | | | | 20010908084636 |
| | | | | | 20000117144135 |
| | | GRIFFIN, PAM | GRIFFIN, PAM | ATTORNEY | 20020928084357 |
| | | | | | 20020927133158 |
| | | | | | 20020803080408? |
| | | | | | 20020802094212 |
| | | | | | 20020706122611 |
| | | | | | 20020706084323 |
| | | | | | 20020705121941 |
| | | | | | 20020705091631 |
| | | | | | 20020609085404 |
| | | | | | 20020414084659 |
| | | | | | 20020119084740 |
| | | | | | 20011214151039 |
| | | | | | 20010907151223 |
| | | | | | 20010721090627 |
| | | | | | 20010623084750 |
| | | | | | 20010622120355 |
| | | | | | 20010512085033 |
| | | | | | 20010511144053 |
| | | | | | 20010401091456 |
| | | | | | 20010331084617 |
| | | | | | 20010217090230 |
| | | | | | 20001231084434 |
| | | | | | 20001230083805 |
| | | | | | 19980502084628 |
| | | | | | 19980315084937 |
| | | | | | 19980314084601 |
| | | | | | 19980117084644 |
| | | | | | 19971213084322 |
| | | | | | 19971102123826 |
| | | | | | 19971101124427 |
| | | | | | 19971011084106 |
| | | | | | 19970906083800 |
| | | | | | 19970622084513 |
| | | | | | 19970621084653 |
| | | | | | 19970511120533 |
| | | | | | 19970511084835 |
| | | | | | 19970510084349 |
| | | | | | 19970409084332 |
| | | | | | 19970308084402 |
| | | | | | 19970215084113 |
| | | | | | 19970111084904 |
| | | | | | 19961201084011 |
| | | | | | 19961130084249 |
| | | | | | 19961102084614 |
| | | | | | 19960721084333 |
| | | | | | 19960720084143 |

Confidential                    73                    122564

09/22/2006  11:36

VISITING INFORMATION FOR INMATE
B26484 ROBERT LEE GRIFFIN

09/22/2006      California Dept. of Corrections C.015      PAGE    2

| CDCf | INST | VISITOR# | VISITOR NAME | RELATION | HISTORICAL |
|------|------|----------|--------------|----------|------------|
| B26484 | PSP | GRIFFIN. PAM | GRIFFIN,PAM | ATTORNEY | 19950625084501 |
| | | | | | 19950528084349 |
| | | | | | 19950527090418 |
| | | | | | 19950422084149 |
| | | | | | 19950312085039 |
| | | | | | 19950204084126 |
| | | | | | 19950101085329 |
| | | | | | 19941231085301 |
| | | | | | 19941231085222 |
| | | | | | 19941127090010 |
| | | | | | 19941126090559 |
| | | | | | 19940911085704 |
| | | | | | 19940807090744 |
| | | | | | 19940625090833 |
| | | | | | 19940416151947 |
| | | █████ | K███,M██████████D | | 00000000000000 |
| | | █████████ | O'████,S████ ██████ | | 00000000000000 |
| | | | | | 00000000000000 |
| | | █████████ | G████,G███████ | | 00000000000000 |
| | | SATRIS | SATRIS,MICHAEL ATTORNEY | | 20010331085126 |
| | | ███████ | M████,S███ ██████ | | 00000000000000 |

Confidential                    74                    122565

Department of Corrections
Information Systems Branch
Distributed Data Processing Unit

## HISTORICAL DATE & TIME FORMAT(CCYYMHDDHHMMSS)

EXAMPLE:   20020904202757  = September 4, 2002 at 08:27 pm and 57 seconds

Time is based upon Military time (24 hr clock)

00000000000000   =   visitor may have applied,
however has no logged visits

| | | |
|---|---|---|
| **CC** | = | CENTURY |
| **YY** | = | YEAR |
| **MH** | = | MONTH |
| **DD** | = | DAY |
| **HH** | = | HOURS |
| **MM** | = | MINUTES |
| **SS** | = | SECONDS |

## INSTITUTIONS

**PSP**   =   Pelican Bay State Prison

mcvrxtrn.doc

**Confidential**

75

122566

State of California

**M e m o r a n d u m**

CONFIDENTIAL

Date  :    June 21, 1996

Approved for Confidential

To    :    Charles D. Caraway
           Correctional Captain
           Investigative Services Unit

_____    _____
Signature           Date

From  :  **Department of Corrections**

Subject :    DEBRIEF INTERVIEW WITH                                ARYAN BROTHERHOOD

           (AB) ASSOCIATE.

This report is deemed confidential in accordance with California
Code of Regulations, Title 15, Division 3, Subchapter 4, Article
5, Section 3321 (a) (1 and 2).  In that other confidential
informants are named within this report for the purpose of
corroborating Subject's information, this report is deemed
confidential to him, as well.

On June 21, 1996, this unit concluded numerous interviews with
inmate                                                    
relevant to his request to debrief and disassociate himself from
the Aryan Brotherhood (AB) prison gang.  Subject is a self
admitted and validated associate of that gang.

Subject stated that he wishes to disassociate himself from the
Aryan Brotherhood (AB) because he feels that any further
participation with the gang will result in him being harmed or
killed or being forced to commit offenses which would extend his
confinement in the Security Housing Unit (SHU) as well as extend
his term in prison.  "S" explained that the Aryan Brotherhood
(AB) normally does the bidding of the Mexican Mafia (EME) and "S"
explained that he always felt he had underlying problems with the
Mexican Mafia due to the fact that he shot an EME associate
during a drug robbery.  "S" further related that he recently
assaulted and inflicted great bodily injury on an EME member when
both were out of their respective cells in the SHU unit at
Pelican Bay.

"S" stated that in July of 1991 he was sent to the Reception
Center at the Central Facility at the California Institution for
Men at Chino (CIM) where he was housed for a while at both
Madrone and Cypress Halls.  "S" went on to say that while housed
at Madrone Hall he met and was celled with Bruce CHRISTENSEN
(              ) with whom he was soon charged with the conspiracy to
assault another inmate.  "S" stated that this charge resulted in
both he and CHRISTENSEN being sent to Palm Hall where they were
housed in the Administrative Segregation (Ad-Seg) Unit on the
Eastside.  "S" stated that he had never previously been housed in
any SHU or Ad-Seg units that contained any Aryan Brotherhood (AB)

Confidential

76                                                         122567



C. D. Caraway
DEBRIEF OF Inmate ██████████
Page 2

members and that he had no tip affiliations at that time.  "S"
said that upon arrival he was housed on the third tier and that
CHRISTENSEN was housed with Danny BARTOSH (██████████  "S" said
that BARTOSH had just recently been given a twenty-five (25) to
life sentence for the murder of an alleged informant who he
assaulted with a twenty pound dumbbell while on the CIM West
yard.  ██████████████████████████████████████████████████████ or
████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
no "Brand" (AB) there at the time, although ABLE was calling the
shots for the Whites until "S" and CHRISTENSEN showed up.

"S" said that he was put on CTQ and sent to the first tier where
he was housed when John STINSON (C-40154) arrived in the unit.
"S" stated that he had heard of STINSON from other White inmates
so when STINSON arrived and announced his presence, "S" greeted
him and sent him some coffee, paper and envelopes.  "S" stated
that STINSON thanked him and told him he would send him back some
things when he got his property.  "S" stated that this was how
his association with the AB started.  "S" recalled that the
following day STINSON wrote him a "kite" which expressed how the
AB were looking for good young "woods" to put in the "tip".  "S"
stated that STINSON wrote of how there were a lot of murders and
robberies that needed to be done and that the AB needed people
out on the streets putting money in the "kitty".  "S" stated that
this planted the seed in his mind that STINSON liked him and that
he should steer his life in that direction.

"S" stated that he was moved back with CHRISTENSEN where he
stayed for a few days until he was moved and STINSON moved in
with CHRISTENSEN.  "S" stated that he and CHRISTENSEN were
separated because  they had assaulted another inmate on the
yard.  "S" stated that after a short while he, STINSON,
CHRISTENSEN, ABLE and "Little Wood from Orange County"
██████████████ were on the yard together.  "S" stated that he,
STINSON and CHRISTENSEN ran the exercise program and then would
just kick back and talk.  "S" stated that during these sessions
STINSON told him that once he got back to Pelican Bay he would
run his name by the "brothers" and put him up for membership.
("S" stated that it takes three (3) brothers to raise their hands
to put you up for membership and then a two (2) year period
before you get in.  "S" further stated that there is now talk of
extending the probationary period to three (3) years.)  "S"
claimed that STINSON made this same statement to ABLE and

122568



C. D. Caraway
DEBRIEF OF Inmate ▮▮▮▮▮▮▮
Page 3

CHRISTENSEN. "S" claims that STINSON was then transferred to Tehachapi then the L.A. County Jail and back to Chino before being sent back to Pelican Bay. "S" stated that there were no stabbings or murders while STINSON was in Palm Hall, ▮▮▮▮▮▮▮▮▮

"S" claims that STINSON told him to just get out to the mainline and kick back because the streets were where he envisioned the future of the AB to be. "S" said that STINSON told him that he wanted youngsters who were loyal to him to do his dirty work and support him and his wife Debra (STINSON, Debra ▮▮▮▮▮▮▮. "S" said that Debra STINSON was in trouble at the time for smuggling narcotics into the L.A. County Jail.

"S" stated that he had been endorsed for Folsom but got into a fistfight which resulted in a new endorsement to Corcoran SHU.



A. "S" stated that Palm Hall was then locked down, although he only stayed for a few more days before being transferred to Corcoran SHU. "S" stated that just prior to leaving he found out that "Big Frank" (FORGIONE, Frank B-88176) was there at Palm Hall but was scheduled to leave soon for Pelican Bay.

Confidential

122569



C. D. Caraway
DEBRIEF OF Inmate ███████████
Page 4

"S" stated that upon arrival in Corcoran SHU he was housed with an inmate named COLLINS (██████████) and immediately received a "kite" from "Boom" (WILSON ████████) who was celled with "Trooper from San Mateo" (unable to identify). "S" said that this kite asked him to beat up COLLINS because COLLINS had refused to assault a Black inmate on the exercise yard. "S" recalled that this message was signed "BOOM-ARYAN BROTHERHOOD" with a shamrock symbol. "S" said he didn't do anything right away but soon got a message from "Tonito from Rancho San Pedro" (unable to identify) who related that "Chuy from VNE" (MARTINEZ, Mariano C-73488) had told him that WILSON was a righteous AB member. "S" said once he got that message he went ahead and assaulted COLLINS just to get WILSON off his back.





