ORIGINAL

1  Bernard J. Rosen/S.B. No. 41538
   1717 4th St., Suite 300
2  Santa Monica, CA. 90401
   Tel. (310) 451-4577
3  Fax: (310) 451-6079
   e-mail: bernardrosenlaw@aol.com
4
5  Donald J. Calabria/ S.B. No. 44935
   16133 Ventura Blvd., Suite 600
6  Encino, CA 91436
   Tel. (818) 990-0110
7  Fax: (818) 990-7630
   e-mail: donaldjcalabria@msn.com
8
9  Attorneys for Defendant
   EDGAR WESLEY HEVLE
10



FILED
OCT 23 2006
CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY _____ DEPUTY

11          UNITED STATES DISTRICT COURT
12          CENTRAL DISTRICT OF CALIFORNIA
13
14  | UNITED STATES OF AMERICA | No. CR 02-938-DOC |
15  | Plaintiff, | **Reply of Defendant Hevle to the Government's Opposition to His Motion for a New Trial** |
16  | v. | |
17  | BARRY BYRON MILLS, et al, | |
18  | Defendants. | |
19

20      TO THE CLERK OF THE ABOVE-ENTITLED COURT AND TO THE UNITED
21  STATES OF AMERICA AND ITS ATTORNEY OF RECORD:
22      Defendant Edgar Wesley Hevle hereby files a document entitled Reply of
23  Defendant Hevle to the Government's Opposition to His Motion for a New Trial.
24  Dated: Oct 19, 2006                Respectfully submitted,
25
26
27                                     BERNARD J. ROSEN
                                       Attorney for Defendant
28                                     EDGAR WESLEY HEVLE

DOCKETED ON CM
OCT 26 2006
BY _____  172

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant Hevle has filed a Motion for New Trial on all counts of conviction and has argued that "the interest of justice" (FRCP 33(a)) would be served thereby for three reasons: a.) that the evidence was insufficient to sustain the convictions, b.) that the Court erroneously refused to admit, as a party admission, a copy of the indictment filed in *United States v. Sahakian, et al* (U.S.D.C., So. Dist. Ill.; Criminal No. 99-CR-40044-JPG), and c.) for what might be termed the collateral consequences of erroneously excluding the *Sahakian* indictment. The government has filed a rather perfunctory Opposition ("Opp.") to the motion which, for the most part, either misconstrues defendant's arguments or avoids responding to them.

1. <u>Sufficiency of the evidence</u>:

The government argues, for instance, that although the defendant has claimed that his arguments apply to all the counts of conviction, "defendant's motion does not actually state a sufficiency of the evidence argument about any counts but Nine and, partially, Two." (Opp., 1:19-22.) The government apparently chooses to ignore the fact that the Supplemental Memorandum ("Supp") the defendant filed in support of his motion, the document in response to which the government filed its Opposition, expressly acknowledged that defendant had made "somewhat similar[]" arguments, i.e., "that there was insufficient evidence to support verdicts of guilty on the four counts he has been convicted of ...," in his pre-verdict Rule 29 motions (Supp., 4:4-6), and though the dangling participle may not have represented good composition, it should have sufficed to give meaning to the later expression that defendant "*incorporates by reference herein all of the arguments he made in that 'Memorandum' concerning the insufficiency of the evidence to sustain all the counts of conviction ....*" (*Id.*, 5:26-28; emphasis added.) That "Memorandum," of course, was the pre-verdict "Memorandum of Points and Authorities in Support of Defendant Hevle's Oral Motion for Judgment of Acquittal on Counts 2, 6, 7, and 9" (Supp., 4:22 - 5:1), which document does indeed contain arguments contesting the sufficiency of

the evidence as it pertains to all the counts of conviction: Two (Memorandum, at 11-12), Six and Seven (*id*, at 4-7), and Nine! (*Id.*, at 7-11.) That defendant chose to "emphasize by reiterating" (Supp, 5:28) only a portion of those arguments does not constitute abandonment of arguments not so "reiterated."

