

1   DEBRA WONG YANG
    United States Attorney
2   THOMAS P. O'BRIEN
    Assistant United States Attorney
3   Chief, Criminal Division
    MARK AVEIS (California Bar. No. 107881)
4   Organized Crime & Terrorism Section
    1500 United States Courthouse
5   312 North Spring Street
    Los Angeles, California 90012
6   Telephone: (213) 894-4477
    FAX: (213) 894-3713
7   Attorneys for Plaintiff
    United States of America
8

9                   UNITED STATES DISTRICT COURT

10          FOR THE CENTRAL DISTRICT OF CALIFORNIA

11  UNITED STATES OF AMERICA,    )  No. CR 02-938(E)-RGK
                                 )
12                  Plaintiff,   )  GOVERNMENT'S OPPOSITION TO PAMELA
                                 )  GRIFFIN'S MOTION TO QUASH
13             v.                )  SUBPOENA; GOVERNMENT'S CROSS-
                                 )  MOTION TO EXCLUDE WITNESS
14  JOHN STINSON, et al.,        )
                                 )  Hearing Date: October 30, 2006
15                  Defendants.  )  Time: 1:30 p.m.
    ─────────────────────────────)

16

17       Plaintiff, United States of America, by and through its

18  counsel of record, respectfully opposes the motion to quash the

19  trial subpoena served on Pamela Griffin on the following

20  grounds: (1) the attorney-client privilege has been waived; (2)

21  the marital communications privilege has been waived; and (3)

22  movant has failed to show a basis for the spousal testimonial

23  privilege

24       The government also cross-moves for an order excluding

25  Pamela Griffin as a witness under Fed.R.Evid. 615 on the grounds

26  that, under Rule 615, the Court shall exclude witnesses at the

27  request of a party, and no exception to Rule 615 exist.

28       Finally, at the least, the government requests that the

    Court deny Pamela Griffin's motion without prejudice and subject

DOCKETED ON CM
OCT 31 2006
BY                172

4070

1  to refiling at such time as the Court may determine that her

2  testimony may not be permitted.

3      This opposition and cross motion is based on the attached

4  memorandum of points and authorities, the Court file, and such

5  other evidence as may be received.

6  Dated: October 27, 2006           Respectfully submitted,

7                                    DEBRA WONG YANG
                                     United States Attorney
8
                                     THOMAS P. O'BRIEN
9                                    Assistant United States Attorney
                                     Chief, Criminal Division
10
11                                   MARK AVEIS
                                     Assistant United States Attorney
12                                   Attorneys for Plaintiff
                                     United States of America
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

I.    PROCEDURAL POSTURE

On August 28, 2006, the government subpoenaed Pamela Jo Griffin, defendant Robert Lee Griffin's wife and attorney, to testify at trial during the government's case in chief.  Pamela Griffin then filed a motion to quash the subpoena, claiming Pamela Griffin cannot be compelled to testify because of her privilege as both a wife of defendant and as defendant Griffin's attorney.  The motion was ordered "not filed" due to movant's counsel's failure to set the matter for a date certain hearing.  Counsel then obtained an order shortening time, setting the motion for hearing on October 30, 2006.  The government received the order shortening time on October 25, 2006.  On October 26, the Court permitted the government to file its opposition by close of business on October 27, 2006.

II.    SUMMARY

Defendant Robert Lee Griffin is currently on trial in this Court for racketeering conspiracy, 18 U.S.C. § 1962(d), and for committing violent crimes in aid of racketeering, 18 U.S.C. § 1959 ("VICAR").  As the Court well knows, the indictment alleges that Griffin was a member of the Aryan Brotherhood ("AB") and that the AB operated its organized crime ring through a "commission" of senior AB members.

For the purposes of this opposition and cross-motion, there can be no honest dispute that defendant Griffin was a member of the AB commission and, as such, was a controlling member of the AB.  The dispute, if any, however, concerns <u>when</u> defendant Griffin was a commissioner.  The government intends to prove

1   that defendant Griffin was a member of the commission or, at

2   least, was a controlling member of the AB, at all relevant

3   times.   That is, defendant Griffin, in his controlling position,

4   participated not only in the AB racketeering conspiracy at all

5   relevant times but also participated in the AB-originated orders

6   to kill Arthur Ruffo (victim in VICAR count four) and Aaron

7   Marsh (victim in VICAR count five) in 1996 and 1997,

8   respectively.

9        Part of the government's proof of defendant Griffin's

10  involvement in the AB comes from defendant Griffin's contacts

11  with the California Department of Corrections and Rehabilitation

12  ("CDC") through his duly authorized representative, namely, his

13  wife and attorney, Pamela Griffin.   Thus, as more fully

14  described below, defendant's wife and attorney, through her

15  contacts with the CDC and others, is an important government

16  witness.

