UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION-RIVERSIDE

HONORABLE VIRGINIA A. PHILLIPS, JUDGE PRESIDING

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
V.                             )  DOCKET NO. CR 02-938(A) VAP
                               )
DAVID MICHAEL SAHAKIAN,        )
RICHARD SCOTT MCINTOSH,        )
CARL EDGAR KNORR, JR.,         )
                               )
            Defendants.        )
_____)

REPORTER'S TRANSCRIPT OF ORAL PROCEEDINGS
Riverside, California
Friday, August 25, 2006

PHYLLIS A. PRESTON, CSR
License No. 8701
Official Court Reporter
United States District Court
3470 Twelfth Street
Riverside, California 92501

**ORIGINAL**

1                          <u>APPEARANCES</u>

2    For the Plaintiff:      OFFICE OF THE UNITED STATES ATTORNEY
                             By:  <u>STEPHEN WOLFE</u>
3                            Assistant United States Attorney
                             1200 U.S. Courthouse
4                            312 N. Spring Street
                             Los Angeles, California 90012
5
                             UNITED STATES DEPARTMENT OF JUSTICE
6                            FEDERAL BUREAU OF PRISONS
                             By:  <u>HARLAN PENN</u>
7                            Western Regional Counsel
                             7950 Dublin Boulevard, 3rd Floor
8                            Dublin, California 94568

9    For Defendant          LERITZ, PLUNKERT & BRUNING, P.C.
     David Sahakian:        By:  <u>JOSEPH GREEN</u>
10                           Federal Criminal Defense Panel
                             One City Centre, Suite 2001
11                           St. Louis, Missouri 63101
                                      and
12                           MOLINE, SHOSTAK & MEHAN, LLC
                             By:  <u>BURTON SHOSTAK</u>
13                           Federal Criminal Defense Panel
                             8015 Forsyth Boulevard
14                           St. Louis, Missouri 63105

15   For Defendant          <u>RICHARD NOVAK</u>
     Richard McIntosh:      Federal Criminal Defense Panel
16                           959 E. Colorado Boulevard, Suite 1B
                             Pasadena, California 91106-2337
17                                    and
                             WYRSCH, HOBBS & MIRAKIAN, P.C.
18                           By:  <u>CHARLES ROGERS</u>
                             Federal Criminal Defense Panel
19                           1000 Walnut, Suite 1600
                             Kansas City, Missouri 61406
20
     For Defendant          <u>DANIEL SCHATTNIK</u>
21   Carl Knorr:            Federal Criminal Defense Panel
                             55 South 9th Street
22                           East Alton, Illinois 62024
                                      and
23                           SINDEL, SINDEL & NOBLE, P.C.
                             By:  <u>RICHARD SINDEL</u>
24                           Federal Criminal Defense Panel
                             8008 Carondelet, Suite 301
25                           Clayton, Missouri 63105

```
 1            FRIDAY, AUGUST 25, 2006, RIVERSIDE, CALIFORNIA

 2                            ---o0o---

 3            THE CLERK:  Calling Item No. 2, EDCR 02-938(A) VAP,

 4   United States of America versus David Michael Sahakian,

 5   Richard Scott McIntosh and Carl Edgar Knorr, Jr.

 6            Counsel, appearances, please.

 7            MR. WOLFE:  Good afternoon, Your Honor.  Steven

 8   Wolfe for the United States and present at counsel table is

 9   Mr. Harlan Penn.  He is the regional counsel for the Bureau

10   of Prisons.

11            THE COURT:  Good afternoon.

12            MR. GREEN:  Joe Green for defendant David Sahakian.

13            THE COURT:  Good afternoon.

14            MR. SHOSTAK:  Good afternoon.  Burt Shostak for

15   defendant Sahakian.

16            THE COURT:  Good afternoon.

17            MR. SINDEL:  Richard Sindel for Carl Knorr.

18            THE COURT:  Good afternoon.

19            MR. SCHATTNIK:  Daniel Schattnik for Carl Knorr.

20            THE COURT:  Good afternoon.

21            MR. ROGERS:  Good afternoon, Your Honor.  Charles

22   Rogers for Mr. McIntosh.

23            MR. NOVAK:  And Richard Novak for Mr. McIntosh.

24            THE COURT:  I now realize we had lunch together.

25            MR. NOVAK:  I'm sorry?
```

1          THE COURT:  But we didn't know each other.  We were

2     all at the same restaurant for lunch this afternoon.  I had a

3     goodbye lunch.  One of my law clerks is about to leave and we

4     had a goodbye lunch at a local restaurant.

5          And I'm sorry you weren't invited, Mr. Wolfe and

6     Mr. Penn.

7          MR. WOLFE:  We weren't that sorry.

8          MR. PENN:  Although he would have paid if we had

9     come.

10         THE COURT:  I know because he's very generous.

11    And, in fact, we can send him the receipts, if you'd like.

12         Good afternoon.  I appreciate everybody arranging

13    their schedule so that we could have the status conference

14    this afternoon.

15         There are a couple of issues I've identified and,

16    of course, the defendants have filed either status reports or

17    motions in raising a couple of issues that we need to resolve

18    and address.  And then I would like to hear what all counsel

19    have to say on the timing so that we can set dates for the

20    mitigation hearing or the mitigation decision to the

21    mitigation discovery to be completed and a decision by the

22    Government to be made regarding whether or not the case will

23    proceed as a capital case and then another discovery cutoff

24    and a trial date to be set.  And I hope to set all those

25    dates today after hearing from all of you.  And then if there

1    are any other issues, of course, that you would like to bring

2    up.  Anything else that needs to be resolved today, I would

3    be happy to hear from you.

4           To begin with, the issues that have been brought to

5    my attention in the form of the motions for status reports

6    that have been filed, and I assume that, Mr. Wolfe, that's

7    why your co-counsel is here today from the Bureau of Prisons,

8    to perhaps give some guidance on that.  As I understand it,

9    Mr. McIntosh, who is being held at Marion -- and actually,

10   all three of these defendants are being held at Marion at the

11   present time; is that correct?

12          MR. PENN:  That's correct.

13          THE COURT:  And Marion is going through a change

14   where it is no longer going to be a U.S. penitentiary but it

15   is going to be an FCI.  So all three of these defendants will

16   be moved; is that correct?

17          MR. PENN:  That's correct.

18          THE COURT:  Mr. McIntosh -- well, his counsel,

19   Mr. Rogers, who is located in Kansas City, suggests -- I took

20   it as a suggestion that if his client is going to be

21   transferred to Florence, the facility at Florence, that would

22   not be -- well, that's no further from your office than to

23   travel as you've been traveling to Marion, correct?

