1   DEBRA WONG YANG
    United States Attorney
2   THOMAS P. O'BRIEN
    Assistant United States Attorney
3   Chief, Criminal Division
    J. MARK CHILDS (Cal. Bar No. 162684)
4   MARK AVEIS (Cal. Bar No. 107881)
    Assistant United States Attorneys
5   Organized Crime & Terrorism Section
    1500 United States Courthouse
6   312 North Spring Street
    Los Angeles, California 90012
7   Telephone:  (213) 894-4477
    Facsimile:  (213) 894-3713
8   Email: mark.aveis@usdoj.gov
    Attorneys for Plaintiff
9   UNITED STATES OF AMERICA

FILED 2006 OCT -5 PM 3:38 CLERK U.S. DISTRICT COURT CENTRAL DIST. OF CALIF. LOS ANGELES

10              UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12   UNITED STATES OF AMERICA,     )   No. CR 02-938(E)-RGK
                                   )
13                  Plaintiff,     )   GOVERNMENT'S OPPOSITION TO
                                   )   DEFENDANT CHANCES'S MOTIONS IN
14             v.                  )   LIMINE; MEMORANDUM OF POINTS
                                   )   AND AUTHORITIES
15   DAVID CHANCE, et al.,         )
                                   )   Date: TBD
16                  Defendants.    )   Time: TBD
     _____)

17

18       Defendant Chance's motion in limine largely restates the

19   arguments set forth in defendant Griffin's motion in limine re

20   Fed. R. Evid. 404(b) and 403.  The government has addressed those

21   same arguments in its opposition to defendant Griffin's motion in

22   limine.  Accordingly, in partial opposition to the present

23   motion, the government incorporates herein by this reference its

24   opposition to defendant Griffin's motion in limine.  A copy of

25   the government's opposition is attached hereto as Exhibit A.

26       As for the balance of its opposition to defendant Chance's

27

28



U.S. v.Chance, et al, CR 02-983(E)-RGK
Government's Opposition to Chance's Motions in
Limine

1 | motions in limine, government respectfully requests that the
2 | motions be denied as without basis in fact or law.
3 |     The government's opposition is based on the attached
4 | memorandum of points and authorities, its opposition to defendant
5 | Griffin's motion in limine (attached hereto as Exhibit A and
6 | incorporated herein by reference), the Court file, and such other
7 | evidence or argument as the Court may consider.
8 | Dated: October 4, 2006       Respectfully submitted,

DEBRA WONG YANG
United States Attorney

THOMAS P. O'BRIEN
Assistant United States Attorney
Chief, Criminal Division

_____
J. MARK CHILDS
MARK AVEIS
Assistant United States Attorneys
Attorneys for Plaintiff
United States of America

U.S. v.Chance, et al., CR 02-983(E)-RGK
Government's Opposition to Chance's Motions in
Limine

2

1                                I.

2                             ARGUMENT

3  A.    The Government's Evidence of Uncharged Conduct Should Be

4        Viewed As Admissible Under the RICO or, Alternatively, the

5        "Inextricably Intertwined" Standard

6        Defendant Chance, like defendant Griffin, has moved to

7  exclude the evidence described in the government's two September

8  2006 disclosures (See Griffin Motion, Exhibits A, B) under Rule

9  404(b).  The government respectfully disagrees with this analysis

10 for the reasons set forth in its opposition to defendant

11 Griffin's motion in limine, a copy of which is attached hereto as

12 Exhibit A and incorporated herein by reference)  Accordingly, the

13 notice requirement of Rule 404(b) does not apply.

14 B.    Even Under A Rule 404(b) Analysis, Notice Was Proper Because

15       Defendants Caused the Recent Disclosure of Incriminating

16       Material

17       Defendant Chance, like defendant Griffin, has argued that

18 the government's notices of uncharged conduct, as ordered by this

19 Court on August 14, 2006, were untimely.

20       As stated in the government's opposition to defendant

21 Griffin's motion in limine, defendants in late April 2006

22 subpoenaed some 13,000 CDC files which this Court in July 2006

23 ordered the government to read, redact, and produce.

24 Furthermore, it was only by defendant Griffin's June 30, 2006

25 motion to dismiss that any defendant gave notice of facts on

26 which a statute of limitations or "withdrawal" defense would be

27

28                                   3

U.S. v.Chance, et al., CR 02-983(E)-RGK
Government's Opposition to Chance's Motions in
Limine

1 mounted.  That motion caused the government to further

2 investigate to prove that no defendant had withdrawn or could

3 otherwise argue his inactivity in the gang. Thus, the

4 government's further investigation focused on each defendants'

5 most recent activity.  Defendants' own last minute actions caused

6 the government to provide the recently obtained evidence that

7 defendants now find troubling.  As the government stated earlier

8 in connection with opposing defendant Griffin's motion in limine,

9 under these circumstances the government's court-ordered notice

10 of uncharged acts was timely and it would be unfair to permit

11 defendants to create their own prejudice.  And, as stated in the

12 government's opposition to defendant Griffin's motion in limine,

13 the scope of such evidence is not so broad as to prevent

14 defendants from conducting their own further investigation.  They

15 will have a period of at least two months in which to do so.

16      Furthermore, the government respectfully opposes defendant

17 Chance's request for a continuance (Motion, 6:15-16).  It is not

18 supported by sufficient evidence that shows that a review of the

19 proffered testimony of some 10 witnesses over the next 60 or so

20 days would justify continuing the trial.

21 C.   The Government Expressed in Detail its Theory of

22      Admissibility of Each Uncharged Act

23      Defendant Chance has next argued that the government should

24 "specify any theory for admissibility" of its uncharged

25 misconduct evidence.  Motion, 6:19-20.

26

27

28

1    The government has expressly identified in detail a theory

2    of admissibility for each uncharged act in the government's

3    opposition to defendant Griffin's motion in limine.

4    D.    The Proffered Evidence Is Relevant

5    In opposition to defendant Chances' next claim, that the

6    "noticed" evidence is irrelevant, the government again

7    incorporates by reference its opposition to defendant Griffin's

8    motion in limine.  Therein, the government detailed the relevancy

9    of each uncharged act.

10   E.    The Proffered Evidence Is Not Subject to Exclusion Under

11         Rule 403

12   In opposition to defendant Chances' next claim, that the

13   "noticed" evidence is subject to exclusion under Rule 403, the

14   government again incorporates by reference its opposition to

15   defendant Griffin's motion in limine.  Therein, the government

16   detailed why each uncharged act is more probative than

17   prejudicial.

18   F.    The Proffered Evidence Is Not Confusing, Will Not Mislead

19         the Jury, Will Not Result in Undue Delay, Etc.

20   Defendant has next offered a catch-all Rule 403 argument

21   that the proffered evidence will confuse or mislead the jury and

22   should otherwise be excluded under Rule 403.  Motion, 9-10.  The

23   government addressed these same objections in its opposition to

24   defendant Griffin's motion in limine.  In summary, the proffered

25   evidence will not be confusing, misleading, time-wasting, or

26   otherwise objectionable under Rule 403 because there is little

27

28                              5

U.S. v.Chance, et al., CR 02-983(E)-RGK
Government's Opposition to Chance's Motions in
Limine

such evidence and what little there is consists of admissions of the defendants from percipient witnesses on very narrow points of fact.

G.    No Order Should Be Made at this Time about "Legal Conclusions"; an AB Member's Statement about the Existence of the AB "Organization" Is Not, in Any Event, a Legal Conclusion

Defendant has next asked for a blanket order precluding witnesses from rendering "legal conclusions." Motion, 12:1-15. The government agrees that legal conclusions should be excluded, and that a witness should not be permitted to state any other inadmissible conclusion or statement. However, such objection is premature and any ruling should be deferred until questionable testimony arises, if at all. As for the sole example of a "legal conclusion," the government submits that an Aryan Brotherhood member's statement that the Aryan Brotherhood is an "organization" is not a legal conclusion. It is, instead, and subject to a proper foundation, the witness' description of a group of individuals who banded together for a common purpose. Contrary to defendant's motion, an "organization" is not necessarily a racketeering "enterprise." Motion, 12:3-6. An "enterprise" is specifically defined as, among other things, "a group of individuals associated in fact . . ." 18 U.S.C. § 1961(4). Thus, with a proper foundation, a witness' testimony about the Aryan Brotherhood as an "organization" is not a legal conclusion.

H.    The Existence of Both Federal and State AB Factions Is
      Highly Relevant And, among Other Things, Defendants' Joint
      Stipulated Statement Read to the Jury Emphasized the
      Existence of the Two Factions

      The indictment makes clear that there is but one Aryan
Brotherhood and that it functioned in federal and California
state prisons.  See, e.g., Indictment, ¶ 4 ("Although the Aryan
Brotherhood began in the California prison system, it has spread
to other prison systems.  During the early 1970's, members of the
Aryan Brotherhood who had entered the federal prison system
formed a faction of the Aryan Brotherhood in the federal prison
system.  Although the California and federal factions have
distinct membership and leadership, both are part of one
organization called the Aryan Brotherhood.")  All of the
government's cooperating witnesses, including several who have
already testified in the Santa Ana <u>Mills</u> trial, where the
transcripts of their testimony were provided months ago to
defense counsel (on a daily basis), will testify to the existence
of but one Aryan Brotherhood that operated in those respective
prison systems.  The government will introduce substantial
evidence that a "hit" (murder) ordered by leadership ("council"
or "commission") of one faction in one prison system was
transmitted to leadership of the other faction in the other
prison system where the hit was carried out.  See, e.g.,
Indictment, ¶ 64 ("In or about February 1982 . . . the members of
the California Council [of the AB], including defendants JOHN

U.S. v.Chance, et al., CR 02-983(E)-RGK
Government's Opposition to Chance's Motions in
Limine

7

1  WILLIAM STINSON, RICHARD LLOYD TERFLINGER, ROBERT LEE GRIFFIN,

2  and RONALD BOYD SLOCUM decided to order that Aryan Brotherhood

3  member Thomas Lamb be murdered for failure to carry out an order

4  to commit a murder"); ¶ 65 ("On or about July 12, 1982 . . .

5  defendants JOHN WILLIAM STINSON and ROBERT LEE GRIFFIN sent a

6  message to another member of the California Council saying that

7  there was a plan in place to murder Thomas Lamb."); ¶ 66 ("In or

8  about October 1988, defendant BARRY BYRON MILLS ordered defendant

9  CLEO ROY to murder Thomas Lamb.").  The Santa Ana jury heard from

10  government witnesses, and this jury should be entitled to hear

11  from the same witnesses, that defendant Mills was part of the

12  leadership of the federal faction and that Lamb was killed at the

13  federal faction's direction which acted on word from the

14  California faction.  It should also be noted that the Santa Ana

15  Mills jury found defendant Mills and three other members of the

16  AB's federal faction guilty of the same racketeering conspiracy

17  charge involving the Lamb murder.

18      Thus, the government should be entitled here, as the

19  government was entitled in the Santa Ana Mills case, and as would

20  be appropriate under any reasonable interpretation of conspiracy

21  law, to prove that the Aryan Brotherhood carried on its business

22  in both federal and California state prisons.  That is the heart

23  of the AB conspiracy.

24      Moreover, defendants stipulated to a reading of portions of

25  the indictment to the entire jury venire, which was completed in

26  the morning of October 4.  See Exhibit B attached hereto.  The

27
U.S. v.Chance, et al., CR 02-983(E)-RGK
Government's Opposition to Chance's Motions in
Limine

8
28

1  reading included each of the foregoing paragraphs regarding the

2  existence and operation of the state <u>as well as</u> the federal

3  faction, and also included a reading of each of the murders

4  alleged to have been ordered by the California faction and

5  carried out by the federal faction.  See, e.g., Indictment ¶¶ 75-

6  80 (involving murder of Richard Andreasen, as called for by the

7  California faction and carried out by the federal faction).

8      Therefore, defendants have virtually conceded, and waived,

9  for the purposes of establishing the broad parameters of the

10  government's case, that the government intends to show, and it is

11  reasonable to expect the government to show, that the Aryan

12  Brotherhood existed and carried out its business in federal and

13  California state prisons.  Any evidence that tends to prove the

14  allegations, that is otherwise introduced with a proper

15  foundation, should be admissible.

16      Finally, it cannot reasonably be argued that evidence of the

17  existence of the two factions and the interconnection between

18  them to carry out charged offenses is more prejudicial than

19  probative.  It is, again, the heart of the case.  It cannot

20  reasonably be argued that some evidence of a broad-ranging

21  conspiracy, as alleged, is subject to Rule 403 while other,

22  similar, evidence is not.

23  I.  <u>Evidence of Race-Based Attacks By A Professed White</u>

24      <u>Supremacist Prison Gang Is Relevant and Not Prejudicial</u>

25      Defendant next contends that the Court should exclude as

26  irrelevant or prejudicial any evidence of "certain acts of

27

28

<u>U.S. v.Chance, et al.</u>, CR 02-983(E)-RGK
Government's Opposition to Chance's Motions in
Limine

1  violence based on race." Motion, 12:22-23. This contention is

2  without merit because the Aryan Brotherhood professed white

3  supremacy and had declared war on black inmates.

4      Specifically, the indictment alleges that the Aryan

5  Brotherhood's federal faction declared war on a black prison gang

6  known as the "DC Blacks." Indictment, ¶¶ 249-308. The

7  California faction, which was, as stated above, part of one Aryan

8  Brotherhood, was equally motivated to plan and was in fact

9  planning attacks against the "Crips," a black prison gang. The

10  government in the Santa Ana <u>Mills</u> case introduced evidence, the

11  government here intends to introduce the same piece of evidence,

12  showing that Stinson and Griffin communicated the AB's position

13  regarding inter-gang race wars by way of a "kite" (surreptitious

14  prison note) which was secreted in the rectum of one gang member

15  for him to transport the kite from one prison to another. In

16  that kite, <u>which Stinson and Griffin each signed</u>, Stinson and

17  Griffin stated, among other pieces of AB "intel," that "a wire

18  from Folsom (prison) said the B.G.F. may be hooking up with the

19  Crips/or Vanguards — we're trying to find out. . . [O]ur concern

20  is the position the Crips take. If they are allied with Yogi we

21  will face them sooner or later and I figure we should strike

22  first." Exhibit C attached hereto, ¶ 2. Both defendants Stinson

23  and Griffin, in their own words, expressed the California AB

24  faction's position regarding an impending war with the Crips, a

25  black prison gang.

26

27

U.S. v.Chance, et al., CR 02-983(E)-RGK
Government's Opposition to Chance's Motions in
Limine

10

28

1   Therefore, evidence of these defendants' intent and plan for

2   the AB to engage in a race war is relevant.  It cannot reasonably

3   be considered more prejudicial than probative because the very

4   nature of the Aryan Brotherhood is its white supremacist

5   philosophy and exclusion all non-whites as members.  Again,

6   defendants stipulated to a reading of the indictment which

7   included such allegations.  See Exhibit B.

8   J.    There Is No Functionally New Evidence to Support

9         Reconsideration of This Court's Denial of Chance's Prior

10        Motion to Sever

11  Defendant Chance has sought reconsideration of this Court's

12  denial of Chance's prior motion for severance, arguing that the

13  proffered "404(b)" evidence precludes a fair trial against

14  defendant Chance.  This is misleading.  The Court is respectfully

15  requested to view the proffered evidence in the context of all

16  prior evidence which was the subject of Chance's first motion for

17  severance.  In so doing, the government submits that the Court

18  should conclude the state of the evidence is functionally the

19  same.  Defendant Chance is no more or less culpable now than he

20  was in comparison to his co-defendants at the time Chance first

21  unsuccessfully moved for severance.  And, defendant has not

22  introduced any evidence to show he is prejudiced or otherwise

23  a candidate for severance.  Thus, there is no new evidence, no

24  real change in circumstances, and no support for reconsideration.

25  ///

26  ///

27

28                                11

U.S. v.Chance, et al., CR 02-983(E)-RGK
Government's Opposition to Chance's Motions in
Limine

K.    Defendants' Overbroad Reading of the Confrontation Clause
      and *Crawford* Should Be Rejected

      Defendant Chance has next argued that this Court hold that
all out-of-court statements and statements by co-conspirators be
excluded as violating the Confrontation Clause and Crawford v.
Washington, 541 U.S. 36 (2004).  Defendant's argument should be
rejected because it is contrary to this Court's order on the
exact same subject.  This Court has already concluded, in
response to defendant Stinson's identical motion, that Crawford
does not apply to co-conspirator statements.  Docket Entry 3623,
August 17, 2006 order denying Stinson's motion to exclude
801(d)(2)(E) statements pursuant to Crawford.

      Furthermore, defendant failed to cite contrary and clearly
controlling Ninth Circuit authority.  Contrary to defendant's
Motion, co-conspirator statements are not excludable under
Crawford.  See United States v. Allen, 425 F.3d 1231, 1235 (9th
Cir. 2005), cert. denied, 126 S. Ct. 1487 (March 6, 2006) (court
confirmed that "co-conspirators statements are not testimonial
and therefore beyond the compass of Crawford's holding.").
Finally, there is no "confrontation clause" issue here because
the witnesses will be present for cross-examination.  United
States v. Valdez-Soto, 31 F.3d 1467, 1470 (9th Cir. 1994) ("[w]e
are aware of no Supreme Court case, or any other case, which
holds that the introduction of hearsay evidence can violate the
Confrontation Clause where the putative declarant is in court,
and the defendants are able to cross-examine him.").

U.S. v.Chance, et al., CR 02-983(E)-RGK
Government's Opposition to Chance's Motions in
Limine

12

1  L.    Expert Testimony Regarding the "Federal" Faction of the AB

2        Is Relevant And Admissible

3        Defendant next seeks an order excluding the testimony

4  of the government's "federal" AB faction expert on the ground

5  that her testimony "in no way directly relates to the

6  'California' faction . . ." Motion, 22:16-19.  This argument is

7  flawed because the proffered expert testimony relates directly to

8  the government's case.

9        First and foremost, as noted above, evidence of <u>both</u>

10 factions and how they operated and were intertwined is relevant

11 to prove the existence of the racketeering conspiracy and the

12 charged pattern of racketeering activity.  As stated above, there

13 is substantial evidence that, for example, a "hit" ordered by the

14 California faction was carried out by its companion federal

15 faction.  Next, communication between inmates in one prison

16 system is accomplished, or better stated, circumvented,

17 differently from another.  Thus, the government's respective

18 prison system experts will help the jury understand how state and

19 federal inmates communicated.  Next, experts from the respective

20 systems are expected to testify about the gang validation process

21 and who members of the AB were in each system.

22       Thus, there is no merit to defendant's further attempt to

23 limit the government's case to a single prison system where

24 defendants, themselves, were responsible for enlarging their own

25 criminal enterprise beyond the walls of just the California

26 prison system.

27

28                                13

U.S. v.Chance, et al., CR 02-983(E)-RGK
Government's Opposition to Chance's Motions in
Limine

The government is more than willing to permit defense voir dire of the government's experts, outside of the jury's presence, to ensure the Court that each expert is otherwise qualified to testify and that the proffered testimony is helpful to the trier of fact.

M. <u>The AB Used Lawyers to Carry Out Its Dirty Work, But There is No Evidence Implicating Present Counsel</u>

Defendant next argues that the Court should exclude all evidence that AB members used lawyers to facilitate AB business and that, therefore, somehow present counsel might be tainted and viewed as in complicity with the AB. This argument is over broad and not supported by any evidence.

Several government witnesses will testify that _former_ counsel assisted the AB in its member-to-member communications. This evidence further supports the government's case that the AB manipulated the legal system (including by fraudulently issuing subpoenas to AB members to testify just so members could hold meetings). This evidence is part and parcel of how the AB conducted its business. There is no evidence, however, that present counsel were engaged in the same activity.

Furthermore, any issue that present counsel could be "tainted" with the AB's prior abuses of the legal system can easily be cured by an instruction to the effect that "the government is not suggesting, and you are not to suspect or find, that present counsel in any way violated the law or aided or abetted the AB."

U.S. v.Chance, et al., CR 02-983(E)-RGK
Government's Opposition to Chance's Motions in
Limine

14

## II.

## CONCLUSION

For the reasons stated herein, and in the attached and incorporated opposition to defendant Griffin's motion in limine, the government respectfully requests that both motions be denied.

1  DEBRA WONG YANG
   United States Attorney
2  THOMAS P. O'BRIEN
   Assistant United States Attorney
3  Chief, Criminal Division
   J. MARK CHILDS (Cal. Bar No. 162684)
4  MARK AVEIS (Cal. Bar No. 107881)
   Assistant United States Attorneys
5  Organized Crime & Terrorism Section
   1500 United States Courthouse
6  312 North Spring Street
   Los Angeles, California 90012
7  Telephone:  (213) 894-4477
   Facsimile:  (213) 894-3713
8  Email: mark.aveis@usdoj.gov
   Attorneys for Plaintiff
9  UNITED STATES OF AMERICA

10              UNITED STATES DISTRICT COURT

11         FOR THE CENTRAL DISTRICT OF CALIFORNIA

12 UNITED STATES OF AMERICA,    )   No. CR 02-938(E)-RGK
                                )
13              Plaintiff,       )   GOVERNMENT'S OPPOSITION TO
                                )   DEFENDANT GRIFFIN'S MOTION IN
14              v.               )   LIMINE RE FED. R. EVID §§
                                )   404(b) AND 403; MEMORANDUM OF
15 ROBERT GRIFFIN, et al.,      )   POINTS AND AUTHORITIES
                                )
16              Defendants.      )   Date: TBD
                                )   Time: TBD
17 ─────────────────────────────

18      The government opposes defendant Griffin's motion to exclude

19 evidence under Fed. R. Evid. §§ 404(b) and 403 on the grounds

20 that the motion incorrectly seeks to exclude defendant Griffin's

21 incriminating admissions and that granting the motion would

22 deprive the trier of fact of hearing relevant and admissible

23 evidence of defendant's role in running the Aryan Brotherhood

24 racketeering enterprise.

25      The government's opposition is based on the attached

26 memorandum of points and authorities, the Court file, the

27
                        U.S. v.Griffin, et al., CR 02-983(E)-RGK
28                      Government's Opposition to Griffin's Motion re Rule
                        404(b)



EXHIBIT A

1   government's pending motions in limine, and on such other

2   evidence or argument as the Court may consider.

3   Dated: October 3, 2006      Respectfully submitted,

4                         DEBRA WONG YANG
                        United States Attorney
5

6                         THOMAS P. O'BRIEN
                        Assistant United States Attorney

7                         Chief, Criminal Division

8

9                         J. MARK CHILDS
                        MARK AVEIS

10                        Assistant United States Attorneys
                       Attorneys for Plaintiff
                       United States of America

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                             <u>U.S. v.Griffin, et al.</u>, CR 02-983(E)-RGK

28                             Government's Opposition to Griffin's Motion re Rule 404(b)

# TABLE OF CONTENTS

**DESCRIPTION** **PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . .  iv

I.  SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . .  3

    A.  The Motion Seeks To Exclude Highly Relevant Evidence, Well-Known to Defendant, of the Racketeering Conspiracy and Defendant's Role in It . . . . . . . . . . . . . . . . . . . . . . . .  3

    B.  The Government's Disclosures Are Timely, Based on Defendant's Own Recent Litigation Strategy, and Defendant Cannot Reasonably Be Permitted to Create His Own Prejudice By Seeking Exclusion of Evidence Designed to Counter His Defenses or Attacks on the Government's Case . . . . . . . . . . . . . . . .  5

II. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . .  8

    A.  Even Under a Rule 404(b) Analysis, the Proffered Evidence Is Relevant and Admissible . . . . . . . . .  8

        1.  The Ninth Circuit Permits the Introduction of Uncharged Acts That Are Inextricably Intertwined with Charged Offenses, Even Outside of RICO Law . . . . . . . . . . . . . .  8

        2.  Rule 404(b) Permits the Proffered Uncharged Acts . . . . . . . . . . . . . . . . . . . . . .  9

        3.  All of the Proffered Evidence Is Relevant and Admissible, Whether by a RICO, "Inextricably Intertwined," or Rule 404(b) Analysis, and Is More Probative than Prejudicial as it "Clearly Show[s] [Defendant's] Intent, Method, and Plan" and [Is] "Closely Involved with the Larger Conspiracy." . . . . . . . . . . . . . . 12

            a.  T-Bone Gibson Was Killed as a Matter of AB Business Because He Disrespected The AB; Defendant Griffin Suborned Perjury As Part of AB Business . . . . . . . . . . . . 12

            b.  The Murder of Deputy Trejo Is Relevant And Admissible Evidence of AB Business and Impeachment Evidence Against Government Witness Schneider . . . . . . . . . . . . 15

U.S. v. Griffin, et al., CR 02-983(E)-RGK

Government's Opposition to Griffin's Motion re Rule 404(b)

i

**TABLE OF CONTENTS (CONT.'D)**

DESCRIPTION                                                                    PAGE

c.   <u>All Other Evidence in the Government's First Notice (Motion, Exhibit A) Should Be Admitted Over a Rule 403 Objection or on "Due Process" Grounds</u> . . . . . . .    17

    1)   <u>"Warlock" Decision</u> . . . . . . . . .    18

    2)   <u>Likai/Grizzle Attack Black Inmates</u> .    18

    3)   <u>Likai Ordered by Stinson to Kill White Inmate</u> . . . . . . . . . .    19

    4)   <u>Solicitations to Kill AB Member Shine</u> . . . . . . . . . . . . .    19

    5)   <u>Schneider Gave Weapons to Defendant Chance</u> . . . . . . . . . . . .    20

    6)   <u>Solicitation to Kill Costa</u> . . . .    20

    7)   <u>Other Activities of AB</u> . . . . . .    20

    8)   <u>AB Reorganizing with the NLR</u> . . . .    21

d.   <u>All Other Evidence in the Government's Second Notice (Motion, Exhibit B) Should Be Admitted Over a Rule 403 Objection or on "Due Process" Grounds</u> . . . . . . .    22

    1)   <u>Stabbing of Inmate Miles</u> . . . . . .    23

    2)   <u>Defendant's Contacts with David Griffin</u> . . . . . . . . . . . . .    25

    3)   <u>Activities of Karl Carter</u> . . . . .    26

    4)   <u>Griffin Solicited Murder of Hickey</u> .    28

    5)   <u>Griffin Contacts with Maurice Matthews</u> . . . . . . . . . . . .    28

    6)   <u>Contacts with Anthony Turner</u> . . . .    29

    7)   <u>Robert Rowland Contact with David Chance and Richard Terflinger</u> . . .    29

TABLE OF CONTENTS(CONT.'D)

DESCRIPTION                                                                    PAGE

8)    Jason Glaza Contacts . . . . . . .    31

9)    Contacts with John "Turtle" Harper .    31

B.    The Court Should Permit the Government to
      Introduce Evidence of Charged Offenses Committed
      in Furtherance of the AB Racketeering Conspiracy  .    33

C.    No Witnesses Are Subject to Exclusion Under
      18 U.S.C. § 3432 . . . . . . . . . .    34

D.    The Government Requests a Preliminary Hearing Under
      Rule 104 as to Murder, Crime Scene, and Related
      Photographs . . . . . . . . . . . .    35

III.  CONCLUSION . . . . . . . . . . . . .    35

# TABLE OF AUTHORITIES

**DESCRIPTION**                                      **PAGE(S)**

**CASES**

United States v. Allen,
      425 F.3d 1231 (9th Cir. 2005) . . . . . . . . . . . . . 33

United States v. Bibo-Rodriguez,
      922 F.2d 1398 (9th Cir. 1991) . . . . . . . . . . . . 10

United States v. Curtin,
      443 F.3d 1084 (9th Cir. 2006) . . . . . . . . . . . . 11

United States v. DeGeorge,
      380 F.3d 1203 (9th Cir. 2004) . . . . . . . . . 8, 31

United States v. Diaz,
      176 F.3d 52 (2nd Cir. 1999) . . . . . . . . . . . . 8

United States v. Houser,
      929 F.3d 1369 (9th Cir. 1990) . . . . . . . . . 10, 11

United States v. Melvin,
      91 F.3d 1218 (9th Cir. 1996) . . . . . . . . 9, 27, 30

United States v. Montgomery,  ,
      384 F.3d 1050 (9th Cir. 2004) . . . . . . . . . . 8, 9

United States v. Sanders,
      928 F.2d 940 (10th Cir. 1991) . . . . . . . . . . . 32

United States v. Valdez-Soto,
      31 F.3d 1467 (9th Cir. 1994) . . . . . . . . . . . 33

**STATUTES**

18 U.S.C. 1962(d) . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 3432 . . . . . . . . . . . . . . . . . . . 34

**RULES**

Fed. R. Crim. Proc. 16 . . . . . . . . . . . . . . 23, 26

Fed. R. Evid. 403 . . . . . . . . . . . . . . 1, 7, 17, 22

Fed. R. Evid. 404(b) . . . . . . . . . . . . . . . PASSIM

Fed. R. Evid. 801(d)(2) . . . . . . . . . . . . . 32, 33

1

I.

2

SUMMARY

3  A.    The Motion Seeks To Exclude Highly Relevant Evidence, Well-

4        Known to Defendant, of the Racketeering Conspiracy and

5        Defendant's Role in It

6        Defendant Griffin seeks to exclude highly relevant evidence

7  of which he has been aware for years but which was only recently

8  brought to the government's attention by Griffin's own litigation

9  strategy.  The government must establish as a matter of law that

10  defendant, and his co-defendants, agreed to operate a continuing

11  racketeering enterprise and that members of the enterprise would

12  carry out specific criminal acts as part of a pattern of

13  racketeering activity.  The evidence which is the subject of this

14  motion, and which consists mainly of defendant's own admissions,

15  directly proves defendant's role in, and the elements of, the

16  first and foremost charge he faces: racketeering conspiracy

17  (Count Two).[1]  Defendant's motion should be denied because every

18  reasonable construction of applicable law supports the

19  introduction of such evidence as proof of each element of _each_ of

20  the charged offenses, especially the racketeering conspiracy.

21        Here, the government will show that defendants agreed to

22  operate the Aryan Brotherhood prison gang ("AB") according to

23  specific rules.  Indictment, ¶¶ 1-15.  The rules included that

24  members who "snitched" - cooperated with law enforcement and

25

26        [1] 18 U.S.C. 1962(d), as alleged in Count Two of the First
   Superseding Indictment filed August 28, 2002.

27                        U.S. v.Griffin, et al., CR 02-983(E)-RGK
                          Government's Opposition to Griffin's Motion re Rule
28                3       404(b)

testified against other members – would be killed. Another rule was that, if the AB could not find or get to a member who had been marked for death, the members' family members would be a fair substitute. Another rule was that law enforcement personnel could be targeted for murder to send the message that the AB was not to be fooled with. Finally, defendants and others agreed that the AB was to be operated, and rule violations were to be determined, by a central management body, known from time to time as the "Commission" or "Council." The management body consisted of senior members of the AB. The AB operated in both California and federal prisons according to the same rules, policies, and governing body. Indictment, ¶ 4. The two factions of the AB used runners, go-betweens, and surreptitious communications (e.g., "kites") to communicate AB business and orders between the two factions. There was, however, by all accounts but "one" Aryan Brotherhood.

The government will show that defendants in the present case – John Stinson, Robert Griffin, and David Chance – were members of AB management. The government has charged that, in connection with their AB management duties, defendants authorized and ordered the killings of several AB members. Indictment, Counts Four, Five.

All of the evidence which is the subject of this motion directly shows that defendant Griffin was a member of the AB; was part of AB management; was well aware of the foregoing and other AB "rules" or policy; that defendant employed those rules and

1  policy; that defendant ordered others to carry out those rules or

2  policy; and that defendant continued to enforce and abide by

3  those rules or policy well into the time frame alleged in the

4  indictment.

5  B.    The Government's Disclosures Are Timely, Based on

6        Defendant's Own Recent Litigation Strategy, and Defendant

7        Cannot Reasonably Be Permitted to Create His Own Prejudice

8        By Seeking Exclusion of Evidence Designed to Counter His

9        Defenses or Attacks on the Government's Case

10       The government's disclosures have been timely, especially

11  given defendant Griffin's own litigation strategy.  First, at the

12  end of June 2006, defendant Griffin filed a motion to dismiss

13  based on the statute of limitations.  See Exhibit A attached

14  hereto.  In his motion, defendant Griffin argued two theories:

15  (1) that the statute of limitations had run because he was not

16  involved in any AB conduct which occurred within five years

17  preceding the date of the indictment, and (2) that he had

18  withdrawn from the AB conspiracy in 1985.  See Exhibit A, pages

19  3-5.  Defendant expressly stated that he "withdrew from

20  participation in the Aryan Brotherhood in 1985" and would "raise

21  the statute of limitations as an affirmative defense at trial."

22  Exhibit A, 6:8-9, 7:1-3.[2]

23       Thus, by his own motion filed a mere two months ago,

24  defendant Griffin placed at issue at least two theories of

25

26  ────────────────

27       [2]   Defendant's motion stands submitted.

