DEBRA WONG YANG
United States Attorney
THOMAS P. O'BRIEN
Assistant United States Attorney
Chief, Criminal Division
J. MARK CHILDS
Assistant United States Attorney
California State Bar Number 162684
     1400 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2433
     Facsimile: (213) 894-0142
     E-Mail: Mark.Childs@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 02-938-RGK |
| Plaintiff, | |
| v. | GOVERNMENT'S MOTION IN LIMINE TO LIMIT TESTIMONY OF IMPEACHMENT WITNESSES CALLED BY DEFENDANT ROBERT LEE GRIFFIN AND PRECLUDE THE USE OF ANY DOCUMENTS NOT PREVIOUSLY PRODUCED IN DISCOVERY BY DEFENDANTS |
| ROBERT LEE GRIFFIN, et al., | |
| Defendants. | |

The motion seeks to limit the scope of the testimony of Neil Collins, Charles Leffler, and Danny Mullikan, three private investigators, who will be called as "impeachment" witnesses by defendant Griffin. The extrinsic "impeachment" testimony should be limited to those instances where the proper foundation has been laid under Fed. Rules Evid., Rule 613(b). The motion also seeks to enforce the Court's prior order regarding reciprocal discovery.

Dated: December 10, 2006          Respectfully submitted,

J. MARK CHILDS
Assistant United States Attorney

DOCKETED ON CM

DEC 12 2006

BY

## POINTS AND AUTHORITIES

Defense counsel for defendant Robert Lee Griffin indicated they intend to call Neil Collins, Charles Leffler, and Danny Mullikan, three private investigators, as witnesses in order to impeach the testimony of certain government witnesses.

The government requests that the Court limit the purported "impeachment" testimony of these three private investigators to those instances where the defense has laid the proper foundation for impeachment under Federal Rules of Evidence, Rule 613(b).

Under Federal Rules of Evidence, Rule 613(b), defense counsel must establish that (1) the witness (who is being impeached) was afforded the opportunity to explain and deny the impeaching statement during the witness's testimony and (2) government counsel was afforded the opportunity to examine the witness about the statement.  If this foundation cannot be laid, then no extrinsic evidence of prior inconsistent statements should be allowed under Federal Rules of Evidence, Rule 613(b).

A witness can be impeached by a prior inconsistent statement. Fed. R. Evid. 613(b).  The witness to be impeached must have previously made a statement about relevant matters, and there must be sufficient inconsistency between his prior and current statements to infer a lack of credibility.  Id.  Extrinsic evidence of the prior inconsistent statement is **not** admissible to impeach a witness unless the witness is afforded the opportunity to explain or deny his prior inconsistent statement, and the opposing counsel is given an opportunity to question the witness.  Id.; United States v. Lay, 644 F.2d 1087 (5th Cir. 1981)(same).  A prior

1  inconsistent statement is not admitted for the truth of the matter

2  asserted therein, but merely impeach the witnesses's credibility.

3  United States v. Martin, 694 F.2d 885, 888 (1st Cir. 1982).

4     **Charles Leffler**

5     Based on the government's review of the transcripts of the

6  testimony in this trial, no counsel asked any witness about a

7  statement made to Mr. Leffler.  Further, Mr. Leffler's was not

8  referenced in the trial transcripts at all.  Thus, Mr. Leffler

9  cannot be used by the defense to impeach the testimony of any

10  witness because no witness was afforded the opportunity to explain

11  or deny any alleged prior inconsistent made by the witness to Mr.

12  Leffler.

13     **Neil Collins**

14     Neil Collins is an investigator for defendant Griffin who

15  interviewed Sidney Griffin and Anthony Likai.

16     During trial, defendant Griffin's counsel briefly examined

17  Sidney Griffin about a short meeting between Sidney Griffin and Mr.

18  Collins.  During Sidney Griffin's testimony, Sidney Griffin denied

19  that he told Neil Collins: (1) "to get out" during the interview

20  (rather Sidney Griffin testified he told Collins "I'm out of

21  here"); and (2) "threatened to put Blinky even more in the case

22  because [Sidney Griffin was] annoyed with Mr. Collins" (rather

23  Sidney Griffin testified there were "no threats").  See copy of

24  transcript of testimony of Sidney Griffin, pgs. 127-29, attached as

25  "1."  Thus, any impeachment testimony by Mr. Collins regarding

26  Sidney Griffin should be limited to these two specific statements.

27     Also, defendant Griffin's defense counsel cross-examined

28  Anthony Likai about a meeting between Anthony Likai, Neil Collins

and defense counsel.  During cross-examination by defendant Griffin's counsel, Mr. Likai did not deny making statements to Neil Collins during the interview that pertained to defendant Griffin. See copy of transcript of testimony of Anthony Likai, pgs. 186-88 and 192-96, attached as "2."  Thus, defense counsel should not be able to introduce prior *consistent* statements of Mr. Likai pertaining to defendant Griffin on the grounds that such statements are impermissible hearsay under Fed. R. Evid. 802.

