

GEORGE S. CARDONA
Acting United States Attorney
THOMAS P. O'BRIEN
Assistant United States Attorney
Chief, Criminal Division
J. MARK CHILDS (Cal. bar No. 162684)
MARK AVEIS (Cal. Bar No. 107881)
Assistant United States Attorneys
Organized Crime & Terrorism Section
1500 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-4477
Facsimile: (213) 894-3713
E-Mail: Mark.Aveis@usdoj.gov
Attorneys for Plaintiff
United States of America

FILED
CLERK, U.S. DISTRICT COURT

DEC 15 2006

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>          v.<br><br>JOHN WILLIAM STINSON and<br>ROBERT LEE GRIFFIN,<br><br>                    Defendants. | No. CR 02-938(E)-RGK<br><br>GOVERNMENT'S RESPONSE TO<br>DEFENDANT GRIFFIN'S OBJECTION<br>TO EXHIBITS 505, 1520A<br>AND 1520B; MEMORANDUM<br>OF POINTS AND AUTHORITIES |

        Plaintiff United States of America, by and through its

counsel of record, the United States Attorney for the Central

District of California, responds to the objection of defendant

Robert Griffin to exhibits 505 (Conviction/Judgment of Curtis

Price for murder of Richard Barnes), 1520A (Conviction/Judgment

of Gary Littrell for voluntary manslaughter of Aaron Marsh), and

1520B (Conviction/Judgment of Scott Grizzle for murder of Aaron

Marsh).  The government submits that such exhibits, already

received in evidence without the present objections, or without

objection, are admissible to prove the fact of the convictions



1   and to rehabilitate the testimony of several witnesses, after

2   attempted impeachment, pursuant to Fed.R.Evid. 802, 803(8),

3   and/or 803(22).

4        The government's response is based upon the attached

5   memorandum of points and authorities, the record in this case,

6   the Court file, and such other evidence and argument as the Court

7   may consider.

8   DATED: December 15, 2006          Respectfully submitted,

9                                     GEORGE S. CARDONA
                                      Acting United States Attorney
10
                                      THOMAS P. O'BRIEN
11                                    Assistant U.S. Attorney
                                      Chief, Criminal Division
12
13                                    _____
                                      J. MARK CHILDS
                                      MARK AVEIS
14                                    Assistant United States Attorneys
                                      Attorneys for Plaintiff
15                                    UNITED STATES OF AMERICA

16

17

18

19

20

21

22

23

24

25

26

27

28                                          2

## MEMORANDUM OF POINTS AND AUTHORITIES

I.    PRICE JUDGMENT

A.    Record

On November 9, 2006, the government called retired L.A. County Sheriff's Detective Robert Morck to testify about the murder of Richard Barnes.  Morck authenticated several photos of the crime scene, including photos of the body of the victim lying on a bed in the rear bedroom of his residence with three bullet holes in the back of his head.  See Exhibits 502, 503A, 503B, 503D, 503F, all received November 9, 2006.  Det. Morck also testified as to the street address of the victim's residence in Temple City.  Det. Morck further testified, on cross-examination by defendant Griffin's counsel, that he knew that Stephen Barnes, the victim's son, Stephen Barnes, had been a witness against defendant Griffin.  RT 11/9/06, 167: 11-13.[1]  Det. Morck also testified, on cross-examination by defendant Griffin's counsel, that Curtis Price was the only person charged with killing Richard Barnes:

> Q:    Now let me ask you one other topic here and then
>       I'll be through, sir.  You previously testified in
>       connection with a case that had to do with the
>       murder of Richard Barnes; is that right?
>
> A:    Yes.

---

[1] All references herein to "RT," reporter's transcript, are to draft daily transcripts prepared by the reporters for this case.

1    Q:   And that trial took part in another part of the state

2         is that right?

3    A:   Yes, it did.

4    Q:   And that was the only time you've testified prior to

5         today in connection with the murder of Richard Barnes;

6         is that right?

7    A:   Yes.

8    Q:   There was only one defendant charged in that case; is

9         that right?

10   A:   Yes.

11   Q:   And that was Mr. Price.

12   A:   Curtis Price, yes.

13   RT 11/9/06; 161: 14-25; 162: 1-5.

14       Notwithstanding the foregoing, defense counsel had also

15   asked a series of questions tending to show that victim Richard

16   Barnes was not murdered by Curtis Price.   Rather, defense counsel

17   suggested that Barnes was murdered either by burglars (victim's

18   wallet, shotgun, and valued "Felix the Cat" statue were missing),

19   Hispanic street gang members, "hitchhiker hobos," his ex-wife, an

20   unidentified woman the victim might have been with at the

21   "Vagabond Motel," members of the "Vagos" motorcycle gang that had

22   kidnaped the victim's daughter, friends of "hillside strangler"

23   Angelo Bono, against whom the victim's son had testified, or

24   friends of Mexican Mafia member Arthur Blaugos, against whom the

25   victim's son had provided information to the police.   RT 11/6/06,

26   150-160.

