UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| vs. | ) No. CR 02-938-DOC |
| RONALD BOYD SLOCUM, WAYNE BRIDGEWATER, and HENRY MICHAEL HOUSTON, | ) |
| Defendants. | ) |

**ORIGINAL**

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

Tuesday, December 19, 2006

JANE C.S. RULE, CSR No. 9316
Federal Court Reporter
UNITED STATES DISTRICT COURT
411 West Fourth Street, Room 1053
Santa Ana, California 92701-4516
(714) 558-7755

Reporter's Reference:  06-12-19 ABSTATUS

CR 02-938-DOC                    December 19, 2006                                    2

```
 1    APPEARANCES:

 2

 3    On behalf of the Plaintiff UNITED STATES OF AMERICA:

 4            OFFICE OF THE UNITED STATES ATTORNEY
              BY:  TERRI K. FLYNN
 5                 BRETT SAGEL
                   Assistant United States Attorneys
 6            411 West 4th Street
              8th Floor
 7            Santa Ana, California 92701
              (714) 338-3500
 8

 9    On behalf of the Defendant RONALD BOYD SLOCUM:

10            LAW OFFICES OF MICHAEL R. BELTER
              BY:  MICHAEL R. BELTER
11                 Attorney at Law
              65 North Raymond Avenue
12            Suite 320
              Pasadena, California 91103
13            (626) 796-2599

14
      On behalf of the Defendant WAYNE BRIDGEWATER:
15
              LAW OFFICES OF MICHAEL V. WHITE
16            BY:  MICHAEL V. WHITE
                   Attorney at Law
17            1717 Fourth Street
              Third Floor
18            Santa Monica, California 90401
              (310) 576-6242
19
                         - AND -
20
              STEWART & HARRIS
21            ATTORNEYS AT LAW
              BY:  WILLIAM S. HARRIS
22                 Attorney at Law
              1499 Huntington Drive
23            Suite 403
              South Pasadena, California 91030
24            (626)441-9300

25
```

Jane C.S. Rule, CSR No. 9316 - Federal Official Court Reporter

```
 1   APPEARANCES (Continued):

 2

 3   On behalf of the defendant HENRY MICHAEL HOUSTON:

 4          LAW OFFICES OF MARK F. FLEMING
            BY:  MARK F. FLEMING
 5               Attorney at Law
            433 "G" Street
 6          Suite 202
            San Diego, CA 92101
 7          (619) 652-9970

 8                    - AND -

 9          ROTHSTEIN, DONATELLI, HUGHES,
            DAHLSTROM, SHOENBURG & FRYE, LLP
10          BY:  MARK H. DONATELLI
                 Attorney at Law
11          P.O. Box 8180
            Santa Fe, New Mexico 87504
12          (505) 988-8004

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CR 02-938-DOC                December 19, 2006                    4

```
 1                          I N D E X

 2

 3

 4  1.    MOTION BY DEFENDANTS HOUSTON AND BRIDGEWATER TO SEVER THE
          TRIAL OF HOUSTON AND BRIDGEWATER FROM CO-DEFENDANT RONALD
 5        SLOCUM (fld. 12/1/06)

 6  2.    MOTION BY DEFENDANT SLOCUM FOR SEVERANCE

 7  3.    MOTION BY GOVERNMENT TO DISMISS COUNT 8 AS TO DEFENDANTS
          SLOCUM, BRIDGEWATER AND HOUSTON
 8
    4.    STATUS CONFERENCE
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1            SANTA ANA, CALIFORNIA, TUESDAY, DECEMBER 19, 2006

 2                            (8:51 a.m.)

 3            THE COURT:  All right.  We are going to bring the case

 4   in order, beginning with the United States Government.

 5            Mr. Sagel, good morning.

 6            MR. SAGEL:  Good morning, your Honor.

 7            THE COURT:  Sit down.

 8            MS. FLYNN:  Good morning, your Honor.  Terri Flynn on

 9   behalf of the United States.

10            THE COURT:  Okay.  On behalf of --

11            MR. BELTER:  Michael Belter, your Honor, for

12   Mr. Slocum.

13            MR. DONATELLI:  Mark Donatelli, your Honor, for

14   Mr. Houston.

15            THE COURT:  Okay.  Why don't you have a seat,

16   gentlemen.

17            THE COURT:  And Mr. White, Mr. Harris?

18            MR. WHITE:  Good morning.

19            MR. HARRIS:  Good morning.

20            THE COURT:  Okay.  I have a number of moving people up

21   here today, and because there is going to be a case taking

22   place with 10 defendants in the complex courtroom beginning in

23   early March, it doesn't make sense that we start in the complex

24   courtroom and then move over here two weeks into the trial.  So

25   we're trying to set this up in some fashion, and I'm going to

CR 02-938-DOC                    December 19, 2006                    6

1   ask for your wisdom about what else we can do.

2          First, gentlemen, you've been transported so far in

3   Bureau of Prisons clothing.  Do you want to start being dressed

4   out for even the pretrial motions, et cetera, or are you more

5   comfortable with what you're wearing?

6          You are fine, Mr. Slocum, with what you're wearing, at

7   least for the pretrial motions?

8          DEFENDANT SLOCUM:  Yes.

9          THE COURT:  And how about you, Mr. Bridgewater?

10         DEFENDANT BRIDGEWATER:  Yeah, that's fine.

11         THE COURT:  Okay.  If at any time you gentlemen want

12  to be dressed out earlier than when the jury comes into

13  session, I'll dress you out at any time.

14         Mr. Houston, what about you?

15         DEFENDANT HOUSTON:  I'm fine.

16         THE COURT:  The next thing is I want to have a dry run

17  and see what you look like in civilian clothes.  I don't want

18  that to be a last-minute problem.

19         So long-sleeved shirts.

20         DEFENDANT HOUSTON:  Are you going to go with gloves,

21  too?

22         (Laughter.)

23         THE COURT:  The government can prove what they've got.

24         What I'm looking for is something around the neck,

25  something around the face.

```
 1              (Defendant Houston shows the Court a tattoo)

 2         THE COURT:  Yeah, but that's -- yeah, it's not a 666

 3  or a star, you know.

 4         Okay.  The next thing I'm worried about, Mr. Belter,

 5  is the ability of the court reporter to see you for a moment,

 6  and I've sat in that chair earlier this morning next to your

 7  client, and right now, as long as you keep that chair in that

 8  position, seat, because she can see your mouth, which helps the

 9  court reporter.  But if you'd like, I can switch you out and

10  put Mr. Slocum on the other side and put you on this side of

11  the table, because when you approach the lectern, it doesn't

12  matter to me what side of the table you come around, except

13  there is going to be a curtain by the next court hearing that

14  we set that's going to extend to right here (indicating).  So

15  it might be more comfortable for you if you want to be on the

16  other side.  I'll just set it up this way for you, and I don't

17  care if you use this space in between.  It's your choice.

18         MR. BELTER:  Thank you, your Honor.  I think I prefer

19  to sit on the other side.

20         THE COURT:  Okay.  We will move you around.

21         You've got first choice.

22         (Complied.)

23         (Discussion held off the record.)

24         THE COURT:  Can you see Mr. Donatelli?

25         THE REPORTER:  Yes.
```

```
 1              THE COURT:  Now, the second thing is you want --

 2         Are you okay?

 3              MR. WHITE:  Well, the thing I'm thinking about is the

 4    thing that got me in trouble in the last trial; are we going to

 5    be able to see the witness?

 6         Bill, can you see?

 7              MR. HARRIS:  I can see over, yes.

 8              THE COURT:  Will one of you gentlemen sit up in the

 9    witness chair in the witness box.

10         What we might do is move that monitor.

11         Would you move that monitor so it's flush?

12         (Complied.)

13              THE COURT:  Okay.  Now, Mr. White, can you see?

14              MR. WHITE:  Yes.

15              THE COURT:  I'm worried about Mr. Harris.

16         Can you see?

17              MAINTENANCE TECHNICIAN:  I can just barely see the top

18    of his head.

19              THE COURT:  Let's move the monitor to the other side,

20    just disassemble it for the time being, because I'll have a

21    monitor behind them also.

22         (Complied.)

23              THE COURT:  Okay.  Now, Mr. Harris, Mr. White, can you

24    see that?

25              MR. WHITE:  White I can see from his nose up, but he
```

```
 1   may be sitting back a little bit.

 2            MAINTENANCE TECHNICIAN:  I'm sitting up straight.

 3            THE COURT:  Slide forward.

 4            (Complied.)

 5            MR. WHITE:  Now I can see fine.

 6            MR. FLEMING:  I'm fine.

 7            THE COURT:  Mr. Fleming is okay.

 8            Mr. Donatelli, are you all right?

 9            MR. DONATELLI:  Yes.

10            THE COURT:  Mr. Harris, we are about to move you.

11   Where would you like to sit?

12            MR. HARRIS:  The problem is -- I can see from the

13   mustache up.

14            I think it's acceptable, your Honor.

15            THE COURT:  Do you want to switch this gentleman?

16            MR. WHITE:  If the witness was sitting up three

17   inches, it would be okay.

18            THE CLERK:  Is that chair all the way up?

19            MAINTENANCE TECHNICIAN:  Yes.

20            MR. WHITE:  How about some wheels?

21            THE COURT:  No.

22            Okay.  We need that chair built up.  I need something

23   in that witness box that elevates him about four inches.

24            Let's put a telephone book down.  I need about four

25   inches of something to sit on.
```

```
 1              THE CLERK:  Do you want to see if this chair is
 2  higher?  It's a different color.
 3              THE COURT:  Nope.
 4              (Discussion held off the record.)
 5              THE COURT:  Okay.  Gentlemen, now we've raised this
 6  about four inches.
 7              Mr. White, can you see?
 8              MR. WHITE:  Yeah, I can see.
 9              THE COURT:  Mr. Bridgewater, can you see?
10              DEFENDANT BRIDGEWATER:  Yes.
11              THE COURT:  Mr. Donatelli -- or Mr. Harris?
12              MR. HARRIS:  Yes, your Honor.
13              THE COURT:  Okay.
14              Brian?
15              We'll be right back.
16              (Recess.)
17              THE COURT:  Now, we've raised this about five inches.
18              Mr. Harris, can you see the witness?
19              MR. HARRIS:  Perfect.
20              THE COURT:  Mr. Bridgewater?
21              DEFENDANT BRIDGEWATER:  Yeah.
22              THE COURT:  Mr. White?
23              MR. WHITE:  Yes, your Honor.
24              THE COURT:  Mr. Fleming?
25              MR. FLEMING:  Yes.
```

```
 1          THE COURT:  Mr. Houston?

 2          DEFENDANT HOUSTON:  Yes.

 3          THE COURT:  Mr. Donatelli?

 4          MR. DONATELLI:  Yes.

 5          THE COURT:  Mr. Belter?

 6          MR. BELTER:  Yes.

 7          THE COURT:  Mr. Slocum?

 8          DEFENDANT SLOCUM:  Yes.

 9          (Discussion held off the record.)

10          THE COURT:  All right.  Mr. Donatelli, will you go up

11   and sit in the jury box.

12          (Complied.)

13          THE COURT:  How tall are you, sir?

14          MR. DONATELLI:  This morning I was 6-5, your Honor.

15          THE COURT:  You always wanted to be 6-6.

16          MR. DONATELLI:  When I left here the last time, Judge,

17   I was about 6-2.

18          (Laughter.)

19          THE COURT:  I don't care what seat you sit in for a

20   moment, and I want to make certain the restraints cannot be

21   seen by a juror.  And remember that all counsel will be seated

22   at all times, and so will the clients, but the jurors will

23   stand.

24          So Mr. Donatelli, will you stand and pretend you are a

25   juror and you are moving out.
```

```
 1              (Complied.)

 2              THE COURT:  Mr. Slocum, will you be kind enough, sir,

 3    and move your chair all the way back for a moment.

 4              (Complied.)

 5              THE COURT:  Now, will you grab your chain for a

 6    second.

 7              (Complied.)

 8              THE COURT:  Say "happy holidays."

 9              No, I'm just kidding you.

10              (Laughter.)

11              THE COURT:  Move that chain for a moment so

12    Mr. Donatelli can feast his eyes on you.

13              (Complied.)

14              THE COURT:  Can you see that?

15              MR. DONATELLI:  I can see it from where I'm sitting.

16              THE COURT:  Yeah, I can too.

17              Now, move closer, now, to the table.

18              (Complied.)

19              THE COURT:  About right there.

20              Now move that up.

21              (Complied.)

22              THE COURT:  Can you see that?

23              MR. DONATELLI:  Yeah.

24              THE COURT:  Now, assuming he wasn't holding the chain

25    up purposely, assuming it was just down, can you see it now?
```

CR 02-938-DOC                    December 19, 2006                    13

```
 1            MR. DONATELLI:  No.

 2            THE COURT:  Mr. Slocum, can you be kind enough to move

 3   your chair all the way back.

 4            (Complied.)

 5            THE COURT:  Mr. Donatelli, can you see that?

 6            MR. DONATELLI:  I can if I stand up.

 7            THE COURT:  I can too.

 8            Now, go to the top row for a moment.  You are in the

 9   bottom row.

10            (Complied.)

11            THE COURT:  Can you see?

12            MR. DONATELLI:  It's about the same.  Yeah, I can see

13   it here (indicating).

14            THE COURT:  Okay.  Now, Mr. Slocum, can you move

15   forward a little bit.

16            (Complied.)

17            THE COURT:  Okay.  Can you see now?

18            MR. DONATELLI:  No.

19            THE COURT:  Okay.  We are going to take the wheels off

20   the chairs.

21            I want you absolutely satisfied.  In other words, no

22   restraints to be in the jurors' view at any time.  We will do

23   all of the silly stuff today so we can make the modifications,

24   so we are not going through three, four months of trial with

25   this.
```

1          So soon there will be a curtain right here

2    (indicating).

