Mark F. Fleming, Esq.
433 G Street #202
San Diego, CA 92101
(619) 652-9961

Mark H. Donatelli, Esq.
1215 Paseo de Peralta
P.O. Box 8180
Santa Fe, New Mexico 87504-8180
(505) 988-8004
NM 691

Attorneys for Defendant
HENRY MICHAEL HOUSTON

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATE OF AMERICA, | Case No. CR 02-938(E)-DOC |
| Plaintiff, | NOTICE OF MOTION AND MOTION OF HENRY MICHAEL HOUSTON TO EXCLUDE THE GOVERNMENT'S GANG EXPERT TESTIMONY AND FOR A PRETRIAL DAUBERT HEARING AS TO THE ADMISSIBILITY OF SUCH TESTIMONY |
| v. | |
| HENRY MICHAEL HOUSTON, | |
| Defendant. | |
| | DATE: February 5, 2007 |
| | TIME: 2:00 p.m. |
| | DEPT.: Courtroom 9D |

TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:

PLEASE BE ADVISED that on February 5, 2007, at 2:00 p.m. or as soon thereafter as counsel may be heard, in the courtroom of the Hon. David O. Carter, U.S. District Judge, 411 West Fourth Street, Courtroom 9D, Santa Ana, California 92701, Defendant Henry Michael Houston will, and hereby does, move the court for an order excluding or limiting each and every proposed gang expert opinion and to hold a pre-trial hearing to determine the admissibility of such testimony:

1. The motion asks the Court to conduct a hearing at which each and every specific opinion, line by line and paragraph by paragraph of any proffered expert testimony on the Aryan Brotherhood be analyzed for its relevance, reliability and possible unfair prejudice.

2. The motion is based on Fed. R. Evidence 702, Fed. R. Evidence 403, § 3593(c)(2), <u>Daubert v. Merrell Dow, Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) and <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999).  Pre-trial determination of the admissibility of such statements is necessary for the Court to fulfill its role as gatekeeper in determining what expert evidence the jury should hear and to ensure that otherwise lengthy court proceedings are not interrupted by lengthy proffers and argument.

3. The motion is based on the attached Memorandum of Points and Authorities, the complete files and records in this case, including all proceedings in <u>United States v. Mills, et al.</u>, such additional evidence and argument as may be presented at the hearing on this motion.

**DATED: January 12, 2007**               **Respectfully submitted,**

By: _____
**Mark F. Fleming
433 G Street #202
San Diego, CA  92101**

**Attorneys for Defendant Henry Michael Houston**

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION.**

The first superceding indictment focuses on the government's allegations that the Aryan Brotherhood constituted an enterprise for the purposes of the Racketeering Influenced Crime Organization Act, 18 U.S.C. §§ 1961, et al. ("RICO") and the Violent Crimes in Aid of Racketeering Act, 18 U.S.C. § 1959 ("VICAR"). The government has charged Mr. Houston as a member of this alleged criminal enterprise and further has alleged that he participated in two murders in furtherance of a racketeering enterprise, thus making him eligible for the death penalty.

In order to prove the existence, structure, operation, and methods of the Aryan Brotherhood as a RICO enterprise as against Mr. Houston, it is anticipated that the government will present a gang expert or experts such as Danine Adams or other BOP or law enforcement agents. While the testimony of Adams may focus on her personal knowledge as an investigating intelligence officer in this case, the government will also attempt to introduce her opinions regarding the existence, organization, structure, and methods of operation of this specific alleged criminal organization, the Aryan Brotherhood. Most importantly, it is anticipated that Adams will be called to establish the elements and theory of the government's main case against Mr. Houston: that Mr. Houston's participation in the homicides at USP Lewisburg in August 1997 was in furtherance of the purposes and goals of the Aryan Brotherhood. It is important to note at the outset that this proposed gang expert testimony is much different from that routinely considered and excluded and by courts, namely testimony that relates to interpretation of slang, recognition of drug distribution methods or establishing a bias of a witness due to alleged gang membership. Rather this testimony will be used to establish the most important elements of the offenses faced by Mr. Houston in a case where the vast majority of the evidence comes from inherently unreliable, professional informants.

