1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3                    - - -

4    HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5                    - - -

6

7    UNITED STATES OF AMERICA,          )
                                        )
8              Plaintiff,               )
                                        )
9     vs.                               )  No. CR 02-938(A)-DOC
                                        )
10   RONALD BOYD SLOCUM, WAYNE          )      VOLUME II
     BRIDGEWATER, and HENRY MICHAEL     )
11   HOUSTON,                           )
                                        )
12             Defendants.              )
     _____)        **ORIGINAL**

13

14

15

16            REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                 Santa Ana, California

18              Wednesday, January 3, 2007

19

20

21   JANE C.S. RULE, CSR No. 9316
22   Federal Court Reporter
     UNITED STATES DISTRICT COURT
23   411 West Fourth Street, Room 1053
     Santa Ana, California 92701-4516
24   (714) 558-7755

25   Reporter's Reference:  07-01-03 ABSTATUSV2

CR 02-938(A)-DOC                  January 3, 2006                                    2

```
 1  APPEARANCES:

 2


 3  On behalf of the Plaintiff UNITED STATES OF AMERICA:

 4          OFFICE OF THE UNITED STATES ATTORNEY
            BY:  TERRI K. FLYNN
 5               BRETT SAGEL
                 Assistant United States Attorneys
 6          411 West 4th Street
            8th Floor
 7          Santa Ana, California 92701
            (714) 338-3500
 8


 9  On behalf of the Defendant RONALD BOYD SLOCUM:

10          LAW OFFICES OF MICHAEL R. BELTER
            BY:  MICHAEL R. BELTER
11               Attorney at Law
            65 North Raymond Avenue
12          Suite 320
            Pasadena, California 91103
13          (626) 796-2599

14
    On behalf of the Defendant WAYNE BRIDGEWATER:
15
            LAW OFFICES OF MICHAEL V. WHITE
16          BY:  MICHAEL V. WHITE
                 Attorney at Law
17          1717 Fourth Street
            Third Floor
18          Santa Monica, California 90401
            (310) 576-6242
19
                     - AND -
20
            STEWART & HARRIS
21          ATTORNEYS AT LAW
            BY:  WILLIAM S. HARRIS
22               Attorney at Law
            1499 Huntington Drive
23          Suite 403
            South Pasadena, California 91030
24          (626)441-9300

25
```

```
 1   APPEARANCES (Continued):

 2


 3   On behalf of the defendant HENRY MICHAEL HOUSTON:

 4           LAW OFFICES OF MARK F. FLEMING
             BY:  MARK F. FLEMING
 5                Attorney at Law
             433 "G" Street
 6           Suite 202
             San Diego, CA 92101
 7           (619) 652-9970

 8                    - AND -

 9           ROTHSTEIN, DONATELLI, HUGHES,
             DAHLSTROM, SHOENBURG & FRYE, LLP
10           BY:  MARK H. DONATELLI
                  Attorney at Law
11           P.O. Box 8180
             Santa Fe, New Mexico 87504
12           (505) 988-8004

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CR 02-938(A)-DOC          January 3, 2006                           4

```
 1                        I N D E X

 2

 3

 4   1.   MOTION BY DEFENDANTS HOUSTON AND BRIDGEWATER TO SEVER THE
          TRIAL OF HOUSTON AND BRIDGEWATER FROM CO-DEFENDANT RONALD
 5        SLOCUM (fld. 12/1/06)

 6   2.   MOTION BY DEFENDANT SLOCUM FOR SEVERANCE

 7   3.   STATUS CONFERENCE

 8

 9            SEALED PROCEEDINGS:   PAGES 33 THROUGH 44

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Jane C.S. Rule, CSR No. 9316 – Federal Official Court Reporter

| | | |
|---|---|---|
| 10:15 | 1 | SANTA ANA, CALIFORNIA, WEDNESDAY, JANUARY 3, 2007 |
| 10:15 | 2 | VOLUME II |
| 10:15 | 3 | (10:38 a.m.) |
| 10:38 | 4 | THE COURT:  Okay.  Then we are back in session.  All |
| 10:38 | 5 | counsel are present, the defendants, and the government is |
| 10:38 | 6 | present. |
| 10:38 | 7 | Racketeering Act 15, we should find that at page 74, |
| 10:39 | 8 | paragraphs 208 to 211, the conspiracy to murder and the murder |
| 10:39 | 9 | of William Puppet McKinney on December 28th, 1992 at Lompoc. |
| 10:39 | 10 | Mr. McKinney finally dies on January 8th, 1993.  McKinney is an |
| 10:39 | 11 | AB member.  He's disrespectful.  I believe there's also blatant |
| 10:39 | 12 | homosexuality here? |
| 10:39 | 13 | MR. WHITE:  Yes. |
| 10:39 | 14 | MS. FLYNN:  Yes. |
| 10:39 | 15 | THE COURT:  All right.  And four days before McKinney |
| 10:39 | 16 | is killed there's four inmates talking, so I think one of the |
| 10:39 | 17 | guards overhears them basically saying that McKinney is being |
| 10:39 | 18 | an asshole. |
| 10:39 | 19 | He's hit with a weightlifting bar by Donald Kennedy, |
| 10:39 | 20 | who is a non-AB member, in the head out by those picnic benches |
| 10:40 | 21 | or those benches near the weight room or the weight area at |
| 10:40 | 22 | Lompoc.  And Spanky Smythe and Dallas Scott basically ordered |
| 10:40 | 23 | the murders, but they broke the rules by having Mr. Kennedy |
| 10:40 | 24 | commit the murder.  And this is the murder that Mr. Al Benton |
| 10:40 | 25 | is incensed about because of his friendship with McKinney. |

10:40  1        Now, Mr. Slocum was the message carrier, and although

10:40  2  this murder didn't follow the AB guidelines because Kennedy was

10:40  3  the killer, it was represented to me that initially when we --

10:40  4  our first focus was on Mr. Mills and Mr. Bingham, Mr. Hevle and

10:41  5  Mr. Gibson, that George Harp was allegedly going to be called,

10:41  6  but he's not available.  Kevin Roach, Eugene Bentley, William

10:41  7  Kelly, who allegedly has participated in the discussion and

10:41  8  suggested the murder weapon.  Glen West, Al Benton, Thomas

10:41  9  Miller, Christopher Risk and Donald Kennedy, who did testify at

10:41 10  the first trial involving Mr. Mills and Mr. Bingham, Mr. Hevle,

10:41 11  Mr. Gibson.

10:41 12        I had forgotten, frankly -- can you refresh my

10:41 13  recollection -- concerning any testimony we've heard in the

10:41 14  first trial of what we can expect to hear in this trial

10:41 15  concerning Mr. Slocum?

10:41 16        MS. FLYNN:  Your Honor, this is the murder that the

10:41 17  jury, I think, found Mr. Mills not guilty of because they

10:42 18  were -- there was the issue of whether or not the guys in

10:42 19  Marion had actually approved of this murder beforehand.  The

10:42 20  testimony was that Slocum got on the phone with, I think it was

10:42 21  Kirk Smythe, and I think it was -- yeah, Spanky and Dallas

10:42 22  Scott, I think, were on the phone with Slocum, and Slocum gave

10:42 23  them the green light to go ahead and do it.  And the issue is

10:42 24  whether or not Slocum had gotten permission previously for

10:42 25  doing that.  So there's allegedly a telephone call when Slocum

| 10:42 | 1  | says, "Go ahead and do it." |
| 10:42 | 2  | THE COURT:  Now, that should be monitored.  Do we have |
| 10:42 | 3  | such a phone call? |
| 10:42 | 4  | MS. FLYNN:  I don't think it was monitored.  This was |
| 10:42 | 5  | in an open population yard and went to one of the phone banks |
| 10:42 | 6  | that they have. |
| 10:42 | 7  | THE COURT:  Okay. |
| 10:42 | 8  | MS. FLYNN:  And I don't think it was monitored, nor do |
| 10:43 | 9  | we have a recording. |
| 10:43 | 10 | THE COURT:  Okay.  So then no surprises.  We don't |
| 10:43 | 11 | have any that you know about, a monitored phone call, there is |
| 10:43 | 12 | no kite.  Once again, it will be all cooperators. |
| 10:43 | 13 | MS. FLYNN:  Correct. |
| 10:43 | 14 | THE COURT:  Okay. |
| 10:43 | 15 | MS. FLYNN:  And this is one that we went back to the |
| 10:43 | 16 | BOP records and double checked everything. |
| 10:43 | 17 | THE COURT:  That's right.  In fact, I think she flew |
| 10:43 | 18 | out there, didn't she? |
| 10:43 | 19 | MS. FLYNN:  Not for this one, because this is at |
| 10:43 | 20 | Lompoc. |
| 10:43 | 21 | THE COURT:  Okay.  Then we have Racketeering Act 16, |
| 10:43 | 22 | narcotics racketeering act again.  It's May 3rd, '93, May 17th, |
| 10:43 | 23 | '93; Racketeering Act 17, narcotics, July 3rd, '93, July 14th, |
| 10:43 | 24 | '93, July 29th, '93; Racketeering Act 18, narcotics, August 17, |
| 10:43 | 25 | '93, August 20th, 1993; Racketeering Act 19, narcotics |