GAMACHE did go to Pelican Bay and did get sent back to Corcoran where he corresponded with "Cornfed" (SCHNEIDER, Paul C-60196) and "Ruffo" (RUFFO, Art C-23189) who were still at Pelican Bay.

"S" stated that he soon cut a Black inmate (BENTON, Michael ████████) with a razor blade supplied by "Shorty from Pomona Sharkies" (█████████████). "S" recalled that this assault resulted in his being placed on walk-alone status.

"S" recalled that "Deadeye" (HEALY, Brian ████████) transferred in from Vacaville Ad-Seg where he had suffered a "severe ass whipping" from the Correctional Officers there because he had speared an officer in the neck. "S" stated that he had

Confidential

79

122570



C. D. Caraway
DEBRIEF OF Inmate ████████████
Page 5

corresponded with HEALY since their previous contact when they
were both housed in Sycamore Hall at Chino and where HEALY asked
him to stab "Silent Mike" (CARMICHAEL, Michael ████████) who was
an AB dropout from Folsom who had dropped out after twenty (20)
years.   "S" stated that CARMICHAEL was at Chino on a parole
violation and that he was assigned to the East yard while "S" was
assigned to the West yard.

"S" recalled that HEALY had arrived at Corcoran via emergency
transport with another inmate named "Buzzard from East Side
Longo" (VALLA, unable to further identify) and that when HEALY
arrived he told "S" that he stabbed the Officer at Vacaville.

"S" stated that HEALY was soon moved to the Gang section and that
"S" tried to continue correspondence with HEALY through a
maildrop for which he received a 115 in April of 1992.  "S"
stated that he was released from the Violence Control Unit to a
regular SHU program pending transfer to Pelican Bay.  "S" said
that he didn't run into anymore AB members until he
transferred to Pelican Bay.  "S" said that HEALY remained at
Corcoran and continued to be dangerous and that "Mylo" (ALLEN,
James ████████) went to Corcoran SHU after he stabbed "Itchy"
(ABLE, Richard ████████).  "S" said that ALLEN was finishing a
parole violation but ended up in the Gang Validation section with
HEALY and Bruce CHRISTENSEN (████████).  "S" said that HEALY
wanted to "hit" CHRISTENSEN because he was telling everyone that
he was AB and that John STINSON had made him a "brother".  "S"
said that HEALY was on walk-alone status and the only White that
could make the "hit" was ALLEN.  "S" stated that ALLEN cut
CHRISTENSEN'S throat and then beat CHRISTENSEN up.  "S" claims he
was told this by ALLEN when they were celled together in D-SHU at
Pelican Bay in April or May of 1995.

"S" recalled that in June of 1992 he got transferred to Pelican
Bay and housed in the Security Housing Unit.  "S" claims that
since his arrival at Pelican Bay he has spent much time around
both Aryan Brotherhood (AB) and Mexican Mafia (EME) members and
associates.  "S" said that he was housed in Unit Nine in D
Facility for two and a half (2 1/2) years and that while there he
met "Bobby Ray" (SHIELDS, Robert B-99475), Joey HAYES (D-05432),
"Pirate" (CLARK, Thomas ████████), John AUSLINGER (unable to
identify), Scott GRIZZLE (H-10106), Art RUFFO (C-23189),
"Cornfed" (SCHNEIDER, Paul ████████, "New York" (CRANE, Robert
████████), "Chunky" (STANTON, Marvin ████████) and Chris CECIL
(████████).

"S" stated that John STINSON and Dale BRETCHES (C-10395) were
angry with CECIL because he had a shamrock tattoo that is only to
be worn by members, and CECIL was just a "wannabe" AB.  "S"
stated that STINSON gave CECIL a pass on this issue but did have

Confidential                          80                          122571



C. D. Caraway
DEBRIEF OF Inmate ████████████
Page 6

CECIL dig the tattoo out of his skin. "S" stated that this did not appease other AB members who were "pissed off" at CECIL over "run ins" he had with people for claiming to be an AB member.

"S" claimed that in March of 1993 GRIZZLE was released to the General Population and CECIL moved into E-Pod with "Wolf from Long Beach" (unable to identify). "S" stated that SHIELDS and Joey HAYES (D-05432) were in the same pod and despised CECIL and that in early 1994 CECIL ended up celled with "Wasted" (RHODES, Jeffery ████████). "S" stated that RHODES had come back from Palm Hall at Chino and that RHODES had previously been celled up with "Scully Bob" (SCULLY, Robert ████████). "S" claimed that CECIL was "put in the hat" by STINSON who told SCHNEIDER to have RHODES "whack". "S" said that SCHNEIDER doesn't like to use people to do his dirty work when they are "short to the street", and since RHODES had only thirty (30) days left SCHNEIDER told STINSON to hold off. "S" stated that STINSON insisted that RHODES do it and told SCHNEIDER to make sure that it was handled.

"S" stated that SCHNEIDER himself was not happy with CECIL because when he (SCHNEIDER) stole an air vent from the Law Library and made an almost perfect replacement out of paper, CECIL exposed the whole thing when he got caught stealing a screw from the bogus vent cover which led to the discovery of the missing vent by staff. "S" stated that the entire SHU was then locked down and a lot of inmates either discarded or got caught with weapons or contraband and it was all the result of CECIL doing something stupid. "S" stated that RUFFO and SCHNEIDER told RHODES to kill CECIL and that the weapon was going to be sent to him via the Law Library. "S" stated that RHODES received the weapon with a note signed by SCHNEIDER and that it was expected that RHODES would "take care of business". "S" stated that RHODES "locked up" the following day and that CECIL paroled soon after and never knew how close he came to dying.

"S" stated that in September of 1994 he was told that he would be serving an indeterminate SHU term. He was moved to Unit Four in D-Facility where he lived in the same pod with Rick WINSON (████████) and Jody SEELYE ████████ who had gotten "rolled up" off of "B" Facility for a stabbing assault and possession of a weapon. "S" stated that WINSON had stabbed his cellie who was a child molester and that this assault occurred during recreation time on the B Facility yard. "S" said that Rick WINSON told him that he and Rick BROWN ████████ had assumed shotcalling positions on the B yard along with Aaron MARSH (E-90574), SEELYE, and "Beetlejuice" (ELMER, John ████████). "S" stated that he was told that these individuals were rounding up youngsters and manipulating them into stabbings and fistfights. "S" said that WINSON acted as if his "shit didn't stink" and like he was

81

C. D. Caraway
DEBRIEF OF Inmate 
Page 7

somebody important.  "S" said that he remained in Unit Four when
WINSON got moved to Unit Seven, where he was housed near Eddie
BURNETT (B-34087) and "Blinky" (GRIFFIN, Robert B-26484).

"S" stated that in December of 1994 he was moved from Unit Four
to Unit Seven where he was housed with T.J. OSBORNE (unable to
identify) and where he met GRIFFIN and BURNETT whom he had known
by reputation from when he was housed at Palm Hall in Chino.  "S"
said that while at Palm Hall he had heard that BURNETT and
"Deadeye" (HEALY, Brian ███████) were the shotcallers on a
homicide that occurred on the third tier where an inmate named
"Solo" Mooney (MOONEY, Victor █████) was beaten to death in his
cell.

"S" stated that when he was a tier tender in that unit he spent a
lot of time talking to GRIFFIN and BURNETT and they told him that
they were really tired of living in SHU.  "S" said that they also
told him that they did not like Todd ASHKER (C-58191) at all.
"S" said they referred to him as an idiot and a retard over the
tier which is not usually done by AB in front of regular White
inmates.  "S" stated that GRIFFIN and BURNETT did not like the 60
Minutes interview that ASHKER did, saying that he did not
represent himself or the AB properly.  "S" said that this dislike
for ASHKER is shared by a number of AB.  "S" stated that GRIFFIN
and BURNETT did not like RUFFO or SCHNEIDER either and that they
referred to them as being reckless and as loose cannons.  They
felt that RUFFO and SCHNEIDER brought too much heat on everyone.

"S" stated that he was soon moved along with T.J. OSBORNE to
another pod in the same unit where there were no other White
inmates.  "S" said that it was just a month until OSBORNE "locked
it up" and "S" was moved to another cell.  "S" said that Danny
FISH (unable to identify) and "Donnie from Co Co County" (LARUS,
Donald ███████) moved into the pod.  "S" said that FISH was only
there for a few minutes when "Johnny from White Fence" (VARGAS,
Johnny ███████) introduced them.  "S" said that FISH ran up the
stairs and said there was some bogus smut on him and that "Hawk"
(LIKAI, Anthony ███████) had been running his mouth.  "S" said
that FISH said that he had heard that "S" had said something
also.  "S" said that he had never even heard of FISH and didn't
even know that he existed, so he told FISH he didn't know what
he was talking about but if FISH wanted they could cell up and
deal with the situation.  "S" stated that FISH declined and that
he just left it at that and the following day he was moved to
another Unit.

"S" said that in April he was moved into Unit 8 in D Facility,
into the same pod with RUFFO and SCHNEIDER.  "S" recalled
thinking that these guys were maniacs and nothing but trouble.
"S" said both RUFFO and SCHNEIDER were "cool" to him when he got



C. D. Caraway
DEBRIEF OF Inmate ██████████
Page 8

there, and told him that they had "steel" (knives) stashed all around the pod and that they would send him some if he needed it. "S" stated that SCHNEIDER and RUFFO sent him some homemade wine the next day and they all got drunk. "S" said they then told him that they got "Itchy" ABLE stabbed because he wouldn't take care of a stabbing while he was in Administrative Segregation (Ad-Seg) at Soledad a number of years back.