But the government's misconstruing of defendant's argument goes much deeper. The government next contends that "There is no serious dispute about the evidence of defendant's involvement in the murders charged in Counts Six and Seven." (Opp., 1:23-25.) Au contraire. Defendant Hevle contends, and has always contended, that there is no evidence of his "involvement in the murders charged in Counts Six and Seven" (*ibid.*) at all. And, indeed, the Court has already expressed at least its partial agreement with that contention -- in that part of its "Order re Defendant Hevle's Motion for Judgment of Acquittal" in which it ruled that the government would not be permitted to obtain Hevle's conviction of those crimes as an "aider and abettor." This ruling was based, obviously, on the Court's ultimate conclusion that the government had been "unable to prove that Hevle specifically intended that the Lewisburg murders occur as the result of the message he sent through Dewey Lee ...." (Order, 10:25-26.)

The government then goes on to argue, as though such an argument is decisive, that the jury has already resolved all of Hevle's disputes against him. (Opp., 2:10-11.) That may be correct -- but that's why defendant Hevle is seeking a new trial! It's certainly not a reason to deny him one! And whatever the evidence may have been concerning the history and character of the AB, given the evidence concerning "the genesis of the race war" (Opp., 2:12-12) -- the undisputed evidence concerning the genesis of the race war -- the defendant submits that the evidence in support of his convictions of Counts Six and Seven, other than that "history and character evidence," was plainly insufficient! After all, whatever the history and character of the AB may be, "evidence of gang membership cannot itself prove that an individual has entered a criminal agreement to attack members of rival gangs" (*United States v.*

*Garcia*, 151 F.3d 1243, 1246 [9th Cir. 1998]) and, defendant Hevle submits, given the evidence of the genesis of the race war, and the Court's finding that the government did not prove that he "specifically intended that the Lewisburg murders occur as the result of the message he sent ...," there is no evidence of his complicity in the commission of the murders alleged in Counts Six and Seven -- except his gang membership!

In addition to misconstruing defendant's arguments, the government has been rather loose with its description of the evidence and its rendition of the facts it claims to have proved. This may be the result, in part, of its choosing not to cite to the record for its evidentiary and factual representations. Thus, for instance, the government asserts that amongst the things it had proven as evidence of defendant's guilt of the RICO conspiracy alleged in Count Two was that "defendant *celebrated with* Tommy Silverstein when Mills killed Marzloff[] ...." (Opp., 2:27-28; emphasis added.) The record, on the other hand, establishes only that when Silverstein, after learning of the Marzloff murder (Reporters Transcript ["RT"], 3/21/06, v. III, 17:14-18:25), was heard to be yelling to Hevle, "He's dead." Hevle's response was, "Who's dead?" (*Id.*, 21:4-14; 22:7-12.) And that when Silverstein then replied, "We got him." Hevle's only response was, "We got who?" (*Id.*, 22:13-17.) In the government's mind this is evidence of "celebrating with;" to defendant Hevle, on the other hand, it seems, rather, to merely push Al Benton's opinion of him -- oftentimes "out of the loop" (*id.*, 5/30/06, v. II, 86:17-87:6) -- to an earlier starting point!

Nor is this the only example. The government asserts, again without citation to any evidence, that "At Lompoc, [Hevle] was involved in the murder[] of ... William McKinney." (Opp., 3:6-7.) The evidence established, of course, that McKinney was fatally assaulted at USP Lompoc on December 28, 1992. (See, e.g., RT, 5/11/06, v. III, 63:4-11.) Moreover, other evidence -- other <u>government</u> evidence -- established that McKinney arrived at Lompoc on August 21, 1992. (Government exhibit 336: William McKinney's "Inmate History Quarters" [IHQ].) Yet that same evidence --

government's exhibit 314 (Hevle's IHQ) -- also established that Hevle left Lompoc on January 12, 1990 -- almost three years prior to that assault! -- and to this date has yet to return. Nevertheless, argues the government, the Court should deny Hevle a new trial because, in part, it has proven that "At Lompoc, he was involved in the murder[] of ... William McKinney." (Opp., 3:6-7.)