17       The same contacts Pamela Griffin had with the CDC form part

18  of defendant Griffin's stated and pending claim[1] that he

19  "withdrew" from the AB at a time such that the statute of

20  limitations is a complete bar to the charges against him.

21       Thus, Pamela Griffin is both a government and a defense

22  witness.   Her testimony is admissible in the government's case

23  in chief, for the reasons stated below, not subject to any

24  privilege, and her motion should be denied.

25       Alternatively, the government suggests that the Court deny

26  the motion without prejudice, subject to refiling after the

27

28      [1]    Defendant Griffin filed a motion to dismiss on the
               ground of the statute of limitations.   That motion is
               currently pending and under submission.

4

1 Court has heard sufficient evidence from which the Court may

2 determine whether or not Pamela Griffin can or should be called

3 as a witness.

4     At the very least, as with any other likely witness, she

5 should be excluded from Court during trial.

6 III.  FACTS

7     Defendant Griffin's wife is an attorney certified to

8 practice law in California under California Bar Number 128760.

9 She represented defendant Griffin in or about 1997.  She

10 contacted the CDC and other law enforcement officials on behalf

11 of her client to explain defendant Griffin's involvement in the

12 AB.  As but one example, Pamela Griffin wrote a letter – dated

13 October 13, 1997, to CDC, under her attorney letter head, in

14 which she transmitted a document purportedly written by

15 defendant Griffin, or with his consent.  In part of the

16 document, defendant Griffin stated that, "although the term

17 'commission' has been used in some cases to describe the

18 structure of AB leadership, numerous other terms have been

19 thrown around as well.  These terms were generally the product

20 of people's imaginations."  See letter attached hereto as

21 Exhibit A.  In another letter to the District Attorney of Del

22 Norte County, dated August 18, 1998, Pamela Griffin stated that

23 "my client, Robert Griffin would like to clear up certain facts

24 . . ." concerning testimony from another prison inmate that may

25 have implicated defendant's involvement in the AB.  Nothing in

26 either documents indicated that the documents were intended to

27 answer any law enforcement inquiry, nor compelled by law

28

1  enforcement actions.  Clearly, the writings were voluntarily

2  conveyed to a third party.

3       The government seeks to call Pamela Griffin as a witness to

4  testify about the subject matter of these communications because

5  they are crucial to the elements of the RICO conspiracy under 18

6  U.S.C. § 1962(d), which the government must prove beyond a

7  reasonable doubt.[2]  Among other elements, under section 1962(d),

8  the defendant must have conspired to participate in conduct of

9  an enterprise's affairs through the pattern of racketeering

10 activity.  In this case, the AB is the enterprise in question.

11 The first writing is clearly a false exculpatory statement, as

12 the government will introduce substantial evidence that the AB

13 commission was not the product of "people's imaginations."

14 Therefore, defendant Griffin's status as an AB member, the

15 existence of the "commission," and the subject matter of

16 communications at issue are crucial to the case and the

17 government should be permitted to examine the witness about the

18 creation and other aspects of these writings.

19 IV.  ARGUMENT

20 A.   Whether to Quash a Subpoena Must Be Determined On A Case-

21      By-Case Basis

22      There is no bright line rule governing the standard a

23 federal court must follow in deciding whether to quash a

24 _____

25   [2]  The government views Pamela Griffin's motion to quash
          as without merit, not only for the reasons stated
26        herein, but because it is obviously designed to "smoke
          out" the likely areas of examining Mrs. Griffin, who is
27        clearly a hostile witness.  Therefore, as for the
          particular questions that the government will ask, the
28        government requests leave to submit to the Court a
          summary of the intended questions in camera.

1   subpoena or grant a privilege.  Rather, a court must analyze the

2   particular circumstances on a case-by-case basis as the

3   standards below show.

4        Under the Federal Rules of Criminal Procedure, courts may

5   grant a motion to quash a subpoena if compliance with the

6   subpoena would be oppressive or unreasonable.   See Fed. R.

7   Crim. Proc. 17(c)((2).[3]  When weighing the unreasonableness or

8   oppressiveness of a subpoena of a witness who has an otherwise

9   privileged relationship with the defendant, the Ninth Circuit

10  has explained that there is no "mechanical rule enabling an

11  escape from case-by-case judgment."  See In re Grand Jury

12  Subpoena to Nancy Bergeson, 425 F.3d 1221, 1225-26 (9th Cir.

13  2005) (addressing whether a client's current attorney could

14  testify against the client on non-privileged information before

15  the grand jury).[4]

16

17  _____

18  [3]   While this sub-section expressly applies to subpoenas
         for documents or production of documents, the Ninth
19       Circuit also has applied this to subpoenas for witness
         testimony, otherwise known as subpoenas ad
20       testificandum.   See In re Grand Jury Subpoena to Nancy
         Bergeson, 425 F.3d 1221, 1225 (9th Cir. 2005).  In
21       general, however, quashing a subpoena ad testificandum
         is "'very rare because until the witness is asked
22       specific questions, usually there is nothing on which
         to base a motion to quash'."  See Weinman v. Stuart
23       Cable, 427 F.3d 49, 53 (1st Cir. 2005) (quoting 9 James
         Wm. Moore et al., Moore's Federal Practice,
24       §45.04[3][a] (3d ed. 2005)).