24          MR. ROGERS:  No further time, Your Honor.

25          THE COURT:  So that, from your perspective, is

1     acceptable?

2              MR. ROGERS:  Certainly.

3              THE COURT:  What about the other defendants in

4     terms of where -- well, first of all, I guess I should ask,

5     has the Bureau of Prisons made any decisions about where

6     these defendants would be moved to?

7              MR. PENN:  Your Honor, the three defendants are,

8     technically, I think now marshal's inmates since they are in

9     pretrial status.  We've had discussions about where they

10    would be placed, if they would continue in the Bureau of

11    Prisons facility, and also what interest or what preference

12    the Court has.  We are prepared to work with the marshals to

13    house them in California, if that's what is needed for the

14    Court.  We would hope that the marshals would be able to

15    consider non-Bureau-of-Prisons facilities if that's

16    workable.  If it isn't, we will work with the marshals to

17    make sure there is a federal facility available.

18             THE COURT:  Well, if I am understanding the

19    defenses' position, since most of defense counsel, with the

20    exception of Mr. Novak, are not in California, what I gather

21    from what I have read so far is you prefer to have your

22    clients housed not in California.  Am I misreading something?

23             MR. SHOSTAK:  You are correct, Judge.  At least

24    until we get closer to a trial date, if we know what that

25    trial date is, it would facilitate the attorney/client

1  communications.

2          THE COURT:  And that's what Judge King had

3  previously ordered.

4          MR. SHOSTAK:  Right.  That's correct.

5          THE COURT:  I see no reason to change that.  I

6  mean, there's going to be a reason to be moved out of Marion,

7  but I think that the concern here that was expressed in Judge

8  King's order is that they be housed at a facility that's

9  close enough to where their counsel are that allows for

10  communication.

11          MR. SHOSTAK:  If the Court please, Your Honor, may

12  I speak to that issue, although Mr. Green has already spoken?

13          We are approximately, at least the St. Louis

14  lawyers, 45 minutes from a federal correctional institution

15  in Greenville, Illinois.  One of the people who will become

16  an assistant warden there is now at Marion and knows all

17  three of these defendants.  It would be extremely helpful to

18  us inasmuch as we see Mr. Sahakian -- and by "we" I mean

19  someone from either Mr. Green's office or my office or the

20  both of us see him at least weekly.

21          THE COURT:  So your preference would be Greenville?

22          MR. SHOSTAK:  There is no question about that, yes,

23  our preference would be Greenville.  And that preference is

24  based on two things.  First of all, it's a lot closer and a

25  lot easier for us.  It's a lot cheaper for the Government.

1    And secondly, there would be no problem with him maintaining

2    his computer at Greenville.

3            THE COURT:  And you say that because you have

4    talked to the assistant warden?

5            MR. SHOSTAK:  I say that because I --

6            THE COURT:  About the computer, I mean?

7            MR. SHOSTAK:  Well, it was the assistant warden who

8    represented to the Court when we filed our initial motion for

9    Mr. Sahakian to have a computer that it would be their

10   preference that he had it -- that he have it because --

11           THE COURT:  Rather than the papers?

12           MR. SHOSTAK:  Rather than the papers because it's a

13   fire hazard.  And he was very concerned about that.

14           THE COURT:  He is familiar with the issue?

15           MR. SHOSTAK:  He's familiar with the issue and,

16   frankly, I can represent to the Court I haven't spoken to him

17   directly and said under these circumstances can we get a

18   computer, but I don't think that any of that would be a

19   problem if Mr. Sahakian were permitted to stay at Greenville.

20           THE COURT:  All right.  Do you want to respond to

21   that?

22           MR. PENN:  Your Honor, as long as -- I'm not

23   expecting that there will be any problem with him continuing

24   to have the use of the computer for discovery as long as they

25   are in the Bureau of Prisons custody.  We have accepted that

1  as the norm in the <u>Leger</u> case and it's been the norm for

2  these inmates in previous cases in Illinois.

3        As far as Greenville is concerned, it is a federal

4  correctional.  It is an FCI.  It is what Marion is becoming.

5  So from our standpoint it is not an appropriate place to

6  house these defendants.

7        THE COURT:  Because it doesn't have the security?

8        MR. PENN:  Right.  Because staff are not accustomed

9  to working with inmates of this --

10        THE COURT:  What other USP do you have in mind?

11        MR. PENN:  Well, in the Midwest area, I suppose

12  closest to St. Louis, would be Terra Haute in Indiana which

13  would be probably, I would guess, three to four hours driving

14  from --

15        MR. GREEN:  May I respond?  Terra Haute --

16        THE COURT:  Were you finished?  Are there any other

17  options?

18        MR. PENN:  In terms of places near to St. Louis,

19  Terra Haute and Florence are the closest USPs.

20        THE COURT:  So Florence is preferable for -- is

21  Florence preferable in terms of proximity than Terra Haute?

22  I know it is for you.

23        MR. GREEN:  For me it is, Your Honor.

24        MR. SINDEL:  Your Honor, in terms of our particular

25  logistical matters, we will -- the attorneys would have to

1    travel if we were here in California.  However, we also have

2    other individuals who are located in the Los Angeles area who

3    could have continued and constant contact and we have

4    arranged that in particular because we had anticipated that

5    he may very well come out to California.

6              My preference between Terra Haute and Florence,

7    certainly with Mr. Knorr's situation, Mr. Knorr doesn't have

8    any other sentence.  He is the same as a man walking in off

9    the street as a pretrial detainee.  I just do not feel that

10   it is appropriate to have him housed in a maximum security

11   facility.  To my knowledge, he has been conduct -- violation

12   free since the event that resulted in this Indictment, at

13   least the Indictment.

14             THE COURT:  So he's only being held on this charge?

15             MR. SINDEL:  That's right.  Otherwise, he would be

16   out.  The circumstances are he would have Marion.  That was

17   all right because of the proximity and also because of the

18   way that he was able to relate to the staff and the comfort

19   level he felt there.  But I can tell you that Florence --

20             THE COURT:  Florence?

21             MR. SINDEL:  I much prefer, and I know my client

22   does, to be housed in California, because I have set up

23   people here in California that can have regular weekly or

24   bi-weekly contact.

25             THE COURT:  And your position?

1    MR. SHOSTAK:  If it please the Court, it is my

2    understanding, Your Honor, that insofar as the FCI at

3    Greenville is concerned, I think that some of the people --

4    well, I know because I've visited a number of them -- were

5    being held at West County -- West Valley Detention Center,

6    which I'm sure that Greenville is considerably more secure

7    than that place would be.  And also some were being held at

8    Terminal Island which is an FCI.  And I think that we would

9    do it.  We will do whatever this Court tells us to do.  It

10    would be very difficult for me and Mr. Green to be in contact

11    with Mr. Sahakian if he were even at Terra Haute, because

12    that's a whole day.  That's a whole -- just a whole day's

13    drive, plus the time in seeing him, plus the time waiting to

14    get in, in some instances, and it's a waste of time.