28                              5

U.S. v.Griffin, et al., CR 02-983(E)-RGK
Government's Opposition to Griffin's Motion re Rule
404(b)

1 defense or attack which, of course, set the government's wheels

2 in motion to counter.[3]  Furthermore, on April 26, 2006, defendant

3 Griffin subpoenaed numerous "debrief" and other confidential

4 inmate files from the California Department of Corrections and

5 Rehabilitation ("CDC").  CDC moved to quash the subpoenas.  On

6 July 17, 2006 (Docket Entry 3382), this Court ordered that the

7 government take possession of the files and produce documents

8 connected to the government's witnesses and which constituted

9 Brady and Giglio  evidence.  This Court ordered that CDC begin

10 production of those documents by July 31, 2006.  Between August 1

11 and up until mid-September 2006, a mere two weeks ago, CDC

12 produced to the government approximately 13,000 such documents

13 pursuant to defendants' subpoenas and this Court's July 17 order.

14 The government promptly began its review and redacting process.

15 In the course of reviewing those thousands of pages, which has

16 taken several government lawyers several weeks, the government

17 has identified witnesses whose statements appeared to rebut

18 defendant Griffin's defenses and attacks which he had only

19 recently set forth in his June 2006 motion to dismiss (Exhibit A

20 attached hereto).

21

22

23    [3] Indeed, as a matter of law, the government must prove
   beyond a reasonable doubt that the defendant did not withdraw
24 from the conspiracy.  See Ninth Circuit Model Jury Instr. 8/19
   (2003 Ed.).  It would, therefore, be grossly unfair and
25 unreasonable for the defendant, who occasioned the recent
   investigation of his defenses, to claim he was prejudiced by the
26 government's diligent response in order to fulfill the
   government's burden of proof.

27

1    Thus, against the backdrop of defendant Griffin's very

2  recent announcement of his defenses and attacks, and the

3  government's very recently completed review of thousands of

4  documents, the government has pursued further investigation to

5  counter defendant Griffin's defenses.  Moreover, in a situation

6  of "be careful what you wish for," defendant Griffin's recently

7  announced affirmative defense and attack on the government's case

8  has caused the government to reconsider several pieces of

9  evidence not previously believed to lend materiality to the

10  government's case.

11    The sum total of evidence proffered in the government's

12  disclosures which are the subject of this Motion is minimal in

13  light of the over 122,000 pages of produced discovery.  It

14  consists of the statements of approximately 10 witnesses, one of

15  whom is dead (and whose statement will likely not be introduced

16  through other means).

17    Moreover, this small amount of evidence is highly relevant

18  and admissible under several theories.  It is not excludable

19  under Rule 403.  It should be received and defendant's motion

20  should be denied.

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27

28                                          7

U.S. v.Griffin, et al., CR 02-983(E)-RGK
Government's Opposition to Griffin's Motion re Rule
404(b)

## II.

## ARGUMENT

A.    Even Under a Rule 404(b) Analysis, the Proffered Evidence Is Relevant and Admissible

    1.    The Ninth Circuit Permits the Introduction of Uncharged Acts That Are Inextricably Intertwined with Charged Offenses, Even Outside of RICO Law

This Court has ordered that the government give notice of its intent to introduce uncharged acts in response to defendant Stinson's motion to exclude Fed. R. Evid. 404(b) evidence. Exhibit B, attached hereto. The government has respectfully disagreed with the Court's order and has maintained that the admissibility of evidence of uncharged acts is controlled by RICO law, not Rule 404(b), which permits the government to prove the elements of RICO by uncharged acts. See United States v. Diaz, 176 F.3d 52, 79-80 (2nd Cir. 1999) (RICO law permits introduction of uncharged acts to prove elements of RICO conspiracy). Thus, the government has maintained that no 404(b) notice is required.

However, even outside of RICO law, the Ninth Circuit has clearly held that, where the government has charged conspiracy, any uncharged acts that prove the conspiracy are "inextricably intertwined" with proof of charged conduct and Rule 404(b) does not apply. United States v. DeGeorge, 380 F.3d 1203, 1219 (9th Cir. 2004) (evidence of uncharged acts may be admitted if the evidence "constitutes a part of the transaction that serves as the basis for the criminal charge"); United States v. Montgomery,

1  384 F.3d 1050, 1062 (9th Cir. 2004) (Rule 404(b) <u>does not apply</u>

2  to uncharged acts "inextricably intertwined" with underlying

3  charged conspiracy if the acts themselves comprise the

4  conspiracy).

5       2.   <u>Rule 404(b) Permits the Proffered Uncharged Acts</u>

6       Even under a Rule 404(b) analysis, the evidence which is the

7  subject of defendant's Motion is clearly relevant and admissible

8  according to recent Ninth Circuit law.   In <u>United States v.</u>

9  <u>Melvin</u>, 91 F.3d 1218 (9th Cir. 1996), defendant was charged with

10 RICO conspiracy for operating a "get rich quick" enterprise.   The

11 conspiracy operated over 80 separate schemes which solicited

12 funds from investors based on "useless or illegal information."

13 91 F.3d at 1221.   "Each scheme was operated under a different

14 name, with the profits going to different back accounts."   <u>Id.</u>

15 Defendant "was responsible for devising at least three schemes"

16 and assisting in "carrying out several others."   <u>Id.</u>

17      Yet, against the backdrop of defendant's role in devising

18 only three of over 80 separate schemes, and merely "assisting" in

19 carrying out others, the trial court overruled defendant's 404(b)

20 objection and admitted evidence of enterprise schemes "not listed

21 on the indictment."   <u>Id.</u> at 1222.

22      <u>Melvin</u> is particularly useful to the present case because

23 the district court there conducted the same analysis as this

24 Court.   Namely, in <u>Melvin</u>, defendant objected at trial to the

25

26

27

28

<u>U.S. v.Griffin, et al.</u>, CR 02-983(E)-RGK
Government's Opposition to Griffin's Motion re Rule 404(b)

introduction of uncharged schemes under 404(b).[4]  The district
court overruled defendant's objection, allowed evidence of
uncharged schemes, and the Ninth Circuit affirmed.  The Ninth
Circuit stated that Rule 404(b) evidence of uncharged acts is
admissible where the evidence: (1) is based on sufficient
evidence; (2) is not too remote in time from charged crimes; (3)
bears some similarity to the charged acts; and (4) proves an
essential element of the charged offense.  Id., at 1222-23,
citing United States v. Houser, 929 F.3d 1369, 1373 (9th Cir.
1990); United States v. Bibo-Rodriguez, 922 F.2d 1398, 1400 (9th
Cir.), cert. denied, 501 U.S. 1234 (1991).

The Melvin court applied the four-part test of Houser and
found that:

> There was sufficient proof of the other schemes because
> Melvin's co-conspirators had already pled guilty to
> them.  The other schemes were not too remote, because
> they were taking place at the same time, and executed
> in a similar manner to the charged schemes.  The
> uncharged schemes were similar in nature to the get-
> rich-quick schemes for which Melvin was charged.
> Finally, these other schemes were admitted to show
> intent, motive, and method of operation of the

---

[4] Apparently, although it cannot be determined from the
reported decision, the government in Melvin did not argue at
trial or on appeal that the proffered uncharged conduct was
admissible under RICO law and that 404(b) did not apply at all.

U.S. v.Griffin, et al, CR 02-983(E)-RGK
Government's Opposition to Griffin's Motion re Rule
404(b)

10

1  conspiracy.  We therefore find the evidence admissible

2  under Rule 404(b).

3  91 F.3d at 1223.  <u>See</u> <u>also</u> <u>United States v. Curtin</u>, 443 F.3d

4  1084, 1091 (9th Cir. 2006) (applying four-part Rule 404(b) test

5  as in <u>Houser</u>).

6      The Ninth Circuit further held that the probative value of

7  the uncharged evidence outweighed any prejudice because "the

8  evidence clearly showed Melvin's intent, method, and plan" and

9  was "closely involved with the larger conspiracy."  <u>Id.</u>

10      Finally, the Ninth Circuit found that any confusion to the

11  jury caused by the introduction of uncharged schemes was avoided

12  by a limiting instruction whereby "the jurors were expressly told

13  that Melvin needed to be found guilty of the substantive counts

14  in order to be convicted of the racketeering and racketeering

15  conspiracy counts."  <u>Id.</u>

16      As will be shown below, all of the proffered evidence meets

17  the <u>Melvin</u> test for admissibility as Rule 404(b) evidence.  The

18  proffered evidence should also be received as RICO evidence

19  and as inextricably intertwined with the racketeering conspiracy

20  and, therefore, not subject to Rule 404(b) notice requirements.

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27

28                              11



3.    <u>All of the Proffered Evidence Is Relevant and</u>
      <u>Admissible, Whether by a RICO, "Inextricably</u>
      <u>Intertwined," or Rule 404(b) Analysis, and Is More</u>
      <u>Probative than Prejudicial as it "Clearly Show[s]</u>
      <u>[Defendant's] Intent, Method, and Plan" and [Is]</u>
      <u>"Closely Involved with the Larger Conspiracy."</u>

No matter how the Court may analyze the proffered evidence, it is relevant and admissible evidence of the AB racketeering conspiracy and of defendant's role in it and, no less, comes directly from defendant's own admissions.

a.    <u>T-Bone Gibson Was Killed as a Matter of AB</u>
      <u>Business Because He Disrespected The AB;</u>
      <u>Defendant Griffin Suborned Perjury As Part of AB</u>
      <u>Business</u>

The government intends to prove the AB RICO conspiracy and defendant's role in it by, among other things, introducing evidence that defendant (1) participated in the AB-orchestrated murder of Steven "T-Bone" Gibson and (2) encouraged another AB member to commit perjury at defendant's trial for that murder. Thus, the government has offered a very limited amount of evidence that tends to show defendant's role and intent in the present RICO conspiracy and will not result in a "retrial" of that underlying offense.[5]

_____

[5] Defendant's argument that the Gibson killing is relevant only to show defendant's motive to kill Richard Barnes because his son, AB member Steven Barnes, testified against Griffin in the Gibson murder trial (Motion, 8:2-5) entirely misses the point

As stated in the government's disclosure (Motion, Exhibit A, page 2), Gibson was murdered because he disrespected the AB, a violation of AB rules and cause for death. Defendant Griffin explained the plan to kill Gibson to another AB member (Masterson). Later, at defendant Griffin's trial, Griffin solicited Masterson to commit perjury to support Griffin's defense.

Applying <u>Melvin</u>, supra, the proffered evidence should be received because it "is based on sufficient evidence" as Masterson will testify first-hand as to what Griffin told him about the plan to kill Gibson and that Griffin suborned his perjury. Griffin's conduct is "not too remote in time from charged crimes" because it occurred at the same time that defendant Griffin and other defendants formed the AB "commission" and "council" in prison at the "Palm Hall" wing of the California Institute for Men ("CIM") at Chino. This is about the same time (1982) and at the same place (CIM Chino) that the defendant and others carried out the charged killing of Steven Clark (Indictment, Overt Acts 69-74). The killing of Gibson bears more than "some similarity to the charged acts." It was strikingly

_____

of the proffered evidence. The evidence of the Gibson murder described above proves defendant Griffin's role in the AB conspiracy, the conspiratorial action (killing Gibson), and defendant's knowledge and employment of AB rules. The later murder of Steven Barnes' father, because Steven Barnes testified against Griffin in the Gibson trial, is relevant for a different reason. Namely, to prove that Griffin endorsed the AB motive and plan to kill AB members (or their family) if the member testified against the AB.

1  similar because Gibson was killed, like every other AB killing in

2  the indictment, because he broke an AB rule, because there was an

3  orchestrated cover-up planned for the killing, and because

4  defendant, like other AB defendants, suborned perjury of another

5  AB member in support of his defense in an underlying case.

6  Virtually every government witness in this case who was formerly

7  a member of the AB will testify that AB rules included committing

8  perjury in favor of an AB member.  Finally, defendant's plotting

9  to kill Gibson and suborning perjury proves an essential element

10 of the charged offense, namely, that AB members agreed to engage

11 in a pattern of racketeering activity by conspiring to kill and

12 killing AB rule violators and then covering up their crimes by

13 suborning perjury.

14     The proffered evidence is certainly more probative than

15 prejudicial, and is not confusing.  The evidence shows Griffin

16 was a high-ranking AB member at the same time as other charged

17 conduct (e.g., Clark killing, Barnes killing, 1982-83) and that

18 Griffin himself followed the AB rule to suborn perjury.  No

19 "mini-trial" will result regarding the Gibson killing because

20 Griffin was convicted of Cal. Pen. C. 32, accessory to murder, in

21 connection with that killing.  Thus, the jury will see the

22 beginning, middle, and end to the entire Gibson murder as it

23 relates to Griffin, without the threatened "retrial" suggested by

24 defendant.

25

26

27

28                          14

1       b.     <u>The Murder of Deputy Trejo Is Relevant And</u>

2            <u>Admissible Evidence of AB Business and Impeachment</u>

3            <u>Evidence Against Government Witness Schneider</u>

4      Government witness and former AB member Paul Schneider will

5 testify that in 1995 AB member Robert Scully was soon to parole

6 and intended to carry out robberies for the benefit of the AB.

7 According to Schneider, Scully expressed to AB managers that he

8 would "go out shooting" or words to that effect if he were

9 detained by law enforcement, as he would be facing a "third

10 strike."  Schneider will testify that Scully's plan was ratified

11 by AB management.  Upon parole, and in course of preparing for

12 the AB-commissioned robberies, Scully executed Sonoma County

13 Deputy Frank Trejo after Trejo stopped Scully and AB associate

14 Brenda Moore for a traffic infraction.  Scully was convicted of

15 first degree murder and received the death penalty.

16      Thus, Schneider's testimony about the facts of the AB's

17 decision to order Scully to commit robberies and ratification of

18 his plan to murder Trejo is the subject of this proffer.  The

19 proffered evidence "is based on sufficient evidence" because

20 Schneider was a percipient witness to meetings of the AB

21 "commission" regarding planning and ordering the robberies, and

22 because defendant Griffin was a member of the commission.  The

23 evidence "is not too remote in time from charged crimes."  In

24 fact, Scully's parole date and Trejo's killing fell squarely at

25 the time defendant and his co-defendants were at Pelican Bay

26 State Prison, conducting AB business, and just prior to the

27

28

charged murders of Arthur Ruffo (Count Four, February 1996) and Aaron Marsh (Count Five, July 1997). The order to Scully to commit robberies and ratification of his plan to murder a law enforcement officer "bears some similarity to the charged acts" as there will be substantial evidence that paroled AB members were required as a matter of AB rules to commit crimes on the "outside" to fund prison AB business. Nearly every government witness will testify that AB members who paroled kept in contact with AB member-inmates and supported the AB's mandate of ensuring the AB's perpetual existence through outside crime. <u>See</u> Exhibit B attached hereto, which was received during the Santa Ana trial and which will be introduced here. Furthermore, the order to commit the robberies and ratification of the murder of Deputy Trejo "proves an essential element of the charged offense," i.e., RICO conspiracy. The evidence shows the AB continued from the early 1980's to well into the 1990's to orchestrate its survival by engaging in criminal activity both in and out of prison.

Additionally, the evidence is more probative than prejudicial. Schneider was convicted of racketeering involving the same conduct to which he will testify. The weight of his testimony will thus be colored by his conviction. Scully was convicted of the killing; no "retrial" will occur.

Finally, a word about the defendant's contention that "there is no evidence that any of the three defendants on trial authorized or encouraged this murder." Motion, 11:9-10. That is entirely a matter of proof. The indictment alleges the existence

<u>U.S. v Griffin, et al.</u>, CR 02-983(E)-RGK
Government's Opposition to Griffin's Motion re Rule 404(b)

16

1  of a closed-knit group of well-organized criminals who followed a

2  set of guidelines and rules to carry out their criminal

3  enterprise.  Each of these defendants have been charged with

4  conducting that conspiracy.  They are responsible for all

5  criminal acts foreseeably committed in furtherance of that

6  conspiracy.  See Ninth Circuit Model Jury Instr. 8.20

7  ("Conspiracy – Pinkerton Charge).  The proffered evidence, and

8  all other evidence, both charged and uncharged, is intended to

9  prove the existence of the criminal conspiracy and defendants'

10  responsibility for foreseeable criminal conduct.  It does not

11  take any stretch of the imagination to conclude that a robbery

12  ordered to be committed by a recent AB parolee will result in

13  violence or death, and that the conspiracy's members knew it.

14        c.   All Other Evidence in the Government's First

15             Notice (Motion, Exhibit A) Should Be Admitted Over

16             a Rule 403 Objection or on "Due Process" Grounds

17      Defendant has made a catch-all objection under Rule 403 and

18  on "Due Process" grounds[6] to all other evidence described in the

19  government's notice as required by the Court's August 14, 2006

20  ruling.  Motion, Exhibit A.  Defendant has not otherwise

21  contended that the evidence is irrelevant.  The government

22  submits that all of the evidence described therein is relevant

23

24        [6] Defendant has not cited any authority for objecting to any

25  of the proffered evidence on "due process" grounds.  This objection is so vague and over broad as to be meaningless.  The

26  government therefore will address the evidence in this section as a matter of admissibility under Fed. R. Evid. 403.

27

28                  17

1  and admissible under any of the grounds stated above, and because
2  defendants have largely misconstrued the purpose of the proffered
3  evidence.

      1)   "Warlock" Decision

5      Government witness Brian Healy will testify that the
6  "Warlock" decision was AB code for killing an inmate in his cell.
7  The code was based on a case in which an inmate strangled his
8  cellmate, and co-defendant Terflinger told Ruffo murderer Brian
9  Healy to carry out the Ruffo killing in the same way.

10      Contrary to defendant's contention, this evidence does not
11  relate to an "uncharged murder planned by [Healy] and another
12  person not on trial here."  Motion, 13:13-16.  Instead, it
13  directly relates to Healy's accepting the order to kill Arthur
14  Ruffo, for which defendant Griffin is charged in Count Four.

      2)   Likai/Grizzle Attack Black Inmates

16      Government witness and former AB member Anthony Likai will
17  support the government's theory that defendant Stinson was a
18  ranking AB member because Stinson ordered Likai to "hit" black
19  inmates.  Thus, Likai's testimony will prove the AB hierarchy.
20  Furthermore, government witness Allan Benton, who testified in
21  the Santa Ana Mills trial, will testify that the AB was at war
22  with black inmates and that he carried out an AB order to "hit"
23  black inmates.  Thus, this evidence is more probative than
24  prejudicial in proving the existence of the AB hierarchy and AB
25  motives.

26  ///

1         3)    Likai Ordered by Stinson to Kill White Inmate

2      Likai will testify that he was required to follow orders

3  from AB senior, defendant Stinson, to "hit" a white inmate in

4  order to send the AB's message of supremacy among white inmates.

5  Again, this evidence is inextricably intertwined, and more

6  probative than prejudicial, to prove how and why the AB

7  conspiracy operated.  The evidence will consist of Likai's

8  testimony of statements made to him by a defendant, Stinson.  It

9  is highly probative and non-prejudicial evidence of

10  conspiratorial intent, plan, and motive.

11        4)    Solicitations to Kill AB Member Shine

12      Nearly all of the government's cooperator witnesses will

13  testify that, as part of AB business, members were tasked with

14  carrying out orders to "hit" or kill offending AB members.

15  Refusal to carry out an AB order of this nature was itself

16  grounds for a death sentence.  Thus, government witness and

17  former AB member Brian Healy will simply testify that the motive

18  behind the murder of Aaron Marsh (Count Five) was the

19  commission's perception that Marsh failed to carry out the

20  commission's order to kill AB member Shine.  Thus, this is hardly

21  venturing into a "detailed mini-trial."  It is simply a single

22  statement by a government witness that serves as direct evidence

23  to explain the motive for killing the victim in a charged count

24  (Count Five).  It is therefore more probative than prejudicial.

25  ///

26  ///

27

28                        19

1         5)    <u>Schneider Gave Weapons to Defendant Chance</u>

2     Government witness Schneider will testify that, as part of

3 AB business, he gave weapons (knives) to defendant Chance and

4 that Schneider heard Chance order another AB member to kill yet

5 another AB member.  This evidence is relevant and admissible to

6 prove Chance's role in the AB, as a high-ranking member and one

7 responsible for ordering murders.  The indictment expressly

8 alleges that the AB had a hierarchy, and that Chance was part of

9 it as a senior member.  <u>See</u> Indictment, ¶¶ 1-15.  Moreover,

10 Chance's statements to Schneider are direct, relevant, and

11 admissible evidence, as party admissions, that Chance was aware

12 of the AB, of its purpose and rules, and of his role.  Such

13 evidence cannot reasonable be deemed more prejudicial than

14 probative.

15         6)    <u>Solicitation to Kill Costa</u>

16     Again, the government intends to call numerous AB

17 cooperators to prove that the AB had a hierarchy which was

18 responsible for ordering "hits" or murders, and that defendants

19 were high-up in the AB hierarchy.  Thus, any evidence that a

20 defendant acted consistent with such rank would be relevant and

21 admissible and direct proof of the existence of the AB enterprise

22 and each defendants' role.

23         7)    <u>Other Activities of AB</u>

24     Defendants have wholesale objected to this information.

25 However, when each item is separately examined, it should be

26 clear that each item is admissible as direct proof of the

<u>U.S. v.Griffin, et al.</u>, CR 02-983(E)-RGK
Government's Opposition to Griffin's Motion re Rule
404(b)

20

1  existence of the AB enterprise and the pattern of racketeering

2  activity.  Furthermore, each item is far more probative than

3  prejudicial.

4          (a)  Deputy Trejo murder: this item was previously

5  addressed.

6          (b)  AB members issuing subpoenas for each other

7  in order to facilitate AB communication: numerous government

8  witnesses will testify that the AB routinely subpoenaed other

9  members under the guise of providing testimony in order to

10 communicate AB business and allow AB members to be housed

11 together.  This evidence is direct proof of the AB enterprise and

12 how it conducted its pattern of racketeering activity, as well as

13 how the AB abused legal processes to carry out its business.

14          (c)  AB discussions about killing correctional

15 officers and other evidence of AB rules or enforcement:

16 government witness Healy will testify that AB rules included

17 harassment or murder of correctional and other law enforcement

18 officers.  Uniform AB rules, and how they were enforced, however

19 heinous, is direct proof of the existence of the AB enterprise

20 and the pattern of racketeering activity.  There is no showing by

21 the defendants that the mere mention by Healy of such rule(s) is

22 more prejudicial than probative.

23          8)  <u>AB Reorganizing with the NLR</u>

24      The government would seek to introduce evidence that, fairly

25 recently, the AB has sought to continue its existence by

26 soliciting another prison gang to carry out AB business.  Namely,

27

28                      21

<u>U.S. v.Griffin, et al.</u>, CR 02-983(E)-RGK
Government's Opposition to Griffin's Motion re Rule
404(b)

1 the AB has solicited the help of the Nazi Low Riders ("NLR").

2 Government prison expert witnesses will testify that the AB has

3 sought to perpetuate its existence and control over white prison

4 inmates through the NLR whose members have not suffered under the

5 same "lock down" status and, hence, are better able to carry out

6 AB business.   Contrary to defendant's assertion, such evidence

7 does more than "add little" to the case.   Instead, it shows the

8 AB is a continuing enterprise, which is elemental RICO law.   It

9 further shows that AB managers Stinson and Terflinger attempted

10 to exert their influence over other prisoners, which is

11 consistent with the operation of the AB throughout the past 20

12 plus years of its existence.   The jury should absolutely be

13 entitled to hear that the AB is not simply a piece of history but

14 is, instead, a continuing criminal enterprise.   Such evidence

15 cannot reasonably be considered more prejudicial than probative

16 given that such evidence is direct proof of the existence of the

17 continuing racketeering enterprise.

18          d.   <u>All Other Evidence in the Government's Second</u>

19               <u>Notice (Motion, Exhibit B) Should Be Admitted Over</u>

20               <u>a Rule 403 Objection or on "Due Process" Grounds</u>

21     Defendant has again proposed a catch-all objection under

22 Rule 403 and on "Due Process" grounds[7] to all other evidence

23

24       [7] Defendant has not cited any authority for objecting to any

25 of the proffered evidence on "due process" grounds.   This objection is so vague and over broad as to be meaningless.   The

26 government therefore will address the evidence in this section as a matter of admissibility under Fed. R. Evid. 403.

27                       <u>U.S. v.Griffin, et al.,</u> CR 02-983(E)-RGK

                    Government's Opposition to Griffin's Motion re Rule

28               22          404(b)

1  described in the government's notice as required by the Court's

2  August 14, 2006 ruling.  Motion, Exhibit B.  The government

3  submits that all of the evidence described therein is admissible

4  under any of the grounds stated above, and because defendants

5  have again largely misconstrued the purpose of the proffered

6  evidence.

7          1)    Stabbing of Inmate Miles

8          As stated above, on June 30, 2006, in connection with the

9  flurry of pretrial motions in this case, defendant Griffin filed

10  a motion to dismiss based upon the expiration of the statute of

11  limitations.  Griffin argued that he had not been actively

12  involved in the AB since 1985 and that the indictment did not

13  otherwise contain evidence of his involvement within five years

14  preceding the date of the indictment.  Nonetheless, in

15  anticipation that defendant Griffin would seek to introduce

16  evidence of expiration of the statute of limitations and that he

17  had withdrawn years ago from the AB conspiracy, the government

18  sought to identify evidence to show the contrary.[8]  The

19

20          [8] Defendant Griffin recently underscored his intent to

21  defend the charges on these grounds.  Two weeks ago, he provided
   his first disclosure of discovery to the government.  The

22  evidence, approximately one-inch thick, primarily consists of
   defendant Griffin's communications and litigation with the

23  California Department of Corrections on his contention that he
   "dropped out" of the AB in 1985.  To emphasize his intent to

24  introduce this evidence at trial as an affirmative defense, his
   attorney's cover letter to the government stated, "Pursuant to

25  Fed. Crim. Proc. Rule 16, Counsel for defendant Robert Lee
   Griffin are hereby providing copies of documents that may be used

26  in the defendant's case in chief."  See highlighted portion of
   Exhibit C attached hereto.

27
                                              U.S. v. Griffin, et al., CR 02-983(E)-RGK
28                                            Government's Opposition to Griffin's Motion re Rule
                     23                       404(b)

government received during the past three months approximately 13,000 pages of "debriefs" from the CDC as well as other evidence previously considered either cumulative or not material.  Based upon defendant Griffin's statute of limitations and conspiracy withdrawal claims, the government identified several documents that tended to show defendant Griffin was in fact active in the AB as late as 1998 and 1999 (well within five years before the indictment which was filed on August 28, 2002).  Those documents included evidence from an unrelated case that identified James Prescott's stabbing of black inmate Johnny Miles[9] while defendant Griffin was the senior AB member at the same prison facility. The government promptly reviewed those documents and provided notice as soon as was practicable regarding the affect on Griffin's case.

It should be noted that the sum total of the evidence regarding Griffin, Prescott, and the Miles stabbing amounted to a single sentence buried on page two of a five-page, single spaced FBI report from another unrelated case.  The sentence read, "Lowery told Bridge to "Hit" (kill) inmate Miles in his section at WVDC per AB shot caller Blinky (NFI)."  Government Discovery,

---

[9] The fact that Prescott pleaded guilty to stabbing Miles in the unrelated NLR case before Judge Schiavelli, <u>United States v. Hayes, et al.</u> is irrelevant.  In that case, Prescott pleaded guilty to stabbing Miles and admitted he was ordered to so by co-defendants Joe Lowery and Michael Bridge as part of NLR business. The AB connection to that "hit" was not relevant at the time Prescott pleaded guilty.  Nothing in Prescott's plea agreement mentions defendant Griffin.  The plea agreement is under seal and will be provided to this Court under seal and <u>in camera</u> if so requested.

<u>U.S. v.Griffin, et al.</u> CR 02-983(E)-RGK
Government's Opposition to Griffin's Motion re Rule 404(b)

24

1   page 122544, attached hereto as Exhibit D.   It would be unfair

2   and unreasonable to deny the government an opportunity to call

3   this single witness (Prescott) to testify to a single event,

4   especially in light of the defendant's own very recent

5   disclosures to the government regarding his "retirement" at a

6   time directly rebutted by witness Prescott.

7          In summary, the evidence of Prescott's involvement in the

8   Miles stabbing is direct evidence of defendant Griffin's recent

9   AB activity as a "shotcaller" or high-ranking member.   The

10  evidence is direct evidence of the continued racketeering

11  enterprise and defendant's role in it.   The evidence is not more

12  prejudicial than probative, especially as defendant has placed

13  his role at issue.

14          2)   Defendant's Contacts with David Griffin

15         Again, given defendant's very recent claim that he

16  "withdrew" from the AB conspiracy, the government has reviewed

17  the case evidence to counter this claim and bolster the

18  government's case in chief to show defendant's ongoing AB

19  activity.   Thus, a statement earlier obtained from former NLR

20  member (not AB member) David Griffin (no relation to defendant)

21  has become highly relevant, as has this witness' "debrief" which

22  was recently received as part of the over 13,000 pages of

23  discovery ordered by this Court in connection with the CDC

24  subpoena litigation.   This witness' testimony will consist of

25  defendant Griffin's very recent (2002) statements about his AB

26  involvement and philosophy including that defendant's "motto" was

27

28                                  25

U.S. v.Griffin, et al., CR 02-983(E)-RGK
Government's Opposition to Griffin's Motion re Rule
404(b)

1    "three people constitutes a conspiracy" so defendant "was careful

2    to never do that,"  Government's Discovery, page 122554, attached

3    hereto as Exhibit E, and that defendant Griffin did not want any

4    gang-related activity to occur while he was present so as to

5    avoid implicating him in AB activity.  Government's Discovery,

6    page 122555, attached hereto as Exhibit F.  This evidence clearly

7    shows defendant Griffin was held in such stature as an AB senior

8    that he could actually control prison gang activity.  Other

9    statements made to this witness by defendant Griffin include

10   defendant Griffin "rocking a member to sleep," which the

11   government will prove was the AB modus operandi for lulling a

12   person into a false sense of security just prior to killing them

13   as AB business.  Id.

14        Thus, this evidence is highly probative of defendant's

15   intent and the AB's methods of operation, both proof of the

16   continuing enterprise and not more prejudicial than probative.

17        3)   Activities of Karl Carter

18        Again, pursuant to defendant's subpoena to the CDC issued in

19   April 2006, and pursuant to this Court's order, the government

20   received approximately 13,000 pages of "debrief" and similar

21   documents.  Among those documents was the debrief of inmate Karl

22   Carter.  Carter had stated to CDC in 2002 (not to the government)

23   that defendant Griffin in 1981, while they were housed at Palm

24   Hall CIM Chino, "asked him about how he felt about performing a

25   killing for the AB."  The solicitation to murder referred to an

AB "dropout" named Roger Wiersma.  Government's Discovery, page 122561, Exhibit G attached hereto.

This information clearly meets the test of <u>Melvin</u>.  First, it is based on sufficient evidence, namely, the proposed testimony of a person, inmate Carter, with percipient knowledge of Griffin's statement.  The government will corroborate the statement with CDC records showing the two were in fact housed together at Palm Hall at the time the statement was made.  This statement is typical of the type of evidence the government will introduce in this case and is no more nor less substantial that any other inmate statement.  Next, Carter's testimony is not too remote in time from charged crimes.  In fact, it falls squarely within the time defendant Griffin was most active in the AB and when the AB was plotting the charged murders of Steven Clark and Richard Barnes (1982-83).  Next, the proposed testimony bears more than "some similarity to the charged acts" as it shows defendant Griffin's subscribing to the AB philosophy of killing AB dropouts, especially those who might testify against AB members.  Next, the proposed testimony proves an essential element of the charged offense, namely, conducting AB business through a pattern of racketeering activity (witness intimidation, murder).  Finally, the evidence is more probative than prejudicial.  As in <u>Melvin</u>, where the Court overruled a 403 objection, the evidence "clearly show[s] [defendant's] intent, method, and plan" and [is] "closely involved with the larger conspiracy."  <u>Melvin</u>, 91 F.3d at 1222-23.  The evidence consists

1  of a single witness' testimony on a very limited but highly

2  relevant and admissible point.  As with all of the proposed

3  evidence which is the subject of this motion, it would be

4  unreasonable and inconsistent with applicable law to exclude as

5  prejudicial any admission against interest made by any defendant.

6  Thus, Carter's testimony should be received.

7          4)  <u>Griffin Solicited Murder of Hickey</u>

8      The government has been unable to find sufficient evidence

9  at this time and subject to further investigation does not intend

10  to introduce such evidence.

11          5)  <u>Griffin Contacts with Maurice Matthews</u>

12      In connection with the government's attempts to counter

13  defendant Griffin's recently announced statute of limitations and

14  conspiracy withdrawal claims, and in the government's recent

15  review of CDC "debriefs" which were subpoenaed by the defendants,

16  the government recently identified an additional witness.  The

17  witness, former NLR member Maurice Matthews, talked to defendant

18  Griffin in 1999 while housed with Griffin at Palm Hall CIM Chino.

19  There, Griffin and Matthews discussed an insurgent NLR movement

20  called "Fuck the Brand" or "FTB."  Other government cooperators

21  and experts will testify that FTB members were marked for death

22  by the AB (also known as the "Brand") for disrespecting the

23  AB/NLR chain of command.  Obviously, from defendant's Griffin's

24  statements to Matthews, Griffin, like any other AB senior, was

25  concerned about the rift because he agreed to intervene on

26  Matthews' behalf and talk to another AB member (Harper) to "give

27

28                            28

1  a pass" (commute Matthews' death sentence for disrespecting the

2  AB).  Thus, as with all other recent admissions by defendant

3  Griffin, this evidence is based on percipient witness testimony

4  to a defendant's own admissions; is close in time to charged

5  conduct; is similar to charged conduct, namely, actions tending

6  to show the AB hierarchy in action; and proves an essential

7  element of the charged conduct, here the continuing operation of

8  the AB racketeering enterprise.  The evidence is more probative

9  than prejudicial for the same reasons stated above.