Mr. Likai did acknowledge that if Mr. Likai told defense counsel and his investigator that Mr. Likai had over 100 prize fights that would have been a lie.  See copy of transcript of testimony of Anthony Likai, pgs. 163-64, attached as "2."  Thus, examination on the "prize fight" issue should be precluded because there is not a sufficient inconsistency between Likai's prior and current statements to infer a lack of credibility.

**Daniel Mullikan**

Defense investigator Daniel Mullikan interviewed Sidney Griffin and Brian Healy.  The government requests that defense counsel establish the requisite foundation for the alleged inconsistent statements prior to Mr. Mullikan testifying.

**Reciprocal Discovery**

The Court has previously issued a ruling regarding reciprocal discovery.  The government has received limited written discovery from defendant Griffin and no written discovery from defendant Stinson.

Rule 16(b)(1)(A) of the Federal Rules of Criminal Procedure provides that, in the event a defendant requests the discovery of the documents and other evidence the government intends to use in

its case-in-chief at trial, the defendant must:

> permit the government, upon request, to inspect and copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of copies of any of these items if:
>
> > (i)  the item is within the defendant's possession, custody, or control, and;
> > (ii) the defendant intends to use the item in defendant's case-in-chief at trial.

Numerous courts have recognized what this rule plainly states -- that defendants are required to produce reciprocal discovery to the government once the government has produced discovery requested by the defendants.  See e.g., United States v. Burger, 773 F. Supp. 1419, 1428-29 (D. Kan. 1991) (granting a government motion for reciprocal discovery made pursuant to an earlier version of Rule 16(b)).  Moreover, both the Supreme Court and the Ninth Circuit have recognized that it is proper for a court to strike testimony or evidence as a sanction in the event a defendant fails to comply with his reciprocal discovery obligations.  See Taylor v. Illinois, 484 U.S. 400, 412-15 (1988) (upholding the exclusion of testimony of a defense witness as a sanction for a defendant's failure to comply with reciprocal discovery obligations); United States v. Nash, 115 F.3d 1431, 1439-40 (9th Cir. 1997) (affirming decision to exclude proposed defense expert witness where defendant failed to provide required discovery relating to the expert's testimony to the government prior to trial).

Defendant Griffin has produced no discovery regarding Neil Collins, Charles Leffler, and Danny Mullikan.  Defendant Stinson has produced no discovery.  This Court should preclude the admission of items covered by Rule 16(b) at trial, not previously

1 │ produced to the government.[1]

2

3 │ Dated: December 10, 2006 Respectfully submitted,

4

5

6 │ J. MARK CHILDS
   │ Assistant United States Attorney

7 │ Attorneys for Plaintiff
8 │ UNITED STATES OF AMERICA

9

10

11

12

13

14

15

16

17

18

19

20

21

22 ──────────────────────

23 │ [1] The government recognizes that certain information
24 │ covered by Rule 16(b)(2) is exempt from discovery. See Rule
   │ 16(b)(2) (exempting from discovery certain "reports, memoranda, or
25 │ other documents made by the defendant, or the defendant's attorney
   │ or agent, during the case's investigation, or defense" and certain
26 │ statements made by the defendant, the defendant's attorney or
   │ agent). The government is not seeking discovery of these materials
27 │ through this motion, but rather those materials and information
   │ defendant is required to produce to the government pursuant to
28 │ Rules 16(b)(1)(A), (b)(1)(B), and (b)(1)(C).

1                          I N D E X

2

3     GOVERNMENT'S WITNESSES:    DIRECT    CROSS    REDIRECT    RECROSS

4

5

6        GRIFFIN, SIDNEY            --
          (Resumed)                         124(w)
7                                                       136           --

8        REPPOND, STEVEN           138    160(p)        179           --

9        CONTRERAS, MARK           181    219(p)        --            --

10

11

12                      E X H I B I T S

13

14    JOINT                                          RECEIVED

15

16    405-2                                             145

17    1507a & b                                         148

18    1517a                                             150

19    513                                               154

20    514a                                              154

21    1513                                              154

22    1514a & b                                         154

23    1510a - e                                         154

24    1512a - d                                         156

25    ///



127

1  not, right?