27

28                              4

To counter defense counsel's suggestions, on redirect Det. Morck testified that he had solved the murder of Richard Barnes and that, after he testified at the trial of Curtis Price, he considered the case of Richard Barnes' murder closed.  RT 11/6/06: 165-166.

Counsel for defendant Stinson did not question Det. Morck.

At the conclusion of the testimony of Det. Morck, the government asked to mark and receive in evidence Exhibit 505, "a ten-page document which is a certified copy of the judgment of death, People versus Curtis [F]loyd Price, County of [Humboldt], Number 9898, indicating July 10, 196 Curtis [F]loyd Price was convicted of 11 counts including the murder of Richard Barnes." RT 11/6/06: 168: 8-13.

Counsel for defendant Griffin did not object.  Rather, counsel for defendant Stinson objected but not on the ground presently at issue.  Instead, counsel for defendant Stinson objected on the ground that the judgment was not final because it was "on habeas."  Id. at 168: 20.  The Court inquired of whether the judgment was a "final judgment," to which government counsel responded, "Through the California Supreme Court."[2]  Exhibit 505 was then received subject to a motion to strike.

B.    Argument

Defendant Griffin's objection to Exhibit 505 should be overruled because the government did not introduce the Price

---

[2] See People v. Price, 1 Cal. 4th 324 (1991), rehearing denied, 1992 Lexis 852 (February 19, 1992).

conviction "for purposes other than impeachment" as a judgment
against "persons other than the accused."  Fed.R.Evid. 803(22).
Rather, the government introduced the conviction to prove the
fact that Curtis Price was convicted of killing Richard Barnes.
The fact of the conviction was made all the more relevant and
important to rehabilitate Det. Morck after defense counsel's
cross examination suggested that Richard Barnes was not killed by
Curtis Price but, instead, that Barnes was the target of a parade
of other perpetrators.

Even if the Court determines the judgment is not admissible
under Rule 803(22), Rule 802 permits the Court to determine the
admissibility of the judgment under any other rule of evidence.
Thus, if the judgment were not admissible under Rule 803(22), it
would be admissible under Rule 803(8) as a public record.  See
United States v. Wilson, 690 F.2d 1267, 1275 (9th Cir. 1982)
(properly authenticated criminal conviction admissible as a
public record); United States v. Koger, 646 F.2d 1194, 1199 (6th
Cir. 1981) ("all criminal convictions are public records); Fed.
R. Evid. 802 (evidence not admissible under one rule may be
admissible under another).

Furthermore, the judgment is admissible under the residual
hearsay exception, Fed.R.Evid. 807, because the judgment has
"equivalent circumstantial guarantees of trustworthiness" and is
"offered as evidence of a material fact," "is more probative on
the point for which it is offered than any other evidence which
the [government] can procure through reasonable efforts, " and

"the general purposes of these rules and the interests of justice will best be served by admission" of the judgment.  Furthermore, Exhibit 505 was provided to defense counsel, through discovery, months before it was introduced at trial, hence counsel had more than sufficient time to object prior to trial.

Additionally, there is no prejudice to defendants by the judgment.  Defense counsel, during cross examination, both suggested Price was the sole killer and suggested other suspects should have been pursued.  Thus, in light of this record, the judgment was properly received and should remain in the record.

Finally, the government would have no objection to a limiting instruction to the effect that the jury should consider the judgment as proof of the conviction of Curtis Price for the murder of Richard Barnes, and whether or not defendants conspired to murder Richard Barnes should be based on the jury's evaluation of other evidence.  A suggested instruction follows this memorandum.

II.  LITTRELL AND GRIZZLE JUDGMENTS

Exhibit 1520A was received on December 5, 2006 regarding the conviction and sentencing of Elliot Grizzle for the murder of Aaron Marsh.  Exhibit 1520B was received the same day regarding the conviction and sentencing of Gary Littrell for the voluntary manslaughter of Aaron Marsh.  <u>These documents were received without objection</u>.  RT 12/5/06: 56-57.

As with the judgment regarding Curtis Price, the government offered these writings as evidence that those individuals were

7

convicted of the relevant crimes.  The writings are therefore
admissible pursuant to Rules 803(22), 803(8), and/or 807, as
argued above.  In a fashion similar to the cross examination by
defense counsel regarding the trial of Curtis Price, defense
counsel put at issue who was responsible for killing Marsh and
the fact of the Marsh murder proceeding by cross examining
government witness Michael "Wino" Contreras about his testimony
at that trial and how he (Contreras) was threatened by CDC
personnel with being charged in the killing of Marsh unless he
cooperated.  RT 12/5/06: 38.