3          And Mr. Bridgewater, you're welcome to go through

4    that, end there will be enough room in the back to approach the

5    lectern.

6          Now, Mr. Donatelli, will you stand up there for a

7    moment (indicating).

8          Mr. Fleming, will you go up on the lectern for a

9    moment, and just start using it.

10          (Complied.)

11          THE COURT:  Put a piece of paper on the ELMO.  Speak

12    into the microphone.  Make sure you're comfortable.  Look

13    around.

14          (Complied.)

15          THE COURT:  What I did was move the lectern forward as

16    I did in the other courtroom, put the U.S. Attorney's cable

17    behind as we did in the other courtroom, but I thought I can

18    have a special port built out again, but I kind of like the

19    idea that everybody looks coequal.  And if I can make it work

20    with coequal benches, I think that's even a better impression

21    than having the massive stands that we'd have to build out in

22    the courtroom, like we have in the complex courtroom.

23          Now, I can have that done, but I'm thinking that

24    defense counsel may appreciate what appears to be a more normal

25    situation, more quality of seating, visually.

1          MR. FLEMING:  This is fine, your Honor.

2          THE COURT:  Okay.  Mr. White?

3          MR. WHITE:  Yes, I agree.  This is fine.

4          THE COURT:  Mr. Harris?

5          MR. HARRIS:  Yes, your Honor.

6          THE COURT:  Mr. Belter?

7          MR. BELTER:  Yes, your Honor.

8          THE COURT:  Give me the input of what works and what

9  doesn't.

10          MR. FLEMING:  Are we going to have a drop screen or --

11          THE COURT:  All on video.  We didn't have a drop

12  screen last time.  No drop screen this time.

13          MR. FLEMING:  Okay.

14          THE COURT:  Mr. Donatelli, are you working on that?

15  In other words, we will raise the cables, provide a buffer, but

16  I think what we are going to do is take the wheels off the

17  chairs.

18          MR. DONATELLI:  Yes, just a matter of backing up, if

19  one backs up too far --

20          THE COURT:  So it can't be an inadvertent mistake by

21  backing up.  That chair will be stationary.  Mr. Slocum has

22  plenty of room, but as long as he has position -- as long as

23  it's all the way back a couple of feet back, but I stood on top

24  of the chairs during the Yao Ming interpretation, Shaq, and

25  then I can barely see Mr. Slocum.  I figured he was 6-5 and had

CR 02-938-DOC                December 19, 2006                        16

```
 1   a pretty good view.

 2           Okay.  Mr. Donatelli, thank you very much.  We will

 3   work on that.

 4           Listen, I want to thank you gentlemen very much.

 5   That's good for the day.

 6           MS. FLYNN:  Your Honor, can I ask for one thing?

 7           THE COURT:  Yeah.

 8           MS. FLYNN:  In the other courtroom I had a phone cord

 9   that the court authorized.  Can I get one in this one as well?

10           THE COURT:  Yes, absolutely.

11           MS. FLYNN:  I would just need you to authorize it and

12   then I can --

13           THE COURT:  I am authorizing the phone cord.

14           MS. FLYNN:  Thank you.

15           THE COURT:  Okay.  The next hearing we'll have it.

16           MS. FLYNN:  Thank you.

17           THE COURT:  Steve, thanks a lot.

18           Just a moment.  Mr. Donatelli, will you go back again,

19   sir.  I apologize.

20           (Complied.)

21           THE COURT:  Mr. Bridgewater, Mr. Houston, will you

22   gentlemen be kind enough to shove your chair back for a moment

23   to the wall.

24           (Complied.)

25           THE COURT:  Okay.  Would you go back up in the jury
```

1  box?

2         (Complied.)

3         THE COURT:  I want to pay the same courtesy to each of

4  your clients for a moment.  I want to see if they see the

5  chains.  They are clear back to the wall.  There is no reason

6  why they will see back that far.

7         Now, will you gentlemen scoot forward.

8         (Complied.)

9         THE COURT:  Unless you are going to hold the chain up,

10 that's voluntarily showing the restraints, you are not going to

11 do that, and I don't want to tighten them down, so it takes a

12 little cooperation.

13        Now, go half way.  In other words, I want you to be

14 comfortable.

15        (Complied.)

16        THE COURT:  Can you see that?

17        MR. DONATELLI:  Mike, hold it up.

18        (Complied.)

19        THE COURT:  No.  I thought it was a chain, but it

20 wasn't.

21        THE COURT:  Okay.  Now, go up to the second row, would

22 you, just to make sure.

23        MR. DONATELLI:  (Complied.)  No, huh-uh.  I can't see.

24        THE COURT:  Okay.  That gives plenty of room.  They

25 are never going to be that far back.

CR 02-938-DOC                    December 19, 2006                    18

```
 1          Okay.  Gentlemen, thank you very much.

 2          Mr. Donatelli, thank you again.

 3          THE COURT:  Okay.  Steve, thank you.

 4          (Recess.)

 5          THE COURT:  Now, counsel, the first order of business

 6   today is the government's motion to dismiss Count 8.  I could

 7   have starred that and send that back to you.  It appears to be

 8   simply a formality, but I'd like that to be on the record and

 9   make certain there is consent from all of the parties, without

10   assuming.

11          The government filed this motion on December 8th.  I

12   assume each of you have gotten copies of this.

13          Mr. Belter?

14          MR. BELTER:  Yes.

15          THE COURT:  Mr. Donatelli?

16          MR. DONATELLI:  Yes, sir.

17          THE COURT:  Mr. Fleming?

18          MR. FLEMING:  Yes, your Honor.

19          THE COURT:  Mr. Harris, Mr. White?

20          MR. HARRIS:  Yes, your Honor.

21          MR. WHITE:  Yes, your Honor.

22          THE COURT:  All right.  Gentlemen, is there any

23   objection on behalf of Mr. Houston, Mr. Bridgewater,

24   Mr. Slocum, that the count is to be dismissed?

25          MR. HARRIS:  No, your Honor.
```

1           MR. WHITE:  No, your Honor.

2           MR. FLEMING:  No, your Honor.

3           MR. DONATELLI:  No, your Honor.

4           MR. BELTER:  No, your Honor.

5           THE COURT:  I am going to give you a tentative

6    concerning your motion to sever.  It's a tentative subject to

7    argument.  It's not a final decision by the Court.  Each of you

8    will be extremely pleased, and each of you will be extremely

9    displeased.  So I want to get your comments on the record about

10   some of my tentative thoughts and any input that you'd like to

11   make, and that will give you a fair opportunity to argue the

12   matter without, you know, simply getting this order in the

13   blind.  There is so much discretion with the Court in terms of

14   severance, and I'll tell you my concerns in just a moment on

15   behalf of both parties.

16           The second is at some point I'd like to get -- I know

17   you've been working on the jury questionnaire.  You have the

18   master copy in the U.S. Attorneys Office.  In fact, after the

19   last hearing, you probably made some of the corrections, and if

20   not, I want to go over that again.  But I want to also

21   distribute to you another rework section.  I've added,

22   tentatively, a new paragraph, subject to your input, and I'll

23   show you in a moment, under "Attitudes regarding the death

24   penalty," and rework Questions Number 62 through 65, and

25   thought about Question Number 71, but this -- this is really a

1  discussion in the vacuum until I give this to you.

2        So I suggest this.  Ms. Flynn, why don't you go down

3  to the U.S. Attorneys Office and will you bring up one master

4  copy, and we'll Xerox it up, unless you have a high-speed

5  copier, and if you do, maybe we can start with that for just a

6  moment.  And I want to spend plenty of time on this motion to

7  sever.  It's critical on both sides.

8        (Ms. Flynn left the proceedings.)

9        THE COURT:  Now, after we do those three things, what

10 else do we need to do today?

11       (No audible response.)

12       THE COURT:  Okay.  The second thing is I changed the

13 date and sent out a minute order to you.

14       Upon your question, Mr. White, I think you are

15 absolutely right.  Since we're taking that entire week, why am

16 I bringing you in on a Tuesday?  So I moved that to Wednesday,

17 the 21st, because we're going to get more jurors in.  What

18 happens if we have a jury pool and people have vacation over

19 the three-day period of time, and then Tuesday they are

20 fighting traffic and decide they want to come back on a

21 Tuesday?  So I thought that we'd start on -- what would that

22 be, the 23rd?

23       MR. FLEMING:  The 21st, your Honor.

24       THE COURT:  I'm sorry.  My apologies.  Yeah, the 21st,

25 and that was the only change.

CR 02-938-DOC                    December 19, 2006                        21

 1          Now, does that meet with your consent, Mr. White?

 2          MR. WHITE:  Yes.

 3          THE COURT:  Mr. Fleming?

 4          MR. FLEMING:  Yes, your Honor.

 5          THE COURT:  Mr. Harris?

 6          MR. HARRIS:  Yes.

 7          THE COURT:  Mr. Donatelli and Mr. Belter?

 8          MR. DONATELLI:  Yes.

 9          MR. BELTER:  Yes.

10          THE COURT:  Okay.

11          MR. WHITE:  Excuse me, your Honor?

12          THE COURT:  Yeah.

13          MR. WHITE:  Oh, Ms. Flynn is gone.

14          (Recess.)

15          THE COURT:  Okay.  These, once again, are only subject

16   to discussion in terms of any of my thoughts concerning the

17   questionnaire.

18          All right, counsel.  Once again, the tentative is

19   simply that it's a tentative, and I'd like to hear from the

20   defense.  I don't care which order who speaks.  Who would like

21   to be the primary --

22          Without a decision, Mr. Belter, your comment.

23          MR. BELTER:  We have no further argument.  We actually

24   would like the Court to make the tentative the final order.

25          THE COURT:  Do you want me to do that right now?

CR 02-938-DOC                December 19, 2006                            22

```
1              MR. BELTER:  No, your Honor.  I think other counsel

2    may want to say something, but we don't.

3              THE COURT:  Okay.  Thank you very much.

4              Let me move to Mr. White and Mr. Donatelli.

5              MR. WHITE:  Your Honor, we would submit.

6              THE COURT:  All right.

7              Mr. Fleming?

8              MR. FLEMING:  Your Honor, I think our position is well

9    stated in the papers in terms of where we differ with the Court

10   with regards to whether these defenses are truly mutually

11   exclusive, so we'll submit on the papers.  We think that the

12   issues presented --

13             THE COURT:  Okay.  Let me turn to the government.

14             What are your thoughts on this?

15             MS. FLYNN:  Your Honor, the government is concerned

16   about the way the Court is proposing to sever based on the

17   issue of spillover evidence.  The government concurs with the

18   tentative rulings on the other two, or reasons that the defense

19   put forward.

20             As to the spillover evidence, Counts 1 and 2 are the

21   substantive RICO counts and the conspiracy RICO count

22   respectively.

23             THE COURT:  Right.

24             MS. FLYNN:  In order to prove 6 and 7, which are the

25   VICAR counts, the government has to prove that Frank Joyner and
```

1  Abdul Salaam was killed as a result and in furtherance of the

2  Aryan Brotherhood enterprise.  In order to prove that, we have

3  to put the murders in context.

4       I need to go back and prove that in the 1960s, the

5  Aryan Brotherhood was formed.  This is how it was formed.  This

6  is what they did.  They killed people.  The objects of the

7  enterprise were murder, narcotics trafficking, extortion, the

8  other things we proved up in the Mills and Bingham case.

9       In doing that, we will be putting on witnesses such as

10 Glen West, who is going to go back and say "I've been a member

11 since the end of the '70s.  This is what happened."

12      THE COURT:  So your point is, "Judge, you'd be

13 fighting with the defense" -- in other words, if I made this

14 ruling, they would request to go back to those time frames to

15 show the activities of the other Aryan Brotherhood, and if I'm

16 going to do that, why wouldn't I allow Counts 1 and 2?