The fact that Adams and the other witnesses will be testifying both as lay and expert witnesses causes great concern regarding the scope of admissible testimony permitted under the Rules of Evidence. If the opinions are largely based on the witnesses's investigation of this case then it should

not be permitted under the guise of "expert" testimony as fact witnesses generally are not permitted to give opinion testimony or base their testimony on hearsay or other inadmissible evidence. Any attempt to present the testimony of a single witness as both lay and expert also will cause great prejudice to Mr. Houston as the jury likely will connote the witness's entire testimony with the imprimatur of an expert. Testimony of these witnesses therefore should be carefully scrutinized and precisely defined as to determine the scope to which it will qualify as expert or as lay witness testimony with an eye towards enhancing the reliability of the fact finding process and eliminating unfair prejudice to Mr. Houston. Counsel seeks to exclude the bulk of the proffered expert testimony due to the greater need for reliability in death penalty proceedings.

### A. This Court's Gate Keeping Duty, Under Daubert, Requires the Exclusion of Expert Opinion Testimony Proffered from the Government's Main Intelligence Officer, or Officers in this case, as Unreliable, Irrelevant and Extremely Prejudicial to Mr. Houston.

Traditionally, Courts have been extremely diligent in limiting and excluding gang expert testimony due to the unreliable nature of the conclusions and the extremely prejudicial effect of such testimony.

In Daubert, 509 U.S. 579, the Supreme Court charged all federal trial courts with the function of gate keeper regarding the admissibility of all expert testimony.[1] According to Daubert, the trial court must make a preliminary determination as to the admissibility of all expert testimony before such testimony is admissible to the jury. This gate keeping function extends to the testimony of nonscientific based criminal gang expert opinions such as that of Danine Adams. See Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999) and United States v. Hankey, 203 F.3d 1160 (9th Cir. 2000).

The admissibility of expert testimony is governed by Fed. R. Evid. 702. Under Rule 702, a witness may provide scientific technical or special knowledge, if it is determined that such a person is qualified as an expert. Once qualified, the expert witness may be permitted to offer opinion testimony "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable

---

[1] Mr. Houston hereby incorporates by reference all facts and arguments offered in support of his motion to order the government to specify each and every proposed gang expert opinion and to disclose the specific basis for each separate opinion as if set forth fully herein.

4

principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Id. According to Fed. R. Evid. 104 and 702, as interpreted by Daubert, the trial court functions as a gate keeper of all proffered expert opinion testimony and must determine the qualifications, relevance, and reliability of all such testimony before it may be presented to the jury.

The offering party must make a showing to the Court, that the expert opinion is relevant, reliable and based on proper qualifications. Relevance, of course, must be evaluated against the potential prejudice to the defendant. Reliability is measured through the methodology upon which the expert bases his opinion. Expert qualifications are based upon the expert's "knowledge, skill, experience, training or education" in a particular field. Hankey, at 1168.

Prejudice may also run from the introduction of expert opinion that stretches the bounds of relevance. Simply qualifying a gang expert does not permit that witness to testify to every aspect of gang activity. In United States v. Long, 917 F.2d 691 (2d Cir. 1990), the Second Circuit held that certain expert testimony regarding the hierarchical structure and methods of operation of a crime family were improperly introduced at a criminal RICO trial. The court held that there was not a sufficient connection between the crime family and the RICO enterprise. As such, the court held the expert testimony regarding the crime family to be inadmissible. See State v. DeShay, 669 N.W.2d 878, 886 (Minn. 2003) ("that criminal gang involvement is an element of a crime does not open the door to unlimited expert testimony").