| | | |
|---|---|---|
| 10:43 | 1 | activities, September 10th, '93. |
| 10:43 | 2 | How are you going to attempt to prove those? |
| 10:43 | 3 | MS. FLYNN:  These are -- these are Racketeering Acts |
| 10:44 | 4 | 26, 28 and 31? |
| 10:44 | 5 | THE COURT:  No.  They're 16, 17, 18 and 19. |
| 10:44 | 6 | MS. FLYNN:  All right. |
| 10:44 | 7 | THE COURT:  Okay. |
| 10:44 | 8 | MS. FLYNN:  Thank you. |
| 10:44 | 9 | Again, there's not a phone record. |
| 10:44 | 10 | THE COURT:  Okay. |
| 10:44 | 11 | MR. DONATELLI:  Your Honor, I am not clear whether you |
| 10:44 | 12 | wanted me to make a specific request of the Court -- |
| 10:44 | 13 | THE COURT:  Please. |
| 10:44 | 14 | MR. DONATELLI:  -- before an order at this time -- |
| 10:44 | 15 | THE COURT:  No, please. |
| 10:44 | 16 | MR. DONATELLI:  -- or file a motion, or just do it |
| 10:44 | 17 | now? |
| 10:44 | 18 | THE COURT:  Do it now. |
| 10:44 | 19 | MR. DONATELLI:  All of the Giglio -- |
| 10:44 | 20 | (Interruption in the proceedings.) |
| 10:44 | 21 | MR. DONATELLI:  All the Giglio, the government would |
| 10:44 | 22 | be obligated to produce for a witness like Bentley? |
| 10:44 | 23 | THE COURT:  Like Bentley, okay.  Excellent. |
| 10:44 | 24 | Racketeering Act 20 is conspiracy to murder and |
| 10:44 | 25 | attempted murder of Jimmy Lee Inman.  It occurs September 30th, |

CR 02-938(A)-DOC             January 3, 2006                          9

| | | |
|---|---|---|
| 10:44 | 1 | 1993 at Marion.  Mr. Inman allegedly offended the AB in |
| 10:44 | 2 | California prison system in 1984, and he gets in a fight.  I |
| 10:44 | 3 | think from memory, wasn't it Phillip Fortman, Mr. Fortman? |
| 10:45 | 4 | MS. FLYNN:  Yes. |
| 10:45 | 5 | THE COURT:  It was Mr. Fortman.  And he's -- Mr. Inman |
| 10:45 | 6 | is eventually housed in Marion.  And in going back over my |
| 10:45 | 7 | notes, it looked -- it appeared to me that 1Mr. Fortman stayed |
| 10:45 | 8 | in a state prison system, although I'm not sure of that.  I |
| 10:45 | 9 | think he stayed in a state prison system, and Mr. Sahakian |
| 10:45 | 10 | allegedly brings the message in 1991.  What's happening again |
| 10:45 | 11 | with Mr. Sahakian?  Is Sahakian on the state side for a while |
| 10:45 | 12 | or gets transferred to the Feds?  Can anybody tell me the |
| 10:45 | 13 | transfer date of Sahakian? |
| 10:46 | 14 | MR. BELTER:  I believe it's '90 or '91, but I have the |
| 10:46 | 15 | housing records to -- |
| 10:46 | 16 | THE COURT:  Just take a look at it a moment, see -- |
| 10:46 | 17 | you know, just your guesstimate.  I -- I don't need the exact |
| 10:46 | 18 | date, but my impression is he's being transferred over from the |
| 10:46 | 19 | state to the federal side, but I just didn't know if that was |
| 10:46 | 20 | the right time period, also, that would correspond to these |
| 10:46 | 21 | allegations. |
| 10:46 | 22 | MR. BELTER:  Your Honor, at some point, he is on the |
| 10:46 | 23 | streets fighting the case, but then there is a -- |
| 10:46 | 24 | THE COURT:  Hold on. |
| 10:46 | 25 | Mr. Slocum, help your counsel.  Do you see that dot? |

| | | |
|---|---|---|
| 10:46 | 1 | Press that thing. |
| 10:46 | 2 | MR. BELTER:  Mr. Sahakian is on the street at some |
| 10:46 | 3 | point in this period of time.  He picked up a gun -- a gun |
| 10:46 | 4 | charge, and then he's -- he's litigating that.  I do have his |
| 10:46 | 5 | housing records.  I could tell you when he goes back into the |
| 10:46 | 6 | federal custody. |
| 10:46 | 7 | THE COURT:  Yeah, when did he go into federal custody? |
| 10:47 | 8 | MR. BELTER:  He gets transferred a lot. |
| 10:47 | 9 | It looks like May 2, 1991. |
| 10:47 | 10 | THE COURT:  Thank you very much. |
| 10:47 | 11 | Now, supposedly in 19- -- in September 1991, |
| 10:47 | 12 | supposedly the California Commission sends word to Mr. Slocum, |
| 10:47 | 13 | who is at Lompoc, that they want Mr. Inman murdered.  Now, if |
| 10:48 | 14 | that's a correct allegation, the California Commission should |
| 10:48 | 15 | still be Mr. Terflinger, Mr. Griffin, Mr. Stinson.  Now, if |
| 10:48 | 16 | that's correct, they are probably all at Pelican Bay again, |
| 10:48 | 17 | right?  And if that's correct -- |
| 10:48 | 18 | MR. BELTER:  If that's correct, your Honor -- |
| 10:48 | 19 | THE COURT:  -- that means that they've got to get a |
| 10:48 | 20 | message from Pelican Bay to the California Commission, to |
| 10:48 | 21 | Mr. Slocum in Lompoc, which is the federal side.  They're |
| 10:48 | 22 | either going to have to phone, send a hit-and-miss or do it by |
| 10:48 | 23 | way of transfer.  There's only three possibilities.  The phone |
| 10:48 | 24 | call could be monitored coming out of Pelican Bay.  Has anybody |
| 10:48 | 25 | checked those?  A hit-and-miss, you know, probably read and |

CR 02-938(A)-DOC                  January 3, 2006                                11

| | | |
|---|---|---|
| 10:49 | 1 | destroyed.  And a transfer is going to be a verbal |
| 10:49 | 2 | conversation, which none of you can get, you know, concrete |
| 10:49 | 3 | evidence about. |
| 10:49 | 4 | So I just want to make sure everybody is satisfied |
| 10:49 | 5 | that you've checked the records at Pelican Bay, have made the |
| 10:49 | 6 | request, that the government doesn't suddenly, you know, come |
| 10:49 | 7 | up with a devastating piece of evidence or somebody gets on |
| 10:49 | 8 | the stand, you know, and something is out there that |
| 10:49 | 9 | corroborates or could be impeaching value.  Pelican Bay I know |
| 10:49 | 10 | is monitored. |
| 10:49 | 11 | So I'll just leave that to all of you.  I just raise |
| 10:49 | 12 | the issue to make sure that discovery is complete on the state |
| 10:49 | 13 | side, okay?  Because this is a little bit different than the |
| 10:49 | 14 | fed side where I'm in Lompoc, you're in Marion, same system. |
| 10:49 | 15 | Pelican Bay has got a whole different structure to it, okay? |
| 10:49 | 16 | Now, therefore, once again, am I hearing, Ms. Flynn, |
| 10:49 | 17 | that, to your knowledge, almost everything we hear will come |
| 10:50 | 18 | from a cooperator? |
| 10:50 | 19 | MS. FLYNN:  Yes. |
| 10:50 | 20 | THE COURT:  Do any of your cooperators, from your |
| 10:50 | 21 | memory -- I am not holding you to this because it's a memory |
| 10:50 | 22 | search on your part -- tell us how that is conveyed from the |
| 10:50 | 23 | California AB Commission, one or more members out of Pelican |
| 10:50 | 24 | Bay to Mr. Slocum?  In other words, why couldn't Pelican Bay |
| 10:50 | 25 | just send that directly to Mr. Mills? |