"S" recalled that RUFFO, SCHNEIDER and Todd ASHKER had a lawsuit going from when they were at Folsom concerning Ad-Seg Procedures. "S" explained that they were mad because only RUFFO could go down there due to a declaration to the court by ex-AB ██████████ which exposed ASHKER, RUFFO and SCHNEIDER'S plans to escape once they got to the Sacramento area. "S" said that RUFFO told him they did in fact have plans to escape. "S" remembered that they were really mad that RUFFO was the only one that the courts were going to allow to go because RUFFO wasn't well educated in everyday things let alone anything concerning the law.

"S" stated that RUFFO and SCHNEIDER asked him if he knew any females who would send drugs in through legal mail. "S" said he told them "no", because he didn't want to get involved in any schemes with them as it was a good way to get killed if something didn't go right. "S" stated that one time the unit control booth officer opened RUFFO and SCHNEIDER'S door while he was standing there and he reached in and shook their hands. "S" said that RUFFO then went out to court, but before he left he asked "S" to get "Mylo" ALLEN as a cellie. "S" stated that ALLEN wanted to get moved near RUFFO and SCHNEIDER and that SCHNEIDER wanted him near because he had things he wanted ALLEN to do once he got out. SCHNEIDER wanted ALLEN to send him cyanide and "speed" so that SCHNEIDER could give it to people who were "in the hat" and kill them. "S" said that SCHNEIDER told ALLEN to get the cyanide at a jewelers shop because they used it there to clean gold, silver and jewels.

"S" stated it was not unusual for one of the control booth officers to let some inmates "cell visit", and on one of these occasions when SCHNEIDER was in "S" cell, SCHNEIDER discussed "Scully Bob" (SCULLY. Robert ██████████) with him. "S" recalled that SCHNEIDER told him that after being released from Pelican Bay SCULLY hooked up with SCHNEIDER'S "old lady", Brenda MOORE, and that the two (2) of them traveled south to Sonoma County where SCULLY shot and killed a Sheriff's Deputy. "S" stated that when this occurred ALLEN was on the streets and SCULLY was supposed to be going to Orange County to meet him, but instead got drunk with MOORE and got into a situation where he killed the Deputy and then took hostages in an attempt to get away.

Confidential

83

122574



C. D. Caraway
DEBRIEF OF Inmate ████████████
Page 9

"S" said that ALLEN had somehow found a Glock 9mm pistol with armor piercing bullets for SCULLY and the two (2) of them were supposed to hook up and sell cocaine and heroin and do some robberies. ██████████████████████████████████

"S" said that SCULLY'S court investigator came to Pelican Bay to see SCHNEIDER and that SCHNEIDER read everything about the case, including SCULLY'S rap sheet where he found that SCULLY had a 1976 Rape conviction. "S" said that SCHNEIDER stated that he hates rapists and had no respect for SCULLY because of that.

"S" said he and SCHNEIDER then talked about ████ W█████ █████ and "S" said he told SCHNEIDER he hated W████ because W████ had a "fat mouth". "S" recalled that SCHNEIDER asked him if he thought that Rick BROWN (████████) had enough heart to kill W████. "S" said he told SCHNEIDER he didn't know because W████ and BROWN were friends from when they were together on B yard at Pelican Bay. "S" said when he asked SCHNEIDER why he wanted to know, SCHNEIDER replied that W████ was at one time celled up with "Casper from Orange County" (C████████, F████████████) and that C████████ was "in the hat" for portraying himself as AB when he was not. "S" said that SCHNEIDER told him that he and RUFFO had asked W████ to kill C████████ and that they would send him some steel to do it, but W████ wouldn't do it because he was "short" to the mainline. "S" said that Rick BROWN wants to be an AB and that this is the reason why he ended up stabbing W████.

"S" stated that another time SCHNEIDER told him that "Deadeye" (HEALY, Brian ████████) almost got put "in the hat" by John STINSON for talking bad about SCHNEIDER, mainly for saying that SCHNEIDER sidestepped on some people. "S" said that SCHNEIDER liked HEALY and they ended up squashing their problems after talking it out, and HEALY got out of being "in the hat". "S" stated that it was ironic how STINSON would sweat HEALY like this when he and most everyone else didn't accept SCHNEIDER as being a true "brother" because he was a "blue brother" brought in by "Blue" (NORRIS, Wendall C-05302) and wasn't really accepted until after NORRIS dropped out.

"S" said that the whole time he lived near SCHNEIDER he was paranoid that SCHNEIDER would find out about his commitment offense where he shot Mexican Mafia (EME) associate Frank WEILER during a robbery. "S" stated it was his belief that the Mexican Mafia (EME) wanted him dead. "S" stated that if the Mexican Mafia (EME) asks the AB to "take care" of White inmates the AB will do it. "S" stated that because of all the "steel" in the unit he started cutting the plexiglass on his light fixture to make a weapon to protect himself if need be.

Confidential

P4

122575



C. D. Caraway
DEBRIEF OF Inmate ███████████
Page 10

"S" stated that a certain Control Booth Officer would open any celldoor upon request and allow inmates to go into other cells. "S" stated that this officer brought in coffee, salmon sausages, shrimp cocktails, Pepsi, raisin bread and supplied plastic trash bags for them to make their wine. "S" stated that this officer also provided steaming hot water for coffee as well as providing small toe nail clippers which SCHNEIDER used to manufacture weapons. "S" stated that after ALLEN got moved into the pod he and "S" were allowed into SCHNEIDER'S cell at least fifteen (15) times. "S" stated that the most "way out" thing he observed of this officers behavior other than accepting inmate manufactured wine from SCHNEIDER, was when the officer provided SCHNEIDER with a wire coat hanger with which to fish out a double edged knife he had hidden in the bottom of the stairwell. "S" stated after SCHNEIDER recovered this weapon he handed it to this officer who inspected it and then gave it back to SCHNEIDER. "S" said that SCHNEIDER then took it back to his cell where he sharpened it some more before walking around the pod and showing it to everyone in the unit.

"S" stated that the very next day, after SCHNEIDER had retrieved the knife, the same Control Booth Officer warned everyone that a massive search of the entire facility was planned. "S" said the Officer let SCHNEIDER out of his cell to put the weapon back into the hiding place in the stairwell. "S" recalled that before SCHNEIDER put the weapon back he attached a handle and a piece of string with which to retrieve it in the future. "S" stated that he attempted to cover up the cut plexiglass light fixture but it was discovered during the search.

"S" stated that as a result of that discovery he and ALLEN were moved to A pod in Unit 8 while SCHNEIDER and LIKAI were moved to C pod. "S" stated that he and ALLEN had talked about LIKAI being "up" for membership in the AB and that he didn't belong in the AB. LIKAI had told ALLEN that John STINSON would wash his hands of ALLEN if he had anything to do with SCHNEIDER and RUFFO. "S" said that ALLEN told him that he had heard from LIKAI that "Irish" (SHINE, Gaven ██████) and the other AB were lobbying to put SCHNEIDER and RUFFO "in the hat".



85



C. D. Caraway
DEBRIEF OF Inmate ████████████
Page 11

"S" stated CRENSHAW had previously been cellies with ████████████ (BRUN, ████████████ . "S" said that there is a "contract" out on BRUN because of his debriefing, this contract was put on BRUN by John STINSON, Dale BRETCHES, Bobby Ray SHIELDS and Gaven SHINE. "S" said that BRUN told SHINE to move in with him to "take care of business" but SHINE refused. "S" also said that BRUN hates SCHNEIDER with a passion.

"S" stated that CRENSHAW went out to yard and talked to SHIELDS through the yard drain. SHIELDS asked CRENSHAW if he knew about BRUN, but when it became apparent that CRENSHAW didn't have a clue SHIELDS changed the conversation and just sent his regards. "S" said CRENSHAW then went in from yard and confronted BRUN who told CRENSHAW to mind his own business. "S" said that CRENSHAW then went to the law library where Dale BRETCHES asked him to stab BRUN because the AB can't get to him. BRETCHES also told CRENSHAW that he or STINSON would get a weapon to him to accomplish this assault. "S" said that this was very unusual because one of the AB rules is that only an AB can stab an AB.

"S" said that CRENSHAW went back to his cell and talked BRUN into doing some exercises, and when BRUN got into a prone position to do some push-ups CRENSHAW tried to kick BRUN in the head. "S" said that this only angered BRUN who got up and put CRENSHAW in a choke hold which he applied until CRENSHAW passed out. "S" stated that when CRENSHAW came to, BRUN told him that he had come within two (2) seconds of dying and that if he ever tried something like that again he would kill him. "S" said BRUN then kicked CRENSHAW in the face and told him to get up on his bunk and stay there. "S" said that CRENSHAW stayed on his bunk and kept quiet for three (3) days until he was released from SHU to go to the mainline.

"S" said John STINSON had been trying to pull the AB together and got everyone talking and squashing all of the petty quarrels that had arisen from the "Blue" NORRIS and "Blinky" GRIFFIN split in the AB. "S" said that BRUN was NORRIS' Lieutenant at Folsom and was brought into the AB by NORRIS. "S" said BRUN was supposed to go to the Law Library and denounce his AB membership through NORRIS and then be put back up for two (2) years at which time he would be given his "rock" as a "Blinky Brother". "S" said that CRENSHAW told him that BRUN flat refused to have anything to do with this plan.



Confidential

86

122577

C. D. Caraway
DEBRIEF OF Inmate ███████████████
Page 12





"S" stated that after his conversations with "Spider" GAVALDON regarding "S" being "in the hat" almost everyone in the pod put he and his celly "on the shine". "S" said that in late January the Control Booth Officer opened his cell door while PALAMINO was already out of his cell and in the shower. "S" stated he stepped out of his cell and stepped in front of the shower where he looked in on PALAMINO who reached for something on the shower shelf and said "come on in, motherfucker". "S" stated that he suspected that PALAMINO was reaching for a weapon, so he immediately ran into the shower where he fought with PALAMINO.

"S" stated that he decided to debrief because the EME now wants to kill him and the AB will help the EME if asked. "S" said that the AB and EME scratch each others backs although the AB will stab someone for the EME but the EME won't do it for the AB. "S" stated that he feels that John STINSON will try to have him killed because STINSON is "Quates" (GRAJEDA, Daniel ████████) crime partner and he is tight with "Wino" (GRAJEDA, Thomas C-████████) and ████████████

"S" stated that "Deadeye" HEALY is very dangerous and doesn't care like a human being. "S" described HEALY as a sociopath who was behind many plots and actual murders as well as numerous stabbings and other assaults. "S" stated that HEALY should be kept single celled forever or there would be another murder.