Also misconstrued is defendant Hevle's argument about the insufficiency of the evidence to support a conviction for Count Nine, the murder of Arva Ray. The attack on that count, the government asserts, "amounts to no more than the claim that some conversations described by West, Manby, and Miller could not have taken place *at precisely the place or time that the witnesses recalled them.*" (*Id.*, 3:20-23; emphasis added.) <u>If</u> this was, in fact, all that the defendant's claim amounted to, nevertheless, the government has still not been able to give the Court any reason -- as by the citation to other nonimpeachable evidence -- why it should not, for that reason alone, doubt their capacity to recollect accurately and, therefore, the sufficiency of their testimony to support the conviction. In this motion, after all, the Court not only "need not view the evidence in the light most favorable to the verdict; *it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.*" (E.g., *United States v. Alston*, 974 F.2d 1206, 1211 [9th Cir, 1992; emphasis added, internal citations omitted].)

But this is not the defendant's claim -- and the government knows full well that this is not the defendant's claim. Defendant Hevle is not simply claiming that "some conversations described by West, Manby, and Miller could not have taken place at precisely the place or time that the witnesses recalled them." (Opp., 3:21-23.) Rather, the defendant is claiming that "material" conversations, i.e., conversations important to establishing the credibility of each witness and the ability of each to accurately recall information as well as conversations <u>directly</u> accusing the defendant of wrongdoing, not only "could not have taken place at precisely the place or time that the witnesses recalled them," (*ibid.*) but that they could not have taken place, in

the manner recalled, at <u>any</u> place or time (or, one might add to avoid "negative pregnants," at all). This is a far more difficult issue for the Court to be wrestling with, it is submitted, than what the government would have it believe. And it is clearly apparent, it is submitted, that the government has deliberately chosen to avoid confronting and responding to the ramifications of defendant's argument in this regard -- probably because it has no alternative explanation!

As indicated above, the government's documentary evidence establishes without contradiction that Hevle left USP Lompoc almost three years before William McKinney's arrival there and never returned. He wasn't at Lompoc when McKinney was attacked and he wasn't at Lompoc when Glen West returned there in September, 1993! (Government's exhibit 347 [West's IHQ].) So where (and when) then does the government claim West had his so-called conversation with Hevle about the McKinney murder? When West was in B unit at Marion and Hevle was in C unit and would go to the rec yard? -- the version West switched to when confronted with the fact that he and Hevle were never at Lompoc together after 1989! (RT, 3/16/06, v. IV, 7:5-25.) Notice that the government doesn't adopt this version of "the facts" either. And for good reason -- the government knows better!

Hevle and West were at the same institution again for a short period of time after the McKinney murder -- at USP Marion for four days in 1993. Hevle was transferred out of Marion's B unit and started his movement to Lewisburg on June 29, 1993 (Exhibit 314), while West arrived at Marion from Leavenworth on June 26, 1993. Nevertheless, such a conversation didn't happen -- indeed, couldn't have happened -- there, either! West was placed in I unit -- the Marion "hole," at the time (RT, 4/19/06, v. II, 10:3-11) -- and kept there until July 1, 1993 (Exhibit 347), three days <u>after</u> Hevle had left Marion. So what? So this: West admitted that an inmate in the hole at Marion -- at the time the most secure prison in the federal system (!) -- could NOT talk to an inmate outside that unit! (RT, 3/16/06, v. IV, 39:4-23.) So where then does the government suggest that their conversation took place? And when?

And where is the fallacy in defendant's assertion, made in his motion, that it is almost a certainty that any conversation West may have engaged in concerning the McKinney murder was engaged in with William Kelly, not Edgar Hevle? And if this is so, from what other evidence can the Court, nevertheless, gain certainty that the rest of West's testimony is reliable and credible? The government, it appears, has nothing in the way of assistance to offer the Court on this crucial point. The government, of course, can choose to ignore it; the Court, it is respectfully submitted, may not.