25  [4]   Specifically, In re Grand Jury Subpoena to Nancy
         Bergeson, the Ninth Circuit explained that the
26       "defendant is not automatically entitled to an order
         quashing such a subpoena merely because the government
27       cannot show that [any] other source of testimony exists
         and that there is a compelling need for it to obtain an
28       indictment."  425 F.3d at 1225-26.

                                    7

1    When it comes to privileges, the Federal Rules of Evidence

2  also allow courts the flexibility to develop rules of privilege

3  on a case-by-case basis to "leave the door open to change".  See

4  Trammel v. United States, 445 U.S. 40, 47 (1980) (the rules of

5  evidence "acknowledge the authority of the federal courts to

6  continue the evolutionary development of testimonial privileges

7  in federal criminal trials 'governed by the principles of the

8  common law as they may be interpreted ... in light of reason and

9  experience.'") (citing Fed. R. Evid. 501).[5]   Accordingly,

10  federal courts must evaluate the applicable boundaries of both

11  the attorney-client privilege and the spousal privilege on a

12  case-by-case basis.

13    Here, it is neither unreasonable nor oppressive to subpoena

14  Pamela Griffin to testify for three basic reasons.  First, both

15  Pamela Griffin and defendant Griffin have voluntarily disclosed

16  information regarding defendant's status as an AB member,

17  waiving both the marital confidential communication privilege

18  and the attorney-client privilege.  See below.  Second, partial

19  waiver of the privilege on one subject matter equals complete

20  waiver of the privilege on that particular subject matter.

21  Hence, defendant cannot pick and chose what evidence the

22  government, or defendant, may introduce in light of any

23

24    [5]    The rule states in pertinent part: "Except as otherwise

25  required by the Constitution of the United States or
   provided by Act of Congress or in rules prescribed by

26  the Supreme Court pursuant to statutory authority, the
   privilege of a witness, person, government, State, or

27  political subdivision thereof shall be governed by the
   principles of the common law as they may be interpreted

28  by the courts of the United States in light of reason
   and experience."

1  privilege.  Furthermore, Pamela Griffin cannot use a blanket
2  assertion of the broader adverse spousal testimonial privilege
3  (hereinafter "testimonial privilege")[6] to avoid the truth.
4  Rather, the court should determine whether the broad testimonial
5  privilege applies on a question-by-question basis, analyzing
6  whether the testimony at issue is in fact adverse to defendant
7  Griffin and whether the need for probative evidence in the
8  search for truth outweighs the need to protect marital harmony
9  between Pamela Griffin and defendant.  Therefore, the
10 government's subpoena of Pamela Griffin is not unreasonable nor
11 oppressive, as the arguments below will show.
12      Finally, Pamela Griffin is clearly a witness who should be
13 excluded during trial, as with any other witness.  In light of
14 the evidence, there is no question that, at the least, she <u>could</u>
15 be called by defendant as part of his announced affirmative
16 defense of withdrawal.  It would be unreasonable and unfair to
17 provide her with a special exemption to sit through the trial
18 before she testified.
19 B.   <u>The Attorney-Client Privilege Was Voluntarily Waived</u>
20      The attorney-client privilege does not apply to
21 communications voluntarily written, spoken, or disclosed to a
22 third party.  <u>See United States v. Rockwell Int'l</u>, 897 F.2d
23 1255, 1265 (3d Cir. 1990) ("The attorney-client privilege does
24 not apply to communications that are intended to be disclosed to
25
26 [6]   The adverse spousal privilege allows a witness spouse
27 to refuse to adversely testify against a non-witness spouse – a privilege that is separate and distinct from
28 the marital privilege protecting confidential communications.  <u>See United States v. Tsinnijinnie</u>, 601 F.2d 1035, 1037 (9th Cir. 1979).

1  third parties or that in fact are so disclosed."); see also

2  Hearn v. Rhay, 68 F.R.D. 574, 580 (E.D. Wash. 1975) ("... all

3  communications between the individual defendants and the

4  attorney general, which were shared with third persons, whether

5  communicated in the presence of such persons or lodged in files

6  that were accessible to others, cannot be deemed confidential

7  for purposes of the attorney-client privilege and are not

8  protected from discovery.").