15    THE COURT:  And Greenville, I'm sorry, is about how

16    far from your office did you say, 45 minutes?

17    MR. SHOSTAK:  Your Honor, we are 45 minutes.  We go

18    right out Highway 70 and we are there in about 40,

19    45 minutes.

20    THE COURT:  And in terms of being in California?

21    MR. SHOSTAK:  If you tell us to be here, we will be

22    here.  I understand.

23    THE COURT:  I'm not saying I'm going to grant your

24    preference.  In terms of preparing the case for trial, that's

25    not --

1          MR. SHOSTAK:  It would be tremendously difficult

2     for us here, some of the people who are, I believe --

3          THE COURT:  So you brought up the -- pardon me for

4     interrupting you, but you brought up the reference to West

5     Valley and so forth, not because you are requesting that your

6     client be transferred there?

7          MR. SHOSTAK:  No, just to make the comparison.  I

8     don't want to go through another 500 motions of whether or

9     not they ought to have toothpaste or not.  I don't want to do

10    this.

11         THE COURT:  I think we are all in agreement with

12    that.

13         MR. PENN:  Your Honor, one of the things that is

14    working in other cases and, in fact, is currently working in

15    a similar type of prosecution out of San Diego is actually

16    using video conferencing for counsel to have at least some of

17    their contact with the defendant while he is still in an

18    institution at a different location.  And that is something

19    that we are prepared to work with, so if they could go to the

20    courthouse in St. Louis and we could have a video --

21         THE COURT:  Well, perhaps you can give me some

22    background on why -- first of all, my understanding of the

23    case, which may not be complete, which is why I'm asking you

24    to, if you could, give me some background, but my

25    understanding of the case is that before Judge King issued

 1    that order approximately a year ago, the defendants were not

 2    -- were being held in local custody, U.S. Marshal custody.

 3    And so one of the defense counsel just now I think raised a

 4    good point, which is that -- and other defendants, of course,

 5    in this case have been held in various local facilities, so

 6    why is the Government taking the position as to these three

 7    defendants that the switch of Marion to FCI status means that

 8    it is necessary to move these three defendants?

 9             MR. PENN:  With the switch of the mission of USP

10    Marion from housing FCI inmates to a minimum security

11    institution, I think it is going to involve a lot of changes

12    in terms of how it operates in terms of staffing and some

13    security aspects.  All of the inmates who are high security

14    inmates are being removed from Marion.  Most have been

15    removed.  I'm not sure if these are the only ones remaining.

16    It has gotten down to a very small number.  I think the

17    reason for that is simply it will allow that institution to

18    begin its new mission for staff to change their way of doing

19    business, run more effectively and efficiently in that way.

20    I'm not familiar with that history in terms of where these

21    particular defendants were housed.

22             THE COURT:  Mr. Wolfe, do you want to speak to

23    that?

24             MR. WOLFE:  Your Honor, I think that at the West

25    Valley Detention Center -- I believe Mr. Garcia knows more

 1  about this than I do, but I believe that they house some

 2  prisoners whose security needs are every bit as high as these

 3  defendants.   The problems that arose at West Valley were not

 4  because it wasn't capable of handling the most dangerous

 5  prisoners.   It arose because it is a jail and they expect to

 6  hold them for months at a time, whereas the demands in this

 7  case meant that they were there for two or three or

 8  four years.

 9          They're also -- not these three defendants, but the

10  others who were at West Valley were men in their late 30s,

11  40s and 50s, and the worst problem was dealing with the

12  health problems that they had, again, because the jail staff

13  is accustomed to people who are with them for a month or two

14  and these are defendants who were there for years on end who

15  had chronic -- they all had hepatitis C, I believe.   Gary

16  Littrell has terrible back problems.   There were a lot of

17  chronic medical problems.   But the security needs were as

18  aptly met at West Valley as they would be at --

19          THE COURT:   But they can't be met at an FCI?

20          MR. WOLFE:   The way that they are met at FCI at

21  Terminal Island the defendants are in a controlled unit.

22  They are in the jail for the FCI where the security, the

23  construction, the staffing and all the arrangements for the

24  jail at an FCI are more or less comparable to a

25  penitentiary.   The difficulty, again, is that it is intended

 1    to be a jail for temporary stays of people who violate rules,

 2    and at Terminal Island they were winding up with a dozen

 3    people.   They have virtually filled the controlled unit

 4    there.   The comparable situation to Terminal Island would be

 5    to house them at Greenville in the controlled unit.

 6              THE COURT:   Is there one in Greenville?

 7              MR. PENN:   There would be a special housing unit at

 8    Greenville.   At Terminal Island we have made adjustments in

 9    terms of staffing and security to accommodate the fact that

10    we have this, what is not normally the condition of that

11    institution in terms of security and various staffing.   And

12    that would very probably have to be done at any location that

13    was an FCI to accommodate them.

14              MR. SINDEL:   I think it is also pertinent to point

15    out that Terminal Island has a dozen of these individuals,

16    and we're talking about three, and that, you know, they have

17    been housed in sort of a controlled unit at Marion without

18    incident or problem at all.   And I don't think that our

19    inmates --

20              THE COURT:   We're talking about two because I think

21    that --

22              MR. SHOSTAK:   That's true.

23              THE COURT:   -- Mr. McIntosh can be housed at

24    Florence.   So we're talking about two.   My inclination is

25    that Mr. McIntosh can be housed at Florence and everybody

1    seems to be in agreement that that accommodates everybody's

2    concerns.  So we are really talking about two inmates.

3            MR. PENN:  We are certainly prepared and I will

4    assure you that we will accommodate them in a federal

5    facility if that is necessary.

6            THE COURT:  The other advantage, it seems to me at

7    least, trying to house them at Greenville is the familiarity

8    with that assistant warden who is about to be transferred

9    there.

10           MR. SHOSTAK:  He will be.  He has been assigned and

11   will take his post very shortly.

12           THE COURT:  Thank you.  And he is familiar with the

13   issue regarding the computer and then the other minor issue

14   that's -- I don't know if it's an issue.  The other point

15   that was made and what's been filed with the Court is the

16   10-day notice so that the computers -- 10-day notice before

17   the inmates -- the defendants are moved so that the

18   computers, I guess can be collected by counsel.  The inmates

19   will be moved and then the computers will be screened by the

20   facility to which they've been moved and then the defendant

21   will get the computer in his cell again.