10              6)   <u>Contacts with Anthony Turner</u>

11      The government recently learned that Turner died.  The

12  government is pursuing a different means to introduce this

13  evidence but at this time does not intend to do so.

14              7)   <u>Robert Rowland Contact with David Chance and</u>

15                   <u>Richard Terflinger</u>

16      Again, as part of the government's recent court-ordered

17  review of some 13,000 CDC "debriefs" and related documents

18  subpoenaed by the defense, the government recently learned that

19  AB dropout Rowland had debriefed.  The government had earlier

20  contacted Rowland but not on the issues only recently made

21  relevant through defendant Griffin's last-minute defenses.

22  Rowland was re-interviewed (his interview report was recently

23  provided) and implicated defendants Chance and Terflinger.  His

24  interview statements were summarized in the government's

25  disclosure (Motion, Exhibit B).  Rowland's statements are <u>very</u>

26  relevant and very narrow in scope.  AB dropout Rowland will

27

28                              29

1   testify that he too was solicited to commit perjury to support

2   the defense of an AB member.  This time the subornation of

3   perjury was by defendant Chance.  The subornation of perjury

4   related to the charged act involving the AB-orchestrated murder

5   of Richard Barnes (Overt Acts 69-74).  In regard to justifying

6   Barnes' murder, Chance told Rowland, "that's the [AB] policy."

7           The proffered evidence clearly meets the Rule 404(b) test

8   described herein as well as every other RICO or "inextricably

9   intertwined" test.  The evidence is "sufficient" because it is a

10  party's (defendant Chance) admission, corroborated by inmate

11  housing records.  It is not too remote, as Chance's statements to

12  Rowland were made between 1983 and 1985, a period of numerous

13  charged offenses.  Next, the evidence bears more than "some

14  similarity" to all other relevant evidence of the AB's rule of

15  suborning perjury and killing snitches or their family members.

16  Finally, the statement proves the continuing enterprise and

17  pattern of racketeering activity elements of the RICO conspiracy

18  charge (Count Two).  As with the "Karl Carter" statement above,

19  and as in Melvin, where the Court overruled a 403 objection, the

20  evidence "clearly show[s] [defendant's] intent, method, and plan"

21  and [is] "closely involved with the larger conspiracy."  Melvin,

22  91 F.3d at 1222-23.  Once again, the evidence consists of a

23  single witness' testimony on a very limited but highly relevant

24  and admissible point.

25  ///

26  ///

27

28                          30

8)     <u>Jason Glaza Contacts</u>

Again, the government first identified Glaza as a potential witness during the government's recent review of the debriefs, noted above.  Glaza is a percipient witness to recent (2000) statements about AB business by defendants Stinson and Terflinger, including conducting business "on the street" and the FTB movement.  For all of the reasons noted above, recent (2000) statements by defendants about conducting the AB are not only clearly "inextricably intertwined" as proof of the conspiracy; they are the conspiracy.  <u>See</u> <u>DeGeorge</u>, supra.

9)     <u>Contacts with John "Turtle" Harper</u>

As mentioned in defendant's Motion, the government obtained John "Turtle" Harper's statements as recently as August 10, 2006 regarding defendant Griffin's attempt to "withdraw" from the AB conspiracy.  The government acted in good faith by providing notice of Harper's testimony in connection with the notice required by the Court, as Harper's testimony relates to charged offenses and should not be construed as Rule 404(b) evidence. His testimony directly proves defendant Griffin's (and defendant Stinson's) membership in the AB (Count Two) and their involvement in the charged murder of Arthur Ruffo (Count Four).  Harper, a 20-plus year member of the AB in both the federal and state prison systems, knows Griffin well and is well acquainted with AB business, rules, and policy.  Harper was affiliated with the AB in the early 1980's with members T.D. Bingham (recently found guilty of RICO, RICO conspiracy, and VICAR charges in Santa Ana,

1  based on the same indictment), Ronnie Slocum (the federal-state

2  "go-between" for the AB), and AB members/killers John Greschner

3  and William McKinney.  Harper, pursuant to AB rules and orders,

4  committed crimes on the street just after his parole.  As with

5  several other witnesses mentioned above, Harper talked to

6  defendant Griffin as recently as 1999, when they were housed

7  together at Palm Hall CIM Chino.  In 1996, Harper was housed with

8  defendant Griffin and defendants Stinson, Terflinger, and Chance,

9  at Pelican Bay State Prison where, among other things, Stinson

10 and Terflinger told him that Arthur Ruffo was an AB target

11 because of bad blood between Ruffo and Griffin.

12     In light of the direct connection between Harper's testimony

13 and charged conduct, no reasonable 404(b) or "indirect"

14 evidentiary argument can be made.  Furthermore, such evidence is

15 clearly more probative than prejudicial because it established

16 the AB plan, scheme, design and defendants' motive and intent.

17     Furthermore, Harper's testimony is not excludable on any

18 other ground advanced by defendant Griffin.  First, it is

19 relevant to Griffin's continued membership in the conspiracy.[10]

20 Next, defendant's statements were "in furtherance" of the

21 conspiracy and admissible under Rule 801(d)(2)(E)  (see

22

23
   _____

24     [10] Defendant cannot exclude evidence of his continued role
   in the conspiracy where he has mounted a "withdrawal" claim as
25 such claim is purely a question of fact for the jury.  See United
   States v. Sanders, 928 F.2d 940 (10th Cir. 1991), cert. denied,
26 502 U.S. 845 (issue of continuing membership in RICO enterprise
   is fact question for jury).

27                              U.S. v. Griffin, et al., CR 02-983(E)-RGK
                               Government's Opposition to Griffin's Motion re Rule
28                 32            404(b)

1  government's pending motion in limine no. 4).[11]  Next, and

2  contrary to defendant's Motion and order of this Court, co-

3  conspirator statements are _not_ excludable under _Crawford._  _See_

4  _United States v. Allen_, 425 F.3d 1231, 1235 (9th Cir. 2005),

5  _cert. denied_, 126 S. Ct. 1487 (March 6, 2006) (court confirmed

6  that "co-conspirators statements are not testimonial and

7  therefore beyond the compass of _Crawford's_ holding."); Docket

8  Entry 3623, August 17, 2006 order denying Stinson's motion to

9  exclude 801(d)(2)(E) statements pursuant to _Crawford._  Finally,

10  there is no "confrontation clause" issue here because the

11  witnesses will be present for cross-examination.  _United States_

12  _v. Valdez-Soto_, 31 F.3d 1467, 1470 (9th Cir. 1994) ("[w]e are

13  aware of no Supreme Court case, or any other case, which holds

14  that the introduction of hearsay evidence can violate the

15  Confrontation Clause where the putative declarant is in court,

16  and the defendants are able to cross-examine him.").

17  B.  The Court Should Permit the Government to Introduce Evidence

18      of Charged Offenses Committed in Furtherance of the AB

19      Racketeering Conspiracy

20  Defendant Griffin next seeks to exclude evidence of certain

21  charged offenses on the ground that Judge King severed this case

22  from a larger group on the basis that the present defendants

23  "were all charged with racketeering acts occurring in state

24  prison . . ."  Motion, 22:21-23.  Defendant's argument is

---

26  [11] The government will lay the proper foundation for co-
conspirator statements at the time it calls each witness.

1  fundamentally incorrect because the district court's grouping and

2  severance for court convenience has nothing to do with proof of

3  the charges.  All defendants have been charged with RICO

4  conspiracy and all evidence of the conspiracy, wherever and

5  whenever occurring, should be admissible, especially as the

6  indictment specifically alleges that the AB operated in two

7  prison systems.  Indictment, ¶ 4.  Evidence of the existence and

8  operation of the AB as a wide-ranging prison gang in California

9  and federal prisons was amply alleged and is a basic theme of the

10  government's case.

Thus, this argument is fundamentally flawed.  The government

12  especially objects to this argument as what appears to be an

13  unreasonable effort to "smoke" out the government's litigation

14  strategy and work-product.

Nonetheless, the government respectfully reserves the right

16  to supplement its opposition to this argument if the Court

17  believes further briefing or supporting evidence is required.

18  C.   No Witnesses Are Subject to Exclusion Under 18 U.S.C.

19       § 3432.

The government's motion in limine no. 2, regarding delaying

21  disclosure of witnesses under § 3432, stands submitted.  The

22  government takes the position that any disclosure requirements of

23  that section are, therefore, tolled.  Out of an abundance of

24  caution, the government recently filed an ex parte application

25  seeking a ruling on that motion.  The application is pending.

26  The government otherwise hereby incorporates herein by reference

27

28                              34

1 │ its pending motion in limine no. 2 and the related ex parte

2 │ application.

3 │ D.    The Government Requests a Preliminary Hearing Under Rule 104

4 │         as to Murder, Crime Scene, and Related Photographs

5 │         The government believes the question of admissibility of

6 │ murder and related (e.g., crime scene, autopsy) photographs

7 │ should be addressed by the Court, outside of the jury's presence,

8 │ by way of a preliminary hearing under Rule 104 during breaks in

9 │ jury presentation.  The government is in the process of

10 │ streamlining its case and identifying specific photographs.  The

11 │ government assures the Court that such a hearing will be brief

12 │ and will not unduly lengthen the trial.  The government reserves

13 │ until such hearing or further order of Court its position on the

14 │ admissibility of such evidence.

15 │                              III.

16 │                           CONCLUSION

17 │         For each of the reasons set forth herein, the government

18 │ respectfully requests that defendant's Motion be denied.

19 │

20 │

21 │

22 │

23 │

24 │

25 │

26 │

27 │                                          U.S. v.Griffin, et al., CR 02-983(E)-RGK
│                                          Government's Opposition to Griffin's Motion re Rule
28 │                         35                404(b)

JOSEPH F. WALSH
Attorney at Law
California Bar No. 67930
316 West Second St., Suite 1200
Los Angeles, CA 90012
Tel: (213) 627-1793
Fax: (213) 489-4700
Email: Attyjoewalsh@aol.com

MICHAEL M. CRAIN
Attorney at Law
California Bar No. 45083
Post Office Box 3730
Santa Monica, CA 90408
Tel: (310) 571-3324
Fax: (310) 571-3354
Email: Michaelmcrain@aol.com

Attorneys for Defendant
ROBERT LEE GRIFFIN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.  CR-02-938-RGK |
|          Plaintiff, | ) | **NOTICE OF MOTION AND MOTION TO DISMISS COUNT TWO BASED ON THE STATUTE OF LIMITATIONS; MEMORANDUM OF POINTS AND AUTHORITIES** |
|    v. | ) | |
| ROBERT LEE GRIFFIN, | ) | |
|          Defendant. | ) | Date:     July 24, 2006 |
| | ) | Time:    1:30 P.M. |
| | ) | Ctrm:    850 |

TO THE UNITED STATES ATTORNEY:

     PLEASE TAKE NOTICE that on July 24, 2006 at 1:30 p.m. or as soon thereafter as counsel may be heard, the Defendant, ROBERT LEE GRIFFIN, will move the Court for an order dismissing Count Two based on the statute of limitations.

     This motion is based upon the attached memorandum of

76                    1



1  points and authorities and any further argument or evidence
2  presented at the hearing on the motion.

3  Dated:     June 23, 2006

4                                          *Joseph F. Walsh*
5                                          JOSEPH F. WALSH

6                                          *Michael M. Crain*
7                                          MICHAEL M. CRAIN

8                                          Attorneys for Defendant
9                                          ROBERT LEE GRIFFIN

37        2

## MEMORANDUM OF POINTS AND AUTHORITIES

## STATEMENT OF THE FACTS

Robert Lee Griffin is charged in Count 2 of the indictment with the crime of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C. §1962(d). The indictment was returned on October 16, 2002. Mr. Griffin moves to dismiss Count 2 on the grounds that it is now barred by the five year statute of limitations. 18 U.S.C. §3282.

Count 2 alleges that on a date unknown and continuing to at least July 25, 2002, Robert Lee Griffin and various co-defendants conspired to operate the Aryan Brotherhood, a RICO enterprise, through a pattern of racketeering activity. It alleges that the Aryan Brotherhood is a prison gang operating in the California state prison system. Robert Griffin is alleged to be a member of the California Commission of the Aryan Brotherhood. Mr. Griffin is said to have participated indirectly in the commission of six murders and three attempted murders, all occurring more than five years before the return of the indictment in this case.

The murders and attempted murders are alleged to have occurred on the following dates: July 3, 1982, the murder of Steven Clark; February 13, 1983, the murder of Richard Barnes; October 6, 1983, the murder of Richard Andreason; October 15, 1988, the murder of Thomas Lamb; March 13, 1990, the attempted murder of Jeffrey Barnett; September 30, 1993, the attempted murder of Jimmy Lee Inman; March 1, 1992, the attempted murder of Joel Burkett; February 7, 1996, the murder of Arthur Ruffo; and

38

3

1  July 25, 1997, the murder of Aaron Marsh.

2      Robert Griffin withdrew from and dropped out of the
3  Aryan Brotherhood in 1985. He married an attorney, Pamela
4  Griffin. Since 1985, Mr. Griffin, with the help of his attorney-
5  wife, has tried to secure a transfer from the high security
6  Segregated Housing Unit (SHU) at Pelican Bay State Prison, where
7  suspected gang members are housed in solitary confinement. In an
8  unpublished opinion of the United States Court of Appeals for the
9  Ninth Circuit, the Court summarized Mr. Griffin's efforts to be
10  transferred out of the SHU at Pelican Bay State Prison. Griffin
11  v. Gomez, 1998 U.S.App. LEXIS 3152. (Exhibit A). The Opinion
12  notes that Mr. Griffin filed a petition for writ of habeas corpus
13  in the United States District Court in March of 1992, alleging
14  that his indefinite solitary confinement in the SHU at Pelican
15  Bay violated the Due Process Clause and the Eighth Amendment.
16  The habeas petition based his legal claims on the fact that Mr.
17  Griffin was no longer a member of the Aryan Brotherhood. Ibid.

18      The indictment charging Mr. Griffin with participation
19  in a RICO conspiracy was returned on October 17, 2002. The five
20  year statute of limitations began running in 1985 when Robert
21  Griffin withdrew from participation in the Aryan Brotherhood.
22  The statute of limitations expired five years later in 1990 and
23  now bars any RICO conspiracy charge.

24      In March of 1992, Robert Griffin filed a petition for
25  writ of habeas corpus challenging his confinement in the SHU. As
26  of that date, the court action made it clear that Mr. Griffin had
27  withdrawn from the Aryan Brotherhood. If the statute of
28  limitations began running from the March 1992 date of the court

39

4

1  action, it would bar any RICO conspiracy indictments after March

2  of 1997.

3      The last racketeering act alleging Mr. Griffin's

4  participation in the RICO conspiracy is the July 25, 1997 Aaron

5  Marsh murder.  Five years after this last racketeering act would

6  be July 25, 2002 and the five year statute of limitations will

7  bar any indictment of Mr. Griffin on the RICO conspiracy charge

8  after July 25, 2002.  Since the indictment was returned three

9  months later on October 17, 2002,  Count 2 alleging the RICO

10  conspiracy must be dismissed under the statute of limitations.

11

12                    **ARGUMENT**

13                        I

14  **COUNT 2 CHARGING A RICO CONSPIRACY SHOULD BE**

15  **DISMISSED BASED ON THE STATUTE OF LIMITATIONS**

16

17      The RICO statute contains no express statute of

18  limitations for criminal prosecutions.  However, the United

19  States Supreme Court has held that the five year statute of

20  limitations set forth in 18 U.S.C. §3282 for non-capital federal

21  offenses is the applicable statute of limitations for criminal

22  RICO offenses.  <u>Agency Holding Corp. v. Malley-Duff and Assoc.</u>,

23  483 U.S. 143, 155 (1987).  Section 3282 provides:  "Except as

24  otherwise expressly provided by law, no person shall be

25  prosecuted, tried, or punished for any offense, not capital,

26  unless the indictment is found or the information is instituted

27  within five years next after such offense shall have been

28  committed."

                        40          5

1     The limitations period is measured from the point at
2  which the crime is completed.  See, <u>Toussie v. United States</u>, 397
3  U.S. 112, 115 (1970).  Because the RICO conspiracy statute does
4  not require proof of an overt act, "the crime of RICO conspiracy
5  is not complete until the purposes of the conspiracy either have
6  been accomplished or abandoned."  <u>United States v. Persico</u>, 832
7  F.2d 705, 713 (2nd Cir. 1987).
8     In the case of Robert Griffin, he withdrew from
9  participation in the Aryan Brotherhood in 1985.  He married his
10 wife, Pamela Griffin, an attorney.  With the help of his
11 attorney-wife, Robert Griffin separated himself from the Aryan
12 Brotherhood worked toward his release from solitary confinement
13 in the Segregated Housing Unit (SHU) at Pelican Bay State Prison.
14    In March of 1992, Mr. Griffin filed a petition for writ
15 of habeas corpus in the United States District Court in the
16 Northern District of California alleging that he was no longer a
17 member of the Aryan Brotherhood.  He asked the District Court to
18 order his release from indefinite solitary confinement in the
19 SHU.  (Exhibit A)
20    The last racketeering act in the indictment alleging
21 Mr. Griffin's involvement in the RICO conspiracy in Count 2 is
22 the July 25, 1997 Aaron Marsh murder. Whether the Court accepts
23 1985, 1992, or July 25, 1997 as the point in time when Mr.
24 Griffin withdrew from the Aryan Brotherhood, an indictment
25 returned on October 17, 2002 is more than five years later.
26 Therefore, the five year statute of limitations bars Mr.
27 Griffin's prosecution on the RICO conspiracy and the Court should
28 dismiss Count 2 of the indictment.

4(        6

If the Court denies a motion to dismiss Count 2 of the indictment, Mr. Griffin will raise the statute of limitations as an affirmative defense at trial. See, <u>United States v. Carlson</u>, 235 F.3d 466, 469 (9th Cir. 2000). A defendant in a criminal case is entitled to have the jury instructed that it may not convict the defendant unless his conduct fell within the five year statute of limitations. See, <u>Yates v. United States</u>, 354 U.S. 298, 312 (1957); <u>United States v. Montgomery</u>, 384 F.3d 1050, 1063 (9th Cir. 2004); <u>United States v. Fuchs</u>, 218 F.3d 957, 961-962 (9th Cir. 2000); <u>United States v. Carlson</u>, supra, at 471. Thus, if a pretrial motion under Rule 12 to dismiss the indictment based on the statute of limitations is denied, Mr. Griffin will raise this defense at trial and will request jury instructions on the statute of limitations defense.

Dated:    June 23, 2006

_Joseph F. Walsh_
JOSEPH F. WALSH

_Michael M. Crain_
MICHAEL M. CRAIN
Attorney for Defendant
ROBERT LEE GRIFFIN

42    7

# EXHIBIT A

43

LEXSEE 1998 U.S. APP. LEXIS 3152

ROBERT LEE GRIFFIN, Petitioner - Appellant, v. JAMES GOMEZ, Director; CHARLES D. MARSHALL, Warden, Respondents - Appellees.

No. 95-16684

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

*1998 U.S. App. LEXIS 3152*

June 11, 1996, Argued and Submitted, San Francisco, California
February 24, 1998, Filed

**NOTICE:** [*1] RULES OF THE NINTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *1998 U.S. App. LEXIS 11428.*

**PRIOR HISTORY:** Appeal from the United States District Court for the Northern District of California. D.C. CV-92-01236-EFL. Eugene F. Lynch, District Judge, Presiding.

**DISPOSITION:** AFFIRMED IN PART AND REMANDED.

**COUNSEL:** For ROBERT LEE GRIFFIN, Petitioner - Appellant: Pamela Griffin, Omaha, NE.

For JAMES H. GOMEZ, CHARLES D. MARSHALL, Respondents - Appellees: Bruce M. Slavin, Dep. Atty. General, Morris Lenk, AAG, ATTORNEY GENERAL'S OFFICE, San Francisco, CA.

**JUDGES:** Before: HUG, Chief Judge, SCHROEDER, and HAWKINS, Circuit Judges.

**OPINION:**

MEMORANDUM *

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3.

Robert Lee Griffin ("Griffin"), who is serving a life sentence for a 1974 assault on another inmate, filed a habeas petition challenging his indefinite confinement in the [*2] Segregated Housing Unit ("SHU") at Pelican Bay State Prison. He contends that his indefinite confinement, which is based on his alleged membership in the Aryan Brotherhood prison gang, violates the Due Process Clause and the Eighth Amendment. He also claims that the "debriefing requirement" violates the Due Process Clause, as well as the Fifth and Eighth Amendments. The district court denied his petition. We have jurisdiction pursuant to *28 U.S.C. § 2253,* and we affirm in part and remand for reconsideration in light of intervening authorities.

Griffin filed this habeas petition in March 1992. In December 1993, the district court held that Griffin's claims were properly brought in a habeas petition; stayed his Fifth Amendment challenge to the debriefing process pending the completion of the Madrid litigation, *Madrid v. Gomez, 889 F. Supp. 1146 (N.D. Cal. 1995);* held that as a member of the then-pending Madrid class action, Griffin was precluded from challenging on due process grounds the gang-member segregation and debriefing policies; and dismissed his Eighth Amendment claim. The district court allowed Griffin's individual due process claim addressing his personal indeterminate [*3] retention in SHU to go forward. In August 1994, the district court granted respondents' motion for summary judgment, concluding that the procedures used for Griffin's placement and detention satisfied due process. The district court also found that "some evidence" supported the decision to segregate and retain Griffin in the SHU.

In June 1995, following the completion of the Madrid class action, the district court addressed Griffin's remaining Fifth Amendment claim and granted respondents' supplemental motion for summary judgment. The district court held that the debriefing process did not violate Griffin's Fifth Amendment privilege.

I. Section 1983 Complaint v. Habeas Petition

44

Respondents contend that Griffin's habeas petition challenges the conditions rather than the legality or duration of confinement, and thus should have been construed by the district court as a § 1983 civil rights claim. See *Crawford v. Bell, 599 F.2d 890, 891 (9th Cir. 1979)* (limiting the scope of habeas petitions to "attacks upon the legality or duration of confinement"). Respondents' argument is foreclosed by *Bostic v. Carlson, 884 F.2d 1267 (9th Cir. 1989)*, in which we held that [*4] "habeas corpus jurisdiction is also available for a prisoner's claims that he has been subjected to greater restrictions of his liberty, such as disciplinary segregation, without due process of law." *Id. at 1269.* n1 Thus, Griffin's claim that he is being subjected to a heightened level of confinement in violation of due process was properly brought as a habeas petition.

n1 In support of this proposition, Bostic cited *McCollum v. Miller, 695 F.2d 1044, 1046 (7th Cir. 1982)*, which held that "habeas corpus can be used to get from a more to a less restrictive custody," in that case from disciplinary confinement in a "Control Unit" to confinement with the general prison population. Although the McCollum holding was refined somewhat in *Graham v. Broglin, 922 F.2d 379, 381 (7th Cir. 1991)* (holding that McCollum rule applies whenever prisoner seeks "a quantum change in the level of custody"), the notion that habeas is the appropriate form of relief for a prisoner seeking a change in custody level has been expressly reaffirmed by the Seventh Circuit. See, e.g., *Graham, 922 F.2d at 381* (noting that one example of a "quantum change in the level of custody" is release to the general prison population from solitary confinement); *Jackson v. Carlson, 707 F.2d 943, 946 (7th Cir. 1983)* (citing McCollum for proposition that "habeas corpus is the proper remedy for getting from a more to a less restrictive custody.").

[*5]

## II. Res Judicata/Collateral Estoppel

Respondents next argue that even if Griffin's claims were properly brought in a habeas petition, res judicata principles preclude Griffin from litigating any claims addressed in Madrid. Res judicata and collateral estoppel, however, do not apply to habeas proceedings. See, e.g., *Clifton v. Attorney General, 997 F.2d 660, 663 n.3 (9th Cir. 1993)*; *Burnside v. White, 760 F.2d 217, 219 (8th Cir. 1985)* ("While a plaintiff in a § 1983 action may, in a proper case, be bound by a determination on the merits

by another court, a decision in another case is not res judicata as to a habeas proceeding.") (quotations and citation omitted); *Hardwick v. Doolittle, 558 F.2d 292, 295 (5th Cir. 1977)* ("The doctrines of res judicata and collateral estoppel are not applicable in habeas proceedings."). In a case with a similar procedural posture, the Seventh Circuit rejected the state's argument that an inmate should be barred by res judicata from bringing a habeas claim that was substantially similar to a claim that inmate brought earlier as a § 1983 action. See *Heirens v. Mizell, 729 F.2d 449, 456 (7th Cir. 1984)*. The court disposed [*6] of the state's argument by noting that "'a decision in another case is not res judicata as to a habeas proceeding.'" Id. (quoting *Warren v. McCall, 709 F.2d 1183, 1184 n.4 (7th Cir. 1983)*). Because the Madrid class action has no preclusive effect in habeas proceedings, we reject respondents' res judicata argument.

## III. Indefinite Confinement in the SHU and Due Process

The threshold question for purposes of Griffin's due process claims is whether Griffin has a state-created liberty interest in remaining free from administrative segregation. At the time Griffin's petition was denied by the district court, it was well established in this circuit that a prisoner has a cognizable liberty interest in remaining free from confinement in the SHU. See, e.g., *Cato v. Rushen, 824 F.2d 703, 704 (9th Cir. 1987)*. Nevertheless, because *Sandin v. Conner, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995)*, issued after the district court denied Griffin's petition, substantially altered the contours of state-created liberty interests in the prison disciplinary context, we remand for a review of the record in light of Sandin, including consideration [*7] of whether the "atypical and significant hardship" standard announced in Sandin extinguishes the previously-recognized liberty interest in remaining free from administrative segregation.

## IV. Debriefing and the Fifth Amendment

Petitioner argues that the debriefing requirement violates his Fifth Amendment right against self-incrimination. The state does not contend that Griffin will not be required to divulge information regarding criminal activity, but argues that (1) the Fifth Amendment does not apply to the debriefing process, and (2) even if it does apply, Griffin's rights have not been violated.

The standard for evaluating whether an individual has a legitimate Fifth Amendment claim is well established. The Fifth Amendment "'can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures which the witness reasonably

45

believes could be used in a criminal prosecution or could lead to other evidence that might be so used.'" *United States v. Bodwell*, 66 F.3d 1000, 1001 (9th Cir. 1995) (quoting *Kastigar v. United States*, 406 U.S. 441, 444-45, 32 L. Ed. 2d 212, 92 S. Ct. [*8] 1653 (1972)); see also *NLRB v. Trans Ocean Export Packing, Inc.*, 473 F.2d 612, 617 (9th Cir. 1973) (noting that Fifth Amendment does not apply "if, under the circumstances, the witness may not reasonably apprehend that the disclosures he is called upon to make could be used against him in a criminal prosecution or could lead to other evidence that might be so used"). Because Griffin does not satisfy this standard, we reject his Fifth Amendment claim.

Griffin does not have a reasonable belief that disclosures made during debriefing could be used against him in a criminal proceeding. n2 It is uncontroverted in the record that "an inmate who debriefs need not necessarily provide information about his criminal activities, if any. It is sufficient for purposes of testing his sincerity if he provides information about the identities and criminal activities of other inmates affiliated with the prison gang." Moreover, nothing in the record indicates that information gained from debriefing has ever been used in any criminal proceeding. Cf. *Baxter*, 425 U.S. 308 at 317, 47 L. Ed. 2d 810, 96 S. Ct. 1551 ("The state has not . . . sought to make evidentiary use of his silence at the disciplinary hearing in any criminal proceeding."). [*9] Rather, the information is used to verify an inmate's abandonment of a prison gang. In sum, while indefinite SHU confinement undoubtedly places immense pressure on gang-validated inmates to debrief, nothing in the record establishes that Griffin has a reasonable belief that the information gained during debriefing could be used against him in a future criminal proceeding. We therefore reject petitioner's Fifth Amendment claim and uphold the district court's decision on this issue.

n2 The state argues that two cases, *Baxter v. Palmigiano*, 425 U.S. 308, 47 L. Ed. 2d 810, 96 S. Ct. 1551 (1976), and *Taylor v. Best*, 746 F.2d 220 (4th Cir. 1984), dispose of Griffin's Fifth Amendment claim. We agree with petitioner that both are distinguishable. While each indicates that the Fifth Amendment has a relatively limited

reach when inmates are questioned for prison administrative purposes, neither controls whether Griffin has a reasonable belief that information gained during debriefing will be used in a future criminal proceeding.

[*10]

## V. Indefinite Confinement in the SHU Pending Debriefing and the Eighth Amendment

Griffin contends that his indeterminate segregation in the SHU, coupled with the debriefing requirement, which Griffin argues requires him to "jeopardize his personal safety and the safety of his family" in order to gain release from the SHU, constitutes cruel and unusual punishment in violation of the Eighth Amendment. We remand Griffin's Eighth Amendment claims for reconsideration in light of *Madrid*, 889 F. Supp. at 1146, issued after the district court denied his petition. The Madrid class action addressed in detail the factual and legal issues raised in Griffin's Eighth Amendment claim, n3 and its effect on the analysis of the record in this case should be determined in the first instance by the district court.

n3 Griffin was a member of the Madrid class, which included "all prisoners who are, or will be, incarcerated by the State of California Department of Corrections at Pelican Bay State Prison." *Madrid*, 889 F. Supp. at 1155.

[*11]

## VI. Griffin's Other Claims

On remand, the district court, in the course of integrating Sandin and Madrid into its decision, may, but is not required to, review again its determinations with respect to the other issues raised by Griffin. When the district court's review is complete, it should include all of its determinations in a final appealable order.

AFFIRMED IN PART AND REMANDED.

## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California.

I am over the age of 18 and not a party to the within action; my business address is 316 West Second Street, Suite 1200, Los Angeles, California 90012.

On June 23, 2006, I served the foregoing document described as **NOTICE OF MOTION AND MOTION TO DISMISS COUNT TWO BASED ON THE STATUTE OF LIMITATIONS; MEMORANDUM OF POINTS AND AUTHORITIES** on interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

MARK CHILDS
ASSISTANT U.S. ATTORNEY
1400 UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA 90012

I am readily familiar with the firm's practice of collection and processing of correspondence for mailing. Under that practice, it is deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date on the envelope is more than one day after date of deposit for mailing contained in the affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 23, 2006, Los Angeles, California.

CANDACE PARK

41    8

 

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES - GENERAL

Priority ✓
Send ✓
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only



Case No.   CR 02-938(A)-RGK                                     Date   AUG 1 4 2006

Present: The Honorable   R. GARY KLAUSNER, UNITED STATES DISTRICT COURT JUDGE

Interpreter   N/A

| Sharon L. Williams | Not Reported | Not Present |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| ROBERT LEE GRIFFIN | N | X | | J. Walsh, M. Crain | N | X | |
| JOHN WILLIAM STINSON | N | X | | P. Potter, T. Bennett | N | X | |
| DAVID ALLEN CHANCE | N | X | | J. Cotsirilos, K. Johnson | N | X | |
| RICHARD LLOYD TERFLINGER | N | X | | S. Perlo, M. Lombard | N | X | |

Proceedings:   **(IN CHAMBERS) ORDER RE: DEFENDANT STINSON'S MOTION TO LIMIT EVIDENCE PURSUANT TO F.R.E. §§ 403 & 404(b) (DE 3220)**

On June 22, 2006, Defendant John William Stinson ("Defendant") filed the present Motion to Limit Evidence Pursuant to F.R.E. §§ 403 & 404(b). In his Motion, Defendant seeks an Order from the Court requiring the Government to specify any evidence of uncharged crimes that the Government intends to introduce pursuant to Fed. R. Evid. 404(b) and to exclude any such evidence that may be more prejudicial than probative pursuant to Fed. R. Evid. 403.

Upon consideration of Defendant's arguments, the Court **grants in part** Defendant's Motion. The Government may not offer evidence as to any acts that are unrelated to the Aryan Brotherhood as alleged in the indictment, unless they provide pre-trial, advance notice.

**IT IS SO ORDERED.**

DOCKETED ON CM
AUG 1 5 2006
BY _____ 172

Initials of Deputy Clerk   slw

3597

cc:

48        EXHIBIT B

# JOSEPH F. WALSH
### ATTORNEY AT LAW
316 WEST SECOND STREET, SUITE 1200
LOS ANGELES, CALIFORNIA 90012

CERTIFIED SPECIALIST
CRIMINAL LAW

AREA CODE 213
TELEPHONE 627-1793
627-1736
FAX 489-4700

September 15, 2006

Mark Childs, Assistant U.S. Attorney
Mark Aveis, Assistant U.S. Attorney
312 North Spring Street
Los Angeles, California 90012

Dear Mr. Childs and Mr. Aveis,

Pursuant to Fed. Crim. Proc. Rule 16, Counsel for defendant Robert Lee Griffin are hereby providing copies of documents that may be used in the defendant's case in chief. The documents are:

1. Mr. Griffin's Petition for Writ of Habeas Corpus filed in the U.S. District Court in San Jose.

2. The District Court's order directing the C.D.C. to release Mr. Griffin from confinement in the SHU at Pelican Bay State Prison.