2  A.   Right.

3  Q.   And have you been told so far you're in or not?

4  A.   I'm going through the phases on it.

5  Q.   You're still in the process of applying?

6  A.   Yes.

7  Q.   But now while you were waiting, you got a visit from

8  Mr. Neal Collins; is that right?

9  A.   Right.

10  Q.   That was the defense investigator?

11  A.   For Blinky.

12  Q.   For Robert Griffin?

13  A.   For Robert Griffin.

14  Q.   And he had asked you whether you knew Robert Griffin,

15  right?

16  A.   Right.

17  Q.   And you told him you didn't know Blinky Griffin

18  personally, right?

19  A.   Right.

20  Q.   And then didn't you get into an argument with him?

21  A.   No.  I told him -- if you want to call it an argument, I

22  told him, Look, man, I'm working for the prosecution, I'm not

23  working for the defense.  If you ask me what I know about

24  Blinky, I don't know him personally, but Barry Mills told me

25  back in such and such time in C unit he was waiting to hear

128

1    from Blinky or Tommy Lamb --

2    Q.    Okay.  And Mr. --

3    A.    -- that was argument, I guess.

4    Q.    You started arguing, raising your voice with Mr. Collins,

5    right?

6    A.    I told him, Look, I'm out of here.  If I know he was a

7    defense guy, I wouldn't even come out here.

8    Q.    You were angry it was a defense investigator that had

9    requested to see you, right?

10   A.    Angry?  Probably wrong word.  I just didn't have no time

11   for him.  I'm wasting my time and his time.  I mean -- so, you

12   know, angry is I want to do something to somebody.  It's not

13   a --

14   Q.    But you raised your voice to him, right?

15   A.    I raise my voice a lot.

16   Q.    And you told him to get out, right?

17   A.    No, I didn't tell him to get out.  I told him, I'm out of

18   here.  I'll see you later.  I can't help you.

19   Q.    You said you weren't going to help him, right?

20   A.    Might have been -- no, I'm not going -- I can't help you.

21   I'm working for the prosecution, and wuff, wuff, waff, waff,

22   I'm gone.

23   Q.    And then you threatened to put Blinky even more in the

24   case because you were annoyed with Mr. Collins?

25   A.    No, I didn't put nobody.  Wasn't no threats.  I told him

129

1    what I knew about Blinky:  Look, you're here for Blinky, okay.

2    Here's what I know about Blinky, wuff, wuff, waff, waff.  Mills

3    told me he was waiting to hear from Blinky on Tommy Lamb, and

4    this and that and there, and I can't remember you, man.  So I'm

5    out of here.  I'm wasting your time, and you're wasting mine.

6    Q.   How long did the conversation with Mr. Neal Collins last?

7    A.   Probably 10, 15 minutes.

8    Q.   And the last area I wanted to ask you.  Want to go back

9    when we were talking about after you had left H unit and you

10   were in D unit.

11           When you were in D unit, were you also housed there

12   with Brian Healy?

13   A.   With who?

14   Q.   Brian Healy.

15           THE COURT:  Do you recognize the name?

16           THE WITNESS:  Is that Dead Eye?

17           MR. WALSH:  Yes.

18           THE WITNESS:  No.  He was there, but I wasn't around

19   him.

20   BY MR. WALSH:

21   Q.   So in other words, the time when you were in H unit when

22   Brian Dead Eye Healy was there --

23           THE REPORTER:  Excuse me.  Please slow down, Counsel.

24           MR. WALSH:  I'm talking too fast.  I'm going to slow

25   down.

163

1    streets?

2    A.    No.

3    Q.    Did you ever fight -- how many fights did you have -- let

4    me ask you this:

5          Did you ever fight as a boxer in the ring but while

6    you were not in prison?

7    A.    Yes.

8    Q.    Over what period of time was that?

9    A.    In the early '80s.

10   Q.    When you say "the early '80s" --

11   A.    '82, '83.

12   Q.    And how many fights did you have?

13   A.    Just a few.

14   Q.    Have you told people you -- let me ask you this:

15         Have you ever fought boxing matches at the Olympic

16   Auditorium here in Los Angles?

17   A.    I used to spar at the Olympic all the time, yeah.  I've

18   been there a hundred times.