Furthermore, the government would not object to a limiting
instruction regarding Exhibits 1520A and 1520B, similar to the
instruction suggested for Exhibit 505.

III. CONCLUSION

For the reasons stated herein, the government respectfully
requests that the Court overrule the objections.  A proposed
limiting instruction is attached.

COURT'S INSTRUCTION NO. ___

Exhibit 505 is the judgment of conviction of Curtis Price for the murder of Richard Barnes.  Exhibit 1520A is the judgment of conviction of Elliot Grizzle for the murder of Aaron Marsh. Exhibit 1502B is the judgment of conviction of Gary Littrell for the voluntary manslaughter of Aaron Marsh.

You are to consider these exhibits only as proof of the fact of the convictions.  Whether or not you find that defendants or anyone else conspired to murder Aaron Marsh as charged in Count One of the Indictment, or whether or not you find that defendant JOHN STINSON aided or abetted the murder of Aaron Marsh as charged in Count Three of the Indictment, is to be based on other evidence.

1    recall to get into the area we talked about earlier?

2              MR. AVEIS:  Yes, Your Honor.

3              THE COURT:  Okay.  You may step down.  You may be

4    called back depending on the ruling the court makes.

5              THE WITNESS:  Today?

6              THE COURT:  I don't know.  You'll have to talk to

7    counsel about that.  Thank you for coming in, sir.

8              MR. AVEIS:  Your Honor, at this time the

9    government would introduce Exhibit 505, a ten-page document

10   which is a certified copy of the judgment of death, People

11   versus Curtis Lloyd Price, County of Humble, Number 9898,

12   indicating July 10, 1986 Curtis Lloyd Price was convicted of

13   11 counts including the murder of Richard Barnes.

14             MR. BENNETT:  We would object on the grounds that

15   judgment is not yet final.

16             THE COURT:  Counsel, is it a final judgment?

17             MR. AVEIS:  Through the California Supreme Court.

18             MR. BENNETT:  There's a pending litigation in the

19   California Supreme Court on People versus Curtis Price --

20             MR. AVEIS:  On habeas which has nothing to do --

21             MR. BENNETT:  Your Honor, could Mr. Aveis --

22             MR. AVEIS:  We can litigate this later.

23             THE COURT:  I'll overrule the objection at this

24   time.

25             MR. AVEIS:  May 505 be received.

169

1              THE COURT:  At this time subject to a motion to

2    strike.

3              (Exhibit 505 received in evidence.)

4              MR. AVEIS:  Your Honor, at this time we do have

5    another witness and we intended to play a recording.

6    However, the speakers on the computer are not loud enough so

7    we have speakers coming.  But rather than kill time, we

8    could recall Mr. Smith.

9              MR. CHILDS:  We can Mike the --

10             THE COURT:  It's up to you.  It's your case.

11             THE CLERK:  Could I have the name of your witness,

12   please.

13             MR. AVEIS:  Sure.  Fred Cook.

14             FRED COOK, PLAINTIFF'S WITNESS, SWORN

15             THE CLERK:  Would you please state your full name

16   for the record and spell your last name.

17             THE WITNESS:  Fred Cook, C-O-O-K.

18             THE CLERK:  Thank you.

19             MR. AVEIS:  Thank you.

20                        DIRECT EXAMINATION

21   BY  MR. AVEIS:

22   Q    Sir, are you currently employed?

23   A    Yes, I am.

24   Q    By whom, please?

25   A    Los Angeles County sheriffs department.

1    Q    What is your assignment?

2    A    I am a sergeant assigned to the L.A. Board of

3    Supervisors, CAO office.

4    Q    What is CAO?

5    A    Chief administrative office.

6    Q    How long have you been with the sheriffs department?

7    A    Approximately 27 years.

8    Q    Now, at some point were you involved in an

9    investigation involving an individual named Barry Mills?

10    A    Yes.

11    Q    What was the nature of your investigation?

12    A    It was a co-investigation along with the Bureau of

13    Alcohol, Tobacco and Firearms.

14    Q    And what specifically were you looking for?

15    A    Specifically we were looking into the aspect of a known

16    prison gang labeled the Aryan Brotherhood.

17    Q    Okay.  And what kind of investigation did you

18    personally undertake?

19    A    That was one of a liaison between L.A. County Sheriffs

20    Department and the Bureau of Alcohol, Tobacco and Firearms,

21    ATF, which my capacity was introducing an informant to

22    members or known members or associates of the Aryan

23    Brotherhood.

24    Q    And how did you go about introducing your informant to

25    such people?

1    Aryan Brotherhood member told him.  It's non-Bruton and

2    non-Crawford.