17      MS. FLYNN:  Yes, because Slocum, for example, in order

18 for the government to convince the jury that Slocum passed this

19 message, we need to put Slocum in context.  So even if he is

20 not in the trial, I intend to prove that Slocum passed murder

21 messages before.  So when Benton got a message passed by

22 Slocum, he knew, "Oh, Slocum passes these messages.  He's a

23 councilmember.  He's high up.  He passes murder messages."  So

24 even if he's not sitting here, that evidence is relevant to

25 Houston and Bridgewater to put it in context so that the jury

CR 02-938-DOC                    December 19, 2006                    24

```
 1   can actually believe that when Benton got the piece of paper on
 2   August 28th, 1997, it was the same as when Slocum passed a
 3   message in the '80s.
 4         THE COURT:  Right, and obviously I'd let you go back
 5   into some of that testimony.  The difficulty for you is you
 6   wouldn't know what before you went into trial.
 7         MS. FLYNN:  Right, and Counts 1 and 2 -- first of all,
 8   Bridgewater and Houston are both charged on Counts 1 and 2
 9   pertaining to the Lewisburg murders to the conspiracy to kill
10   black inmates, so by proving up Counts 6 and 7, we're also
11   proving up Counts 1 and 2, the conspiracy and the substantive
12   counts as to those defendants anyways.
13         THE COURT:  But Counts 1 and 2 are much broader.
14   Hidden behind all of this is a deep concern I have concerning
15   the Barnes murder.
16         MS. FLYNN:  And that can be worked out.  To be
17   perfectly honest --
18         THE COURT:  What's really driving my exclusion of
19   Counts 1 and 2 is the following:  I agree that you should be
20   able to show the prior murders, attempted murders and
21   conspiracies involving Slocum, and I can handle that probably
22   through limiting instructions.  But I'm deeply concerned about
23   the Barnes murder because it occurs -- what year, 1980 --
24         MS. FLYNN:  '2 or '83, your Honor.
25         THE COURT:  When Mr. Houston and Mr. Bridgewater may
```

```
 1   or may not have been active in the Aryan Brotherhood.

 2              Second, if I had a 352, or what we call a 403 ruling

 3   on this, I'd be concerned about the Barnes murder because it

 4   involves a civilian, a father, apparently.  It takes it out of

 5   the context of what we are normally going to hear concerning

 6   the AB.

 7              So for a while, frankly, I toyed with the exclusion of

 8   the Barnes murder, which is -- what count is it?  It's simply

 9   in Count 1.

10              MS. FLYNN:  It's Racketeering 3 of Count 1.

11              THE COURT:  Count 1.

12              MS. FLYNN:  And your Honor, to be perfectly honest, I

13   have not decided if I intend to prove up the Barnes murder at

14   this point in the case against these defendants.

15              THE COURT:  Well, I am not going to give you the

16   chance.

17              (Laughter.)

18              MS. FLYNN:  Well, even if that were to be excluded,

19   the other murders and the narcotics trafficking is directly on

20   point to put the Aryan Brotherhood in context and to show

21   Slocum's role and why Benton took it seriously and,

22   subsequently, Bridgewater and Houston acted the way they did.

23              Moreover, Bridgewater has been a member of the Aryan

24   Brotherhood as long as Benton was.  I think in the early '80s,

25   or sometime in the '80s, he became a member of the Aryan
```

```
 1  Brotherhood.  So many of the activities that went on during
 2  that time, he may not have been particularly aware, so he is
 3  not culpable as a racketeering act, but he was part of the
 4  enterprise as it was doing its activities for much of the
 5  time.
 6          In the Mills and Bingham case, we talked extensively
 7  about Slocum and Slocum's activities because he was relevant as
 8  a message passer.  I don't see that being any different for
 9  Houston and Bridgewater, even though the direct evidence of
10  these individuals start in 1997.
11          THE COURT:  I want to assume for a moment that I
12  simply severed Slocum in totality.  I mean, hypothetically, as
13  the defense has requested.  You'd still be asking the Court to
14  go back through much of the same information that's set forth
15  in Count 1.
16          MS. FLYNN:  Exactly, yes.
17          THE COURT:  And there we would have that constant
18  struggle between the defense and the government with every
19  piece of evidence --
20          MS. FLYNN:  Yes.
21          THE COURT:  -- that you requested outside the direct
22  Lewisburg murder.
23          MS. FLYNN:  Yes.  I want to show that he was involved
24  in the California AB, that there is a link between the two of
25  them, to prove that he is a message passer, that he was with
```

```
 1   the big guys in California.  He got out, then he passed

 2   messages between California and Feds.  Mills and Bingham knew

 3   this.  They trusted him.  Al Benton knew this.  So when a

 4   message went from him into Lewisburg, Benton took it for what

 5   it was, a serious message coming from Slocum, a man who could

 6   be trusted to pass the messages of commissioners.  And I think

 7   without that context, your Honor, it's very difficult to put

 8   the Joyner and Salaam murders, or to prove them as an

 9   enterprise murder.

10        THE COURT:  Yeah, because in the Mills trial, you had

11   strong evidence of Slocum's continuing role as a message

12   carrier.  Therefore, you have strong probative evidence that

13   since he acted in that role on so many occasions, that,

14   therefore, the inference is and the circumstantial evidence is

15   that when other people claim he is the message carrier here, in

16   all probability he is --

17        MS. FLYNN:  Yes.

18        THE COURT:  -- from their prospective.

19        MS. FLYNN:  Yes.  And even further, that it was a war

20   message, that Slocum was trusted to send a war with DC Blacks

21   message, you know, one of the most serious messages that the

22   Aryan Brotherhood could pass.  Slocum was trusted to pass that

23   message and --

24        THE COURT:  So in other words, much of the same

25   evidence you are going to request -- if Slocum was entirely
```

CR 02-938-DOC                    December 19, 2006                         28

```
 1   severed, would the evidence that you would put on if Slocum
 2   would remain in the case in Count 1 and Count 2?
 3            MS. FLYNN:   Yes, your Honor.
 4            THE COURT:   What about the Barnes murder?
 5            MS. FLYNN:   If Slocum were severed, the Barnes murder
 6   wouldn't have any evidence against Bridgewater and Houston.
 7            THE COURT:   And what happens if he is not severed?
 8   What happens if I adopt your position in terms of Counts 1 and
 9   2?   In other words, we make a clean decision so we are not
10   going back through each and every, you know, disagreement.   You
11   know my concerns about the Barnes murder.
12            MS. FLYNN:   I think it could be still proved up with
13   limiting instructions.   I do see a 403 potential issue, and I
14   would submit that to the Court to decide whether or not that
15   racketeering act could be proved up by the government.
16            THE COURT:   I could probably state categorically if I
17   let this remain in a joint situation, that I'd sever Barnes.
18   And under those circumstances, do you still want to join trial?
19            MS. FLYNN:   If that's my option, yes, I'd request a
20   joint trial with just the Barnes -- with not being allowed to
21   prove up the Barnes --
22            THE COURT:   Do you want to think about that, or are
23   you pretty solid about that?
24            MS. FLYNN:   (No audible response.)
25            THE COURT:   In other words, we are going to come back.
```

```
 1  I am going to need another day, and I am going to ask if you

 2  want to come back tomorrow with all counsel or, you know, next

 3  Tuesday, but we're coming back into session.  I am not going to

 4  decide the severance motion today.  I am going to listen to

 5  everybody and go back and do some rethinking on it.  It's just

 6  a tentative.

 7          MS. FLYNN:  My initial thought, your Honor, is I'm

 8  fine with that.  I want a joint trial.  I'm okay with the

 9  racketeering act Barnes.  I would like an hour to think about

10  it to see if I change my mind or so.

11          THE COURT:  Sure.  You may have more than that.

12          Okay.  Counsel, I invite any thoughts you have.

13          Mr. Belter?

14          MR. BELTER:  Well, your Honor --

15          THE COURT:  Stay seated.

16          MR. BELTER:  You know, obviously I think what drives

17  the severance, once you get beyond the antagonistic defense

18  issue, is the spillover issue of Mr. Slocum's, sort of the

19  breadth of his involvement in this 25-, 30-year period of time

20  and how that would relate to Mr. Houston and Mr. Bridgewater.

21  So I think their counsel need to speak directly to the Court

22  about that.

23          THE COURT:  How long has Mr. Houston allegedly been a

24  member of the Aryan Brotherhood?

25          MR. DONATELLI:  Your Honor --
```

CR 02-938-DOC                    December 19, 2006                    30

```
 1            MS. FLYNN:  He's been an associate for many years

 2  leading up to '97.  I believe he was made a member of the Aryan

 3  Brotherhood the day of the murders before the committee, which

 4  is what Mr. Benton said.

 5            THE COURT:  Was he an associate status?

 6            MS. FLYNN:  Yes, he was an associate of them before.

 7            THE COURT:  When?

 8            MS. FLYNN:  I don't know exactly when.  I mean --

 9            THE COURT:  How old is Mr. Slocum?

10            MR. FLEMING:  44.

11            I'm sorry.  I thought you were talking about

12  Mr. Houston.  I'm sorry.

13            MR. BELTER:  Mr. Slocum is 62, your Honor.

14            THE COURT:  Okay.  How old is Mr. Houston?

15            MS. FLYNN:  I think Mr. Fleming just said 44.

16            MR. FLEMING:  Yes.

17            THE COURT:  How old is Mr. Bridgewater?

18            MR. WHITE:  54.

19            MR. DONATELLI:  Your Honor, if I could, page 47 of the

20  Indictment alleges that Mr. Houston became a member in

21  September of 1997.

22            THE COURT:  All right.  Mr. Belter, any other

23  thoughts?

24            MR. BELTER:  Your Honor, with respect to the passing

25  of the war message, I know the Court has heard Mr. Benton's
```

1   testimony, and I went back and reread it for the purposes of

2   this hearing, and I think what's significant is that Mr. Benton

3   testified repeatedly that Mr. Slocum did not know what was

4   contained in that message, and that's the government's best

5   evidence with respect to Mr. Slocum and that message is that he

6   made an attempt to actually determine if Mr. Slocum knew

7   anything else about either rumor assaults that occurred earlier

8   at Marion, as well as whether or not he had any additional

9   information that would put this message that he claims to have

10  received in some context.

11              THE COURT:  There is a phone call to Mr. Slocum.

12              MR. BELTER:  Yes, there was, your Honor, and there was

13  a phone call after, as the Court may recall, so August 28th and

14  also September 3rd.  And so I think that, at least for purposes

15  of our discussion today, I think it's significant or important

16  that we remember what Mr. Benton testified in court and that he

17  was the government's witness.

18              As far as we're concerned, the tentative ruling --

19  we're not going to argue against the tentative ruling.  And

20  again, I think that the leader on any spillover argument has to

21  come from Houston and Bridgewater.

22              THE COURT:  Okay.

23              Mr. Donatelli?

24              MR. DONATELLI:  Judge, I am not arguing against the

25  Court's rulings either, and I do agree with Ms. Flynn, however,

 1   that even with the Court's ruling, just as the Court said,

 2   because this is a capital case, the Court is going to have to

 3   look at every constitutional stage with the additional scrutiny

 4   that a capital case deserves.  So whether it's 403 or 3593C,

 5   you are going to be weighing the potential for prejudice

 6   against the probative value.  And that's why I point out that

 7   Mr. Houston, according to the government's Indictment, joined

 8   in September of 1997, and all this other information about

 9   Mr. Slocum -- I think the last thing that is like '93, the

10   Ruopoli and Inman case, it's four years before he becomes a

11   member that he enters the chain.

12           We are stipulating that a message came in.  They want

13   to introduce evidence of Mr. Slocum's alleged involvement and

14   prior roles as a messenger and other murders that took place

15   long before Mr. Houston was, according to the government, a

16   member in 1997.  And I ask the Court that -- we are not

17   contesting that the message came in.  I think that the

18   government wants to prove this against Mr. Slocum.  We are not

19   contesting that issue that there was a phone call that

20   triggered the events.  We're not litigating that issue.

21           And when I look at what the Court has done in the way

22   of severing this, keeping in mind that these are the capital

23   defendants, what is it that we'd be gaining?  What are you

24   saving in terms of judicial economy or savings by having him in

25   the courtroom?  And at the same time, the government proving up

1    this pattern information against Mr. Slocum, which ends up

2    prejudicing the capital defendants, ironically, even

3    non-capital defendants.

4            I couldn't agree more with the Court's analysis saying

5    that this is a capital case.  The government filed the death

6    notices.  It's going to have to live with that decision.  I

7    have to protect these men, or if it's a non-capital case, I'll

8    try it altogether.  But I've got these 403 and 3593C

9    considerations, critical constitutional stages.  So yes, of

10   course, if you sever them off, severed off Mr. Slocum, he'd

11   have to go through all of the information that the government

12   is going to try to introduce about the Aryan Brotherhood and

13   evaluate just like you did with the Mills and Bingham case,

14   where the probative value was outweighed by the prejudicial

15   effect, and it might lead to unfair prejudice, and we believe

16   you'll be excluding virtually all of that.

17           I'll certainly give the government the opportunity to

18   prove up the pattern and enterprise and show there was

19   furtherance, but you don't need prejudicial information about

20   specific murders to do that.  You have gang experts that come

21   in and talk about the reputation, the government informants,

22   all of that is going to come in without specifics about who got

23   shot, how, when and where in cases that happened at least four

24   years before Mr. Houston became a member, according to the

25   government.  And in some cases, the old murders go back to the

1  early '80s, almost at a time when Mr. Houston is a juvenile.  I

2  think he didn't even enter the federal system until '93, and

3  all of these things are 10 years old or occurred 10 years

4  before he enters the federal system.

5       So I think that we'll end up in the same place, as

6  Ms. Flynn says.  You'll have to evaluate all of this, but if

7  Mr. Slocum's presence somehow causes additional evidence to

8  come in about the Aryan Brotherhood's operations that you

9  wouldn't let in in a separate trial, I don't see what the Court

10 is gaining in judicial economy, or not, to send him out of

11 here.  But I mean, we are not arguing with the Court's ruling

12 because it's true, you are going to have to go through

13 balancing those decisions all the way through the trial.

14      THE COURT:  What if the Court was inclined to let in

15 most of the history of the Aryan Brotherhood through Glen West

16 and others who are testifying?  Why is it judicially economic,

17 then, to sever, other than my concern about the Barnes murder,

18 which is a tremendous concern on my part?