Hankey, the leading Ninth Circuit case on gang expert testimony, contains an excellent discussion of the problems inherent in receiving gang expert testimony and the diligence with which courts must assess relevance and reliability. The district court in Hankey conducted an extensive motion in limine hearing outside the presence of the jury after which it refused admission of some of the proffered gang expert testimony. The court then gave a limiting instruction as to the testimony it ultimately admitted. In affirming the conviction, the court congratulated the district court in conducting extensive voir dire, making detailed findings and being diligent in assessing relevance and reliability. In summary, Hankey approves the use of gang expert testimony:

- after motion in limine consideration.

- on limited issues (the evidence did not go towards proof of an element of the offense).
- with full disclosure of the basis of the opinion.
- with limiting instructions.
- where there were extensive findings on relevance and reliability and the evidence was not unduly prejudicial.

The circuit had another opportunity to address gang expert testimony in <u>United States v. Hermanek</u>, 289 F.3d 1076 (9th Cir. 2002). Once again, the court considered expert testimony offered for an extremely limited purpose, that of interpreting drug slang or drug codes. Although affirming the conviction on a harmless error analyses, the court faulted the district court for failing to sufficiently establish the reliability of the expert's methods for interpreting slang. There the expert described a background and experience somewhat similar to that described by Danine Adams. Yet again, much like Ms. Adams, the expert never explained the methodology used in reaching conclusions or how the methodology she utilized was ever established to be reliable. In a detailed analysis of the inadequacy of the foundation for the opinion, the court stated in part:

> Broderick's qualification on the stand also did not establish that his interpretation of new words and phrases were supported by reliable methods. The government offered only Broderick's general qualifications, his extensive experience and knowledge of drug terminology based on several years investigating the cocaine trade in the Bay Area and interpreting hundreds of intercepted communications. These qualifications are relevant but standing alone they neither explain or establish the reliability of Broderick's interpretations of new words and phrases. It is well established that bare qualifications alone cannot establish the admissibility of scientific expert testimony (citing <u>Daubert</u>) . . . after <u>Kumho</u> that proposition indisputably carries over to nonscientific expert testimony as well. . . . As a prerequisite to making the Rule 702 determination that an expert's methods are reliable, the court must assure that the methods are adequately explained . . . the factors Broderick identified - his knowledge and prior investigation of the defendants and the evidence seized in the case - were too vague and generalized to satisfy the requirements of Rule 702. Under Rule 702, the proffered expert must establish that reliable principles and methods underlie the particular conclusions offered here. . . . Without a link between Broderick's knowledge and the particular matter he interpreted, there are simply two great an analytical gap between the data and the opinion proffered. <u>Id.</u> at 1093-1095.

The testimony of Adams and similar witnesses must be carefully examined in order to determine the specific areas on which the witnesses qualify as experts and whether their

proffered testimony is relevant and reliable, and based on a specific methodology accepted and proven to be reliable. Mr. Houston has not yet received the required discovery from the government regarding either a summary of expert opinions or the bases in order to properly evaluate the scope of any proffered expert testimony under Rule 702. At no time in the previous trial did Adams ever explain her methodology, where her methodology came from, why the methodology is reliable or how the methodology produced the opinions she reached. Mr. Houston, however, has identified numerous additional problems inherent in any attempt the government makes to introduce the previous testimony as to Mr. Houston. Essentially, the status of Ms. Adams as a lead intelligence officer necessarily should preclude her from being able to testify as a gang "expert" as her testimony was primarily as a fact witness. Most of her knowledge has come from her own criminal or administrative investigation in the case and not any particular expertise on the subject.

**B. Experts Cannot Be Used to Bootstrap Inherently Unreliable Prejudicial Hearsay from Informants into Evidence Receiving the Imprimatur of an Expert Witness.**

Only matters that follow from the specific expertise of a gang expert may be admitted under Rule 702. The reason for this is that Rule 702 permits experts to offer opinion evidence based on otherwise inadmissible evidence such as hearsay. Indeed, the whole point of the trial court's gate keeping function, defined in Daubert, is to limit the introduction of inadmissible and prejudicial evidence to the jury. See Fed R. Evid. 703 ("facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that the probative value in assisting the jury to evaluate the expert opinion substantially outweighs their prejudicial effect").