CR 02-938(A)-DOC                    January 3, 2006                              12

| | | |
|---|---|---|
| 10:50 | 1 | What I'm searching for is why -- I know it's alleged |
| 10:50 | 2 | that Mr. Slocum is the message carrier, in fact, in every |
| 10:50 | 3 | single count I've gone down in the last two weeks just to |
| 10:50 | 4 | verify.  Some of your argument has great weight after |
| 10:50 | 5 | re-looking at this, but I'm curious why Slocum, who's sitting |
| 10:50 | 6 | in Lompoc, is always the carrier.  Why can't this just go from |
| 10:50 | 7 | Pelican Bay directly to Mills?  I mean, it seems like it's one |
| 10:50 | 8 | extra step and a step that causes the possibility of a security |
| 10:51 | 9 | breach. |
| 10:51 | 10 | In other words, if I wanted to communicate something |
| 10:51 | 11 | secretly to you, and I could open up a channel of |
| 10:51 | 12 | communication with you, I wouldn't go through Mr. White.  It |
| 10:51 | 13 | increases the chance of my message being discovered.  I sent it |
| 10:51 | 14 | to Mr. White, the prison authorities are looking at it, or I've |
| 10:51 | 15 | got a transferee who I don't know if he's going to turn into a |
| 10:51 | 16 | snitch, and Mr. White's got to find somebody to convey it back |
| 10:51 | 17 | over to you on the federal side.  So help me with this. |
| 10:51 | 18 | MS. FLYNN:  As to why they used Slocum? |
| 10:51 | 19 | THE COURT:  Yeah. |
| 10:51 | 20 | MS. FLYNN:  I think some of the -- the cooperators had |
| 10:51 | 21 | said that Slocum had the contact, was high-ranking and was |
| 10:51 | 22 | trusted.  I don't know much more than that, your Honor. |
| 10:51 | 23 | THE COURT:  Okay.  Let me -- let me accept that for a |
| 10:51 | 24 | moment.  I can understand Mr. Slocum allegedly having runners |
| 10:51 | 25 | on the street, okay?  What I don't understand yet is the |

| | | |
|---|---|---|
| 10:51 | 1 | methodology that Mr. Slocum uses between the state and the |
| 10:51 | 2 | federal side that gives him this disability.  I don't know why |
| 10:52 | 3 | I can't find a runner with Mr. Mills coming out, for instance, |
| 10:52 | 4 | just like Mr. Bingham did.  That allegedly came from Mr. Slocum |
| 10:52 | 5 | again, didn't it? |
| 10:52 | 6 | MS. FLYNN:  Yeah. |
| 10:52 | 7 | THE COURT:  Okay. |
| 10:52 | 8 | MS. FLYNN:  When he's in prison, I don't know exactly |
| 10:52 | 9 | why he's still being used to relay a message from one prison to |
| 10:52 | 10 | his prison to another prison.  When he was on the street, I |
| 10:52 | 11 | know why they were using him. |
| 10:52 | 12 | THE COURT:  Okay. |
| 10:52 | 13 | MS. FLYNN:  He was a high-ranking member that was the |
| 10:52 | 14 | go-between. |
| 10:52 | 15 | THE COURT:  Okay.  Now, Racketeering Act 21, narcotics |
| 10:52 | 16 | again, October 18th, '93, October 24th, '93; Racketeering Act |
| 10:52 | 17 | 22, narcotics, December 28th, '93; Racketeering Act 23, |
| 10:52 | 18 | narcotics, February 12th, '93; Racketeering Act 24, narcotics, |
| 10:52 | 19 | June 3rd, '94; Racketeering Act 25, narcotics, October 4, '94; |
| 10:52 | 20 | Racketeering Act 26, narcotics, February 1, '94, February 17, |
| 10:52 | 21 | '95; Racketeering Act 27, narcotics, May 7th, '95; Racketeering |
| 10:53 | 22 | Act 28, narcotics, July 29th, '95; Racketeering Act 30 -- |
| 10:53 | 23 | We didn't make a mistake.  29 doesn't pertain. |
| 10:53 | 24 | So Racketeering Act 30, narcotics, September 21st, |
| 10:53 | 25 | '95; Racketeering Act 31, narcotics, September 10th, '96, once |

| | | |
|---|---|---|
| 10:53 | 1 | again, through Mary? |
| 10:53 | 2 | MS. FLYNN:  Yes, your Honor.  For the most part, it's |
| 10:53 | 3 | been Mary Bentley, also, possibly Gene Bentley. |
| 10:53 | 4 | THE COURT:  Okay. |
| 10:53 | 5 | MS. FLYNN:  Richard Bernard. |
| 10:53 | 6 | THE COURT:  Gene Bentley. |
| 10:53 | 7 | MS. FLYNN:  And Kevin Roach. |
| 10:53 | 8 | THE COURT:  Richard Bernard. |
| 10:53 | 9 | Now, Gene Bentley becomes a cooperator when; does |
| 10:53 | 10 | anybody know?  It's in '98 or '99.  It's '99, put in Unit H, so |
| 10:53 | 11 | let's just say about '99.  For my purposes, that's good enough. |
| 10:54 | 12 | He has to be promised or -- or hoped to get something from the |
| 10:54 | 13 | government eventually. |
| 10:54 | 14 | What's hanging over Mary Bentley's head?  Why is she |
| 10:54 | 15 | one of the cooperators?  What evidence is out there that, you |
| 10:54 | 16 | know, each side has about Mary Bentley concerning Mr. Slocum? |
| 10:54 | 17 | Is she doing it because her husband hopes for the cooperation? |
| 10:54 | 18 | What am I going to hear when Mary Bentley takes the stand; does |
| 10:54 | 19 | anybody know? |
| 10:54 | 20 | MR. DONATELLI:  That's what I was going to ask you |
| 10:54 | 21 | also, Judge.  It's a big mystery to us as well. |
| 10:54 | 22 | THE COURT:  Okay.  Well -- |
| 10:54 | 23 | MR. DONATELLI:  There is no agreement that we've seen, |
| 10:54 | 24 | and we don't know how -- if she's involved in all these drug |
| 10:54 | 25 | dealings, we haven't seen any cooperation or -- |

10:54   1           THE COURT:  This is speculation on my part.  One,

10:54   2   loves her husband?  No?

10:54   3           MS. FLYNN:  Ex-husband.

10:54   4           THE COURT:  I see a number of nods saying "no" for the

10:54   5   record.

10:55   6           Ex-husband.  She doesn't love an ex-husband?  I'm just

10:55   7   kidding you.  So that's not very good motivation.

10:55   8           Number two, she's working off a beef herself.  There's

10:55   9   something out there in terms of narcotics involvement, because

10:55   10  if she's bringing it in, she's got access to narcotics, which

10:55   11  would lead me to the inference that she must be a user, which

10:55   12  leads me to the inference that she must have some rap sheet

10:55   13  with narcotics involvement, like paraphernalia or something,

10:55   14  some indicia.  So has everybody explored this?

10:55   15          MR. DONATELLI:  Judge, there is another Bentley

10:55   16  request we'd like to make.  The number of phone calls to Mary

10:55   17  Bentley to Lewisburg, jumping ahead to '96 and '97, we would

10:55   18  like to have all phone record conversations between Mary

10:55   19  Bentley and Lewisburg.

10:55   20          THE COURT:  Mary Bentley, phone records and Giglio.

10:55   21          Okay.  Just a moment.

10:55   22          MR. DONATELLI:  We've got some, but we just don't know

10:55   23  if they are complete or not.

10:55   24          THE COURT:  Now, the other thing you are going to

10:56   25  need, obviously, let's say Racketeering Act 21.  Witness takes

10:56  1    the stand and says, "I'm shipping drugs to Mr. Slocum."

10:56  2            "When?"

10:56  3            "Oh, it was October 21st of 19- -- or October 18th of

10:56  4    1993."

10:56  5            "How do you know that?"

10:56  6            "I just remember."

10:56  7            The government is entitled to charge "on or about."

10:56  8    Nobody expects the exact date, time after time, but you do

10:56  9    expect the same year, the same period of time and the right of

10:56 10    each of the parties to know what those phone records show

10:56 11    coming in and out of the institutions.

10:56 12            Now, those phone records must be available, and if

10:56 13    they are not, then they have to be destroyed.  And if they have

10:56 14    been destroyed, then we need the affidavit and we need a

10:56 15    responsible party, not a record search to come in, so I think

10:56 16    you ought to make that formal request to the government.  You

10:57 17    can handwrite it, for all I care, but we're going to turn that

10:57 18    out today, okay?

10:57 19            Okay.  Then Richard Bernard, he's one of the -- well

10:57 20    that's self-explanatory.

10:57 21            Racketeering Act 35, conspiracy to murder Frank

10:57 22    Ruopoli, June 1998.  The AB in California in the early 1980s,

10:57 23    they believe Mr. Ruopoli provided info about the murder of John

10:57 24    Stinson.  And didn't we see some of this at the first trial?

10:57 25    Was there a transcript of this?  No, no, there wasn't.

CR 02-938(A)-DOC        January 3, 2006                    17

10:57  1        They -- he -- also, he testified against the wife of

10:57  2  an AB member.  Who -- who is that?

10:57  3        Oh, Bobby Lee Crane?