Confidential

87

122578



C. D. Caraway
DEBRIEF OF Inmate ▮▮▮▮▮▮▮▮▮▮
Page 13

said that BROWN told him he should go to the law library when the package came in so that he could get a "touch" of the drugs. "S" said that BROWN planned to get a rubber stamp that said Legal Mail and just send the drugs straight in. "S" also said that BROWN intended to write a letter to PAPPAN explaining "S" problem with PALAMINO. "S" said that BROWN thought he might have a little pull from the things that he did for Rick BROWN and Rick WINSON when he was on B-Yard. "S" stated that BROWN was WINSON'S little "pet" because BROWN was young and impressionable. "S" stated that BROWN may not now try to send drugs in since it was obvious that "S" has "locked up" and BROWN may be afraid that "S" would tell about his plan.



"S" stated when SCULLY was out on parole the first time he was running around with "Moose" Hart (HART, Jeffrey ▮▮▮▮▮▮) and that when they got pulled over in a traffic stop SCULLY told HART to shoot the cop. HART wouldn't do it because he wasn't going to pick up a three strike case for SCULLY. "S" said he was told by SCHNEIDER that HART was "put in the hat" because of that.

"S" said SCHNEIDER told him that he wants "Wasted" RHODES killed for snitching off the Chris CECIL murder plot and that if he can't get RHODES he will get RHODES ▮▮▮▮▮▮ "S" claims that SCHNEIDER has RHODES ▮▮▮▮ address in ▮▮▮▮▮▮▮

"S" stated that SCHNEIDER spoke of killing "Hawk" LIKAI before they celled up together. "S" said SCHNEIDER referred to LIKAI as weak and said that when RUFFO went to court he was going to move LIKAI in and chop his head off. "S" said after a while talk let up and "S" and ALLEN gave SCHNEIDER a way to save face when they told him he should give LIKAI a chance. "S" said SCHNEIDER told them that BRETCHES and the other "brothers" would be mad at him if he killed LIKAI so he would give him a chance.

"S" said SCHNEIDER and LIKAI have been cellies for quite a while now and that SCHNEIDER will stay with LIKAI because LIKAI is not a killer and is no threat to him. "S" said if SCHNEIDER ever got

Confidential

88

122579



C. D. Caraway
DEBRIEF OF Inmate ██████████
Page 14

"put in the hat" and the AB told LIKAI to kill SCHNEIDER he didn't think LIKAI could or would do it.

"S" stated the AB were very relaxed on their standards right now and that a lot of the original AB do not like it. "S" said the older AB want to go back to the blood in, blood out philosophy. "S" said LIKAI will probably debrief in the future because he is not "brand" material. "S" further stated that Pelican Bay is making the AB weaker and their standards are low.

"S" claims SCHNEIDER told him that STINSON is bringing in more weak youngsters that are loyal to him and that he can control. "S" said that STINSON is gaining more power and higher standing in the AB and that he is one of the inner circle. "S" further stated that STINSON is well liked and respected by EME members.

"S" made the following statements regarding inmates and or incidents that he recalled:

James "Mylo" ALLEN: When ALLEN paroled he was expected to pay tribute to Debra STINSON out of any drug deals that he did. John STINSON wanted to make sure Debra has money and is taken care of. John STINSON expected ALLEN to look out for Debra and drop off cash to her as a sign of respect to John. If Debra needed anything ALLEN was expected to help make it happen.



"S" said that in 1994 SCHNEIDER and RUFFO received drugs (speed and acid) from Brenda MOORE. "S" said that the drugs were sent in through legal mail and that the drugs were distributed to associates and members of the AB at the law library. "S" said that this happened before the last shipment that got busted with the Attorney General's return address on it.



"Irish" Gaven SHINE usually takes new recruits into his cell and schools them and introduces them to AB politics. "S" also said that SHINE'S "ol lady", Lee Ann SHINE,

Confidential

89

122580

*(105)*

C. D. Caraway
DEBRIEF OF Inmate ███████████
Page 15

████████████████████████  "S" said she also passes
information back and forth and helps circumvent the mail.  "S"
said that she hangs out with other women who visit and live in
the area and do drugs and live as "welfare scumbags".

"S" stated that these women and their visits are what keeps the
EME and AB going because the visiting room is where they
circulate their murder plots and distinguish who is "up" and who
is "out".  "S" said that these women visitors are an information
highway for the AB and EME.



████████████████████  "S" said that GOVEY had been telling
people on the B Yard that he was AB.  "S" said that GOVEY was
actually just riding John STINSON'S coat tails but did not know
that STINSON was angry with him for advising Debra STINSON to
"take a deal" on the drug smuggling case she was charged with at
the L.A. County Jail.  "S" stated that John STINSON is really
good with law and wanted Debra to fight the case.  "S" recalled
that SCHNEIDER was in "Bedrock" (VCU) at the time and liked GOVEY
so he ordered an assault on STYLES who was subsequently stabbed
with a pen.  "S" said that GOVEY later received a pass from John
STINSON but that the pass was later retracted due to GOVEY
"running his mouth" and not going along with the program.



Confidential

90

122581



C. D. Caraway
DEBRIEF OF Inmate ███████████
Page 16

"S" stated that when he and ALLEN were cellies they had numerous conversations regarding Aryan Brotherhood (AB) members and their status in the AB. One such conversation that he recalled was regarding Art RUFFO and "Cornfed" SCHNEIDER. "S" said ALLEN told him that while ALLEN was celled with Anthony LIKAI, LIKAI told him that his previous celly was "Irish" Gaven SHINE. SHINE told him that various brothers at one time or another were lobbying to put SCHNEIDER and RUFFO "in the hat" because they were bringing too much heat on the AB. "S" stated that before ALLEN was moved from LIKAI'S cell to his, he was told by SHINE that he shouldn't get mixed up with SCHNEIDER and RUFFO because they were reckless and not in good standing with the other AB. "S" said that SHINE also told ALLEN that if he got out and did things for RUFFO and SCHNEIDER that John STINSON would wash his hands of him. John STINSON was ALLEN'S sponsor into the AB and ALLEN is supposed to write to STINSON for instructions once he paroles.



contract out on his life from Thomas "Wino" GRAJEDA and John STINSON ███████████████████████



C. D. Caraway
DEBRIEF OF Inmate ███████████████
Page 17



"S" supplied the following addresses he claims are used by the AB as mail drops:



In addition to the individuals named in the body of this report, "S" identified numerous individuals with whom he has had contact throughout his incarceration with the California Department of Corrections. Subject identified the following individuals by name and/or alias, their hometown/set and gang status. The gang status is according to his last contact with them or subsequent information reported to him by others.

| Inmate Name | Alias | Hometown | CDC # | CI&I No. | DOB | Status |
|---|---|---|---|---|---|---|

Confidential

92

122583

# Memorandum

**CONFIDENTIAL**

Magee, J.

SPECIAL OPS

JAN 2 4 2003

RECEIVED

Date    :    January 10, 2003

To    :    M. D. Castellaw
Correctional Captain
Investigative Services Unit

Approved for Confidential

_____ Signature    1-21-03 Date

From    :    Department of Corrections

Reviewed by:
Luis Puig

_____ Signature    2/21/03 Date

Subject:    **DEBRIEF OF** ████████████████ **NAZI LOW RIDER** (NLR) ████████

The information contained in this report is classified as confidential in accordance with the California Code of Regulations (CCR), Title 15, Section 3321(a)(1) and (2). ████████ identified the following individuals with the information indicated. Data contained within parenthesis or in italicized print are investigative notes, which provide identification or substantiate ████ information.

On August 13, 2002, Correctional Lieutenant E. Madrid (Madrid), Institutional Gang Investigator (IGI), ███████████████████ conducted a Confidential Interview with ████ (date of birth: ██████████████████████ relevant to his request to debrief and disassociate himself from the NLR prison gang. In a good faith effort on ████ part, he disclosed the location of an inmate manufactured stabbing weapon (knife), which correctional staff discovered on August 14, 2002 (██████████████████████████ ████████████████████ claims his sole purpose for disassociating himself from the NLR and Aryan Brotherhood (AB) is because upon his release date in 2004, the AB want ████ to carry out terrorist acts upon the community.

During August and September 2002, I conducted several interviews with ████████. He has submitted written accounts of his involvement in gang activity. ████ has reviewed the pages marked with his initials. These initialed pages represent his verification of the accuracy of the pages. ████████████████████████████████████████████████████

████ reports that his first encounter with the NLR occurred in 1992, at the age of 16, while residing in a foster home located in ████████████████████████ California. He met ████████████, a methamphetamine dealer, who claimed to be a NLR member. ████ chose ████ as a "role model," and began carrying himself in the same manner. ████ reports that he ran into an enemy of ████'s and, to gain respect from ████ and others in the neighborhood, ████ "took care of business," by assaulting ████'s enemy. ████ believes this was a turning point in his life. He learned that by instilling fear he gained a false sense of power, control, and respect from others.

████ admits to selling methamphetamine for ████████████ from ████████ California until he was arrested on November 26, 1994, for receiving stolen property, resulting in a camp placement.

M. D. Castellaw
Debrief of ███████████
Page 2

CONFIDENTIAL

While awaiting trial in the San Bernardino County Jail, ███ claims there were no NLR members in his unit; however, he took it upon himself to check all white inmates' "paperwork" ███████████). In an attempt to "weed out" all sex offenders, ███ began organizing the "Woods" (white inmates) in the unit. In 1994, an alleged sex offender, █████ was housed in ████'s unit. ███ took it upon himself to assault ███████, was transferred to the California Department of Corrections (CDC) for incarceration.

On February 23, 1995, ███████ began to serve a one-year and four month sentence. ████ was received at the California Correctional Institution (CCI) Reception Center, in Tehachapi, California where he was housed in a gym setting. While at the Reception Center, ████ became acquainted with Leonard MOORE, ████████████ "Lenny," from Fontana, California. ████ heard rumors that there was possibly a rift between the AB and the NLR. ████ had respect for both groups so he decided not to pursue membership into either gang until he was able to research each group's political agendas. ████ chose to associate himself with the Inland Empire (IE) Peckerwoods. According to ████ the IE Peckerwoods are not a prison or street gang, just the "Woodpile from I" (███████████████). ████ admits to physically assaulting several inmates while incarcerated at CCI, but he was never charged in these incidents.