And this dilemma repeats itself with Manby. If he did engage in conversation about the Arva Ray murder with anyone who threatened him with a "necktie man" it must have been, as he repeatedly testified, "after" the Ray murder (*id.*, 5/9/06, v. IV, 58:14-59:12; 5/10/06, v. I, 10:16-11:6 (!), 45:14-22; v. II, 17:8-18:1 (!); 5/11/06, v. I, 19:16-24) -- because the idea to strangle Ray with a garrote was apparently a last-minute decision by Glen Filkins when the "hot-shot" attempt didn't seem to be working! (*Id.*, 3/21/06, v. IV, 40:10-42:13.) But as the government's records establish, Hevle did NOT come out of the Lompoc "hole," as Manby initially testified (*id.*, 5/9/06, v. IV, 58:24-59:12), after the Ray murder and he was gone from Lompoc, entirely, when Manby, a year later, was moved into the hole. So where did this conversation occur? When? With whom? And if the Court has doubts about Manby's contention that Hevle did participate in such a conversation, on what other evidence can the Court rely to conclude that, nevertheless, everything else Manby had to say about Hevle is reliable and credible? Once again the government's silence resonates.

Contrary to the government's assertion, the impossibility of these conversations occurring does indeed "undercut" the testimony of witnesses concerning their recollection of events seventeen years in the past, including, it is submitted, "that defendant was a leader of the AB at Lompoc at the time" (Opp., 3:24-26) and, especially, "that he wanted to have Ray killed." (*Id.*, 3:26.) This may

constitute, as the government claims, merely "arguing his case once more" (*id.*, 4:1), but that is what a motion for a new trial is: an argument, "once more," but to a different entity -- the court -- which has the authority and, it is submitted, the duty to "*weigh the evidence and in so doing evaluate for itself the credibility of the witnesses*"! (*United States v. Alston, supra,* 974 F.2d at 1211; emphasis added.)

2. The Illinois indictment:

Concerning defendant's contention that the Court erred in excluding the *Sahakian* indictment, the government first argues that defendant's argument that such error should cause the granting of a new trial on Counts Two and Nine, as well as Six and Seven, is "silly," as that indictment "makes no mention of [the Ray murder], and has nothing to do with Counts Two or Nine." (Opp., 4:8-12.) Sadly, it is the government's response that tilts towards silliness.

The government made certain choices in deciding how to prosecute this case, and choices have consequences. Amongst its choices were to allege the substantive murder counts, Six, Seven, <u>and</u> Nine, as overt acts to the RICO conspiracy alleged in Count Two. In this motion, Hevle contends that his convictions for the murders alleged in Counts Six and Seven ought to be set aside, and he be granted at least a new trial, because, amongst other grounds, the Court's decision to exclude the Illinois indictment erroneously denied him the right to present his "complete" defense (*California v. Trombetta,* [1984] 467 U.S. 479, 485) to those charges. By the government's choice, however, the events leading up to and surrounding those two murders were also alleged as overt acts to the RICO conspiracy charge, indeed, they constituted a substantial part of that charge -- almost sixty overt acts worth, far more than any other specific criminal event was awarded. *A fortiori*, it is submitted, if the Court's error denied Hevle the right to present his "complete" defense to the murders alleged in Counts Six and Seven, at the very same time it denied him the right to present his "complete" defense to a substantial part of the RICO conspiracy charge! By choosing to "double" the effects of a conviction, in other words, the

government took on the risk of "doubling" the effects of any error that might have occurred.