9       Under this analysis, the attorney-client privilege does not

10 protect any communication regarding defendant Griffin's status

11 as an AB member that attorney Pamela Griffin voluntarily

12 disclosed on behalf of her client, defendant Griffin.  For

13 example, Exhibit A was voluntarily sent on behalf of her client

14 to clarify any potential implication that defendant Griffin was

15 involved in what the CDC clearly thought was an organized

16 criminal enterprise which operated through a controlling

17 "commission."  Since this writing was voluntarily sent by Pamela

18 Griffin on behalf of defendant Griffin, the attorney-client

19 privilege does not protect the writing itself.  See United

20 States v. Flores, 679 F.2d 173, 177-78 (9th Cir. 1982) (finding

21 that a letter that admitted the defendant's possession of guns

22 sent to the City of San Jose could be admitted as evidence

23 because it "was voluntarily mailed by [defendant] and his

24 attorney at their election."); see also United States v.

25 Clawson, 831 F.2d 909, 911-12 (9th Cir. 1987) (defendant's

26 affidavit admitting ownership of pistol seized by police was

27 admissible because defendant voluntarily made the affidavit).

28

1    Accordingly, the court should compel Pamela Griffin to

2    testify about this and other similar writings as well as the

3    same subject matter that was discussed in this writing (_i.e._,

4    defendant Griffin's status as an AB member or the "commission").

5    Neither Defendant Griffin nor Pamela Griffin can invoke the

6    attorney-client privilege to protect information that they

7    willingly offered to other parties.

8    C.   The Marital Communications Privilege Was Voluntarily Waived

9         While the marital privilege protects private

10   communications[7] between spouses because they are presumed to be

11   made in confidence, see Edwards v. Lamarque, 439 F.3d 504, 512

12   (9th Cir. 2005), it too can be waived if disclosed by the spouse

13   claiming the privilege, see United States v. Lilley, 581 F.2d

14   182, 189 (8th Cir. 1978). "Disclosure is generally inconsistent

15   with confidentiality and, 'courts need not permit hide-and-seek

16   manipulation of confidences in order to foster candor.'" SEC v.

17   Lavin, 111 F.3d 921, 933 (D.C. Cir. 1997).

18       As the case law above shows, any communication between

19   defendant Griffin and Pamela Griffin, as his wife, that was

20   voluntarily disclosed to a third party is not protected by the

21   marital privilege to confidential communications.  Furthermore,

22   the Ninth Circuit has already held that the privilege does not

23   apply to communications between Pamela Griffin and defendant

24

25
         ───────────────────
26   [7]   The Ninth Circuit applies this marital confidential
         communications privilege only to (1) words or acts
27       intended as communication from one spouse to another;
         (2) communication made during a valid marriage, unless
         the couple has irreconcilably separated; and (3)
28       communications that are confidential.  See United
         States v. White, 974 F.2d 1135, 1138 (9th Cir. 1992).

                                  11

1  Griffin even if they "intended" them to be confidential when the

2  law requires third-party disclosure.   See United States v.

3  Griffin, 440 F.3d 1138, 1144-45 (9th Cir.) ("There is no free

4  standing marital communications privilege, under either federal

5  or state law, allowing a California prisoner to send

6  confidential letters from prison to his or her spouse.") cert.

7  denied 2006 U.S. LEXIS 6155 (U.S. Oct. 2, 2006).

8        In Griffin, the Ninth Circuit found that allegedly

9  confidential letters sent between Pamela Griffin and defendant

10  were not protected by the marital communications privilege

11  because, as a matter of law, the Bureau of Prisons had the right

12  to review letters between husband and wife.   In other words, the

13  Ninth Circuit refused to allow Pamela Griffin and her husband to

14  skirt the law by attempting to use the attorney-client privilege

15  as a cloak to hide non-privileged marital communications.   Id.

16  at 1145  ("... we hold that Griffin has no right to protect from

17  disclosure to the government as privileged marital

18  communications those portions of the letters to his

19  wife/attorney that were improperly included in the envelopes on

20  which he wrote 'Attorney at Law'").   Accordingly, Pamela Griffin

21  cannot use the marital privilege to protect her from testifying

22  about confidential communications already disclosed.   See Lavin,

23  111 F.3d at 933.

24

25  D.   Partial Waiver Equals Total Disclosure on Subject Matter

26        As noted above, disclosure of a confidential communication

27  waives the protection of the privilege as to that communication

28  specifically.   However, a party cannot partially waive the

1  protection of a privilege on a specific subject matter for self-
2  serving purposes.    Id. at 933 (a party may not "selectively
3  disclose part of a privileged communication in order to gain an
4  advantage in litigation").