22           MR. PENN:  We will work with the computer issue

23   wherever they are housed.  I do not know all the concerns we

24   might have at Greenville, so I would be very hesitant to say

25   that.

1    THE COURT:  Well, from what I've heard so far, I

2  think that that is the best solution.  It certainly would

3  be -- Mr. Knorr would be transferred to Florence, Colorado.

4    MR. NOVAK:  Mr. McIntosh.

5    THE COURT:  I'm sorry, it's Mr. McIntosh.  I don't

6  see any reason for the defendants -- I think it would be

7  burdensome on the marshals here to arrange for housing in

8  California at this point.  And I don't think that the -- I

9  think it would be burdensome on defense counsel trying to

10  communicate with their clients at this point, so that will

11  change as we get closer to trial.  But at this point, it

12  seems to me, if I'm understanding you correctly, Greenville

13  is more acceptable to the Government than having them remain

14  at Marion.

15    MR. PENN:  I can't represent that.  I'm not sure.

16    THE COURT:  This will be the Court's order:  That

17  the other two defendants either remain at Marion or, if they

18  are going to be transferred from Marion, they are to be

19  transferred to Greenville, so that choice will depend on what

20  the Bureau of Prisons finds is most workable.  But they are

21  to be housed in one of those two facilities.

22    Now, I think that's all of the issues.  Before any

23  of the defendants are transferred at least 10 days notice to

24  counsel is to be given so that proper issues -- proper care

25  can be taken with respect to the laptop computers that the

 1    inmates or the defendants are permitted to have in their

 2    cells.

 3            Now, before we move on to schedule the discovery

 4    and trial dates and cutoff dates and so forth, are there any

 5    other issues that either side wishes to bring up?

 6            Mr. Wolfe, has the Government made a decision about

 7    who the trial counsel are going to be in this case?  Is

 8    Mr. Akrotirianakis an understudy?  I see him in the wings.

 9            MR. WOLFE:  Your Honor, there is no final decision.

10    It is likely to be an assistant from Los Angeles and

11    Mr. Akrotirianakis, but it depends a great deal on when the

12    Court sets the trial because we've got three or four other

13    trials, and managing who is assigned depends a great deal on

14    the timing.  It might well be myself and Mr. Akrotirianakis.

15    If that proves to be impossible because I'm committed

16    elsewhere, then we have to find someone else.

17            THE COURT:  Well, which side wishes to make the

18    opening bid on the discovery and the amount of time it is

19    going to take in the first phase; that is, the litigation

20    phase?

21            MR. NOVAK:  The Court in its introductory remarks

22    was asking what date the Government might make a decision on

23    whether it is a death penalty matter.  We have a schedule

24    that Judge King set out which we have all so far complied

25    with.  We're expecting the Department of Justice to make a

1    decision no later than December 22nd.  Apparently, the

2    Government, if it followed the schedule -- I'm not suggesting

3    it didn't -- sent its local recommendation to the Department

4    of Justice earlier this week.  We don't know whether that

5    happened.  Of course, we wouldn't be privy to that.  But at

6    least Mr. Wolfe and I discussed a few weeks ago that we were

7    all still on track on that schedule.  So we are not going to

8    know, literally, until the end of December what path this

9    case is going.

10           THE COURT:  Well, maybe I didn't word my question

11   right.  Does either side -- let me reword the question.

12           Does either side at this point have any information

13   for the Court about whether any changes need to be made in

14   Judge King's order regarding that?

15           MR. WOLFE:  Your Honor, I don't believe there's a

16   necessity for a change in the schedule previously set by

17   Judge King, not from the point of view of the Government.

18   I'm not sure how the defendants feel.

19           THE COURT:  Now, an argument can obviously be made

20   about not setting a trial date until we know early next year,

21   I suppose, the frame work in which the case we'll go to

22   trial, but I am inclined to go ahead and set a trial date,

23   unless someone wants to take a stab at trying to change my

24   mind.

25           MR. SINDEL:  Duelling lawyers at lunch.

1        THE COURT:  I wasn't going to make that invitation

2    quite so clear.

3        MR. SINDEL:  At lunch, when you guys were talking

4    about nice wonderful things, we were talking about the

5    scheduling and what our thoughts and preferences would be.  I

6    think at least because we have experienced this case at least

7    one time before in the six-month trial and now we've sort of

8    all got our feet wet not only in this trial but in the

9    federal capital cases, there's going to be a lot of decisions

10   that are going to hinge upon whether or not this is going to

11   be capital or not, not only the amount of time necessary for

12   voir dire and the length of the trial and maybe, in fact,

13   many of the evidentiary issues during the course of the

14   trial.

15        I think that if I speak for the rest of defense

16   counsel, we had hoped to try to convince the Court to wait

17   until after a decision had been made so that we could better

18   assess how much time we felt would be appropriate, what kind

19   of discovery issues might be relevant because of the fact of

20   a capital case as opposed to a non-capital case and be much

21   more able to address the issue of when is the best trial date

22   and how long we think the trial will last after we know what

23   that decision is.

24        THE COURT:  You all join in those remarks?

25        MR. GREEN:  Yes, Your Honor.

1          THE COURT:  Mr. Wolfe?

2          MR. WOLFE:  Your Honor, I don't have any strong

3    feelings about whether Your Honor should set a date, but I

4    honestly don't think that the capital decision really weighs

5    heavily on either side.  I say that for a couple of reasons.

6    One is the point Mr. Sindel makes is that it will affect the

7    length of the trial, but Your Honor may have in mind that the

8    trial date ought to be "X" without regard to whether the

9    trial takes three months or seven.  It is not likely to make

10   it more difficult to prepare for trial.  I don't think that

11   it affects the starting date for the trial as much as it does

12   the end.  And I don't mean to suggest that the Attorney

13   General might not decide that some of these defendants

14   shouldn't face the death penalty, but in the case in the

15   Southern District of Illinois they did.  And while that

16   doesn't dictate to this Attorney General what the decision

17   should be, it does at least suggest that it is not a question

18   that's wildly flux.

19         THE COURT:  That case took six months to try in

20   Illinois?

21         MR. WOLFE:  That's correct, Your Honor.

22         THE COURT:  Well, you are not finished with it yet

23   because there is a penalty phase in front of Judge Carter,

24   and if it started the end of January and took seven months --

25         MR. WOLFE:  It started January 27th, Your Honor,

1    with the jury panel coming in and filling out their

2    questionnaire.  The trial of these three defendants I would

3    say is about -- it is about comparable in length to what we

4    have just gone through before Judge Carter, plus or minus

5    10 percent.