3. Court records from the San Bernardino County Superior Court showing that Mr. Griffin was found not guilty of the murder of Steven T-Bone Gibson.

4. A subpoena returned from the West Valley Detention Center, San Bernardino County Jail, with the declaration of Sergeant Jay Blankenship showing no records of gang activity or taped conversations involving Mr. Griffin at WVDC.

5. Letter from Deputy District Attorney James Fallman.

6. Letter from Ron Forbush, Private Investigator.

7. C.D.C. appeal records related to Mr. Griffin's request to remove tattoos.

8. C.D.C. appeal records related to Mr. Griffin's declaration stating his desire to separate himself from

49

EXHIBIT C



all gang members.

9.    C.D.C. records from the Central File of Arthur Ruffo relating to his enemies list.

        Counsel for Mr. Griffin also intend to use several documents from Mr. Griffin's C.D.C. Central File.  Since we received a copy of Mr. Griffin's Central File from Assistant United States Attorney Gregory Jessner as a part of the discovery provided by the Government, there is no need for defense counsel to provide copies back to the Government.  In an effort to comply with the Court's September 15, 2006 compliance date, we are at this point designating all of the documents in Mr. Griffin's Central File as Defense Rule 16 documents.

        As we get closer to trial we will select a smaller number of documents out of the Central File to be used as evidence.  Because of the complexity of the case, and the continuing nature of our trial preparation, we have not made a decision at the present time which documents from the Central File we will be using.  Once we have made a decision we will prepare exhibit books and provide the Government with copies of our exhibits.

                        Sincerely,

                        JOSEPH F. WALSH

50

**Childs, Mark (USACAC)**

| | |
|---|---|
| **From:** | Childs, Mark (USACAC) |
| **Sent:** | Saturday, September 23, 2006 8:25 PM |
| **To:** | 'pepsquire@earthlink.net' |
| **Cc:** | Terry Bennett; Michael Crain; Joe Walsh; John Cotsirilos; Knut S.Johnson; Aveis, Mark (USACAC) |
| **Subject:** | 404(b) Disclosure (2nd Letter) |
| **Attachments:** | Discovery Letter re 404 b (No. 2 FINAL) .wpd |

Attachments will be sent by overnight mail on Monday, September 25, 2006.

J. Mark Childs
Organized Crime Drug Enforcement Task Force
United States Attorney's Office – CDC
312 N. Spring St., 14th Floor
Los Angeles, California 90012
(213) 894-2433 (direct)
(213) 894-0142 (fax)
Mark.Childs@usdoj.gov

51

FD-302 (Rev. 10-6-95)



- 1 -

FEDERAL BUREAU OF INVESTIGATION

Date of transcription    06/23/2005

On 6/17/2005, James Aaron Prescott, aka Irish, date of birth ▮▮▮▮, FBI number ▮▮▮▮▮, Social Security number ▮▮▮▮ a member of the Nazi Low Riders (NLR) prison gang, was interviewed during a Proffer at the Los Angeles United States Attorney's Office (LAFO), 312 North Spring Street, Los Angeles, California.  Present during the proffer were Assistant United States Attorneys (AUSA) Adam Kamenstein and Kevin Lally, and Prescott's defense attorney ▮▮▮▮▮▮▮▮.  After being advised of the identity of the interviewing agents and the nature of the interview, Prescott provided the following information:

Prescott decided to proffer with the government regarding his RICO charges for family reasons and he is "Tired of it." Prescott and all of his co-defendants are "In the hat" (targeted for murder) as a result of this case.  Co-defendant and Aryan Brotherhood (AB) member Joey Hayes put everybody in the hat. Hayes used to write to Prescott regarding the case because he trusted Prescott.  Approximately eight months ago, Hayes just stopped writing to him.



In 1998, Prescott came down from Pelican Bay State Prison (PBSP) to the West Valley Detention Center (WVDC) on a possession case.  Prescott was housed in unit 5D at WVDC.  NLR shot caller Joseph Lowery, aka Blue, was at WVDC at the time and housed in unit 5PIM (problem inmate).  Lowery gave the "Keys" (control) to unit 5D.  Lowery was given the "Keys" to all of unit 5 from Hayes.

NLR member Michael Mesa, aka Thumper, came into unit 5D on a parole violation.  Mesa was "Spun out" (high on drugs) and had hickies all over his neck.  Prescott knew Mesa was "In the hat" for

Investigation on   6/17/2005   at  Los Angeles, California

File # ▮▮▮▮▮▮▮▮▮▮▮

by  SA David A. Volk
    SA Stacy K. Muldoon                    Date dictated _____

Confidential

52

122543

FD-302a (Rev. 10-6-95)





Continuation of FD-302 of ___James Aaron Prescott_____ , On _6/17/2005_ , Page ___2___

not "Earning his letters" ("NLR" tattoo earned by putting in work for the gang). Prescott sent Lowery a "Kite" (surreptitious prison letter) regarding Mesa being "In the hat."

While Lowery was on the telephone on the recreation yard, he used sign language to tell Prescott to "Wack" (kill) Mesa by motioning with his finger across his neck.

Prescott went to NLR member Carl Davis, aka German, and told him to make a weapon. Davis was scared to help. Prescott then went to a visit with his mom. When he came back, he went to Davis' cell. All the cell doors were open after the count. Davis, however, had his door closed and slid the weapon under the door.

Prescott took the weapon to Mesa's cell and sliced Mesa in the neck. Davis was not in the cell during the time of the assault. During the assault, Prescott cut his own wrist on accident. Mesa punched Prescott in the face after Prescott sliced Mesa's neck. Prescott was so caught up in the assault that he left Mesa's cell with the knife instead of flushing it. Prescott gave the knife to his cell mate (not further identified - NFI) who flushed it down the toilet for him.

At first, Mesa did not leave his cell. Prescott and Davis went to Mesa's cell and told him to get out or they will kill him. Only then did Mesa hit his emergency button to alert deputies that he was injured.

Davis was only with Prescott after the assault to warn Mesa to leave. Davis did not take part in the actual assault. Prescott's intention was to kill Mesa.

A short time after Prescott assaulted Mesa, Prescott moved into a cell with NLR shot caller Michael Bridge, aka Snake. One day, Lowery and Bridge went to court together. Lowery told Bridge to "Hit" (kill) inmate Miles in his section at WVDC per AB shot caller Blinky (NFI). Miles was a black inmate in jail for rape. Bridge told Prescott that he was going to do the hit on Miles.

A couple of days later, Lowery kicked on the door to Prescott's unit from the recreation yard and told him to kill Miles, not just scratch him. Lowery told Prescott that they want Miles dead. Lowery also told Prescott that he was doing a good job and doing this hit for AB is a big honor.

**Confidential**

53

122544

D-302a (Rev. 10-6-95)





Continuation of FD-302 of ___James Aaron Prescott___ , On 6/17/2005 , Page 3

Prescott got a knife from Ontario Black Angels (OBA) gang member Hook (NFI). Hook was told to give the knife to the NLR by Mondo █████████. The "Piece" (weapon) was a piece of metal from the shower. Prescott put the handle on the knife himself. Prescott also made a razor weapon to cut himself with and throw down to make it look like Miles had a weapon too so he could argue self defense.

Bridge told inmate Ronnie Coyle, an NLR associate, to help Prescott with the assault. Prescott hid in the shower and waited for Coyle to tell him to go.

Coyle opened the shower door and told Prescott to go. Prescott came out of the shower and stabbed Miles while he was turned away.

Prescott heard deputies yelling for Prescott to drop the knife. Prescott dropped the knife and saw Miles go for it. Prescott kicked the knife away and Miles punched him in the face. Prescott and Miles fought until the deputies broke it up with pepper spray. Prescott got down and saw Miles coming to kick him. Deputies forced Miles to the ground.

Prescott was sent to the barber shop which was connected to where Lowery was by the air vent. Lowery yelled through the vent to Prescott telling him he did a good job. After about forty minutes in the barber shop, Prescott was sent to unit 7PIM where Richie was housed at the time.



While in 7PIM, Prescott was given a hacksaw blade by inmate Art (NFI). Prescott began to use the hacksaw blade to cut the metal in his cell for making weapons. After about week in 7PIM, Prescott was sent back to unit 5A. Prescott was not able to finish cutting the metal before he was transferred but was able to sneak the hacksaw blade with him.

Approximately two days after transferring to unit 5A, Bridge sent Prescott a "Kite" telling him he did a good job and that he was now in the "Circle of the chosen few."

Confidential

54

EXHIBIT D    122545

D-302a (Rev. 10-6-95)





ontinuation of FD-302 of _James Aaron Prescott_ , On _6/17/2005_ , Page _4_

Three or four days after his move to 5A, Prescott gave the blade to a southsider named Flaco (NFI). Prescott told Flaco to give the blade to Lowery.



After committing the assaults at WVDC, Prescott was sent to the California Institution For Men (CIM) in Chino, California, and then to Corcoran State Prison (CSP) in Corcoran, California. Before getting sent to PBSP, Prescott was sent back down to the Presley Detention Center (PDC) in Riverside, California, to face charges of Penal Code 245a; Assault With A Deadly Weapon.

Prescott met NLR member Matthew Nall, aka Auto, in unit A2. Nall was living with Youngster from San Fernando Valley (NFI). Donny Trout and Billy Austin were also at PDC for a murder charge.

While at PDC, Youngster disrespected Austin. As a result, Austin told Prescott to tell Nall to "Hit" (kill) his cell mate.

At that same time, NLR member Sean Greenblatt, aka Spanky, came in from CIM spouting "Fuck The Brand" (FTB) politics (a movement within NLR to separate from AB). Prescott invited Greenblatt to move in with him to handle it since Prescott supported the AB and not FTB. Greenblatt was with ▇▇▇ at the time. Prescott sent Greenblatt a "Kite" ordering him to handle ▇▇. Instead, Greenblatt showed ▇▇ the "Kite."

A short time later, Prescott was sent to Delano State Prison (DSP) where he met up with AB member Micky ▇▇▇. Soon after, Nall transferred to DSP and asked Prescott to move in with him to handle their business. They moved in together and Nall told Prescott he wants to "Clean it up." Prescott said okay.

Confidential

55

122546

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of _____ **James Aaron Prescott** _____ , On **6/17/2005** , Page **5**

Johnny Boy from Big Bear (NFI), who was "In the hat," was transferred to DSP.  Nall wanted to "Hit" Johnny Boy to "Clean up."

Mickey sent Prescott a weapon packaged in some cookies to use on ████.  Nall opened the cookies and found the weapon.  Instead of giving the weapon to Prescott, Nall "Took it to the hoop" (put it in his rectum).

Prescott told Micky through sign language that Nall had the weapon.  Micky told Prescott to get it back from Nall.  Prescott told Micky to send Nall a bogus "Kite" about giving the weapon to Prescott.  Micky sent Nall the bogus "Kite" and Nall gave Prescott the weapon.

Prescott told Nall to stand guard while he (Prescott) "Took it to the hoop."  While Nall's back was turned, Prescott stabbed him.  Prescott flushed the knife and told the guards to get Nall out of the cell.

During a cell search, guards found a nail hidden behind the air vent.  The nail was not used in the assault.

Confidential

56

122547



## REPORT OF INTERVIEW

With David Griffin on January 14, 2003, with Special Agent Michael Halualani, and Special Agent Daniel Smith, California Department of Corrections - Special Services Unit, Sacramento, California. Mr. Griffin stated the following:

Griffin stated that he is a former member of the Nazi Lowrider prison gang. In 1999, while incarcerated at Palm Hall in the California Correctional Institution in Chino, California, he began associating with members of the Aryan Brotherhood prison gang. He further stated that he was in Palm Hall from January 1999 until December 1999, and Aryan Brotherhood members Robert Griffin, John Harper, Joey Hayes, and William Petersen were present at one time or another with him during that time frame. Griffin added that while he was incarcerated at Palm Hall he was one of the ranking members of the Nazi Lowriders and was "given the keys" by the Aryan Brotherhood members to "run" the criminal activities of white inmates in Palm Hall.

During his incarceration in Palm Hall, he met California commission member Robert Griffin and spoke with him on numerous occasions. Robert Griffin told him that no murders or assaults were to occur while Robert Griffin was being held in Palm Hall but upon his departure from Palm Hall, Griffin was ordered to murder or arrange the murders of Maurice Matthews, Mike Hykes (sic.), "Kimo", "Lefty" Hack, and "Ocean Blue" (████████████████████████████ ██████████████████████████████████████████ Furthermore, Robert Griffin told him that he wanted "Lawless" murdered because "Lawless" had "ratted out" Robert Griffin while Robert Griffin was in the San Bernardino County Jail.

Also, while incarcerated in Palm Hall, he was told by Aryan Brotherhood members John Harper and Joey Hayes to murder his cellmate, Timothy Shriver. Griffin stated that he attempted to murder Shriver but was unable to complete the murder because the knife he was using bent while he was stabbing Shriver.

Confidential

57,

122548

Prior to his release from custody, he was told by Aryan Brotherhood members Mark Glass and Gary Littrell to begin manufacturing and trafficking in methamphetamine. Furthermore, he was instructed to provide a percentage of the proceeds of the narcotics trafficking to Glass' point person in Lancaster, California, and that if she was unavailable, he should contact Littrell's wife in Ventura, California. He was provided the address and telephone numbers of both individuals. He stated that while on parole, he provided narcotics to Aryan Brotherhood member Danny Christiansen. Furthermore, he was later told that Simone Lawrence was a point person for the Aryan Brotherhood and would relay messages and orders for the Aryan Brotherhood.

Finally, on July 18, 2002, he spoke with Robert Griffin in the Visiting Room at Pelican Bay State Prison in Crescent City, California. Robert Griffin told him that if he provided information to law enforcement regarding Robert Griffin's activities at the California Correctional Institute in Chino, California, he would have Griffin's family murdered by the Aryan Brotherhood.

Confidential

122549



## REPORT OF INTERVIEW

With David Griffin on March 25, 2003, with Special Agent Michael Halualani, and Special Agent Daniel Smith, California Department of Corrections - Special Services Unit, Sacramento, California. Mr. Wilson stated the following:

He first came into contact with members of the Aryan Brotherhood while incarcerated in the California Institute for Men in Chino, California, in 1997.  Mr. ████ added that in 1999 while incarcerated at Corcoran State Prison in Corcoran, California, he met with Aryan Brotherhood members Gary Littrell and Mark Glass.  At this time, Glass told him that when he was released from custody he was to begin smuggling illegal narcotics into Corcoran for the Aryan Brotherhood to sell and use.  Furthermore, Littrell told him that he had placed "Pig Pen", Danny Shores (sic.), "Mylo", "Wicked" and "Cowboy", "in the hat" for failing to follow the orders of the Aryan Brotherhood.

In 2000, he was again incarcerated in the California Institute for Men in Chino, California.  At this time, he was housed with California commission member Robert Griffin and Aryan Brotherhood member John Harper.  While in the California Institute for Men, Griffin and Harper approved the murder of Nazi Lowrider member "Buckethead".  Furthermore, "Thrasher" from Long Beach attempted to murder "Buckethead" on the recreation yard at the California Institute for Men after approval was received from Griffin and Harper.  Finally, other members of the Nazi Lowriders told him that no crimes were to be committed at the California Institute for Men unless specifically approved by Griffin because Griffin did not want any crimes occurring while he was at the California Institute for Men. They also told him that at that time, Richard Terflinger and John Stinson were in charge of the Aryan Brotherhood.

Confidential

59

122550

State of California

**Memorandum**    CONFIDENTIAL

*Don Grifis* ... (103)

attest that it accurately relates the information I provided. The information may appear on any attached written statement

*DAVID GRIFFIN*    *5/17/02*
Name                                    Date

Approved for Confidential

Signature *[signature]*    5/17/02
Date

*W. Castillaw*  5-17-02

Date    May 17, 2002

To    Mark D. Castellaw
Investigative Captain
Investigative Services Unit

From    Department of Corrections
Pelican Bay State Prison, P. O. Box 7000, Crescent City, CA 95532-7000

Subject    DEBRIEFING OF DAVID GRIFFIN, *(SUBJECT)*, ████ AKA "BUCKETHEAD FROM SAN GABRIEL VALLEY," VALIDATED MEMBER OF THE NAZI LOW RIDER *(NLR)*, CII ████ DOB ████

**Confidentiality:** This report is confidential in accordance with the California Code of Regulations *(CCR)*, Title 15, Division 3, Subchapter 4, Article 5, and Section 3321 *(a) (1 &2)*. In that other confidential informants are named within this report for the purpose of corroborating Subject's information, portions of this report are deemed confidential to him as well. *Information in italics is supplied by staff.*

On February 15, and May 16, 2002, I interviewed inmate David GRIFFIN, ████, AKA "Buckethead from San Gabriel Valley," a validated member of the Nazi Low Rider *(NLR)* prison gang. The interview was relevant to his request to disassociate from the Nazi Low Rider & the Aryan Brotherhood *(AB)* prison gangs.

GRIFFIN decided to disassociate from the NLR due to being tired of the lies and threats made by the gang. He does not really agree with their goals and objectives or their use of threats and intimidation to get others to further the gang's power. He now realizes that the gang is not fighting for the betterment of the White inmates as he had first thought, but is actually using the White inmates to gain more power for the individual high-ranking gang members. He does not wish to be involved with the NLR any longer and just wants to be able to do his own time

Interview and written summary: *GRIFFIN relates that the first NLR activities began before 1997, however nothing notable occurred until November 1995, when GRIFFIN was on parole and was arrested for guns found in a search of his residence.* He was sent to the California Institution for Men and housed in the West facility. There he met "Lil Joe from La Puente" *(Joel AGENBROAD, ████.* ████ AGENBROAD was NLR. Also on the yard were "Jimbo from Norwalk" *(unable to further identify).* "Egor" who claimed Peni *(Skinhead) (Shane DAVIS, ████ "Egor"),* and "Lippy from Costa Mesa" *(Steven SHELEY, ████ AKA "Lippy").* GRIFFIN recalls that "Squeek" or "Tweek from Orange County" *(unable to further identify)* was admitted into the NLR without having to do anything. "Lil Joe" AGENBROAD raised his hand for GRIFFIN to become a NLR member and tattooed the letters NLR on his *(GRIFFIN's)* neck. GRIFFIN recalls that up until that time the only other NLR he met was "Shadow Orange County" *(unable to further identify).*

Mark D. Castellaw
Confidential Interview of GRIFFIN,
May 17, 2002
Page 2



GRIFFIN reports that he paroled soon after being made a member of the NLR. He did not meet up with any NLR on the streets until he was approached by "Termite from San Gabriel Valley" *(unable to further identify)*, who had a stolen car and wanted GRIFFIN to give him a ride from where he dumped the car. GRIFFIN was arrested March 5, 1997, for "Manufacture of a Controlled Substance" and went to the San Bernardino County Jail/West Valley. GRIFFIN recalls the only NLR in his section was Mike MESA *(Michael MESA,* *AKA "Thumper from San Gabriel Valley")*. Joe LOWERY *(Joseph LOWERY,* *, AKA "Blue")* was across the way in another section. GRIFFIN remained there 35 or 36 days until he transferred to the California Correctional Institution (CCI) for reception. While there at CCI Jimmy MORGAN from Orange County *(James MORGAN,* *AKA "Jimmy")* raised his hand for "Billy GARCIA from Norwalk *(unable to further identify)*, who had been prospecting *(being looked at and doing things for the gang)*, to become a member

From CCI GRIFFIN transferred to Ironwood State Prison *(ISP)*. Billy GARCIA was transferred with GRIFFIN. GRIFFIN recalls the following NLR there at ISP,



*(requested Protective Custody)* when GRIFFIN arrived at ISP. GRIFFIN related that and who "checked in" thought he was going to be stabbed so he "checked in." GRIFFIN states that the NLR and the Blacks got into a race riot and most of them went to the Administrative Segregation Unit *(ASU)* over the incident. While there the Gang Investigation Unit held "Peace Talks" with the inmates and asked GRIFFIN to represent the Whites. GRIFFIN agreed and a deal was made to allow only five or six of the seventy-five inmates locked up over the incident to be released to the main line. GRIFFIN took Lonnie Ray SCOTT to the yard with him to quell the tension between the Blacks and Whites.

GRIFFIN stated that his participating in the staff's "Peace Talks" came back to haunt him when a couple of months later when out of the blue he was moved from the Facility C Yard to the Facility D Yard and celled with the Facility Captain's clerk. GRIFFIN was only housed with

Reviewed by

David Griffin, E-79504

Confidential

CONFIDENTIAL

ㄱ1

122552

CONFIDENTIAL



Mark D. Castellaw
Confidential Interview of GRIFFIN, E ███████
May 17, 2002
Page 5

the Captain's clerk seventeen days when he was placed in the Administrative Segregation Unit *(ASU)* and charged with running an institution wide extortion ring and ordering inmates assaulted and stabbed. GRIFFIN relates that he ordered "Hillbilly from San Gabriel Valley" *(unable to further identify)* to beat up his cellmate but that "Hillbilly refused to do it. GRIFFIN was issued a CDC-115 *(Rules Violation Report)* for this along with four other inmates. He was convicted of the charge and appealed it with an attorney and beat the CDC-115. He later learned that the CDC-115 had been fabricated. GRIFFIN was released to the Facility D Yard.

GRIFFIN was housed on Facility D Yard approximately 32 days until he was issued a CDC-115 for "Assault on Staff." He appealed the CDC-115 and won and was released to Facility C Yard where he remained until he paroled a couple months later on October 6, 1998.

After GRIFFIN paroled he began cooking dope and hooked up with several NLR on the street. The ones he could remember were ████████████████████████████████████████████████████████████████████████████████

"Parrot's from South Bay" ███████ house for him to get it to Lonnie Ray SCOTT and Wigmo who were still housed in Ironwood State Prison *(ISP)*. GRIFFIN also took dope to a Mexican's house in San Gabriel, who he did not know by name, who would get the dope to "Snake" MCCOY and "Trojan" SMITH. GRIFFIN did mail outs for "Wigmo" ██████████████ ████████). GRIFFIN was arrested for "Possession for Sale" on January 17, 1999.

GRIFFIN was sent to the California Institution for Men *(CIM)* in January and remained there through December of 1999. GRIFFIN relates that he had personal knowledge of NLR & AB prison gang activities from when he was housed in the California Institution for Men *(CIM)* and Palm Hall. He stated that it might be relevant to the RICO case the Federal Bureau of Investigation *(FBI)* unit was doing against AB & NLR gang members/associates. He related that he was housed in CIM Central on January 20th or 21st of 1999. GRIFFIN related GRIFFIN was moved to the East Yard, which lasted only a couple days. On January 29, 1999, he and all the other NLR were moved to Palm Hall. He was released from Palm Hall on February 4, 1999. GRIFFIN was involved in an assault of a Skin, "JR. from Ontario" *(unable to further identify)* for running his mouth about the "Ride" *(NLR)* and was moved from Madrone Hall to Cypress Hall. "JR" ended up getting shoed for talking bad about Mikey Hikes *(Michael HIKES,* ███████*, "Mikey").* GRIFFIN recalls that the "FTB" *(Fuck The Brand)* faction of the NLR was very strong at CIM at this time. GRIFFIN, "Zak" Zak E. NEUBERT, ███████, "Lil Huss from San Diego" (██████████████████████ *(both NLR members)* received CDC-115's, Rule Violation Reports, *(verified by RVR # C-0047 dated 3-8-99)* for assaults on Black inmates. The shot caller for the "Bloods" (██████████████) disrespected