19   Q.    You told people you fought there as a boxer in prize

20   fights?

21   A.    No.

22   Q.    You never said that?

23   A.    No.

24   Q.    You never told me that?

25   A.    No.



164

1    Q.    And have you told people --

2    A.    If I did, I was lying, but I don't remember telling you

3    that.

4    Q.    Have you told people that, as a boxer you, fought 102

5    prize fights and you won a hundred of them?

6    A.    No, I --

7    Q.    Did you tell me that one when we met up at Pleasant Valley

8    State --

9    A.    No.  If I did tell you that, I was lying.  I don't think I

10   told you that, though, but I don't believe -- no, that's not

11   true.  I've had over a hundred fights in -- but in the ring and

12   out of the ring.

13   Q.    So if you told me that, it was a lie; is that right?

14   A.    Yeah, but I didn't tell -- you might have misunderstood

15   what I say because I do have over a hundred fights.  I've been

16   in over a hundred fights, but that's in the ring and out of the

17   ring.

18   Q.    And as you told us, you've done a lot of drugs, right?

19   A.    Yes, absolutely.

20   Q.    And among were LSD?

21   A.    Yes.

22   Q.    How many times have you done LSD?

23   A.    Couple dozen.

24   Q.    And over what time period?

25   A.    Say 1980 to 1991.

186

1    A.    Right.

2    Q.    So now you're a drop-out type of person in protective

3    custody, so to speak?

4    A.    Yes.

5    Q.    That was at Pleasant Valley State Prison?

6    A.    Yes.

7    Q.    They threw you in the hole, right?

8    A.    Right.

9    Q.    What does being in the hole mean?

10   A.    The same thing as being in the SHU.  You're ad seg the

11   whole -- they're the same everywhere.

12   Q.    So Mr. Neal Collins and I came up to interview you a month

13   later, right?

14   A.    Right.

15   Q.    You're still in the hole, right?

16   A.    Yes.

17   Q.    They brought you out for the interview?

18   A.    Right.

19   Q.    You came out and we introduced ourselves, right?

20   A.    Yes, you did.

21   Q.    Told you who we were and why we were there, right?

22   A.    Rights.

23   Q.    And -- now, because you were in the hole they wouldn't

24   give you a contact or a face-to-face -- well, they wouldn't

25   give you a visit except over a telephone speaking through the

1   glass, right?

2   A.   Correct.

3   Q.   Okay.  So most of the interview was me talking on the

4   glass to you, right?

5   A.   Right.

6   Q.   But Mr. Collins was there as a witness to this, right?

7   A.   He was.

8   Q.   He was sitting right next to me, wasn't he?

9   A.   Yes.

10  Q.   And you and I had an understanding at beginning that I

11  would repeat -- I would ask a question, Mr. Collins could hear

12  the question, and you would then answer it over the telephone,

13  because there was only one telephone between the two of us?

14  A.   Right.

15  Q.   I had one and you had one?

16  A.   Right.

17  Q.   And then you would hear me repeat your answer to

18  Mr. Collins, right?

19  A.   Right.

20  Q.   That was our understanding, correct?

21  A.   Correct.

22  Q.   And you were told I'm going to do it this way make sure

23  there's no misunderstanding about what we're talking about

24  here, correct?

25  A.   Correct.

1  Q.  And that's what happened, and that is what you agreed to;

2  is that true?

3  A.  Sure.

4       THE COURT:  We're going to break at this time, ladies

5  and gentlemen, for the afternoon recess.  We'll see you back in

6  15 minutes.  Remember the admonishment not to discuss the case.

7  When you leave, please leave quietly.  I want to talk to the

8  attorneys for just a second.

9       (Proceedings held outside the presence of the jury:)

10       THE COURT:  The record will reflect the jurors have

11  left the courtroom.  The witness may stand down.

12       Counsel, I intended to tell the jury tonight that it

13  looks like we may be wrapping up the first part of next week.

14  And if we do wrap up the government's case, we're going to go

15  over until Monday --

16       MR. POTTER:  Excuse me, Your Honor.  Over to Tuesday,

17  the 12th?

18       THE COURT:  Over to Tuesday.  You're correct,

19  Counsel.

20       MR. POTTER:  Sorry.

21       THE COURT:  So that they can make their plans.

22       I've got a list of five witnesses for Monday; is that

23  correct?