3            MR. CRAIN:  That's completely erroneous.

4            THE COURT:  Counsel, I'm going to explain to

5    everybody, if you have an objection, you'd better get

6    together and share information as to what you're going to be

7    asking your witnesses.  If you have an objection, you bring

8    it up before we get the jury.  You do not interrupt the

9    jury.  If you want to excuse this witness and call somebody

10   else and bring him back after the offer of proof, that's

11   fine.  But you do not interrupt this jury to have offerings

12   of proof.

13           MR. AVEIS:  That's fine.  We're at the end of

14   interrogating this witness.  I'll turn it -- subject to

15   recall?

16           THE COURT:  You can always recall him, counsel.

17           MR. AVEIS:  And we'll leave it for cross.  Thank

18   you.

19           THE COURT:  Okay.  Cross?

20                   CROSS-EXAMINATION

21   BY  MR. CRAIN:

22   Q    Detective Sergeant, is it Morck?

23   A    That's correct.  It's citizen Bob Morck.

24   Q    All right.  Well anyway, we're trying to roll back the

25   clock here 20-something years.  At that time, you were a

1    detective sergeant and had been for an extended period of

2    time, right?

3    A    Yes.

4    Q    I would like to ask you some questions about your, some

5    further questions about your activities in investigating

6    this matter, particularly around February of 1983.  You had

7    a partner working with you in this investigation; is that

8    correct?

9    A    Yes, Robert Ross.

10    Q    And both of you, you both equally shared in the

11    investigative duties?

12    A    Yes.

13    Q    And you ultimately dictated the report, the

14    investigation report about the case, didn't you?

15    A    I did, yes.

16    Q    And you said this house that you went to is in Temple

17    City.  Can you tell us roughly for those of us who might not

18    know where Temple City is, just generally speaking.

19    A    It's about eight miles south of Santa Anita racetrack.

20    Q    It's out near the 10 freeway?

21    A    Yes.

22    Q    Just east of downtown Los Angeles?

23    A    Yes.

24    Q    Is it next to Rosemead?

25    A    Yes, Rosemead, Temple City, El Monte.

152

1  Q   And when you got to the house, you determined that

2  there was no forced entry, correct?

3  A   Yes.

4  Q   And you had also determined that there was property

5  missing; isn't that right?

6  A   Yes.

7  Q   Mr. Barnes' wallet was missing; is that right?

8  A   It never -- his wallet was not on his person, no.

9  Q   In the course of your investigation, you learned that

10  he habitually carried his wallet with him, right?

11  A   Yes.

12  Q   And it's never been found?

13  A   No, not to my knowledge.

14  Q   There was also a shotgun missing; is that right?

15  A   There were shotgun shells there and no shotgun, yes.

16  Q   In your investigation you determined that Mr.~Barnes

17  owned a shotgun but that that also was not there upon your

18  arrival.

19  A   That's correct.

20  Q   And there was also another item, a Felix the Cat statue

21  or doll that was taken; is that right?

22  A   I recall, yes, some sort of a doll or a statue.

23  Q   In your investigation you conferred with family members

24  of Richard Barnes, did you not?

25  A   Yes, I did.

153

1  Q    You talked to his ex-wife Alice; is that correct?

2  A    Yes.

3  Q    You talked to one of his sons, his name was Paul; is

4  that right?

5  A    Yes, I did.

6  Q    And various other people, neighbors and so forth to

7  gather information about Richard Barnes and what had

8  occurred that night; is that right?

9  A    Yes, I did.

10  Q    Now, going back to the statue, does it refresh your

11  recollection to hear about the name Felix the Cat, that

12  there was a Felix the Cat statue in the house that

13  Mr.~Barnes kept and was rather proud of that this had

14  disappeared or was taken?

15  A    Yes, I recall that now.

16  Q    And did you also determine that there was a Kermit the

17  Frog statue which had been moved to a part of the house

18  where he did not habitually keep the statue, it had been

19  moved to another room; do you remember that?

20  A    Just vaguely, yes.

21  Q    Now, when you saw Richard Barnes -- well, you said you

22  went to the autopsy, right?

23  A    Yes.

24  Q    And during the course -- and you've been to many

25  autopsies I gather in your years as a sheriff?

154

1  A    Yes, I have.

2  Q    And one of the things that's done by the coroner or

3  someone that's connected with the coroner is to determine

4  the blood alcohol of a decedent; is that right?

5  A    That's correct.

6  Q    And Mr. Barnes had a rather high blood alcohol reading

7  is that right?

8  A    It was up there somewhat.  I don't recall exactly what

9  it was.  But we determined that he had drank some, a

10  sufficient amount of vodka.

11  Q    That evening?

12  A    That evening, yes.

13  Q    If you were to hear that it was a .17 blood alcohol,

14  would that refresh your memory?

15  A    Approximately, yeah, that's about what I recall.

16  Q    Okay.  Now, a few minutes ago the prosecutor showed you

17  a color photograph, Exhibit 503B.  Do you have still have

18  those photos up there?