19      MR. DONATELLI:  Because I -- well, I may be begging

20 the question, but we think because of the gross disparity of

21 the evidence about the kind of violent conduct, the kind of

22 what jurors would consider aggravating conduct, that because

23 you have a capital case, the Court would exercise its

24 discretion and excluding information that has the potential for

25 and fairly prejudicing the eligibility decision, the weighing

 1    decision.  Because it's a capital case, we expect that we would

 2    further limit the kind of information from Speedy West and

 3    Kevin Roach because of the remoteness to the defendants who are

 4    facing the death penalty for the Lewisburg case.  I mean,

 5    basically, Judge, it sort of stands the narrowing process on

 6    its head.

 7              THE COURT:  The difficulty is if the government's able

 8    to prove through these different lists, et cetera, that your

 9    clients are members of the Aryan Brotherhood, then the Court's

10    going to be inclined to allow the history of the Aryan

11    Brotherhood because your clients joined the Aryan Brotherhood

12    and adopted, et cetera, the mantra or the beliefs of that

13    organization.

14              So I don't know what I would be excluding.  I mean,

15    narcotics trafficking?  Certainly not.  Past murders or

16    conspiracies to commit murder?  Certainly not.  So I come back

17    to that point that Ms. Flynn just made, and that is what --

18    what am I gaining in terms of judicial economy?

19              I think hidden behind this is your belief that I'll

20    simply sever out a good part of the evidence or preclude it.

21    If, in fact, I grant a -- if I don't -- if I grant a severance,

22    and I am not certain of that.  I think quite the opposite.  If

23    they can show foundationally, as they did in the last trial,

24    and I need to go right through this again and see what the

25    foundation is, but my memory is that Mr. Houston and

1    Mr. Bridgewater were on a number of lists.  And as such, if

2    they establish that foundation, then the history of the Aryan

3    Brotherhood and its activities flow.  There is a nexus to that.

4           So then I'm questioning, you know, why I severed,

5    because all of that same evidence is coming in, or we'll have a

6    struggle over each piece of it as we go, but it all comes in,

7    except Barnes.  Barnes I'm concerned about.  Barnes, in and of

8    itself, causes a severance in my view.

9           MR. DONATELLI:  Your Honor, I am not sure --

10          (Interruption in the proceedings.)

11          MR. DONATELLI:  I suspect your 403 calls are much

12   different as to Mr. Mills and Mr. Bingham when there was no

13   dispute about their involvement in the conspiracy from 1983 on.

14   So it wasn't a matter of determining whether there was unfair

15   prejudice to them.  They were part of the conspiracy at the

16   time it happened, so I don't think you were losing sleep over

17   about letting a lot of that information in.

18          I agree, the Court has to decide when enough is

19   enough, when the government has had a fair opportunity to prove

20   that an enterprise exists, and at this point, it's overkill.

21          THE COURT:  Here is the demarcation.  Your argument

22   eventually will be, and I think it is now, "Judge, you should

23   determine what you allow into evidence based upon when my

24   client joined the organization, or when they can approve, let's

25   say an association with the organization, let's say in 1991,

 1   hypothetically.  The government's argument is going to be "No,

 2   that shouldn't be the dispositive date.  In fact, the date

 3   should extend backward in time because the organization

 4   represents a whole value structure, and by joining that

 5   organization, you adopt the value structure of that

 6   organization."

 7            So therefore, the past murders, conspiracies to commit

 8   murders, narcotics activities, you know, the protection of the

 9   mafia, all those things that we heard in the Mills case seems

10   relevant to the organization that this gentleman joins and

11   adopts.  I mean, that's really what we are going to be fighting

12   about.

13            All right.  Mr. Fleming?

14            Don't take this tentative for granted right now.

15            MR. FLEMING:  Okay.  I think the point has been made.

16   I think Mr. Houston, in looking through the overt acts

17   contained in Count 1, is barely mentioned outside of the

18   Lewisburg counts.  And the government in the last trial, I

19   think, was able to show virtually any white inmate that was a

20   member of or an alleged member of the Dirty White Boys or the

21   Nazi Low Riders, could fall within that category of AB

22   associates.  And so for purposes of what they need to prove

23   against Mr. Houston in regards to Counts 6 and 7, it seems like

24   the evidence that would be required to do that is much, much

25   more limited than the full scope of the Indictment, and that's

1  why we go back to what your Honor's already identified as the

2  central issue, and that is what -- at what point does it become

3  unduly prejudicial against Mr. Houston who, by the government's

4  own account, joined this organization on the very day that the

5  murders in Lewisburg occurred.

6          THE COURT:  Okay.  One of you argued in your brief,

7  and I forget which one, that if Mr. Houston was severed, he

8  simply could be put into another group, and he named Judge

9  Phillips' group.

10         Was that you, Mr. Fleming?

11         MR. FLEMING:  No, your Honor.  I believe that was

12 Mr. Slocum we suggested could be placed in another group, and I

13 believe that was suggested by Mr. Harris.

14         THE COURT:  By Mr. Harris?

15         MR. HARRIS:  Yes, your Honor.

16         THE COURT:  Okay.  Now, which group should I put him

17 in?

18         MR. HARRIS:  I think you should put him in Judge

19 Carnie's upcoming trial.

20         THE COURT:  With the State?

21         MR. HARRIS:  Yes.  That would be the logical fit.

22         THE COURT:  Okay.

23         Mr. White?

24         MR. WHITE:  Your Honor, I think that the Court's

25 tentative, in large part, is based upon the fear that Wayne

CR 02-938-DOC                    December 19, 2006                           39

```
 1   Bridgewater and Michael Houston will receive the death penalty
 2   because of acts that they had nothing to do with, eight murders
 3   that Mr. Slocum is charged with.
 4             THE COURT:  Uh-huh.
 5             MR. WHITE:  And I think that is what, to a large part,
 6   drove the Court in the interest of fairness.  In essence, our
 7   fear is that Mr. Bridgewater will receive the death penalty and
 8   it will be death by association.
 9             Ms. Flynn responds by saying, "Judge, I need to be
10   able to prove those eight murders anyway in order to make my
11   case with regards to Mr. Slocum sending in the message to
12   Lewisburg."
13             THE COURT:  Uh-huh.
14             MR. WHITE:  The foundation of our defense is that
15   Mr. Slocum sent the message into Lewisburg.  That's the
16   foundation of our defense, because that lays the foundation for
17   what we hoped to be arguing to the jury with regards to
18   self-defense.  So we are not only -- we're not only going to
19   stipulate that that occurred, but we are going to be arguing
20   that, in fact, Mr. Slocum sent that message into Mr. Benton
21   because that is the foundation of our self-defense.
22             So to use the -- so Ms. Flynn does not need in a trial
23   against Mr. Bridgewater, Mr. Houston to prove up those eight
24   murders in order to make her case that Mr. Slocum sent this
25   message in.  We never have to reach that concern of death by
```

```
 1   association because, ironically, Mr. Slocum, as the Court well

 2   knows, is not -- they are not pursuing the death penalty

 3   against Mr. Slocum, and our fear is that we are going to get

 4   the death penalty as a result of all of the acts that

 5   Mr. Slocum committed.

 6            THE COURT:  Mr. Harris?

 7            MR. HARRIS:  The quantum or the amount of proof

 8   necessary to prove up that the murders in Counts 6 and 7

 9   were to maintain or advance the position of the defendants in

10   the AB, comparing this to the historical evidence, that will be

11   a lot less than if actually proving individual murders against

12   Mr. Slocum.  I would imagine if Mr. West testified about this,

13   it would be sort of a summary matter on Andreasen or Lamb or

14   Ray, for example.  It would be a broad overview, and it would

15   be quick.  This is addressing your point about judicial

16   economy.  Whereas if these murders were actually being proven

17   up, it would be a lot different, and the level of proof would

18   be more exacting.

19            So if you stick to your tentative, it seems the proper

20   way to handle it is, yes on Counts 6 and 7, the government

21   still has to prove that these murders were to maintain or

22   advance the position of these defendants in the AB, but that

23   can be done in relatively efficiently and quickly, I think, and

24   then it's just a 403 issue of when enough is enough.

25            THE COURT:  What happens if you had the ability to
```

1  prove the past history of the organization, the many murders

2  that were carried out, and you were able to present evidence on

3  behalf of the government that Slocum was a message carrier in

4  the past, and Mr. Slocum was severed, couldn't you do that much

5  quicker?

6          MS. FLYNN:  Actually, no, your Honor.  That was going

7  to be my first point I was going to respond to.  As the

8  Court -- the Judge presiding over the Mills-Bingham trial,

9  these are really old murders.  They are not like a typical

10 murder case you'd see.  The Andreasen murder, it took no more

11 than a couple of witnesses talking about it and three BOP

12 witnesses that took 15 minutes.  It's not -- there's not

13 extensive proof needed to prove each one up because they are

14 so old.

15         I might agree with Mr. Harris where if this were the

16 case that we had tons of murder scene footage, we had to walk

17 through everything and there was a lot more to go into to prove

18 the death.  You know, the government is going to pursue on much

19 the same as they did on Mills and Bingham; a death certificate,

20 cooperators and then some BOP people to say that this is how

21 the Andreasen murder, for example, went down.  It's going to be

22 almost the exact same time to prove each one, were Mr. Slocum

23 severed or were he with Mr. Bridgewater and Houston.

24         Your Honor, can I address just a few more points --

25         THE COURT:  Certainly.  Absolutely.

```
 1            MS. FLYNN:  -- that they raised?

 2        First, Mr. Donatelli brought up Houston, and he kept

 3   repeating that Mr. Houston just joined or was an associate in

 4   the '90s.  That overlooks the fact that Mr. Houston does not

 5   request a severance from Mr. Bridgewater.  In fact, they want

 6   to go to trial together, what all their papers say.

 7   Mr. Bridgewater has been a member since 1980.

 8            THE COURT:  I mean, a logical severance could be,

 9   frankly, that Mr. Bridgewater and Mr. Slocum be tried together.

10            MS. FLYNN:  I'm not requesting any of that, your

11   Honor.  I'm just saying that the defense, the way that they put

12   this forward, Mr. Bridgewater, Mr. Benton testified, has been a

13   member since 1980, and much of the activities of the Aryan

14   Brotherhood that happened from then are relevant.  He is in

15   many of the photographs with Mills and Bingham and several

16   other of the defendants that were found in the property that

17   were introduced in the other trial.

18            THE COURT:  How about Mr. Slocum?  Is he with

19   Mr. Slocum?

20            MS. FLYNN:  Is he -- I don't know, your Honor, right

21   now.  He is on a membership list.  I just found it.  It's

22   Exhibit 238 in the Mills' case.  It's a membership list found

23   in Bingham's property in September of '97.

24            THE COURT:  Just a moment.  Just a moment.  Just a

25   second.
```

```
 1              What's 238 again?

 2              MS. FLYNN:  It is a membership list found in

 3   Mr. Bingham's property in September of '97.  The first name on

 4   the list is --

 5              THE COURT:  1987?

 6              MS. FLYNN:  '97.

 7              THE COURT:  1997.

 8              MS. FLYNN:  And the first name on the list is Wayne

 9   Bridgewater.

10              I'm just -- the Court had made a mention of are there

11   any names on any lists.

12              THE COURT:  Right.

13              MS. FLYNN:  We don't know how long he's had that list,

14   but he is clearly a member.  Benton testified that they joined

15   the Aryan Brotherhood together in about 1980.

16              Additionally, your Honor, while Mr. Bridgewater and

17   Houston, they may put forth as part of their defense that

18   Slocum is, in fact, a message passer, the government still has

19   a burden of proof beyond a reasonable doubt, and because of

20   that, we cannot be asked to rely simply on a stipulation from

21   them that Ronny Slocum passed the message.  I have to convince

22   12 people that this was done in furtherance of the enterprise,

23   that a violent crime was committed in aid of racketeering,

24   which requires me to put the murder in context of the Aryan

25   Brotherhood, and that requires me to explain to the jury what
```

CR 02-938-DOC                    December 19, 2006                      44

1     the Aryan Brotherhood was.

2           The Mills and Bingham trial, we did a lot of that

3     through our witnesses, and I anticipate doing much of the same

4     in this trial to put the murders in the context where they

5     belong, so the jury sees them as a VICAR murder versus simply

6     two murders committed by these men in a prison in Lewisburg.

7           THE COURT:  You do need to show the VICAR murders, and

8     that's a distinction that shouldn't be lost by this Court.  The

9     defense will always seek the narrowest, and should, the

10    narrowest proof for trying this as two murders in an isolated

11    context within the Lewisburg system and a war developing at

12    least around that period of time, 1997.  But for VICAR, you

13    have to go back to the organizational structure of this, and

14    that's why your argument concerning the adoption of the goals,

15    structure, motivation, organization, thoughts shouldn't

16    preclude you because of the VICAR allegations, and it shouldn't

17    narrow you into the box that these are two simple murders

18    occurring at Lewisburg.

19          If I took your position, I will absolutely guarantee

20    you that the Barnes murder would be severed.

21          MS. FLYNN:  Understood.

22          THE COURT:  And that wouldn't be coming in during the

23    death phase, if we got there, because what the defense is

24    really saying is this:  They are not conceding guilt in the

25    guilt phase, but who is kidding who?  There is a substantial

1  chance, once again, that we get into the death phase in this

2  case, and that's probably going to be where the real struggle

3  develops.  All of the defense will take the position, and

4  should, that they are not guilty, and I'm not casting an

5  opinion, but usually cases like this end up in the death phase,

6  and I've said to the other counsel, and I'll say it to you,

7  although I will sound like a broken record, it's too easy in

8  the federal level to get to the death phase compared to the

9  state.  It's harder to get to the death phase in the state and

10  it's easier to prove up death.  Here, it's easier to get to the

11  death phase the way the federal statutes are written, but it's

12  hard to prove up death in the death phase.