A fact witness may not introduce evidence based on hearsay or otherwise inadmissible evidence. See Rule 701. As a gate keeper, the trial court must carefully prevent fact witnesses from introducing testimony that is reserved for qualified experts subject to judicial scrutiny under Rule 702. On the other hand, an expert may not introduce inadmissible evidence that is not within the scope of his or her qualifications, not relevant to the case and not based

upon a reliable methodology.  See United States v. Dukagjini, 326 F.3d 45, 58 (2d Cir. 2001) ("the government has cited no case and we have found none, in which a court has permitted a witness to rely on hearsay for non-expert testimony simply because that witness was also qualified to rely on hearsay for other, expert testimony").  Courts have recognized that Rule 702 and Daubert hearings should not be used as a tool for introducing otherwise inadmissible evidence through the lens of expert testimony.  See for example, State v. DeShay, supra, ("the state should not be permitted to launder inadmissible hearsay evidence, turning it into admissible evidence by the simple expedient of passing it through the conduit of a purportedly expert opinion").  The court therefore must be vigilant in limiting the scope of all expert testimony in matters for which they are qualified and limiting opinions based on the relevance and reliability.  The possibility of undue prejudice is heightened when, as in this case, intelligence investigators offer testimony regarding both the investigation of a crime and expert opinion on the nature of criminal activity in general.  See Dukagjini, 326 F.3d at 53 ("particular difficulties, warranting vigilance by the trial court arise when an expert, who is also the case agent, goes beyond interpreting code words and summarizes his beliefs about the defendant's conduct based on his knowledge of the case").  In Dukagjini, the court held that the trial court failed in its gate keeping function to limit the scope of expert opinion offered by the government's gang expert who was also the investigating expert in that case.  See Id. at 55.  Similarly, Adams claimed that she based her opinions on her knowledge and experience of Aryan Brotherhood related matters as a result of her role as an SIS tech and recently as an administrator in SIS, Sacramento.  But here, just as in Dukagjini, "there is a high risk that when a case agent/expert strays from the scope of his expertise, he may impermissibly rely upon and convey hearsay evidence." Dukagjini, 326 F.3d at 55.  The testimony of an investigating agent like Adams who simply recites facts as discovered through investigation of the case cannot form the proper basis for expert testimony.  Given their role, their perspective and their focus on the facts, these case agent experts are more likely to stray from the scope of their expertise and testify about other aspects of the case, including the divulging of hearsay evidence." Id. at 56.

This was precisely the problem confronted by this court in receiving Adams' testimony about Aryan Brotherhood activities, and in particular, the critical August 28, 1997 phone call from Ron Slocum to Al Benton in a letter and the phone call. Not only was she allowed to interpret plain language that was not code or slang, and merely susceptible of different interpretations by lay people, but she was also allowed to give her opinion that the murders at Lewisburg were committed in furtherance of the Aryan Brotherhood at the behest of ADX prisoners they sent through Slocum to Benton. When confronted by the court as to the basis of her opinion, she confessed that it was based on her debriefs of informant Kevin Roach and other H Unit information she and other SIS agents obtained. The following transcripts from the Mills/Bingham case contain precisely the type of inadmissible testimony described in Dukagjini and other courts:

> Day 9, Volume I, Page 70, Line 16. After explaining the significance of the "baby boy" letter, the following exchanges took place with Danine Adams.
>
> Q:   And this letter was intercepted on August 17, 1997?
>
> A:   August 26.
>
> Q:   August 26 of 1997?
>
> A:   Right.
>
> Q:   And do you know whether anything happened in relation to a message that said, "Let's go."
>
> A:   Yeah.
>
> Q:   What happened?
>
> A:   Two days later, the Aryan Brotherhood at USP Lewisburg killed two inmates, two black inmates at USP Lewisburg and seriously assaulted a third. Inmate Alan Benton was involved in that, Jason Schreihart, Campbell Bridgewater and we were -- at the ADX. We were pretty excited when we got this letter. We thought we got it and we stopped it. It turns out that the letter turns out that the message was sent out in a variety of ways and --
>
> Q:   You intercepted one letter but your --
>
> (Motion to Strike "turns out" granted.)
>
> Q:   You intercepted this letter. Is that correct?