10:57  4        MR. FLEMING:  Cheryl Crane.

10:57  5        THE COURT:  Cheryl Crane.  Okay.  Is that Bobby

10:57  6  Crane's wife?

10:57  7        MR. WHITE:  Yes.

10:57  8        THE COURT:  And he's New York?

10:57  9        MR. WHITE:  Yes.

10:57 10        THE COURT:  Okay.  The message sent by the California

10:58 11  Commission to the Federal Commission in June 1991, Slocum sends

10:58 12  the message to Mr. Mills saying Ruopoli was to be murdered.

10:58 13  Mr. Mills tells Bentley.  Arthur Ruffo then tells Brian Healy.

10:58 14        In June 1998, Frederick Frakes gave Kevin Roach a

10:58 15  telephone number to be used tracking down Frank Ruopoli, and

10:58 16  this is alleged at page 52, paragraphs 141 through 146 in much

10:58 17  greater detail than Count I.

10:58 18        You told me before that we might see Frank Ruopoli as

10:58 19  a witness.  George Harp, of course, is not available.  Glen

10:58 20  West, Kevin Roach, Eugene Bentley, Richard Bernard, Christopher

10:59 21  Risk, Brian Healy.

10:59 22        Okay.  Do we have any more information about how the

10:59 23  letter is transmitted, once again, from the California

10:59 24  commission, many of whom are at Pelican Bay at this time, to

10:59 25  Mr. Slocum at Lompoc and Mr. Mills in 1991 at Marion, or all

CR 02-938(A)-DOC                    January 3, 2006                              18

| | | |
|---|---|---|
| 10:59 | 1 | cooperators again? |
| 10:59 | 2 | MS. FLYNN:  Roach testified that Mills got information |
| 10:59 | 3 | from Slocum at various times, including when Slocum was on the |
| 10:59 | 4 | streets living in Northern California. |
| 11:00 | 5 | THE COURT:  But the means, a phone call or a |
| 11:00 | 6 | hit-and-miss or a transfer to the outside, too vague about that |
| 11:00 | 7 | or never asked, because the focus in the Mills-Bingham trial |
| 11:00 | 8 | isn't on the message carrier. |
| 11:00 | 9 | MS. FLYNN:  Exactly. |
| 11:00 | 10 | THE COURT:  So nobody really knows. |
| 11:00 | 11 | MS. FLYNN:  Right. |
| 11:00 | 12 | THE COURT:  Okay.  37, conspiracy to murder black |
| 11:00 | 13 | inmates August 28th, 1997 at -- Racketeering Act 37. |
| 11:00 | 14 | Racketeering 38 -- Racketeering Act 38 is the murder |
| 11:00 | 15 | of Frank Joyner allegedly by Mr. Bridgewater.  That's VICAR 6. |
| 11:00 | 16 | 39 is the murder of Abdul Salaam, which is by |
| 11:00 | 17 | Mr. Houston, allegedly, and Al Benton, VICAR 7, and there was |
| 11:00 | 18 | extensive testimony about that by Mr. Benton at the first |
| 11:00 | 19 | trial. |
| 11:00 | 20 | 40, the attempted murder of Titus Webster. |
| 11:00 | 21 | Mr. Campbell and Mr. Schwyhart make that attempt. |
| 11:01 | 22 | Is Mr. Webster alive? |
| 11:01 | 23 | MS. FLYNN:  I believe so, your Honor. |
| 11:01 | 24 | THE COURT:  Okay.  Will we be seeing him? |
| 11:01 | 25 | MS. FLYNN:  I don't think so. |

11:01  1            THE COURT:  Okay.  41 -- in other words, you'll

11:01  2    present that through the prison guards or photographs --

11:01  3            MS. FLYNN:  Yes.

11:01  4            THE COURT:  -- the attempted -- okay.

11:01  5            Byron Ball, we saw him at the first trial.

11:01  6            MS. FLYNN:  Yes.

11:01  7            THE COURT:  Will we see him again?

11:01  8            MS. FLYNN:  Yes.

11:01  9            THE COURT:  Okay.  So we have Mr. Schwyhart who

11:01 10    attempted to murder Mr. Ball.

11:01 11            42, the attempted murder of Mr. Harold Roberts.

11:01 12    Mr. Campbell and Mr. Schwyhart attempted to murder Mr. Roberts.

11:01 13            Will we see Mr. Roberts?

11:01 14            MS. FLYNN:  No, your Honor.

11:01 15            THE COURT:  Okay.  Why?  Is he a big, tough looking

11:01 16    guy?  I am just kidding you.

11:01 17            (Laughter.)

11:01 18            THE COURT:  43 is the attempted murder of Larry

11:01 19    Fortune.  Wayne Bridgewater attempted to murder Mr. Fortune.

11:01 20    Allegedly, Mr. Houston, according to Mr. Benton, is coming into

11:01 21    Cellblock A for the murder of prisoners in Cellblock A, and

11:01 22    Campbell, Schwyhart, Bridgewater, and Mr. Benton prepare

11:01 23    knives.

11:01 24            Now, on August 23, supposedly Slocum mailed a

11:02 25    hit-and-miss letter to Al Benton, but at the first trial, that

```
11:02   1   seemed to be a little bit earlier.  I -- I recall the testimony
11:02   2   being about August 16th or 18th, someplace in there.  I may be
11:02   3   mistaken.
11:02   4           Mr. White, do you remember?
11:02   5           MR. WHITE:  I think the August 16th date was the date
11:02   6   that Slocum sent something --
11:02   7           THE COURT:  Okay.  But that was a hit-and-miss
11:02   8   letter, supposedly.  In other words, if you look at the
11:02   9   Indictment and the conspiracy, it sets out with particularity
11:02  10   that it's August 23rd.  At the time of trial, that got moved
11:02  11   forward, in my mind.  I came away believing it must have been
11:02  12   August 16th or 18th.  It doesn't matter.  It's the war with the
11:02  13   DC Blacks message, and on August 28th, apparently Mr. Benton
11:02  14   and Mr. Bridgewater heated.
11:02  15           On the 28th, Benton calls Slocum, and that's the phone
11:02  16   call that we heard at the first trial, and that's the message
11:03  17   that the only hidden message on the letter that Mr. Slocum's
11:03  18   knowledge has is that -- whatever that message is.  There is
11:03  19   one message.
11:03  20           Okay.  Now, I could go over the rest of it, but
11:03  21   Count II is a conspiracy to commit RICO.  You know, you've got
11:03  22   Count IV, the murder of Frank Joyner, Count -- I'm sorry,
11:03  23   Counsel, Count VI, the murder of Frank Joyner, Count VII, the
11:03  24   murder of Abdul Salaam, VICAR.
11:03  25           Then you have the murder of Terry Walker, May 18th,
```

| 11:03 | 1 | 1999.  Slocum, Bridgewater and Houston are all involved. |
| 11:03 | 2 | You dismissed Count IX, didn't you? |
| 11:03 | 3 | MS. FLYNN:  Count VIII, your Honor, yes. |
| 11:03 | 4 | THE COURT:  Count -- Count VIII was dismissed.  My |
| 11:03 | 5 | apologies. |
| 11:03 | 6 | Count IX remains, the murder of Arva Lee Ray. |
| 11:03 | 7 | And we have Count X, murder of William McKinney. |
| 11:04 | 8 | Mr. McKinney involves Slocum only, and Count IX, the murder of |
| 11:04 | 9 | Arva Lee Ray, involves Slocum only, right? |
| 11:04 | 10 | MS. FLYNN:  Yes. |
| 11:04 | 11 | THE COURT:  Okay.  Here are my questions for the |
| 11:04 | 12 | defense.  Let me start, and if you want the government out at |
| 11:04 | 13 | any time -- you've already told me in their presence, and it's |
| 11:04 | 14 | no secret that there's literally almost a stipulation from your |
| 11:04 | 15 | standpoint that Mr. Houston and Mr. Bridgewater received a |
| 11:04 | 16 | message, and that's why they -- they went to war.  And to |
| 11:04 | 17 | develop that, to give the defense that opportunity in the |
| 11:04 | 18 | Mills-Bingham trial, I told you that you could extend all the |
| 11:04 | 19 | way back in the black-white confrontation till as early as 1960 |
| 11:04 | 20 | if you wanted to. |
| 11:04 | 21 | You can go all the way back to San Quentin and the |
| 11:04 | 22 | Blue Tooth Diamond Gang, or whatever you wanted to do, because |
| 11:04 | 23 | for your defense, it seemed essential that your clients weren't |
| 11:04 | 24 | just a bunch of thugs, from your perspective, going out and |
| 11:05 | 25 | killing blacks for racial motives, that your clients were going |

CR 02-938(A)-DOC          January 3, 2006                          22

11:05  1  out and reacting to a perceived threat from a high demographic

11:05  2  black population, and that when they got this message at

11:05  3  Lewisburg, where the demographics were so out of kilter, if you

11:05  4  will, that they are not acting from stealth.  When they get the

11:05  5  message, they don't know if there is an ongoing war.  They

11:05  6  don't know if it's already broken out at Marion.  They just

11:05  7  have "war with DC Blacks."  That could mean a number of people

11:05  8  have already been stabbed at Marion or ADX or Lompoc or any

11:05  9  other place, or they could be acting in stealth, but your

11:05  10  clients immediately react.