On June 7, 1995, ████ was transferred to McFarland Detention Center (CCF), Level I, at which time he physically assaulted inmate ████ L████████ (████████████). ████ claims the reason he assaulted Lipscombe was because L████ had been talking disrespectfully about Lenny Moore. ████ received a higher custody level due to the assault and, shortly thereafter, he was transferred to California State Prison, Corcoran (Corcoran).

Upon his arrival at Corcoran on August 25, 1995, ████ met NLR member "Blue" from Orange County (unable to identify). Blue was the only NLR member on his yard, but they rarely communicated due to a lockdown, and ████ paroled from Corcoran in December 1995.

On December 1, 1995, upon ████ release from custody, he returned to Victorville, California located in San Bernardino County. However, in August 1996, ████ was extradited to ████████ in ███████████, where he accepted a guilty plea on two counts of burglary.

In October 1996, ██████ was released from ██████████ and once again returned to San Bernardino County. He was having a hard time fitting in with society. ████ was having a hard time socializing, specifically around large groups of people. He began unemployed, had no money, too much free time on his hands, and no direction in sight. He psychiatric help. He was prescribed medication, which seemed to help. However, ████ stopped taking the medication and returned to participating in criminal activities. He was eventually arrested for burglary and returned to custody.



Confidential

Reviewed by

CONFIDENTIAL

94

122585

M. D. Castellaw
Debrief of J██████████████
Page 3

**CONFIDENTIAL**

█████ was incarcerated in the San Bernardino County Jail (SBCJ) on December 16, 1996, his second term at the age of 20. █████ describes his housing assignment was equivalent to that of a "gang unit." Upon his arrival at the SBCJ, █████ claims Joseph LOWERY, █████, a.k.a. "Blue," had the "keys" (directed gang activity) to the SBCJ. It was there that █████ claims he began to "meet people of a higher caliber." █████ began associating with "Beanie," Jeffory PAXTON, █████████, from Ontario, California, and Paxton's cellie, "Bam Bam" from ████████████████ (unable to identify). █████ was involved in the assault of a Black inmate known as "Easy" (unable to identify). █████ claims Easy was the shot-caller for the Crips (street gang). As the assault escalated, the entire pod became involved, and heightened into a melee between White and Black inmates. This incident reinforced ████ reputation as being a person who would "take care of business." As a result of the melee, █████ was re-housed in Administrative Segregation (Ad-Seg) where he met "Ollie from San Bernardino" (unable to identify), and Joey B. from San Bernardino (unable to identify), both of whom ██████ identified as NLR members.

Upon █████ release from Ad-Seg, he was re-housed within the same building/section as Russell KING, █████, a.k.a. "Rusty," and Guthrie DANOWSKI, █████ a.k.a. "Fontana Kid." █████ claims that as he watched from his cell window, he witnessed King utilize an inmate manufactured weapon (knife) to slash Fontana Kid's throat and face. Correctional staff conducted a thorough search of the unit, at which time deputies discovered a weapon located in █████ belongings. █████ was returned to Ad-Seg, where he was re-housed with King.

While housed in Ad-Seg, █████ claims King received a message from Lowery, indicating King was "in the ride" (gained membership into the NLR) for slashing Fontana Kid's throat. King began grooming █████ for NLR membership. King taught █████ to get up early, exercise, study, and the basis of NLR politics. Additionally, King taught █████ how to manufacture a double-bladed razor knife. █████ states that King had claimed this type of razor knife was the same kind of weapon that he had used on the Fontana Kid. According to █████, King was "pretty much insane," and █████ gained a lot of respect from other inmates because he was able to live with King. Once King felt that █████ had been groomed enough for NLR membership he (King) contacted Lowery asking permission to bring █████ into the NLR. Lowery wrote back, stating that if █████ were able to "hit" (assault) inmate Louis F█████ (unable to identify), it would be a good start. █████ agreed, but was never afforded the opportunity to carry out the assault. Upon █████ release from Ad-Seg he was reassigned to housing within the general population. Shortly thereafter, █████ was found in possession of dangerous contraband and was returned to Ad-Seg until his transfer to CCI.

On April 8, 1997, █████ was received into the custody of the CCI Reception Center. While at the Reception Center, █████ met NLR members, Jason SWONGER, █████████ a.k.a. "Crazy Dougie" from Fontana and "Shotgun" of San Fernando Valley (unable to identify.)

On May 19, 1997, █████ was transferred to High Desert State Prison (HDSP), Susanville, California. He began associating with NLR members, Travis HOUGH, █████, a.k.a. "Crazy Trav," Michael BILEVICH, █████, a.k.a. "Spider," Cody ROSBRUGH, █████████

Reviewed by █████████████

**CONFIDENTIAL**



M. D. Castellaw
Debrief of ████████████
Page 4

CONFIDENTIAL

a.k.a. "Rhino," Daniel YATES, ████████ a.k.a. "Mugsy," and David DELAHANTY, ████████, z.k.a. "Peanut." ████ reports that there were several racially motivated riots on the yards at HDSP; however, he was only involved in one of the riots (████████████████████████████████. At that time ████████ was sent to Ad-Seg where he began spending a lot of time with Yates. ████ claims that Yates began campaigning for him to become a member of the NLR. Upon ████████ decision to become a NLR member, Yates sent a message to Bilevich stating he was in support of ████████ desire to become a member.

On November 17, 1997, ████████ and several other NLR members assaulted inmate Benny B███████████████████, which resulted in serious bodily injury. ████ claims the reason for the assault was over B███████ accumulation of drug debts ████████ ██████████████████.

Bilevich told ████████ that in order to gain membership into the NLR he would have to stab "the next victim" who came to the exercise yard. Additionally, ████ was instructed to stab the victim in either the neck or the eye. In early March 1998, NLR member Hough told ████ that inmate S███████████████ had been chosen as ████ victim. ████ acquired a plastic and metal-tipped weapon. Bilevich assigned ████ and Hough to carry out the attack on Sevey.

On March 13, 1998, during afternoon yard, ████ approached S███ and stabbed him in the neck area. As S███ turned, ████ attempted to stab him in the eye, but missed and stabbed him in the forehead. S███ fought back, and punched ████ in the nose, but ████ continued his attack. Delahanty, Hough, and Yates jumped in and also began stabbing S███ ████████ states Delahanty succeeded in stabbing S███ in the eye ████████████████████████. Due to the severity of the assault, ████ earned his membership into the NLR prison gang. ████ reports that his official sponsors for membership into the NLR were Hough and Belivich.

In May 1998, ████ was assigned housing with "Worm from Bakersfield" (unable to identify). Worm told ████ that his old cellie, ████████ F██████████ a.k.a. "Pirate," had told him that all NLRs were "in the hat" with the AB, and when they (NLR) got to PBSP they would be moved on. ████ confronted Farris regarding his statements about the AB wanting to attack the NLR. F███ claimed he had only said part of it. ████ told NLR member Hough what F███ had said, but when Hough confronted F███ F███ told Hough that he has never said anything about NLR/AB politics. ████ felt that F███ was calling him a liar, so ████ asked Hough for permission to assault F███. Hough gave ████ the "green light" to assault F███. On May 26, 1998, ████ retaliated against F███ by slashing his throat and the back of his neck with a razor blade (██████████████████████████████████.

From May 1997 through August 1998, ████ was involved in several cell extractions (████████ ████████████████████████). During the course of one of the cell extractions, ████ struck a member of the extraction team member's helmet. ████ was charged with Battery on a Peace Officer (████████████████████████████████) ████ admits that on several occasions, due to his actions, entire sections protested necessitating extractions. Due to

Reviewed by ████████████████

Confidential

CONFIDENTIAL

96

122587

M. D. Castellaw
Debrief of ▮▮▮▮▮▮▮▮▮
Page 5

CONFIDENTIAL

▮▮▮▮▮▮nd the following inmates' continuous disruptions, deeming them a failure to programming inmates, on August 16, 1998, inmates Delahanty, Rosbrough, Braden, Jacob, Benjamin PILARZYK, ▮▮▮▮▮▮, a.k.a. "Benji," and ▮▮▮ were transferred to PBSP.

Upon arrival at PBSP, ▮▮▮ and Pilarzyk were housed together in the Security Housing Unit (SHU), Facility C, Unit 8. This is where ▮▮▮▮met AB associate, Bob TANNER, C-29264, a.k.a. "K Bob." ▮▮▮▮immediately wrote to Tanner inquiring as to the status between the NLR and AB. Tanner told ▮▮▮ that he only knew of one incident in which a member of the AB had a conflict with a NLR member. ▮▮▮▮and Pilarzyk were cellies for approximately 15 months, until ▮▮▮▮claims that Pilarzyk began to get on his nerves. Due to the tension, on November 11, 1999, ▮▮▮▮physically assaulted Pilarzyk ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮was reassigned housing in

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ admits that he is actually a Member of the NLR (▮▮▮▮▮▮▮▮▮▮▮▮).

Upon arrival in CII, ▮▮▮▮ informed NLR members Richard MILEY, ▮▮▮▮▮▮ a.k.a. "Smiley," and Thomas GRAY, ▮▮▮▮▮, a.k.a. "Trouble," that he had just moved into their block. Within one week, ▮▮▮▮was reassigned housing in Miley's and Gray's pod. ▮▮▮▮▮▮▮▮

▮▮▮▮claims that Miley, Gray, and himself talked extensively about the politics between the NLR and AB. ▮▮▮▮ reports that both Miley and Gray were adamant that if the AB continued to disrespect the NLR, war would erupt between the two gangs. ▮▮▮▮claims both Miley and Gray claimed that they were willing to kill any AB who harmed a NLR.