And how quickly the government forgets *Pinkerton* liability -- when it's no longer convenient. The jury was instructed that they could convict defendant Hevle of the Ray murder on the basis of "co-conspirator liability." (Court's Instruction 41; RT, 7/14/06, v. I, 119:20-22.) There was no instruction, however, nor government argument, for that matter, that that liability had to be based on some separate conspiracy limited to furthering only the effort to murder Ray. Given the "hardly overwhelming" government case (*United States v. Crosby*, 75 F.3d 1343, 1349 (9th Cir. 1996) presented by the testimony of Miller, West, Manby, and Kelly (see above) regarding Hevle's direct involvement in the events leading up to that murder, it is very likely, it is submitted, that the jury, having already convicted Hevle of conspiracy -- the RICO conspiracy alleged in Count Two, which included, of course, the Ray murder as overt acts thereto(!) -- decided that that was the conspiracy by which he was rendered liable for the Ray murder as well. But if he was erroneously denied the right to present his "complete" defense to the conspiracy charge ....

The last sentence need not be finished for the concept to be understood. The issue is not whether the Illinois indictment "mentions" the Ray murder, it's whether the criminal activity that was <u>also</u> the subject of the Illinois indictment was used as a means of obtaining Hevle's conviction for Count Nine, and, if so, the effect on the latter conviction of the erroneous refusal to permit Hevle to present his "complete" defense to the former. Clearly, it is submitted, not only was what happened in Illinois used as a means of obtaining the RICO conspiracy conviction, here, it played a significant and substantial role in that regard. It also, therefore, played a significant and substantial role in establishing the conspiratorial basis of liability for Count Nine! If error was committed in this regard, it was error that prejudicially affected defendant Hevle defense to Counts Two and Nine, as well as Six and Seven!

Epithets are not answers. Defendant's argument is not silly. It is simply

another application of the rule "which requires a verdict to be set aside in cases where the verdict is supported [as possibly, here] on one ground, but not on another, and it is impossible to tell which ground the jury selected." (*Yates v. United States*, 354 U.S. 298, 312 [1958].)

The government goes on to argue that the defendant's contentions about the relevance of the Illinois indictment are "mistaken" because, in part, he doesn't understand "the differing relevance" of his message to what the government seems to suggest were two separate race wars -- that declared against black inmates at USP Marion and that declared against black inmates at penitentiaries across the country. (Opp., 4:17-23.) That difference the government claims is, one chronological, i.e., the message arrived after the Marion war had been declared but before the declaration of the national war (*id.*, 5:1-6) and, probably more importantly, because "it was *peculiarly relevant* to a national extension of the race war, because it was a call to arms from another AB leader from another prison." (*Id.*, 5:6-8.)

Concerning the government's chronology, defendant Hevle assumes that the government's position is that the national war hadn't been "declared" until a second "Commissioner" had approved it. But the government's evidence clearly establishes that AB member Sahakian had come to the conclusion that it should be nationalized well before it was. So when does the government claim it established that Sahakian came to this decision? And what is the government's proof of that? These are not just rhetorical exercises. The government's contention that Hevle's message was "peculiarly relevant" is so, it is submitted, only IF the government can show that it was delivered to Sahakian before he had come to that conclusion AND if the government can show that it influenced that decision.

Clearly, the government cannot prove the chronological link necessary to establish "peculiar relevance." More importantly, however, it didn't even attempt to prove any effect of Hevle's message -- on anyone! Lee, himself, testified that McElhiney's only response to the message was that Lee "was a little late" because of

what had already occurred on January 2nd. (RT, 5/23/06, v. I, 25:14-25.) And, indeed, the only other reference to the message -- one that emerged via a somewhat non-responsive answer to a question obviously seeking different information put later to Jesse VanMeter (*id.*, 5/30/06, v. IV, 15:4-10) -- actually negated any relevance the message may have had for the government's position, peculiar or otherwise!

The message VanMeter testified that Lee[1] told him he brought from "Snail" was that there had been "a skinhead incident" at USP Lewisburg that was "*an isolated incident* between ... the skinheads and the Muslim[s] ...."! (*Id.*, 15:11-16:2; emphasis added.) The relevance of this version of the message -- a version closely tracking what actually occurred at Lewisburg[2] -- lies only, it is submitted, with the defense. Given "the evidence about the history and character of the AB" (Opp., 2:11-12), calling an incident "isolated" seems much more like a call for calm than one "to arms," as the government would characterize it. (*Id.*, 5:7.) VanMeter's version of the message, in other words, contradicts any suggestion, or "twist," the government would like to give to it in order to further its insistence that somehow Hevle was "involve[d] in the murders charged in Counts Six and Seven"! (Opp., 1:24-25.)