5      For instance, under the marital privilege, partial waiver
6  of the confidence protecting a particular subject matter waives
7  the total protection of communications on that same subject
8  matter.    Id. ("the purpose of the marital privilege is to
9  protect the privacy of marital communications, a purpose that is
10  not served by protecting communications that have been
11  deliberately disclosed, even if only in part")[8] (citations
12  omitted); see also United States v. Yerardi, 192 F.3d 14 (1st
13  Cir. 1999) (in determining waiver by conduct, a court must
14  decide whether the privilege holder's conduct in waiving part of
15  a privileged communication makes it unfair to allow subsequent
16  assertion of the privilege ... "[s]uch a pick-and-choose
17  approach may seem unfair in general or because it distorts the
18  evidence that is presented to the factfinder.").

19      The same reasoning applies to the attorney-client
20  privilege.    See Permian Corp. v. United States, 665 F.2d 1214,
21  1221 (D.C. Cir. 1981) ("courts have been vigilant to prevent
22  litigants from converting the privilege into a tool for

23  _____

24  [8]    The D.C. Circuit specifically said that "the
        considerations that support a strict approach to waiver
25      in the attorney-client context would appear to apply as
        well in the marital context: while both privileges
26      serve to promote important public interests by
        encouraging full and frank communications within
27      special relationships, they must be narrowly construed
        because of their adverse effect on full disclosure of
28      the truth." SEC v. Lavin, 111 F.3d 921, 929 (D.C. Cir.
        1997)(citations omitted).

13

1    selective disclosure"). Therefore, voluntary disclosure of part

2    of an attorney-client privileged communication is a waiver of

3    the remainder of the privileged communication about the same

4    subject.  See Handgards, Inc., v. Johnson & Johnson, 413 F.

5    Supp. 926, 929 (N.D. Cal. 1976); see also Lee Nat'l Corp. v.

6    Deramus, 313 F. Supp. 224, 227 (D. Del. 1970) (When a party

7    freely and voluntarily reveals a particular subject matter to a

8    third person, the party cannot assert the privilege as grounds

9    for refusing to identify other occasions when the same subject

10   matter was disclosed.  "It would be patently unfair for a client

11   to disclose those instances which please him and withhold all

12   other occasions.").  In fact, the D.C. Circuit has held that the

13   privilege is lost even if the disclosure is inadvertent.  See In

14   re Sealed Case, 877 F.2d 976, 980 (D.C. Cir. 1989) ("the

15   confidentiality of communications covered by the privilege must

16   be jealously guarded by the holder of the privilege lest it be

17   waived.")

18       Moreover, the attorney-client privilege can be implicitly

19   waived when a defendant asserts a claim that, in fairness to the

20   opposing party, requires examination of the protected

21   communications.  See Chevron Corp. v. Penzoil Co., 974 F.2d

22   1156, 1162-63 (9th Cir. 1992) (a defendant cannot invoke the

23   attorney-client privilege to deny plaintiff access to the very

24   information that plaintiff must refute); see also United States

25   v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991) ("A defendant

26   may not use the privilege to prejudice his opponent's case or to

27   disclose some selected communications for self-serving

28   purposes.").

1    Here, defendant Griffin has expressly stated that he plans

2   to assert the affirmative defense of withdrawal from the AB

3   prison gang and its conspiracy.  (Def.'s Notice of Mot. And Mot.

4   to Dismiss Count Two Based on the Statute of Limitations, at 7,

5   July 24, 2006).  In raising this defense, defendant Griffin has

6   waived his attorney-client privilege on communications

7   addressing his status as an AB prison gang member, a critical

8   issue to the outcome of this case.  See Chevron, 974 F.2d at

9   1162-63.  The court should not allow defendant Griffin and his

10  wife and former attorney, Pamela Griffin, to use privileges as a

11  shield to hide information especially if they plan to attack

12  with the very same information.

13    Under both privileges then, partial waiver of the

14  confidence of a subject matter equals total waiver of the

15  privilege as to that same subject matter.  Pamela Griffin is the

16  wife of defendant Griffin, her client.  As defendant Griffin's

17  attorney, she voluntarily disclosed information relevant to this

18  case (i.e. defendant's involvement and status as an AB member)

19  to third parties on behalf of defendant, as the letter addressed

20  above shows.  Since voluntary disclosure waives both the

21  attorney-client privilege and the spousal privilege protecting

22  confidential communications, the government seeks Pamela

23  Griffin's testimony regarding communications on the same subject

24  matter.  Therefore, the subpoena seeking this testimony is

25  neither unreasonable nor oppressive.

26  E.    The Court Should Deny Blanket Testimonial Privilege

27    Pamela Griffin also asserts the testimonial privilege, a

28  privilege that is separate and distinct from the marital

15

1   privilege protecting confidential communications.[9]  See <u>United</u>

2   <u>States v. Tsinnijinnie</u>, 601 F.2d 1035, 1037 (9th Cir. 1979)  The

3   marital testimonial privilege sweeps broader than any other

4   testimonial privilege.  See <u>Trammel</u>, 444 U.S. at 51, 53 (holding

5   that a witness spouse had a privilege to refuse to testify

6   adversely against his or her spouse without the consent of non-

7   witness spouse).  In <u>Trammel</u>, the Court held that the

8   testimonial privilege protects testimony of not only

9   confidential communications but also "evidence of criminal acts

10  and of communications made in the presence of third persons."