6             MR. GREEN:  Judge, if I may, the problems I see

7    with these particular defendants, and we have discussed it

8    amongst ourselves, depending on what comes back out of

9    Washington can have numerous effect on the type of motions

10   that we file, whether or not it goes to severance issues,

11   whether or not it goes to strategy and how we are defending.

12            I know when we tried the cases in Illinois we made

13   certain strategic decisions and motions that we filed that we

14   were going to have evidentiary hearings on based upon the

15   fact that it was a death penalty case as opposed to a

16   straight murder case.  It brings in a lot of other issues.

17            So if we can't even start to make our strategic

18   decisions, how are we going to proceed with litigation until

19   that is done?  And it is my understanding that at least Mr.

20   McIntosh is contemplating a severance motion, depending on

21   what the Government comes back with.  So I don't see how we

22   can address those issues until we get that decision.  And it

23   is my understanding the ruling is set for December 22nd, but

24   they can come back earlier than that.

25            THE COURT:  Well, let me ask you this:  It is hard

1   for me to see the harm in setting a schedule today that makes

2   an assumption that the case would proceed as a capital case.

3   If we make that assumption and we set dates accordingly today

4   and we learn in December or before that it is not going to

5   proceed that way, then one of two things would happen.  You

6   will either have a gracious plenty of time or I will move the

7   dates up.  You will probably argue strenuously that the dates

8   should remain the same and you will just have an awful lot of

9   time for a non-capital case, but you will have a trial date.

10          On the other hand, if we set the date today,

11  assuming it is going to be a capital case and it turns out to

12  be a capital case, then we all know what the dates are.  I

13  know from my calendar, you all know from your calendars,

14  everyone knows and I will have plenty of notice.  I will

15  listen to what all of you have to say.  And the Government

16  can make its decision about staffing the case and you all and

17  your clients have the benefit of knowing what the trial date

18  is.  And I just see no -- the only possible disadvantage to

19  doing that, if it turns out not to be a capital case, and

20  there's a little more time built in and someone wants to

21  advance the trial date, in that event, the appropriate motion

22  can be brought.  Mr. --

23          MR. SHOSTAK:  Shostak.

24          THE COURT:  Thank you.

25          MR. SHOSTAK:  I would have to agree with the Court

1    in its appraisal of the situation.  So if we want to set a

2    trial date, we ought to set one on the theory that it is

3    going to be a capital case.  Then we go from there.

4            THE COURT:  All right.  Now, assuming that it would

5    take -- I would say the last deadline, as I understand it,

6    please correct me if I'm wrong, the last deadline that Judge

7    King set was the December 22nd date.

8            MR. WOLFE:  Yes.

9            THE COURT:  So probably the first order of business

10   would be to set perhaps a deadline for any motions regarding

11   severance.  I would say any motions regarding severance

12   should be set for hearing no later than March 26th, 2007.

13   And unless otherwise ordered, all motions must be served with

14   21 days notice, and all will accept service by fax.

15           I take it you have an agreement like that?

16           MS. GREEN:  We don't but we can enter into such.

17           THE COURT:  All right.

18           MR. SHOSTAK:  Or e-mail.

19           THE COURT:  If that's acceptable.  And if there's

20   lengthy exhibits, you will enter into an agreement for FedEx

21   delivery of lengthy exhibits, unless you can scan them.  So

22   three weeks service, that's 21 days service.  That means you

23   have to serve your motions for severance by the 5th.

24   Opposition is due two weeks before.  That would mean by the

25   12th.  And any reply must be filed by the 19th.  And that's

1    the general rule, unless I order otherwise.

2          So when I set a motion hearing date, that means the

3    motion is filed three weeks before that, the opposition is

4    due two weeks before the hearing date, and the reply is due

5    one week before.  And courtesy copies must always be dropped

6    off in the courtesy box outside my chambers.

7          Now, did Judge King issue orders regarding the

8    Government's responsibility in terms of discovery?

9          MR. GREEN:  No, Your Honor.

10         MR. WOLFE:  No, Your Honor.

11         THE COURT:  I take it, however, there has been

12   discovery that's been disclosed?

13         MR. WOLFE:  118,000 pages so far from us.

14         THE COURT:  Do you have any proposals regarding

15   deadlines for Jencks material?

16         MR. WOLFE:  Your Honor, what we have done -- pardon

17   me, Your Honor.  Judge Carter makes us stay seated at trial

18   because the defendants can't stand up.  And I apologize to

19   the Court for not rising before I spoke this time.

20         Judge Carter adopted a practice of setting a date

21   for disclosure of Jencks and Giglio material, I think

22   approximately a month before jury selection in order of the

23   statements, but in this case most all discovery --

24         THE COURT:  Hasn't it already been turned over

25   because of the other case?

1          MR. WOLFE:  There are new things that turn up, but

2     they are not voluminous.  The new material is when a witness

3     who is going to testify against these folks testifies at one

4     of the other trials and the defendants have it as quickly as

5     the Government does because they order transcripts.  I don't

6     believe that there's any significant amount of discovery that

7     hasn't been made about these defendants, with a possible

8     exception of Mr. Sahakian is charged with murders that Knorr

9     and McIntosh -- or with a murder that Knorr and McIntosh are

10    not.  Charles Leger in Count 3 and the discovery on that

11    might be a little slower because no one has been tried on

12    it.  But, fundamentally, the bulk of the discovery, unless

13    they feel differently --

14          MR. GREEN:  The Leger case, it entered into a plea

15    and then there was a sentencing hearing.  And the Government

16    requested from -- and actually Mr. Rogers represented Greg_

17    Storey at the time -- asked for the discovery back that was

18    handed over.  So he wasn't allowed to keep the discovery.  So

19    it hasn't -- to that extent, what was originally given in

20    that first trial has been since taken back.

21          MR. WOLFE:  Well, as I said, the discovery about

22    the murder of Terry Walker at USP Marion has largely been

23    made.  Tell me if I'm mistaken about that.

24          MR. GREEN:  With respect to Marion, that's true.

25          MR. WOLFE:  And the only -- the additional material

1   about the Leger murder in Count 3 is being made now because a

2   defendant whose trial is pending in front of Judge King in

3   April, McElhiney, is also charged with that.  So that trial

4   team is paying attention to that.  I expect all of the

5   discovery, but for odds and ends that are not noticed or not

6   discovered, to have been made before the Attorney General's

7   death decision is made, probably.

8           THE COURT:  I'm going to issue a written order and

9   I'm inclined to order that all <u>Jencks</u> and <u>Giglio</u> material be

10  turned over 60 days before jury selection begins.  It sounds

11  like it will all be done long before that, but that's what I

12  am inclined to do in this case.

13          MR. GREEN:  Judge, may I address Mr. Wolfe out of

14  an abundance of caution?