Reviewed by
~~~~~~~~~
David Griffin, E-79592

62

Mark D. Castellaw
Confidential Interview of GRIFFIN,
May 17, 2002
Page 4



some NLR members, who were housed in the Administrative Segregation Unit *(ASU)*.

GRIFFIN went back to Palm Hall for this CDC-115. He remembers the following inmates were leaders of the FTB at that time; "Gangster from Norco-Inland Empire" *(Maurice MATHEWS, AKA "Gangster")*; "Lefty from Anaheim-Orange County" *(Eric J. MACK, AKA "Lefty")*; "Mikey from Anaheim-Orange County" *(Michael HIKES, AKA "Mikey")*; "Foot from Westminster-Orange County" *(Mark MOEN, AKA "Foot")*; "Bam Bam from Bell Gardens" *(Timothy SCHRIBER, AKA "Bam Bam")*; "Face from Orange County" *(William G. WRIGHT, AKA "Face")*; and "Kemo from San Bernardino-Inland Empire" *(Mark CRAVER, AKA "Kemo")*. "Gangster" MATHEWS had the "keys" *(White authorization)* to run CIM when GRIFFIN and he fought ( ). "Big Hoss from Tustin-Orange County" *(James Anthony LAMBERT, AKA "Big Hoss")*, and "Skully from Pamona-Inland Empire" *(Brian ROBERG, AKA "Skully")*, took the "keys" when "Gangster" MATHEWS was removed from the yard and placed on walk alone status. After this incident the NLR were split up. West Side Palm Hall. 3rd tier was for FTB. East Side was other NLR.

The "Brand" *(Aryan Brotherhood prison gang members)* who were there were "Joey" Joseph HAYES, D-05432; "Jodi" Joseph Howard LAMBERT, ; "Blinky" Robert Lee GRIFFIN, B-26484; "Turtle" John Henry HARPER, and "Hillbilly" Robert Allen PETERSON, The Brand was in the process of trying to get their "Shit" together, kind of like the Mexican Mafia *(EME)* prison gang does, stop the gang banging. It's all about organized crime. "Hillbilly" PETERSON was putting together a crew for up North. "Turtle" HARPER asked GRIFFIN to help put it together and to manufacture speed for the Brand. "Turtle" HARPER told GRIFFIN he wanted to take him *(GRIFFIN)* to the top of the organization with him. After "Turtle" HARPER paroled he stayed in close contact with GRIFFIN through the mail, until he was violated. When GRIFFIN paroled he contacted him *(HARPER)* briefly, but stayed in close contact with GRIFFIN sent money to for "Turtle" HARPER.

GRIFFIN related that "Blinky" GRIFFIN tries to make everyone think that he is retired from the Brand, but he isn't. After "Turtle" HARPER left on parole he gave GRIFFIN *(Subject)* the "keys." Then around August of 1999, "Blinky" GRIFFIN gave GRIFFIN *(Subject)* the "keys" and would advise GRIFFIN *(Subject)* on a one to one basis. "Blinky" GRIFFIN's motto is three (3) people constitutes a conspiracy so he was careful to never do that. GRIFFIN *(Subject)* related that "Blinky" GRIFFIN would give people a pass if they asked for it, but once he *("Blinky" GRIFFIN)* leaves,

Reviewed by

David Griffin, E-79594

**Confidential**

63

EXHIBIT E 122554

Mark D. Castellaw
Confidential Interview of GRIFFIN,
May 17, 2002
Page 5



the passes were no good. "Blinky" GRIFFIN just did not want anything to happen while he was around, as this would implicate him in gang activity. "Blinky" GRIFFIN asked GRIFFIN *(Subject)* to talk to Correctional Lieutenant Maldanado to get "Gangster" MATHEWS re-assigned to their yard. GRIFFIN *(Subject)* stated that shortly after this conversation, sometime between August 25, 1999, and October 4, 1999, he overheard "Blinky" GRIFFIN tell "Turtle" HARPER, face to face, to tell "Gangster" MATHEWS he *(HARPER)* would raise his hand for him becoming a Brand member. This was a ploy to maneuver "Gangster" MATHEWS into a position to where the Brand could kill him at a later date, after "Blinky" GRIFFIN had left the prison. This ploy almost worked except the guy that was supposed to kill "Gangster" MATHEWS got scared once he got "Gangster" in his cell. GRIFFIN *(Subject)* could only remember that the guy who was supposed to kill "Gangster" MATHEWS went by the AKA of "Grumpy" *(unable to further identify)*.

GRIFFIN relates that "Blue" Joseph LOWERY, ██████, personally told him that during the "Peace Talks" at Pelican Bay State Prison *(PBSP)*, "Blinky" GRIFFIN told John William STINSON, C-40154, that he *("Blue" LOWERY)* could and should be a Brand member. GRIFFIN *(Subject)* knew that "Joey" HAYES was raising his hand for him *(LOWERY)* to become a Brand member, but does not know who the second Brand member was that raised their hand for LOWERY. "Turtle" HARPER and "Joey" HAYES gave GRIFFIN *(Subject)* a "Green Light" to stab "Bam Bam" Timothy SCHRIBER. "Turtle" HARPER made the knife to stab "Bam Bam" ██████████████.

While housed at the California State Prison at Corcoran, "Buzz" Mark Anthony GLASS, C-38781, and Gary Joe LITTRELL, C-45888, told GRIFFIN *(Subject)* that they were in the process of organizing crime. This was the same thing "Turtle" HARPER and "Hillbilly" PETERSON was trying to do. GRIFFIN *(Subject)* told "Buzz" GLASS that "Turtle" HARPER had already asked him if he would be part of the organization and "Buzz" said fine and good. "Buzz" GLASS then gave GRIFFIN his wife's address, which was in ██████████. "Buzz" told GRIFFIN that if he ever needed help, to get a hold of her and she would contact him. "Gary" LITTRELL gave GRIFFIN his wife's address and told him that if he ever needed help to get at her. GRIFFIN thinks the address was in ██████████.

GRIFFIN related that "Buzz" GLASS made it known that he really wants "Snake from Ontario" Michael BRIDGE, ██████, dead. "Snake" BRIDGE made numerous promises to "Buzz" GLASS and then did not follow through with his promises. "Buzz" GLASS never heard anything back from "Snake" BRIDGE and felt disrespected and that's why he wanted "Snake" BRIDGE hit.

Reviewed by

David Griffin, E-79504

Confidential

EXHIBIT F    122555

CONFIDENTIAL

Mark D. Castellaw
Confidential Interview of GRIFFIN, ▓▓▓▓▓▓▓
May 17, 2002
Page 6



GRIFFIN was transferred to Pelican Bay State Prison *(PBSP)* and was housed in the same pod as "Blue" LOWERY. GRIFFIN knew "Blue" LOWERY briefly from the past and when he talked with "Blue," he *("Blue" LOWERY)* told him he was on his way out to court for a case involving a southsider *(southern Hispanic)* named "Pelon." GRIFFIN told "Blue" LOWERY that "Pelon" had been charged with a murder while housed in the San Bernardino County Jail *(unable to further identify)*. "Blue" LOWERY told GRIFFIN that he was going to try to get "Pelon" to pull "Joey" HAYES down to the trial also and wanted GRIFFIN and "Joey" HAYES to help them escape. "Blue" LOWERY told GRIFFIN that when someone goes out to court in Rancho Cucamonga there are only ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ when they ▓▓▓▓▓▓▓▓ "Blue" LOWERY informed GRIFFIN that the escape plan involved ▓▓▓▓▓▓▓▓▓▓▓▓▓ and a handcuff key w▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ GRIFFIN that they would have the clothing and shoes delivered ▓▓▓▓▓▓). "Blue" LOWERY told GRIFFIN that "Pelon" might not get to pull him down to his trial but asked "Blue" GRIFFIN if he would get the gun and handcuff key so if he gets pulled down at a later date he will have the items ready. GRIFFIN did not do what "Blue" LOWERY asked.

The following list reflects the identification of persons known to GRIFFIN through his association with the NLR, as gang members, gang associates, or victims of gang-related criminal activity. The names noted with an asterisk (*) are persons GRIFFIN and/or the Institutional Gang Investigations Unit *(IGI)* staff have identified as his enemies. The noted "Gang Status" of each person is as given by the GRIFFIN at the time of this report and may not correspond with other official CDC records.

<u>NOTE:</u> The following is a code list used to decipher the gang codes utilized in the name lists below.

| CODE | MEANING | | CODE | MEANING |
|---|---|---|---|---|
| 0001 | BLACK GUERRILLA FAMILY | | B | ASSOCIATE |
| 0002 | MEXICAN MAFIA | | C | MEMBER |
| 0003 | NUESTRA FAMILIA | | D | DROPOUT |
| 0004 | ARYAN BROTHERHOOD | | F | SAFETY CONCERN |
| 0006 | TEXAS SYNDICATE | | | |
| 0007 | NORTHERN STRUCTURE | | | |
| 4005 | NAZI LOW RIDER | | | |

| INMATE NAME | ALIAS | CDC # | DOB | CID | HOMETOWN | GANG |
|---|---|---|---|---|---|---|
| ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | | | | | | |

Reviewed by
David Griffin, E-79594

Confidential

105

122556

Mark D. Castellaw
Confidential Interview of GRIFFIN,
May 17, 2002
Page 7





GRIFFIN was unable to supply sufficient information regarding the following persons to complete an accurate identification of each; although he claims each is known to him through his association with the NLR and believes the "Gang Status" classification to be accurate.

Reviewed by



David Griffin, E-79594

Confidential

66

122557

Mark D. Castellaw
Confidential Interview of GRIFFIN
May 17, 2002
Page 8



| NAME | ALIAS | CDC # | DOB | CII # | HOMETOWN | |
|------|-------|-------|-----|-------|----------|---|
| Patton | | | | | | |

GRIFFIN has indicated he is willing to participate in a polygraph examination to corroborate the truthfulness and sincerity of the information he has provided.

GRIFFIN has indicated he is willing to testify in a court of law, if necessary, regarding this information. He says he has concerns regarding his personal safety.

CONCLUSION:

Reviewed by
David Griffin, E-79594

Confidential

122558

Mark D. Castellaw
Confidential Interview of GRIFFIN,
May 17, 2002
Page 9



GARY H. WISE
Correctional Lieutenant
Institutional Gang Investigations

NOTED/APPROVED BY:

NOTED/APPROVED BY:

MARK D. CASTELLAW
Investigative Captain
Investigative Services Unit

Reviewed by
David Griffin, E-79593

**Confidential**

68

122559

State of California

# Memorandum

**CONFIDENTIAL**

**Date** : June 11, 1992

**To** : T. Jenkins, Correctional Captain
Security & Investigations Unit

GRIFFIN    B26484

**From** : Department of Corrections

**Subject** : DEBRIEFING INTERVIEW WITH ███████████

This report is deemed confidential in accordance with California Code of Regulations, Title 15, Division 3, Subchapter 4, Article 5, section 3321 (a) (1 and 2). In that other confidential sources were referenced for the purpose of corroborating the information, it is also confidential to Subject.

On June 11, 1992, this unit interviewed ████████████ ██████ evant to his request to debrief and disassociate himself from the Aryan Brotherhood prison gang. ██████ is an admitted and validated associate of that gang. Subject stated that the reason he wishes to disassociate himself from that gang is because: (1) he is no longer interested in the gang; (2) he has no more respect for the gang; (3) he wishes to improve his conditions of confinement; and (4) he no longer agrees with the actions of the AB (currently nor historically).

Subject stated that he first became aware of the AB in 1975, when he was incarcerated at Y.T.S. (California Youth Authority- Youth Training School) with "Richie" Richard CRANE. "S" related that CRANE's brother, "New York" Robert CRANE (C32455) was a member of the AB and corresponded with Richard CRANE from San Quentin. ██████ said that he considered himself as a "Nazi", and had great respect for the AB.

██████ related that he was incarcerated at SQ in 1978. He said that "Rob" Robin LATHAM (B86845) directed him to gather and move weapons to North Block - Max B. He added that these weapons were used by "Donnie" PARRISH ████████, "Baby Dave" ELLIOTT ████████, "Steve" RUPOLI ████████, and Steven BARNES (B69188) to assault and murder some Bikers on the yard (members of the Satans Few). Concerning the incident, CARTER stated that the Satans Few rivaled the AB, when "Vic" (MAURUS ████████) wrote a note intended for delivery to other Satans Few members which said that the AB was no longer controlling anything. According to "S", MAURUS requested "Whitey" (unable to ID), a block worker, to deliver the note to the other bikers on the yard. "S" said that "Whitey" delivered the note to AB member, "Harpo"

Confidential

**CONFIDENTIAL**

Reviewed by:
Larry Bogn.

122560

CONFIDENTIAL



DEBRIEFING OF ████████████
June 11, 1992
Page 2

Ronnie HARPER (████); and the ABs responded by killing MAURUS and "Coyote" (Ronald HENDERSON B08310) on the yard (on 2-22-79)

████████ also admitted to sending drugs to "T.D." BINGHAM (B17741), HARPER (██████), and other AB members. ████████ stated that he collected the drugs from white inmates who were required to provide a percentage of their profits to the AB. As an additional note, ████████ said that LATHAM, who was a cousin to "Terrible Tommy" SILVERSTEIN (B68720, Fed# ████████████), died from a drug overdose in Orange County Jail. (This occurred on 8-20-85).

According to ████████, he was transferred to C.I.M. - Palm Hall in 1981. He stated that he requested to be placed on the affiliated yard where the AB members were housed. He stated that "Blinky" (Robert GRIFFIN B26484) asked him how he felt about performing a killing for the AB; specifically of "Bullet" (Roger WIERSMA C05777), who was an AB dropout living in San Bernardino. "S" stated that he never received all of the information about how to find WIERSMA, except that he was testifying against GRIFFIN in court. ████████ related that because of not receiving enough information about WIERSMA, he did not do the murder when he paroled.

████████ admitted to participating in a plan at Folsom to assault an inmate that was suspected of being a child molester (████████████████████). Subject explained that "Rudy" from Santa Monica (Rudy DUARTE ████) reported to him and "Pirate" (Thomas CLARK ████) that ████████ was a child molester. "S" related that he delivered a knife to "Lancaster" (Phillip LANCASTER ████) so that he would take it to the yard. ████████ said that he planned on retrieving the weapon from LANCASTER; and then using it to stab ALBERTSON. He added that instead, LANCASTER gave the weapon to staff. (This occurred on 8-27-88).



According to subject, while he was on the mainline at New Folsom - B Facility, he, CLARK, "Cal" (Calvin NICHOLS ████), and "RJ" (Ronald JOSEPH E76275) manufactured weapons and delivered them to B Facility - SHU. He specifically identified "Irish" Gaven SHINE (████) and "Blue" Wendell NORRIS (C05302) as recipients.

Confidential



CONFIDENTIAL
70

EXHIBIT G        122561

09/22/2006  11:36 ███████ SYS DDPS                          PAGE  03/07

VISITING INFORMATION FOR INMATE
███████ DAVID TROY GRIFFIN

09/22/2006      California Dept. of Corrections 0.019      PAGE   1

| CDC# | INST VISITOR | VISITOR NAME | RELATION | HISTORICAL |
|------|--------------|--------------|----------|------------|
| ███████ | PSP ███████ | ███████ | | 00000000000000 |
| | ███████ | ███████ | | 00000000000000 |
| | ███████ | ███████ | | 00000000000000 |
| | ███████ | ███████ | █ | 00000000000000 |
| | ███████ | ███████ | | 00000000000000 |
| | ███████ | ███████ | | 00000000000000 |
| | ███████ | ███████ | | 00000000000000 |
| | ███████ | ███████ | | 00000000000000 |
| | ███████ | ███████ | | 00000000000000 |
| | ███████ | ███████ | | 00000000000000 |
| | ███████ | ███████ | | 00000000000000 |
| | ███████ | ███████ | | 00000000000000 |
| | ███████ | ███████ | | 20020609085545 |
| | | | | 20020609122521 |
| | | | | 20020609085048 |

Confidential

71

122562

PAGE  04/07

VISITING INFORMATION FOR INMATE
B26484 ROBERT LEE GRIFFIN

09/22/2006        California Dept. of Corrections C.015        PAGE    1

| CDC# | INST | VISITOR# | VISITOR NAME | RELATION | HISTORICAL |
|---|---|---|---|---|---|
|  | PSP |  | G████, D████ | ████ | 20020609122055 |
|  |  |  |  |  | 20020609122144 |
|  |  |  |  |  | 20000716085731 |
|  |  |  |  |  | 20000715121355 |
|  |  |  |  |  | 19971102085430 |
|  |  |  |  |  | 19971102084836 |
|  |  |  |  |  | 19971101084818 |
|  |  |  |  |  | 19950331085708 |
|  |  |  | G████, L█ |  | 00000000000000 |
|  |  |  | G████, M█ |  | 19931010090246 |
|  |  |  | G████, M█ |  | 00000000000000 |
|  |  |  | G████, M█ |  | 00000000000000 |
|  |  |  | L██, X█ |  | 00000000000000 |
|  |  |  | F███, L█ |  | 00000000000000 |
|  |  |  | GRIFFIN, PAMELA | WIFE | 20020608122136 |
|  |  |  |  |  | 20020608084545 |
|  |  |  |  |  | 20020413084710 |
|  |  |  |  |  | 20011005153927 |
|  |  |  |  |  | 20001118085237 |
|  |  |  |  |  | 20001007084220 |
|  |  |  |  |  | 20000920090636 |
|  |  |  |  |  | 20000716085716 |
|  |  |  |  |  | 20000715083835 |
|  |  |  |  |  | 20000610084628 |
|  |  |  |  |  | 20000402083631 |
|  |  |  |  |  | 20000401083710 |
|  |  |  |  |  | 20000219085217 |
|  |  |  |  |  | 20000115083735 |
|  |  |  |  |  | 19991221085439 |
|  |  |  |  |  | 19991031085018 |
|  |  |  |  |  | 19991030084904 |
|  |  |  |  |  | 19971101084934 |
|  |  |  |  |  | 19970726084451 |
|  |  |  | L██, H████ |  | 00000000000000 |
|  |  | GRIFFIN | GRIFFIN, PAMELA | WIFE/ATTY | 20021102083202 |
|  |  |  |  |  | 20021101132132 |
|  |  |  |  |  | 20020302084405 |
|  |  |  |  |  | 20020118120302 |

Confidential

72

VISITING INFORMATION FOR INMATE
B26484 ROBERT LEE GRIFFIN

09/22/2006        California Dept. of Corrections 0.015        PAGE    2

| CDC# | INST | VISITOR# | VISITOR NAME | RELATION | HISTORICAL |
|------|------|----------|--------------|----------|------------|
|      | PSP  | GRIFFIN  | GRIFFIN, PAMELA | WIFE/ATTY. | 20011215085023 |
|      |      |          |              |          | 20011030132023 |
|      |      |          |              |          | 20011006084959 |
|      |      |          |              |          | 20010908084636 |
|      |      |          |              |          | 20001117144135 |
|      |      | GRIFFIN, PAM | GRIFFIN, PAM | ATTORNEY | 20020928084357 |
|      |      |          |              |          | 20020927133158 |
|      |      |          |              |          | 20020803084083 |
|      |      |          |              |          | 20020802094212 |
|      |      |          |              |          | 20020706122611 |
|      |      |          |              |          | 20020706084323 |
|      |      |          |              |          | 20020705121941 |
|      |      |          |              |          | 20020705091631 |
|      |      |          |              |          | 20020609085404 |
|      |      |          |              |          | 20020414084659 |
|      |      |          |              |          | 20020119084740 |
|      |      |          |              |          | 20011214151039 |
|      |      |          |              |          | 20010907151223 |
|      |      |          |              |          | 20010721090627 |
|      |      |          |              |          | 20010623084750 |
|      |      |          |              |          | 20010622120355 |
|      |      |          |              |          | 20010512085033 |
|      |      |          |              |          | 20010511144053 |
|      |      |          |              |          | 20010401091456 |
|      |      |          |              |          | 20010331084617 |
|      |      |          |              |          | 20010217090230 |
|      |      |          |              |          | 20001231084434 |
|      |      |          |              |          | 20001230083805 |
|      |      |          |              |          | 19980502084628 |
|      |      |          |              |          | 19980315084937 |
|      |      |          |              |          | 19980314084601 |
|      |      |          |              |          | 19980117084644 |
|      |      |          |              |          | 19971213084322 |
|      |      |          |              |          | 19971102123826 |
|      |      |          |              |          | 19971101124427 |
|      |      |          |              |          | 19971011084106 |
|      |      |          |              |          | 19970906083800 |
|      |      |          |              |          | 19970622084513 |
|      |      |          |              |          | 19970621084653 |
|      |      |          |              |          | 19970511120533 |
|      |      |          |              |          | 19970511084635 |
|      |      |          |              |          | 19970510084349 |
|      |      |          |              |          | 19970405084332 |
|      |      |          |              |          | 19970308084402 |
|      |      |          |              |          | 19970215084113 |
|      |      |          |              |          | 19970211084304 |
|      |      |          |              |          | 19961201084011 |
|      |      |          |              |          | 19961130084249 |
|      |      |          |              |          | 19961102084414 |
|      |      |          |              |          | 19960721084333 |
|      |      |          |              |          | 19960720084143 |

Confidential

73

122564

VISITING INFORMATION FOR INMATE
B26484 ROBERT LEE GRIFFIN

09/22/2006        California Dept. of Corrections C.C15        PAGE    3

| CDC# | INST | VISITOR# | VISITOR NAME | RELATION | HISTORICAL |
|------|------|----------|--------------|----------|-----------|
| B26484 | PSP | GRIFFIN, PAM | GRIFFIN, PAM | ATTORNEY | 1995062508450C1 |
| | | | | | 19950528084349 |
| | | | | | 19950527090418 |
| | | | | | 19950422084149 |
| | | | | | 19950312085039 |
| | | | | | 19950204084126 |
| | | | | | 19950101085329 |
| | | | | | 199412310853C1 |
| | | | | | 19941231085232 |
| | | | | | 199411270900010 |
| | | | | | 19941126090559 |
| | | | | | 19940911085704 |
| | | | | | 19940807090744 |
| | | | | | 19940625090633 |
| | | | | | 19940416151847 |
| ▓▓▓▓ | | K▓▓ M▓▓▓ D | | | 00000000000000 |
| ▓▓▓▓ | | O'▓▓▓, S▓▓ ▓▓▓ | | | 00000000000000 |
| | | | | | 00000000000000 |
| ▓▓▓▓ | | G▓▓, G▓▓▓▓ | | | 00000000000000 |
| SATRIS | | SATRIS, MICHAEL | ATTORNEY | | 20010331085126 |
| ▓▓▓▓ | | M▓▓, S▓ ▓▓▓ | | | 00000000000000 |

Confidential

74

Department of Corrections
Information Systems Branch
Distributed Data Processing Unit

## HISTORICAL DATE & TIME FORMAT(CCYYMHDDHHMMSS)

EXAMPLE:   20020904202757 = September 4, 2002 at 08:27 pm and 57 seconds

Time is based upon Military time (24 hr clock)

00000000000000     =     visitor may have applied,
                         however has no logged visits

CC  =  CENTURY
YY  =  YEAR
MH  =  MONTH
DD  =  DAY
HH  =  HOURS
MM  =  MINUTES
SS  =  SECONDS

## INSTITUTIONS

PSP  =  Pelican Bay State Prison

State of California

# Memorandum

Date : **June 21, 1996**

CONFIDENTIAL

Approved for Confidential

_____    _____
Signature                Date

To : Charles D. Caraway
Correctional Captain
Investigative Services Unit

From : Department of Corrections

Subject : DEBRIEF INTERVIEW WITH ██████████

(AB) ASSOCIATE.                                    ARYAN BROTHERHOOD

This report is deemed confidential in accordance with California Code of Regulations, Title 15, Division 3, Subchapter 4, Article 5, Section 3321 (a) (1 and 2). In that other confidential informants are named within this report for the purpose of corroborating Subject's information, this report is deemed confidential to him, as well.

On June 21, 1996, this unit concluded numerous interviews with inmate ████████████████████████ relevant to his request to debrief and disassociate himself from the Aryan Brotherhood (AB) prison gang. Subject is a self admitted and validated associate of that gang.

Subject stated that he wishes to disassociate himself from the Aryan Brotherhood (AB) because he feels that any further participation with the gang will result in him being harmed or killed or being forced to commit offenses which would extend his confinement in the Security Housing Unit (SHU) as well as extend his term in prison. "S" explained that the Aryan Brotherhood (AB) normally does the bidding of the Mexican Mafia (EME) and "S" explained that he always felt he had underlying problems with the Mexican Mafia due to the fact that he shot an EME associate during a drug robbery. "S" further related that he recently assaulted and inflicted great bodily injury on an EME member when both were out of their respective cells in the SHU unit at Pelican Bay.

"S" stated that in July of 1991 he was sent to the Reception Center at the Central Facility at the California Institution for Men at Chino (CIM) where he was housed for a while at both Madrone and Cypress Halls. "S" went on to say that while housed at Madrone Hall he met and was celled with Bruce CHRISTENSEN ████████ with whom he was soon charged with the conspiracy to assault another inmate. "S" stated that this charge resulted in both he and CHRISTENSEN being sent to Palm Hall where they were housed in the Administrative Segregation (Ad-Seg) Unit on the Eastside. "S" stated that he had never previously been housed in any SHU or Ad-Seg units that contained any Aryan Brotherhood (AB)

Confidential

76

122567



C. D. Caraway
DEBRIEF OF Inmate ████████████
Page 2

members and that he had no tip affiliations at that time.   "S"
said that upon arrival he was housed on the third tier and that
CHRISTENSEN was housed with Danny BARTOSH (████████   "S" said
that BARTOSH had just recently been given a twenty-five (25) to
life sentence for the murder of an alleged informant who he
assaulted with a twenty pound dumbbell while on the CIM West
yard. ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

no "Brand" (AB) there at the time, although ABLE was calling the
shots for the Whites until "S" and CHRISTENSEN showed up.

"S" said that he was put on CTQ and sent to the first tier where
he was housed when John STINSON (C-40154) arrived in the unit.
"S" stated that he had heard of STINSON from other White inmates
so when STINSON arrived and announced his presence, "S" greeted
him and sent him some coffee, paper and envelopes.   "S" stated
that STINSON thanked him and told him he would send him back some
things when he got his property.   "S" stated that this was how
his association with the AB started.   "S" recalled that the
following day STINSON wrote him a "kite" which expressed how the
AB were looking for good young "woods" to put in the "tip".   "S"
stated that STINSON wrote of how there were a lot of murders and
robberies that needed to be done and that the AB needed people
out on the streets putting money in the "kitty".   "S" stated that
this planted the seed in his mind that STINSON liked him and that
he should steer his life in that direction.

"S" stated that he was moved back with CHRISTENSEN where he
stayed for a few days until he was moved and STINSON moved in
with CHRISTENSEN.   "S" stated that he and CHRISTENSEN were
separated because they had assaulted another inmate on the
yard.   "S" stated that after a short while he, STINSON,
CHRISTENSEN, ABLE and "Little Wood from Orange County" ████████
████████ were on the yard together.   "S" stated that he,
STINSON and CHRISTENSEN ran the exercise program and then would
just kick back and talk.   "S" stated that during these sessions
STINSON told him that once he got back to Pelican Bay he would
run his name by the "brothers" and put him up for membership.
("S" stated that it takes three (3) brothers to raise their hands
to put you up for membership and then a two (2) year period
before you get in.   "S" further stated that there is now talk of
extending the probationary period to three (3) years.)   "S"
claimed that STINSON made this same statement to ABLE and

Confidential

77

122568



C. D. Caraway
DEBRIEF OF Inmate ████████
Page 3

CHRISTENSEN. "S" claims that STINSON was then transferred to Tehachapi then the L.A. County Jail and back to Chino before being sent back to Pelican Bay. "S" stated that there were no stabbings or murders while STINSON was in Palm Hall, ████████

"S" claims that STINSON told him to just get out to the mainline and kick back because the streets were where he envisioned the future of the AB to be. "S" said that STINSON told him that he wanted youngsters who were loyal to him to do his dirty work and support him and his wife Debra (STINSON, Debra ████████. "S" said that Debra STINSON was in trouble at the time for smuggling narcotics into the L.A. County Jail.

"S" stated that he had been endorsed for Folsom but got into a fistfight which resulted in a new endorsement to Corcoran SHU.



█. "S" stated that Palm Hall was then locked down, although he only stayed for a few more days before being transferred to Corcoran SHU. "S" stated that just prior to leaving he found out that "Big Frank" (FORGIONE, Frank B-88176) was there at Palm Hall but was scheduled to leave soon for Pelican Bay.

Confidential

78

122569



C. D. Caraway
DEBRIEF OF Inmate ████████████████
Page 4

"S" stated that upon arrival in Corcoran SHU he was
housed with an inmate named COLLINS (█████████████ 2)
and immediately received a "kite" from "Boom" (WILSON,
████████) who was celled with "Trooper from San Mateo" (unable to
identify). "S" said that this kite asked him to beat up COLLINS
because COLLINS had refused to assault a Black inmate on the
exercise yard. "S" recalled that this message was signed "BOOM-
ARYAN BROTHERHOOD" with a shamrock symbol. "S" said he didn't
do anything right away but soon got a message from "Tonito from
Rancho San Pedro" (unable to identify) who related that "Chuy
from VNE" (MARTINEZ, Mariano C-73488) had told him that WILSON
was a righteous AB member. "S" said once he got that message he
went ahead and assaulted COLLINS just to get WILSON off his back.





get sent back to Corcoran because of that.
GAMACHE did go to Pelican Bay and did get sent back to Corcoran
where he corresponded with "Cornfed" (SCHNEIDER, Paul C-60196)
and "Ruffo" (RUFFO, Art C-23189) who were still at Pelican Bay.

"S" stated that he soon cut a Black inmate (BENTON, Michael
████████) with a razor blade supplied by "Shorty from Pomona
Sharkies" ████████████████████. "S" recalled that this
assault resulted in his being placed on walk-alone status.

"S" recalled that "Deadeye" (HEALY, Brian ████████) transferred in
from Vacaville Ad-Seg where he had suffered a "severe ass
whipping" from the Correctional Officers there because he had
speared an officer in the neck. "S" stated that he had

Confidential

79                                                      122570



C. D. Caraway
DEBRIEF OF Inmate ████████
Page 5

corresponded with HEALY since their previous contact when they were both housed in Sycamore Hall at Chino and where HEALY asked him to stab "Silent Mike" (CARMICHAEL, Michael ████████ who was an AB dropout from Folsom who had dropped out after twenty (20) years. "S" stated that CARMICHAEL was at Chino on a parole violation and that he was assigned to the East yard while "S" was assigned to the West yard.

"S" recalled that HEALY had arrived at Corcoran via emergency transport with another inmate named "Buzzard Longo" (VALLA, unable to further identify) and that when HEALY arrived he told "S" that he stabbed the Officer at Vacaville.

"S" stated that HEALY was soon moved to the Gang section and that "S" tried to continue correspondence with HEALY through a maildrop for which he received a 115 in April of 1992. "S" stated that he was released from the Violence Control Unit to a regular SHU program pending transfer to Pelican Bay. "S" said that he didn't run into anymore AB members until he transferred to Pelican Bay. "S" said that HEALY remained at Corcoran and continued to be dangerous and that "Mylo" (ALLEN, James ████████) went to Corcoran SHU after he stabbed "Itchy" (ABLE, Richard ████████). "S" said that ALLEN was finishing a parole violation but ended up in the Gang Validation section with HEALY and Bruce CHRISTENSEN (████████. "S" said that HEALY wanted to "hit" CHRISTENSEN because he was telling everyone that he was AB and that John STINSON had made him a "brother". "S" said that HEALY was on walk-alone status and the only White that could make the "hit" was ALLEN. "S" stated that ALLEN cut CHRISTENSEN'S throat and then beat CHRISTENSEN up. "S" claims he was told this by ALLEN when they were celled together in D-SHU at Pelican Bay in April or May of 1995.

"S" recalled that in June of 1992 he got transferred to Pelican Bay and housed in the Security Housing Unit. "S" claims that since his arrival at Pelican Bay he has spent much time around both Aryan Brotherhood (AB) and Mexican Mafia (EME) members and associates. "S" said that he was housed in Unit Nine in D Facility for two and a half (2 1/2) years and that while there he met "Bobby Ray" (SHIELDS, Robert B-99475), Joey HAYES (D-05432), "Pirate" (CLARK, Thomas ████████, John AUSLINGER (unable to identify), Scott GRIZZLE (H-10106), Art RUFFO (C-23189), "Cornfed" (SCHNEIDER, Paul ████████, "New York" (CRANE, Robert ████████), "Chunky" (STANTON, Marvin ████████) and Chris CECIL (████████).

"S" stated that John STINSON and Dale BRETCHES (C-10395) were angry with CECIL because he had a shamrock tattoo that is only to be worn by members, and CECIL was just a "wannabe" AB. "S" stated that STINSON gave CECIL a pass on this issue but did have

Confidential

80

122571

C. D. Caraway
DEBRIEF OF Inmate ████████████
Page 6

*IOS*

CECIL dig the tattoo out of his skin. "S" stated that this did not appease other AB members who were "pissed off" at CECIL over "run ins" he had with people for claiming to be an AB member.

"S" claimed that in March of 1993 GRIZZLE was released to the General Population and CECIL moved into E-Pod with "Wolf from Long Beach" (unable to identify). "S" stated that SHIELDS and Joey HAYES (D-05432) were in the same pod and despised CECIL and that in early 1994 CECIL ended up celled with "Wasted" (RHODES, Jeffery ████████). "S" stated that RHODES had come back from Palm Hall at Chino and that RHODES had previously been celled up with "Scully Bob" (SCULLY, Robert ████████). "S" claimed that CECIL was "put in the hat" by STINSON who told SCHNEIDER to have RHODES "whack" CECIL. "S" said that SCHNEIDER doesn't like to use people to do his dirty work when they are "short to the street", and since RHODES had only thirty (30) days left SCHNEIDER told STINSON to hold off. "S" stated that STINSON insisted that RHODES do it and told SCHNEIDER to make sure that it was handled.

"S" stated that SCHNEIDER himself was not happy with CECIL because when he (SCHNEIDER) stole an air vent from the Law Library and made an almost perfect replacement out of paper, CECIL exposed the whole thing when he got caught stealing a screw from the bogus vent cover which led to the discovery of the missing vent by staff. "S" stated that the entire SHU was then locked down and a lot of inmates either discarded or got caught with weapons or contraband and it was all the result of CECIL doing something stupid. "S" stated that RUFFO and SCHNEIDER told RHODES to kill CECIL and that the weapon was going to be sent to him via the Law Library. "S" stated that RHODES received the weapon with a note signed by SCHNEIDER and that it was expected that RHODES would "take care of business". "S" stated that RHODES "locked up" the following day and that CECIL paroled soon after and never knew how close he came to dying.

"S" stated that in September of 1994 he was told that he would be serving an indeterminate SHU term. He was moved to Unit Four in D-Facility where he lived in the same pod with Rick WINSON ████████ and Jody SEELYE ████████ who had gotten "rolled up" off of "B" Facility for a stabbing assault and possession of a weapon. "S" stated that WINSON had stabbed his cellie who was a child molester and that this assault occurred during recreation time on the B Facility yard. "S" said that Rick WINSON told him that he and Rick BROWN ████████ had assumed shotcalling positions on the B yard along with Aaron MARSH (E-90574), SEELYE, and "Beetlejuice" (ELMER, John ████████. "S" stated that he was told that these individuals were rounding up youngsters and manipulating them into stabbings and fistfights. "S" said that WINSON acted as if his "shit didn't stink" and like he was

Confidential

*81*

C. D. Caraway
DEBRIEF OF Inmate ████████████
Page 7

(105)

somebody important. "S" said that he remained in Unit Four when WINSON got moved to Unit Seven, where he was housed near Eddie BURNETT (B-34087) and "Blinky" (GRIFFIN, Robert B-26484).

"S" stated that in December of 1994 he was moved from Unit Four to Unit Seven where he was housed with T.J. OSBORNE (unable to identify) and where he met GRIFFIN and BURNETT whom he had known by reputation from when he was housed at Palm Hall in Chino. "S" said that while at Palm Hall he had heard that BURNETT and "Deadeye" (HEALY, Brian ████████) were the shotcallers on a homicide that occurred on the third tier where an inmate named "Solo" Mooney (MOONEY, Victor ████████) was beaten to death in his cell.

"S" stated that when he was a tier tender in that unit he spent a lot of time talking to GRIFFIN and BURNETT and they told him that they were really tired of living in SHU. "S" said that they also told him that they did not like Todd ASHKER (C-58191) at all. "S" said they referred to him as an idiot and a retard over the tier which is not usually done by AB in front of regular White inmates. "S" stated that GRIFFIN and BURNETT did not like the 60 Minutes interview that ASHKER did, saying that he did not represent himself or the AB properly. "S" said that this dislike for ASHKER is shared by a number of AB. "S" stated that GRIFFIN and BURNETT did not like RUFFO or SCHNEIDER either and that they referred to them as being reckless and as loose cannons. They felt that RUFFO and SCHNEIDER brought too much heat on everyone.