24       MR. CHILDS:  Yes, Your Honor.  In fact, those are our

25  final witnesses.  I mean if defense -- will be Juan Contreras,

192

1    No need to get into anything more than that.  We stand by the

2    need for security --

3                THE COURT:  Counsel, it has not been demonstrated to

4    this court yet.  If you want to agree into a protective order,

5    I'm more than happy to order unless you both state it.  Absent

6    that, you're going to have to show me specifically, not just

7    generally, We think it should be redacted for security reasons.

8    Specifically as to each word that is redacted and why that word

9    is material and why that word is a security problem.  That is

10   the only time that I would come off the ruling that the entire

11   matter should be turned over without redaction.

12               You can work it out between you, and if you can't

13   agree on it by four o'clock -- otherwise the whole 115s will be

14   returned -- excuse me -- turned over unredacted.  That will be

15   the order of the court.

16                         (Recess)

17               THE COURT:  The record will reflect that all jurors

18   are in their respect seats in the jury box.

19               Cross-examination, Counsel.  You may continue.

20               MR. CRAIN:  Thank you.

21   Q.    I think when we took the break we were talking about the

22   time that Investigator Neal Collins and I were talking to you

23   at Pleasant Valley State Prison?

24   A.    Yes.

25   Q.    That's up in Central California somewhere?

193

1   A.   Yep.

2   Q.   Okay.  That was back in February of this year, right?

3   A.   Yes.

4   Q.   And as you said, at that time, you had dropped out many

5   years ago, right?

6   A.   Yes.

7   Q.   And you talked to us for a relatively long period of time,

8   right?

9   A.   Yep.

10  Q.   And I asked you questions about various things that you

11  knew or didn't know about, right?

12  A.   Yes.

13  Q.   And you answered questions, correct?

14  A.   Correct.

15  Q.   And among these answers that you provided, you said that

16  Mr. Griffin, during the entire time that you were at Pelican

17  Bay, you knew that Mr. Griffin was no longer involved in the

18  Aryan Brotherhood, right?

19  A.   Yep.

20  Q.   He had retired, withdrawn and dropped out from it, right?

21  A.   Right.

22  Q.   That's what you said, right?

23  A.   That's what I said.

24  Q.   And you told us that Mr. Griffin -- all you heard --

25  because you never met him, right?

1   A.   Right.

2   Q.   This is based on what you heard from sources, correct?

3   A.   Correct.

4   Q.   And -- that he kept to himself?

5   A.   Right.

6   Q.   And basically, like I just said, during the entire period

7   of time he had withdrawn and wasn't involved in the Aryan

8   Brotherhood anymore, right?

9   A.   That's what I said.

10   Q.   Okay.  So you're claiming today that this was the big lie

11   that you told us?

12   A.   Pretty, yeah.

13   Q.   Because you thought that if you said Mr. Griffin is not in

14   the Aryan Brotherhood -- because you thought -- because you

15   didn't want to come to court.  Is that what your reason for

16   lying?

17   A.   Yes.

18   Q.   You thought that if you lied to me and to the investigator

19   Neal Collins that a lie would mean we wouldn't want to call you

20   at court, right?

21   A.   Correct.

22   Q.   So by telling us that Mr. Griffin wasn't in the Aryan

23   Brotherhood, you're telling us you thought that would mean that

24   I wouldn't call you to court?

25   A.   Well, that's why -- like I told you about the letter and

195

1    stuff -- because I wanted you to -- and that is why I told you

2    a lot of things.  I did tell you a lot of tough about the A.B.

3    and what was going on, because I wanted you to know that I'd be

4    damaging to the case, but I wasn't interested in coming to

5    court, I wasn't in interested in the case.  But I knew you

6    wouldn't want to call me after what you heard from me, but I

7    didn't want you to come and tell him that I was saying a bunch

8    of negative things about him or his character, even if you

9    weren't going to call me.  So that's why I just that.

10   Q.    What you said was positive about him, right?

11   A.    Yeah, it was positive about him, but I also let you know

12   that I read that letter from him to John Stinson and I knew you

13   didn't want me to come here after that.

14   Q.    I didn't tell you that, did I?

15   A.    No, but --

16   Q.    You were trying to say something -- you were trying to

17   trick Mr. Collins and me; is that right?