19  A    Yes, I do.

20  Q    Could you look at 503B, sir, for just a minute.

21  A    Yes.

22  Q    And this is a picture that shows Mr. Barnes lying face

23  down on the bed with his right arm at the front of the photo

24  as we look at it, right?

25  A    Yes.

1    Q    And there are some tattoos on there; is that right?

2    A    Yes, there are.

3    Q    And to some extent, at least one of the tattoos, you

4    can read it; is that right?

5    A    I can make out letters, yes.

6    Q    And do you see the letters on the back of his right

7    hand there in this photograph 503B?

8    A    Yes.

9    Q    It says Loma?

10   A    Yes.

11   Q    Loma is a Los Angeles street gang; is that right,

12   Hispanic street gang?

13   A    I believe so.

14   Q    And you said you were, in your investigation you were

15   trying to gather information about Richard Barnes'

16   activities and customs and habits in order to try to figure

17   this case out in some way.

18   A    Yes.

19   Q    And you determined that he often brought people to the

20   home, didn't he?

21   A    Yes.

22   Q    Hitchhikers hobos, people like that?

23   A    I don't know about hobos.  But I recall that someone

24   informed us that he had brought a hitchhiker home.

25   Q    If you were to look at the testimony of Alice Barnes

1    about hobos, do you think that might refresh your

2    recollection or not?

3    A    I don't recall hobos.  But I do recall being told that

4    he did take hitchhikers home.

5    Q    Okay.  So it wouldn't refresh your recollection on that

6    particular topic about hobos.  You recall hitchhikers.

7    A    Yes.

8    Q    Okay.  When you and your partner Sergeant Ross and the

9    other sheriffs who were on the scene were and there, were

10   any fingerprints taken off that Kermit the Frog statue?

11   A    I don't recall if any latent fingerprints were removed

12   from that statue at all.

13   Q    Was there an effort to take fingerprints from that

14   statue?

15   A    I believe I had the technician dust all the items at

16   the time that he was capable of doing.

17   Q    In the entire house?

18   A    Unlike today's scientific crime scene thing, we didn't

19   have all the things that they have now back 26 years ago or

20   23 years ago.

21   Q    But the sheriff's department did have fingerprint

22   technicians at that time.

23   A    Yes.  A technician was on the scene and he did

24   fingerprint all places where and items that were possibly

25   touched by someone.

157

1   Q    Like a door handle or a door, anything upon which a

2   fingerprint could be left?

3   A    Yes, the obvious places that you'd look.

4   Q    And then the fingerprint examiner would take those

5   prints down to the sheriff's lab and would attempt to make a

6   match against anybody of interest in the case; is that

7   right?

8   A    Yes.

9   Q    Okay.  Now, in your investigation in trying to find out

10  about Richard Barnes, did you learn that he had aliases of

11  Marty Griego and Anthony Mendez?

12  A    Yes.

13  Q    Now, you mentioned his ex-wife Alice.  They were

14  separated at that time; is that right?

15  A    That's correct.

16  Q    They were living in two different residences but not

17  too far apart?

18  A    Yes.

19  Q    Did you go to a particular motel not too far from

20  Mr.~Barnes' home to try to find the identity of a woman he

21  had stayed with in December, the Vagabond Motel.  Does that

22  ring a bell?

23  A    Yes, that rings a bell.  I don't remember.  I don't

24  recall.

25  Q    Do you remember learning that Mr. Barnes occasionally

158

```
 1    stayed at this motel?

 2    A    Yes, I had been told that.

 3    Q    And this was just a few blocks from his home?

 4    A    Yes.

 5    Q    And did you in your investigation determine the name or

 6    attempt to determine the name of any woman he might have

 7    been with at that motel recently?

 8    A    I believe we attempted to ascertain if we could locate

 9    the woman.  But I don't believe we did.

10    Q    Did you attempt to locate the identity of any of these

11    people that Mr.~Barnes used to bring into his home, these

12    hitchhikers you mentioned previously?

13    A    No.

14    Q    And previously you said they had a son named Paul,

15    right?

16    A    Yes.

17    Q    And he also had a son Stephen; is that correct?

18    A    Yes.

19    Q    And Stephen had a former wife or maybe she was his

20    current wife actually at that time.  It's not clear to me,

21    perhaps you know, either Marguerite or Marguerita?

22    A    Yes.

23    Q    And during this approximate, close proximity to

24    February 13th, she reported to you and to your partner that

25    she had been kidnapped by the Vagos motorcycle gang?
```

159

1    A    Yes.

2    Q    And was Paul a member, the son Paul, was he a member of

3    the Vagos motorcycle gang?

4    A    Yes, he was.

5    Q    So let me ask you a couple questions, a few questions

6    actually about Stephen Barnes, one of the other sons.  Now,

7    as of February 13th, 1983, Stephen Barnes, you determined in

8    your investigation, was prepared to testify as a witness for

9    the prosecution against Angelo Bono; is that right?