13         Okay.  I've belabored enough.  What I'm going to do is

14  just put it aside for a while.  I just want some quiet time for

15  reflection.  It's too critical a call to simply make today.  If

16  you have any other thoughts, I am going to invite them, and

17  then we will either come back tomorrow or next Tuesday, and

18  I'll be courteous, or the first week in January.  We'll come

19  back the first week of January, if you want.  I want some

20  significant period of time on this.  Not tomorrow, but a couple

21  of days.

22         Now, Mr. Belter?

23         MR. BELTER:  Your Honor, next Tuesday is the 26th,

24  that's fine, or the first week of January is fine.

25         THE COURT:  Why don't you get together with counsel.

CR 02-938-DOC                  December 19, 2006                          46

```
 1          What's convenient for the government?

 2          MS. FLYNN:  I can work with defense counsel, your

 3   Honor, and we can pick a date.  Is that --

 4          THE COURT:  Sure.

 5          Watch, Mr. Belter, this will be a new experience for

 6   you.  Why don't you move towards the government, and why don't

 7   you quietly take Mr. Donatelli and Mr. Fleming and --

 8          MR. DONATELLI:  Your Honor, can we ask, are you

 9   looking for one day or two days or how much time --

10          THE COURT:  I don't know.  I don't know.

11          (Attorney discussion held off the record.)

12          THE COURT:  Don't break any of your vacations or harm

13   your families.  My suggestion is that it would be the 26th as

14   the earliest date, and if not, the first week of January

15   sometime, like the 3rd, a Wednesday, or the 4th.

16          (Attorney discussion held off the record.)

17          MR. WHITE:  Your Honor, is it one day that we need,

18   because --

19          THE COURT:  I don't know.

20          MR. WHITE:  We need two days?

21          THE COURT:  I don't know.

22          MR. WHITE:  Oh.

23          THE COURT:  I am not going to do that.  I am going to

24   take the time I need and subject it to argument again on that

25   day, so we all think about this one more time.
```

```
 1              (Attorney discussion held off the record.)

 2          THE COURT:  Let me help you.  I'm only going to give

 3   you two choices.  It's either going to be the 26th of December

 4   or the first week of January, because I don't want to get past

 5   that point without a decision being made.

 6              (Attorney discussion held off the record.)

 7          MR. WHITE:  Can we have one moment to make a phone

 8   call to verify a date?

 9          THE COURT:  Yeah.  What date are you thinking about?

10          MR. WHITE:  We're talking about either the 3rd or the

11   4th, and the problem is that Bill is going to be in Florida

12   over the holidays.  He is not sure whether he is coming back

13   the 2nd or the 3rd.  For me the problem is the morning of the

14   5th.  I've got a weekend to celebrate my 60th birthday.  We are

15   going up to Napa, and we're leaving at 6:00 in the morning of

16   the 5th.

17          THE COURT:  So let's do this.  Why don't we just make

18   it on the 4th.  Let me just represent to you that I'm going to

19   make the decision.

20          MR. WHITE:  That's great.  That will be perfect.

21          THE COURT:  And if not, then I'll submit it to you in

22   writing after more argument on this, okay?

23          MR. WHITE:  That's perfect.

24          THE COURT:  I really want some time.  I'm afraid to

25   bring you back on the 26th just because if we don't get done --
```

1   why don't we just schedule it for the 4th.

2          Would that be acceptable for the government?

3          MS. FLYNN:  Yes, your Honor.

4          THE COURT:  Are you sure?

5          MR. SAGEL:  Yes, your Honor.

6          THE COURT:  Convenient for you?

7          MR. BELTER:  At what time?

8          THE COURT:  Well, we tried at 8:00 this morning with a

9   miserable faith here, so let's try again at 8:00, okay, just

10  because we're getting set up for the first time.

11         Is the 4th okay with you, Mr. Donatelli?

12         MR. DONATELLI:  Yes, sir.

13         THE COURT:  Are you sure?

14         MR. DONATELLI:  Yes, absolutely.

15         THE COURT:  Mr. Fleming, Mr. Harris, are you sure?

16         MR. FLEMING:  Yes.

17         MR. HARRIS:  Yes, your Honor.

18         THE COURT:  And I assume the gentlemen are available.

19         Now, the second document I gave to you is a tentative,

20  once again, a revision of the questions beginning with the

21  attitudes regarding the death penalty.  And I'm wondering if

22  the government has the first --

23         MS. FLYNN:  Your Honor, I went and made copies.

24  Unfortunately, it doesn't contain the changes that we talked

25  about in Court.  I made them on a different version.

1          THE COURT:  Don't worry.  That's okay.  Let's go

2    through that again anyway, then I'll probably release you for

3    the day.

4          Thank you for doing that.

5          Can we go back through those changes one more time

6    anyway?  Do you have a copy of them someplace?

7          MS. FLYNN:  Yes, your Honor.

8          THE COURT:  Okay.  Do you want to go down and get it?

9          MS. FLYNN:  Actually, I just need my power cord, and I

10   can look at it on my computer, if you can give me one sec.

11         THE COURT:  Sure.

12         MS. FLYNN:  Thank you.

13         (Attorney discussion held off the record.)

14         MR. SAGEL:  We're ready.

15         MS. FLYNN:  Thank you, your Honor.

16         THE COURT:  Page 1, were there any changes that any of

17   the parties recall on page 1?  I wrote those down.  It's just

18   as easy, though, to go back through it.

19         Mr. Harris, I'm sure you have your notes also.

20         MS. FLYNN:  Your Honor, there were some kind of global

21   changes that were made.  I think the word "alleged," any time

22   it was in there, it was stricken.  But other than that, I don't

23   think there is anything on page 1.

24         THE COURT:  Well, we are going to produce this

25   questionnaire today, the one thing we are going to accomplish

1  today.  So let's go down.

2        Number 1, "Juror number."  Are any of you objecting to

3  an anonymous jury?  I continually raise that with you.

4        MR. BELTER:  No, your Honor.

5        THE COURT:  Mr. Belter?

6        MR. BELTER:  No, your Honor.

7        THE COURT:  Mr. Donatelli?

8        MR. DONATELLI:  No, your Honor.

9        THE COURT:  Mr. Fleming?

10       MR. FLEMING:  No, your Honor.

11       THE COURT:  Mr. White, Mr. Harris?

12       MR. WHITE:  No, your Honor.

13       MR. HARRIS:  No, your Honor.

14       THE COURT:  The government?

15       MS. FLYNN:  No, your Honor.

16       THE COURT:  Okay.  "Age."  The third question, "What

17  is your ethnic background?"  Fourth question, "Are you married,

18  separated, divorced, single, widowed?"

19       MR. BELTER:  No, your Honor.

20       THE COURT:  Next question, "What city do you live?"  I

21  assume that was objectionable in the last occasion, but I don't

22  think there is any harm concerning the city.

23       Okay.  "How long have you lived in the city?"  Do you

24  own or rent your home?"  "Describe the ethnic makeup of your

25  neighborhood."  "How big a problem is crime in your

1    neighborhood?"  "What types of crime is seen most often?"

2          Acceptable so far?

3          MR. BELTER:  Yes.

4          THE COURT:  Number 6, "What other cities, towns,

5    communities or foreign countries have you lived in, and when

6    did you live there?"

7          Number 7, "Do you speak English; yes or no?"  "Do you

8    read English; yes or no?"

9          Number 8, "How many other people live with you?"

10         Number 9, "If you are married or in a long-term

11   relationship, either now or in the past, please give the

12   following information about your spouse or significant other:

13   Occupations, work skills, education, special training,

14   interests, memberships in clubs or organizations."

15         Number 10, "What are the occupations of the persons

16   you live with, and how are they related to you?"

17         I assume hearing nothing, that page 1 is acceptable?

18         MR. BELTER:  Yes.

19         THE COURT:  Okay.  As an aside, this time when we

20   summon the jury, we are going to bring 30 jurors up to the

21   court, but we are having the courthouse rewired, and when I

22   read the Indictment, the other 150 jurors will be downstairs in

23   the jury room instead of just next door.  And so the

24   information will simply be telecast right down to them, and

25   they will sit there with -- because there we have seven

CR 02-938-DOC                December 19, 2006                      52

```
 1   screens.  Last time we only had two screens per courtroom.

 2           Mr. Belter, my apologies.

 3           Mr. Donatelli, my apologies.

 4           The last time we used the complex courtroom, but we

 5   ran cable to this courtroom, and we ran cable to Judge Carnie's

 6   courtroom.  So we had about 80 jurors in this courtroom

 7   watching 2 monitors, and we had 80 jurors in Judge Carnie's

 8   courtroom.

 9           I wasn't smart enough to figure out a better   method

10   because in Los Angeles, with the Mexican Mafia trials, it never

11   would have dawned on us because the jury commissioner -- the

12   jury room was on Spring Street, and the complex courthouse was

13   in Roybal, a quarter mile away.  Since we are in the same

14   building, we can simply run the cable down instead of having

15   jurors sitting in both rooms, or sitting watching screens down

16   there.  I'll take you for a tour so you see how that looks

17   like.  That will save us moving about 200 jurors up and down

18   the elevators.  And as soon as we are done reading the

19   Indictment, then they will start filling out the

20   questionnaires, and we'll just transport the 30 jurors down.

21           The other thing we should do today is go through the

22   Indictment line by line, like we did last time, Mr. Harris,

23   just start -- and assuming for a moment there's absolutely no

24   severances for a moment, we should just go through that, okay?

25           Number 11, "If you have any adult children or adult
```

1  grandchildren, please give their occupation."

2        11-a.  "Please give the occupation for the parents,

3  brothers, sisters or roommates."

4        12, "Do you consider yourself a religious person; yes

5  or no?"

6        MS. FLYNN:  This has changed, your Honor.  It says,

7  "Do you attend religious services?"

8        THE COURT:  Okay.  "Do you attend" --

9        MS. FLYNN:  Yes.  What you guys have is the old one.

10        MR. WHITE:  "Do you consider yourself a religious

11  person?"

12        MS. FLYNN:  That was the old one.  At the last

13  hearing, you all wanted it changed to "Do you attend religious

14  services?"  Unfortunately, the copy containing the changes did

15  not get printed out and copied.

16        THE COURT:  Well, we will today.  We will have a copy

17  today.

18        MR. DONATELLI:  Your Honor, I think I --

19        (Interruption in the proceedings.)

20        THE COURT:  Just a moment.  I have the old

21  questionnaire.  The old questionnaire stated, "Do you consider

22  yourself a religious person?"  Now, which do you want?

23        MR. HARRIS:  Well, what we said last time was to

24  change the follow-up question to "How often do you attend

25  worship services?"  That was the change.

CR 02-938-DOC                    December 19, 2006                           54

```
 1              THE COURT:  So you want to leave "Do you consider
 2   yourself a religious person?"
 3              MR. WHITE:  Yes.
 4              MR. HARRIS:  Yes.
 5              THE COURT:  Okay.  And then the follow-up question.
 6              MR. HARRIS:  "If so, how often do you attend worship
 7   services?"
 8              THE COURT:  "If yes, how often do you attend" -- "do
 9   you attend religious" service or services?
10              MR. HARRIS:  Services.
11              THE COURT:  And then a line, correct?
12              MR. HARRIS:  Yes.
13              THE COURT:  "Have you ever served in the armed forces;
14   yes or no?"
15              MR. SAGEL:  Your Honor, did you want "worship
16   services" or "religious services"?
17              THE COURT:  Religious services.
18              MR. SAGEL:  Okay.
19              THE COURT:  Keep it the same.
20              "Have you ever served in the armed forces; yes or no?"
21              "Branch and highest rank, dates, duties."
22              "Have you sat on a Military Court Marshal; yes or no?"
23              "If yes, please explain."
24              14, "Current occupation or employment and the nature
25   of the business activity.  Do not include the name of your
```

1    specific employer or the location."

2             "Length of employment.  Job description.  Do you have

3    supervisory responsibilities?  What other types of jobs have

4    you held as a adult?"

5             15.  "What is the highest form of education level

6    you've completed?  Please list any degrees with the field

7    involved."

8             16.  "Have you had training or education in the

9    following fields:

10            "Law, criminal justice; forensics, for example,

11   ballistics, fingerprint identification, autopsies or any other

12   forensic fields; firearm identification, medicine;

13   psychology/psychiatry, other."

14            And 17, "Are you registered with any political party;

15   yes or no?"

16            Acceptable?

17            (No audible response.)

18            THE COURT:  Okay.  Page 3, question 18, "Have you ever

19   sought or held a political office; yes or no?"

20            "If yes, please give us details, but not location or

21   years of service, title only."

22            19.  "What is the most important issue we face today?"