9

| | | |
|---|---|---|
| 1 | A: | That is correct. |
| 2 | Q: | So did you allow it to go forward? |
| 3 | A: | No. |
| 4 | Q: | Did you know whether the same message got out in other ways? |
| 5 | A: | Well, yes, it did. |
| 6 | Q: | How did you know and how do you know? |
| 7 | A: | Because the inmates were killed at Lewisburg. |
| 8 | (Motion to Strike last answer granted.) | |
| 9 | Q: | But the inmates were, in fact, killed at Lewisburg two days later? |
| 10 | A: | I believe it was two days later. It was the 27th or the 28th. I can't remember which one. |
| 11 | | |
| 12 | Q: | Thank you. |
| 13 | (Testimony resumes. Day 9, Vol. II, Page 6 with Adams) | |
| 14 | Q: | Do you recall when you found this letter (Exhibit 158)? |
| 15 | A: | Yes, I do. |
| 16 | Q: | What was your reaction? |
| 17 | A: | We were very excited. I was very excited. I took it into my boss, Danny Shoff. That's whose initials are on the letter and I was like "we got it". You know we really thought that we had let the correspondence move. |
| 18 | | |
| 19 | Q: | The prior correspondence? |
| 20 | A: | The prior correspondence that you see here, we let it move with the end result to get the answer. "Is it a boy or a girl" and then that was it. We would never have mailed this letter out. So you know we were pretty excited. We thought that we had caught it in time. |
| 21 | | |
| 22 | | |
| 23 | Q: | Do you know if another piece of correspondence actually went out? |
| 24 | A: | Yes, I do. |
| 25 | Q: | How do you know?\ |
| 26 | A: | I know. I learned it from an inmate who dropped out of the Aryan Brotherhood. |
| 27 | | |
| 28 | Q: | When did he drop out? Which inmate? |

| | | |
|---|---|---|
| 1 | A: | Kevin Roach. |
| 2 | Q: | And when did he drop out? |
| 3 | A: | In May or June of 1998, I believe. |
| 4 | Q: | So almost a year later you had a conversation with Kevin Roach. |
| 5-6 | A: | Yeah. I don't remember exactly when we had the conversation but I know that we did have it and we knew that we had missed it. We knew that we had missed how the message went out and |
| 7-8 | Q: | I am sorry. Let me interrupt you. You assumed that a message had gone out. |
| 9 | A: | Absolutely. |
| 10 | Q: | Why? |
| 11 | A: | Because the inmates ended up dead at Lewisburg. |
| 12 | Q: | You assumed that a message had gone out? |
| 13 | A: | Absolutely. |
| 14 | Q: | Why? |
| 15 | A: | Because the inmates ended up dead at Lewisburg. |
| 16 | Q: | And was that |

(Motion to Strike overruled).

| | | |
|---|---|---|
| 17-18 | Q: | So you had assumed once the inmate died at Lewisburg, you assumed that you had missed a message. Is that right? |
| 19-21 | A: | Yes. Because again we had been looking for this. When we stopped this letter, we figured we had stopped the trigger for the violence and two days later when the inmates were murdered we were sad to learn that. |
| 22 | . . . | |

Resumes page 9.

| | | |
|---|---|---|
| 23 | Q: | Was your assumption eventually confirmed? |
| 24 | A: | Yes. |
| 25 | Q: | How was it confirmed? |
| 26 | A: | I had learned from Inmate Roach that. |
| 27-28 | Q: | That was almost a year later. |