11:05  11        Now, that's what you've told me so far, right,

11:05  12  Mr. White?

11:05  13        MR. WHITE:  Yes.

11:05  14        THE COURT:  Okay.  I'm assuming that you want the same

11:05  15  latitude of the Court, because if I don't give you the latitude

11:05  16  to go back into the 1980s and even the 1970s, and if you

11:06  17  choose, the 1960s, you're not going to have the same strength

11:06  18  of a defense in front of the jury.  If it just looks like in

11:06  19  1997 they get a letter for no particular reason, "Kill," you

11:06  20  know, "the DC Blacks," and they go out and stab five blacks; is

11:06  21  that right, Mr. White?

11:06  22        MR. WHITE:  Yes.

11:06  23        MR. DONATELLI:  I would condition at some point --

11:06  24        THE COURT:  Why don't you talk to Mr. White first

11:06  25  before you condition that.  Just have a little conference

11:06   1    there.

11:06   2              That's good.  It's always healthy to do that.

11:06   3              (Attorney discussion held off the record.)

11:06   4              THE COURT:  Mr. Fleming, talk to them.  I'd say you're

11:06   5    on the same page or a different page.

11:06   6              Now, any time that you want Ms. Fleming (sic) out --

11:06   7    or Ms. Flynn out, you're more than welcome to have her out

11:07   8    here, but there's no secrets so far, it seems to me.  You've

11:07   9    already told me this in her presence.

11:07  10              (Attorney discussion held off the record.)

11:07  11              MR. WHITE:  Your Honor, out of an abundance of

11:07  12    caution --

11:07  13              MS. FLYNN:  We're getting the boot?

11:07  14              THE COURT:  Would you like Ms. Fleming (sic) out?

11:07  15              MS. FLYNN:  Ms. Flynn.

11:07  16              THE COURT:  Ms. Flynn.

11:07  17              MR. WHITE:  Those two are married?

11:07  18              (Laughter.)

11:07  19              THE COURT:  Well, I didn't inquire whether they were

11:07  20    single, Counsel, so I didn't know.

11:07  21              Okay.  If you'd be kind enough just to wait out in the

11:07  22    hallway for one moment, and I'll seal this portion, but I won't

11:07  23    go very far -- well, let me say before you leave for a moment,

11:07  24    here is my concern, so Ms. Flynn can think about it.

11:07  25              It seemed to me in writing this weekend that it was

| 11:07 | 1 | essential for the defense to be allowed to develop the |
| 11:07 | 2 | historical conflict between the white-black inmates.  This gave |
| 11:08 | 3 | credence and gives credence to Mr. Bridgewater and |
| 11:08 | 4 | Mr. Houston's defense that they -- when they got the message, |
| 11:08 | 5 | that they acted immediately in a preemptive strike.  Now, that |
| 11:08 | 6 | may or may not be effective in terms of the guilt phase, but it |
| 11:08 | 7 | turned out to be very effective during the penalty phase. |
| 11:08 | 8 |          And as I've said to Mr. Mills and Mr. Bingham, on the |
| 11:08 | 9 | federal level, Mr. Houston and Mr. Bridgewater, it's too easy, |
| 11:08 | 10 | in a sense, to get to the death phase.  When you get to the |
| 11:08 | 11 | death phase, unlike the state, it's very difficult to get a |
| 11:08 | 12 | death penalty.  And that's my -- my perception on the federal |
| 11:08 | 13 | level.  On the state level, it's the opposite.  On the state |
| 11:08 | 14 | level, it's very difficult to get to the death phase, but once |
| 11:08 | 15 | you get to the death phase -- and this is my personal |
| 11:08 | 16 | opinion -- it's very easy to, in state court, to get a death |
| 11:08 | 17 | penalty.  It's kind of reversed. |
| 11:08 | 18 |          So in a -- so in a sense, what's happening is you hope |
| 11:08 | 19 | to be successful in the first phase, you know, and never get a |
| 11:09 | 20 | guilty verdict, but by the same token, you're hoping to avoid |
| 11:09 | 21 | the death penalty, and therefore, what you do in that first |
| 11:09 | 22 | phase plays out dramatically in the second phase.  Therefore, |
| 11:09 | 23 | from what I've heard so far, it's not a lay down.  You are not |
| 11:09 | 24 | saying "we're guilty," but you're making darn certain if you |
| 11:09 | 25 | get to that, what I call that easy access into the penalty |

CR 02-938(A)-DOC          January 3, 2006                                25

| | | |
|---|---|---|
| 11:09 | 1 | phase, that you're not -- then you've got a real fighting |
| 11:09 | 2 | chance of not getting the death penalty. |
| 11:09 | 3 | Those are hard decisions for your counsel.  Those are |
| 11:09 | 4 | tough decisions because nobody ever wants to say, "Well, |
| 11:09 | 5 | here," you know, "here's guilt on a platter in the first phase, |
| 11:09 | 6 | and let's just get right into the death" -- that's quite the |
| 11:09 | 7 | opposite.  Nobody is laying down on this, but they have to be |
| 11:09 | 8 | very careful, obviously, what they do in that first phase, |
| 11:09 | 9 | because if that credibility is destroyed, you get into that |
| 11:09 | 10 | penalty phase, and you've got the jury thinking a different |
| 11:09 | 11 | way. |
| 11:09 | 12 | So with Mr. Mills and Mr. Bingham, I understood that |
| 11:09 | 13 | at the beginning, it opened what I call Pandora's box.  Instead |
| 11:10 | 14 | of arbitrarily cutting off the gate and saying "Well, 1990 or |
| 11:10 | 15 | 1995 is the demarcation line for the government and for the |
| 11:10 | 16 | defense," I'll let them go clear back into the history of the |
| 11:10 | 17 | black-white confrontation. |
| 11:10 | 18 | And we found out some interesting things that we |
| 11:10 | 19 | didn't know about in depth.  One, we found out about a January |
| 11:10 | 20 | 2nd, 1997 ambush at Marion prison by a black inmate of another |
| 11:10 | 21 | white inmate. |
| 11:10 | 22 | We found out in depth, which we didn't know before, in |
| 11:10 | 23 | November 1996, that old Joe Tokash had been unmercifully beaten |
| 11:10 | 24 | by a black inmate trying to PC up. |
| 11:10 | 25 | And third, more importantly, something I don't think |

CR 02-938(A)-DOC          January 3, 2006                    26

11:10  1  anybody knew, was there was a white inmate at Lewisburg prison

11:10  2  in 1996 who was absolutely butchered.  Now, that doesn't mean

11:10  3  atrocities weren't being committed on the other side of the

11:10  4  black prisoners, but there was a white inmate in Lewisburg in

11:10  5  '96 when Mr. Hevle was there who literally was used as a knife

11:11  6  punching bag.  He was in his cell, and the black inmates came

11:11  7  in and stabbed, went out, went in and stabbed, came back in,

11:11  8  stabbed, and it went all over the prison.

11:11  9        Therefore, those are things that we didn't know in

11:11 10  depth until we got into this massive discovery, laborious

11:11 11  discovery in the first phase.  We -- we'd heard about them.  I

11:11 12  don't think the government, the Court or even counsel

11:11 13  recognized the significance of that until we got to the penalty

11:11 14  phase.

11:11 15        My question is this, and this is what's causing me a

11:11 16  problem.  The war message means that both sides are prepared

11:11 17  to strike.  I don't think the Court can assume that

11:11 18  Mr. Bridgewater and Mr. Houston were either acting in a

11:11 19  stealthy matter with the first strike or that a war hadn't

11:11 20  broken out, and I don't think that's my place to assume that.

11:12 21  The government will argue that this was completely stealth, a

11:12 22  surprise attack.

11:12 23        The defense is going to argue that this isn't a

11:12 24  surprise attack at all, this is a continuing of a long

11:12 25  exacerbating series of events, that there is no real surprise

11:12  1  here.  The particular act may, you know, be one of suddenness,

11:12  2  but that the war was pretty well implanted after January 2nd of

11:12  3  1997.

11:12  4          If I don't allow you, on the defense side, to develop

11:12  5  that historical perspective, then that severely harms your

11:12  6  claim of, if not self-defense in the first trial, the

11:12  7  mitigating aspects in the second trial, the penalty phase

11:12  8  trial.  In fact, I think it would be devastating to the defense

11:12  9  if I arbitrarily said your time limit, for instance, is 1995 or

11:13  10 in 1990, and I treat this just as an isolated attack.  I think

11:13  11 that would almost automatically bring a death penalty.