▮▮▮▮ claims that in the early months of 2000, Miley began communicating with John STINSON, C-40154, a.k.a. "Youngster," and Richard TERFLINGER, B-18173, a.k.a. "Ricky T." ▮▮▮▮claims Stinson initially offered to appoint Miley and three other NLR's membership into the Brand (AB). ▮▮▮▮believes the AB made this offer, so that Miley would help control the NLR population. Miley did not agree with the AB's initial terms. Miley wanted himself placed on the AB council, and that four other NLR members of his choosing be given AB membership. Additionally, Miley demanded that only a NLR would be allowed to hit another NLR member, and that some of the NLRs be taken off the AB "hit list." After a short period of negotiations between Miley and the AB (Stinson), Miley told ▮▮▮▮that both Terflinger and Stinson had agreed upon most of Miley's stipulations.

According to Miley, the AB agreed that Miley would have complete control over the NLR, and that Miley would be placed on the AB council, as second in command. Miley told ▮▮▮▮that James McMAHON, ▮▮▮▮▮, a.k.a. "PeeWee," was also appointed to a position on the AB council. NLR members Thomas GRAY, ▮▮▮▮▮▮, a.k.a. "Trouble," Goran LONCAR, ▮▮▮▮ a.k.a. "Lightfoot," and Jason GANN▮▮▮▮▮ a.k.a. "Creeper from Visalia," were each given membership into the AB. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Reviewed by 

Confidential

CONFIDENTIAL

122588

97

M. D. Castellaw
Debrief of ▇▇▇▇▇▇
Page 6

CONFIDENTIAL



▇▇ claims that Miley was unable to get NLR members out of trouble with the AB who had aligned themselves as FTB's (Fuck the Brand) members. ▇▇▇ describes the FTB as a faction of the NLR who refuse to align themselves with the AB. However, Miley told ▇▇▇ that his intention in uniting the two gangs (AB and NLR) was to bring NLR members into the AB who were loyal to the NLR, and eventually inundate the Brand with NLR, swinging the balance of power to himself and the NLR. In ▇▇▇ opinion, he does not foresee Miley having the ability to overthrow the Brand.

According to ▇▇▇ several of the younger AB's are very upset with Stinson and Terflinger, because Miley was placed in such a high position without even having to serve the standard two-year probation period. Both Miley and Gray told ▇▇▇ that once he met the AB's required two-year waiting period, he ▇▇▇ would be put up for membership into the Brand. Miley began to set his plans in motion for ▇▇▇ future leadership role in the NLR. Miley wanted McMahon closer to him, and ▇▇▇ moved to C3 where he would be in charge of all NLR business. Miley instructed ▇▇▇ to inform everyone he came in contact with what had transpired between the NLR and AB, and that he was the top NLR member. Miley instructed ▇▇▇ to house up with any FTB member who was assigned housing in the unit for the purpose of killing them.

During May 2000, ▇▇▇ was re-housed in C3, which also housed NLR members Delahanty and Rosbrugh. These three proceeded to establish and enforce the following rules for the NLR and Woods housed in C3:

- No cell extracting without permission
- No attacking an officer with a weapon. If an inmate had a personal issue with an officer, it was okay to fight; however, a weapon could not be used without permission from an AB
- In the event your cell door was accidentally opened, the NLRs/White inmates would not take the first aggressive stance. ▇▇▇ claims this change in policy was due to the peace talks, because it would appear the white inmates were not sincere
- Fighting was only allowed if you had a personal issue
- All NLRs were required to attend Law Library whenever possible, in order to pass information
- All NLRs had to arise by 0600 hours and exercise was encouraged

▇▇▇, Delahanty, and Rosbrugh began their daily regiment at 0500 hours, with a strict exercise and study routine. ▇▇▇ claims all NLRs housed in C3 began to study Spanish, in an attempt to gain an advantage over correctional staff monitoring inmate mail and conversations.

Reviewed by ▇▇▇

CONFIDENTIAL

Confidential

122589

98

M. D. Castellaw
Debrief of █████████
Page 7

CONFIDENTIAL



Reviewed by ████████

CONFIDENTIAL

M. D. Castellaw
Debrief of ▮▮▮▮▮▮
Page 8

CONFIDENTIAL

▮▮▮▮▮▮▮ ▮▮▮ explained to Wood the arrangement that had been made between Miley, Stinson, and Terflinger, and anyone who was aware of this arrangement, and chose not to ▮▮▮▮▮▮ ▮▮▮▮ agreed to honor the NLR/AB chain of command. ▮▮



▮▮▮▮▮ reports that around August 2001, he moved into ▮▮▮▮▮▮▮od, where he was celled with ▮▮▮ with ▮▮▮▮ E▮▮▮ While housed in F Pod, ▮▮▮ became acquainted ▮▮▮▮▮▮▮▮ Evans gave ▮▮▮ a piece of stainless steel, which Evans had fished out of the plumbing chase. ▮▮▮▮hid the piece of metal in a hole located in his cell locker. Evans taught ▮▮▮ how to gain access by opening the slot where the television wires go into the plumbing chase, thus allowing access to stainless steel hose clamps. ▮▮▮▮▮▮

▮▮▮▮ claims that in 2002, during an escort to ▮▮▮▮ visiting, he was able to talk to Miley, at which time ▮▮▮▮ asked how McMahon was doing. Miley stated that Pee Wee (McMahon) was "stressing" and for ▮▮▮ not to tell Terflinger. Miley further related to ▮▮▮ that he did not know if "the unity" thing was going to work out, referring to the unity between the NLR and AB.

Reviewed by ▮▮

M. D. Castellaw
Debrief of █████████████
Page 9

CONFIDENTIAL

told ████ that he respected him because he carried himself differently than the other "Woods" in the pod. ████ old Dash that he was not interested in hearing him trying to patronize him, while putting down other Woods. Dash got mad and said he that he had already "Gotten at the fellas about you punk ass youngsters." █████ told Dash that if he felt he was a punk, they could cell up together and resolve the problem. Dash said "No." However, a couple of hours later he received a cell slip, so ████ signed it and waited. In the meantime, █████ sent Miley a letter to inform him what had transpired. Miley wrote back, giving ████ permission to do whatever he needed to do, to "Keep [his] house clean." ████ a further related that it was not general practice for a NLR member to be given permission to "do whatever he has to" when it comes to business involving the AB. ████ claims the reason he was given permission to "take care of business" (to attack █████) is because he (B█████ is not a Brother (AB member), he is already an "Gotten at the fellas ████ claims that since Miley, who is a high enough ranking Brother (AB), had given him "the keys to the building," Miley could give █████ permission to hit anyone, except an actual AB member.

surrounding this incident as follows: "Little John is a bully who beat up his cellie, "Dougie," (

"Terflinger also wanted Little John dealt with because Little John had

████ reports that early in 2002, Terflinger moved into his section (C3). █████ had already left the unit, leaving inmates Terflinger, Wood, Brief, Milum, and himself. █████ immediately contacted Terflinger to let him know that Miley had put him (████) in charge of the Unit, but now that he (Terflinger) was there he would contact the other Woods and NLRs in the building to let them know he (Terflinger) would be in charge. Terflinger told ████ to keep



Reviewed by

Confidential

CONFIDENTIAL

122592

M. D. Castellaw
Debrief of ▮▮▮▮▮▮
Page 10

CONFIDENTIAL

doing what he had been doing; however, the only policy change was that if someone wanted to attack a Black or Northern Mexican on sight, it was okay.

In March 2002, ▮▮▮▮ told Terflinger that he was in possession of a piece of stainless steel and that there was a spot on his door where someone had started cutting. Terflinger instructed ▮▮▮ to utilize the piece of stainless steel to finish cutting out the spot on the door. ▮▮▮ finished cutting out the piece of the door, thus obtaining a weapon. ▮▮▮ did not want the weapon in his house and Terflinger claimed there was too much "heat" to keep the weapon in his cell. Terflinger told ▮▮▮ to hide the weapon in a crevice under the pod stairwell (common area).



▮▮▮claims the more he talked with Terflinger, the more disenchanted he became with some of the politics that were going on with the Brand and the NLR. Terflinger informed ▮▮▮ that some of the things that Miley was saying were not true. For example, Miley is not second in command with the Brand; however, he is on the Council. Terflinger told ▮▮▮that the NLR is "allowed to be associated with the AB; however, there is only one "Tip" and that is the Brand (AB)." ▮▮▮ claims that he and Terflinger got into an argument over the FTBs. ▮▮▮ agreed that the FTB's needed to be dealt with; however, ▮▮▮ also believed the lower level AB's needed to show the NLRs more respect. Terflinger claimed that a lot of the AB's viewed all NLR's as FTB's. Terflinger further stated that many AB's believe that no NLRs should get respect until all of the FTB's are gone. ▮▮▮ claims their argument left no hard feelings.

▮▮▮claims that Terflinger was always discussing his plans once he ▮▮▮ and ▮▮▮paroled. ▮▮▮ claims Terflinger's big moneymaking plans involved selling drugs. ▮▮▮ did not like the idea because of the number of people involved. ▮▮▮ expressed his concerns to Terflinger. ▮▮▮ was trying to push the idea of robbing drug dealers, or just committing robberies, because large amounts of money could be collected without having to sell drugs for a long period of time. Terflinger wanted ▮▮▮ and ▮▮▮to set up criminal activities/structure known as "Cells."

▮▮▮describes "Cells" as follows: Upon ▮▮▮s and ▮▮▮s release, they would each have two "Lieutenants" working under them. The two Lieutenants would be in charge of a crew of street level criminals, organizing drug dealing, robberies, burglaries, violent crimes, etc.  The Lieutenants would collect money from the street level criminals and, in turn, ▮▮▮ and ▮▮▮ would collect money from the Lieutenants. ▮▮▮and ▮▮▮ would send the money to AB members, or to put into a "Bank," which would be used for NLR or AB members who were being released on parole and needed money. ▮▮▮ claims as for carrying out hits for the NLR or AB, the street level criminals would not be used for this; the only people that could carry out hits would be the Lieutenants, ▮▮▮, or ▮▮▮. Each Lieutenant would be expected to "Groom" one of his street level contacts to eventually be promoted to a Lieutenant position in the event a Lieutenant was promoted to head his own "Cell."