The government also goes on to contend that the cases defendant Hevle cited do not support his position because, in part, they "all involve *positive* evidence that was *directly in conflict with* the government's case." (Opp., 5:28-6:1; emphasis added.) First of all, it is submitted, none of them involved evidence "*directly in conflict with* the government's case." Each involved nothing more than circumstantial evidence from which a jury might, if they chose, draw inferences contrary to the government's

---

[1] VanMeter identified Lee as "Tony" (RT, 5/30/06, v. IV, 15:8) but Dewey Lee testified that other inmates called him "Tony." (*Id.*, 5/23/06, v. 1, 48:24-49:1.)

[2] Al Benton testified, amongst other things, that, "... one of them (i.e., a skinhead) changed to a Muslim and his partners got mad ... and they killed him, which set all the blacks and Muslims ... in a frenzy" (RT, 5/25/06, v. III, 52:25-53:5), "15 blacks took turns killing this one white kid on the range ..., that was their response" (*id.*, 53:8-16), but "... basically it didn't concern us, ... the Aryan Brotherhood." (*Id.*, 54:15-16.)

position. The medical records proffered in *Blaylock* (*United States v. Blaylock*, 20 F.3d 1458 [9th Cir. 1994) wouldn't have established that defendant <u>didn't</u> run out of the apartment, as the officers had testified -- a "direct" conflict with that testimony -- they merely constituted evidence from which the jury "could have [so] inferred ...." (*Id.*, at 1464.) Similarly, in *Crosby* (*United States v. Crosby, supra* [75 F.3d 1343]), the excluded evidence merely would have provided the defense a basis for arguing that "someone other than Crosby had the opportunity, ability, and motive to commit the crime" (*id.*, at 1347), a far different case, it is submitted, than establishing that Crosby did not, in fact, assault Dorothy -- the "direct" conflict with the government's case. And finally, the evidence excluded in *Cruz-Garcia*, (*United States v. Cruz-Garcia*, 344 F.3d 951 [9th Cir. 2003]) rather than establishing that that defendant was not involved in drug trafficking -- i.e., the direct conflict -- would merely have established that the government's cooperating witness "could have more than held his own against a box of rocks, [i.e., he had an] ability to act on his own, [which] could well have cast a reasonable doubt on the theory that defendant must have been involved." (*Id.*, at 958.)

More importantly, however, the Federal Rules of Evidence do not limit the admissibility of evidence to that which is "positive" but, rather, admits all, subject to certain exceptions, which is "relevant." (Rule 402.) As the government seems well aware, "relevant" evidence includes "admission[s] by silence, or ... omission." (Opp., 5:17-18.) Defendants are frequently skewered by that kind of evidence (see, e.g., *United States v. Monks*, 774 F.2d 945, 950-951 [9th Cir. 1985]), yet the government offers no reason why the rule that permits its admission against one party doesn't apply equally to -- itself! All the government feebly offers is the argument that "[t]hat silence could stem from many things other than a recognition of defendant Hevle's supposed innocence ...." (Opp., 6:21-23.) Indeed, it might -- as might a defendant's silence or omission mean something other than an admission of guilt! In *Monks*, for instance, the defendant against whom such evidence was offered

complained on appeal that his silence occurred because the statement he allegedly adopted by silence was made to him in a holding cell with other inmates present and, thus, silence was the "prudent" response. (774 F.2d *supra*, at 951.) Perhaps so, but all defendants get in that situation is the opportunity to so argue -- to the trier-of-fact! (*Id.*, at 951, fn. 4: "Of course, once the evidence was admitted, *the jury* was still free to find otherwise." [Emphasis added.]) Why doesn't that apply to the government?[3]

3. <u>Conviction of Count Two</u>:

As to Count Two, the government makes one final argument that the defendant's contention, that Count Two must be set aside if Counts Six and Seven are set aside because that would effectively undermine the finding of the necessary predicate racketeering activity, is "directly contrary to the governing law." (Opp., 7:19-20.) Rather, the government contends, "[d]efendant was guilty when he reached the proscribed agreement." (*Id.*, 8:21.)