11  <u>Id.</u> at 51.  Therefore, it appears that this testimonial

12  privilege trumps the marital confidential communications

13  privilege.

14       However, before a spouse can invoke this broad testimonial

15  privilege, the court must determine <u>for each particular question</u>

16  (1) whether the testimony is adverse to the non-witness spouse

17  and, if so, (2) whether application of the privilege promotes

18  sufficiently important interests that outweigh the need for

19  probative evidence in the administration of criminal justice.

20  See <u>United States v. Van Cauwenberghe</u>, 827 F.2d 424, 431 (9th

21  Cir. 1987) (court refused to apply a blanket assertion of

22  privilege where the witness failed to demonstrate that the

23  testimony was adverse to her spouse's penal interests); <u>Trammel</u>,

24  444 U.S. at 51.  Pamela Griffin, however, argues that she can

25  invoke this testimonial privilege across the board.  Clearly,

26  she cannot do so.

27  _____

28      [9]   This privilege is also referred to as the anti-marital facts privilege.

16

1.   <u>The Court Must Examine Particular Questions at Issue</u>

In <u>Van Cauwenberghe</u>, the Ninth Circuit found that the testimonial privilege is "not a general one: It must be asserted as to particular questions."  827 F.2d at 431.  In other words, the privilege does not protect the "very act of testifying." <u>See also</u> <u>In re Grand Jury</u>, 111 F.3d 1083, 1086 (3d. Cir. 1997). In <u>In re Grand Jury</u>, the Third Circuit held a witness spouse in contempt of court for refusing to answer questions before the grand jury and continuing to assert her spousal testimonial privilege even though the government had promised immunity.  <u>Id.</u> at 1089.  The Third Circuit explained that the testimonial privilege is not absolute: "'it does not shield all testimony nor does it bar procedures that may protect the spouse from the effect of the testimony'."  <u>Id.</u> at 1088 (quoting <u>In re Snooninan</u>, 502 F.2d 100, 112 (1st Cir. 1974)).

Therefore, Pamela Griffin cannot assert the testimonial privilege as a reason to refuse to testify on general grounds. Rather, she has the burden of showing she can assert the privilege on a question-by-question basis.  Then, once asserted on each particular question, the Court must decide whether to grant the privilege after determining whether the testimony would be adverse and whether marital harmony between Pamela and defendant Griffin is a public good that outweighs the need for probative evidence in the search for truth under these circumstances.  <u>Trammel</u>, 444 U.S. at 50.

2.   <u>The Court Must Find Testimony Adverse</u>

The Ninth Circuit has held that the testimonial privilege only applies to testimony that is adverse to the non-witness

1   spouse.  See Van Cauwenberghe, 827 F.2d at 431 ("the marital

2   privilege ... 'is not available unless the anticipated testimony

3   would in fact be adverse to the nonwitness spouse.'"); see also

4   In re Grand Jury, 111 F.3d 1083, 1087 (3rd Cir. 1997)("Courts

5   have consistently recognized that the privilege only applies to

6   testimony that is 'adverse' to the other spouse.").

7       Therefore, the Court must determine whether the testimony

8   is adverse if and when it arises at trial on a question-by-

9   question basis.  Consequently, if the Court determines that the

10  testimonial privilege applies, then the government will refrain

11  from inferring in the presence of the jury that Pamela Griffin's

12  invocation of this testimonial privilege could be construed as

13  adverse to defendant.[10]  The court may also avoid any prejudice

14  to defendant by asking for a showing of exactly what testimony

15  that Pamela Griffin objects to and/or hold a hearing out of the

16  presence of the jury to determine whether or not a claim of the

17  privilege is bona fide.  See In re: Grand Jury Matter, 673 F.2d

18  688, 693-94 (3d Cir. 1982) (a district court has authority to

19  hold a hearing to address when the link between one spouse's

20  testimony and its potential adverse impact on the other spouse

21

22  [10]  This would comply with Pamela Griffin's concerns in her
        motion to quash as well as United States v. Sanchez,
23      176 F.3d 1214, 1223 (9th Cir. 1999) (Allowing the
        prosecutor to reveal in the presence of the jury that
24      the husband's wife could not be made to testify against
        him improperly suggested to the jurors that they could
25      legitimately infer that her testimony would be adverse
        to his defense).  However, according to the authority
26      in Pamela Griffin's own motion, concerns of improper
        inferences that may be prejudicial to the defense can
27      be sufficiently cured by jury instructions to disregard
        those inferences.  See Namet v. United States, 373 U.S.
28      179, 187-88 (1963).