15          THE COURT:  Certainly.

16          MR. GREEN:  You omitted Lewisburg with the joinder

17  of Salaam with respect to Sahakian.  I didn't know if that

18  was intentional.

19          MR. WOLFE:  I think that discovery is also out long

20  since.

21          MR. GREEN:  That wasn't intentional.  You assumed

22  because in those cases --

23          MR. WOLFE:  Yes.  I'll make a record of it.  I'm

24  assuming with the Lewisburg murders 99.99 percent of it has

25  been turned over already, because everything that's produced

1    in the _Mills_ case is placed in the depository for all

2    defendants to have access.

3         MR. GREEN:  Thank you.

4         THE COURT:  Thank you.  Counsel, you might -- while

5    Ms. Ingram is checking the Court's calendar, you might let me

6    tell you what I'm thinking about for a trial date in this

7    case.  It would be either June of next year -- that would be

8    June of 2007 or -- well, how does June of 2007 sound?

9         MR. NOVAK:  If I could say something, Mr. Wolfe and

10   I had a conversation about trial dates anticipating that the

11   Court might want to set a trial date, and the conversation

12   was a couple of weeks ago, but I got the impression that the

13   Government was concerned about witnesses needing to be in two

14   places at once because of multiple trials.  And I think at

15   this point there's a defendant who has an April trial date.

16   And at least the impression I had, April of '07, Mr. Wolfe

17   thinks there's a lot of overlap in those witnesses.  And

18   Mr. McElhiney is set before Judge King, and I don't know if

19   the Government still thinks that's a concern or not.

20        MR. WOLFE:  Your Honor, that's precisely right.  I

21   didn't hear -- I was waiting to hear the second possibility

22   that Your Honor had in mind, but --

23        THE COURT:  I was waiting to see if you would take

24   the first.  The second possibility would be January because I

25   have another death penalty case that starts in November, but

1    that one has a pretty short estimate.    January of '08?

2            MR. WOLFE:  Your Honor --

3            THE COURT:  Is that preferable?

4            MR. WOLFE:  -- the Government would prefer January

5    of '08 for precisely the reason Mr. McElhiney's trial is

6    supposed to start April 3rd or 4th.  It will be -- it is a

7    capital case so it is a capital jury selection, so that the

8    trial will be happening in May, June, July.  The

9    Government -- well, the overlap between defendants McElhiney

10   and Sahakian is very, very great.

11           THE COURT:  So in terms of your witness scheduling,

12   et cetera?

13           MR. WOLFE:  Yes.  And not only -- it is made even

14   more difficult because many of the witnesses are in the

15   witness security program and they are moved with a lot of

16   effort and resources devoted to it.  And generally, they're

17   set up so that -- it's very difficult for the Marshals

18   Service to have two in the district at the same time, because

19   it means having two different security teams.  And if there

20   had to be two at the same time at each trial, I think --

21           THE COURT:  Is Mr. McElhiney -- is that the

22   defendant that is pro se?

23           MR. WOLFE:  Yes, ma'am.

24           MR. ROGERS:  One of the defendants, Your Honor.

25           THE COURT:  Judge King, I offered to take that one

1    as well as this case and he insisted on keeping it for

2    himself.  He is just one of the hardest working, smartest

3    judges you could ever meet.  And he insisted it was his case

4    and he would take the most difficult parts of it.

5              MR. WOLFE:  Your Honor --

6              THE COURT:  And he said, since you volunteered, he

7    would send me the nicest attorneys, so that's why I have you

8    all.

9              MR. NOVAK:  I'm sure he said that.

10             THE COURT:  Actually, he did.  So live up to it,

11   as I'm sure you will.

12             January, is that agreeable for everyone?

13             MR. SINDEL:  I think that's a preferable date for

14   the entire defense team, Your Honor.

15             MR. WOLFE:  Your Honor, I don't know whether to be

16   forward -- well, I will, if Your Honor will.

17             THE COURT:  You know, I'm going to get cranky any

18   minute.  Go ahead.

19             MR. WOLFE:  Your Honor, the Government urged Judge

20   King as strongly as we knew how to try McElhiney with these

21   three defendants, because it is a six-month or seven-month

22   trial with McElhiney and it is the same six- or seven-month

23   trial with these defendants.  As a matter of economy the

24   Government urged His Honor, if His Honor feels -- I'm really

25   on thin ice.

1          THE COURT:  You don't need to say anymore.   I think

2    I understand what you're saying.

3          MR. WOLFE:  There's another thing.  Judge Klausner

4    yesterday severed defendant Richard Terflinger, one of the

5    California Commissioners of the Aryan Brotherhood, from the

6    trial of the California Commission which is to start in

7    October.  And there are now two state defendants, Terflinger

8    and Littrell, who are before Judge King not set for trial who

9    are naturally tried together, because the accusation is that

10   Terflinger ordered the murder and Littrell carried it out.

11         If Your Honor will pardon me for putting my nose

12   where it is absolutely not my business, if Judge King needs a

13   nasty piece of this trial, then I commend to His and Your

14   Honor's attention the possibility that Littrell and

15   Terflinger, both capital defendants, tried together is plenty

16   of work for anyone.  And reuniting McElhiney with these three

17   defendants is the most efficiency-promoting step that could

18   be taken in this case.

19         THE COURT:  You don't need to say more.  I see the

20   problem.  I will make a phone call.  Whether I can keep him

21   from throwing himself -- I already had this discussion.  I've

22   already had this discussion and we will see.

23         MR. NOVAK:  It might change the nature of the

24   severance motions.

25         THE COURT:  You mean it might multiply them?

1      MR. ROGERS:  You will still have them done by

2  March.

3      THE COURT:  Now, how about January 15th for a trial

4  date?  I don't want -- let me be wise and let's set it to the

5  end of January so we're not over the holidays doing all the

6  last minute things.  Let's say January 29th for the trial

7  date.  January 29th, 2008, would be the trial date.  Of

8  course, that will give us some time earlier that month.

9      What I envision, there's many other things we will

10  need to talk about before then, but just so you know what I

11  envision on this case is that we would maybe call the panel

12  in perhaps around the 15th.  We would send out a

13  questionnaire.  We will work on a questionnaire ahead of

14  time, mail that out to the panel.

15      What I don't like to do -- just to step back a

16  moment, what I don't like to do, and I'm sure you all feel

17  the same way and every judge roughly feels the same way is,

18  of course, to keep the jury waiting.  So if we devise a

19  questionnaire in plenty of time, we send it out ahead of

20  time, you will get their completed questionnaires in and we

21  can have the members of the jury -- we can meet perhaps

22  earlier in the month.  And after you've had time to go over

23  the completed questionnaires, if you stipulate as to the

24  excusal of certain jurors, the ones that you feel you need to

25  question, we can have those jurors come in earlier in the

 1    month so you can do voir dire in groups of them.  So we're

 2    not having 100 people waiting at a time, we can bring them in

 3    in groups.