"S" stated that he was soon moved along with T.J. OSBORNE to another pod in the same unit where there were no other White inmates. "S" said that it was just a month until OSBORNE "locked it up" and "S" was moved to another cell. "S" said that Danny Donald FISH (unable to identify) and "Donnie from Co Co County" (LARUS, ████████) moved into the pod. "S" said that FISH was only there for a few minutes when "Johnny from White Fence" (VARGAS, Johnny ████████) introduced them. "S" said that FISH ran up the stairs and said there was some bogus smut on him and that "Hawk" (LIKAI, Anthony ████████) had been running his mouth. "S" said that FISH said that he had heard that "S" had said something also. "S" said that he had never even heard of FISH and didn't even know that he existed, so he told FISH he didn't know what he was talking about but if FISH wanted they could cell up and deal with the situation. "S" stated that FISH declined and that he just left it at that and the following day he was moved to another Unit.

"S" said that in April he was moved into Unit 8 in D Facility, into the same pod with RUFFO and SCHNEIDER. "S" recalled thinking that these guys were maniacs and nothing but trouble. "S" said both RUFFO and SCHNEIDER were "cool" to him when he got

Confidential

82

122573



C. D. Caraway
DEBRIEF OF Inmate ▓▓▓▓▓▓▓▓
Page 8

there, and told him that they had "steel" (knives) stashed all around the pod and that they would send him some if he needed it. "S" stated that SCHNEIDER and RUFFO sent him some homemade wine the next day and they all got drunk. "S" said they then told him that they got "Itchy" ABLE stabbed because he wouldn't take care of a stabbing while he was in Administrative Segregation (Ad-Seg) at Soledad a number of years back.

"S" recalled that RUFFO, SCHNEIDER and Todd ASHKER had a lawsuit going from when they were at Folsom concerning Ad-Seg Procedures. "S" explained that they were mad because only RUFFO could go down there due to a declaration to the court by ex-AB ▓▓▓▓▓ which exposed ASHKER, RUFFO and SCHNEIDER'S plans to escape once they got to the Sacramento area. "S" said that RUFFO told him they did in fact have plans to escape. "S" remembered that they were really mad that RUFFO was the only one that the courts were going to allow to go because RUFFO wasn't well educated in everyday things let alone anything concerning the law.

"S" stated that RUFFO and SCHNEIDER asked him if he knew any females who would send drugs in through legal mail. "S" said he told them "no", because he didn't want to get involved in any schemes with them as it was a good way to get killed if something didn't go right. "S" stated that one time the unit control booth officer opened RUFFO and SCHNEIDER'S door while he was standing there and he reached in and shook their hands. "S" said that RUFFO then went out to court, but before he left he asked "S" to get "Mylo" ALLEN as a cellie. "S" stated that ALLEN wanted to get moved near RUFFO and SCHNEIDER and that SCHNEIDER wanted him near because he had things he wanted ALLEN to do once he got out. SCHNEIDER wanted ALLEN to send him cyanide and "speed" so that SCHNEIDER could give it to people who were "in the hat" and kill them. "S" said that SCHNEIDER told ALLEN to get the cyanide at a jewelers shop because they used it there to clean gold, silver and jewels.

"S" stated it was not unusual for one of the control booth officers to let some inmates "cell visit", and on one of these occasions when SCHNEIDER was in "S" cell, SCHNEIDER discussed "Scully Bob" (SCULLY. Robert ▓▓▓▓▓▓) with him. "S" recalled that SCHNEIDER told him that after being released from Pelican Bay SCULLY hooked up with SCHNEIDER'S "old lady", Brenda MOORE, and that the two (2) of them traveled south to Sonoma County where SCULLY shot and killed a Sheriff's Deputy. "S" stated that when this occurred ALLEN was on the streets and SCULLY was supposed to be going to Orange County to meet him, but instead got drunk with MOORE and got into a situation where he killed the Deputy and then took hostages in an attempt to get away.

Confidential

83

122574



C. D. Caraway
DEBRIEF OF Inmate ▇▇▇▇▇▇▇▇
Page 9

"S" said that ALLEN had somehow found a Glock 9mm pistol with armor piercing bullets for SCULLY and the two (2) of them were supposed to hook up and sell cocaine and heroin and do some robberies. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

"S" said that SCULLY'S court investigator came to Pelican Bay to see SCHNEIDER and that SCHNEIDER read everything about the case, including SCULLY'S rap sheet where he found that SCULLY had a 1976 Rape conviction. "S" said that SCHNEIDER stated that he hates rapists and had no respect for SCULLY because of that.

"S" said he and SCHNEIDER then talked about ▇▇▇ ▇▇▇▇▇ ▇▇▇ and "S" said he told SCHNEIDER he hated W▇▇▇ because W▇▇▇ had a "fat mouth". "S" recalled that SCHNEIDER asked him if he thought that Rick BROWN (▇▇▇▇▇▇) had enough heart to kill W▇▇▇. "S" said he told SCHNEIDER he didn't know because W▇▇▇ and BROWN were friends from when they were together on B yard at Pelican Bay. "S" said when he asked SCHNEIDER why he wanted to know, SCHNEIDER replied that W▇▇▇ was at one time celled up with "Casper from Orange County" (C▇▇▇, F▇▇▇▇▇▇▇) and that C▇▇▇▇ was "in the hat" for portraying himself as AB when he was not. "S" said that SCHNEIDER told him that he and RUFFO had asked W▇▇▇ to kill C▇▇▇, and that they would send him some steel to do it, but W▇▇▇▇ wouldn't do it because he was "short" to the mainline. "S" said that Rick BROWN wants to be an AB and that this is the reason why he ended up stabbing W▇▇▇

"S" stated that another time SCHNEIDER told him that "Deadeye" (HEALY, Brian ▇▇▇▇▇▇) almost got put "in the hat" by John STINSON for talking bad about SCHNEIDER, mainly for saying that SCHNEIDER sidestepped on some people. "S" said that SCHNEIDER liked HEALY and they ended up squashing their problems after talking it out, and HEALY got out of being "in the hat". "S" stated that it was ironic how STINSON would sweat HEALY like this when he and most everyone else didn't accept SCHNEIDER as being a true "brother" because he was a "blue brother" brought in by "Blue" (NORRIS, Wendall C-05302) and wasn't really accepted until after NORRIS dropped out.

"S" said that the whole time he lived near SCHNEIDER he was paranoid that SCHNEIDER would find out about his commitment offense where he shot Mexican Mafia (EME) associate Frank WEILER during a robbery. "S" stated it was his belief that the Mexican Mafia (EME) wanted him dead. "S" stated that if the Mexican Mafia (EME) asks the AB to "take care" of White inmates the AB will do it. "S" stated that because of all the "steel" in the unit he started cutting the plexiglass on his light fixture to make a weapon to protect himself if need be.

Confidential



C. D. Caraway
DEBRIEF OF Inmate ▉▉▉▉▉▉▉
Page 10

"S" stated that a certain Control Booth Officer would open any celldoor upon request and allow inmates to go into other cells. "S" stated that this officer brought in coffee, salmon sausages, shrimp cocktails, Pepsi, raisin bread and supplied plastic trash bags for them to make their wine. "S" stated that this officer also provided steaming hot water for coffee as well as providing small toe nail clippers which SCHNEIDER used to manufacture weapons. "S" stated that after ALLEN got moved into the pod he and "S" were allowed into SCHNEIDER'S cell at least fifteen (15) times. "S" stated that the most "way out" thing he observed of this officers behavior other than accepting inmate manufactured wine from SCHNEIDER, was when the officer provided SCHNEIDER with a wire coat hanger with which to fish out a double edged knife he had hidden in the bottom of the stairwell. "S" stated after SCHNEIDER recovered this weapon he handed it to this officer who inspected it and then gave it back to SCHNEIDER. "S" said that SCHNEIDER then took it back to his cell where he sharpened it some more before walking around the pod and showing it to everyone in the unit.

"S" stated that the very next day, after SCHNEIDER had retrieved the knife, the same Control Booth Officer warned everyone that a massive search of the entire facility was planned. "S" said the Officer let SCHNEIDER out of his cell to put the weapon back into the hiding place in the stairwell. "S" recalled that before SCHNEIDER put the weapon back he attached a handle and a piece of string with which to retrieve it in the future. "S" stated that he attempted to cover up the cut plexiglass light fixture but it was discovered during the search.

"S" stated that as a result of that discovery he and ALLEN were moved to A pod in Unit 8 while SCHNEIDER and LIKAI were moved to C pod. "S" stated that he and ALLEN had talked about LIKAI being "up" for membership in the AB and that he didn't belong in the AB. LIKAI had told ALLEN that John STINSON would wash his hands of ALLEN if he had anything to do with SCHNEIDER and RUFFO. "S" said that ALLEN told him that he had heard from LIKAI that "Irish" (SHINE, Gaven ▉▉▉▉▉▉) and the other AB were lobbying to put SCHNEIDER and RUFFO "in the hat".



Confidential

85

122576



C. D. Caraway
DEBRIEF OF Inmate ███████████
Page 11

"S" stated CRENSHAW had previously been cellies with ███████ (BRUN, ███████. "S" said that there is a "contract" out on BRUN because of his debriefing, this contract was put on BRUN by John STINSON, Dale BRETCHES, Bobby Ray SHIELDS and Gaven SHINE. "S" said that BRUN told SHINE to move in with him to "take care of business" but SHINE refused. "S" also said that BRUN hates SCHNEIDER with a passion.

"S" stated that CRENSHAW went out to yard and talked to SHIELDS through the yard drain. SHIELDS asked CRENSHAW if he knew about BRUN, but when it became apparent that CRENSHAW didn't have a clue SHIELDS changed the conversation and just sent his regards. "S" said CRENSHAW then went in from yard and confronted BRUN who told CRENSHAW to mind his own business. "S" said that CRENSHAW then went to the law library where Dale BRETCHES asked him to stab BRUN because the AB can't get to him. BRETCHES also told CRENSHAW that he or STINSON would get a weapon to him to accomplish this assault. "S" said that this was very unusual because one of the AB rules is that only an AB can stab an AB.

"S" said that CRENSHAW went back to his cell and talked BRUN into doing some exercises, and when BRUN got into a prone position to do some push-ups CRENSHAW tried to kick BRUN in the head. "S" said that this only angered BRUN who got up and put CRENSHAW in a choke hold which he applied until CRENSHAW passed out. "S" stated that when CRENSHAW came to, BRUN told him that he had come within two (2) seconds of dying and that if he ever tried something like that again he would kill him. "S" said BRUN then kicked CRENSHAW in the face and told him to get up on his bunk and stay there. "S" said that CRENSHAW stayed on his bunk and kept quiet for three (3) days until he was released from SHU to go to the mainline.

"S" said John STINSON had been trying to pull the AB together and got everyone talking and squashing all of the petty quarrels that had arisen from the "Blue" NORRIS and "Blinky" GRIFFIN split in the AB. "S" said that BRUN was NORRIS' Lieutenant at Folsom and was brought into the AB by NORRIS. "S" said BRUN was supposed to go to the Law Library and denounce his AB membership through NORRIS and then be put back up for two (2) years at which time he would be given his "rock" as a "Blinky Brother". "S" said that CRENSHAW told him that BRUN flat refused to have anything to do with this plan.



Confidential

86

122577



C. D. Caraway
DEBRIEF OF Inmate ███████████
Page 12



"S" stated that after his conversations with "Spider" GAVALDON regarding "S" being "in the hat" almost everyone in the pod put he and his celly "on the shine". "S" said that in late January the Control Booth Officer opened his cell door while PALAMINO was already out of his cell and in the shower. "S" stated he stepped out of his cell and stepped in front of the shower where he looked in on PALAMINO who reached for something on the shower shelf and said "come on in, motherfucker". "S" stated that he suspected that PALAMINO was reaching for a weapon, so he immediately ran into the shower where he fought with PALAMINO.

"S" stated that he decided to debrief because the EME now wants to kill him and the AB will help the EME if asked. "S" said that the AB and EME scratch each others backs although the AB will stab someone for the EME but the EME won't do it for the AB. "S" stated that he feels that John STINSON will try to have him killed because STINSON is "Quates" (GRAJEDA, Daniel █████ crime partner and he is tight with "Wino" (GRAJEDA, Thomas C- ████ and ████████████████

"S" stated that "Deadeye" HEALY is very dangerous and doesn't care like a human being. "S" described HEALY as a sociopath who was behind many plots and actual murders as well as numerous stabbings and other assaults. "S" stated that HEALY should be kept single celled forever or there would be another murder.

Confidential

87

122578



C. D. Caraway
DEBRIEF OF Inmate ████████████████
Page 13

████████████████████████████████████████ "S"
said that BROWN told him he should go to the law library when the
package came in so that he could get a "touch" of the drugs. "S"
said that BROWN planned to get a rubber stamp that said Legal
Mail and just send the drugs straight in. "S" also said that
BROWN intended to write a letter to PAPPAN explaining "S" problem
with PALAMINO. "S" said that BROWN thought he might have a
little pull from the things that he did for Rick BROWN and Rick
WINSON when he was on B-Yard. "S" stated that BROWN was WINSON'S
little "pet" because BROWN was young and impressionable. "S"
stated that BROWN may not now try to send drugs in since it was
obvious that "S" has "locked up" and BROWN may be afraid that "S"
would tell about his plan.



"S" stated when SCULLY was out on parole the first time he was
running around with "Moose" Hart (HART, Jeffrey ██████████ and that
when they got pulled over in a traffic stop SCULLY told HART to
shoot the cop. HART wouldn't do it because he wasn't going to
pick up a three strike case for SCULLY. "S" said he was told by
SCHNEIDER that HART was "put in the hat" because of that.

"S" said SCHNEIDER told him that he wants "Wasted" RHODES killed
for snitching off the Chris CECIL murder plot and that if he
can't get RHODES he will get RHODES ██████████████████ "S" claims that
SCHNEIDER has RHODES ██████████████ address in ████████ "S" claims that

"S" stated that SCHNEIDER spoke of killing "Hawk" LIKAI before
they celled up together. "S" said SCHNEIDER referred to LIKAI as
weak and said that when RUFFO went to court he was going to move
LIKAI in and chop his head off. "S" said after a while talk let
up and "S" and ALLEN gave SCHNEIDER a way to save face when they
told him he should give LIKAI a chance. "S" said SCHNEIDER told
them that BRETCHES and the other "brothers" would be mad at him
if he killed LIKAI so he would give him a chance.

"S" said SCHNEIDER and LIKAI have been cellies for quite a while
now and that SCHNEIDER will stay with LIKAI because LIKAI is not
a killer and is no threat to him. "S" said if SCHNEIDER ever got

Confidential

88

122579



C. D. Caraway
DEBRIEF OF Inmate ███████████
Page 14

"put in the hat" and the AB told LIKAI to kill SCHNEIDER he didn't think LIKAI could or would do it.

"S" stated the AB were very relaxed on their standards right now and that a lot of the original AB do not like it. "S" said the older AB want to go back to the blood in, blood out philosophy. "S" said LIKAI will probably debrief in the future because he is not "brand" material. "S" further stated that Pelican Bay is making the AB weaker and their standards are low.

"S" claims SCHNEIDER told him that STINSON is bringing in more weak youngsters that are loyal to him and that he can control. "S" said that STINSON is gaining more power and higher standing in the AB and that he is one of the inner circle. "S" further stated that STINSON is well liked and respected by EME members.

"S" made the following statements regarding inmates and or incidents that he recalled:

James "Mylo" ALLEN: When ALLEN paroled he was expected to pay tribute to Debra STINSON out of any drug deals that he did. John STINSON wanted to make sure Debra has money and is taken care of. John STINSON expected ALLEN to look out for Debra and drop off cash to her as a sign of respect to John. If Debra needed anything ALLEN was expected to help make it happen.



"S" said that in 1994 SCHNEIDER and RUFFO received drugs (speed and acid) from Brenda MOORE. "S" said that the drugs were sent in through legal mail and that the drugs were distributed to associates and members of the AB at the law library. "S" said that this happened before the last shipment that got busted with the Attorney General's return address on it.



"Irish" Gaven SHINE usually takes new recruits into his cell and schools them and introduces them to AB politics. "S" also said that SHINE'S "ol lady", Lee Ann SHINE, ███████████

Confidential

89

122580



C. D. Caraway
DEBRIEF OF Inmate ████████████
Page 15

████████████████████████        "S" said she also passes
information back and forth and helps circumvent the mail. "S"
said that she hangs out with other women who visit and live in
the area and do drugs and live as "welfare scumbags".

"S" stated that these women and their visits are what keeps the
EME and AB going because the visiting room is where they
circulate their murder plots and distinguish who is "up" and who
is "out". "S" said that these women visitors are an information
highway for the AB and EME.



people on the B Yard that he was AB.   "S" said that GOVEY
actually just riding John STINSON'S coat tails but did not know
that STINSON was angry with him for advising Debra STINSON to
"take a deal" on the drug smuggling case she was charged with at
the L.A. County Jail.   "S" stated that John STINSON is really
good with law and wanted Debra to fight the case.   "S" recalled
that SCHNEIDER was in "Bedrock" (VCU) at the time and liked GOVEY
so he ordered an assault on STYLES who was subsequently stabbed
with a pen.   "S" said that GOVEY later received a pass from John
STINSON but that the pass was later retracted due to GOVEY
"running his mouth" and not going along with the program.

Confidential

90

122581



C. D. Caraway
DEBRIEF OF Inmate ████████████████
Page 16

████████████████████ "S" stated that when he and ALLEN were cellies they had numerous conversations regarding Aryan Brotherhood (AB) members and their status in the AB. One such conversation that he recalled was regarding Art RUFFO and "Cornfed" SCHNEIDER. "S" said ALLEN told him that while ALLEN was celled with Anthony LIKAI, LIKAI told him that his previous celly was "Irish" Gaven SHINE. SHINE told him that various brothers at one time or another were lobbying to put SCHNEIDER and RUFFO "in the hat" because they were bringing too much heat on the AB. "S" stated that before ALLEN was moved from LIKAI'S cell to his, he was told by SHINE that he shouldn't get mixed up with SCHNEIDER and RUFFO because they were reckless and not in good standing with the other AB. "S" said that SHINE also told ALLEN that if he got out and did things for RUFFO and SCHNEIDER that John STINSON would wash his hands of him. John STINSON was ALLEN'S sponsor into the AB and ALLEN is supposed to write to STINSON for instructions once he paroles.



contract out on his life from Thomas "Wino" GRAJEDA and John STINSON. ████████████████

C. D. Caraway
DEBRIEF OF Inmate ███████████
Page 17



"S" supplied the following addresses he claims are used by the AB as mail drops:



In addition to the individuals named in the body of this report, "S" identified numerous individuals with whom he has had contact throughout his incarceration with the California Department of Corrections. Subject identified the following individuals by name and/or alias, their hometown/set and gang status. The gang status is according to his last contact with them or subsequent information reported to him by others.

| Inmate Name | Alias | Hometown | CDC # | CI&I No. | DOB | Status |
|---|---|---|---|---|---|---|



**Confidential**

92

122583

State of California

# Memorandum

**CONFIDENTIAL**

Magee, J.

SPECIAL OPS

JAN 24 2003

RECEIVED

Date    :    January 10, 2003

To    :    M. D. Castellaw
Correctional Captain
Investigative Services Unit

Approved for Confidential
_____ 1-21-03
Signature                    Date

Reviewed by:
Luis Rivera
_____ 2/21/03
Signature                    Date

From    :    Department of Corrections

Subject:    DEBRIEF OF ███████████████████████ NAZI LOW RIDER (NLR) ███

The information contained in this report is classified as confidential in accordance with the California Code of Regulations (CCR), Title 15, Section 3321(a)(1) and (2). ████████ identified the following individuals with the information indicated. Data contained within parenthesis or in italicized print are investigative notes, which provide identification or substantiate ████████ information.

On August 13, 2002, Correctional Lieutenant E. Madrid (Madrid), Institutional Gang Investigator (IGI), █████████████████████████ conducted a Confidential Interview with ███████ (date of birth: ██████████████████████ relevant to his request to debrief and disassociate himself from the NLR prison gang. In a good faith effort on ████████ part, he disclosed the location of an inmate manufactured stabbing weapon (knife), which correctional staff discovered on August 14, 2002 (█████████████████████████████ claims his sole purpose for disassociating himself from the NLR and Aryan Brotherhood (AB) is because upon his release date in 2004, the AB want ████ to carry out terrorist acts upon the community.

During August and September 2002, I conducted several interviews with ███████. He has submitted written accounts of his involvement in gang activity. ████████ has reviewed the pages marked with his initials. These initialed pages represent his verification of the accuracy of the pages.

████████ reports that his first encounter with the NLR occurred in 1992, at the age of 16, while residing in a foster home located in ██████████████████████████████████ California. He met ███████████████, a methamphetamine dealer, who claimed to be a NLR member. ████ chose ████ as a "role model," and began carrying himself in the same manner. ████ reports that he ran into an enemy of ████████'s and, to gain respect from ████ and others in the neighborhood, "took care of business," by assaulting ████████'s enemy. ████ believes this was a turning point in his life. He learned that by instilling fear he gained a false sense of power, control, and respect from others.

████████ admits to selling methamphetamine for ████████████ from ████████ California until he was arrested on November 26, 1994, for receiving stolen property, resulting in a camp placement.

Confidential

CONFIDENTIAL

93

122584

M. D. Castellaw
Debrief of █████████
Page 2



**CONFIDENTIAL**

While awaiting trial in the San Bernardino County Jail, █████ claims there were no NLR members in his unit; however, he took it upon himself to check all white inmates' "paperwork" (███████████████████). In an attempt to "weed out" all sex offenders, ████ began organizing the "Woods" (white inmates) in the unit. In 1994, an alleged sex offender, N████ ████ was housed in ████'s unit. ████ took it upon himself to assault N████. Shortly thereafter, █████████ was transferred to the California Department of Corrections (CDC) for incarceration.

On February 23, 1995, ████ began to serve a one-year and four month sentence. ████ was received at the California Correctional Institution (CCI) Reception Center, in Tehachapi, California where he was housed in a gym setting. While at the Reception Center, ████ became acquainted with Leonard MOORE, ██████████ "Lenny," from Fontana, California. ████ heard rumors that there was possibly a rift between the AB and the NLR. ████ had respect for both groups so he decided not to pursue membership into either gang until he was able to research each group's political agendas. ████ chose to associate himself with the Inland Empire (IE) Peckerwoods. According to ██████ the IE Peckerwoods are not a prison or street gang, just the "Woodpile from I" (███████████). ███████ admits to physically assaulting several inmates while incarcerated at CCI, but he was never charged in these incidents.

On June 7, 1995, ████ was transferred to McFarland Detention Center (CCF), Level I, at which time he physically assaulted inmate ███████ L██████████████. ████ was because L█████ had been talking disrespectfully about Lenny Moore. ████ received a higher custody level due to the assault and, shortly thereafter, he was transferred to California State Prison, Corcoran (Corcoran).

Upon his arrival at Corcoran on August 25, 1995, ████ met NLR member "Blue" from Orange County (unable to identify). Blue was the only NLR member on his yard, but they rarely communicated due to a lockdown, and ████ paroled from Corcoran in December 1995.

On December 1, 1995, upon ████ release from custody, he returned to Victorville, California located in San Bernardino County. However, in August 1996, ████ was extradited to ████████y in ██████████████, where he accepted a guilty plea on two counts of burglary.

In October 1996, ████ was released from █████████ and once again returned to San Bernardino County. He was having a hard time fitting in with society. ████ was unemployed, had no money, too much free time on his hands, and no direction in sight. He began having a hard time socializing, specifically around large groups of people. He ████ sought out psychiatric help. He was prescribed medication, which seemed to help. However, ████ stopped taking the medication and returned to participating in criminal activities. He was eventually arrested for burglary and returned to custody.

M. D. Castellaw
Debrief of J███████
Page 3

**CONFIDENTIAL**

████ was incarcerated in the San Bernardino County Jail (SBCJ) on December 16, 1996, his second term at the age of 20. ████ describes his housing assignment was equivalent to that of a "gang unit." Upon his arrival at the SBCJ, ████ claims Joseph LOWERY, ████, a.k.a. "Blue," had the "keys" (directed gang activity) to the SBCJ. It was there that ████ claims he began to "meet people of a higher caliber." ████ began associating with "Beanie," Jeffory PAXTON, ██████, from Ontario, California, and Paxton's cellie, "Bam Bam" from ██████ (unable to identify). ████ was involved in the assault of a Black inmate known as "Easy" (unable to identify). ████ claims Easy was the shot-caller for the Crips (street gang). As the assault escalated, the entire pod became involved, and heightened into a melee between White and Black inmates. This incident reinforced ████ reputation as being a person who would "take care of business." As a result of the melee, ████ was re-housed in Administrative Segregation (Ad-Seg) where he met "Ollie from San Bernardino" (unable to identify), and Joey B. from San Bernardino (unable to identify), both of whom ████ identified as NLR members.

Upon ████ release from Ad-Seg, he was re-housed within the same building/section as Russell KING, ████, a.k.a. "Rusty," and Guthrie DANOWSKI, ████, a.k.a. "Fontana Kid." ████ claims that as he watched from his cell window, he witnessed King utilize an inmate manufactured weapon (knife) to slash Fontana Kid's throat and face. Correctional staff conducted a thorough search of the unit, at which time deputies discovered a weapon located in ████ belongings. ████ was returned to Ad-Seg, where he was re-housed with King.

While housed in Ad-Seg, ████ claims King received a message from Lowery, indicating King was "in the ride" (gained membership into the NLR) for slashing Fontana Kid's throat. King began grooming ████ for NLR membership. King taught ████ to get up early, exercise, study, and the basis of NLR politics. Additionally, King taught ████ how to manufacture a double-bladed razor knife. ████ states that King had claimed this type of razor knife was the same kind of weapon that he had used on the Fontana Kid. According to ████, King was "pretty much insane," and ████ gained a lot of respect from other inmates because he was able to live with King. Once King felt that ████ had been groomed enough for NLR membership he (King) contacted Lowery asking permission to bring ████ into the NLR. Lowery wrote back, stating that if ████ were able to "hit" (assault) inmate Louis F██████ (unable to identify), it would be a good start. ████ agreed, but was never afforded the opportunity to carry out the assault. Upon ████ release from Ad-Seg he was reassigned to housing within the general population. Shortly thereafter, ████ was found in possession of dangerous contraband and was returned to Ad-Seg until his transfer to CCI.

On April 8, 1997, ████ was received into the custody of the CCI Reception Center. While at the Reception Center, ████ met NLR members, Jason SWONGER, ████, a.k.a. "Crazy Dougie" from Fontana and "Shotgun" of San Fernando Valley (unable to identify.)

On May 19, 1997, ████ was transferred to High Desert State Prison (HDSP), Susanville, California. He began associating with NLR members, Travis HOUGH, ████, a.k.a. "Crazy Trav," Michael BILEVICH, ████, a.k.a. "Spider," Cody ROSBRUGH, ████

Reviewed by ████████

Confidential                                    CONFIDENTIAL

95

122586

M. D. Castellaw
Debrief of ████████████
Page 4

CONFIDENTIAL

a.k.a. "Rhino," Daniel YATES, ████████, a.k.a. "Mugsy," and David DELAHANTY, ████, 2.k.a. "Peanut." ████ reports that there were several racially motivated riots on the yards at HDSP; however, he was only involved in one of the riots ████████████████ ██████ where he began spending a lot of time with Yates. At that time ████ was sent to Ad-Seg for him to become a member of the NLR. Upon ████ claims that Yates began campaigning Yates sent a message to Bilevich stating he was in support of ████ decision to become a NLR member, ████ desire to become a member.

On November 17, 1997, ████████, ████ and several other NLR members, assaulted inmate Benny B████████████, which resulted in serious bodily injury. ████ claims the reason for the assault was over B████ accumulation of drug debts ████████. ████ claims the reason

Bilevich told ████ that in order to gain membership into the NLR he would have to stab "the next victim" who came to the exercise yard. Additionally ████ was instructed to stab the victim in either the neck or the eye. In early March 1998, NLR member Hough told ████ that inmate S████████ had been chosen as ████ victim. ████ acquired a plastic and metal-tipped weapon. Bilevich assigned ████ and Hough to carry out the attack on Sevey.

On March 13, 1998, during afternoon yard, ████ approached S████ and stabbed him in the neck area. As S████ turned, ████ attempted to stab him in the eye, but missed and stabbed him in the forehead. S████ fought back, and punched ████ in the nose, but ████ continued his attack. Delahanty, Hough, and Yates jumped in and also began stabbing S████████ states Delahanty succeeded in stabbing S████ in the eye ████████████. Due to the severity of the assault, ████ earned his membership into the NLR prison gang. ████ reports that his official sponsors for membership into the NLR were Hough and Belivich.

In May 1998, ████ was assigned housing with "Worm from Bakersfield" (unable to identify). Worm told ████ that his old cellie, F████ a.k.a. "Pirate," had told him that all NLRs were "in the hat" with the AB, and when they (NLR) got to PBSP they would be moved on. ████ confronted Farris regarding his statements about the AB wanting to attack the NLR. F████ claimed he had only said part of it. ████ told NLR member Hough what F████ had said, but when Hough confronted F████ F████ told Hough that he has never said anything about NLR/AB politics. ████ felt that F████ was calling him a liar, so ████ asked Hough for permission to assault F████. Hough gave ████ the "green light" to assault F████. On May 26, 1998, ████ retaliated against F████ by slashing his throat and the back of his neck with a razor blade ████████████████████.

From May 1997 through August 1998, ████ was involved in several cell extractions (████ ████ ████████████████. During the course of one of the cell extractions, ████ struck a member of the extraction team member's helmet. ████ was charged with Battery on a Peace Officer (████████████ ████████. ████ admits that on several occasions, due to his actions, entire sections protested necessitating extractions. Due to

Reviewed by ████████

Confidential                                                    CONFIDENTIAL

96

M. D. Castellaw
Debrief of ████████████████
Page 5

CONFIDENTIAL

████████and the following inmates' continuous disruptions, deeming them a failure to programming inmates, on August 16, 1998, inmates Delahanty, Rosbrough, Braden, Jacob, Benjamin PILARZYK ████████, a.k.a. "Benji," and ████████ were transferred to PBSP.

Upon arrival at PBSP, ████████ and Pilarzyk were housed together in the Security Housing Unit (SHU), Facility C, Unit 8. This is where ████████met AB associate, Bob TANNER, C-29264, a.k.a. "K Bob." ████████immediately wrote to Tanner inquiring as to the status between the NLR and AB. Tanner told ████████that he only knew of one incident in which a member of the AB had a conflict with a NLR member. ████████and Pilarzyk were cellies for approximately 15 months, until ████████ claims that Pilarzyk began to get on his nerves. Due to the tension, on November 11, 1999, ████████ physically assaulted Pilarzyk ██████████████████████████████████████████ ████was reassigned housing in ████████████████████████████████████████████

████████ admits that he is actually a Member of the NLR (█████████████████████).

Upon arrival in C11, ████████ informed NLR members Richard MILEY, ████████, a.k.a. "Smiley," and Thomas GRAY, ████████, a.k.a. "Trouble," that he had just moved into their block. Within one week, ████████was reassigned housing in Miley's and Gray's pod. ███████████████████████████████████████████████████

████████claims that Miley, Gray, and himself talked extensively about the politics between the NLR and AB. ████████ reports that both Miley and Gray were adamant that if the AB continued to disrespect the NLR, war would erupt between the two gangs. ████████claims both Miley and Gray claimed that they were willing to kill any AB who harmed a NLR.

████████ claims that in the early months of 2000, Miley began communicating with John STINSON, C-40154, a.k.a. "Youngster," and Richard TERFLINGER, B-18173, a.k.a. "Ricky T." ████████ claims Stinson initially offered to appoint Miley and three other NLR's membership into the Brand (AB). ████████ believes the AB made this offer, so that Miley would help control the NLR population. Miley did not agree with the AB's initial terms. Miley wanted himself placed on the AB council, and that four other NLR members of his choosing be given AB membership. Additionally, Miley demanded that only a NLR would be allowed to hit another NLR member, and that some of the NLRs be taken off the AB "hit list." After a short period of negotiations between Miley and the AB (Stinson), Miley told ████████that both Terflinger and Stinson had agreed upon most of Miley's stipulations.

According to Miley, the AB agreed that Miley would have complete control over the NLR, and that Miley would be placed on the AB council, as second in command. Miley told ████████that James McMAHON, ████████, a.k.a. "PeeWee," was also appointed to a position on the AB council. NLR members Thomas GRAY, ████████, a.k.a. "Trouble," Goran LONCAR, ████████a.k.a. "Lightfoot," and Jason GANN████████, a.k.a. "Creeper from Visalia," were each given membership into the AB.

Reviewed by ████████████████████

Confidential                                    CONFIDENTIAL

97

122588

M. D. Castellaw
Debrief of ████████
Page 6

**CONFIDENTIAL**



████ claims that Miley was unable to get NLR members out of trouble with the AB who had aligned themselves as FTB's (Fuck the Brand) members. ████ describes the FTB as a faction of the NLR who refuse to align themselves with the AB. However, Miley told ████ that his intention in uniting the two gangs (AB and NLR) was to bring NLR members into the AB who were loyal to the NLR, and eventually inundate the Brand with NLR; swinging the balance of power to himself and the NLR. In ████ opinion, he does not foresee Miley having the ability to overthrow the Brand.

According to ████ several of the younger AB's are very upset with Stinson and Terflinger, because Miley was placed in such a high position without even having to serve the standard two-year probation period. Both Miley and Gray told ████ that once he met the AB's required two-year waiting period, he ████ would be put up for membership into the Brand. Miley began to set his plans in motion for ████ future leadership role in the NLR. Miley wanted McMahon closer to him, and ████ moved to C3 where he would be in charge of all NLR business. Miley instructed ████ to inform everyone he came in contact with what had transpired between the NLR and AB, and that he was the top NLR member. Miley instructed ████ to house up with any FTB member who was assigned housing in the unit for the purpose of killing them.