18   A.    Yeah, I didn't want to be involved in this, and I didn't

19   want to talk to you guys.  But I mean --

20   Q.    I told you that you were the government's expected witness

21   list and you were likely to be called by the government, right?

22   A.    I never talked to anybody until I talked to you.  Nobody

23   ever talked to me until after you left.

24   Q.    You told us that you were aware that you were likely to be

25   called by the government, right?

196

1   A.   No, I had no idea.

2   Q.   Until I told you?

3   A.   Yeah, I had no idea until you told me.

4   Q.   Okay. But the bottom line is that you told us that

5   Mr. Griffin wasn't in the Aryan Brotherhood?

6   A.   Yes, I did say that.

7   Q.   That he had been, but during the entire time you were at

8   Pelican Bay, everybody knew that he had withdrawn from it,

9   right?

10  A.   That's what I said, yes.

11  Q.   Now, you mentioned on your direct examination by

12  Mr. Childs, the gentleman over here, awhile ago, something

13  about a lawsuit, right?

14  A.   Right.

15  Q.   And that this lawsuit Mr. Griffin was a party to, right?

16  A.   Right.

17  Q.   And that -- what is your understanding of what was claimed

18  in that lawsuit?

19  A.   I don't -- I just read some -- I don't remember if it was

20  some motions or whatever, but from my understanding, it was

21  just a few pages of some court documents that it said that he

22  was trying to deny that if -- that the CDC's definition of the

23  Aryan Brotherhood even existed and that their indeterminate SHU

24  policy was illegal.

25  Q.   Wait a minute.  Let's take that step by step.  You are

## CERTIFICATE OF SERVICE

I, **NETTIE RAFEE** declare:

That I am a citizen of the United States and resident or employed in Los Angeles, County, California; that my business address is Office of United States Attorney, Federal Courthouse 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction the service by mail described in this Certificate was made; that on December 11, 2006, I deposited in the United States mail, at the U.S. Courthouse, in the above-entitled action, in an envelope bearing the requisite postage,

a copy of:**"Government's Motion in Limine to Limit Testimony of Impeachment Witness Called by Defendant Robert Lee Griffin and Preclude the Use of Any Documents Not Previously Produced in Discovery by Defendants**
was:

| | |
|---|---|
| [] Placed in a closed envelope, for collection and interoffice delivery addressed as follows: | [] Placed in a sealed envelope for collection and mailing via United States Mail, addressed as follows: |
| [] By hand delivery addressed as follows: | **[X]** By facsimile as follows: |

[ ] By messenger as follows:  **[X]** Served by E-Mail (see attachment):

SEE ATTACHMENT

at their last known address, at which place there is a delivery service by United States mail.

This Certificate is executed on **December 11, 2006**, at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.

**Nettie Rafee**

<u>U.S. v. ROBERT LEE GRIFFIN, ET AL.</u>,
CR NO. 02-938-RGK

Joseph F. Walsh, Esq. (ROBERT GRIFFIN)
316 West Second Street, Suite 1200
Los Angeles, CA 90012
Tel: 213-627-1793
Fax: 213-489-4700
Email: Attyjoewalsh@aol.com

Michael M. Crain, Esq. (ROBERT GRIFFIN)
P.O. Box 3730
Santa Monica, CA 90408
Tel: 310-571-3324

Fax: 310-626-9983
Email: Michaelmcrain@aol.com

Paul Potter, Esq. (JOHN STINSON)
Potter, Cohen & Samulon
3852 East Colorado Blvd.
Pasadena, CA 91107
(626) 795-0681
Email: pepsquire@earthlink.net

Terrence Bennett, Esq. (JOHN STINSON)
P.O. Box 709
Pasadena, CA 91102-0709
(626) 798-6675
Email: benedictus@earthlink.net


Kenneth Alan Reed (JOHN STINSON)
404 West Fourth St., Suite C
Santa Ana, CA 92701
(714) 953-7400
Fax: 714-953-7412
Cell: 714-423-9947
KAR_crimlaw@bcglobal.net

**Childs, Mark (USACAC)**

**To:**           kar_crimlaw@sbcglobal.net; Aveis, Mark (USACAC); Paul, Esq. Potter
**Cc:**           Terry Bennett; Mike Crain; Joe Walsh
**Subject:**      Motion in Limine re: Impeachment and Recriprocal Discovery.

**Attachments:**  DOC005.PDF



DOC005.PDF (548
KB)

　　　　Motion will be filed on Monday.

1