10   A    Yes.

11   Q    And is Angelo Bono also known as the hillside

12   strangler?

13   A    Well, he was one of them.

14   Q    He was one of two, right?

15   A    Yes.

16   Q    He had a partner who was the other hillside strangler,

17   Kenneth Bianchi, right?

18   A    Yes.

19   Q    So Stephen Barnes was set to testify against one of the

20   hillside stranglers; is that right?

21   A    That's correct.

22   Q    He was also set to testify against a person named

23   Arthur Blaugos (phonetic); is that right?

24   A    Yes.

25   Q    And Arthur Blaugos was a member of the Mexican Mafia?

160

1    A    I believe so.

2    Q    Now, Barnes, Stephen Barnes had given information to

3    law enforcement prior to February 13th, 1983 about Arthur

4    Blaugos and a murder that Blaugos was suspected of

5    committing in the Los Angeles County jail, right?

6    A    That was my case also.

7    Q    So you're already familiar with the fact that Stephen

8    Barnes had given information implicating Blaugos in that

9    particular murder, right?

10   A    Yes.

11   Q    In fact, you considered Blaugos a suspect in this case,

12   didn't you, Richard Barnes?

13   A    We looked at him, yes.

14   Q    You also determined and I think you put it in one of

15   your reports or testified that Blaugos was good for several

16   murders, right?

17   A    Yes.

18   Q    And in fact, one of them, isn't it true, was very

19   similar to the Richard Barnes murder that happened in 1982;

20   is that right?

21   A    I really only recall the murder in the jail that he

22   did.

23   Q    You don't recall the others at this time?

24   A    No.

25   Q    It's been too long, 23 years?

1   A    Yeah.

2   Q    Okay.  And you interviewed Alice Barnes on several

3   occasions?

4   A    Yes.

5   Q    Did you ever talk -- she had a brother named William

6   Schneider, right?

7   A    Yep.

8   Q    Did you ever meet with Mr.~Schneider?

9   A    Not that I recall.

10  Q    But you do know that he was connected to a man who was

11  very powerful with the Mexican Mafia named Ernest Roybal,

12  don't you?

13  A    Yes.

14  Q    Now, let me ask you on one other topic here and then

15  I'll be through, sir.  You previously testified in

16  connection with a case that had to do with the murder of

17  Richard Barnes; is that right?

18  A    Yes.

19  Q    And that trial took place in another part of the state

20  is that right?

21  A    Yes, it did.

22  Q    And that was the only time you've testified prior to

23  today in connection with the murder of Richard Barnes; is

24  that right?

25  A    Yes.

162

1    Q    There was only one defendant charged in that case; is

2    that right?

3    A    Yes.

4    Q    That was Mr. Price.

5    A    Curtis Price, yes.

6    Q    Your testimony came around 1985; is that right?

7    A    I guess so.

8    Q    Is it fair to say it was approximately 20 years ago?

9    A    Yes.

10         MR. CRAIN:  Thank you, Your Honor.  I don't have

11   any other questions.

12         THE COURT:  Cross?

13         MR. BENNETT:  No, Your Honor.

14         THE COURT:  Redirect?

15         MR. AVEIS:  Yes, thank you.

16                   REDIRECT EXAMINATION

17   BY  MR. AVEIS:

18   Q    Mr. Crain asked you a number of questions about the

19   crime scene.  Do you recall those questions he asked you?

20   A    Yes.

21   Q    And a number of questions to suggest, would it be true

22   that a number of questions based on your training and

23   experience were to suggest that you had leads you needed to

24   follow to rule out whether or not other people may have

25   killed Richard Barnes?

1    A    I believe so, yes.

2    Q    For example, Mr. Crain said that the victim Mr. Barnes,

3    Richard Barnes had been a member of Loma street gang.   Do

4    you recall that question?

5    A    Yes.

6    Q    Mr. Crain  also told you that --

7                MR. CRAIN:   Your Honor, I think that misstates the

8    question.   I asked him about the gang.

9                THE COURT:   Is that correct, counsel?

10               MR. AVEIS:   About the gang.

11   BY MR. AVEIS:

12   Q    I believe you just said that there was a tattoo on

13   Richard Barnes that was consistent with perhaps association

14   in the Loma street gang?

15   A    Yes.

16   Q    Mr. Crain also asked you whether or not there was

17   evidence that Richard Barnes, the victim, had brought home

18   sometimes hobos or hitchhikers.

19   A    That's correct.

20   Q    And you were also asked whether or not fingerprints

21   were lifted from Kermit the Frog.

22   A    Yes.

23   Q    I'm not even going to get into whether that's a

24   printable surface but you were asked that question, right?