23            And then we add "At the national level.  At the state

24   level.  The local level."  And I thought we were going to

25   delete that.

```
 1              What is the most important issue?

 2         MR. BELTER:  Your Honor, that's fine.

 3         MR. DONATELLI:  The old one just had what was the most

 4  important issue, and then Ms. Flynn and I agreed that those

 5  three --

 6              (Interruption in the proceedings.)

 7         MR. DONATELLI:  These are additions, Judge, that we

 8  agreed with Ms. Flynn.

 9         THE COURT:  So this is the corrected -- this is the

10  new copy that we are looking at?

11         MR. DONATELLI:  Yes.  Yes.

12         THE COURT:  Oh, are you sure?

13         MR. DONATELLI:  Absolutely.  It tracks our letter.

14         MS. FLYNN:  Your Honor, it's the one that I filed

15  before the last hearing, and then at the last hearing, we made

16  a few minor changes.  Unfortunately, those minor changes had

17  not made it into a document yet.

18         THE COURT:  Okay.  So the only question we would

19  change is Question Number 12, and we've added A, B and C.

20         MR. DONATELLI:  Correct.

21         THE COURT:  Thank you.

22              Number 20, "Which three persons do you admire most?

23  Please explain why you admire each person."

24              21, "Have you, a family member or a close friend ever

25  served on a Grand Jury; yes or no?"
```

1          "If yes, when did you/they serve on a Grand Jury?"

2          22, "Have you ever served on a trial jury before; yes

3    or no?"

4          "If yes, please answer the following:"

5          And without going through each of those there, is A, B

6    and C -- well, A, "State court, number of times; civil case,

7    number of times; criminal case, number of times; federal court,

8    number of times; civil case, number of times; criminal case,

9    number of times."

10         "Were you ever the foreperson; yes or no?"

11         "Was a verdict reached; yes or no?"

12         Number 23, "If you or your spouse, relative or a close

13   friend ever been associated with any federal, state or local

14   law enforcement agency or government office, such as sheriffs,

15   marshals, police (military or civilian), probation or parole

16   officers, correction officers, police reserve officers,

17   security guards, IRS, FBI, ATF, Bureau of Prisons, California

18   Department of Corrections, federal or state prosecutors,

19   alcohol counseling, drug counselors, psychologist or

20   psychiatrist or prison outreach program?"

21         Should that be plural, "programs" or "program"?

22         I'll leave it program.

23         MR. BELTER:  Your Honor, I don't think it matters.

24         THE COURT:  "Please explain."

25         "Have you sought or do you plan to seek employment in

Jane C.S. Rule, CSR No. 9316 – Federal Official Court Reporter

CR 02-938-DOC                    December 19, 2006                    58

```
 1   any of the above fields; yes or no?"

 2              24, "Are you personally acquainted with a judge?"

 3              "If so, state name and nature of the relationship."

 4              25, "Are you or any close friend or relative

 5   associated with any attorney that practice criminal law; yes or

 6   no?"

 7              "If so, please state the nature of the relationship."

 8              26, "Have you or any close friend or relative ever

 9   been involved in a criminal case either as a victim, defendant

10   or witness?"

11              "If so, state relationship (if not yourself), year and

12   location, with a brief summary of the occurrence."

13              a.   "Was anyone arrested; yes, no?"

14              b.   "If there was a trial, did you testify; yes, no?"

15              c.   "Was anyone incarcerated, and if so, for how

16   long?"

17              d.   "If you answered 'yes' to any of the above, what

18   are your opinions or attitudes towards the criminal justice

19   system as a result of your experience?"

20              That's been added there, Mr. Donatelli; is that

21   correct?

22              MR. DONATELLI:   (No audible response.)

23              THE COURT:  27, "Have you, any family members or close

24   friends ever had a negative experience involving the police or

25   other law enforcement agencies; yes, no?"
```

1              "If yes, please explain."

2              Page 5 --

3              MR. HARRIS:  Excuse me, your Honor.  Before we

4    continue, there is a typo on number 25.  It should be

5    "practices."

6              THE COURT:  I'm sorry?

7              MR. HARRIS:  "Practices."

8              THE COURT:  I agree.  Add the S?

9              MR. HARRIS:  Yes.

10             MS. FLYNN:  Yes, your Honor.

11             THE COURT:  Okay.  Page 5, question 28, "Have you, any

12   family members or close friends ever had a positive experience

13   involving the police or other law enforcement agencies; yes,

14   no?"

15             "If yes, please explain."

16             29, "Have you, your spouse or significant other, any

17   family members or close friends ever been accused, arrested,

18   indicted, charged or convicted of a criminal offense (please do

19   not include infractions or traffic offenses); yes, no?"

20             30, "What clubs, groups or organizations have you been

21   associated with which have goals or activities relating to law

22   enforcement, public safety, public health or public morals

23   (such as Crime Stoppers, MADD, We Tip, neighborhood watch

24   programs, shelters or crisis centers)?"

25             31, "What civic, social, union, professional,

1    fraternal, political or recreational organizations do you

2    belong to or participate in, and what offices, if any, do you

3    hold in any of these organizations?"

4              32, "Have you ever owned any kind of firearm; yes,

5    no?"

6              "If so, what kind of firearms did you own and for what

7    purposes did you own them?"

8              33, "Have you, any family members or friends ever had

9    a gun pointed at you, been shot at, or otherwise had a bad

10   experience with a firearm; yes, no?"

11             "If so, please explain."

12             Number 34, "Have you, any family members or friends

13   ever been stabbed or threatened with a knife; yes, no?"

14             "If so, please explain."

15             Page 6, number 35, "Have you ever known anyone who was

16   involved with drugs; yes, no?"

17             "If so, please explain."

18             Number 36, "Have you or anyone close to you ever had a

19   drug dependency problem; yes, no?"

20             "If so, please explain."

21             37, "Have you or anyone close to you ever been

22   involved in any way in a drug-related crime; yes, no?"

23             "If so, please explain."

24             38, "Have you ever had an unpleasant experience with

25   someone whom you believed to be using or dealing drugs; yes,

1    no?  Without mentioning names, please explain."

2           39, "Have you, any family members or close friends

3    ever taken part in any type of effort or campaign to keep your

4    neighborhood, schools or community free of street drugs and/or

5    gangs; yes, no?"

6           "If so, please explain the effort or campaign and your

7    participation in it."

8           40, "Has your life or that of family members or close

9    friends been affected in any way by gang activity; yes, no?"

10          "If yes, please explain."

11          41, "Have you had any personal experience with gangs;

12   yes, no?"

13          "If yes, please explain."

14          42, "Have your children had any involvement or

15   encounters with gangs; yes, no?"

16          "If yes, please explain."

17          43, "Have you known anyone involved in a gang; yes,

18   no?"

19          "If yes, please explain (you need not give names)."

20          44, "Have you seen any TV programs or movies about

21   gangs; yes, no?"

22          "If yes, please explain."

23          45, "Have you read any books or publications about

24   prison gangs; yes, no?"

25          "If yes, please explain."

1          46, "Have you read anything about prison gangs on the

2   internet; yes, no?"

3          "If yes, please explain."

4          47, "How often do you read newspapers or magazines?

5   If you do, which ones?"

6          48, "How often do you watch television newscasts?  If

7   you do, which ones?"

8          49, "How" -- it should be "many hours" -- "How many

9   hours a day do you watch television or listen to radio?"

10         a.  "Do you regularly watch America's Most Wanted,

11  Cops, CSI, Oz, or other crime-related shows?"

12         b.  "What is your opinion of these programs?"

13         c.  "If you are instructed that what you might

14  learn" -- strike that.

15         c.  "If you are instructed that what you might learn

16  from any of these programs should play no part in any decision

17  you might make in this case, would you follow this instruction;

18  yes, no?"

19         50, "How often do you listen to radio stations?  If

20  you do, which ones?"

21         51, "How often do you use the internet?"

22         a.  "What sort of things do you use the internet for?"

23         b.  "What sort of information do you obtain from the

24  internet?"

25         c.  "What sort of websites and/or chat rooms do you

1  visit regularly?"

2          52, "How often do you listen to any radio talk shows?

3  If you do, which ones?"

4          53, "Do you like to read books; yes, no?"

5          "If yes, what types of books do you like to read?"

6          "The defendants in this case are charged with being

7  members and associates and aiders and abettors of an alleged

8  organization engaged in murder, attempted murder, conspiracy to

9  commit murder, robbery, extortion and narcotics trafficking for

10 monetary gain.  This alleged organization, allegedly known as

11 the 'Aryan Brotherhood' or the 'AB,' allegedly operated in

12 state and federal prisons and elsewhere."

13         MS. FLYNN:  Your Honor, can I ask a question?

14         There was originally going to be a global change for

15 "alleged" but I am not sure where to make it.

16         MR. WHITE:  Yes, I think we should --

17         MS. FLYNN:  I don't know what we should do.

18         MR. WHITE:  I'm sorry.  I think we should move

19 "alleged," the first "alleged," so it should read "associates

20 and aiders and abettors of an organization allegedly engaged in

21 murder, attempted murder," and then we strike the other two

22 "alleged" and "allegedly."

23         MS. FLYNN:  I have no objection.  That sounds good.

24         THE COURT:  Okay.  I agree.  Thank you.

25         MR. FLEMING:  Your Honor, in that same sentence --

1          THE COURT:  So "This organization allegedly known as

2    the 'Aryan Brotherhood' or the 'AB' operated in state and

3    federal prisons and elsewhere"?

4          MR. WHITE:  No.  Actually, it should read "This

5    organization known as the 'Aryan Brotherhood' or the 'AB'" --

6          THE COURT:  Okay.

7          MR. WHITE:  -- "allegedly operated."

8          THE COURT:  "Allegedly," thank you.

9          Let me read it one more time.  "The defendants in this

10   case are charged with being members and associates and aiders

11   and abettors of an organization allegedly engaged in murder,

12   attempted murder, conspiracy to commit murder, robbery,

13   extortion and narcotics trafficking for monetary gain.  This

14   organization known as the 'Aryan Brotherhood' or the 'AB'

15   allegedly operated in state and federal prisons and elsewhere."

16         All right.  Mr. Fleming?

17         MR. FLEMING:  (No audible response.)

18         MR. BELTER:  That's fine, your Honor.

19         THE COURT:  54, "Have you heard or seen any

20   information about this case; yes, no?"

21         "If yes, check the option below that applies:

22         "Local newspapers, magazines or other periodicals,

23   TV/radio, friends, other, the internet, never heard about it."

24         "Please explain what information you have heard."

25         55, "Have you read, seen or heard anything about the

1    alleged Aryan Brotherhood, also known as the 'AB'; yes, no?"

2          "If yes, please explain what you have read, seen or

3    heard about this alleged organization and the source of such

4    information."

5          MS. FLYNN:  Do you want the "alleged" out of both of

6    those?

7          MR. WHITE:  Yes.

8          THE COURT:  So "Have you read, seen or heard anything

9    about the Aryan Brotherhood"; is that correct?

10          MR. FLEMING:  Yes.

11          MR. WHITE:  Yes.

12          THE COURT:  And the other "alleged" would be taken out

13    also?

14          MR. WHITE:  Yes.

15          THE COURT:  All right.

16          56, "Based on what you've seen, read or heard, do you

17    have any impression of the" -- do you want the "alleged" out?

18          MR. WHITE:  Yes.

19          MR. FLEMING:  Yes.

20          THE COURT:  -- "of the Aryan Brotherhood or the AB;

21    yes, no?"

22          "If yes, please describe your impression."

23          57, "What does the term 'Aryan Brotherhood' mean to

24    you?"

25          58, "How do you feel about people who have tattoos?"

1          59, "Do you have any specific language, health,

2     hearing, vision or other physical problems of a serious nature

3     that might make it difficult for you to sit as a juror in this

4     case; yes, no?"

5          "If so, please describe them."

6          60, "Are you taking any medication regularly that

7     might make it difficult for you to concentrate; yes, no?"

8          "If so, state what type of medication."

9          Now, we are on page 10.  I told you I was going to

10    rework this section.  This is a tentative.  I've added the

11    following paragraphs and bolded it out so you can see that the

12    following is new.

13         What it goes on to explain is "If the jury does reach

14    the penalty phase, the law provides a procedure for the jury to

15    go through in order to choose a punishment.  This procedure

16    would involve weighing positive and negative aspects about the

17    accused and the severity of the crimes.  The jury must go

18    through this process before choosing a punishment."

19         "At the end of the process, the jury will impose

20    whichever punishment is appropriate according to the law.  In

21    any case in which the charge carries a possible penalty of

22    death, the law requires that jurors answer questions regarding

23    their thoughts, feelings and opinions about the possible

24    penalties.  This is true even though the defendant might be

25    found not guilty and, thus, the trial might not reach the

1    second stage.  You must not assume from any question asked that

2    a defendant will be found guilty of a crime."

3            Now, I skipped the first portion that we've already

4    used in the prior trial, and that is "The Court is asking these

5    questions regarding your feelings about the death penalty

6    because one of the possible sentences for a person convicted of

7    the charges in this case is the death penalty.  The other

8    possible punishment is life imprisonment without the

9    possibility of parole.  Therefore, the Court must know whether

10   you could be fair to both the defendants and the prosecution on

11   the issue of punishment, if you reach that issue."

12           "The law provides for a two-stage trial in cases where

13   the death penalty may be imposed, and in fact, this means there

14   could be two trials in this case."

15           Oh, Kristee, will you ask Alyssa to get two copies of

16   the First Superseding Indictment ready for me?

17           "In the first trial, the jurors job is the same as it

18   would be in any other criminal case to decide if the accused is

19   guilty or not guilty.  If and only if the jury returns a

20   verdict of guilty of murder against the accused, the same jury

21   will have the task of considering the penalties.  In that case,

22   the jury may hear additional evidence and arguments in order to

23   decide to impose one of two penalties, life imprisonment

24   without parole and then death.