11

| | | |
|---|---|---|
| 1 | A: | The better part of a year, yes, that a separate letter had been sent. |
| 2 | Q: | From whom? |
| 3 | A: | From inmate Bingham. |
| 4 | Q: | To whom? |
| 5 | A: | To Slocum on the street. |
| 6 | Q: | And what was Slocum supposed to do with it? |
| 7 | A: | Forward the message in the letter to inmate Benton at Lewisburg. |
| 8 | Q: | And according to Kevin Roach, had that happened? |
| 9 | A: | Yes. |
| 10 | Q: | What kind of message was it? |
| 11 | A: | To move on the DC Inmates to kill them. |
| 12 | Q: | And was that a coded message also? |
| 13-15 | A: | Yes. Again I learned that the way that the letter had been coded was with the demonstration that I showed you earlier with the invisible ink. We didn't know that that existed at that time so the chances are very good that we read the letter and didn't know it was there and sent it forward thinking it was benign. |
| 16 | Q: | And who was Al Benton? |
| 17-18 | A: | Al Benton is an Aryan Brotherhood member who was housed at Lewisburg at this time. |
| 19 | Q: | And he was involved in the killings we were talking about? |
| 20 | A: | Yes. He was a commissioned member. He was involved in the homicides. |
| 21 | . . . | |

Page 13. The government plays the audiotape (Exhibit 163 and transcript 164) for the jury after which, Page 13 at line 21.

| | | |
|---|---|---|
| 23 | Q: | Ms. Adams, do you recognize the voices on that tape? |
| 24 | A: | I recognize Ron Slocum's voice, yes. And Al Benton. |
| 25-26 | Q: | And this at the beginning of the transcript on the tape? It states that was August 28, 1997? |
| 27 | A: | Yes. |

|   |   |   |
|---|---|---|
| 1 | . . . | |
| 2 | Page 14, line 21. | |
| 3-4 | Q: | And if you could turn to the second page of the transcript where Mr. Benton tells Mr. Slocum that he got a postcard. Do you see that? |
| 5 | A: | Yes. |
| 6-7 | Q: | Do you recall on the tape that Mr. Benton said "OK. I got a postcard you know from TD?" |
| 7 | A: | Yes. |
| 8-10 | Q: | And Slocum says "Yeah. Yeah." And Benton says "Right. I couldn't - after his name, I couldn't understand nothing. Was there anything there? |
| 10 | A: | Uh huh. |
| 11 | Q: | And Slocum says "No. That was the end." Do you recall that? |
| 12 | A: | Yes. |
| 13-14 | Q: | And Slocum then confirms "You got the first part, right?" And Benton says, "Yeah." Do you see that? |
| 15 | A: | Yes, I do. |
| 16 | Q: | <u>Do you know what that conversation is about?</u> (emphasis added) |
| 17-18 | A: | <u>It was about the message that was received, the hit or miss message that was received.</u> (emphasis added) |
| 18-19 | Q: | And the hit or miss message is a message that needs to be heated up? |
| 20 | A: | Yes. |
| 21 | Q: | The invisible ink message. |
| 22 | A: | Yes. |
| 23 | Q: | And Slocum says "You did get the first part. Right?" |
| 24 | A: | Yes. |
| 25-26 | Q: | And later that day Al Benton was involved in two killings of black inmates at Lewisburg? |
| 26 | A: | That's correct. |

It is important to note that Adams was asked specifically about the bases for her understanding

13

of the Bingham to Slocum to Benton communications and their meanings. At Day 9, Vol. I, Page 73, Adams was asked by the court:

> Q: And then the next question is going to be, how did you know that? Did you see that letter? Did you debrief somebody? Did you listen to a tape? Tell me the foundation of how you know this?
>
> The Witness: Obviously, we didn't see it or we wouldn't have let it go. We learned that from the inmates that we debriefed.
>
> The Court: Okay, now, "We"- I know you work as a unit.
>
> The Witness: I am sorry. I and my partners, yes. We got that. I got that information.

The witness then went on to discuss her debrief of Kevin Roach.