11:13  12         But if the Court severs Mr. Slocum, and my reason for

11:13  13 doing that is to limit the activities of Mr. Slocum and the AB

11:13  14 back in the 1980s, then in fairness, shouldn't I allow -- then

11:13  15 how do I allow you to go back into that defense?

11:13  16         Hold on, don't answer that now.  I am going to kick

11:13  17 Ms. Flynn out for a moment.  I'm just going to lay these

11:13  18 questions so she can think about it when she comes back.

11:13  19         How do I say to the government, "Mr. Slocum's out, and

11:14  20 the real reason I'm doing that is because of the activities of

11:14  21 the AB in the 1980s," and then turn around and say to the

11:14  22 defense, you know, "I understand your predicament, especially

11:14  23 the penalty phase, so I'm going to let you develop in the first

11:14  24 phase," which is the proper place to bring it, quite frankly.

11:14  25 In all truth, you are going to be weaving the same segment that

CR 02-938(A)-DOC              January 3, 2006                        28

11:14  1   you weaved in the Mills-Bingham case about this ongoing series

11:14  2   of events.  You are not going to bring back probably Mr. Smith

11:14  3   and some of the others just for that purpose.

11:14  4          Also, if I sever Mr. Slocum and I let you develop the

11:14  5   1980s and 1970s conflict, then if I was the government, I would

11:14  6   be wondering why the severance and where is the fairness in

11:14  7   terms of their being able to develop the activities of the AB?

11:15  8   It seems to me like I'm letting you develop the race

11:15  9   confrontation, but I'm not allowing the government also to

11:15  10  develop, you know, all this activity which Mr. Slocum is

11:15  11  allegedly an absolute integral part.  Besides Mr. Mills and

11:15  12  Bingham, he weaves this great web, allegedly.

11:15  13         Finally, Mr. Harris, I've listened very closely.  I

11:15  14  went back and tried to do this, I tried to fit Mr. Slocum into

11:15  15  any other category.  In other words, in using my discretion,

11:15  16  which a severance is, I tried to think, "Where does Mr. Slocum

11:15  17  belong?"

11:15  18         First of all, from hindsight, one place Mr. Slocum

11:15  19  belongs was in the trial of Mr. Mills and Mr. Bingham.  But

11:15  20  remember, I have said, but not too unjokingly to counsel one

11:15  21  day, and I was serious, "Would Mr. Slocum like to join us?"

11:15  22  The oddity of that was that Mr. Slocum came to us in a

11:16  23  different time period than Mr. Mills and Mr. Bingham did.  All

11:16  24  of the defendants being marshaled from across the country came

11:16  25  into the court system in different time frames with different

11:16  1  death penalty qualifying procedures taking place, and Judge

11:16  2  King, you know, was faced with 42 defendants on different time

11:16  3  tracks.  So Mr. Mills, Mr. Bingham, Mr. Hevle, Mr. Gibson, were

11:16  4  ready to go.  We invited Mr. Slocum to come in.  Counsel was

11:16  5  here that day, she was laughing and respectfully declined.

11:16  6            Mr. Slocum does not belong with the state side.  He

11:16  7  fits -- he fits on the federal state side, and he more -- he

11:16  8  more -- he fits more with this group of defendants than he does

11:16  9  with any state defendant that I can find.

11:16  10           Now, the only other alternative would be Mr. Slocum

11:17  11  being tried solely by himself.  In other words, you are going

11:17  12  to have all day, don't worry, tonight if you'd like, give me a

11:17  13  few moments.

11:17  14           Any group that I put Mr. Slocum with, Mr. Slocum's

11:17  15  defense is going to be, "I didn't send the letter."  And any

11:17  16  group that has the wisdom of you counsel is going to say, "We

11:17  17  got the letter, and we acted on it, and here is why.  And if

11:17  18  you don't -- we hope you don't convict us in the first trial,

11:17  19  but if you do, for God sakes, don't give us death, because

11:17  20  here's what was really happening in this back and forth,

11:17  21  black-white confrontation, they hit us just as hard, if not

11:17  22  harder."  That's good that you're defense.

11:17  23           Mr. Slocum is not entitled to a separate and distinct

11:17  24  trial.  He's entitled to be with Mr. Mills or Mr. Bingham,

11:17  25  tentatively, or he's entitled to be with this group, but he

11:18  1  doesn't fit on the state side.  He's a conduit on the state

11:18  2  side for the state side.  He's a conduit on the -- allegedly,

11:18  3  on the state and the federal side.  He's a conduit on the

11:18  4  street, and he is a conduit when he gets back in on the

11:18  5  federal-to-federal and federal-to-state side, so I have to draw

11:18  6  the line.

11:18  7         Now, that's not a ruling right now.  That's just some

11:18  8  thoughts, because if, in fact, I severed Slocum out, I think my

11:18  9  next step might be to start limiting the defense, because the

11:18 10  very reason I would be severing him is because I'm not going

11:18 11  back into -- I wouldn't be allowing the sides to go back in the

11:18 12  1970s and 1980s.  Now, your response to that would be -- well,

11:18 13  I'll -- I'll wait.

11:18 14         Ms. Flynn, would you be kind enough, because, I mean,

11:18 15  these are some initial thoughts.  I am still concerned about

11:18 16  the Barnes murder.  I'm absolutely concerned about that, and

11:18 17  I'm concerned about the narcotics.  This is not a narcotics

11:18 18  case, but I'll leave that to your discretion.

11:19 19         MS. FLYNN:  Your Honor, just so you know -- you had

11:19 20  asked me to think about the Barnes murder -- I am willing to

11:19 21  forgo that if they can all stay together.

11:19 22         THE COURT:  Just walk away from it.  And here's my

11:19 23  next question when you came back in, foreseeing that.  What I

11:19 24  didn't think was fair was this, and I was going to give you the

11:19 25  devil's choice when I proceeded down this road.  I don't want

CR 02-938(A)-DOC             January 3, 2006                        31

11:19  1  Mr. Slocum to be in a situation where I severed Barnes, and if

11:19  2  you weren't successful, not you personally, but the government

11:19  3  could come back in Count II on the conspiracy and run right

11:19  4  back in on the Barnes murder again, and in a sense, try him

11:19  5  twice.

11:19  6        So that's what you really have to do.  In other words,

11:19  7  if you're really serious about keeping them together,

11:19  8  literally, you are going to have to potentially tell me that

11:19  9  you're -- you're done with Barnes, okay?  And that's the

11:19  10  only -- that's one of the most significant problems for me, and

11:19  11  that murder just seems out here under 403 to be the kind of

11:20  12  concern I would have if I was on the Circuit.  The other one is

11:20  13  a severance call.  The Circuit can disagree or agree, but

11:20  14  there's a strong presumption of --

11:20  15        (Interruption in the proceedings.)

11:20  16        THE COURT:  -- a strong presumption in terms of

11:20  17  keeping the cases together.

11:20  18        Now, I've written two tentatives, and I will

11:20  19  distribute the other one when you come back and let you argue

11:20  20  that one.

11:20  21        Okay.  Ms. Flynn, thank you very much.  This is in

11:20  22  camera.

11:20  23        Now, I'm not going to hear too much argument on this,

11:20  24  though, you know, outside your presence.

11:20  25        This has to do with the severance, gentlemen, so if

11:20  1  she's -- Mr. White, if she's being excluded, you know, just to

11:20  2  argue the matter, I'm going to have her right back in.  These

11:20  3  are severance motions.

11:20  4          MR. WHITE:  Right.

11:20  5          THE COURT:  Okay.  So she'll be excluded, but we're

11:20  6  not getting into too much argument.

11:20  7          MR. WHITE:  Right.

11:20  8          THE COURT:  Okay.

11:20  9          (Government counsel has left the proceedings.)

11:20 10          (The following proceedings is taken in camera, outside

16:27 11  the presence of government counsel.)