Reviewed by
▮▮▮▮▮▮▮▮

CONFIDENTIAL

122593

(102)

M. D. Castellaw
Debrief of ████████████
Page 11

CONFIDENTIAL

According to █████ any information coming from an incarcerated AB member would be sent via legal mail. Terflinger told ████ to hire a lawyer, and have this lawyer send a few legitimate legal letters to the incarcerated member. Then, when they (████████████████ wanted to send some "Hot" mail to the prison, they were to create and use the same letterhead utilized by the attorney. Terflinger claimed that if CDC were to question the validity of the letter, the address would check out. Also, if CDC were to call the lawyer to see if the inmate had retained the lawyer that, too, would appear legitimate. █████ claims Terflinger was very upset with Paul SCHNEIDER, ███████, a.k.a. "Cornfed," for keeping letters from Attorneys Noel and Knoeller, because Terflinger felt that the letters exposed the fact that AB's use legal mail to send and receive information.

██████ claims Terflinger became very comfortable with him and ████████ Terflinger began discussing more serious issues such as bomb-making, and how much information was available on the Internet. Terflinger suggested that they could hook up with some separatist groups in Idaho. █████ claims that every time a television show came on Terflinger would call down to them and tell them to "check it out." Terflinger suggested that they should check out a United States Army book titled "████████████," to learn how to make explosives; however, █████ claims that Terflinger never mentioned a specific target.

██████ spoke to Terflinger regarding the rumors surrounding PeeWee ████████ Terflinger told ███████ that "Blue" Joseph Lowery and James MAGEE, ████████ a.k.a. Jimmy/Jimmy Mac, had told him (Terflinger) about an incident at Calipatria State Prison, where PeeWee had an argument with another inmate. Other NLRs and "Woods" told Pee Wee he needed to bring a weapon to the yard and, "take care of business." However, PeeWee did not bring a weapon to the yard and was subsequently attacked. (███████████████████████████████████████████████████████████████████████████████████████████

Terflinger told █████ that he had already brought questions about PeeWee to Miley's attention. Terflinger claims that Miley defended PeeWee and said that Jimmy Magee was lying about McMahon. Terflinger asked █████ to get at Miley and let him know what he had heard about McMahon, then Miley would know the accusations against McMahon were not just coming from a disgruntled AB member. Additionally, Terflinger wanted █████ to tell Miley he wanted McMahon tested on the streets.

According to Terflinger, once ██████ McMahon, Loncar, and ██████ all paroled, Loncar would receive the name and address of an intended victim (someone targeted for death). Terflinger again stated that he wanted McMahon tested; therefore, McMahon had to be the one doing the actual killing. █████ told Terflinger that he was not comfortable doing anything with PeeWee (███████) because of all the things he had heard about PeeWee. According to █████, Terflinger told him that if McMahon got shaky and did not carry out the required hit, then █████ was to "Do what he had to do" (kill the intended victim and Pee Wee ████████). █████ reports that this order surprised him because Terflinger had previously told him that he could not harm McMahon because he (████████ was not a member of the Brand. █████ further states that McMahon will be

Reviewed by


122594

103

M. D. Castellaw
Debrief of ▓▓▓▓▓▓▓▓▓▓▓
Page 12

# CONFIDENTIAL

"hit" anyway, once the AB finds out that he was heard saying, "Fuck the Brand." Terflinger told ▓▓▓▓ that John STINSON, C-40154, a.k.a. "Youngster," is the only person who will know that the above-mentioned inmates were carrying out AB objectives.

In May 2002, ▓▓▓▓▓ received a letter from Miley indicating that he ▓▓▓▓▓ was going to be put up for membership in the Brand. At that point Terflinger began discussing AB politics and history in greater detail with ▓▓▓▓. Terflinger told ▓▓▓▓ about Joseph HAYES', D-05432, a.k.a. "Joey," failed attempt to kill Gaven SHINE, ▓▓▓▓, a.k.a. "Irish." The failed attempt was attributed to Hayes not having a weapon. ▓▓▓▓ notes that Terflinger was furious when Hayes failed to kill Shine. However, Hayes was not placed in bad standing with the AB, because Hayes was told he would have to "make it up." Reportedly, Hayes made up for his error by stabbing somebody "down south." ▓▓▓▓ believes this to be true because while Terflinger and Hayes were both out to court in Tehachapi, California, Terflinger and Hayes were housed together for a night, and if Hayes were in trouble, Terflinger would have taken the opportunity to kill Hayes at that time.

According to ▓▓▓▓ Terflinger has the reputation of not bringing anyone into the AB himself. Usually, if Terflinger liked someone he would school them, and then tell them to associate with lower ranking Brand members. Then, one of the lower ranking members would actually put the person up for membership. This practice relieves Terflinger of having to assume responsibility for any unfavorable actions of the new member.

Terflinger told ▓▓▓▓ that Elliot Scott GRIZZLE, H-10106, a.k.a. "Rascal," sponsored Rob Johnson's membership into the AB. In early 2002, Terflinger told ▓▓▓▓ that inmates Rob JOHNSON, ▓▓▓▓▓ a.k.a. "Rob," Daniel BARTOSH, ▓▓▓▓▓ a.k.a. "Danny," and Kenny JOHNSON, ▓▓▓▓▓ a.k.a. Kenwood had just earned membership into the AB.

In February 2000, Evans told ▓▓▓▓ that he had just received a letter from Blue Stanton (Russell STANTON, ▓▓▓▓▓ a.k.a. "Blue") in which Stanton stated he had received "That position on the ranch," meaning he had just been given membership in the Brand (AB). ▓▓▓▓ claims when he told Terflinger what he heard, Terflinger told him he had never heard of the guy. Terflinger and ▓▓▓▓ later learned that "Cornfed Schneider" had brought "Blue into the AB," so Terflinger was in the process of contacting Schneider when he received word from two lawyers who told Terflinger that "Cornfed" had "flipped" (became an informant) into the federal system. ▓▓▓▓ claims Stanton's membership had not been confirmed. ▓▓▓▓ claims Joseph LOWERY, ▓▓▓▓▓, a.k.a. "Blue" was also up for membership w▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Terflinger showed ▓▓▓▓ a picture of a woman named Janet MEYERS, who Terflinger claims testified against death row inmate Curtis PRICE, ▓▓▓▓▓, a.k.a. "Baby Curt." Terflinger further stated that Meyers still lives in ▓▓▓▓▓▓▓▓▓▓▓▓, and she is a possible target for either ▓▓ or ▓▓▓▓ to kill. Terflinger told ▓▓▓▓ that if he should ever commit a murder for the AB


Reviewed by

Confidential                                                    CONFIDENTIAL

104                                                                    122595

M. D. Castellaw
Debrief of ███████████████
Page 13

CONFIDENTIAL

it was to be extremely brutal, i.e., dismember the body, burn AB on the forehead, or repeatedly return to the body and dump more lye on it in an attempt to speed up the decomposition.

Terflinger told █████ that if San Quentin death row inmate Baby Curt is executed, the AB policy is three CDC Administrators or politicians will be killed. Terflinger told █████ on several occasions that he wanted administrative level CDC employees targeted. Terflinger claimed that he did not want Correctional Officers killed because they are just doing their jobs. █████ reports that Terflinger had stated on several occasions that PBSP Warden, █████████████ and PBSP Chief Deputy Warden, ██████████████████ are two prime targets. Terflinger believes they are responsible for all the new restrictions that are being placed on SHU inmates. ████████████████

Terflinger suggested to ██████ that if explosives were hidden in an ambulance that would be an easy way to blow up a State building, because an ambulance driving right up to a building's door would not alarm anyone.

█████ contends Terflinger has a couple of people who write to him, but █████ is unaware of any real moneymaking schemes involving Terflinger. █████ does not believe Terflinger currently has anyone living within the community who will carry out AB missions. However, █████ states that in 2004, Terflinger will have the following inmates carry out AB/NLR objectives upon their release from PBSP.



Loncar will be expected to organize business on the street. Terflinger instructed █████ to tell Loncar he would be in charge of the San Fernando Valley.

█████████████████████████████████████████████████████

pushing the issue that McMahon be tested (i.e., he needs to kill for the AB). █████ claims that if McMahon fails, he will be killed.

Reviewed by


CONFIDENTIAL

122596

105

M. D. Castellaw
Debrief of ████████████████████
Page 14

CONFIDENTIAL

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ reports that Allendorf is very close to Terflinger, and ██████ knows that Allendorf has been instructed to carry out missions for Terflinger.

██████████████████████████████████████████████████████

████████████████████████████████████████████████████ claims that
w████████████████████████████████████████████████████████

Terflinger added a few of his own agendas and authorized Wood to work under the Brand name. ████ claims that Wood has been instructed to lay low for awhile. Then, Wood is to begin taxing local drug dealers for the AB. Wood is required to find out who the customers of the drug dealer's are. If they own or manage a business, Wood is to pressure/manipulate them into hiring AB or NLR members/associates for employment, upon their release from prison. In ████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

at the same time he (████ was and he would put them in touch. Terflinger told ████ that Eric would be out Eric had already done some things on the PBSP mainline for the Brand

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Reviewed by

Confidential                     CONFIDENTIAL

122597

M. D. Castellaw
Debrief of ███████████████
Page 15

CONFIDENTIAL



**Drug Activity:**









CONFIDENTIAL

122598

107

M. D. Castellaw
Debrief of ████████
Page 16

CONFIDENTIAL



Terflinger instructed ████ to contact Rob Johnson via "Sparky's" (Phillip Evans) mail drop, to let Rob Johnson know that he had been approved for membership into the Brand.

Reviewed by 

CONFIDENTIAL

122599

108

M. D. Castellaw
Debrief of █████████
Page 17

CONFIDENTIAL



...claims inmate Michael BRIDGE's, ████████ a.k.a. "Snake," lawyer (unable to identify) sent Terflinger several copies of the February 2000, Grand Jury NLR Rico Indictments report, along with a request asking Terflinger for advice on debunking any of the informant's information. Terflinger gave ████████ copy of the report. ...

Reviewed by


Confidential

CONFIDENTIAL

122600

(09

M. D. Castellaw
Debrief of ████
Page 18

CONFIDENTIAL





CONFIDENTIAL

122601

M. D. Castellaw
Debrief of
Page 19

CONFIDENTIAL



**Confidentiality:**

The following is an index of persons referenced in this report. This report should be placed in the Central Files of the persons who have been identified as being or having been under the supervision of the California Department of Corrections.