Although defendant contends that the far more significant error regarding Count Two was the Court's refusal to permit him to present his "complete" defense, i.e. the *Sahakian* indictment, to the charge, he still contends that under the theory and arguments the government presented to the jury as the basis for defendant Hevle's conviction of Count Two, setting aside the convictions for the murders alleged in Counts Six and Seven would leave the Court, any court, unable to discern upon what predicate racketeering activity the jury based its decision. After all, the government does not, indeed, cannot, deny that the jury was specifically instructed that they had to make "special findings" regarding the type of racketeering activity each defendant "agreed would be committed" in order to convict a defendant of Count Two

---

[3] While on the subject of "admissions by silence," defendant Hevle notes that the government's silence speaks volumes on two other sub-issues raised in his Supplemental Memorandum in support of his motion for a new trial. The government does not contest that it was put on notice by Hevle's counsel that at trial Hevle would offer the *Sahakian* indictment into evidence as a party admission (Supp, at 9, fn. 4); nor does it contest the fact that despite repeated opportunity, and at least one express invitation by the Court (*id.*, 10:26-11:3), it did not interpose an objection to the proffered evidence at trial -- not as irrelevant, and certainly not pursuant to Rule 403! (*Id.*, 9:18-19.)

1 (Court's instruction 34; RT, 7/14/06, v. I, 105:5-22) and that the type of such activity
2 the jury found regarding defendant Hevle was "two acts involving murder."
3 (Verdict; RT, 7/28/06, v. 1, 27:6-7.) But as defendant originally argued, -- an
4 argument the government does not deny -- the government's opening statement
5 regarding defendant Hevle, the government's evidence regarding defendant Hevle,
6 and the government's closing argument regarding defendant Hevle repeatedly
7 stressed his involvement with only three murders -- those alleged in Counts Six,
8 Seven, and Nine. The government's reliance on these three murders as proof of
9 Hevle's guilt, it is submitted, makes his contention a reasonable one. (*Cf.*, *United*
10 *States v. Vizcarra-Martinez*, 66 F.3d 1006, 1017 [9th Cir. 1995], holding evidence
11 wrongly admitted at trial was not harmless where the "government relied heavily"
12 upon it in its "opening argument, closing argument, and rebuttal." *Accord*, *United*
13 *States v. Cruz-Garcia*, *supra*, 344 F.3d at 957, holding error in wrongly excluding
14 defense evidence was not harmless where it rebutted "the government's most
15 compelling argument against him," one upon which the government "relied
16 extensively.")

## Conclusion

As previously argued, and for all the reasons argued herein, defendant Hevle respectfully submits that the "interest of justice" warrants that the Court set aside all the verdicts of guilty returned against him and grant him new trials on those counts it believes should be re-tried.

Respectfully submitted,

BERNARD J. ROSEN
Attorney for Defendant
EDGAR WESLEY HEVLE

# PROOF OF SERVICE

STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

I am an active member of the State Bar of California and not a party to the within action. My business address is 1717 4th St., Suite 300, Santa Monica, CA. 90401.

On Oct 19, 2006, I served the foregoing document:

**Reply of Defendant Hevle to the Government's Opposition to His Motion for a New Trial**

on the parties interested in this action by:

___ personally delivering a true copy thereof to their address as follows:

___ delivering a true copy thereof by messenger to their address as follows:

___ delivering a true copy thereof by telefax to their address as follows:

X depositing it in the United States mail in a sealed envelope with postage fully prepaid to their address as follows:

Stephen G. Wolfe
Asst. United States Attorney
1500 United States Courthouse
312 N. Spring St.
Los Angeles, CA 90012

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19 day of Oct, 2006, at Santa Monica, California.