1  may be too attenuated).  Since the government will submit its

2  questions to the court in camera to protect any privilege that

3  may exist, the court has discretion to determine the extent of

4  adversity of the testimony the government seeks on each

5  particular question and decide accordingly.

6      Pamela Griffin argues, however, that even testimony against

7  co-defendants would be adverse to her husband because of the

8  RICO conspiracy charges against him.  See Motion, at 6-7.

9      Plainly, this argument should be rejected as speculative.

10 Movant has not offered any evidence to support this claim and it

11 is contradicted by the evidence which shows that Pamela

12 Griffin's writings were not adverse to her client's or his co-

13 defendant's interest.

14     In addressing this issue, the government again requests the

15 court to review the application of the testimonial privilege on

16 a question-by-question basis because, even if the testimony is

17 adverse, the interests in its application must be balanced

18 against the interest of the administration of justice, as

19 addressed below.

20     3.   Court Must Strictly Construe Privilege

21     If the court determines that the testimony on a particular

22 question is adverse, the court still must determine whether the

23 public good of protecting the harmony between Pamela Griffin and

24 defendant Griffin outweighs the public good in the

25 administration of justice in this case.   As the Supreme Court

26 said in Trammel, the testimonial privilege must be "strictly

27 construed and accepted 'only to the very limited extent that

28 permitting a refusal to testify or excluding relevant evidence

has a public good transcending the normally predominant principle of utilizing all rational means of ascertaining truth.'" Trammel, 444 U.S. at 50 (quoting Elkins v. United States, 364 U.S. 206, 234 (1960) (Frankfurter, J. dissenting). In essence, the Supreme Court established a balancing test to determine "whether the privilege against adverse spousal testimony promotes sufficiently important interests to outweigh the need for probative evidence in the administration of criminal justice." Id. at 51.

One circumstance in which courts have denied the testimonial privilege is when the marriage was entered into for the purpose of invoking the testimonial "marital" privilege only.  See e.g. United States v. Saniti, 604 F.2d 603, 604 (9th Cir. 1979).  Courts have also refused to apply the testimonial privilege when a crime has been committed against either a spouse or a child of either spouse.  See, e.g., United States v. Allery, 526 F.2d 1362, 1367 (8th Cir. 1975).  Courts, however, are split on whether they deny the testimonial privilege when the witness spouse participated in the crime at issue.  See United States v. Van Drunen, 501 F.2d 1393, 1396-97 (7th Cir. 1974) (refusing the application of the testimonial privilege to a witness spouse who participated in the crime); but see United States v. Ramos-Oseguera, 120 F.3d 1028 (9th Cir. 1997) ("we hold that there is no joint participant exception to the testimonial privilege") overruled on other grounds.

1    The facts of the case at hand appear unique.[11]  While

2  analysis of this balancing test would depend on each question at

3  issue, in general it appears that the need for probative

4  evidence in the search for justice in stopping an enterprise

5  from committing murder outweighs the need for marital harmony

6  between Defendant Griffin and Pamela Griffin for several reasons

7  under these circumstances.

8    First, the couple has already tried to cloak the truth from

9  not only the Bureau of Prisons but also the Ninth Circuit by

10  expressly sending letters under the "Attorney at Law" heading to

11  make some communications appear confidential when they did not

12  rightly deserve this protection.  See Part IV(B) infra.  The

13  Ninth Circuit did not allow this.  Id.  Neither should this

14  court.  Moreover, Pamela Griffin, as defendant Griffin's, had

15  chosen to voluntarily disclose some information on defendant's

16  ────────────────────

17  [11]    It appears that there is only one case addressing
          whether an attorney-spouse can assert the broader
18        testimonial privilege and refuse testimony on any topic
          even if that spouse may have been a necessary witness.
19        See Barbee v. The Luong Firm,  126 Wash. 148, 157
          (Wash. Ct. App.  2005).  In that case, the husband was
20        the current attorney for the wife and the trial court
          disqualified him so he could be a witness.  The
21        appellate court, however, found that the husband could
          invoke the broader spousal testimonial privilege and
22        therefore reversed the trial court's disqualification.
          Id. at 160.  The Barbee case, however, differs
23        significantly from the case at hand for two reasons.
          First, the issue addressed was whether the husband
24        should be disqualified as the wife's current lawyer.
          In the case at hand, Pamela Griffin is not defendant
25        GRIFFIN's current attorney.  Second, the Barbee court
          was following Washington state law, which specifically
26        requires the consent of the spouse to waive the
          testimonial privilege.  Under federal law, the U.S.
27        Supreme Court has clearly held that the witness spouse
          does not need the consent of the non-witness spouse.
28        See Trammel v. United States, 444 U.S. 40, 53 (1980).