 4         That way -- when I say the 29th for trial, we will

 5    still be doing voir dire, but we will have really narrowed

 6    the venire significantly.  So we'll have had the

 7    questionnaires and we will have done some voir dire perhaps

 8    already.  So keep that in mind.  The 29th might be pretty

 9    close to only doing just some real refining voir dire on

10    jurors who haven't been disqualified for either inability to

11    serve or for some obvious reasons.

12         Now, I will set my trial schedule.  We can talk

13    about this closer in time to the trial, but what you can

14    anticipate is that we would be in trial Tuesday through

15    Friday and probably a typical schedule would be, say 9 to

16    4:30, but Friday we'll probably start at 8 and go until 1:30

17    or 2:00 without a lunch break, let the jury go at 2 and let

18    you all go.  We take two 15- or 20-minute long breaks, snack

19    breaks.  If we have matters to take up outside the presence

20    of the jury, we will do it either on Friday afternoons, if

21    necessary, or sometimes I have some time on Monday

22    afternoons, too.  Sometimes I do, sometimes I don't.  But we

23    will have full trial days every day except for Monday.

24         Any other deadlines?

25         I will issue the discovery cutoff or the discovery

1  order that I said regarding Jencks and Giglio material and

2  that deadline will be sometime in November of 2007.

3        MR. GREEN:  Judge, Joe Green.  I anticipate that

4  there will be some evidentiary motions that will be filed and

5  you had said that you were going to have a trial there, so at

6  the end of the year --

7        THE COURT:  I would assume that in terms of

8  evidentiary motions that those should be given -- all the

9  other trials the Government is doing in this case, that the

10  evidentiary problem should be clear to everyone.  There's not

11  going to be any surprise in terms of what the evidence is.

12  There will be surprises, but that shouldn't be what they

13  are.  And I would assume that we could set a cutoff date for

14  the hearings of those motions to occur.  I would suggest

15  around November the 5th.

16        MR. SINDEL:  November the 5th?

17        MR. NOVAK:  Are you referring to in limines or

18  larger issues of larger scope?

19        THE COURT:  Well, I think there is -- that's a good

20  question.  I think what I'm thinking of is by November the

21  5th is really more motions in limine.  Motions regarding

22  whether evidence has been produced, produced timely, is that

23  what you're referring to, or evidentiary?  You're referring

24  to motions that are going to have an evidentiary hearing?

25        MR. NOVAK:  Yes.

1          THE COURT:  I would suggest that those need to be

2     heard by September.  And I'm going to issue an order.  I'm

3     going to have a separate briefing schedule that is a slightly

4     longer briefing schedule.  So I'll issue the order and that

5     will go out today.  We'll have a briefing schedule the end of

6     September for those.

7          MR. GREEN:  Judge, I don't think I'm revealing

8     anything, what I've read from so far in the first trial, that

9     some motions that were not brought up in that case, that I

10    anticipate from the testimony that was given, it looks like

11    there was some expert opinions given.  We may be raising it

12    in our motions, so we would ask for the disclosure of

13    experts.  And it appears that some of the witnesses testified

14    --

15         THE COURT:  Now that I think would be covered --

16    sorry for interrupting you.  That would be covered by the

17    November 5th deadline.

18         Now, what other types of motions?

19         MR. GREEN:  It appears that some of the inmate

20    witnesses may have been working with the Government and then

21    continued to work with the Government after the Indictment,

22    so we may have asylum motions also.  That's just off the top

23    of my head.  I haven't finished reading the transcripts yet.

24         THE COURT:  I think any motion that deals with

25    limiting the admission of testimony is an in limine motion,

1    and that's why I think a <u>Daubert</u> motion, an in limine motion

2    -- if there's any doubt about it, file it earlier.

3              MR. GREEN:  Okay.

4              THE COURT:  Or seek the Court's guidance on it.

5              MR. GREEN:  Okay.

6              THE COURT:  Now, in terms of the defendants'

7    presence at any of these, which brings up the question, at

8    what point are the defendants going to be transported to this

9    district to be housed in this district?  Their presence, when

10   it comes down to hearing the motions on trial-related

11   matters, counsel have an opinion about the defendants'

12   presence at those motions?

13             MR. NOVAK:  I think on behalf of Mr. McIntosh there

14   may be not only a desire by Mr. McIntosh to be present for

15   the first motion which the Court scheduled, which is a

16   severance hearing, but there's also -- and I just want to

17   throw it out as a theoretical possibility, that he could be a

18   declarant in support of the motion.

19             THE COURT:  But if the Government doesn't wish to

20   cross-examine him, he wouldn't need to be present.

21             MR. NOVAK:  Unless he doesn't want to waive his

22   presence, and we have not discussed that with him at all.

23             THE COURT:  Now, earlier one of you brought up the

24   idea -- no, I'm sorry, it was counsel for the BOP brought up

25   the idea that in San Diego, in the Southern District, they're

1    using teleconferencing for counsel to meet with the clients.

2              MR. PENN:  It is also available and I think it is

3    anticipated that it will be used for viewing and be able to

4    participate --

5              THE COURT:  For arraignments.  It hasn't really

6    been tested as to whether it is acceptable to be used in --

7              MR. GREEN:  I'm sorry, Judge.

8              THE COURT:  No, go ahead.

9              MR. GREEN:  The problems I see with that, with the

10   amount of materials that we have to go over, like we've

11   already said, we meet with our client on a weekly basis.

12             THE COURT:  I'm talking about the hearings.  I'm

13   just talking about the hearings.

14             MR. GREEN:  As long as it's not testimonial.  We

15   have done that before with Mr. Sahakian, so I don't see that

16   as being a problem.

17             THE COURT:  Having it teleconferenced?

18             MR. GREEN:  Right.

19             THE COURT:  We don't have the equipment for it, but

20   I'm wondering if we could.

21             MR. SINDEL:  I'm not so sure, speaking on behalf of

22   Mr. Knorr and the active interest he takes in communicating

23   with his lawyers during the progress of anything that occurs

24   in court, that it would work for a video teleconferencing.

25   We did it once, at least once that I can remember, when they

1   were housed initially in Colorado, and the two inmates that

2   were housed there at that time, Mr. McIntosh and Mr. Knorr,

3   and at the subsequent events the video conferencing, they

4   refused to show up because there was no opportunity for them

5   to engage in anything other than watching the events unfold

6   on a television screen.  So I would like, before any decision

7   is made, obviously, to talk with Mr. Knorr and see what his

8   preference would be.