During May 2000, ████ was re-housed in C3, which also housed NLR members Delahanty and Rosbrugh. These three proceeded to establish and enforce the following rules for the NLR and Woods housed in C3:

- No cell extracting without permission
- No attacking an officer with a weapon. If an inmate had a personal issue with an officer, it was okay to fight; however, a weapon could not be used without permission from an AB
- In the event your cell door was accidentally opened, the NLRs/White inmates would not take the first aggressive stance. ████ claims this change in policy was due to the peace talks, because it would appear the white inmates were not sincere
- Fighting was only allowed if you had a personal issue
- All NLRs were required to attend Law Library whenever possible, in order to pass information
- All NLRs had to arise by 0600 hours and exercise was encouraged

████ Delahanty, and Rosbrugh began their daily regiment at 0500 hours, with a strict exercise and study routine. ████ claims all NLRs housed in C3 began to study Spanish, in an attempt to gain an advantage over correctional staff monitoring inmate mail and conversations.

Reviewed by ████

**CONFIDENTIAL**

Confidential

98

122589

M. D. Castellaw
Debrief of
Page 7

CONFIDENTIAL

Confidential

Reviewed by

99

122590

M. D. Castellaw
Debrief of ▓▓▓▓▓
Page 8

CONFIDENTIAL

▓▓▓▓▓ explained to Wood the arrangement that had been made between Miley, Stinson, and Terflinger, and anyone who was aware of this arrangement, and chose not to ▓▓▓▓▓ agreed to honor the NLR/AB chain of command. ▓▓▓▓▓

▓▓▓▓▓ reports that around August 2001, he moved into ▓▓▓▓▓d, where he was celled with ▓▓▓▓▓ with ▓▓▓▓ E▓▓▓▓▓ While housed in F Pod, ▓▓▓▓ became acquainted which Evans had fished out of the plumbing chase. ▓▓▓▓ Evans gave ▓▓▓ a piece of stainless steel, in his cell locker. Evans taught ▓▓▓ how to gain access by opening the slot where the television wires go into the plumbing chase, thus allowing access to stainless steel hose clamps. ▓▓▓

▓▓▓ claims that in 2002, during an escort to ▓▓▓ visiting, he was able to talk to Miley, at which time ▓▓▓ asked how McMahon was doing. Miley stated that Pee Wee (McMahon) was "stressing" and for ▓▓▓ not to tell Terflinger. Miley further related to ▓▓▓ that he did not know if "the unity" thing was going to work out, referring to the unity between the NLR and AB.

Reviewed by ▓▓▓

Confidential

CONFIDENTIAL

122591

100

M. D. Castellaw
Debrief of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Page 9

CONFIDENTIAL

told ▮▮▮▮▮ that he respected him because he carried himself differently than the other "Woods" in the pod. ▮▮▮▮ old Dash that he was not interested in hearing him trying to patronize him, while putting down other Woods. Dash got mad and said he that he had already "Gotten at the fellas about you punk ass youngsters." ▮▮▮▮ old Dash that if he felt he was a punk, they could cell up together and resolve the problem. Dash said "No." However, a couple of hours later he received a cell slip, so ▮▮▮ signed it and waited. In the meantime, ▮▮▮▮ sent Miley a letter to inform him what had transpired. Miley wrote back, giving ▮▮▮▮ permission to do whatever he needed to do, to "Keep [his] house clean." ▮▮▮ a further related that it was not general practice for a NLR member to be given permission to "do whatever he has to" when it comes to business involving the AB. ▮▮▮ claims the reason he was given permission to "take care of business" (to attack B▮▮▮) is because he (B▮▮▮) is not a Brother (AB member), he is just an associate of the AB. ▮▮▮ claims that since Miley, who is a high enough ranking Brother (AB), had given him "the keys to the building," Miley could give ▮▮▮▮ permission to hit anyone, except an actual AB member.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
surrounding this incident as follows: "Little John is a bully who beat up his cellie, "Dougie," ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ describes the politics (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮ "Terflinger also wanted Little John dealt with because Little John had ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ reports that early in 2002, Terflinger moved into his section (C3). ▮▮▮▮▮▮▮▮▮▮ had already left the unit, leaving inmates Terflinger, Wood, Brief, Milum, and himself. ▮▮▮▮▮ immediately contacted Terflinger to let him know that Miley had put him (▮▮▮▮) in charge of the Unit, but now that he (Terflinger) was there he would contact the other Woods and NLRs in the building to let them know he (Terflinger) would be in charge. Terflinger told ▮▮▮▮ to keep

Reviewed by ▮▮▮▮▮

Confidential                                    CONFIDENTIAL

122592

/ 6 /

M. D. Castellaw 
Debrief of
Page 10

CONFIDENTIAL

doing what he had been doing; however, the only policy change was that if someone wanted to attack a Black or Northern Mexican on sight, it was okay.

In March 2002, ████ told Terflinger that he was in possession of a piece of stainless steel and that there was a spot on his door where someone had started cutting. Terflinger instructed ████ to utilize the piece of stainless steel to finish cutting out the spot on the door. ████ finished cutting out the piece of the door, thus obtaining a weapon. ████ did not want the weapon in his house and Terflinger claimed there was too much "heat" to keep the weapon in his cell. Terflinger told ████ to hide the weapon in a crevice under the pod stairwell (common area).



████ claims the more he talked with Terflinger, the more disenchanted he became with some of the politics that were going on with the Brand and the NLR. Terflinger informed ████ that some of the things that Miley was saying were not true. For example, Miley is not second in command with the Brand; however, he is on the Council. Terflinger told ████ that the NLR is "allowed to be associated with the AB; however, there is only one "Tip" and that is the Brand (AB)." ████ claims that he and Terflinger got into an argument over the FTBs. ████ agreed that the FTB's needed to be dealt with; however, ████ also believed the lower level AB's needed to show the NLRs more respect. Terflinger claimed that a lot of the AB's viewed all NLR's as FTB's. Terflinger further stated that many AB's believe that no NLRs should get respect until all of the FTB's are gone. ████ claims their argument left no hard feelings.

████ claims that Terflinger was always discussing his plans once he ████ and ████ paroled. ████ claims Terflinger's big moneymaking plans involved selling drugs. ████ did not like the idea because of the number of people involved. ████ expressed his concerns to Terflinger. ████ was trying to push the idea of robbing drug dealers, or just committing robberies, because large amounts of money could be collected without having to sell drugs for a long period of time. Terflinger wanted ████ and ████ to set up criminal activities/structure known as "Cells."

████ describes "Cells" as follows: Upon ████'s and ████'s release, they would each have two "Lieutenants" working under them. The two Lieutenants would be in charge of a crew of street level criminals, organizing drug dealing, robberies, burglaries, violent crimes, etc. The Lieutenants would collect money from the street level criminals and, in turn, ████ and ████ would collect money from the Lieutenants. ████ and ████ would send the money to AB members, or to put into a "Bank," which would be used for NLR or AB members who were being released on parole and needed money. ████ claims as for carrying out hits for the NLR or AB, the street level criminals would not be used for this; the only people that could carry out hits would be the Lieutenants, ████, or ████. Each Lieutenant would be expected to "Groom" one of his street level contacts to eventually be promoted to a Lieutenant position in the event a Lieutenant was promoted to head his own "Cell."

Reviewed by

M. D. Castellaw
Debrief of ▆▆▆▆▆▆▆▆
Page 11

CONFIDENTIAL

According to ▆▆▆ any information coming from an incarcerated AB member would be sent via legal mail. Terflinger told ▆▆▆ to hire a lawyer, and have this lawyer send a few legitimate legal letters to the incarcerated member. Then, when they (▆▆▆▆▆▆▆▆▆▆ wanted to create and send some "Hot" mail to the prison, they were to create and use the same letterhead utilized by the attorney. Terflinger claimed that if CDC were to question the validity of the letter, the address would check out. Also, if CDC were to call the lawyer to see if the inmate had retained the lawyer that, too, would appear legitimate. ▆▆▆▆ claims Terflinger was very upset with Paul SCHNEIDER, ▆▆▆▆ a.k.a. "Cornfed," for keeping letters from Attorneys Noel and Knoeller, because Terflinger felt that the letters exposed the fact that AB's use legal mail to send and receive information.

▆▆▆ claims Terflinger became very comfortable with him and ▆▆▆▆ Terflinger began discussing more serious issues such as bomb-making, and how much information was available on the Internet. Terflinger suggested that they could hook up with some separatist groups in Idaho. ▆▆▆ claims that every time a television show came on Terflinger would call down to them and tell them to "check it out." Terflinger suggested that they should check out a United States Army book titled "▆▆▆▆▆▆," to learn how to make explosives; however, ▆▆▆ claims that Terflinger never mentioned a specific target.

▆▆▆ spoke to Terflinger regarding the rumors surrounding PeeWee (▆▆▆▆ ▆▆▆▆ that "Blue" Joseph Lowery and James MAGEE, ▆▆▆▆ a.k.a. Jimmy/Jimmy Mac, had told him (Terflinger) about an incident at Calipatria State Prison, where PeeWee had an argument with another inmate. Other NLRs and "Woods" told Pee Wee he needed to bring a weapon to the yard and, "take care of business." However, PeeWee did not bring a weapon to the yard and was subsequently attacked. (▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

Terflinger told ▆▆▆ that he had already brought questions about PeeWee to Miley's attention. Terflinger claims that Miley defended PeeWee and said that Jimmy Magee was lying about McMahon. Terflinger asked ▆▆▆ to get at Miley and let him know what he had heard about McMahon, then Miley would know the accusations against McMahon were not just coming from a disgruntled AB member. Additionally, Terflinger wanted ▆▆▆ to tell Miley he wanted McMahon tested on the streets.

According to Terflinger, once ▆▆▆McMahon, Loncar, and ▆▆▆all paroled, Loncar would receive the name and address of an intended victim (someone targeted for death). Terflinger again stated that he wanted McMahon tested; therefore, McMahon had to be the one doing the actual killing. ▆▆▆told Terflinger that he was not comfortable doing anything with PeeWee (▆▆▆▆) because of all the things he had heard about PeeWee. According to ▆▆▆, Terflinger told him that if McMahon got shaky and did not carry out the required hit, then ▆▆▆as to "Do what he had to do" (kill the intended victim and Pee Wee ▆▆▆▆). ▆▆▆ reports that this order surprised him because Terflinger had previously told him that he could not harm McMahon because he (▆▆▆ was not a member of the Brand. ▆▆▆ further states that McMahon will be

Reviewed by ▆▆▆▆▆▆▆

Confidential                    CONFIDENTIAL

122594

CONFIDENTIAL

"hit" anyway, once the AB finds out that he was heard saying, "Fuck the Brand." Terflinger told that John STINSON, C-40154, a.k.a. "Youngster," is the only person who will know that the above-mentioned inmates were carrying out AB objectives.

In May 2002, received a letter from Miley indicating that he was going to be put up for membership in the Brand. At that point Terflinger began discussing AB politics and history in greater detail with Terflinger told about Joseph HAYES', D-05432, a.k.a. "Joey," failed attempt to kill Gaven SHINE, 2, a.k.a. "Irish." The failed attempt was attributed to Hayes not having a weapon. notes that Terflinger was furious when Hayes failed to kill Shine. However, Hayes was not placed in bad standing with the AB, because Hayes was told he would have to "make it up." Reportedly, Hayes made up for his error by stabbing somebody "down south." believes this to be true because while Terflinger and Hayes were both out to court in Tehachapi, California, Terflinger and Hayes were housed together for a night, and if Hayes were in trouble, Terflinger would have taken the opportunity to kill Hayes at that time.

According to Terflinger has the reputation of not bringing anyone into the AB himself. Usually, if Terflinger liked someone he would school them, and then tell them to associate with lower ranking Brand members. Then, one of the lower ranking members would actually put the person up for membership. This practice relieves Terflinger of having to assume responsibility for any unfavorable actions of the new member.

Terflinger told that Elliot Scott GRIZZLE, H-10106, a.k.a. "Rascal," sponsored Rob Johnson's membership into the AB. In early 2002, Terflinger told that inmates Rob JOHNSON, .k.a. "Rob," Daniel BARTOSH, a.k.a. "Danny," and Kenny JOHNSON, .k.a. Kenwood had just earned membership into the AB.

In February 2000, Evans told that he had just received a letter from Blue Stanton (Russell STANTON, a.k.a. "Blue") in which Stanton stated he had received "That position on the ranch," meaning he had just been given membership in the Brand (AB). claims when he told Terflinger what he had heard, Terflinger told him he had never heard of the guy. Terflinger and later learned that "Cornfed Schneider" had brought "Blue into the AB," so Terflinger was in the process of contacting Schneider when he received word from two lawyers who told Terflinger that "Cornfed" had "flipped" (became an informant) into the federal system. claims Stanton's membership had not been confirmed. claims Joseph LOWERY, , a.k.a. "Blue" was also up for membership w

Terflinger showed a picture of a woman named Janet MEYERS, who Terflinger claims testified against death row inmate Curtis PRICE, , a.k.a. "Baby Curt." Terflinger further stated that Meyers still lives in , and she is a possible target for either or to kill. Terflinger told that if he should ever commit a murder for the AB

Reviewed by

M. D. Castellaw
Debrief of ▮▮▮▮▮▮▮▮▮
Page 13

CONFIDENTIAL

it was to be extremely brutal, i.e., dismember the body, burn AB on the forehead, or repeatedly return to the body and dump more lye on it in an attempt to speed up the decomposition.

Terflinger told ▮▮▮▮ that if San Quentin death row inmate Baby Curt is executed, the AB policy is three CDC Administrators or politicians will be killed. Terflinger told ▮▮▮▮ on several occasions that he wanted administrative level CDC employees targeted. Terflinger claimed that he did not want Correctional Officers killed because they are just doing their jobs. ▮▮▮▮ reports that Terflinger had stated on several occasions that PBSP Warden, ▮▮▮▮▮▮▮ and PBSP Chief Deputy Warden, ▮▮▮▮▮▮▮▮▮▮ are two prime targets. Terflinger believes they are responsible for all the new restrictions that are being placed on SHU inmates. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Terflinger suggested to ▮▮▮▮ that if explosives were hidden in an ambulance that would be an easy way to blow up a State building, because an ambulance driving right up to a building's door would not alarm anyone.

▮▮▮▮ contends Terflinger has a couple of people who write to him, but ▮▮▮▮ is unaware of any real moneymaking schemes involving Terflinger. ▮▮▮▮ does not believe Terflinger currently has anyone living within the community who will carry out AB missions. However, ▮▮▮▮ states that in 2004, Terflinger will have the following inmates carry out AB/NLR objectives upon their release from PBSP.



Loncar will be expected to organize business on the street. Terflinger instructed ▮▮▮▮ to tell Loncar he would be in charge of the San Fernando Valley. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

pushing the issue that McMahon be tested (i.e., he needs to kill for the AB). ▮▮▮▮ Terflinger is McMahon fails, he will be killed. ▮▮▮▮ claims that if

Reviewed by ▮▮▮▮▮▮▮

CONFIDENTIAL

122596

105

M. D. Castellaw
Debrief of ▮▮▮▮▮
Page 14

CONFIDENTIAL

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ reports that Allendorf is very close to Terflinger, and ▮▮▮▮ knows that Allendorf has been instructed to carry out missions for Terflinger.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ claims that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Terflinger added a few of his own agendas and authorized Wood to work under the Brand name. ▮▮▮▮ claims that Wood has been instructed to lay low for awhile. Then, Wood is to begin taxing local drug dealers for the AB. Wood is required to find out who the customers of the drug dealer's are. If they own or manage a business, Wood is to pressure/manipulate them into hiring AB or NLR members/associates for employment, upon their release from prison. In ▮▮▮▮▮▮

at the same time he (▮▮▮▮) was and he would put them in touch. Terflinger told ▮▮▮▮ that Eric would be out Eric had already done some things on the PBSP mainline for the Brand

Reviewed by ▮▮▮▮▮▮▮▮

Confidential                         CONFIDENTIAL

106

122597

M. D. Castellaw
Debrief of
Page 15

CONFIDENTIAL



**Drug Activity:**

CONFIDENTIAL

167

122598

M. D. Castellaw
Debrief of
Page 16

CONFIDENTIAL

bise.

Cl[...]                                                                              t not

[...]otice
a
p or

A[...]
c[...]
th[...]
pe[...]
ou[...]

M[...]

Terflinger instructed [redacted] to contact Rob Johnson via "Sparky's" (Phillip Evans) mail drop, to
let Rob Johnson know that he had been approved for membership into the Brand.

Reviewed by

Confidential                           CONFIDENTIAL

108

M. D. Castellaw
Debrief of
Page 17

CONFIDENTIAL



...claims inmate Michael BRIDGE's, _____ a.k.a. "Snake," lawyer (unable to identify) sent Terflinger several copies of the February 2000, Grand Jury NLR Rico Indictments report, along with a request asking Terflinger for advice on debunking any of the informant's information. Terflinger gave _____ copy of the report. ...



Reviewed by

Confidential

CONFIDENTIAL

109

122600

M. D. Castellaw
Debrief of
Page 18

CONFIDENTIAL



Reviewed by

Confidential

CONFIDENTIAL

122601

110

M. D. Castellaw
Debrief of
Page 19



CONFIDENTIAL



**Confidentiality:**

The following is an index of persons referenced in this report. This report should be placed in the Central Files of the persons who have been identified as being or having been under the supervision of the California Department of Corrections.

| CODE | MEANING | | CODE | MEANING |





Confidential

CONFIDENTIAL

M. D. Castellaw
Debrief of
Page 20

CONFIDENTIAL



112

122603

M. D. Castellaw
Debrief of █████████
Page 21

CONFIDENTIAL



Page Locator Index of Persons Referenced in this Report:



M. D. Castellaw
Debrief of
Page 22

CONFIDENTIAL



Confidential

122605

M. D. Castellaw
Debrief of ▇▇▇▇▇
Page 23

CONFIDENTIAL



**Reliability:**

Per CCR, Title 15, Section 3321(2), the informant is considered reliable if another confidential source has independently provided information. In this instance, as documented by the confidential file, another informant has provided information that is consistent with and supports the information provided by this informant. Corroboration is documented throughout ▇▇▇▇ debrief report.



Confidential

CONFIDENTIAL

115

122606

M. D. Castellaw
Debrief of
Page 24

CONFIDENTIAL

**Conclusion:**

[redacted]

**Statement of Confidentiality:**

[redacted]

C. MCGUYER
Correctional Sergeant
Institutional Gang Investigations

M. RANDOLPH
Correctional Lieutenant
Institutional Gang Investigations

NOTED/APPROVED

RUBEN ROMAN
Special Agent
Special Services Unit

Reviewed by

CONFIDENTIAL

Confidential

116

122607

DEBRIEF OF INMATE ███████████████

*Maurice Mathews*

**8/12/99 – 11/24/99 ACTIVITY CIM PALM HALL:**

Subject says when he arrived at CIM he went to Palm Hall, AB members, *'Blinky' Griffith (Robert Griffin, B26484)* from *OC,* *'Turtle' Harper (John Harper,* ███████ from ████ and *'Hillbilly' (Robert Peterson,* ███████*) from* ███████ were there.

Confidential 

117

122608

DEBRIEF OF INMATE ▓▓▓▓▓▓▓▓▓▓▓

Subject says he was on the first tier and he was able to talk to 'Blinky'. Subject says they were all going to the yard and he was on walk alone status for 30 days, when he first got there.

Subject told 'Blinky' he was planning to go to the yard after his 30 days was up. Subject says he told 'Blinky' he was one of the NLR who started "FTB" along with 'Mikey' Hikes. Subject says 'Blinky' told him he respected him for telling him the truth and not locking up. 'Blinky' told him it wasn't his house, it was 'Turtle's' but he would get at 'Turtle' and ask him to give Subject a pass. Subject says they did give him a pass and he did go to the yard. Subject says after a couple of weeks on the yard 'Turtle' asked him if he was interested in becoming "Brand" (AB). Subject said he feared if he said no they were going to kill him, so he said yes. 'Turtle' then told him he had to kill 'Mikey' Hikes to show his loyalty to the Brand. Subject says 'Turtle', 'Hillbilly' and he talked about it during every scheduled yard time and 'Blinky' never took part in the discussions. Subject says 'Turtle' told him he wanted him to torture 'Mikey' and then cut off his head and put it on a stick.

Subject says in October 1999 'Bucket Head' (Griffin) disrespected 'Thrasher' (Billy McConnell, ▓▓▓▓▓ from Long Beach, out on the yard, 'Turtle' told 'Thrasher' to stab him so he did. 'Thrasher' stabbed 'Bucket Head' in the back of his neck. Subject says with the plan to kill 'Mikey' now on him, he just kicked back and waited. Subject says nothing else happened and he was transferred to CSP - Corcoran SHU.



Report of Interview with John Harper on May 31, 2006 and August 10,2006, by Special Agent Michael Halualani, Bureau of Alcohol, Tobacco, Firearms and Explosives, Los Angeles, California.  Mr. Harper stated the following:

He is a member of the Aryan Brotherhood prison gang.

That in or about 1993, while he was housed at Pelican Bay State Prison, he was told by Aryan Brotherhood member Todd Ashker that Robert "Blinky" Griffin, one of the original members of the California commission, wanted Aryan Brotherhood member Arthur Ruffo murdered.  He had also been told by other Aryan Brotherhood members that Griffin was actively campaigning to have Ruffo murdered.

That a few months prior to the murder of Ruffo, he was in the law library at Pelican Bay State Prison with John Stinson and Richard Terflinger, who were two of the three members of the California commission.  At this time, he heard Stinson and Terflinger order AB member Brian Healy to murder Ruffo.

He was told that the California commission had ordered the murder of Ruffo because of ongoing problems between Ruffo and other Aryan Brotherhood members. Furthermore, that the rules of the Aryan Brotherhood required the California commission, at the time comprised of Stinson, Terflinger and David Chance, to approve and order the murder of Ruffo. He added that it was common knowledge that their was "bad blood" between Griffin and Ruffo stemming back to the early days of the Aryan Brotherhood.

In 1999 or 2000, he was housed at Palm Hall with Griffin. Griffin told him that he was "glad" that Ruffo had been killed.

Report of Interview with John Harper on May 31, 2006 and August 10, 2006, by Special Agent Michael Halualani, Bureau of Alcohol, Tobacco, Firearms and Explosives, Los Angeles, California. Mr. Harper stated the following:

He is a member of the Aryan Brotherhood prison gang.

After he paroled from the California Department of Corrections in 2000, he received a letter from California commission member John Stinson. He was told by Stinson and California commission member Richard Terflinger that upon his release from prison he was to begin "acting like" Aryan Brotherhood member Ronald Slocum.

That is conveying information between the members of the Federal Commission and California Commission. Also, he was to relay the instructions of the California commission to AB members and associates in prison and out of prison.

He was also to coordinate and organize members and associates of the Aryan Brotherhood who were released from prison to conduct illegal activities for the organization. He was supposed to provide newly released members and associates with firearms, lists of businesses and narcotics traffickers that can be targets for extortion or robbery, and businesses that will assist in the laundering of money obtained by the Aryan Brotherhood.

He arranged a meeting with Aryan Brotherhood associate Thomas Hampton so that Hampton could begin conducting illegal activities for the benefit of the Aryan Brotherhood. He planned on having Hampton begin trafficking in narcotics and "taxing" narcotics traffickers in order to obtain money for the Aryan Brotherhood. Finally, that Hampton did not show up for the planned meeting at the United States Post Office in Malibu.

Confidential

120

122612

Report of Interview with John Harper on May 31, 2006 and August 10, 2006, by Special Agent Michael Halualani, Bureau of Alcohol, Tobacco, Firearms and Explosives, Los Angeles, California.  Mr. Harper stated the following:

He is a member of the Aryan Brotherhood prison gang.

That approximately five months prior to the murder of Aryan Brotherhood Aaron Marsh, he was in the law library at Pelican Bay State Prison with John Stinson and Richard Terflinger, who were two of the three members of the California commission.  At this time, he was told by Stinson and Terflinger that Marsh was to be murdered.

A few weeks prior to the murder of Marsh, he was in the law library with Stinson and Terflinger.  At this time, Stinson and Terflinger to him have Marsh move out of his cell because they wanted Marsh to cell with Aryan Brotherhood member Gary Littrell so that Littrell could murder Marsh. After speaking with Stinson and Terflinger in the law library he returned to his cell and told Marsh to "move out".  Within a few days, Marsh moved into a cell with Littrell.

Following the murder of Marsh, he spoke with Littrell and Aryan Brotherhood member Scott Grizzle about a defense if they were charged with the murder of Marsh.  He told Littrell to "lie" and claim self defense as the reason he killed Marsh.

<u>CERTIFICATE OF SERVICE</u>

I, <u>Tonia L. Johnson</u>, declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy of:

**GOVERNMENT'S OPPOSITION TO DEFENDANT GRIFFIN'S MOTION IN LIMINE RE FED. R. EVID §§ 404(b) AND 403; MEMORANDUM OF POINTS AND AUTHORITIES** service was:

[ ] Placed in a closed envelope, for collection and interoffice delivery addressed as follows:

[X] Placed in a sealed envelope for collection and mailing via United States Mail, addressed as follows:

**SEE ATTACHED SERVICE LIST**

[] By hand delivery

[ ] By facsimile as follows:

[ ] By messenger as follows:

[ ] By federal express as follows:

This Certificate is executed on **October 4, 2006**, at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.

TONIA L. JOHNSON

122



<u>U.S. v. ROBERT LEE GRIFFIN, ET AL.</u>,
CR NO. 02-938-RGK

Joseph F. Walsh, Esq. (ROBERT GRIFFIN)
316 West Second Street, Suite 1200
Los Angeles, CA 90012
Email: Attyjoewalsh@aol.com

Michael M. Crain, Esq. (ROBERT GRIFFIN)
P.O. Box 3730
Santa Monica, CA 90408
Email: Michaelmcrain@aol.com

Knut Johnson, Esq. (DAVID CHANCE)
1010 Second Avenue, Suite 1850
San Diego, CA 92101
Email: knut@knutjohnson.com

John Cotsirilos, Esq. (DAVID CHANCE)
2442 Fourth Avenue
San Diego, CA 92101
Email: Mccabeatty@aol.com

Paul Potter, Esq. (JOHN STINSON)
Potter, Cohen & Samulon
3852 East Colorado Blvd.
Pasadena, CA 91107
Email: pepsquire@earthlink.net

Terrence Bennett, Esq. (JOHN STINSON)
P.O. Box 709
Pasadena, CA 91102-0709
Email: benedictus@earthlink.net

Stanley Perlo, Esq. (RICHARD TERFLINGER)
250 West Ocean Blvd., Suite 1714
Long Beach, CA 90802
Email: sperloesq@aol.com

Matthew J. Lombard, Esq. (RICHARD TERFLINGER)
316 West Second Street, Suite 1202
Los Angeles, CA 90012
Email: mlombard@lombardlaw.net



1   DEBRA WONG YANG
    United States Attorney
2   THOMAS P. O'BRIEN
    Assistant United States Attorney
3   Chief, Criminal Division
    J. MARK CHILDS (Cal. State Bar # 162684)
4   Assistant United States Attorney
        1400 United States Courthouse
5       312 North Spring Street
        Los Angeles, California 90012
6       Telephone: (213) 894-2433
        Facsimile: (213) 894-0142
7       Mark.Childs@usdoj.gov

8   Attorneys for Plaintiff
    UNITED STATES OF AMERICA

9

10                  UNITED STATES DISTRICT COURT

11            FOR THE CENTRAL DISTRICT OF CALIFORNIA

12
    UNITED STATES OF AMERICA,    ) No. CR 02-938-RGK
13                               )
                 Plaintiff,      )
14                               )
            v.                   ) STIPULATION RE: JOINT SUBMISSION OF
15                               ) STATEMENT OF THE CASE TO BE READ TO
    JOHN STINSON, et al.,        ) THE PROSPECTIVE JURORS
16                               )
                 Defendants.     )
17                               )
                                 )
18                               )
                                 )
19                               )

20        Plaintiff United States of America, by and through its

21   counsel of record, the United States Attorney's Office for the

22   Central District of California, and defendants, by and through

23   their below counsel, hereby stipulate to request that the Court

24   read the attached statement of the case to the prospective

25   jurors.  The attached statement is a summary of the indictment.

26   For the convenience of the Court, the statement includes

27   ///

28

EXHIBIT B

1  references to the corresponding paragraphs of the First

2  Superseding Indictment.

3  DATE: September 28, 2006 Respectfully submitted,

4                              DEBRA WONG YANG
                             United States Attorney
5

6

7                              J. MARK CHILDS
                             Assistant United States Attorney

8                              Attorneys for Plaintiff
9                              United States of America

10 DATE: September 28, 2006

11                             PAUL POTTER

12                             Attorney for defendant
13                             JOHN STINSON

14 DATE: September 28, 2006

15                             JOSEPH WALSH

16                             Attorney for defendant
17                             ROBERT GRIFFIN

18 DATE: September 28, 2006

19                             JOHN COTSIRILOS

20

21                             Attorney for defendant
                             DAVID CHANCE

22

23

24

25

26

27

28

                              2

1

2

3                    UNITED STATES DISTRICT COURT

4              FOR THE CENTRAL DISTRICT OF CALIFORNIA

5    UNITED STATES OF AMERICA,    )    CR 02-938(E)
                                  )
6              Plaintiff,         )
                                  )    **JOINT SUBMISSION RE:**
7              v.                 )    **SUMMARY OF INDICTMENT TO BE**
                                  )    **READ TO THE PROSPECTIVE JURORS**
8    JOHN WILLIAM STINSON,        )
      aka "Youngster,"            )
9     aka "The Youngest,"         )
     ROBERT LEE GRIFFIN, and      )
10    aka "Blinky,"               )
      aka "McGrif,"               )
11   DAVID ALLEN CHANCE,          )
                                  )
12             Defendants.        )

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT TWO

[18 U.S.C. § 1962(d)]

65.  Paragraphs One through Fifteen of the Introductory Allegations of this Indictment are:

INTRODUCTORY ALLEGATIONS

THE RACKETEERING ENTERPRISE

1.  At all relevant times, defendants JOHN WILLIAM STINSON, aka "Youngster," aka "The Youngest," ROBERT LEE GRIFFIN, aka "Blinky," aka "McGrif," DAVID ALLEN CHANCE, and others, were members and associates of a criminal organization whose members and associates engaged in, among other things, murder, attempted murder, conspiracy to commit murder, extortion, robbery, and narcotics trafficking.  At all relevant times, this organization, which is known as "the Aryan Brotherhood," operated in the Central District of California and elsewhere.  The Aryan Brotherhood and the individuals who associate with it for criminal purposes constitute an "enterprise" as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, who engaged in, and whose activities affected, interstate and foreign commerce.  The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

GENERAL BACKGROUND

2.  The Aryan Brotherhood is a powerful gang that controls drug distribution and other illegal activity within portions of the California and federal prison systems and has worked to expand its influence over illegal activity conducted outside of

1   prison.

2       3.    The Aryan Brotherhood was formed in the California

3   prison system in approximately 1964 by white inmates who wanted

4   to gain power and authority in prison by forming a race-based

5   gang.  While it is not necessary to be white to join the Aryan

6   Brotherhood, nearly all of its members are white.  All Aryan

7   Brotherhood members are male.

8       4.    Although the Aryan Brotherhood began in the California

9   prison system, it has spread to other prison systems.  During the

10  early 1970's, members of the Aryan Brotherhood who had entered

11  the federal prison system formed a faction of the Aryan

12  Brotherhood in the federal prison system.  Although the

13  California and federal factions have distinct membership and

14  leadership, both are part of one organization called the Aryan

15  Brotherhood.  If a member of either faction enters the prison

16  system controlled by the other faction, that member automatically

17  becomes a member in his new prison system.  Although there are

18  Aryan Brotherhood members in other prison systems, the California

19  and federal factions are the Aryan Brotherhood's primary

20  factions.

21      5.    In addition to Aryan Brotherhood members in prison,

22  there are members who have been released from prison.  When Aryan

23  Brotherhood members leave prison, they are required to remain

24  loyal to the Aryan Brotherhood and to work to further the goals

25  of the Aryan Brotherhood while in the community.

26      6.    The Aryan Brotherhood enforces its rules and promotes

27  discipline among its members and associates by murdering,

28  attempting to murder, conspiring to murder, assaulting, and

1  threatening those who violate the enterprise's rules or pose a
2  threat to the enterprise.  The Aryan Brotherhood also uses murder
3  and the threat of murder to maintain a position of power within
4  the California and federal prison systems.  Inmates and others
5  who do not follow the orders of the Aryan Brotherhood are subject
6  to being murdered, as is anyone who uses violence against an
7  Aryan Brotherhood member.  Inmates who cooperate with law
8  enforcement authorities are also subject to being murdered.

9  <u>MEMBERSHIP</u>

10     7.  Aryan Brotherhood members are recruited from the prison
11 population.  In order to be considered for membership in the
12 Aryan Brotherhood, an inmate must be sponsored by a member.  Once
13 an inmate is sponsored, he generally must serve a term of
14 "probation" while his conduct is observed by the members of the
15 Aryan Brotherhood.  If the inmate's conduct during the
16 probationary period is satisfactory, he is admitted into the
17 Aryan Brotherhood.  Once accepted as an Aryan Brotherhood member,
18 the inmate must swear an oath of loyalty, pledging his life to
19 the Aryan Brotherhood.

20     8.  Members are required to follow all orders of higher-
21 ranking members.  In particular, members are required, when
22 ordered, to kill without hesitation.  They are also required to
23 give false testimony in court on behalf of other members.
24 Members who do not fulfill their obligations to the Aryan
25 Brotherhood are subject to being murdered.

26     9.  In addition to members, the enterprise includes those
27 closely affiliated with the Aryan Brotherhood, who are called
28 "associates."  Associates are required to follow the orders of

1  Aryan Brotherhood members.  Associates who do not fulfill their

2  obligations to the Aryan Brotherhood are subject to being

3  murdered.

4                        LEADERSHIP STRUCTURE

5       10.  Originally, the Aryan Brotherhood did not have a

6  leadership structure, but instead was governed by consensus.  In

7  approximately 1980, with the blessing of the California faction

8  of the Aryan Brotherhood, the members of the federal faction

9  formed a three-man Federal "Commission" with authority over the

10 activities of the federal faction.  In approximately 1993, the

11 members of the Federal Commission formed a "council," reporting

12 to the Federal Commission, with authority over day-to-day

13 operations of the federal faction.

14      11.  In approximately 1982, inmates in the California

15 faction of the Aryan Brotherhood met and formed a 12-man

16 California Council to govern the faction's affairs.  The members