25   A    Yes.

164

1   Q    You were also asked questions about Mr. Barnes, the

2   victim, having an alias, Marty Griego or something else,

3   Mr.~Mendez, do you remember that?

4   A    Yes.

5   Q    You were also asked whether or not Richard Barnes had

6   an ex-wife.

7   A    That's correct.

8   Q    Also asked whether or not Richard Barnes had gone to a

9   motel and may have seen a particular woman whose I.D. you

10  didn't determine, right?

11  A    That's correct.

12  Q    And you were also questioned on whether or not you

13  identified any of the hobos or hitchhikers that Richard

14  Barnes had spent time with.  Do you remember that?

15  A    Yes.

16  Q    You were also questioned and it was suggested to you

17  that Richard Barnes' son Paul had been at one time a member

18  of the Vagos motorcycle gang?

19  A    That's correct.

20  Q    Was that a violent motorcycle gang?

21  A    I would say so.

22  Q    You believe it was a gang connected with crime, right?

23  A    Yes.

24  Q    And you were also questioned about Stephen Barnes as

25  the son of Richard Barnes, correct?

1    A    Yes.

2    Q    And you said that Stephen Barnes had testified against

3    a number of individuals, including one of the hillside

4    stranglers and also a violent individual named Arthur

5    Blaugos.  Do you recall that testimony?

6    A    Yes, I do.

7    Q    You were also asked about whether or not a relative of

8    Richard Barnes, the victim, Alice Barnes, had been married

9    to a gentleman Schneider who was connected with an Eme

10   member Ernest Roybal, correct?

11           MR. CRAIN:  That misstates the evidence.

12           MR. AVEIS:  I'm sorry.  Withdrawn.

13   BY MR. AVEIS:

14   Q    Some connection suggested between Alice Barnes and

15   Ernest Roybal?

16   A    Yes.

17   Q    So you were asked questions by defense counsel about a

18   bunch of leads you might have followed up in connection with

19   trying to determine who killed Richard Barnes, right?

20   A    I believe that was the point, yes.

21   Q    At some point did you solve the killing of Richard

22   Barnes?

23   A    Yes, I did.

24   Q    Did you testify in the trial of an individual named

25   Curtis Price?

66

1           MR. CRAIN:  Your Honor, that really calls for a

2    conclusion.  Counsel is editorializing in every question.

3           THE COURT:  Well --

4           MR. AVEIS:  Following up on cross.

5           THE COURT:  Two different issues.  The question

6    has been asked, not whether or not it's appropriate, because

7    the jury remembers what he was asked and what he's answered.

8           The second thing is that there's conclusions being

9    asked for.

10   BY MR. AVEIS:

11   Q    Did you testify at a trial of an individual named

12   Curtis Price?

13   A    Yes, I did.

14   Q    Do you know how that trial ended?

15   A    Yes, I do.

16   Q    How did it end?

17          MR. CRAIN:  That calls for hearsay.

18          THE COURT:  Sustained.

19   BY MR. AVEIS:

20   Q    Did it end?

21   A    Yes, it did.

22   Q    Did you testify further in any trial involving Curtis

23   Price?

24   A    No.

25   Q    Did you close your file in regard to the homicide

56

1   Medical and Health Data Death Certificate for Aaron Edward

2   Marsh.  The date of the event is July 25th, 1997.

3           THE COURT:  Okay.  Any objection?

4           MR. BENNETT:  Number again?

5           THE COURT:  1521B.

6           MR. CHILDS:  Yes.  Request to publish?

7           THE COURT:  Okay.  But you may want to wait until

8   the -- does this take a witness?

9           MR. CHILDS:  It's self-authenticating, Your Honor.

10  It's a certified copy.

11          THE COURT:  It will be received.

12          (Exhibit 1521B received in evidence.)

13          MR. CHILDS:  Thank you, Your Honor.

14          Request to publish?

15          THE COURT:  Yes.

16          (The exhibit was displayed on the screen.)

17          MR. CHILDS:  Your Honor, the government would also

18  request to have received 1520A and 1520B, certified

19  conviction documents of the People of the State of

20  California v. Elliott Grizzle -- that would be 1520A -- as

21  well as the certified copy of the conviction documents for

22  the People of the State of California v. Gary Joe

23  Littrell -- that's 1520B -- relating to the murder of

24  Aaron Marsh.  Request to have both of them received.

25          THE COURT:  They may be received.

57

1          (Exhibit 1520A received in evidence.)

2          (Exhibit 1520B received in evidence.)

3              (Pause in the proceedings.)

4          THE COURT:  Counsel, do you have a time estimate?

5          MR. CHILDS:  It will be a long witness.

6          THE COURT:  No.  Time estimate before the witness

7   gets here.

8          MR. CHILDS:  I know it's a special transport

9   issue.  I don't.