25           And then the portion that follows that I just read,

CR 02-938-DOC                    December 19, 2006                          68

1   "If the jury reaches the penalty phase, the jury will provide a

2   procedure," et cetera.

3           Now, let me stop at that point before I go to

4   Question 61.  Is there any objection to that?  Any improvement?

5   Any comment?

6           I think it's much more complete, and we had numerous

7   questions last time.  We might as well start becoming

8   accustomed to what happens if we get there, so --

9           (No audible response.)

10          THE COURT:  Well, is this acceptable to you,

11  Mr. Donatelli?

12          MR. DONATELLI:  Yes, sir.

13          THE COURT:  Mr. Fleming?

14          MR. FLEMING:  It's fine, your Honor.

15          THE COURT:  Mr. White?

16          (Attorney discussion held off the record.)

17          MR. HARRIS:  Two things, your Honor.  On the first

18  section, "attitudes regarding the death penalty," on the very

19  last line, instead of "parole" it should be --

20          THE COURT:  It should be "release."

21          MR. DONATELLI:  "Without the possibility of release."

22          THE COURT:  "Without the possibility of release"; I

23  agree.

24          MR. HARRIS:  And the second point is under the new

25  paragraph, the last sentence says "At the end of the process,

1   the jury would impose whichever punishment was appropriate

2   according to the law."

3            THE COURT:  That should be changed.

4            MR. HARRIS:  The problem is like the law one way or

5   the other.  It should be "under the law as explained by the

6   Court and the facts introduced."  The idea of getting the

7   factual part of that in there also, because the law itself is

8   not going to compel a result, one way or the other.

9            THE COURT:  What happens if we took out "according to

10  the law," and just left it "appropriate," period?

11           MR. WHITE:  Yes.

12           MR. HARRIS:  Yes, that's better.

13           THE COURT:  Is that acceptable?

14           MR. DONATELLI:  It's fine with me.

15           So we've explained there are only two choices, so let

16  me make sure.

17           Mr. Harris, Mr. White?

18           MR. HARRIS:  Yes.

19           MR. WHITE:  Yes.

20           THE COURT:  Do you have copies of the First

21  Superseding Indictment with you?

22           MR. HARRIS:  Yes.

23           THE COURT:  Mr. Donatelli?

24           MR. WHITE:  I have a copy, but it's the one we used

25  with Mills, Bingham, so there was a lot --

CR 02-938-DOC                    December 19, 2006                         70

```
 1              THE COURT:  Do you have the original, Mr. Harris?

 2         MR. HARRIS:  Yes.

 3              THE COURT:  You can share it with Mr. Harris.

 4         MR. BELTER:  Your Honor, I would like a copy.

 5              THE COURT:  Would you like a copy?

 6         MS. FLYNN:  Yes, your Honor.

 7         MR. FLEMING:  Your Honor, can we get a copy over here,

 8  too?

 9              THE COURT:  Sure.

10         (Discussion held off the record.)

11              THE COURT:  All right.  61, it's the same question as

12  before, "What are your feelings regarding the death penalty?"

13         I assume there is no objection to that by either

14  parties.

15         Oh, I'm sorry, Ms. Flynn, do you have any objections

16  concerning the additions that the Court made which begin with

17  the following paragraphs, or paragraph?

18         MS. FLYNN:  No objection, your Honor.  That's fine.

19              THE COURT:  Okay.  Anything you'd like to include?

20         MS. FLYNN:  No.  It's fine.

21              THE COURT:  Counsel, I think that Question 62 through

22  65 is too convoluted in the Mills case.  It caused discussion,

23  but it wasn't beneficial in some ways, and I'm going to

24  simplify this down.  This is just a beginning product, but --

25  In some death work I've done, I just used the substantial,
```

CR 02-938-DOC                    December 19, 2006                        71

```
 1  because they were substantial if assumed automatic.  We are not
 2  going to do that.  I think the jury need the four questions to
 3  reinforce it.
 4           So Question 62, "Assume for this question only that
 5  the proof presented at trial did not convince you beyond a
 6  reasonable doubt of the guilt of" -- and I think that should be
 7  "death-qualified defendants," shouldn't it?
 8           (No audible response.)
 9           THE COURT:  Now, for my purposes, we normally use
10  "death qualified" after the protocol, but although that's
11  appropriate, I left it "death eligible" for one reason.  Even
12  though it's not technically correct, I mean, if you use "death
13  qualified," it might have a nuance to it a little stronger than
14  "death eligible," and so I prefer to use the laymen term
15  "eligible."
16           "Would you have substantial difficulty," and please
17  help me, is that -- that should be Witherspoon.  Witherspoon or
18  is it Witt?
19           MR. DONATELLI:  Witt, Morgan Witt.
20           THE COURT:  I use it synonymously.  I don't know.  I
21  have it written down in the back.
22           "Would you have substantial difficulty voting not
23  guilty because you would want to make a decision regarding
24  punishment?"
25           "Yes, I would have substantial difficulty voting not
```

CR 02-938-DOC                    December 19, 2006                    72

1    guilty."

2            "No, I would not have any substantial difficulty

3    voting not guilty."

4            Regardless of what we do, we should change the format

5    around and start with "automatic."  The first two questions

6    should be "Would you automatically vote for death?"  And the

7    second question should be "Would you never vote for death?"

8    That way we'll move to the substantiality test next.  No matter

9    what, we are going to flip those around.

10           Now, I think even this is convoluted, so my effort

11   isn't very good.

12           MR. DONATELLI:  I don't know if you'll ever get it in

13   one question, Judge.  That's the problem with the concept.

14           THE COURT:  I'm sorry?

15           MR. DONATELLI:  I don't think you'll ever get it in

16   one question.  That's why you always have to do follow-ups

17   anyways.  So I don't think you are going to solve the problem

18   with it.  It's very a complicated concept to try to get it in

19   one question.

20           THE COURT:  Okay.  You know, first of all, it's too

21   long.  Just when you look at it, it gets bound up in the

22   verbiage.

23           Check out the first line for a moment.  There should

24   be a preamble to all four questions, just a little sentence

25   assuming something, but it should be as simple as "Will you

```
 1   have substantial difficulty voting not guilty because you
 2   would want to make a decision regarding punishment; yes, no?"
 3   Because we are going to have follow-up questions to that.  And
 4   "Would you have substantial difficulty voting guilty because
 5   you would not want to have to make a decision regarding
 6   punishment; yes, no?"  Not the "Yes, I would have substantial
 7   difficulty voting guilty."  "No, I would not."  Just "yes,
 8   no."
 9           Question 64, "Would you have substantial difficulty in
10   voting for a sentence of death even if you believe the law
11   supported death as the proper punishment?"
12           MR. WHITE:  Judge?
13           THE COURT:  Yeah, yes.
14           MR. WHITE:  If we were -- in 62 and 63, starting with
15   those two, if we were to forget about the proof beyond a
16   reasonable doubt issue and simply ask, "Are your views
17   concerning the death penalty such that you would automatically
18   vote guilty in order to get to the penalty stage?"  "Are your
19   views concerning the death penalty such that you would
20   automatically vote not guilty" --
21           THE COURT:  "To avoid the penalty phase?"
22           MR. WHITE:  -- "to avoid the penalty phase?"
23           THE COURT:  I like that.  And then move to
24   substantiality?
25           MR. WHITE:  Yes.
```

```
 1              And then as to 64 and 65, I actually think that what
 2   we had in the first questionnaire was simple, "Are your views
 3   concerning the death penalty such that if we were to reach a
 4   death penalty phase in this case, you would automatically vote
 5   for death," or "automatically vote for life?"
 6              MR. DONATELLI:  And then substantial --
 7              MR. WHITE:  And then move to substantial.
 8              THE COURT:  So on the original questionnaire, 64 and
 9   65 would stay as is?
10              MR. WHITE:  Yes, except we would start with
11   "automatic."
12              THE COURT:  And then 62 and 63, those are the two we
13   are going to change.
14              MR. WHITE:  Yes.
15              THE COURT:  Okay.  I agree.  I agree.  I agree,
16   because the substantial difficulty in 64 and 65, I think it's
17   nice, clean and simple.  Where we have the problem I think is
18   in 62 and 63, and it's too big of a risk to both sides not to
19   have clarity.
20              So do you want to just draft that out for a moment?
21              MR. WHITE:  Sure.
22              THE COURT:  And show it to Ms. Flynn.
23              (Attorney discussion held off the record.)
24              THE COURT:  Now, while they are doing that, Mr. Slocum
25   and Mr. Belter, if this trial remained joined in some way,
```

CR 02-938-DOC                    December 19, 2006                              75

```
 1   either based upon the tentative or a change in the tentative,
 2   and there wasn't a complete severance, have you gentlemen
 3   discussed or thought about whether you'd like to be present at
 4   the Hovey voir dire or whether you'd like to separate
 5   yourself?  I man, your counsel is much more able to report, but
 6   the decision is always this, Mr. Slocum.  On one hand, as we're
 7   going through this death-qualification process, and Mr. Houston
 8   and Mr. Bridgewater are the focus of that, and you need to
 9   decide and counsel may decide, based upon his advice, not to be
10   present and not to be associated with, you know, that death
11   qualification.  In other words, you are not sitting in the
12   room.

13          By the same token, I'm not going to let counsel stray
14   beyond the limited questions concerning death because sometimes
15   things come up.  For instance, a juror states, "You know, I
16   forgot.  My cousin is sick, and I'm the full-time person who is
17   doing the nursing, and I thought I could serve, but I'd like to
18   be excused."  Now, the problem with you not being there is you
19   either have to give carte blanche, as the attorney representing
20   Mr. Gibson and Mr. Hevle did, to the other attorneys, or your
21   attorney needs to be there.  And if your attorney is there,
22   then you need to be there because you obviously would want to
23   get rid of that person.  Why have them come back?

24          Or the person says -- well, some disqualifier,
25   something that just makes it so obvious.  In the last jury, for
```

1  instance, we had a witch.  She was a witch.  A very nice

2  person, by the way, and I think both sides left somewhat

3  equivocal about whether to keep her or not.  But there is a

4  stipulation reached upon by all parties based upon her

5  professed witchcraft.  That just didn't leave the parties in

6  the situation where one wanted to exercise, you know, a

7  preemptory later on, and all parties just kind of said, "Well,

8  apparently, Judge, would you ask to excuse her?"  And those are

9  some of the things we run across.

10          What we are going to do is a lot of people will be

11  coming in there, about 160 to 200 people, and I guarantee you

12  that they didn't know what they were bargaining for.  So after

13  we read the Indictment, there are 20 or 30 people thinking "How

14  do I get out of this?  I showed up as a patriotic person, but I

15  don't want to serve on this."

16          So we are going to hear all excuses and reasons, some

17  of which are very good, and then others that aren't good at

18  all, but counsel are going to be sitting here as things come up

19  in that stage, so I want you to talk about it.  You don't have

20  to reach a decision today, but eventually I'll be asking you do

21  you want to be present if we stay in a joined position, okay?

22  Because in all likelihood, if I reach this tentative, it's

23  going to be joined, and if I reverse this tentative, it's

24  probably still joined, just with more things coming out, okay?

25  So come back to me with that.

1           (Attorney discussion held off the record.)

2           THE COURT:  Okay.  Now, are you two in agreement about

3   those questions?

4           MR. WHITE:  Yes.

5           THE COURT:  Could you read what is now going to be

6   Question 61 -- I'm sorry, 62, to me.

7           MS. FLYNN:  "Are your views concerning the death

8   penalty such that you would automatically vote guilty because

9   you want to make a decision regarding penalty?"

10          THE COURT:  "Regarding death penalty."

11          And then Question 63?

12          MS. FLYNN:  "Are your views concerning the death

13  penalty such that you would automatically vote not guilty to

14  avoid making a decision regarding the penalty?"

15          THE COURT:  Is that agreeable with you, Mr. Donatelli?

16          MR. DONATELLI:  Yes.

17          THE COURT:  Mr. Fleming?

18          MR. FLEMING:  That's fine.

19          THE COURT:  Mr. White, Mr. Harris?

20          MR. WHITE:  Yes.

21          MR. HARRIS:  Yes.

22          THE COURT:  Ms. Flynn, is that agreeable with the

23  government?

24          MS. FLYNN:  Yes, your Honor.

25          THE COURT:  Okay.  Then 64 and 65 would follow off the

1  old rendition as is.

2          And I agree with you, Mr. White, that it's crisp and

3  clear.

4          And then 66 is the same.  67 is the same.  68 would be

5  the same.  69 would remain the same.  70 -- now 70 really isn't

6  a typical Hovey question, but I put it in there over the years

7  as -- so that each counsel kind of had a flavor when you get --

8  it's not going to be a disqualifier, unless they say in that

9  question something that contradicts 62, 63, 64, 65, assuming

10 that they answered those questions appropriately, it's a way of

11 double checking, and it also gives each of you the idea of how

12 strong they are in their beliefs, so later on in general voir

13 dire, you have a chance to preempt them.

14         70 -- well, 71, that's just general background

15 information.  72 -- now 73 caused a lot of problems last time,

16 so I want to talk to you about 73 for a moment.

17         THE COURT:  Last time we got into a box.  They can

18 certainly render the death penalty because of multiple murders.

19 That's one of the factors.  The difficulty is here, it tends to

20 negate the factor to a certain extent.