In short, Adams' opinion testimony established the VICAR elements of the USP Lewisburg homicides by interpreting the Slocum-Benton phone call and adding Kevin Roach's hearsay-purchased-testimony account of how and why Lewisburg happened. This was not "expert" testimony. It was simply a lay opinion. Most importantly, questions regarding whether there ever was a Slocum letter, what the Slocum message was (if there was one), which written communication Slocum and Benton were referring to, the contents of the message (a warning that Benton was in danger or an order to kill), whether the phone call was related to the homicides at Lewisburg -- were all ultimate issues for the jury to resolve on the basis of facts before them from live witnesses. The August 28, 1997 phone call was not in code and the speakers used common terms and language. Although susceptible of several interpretations, Adams gave her interpretation of the call as a lay investigator or case agent, based on her snitch interviews, not as an "expert".

If the <u>Dukagjini</u> opinion could have put an illustrative transcript in its opinion, it would have been the exchanges above. In that case, the case agent was qualified to interpret a certain drug code language. However, in his testimony he went on to testify about the meaning of specific conversations beyond the general interpretations of code words.

> This testimony often interpreted pronouns and completely ambiguous statements that were patently not drug code. For example, when Biggs testified that the statement "What's left over there in the can" referred to "probably . . . bundles of heroin" he essentially used his knowledge of the case file and witness interviews .

14

1 . . 326 F.3d at 55.

2 The same analysis applies to Adams' statements. By commenting on the meaning of the Slocum Benton phone call and the hit or miss letter contents, Adams was offering opinions well outside the scope of her expert qualifications and simply giving lay person interpretations and opinions.

Adams' testimony further demonstrates the difficulty that the court will have in limiting such expert testimony within the scope of her qualifications. When the government asked questions about specific gang methodology, Adams often went ahead and offered information related to specific people, specific events and gave information not responsive to the limited question. Whether or not her opinions were lay or expert, they were intertwined with simple facts and inadmissible hearsay from informants. Such spillover between the intelligence officer's knowledge of the case and general knowledge of gangs and prison life is inevitable and it would be almost impossible to prevent at trial, unless, specific proffers are made and approved and limited.

Equally dangerous in this case is the prejudice caused by the dual role of an investigator like Adams who has debriefed the informants. By wearing two hats at one trial, the jury is likely to become confused during the testimony as to whether they are testifying as experts or as case investigators. As observed in <u>Dukagjini</u>, "whenever a court permits a case agent to testify as an expert, there is a significant risk that if the witness digresses from his expertise he will be improperly relying upon hearsay evidence and may convey hearsay to the jury." The problems with this are obvious. First, the court noted that when a fact witness such as a case agent or investigator functions as an expert, the government "confers upon him the aura of special reliability and trustworthiness surrounding expert testimony which ought to caution its use". <u>Id.</u> In other words, the jury attaches a heightened credibility to the testimony of a qualified expert which risks bolstering the fact-based testimony of the same witness. The clear risk is that the witness who is simply an officer, intelligence technician or record keeper will obtain unmerited credibility regarding his or her investigation of the case as opposed to a very limited area in which the same witness may have bona fide expert qualifications, methodology

and reliable testimony.

Second, an investigating officer, as opposed to an expert, should not be allowed to offer general conclusions about the alleged criminal conduct in a case, whether or not the testimony is admissible as expert opinion. Such broadening of the scope of permissible expert testimony implicates Rule 403 as it implies to the jury that all the conclusions asserted by the witness have been drawn from a reliable methodology. As the Dukagjini court noted,

> Throughout much of Bigg's testimony, his conclusions appear to have been drawn largely from his knowledge of the case file and upon his conversations with co-conspirators rather than upon his extensive general experience with the drug industry. . . . Biggs acted at times as a summary prosecution witness; the effect was a bolstering of the testimony of the cooperating codefendants and imprinting upon the exclusive function of the jury.

Id. at 55. See also United States v. Cruz, 363 F.3d 187 (2nd Cir. 2003), a case reversing a drug conviction where a DEA case agent also testified as an expert witness. There the court's rationale was based almost entirely on Dukagjini.