16:27 12              * * * **SEALED PROCEEDINGS FOLLOW** * * *

16:27 13          *(Written Court approval required for viewing.)*

16:27 14                          * * *

16:27 15

      16

      17

      18

      19

      20

      21

      22

      23

      24

      25

| 11:52 | 1 | **SANTA ANA, CALIFORNIA, WEDNESDAY, JANUARY 3, 2007** |
| 11:52 | 2 | **VOLUME II** |
| 11:52 | 3 | **(In-court proceedings resumed.)** |
| 11:52 | 4 | (Government counsel has re-entered the proceedings.) |
| 11:52 | 5 | THE COURT:  All right.  Ms. Flynn is present, and |
| 11:52 | 6 | Mr. Sagel will be -- |
| 11:52 | 7 | MS. FLYNN:  He should be joining us shortly. |
| 11:52 | 8 | THE COURT:  Great.  Why don't we wait for the |
| 11:52 | 9 | gentleman. |
| 11:53 | 10 | While we are waiting for Mr. Sagel -- |
| 11:53 | 11 | MS. FLYNN:  Your Honor, we don't actually have to wait |
| 11:53 | 12 | for Mr. Sagel.  That's fine. |
| 11:53 | 13 | THE COURT:  Okay.  One of the assumptions I don't want |
| 11:53 | 14 | to have made is that the self-defense instruction necessarily |
| 11:53 | 15 | would or wouldn't be given in the first phase.  I don't know |
| 11:53 | 16 | yet.  Obviously, it's a mitigating factor, and obviously, with |
| 11:53 | 17 | Mills and Bingham, if we get to the penalty phase, it seems to |
| 11:53 | 18 | this Court that the jury would be entitled to know that |
| 11:53 | 19 | Mr. Bingham was 8 to 4 for life, and Mr. Mills was 9 to 3 for |
| 11:53 | 20 | death.  And they would be entitled to have you develop either |
| 11:54 | 21 | along the way in the first phase, assuming we get to a second |
| 11:54 | 22 | phase for a moment, you know, the culpability or the structure |
| 11:54 | 23 | of Mr. Mills and Mr. Bingham, that they appear to be at the top |
| 11:54 | 24 | of the food chain. |
| 11:54 | 25 | I don't know whether I'd give the self-defense |

11:54  1  instruction yet or not, and I'm wondering if we want to have

11:54  2  argument on that and if it relates in any way to the severance

11:54  3  motion and some of the choices and decisions you gentlemen will

11:54  4  be making.

11:54  5          Well, think about it for a while, okay?  Think about

11:54  6  it for a while, because I believe that Judge Real didn't give a

11:54  7  self-defense instruction in the sole case that he had, and I

11:54  8  don't know if Judge Klausner did or not, do you?

11:54  9          Does anybody have a copy of his instructions?

11:54 10          Do you know, Ms. Flynn?

11:55 11          MS. FLYNN:  I don't know.  I can find out, your Honor.

11:55 12          THE COURT:  I call it imperfect self-defense for want

11:55 13  of a better word, and I don't know if he gave an imperfect

11:55 14  self-defense instruction or not, and I don't know what the

11:55 15  defense was in Judge Klausner's -- or I don't think they

11:55 16  reached the same issue, because they weren't dealing with

11:55 17  death.  Therefore, you've had a much more difficult case in

11:55 18  both Mills and Bingham and with Mr. Houston, Mr. Bridgewater

11:55 19  than Mr. Stinson and Mr. Griffin?

11:55 20          MR. WHITE:  Griffin, yes.

11:55 21          THE COURT:  Griffin -- Mr. Griffin do, entirely

11:55 22  different case.  So maybe it didn't come up, but I just don't

11:55 23  know about that instruction, and I don't want you assuming that

11:55 24  I'm going to give it, but I don't want you assuming I'm not

11:55 25  going to give it either.  There may be very strong reasons for

11:55   1   giving an imperfect self-defense instruction.  You'd have it

11:55   2   drafted, and you'd have it researched, and I don't know if that

11:55   3   would make a difference, okay?

11:55   4          All right.  What cannot -- what can I not relate to

11:56   5   Ms. Flynn?  What's the secret we have here, anything?

11:56   6          MR. FLEMING:  There aren't any.

11:56   7          THE COURT:  I don't think there are any.

11:56   8          Okay.  Ms. Flynn, here is the discussion outside your

11:56   9   presence.  It seems from my perspective, once again, and I'm

11:56  10   repeating myself, that it was essential for the defendants in

11:56  11   the Mills-Bingham case, and it's essential for the defendants

11:56  12   in the Houston, Bridgewater case to be allowed to develop the

11:56  13   historical conflict between the white and black inmates, and I

11:56  14   don't think a court should be shaping that.  I don't think that

11:56  15   I should be able to say, "Well, you can go back," you know,

11:56  16   "just this far, but the government wants to go back this far,

11:56  17   and if I let the government go back this far, then the defense

11:56  18   wants to go back this far."  We keep playing leapfrog who has

11:57  19   the tactical advantage.

11:57  20          It gives, certainly, credence to Mr. Bridgewater and

11:57  21   Mr. Houston's defense that when they got the message, they

11:57  22   acted immediately, and what they are going to argue is a

11:57  23   preemptive strike.  There is no secret about that.  They've

11:57  24   already acceded that they're almost willing to stipulate that

11:57  25   they got a message, that the message just didn't come from

| 11:57 | 1 | Slocum, they don't know where it came from. |

11:57   1    Slocum, they don't know where it came from.

11:57   2          Mr. Slocum's defense, of course, is that he didn't

11:57   3    send a message, which may even give greater credibility to the

11:57   4    defense, in a sense, that one side is saying, "I got the

11:57   5    message," and Mr. Slocum is saying, "Well, if there was a

11:57   6    message, it's simply not mine, but I'm not arguing that there

11:57   7    wasn't."

11:57   8          And unless the jury understands that historical

11:57   9    perspective, the defendants would not have any reason for

11:57  10    acting.  They would simply look like a racist organization

11:57  11    striking black prisoners when, in fact, there's a lot of

11:57  12    evidence that it can be perceived to be racist, and it can also

11:58  13    be perceived to be simply gang related.  And it can also be

11:58  14    perceived to be much broader, organizational in terms of

11:58  15    snitches, cooperators, because you have a variety of different

11:58  16    kinds of murder here.

11:58  17          This war message can be construed that both sides are

11:58  18    prepared to strike, and I think although the government

11:58  19    portrayed that this was a stealth message coming from Mills and

11:58  20    a surprise attack, that when you look at it from

11:58  21    Mr. Bridgewater and Mr. Houston's viewpoint, it also could be

11:58  22    argued that they had no way of knowing if this was a stealth

11:58  23    message or if war had already overtly broken out.  And if they

11:58  24    are not simply in the situation where this is an ongoing war,

11:58  25    it's right at the level, and everyone has knowledge, and

11:58   1   therefore, they're not going to simply sit there, they're going

11:59   2   to act.

11:59   3        They certainly knew that the white inmates had been

11:59   4   ambushed at Marion on January 2nd, 1997.  They certainly should

11:59   5   be allowed to show that Joe Tokash had been attacked at Marion

11:59   6   on November 1996 and that they had knowledge about that.  And

11:59   7   the defense certainly should be able to show that the white

11:59   8   inmate had been butchered in 1996 at Lewisburg, which everybody

11:59   9   knew about, Mr. Hevle, everybody at the institution.  And

11:59  10   therefore, there's ever reason to strike, and that's not from

11:59  11   prejudice or racial motivation.  That's because of protection.

11:59  12        Now, the jury may not accept that.  They may look at

11:59  13   the elderliness of the people attacked, how they were attacked

11:59  14   or if there was even a good reason if that's not sufficient.

11:59  15        If the defense cannot develop the historical

12:00  16   perspective, then I'm concerned about, not the fairness of the

12:00  17   first trial, because I don't know if they are entitled to an

12:00  18   imperfect self-defense, but I am concerned about the mitigation

12:00  19   phase, because everything from the first trial carries over to

12:00  20   the mitigation phase, and there is just no presumption that

12:00  21   we're getting that, but if we do, what happens in the first

12:00  22   trial is just critical.

12:00  23        If I -- I think you had a good point last time, one

12:01  24   that's caused a lot of reflection on my part, and that is, if I

12:01  25   sever Slocum, I would still allow you to go into many, if not

12:01  1  most, of the acts to show the method of carriage, and

12:01  2  therefore, in severing Slocum, I'm right back in the same

12:01  3  position of allowing you to create the modus operandi, the

12:01  4  carrier that Mr. Slocum is, and to show the network and the way

12:01  5  messages are passed.  And I think your response last time,

12:01  6  which I hadn't thoroughly thought through is, "Why the

12:01  7  severance, because we are going to be asking to present the

12:01  8  same testimony, and Judge, would you allow it?"

12:01  9          That's what I've literally spent the -- the Christmas

12:01 10  recess trying to decide, would I allow it.  I think the answer

12:02 11  tentatively is yes, I'd allow you to go back into those acts.

12:02 12  Now, the depth of those and the objections would be, you know,

12:02 13  piecemeal, 403 on each occasion.

12:02 14          Also, if I severed Slocum, I tried to pay attention to

12:02 15  Mr. Harris' argument and the argument where he best fit.  He

12:02 16  doesn't fit any other place other than Mills and Bingham, which

12:02 17  Mr. Slocum declined to be involved with or with this case,

12:02 18  unless he has a separate, complete trial, because any group he

12:02 19  joins with, he's always going to have the defense, "I didn't

12:02 20  send the message."