CODE          MEANING                              CODE       MEANING



Reviewed by

Confidential

CONFIDENTIAL

122602

M. D. Castellaw
Debrief of ████████████
Page 20

CONFIDENTIAL



122603

M. D. Castellaw
Debrief of █████████
Page 21

CONFIDENTIAL



Page Locator Index of Persons Referenced in this Report:



Confidential

CONFIDENTIAL

122604

M. D. Castellaw
Debrief of ███████
Page 22

CONFIDENTIAL



Confidential

CONFIDENTIAL

122605

114

M. D. Castellaw
Debrief of
Page 23

CONFIDENTIAL



| N/A | | N/A | | |
| N/A | | N/A | | |
| N/A | | N/A | | |
| N/A | | N/A | | |
| N/A | | N/A | | |
| N/A | | N/A | | |
| N/A | | N/A | | |

**Reliability:**

Per CCR, Title 15, Section 3321(2), the informant is considered reliable if another confidential source has independently provided information. In this instance, as documented by the confidential file, another informant has provided information that is consistent with and supports the information provided by this informant. Corroboration is documented throughout ████ debrief report.



Reviewed by



CONFIDENTIAL

115

M. D. Castellaw
Debrief of
Page 24

CONFIDENTIAL

Conclusion:



Statement of Confidentiality:



C. McGuyer
C. MCGUYER
Correctional Sergeant
Institutional Gang Investigations

M. RANDOLPH
Correctional Lieutenant
Institutional Gang Investigations

NOTED/APPROVED

RUBEN ROMAN
Special Agent
Special Services Unit

Reviewed by

CONFIDENTIAL

Confidential

116

*Maxine McPhen*

**DEBRIEF OF INMATE** ███████ ██████████████████████



## 8/12/99 – 11/24/99 ACTIVITY CIM PALM HALL:

Subject says when he arrived at CIM he went to Palm Hall, AB members, *'Blinky' Griffith
(Robert Griffin, B26484)* from *OC;* *'Turtle' Harper (John Harper,* ██████ from ██████ and
*'Hillbilly' (Robert Peterson,* ██████) frcm ██████████ e were there.

**Confidential**

117

122608

DEBRIEF OF INMATE ██████████████

Subject says he was on the first tier and he was able to talk to *'Blinky'*. Subject says they were all going to the yard and he was on walk alone status for 30 days, when he first got there.

Subject told *'Blinky'* he was planning to go to the yard after his 30 days was up. Subject says he told *'Blinky'* he was one of the NLR who started *"FTB"* along with *'Mikey' Hikes*. Subject says *'Blinky'* told him he respected him for telling him the truth and not locking up. *'Blinky'* told him it wasn't his house, it was *'Turtle's'* but he would get at *'Turtle'* and ask him to give Subject a pass. Subject says they did give him a pass and he did go to the yard. Subject says after a couple of weeks on the yard *'Turtle'* asked him if he was interested in becoming *"Brand"* (AB). Subject said he feared if he said no they were going to kill him, so he said yes. *'Turtle'* then told him he had to kill *'Mikey' Hikes* to show his loyalty to the Brand. Subject says *'Turtle'*, *'Hillbilly'* and he talked about it during every scheduled yard time and *'Blinky'* never took part in the discussions. Subject says *'Turtle'* told him he wanted him to torture *'Mikey'* and then cut off his head and put it on a stick.

Subject says in October 1999 *'Bucket Head'* (*Griffin*) disrespected **'Thrasher'** (**Billy McConnell**, ██████ from *Long Beach*, out on the yard, *'Turtle'* told *'Thrasher'* to stab him so he did. *'Thrasher'* stabbed *'Bucket Head'* in the back of his neck. Subject says with the plan to kill *'Mikey'* now on him, he just kicked back and waited. Subject says nothing else happened and he was transferred to CSP - Corcoran SHU.

Confidential

118

122609

Report of Interview with John Harper on May 31, 2006
and August 10,2006, by Special Agent Michael
Halualani, Bureau of Alcohol, Tobacco, Firearms and
Explosives, Los Angeles, California.  Mr. Harper
stated the following:


He is a member of the Aryan Brotherhood prison gang.

That in or about 1993, while he was housed at Pelican Bay
State Prison, he was told by Aryan Brotherhood member Todd
Ashker that Robert "Blinky" Griffin, one of the original
members of the California commission, wanted Aryan
Brotherhood member Arthur Ruffo murdered.  He had also been
told by other Aryan Brotherhood members that Griffin was
actively campaigning to have Ruffo murdered.

That a few months prior to the murder of Ruffo, he was in
the law library at Pelican Bay State Prison with John
Stinson and Richard Terflinger, who were two of the three
members of the California commission.  At this time, he
heard Stinson and Terflinger order AB member Brian Healy to
murder Ruffo.

He was told that the California commission had ordered the
murder of Ruffo because of ongoing problems between Ruffo
and other Aryan Brotherhood members.  Furthermore, that the
rules of the Aryan Brotherhood required the California
commission, at the time comprised of Stinson, Terflinger
and David Chance, to approve and order the murder of Ruffo.
He added that it was common knowledge that their was "bad
blood" between Griffin and Ruffo stemming back to the early
days of the Aryan Brotherhood.

In 1999 or 2000, he was housed at Palm Hall with Griffin.
Griffin told him that he was "glad" that Ruffo had been
killed.

Confidential

119

122610

Report of Interview with John Harper on May 31, 2006
and August 10, 2006, by Special Agent Michael
Halualani, Bureau of Alcohol, Tobacco, Firearms and
Explosives, Los Angeles, California.  Mr. Harper
stated the following:

He is a member of the Aryan Brotherhood prison gang.

After he paroled from the California Department of
Corrections in 2000, he received a letter from California
commission member John Stinson.  He was told by Stinson and
California commission member Richard Terflinger that upon
his release from prison he was to begin "acting like" Aryan
Brotherhood member Ronald Slocum.

That is conveying information between the members of the
Federal Commission and California Commission.  Also, he was
to relay the instructions of the California commission to
AB members and associates in prison and out of prison.

He was also to coordinate and organize members and
associates of the Aryan Brotherhood who were released from
prison to conduct illegal activities for the organization.
He was supposed to provide newly released members and
associates with firearms, lists of businesses and narcotics
traffickers that can be targets for extortion or robbery,
and businesses that will assist in the laundering of money
obtained by the Aryan Brotherhood.

He arranged a meeting with Aryan Brotherhood associate
Thomas Hampton so that Hampton could begin conducting
illegal activities for the benefit of the Aryan
Brotherhood.  He planned on having Hampton begin
trafficking in narcotics and "taxing" narcotics traffickers
in order to obtain money for the Aryan Brotherhood.
Finally, that Hampton did not show up for the planned
meeting at the United States Post Office in Malibu.

**Confidential**

120

122612

Report of Interview with John Harper on May 31, 2006 and August 10, 2006, by Special Agent Michael Halualani, Bureau of Alcohol, Tobacco, Firearms and Explosives, Los Angeles, California. Mr. Harper stated the following:

He is a member of the Aryan Brotherhood prison gang.

That approximately five months prior to the murder of Aryan Brotherhood Aaron Marsh, he was in the law library at Pelican Bay State Prison with John Stinson and Richard Terflinger, who were two of the three members of the California commission. At this time, he was told by Stinson and Terflinger that Marsh was to be murdered.

A few weeks prior to the murder of Marsh, he was in the law library with Stinson and Terflinger. At this time, Stinson and Terflinger to him have Marsh move out of his cell because they wanted Marsh to cell with Aryan Brotherhood member Gary Littrell so that Littrell could murder Marsh. After speaking with Stinson and Terflinger in the law library he returned to his cell and told Marsh to "move out". Within a few days, Marsh moved into a cell with Littrell.

Following the murder of Marsh, he spoke with Littrell and Aryan Brotherhood member Scott Grizzle about a defense if they were charged with the murder of Marsh. He told Littrell to "lie" and claim self defense as the reason he killed Marsh.

Confidential

121

122611

## CERTIFICATE OF SERVICE

I, <u>Tonia L. Johnson</u>, declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy of:

**GOVERNMENT'S OPPOSITION TO DEFENDANT GRIFFIN'S MOTION IN LIMINE RE FED. R. EVID §§ 404(b) AND 403; MEMORANDUM OF POINTS AND AUTHORITIES**
service was:

[ ] Placed in a closed envelope, for collection and interoffice delivery addressed as follows:

[X] Placed in a sealed envelope for collection and mailing via United States Mail, addressed as follows:

**SEE ATTACHED SERVICE LIST**

[] By hand delivery

[ ] By facsimile as follows:

[ ] By messenger as follows:

[ ] By federal express as follows:

This Certificate is executed on **October 4, 2006**, at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.

TONIA L. JOHNSON

122

<u>U.S. v. ROBERT LEE GRIFFIN, ET AL.</u>,
CR NO. 02-938-RGK

Joseph F. Walsh, Esq. (ROBERT GRIFFIN)
316 West Second Street, Suite 1200
Los Angeles, CA 90012
Email: Attyjoewalsh@aol.com

Michael M. Crain, Esq. (ROBERT GRIFFIN)
P.O. Box 3730
Santa Monica, CA 90408
Email: Michaelmcrain@aol.com

Knut Johnson, Esq. (DAVID CHANCE)
1010 Second Avenue, Suite 1850
San Diego, CA 92101
Email: knut@knutjohnson.com

John Cotsirilos, Esq. (DAVID CHANCE)
2442 Fourth Avenue
San Diego, CA 92101
Email: Mccabeatty@aol.com

Paul Potter, Esq. (JOHN STINSON)
Potter, Cohen & Samulon
3852 East Colorado Blvd.
Pasadena, CA 91107
Email: pepsquire@earthlink.net

Terrence Bennett, Esq. (JOHN STINSON)
P.O. Box 709
Pasadena, CA 91102-0709
Email: benedictus@earthlink.net

Stanley Perlo, Esq. (RICHARD TERFLINGER)
250 West Ocean Blvd., Suite 1714
Long Beach, CA 90802
Email: sperloesq@aol.com

Matthew J. Lombard, Esq. (RICHARD TERFLINGER)
316 West Second Street, Suite 1202
Los Angeles, CA 90012
Email: mlombard@lombardlaw.net