1  status as an AB prison gang member.  She should not now be

2  allowed to deny the court full disclosure on his status as an AB

3  member because she wants to assert the broader testimonial

4  privilege.  A court should not allow her to pick and choose the

5  truth because it would "permit hide-and-seek manipulation of

6  confidences."  See Lavin, 111 F.3d at 933.

7  V.    THE COURT SHOULD EXCLUDE PAMELA GRIFFIN AS A WITNESS

8       Notwithstanding Pamela Griffin's motion, the Court has not

9  been presented with sufficient evidenced to entirely rule out

10  Pamela Griffin as a witness.  Thus, unless and until such a

11  determination may be made, the Court should exclude Pamela

12  Griffin from the courtroom throughout the trial in fairness to

13  the government.  See Fed. R. Evid. 615;[12]  see also Charles v.

14  United States, 215 F.2d 825, 828 (9th Cir. 1954) (trial court's

15  failure to exclude witness from trial to prevent witness from

16  shaping his or her testimony to match that given by other

17  witnesses was in error).  If she is allowed to watch others

18  testify, she could easily shape her testimony to match that of

19  the others in support of her husband.  See Charles, 21 F.2d at

20  827.

21       Moreover, the risk of prejudice to the government is

22  especially great where, as a practical matter, at this point no

23  defendant can or should be required to waive calling Pamela

24  Griffin without first hearing the government's case.

25  ///

26  _____

27  [12]  The rule provides in pertinent part: "At the request of
        a party the court shall order witnesses excluded so
28      that they cannot hear the testimony of other witnesses,
        and it may make the order of its own motion."

1  VI.  CONCLUSION

2      For the foregoing reasons, the court should deny Pamela

3  Griffin's motion to quash the subpoena as neither neither

4  unreasonable nor oppressive.  At the least, Pamela Griffin

5  should be excluded as a witness and her motion should be denied

6  without prejudice.

Pamela J. Griffin
Attorney at Law
P.O. Box 4963
Omaha, NE 68104

Lt. Barry J. O'Neill
Institutional Gang Investigator
Pelican Bay State Prison
5904 Lake Earl Drive
Crescent City, CA 95531

**EXHIBIT** *A*

Fourn
6/27/06
inmate/H

*Pamela J. Griffin*
*Post Office Box 4963*
*Omaha, Nebraska 68104*                                          *Attorney at Law*
*(402) 222-5670*                                                 Calif. Bar No. 128760

October 13, 1997

Lt. Barry J. O'Neill
Institutional Gang Investigator
Pelican Bay State Prison
5904 Lake Earl Drive
Crescent City, CA 95531

Re:    Robert Lee Griffin, B-26484

Dear Lt. O'Neill:



     Also enclosed are paper copies of both these documents, along with various items marked as attachments. These are organized as follows: the "memo" document serves as the main cover document which references all the attachments. The "statement" document is included as an attachment to the memo. The attachments include many I sent you before, but I thought it would be easier for everyone if I just started with a new set, since I added some new materials and rearranged the order somewhat.

     As you can see, the "memo" document doesn't include any kind of opening, heading or closing. This material can be used and reorganized in whatever format you want. I assume that you will not change Robert's statement without his understanding and consent.

     I'm not sure if this is what you had in mind. If you have any questions or concerns, please contact either me or Robert.

Sincerely,

Pamela J. Griffin

cc: Robert Lee Griffin

**EXHIBIT 25-1**

**Attachment 4**

EXHIBIT 25-2

## STATEMENT RESPONDING TO CONFIDENTIAL DISCLOSURES

### Robert Lee Griffin
### B-26484



EXHIBIT 25-3

## Confidential Disclosure Forms Disclosed on September 10, 1987

On September 10, 1987, I was issued 34 confidential disclosure forms. My responses are in chronological order based on the date of the confidential memorandum or other item the disclosure is based on.

**11/16/72:** The memo states I have a gang tattoo on my person. This is true; in 1972 while in Palm Hall I was housed with inmates that were divided along racial lines. Each ethnic group had various names; the whites, as a show of unity, called themselves Aryan Brothers, and the relationship was that of a brotherhood. As a way of identifying myself with them, I had the tattoo put on. The main purpose of the association was to identify and look out for one another.



1

EXHIBIT 25-4



**7/23/87:**  Memorandum lists me as part of Commission leadership.                       Although the term "commission" has been used in some cases to describe the structure of AB leadership, numerous other terms have been thrown around as well.  These terms were generally the product of people's imaginations.  I never accepted any title or formal power – it was attributed to me by staff and inmates alike, but I looked upon it as jailhouse fantasy.  Several times I informed staff that I cannot control inmates without using force and I won't do that.

**EXHIBIT 25-5**

4



The foregoing information is true and correct to the best of my knowledge.

Robert Lee Griffin

EXHIBIT **25-6**