9           THE COURT:  I think what you ought to be prepared

10  for is when these hearings begin to take place, which would

11  be in the fall before the trial starts, your clients may be

12  permanently moved out here, because I don't anticipate that

13  the marshals are going to move them back and forth.  So as to

14  the severance motion, that's going to be a particular issue

15  whether you want your client moved out here as early as

16  March, whether he wants to waive his presence at the

17  severance motion.  So give that some thought.

18          MR. ROGERS:  I might suggest, Your Honor, since we

19  are talking ten months rather than three months prior to the

20  commencement of trial, maybe that would be an appropriate

21  time for the defendants, if they wish to be present, to be

22  brought in on a writ, rather than to be transferred, to be

23  housed in the district.

24          THE COURT:  What you're suggesting is that they be

25  brought out or your client --

1    MR. ROGERS:  If he wants to come, if there's a

2  reason for him to be here, et cetera.

3    THE COURT:  For a motion to sever you will have to

4  persuade me that that's --

5    MR. ROGERS:  We filed the motion to sever, Your

6  Honor, in the Southern District of Illinois.  And part of the

7  basis of it was that Mr. McIntosh's declaration, that if he

8  were tried separately, before Mr. Sahakian, he would be

9  willing to give testimony in support of Mr. Sahakian, but he

10  did want to assert his right to remain silent in his own

11  trial.  And that's the kind of thing which, you know, he is

12  the declarant on, and if the Government wanted to

13  cross-examine him, he needed to be here.

14    THE COURT:  Well, one way to handle that would be

15  if you file that motion, the Government will have a certain

16  amount of time to let the Court know whether or not it

17  intends to cross-examine him on that declaration.

18    MR. WOLFE:  Yes, Your Honor.

19    THE COURT:  If it doesn't, it might not be

20  necessary, if he wishes to continue with his waiver, but then

21  the Government will not have the opportunity to cross-examine

22  him.

23    MR. ROGERS:  That's true.

24    THE COURT:  Anything else that anyone else wishes

25  to bring up at this time?

1          MR. WOLFE:  Your Honor, where will the trial take

2     place?  In this building?

3          THE COURT:  This building, this courtroom.  With

4     only three defendants, we can go forward here.

5          MR. GREEN:  The trial that we had in Illinois we

6     had laptops at our tables, will that be okay here?

7          THE COURT:  Absolutely.

8          MR. SHOSTAK:  Your Honor, in an effort to

9     accommodate the Court, I know that you want courtesy

10    pleadings.  May we just mail them directly to Ms. Ingram or

11    mail them to your attention or how do you want that done from

12    us?

13         THE COURT:  Well, that's why I mentioned the drop

14    box, courtesy copies in the drop box.  My concern is getting

15    them the day that they are filed.  I'm not sure I understand

16    your question.

17         MR. SHOSTAK:  We don't live -- the drop box is kind

18    of far away from my house.

19         MR. SINDEL:  You're such a baby about things.

20         MR. SHOSTAK:  We will be glad to see if we can get

21    counsel here to whom we can e-mail it.

22         THE COURT:  Exactly.  You can fax it or e-mail it

23    and they can drop it off.  My concern is if I -- it is really

24    a problem with the replies because I may not get a reply

25    which is filed a week before the copy that gets filed, you

1    know, with your original.  I may not get it for several days.

2    And that's why I need to get everything in the courtesy box.

3    You've got local counsel.

4            MR. NOVAK:  I don't think counsel is referring to

5    me, even though I do live in the district.  I don't think

6    that -- and I don't know that Pasadena is local.

7            MR. SCHATTNIK:  Your Honor, with some of our

8    judges --

9            THE COURT:  It is 45 miles.

10           MR. SCHATTNIK:  In the Southern District of

11   Illinois we would actually e-mail the pleadings to the judge

12   or to the judge's clerk in PDF form.

13           MR. SINDEL:  With viruses attached.

14           THE COURT:  With viruses attached?  Do you know

15   which attorney that was?

16           MR. SCHATTNIK:  That way the Court would get it the

17   same day.

18           THE COURT:  Well, Ms. Ingram reminds me what I

19   usually tell counsel is that here in Riverside -- I was about

20   to say we have running water and electricity -- we have many

21   attorney services.  You can send it to them by fax.  They

22   will deliver it.  But you can also do, which is more cost

23   effective -- well, let me say this:  I don't want to do

24   anything I might regret here.  I will take under submission

25   the request that you be allowed to do your courtesy copies

1    via e-mail to the clerk.

2              MR. SHOSTAK:  Thank you, Your Honor.

3              THE COURT:  I know you're all out of state.  I will

4    take that under submission and we will let you know about

5    that.  If I do it, don't tell anybody.  And the same thing

6    would apply for the Government, although you have an office

7    here.  If you're filing from Los Angeles, I would allow you

8    to do the same thing.

9              Any other issues that either side wishes to take

10   up?

11             MR. PENN:  Your Honor, just to make sure I

12   understand correctly, what we are allowed to do with regard

13   to Mr. McIntosh, we are cleared to move him to Florence?

14             THE COURT:  Yes.

15             MR. PENN:  With regard to the other inmates, we are

16   cleared to either move them to Greenville --

17             THE COURT:  Or to keep them.

18             MR. PENN:  -- or to keep them at Marion.  Since

19   this is not something that, as far as I know, the Bureau of

20   Prisons had considered in terms of keeping anyone of this

21   caliber at Marion or moving anyone of this caliber to

22   Greenville, would we have the option -- would it be

23   acceptable to counsel if eventually it was determined to keep

24   McIntosh at Marion or move him, keep him with the other two?

25             MR. ROGERS:  That would be fine.  Greenville is

1    actually closer for my travel time than either Marion or

2    ADX.  ADX is the same.

3            THE COURT:  I was going to say it would be easier

4    for the BOP.

5            MR. PENN:  It is.  It is preferable for us to move

6    them to Florence.

7            THE COURT:  That's your decision.

8            MR. PENN:  But the possibility is that having two

9    in one place and having a third would be --

10            THE COURT:  More trouble, burdensome.  Then that

11    decision is up to the BOP.

12            MR. PENN:  Very well.

13            THE COURT:  All right.  Thank you very much.  A

14    formal order will go out with these dates in it.

15            Thank you very much.

16            MR. NOVAK:  Thank you, Your Honor.

17            MR. GREEN:  Thank you, Judge.

18                    (Proceedings concluded)

19                        ---o0o---

20

21

22

23

24

25

C E R T I F I C A T E

DOCKET NO. CR 02-938(A) VAP

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and accurate transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


PHYLLIS A. PRESTON, CSR              DATED:  November 1, 2006
Official U.S. Court Reporter
License No. 8701