17 of the California Council then formed a three-man California

18 Commission with authority over the California Council and all

19 other California Aryan Brotherhood members.  The number of

20 members on the California Council has since been reduced to six.

21      12.  In both the California and federal factions of the

22 Aryan Brotherhood, the commission in charge of a particular

23 faction has final authority over all matters involving that

24 faction.  A murder of or assault on a member may be carried out

25 only if it is authorized by the commission of the faction to

26 which the member belongs, although the murder of a nonmember does

27 not require commission approval.

28

                                  5

## PURPOSES OF THE ENTERPRISE

13.   The members of the Aryan Brotherhood and their associates constitute an enterprise, referred to below as "the Aryan Brotherhood," "the Aryan Brotherhood criminal enterprise," or "the enterprise."   The word "member" as used below refers to a full-fledged member of the Aryan Brotherhood.   Both members and associates of the Aryan Brotherhood are participants in the Aryan Brotherhood criminal enterprise.

14.   The purposes of the Aryan Brotherhood criminal enterprise include, but are not limited to, the following:

a.   Controlling illegal activities, such as narcotics trafficking, gambling, and extortion, within the California and federal prison systems.

b.   Preserving, protecting, and expanding the power of the Aryan Brotherhood through the use of intimidation, violence, threats of violence, assaults, and murders.

c.   Promoting and enhancing the Aryan Brotherhood and the activities of its members and associates.

## THE MEANS AND METHODS OF THE ENTERPRISE

15.   Among the means and methods by which the defendants and their co-racketeers conduct and participate in the conduct of the affairs of the Aryan Brotherhood criminal enterprise are the following:

a.   Members of the Aryan Brotherhood use the Aryan Brotherhood criminal enterprise to commit, and attempt and threaten to commit, acts of violence, including murder and assault, to protect and expand the enterprise's criminal operations.

6

b.   Members of the Aryan Brotherhood use the Aryan
Brotherhood criminal enterprise to promote a climate of fear
through violence and threats of violence.

c.   Members of the Aryan Brotherhood promulgate rules
to be followed by all participants in the Aryan Brotherhood
criminal enterprise, including the rule that a participant in the
enterprise may not act as an informant for law enforcement
authorities.

d.   To enforce the rules of the Aryan Brotherhood
criminal enterprise and to promote discipline, the members of the
Aryan Brotherhood use the enterprise to murder, attempt to
murder, assault, and threaten those participants in the
enterprise and others who violate rules or orders, or who pose a
threat to the enterprise.

e.   To generate income, participants in the Aryan
Brotherhood criminal enterprise engage in illegal activities
under the protection of the enterprise, including narcotics
trafficking, bookmaking, extortion, robbery, and contract murder.

f.   To generate income, participants in the Aryan
Brotherhood criminal enterprise require that white inmates
engaged in profit-making activities in prison pay "taxes" to the
Aryan Brotherhood under threat of violence.

g.   To generate income, participants in the Aryan
Brotherhood criminal enterprise who are not in prison require
that white narcotics dealers and other white criminals pay
"taxes" to the Aryan Brotherhood under threat of violence.

h.   To perpetuate the Aryan Brotherhood criminal
enterprise, participants'in the enterprise attempt to conceal

7

1   from law enforcement the existence of the Aryan Brotherhood, the
2   identity of its participants, and the ways in which it conducts
3   its affairs.

4          I.    To keep secret the activities of the Aryan
5   Brotherhood criminal enterprise, participants in the enterprise
6   communicate using codes and hidden messages, and use a network of
7   Aryan Brotherhood members and associates outside of prison to
8   relay messages to incarcerated members and associates.

9          66.    From a date unknown to the Grand Jury and
10  continuing until at least July 25, 2002, within the Central
11  District of California and elsewhere, defendants JOHN WILLIAM
12  STINSON, aka "Youngster," aka "The Youngest," ROBERT LEE GRIFFIN,
13  aka "Blinky," aka "McGrif,"  DAVID ALLEN CHANCE, and others known
14  and unknown, being persons employed by and associated with the
15  Aryan Brotherhood criminal enterprise as described above and as
16  defined in Title 18, United States Code, Section 1961(4), which
17  enterprise was engaged in, and the activities of which affected,
18  interstate and foreign commerce, unlawfully, willfully, and
19  knowingly combined, conspired, confederated, and agreed together
20  and with each other to violate Title 18, United States Code,
21  Section 1962(c), that is, to conduct and participate, directly
22  and indirectly, in the conduct of the affairs of the enterprise
23  through a pattern of racketeering activity, as that term is
24  defined in Title 18, United States Code, Sections 1961(1) and
25  1961(5), consisting of multiple acts involving murder, and
26  distribution of controlled substances, including heroin,
27  methamphetamine, and cocaine.  It was a further part of the
28  conspiracy that the defendants agreed that a conspirator would

1    commit at least two acts of racketeering in the conduct of the

2    affairs of the enterprise.

3                              OVERT ACTS

4        67.   In furtherance of the conspiracy and to accomplish the

5    objects of the conspiracy, the defendants and their

6    coconspirators committed the following overt acts on the dates

7    set forth below:

8                      Organization and Membership

9            1)    In or about 1964, a group of inmates in the

10   California prison system formed the Aryan Brotherhood prison

11   gang.

12           2)    In or about 1973, a group of inmates in the

13   federal prison system formed a federal faction of the Aryan

14   Brotherhood prison gang.

15           3)    In or about January 1978, defendant ROBERT LEE

16   GRIFFIN sponsored Clifford Smith for membership in the Aryan

17   Brotherhood.

18           4)    In or about May 1978, defendants JOHN WILLIAM

19   STINSON, RICHARD LLOYD TERFLINGER, ROBERT LEE GRIFFIN, and RONALD

20   BOYD SLOCUM, among others, voted to allow Clifford Smith to

21   become a member of the Aryan Brotherhood.

22           5)    In or about 1980, defendant BARRY BYRON MILLS and

23   other Aryan Brotherhood members formed a three-member "Federal

24   Commission," including defendant BARRY BYRON MILLS, to govern the

25   activities of the federal faction of the Aryan Brotherhood.

26           6)    In or about February 1982, in the Central District

27   of California, defendants JOHN WILLIAM STINSON, RICHARD LLOYD

28   TERFLINGER, ROBERT LEE GRIFFIN, RONALD BOYD SLOCUM, and EDWARD

                                     9

1  TYLER BURNETT, and others, met and formed a 12-man "California
2  Council," including defendants JOHN WILLIAM STINSON, RICHARD
3  LLOYD TERFLINGER, ROBERT LEE GRIFFIN, and RONALD BOYD SLOCUM, to
4  govern the activities of the California faction of the Aryan
5  Brotherhood.

6          7)   In or about February 1982, in the Central District
7  of California, the members of the California Council met and
8  formed a three-man "California Commission," including defendant
9  ROBERT LEE GRIFFIN, with authority over the council and all other
10  activities of the California faction of the Aryan Brotherhood.

11          8)   On or about March 13, 1984, in the Central
12  District of California and elsewhere, defendant JOHN WILLIAM
13  STINSON sent a letter to Pete Pulos informing him that Rick Rose
14  had dropped out of the Aryan Brotherhood.

15          9)   In or about September 1985, in the Central
16  District of California and elsewhere, defendant TYLER DAVIS
17  BINGHAM assumed a position as one of the three federal
18  commissioners.

19          10)  In or about 1989, the members of the California
20  Commission, including defendant ROBERT LEE GRIFFIN, increased the
21  number of members of the California Commission from three to
22  four.

23          11)  In or about 1989, the members of the California
24  Commission, including defendant ROBERT LEE GRIFFIN, named
25  defendants JOHN WILLIAM STINSON and RICHARD LLOYD TERFLINGER to
26  the California Commission.

27          12)  In or about 1989, the members of the California
28  Commission, including defendant ROBERT LEE GRIFFIN, disbanded the

1  California Council.

2  13)  In or about 1990, in the Central District of
3  California, defendant EDWARD TYLER BURNETT sponsored Brian Healy
4  for membership in the Aryan Brotherhood.

5  17)  In or about 1994, the members of the California
6  Commission, including defendants JOHN WILLIAM STINSON, RICHARD
7  LLOYD TERFLINGER, and ROBERT LEE GRIFFIN, increased the number of
8  members of the California Commission from four to six.

9  18)  In or about 1994, the members of the California
10  Commission, including defendants JOHN WILLIAM STINSON, RICHARD
11  LLOYD TERFLINGER, and ROBERT LEE GRIFFIN, named defendant DAVID
12  ALLEN CHANCE and James Pendleton to the California Commission.

13  19)  In or about 1994, defendant JOHN WILLIAM STINSON
14  sponsored defendant ELLIOTT SCOTT GRIZZLE for membership in the
15  Aryan Brotherhood.

16  20)  In or about 1994, Mark Glass sponsored defendant
17  GARY JOE LITTRELL for membership in the Aryan Brotherhood.

18  39)  In or about July 1999, defendants JOHN WILLIAM
19  STINSON and RICHARD LLOYD TERFLINGER approved the Aryan
20  Brotherhood membership of James Magee.

21  40)  In or about August 2000, the members of the
22  California Commission, including defendants JOHN WILLIAM STINSON,
23  RICHARD LLOYD TERFLINGER, and DAVID ALLEN CHANCE, decreased the
24  number of members of the California Commission from six to three.

25  41)  In or about August 2000, the California
26  Commission, including defendants JOHN WILLIAM STINSON, RICHARD
27  LLOYD TERFLINGER, and DAVID ALLEN CHANCE, re-formed the
28  California Council, changing the number of members from four to

11

1  six.

2      42)   In or about August 2000, the California

3  Commission, including defendants JOHN WILLIAM STINSON, RICHARD

4  LLOYD TERFLINGER, and DAVID ALLEN CHANCE, named defendant RONALD

5  BOYD SLOCUM, Marvin Stanton, James Pendleton, Dan Troxell, Dale

6  Bretches, and Philip Fortman to the California Council.

7

8      45)   On or about July 25, 2002, defendant DAVID ALLEN

9  CHANCE possessed a list of Aryan Brotherhood members and of

10 enemies of the Aryan Brotherhood who were to be killed.

11

12              Murder of Richard Barnes

13      54)   In or about February 1982, in the Central District

14 of California, the members of the California Council, including

15 defendants JOHN WILLIAM STINSON, RICHARD LLOYD TERFLINGER, ROBERT

16 LEE GRIFFIN, and RONALD BOYD SLOCUM, enacted an Aryan Brotherhood

17 rule that if a member of the Aryan Brotherhood became a witness

18 against the Aryan Brotherhood, a member of the witness' family

19 would be killed.

20      55)   In or about February 1982, in the Central District

21 of California, the members of the California Council, including

22 defendants JOHN WILLIAM STINSON, RICHARD LLOYD TERFLINGER, ROBERT

23 LEE GRIFFIN, and RONALD BOYD SLOCUM, decided to have a family

24 member of Aryan Brotherhood member Steven Barnes murdered because

25 Barnes had testified against a member of the Aryan Brotherhood.

26      56)   In or before February 1983, in the Central

27 District of California, the members of the California Council,

28 including defendants JOHN WILLIAM STINSON, RICHARD LLOYD

                              12

1  TERFLINGER, ROBERT LEE GRIFFIN, and RONALD BOYD SLOCUM, decided

2  that defendant ROBERT LEE GRIFFIN would make arrangements to

3  carry out the murder contract on a member of Steven Barnes'

4  family.

5          57)   In or before February 1983, in the Central

6  District of California, the members of the California Council,

7  including defendants JOHN WILLIAM STINSON, RICHARD LLOYD

8  TERFLINGER, ROBERT LEE GRIFFIN, and RONALD BOYD SLOCUM, decided

9  that Aryan Brotherhood member Curtis Price would be given the

10 opportunity to murder a member of Steven Barnes' family.

11         58)   In or before February 1983, in the Central

12 District of California, defendant ROBERT LEE GRIFFIN asked Curtis

13 Price to murder a member of Steven Barnes' family.

14         59)   In or before February 1983, in the Central

15 District of California, Curtis Price agreed to murder a member of

16 Steven Barnes' family.

17         60)   In or before February 1983, in the Central

18 District of California, defendant ROBERT LEE GRIFFIN arranged to

19 have firearms supplied to Curtis Price for use in murdering a

20 member of Steven Barnes' family.

21         61)   In or before February 1983, in the Central

22 District of California, defendant JOHN WILLIAM STINSON provided

23 defendant ROBERT LEE GRIFFIN with the address of Richard Barnes,

24 Steven Barnes' father.

25         62)   In or before February 1983, in the Central

26 District of California, defendant ROBERT LEE GRIFFIN gave Richard

27 Barnes' address to Curtis Price.

28         63)   On or about February 13, 1983, in the Central

13

District of California, Curtis Price murdered Richard Barnes by shooting him in the head.

### Murder of Thomas Lamb

64)   In or about February 1982, in the Central District of California, the members of the California Council, including defendants JOHN WILLIAM STINSON, RICHARD LLOYD TERFLINGER, ROBERT LEE GRIFFIN, and RONALD BOYD SLOCUM, decided to order that Aryan Brotherhood member Thomas Lamb be murdered for failure to carry out an order to commit a murder.

65)   On or about July 12, 1982, in the Central District of California and elsewhere, defendants JOHN WILLIAM STINSON and ROBERT LEE GRIFFIN sent a message to another member of the California Council saying that there was a plan in place to murder Thomas Lamb.

66)   In or about October 1988, defendant BARRY BYRON MILLS ordered defendant CLEO ROY to murder Thomas Lamb.

67)   On or about October 15, 1988, defendant CLEO ROY choked Thomas Lamb to death while defendant JOHN STANLEY CAMPBELL, JR., held Thomas Lamb's legs.

68)   On or about October 15, 1988, defendants CLEO ROY and JOHN STANLEY CAMPBELL, JR., placed a noose around Thomas Lamb's neck and hung him from shelves in his prison cell to make it appear that he had committed suicide.

### Murder of Stephen Clark

69)   On or before July 3, 1982, in the Central District of California, defendants JOHN WILLIAM STINSON and ROBERT LEE GRIFFIN, and others, decided to order that Aryan Brotherhood member Stephen Clark be murdered for disrespecting high-ranking

1  Aryan Brotherhood members.

2      70)  On or before July 3, 1982, in the Central District

3  of California, defendants JOHN WILLIAM STINSON and ROBERT LEE

4  GRIFFIN, and others, decided that the murder of Stephen Clark

5  would be carried out by Aryan Brotherhood member Clifford Smith.

6      71)  On or about July 3, 1982, in the Central District

7  of California, defendant ROBERT LEE GRIFFIN told Clifford Smith

8  to get a knife from defendant EDWARD TYLER BURNETT to be used to

9  murder Stephen Clark.

10      72)  On or about July 3, 1982, in the Central District

11  of California, defendant EDWARD TYLER BURNETT supplied Clifford

12  Smith with a knife to be used to murder Stephen Clark.

13      73)  On or about July 3, 1982, in the Central District

14  of California, Clifford Smith murdered Stephen Clark by stabbing

15  him to death.

16      74)  On or about July 12, 1982, in the Central District

17  of California and elsewhere, defendants JOHN WILLIAM STINSON and

18  ROBERT LEE GRIFFIN sent a message to another member of the

19  California Council explaining why Stephen Clark had been

20  murdered.

21                  Murder of Richard Andreasen

22      75)  In or before January 1983, in the Central District

23  of California, the members of the California Council, including

24  defendants JOHN WILLIAM STINSON, RICHARD LLOYD TERFLINGER, and

25  ROBERT LEE GRIFFIN, ordered that Aryan Brotherhood associate

26  Richard Andreasen be murdered because Andreasen had provided

27  information to law enforcement authorities.

28      76)  In or before January 1983, in the Central District

15

1  of California and elsewhere, defendant RONALD BOYD SLOCUM sent

2  word to the Federal Commission that Richard Andreasen was to be

3  murdered.

4      77)  In or before May 1983, in the Central District of

5  California, the members of the California Council, including

6  defendants JOHN WILLIAM STINSON, RICHARD LLOYD TERFLINGER, and

7  ROBERT LEE GRIFFIN, ordered Aryan Brotherhood associate Rick Rose

8  to murder Richard Andreasen.

9      78)  On or about May 24, 1983, in the Central District

10  of California, Rick Rose attempted to murder Richard Andreasen by

11  stabbing him.

12      79)  In or before October 1983, defendant BARRY BYRON

13  MILLS ordered Aryan Brotherhood member John Greschner to murder

14  Richard Andreasen.

15      80)  On or about October 6, 1983, John Greschner and

16  Aryan Brotherhood associate Ronnie Joe Chriswell murdered Richard

17  Andreasen by stabbing him to death.

18                  Attempted Murder of Jeffrey Barnett

19      81)  In or before June 1983, in the Central District of

20  California, defendant ROBERT LEE GRIFFIN ordered that Jeffrey

21  Barnett be murdered because Barnett's wife had refused to smuggle

22  narcotics into prison.

23      82)  On or about June 19, 1983, Aryan Brotherhood

24  associate Richard Woerner attempted to murder Jeffrey Barnett by

25  stabbing him.

26      83)  In or before March 1990, in the Central District

27  of California and elsewhere, defendant RONALD BOYD SLOCUM

28  informed defendant BARRY BYRON MILLS that the California

1  Commission wanted Jeffrey Barnett murdered.

2      84)  In or before March 1990, in the Central District
3  of California and elsewhere, defendant BARRY BYRON MILLS ordered
4  defendant RONALD BOYD SLOCUM to have defendants STEVEN WILLIAM
5  HICKLIN and CHRISTOPHER OVERTON GIBSON murder Jeffrey Barnett.

6      85)  In or before March 1990, in the Central District
7  of California, defendant RONALD BOYD SLOCUM ordered defendants
8  STEVEN WILLIAM HICKLIN and CHRISTOPHER OVERTON GIBSON to murder
9  Jeffrey Barnett.

10     86)  On or about March 13, 1990, in the Central
11 District of California, defendant CHRISTOPHER OVERTON GIBSON held
12 Jeffrey Barnett while defendant STEVEN WILLIAM HICKLIN repeatedly
13 stabbed Barnett, all in an effort to murder Barnett.

14             <u>Attempted Murder of Jimmy Lee Inman</u>

15     92)  In or about 1984, in the Central District of
16 California and elsewhere, the members of the California
17 Commission, including defendant ROBERT LEE GRIFFIN, ordered that
18 Jimmy Lee Inman be murdered for having assaulted an Aryan
19 Brotherhood member.

20     93)  In or about 1990, in the Central District of
21 California, defendant EDWARD TYLER BURNETT told Aryan Brotherhood
22 member Brian Healy that Healy was to murder Jimmy Lee Inman if
23 given the opportunity.

24     94)  In or before April 1991, in the Central District
25 of California and elsewhere, the members of the California
26 Commission, including defendants JOHN WILLIAM STINSON, RICHARD
27 LLOYD TERFLINGER, and ROBERT LEE GRIFFIN, ordered defendant DAVID
28 MICHAEL SAHAKIAN to deliver a message to the federal faction of

                              17

1   the Aryan Brotherhood requesting that Jimmy Lee Inman be
2   murdered.

3        95)  In or about May 1991, defendant DAVID MICHAEL
4   SAHAKIAN delivered the message to the federal faction of the
5   Aryan Brotherhood that the California Commission wanted Jimmy Lee
6   Inman murdered.

7        96)  In or before September 1991, in the Central
8   District of California and elsewhere, the members of the
9   California Commission, including defendants JOHN WILLIAM STINSON,
10  RICHARD LLOYD TERFLINGER, and ROBERT LEE GRIFFIN, sent word to
11  defendant RONALD BOYD SLOCUM that the California Commission had
12  requested that Jimmy Lee Inman be murdered.

13       97)  In or before September 1991, in the Central
14  District of California and elsewhere, defendant RONALD BOYD
15  SLOCUM informed defendant BARRY BYRON MILLS that the California
16  Commission had requested that Jimmy Lee Inman be murdered.

17       98)  In or about February 1992, defendant EDGAR WESLEY
18  HEVLE ordered Aryan Brotherhood member Lawrence Klaker to murder
19  Jimmy Lee Inman if given the opportunity.

20       99)  In or before September 1993, defendant BARRY BYRON
21  MILLS ordered Aryan Brotherhood member Kurt King to murder Jimmy
22  Lee Inman.

23       100) On or about September 30, 1993, Kurt King
24  attempted to murder Jimmy Lee Inman by stabbing him.

25               Attempted Murder of Joel Burkett

26       101) In or about 1986, the members of the California
27  Commission, including defendant ROBERT LEE GRIFFIN, ordered that
28  Joel Burkett be murdered for giving information to prison

18

1 authorities about the location of weapons hidden at Folsom State
2 Prison in Represa, California.

3      102) In or about 1990, in the Central District of
4 California, defendant EDWARD TYLER BURNETT told Aryan Brotherhood
5 member Brian Healy that Healy was to murder Joel Burkett if given
6 the opportunity.

7      103) In or before April 1991, in the Central District
8 of California and elsewhere, the members of the California
9 Commission, including defendants JOHN WILLIAM STINSON, RICHARD
10 LLOYD TERFLINGER, and ROBERT LEE GRIFFIN, ordered defendant DAVID
11 MICHAEL SAHAKIAN to deliver a message to the federal faction of
12 the Aryan Brotherhood requesting that Joel Burkett be murdered.

13      104) In or about May 1991, defendant DAVID MICHAEL
14 SAHAKIAN delivered the message to the federal faction of the
15 Aryan Brotherhood that the California Commission wanted Joel
16 Burkett murdered.

17      105) In or before July 1991, in the Central District of
18 California and elsewhere, the members of the California
19 Commission, including defendants JOHN WILLIAM STINSON, RICHARD
20 LLOYD TERFLINGER, and ROBERT LEE GRIFFIN, sent word to defendant
21 RONALD BOYD SLOCUM that Joel Burkett was to be murdered.

22      106) In or before July 1991, in the Central District of
23 California and elsewhere, defendant RONALD BOYD SLOCUM informed
24 defendant BARRY BYRON MILLS that the California Commission had
25 requested that Joel Burkett be murdered.

26      107) In or before December 1991, defendant BARRY BYRON
27 MILLS told Aryan Brotherhood member John Greschner to tell Aryan
28 Brotherhood member Lawrence Klaker to murder Joel Burkett if

1  given the opportunity.

2  108) In or about December 1991, John Greschner told

3  Lawrence Klaker that defendant BARRY BYRON MILLS had ordered

4  Klaker to murder Joel Burkett if given the opportunity.

5  109) In or about February 1992, defendant EDGAR WESLEY

6  HEVLE ordered Lawrence Klaker to murder Joel Burkett if given the

7  opportunity.

8  110) On or about March 1, 1992, Lawrence Klaker

9  attempted to murder Joel Burkett by stabbing him.

<u>Murder of Arthur Ruffo</u>

11  135) In or before 1990, in the Central District of

12  California and elsewhere, the members of the California

13  Commission, including defendants JOHN WILLIAM STINSON, RICHARD

14  LLOYD TERFLINGER, and ROBERT LEE GRIFFIN, decided that Aryan

15  Brotherhood member Arthur Ruffo was to be murdered.

16  136) In or about 1990, in the Central District of

17  California, defendant EDWARD TYLER BURNETT told Aryan Brotherhood

18  member Brian Healy that the California Commission had ordered

19  that Arthur Ruffo be murdered.

20  137) In or about August 1995, defendants JOHN WILLIAM

21  STINSON, RICHARD LLOYD TERFLINGER, and DAVID ALLEN CHANCE ordered

22  Brian Healy to murder Arthur Ruffo.

23  138) On or about February 5, 1996, defendant RICHARD

24  LLOYD TERFLINGER sent a message to Brian Healy ordering him to

25  murder Arthur Ruffo.

26  139) On or about February 7, 1996, Brian Healy murdered

27  Arthur Ruffo by strangling him to death.

28  140) In or about November 1997, defendant ROBERT LEE

20

1  GRIFFIN told Brian Healy that he was among those who ordered that
2  Arthur Ruffo be murdered.

3                    Conspiracy to Murder Frank Ruopoli

4        141) In or before June 1991, in the Central District of
5  California and elsewhere, members of the California faction of
6  the Aryan Brotherhood asked defendant RONALD BOYD SLOCUM to
7  transmit a message to the federal faction of the Aryan
8  Brotherhood saying that Frank Ruopoli was to be murdered for
9  having provided information about defendant JOHN WILLIAM STINSON
10  to law enforcement authorities.

11        142) In or before June 1991, in the Central District of
12  California and elsewhere, defendant RONALD BOYD SLOCUM sent a
13  message to defendant BARRY BYRON MILLS saying that Frank Ruopoli
14  was to be murdered.

15        143) In or about June 1991, defendant BARRY BYRON MILLS
16  told Aryan Brotherhood member Kevin Roach to contact members of
17  the federal faction of the Aryan Brotherhood and tell them to try
18  to locate Frank Ruopoli so that Ruopoli could be murdered.

19        144) In or about 1995, defendant BARRY BYRON MILLS told
20  Aryan Brotherhood member Eugene Bentley that the California
21  Commission wanted Frank Ruopoli murdered.

22        145) In or about April 1995, Arthur Ruffo told Aryan
23  Brotherhood member Brian Healy that Frank Ruopoli was to be
24  murdered because he had testified in court against defendant JOHN
25  WILLIAM STINSON.

26        146) In or about June 1998, Aryan Brotherhood member
27  Frederick Frakes gave Kevin Roach a telephone number to be used
28  in tracking down Frank Ruopoli.

<u>Conspiracy to Murder Chris Cecil</u>

214) On or about June 10, 1994, defendant JOHN WILLIAM
STINSON ordered Aryan Brotherhood member Jeffrey Rhodes to murder
Aryan Brotherhood associate Chris Cecil because Cecil had failed
to follow an order to commit a murder on behalf of the Aryan
Brotherhood.

215) Between June 10, 1994, and June 17, 1994, Aryan
Brotherhood member Paul Schneider made a knife for Jeffrey Rhodes
to use in murdering Chris Cecil.

216) On or about June 17, 1994, Paul Schneider brought
the knife he had made, concealed inside a manila envelope, to the
law library at Pelican Bay State Prison in Crescent City,
California.

217) On or about June 17, 1994, Paul Schneider, in the
law library at Pelican Bay State Prison in Crescent City,
California, passed the manila envelope containing the knife he
had made to another inmate, who passed the manila envelope to
Jeffrey Rhodes.

218) On or about June 17, 1994, defendants JOHN WILLIAM
STINSON, RICHARD LLOYD TERFLINGER, and DAVID ALLEN CHANCE
instructed Jeffrey Rhodes on how to murder Chris Cecil and make
the murder appear to have been committed in self defense.

<u>Murder of Aaron Marsh</u>

309) In or before March 1997, the members of the
California Commission, including defendants JOHN WILLIAM STINSON,
RICHARD LLOYD TERFLINGER, ROBERT LEE GRIFFIN, and DAVID ALLEN
CHANCE, decided to order that Aryan Brotherhood member Aaron
Marsh be murdered for failure to carry out an order to murder

22

1   another inmate.

2        310) In or before March 1997, defendant RICHARD LLOYD

3   TERFLINGER sent a message to Aryan Brotherhood member Brian Healy

4   saying that Aaron Marsh was to be murdered.

5        311) On or about March 13, 1997, Brian Healy told

6   defendant ELLIOTT SCOTT GRIZZLE that Aaron Marsh was to be

7   murdered.

8        312) In or before July 1997, defendant ELLIOTT SCOTT

9   GRIZZLE told defendant GARY JOE LITTRELL that Aaron Marsh was to

10  be murdered.

11       313) On or about July 25, 1997, defendant GARY JOE

12  LITTRELL murdered Aaron Marsh by strangling him to death.

13                  COUNTS FOUR AND FIVE

14                 [18 U.S.C. § 1959(a)(1)]

15      70.  On or about the dates specified below, the defendants

16  specified below committed the offenses specified below, and each

17  such offense was committed for the purpose of gaining entrance to

18  or maintaining and increasing the position of the specified

19  defendants in the Aryan Brotherhood, an enterprise engaged in

20  racketeering activity, in violation of Title 18, United States

21  Code, Section 1959(a)(1).

22                      COUNT FOUR

23      73.  Paragraphs Sixty-Eight through Seventy are hereby

24  incorporated and realleged herein as if set forth in full.

25      74.  On or about February 7, 1996, within the Central

26  District of California and elsewhere, defendants JOHN WILLIAM

27  STINSON, aka "Youngster," aka "The Youngest," RICHARD LLOYD

28  TERFLINGER, aka "Bart Simpson," ROBERT LEE GRIFFIN, aka "Blinky,"

                            23

aka "McGrif," DAVID ALLEN CHANCE, and EDWARD TYLER BURNETT unlawfully, willfully, deliberately, maliciously, and with premeditation and malice aforethought did aid, abet, advise, encourage, and otherwise participate in the murder of Arthur Ruffo, in violation of California Penal Code Sections 31 and 187.

COUNT FIVE

75.  Paragraphs Sixty-Eight through Seventy are hereby incorporated and realleged herein as if set forth in full.

76.  On or about July 25, 1997, within the Central District of California and elsewhere, defendants JOHN WILLIAM STINSON, aka "Youngster," aka "The Youngest," RICHARD LLOYD TERFLINGER, aka "Bart Simpson," ROBERT LEE GRIFFIN, aka "Blinky," aka "McGrif," DAVID ALLEN CHANCE, GARY JOE LITTRELL, and ELLIOTT SCOTT GRIZZLE, aka "Scott," unlawfully, willfully, deliberately, maliciously, and with premeditation and malice aforethought did aid, abet, advise, encourage, and otherwise participate in the murder of Aaron Marsh, in violation of California Penal Code Sections 31 and 187.

24

## CERTIFICATE OF SERVICE

I, **NETTIE RAFEE** declare:

That I am a citizen of the United States and resident or employed in Los Angeles, County, California; that my business address is Office of United States Attorney, Federal Courthouse 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction the service by mail described in this Certificate was made; that on September 28, 2006, I deposited in the United States mail, at the U.S. Courthouse, in the above-entitled action, in an envelope bearing the requisite postage,

a copy of:**STIPULATION RE: JOINT SUBMISSION OF STATEMENT OF THE CASE TO BE READ TO THE PROSPECTIVE JURORS.** was:

[] Placed in a closed envelope, for collection and interoffice delivery addressed as follows:

[ x]Placed in a sealed envelope for collection and mailing via United States Mail, addressed as follows: (**By Nettie Rafee**)

[] By hand delivery addressed as follows:

[**x**] By facsimile as follows: (**By Mark Childs**)

[ ] By messenger as follows:

[ ] By federal express as follows:

Paul Potter, Esq.
Potter, Cohen & Samulon
3852 East Colorado Blvd
Pasadena, Ca 91107

Terrence Bennett, Esq.
P.O Box 709
Pasadena, CA 91102-0709

at their  last known address, at which place there is a delivery service by United States mail.

This Certificate is executed on **September 28, 2006**, at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.

*Nettie Rafee*
Nettie Rafee

MASTERSON    C-12281

Bobby- All that could be done was done but in the last two months he had gone completely insane. It was a combination of drugs, paranoia, and insanity. Everyone did all they could to tolerate and help him get to the streets but in the end he turned on everyone except T.D. There's a great many details that Mike can fill in - there's a great deal more that he isn't aware of. I'll give you all the details when you come for court on Rick's case - they say it's necessary but will only be for a few days. That'll be the end of this month.

A wire from Folsom said the B.S.F. maybe hooking up with the Crips/a Vanguards - we're trying to find out. Folsom is doing good and Ronnie has it covered if they are. Moe was one of the Mex's hit and now they're politicing real hard to be friends again. say Moe had it coming for drinking wine ect. with them. That all sounds good but our concern is the position the Crips take. If they are allied with Yogi we will face them sooner or later and I figure we should strike first. I don't want to jump the gun and have it look like we're with the Mex's on this though. I sent Ronnie a wire and told him to let us both know what the story is and just how we stand. We may be fighting the same enemy but that's as far as it should go with the Mex's.

We sent Buck Knife and Spook (Waste) to Folsom but neither one made it. No heat came back on us but that detector in 4-27 is Brutal. We also lost one here with the new detectors (WAND) but it went to Bay bench without the bulls knowing. Find out from Mike how he was searched when he got back. We are working on more.

Things here are free to meddlin'- Steve Barnes is on the Federal protection program as is his wife. We have someone on T.L. and hear something soon. Have you found out or decided anyelse about Rick? All we able to determine is what I ran to you (In the kite that was a month and a half late.) He's still on suspended status

EXHIBIT C

AND swears by what he told us. There's more but it's something we'll cut up. Here we can really only go by what we know happened and what we feel. We had to believe he'd actually be a traitor.

The campaign on drug abuse is working – add Li'l Mike, Wendell, and of me, John, Smitty. Tryin' real hard on Eddie but he's a hard nut to crack. This last ordeal convinced everyone progress and heroin don't mix. Mike made an oath not to use it so keep him honest.

I sent the card to David with everyones name – never heard back but the card didn't come back so I'd think he got it.

That's about it – you'll be down this month but really wanted you to know that it was all the way necessary – it was. A total wash, and let you know about the possibilities of Crips and B.G.F.

All send their regards to everyone. Respect Dickey

Bobby – We tried every thing! Every Brother here agreed it needed to be done. He was completely different from when we were in L.A. or when you were here. He turned totally against the grant. Somewhat like a clone of Broadway, & much worse – more dangerous.

I should be going back right after Ricki's trial. I may get hung up for Blinky's trial. I should be going to max-E as soon as I get back. I left Fisher in charge of A.C. Everything here is real positive.

I will fill in all the details when you get here. Let Buff and B.Mc know that we had no choice. You know how it is when it comes to hittin' a Crip Brother, no matter who it is! That's all to be said for now. Respect

John

CERTIFICATE OF SERVICE

I, Tonia L. Johnson, declare:

That I am a citizen of the United States and resident or employed in Los Angeles County,

California; that my business address is the Office of United States Attorney, United States

Courthouse, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of

eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a

member of the Bar of the United States District Court for the Central District of California, at whose

direction I served a copy of:

**GOVERNMENT'S OPPOSITION TO DEFENDANT CHANCES MOTIONS IN LIMINE; MEMORANDUM OF POINTS AND AUTHORITES**
service was:

| [ ] Placed in a closed envelope, for collection and interoffice delivery addressed as follows: | [X] Placed in a sealed envelope for collection and mailing via United States Mail, addressed as follows: |

**SEE ATTACHED SERVICE LIST**

| [] By hand delivery | [ ] By facsimile as follows: |
| [ ] By messenger as follows: | [ ] By federal express as follows: |

This Certificate is executed on **October 5, 2006**, at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.


TONIA L. JOHNSON

<u>U.S. v. ROBERT LEE GRIFFIN, ET AL.</u>,
CR NO. 02-938-RGK

Joseph F. Walsh, Esq. (ROBERT GRIFFIN)
316 West Second Street, Suite 1200
Los Angeles, CA 90012
Email: Attyjoewalsh@aol.com

Michael M. Crain, Esq. (ROBERT GRIFFIN)
P.O. Box 3730
Santa Monica, CA 90408
Email: Michaelmcrain@aol.com

Knut Johnson, Esq. (DAVID CHANCE)
1010 Second Avenue, Suite 1850
San Diego, CA 92101
Email: knut@knutjohnson.com

John Cotsirilos, Esq. (DAVID CHANCE)
2442 Fourth Avenue
San Diego, CA 92101
Email: Mccabeatty@aol.com

Paul Potter, Esq. (JOHN STINSON)
Potter, Cohen & Samulon
3852 East Colorado Blvd.
Pasadena, CA 91107
Email: pepsquire@earthlink.net

Terrence Bennett, Esq. (JOHN STINSON)
P.O. Box 709
Pasadena, CA 91102-0709
Email: benedictus@earthlink.net

Stanley Perlo, Esq. (RICHARD TERFLINGER)
250 West Ocean Blvd., Suite 1714
Long Beach, CA 90802
Email: sperloesq@aol.com

Matthew J. Lombard, Esq. (RICHARD TERFLINGER)
316 West Second Street, Suite 1202
Los Angeles, CA 90012
Email: mlombard@lombardlaw.net