10         THE COURT:  Will it take five minutes or so?

11         MR. CHILDS:  Yes, Your Honor.

12         THE COURT:  Ladies and gentlemen, we'll break for

13  our afternoon recess.  We'll break a little bit early now

14  but let's break at this time so we don't waste the time; and

15  we'll see you back in fifteen minutes.  Remember the

16  admonishment not to discuss this case among yourselves.

17              (The jurors exited the courtroom.)

18                      (Recess.)

19              (The jurors entered the courtroom.)

20         THE COURT:  Okay.  The record reflect the jurors

21  are all in their respective seats in the jury box including

22  the alternates.

23         We have the witness on the witness stand; and,

24  counsel, direct?

25         MR. CHILDS:  Yes, Your Honor.

36

1   feel frightened, correct?

2   A.   Yes.

3   Q.   And that's because, based on your experience in the

4   CDC, the prison system can do what they want?  They can

5   manipulate events and they can manipulate --

6           MR. CHILDS:  Objection.

7   BY MR. POTTER:

8   Q.   -- people, correct?

9           MR. CHILDS:  Argumentative.

10           THE COURT:  Sustained.

11   BY MR. POTTER:

12   Q.   Did you testify that based on your experience that

13   system can manipulate events and people when you were

14   testifying previous --

15           MR. CHILDS:  Same objection.

16           THE COURT:  Overruled.

17   BY MR. POTTER:

18   Q.   -- in previous proceedings in state court?

19           THE COURT:  Do you remember testifying to that?

20           THE WITNESS:  I can't recall.

21           THE COURT:  Okay.

22           THE WITNESS:  It's been nine years.

23           THE COURT:  Okay.

24   BY MR. POTTER:

25   Q.   All right.  I'm on Bates page 9344 and this is the

37

1    testimony from cross-examination of you by Mr. Clanton in

2    the Grizzle trial, I believe.

3              "System can manipulate events" --

4              MR. CHILDS:  Objection; improper impeachment.

5    Document has been introduced.

6              THE COURT:  On that ground, overruled.

7    BY MR. POTTER:

8    Q.    "The system can manipulate events and people, can't

9    they?"

10             And your answer:  "Yes.

11             "Okay.  And you were concerned about them doing

12   that to you, weren't you?

13   "ANSWER:  Yes.

14             "And that was a reality for you, wasn't it?

15             "Yeah.

16             "So you left that room thinking they were going to

17   charge you, didn't you?

18             "Yes.

19             "You were sweating it pretty seriously at that

20   point?

21   "ANSWER:  I was upset.

22   "QUESTION:  Feel threatened?

23   "ANSWER:  Yeah."

24             Does that still accurately portray how you were

25   feeling when Lieutenant Boyle told you that she was going to

38

1   charge you?

2   A.    You mean if I'm feeling the same now?

3   Q.    No.  About feeling the same -- that's how you were

4   feeling then at that time --

5   A.    Yeah.

6   Q.    -- when Lieutenant Boyle told you:  Hey, look, I know

7   you've got nothing to do with it; but I'm going to charge

8   you anyway.

9           MR. CHILDS:  Objection; compound.

10          THE COURT:  Sustained.

11          Is that how you felt then?

12          THE WITNESS:  Well, I know how the CDC works

13  sometimes and sometimes they just throw it on you like that.

14          THE COURT:  Okay.

15          Next.

16  BY MR. POTTER:

17  Q.    You were afraid it was you they were going to throw it

18  on?

19  A.    Yeah.

20  Q.    All right.  So -- and then the third time they pulled

21  you out again, they told you they knew that you weren't

22  involved but they were going to charge you anyway.  Right?

23          MR. CHILDS:  Objection; form of the question.

24          THE COURT:  Overruled.

25          Did they ever say that to you?

39

1          THE WITNESS:  They said that they know that I had

2    nothing to do with it and they don't want to charge me with

3    it.  But they're going to try to try me if I don't tell what

4    I know.

5          THE COURT:  They were going to try you -- I'm

6    sorry.

7          THE WITNESS:  They were going to try to charge me.

8          THE COURT:  They were going to try to charge you.

9    Okay.

10   BY MR. POTTER:

11   Q.   They were going to try to charge you if you didn't talk

12   with them, right?

13   A.   Yeah.

14   Q.   At some point, you met with Mr. Fallman, correct?

15   A.   I think that was the third time.

16   Q.   The DA.  Did he show up the third time or the fourth

17   time if you remember?

18   A.   I think it was the third.  I'm not sure.

19   Q.   All right.  And Mr. Fallman basically told you you were

20   looking at 50 to life, 25 to life, and then because of your

21   strike, they were going to double you up.  But if you were

22   willing to speak with him, that you wouldn't get charged.

23          Do you recall that?

24   A.   No.

25   Q.   Did Mr. Fallman ever tell you you were looking at 50 to