21         "Do you believe anyone who has committed multiple

22 murders should automatically, without consideration of any

23 other circumstances, be sentenced to death?"  Well, I agree

24 with the "automatic," the inquiry about "automatically," but I

25 don't like the wording because -- "without any other

1  circumstances," it appears that they have to find something

2  else besides multiple murders.  Well, they do.  They have to

3  find a mental state.  Multiple murders, in and of themselves --

4            MR. FLEMING:  You have to still consider all of the

5  mitigating factors before the imposition of the death penalty,

6  and I think that's what --

7            THE COURT:  I'll cover that by including it, but in

8  and of itself, I am not going to give.  I am just forewarning

9  you, so you've got to rework this somehow.

10           MR. WHITE:  Our concern obviously is that a juror will

11 believe that if one is convicted of multiple murders, that's

12 the end of --

13           THE COURT:  No, I understand that.  I'm going to give

14 you that, obviously, but I don't like the present form without

15 more or something else in this question, because we spent a

16 significant period of time last time with this question, and

17 it does read -- I mean, if I was a juror, I would think, "Well,

18 if I reach multiple murders, that's not enough.  I've got to

19 go find something else."  No, they don't.  As long as there is

20 a mental element and they reach multiple murders, that is

21 enough.

22           MR. WHITE:  What about if we take out "without the

23 consideration of any other circumstances" and just allow it to

24 read "do you believe anyone who have committed multiple murders

25 should automatically be sentenced to death," because that's

1    really the question we are asking.

2              THE COURT:  And that's the place we got to last time

3    in the questioning.  Now my memory is coming back.

4              MR. WHITE:  Yes.

5              THE COURT:  We kept having to go over that time and

6    time again.  Let's think about that for a moment.

7              MS. FLYNN:  Your Honor, are we then saying that if

8    they answered "yes" to that question, we are automatically

9    striking them without further inquiry?

10             THE COURT:  Yeah.

11             MS. FLYNN:  Because, I mean, if you inquire further,

12   they may be able to say, "Oh, no, I'll weigh the mitigating

13   factors, but if I convict them of two murders, I am going to

14   weigh and then do it."

15             THE COURT:  Yeah.

16             MR. WHITE:  I don't think we are saying that they are

17   automatically struck, but it's certainly a point that we can

18   explore.

19             THE COURT:  Well, you can.  It singles out one factor,

20   though.  I know you are concerned about it.  It singles out one

21   factor.

22             MR. WHITE:  Your Honor, I think for the defense, it's

23   the most important factor in the case, and I remember during

24   the penalty phase that the government repeatedly talked about

25   Mr. Mills and Mr. Bingham as being multiple murderers.

1          THE COURT:  Okay.  We will come back to it in just a

2    moment.

3          Concerning the concluding questions on 74, 75, 76, 77,

4    et cetera, on pages 12 and 13, any additions, deletions or

5    comments?

6          MR. WHITE:  No, your Honor.

7          THE COURT:  Okay.  Then I am not going to read through

8    those.  I initially thought that 71, 72 and 73 were relevant,

9    but do you want 71 included?

10          MR. WHITE:  Yes.

11          THE COURT:  And while we are considering that, does

12    the government want 71 included?

13          MS. FLYNN:  71?

14          THE COURT:  71.  I mean it's up to 70 -- 70 is

15    generous on the Court's part, and I'm trying to give each of

16    you enough information so you are not getting into multiple

17    questions in front of the whole venire.

18          (Attorney discussion held off the record.)

19          THE COURT:  What about 71?

20          MR. WHITE:  Yes.

21          THE COURT:  Mr. Donatelli, do you want 71?

22          MR. DONATELLI:  Yes, sir.

23          THE COURT:  Does the government?

24          MS. FLYNN:  That's fine, your Honor.

25          THE COURT:  Okay.  72?

1          MR. WHITE:  Yes, we want 72.

2          THE COURT:  Okay.  Does the government want 72?

3          MS. FLYNN:  Not really, your Honor.  I don't see the

4    relevancy of it.

5          THE COURT:  Yeah.  Well, the relevancy is over the

6    years, and that is the reality of this actually taking place.

7    In other words, is this just a game being played as far as the

8    jury is concerned?  And it has no sense of reality because

9    they've read the papers, and they believe that because of the

10   length of time and people dying of old age rather than being

11   executed, and people being executed when they are convicted in

12   the 1980s, then it has no reality.  Whatever we do, the jury

13   doesn't make a difference.  That's why the defense wants it.

14   Let me think about it.

15         73, I am not going to give 73 in the present form.

16   Something has to be done with 73.  I woke up to that in the

17   last proceeding, part way through I realized that you are going

18   to get on the defense side something about the automatic.  I

19   understand your need, but you've got to help in terms of coming

20   up with some other question that is more balanced, because I

21   think that the inference here is that multiple murders are

22   almost being discounted as a given, and that we have to

23   consider -- we have to consider something else, and that's not

24   true.  Once you reach the mental state, plus the multiple

25   murder, that's enough to the jury if it chooses.

1          Yeah, would you be kind enough to give Mr. White a

2   copy of the First Superseding Indictment, Mr. Fleming,

3   Mr. Belter.

4          Do you need one?

5          MR. SAGEL:  We have two copies, your Honor.

6          THE COURT:  I am going to strike at the present time

7   73, and I'm going to put the burden on everybody to come up

8   with a new one, so just strike it out of the questionnaire.

9   I'm going to wait to see what the next rendition is.

10         I'm going to leave 72 the same for the time being.

11         MS. FLYNN:  You're leaving --

12         THE COURT:  I think that will save the defense a lot

13  of awkward questions in that regard.  And the problem is if I

14  don't give that to the defense team, you've got to ask that at

15  some point, and the only chance to ask that, unless I let you

16  ask that repeatedly during the Hovey voir dire, which shouldn't

17  take that long, is in the general venire, and that's -- that's

18  a difficult place to be, because I know some juror, if they are

19  honest, is going to say, "No.  The system is a joke.  They are

20  never going to be executed.  Even if we reach death, I've been

21  reading things in the paper," and there you are, right in front

22  of the whole panel.  So I think the wise thing to do is use my

23  discretion to keep 72, but you've got to clean up 73.  I am not

24  going to give it in its present form.

25         MR. HARRIS:  I think I have a suggestion, your Honor,

 1  on 73.

 2          THE COURT:  Okay.

 3          MR. HARRIS:  Well, to preface it, what you want to

 4  avoid is the inference that multiple murders, that's never

 5  sufficient.

 6          THE COURT:  Right.

 7          MR. HARRIS:  Okay.  So the suggestion is, "Do you

 8  believe that commission of multiple murders is always

 9  sufficient to justify the death penalty?"

10          THE COURT:  "Always" or "automatically"?  First of

11  all, thank you.  That's a great suggestion to start with.

12          I prefer to use the word "automatically" because

13  "always" I don't know how to define, and "automatically" goes

14  back and double checks the Hovey question, which would be 62.

15          Anyway, think about it.

16          MR. HARRIS:  I think that's better.

17          THE COURT:  Now, for the time being, just put 73 in

18  that form, and we're going to put a big circle around it.  We

19  are going to come back to it, okay?  Now, that should allow us

20  to put together a questionnaire by the time we all choose to

21  reassemble today.

22          And if you want to Xerox copies, that's great.  If you

23  want us to, Ms. Flynn, just bring up one copy and we can do

24  that.

25          MS. FLYNN:  I can copy them, your Honor.  That's fine.

1          THE COURT:  And I want you all to have a lunch,

2   because at times you don't have much of a lunch.  So do you

3   want to come back at 1:30 or 2:00?

4          Because I want Ms. Flynn to have time.

5          MS. FLYNN:  The sooner we can come back, the better

6   for the government.

7          THE COURT:  Okay.  You have something today, don't

8   you?

9          MS. FLYNN:  Our office has a Christmas party today.

10         THE COURT:  Oh, that's right.

11         MR. WHITE:  Are we invited?

12         MS. FLYNN:  Sure.  Come on over.

13         THE COURT:  You are not invited.

14         (Laughter.)

15         THE COURT:  You'll be there.  By the way, you'll be

16  there.

17         MS. FLYNN:  I'm sorry, "holiday party," your Honor.

18  I've been corrected.

19         (Laughter.)

20         THE COURT:  Okay.  Then, if that's the case, be

21  back earlier.

22         All right.  Assume for a moment that there is complete

23  joinder for a moment, and we are going through this, and if

24  there is not, then obviously I'll know what to do, but I'll get

25  a lot of accomplished either way today.

CR 02-938-DOC            December 19, 2006                    86

1            On page 1, on the last occasion, I should have a copy

2    of the old Indictment that we actually read to the Grand Jury

3    in the Mills and Bingham matter.  Do you recall if we read all

4    of the names?

5            MS. FLYNN:  I'm checking right now, your Honor,

6    because I can't remember that myself.

7            THE COURT:  I believe we did, because all of these

8    names were going to become familiar anyway.  And I thought it

9    was the defense's decision at that time not to try to -- not to

10   try to downplay the involvement of all of the people that were

11   going to be heard, but maybe Mr. Harris recalls.

12           MS. FLYNN:  Your Honor, we only read the four

13   defendants.

14           THE COURT:  Four defendants?

15           MS. FLYNN:  Well, I take that back, your Honor.  The

16   one I'm looking at, I think we read them all to the jury for

17   jury selection, but then we only gave them the Indictment that

18   went back to them with only the four defendants.

19           THE COURT:  That's correct.

20           MR. HARRIS:  Yes.

21           THE COURT:  That's correct.

22           Can I suggest that we read all of the names because

23   they are all going to become familiar anyway?  It would just --

24           MS. FLYNN:  It's fine with the government.

25           THE COURT:  And in fact, if the names are read, the

1    benefit is everybody starts getting to know the players.  I

2    mean, your defense isn't that Mr. -- that Glen West doesn't

3    exist or a message isn't allegedly passed by Mr. Mills or

4    Mr. Bingham through somebody, okay?  So why would you be in a

5    position of trying to pretend that Mr. Mills and Mr. Bingham,

6    for instance, don't exist?  Why wouldn't we just be reading

7    that?

8            Let me turn to the defense first.  Not to be

9    discourteous, but I think it's their initial opportunity to

10   decide.

11           (Attorney discussion held off the record.)

12           THE COURT:  We are going to go through each of the

13   pages, by the way.  It's just the initial decision of how we

14   start off.

15           I mean, here is the tough choice that's being made.

16   If you get to the death penalty phase, a lot of the credibility

17   that you'll be arguing is the fact that we are open and

18   aboveboard, and we just kind of gave it to you, and this is the

19   basic defense, the focused defense.  If your defense is "We

20   didn't do it, and we didn't know any of these people," then I

21   suggest the opposite, you know, there's just a limited reading.

22           MR. DONATELLI:  From our prospective, Judge, guilt by

23   association is the most deadly factor in this case.  And

24   reading our name along with a list of 23 or 43 others just

25   starts that whole concept of guilt by association, so we want

CR 02-938-DOC                    December 19, 2006                        88

```
 1    to resist it any chance we get.

 2             THE COURT:  Okay.

 3             Mr. Fleming?

 4             MR. FLEMING:  I agree with that.

 5             THE COURT:  Okay.  Mr. White?

 6             MR. WHITE:  We would agree, your Honor.

 7             THE COURT:  Mr. Harris?

 8             MR. HARRIS:  Yes, your Honor.

 9             THE COURT:  Okay.

10             Mr. Belter?

11             MR. BELTER:  Your Honor, so much of it depends on the

12    Court's ruling, but Mr. Slocum is named so often throughout the

13    Indictment that I think it's difficult to not read other names.

14             THE COURT:  Okay.

15             MR. BELTER:  I'm not so sure we need to read all of

16    the names, but as the Court is aware, Mr. Slocum is named

17    throughout the Indictment and is joined with many of the other

18    people, other than Mr. Bridgewater and Mr. Houston.  So in

19    those areas or in those offenses or acts where he's named with

20    other individuals, I think that it would be necessary for those

21    names to be -- those names to be read.

22             THE COURT:  Okay.  Let's do this.  Let's put that

23    aside.  Let's just get the questionnaire done.  Why don't you

24    go down and Xerox it off, and I'll meet you in an hour and 15

25    minutes; how is that?
```

```
 1            We will meet at 1:15.  We'll go over that
 2   questionnaire, and we'll solidify that, and then I'll let you
 3   go today, okay, and then we'll get back together on the --
 4            MR. DONATELLI:  4th.
 5            THE COURT:  -- the 4th, and I'll let you reargue the
 6   matter on the 7th, so I can hear it one more time, but by then
 7   I'll be pretty far down the line, one way or the other.
 8            We'll see you at 1:15.
 9            Gentlemen, we'll get you fed also in a timely fashion.
10            (Recess.)
11            (Volume II is reported by Jennifer Lewis.)
12   /
13   /
14   /
15
16
17
18
19
20
21
22
23
24
25
```

1                          **_CERTIFICATE_**

2

3    *I hereby certify that pursuant to Section 753, Title 28 of the*

4    *United States Code, the foregoing is a true and correct*

5    *transcript of the stenographically reported proceedings held in*

6    *the above-entitled matter and that the transcript page format*

7    *is in conformance with the regulations of the Judicial*

8    *Conference of the United States.*

9

10

11   _____        _____
     *JANE C.S. Rule, CSR NO. 9316*          *Date* 12/20/06
12   *Federal Official Court Reporter*

13

14

15

16

17

18

19

20

21

22

23

24

25