The Adams' testimony was much worse than that in either case. In the annals of federal criminal jurisprudence, it is hard to find two government witnesses more inherently unreliable and impeachable than Alan Benton and Kevin Roach. Nonetheless, Adams, through her stature as an expert, was allowed to perform the ultimate courtroom alchemy -- turning raw snitch sewage into prosecution gold. It is no answer to say that Roach and Benton were later provided for cross examination. The damage had already been done. A witness with the court's imprimatur as an "expert" had wholly embraced and vouched for raw hearsay of one time co-conspirators who had clearly withdrawn from the conspiracy and implicated their alleged co-conspirators for their own little piece of prosecution gold.

This is but one example of many possible problems presented by the testimony of Adams and other witnesses like her. In the interest of judicial economy and protecting the defendant's right to a fair trial, the court must get word by word and line by line proffers of the proffered expert testimony and compartmentalize that testimony for proper consideration by the jury.

**II.     THE RISK OF PREJUDICE AND COMPLEXITY OF THESE ISSUES WARRANT A PRE-TRIAL DAUBERT HEARING.**

Perhaps counsel for Mr. Houston is wrong. Perhaps after the government is required to provide the specific proffers and the extensive discovery requested in defendant's companion motion, the court will be met with extremely limited testimony and a pre-trial Daubert hearing may not be necessary. However, based on the experiences in the Mills case, counsel do not believe that is likely.

Vigilant gate keeping in this case requires a pre-trial determination of the witness' qualifications and bases of their opinions and proven reliable methodologies which support each line of proffered expert testimony. The court should not wait until trial as such delay will risk substantial prejudice to the defendants. For example if the admissibility of these opinions is not addressed before trial, the government will likely introduce to the jury a preview of the proffered expert testimony in its opening statement. Once a jury is told that an "expert" has vouched for the likes of Benton and Roach, it is unlikely that any instruction could cure the prejudice to the defendants.

Additionally, a proper Daubert hearing where defense counsel is armed with all necessary discovery will require extensive voir dire. Counsel anticipate that effective cross examination of such a witness is likely to take one day or more of trial time. The reason for such a lengthy hearing is that these witnesses have access to years worth and potentially millions of pages of information, some of which may be legitimately related to opinions and some of which is not. Other parts of the information will be useable for purposes of confrontation. Counsel is entitled to examine in voir dire the witness as to the entire informational record available to and consulted by the witness to challenge their qualifications and to distinguish which information formed their purported expert opinions and which conclusions were based solely on case investigation and intelligence operations.

The complexity of the charges in this case, including the VICAR allegations, further warrant careful scrutiny of the admissibility of expert evidence proffered to prove these complicated facts. Again, since this case may very well proceed to a penalty phase, analysis of

the potential prejudicial effect must be conducted not only under 403 but under 18 U.S.C.A. § 3593(c). A pre-trial determination of admissibility would provide the court and the parties sufficient time to adequately prepare and present evidence at such a hearing and to prepare for trial. The same opportunity would not be available if the hearing were held once the jury was impaneled.

### III.   CONCLUSION

This is not an expert case. There is no need for an expert to establish the enterprise, its purposes or goals or to explain the connection between communications from ADX and USP Lewisburg. Numerous informants who claim to have been members of the enterprise will describe these matters first hand. Even the "baby boy" alleged coded letters will be explained by these witnesses. The August 28, 1997 telephone call, tape and transcript speak for themselves and Benton, who was on the call, will explain what he was talking about. Adams and witnesses like her can be called to establish a chronology, but they should not be allowed to offer <u>any</u> opinions. If they do, it will violate Mr. Houston's right to confrontation, to present a defense to a fair trial and due process of law.

**DATED: January 12, 2007   Respectfully submitted,**

By: _____
**Mark Donatelli
Mark F. Fleming
433 G Street #202
San Diego, CA  92101**

**Attorneys for Defendant Henry Michael Houston**