12:02 21          I don't think he's entitled to a separate trial all by

12:02 22  himself, and he doesn't fit well on the state side.  He fits

12:02 23  well on the federal side and the state federal interaction,

12:02 24  because much of the state is simply state murders like Barnes.

12:03 25          And Mr. Harris, I truly went back and tried to look at

12:03   1   those -- you know, that argument, "Where would I put Mr. Slocum

12:03   2   in a practical sense?"  He best belongs in this group.

12:03   3           Finally, the defense is -- I've read quite a bit about

12:03   4   whether they're contradictory or not, and if they are, what

12:03   5   that is.  I want to rework this this evening and really think

12:03   6   this through again after and outside your presence.  I'm not

12:03   7   done.  I'm speaking too much, but I'm thinking as I'm going,

12:03   8   quite frankly, but I want to go back over this tentative, put

12:03   9   it out again to what holds the defendants together.

12:04  10           You had another good point that you argued last time I

12:04  11   hadn't thoughtfully considered.  It could be construed to be

12:04  12   mutually consistent, but it's not.  Mr. Bridgewater and

12:04  13   Mr. Houston, if counsel stay with what they've represented, and

12:04  14   they're not -- they don't have to, but if they do stay with the

12:04  15   theory, actually want to admit that the letter was received, it

12:04  16   may be because of that phone call that we hear that the jury

12:04  17   believes that Mr. Slocum didn't send, you know, that message,

12:04  18   and it may not be mutually exclusive concerning Mr. Slocum,

12:04  19   because for Mr. Bridgewater and Mr. Hughes' viewpoint, that was

12:04  20   a matter of how the message got there.  It could have come

12:04  21   through any other source, and Mr. Slocum is not prejudiced by

12:05  22   simply maintaining the position that he didn't send it.  He may

12:05  23   have sent messages in the past.  He may readily admit to

12:05  24   messages that don't -- you know, don't have the same weight.

12:05  25   He may not.  He may deny sending all messages, but you are

12:05  1   entitled to show, you know, the methodology and how it goes

12:05  2   back in time.

12:05  3          Now, a couple offers were made.  I don't know -- if

12:05  4   the defense truly wanted to limit this to the murders at

12:05  5   Lewisburg, I don't know if the Court would finally make that

12:05  6   ruling, but I've tossed that out to them.  If you really want

12:05  7   to get rid of all the past history, the black-white

12:05  8   confrontation, then I may be willing to limit this just to

12:05  9   Lewisburg.  But be careful with that defense, because then it

12:05 10   looks like your clients are just racist thugs.

12:05 11          But there is no reason to except the black

12:05 12   prisoners -- and we -- you know, commit this murder, and I

12:06 13   would cut that off around Lewisburg tentatively, because it's

12:06 14   not fair that they go back into 1997 or 1996 or 1995 and cut it

12:06 15   at the most, you know, beneficial place for the defense and not

12:06 16   let the government also develop the history.  Then the Court is

12:06 17   simply arbitrarily chopping that up, and the best -- the best

12:06 18   chance at fairness and truthfulness is the more information

12:06 19   that comes out, not the least amount.

12:06 20          I think in my past experience as a trial judge,

12:06 21   especially when I've tried to get cute with the evidence,

12:06 22   because they understood the case, the end result is I'm

12:06 23   chopping it up half the time.  And I think I have to trust both

12:06 24   sides that the more evidence, as long as it's relevant and

12:06 25   appropriate and admissible, is better.

| | | |
|---|---|---|
| 12:06 | 1 | They've declined that offer.  Now, that's not an |
| 12:07 | 2 | offer, but that's, you know, a thought, and I -- I wouldn't |
| 12:07 | 3 | have made that ruling until I came back and talked to the |
| 12:07 | 4 | government, also, and you were included, but you fully |
| 12:07 | 5 | understand the following:  One, you're walking away from |
| 12:07 | 6 | Barnes, and that closes the door to any subsequent prosecution |
| 12:07 | 7 | if this case remains joined, because under Barnes, it's 403. |
| 12:07 | 8 | And if I grant the 403 and I allow Barnes out of this case, I |
| 12:07 | 9 | am not going to allow the government to come back if you're not |
| 12:07 | 10 | successful with Mr. Slocum and then get in a claim on a |
| 12:07 | 11 | conspiracy charge; fair enough? |
| 12:07 | 12 |         MS. FLYNN:  That's fair, your Honor. |
| 12:07 | 13 |         THE COURT:  Number two, I'm worried about not the |
| 12:07 | 14 | narcotics, you are entitled to show the narcotics transactions, |
| 12:07 | 15 | because it -- it's relevant to show that he has access to the |
| 12:07 | 16 | outside.  I didn't know it was Mary -- |
| 12:07 | 17 |         MS. FLYNN:  Bentley. |
| 12:07 | 18 |         THE COURT:  Yeah, Mary Bentley.  I don't know her |
| 12:07 | 19 | motivation.  That's not the type or the kind of structure I'm |
| 12:07 | 20 | looking for, but you are entitled to show that he's got people |
| 12:08 | 21 | who make him a logical centerpiece for communication. |
| 12:08 | 22 |         But I'm a little concerned about the way it -- it |
| 12:08 | 23 | sorts out.  The narcotics start to overwhelm by the redundancy |
| 12:08 | 24 | of this and the way it's divided out, and I'm just wondering if |
| 12:08 | 25 | there is something -- I'm not suggesting you dismiss it, but |

CR 02-938(A)-DOC            January 3, 2006                         54

12:08  1   something that can't be done about that.  And before I ever get

12:08  2   to the point of joinder in this or non-severance, I want you to

12:08  3   think about, you know, what's really necessary from your

12:08  4   standpoint in terms of these narcotics and tell me at 1:30,

12:08  5   okay?  1:30, 2:00, because I'm not about to sit through,

12:08  6   frankly, an undue consumption of time involving minimal

12:08  7   narcotics transactions, that although they lead to

12:08  8   repercussions when it comes to sentencing, that's not the

12:08  9   gravamen of why you brought this case.  You brought this case

12:08  10  because of the Aryan Brotherhood and the murders, and that's

12:08  11  the focus.  And somebody dressed this up in a nice, neat

12:09  12  package with separate dates and separate times, and I have

12:09  13  no -- no quarrel with that, but I do have a tremendous concern

12:09  14  that our focus gets lost in the minutia of Mr. Slocum in some

12:09  15  of these narcotics transactions.

12:09  16       So why don't you talk to Mr. Sagel about that, whoever

12:09  17  you need to, and if we need an answer by 5:00, fine, or

12:09  18  tomorrow, fine, but at some point, I'm going to ask you to

12:09  19  thoughtfully consider you have Barnes, you know, bringing this

12:09  20  down in size.  And I know that your representation issue is not

12:09  21  up there very long.  Certainly she can have a narcotics

12:09  22  transaction, I am not precluding that, but if you want me to go

12:09  23  forward, the essence of this is murder.

12:09  24       All right.  So we'll see you, what, 2:00 or 1:30?

12:09  25       MR. DONATELLI:  1:30 is good.

CR 02-938(A)-DOC         January 3, 2006                                    55

| | | |
|---|---|---|
| 12:09 | 1 | THE COURT:  Tentatively, lets say 1:30. |
| 12:09 | 2 | Now, what else do we need to do today, excepted by a |
| 12:09 | 3 | hold the joinder right now, going through the Indictment and |
| 12:09 | 4 | picking out the paragraphs I read.  I've already done that, you |
| 12:09 | 5 | know, both ways.  If I severed it, I did that, and if I kept it |
| 12:10 | 6 | in a joined condition, I've done that, but I'd like to go |
| 12:10 | 7 | through each page.  It won't take very long, but just what we |
| 12:10 | 8 | agreed.   Now, we can go late for a week or so and come back |
| 12:10 | 9 | and look at it again, okay? |
| 12:10 | 10 | Have a nice lunch.  We'll see you at 1:30. |
| | 11 | (Recess.) |
| | 12 | / |
| | 13 | / |
| | 14 | **CERTIFICATE** |
| | 15 | |
| | 16 | *I hereby certify that pursuant to Section 753, Title 28 of the* |
| | 17 | *United States Code, the foregoing is a true and correct* |
| | 18 | *transcript of the stenographically reported proceedings held in* |
| | 19 | *the above-entitled matter and that the transcript page format* |
| | 20 | *is in conformance with the regulations of the Judicial* |
| | 21 | *Conference of the United States.* |
| | 22 | |
| | 23 | |
| | 24 | _____        1/4/07 |
| | | JANE C.S. Rule, CSR NO. 9316      Date |
| | 25 | Federal Official Court Reporter |

Jane C.S. Rule, CSR No. 9316 – Federal Official Court Reporter