UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

- - -

HONORABLE MANUEL L. REAL
UNITED STATES DISTRICT JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,           )
                                    )      **ORIGINAL**
                 PLAINTIFF,         )
                                    )
VS.                                 )      CASE NO.:
                                    )      CR 02-938(A)-R
STEVEN LOREN SCOTT,                 )
                                    )
                 DEFENDANT.         )
                                    )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

MONDAY, OCTOBER 2, 2006

LOS ANGELES, CALIFORNIA


LAURA MILLER ELIAS, CSR 10019
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 453
LOS ANGELES, CALIFORNIA 90012
PH:  (213)620-0808

UNITED STATES DISTRICT COURT

FILED
CLERK, U.S. DISTRICT COURT
JAN 1 6 2007
CENTRAL DISTRICT OF CALIFORNIA
BY

DOCKETED ON CM
JAN 1 1 2007
BY ___ 115

APPEARANCES OF COUNSEL:

ON BEHALF OF PLAINTIFF:

BY:   JOEY BLANCH
ASSISTANT UNITED STATES ATTORNEY

1100 UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CA 90012

ON BEHALF OF DEFENDANT:

AMY JACKS, ESQ.

UNITED STATES DISTRICT COURT

3

INDEX

**WITNESSES FOR
THE PLAINTIFF:**

| | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** |
|---|---|---|---|---|
| **HALUALANI, MICAHEL** | | | | |
| BY:  MS. BLANCH | 5 | | 39 | |
| BY:  MS. JACKS | | 7 | | |
| **SMITH, LESLIE** | | | | |
| BY:  MS. BLANCH | 42 | | | |
| BY:  MS. JACKS | | 58 | | |
| **CUPPLES, SCOTT** | | | | |
| BY:  MS. BLANCH | 64 | | 132 | |
| BY:  MS. JACKS | | 85 | | 134 |

| **EXHIBITS** | **RECEIVED** |
|---|---|
| 68 | 7 |
| 70 | 7 |
| 72 | 7 |
| 74 | 7 |
| 76 | 7 |
| 77 | 7 |
| 69 | 46 |
| 113 | 55 |

UNITED STATES DISTRICT COURT

LOS ANGELES, CALIFORNIA; MONDAY, OCT. 1, 2006; 9:20 A.M.

- - -

THE CLERK:  Calling Item No. 1.

Case No. CR 02-938(A).

United States of America versus Steven Loren Scott.

Counsel, your appearances, please.

MS. BLANCH:  Good morning, Your Honor.

Joey Blanch for the United States.

MS. JACKS:  Good morning, Your Honor.

Amy Jacks for the defendant.

THE COURT:  All right.  Bring out of the jury.

(Jury present.)

THE COURT:  All right.  The record should show the jurors are all present and in their proper places, and defendant is present with his counsel.

Call your next witness.

MS. BLANCH:  Your Honor, the government calls Michael Halualani.

THE CLERK:  Please come forward.  Please be seated.

Please raise your right hand.

(Witness sworn.)

THE CLERK:  For the record, sir, would you please state your full name and spell your last name?

THE WITNESS:  Michael Halualani, H-a-l-u-a-l-a-n-i.

DIRECT EXAMINATION

BY MS. BLANCH:

Q.   Mr. Halualani, how are you employed?

A.   I'm a Special Agent with the United States Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives.

Q.   And were you involved in the execution of some search warrants in this case on October 2002?

A.   Yes.

Q.   How were you involved?

A.   I was -- I am actually the case agent for all the search warrants that were executed in October of 2002.  My involvement stemmed not in the actual execution but in the review of documents retrieved from cells and residences in the communities where search warrants were executed.

Q.   And are you aware of some search warrants executed on the cell of Steve Loren Scott at the ADX at that time?

A.   Yes.

Q.   How are you aware of that?

A.   I am aware -- in fact, have spoken to the special agent who -- and the SIA, the special investigative agent, from the Bureau of Prisons who actually entered the cell and retrieved the items requested to be seized in the search warrant. Those items deemed nonprivilege having no attorney/client privilege were shipped directly to me.  I reviewed them for

any material that might be of evidentiary value and returned those items not to Mr. Scott or Mr. Scott's representative.

Q.    The items that came to you from the ADX, how do you know which items came from whose cell?

A.    Special Agent Wood, W-o-o-d, who is the ATF Special Agent labeled the documents using a label saying whose cell it came from.  Based on those labels, we've reviewed them and made determinations.

Q.    Could you look in front of you at Exhibits 68, 70, 72?

A.    And 72?

Q.    And 72.

A.    Yes.

Q.    And 74?

A.    Yes.

Q.    And 75 and 76?

A.    Yes.

Q.    And 77?

A.    Yes.

Q.    Do you recognize these exhibits?

A.    Yes, I do.

Q.    How do you recognize them?

A.    I reviewed them from the nonprivileged material received from Mr. Scott's cell.

        MS. BLANCH:  Your Honor, I offer Government Exhibits 68, 70, 72, 74, 75, 76 and 77 into evidence.

THE COURT:  Any objection?

MS. JACKS:  No.

THE COURT:  68, 70, 72, 74, 76, 77 will be received.

(Exhibits 68, 70, 72, 74, 76 and 77 admitted.)

MS. BLANCH:  I have no further questions, Your Honor.

THE COURT:  Cross-examination.

MS. JACKS:  Thank you.

CROSS-EXAMINATION

BY MS. JACKS:

Q.   Good morning, Officer Halualani.

A.   Good morning.

Q.   Just one quick question right off the bat.  If you could turn to Exhibit 63?

A.   Yes, ma'am.

Q.   I want to ask you if that was also seized from Mr. Scott's cell in October of 2002?

A.   I don't recall this one being seized, but off the top of my head, I'm not sure.

Q.   Is there something you could look at to be sure?

A.   If I actually had the originals, I could take a look at the originals.

Q.   I'll see if we can locate those at a recess.  In addition to reviewing documents that were seized pursuant to

a search warrant in this case, did you conduct interviews with various individuals?

A.    Yes.

Q.    Okay.  And specifically, did you speak with an individual known as Waylen Gene Bentley?

A.    Gene Bentley?  Yes, ma'am.

Q.    Did you also speak with an individual known as Glen West?

A.    Yes.

Q.    And did you also interview an individual named Donnie Kennedy?

A.    Yes.

Q.    Specifically --

        MS. JACKS:  If I can just have a moment.

        How many times did you meet with Gene Bentley and talk with him about the facts and circumstances surrounding this case?

A.    I would say -- I couldn't give you an exact number.  I would guess somewhere more than six and less than twelve.

Q.    Somewhere between six and twelve times?

A.    Yes.

        THE COURT:  That's what he said, Counsel.

BY MS. JACKS:

Q.    And were all -- were all those meetings face-to-face or did some of them occur over the telephone?

A.    No.   Most of them occurred over the telephone.

Q.    How many of those six to twelve times did you talk to Mr. Bentley about the stabbing of Ismael Benitez Mendez at Levenworth in January of 1992?

A.    I don't recall.   Maybe two.

Q.    And in those interviews with Mr. Bentley, did he ever tell you that Steve Scott told him that he stabbed Ismael Benitez Mendez?

A.    You know, off the top of my head, I don't recall.   I would have to review a report.

Q.    He never told you that, did he?

A.    I don't recall.

Q.    What Bentley told you in those interviews is that TD Bingham told him that he had told Steve Scott to stab Benitez Mendez; correct?

A.    I don't know without reviewing a report.

Q.    Do you have your reports regarding your interviews with Mr. Bentley with you today?

A.    No, I do not.

Q.    How many times during the course of your investigation in this case did you speak with Witness Donald Kennedy?

A.    Probably four or five times.

Q.    And the first time that you spoke with Mr. Kennedy was within a few days of him making a deal to become a government witness?

A.    No, the first time --

Q.    Oh.    Excuse me, I'm sorry.    Go on.

A.    The first time I would have interviewed him would have been prior to him becoming a government witness.

Q.    Correct, my mistake.    In November of 2002; right?

A.    Yes.

Q.    And that was when you went to the United States Medical Center for Federal Prisoners at Springfield, Missouri?

A.    Yes.

Q.    And you talked to Mr. Kennedy there?

A.    Yes.

Q.    In a face-to-face conversation?

A.    Yes.

Q.    How long did you talk to Mr. Kennedy that day?

A.    40, 45 minutes.

Q.    And during that conversation, did Mr. -- well, did the stabbing of Ismael Benitez Mendez come up?

A.    No, it did not.

Q.    Okay.    And so would it be fair to say that Mr. Kennedy said absolutely nothing about that incident in November of 2002?

A.    Yes.

Q.    The next time that you talked to Mr. Kennedy, was that after he made a -- some sort of agreement to become a witness for the prosecution in this case?

A.    I -- I believe so, yes.

Q.    And you talked to him approximately what, three or four times after he made an agreement to become a government witness?

A.    Yeah, I think that's about right.

Q.    And during those conversations -- let me go back a second.  After the November 2002 conversation with Mr. Kennedy, was he brought here to Los Angeles and housed at Terminal Island?

A.    Yes, he was.

Q.    And while at Terminal Island, was he provided with discovery materials in this case?

        MS. BLANCH:  Objection.  Lack of foundation.

        THE COURT:  Objection sustained.

BY MS. JACKS:

Q.    Well, did you participate with a U.S. Attorney in releasing certain of your reports to the various defendants in this case?

A.    Yes.

Q.    I mean, you kind of kept a list of what you were giving them to give the defense lawyers; right?

A.    The U.S. Attorney's Office does.  I don't.

Q.    Okay.  But you did turn over some of your reports?

A.    Yes.

Q.    Your -- the reports you wrote?

A.    Yes.

Q.    And you turned over other reports that you gathered in your investigation; correct?

A.    That's correct.

Q.    And those reports that you turned over in -- prior -- well, the reports that you initially turned over, did those relate to the stabbing of Ismael Benitez Mendez?

A.    Yes.

Q.    And to your knowledge, were those reports provided to the various defendants in the case?

A.    Yes, I believe so.

Q.    And, in fact, they were redacted in certain ways so that the defendants could have them, weren't they?

A.    I believe that's correct, yes.

Q.    And at the time, was Mr. Kennedy, a defendant in this case, housed at Terminal Island?

A.    Yes, I believe he was.

Q.    Now, sometime after Mr. Kennedy had made his deal to become a witness for the prosecution, did you speak to him specifically about the stabbing of Mr. Benitez Mendez in January of 92?

A.    Yes, I did.

Q.    And did you have information from other government witnesses, specifically from Mr. West claiming that Mr. Kennedy provided the knife for that assault?

A.    Yes, I believe Mr. West had told me previously.

Q.    Did you talk to Mr. Kennedy about that?

A.    I don't believe I did, no.

Q.    So you never brought up to Mr. Kennedy that some other government witness was saying he actually played a role in the stabbing of Mr. Benitez Mendez?

THE COURT:  That's what he said, Counsel.  Please do not repeat it.

BY MS. JACKS:

Q.    Are you sure?

THE COURT:  That's what he said.  I did not.

BY MS. JACKS:

Q.    Now, Mr. Kennedy and Mr. West are both witnesses for the prosecution; correct?

A.    Yes.

Q.    And they both have made some sort of agreement requiring them to testify truthfully; correct?

A.    Yes.

Q.    What have you done in the course of your investigation to reconcile the conflicting stories given to you by Mr. West and by Mr. Kennedy?

A.    Which conflicting story?

Q.    Well, Mr. West says Mr. Kennedy gave Mr. Scott the knife to stab Mr. Benitez Mendez; right?

A.    That's correct.

Q.    And Mr. Kennedy has testified in court previously and in this case that he didn't do any such thing?

MS. BLANCH:  Objection.

THE COURT:  The objection is sustained.

BY MS. JACKS:

Q.    Well, have you done anything to corroborate Mr. West's claim that Kennedy had something to do with the stabbing of Mr. Benitez Mendez?

A.    In this particular instance, no.

Q.    And, in fact, you never even talked to Mr. Kennedy about it?

A.    That would be correct.

Q.    Now, during the course of your investigation, did you also interview a witness named Richard Bernard?

A.    Yes.

Q.    And do you remember the first time that you came into contact with Mr. Bernard?

A.    It's going to be like October of '98 I want to say off the top of my head.

Q.    Was your first contact with Mr. Bernard while he was housed in the H Unit at the ADX in Florence, Colorado?

A.    Yes, I believe it was.

Q.    Okay.  And that was when he was housed with Mr. Bentley and Mr. Roach?

A.    Yes, I believe that's correct.

Q.    Among other witnesses for the government?

A.    Among other witnesses and non-witnesses for the government, yes.

Q.    And when you first met with Mr. Bernard, this was prior to your first conversation with Mr. West; correct?

A.    Yes.

Q.    Now, what did Mr. Bernard tell you regarding Mr. West?

A.    In terms of anything specifically or just kind of general?

Q.    One of the things that you talked to Mr. Bernard about was a stabbing that he did at Lompoc of an inmate by the name of David Newman; correct?

        MS. BLANCH:  Objection.  Relevance.

        THE COURT:  Objection sustained.

        MS. JACKS:  Your Honor, I'd like to be heard at side bar.

        THE COURT:  No.

BY MS. JACKS:

Q.    Mr. Halualani, did you as part of your investigation in this case speak with Glen West?

A.    Yes.

Q.    Now, Glen West was indicted in this matter on Count 10, a murder; correct?

A.    Yes.

Q.    And when you spoke to him -- well, did you speak to

him -- you told us you spoke to Mr. Kennedy right after the indictment before he made a deal to become a government witness?

A.    Yes.

Q.    Did you speak to Mr. West in the same manner?

A.    No, I did not.

Q.    So Mr. West was charged and brought here to Los Angeles; correct?

A.    Yes.

Q.    Was he housed at Terminal Island?

A.    I believe he was, yes.

Q.    And like Mr. Kennedy, was Mr. West provided with various discovery materials?

        MS. BLANCH:  Objection.  Lack of foundation.

        THE COURT:  The objection is sustained.

BY MS. JACKS:

Q.    Well, we discussed earlier this morning how Mr. Kennedy came into possession of discovery materials.  Do you believe Mr. West came -- came into possession of the discovery --

        THE COURT:  What he believes is totally irrelevant, Counsel.

BY MS. JACKS:

Q.    Did Mr. West come into possession of discovery materials in the same way?

A.    Yes.

Q.    And when was it that Mr. West was brought to Terminal Island in Los Angeles?

A.    November or December of 2002.  I'm not sure what the exact date is.

Q.    Okay.  Now, have you seen the indictment in this case?

A.    Yes.

Q.    And would you agree with me that the indictment is essentially a road map to the government's theory of the case?

THE COURT:  Counsel, that's irrelevant, what his belief is.

BY MS. JACKS:

Q.    Is the indictment a road map --

THE COURT:  That's irrelevant, Counsel, and this man's opinion is totally irrelevant.

BY MS. JACKS:

Q.    Was the indictment provided to Mr. West?

A.    I believe it was provided to everyone who was charged in this case.

Q.    All right.  Which would -- at the time would include Mr. West; correct?

A.    Yes.

Q.    And how many pages was the indictment that was provided to Mr. West?

MS. BLANCH:  Objection.  Relevance.

THE COURT:   The objection is sustained.

MS. JACKS:   It goes to the credibility of his testimony, Your Honor.

THE COURT:   The objection is sustained, Counsel.

BY MS. JACKS:

Q.   In the indictment that was provided to Mr. West, was -- were claims of the government about the stabbing of Ismael Benitez Mendez included?

THE COURT:   The indictment is the best evidence of what it contains, Counsel, and the jury can have it if they so want it.

BY MS. JACKS:

Q.   When did you first speak to Mr. West?

A.   Sometime in 2003, I believe.

Q.   After Mr. West made a deal to become a witness for the government?

A.   Yes.

Q.   And after he was permitted to review the discovery materials in the indictment for over 9 months?

MS. BLANCH:   Objection.   Lack of foundation.

THE COURT:   Objection is sustained.

BY MS. JACKS:

Q.   When in 2003 did you first talk with Mr. West?

A.   I want to say the Spring, but I can't be exactly sure.

Q.   Mr. West made an agreement to become a witness for the

government on August 20th of 2003, didn't he?

A.    Okay.  If you say so, yes.

Q.    And he was released from jail about 10 days later?

A.    Uh, I believe that's correct.

Q.    And you actually met with him the day he was released from jail then, didn't you?

A.    Oh, yes, that's correct.

Q.    Okay.  And that was to talk to him about what he was going to testify to in this case?

A.    To ask him questions about what he knew about this case.

Q.    And he was arrested at the same time that the search warrants were served on the other inmates in October of 2002?

A.    October 17th, 2002.

Q.    At some point during your interviews with Mr. West, did you speak to him about the stabbing of Mr. Benitez Mendez?

A.    Yes, I did.

Q.    And did Mr. West tell you that Mr. Kennedy participated in that stabbing by providing the knife?

A.    Yes, he did.

Q.    When -- Mr. West told you that Mr. Kennedy actually told that to him; right?

A.    I believe on -- I believe on two separate occasions if my -- if my memory's correct.

Q.    Just so that we're talking about the same thing, did Mr. West tell you that Mr. Kennedy told him about his role on

two separate occasions?

A.    That's correct.

Q.    All right.  And when was the first occasion that Mr. West claimed he spoke to Mr. Kennedy about his role in the Benitez Mendez stabbing?

A.    It would have been within a few months or a year or so of the actual stabbing.

Q.    So he told you way back in 1992, Mr. Kennedy had told him, hey, I was involved, I provided the knife?

A.    I believe -- yeah, I believe it was '92, '93.  Someplace around that, yes.

Q.    And that was a conversation that Mr. West claimed took place at the United States Penitentiary Levenworth?

A.    I believe that's correct, yes.

Q.    Now, did you as part of your investigation do anything to determine whether Mr. West and Mr. Kennedy were actually present at the United States Penitentiary Levenworth after Mr. Benitez Mendez was stabbed?

A.    Yeah.  I -- I reviewed their inmate quarter's history to see if they were ever -- if they were together around that time.

Q.    And when was the second time that Mr. West claimed that Mr. Kennedy said he was involved in that stabbing?

A.    It would have been sometime following their -- both of their arrivals at Terminal Island in 2002 or 2003.

Q.    And he said, again, that they -- that they spoke about it there, and Mr. Kennedy reiterated that he was involved in that matter?

A.    Yes.

Q.    One of the things that you have gathered in connection with the investigation in this case are the various intelligence reports from the ADX in Florence, Colorado; is that correct?

A.    Those reports were actually not given to me directly. They were given directly to the U.S. Attorney' Office.

Q.    Did you find -- did you discover the existence of those reports?

A.    Um, yes, I did.

Q.    So you in your investigation found out that there was staff at the prison in Florence, Colorado that was monitoring the mail in and out of the various inmates?

A.    Yes.

Q.    Okay.  Did you also find out that there was staff at the United States Penitentiary Lewisberg, Pennsylvania that did the same thing?

A.    Yes.

Q.    Okay.  Um, one of the things that Mr. West told us during the course of this trial is that after the killings at Lewisberg, he received letters from Inmates Campbell and Bridgewater regarding that incident.  Did he ever make those

claims to you?

A.    I don't recall, no.  I don't know.

Q.    Okay.  Um, during the course of your investigation, have you uncovered any letters from Mr. Bridgewater or Mr. Campbell sent from Lewisberg to a third party after the Lewisberg stabbings?

A.    No, I don't believe I have.

Q.    Was Mr. West charged in this case of the murder of an individual known as Alvin Lee Ray?

            THE COURT:  Counsel, that's irrelevant.

            MS. JACKS:  Well, I think it's relevant --

            THE COURT:  It's not, Counsel.

            MS. JACKS:  I would like to approach --

            THE COURT:  It has nothing to do with this case. If it's in this indictment, the jury will -- will get it.

BY MS. JACKS:

Q.    Mr. Halualani, if you could turn to what I believe is Exhibit 1.  Did you find it?

A.    Yes.

Q.    Do you recognize that document?

A.    Yes.

Q.    Is that a document that was seized during the service of a search warrant from October of 2002?

A.    Yes.

Q.    Prior to this -- well, let me -- prior to the seizure of

that document, did any individual, Mr. Roach or Mr. Bentley, anybody that you were talking to, tell you that that document existed, and you needed to look for it?

A.    No, they did not.

Q.    Okay.  And did you during the course of your interviews with any of the government witnesses in this case ask them about that specific document, Exhibit 1?

A.    After it was found?

Q.    Correct.

A.    Yes, I believe I did.

Q.    Okay.  And who did you speak to?

A.    I believe I spoke to Mr. West about it, and I want to say I also spoke to Mr. Roach about it.

Q.    Well, prior -- when you spoke to Mr. West, do you remember the date?

A.    No, I don't.

Q.    Is it reflected in any of your reports that you spoke to Mr. West about this document?

A.    I don't believe it is.

Q.    I'm sorry?

A.    No.

Q.    You don't believe it is?

A.    No.  No, I don't.

Q.    What about Mr. Roach?  Do you remember the date that you say you spoke to him about it?

A.    No, I don't.

Q.    Is it reflected in any your reports regarding this case that you did talk to him about it?

A.    No.

Q.    Um, did you talk to each of these witnesses about this document, Exhibit 1, prior to their testimony in a trial earlier this year?

A.    Yes.

Q.    And when you talked to them, did you actually have the document or a copy of it in your hand?

A.    In regards to Mr. West, I actually had a copy of the document.  And in terms of Mr. Roach, I believe I spoke to him over the telephone so I did not have a copy of the document.

Q.    So you --

A.    Or he did not have a copy of the document.

Q.    So you just described the document?

A.    Yes.

Q.    And is it fair to say that both Mr. West and Mr. Roach when you brought up the existence of this document suddenly told you that, oh, yes, they had seen this document a long time ago?

MS. BLANCH:  Objection.

THE COURT:  The objection is sustained.

BY MS. JACKS:

Q.    Well, you -- you brought this document up to Mr. West and to Mr. Roach sometime in 2006; right?

A.    No.  It's gonna be 2003 or 2004.

Q.    Oh, I'm sorry.  I thought you said you spoke to them about it just prior to their testimony in a trial this year.

THE COURT:  Just ask a question, Counsel.  Don't argue with the witness.

BY MS. JACKS:

Q.    Did you testify earlier this morning that you --

THE COURT:  Counsel, don't argue with the witness.

MS. JACKS:  I'm not trying to argue with the witness.

THE COURT:  The jury has heard his testimony.

BY MS. JACKS:

Q.    Well, let's go back then.  When did you speak to Mr. West about this document?

A.    I want to say in 2003, 2004.

Q.    Is there any report where you can give us a more firm date?

A.    No.

Q.    And did Mr. West -- is that your testimony as well regarding Mr. Roach?

A.    Yes.

Q.    And, again, no -- no document that you could be more specific about?

A.   That's correct.

Q.   About the actual date?

A.   That's correct.

Q.   Did Mr. West tell you that that -- that he saw that document back in 1993?

A.   No, he said he -- no, he did not.

Q.   Okay.  Did Mr. Roach tell you that he saw that document back in 1993?

A.   I don't believe he did, no.

Q.   And the copy of the document that you have before you, that's not the original, is it?

A.   No, it's not.

Q.   But you do have the original?

A.   Yes.

Q.   The original was actually seized as part of the -- the service of the search warrant in 2002; correct?

A.   That's correct.

Q.   Okay.  Um, did you as part of your investigation do anything to try to date the document?

A.   Um, well, basically, what we did in order to date it was by speaking to other individuals about this type of organization being discussed by the Arian Brotherhood, we were able to pin down when we believe it was authored.

Q.   Okay.  I'm just wondering if you examined the document in any matter forensically to determine if you could date it.

UNITED STATES DISTRICT COURT

A.    No.

Q.    For example, certain kinds of paper could have been in use back in 1993 that aren't in use in 2000?  Did you --

MS. BLANCH:  Objection.  He said he didn't do that.

THE COURT:  Objection is sustained.

BY MS. JACKS:

Q.    Did you do anything to determine -- the document's typed; correct?

A.    Part of it was typed.

Q.    And the first page?

A.    The first page, yes.

Q.    I think what's marked as the first page of Exhibit 1. Would you agree with me that the type face is somewhat unusual?

A.    It looks like an old typewriter to me.

Q.    Like an old typewriter.  Did you do anything to determine where that document was manufactured?

A.    No.

Q.    I mean, inmates in the United States Penitentiary don't have typewriters in their cells, do they?

A.    No, but they have access to typewriters.

Q.    In like, for example, a law library?

A.    I don't know if it would be a law library or wherever -- wherever they worked.  If they worked as a clerk or something, I'm sure they would have access to a typewriter.

Q.    Did you conduct any investigation to determine where an inmate may have access to a typewriter that produced that sort of typeface?

A.    Within the whole Bureau of Prisons?  No.

Q.    Well, the document was seized at Marion; right?

A.    It was seized in the cell of an individual in 2002 in Marion, that's correct.

Q.    Okay.  Did you look to see what typewriters that person may or may not have had access to at Marion in 2002?

A.    I didn't think it was relevant.  We determined it was made in 1992.

Q.    Well, you're basing that conclusion on claims of government witnesses; correct?

            THE COURT:  You're arguing with the witness, Counsel.

            MS. JACKS:  I'm not.  I'm trying to find the basis --

            THE COURT:  That's argument.

            MS. JACKS:  I'm trying to find the basis --

            THE COURT:  That's argument.

            MS. JACKS:  -- of his conclusion.

            THE COURT:  That's an argument.

            MS. JACKS:  I would object that the Court's denying Mr. Scott his right to confront and cross-examine the witnesses and his rights to due process.

THE COURT:   That's an argument, and an argument is not a question.

BY MS. JACKS:

Q.   Is the basis of that conclusion, that the document was made in 1992, statements from witnesses for the prosecution?

A.   It was based on interviews with witnesses and a review of their inmate quarter's history showing that when they were around, the individual's believed to have written this.

Q.   I want to talk you a minute about the government witnesses being housed at H Unit in 1999.   Okay?

A.   Sure.

Q.   Okay.   First of all, did you become aware that certain government witnesses were being housed together in a special unit at the United States Penitentiary Florence, Colorado?

A.   Special unit or a unit -- I'm not sure how you define a special unit.

Q.   Well, units where they were (a) together.   Were they housed together?

A.   They were housed together, that's correct.

Q.   Were they housed in a unit that was open for the majority of the day so that they could walk around and talk to each other?

A.   I believe that's correct, yes.

Q.   And were they provided materials by you to review and discuss in that unit?

A.   No, they all were not provided materials by me.

Q.   Did you provide anybody materials?

A.   Select individuals, yes, ma'am.

Q.   Okay.  And were those -- how were those materials provided to the witnesses?

A.   They were provided in the form of copies to the institution staff who then presented it to the inmates.

Q.   So you mailed them or federal expressed the materials to a Demine Adams?

A.   No.  I believe I sent it actually to Danny Schof.

Q.   Okay.  And then Danny Schof did whatever he did with those materials in terms of taking them into the unit and distributing them?

A.   It would have given them on my direction to specific inmates, not to the entire unit.

Q.   At some point -- well, let me go back.  Was Kevin Roach housed in an H Unit in 1999?

A.   Yeah, I believe he was.

Q.   And Mr. Bentley?

A.   I think he was.  I'm not sure.

Q.   And Mr. Bernard?

A.   I believe he was, yes.

Q.   At some point, did you become concerned that perhaps witnesses' testimony could be tainted because they were talking to other witnesses?

A.    I think any time you house prisoners, witnesses together, I think it's always a concern.  I don't think it can be anything but a concern.

Q.    Um, did you bring your concern to anyone?

A.    I believe I spoke to -- I believe we spoke to the U.S. Attorney's Office maybe, but . . .

Q.    And do you know whether your concern was ever brought to the prison officials at Florence, Colorado ADX?

A.    I don't know specifically if it was.  I believe it was, but I'm not sure.

Q.    Did you provide money to various government witnesses?

A.    Yes.

Q.    And specifically, did you provide money to Mr. West?

A.    Yes.

Q.    How -- how did that work?

A.    Um, I believe in one instance, uh, I gave him $100, and in two other instances, I paid for lodging prior to him being relocated.

Q.    And in total, how much money or benefits did you provide personally to Mr. West?

A.    I think a thousand dollars.

Q.    And then you're also aware that he has received over $80,000 of additional benefits from the Wit Seg Program; is that right?

MS. BLANCH:  Objection.  Lack of foundation.

UNITED STATES DISTRICT COURT

THE COURT:  The objection is sustained.

BY MS. JACKS:

Q.    Well, are you aware of the benefits that he's received from the Wit Seg Program?

THE COURT:  The objection was just sustained, Counsel.  Please do not do that.

MS. JACKS:  I thought that was a different question, Your Honor.

THE COURT:  No, it was the same question.

BY MS. JACKS:

Q.    Well, you're the investigating officer with the primary responsibility for this case; right?

A.    Yes.

Q.    And as part of your job, did you obtain information from the Wit Seg Program regarding the benefits made to Mr. West?

A.    No, I did not.

Q.    Let's talk about Mr. Bentley.  Did you provide him with cash payments?

A.    Yes, I believe I did.

Q.    And how did that work because he's in prison; right?

A.    Um, you mail it, just like with Mr. Scott would get money, a money order to a P.O. Box, and it's placed on his books.

Q.    How many times did you do that?

A.    I couldn't even guess.

Q.    More than ten?

A.    Yeah.  I mean, more than ten, less than a hundred.  I -- something.  I don't know.

Q.    Well, how much money would you send him?

A.    What do you mean?  At a time?

Q.    Right.

A.    In totality?  Maybe $100 at a time.

Q.    And would you send him money after you had conversations with him about the case?

A.    Yes.

Q.    So each time he talked to you on the phone or met with you, then a few days later, you'd send him a money order?

A.    A few days or a few weeks.

Q.    How much -- excuse me.  How much money in total have you sent to Mr. Bentley?

A.    Off the top of my head, I'm gonna guess like $3,000 maybe?

Q.    3,000?

A.    Yeah.  If I'm wrong, one of you guys can correct me.  I don't know off the top of my head.

Q.    There's records of that kept somewhere?

A.    Yes.

Q.    And would you say you're accurate plus or minus a thousand dollars?

A.    In terms of --

Q.    What you sent to Mr. Bentley.

A.    My guess -- yes, I would say I'm accurate within a thousand dollars, plus or minus.

Q.    And what about Mr. Roach?  Did you send him money in the same way that you sent Mr. Bentley money?

A.    Yes.

Q.    So after you met with him or spoke with him on the phone, you would send a money order to be placed on a commissary account?

A.    Well, I'd review letters or phone calls that we deemed evidentiary in value, yes.

Q.    And how much money in total do you think that you've sent Mr. Roach over the course of this investigation?

A.    I think between 6,000 and 7,000.  Yeah, I'm not -- I don't know what the exact amount is.

Q.    Okay.  Um, we've heard some testimony about a Rule 35?

A.    Yes.

Q.    Are you aware of what that is?

A.    I believe it's a request for a reduction in sentence.

Q.    And that's something that the U.S. attorney would bring to a court and ask that the Court reduce the particular inmate's sentence?

A.    That's my understanding, yes.

Q.    And is Rule 35 based on a U.S. attorney saying that an inmate has participated in a government investigation or

UNITED STATES DISTRICT COURT

testified at trial?

MS. BLANCH:  Objection.  Lack of foundation.

THE COURT:  Objection is sustained.

BY MS. JACKS:

Q.    A Rule 35 is something that the witnesses in this case have brought up to you, isn't it?

A.    Yes.

Q.    And specifically, has Mr. Roach discussed with you the possibility of getting a Rule 35 sentence reduction?

A.    I think we've discussed it.

Q.    Okay.  And what about Mr. Bernard?

THE COURT:  We've heard all about that, Counsel. The jury has heard all of that.

BY MS. JACKS:

Q.    What about Mr. Bernard?

A.    Yes.

Q.    And what about Mr. Bentley?

A.    Yes.

Q.    And were these discussions about the Rule 35 something that you initiated with these witnesses or something that the witnesses initiated with you?

A.    I want to say in terms of Mr. Roach, I probably initiated the conversation, and I want to say with Mr. Bentley and Mr. Bernard, they initiated it just off the top of my head.

Q.    Now, Mr. Halualani, you've testified previously about your investigation in this case, haven't you?

A.    Yes.

Q.    Have you used the phrase there is no Switzerland?

A.    Yes.

Q.    Can you explain what that means and how that relates to your conduct of the investigation in this case?

A.    I guess I'm a little fuzzy on your question.

Q.    Well, how does the -- what does the phrase no Switzerland mean?

A.    I think it's a little out of context.  You've shortened the answer a little bit.  But, you know, if you're asking me did I ever make a comment to a witness trying to keep them as a witness, the answer would be yes.

Q.    And -- and how does that relate to the fact that there's no Switzerland?

A.    Uh, I believe I told at least one of the inmates, and I'm going to paraphrase or just kind of guess, that, you know, there's the government's side, and then there's the AB.  There is no Switzerland.  You don't get to be neutral in this trial.

Q.    Meaning that either you testify as a witness for the prosecution or you face prosecution?

A.    Yes.

Q.    There's no in-between?

A.    That's right.

Q.    Now, we've heard some testimony by witnesses that if they lie, their government benefits are going to be cut off.

A.    Yes.

Q.    Is that accurate?

A.    Yeah, I think so, yes.

Q.    Well, specifically, there was a government witness by the name of Clifford Smith.  Do you recall that individual?

        MS. BLANCH:  Objection.  He's not a witness in this case.

        THE COURT:  The objection's sustained.

        MS. JACKS:  Well, he's a witness in this investigation.

        THE COURT:  The objection is sustained, Counsel.

        MS. JACKS:  I'd like to make an offer of proof at side bar.

        THE COURT:  The objection's sustained.

BY MS. JACKS:

Q.    Well, in connection with your investigation in this case, Agent Halualani, haven't you become aware of individuals that have committed perjury in death penalty cases?

        MS. BLANCH:  Objection.  Relevance.

        THE COURT:  The objection is sustained.

        MS. JACKS:  If I can have a moment?  I have one

further area of questioning, and then I'll be done.

Q.    You talked about seizing a scrapbook or a photo album I think that would be Exhibit . . .

A.    68.

Q.    Yes.  Is Exhibit -- have -- you've had a chance to look through Exhibit 68; is that right?

A.    Yes.

Q.    And is Exhibit 68 in the same condition it was when you seized it from -- or when it was seized from Mr. Scott's cell or have things been deleted from it?

A.    Things have been removed.

Q.    And specifically, who decided what to remove?

A.    I did.

Q.    And those things were returned to Mr. Scott's counsel at the time?

A.    Yes.

Q.    Okay.  And the things that you removed, specifically were those family pictures and family mementos, thing of that nature?

A.    Yeah, things that I didn't think were of much value.

Q.    And would you describe Exhibit 68 as a scrapbook?

A.    I was thinking it was more of a photo album, but I guess it's kinda semantics.

Q.    Okay.

          MS. JACKS:  Thank you, I have nothing further at

this time.

THE COURT:  Redirect.

MS. BLANCH:  Yes.

REDIRECT EXAMINATION

BY MS. BLANCH:

Q.    Mr. Halualani, when you talk about materials being given to inmates in the H Unit, what type of materials are you talking about?

A.    I provided two inmates with letters intercepted that were reviewed by the BOP and was said to have contained gang activity relative to the Arian Brotherhood Organization.

Q.    And why were you giving those inmates letters?

A.    Well, as much as we all like to profess the words experts and that we know something, at the end of the day, the expert's the actual gang member.  He knows what's going on.  He can put the letter in context.

It's like -- it's akin to a wiretap.  When they speak in codes, the only people that know those codes -- I mean, we all think we're good at finding them, but the only people that know those codes are the actual people who are in the organization.

If you work for Apple, and you're talking about Apple software, you don't -- you don't ask the guy from Intel what Apple's doing.  You ask the guy from Apple.  And that's what we did in this case.

Q.   Did you ever provide them with reports and investigative materials for them to memorize and discuss?

A.   No.

Q.   But were the letters that you were asking them to work on the only materials that you provided to them?

A.   Yes.

Q.   Regarding giving witnesses money, why do you do that?

A.   Well, we actually -- you know, how we put is I have handled this case no differently than I would handle an informant in the street.  I pay for their time, and I pay for their information.  Because their information is based on an old letter, it's still information, and it's still time.  It still takes them time to go through it and review the letters.  We don't pay for convictions.

You know, if you -- this is all about time.  If you were an informant on the streets, and I took you out to go buy a machine gun, and it didn't go, because you hung out with me for 2 hours and the machine gun deal didn't go doesn't mean you don't get paid.  We pay for time.

Q.   When you discussed a Rule 35 with some of the witnesses in this case, were you promising them that?

A.   No.

Q.   Do you even have the authority to promise them that?

A.   No, it's outside of my purview.

Q.   What was the context of your discussions?

A.    Um, in terms of Mr. Bentley and Mr. Bernard, they said they wanted a Rule 35, and I basically said, not my call.  I said, you know, I don't make those decisions, but, in fact, I am happy to tell whoever you would like me to tell that you've cooperated.  Whether it's your mother, your father, your uncle, your attorney or the government, we tell everyone who you want us to tell, but we offer no recommendations as to whether you should get out or whether you shouldn't get out.  It's not our job.

MS. BLANCH:  Thank you.

I have no further questions, Your Honor.

THE COURT:  Recross?

MS. JACKS:  Nothing further.

THE COURT:  You may step down.

Call your next witness.

MS. BLANCH:  Government calls Leslie Smith, Your Honor.

THE CLERK:  Please come forward.  Please be seated.

Please raise your right hand.

(Witness sworn.)

THE CLERK:  For the record, sir, would you please state your full name and spell your last name?

THE WITNESS:  Excuse me.  My name's Leslie Smith, S-m-i-t-h.

DIRECT EXAMINATION

BY MS. BLANCH:

Q.    Mr. Smith, where are you employed?

A.    I'm employed by the Bureau of Prisons.  I'm currently the Chief of the Counter Terrorist Unit.

Q.    And how long have you been employed by the Bureau of Prisons?

A.    This December will give me 17 years.

Q.    Did you spend any time working at the ADX?

A.    Yes, ma'am, approximately 10 years.

Q.    And in what capacity?

A.    I first went over there in 1995 as a Lieutenant.  And in 2002, I was promoted to a Special Investigative Agent.  I held that position till March of 2005.

Q.    What is a special investigative agent?

A.    Basically in charge of the special investigative supervisory's office.  I'm the supervisor.  I'm responsible for investigations within the facility and gang intelligence.

Q.    In October of 2002, did you participate in some search warrants in connection with the ATF?

A.    Yes, I did.

Q.    And what was your role in that search warrant?

A.    I coordinated the visit of the ATF special agent who came down from Colorado Springs, and I supervised my staff. There was three of us.  The Bureau of Prisons assisted the

ATF conducting the search warrants.

Q.    And was -- well, let me ask it a different way.  Did you assist in conducting a search of Steve Scott's cell?

A.    Yes, we did.

Q.    And what did you do with the materials that were taken out of that cell?

A.    The materials were boxed.  We had two separate boxes that we were boxing.  One we considered non-legal.  Anything we considered legal or attorney/client privilege, we placed in a separate box.  Once we were completed with the search, we moved them upstairs to my office where we -- inventory would be non-legal, and we sealed it and turned everything over to the ATF agent.

Q.    Could you look in front of you --

        MS. BLANCH:  Or actually, could you please place Government's Exhibit 68 in front of the witness?

        THE CLERK:  68?  68 in evidence before the witness.

BY MS. BLANCH:

Q.    Do you recognize this?

A.    Yes.

Q.    Could you explain what that is?

A.    This is a photo album that was retrieved from Inmate Scott's cell.

Q.    And do you know Steve Scott?

A.    Yes, I do.

Q.   Could you point him out in the courtroom, please?

A.   He's the defendant sitting at the table.

THE COURT:   The record will indicate the witness has identified Defendant Steve Loren Scott.

BY MS. BLANCH:

Q.   Could you turn to Exhibit 69?

A.   69?

Q.   69 in the book.

A.   Which book, ma'am?  I'm sorry.

Q.   Yeah, one of -- one of those binders in front of you has Exhibit 69.

A.   Okay.

Q.   Could you look at that?

A.   Pardon?

Q.   Could you look at that for me, please?

A.   Yes.

Q.   Do you recognize that?

A.   Yes.

Q.   What is that?

A.   These are photocopies of the original photo album taken from Mr. Scott's cell.

Q.   Photocopies of Government's Exhibit 68, the photo album in front of you?

A.   That's correct.

Q.   And have you seen Government's Exhibit 69 before?

A.    Yes.

Q.    What's different about Government's Exhibit 69 and the original photo album?

A.    Well, again, these are photocopies of the original documents, pictures and so forth that are actually in the photo album itself.

Q.    Have you actually made notations on the photocopies?

A.    Yes, I did.

Q.    Why did you make notations on the photocopies?

A.    The search warrant required to -- we were looking for items that showed any association with the Arian Brotherhood. And the notations I made on this would be identifications of inmates known -- inmates who are known to be associated with the Arian Brotherhood and/or symbolisms that the Arian Brotherhood members use.

Q.    And did you take out the pictures from the photocopies that had nothing to do with the Arian Brotherhood in your opinion?

A.    That's correct.

Q.    And the rest, what's here, you labeled?

A.    What's left is what I labeled.

        MS. BLANCH:    Your Honor, I offer Government's Exhibit 69.

        THE COURT:    69?

        MS. BLANCH:    Yes, Your Honor.

THE COURT: I thought he had 68.

MS. BLANCH: 68 is the original, Your Honor. 69 are the photocopies which he has labeled.

THE COURT: 69 is in evidence.

(Exhibit 69 admitted.)

BY MS. BLANCH:

Q. Mr. Smith, I'm gonna show you the first page inside that photo album. What is that?

A. It appears to be a drawing -- drawing of a cloverleaf which is closely associated with the Arian Brotherhood.

Q. And the next page, and I'm going to zoom in on this photograph, who is depicted in this photograph?

A. In the top, top center is an inmate named Wayne Bridgewater. The top right is the defendant himself. The bottom center is Inmate TD Bingham, a known member of the Arian Brotherhood. And the one to the left bottom is Mark Niquist.

Q. And do these individuals have anything in common?

A. All four are known members of the Arian Brotherhood.

Q. And this photograph?

A. That's TD Bingham.

Q. And on the back, there is a notation. What is that?

A. Scotty Woo give you . . . I'm trying to read it. Scotty Woo is Steve Scott's nickname. Give you one shot at the chance?

UNITED STATES DISTRICT COURT

Q.    Skipping a few pages, what is that?

A.    And this is a -- a drawing of -- probably pen and ink drawing of a Norse pretty common with their followings.  The members who follow usually draw these Norse symbols.  The hand band or wristband on right arm has the cloverleaf design.

Q.    On the same page, who is this depicted?

A.    That's Inmate Scott Cupples, a known member of the Arian Brotherhood.

Q.    And this?

A.    That's Russ Semus, a known member of the Arian Brotherhood.

Q.    I'm gonna show you the back of one of the photographs here.  This blue wolf and a symbol, what is that symbol?

A.    The symbol is a cloverleaf, a known symbol utilized by members of the Arian Brotherhood.

Q.    Who is that depicted?

A.    That's Ronald Slocum.

Q.    Whose that?

A.    He's a known member of an Arian Brotherhood that lived in California.  He became known as a mail drop, our communication link for inmates incarcerated -- inmates incarcerated in the California Department of Corrections, the federal prisons and inmates on the street, former inmates who have been released.

Q.    And skipping a number of pages, I'm now showing you this one.  Whose is this?

A.    That is Barry Merrills considered to be the Commissioner of the Arian Brotherhood.

Q.    In your experience, does having a photograph like this in a photo album mean anything in prison?

A.    Definitely.  This is a calling card.  You don't -- the inmates would not be in possession of these photos unless an inmate actually gave it to them.

Q.    And this drawing, what does this depict?

A.    It's pen and ink.  If you look at it, you'll have the three, lack of better words, leaves of a cloverleaf.

Q.    Is that where I'm pointing?

A.    That's correct.  You're drawing the outline.

Q.    And viewing this card, what's significant about this card?

A.    Well, two things.  Excuse me.  The significance of the green and the cloverleaves.

Q.    What's significant about the green?

A.    The green historically is the color used by the Arian Brotherhood.  It symbolizes the Irish heritage and the green leaf clover.

Q.    And this photograph here, you've labeled Scott here. Whose that?

A.    That's the defendant, Steve Scott.

Q.   And who is this individual here?

A.   That's Solis, Robus Solis, a known member of the Mexican Mafia.

Q.   In your experience, what's the relationship between the Arian Brotherhood and the Mexican Mafia?

A.   They've been known to associate in business dealings, narcotics trafficking, weapons, so forth, illegal activities within the prison system itself.  It's the one gang or one prison gang that they're most closely associated with.

Q.   And on the same page, there's another photograph above you've labeled Versino and Solis.  Who are they?

A.   It's the same name, Robus Solis.  Rodney Versino is also -- both are known members of the Mexican Mafia.

Q.   And also on the same page, who's that?

A.   That's Manuel Jackson nicknamed Cricket, a known member of the Mexican Mafia.

Q.   Can I ask you to turn to Government's Exhibit 70, please?  It's the address book.  Have you had a chance to look through this address book?

A.   Yes.

Q.   And are there -- is there anything significant about Mr. Scott's address book?

A.   Well, first of all, when you first open it up, there's a green leaf clover on the inside which appears to be a sticker stuck to it which again would signify Arian Brotherhood.

Q.    Is that what I'm putting to on the monitor here?

A.    That's correct, ma'am.

Q.    And is there anything significant about the entries?

A.    As you look through them, it identifies quite a few members, known members of the Arian Brotherhood.

Q.    I'm just going to show you this one page on the monitor from that.  There is a list here of individuals.  Is there anything particularly significant about this list of people?

A.    Well, some of them are recognized names as being members of the Arian Brotherhood.  You have TD?  You have Chris G, Christopher Gibson.  Uh, you just have different names or nicknames of people that are known members of the Arian Brotherhood.

Q.    Could you turn please to Government's Exhibit 72?  Do you recognize that?

A.    Yes.  This is an inmate -- information about the information telephone system in use within the Bureau of Prisons.

Q.    And what's the point of something like this?

A.    This is a guide that was provided to the inmates that basically tells them how to use the inmate telephone itself, how to make deposits to telephone accounts, request number changes, their pins or personal identification numbers.

Q.    And is there a place on it to keep telephone numbers?

A.    Yes.  There's a place in there that the inmates can

UNITED STATES DISTRICT COURT

write down their telephone numbers that they would like to have added to their authorized telephone list.

Q.   I'm gonna show you the people on that list.  Who on this list in your experience is a member or affiliate of the Arian Brotherhood?

A.   The people that I'm aware of on this list would be considered associates of Arian Brotherhood would be Dorothy Scott, Deborah Pool, Cathy Owen.  And the reason I say that is they're known to receive and pass messages for the Arian Brotherhood.

Q.   Can you turn to Exhibit 74, please?  What is this?

A.   This is copies of a piece of paper we retrieved from Inmate Scott's cell.

Q.   And what is it specifically?  What's the subject matter?

A.   Talk about a chair, a dance, a ball, a gift, a husband, a share, a smile, a grin.  To me, this was the hand signs or hand signals, how they were using these to -- inmates signing back and forth.

Q.   So there are sign language instructions?

A.   Basically yes, that's correct.

Q.   In your experience, does the Arian Brotherhood use sign language to communicate?

A.   Yes, they do quite a bit.

Q.   Could you turn to Government's Exhibit 75, please?  It's already in evidence.  On the letter, the return address says

Valerie Mayberry.  Is that letter actually from Valerie Mayberry?

A.  No, it's not.  She's just the one that forwarded it on to Inmate Scott.

Q.  Who's it from?

A.  Uh, if you look at the letter itself, it's signed L and R, love and respects, Ronnie.  That's Ronnie Endel, a known member of the Arian Brotherhood.

Q.  Is there anything particularly significant about L and R?

A.  L and R, love and respect.  It's used quite a bit by the Arian Brotherhood.  Another symbol.

Q.  And can you turn to Government's Exhibit 76, please?  Who is this a card from?  It says to Scotty.  Who is it from?

A.  It's from Ronnie Endel, Ronald Endel, a known member of the Arian Brotherhood.

Q.  It's says love, loyalty and respect to my last breath.  What does that mean in your experience?

A.  Basically, it's showing his affiliation, his love of the inmate.  And again, it has the L and R, love and respect.

Q.  And glued to it, there is a small piece of what looks to be from a newsprint.

A.  Correct.

Q.  What is that?

A.  It references Norman Matthews, another known member of

the Arian Brotherhood.

Q.   And finally, can you turn to Exhibit 77, please?

A.   Yes, ma'am.

Q.   Who has signed this Christmas card?

A.   This is signed by several different inmates.

Q.   Here it's signed Wheez.  Whose is Wheez?

A.   I believing that's Weasel.  Um, I'm not sure.  I'm believing that's Weasel Smythe.

Q.   And what's that symbol?

A.   It's the shamrock symbol.

Q.   And below it?

A.   Dallas.  I believe that's Dallas Scott.  And again, it's L and R, love and respect, and then the cloverleaf, also. Shamrock.

Q.   And it's signed Donnie or Danny?

A.   Danny.  I believe it's Danny.

Q.   And who is that?

A.   I'm thinking it's Danny Weeks.

Q.   A member of the Arian Brotherhood?

A.   Correct.

Q.   In prison, in your experience, is it significant who signs something like this, who signs your Christmas card?

A.   Yes.  Typically, all of the known members of the Arian Brotherhood if it's going to a known member.  The one that helps us identify somebody was if we have an inmate who we

believe is suspect, if all of a sudden, they start signing their card, that's significant, and that shows their membership.

Q.   Moving on to a different topic, did you ever -- in dealing with members of the Arian Brotherhood who had dropped out, did you ever receive information about where they were hiding weapons?

A.   Yes.

Q.   Did you ever receive information that they were hiding weapons up in the ceiling in the rec cage?

A.   Yes, I did.  At the ADX.

Q.   And in response to that information, did you do anything?

A.   We conducted a search, yes.

Q.   Where you did you search?

A.   Well, we actually searched the interior of the recreation rooms.  Obviously the ceiling are exceptionally high so we had to utilize staff from mechanical surfaces to come in with a lift.  They were able to lift us up towards the ceiling.

Q.   Could you look at Government's Exhibit 113?

A.   Yes, ma'am.

Q.   Do you recognize these?

A.   Yes.  These are pictures of a place we discovered in the ceiling and one of the -- I believe it was the F Unit if I'm

not mistaken, but it was in the ADX, one of the interior recreation rooms where the inmates went to recreation.

Q. And what was found in the ceiling?

A. Oh, we found all kinds of things. We basically discovered once we got up there, it was in the corner, one corner of it, they had basically dug a hole and patched it back up and tried to match the paint as to where staff's standing down looking up would have a hard distinguishing that they had actually cut out a hiding place.

Quite a few items were pulled out. Most of it appeared to be from a pair of glasses, the arms, the metal from a pair of glasses.

Q. And is that what's depicted in Exhibit 113, the whole in the ceiling and the things that were pulled out?

A. Yes. Hole in the ceiling. You had the weapons made out of pins.

MS. BLANCH: Your Honor, I offer Government's Exhibit 113.

THE COURT: Any objection?

MS. JACKS: I just object to the lack of foundation as to the date these items were found.

THE COURT: 113 is in evidence.

(Exhibit 113 admitted.)

BY MS. BLANCH:

Q. Do you recall approximately when the hole in the ceiling

was discovered?

A.    I'm going to say late 2003, 2004.

Q.    Now, we were talking about the indoor rec cage?

A.    Correct.

Q.    How many stories high is it?

A.    I would say at least two.  Yes, two.

Q.    I'm gonna show you the first picture.  Is that looking outside the window in the rec cage?

A.    Yes.  That's the top.  That picture is you're standing up top, and you had to use a man lift to get up that tall or that high.  We have windows up there to give us the sunlight obviously for the interior recreation room.  There are bars.  Those are security bars.  What you see on the outside is the roof of the building.

Q.    And what's this photograph we're looking at here?

A.    That's the actual hiding place for lack of better words where they had cut out and secreted their contraband in the ceiling.  Obviously, that's the hand of a facilities foreman who's pulling it back and another staff member taking a photo.

Q.    Was there more than one hole in the ceiling?

A.    Yes, there were, but for this specific location, I believe that was it.

Q.    And what is this?

A.    That's the actual -- if you're looking up at it in the

man lift, you're looking up that where I said they tried to -- once they took it -- once they created their hole, they tried patching it. That bar you see going across is your -- actually a sprinkler, fire safety, life safety equipment. So it's above it on the ceiling.

Q.   So this section that I'm pointing to here, that's the ceiling?

A.   I'm sorry?

Q.   This section that I'm pointing to here is the ceiling?

A.   Yes, ma'am.

Q.   And these two are walls?

A.   Exterior -- no, interior walls, yes.

Q.   Is that the same view but with the hole taken off?

A.   That's correct.

Q.   Is this how they managed to patch the ceiling up?

A.   Yes.  To hold it in place.

Q.   How difficult would it be for an inmate in the rec cage to get all the way up to that ceiling?

A.   They'd have to climb up using those -- the first picture looking out, you saw those bars?  There's other pictures -- or, excuse me, the bars below that -- and again, that's at the top, below that, there's another window.  They would use those bars to climb up.

        MS. BLANCH:  I have no further questions, Your Honor.

THE COURT:  Cross-examination.

MS. JACKS:  Thank you.

CROSS-EXAMINATION

BY MS. JACKS:

Q.    Good morning, Mr. Smith.

A.    Good morning, ma'am.

Q.    I want to ask you a couple questions about the exhibits that Ms. Blanch just went through with you so if you'll bear with me.  If you could turn to Exhibit 70-A.

A.    70-A?

Q.    Right.  That's the address book you were talking about. Specifically, I want to show you this page which you were asked some questions about earlier.  You may find it easier, Mr. Smith, to look at the monitor instead of the whole exhibit, I don't know.  You said you recognize the names of some Arian Brotherhood members or associates on that list?

A.    I recognize nicknames.

Q.    Okay.  Would you agree with me that that appears to be a list of people's birthdays?

A.    Correct.

Q.    And that the list includes people that the Bureau of Prisons says are in this Arian Brotherhood and other people as well; right?

A.    That's correct.

Q.    I want to show you a page of Exhibit 72, the phone list.

Have you found that exhibit?

A.    Yes.

Q.    Now, the significance in this list is that an inmate in order to call somebody has to get approval from the ADX to call them; right?

A.    That is correct.

Q.    So Mr. Scott is an inmate at the ADX, and when he gets that phone call, he just can't pick up and dial any number?

A.    That's correct.

Q.    He has to call somebody whose number is on his approved list?

A.    That's correct.

Q.    Can you tell me who Dorothy Scott?

A.    A known drop for the Arian Brotherhood.

Q.    Would that be Steve Scott's mother?

A.    I believe so.

Q.    Deborah Pool?  Do you know her relationship to Mr. Scott?

A.    Not that I recall.

Q.    Would that be his common law wife?

A.    It could be.  I just don't recall.  I just recognize the name.

Q.    What about Carol Bates?  Do you recognize that name as being the name of Mr. Scott's sister?

A.    No, I don't.

THE COURT:  Again, ladies and gentlemen of the jury, the questions of counsel are not evidence.  The facts that you are to consider is the answer of the witness as your evidence in this case.

BY MS. JACKS:

Q.    What about Trisha Hebini?

A.    I don't recognize the name.

Q.    Do you know whether that's a friend of Mr. Scott's from the early '80s?

A.    No, I don't.

Q.    What about Brian Conway?  Do you recognize that name as an attorney from Portland?

A.    No, I do not.

Q.    What about Allan Ellis?

A.    No, I do not.

Q.    Do you know the relationship of any of these individuals on this list to Mr. Scott other than the ones you already told us about?

A.    There are three names.  Dorothy Scott, Deborah Pool and Kathy Owen I know are names associated with communication links for various members of the Arian Brotherhood.

Q.    But you don't the relationship of these individuals to Mr. Scott?

A.    Some of them I might.  Some of them I don't recall.

Q.    And, for example, Mr. Scott's mother could be considered

a communication link to the Arian Brotherhood if somebody sent her a letter, and she tried to mail that to Mr. Scott?

A.    That's be correct.

Q.    I want to ask you just a couple questions about Exhibit 113.  That's the exhibit that has photographs from the hole in the recreation cage.

A.    Yes, ma'am.

Q.    I'm just gonna put up one of them, I don't think it really matters.  First of all, you testified you became aware of this stash of weapons up in the recreation cage in late 2003 or early 2004?

A.    Well, I don't recall this specific one.  I do know we've had others over the years.

Q.    Well, I'm just asking you about this one.  I think Ms. Blanch asked you when you became aware of this particular hole.

A.    If it's the one I believe it is, it would be late 2003, early 2004.

Q.    Okay.  And at that time, Mr. Scott was not an inmate at the United States Penitentiary Florence, Colorado ADX, was he?

A.    Not to my knowledge, no.

Q.    In fact, he was here in Los Angeles fighting this case?

A.    The indictment came out -- I don't recall when he was actually moved from ADX to California, but he did depart,

yes.

Q.    Okay.

MS. JACKS:  Your Honor, I think one of the exhibits is Mr. Scott's inmate housing quarters.  Exhibit 151.  Those haven't been admitted.  I ask they be admitted right now.

MS. BLANCH:  No objection.

THE CLERK:  151 is already in evidence.

BY MS. JACKS:

Q.    And is there some reason, Mr. Smith, that you associate this hole with something that occurred or finding this hole in the recreation cage in late 2003 or early 2004?

A.    If that's the one I recall, the location was given to me by an informant inmate.

Q.    You're talking about Scott Cupples?

A.    Yes.

Q.    So you spoke with Mr. Cupples after he made some sort of agreement to become a government witness in this case?

A.    No.  When I first started talking to him, we had not talked to any outside case agents.

Q.    Did Mr. Cupples give you -- tell you there's weapons hidden in this recreation cage?

A.    If remember correctly, yes, he gave me this location.

Q.    And did he say that he had actually placed some weapons up in this hole?

A.    I don't remember that, ma'am.

Q.   It looks to me, Mr. Smith, like the -- the hole is covered with some sort of newspaper?

A.   Yes.

Q.   What are the dates of those newspapers?

A.   I do not recall, ma'am.

Q.   Did you make any effort to figure that out?

A.   No, ma'am.

MS. JACKS:   I have nothing further at this time.

THE COURT:   Redirect?

MS. BLANCH:   No, Your Honor.

THE COURT:   You may step down.

We'll take our morning recess at this time.

Members of the jury, I would remind you not to converse or otherwise communicate among yourselves or with anyone on any subject touching the merits of the cause in the trial.  You're not to form or express any opinion of the case until it's finally submitted to you for your verdict.  The jury is excused.  The court will remain in session.

(Jury not present.)

THE COURT:   10 minutes.

THE CLERK:   This court stands in recess for 10 minutes.

(Recess taken.)

THE COURT:   Bring down the jury.

Swear the witness.

THE CLERK:  Please raise your right hand.

(Witness sworn.)

(Jury present.)

THE COURT:  The record will show that all jurors are in their proper places, the defendant is present with counsel.

Call your next witness.

MS. BLANCH:  Government calls Scott Cupples.

THE CLERK:  Having been already sworn, would you please state your full name and spell your last name, sir?

THE WITNESS:  Scott Lee Cupples, C-u-p-p-l-e-s.

DIRECT EXAMINATION

BY MS. BLANCH:

Q.   Mr. Cupples, are you familiar with the Arian Brotherhood?

A.   Yes, I am.

Q.   How are you familiar with them?

A.   I was a member of the Arian Brotherhood.

Q.   From when to when?

A.   From approximately 1997 to 2003.

Q.   Does that mean you're an inmate now?

A.   Yes.

Q.   Serving what sentence?

A.   Uh, Iowa State time.  65 years Iowa State time.

Q.   How many felonies do you have?

A.   Numerous.  Probably -- probably about ten.

Q.   State and federal?

A.   Yes.

Q.   How much time do you have left on your current sentence?

A.   I've done 15 years on 65.

Q.   How did you become familiar with the Arian Brotherhood?

A.   In 1997, I was transferred from Iowa State Penitentiary to ADX in Florence, Colorado which is a federal super max. And while I was there, I met several members of the Arian Brotherhood, and eventually, I became a member myself.

Q.   Which members of the Arian Brotherhood did you meet at the ADX?

A.   Barry Mills, Steve Scott, TD Bingham, Chris Gibson. Many.

Q.   You said Steve Scott.

A.   Yes.

Q.   Do you recognize him?

A.   Yes, I do.

Q.   Could you point him out?

A.   Right there.

        THE COURT:  The record will indicate that the witness has identified the defendant, Steven Loren Scott.

BY MS. BLANCH:

Q.   How did you first become familiar with the Arian Brotherhood?

A.    I was in a fight in the cages in ADX, and that's -- are you talking about -- are you referring to when I got into it or when I first met an Arian Brotherhood member period?

Q.    When you first got into it.

A.    Okay.  As a result of a fight, I was sent to the hole. And when I was in the hole, Barry Mills began to talk to me through the pipe, through the toilet pipe about becoming a member.

Q.    Do you know why he was interested in you becoming a member of the Arian Brotherhood?

A.    Because of the outcome of the fight that I had.  I did fairly well, and they were -- Barry specifically was impressed with the results of the fight, and he wanted to sign me up.

Q.    And what was your reaction?

A.    At first -- for the first 2 months, he was just telling me about it, but I definitely wanted to be a part of it.

Q.    Why?

A.    Because you got to understand, it was a really hostile environment at that time.  The guys I had got into fight with on that tier, they're talking about killing me.  They're, you know, yelling out on the tier about killing me.  So I had them talking about moving on me.  And on the other side, I had the AB, you know, talking about protecting me, and they started sending me property, clothes, food, everything.  So

it was kind of a no brainer for me at that time.

Q.    When you were thinking about joining the Arian Brotherhood, did you know what that meant?

A.    No.  I mean not -- not -- not -- totally.  I knew that it meant that you were joining a gang, but to be honest, I thought joining the Arian Brotherhood would be an end of having, you know -- it's a pretty threatening existence when you live in a hostile environment like that.  You think that when you join a gang like that, you have a certain amount of protection.  What you don't realize at the beginning is that you're signing on to be a soldier, and now you're going to be at war.  Constantly.  Period.  I mean all the time.

So, you know, to that extent, I didn't understand what I was getting into.  I thought I was getting into a safe -- you know, I thought I was, you know, creating a degree of safety for myself, but that wasn't the case.

Q.    When you first met Barry Mills in the hole, did he tell you why he was in the hole?

A.    Yes.

Q.    Why?

A.    He told me that at that point -- the first time I met Barry was when I first got there.  He told me he was in there for cutting a piece of metal off of his knife -- off of his light to make a knife with.

Q.    And did he ever tell you what he was planning to do with

that knife?

A.   He didn't tell me specifically, but what he said was that they were at war on the war footing, and you had to stay on point, and that he was over there for cutting a knife out of his light.  So I assumed that that's what he was arming himself for.

Q.   Did he tell you who they were at war with?

A.   Yeah.  The D.C. Blacks.

Q.   As a member of the Arian Brotherhood, did you become more familiar with its policies and practices?

A.   Yes.

Q.   What are you expected to do as a member of the Arian Brotherhood?

A.   Exactly what you're told.

Q.   Told by whom?

A.   By your counselors or the commission.

Q.   And what sorts of things are you told?

A.   For instance, you may be given a list of names of people who are in the hat or an enemy's list, and you're told to move on them on sight.  And you may be told to cut metal at all hours of the day.  You may be told to send a message or to receive a message through somebody else.  That's some of the things you would be told to do.

Q.   And what would happen if you disobeyed?

A.   Well, if you disobeyed an order -- if they told you it's

a direct order, and you disobeyed, you're going to get killed.

Q.    You ever heard the term let in, let out?

A.    Yes.

Q.    What does that mean?

A.    It means when you -- you got to spill blood to get into the AB, and they're gonna spill your blood to get out.  In other words, the only way out of the AB is through death.

Q.    Did you have to comply with the blood in part?

A.    Not -- not to the degree that other guys had to, but they -- they chalked up a fights my -- a couple of fights that I had as -- as to the blood in part, I suppose.

Q.    Did you have to go through any sort of probationary period?

A.    Yes, I did.

Q.    How long was that?

A.    For me, it was very fast because we were at war -- they were at war, and they needed young guys to fight, but for me, it was only like between 2 and 4 months.

Q.    And is that an accelerated membership program?

A.    Very accelerated.

Q.    Why did they need new members?

A.    They had gone to war with a gang that's probably 3,000 plus members.  There was only probably about 15 to 20 of them at the time in this prison.  It's very difficult to have

knives and stuff there unless you're making them. It's very difficult to make a knife. So what they were really wanting was young guys that could fight well, and that's basically why I was on the accelerated program as you put it.

Q. Do you know an inmate named Jesse Van Meter?

A. Yes, I do.

Q. Was he a member of the Arian Brotherhood?

A. Yes.

Q. Do you know an inmate named Wordel Hillard?

A. Yes.

Q. Who's he?

A. He was a D.C. Black.

Q. Do you know anything about a fight between Jesse Van Meter and Wordel Hillard on November 12th, 1997?

A. Yes, I do.

Q. What do you know about it?

A. Jesse originally had attacked by a lot of the D.C. Blacks in Marion. So when he got to the ADX, they put him on a tier with a bunch of DCs, and he knew that when he got into the cage that they would try and kill him. He asked me if I had a knife.

I had a knife, and I hid it in the dip bar, the dip rack in the exercise cage. He was able to come down to exercise, retrieve the knife and go out into the cage the following day. And by luck, he was the first one out into

the cage.  And the next person out was Hillard, and he stabbed Hillard I believe several times.

Q.    Was that part of the Arian Brotherhood D.C. Black War?

A.    Yes.

Q.    Did you ever have any conversations with the defendant, Steve Scott, about the war between the Arian Brotherhood and the D.C. Blacks?

A.    Yes, I did.

Q.    Where were you when you had those conversations?

A.    In the hole, originally.

Q.    At the ADX?

A.    Yes.

Q.    And what did he have to say about that war?

A.    I think I met Scott after I had already been made a member.  I got put on his tier eventually.  And he gave me a list of names because I told him I had a concern that I didn't know who these D.C. guys were.  There's a lot of Blacks there, but that doesn't necessarily mean they're from D.C.  And I was having worries that when I got into a cage, I didn't want to stab the wrong person or get stabbed by someone who I didn't realize was D.C. so he'd made a list for me of the D.C.s that he were we were moving on.

And he was a counselor so he basically laid down their rules.  And he also helped me along the way because I had gotten into a couple of wrecks with some of the other

Brothers, and he would smooth things out, and he would talk to me about how I was supposed to act with the other guys and what was expected of me when I got in the cage and stuff.

Q.    When he gave you a list of D.C. Blacks, is that just a list of people to be afraid of or a list of people you're supposed to move on?

A.    No.  That means that everybody on that list is in the hat meaning that everyone -- the AB doesn't really have lesser penalties than death.  I mean, if you're on a list with the AB, you're slated for death.  Period.

Q.    Could you turn in the book in front of you to Government's Exhibit 6, please?

A.    Yes.

Q.    Do you recognize that?

A.    Yes.

Q.    What is that?

A.    A list of people who were in the hat.

Q.    In the hat with the Arian Brotherhood?

A.    Exactly.

Q.    Is Wordel Hillard on that list?

A.    Let me look.  I don't see it.

Q.    All right.  We'll move on from that exhibit.  Did you ever have any conversations with Steve Scott about killing anyone else?

A.    Uh, yes.  I remember one particular.

Q.    Who was that?

A.    It was a black they called New York or Wakeel.

Q.    And what was the substance of that conversation?

A.    The Arian Brotherhood had gotten word that John Gotti was gonna pay for a hit on this guy, and everyone was really excited about it because of the money it would bring into the funds.  And so he talked to me as well as other members talked to me specifically about making him a priority target.

Q.    Do you know why John Gotti was paying money to have Wakeel killed?

A.    They said that he had been assaulted in Marion by this guy, and that John was pretty mad about it and wanted the guy killed.

Q.    And what was the substance of your conversation with Steve Scott about killing Wakeel on behalf of John Gotti?

A.    Steve told me to make polish the rock, in other words, make the AB, you know, proud, make us shine and make this guy my priority.  And that I was, you know, in better shape than some of the older guys that were in the core, and that he wanted to make sure that I made an effort to try and get this guy if the opportunity arose.

Q.    And did he tell you that in his capacity as your counselor?

A.    Yes.

Q.    Explain what that means.  If he's your counselor, what

does that mean in terms of the Arian Brotherhood?

A.    There's really only three ranks, soldier, counselor and commissioner member.  And Scotty who we called him Scotty who was Scotty who was a counselor.  A counselor would be kind of equivalent to being a lieutenant in the army or in the armed forces.  When a counselor is on the range, the most senior counselor is in charge of that range unless he defers to one of the other counselors.  He's in charge of daily operations. Whether it'd be working out, whether it'd be making weapons or communications or anything that goes on with those brothers that are in that immediate area, he's in charge of it.

Q.    Did there come a time when you were transferred to Springfield?

A.    Yes.

Q.    What is Springfield?

A.    Springfield is a federal prison hospital.

Q.    And were there members of the Arian Brotherhood on your tier there?

A.    Yes.

Q.    Who?

A.    When I first got there, Timmy Rubel was on my tier, a guy who was trying to become an Arian Brotherhood named Tiny, and I can't remember his name, and then when I got down to the hole, Steve Scott was on my tier.

Q.    Did you ever have any conversations with Steve Scott while you were at Springfield about the war between the Arian Brotherhood and the D.C. Blacks?

A.    Yes.

Q.    When was the substance of that conversation?

A.    The substance was that there were several targets, D.C. Blacks and a couple of dropouts from the AB or people that the AB wanted to get out if they were dropouts, but they were white guys, and he wanted us to make a -- me and him together make a concerted effort to kill these guys.

Q.    Do you know an inmate by the name of Irving Bond?

A.    Yes.

Q.    Who is he?

A.    He's a D.C. Black.

Q.    Was he on your tier --

A.    Yes.

Q.    -- at Springfield?

A.    Yes, he was.

Q.    Was that in November of 2000?

A.    Yes, it was.

Q.    How did you find out that Irving Bond on was your tier?

A.    Scotty already thought the guy was a D.C. Black, but John Gotti came down to the hole to exercise.  He was actually on a different ward, on the cancer ward, but because he was a Max inmate, they would bring him down to exercise.

While he was down there, he told Tiny through sign language through the window that we had a target on our range, and he was specifically referring to Bonds.  The message got around to Scotty, and that's how Scotty told me that we had a target right on our range, and he believed that there was another one around the corner.

Q.   Did you ever have a chance to confirm that conversation with Gotti?

A.   As John Gotti walked by my cell, I asked him -- I gave the sign for Black because in sign language, we had a sign for Black, and then I put up my finger for Cell 1, and he nodded his head yes.

Q.   Once you would confirmed that there was a D.C. Black inmate on your tier, what conversations, if any, did you have with Steve Scott about that?

A.   Steve Scott outside in the rec cage told me that he had put a piece of metal in the law library or I don't know if he said he put it there, but that there was arsenal, an A-- we -- they were creating an AB arsenal inside the law library, and that he wanted me to go retrieve one of the pieces of metal and to make knives with it so that we could move on this guy.  That's when I basically found out what we were gonna do.

Q.   And what was the plan?  How -- how were you going to get to Irving Bond?

A.    At this time, there was a guard named Henry, and Henry was a good size, kind of a bullish kind of guard.  And he started making the mistake of unlocking my door without me being in handcuffs and then putting handcuffs on me which is never, never done.  And Scott had recognized that this was a good chance to do what -- the plan that he had which was he wanted me to take the knife and stab Henry, take the keys, go down, unlock Steve Scott's cell door.

And then at the beginning of the range, there's a closet with a body armor and stuff in it for the guards when they run in the cell, and there are helmet and shields and things of that nature.  He wanted to suit up, and then we were gonna go from cell and cell and kill the people that -- the D.C. Blacks and a couple of dropouts.  Randy Gomez is one of 'em.  I don't remember who else was up there, though, but there was several people he wanted to kill.

Q.    What was your reaction to that plan?

A.    Oh, I was scared.  I told him -- and I started making excuses.  I told him, no, we can't do that because Barry Mills has told me not to put my hands on any more guards because it reflects on if I do something to a guard here, the brothers in every other institution would have suffered from it.  They would have been, you know, locked down or had property taken or had heat put on 'em.

And one of the first things that Barry Mills ever

told me was don't touch an officer unless it's absolutely necessary. So I used that as an excuse to tell Scotty, look, we don't -- I don't want to do this, we can't do this because Barry told me not to do this.

Q.   Did he agree to change the plan?

A.   Yes, he did.

Q.   What was the new plan?

A.   The new plan was I told Scotty, I said, let me make some cuff slips, and when we go to rec, I'll move on him then. We'll just both of us come out of our handcuffs and move on him on our way to rec. And so he went for that. That's -- that's what he wanted to do.

Q.   Had you made the knives by them?

A.   Yes.

Q.   How many knives did you make?

A.   I made two.

Q.   Could you describe what they looked like?

A.   Uh, the metal itself was a long -- the width of a typewriter, and that's the length of the bar, and it was very narrow gauged, but it was really strong black steel. I broke it in half, put points on 'em. I took paper to make the handles and rolled the paper around the handles until they were fat enough to get your hand around 'em. And then I took some strips of sheet, I may have bladed the sheet, and wrapped 'em around my handles so that they wouldn't be

slippery if there was blood on 'em.

Q.    And once you made those knives, what did you do with them?

A.    I gave one to Scotty, and I kept one.

Q.    Did there come a time when you gave him the other knife?

A.    Yes.

Q.    Why?

A.    Uh, I was getting ready to leave.  They told me -- they said I was done there for my medical procedure, and that I would be leaving.  And the thing is once they tell you that, you never know when you're going.  It could have been that day, the next day or whatever.  And you're worried about losing that knife and me getting caught with it so I gave it back to Scotty.

        MS. BLANCH:  Can I ask that the witness be shown Government's Exhibit 19 and 20?  Just hold them up and show it to him.

        THE CLERK:  That's 19 and 20.

        MS. BLANCH:  Okay.

Q.    Do you recognize those?

A.    Yes.

Q.    What are they?

A.    They're the knives that I made.  They're broken down now, though.

Q.    What do you mean by broken down?

A.    They're not in the form that I manufactured them. They're just taken apart.

Q.    And are those the knives that you gave to Steve Scott --

A.    Yes.

Q.    -- to kill Irving Bond?

A.    Yes.

Q.    Do you know whether Steve Scott ever tried to stab Irving Bond?

A.    Yes, he did.

Q.    Were you present on the tier at the time?

A.    Kind of.  I was in the shower off to the side of the tier in an open shower.  And by open, I mean that it had screen fencing so it wasn't like I was in a closed cell.  I didn't -- I couldn't see the altercation, but I could hear it.  It was only like maybe 8 feet away from where I was at.

Q.    You couldn't see what happened?

A.    No.

Q.    How do you know that that was Steve Scott stabbing Irving Bond?

A.    Because the guards were yelling for Scott to put down the knife and to lay down.

Q.    Did there come a point where you dropped out of the Arian Brotherhood?

A.    Yes.

Q.    Why?

A.    A lot of reasons, but, uh, primarily for political reasons.  And a second primary reason was probably cause I was just having a change -- I mean, I was -- I was growing up.  I was changing, but it coincided at the same time with, uh, political problems with inside the organization that I seen the writing on the wall and realized it was time to go.

Q.    What do you mean by political problems?

A.    Well, one faction -- within the AB, there's subgroups or there's political power bases that one guy -- these five guys may be backing this guy, and these twelve guys over here may be backing the other guy.

And what happened to me was my closest relationship was with the head of the AB, Barry Mills.  They got indicted, and they were taken out of the ADX.  So once they were removed, a different faction started to take over power. They had plans of taking over the AB.

And one of the first things they wanted to do was kick out every AB that wasn't from California because they thought that a lot of the problems they were having were with guys that weren't from the California system.  I'm from Iowa. And to be kicked out of the AB, there's only one way to get kicked out of the AB.  So I overheard this conversation on the pipe, and as a result of that, I decided to make a move.

Q.    And what did you do?

A.    Well, the first -- the first night I talked to another

brother named Ben Masters, and I told him that I had knife on the yard, and I tried him talk into killing the one guy that was -- that I overheard on the pipe talking about this.  And Ben didn't want to do that because he said that we needed a green light from the commission members who were in L.A. which is the very problem that I'm having.

So long story short, I just -- the next day, I just -- my only other option was to get out of the AB, and so I wrote a letter to the SIA and made an offer to them telling them I had information and asking them what could they do for me.

Q.    Were you still an active member of the Arian Brotherhood when Kevin Roach dropped?

A.    Kevin Roach . . .  look, I couldn't tell you because when I got brought into the AB was right in that time period. It may have been -- it could have even been a day before or a day after, but it could have been as long as 2 months before or maybe 2 months after, but it was right in that period when I got in the AB.  When we -- I was already considered one of the fellows.  If I wasn't an AB member yet, I was -- I was on probation to become one at that time when he dropped.

Q.    When was the reaction of the Arian Brotherhood at the ADX when Kevin Roach dropped?

A.    Oh, they were dumbfounded.  They were in total shock.

Q.    Was there any talk about what to do with him?

A.    Oh, kill him, yeah, but, you know, he was in the hat instantly as soon as he did that.

Q.    Did you ever have any conversations with Steve Scott about killing cooperators?

A.    Oh, yeah.  I mean, they were on the list, too.  Anybody that rolled over, uh, would be -- and when I say list, I don't necessarily mean one that's written down because we didn't always write these down.  They would say simply he's in the hat.  When we got confirmation that a guy was rolling over, it was just said that he was in the hat.  That's all that had to be said.  You would kill that guy on sight.

Q.    And as your counselor, did you ever have that conversation with Steve Scott?

A.    Sure.

Q.    Are you getting any benefits for testifying today?

A.    As far as money and paroles and stuff like that?  No.

Q.    What are you getting for testifying?

A.    Uh, nothing of nature like that, but I'll say this.  My cooperation when the parole board looks at it, I mean, I think it'll benefit -- it benefited me and things of that nature.  But as far as has anybody given me anything, no.

Q.    Are you also cooperating with the State of Iowa?

A.    Yes, I am.

Q.    In a case totally unrelated to this one?

A.    Yes.

Q.    And have you actually met with the Iowa Parole Board?

A.    Yes.

Q.    Have they given you a parole date?

A.    Yes.

Q.    Do you think that your cooperation in this case had anything to do with that?

A.    Oh, I think they definitely looked at it and seen that it was -- it was definitely an indication that I had changed. But as far as anything, you know -- at no time, no one said, look, you do this, you get a parole so if that's what you're asking, no.  But as far as the very act of me cooperating is definitely a positive sign to them that I've changed, that I'm not the same person.

Q.    Are you in the hat?

A.    Yes.

Q.    Are you being protected?

A.    Yes.

Q.    Do you consider that a benefit?

A.    Yes.

Q.    Are you in what's commonly known as the Witness Security Program?

A.    Yes, I am.

        MS. BLANCH:   No further questions, Your Honor.

        THE COURT:   Cross-examination.

        MS. JACKS:   Thank you.

CROSS-EXAMINATION

BY MS. JACKS:

Q.    Mr. Cupples, on April 6th of 1992, were you sentenced to 10 years in the State of Iowa for dealing drugs?

A.    No.  On April 10th of what year?

Q.    April 6, '92.

A.    Yes.

Q.    And on June 1st of 1992, were you sentenced to 25 years in the State of Iowa for an armed robbery?

A.    Yes, I was.

Q.    And on April 1st of 1994, were you sentenced to a 151 months for possession of a shotgun and a felon in possession of a weapon?

A.    Yes, I was.

Q.    Was that a federal sentence?

A.    Yes.  Both of those last two were federal.

Q.    The armed robbery and the 151 months for possession of a shotgun?

A.    No.  The state was armed robbery, and the dope charge was state as well, but the two gun charges were both federal.

Q.    Okay.  And those were in the same case?

A.    Uh, not as the state cases.  The robbery was related to maybe one of the gun charges, but I'll just say they were separate because they were like 3 years apart.

Q.    Okay.  In 1996, were you sentenced to 30 years

consecutive for all of that time for stabbing a prison guard?

A.    Yes, I was.

Q.    And was that federal time or state time?

A.    No, that was state time.

Q.    State of Iowa?

A.    Yes.

Q.    So that contributed to your 65-year sentence in the State of Iowa?

A.    Yes.  That's the makeup of the whole sentence.

Q.    And, in fact, when you were sentenced to that 30-year consecutive term, did you attempt to -- did you pick up a knife in court and attempt to stab the prosecutor in that case?

A.    Yes, I did.

Q.    And were you prosecuted for that as well?

A.    No.

Q.    And when was it that you were transferred from the State of Iowa prison system into the federal prison system?

A.    Shortly after that.  Right maybe the day after I was sentenced on that charge, I think they took me the next day or the next week, within that next week after.

Q.    Did you go directly to the United States Prison in Florence, Colorado, it was called the ADX?

A.    Almost.  I went to Oklahoma City and then on to there.

Q.    Did you arrive at the ADX in June of 1997?

A.    Yes, ma'am.

Q.    Tell me a little about -- you served quite a bit of time in prison in Iowa; correct?

A.    Yes, I have.

Q.    Did you possess weapons in prison in Iowa?

A.    Yes, I did.

Q.    How frequently?

A.    I've probably never been a day in prison until I dropped out of the AB without a weapon.

Q.    And that would include the time that you served in the Iowa State Prison System?

A.    Yes.

Q.    After you were transferred to the ADX in Florence, Colorado, did you continue to arm yourself on a daily basis?

A.    It was more difficult there, but I was definitely trying, yes.

Q.    And if I understand your testimony correctly, when you first got transferred to Florence, Colorado, the ADX, you were not a member of the AB; is that correct?

A.    No, I wasn't.

Q.    And you became a member of the AB sometime in the Spring of 1998?

A.    Yes, you're right.  It wasn't '97 as I previously said. It was early '98.

Q.    Because you got into a fight in '97; right?

A.    Right.

Q.    At the ADX?

A.    I got into two fights, but I can't tell you exactly -- I think the one you're referring to was in the late '97 or early '98.  Right in that area.

Q.    You talked about meeting Barry Mills in the hole.  Was that when you were placed in the hole after you'd been in a fight?

A.    I met Barry the first time was right when I got to ADX, he happened to be on the tier with me in June of 1997.

Q.    When you were first transferred?

A.    Exactly.

Q.    And then you met him again in the Fall of 1997?

A.    Yeah.  It was either fall or spring of 1998, but he was in the cell above me around that time or somewhere where I could talk to him through the pipe.

Q.    You actually were introduced to Mr. Mills by a prison guard, weren't you?

A.    Yes.

Q.    And can you tell my why it was that a prison guard somehow thought you ought to be introduced to Mr. Mills?

A.    We were talking about that war that had just jumped off between the ABs and the D.C. Blacks, and I was asking what the situation was there.  I mean, if -- did they have a lot of metal weapons?  Was there a lot of fights?  Was there a

lot of killings and stabbings?  And he was basically telling me what -- the political outlay and what the -- you know, what I'd have to watch out for when I got into the cages. And he said that he was gonna put me in touch with Barry Mills in relation to that's who I -- or in regards to that's who I should be hooking up with when I got there.

Q.    All right.  Were you express -- according to this, were you expressing some sort of concern about your personal safety?

A.    Yes.

Q.    Have you previously said that you were introduced to Mr. Hills because you were having problems with the prison guards at ADX?

A.    That was -- I was -- the reason why the guard was back there talking to me was in relation to the same thing.  It was the same conversation.

Q.    That was all in one conversation?

A.    Yeah, yeah.

Q.    So you got to ADX, and you were having problems with black inmates and with prison guards?

A.    No.  I didn't have any problems with black inmates.  I was having problems with prison guards when I first got there.

Q.    What were the problems that you were having with the prison guards?

A.    They came on the bus when I -- when we first pulled up, and they'd beat me up on the bus and then again in the garage when I was in chains.  And then they didn't feed me for a while, for a day or two.  They weren't letting me mail out, send out any mail.  At one point, they held me over a railing, and they stomped on my --

MS. BLANCH:  Objection.  Relevance.

THE COURT:  Objection is sustained.

BY MS. JACKS:

Q.    Well, as part of the problem that you were having with the prison guards, were you introduced to Mr. Mills because it was thought that he could quell some of that problem?

A.    No, that's not why I was introduced, but Barry did stop the problem.

Q.    And after you met Mr. Mills, did you start to get food?

A.    Yes.

Q.    And did you start to be treated humanely in prison?

A.    Yes.

Q.    By the guards?

A.    Yes.

Q.    Now, Ms. Blanch asked you some questions about Jess Van Meter.  Do you recall those questions?

A.    Yes.

Q.    And -- well, first of all, did Jess Van Meter get into a fight with Wordel Hillard in November of 1997?

A.    It would have been around that time period, yes.

Q.    At the time that you met Jesse Van Meter -- is that when you met him, in November of '97?

A.    Well, actually, just by coincidence, I met Jesse as I was goin -- I spent 2 weeks in Oklahoma City at the hub. It's a transfer thing, and you go there first, and then you go to ADX.  They were coming back from a trial or something. That's when I first met Jesse, but we really didn't have a chance to talk a whole lot there.  But when I really got to be a friend with him was at ADX.

Q.    And was that in November of 1997?

A.    Yes.

Q.    And was that just prior to when he went out and had an altercation with Wordel Hillard?

A.    Yes, it was.

Q.    At the time that met him -- well, at the time that you got to know him at the ADX, was he a member of the AB or was he a member of another gang called the Dirty White Boys?

A.    He was a member of the Dirty White Boys.

Q.    And did he tell you that the Dirty White Boys had been attacked by black inmates on the rec yard at Marion?

A.    Yes, he did.

Q.    And was there something that Mr. Van Meter -- was Mr. Van Meter injured in that attack?

A.    I think he was stabbed with a plastic toothbrush.  I

think he was stabbed, but I don't think it was real, real, bad, but I think he did get stabbed.

Q.   Did he also have his jaw broken?

A.   He may have.  He may have.  I know -- I know he got -- he got attacked pretty good, but I don't remember if he -- if he got stabbed, you know, with a piece of metal or anything.

Q.   When you talked to him in November of '97 just before he went out and stabbed Mr. Hillard, did he express to you that he was intending to get revenge for what had happened to him at Marion?

A.   No.  What he basically expressed to me was that he was on a tier full of D.C. Blacks and didn't have no backup.  He was -- he was a little freaked out that he was gonna get killed up there, and that's why he made the move.

Q.   Does the tier -- do all the people on the tier go out to the recreation yard together?

A.   At that time, yes.

Q.   And so what Mr. Van Meter was expressing to you was that if he didn't do something, he would be out on the rec yard with all D.C. Black inmates?

A.   Correct.

Q.   And given the environment at ADX, is that a situation that you would perceive as dangerous?

A.   Yes.

Q.   Why?

A.    Because he would have been killed.  Plain and simple. If he would have been the first or the last guy out that day, he would have just been a memory.

Q.    Because -- or why?  What if he didn't do anything?  What if he just minded his business and did his pushups?

A.    It doesn't work like that.  When there's a war which apparently he had already been a part of in Marion, and a lot of those guys on that tier knew that, when they got out to the cage together, they would have moved on him.  He knew that, everybody knew that.

Q.    So you gave him a weapon so that he could protect himself on the rec yard?

A.    Yes.

Q.    And after that incident where Mr. Van Meter and Mr. Hillard fought on the rec yard, is that when you were then placed out on the rec yard and the fight happened?

A.    Yes.

Q.    Now, was that a situation where you just went on the recreation yard and started attacking black inmates?

A.    No.

Q.    Um, was something happening on the recreation yard at the time that made you feel you were about to be attacked?

A.    Well, what had happened is right after that stabbing with Jesse, several blacks on may range were talking about the Honky from Iowa.  Now --

Q.    Would that be you?

A.    That had to be me.  There wasn't very many other Whites there, and I was the only -- I was the only white on the tier, and I was the only person from Iowa and the only one in the whole prison from Iowa so I rightly assumed that they were talking about me.  And it wasn't a conversation that would lend you to believe that they're gonna befriend you in any way so . . .

Q.    Wait a second.  At the time, you were a member of the Arian Brotherhood?

A.    No.  But it was -- a lot of people, if they see you have your head shaved, they just automatically assume that you're AB or that you're some White Racist or something.  So it's -- they made an assumption.

Q.    And what were they saying prior to you being placed on the rec yard, it was something about the Honky from Iowa?

A.    I didn't hear it.  But just the fact that I heard that much of it, you know, if you say that about somebody, you're gonna get moved on.  They had to know that I was gonna move on 'em if they would have said something like that.  But what I was told by a member of the Mexican -- La Eme -- I mean, the Mexican Mafia, he told me, just be cool.  And we went outside together, and it was him that was talkin to one of the guys, a guy named Big B, about he had been standing too close to the door when we came out -- when he came out.  You

don't do that unless you're gonna move on somebody.

Q.    Is that what you call crowding?

A.    Crowding a door, yeah.

Q.    And is that considered in the prison world an act of aggression?

A.    Yes.

Q.    Go on.

A.    Exactly.  And so Little Man -- the La Eme guy that I'm talkin about, Munoz, he went up to Big B who was actually a GD member and told him, don't be crowdin the fuckin door.  You do that again, you know, we got a problem.  And Big B is like, well, we got a problem right now.  You ain't gonna talk -- and so that got started like that.  And there was a D.C. Black out there by the name of Malik.  I think that might have been his nickname.

        But long story short, I seen those two getting ready to jump on Little Man so -- I liked Little Man.  He was a -- I mean, his name speaks for itself.  He was just a little guy.  I played handball with him, and I'd gotten a rapport with him.  And so when they moved on him, I ran over, and I hit Big B, and I knocked out Big B.

Q.    Before that happened, did you observe somebody in the area of the toilet on the rec yard?

A.    Yeah.  Big B was over by the toilet, and he was reaching down into pants, and I thought that he was retrieving a knife

from his rectum.  And so I told Little Man, let's move on him now.  You know?  Stop waiting for this guy to get a knife out.  And he's like, oh, this guy's a coward, he ain't gonna do nothin.  But I felt differently.  But these guys, they knew better than me.  I just rolled up so I let it go.

Q.    This all happened before you were a member of the Arian Brotherhood?

A.    Right.  In fact -- excuse me.

Q.    Well, I mean, you were mentioning people that were other sort of gang members.  You talked about a guy, Munoz, who was from the MA?

A.    Right.

Q.    And you mentioned --

THE COURT:  Counsel, we're far afield in this case so let's get to this case.

BY MS. JACKS:

Q.    When you're in prison, do you meet people in prison gangs even if you aren't in a gang?

A.    Yes.

Q.    And it possible to become friendly with them or to develop a relationship with them even if you're not in their gang?

A.    Yes.

Q.    Now, Ms. Blanch asked you some questions about Exhibit 6 which is a document entitled party list.  Is that in front of

you right there?

A.    Yes.

Q.    One of the things you said was that as a new inmate at ADX, you didn't know who the D.C. Blacks were.

A.    Right.

Q.    Was part of the purpose of this list to advise you of who might attack you?

A.    Yes.

Q.    I mean, was it obvious who might be your enemy?

A.    No.  It wasn't always obvious so a list was given to everybody for both -- exactly what you're talking about and exactly what Ms. Blanch was talking about, for both offensive and defensive you can say.

Q.    And one of the things after you got the list, did you try to determine who was on your tier or if anybody on your tier was on that list?

A.    I tried to determine -- when you go to the hole, they -- sometimes you know what unit you're going to be going back to, and so I would ask guys about these names.  What does this guy look like?  What does this guy look like?  The guys on the list that were specifically in the unit that I thought I would be going to, I would ask them what does this guy look like and so on so that I had another leg up.  You know?

Q.    You wanted to try to figure it out for yourself.  People aren't wearing nametags.

A.   No.  No.

Q.   Now, I think Ms. Blanch asked you some questions about a letter that you wrote to the SIA office at ADX.

A.   Yes.

Q.   And did you write that letter on February 19th of 2003?

A.   Probably.  It was in that general area right there.

Q.   Okay.  Was it addressed to somebody in particular?

A.   I think it was to Les Smith, but I may be wrong.  Unless there's something else on the paper, I believe it was Les Smith.

Q.   Okay.  And did you write that letter with the intent of offering your services as a witness for the government?

A.   Exactly.

Q.   Okay.  Um just prior to writing that letter, um, did you have money?

A.   Did I have money?

Q.   Yeah, on your books.

A.   Um, to be honest, I couldn't tell you.  That was several years ago.  I may have, but it was never very much.  If I did have, it probably wouldn't have been very much.

Q.   Were you working on a job in the prison?

A.   Um, at that time?  I may have been.  See, there's only one or two jobs, and they get passed around.  I may have had it at that time, but I couldn't tell you to be honest.

Q.   Did you have people, friends or family on the outside,

that were sending you money so that you could purchase commissary items?

A.    I may have had a girlfriend at that time or I might have gotten 10 or $20 from a relative, but to tell you the truth, I can't remember.  It was very sporadic if I did.

Q.    Just prior to writing the SIA officer, Mr. Smith in particular, in February of 2003, had you read about the fact that there was an indictment here in Los Angeles of 40 members -- 40 people that the government said were members of the Arian Brotherhood?

A.    I knew of it because I got -- my own cell was raided.

Q.    So you knew that there was a pending criminal case here in Los Angeles?

A.    Exactly, but I had never read about it.  But that was I think in -- it had been about a year prior to that or so maybe.

Q.    Were you concerned -- just prior to writing Mr. Smith of the SIA office in February of 2003, were you concerned that you personally might be wrapped up in this indictment somehow?

A.    It was a concern but not a real big one because I had never done killed -- I have never done anything.  So I knew that I might have been indicted but if I was, that it wasn't gonna be for anything very serious.

Q.    You weren't too worried about it if you were worried at

all.

A.    Not very worried about that, no.

Q.    Um, in being aware of the indictment and the subject matter of the indictment, did you think that the government might be looking for witnesses?

A.    Yes.

Q.    And did you think that the government might be willing to pay, give money to witnesses?

A.    Not money, no.  I didn't -- I had no idea that they would give you money.  I've never heard of that, but I thought that they might be able to help me with Iowa, take a detainer off of me.

Q.    So do you think there could be other benefits that witnesses might get aside from money?

A.    I never though -- the only thing I had in mind at that time was getting a detainer off me which is mainly why I wrote the letter.

Q.    Did you think that the government might be offering benefits in terms of a transfer to a more pleasant penal institution?

A.    That is --

         THE COURT:  Counsel, he already answered the question.

         MS. JACKS:  That was actually a different question.

         THE WITNESS:  Yes.  I was hoping for that as well

for my own safety.

BY MS. JACKS:

Q.    And did you think that the government cared if the information the witnesses provided was truthful?

A.    Sure.

Q.    You thought it mattered?

A.    Yeah, it would damage their case if someone came in here and lied.

        MS. JACKS:  Your Honor, I have a letter dated February 3rd, 2003 addressed to Angel.  If I could have that marked as defense next in order.  I think that would be 313.

        THE CLERK:  Yes.

BY MS. JACKS:

Q.    Mr. Cupples, I'll give you a minute to look at it to see if you recognize it.

A.    Would you like me to read the whole letter or just look? I recognize my handwriting.

Q.    Okay.  And did you know a person named Angel at that time?

A.    Yes, I did.

Q.    And is that a letter that you wrote to Angel on February 3rd, 2003?

A.    Yes, it is.

        MS. JACKS:  Your Honor, I move that that be admitted.

MS. BLANCH:  Objection.  Irrelevant.

THE COURT:  Beg your pardon?

MS. BLANCH:  I wonder what the relevance is before I say I don't have any objection.

THE COURT:  Let me see the letter.

MS. JACKS:  I'm happy to explain that to the Court and counsel as well.

THE COURT:  The objection is sustained.

MS. JACKS:  May I ask that the letter be placed in front of the witness, please?

THE COURT:  No.  It's irrelevant.

MS. JACKS:  Well, it's not irrelevant, Your Honor.

THE COURT:  It is irrelevant, Counsel.  And the objection has been sustained.

BY MS. JACKS:

Q.    Mr. Cupples --

THE COURT:  And it's not in evidence.

BY MS. JACKS:

Q.    Mr. Cupples, did you write Angel on February 3rd, 2003 just about 2 weeks before you wrote the SIA office?

A.    I'm assuming I did if the dates correspond with what you just said, yes.

Q.    And you testified earlier that you can't remember what your monetary situation was at the time.

A.    Correct.

Q.    Do you think if you reviewed your letter to Angel, that would --

THE COURT:  It's irrelevant, Counsel.  Please.

MS. JACKS:  It's relevant in that --

THE COURT:  It's irrelevant, Counsel.  And it's 403.  It's definitely 403.

BY MS. JACKS:

Q.    Mr. Cupples, do you recall writing the letter to Angel?

THE COURT:  Counsel, I've told you to stop.

MS. JACKS:  Asking all questions, Your Honor?

THE COURT:  About that letter.

BY MS. JACKS:

Q.    Mr. Cupples, based on what you heard about the Los Angeles indictment, did you think that the government was going to pay people to lie?

THE COURT:  Counsel, I've told you, Stop.

MS. JACKS:  I'm not -- I'm not asking about the letter.

THE COURT:  Counsel --

MS. JACKS:  I'm asking --

THE COURT:  I told you to stop.

MS. JACKS:  Your Honor, I'm asking him just his state of mind at the time.

THE COURT:  No.  That has nothing to do with that.

MS. JACKS:  Well, I'm not directing his attention

to the letter in any way.

THE COURT:  Counsel, I've told you to stop.

MS. JACKS:  Your Honor, this Court is interfering with Mr. Scott's right to confront and cross-examine --

THE COURT:  Stop saying that.

MS. JACKS:  -- the witnesses against him.

THE COURT:  You keep saying that.

MS. JACKS:  Well, I think it's because the Court keeps doing it.

THE COURT:  Don't do that, Counsel.  Please do not do that.

MS. JACKS:  I would direct the Court's attention to page 2 of the letter.

THE COURT:  I've read the letter.  I have read it. I have read it.

BY MS. JACKS:

Q.   After you wrote the letter to Angel, did you write the SIA office?

A.   I can't tell you.  By the dates -- if the SIA -- I always date my letters.  If the one is dated afterwards, then yes, I did.

Q.   Okay.  Um, when you wrote the SIA office, did you tell them that you wanted to become a witness for the prosecution because you had grown up during your course of time in prison?

A.    It's very possible.

Q.    Did you tell them that you wanted to become a witness for the prosecution because there were political issues inside the AB that made you want to drop out?

A.    Very possible.

Q.    Did you write them and tell them in that initial letter that you were going to be killed, and so you had to become a government witness?

A.    Um, I can't tell you verbatim what the letter said.  If I could look at it, I could tell you.

        MS. JACKS:  I have a copy of a letter dated April 13th, 2003.  I'd ask that be marked as Defense Exhibit 314.

Q.    I'm going to ask you, Mr. Cupples, to take some time to review that letter to see if that refreshes your memory of what you wrote to the SIA office in February of 2003.  Just let me know when you're done.

A.    Okay.  I'm finished.

Q.    Does that refresh your memory about the content of the letter that you wrote to the SIA office?

A.    Yes, it does.

Q.    Mr. Cupples, you didn't say anything to the SIA back on February 19th of 2003 about growing up during your time in prison, did you?

A.    No, I didn't.

Q.   All right.  You didn't say anything about you wanted to become a government witness because there were political issues in the Arian Brotherhood, did you?

A.   No, I didn't.

Q.   Did you say anything about the fact that you thought you were gonna be killed by members of the Arian Brotherhood and had to get out for that reason?

A.   No, I didn't.

Q.   Um, in fact, you didn't even mention any concern about your personal safety, did you?

A.   Yes, I did.

Q.   Well, what was your -- what was your request in that letter on February 19th, 2003?

A.   Concerning my personal safety?

Q.   No.  What was your main request to Mr. Smith or whoever read the letter?

A.   I basically told them in here that I had information or incentive as I put it, and that I wanted some detainers taken off of me.  In other words, if they would take these detainers off me, I would have an incentive.  I would have a light at the end of my tunnel, that I had an incentive.  I had information -- I alluded to information that I might have for them.

Q.   Okay.  You told them that you had incentive; right? That's the word you used?

A.    I was looking for the incentive or something along those lines, yes.

Q.    And basically, what you expressed to Mr. Smith was that you had this long sentence waiting for you in Iowa?

A.    Yeah.

Q.    Right?

A.    Yes.

Q.    And that if the government could do something about getting that sentence removed or shortening it, then you were willing to provide them with some what you called incentive?

A.    With letters basically about illegal detainers that had been placed on me, and I asked them to take the illegal detainer off and told 'em why the detainer was illegal.  And that if they would move in my favor, that the incentive was that I had -- I may have something to tell them.  That's exactly what the letter is about.

Q.    And did you tell you had nothing to discuss unless they could remove your detainers?

A.    Exactly.

Q.    All right.  So essentially, when you wrote that letter, you were offering to become a witness for the prosecution if they could get you out of your 65-year Iowa sentence?

           THE COURT:  That's not what he said, Counsel.

           MS. JACKS:  I think it is.

           THE COURT:  No, it's not what he said.

BY MS. JACKS:

Q.    Well, was that the --

THE COURT:  To release the detainer.

BY MS. JACKS:

Q.    Well, maybe --

THE COURT:  Counsel, please.  Don't -- do it differently.

BY MS. JACKS:

Q.    What was the detainer -- what is a detainer, Mr. Cupples?

A.    The detainer was lodged by the State of Iowa saying that they wanted me back after they had already released me from serving their time.

Q.    So what happened is you got that big sentence in Iowa, 65 years; right?

A.    Exactly.

Q.    And you served a little bit of it?

A.    Well, that's relative to what you think is little.  When you --

Q.    How much time did you serve there?

A.    At that point --

Q.    On that 65-year sentence?

A.    Uh, I think I was maybe 6 in then.

Q.    Okay.  And the you got transferred to the Feds?

A.    Yeah.

Q.    And you went to the federal prison?

A.    Yeah.

Q.    At ADX?

A.    Yes.

Q.    And after you got to ADX, the State of Iowa issued what is called a deterrent saying, hey, when you're done with your federal sentence, you're coming back and doing the rest of ours.

A.    9 months after I got there, all a sudden, the ADX wrote them and said, hey, are you gonna want this guy back, and they were like, oh, yeah, okay, we'll take him back, and they filed detainers 9 months after they had already released me.

Once -- I mean, I don't want to get into a whole long drawn out thing, but once you're serving a time -- a sentence in the state, and if you leave -- they release you to another government to serve another sentence except for if you escape or something, you're through with your time.  They can't -- it's called piecemeal service.  They can't bring you back and make you serve more on it.

Q.    And after you got to the ADX, you found out that Iowa had tried to put some sort of hold on you so saying that when you get done, you have to come back and do 59 more years?

A.    Yeah.

Q.    And you thought that was unfair?

A.    Exactly.

Q.    And you also thought that perhaps if you would turn a government witness, maybe somebody in the government could fix the situation for you?

A.    Yeah, that was my original hope although that didn't pan out.

Q.    That in this letter of February 19th, 2003 is what you're offering to become a government witness in exchange for; right?

A.    Exactly.

Q.    Lift those 59 years on my shoulders, and we can talk.

        THE COURT:    Counsel, don't keep repeating things like that.  It's arguing with the witness.

BY MS. JACKS:

Q.    After you sent that letter, did you have some communications back and forth with Mr. Smith?

A.    No.

Q.    Who was your -- who did you communicate with?

A.    I mean, are you talking -- I wrote another letter because I didn't hear back from the first one.  I had to write a second letter, and I didn't hear back from that yet either.  And I asked my case manager or counselor what was going on, and they said they would call him and find out.

Q.    So you had to kind of be persistent about seeing if they were interested in working with you to take the detainer off?

A.    I became worried because I thought they were gonna . . .

you know, I -- I thought -- I was in between at that time.  I had just made a move that could get me killed, by writing letter could get me killed which -- when we were talking about safety which is what's on that last page.  I'm talking about don't approach my cell directly and so forth, I mean, because I would get killed if they came -- they would know what was going on.  And so --

Q.   Well, let's go to that right now because I don't want to skip over that.  You said you wrote the letter to Mr. Smith or to the SIA and --

THE COURT:  Counsel, don't repeat the man's testimony.

BY MS. JACKS:

Q.   In addition to talking about getting rid of this detainer where you're supposed to back to Iowa and do 59 years, did you talk to him about how subtly remove you for some sort of interview?

A.   Yes.

Q.   So that it wouldn't be put out in the prison that you were working with the Prison Intelligence?

A.   Right.

Q.   And eventually, after you were persistent and wrote back a couple of more times, did you actually -- were you actually presented with a list of questions about Mr. Smith?

A.   Yes, I was.

Q.    And did he send those to you in some sort of envelope or did he hand them to you?  What?

A.    I can't remember, I think a combination of the two.  I think it was an envelope, and I think my counselor handed it to me.

Q.    Okay.  And he -- was the request for Mr. Smith that you fill out the list of questions and provide him the information he was asking for?

A.    This was a small list, and they wanted to know specific things or general topics of what I might know, and I refused to answer.  I through it in the toilet and flushed it.

Q.    Did you eventually on March 14th of 2003 provide a handwritten list of answers to Mr. Smith's questions?

A.    Yes, I did.

Q.    And he asked you numerous questions, something -- something over 50 questions?

A.    Yeah.

Q.    Just about different things.  What you knew about the Arian Brotherhood.

A.    Yes.

Q.    What you knew about weapons in prison.

A.    Yes.

Q.    And what you knew about various people.

A.    Yes.

Q.    Now, one of the things -- one of the things that you

told him about was about some weapons that were placed in a rec cage; is that right?

A.    Yes.

Q.    And we saw some pictures this morning -- if I may, I'm going to show you a page from an exhibit that's been marked 113.  Can you see what that is, Mr. Cupples?

A.    It looks like a -- it looks like a wall or something. Is it a wall?

Q.    Is it the ceiling in one of the recreation cages?

A.    Oh, yes, yes.  I -- I recognize it now.

Q.    And is that something that you told Mr. Smith about?

A.    Uh, yeah but long after the fact.  I told him I was the one that had done it.

Q.    Um, there were some sort of weapons and things secreted up in that area?

A.    Um, I think just tools.  There may have just been tools.

Q.    One of the things then when you're dealing with prison intelligence is they want you to somehow prove that you're not lying to 'em 'right?

A.    Correct.

Q.    And in this Intelligence interview that you provided to Mr. Smith in March of 2003, you wanted to sort of earn your credibility; right?

A.    Yes.

Q.    And was one of the things that you did to sort of try to

convince him that you were credible is to tell him about these tools that were in the rec cage ceiling?

A.    It may have been.  I definitely told him at some point. I just don't know if it was for credibility or later on when I debriefed on everything.

Q.    Now, in that written interview of March 14th of 2003, um, did you provide some information about the stabbing of Mr. Bond that happened at Springfield?

A.    Yes.

Q.    And you told him that you were actually at Springfield when Mr. Scott stabbed Mr. Bond; right?

A.    Yes.

Q.    In -- in that interview, did you say anything about John Gotti communicating a message that Mr. Bond was to be killed?

A.    I -- I couldn't tell you if I mentioned that or -- or not.

Q.    Did you say anything in that handwritten interview of March 14th of 2003 about Mr. Scott wanting to kill prison guards?

A.    Uh, I don't think they were even interested in Steve Scott with me at that point.  I don't think that we even discussed him that much.

Q.    Well, you did in your handwritten interview of March 14th, 2003 provide details about the stabbing at Springfield, didn't you?

A.    I mean . . .  it's been -- I'll -- I'll -- I'll take your word for it.  I'm not --

Q.    No, I don't --

A.    -- saying I didn't, but I --

Q.    I don't --

A.    -- just don't remember.  I mean, it's be so long ago, and it was so much -- that thing was gigantic.  It seemed like it took me a whole day to . . .

Q.    To fill it out?

A.    Yeah.

Q.    It's a lot of questions.

A.    Yeah.

Q.    Um, and you had a chance to -- an opportunity to review that today prior to testifying?

A.    No, I haven't.

Q.    Um, and then what I'd like to do is just mark that and show it to you to give you a chance to refresh your memory.

MS. JACKS:  Mark that as 314.

THE WITNESS:  Is there anything specific you want me to go right to or --

Q.    Why don't you just take a look through it and see if those were the types of questions that you answered and look at some of the responses and see if those look accurate. Specifically, I'm gonna ask you about what you said or didn't say about Mr. Scott stabbing Mr. Bond.

UNITED STATES DISTRICT COURT

A.   Okay.  Yes, this is definitely some of the responses I gave.  I haven't looked at every single one of 'em, but this . . .

Q.   That looks like your -- or the -- the --

A.   Yes.

Q.   -- questions you answered and the responses that you gave?

A.   Yes, it does.

Q.   Okay.  Um, specifically, I think the question that I had -- that I had started to ask you before we brought that up there was did you say anything on March 14th of 2003 about Mr. Scott and you making some sort of plans to suit up and -- in some sort of protective gear and stab people on the unit?

A.   I -- is it in here anywhere or, I mean, can I --

Q.   That's what I'm asking you.  Um, I . . .

A.   I -- and I -- I -- I -- I'll answer again I don't recall.

Q.   Okay.  If I can direct your attention to page 11, I think there is a paragraph that starts with Scott and Springfield, and that goes over -- there's also another paragraph on page 12.  Maybe if you refresh your memory, that will help you answer my questions.

A.   I've read it.  I don't, uh, see anything that I'm -- that I've written about that, though.

Q.   Okay.  Did you get a chance to look at page 12 as well?

UNITED STATES DISTRICT COURT

I want you to be complete.

A.    Is it all the way down or just at the top here?

Q.    Well, I think the second full paragraph on page 12 refers to Mr. Scott and Mr. Bond and what happened at Springfield.

A.    No, that's about Jesse Van Meter.  No, it's not on here.

Q.    So there's nothing in that interview about Mr. Scott trying to get you to make plans to suit up and start stabbing guards and other inmates?

A.    No, this is a very sketchy -- it doesn't say anything about -- it doesn't talk about the knives.  It doesn't really talk about anything except for that we heard -- and I had forgotten about that, that we had heard that guy makin a -- or Scotty had heard that guy makin a knife himself on the wall.

Q.    Well, it says you told the SIA Agent Mr. Smith back in March of 2003 that both you and Mr. Scott had heard Mr. Bond grinding a knife in his cell the night before, didn't you?

A.    Yeah, I may have said that, but I'm -- I -- I can tell you right now that I was too far away.  I don't think I would have heard.  But Scotty definitely told me that he heard the guy makin a knife.  He told me out in the rec cage.

Q.    Did you say anything to Mr. Smith on March 14th of 2003 that Mr. Scott wanted to plan to kill multiple people?

A.    Yes.

Q.   You did?

A.   I don't know if I told him that.  I just know that Scott, he had originally planned to kill Randy Gomez and Bond, minimum.  I think there was a couple others, but I don't know if I told Smith that.

Q.   I'm asking what you told Mr. Smith back in March 2003.

A.   And I -- I'm tellin you I can't -- it's --

Q.   You didn't say anything about killing multiple people, did you?

A.   I probably did if I was talkin about that specific incident.  And again, I'll tell you again that they weren't really that concerned with Scotty at that time because he had already gone to trial.  They were asking mainly questions about Barry and them guys.

Q.   Okay.  Mr. Cupples, in that Intelligence Interview, you just told us yourself you spent all day filling it out; right?

A.   In my cell, yes.

Q.   And would you agree with me that there is a substantial portion of page 11 and part of page 12 that refers to Mr. Scott and what happened at Springfield?

A.   No, I wouldn't.  That's what i was trying to tell you. I couldn't see anything on page 12 that had anything to do with Scott.

Q.   All right.  Would you agree with me that two-thirds of

page 3 has to do with Springfield?  In fact, there's a whole section entitled Scott and Springfield?

A.    On what page --

Q.    Page 11.

A.    I don't -- we're lookin at two different things.

Q.    It's page 11 of 13 and has a number at the very bottom 110557?

A.    11 of 13?

Q.    Mm-hmm.

A.    No, we're looking at two different documents, ma'am.

Q.    You don't have it up there?

A.    No.  That's why I was confused.  You kept talkin about that last page, and I couldn't see anything on there.  Talks about Jesse Van Meter?

Q.    Let me give you mine.  You're right.  It looks to me like our paging is different cause I see that this one is -- has a number on the bottom 106484.

A.    They're essentially the same documents, but the paging is different on 'em.

Q.    I would agree with you.  Um, let me hand you this exhibit back, and I think I found the section.  It's page 10 of 12.

A.    Want yours back?

Q.    Yeah.

A.    What page again?

Q.    10.    Towards the bottom and then going on to page 11.

A.    Got it.

Q.    Thank you.  Have you had a chance to review that?

A.    Yes, I have.

Q.    And does that appear to be a typed version of -- of your Intelligence Interview that you filled out --

A.    Yes.

Q.    -- for Mr. Smith on March 14th, 2003?

A.    Yes, it does.

Q.    Okay.  And there is a fairly lengthy paragraph there about -- entitled Scott and Springfield; right?

A.    Yes.

Q.    And you go into some details about what you said at that time occurred at Springfield regarding the stabbing of Mr. Bond?

A.    The final plan but not the original.

Q.    And my question to you is did you say anything to Mr. Smith on March 14th of 2003 about Mr. Scott wanting to kill a prison guard?

A.    See, I never talked with Mr. Smith.  I wrote.  So everything that's on this paper, it's exactly as I read it, and that's all that was written.  Not said but written.

Q.    Okay.  Did you write to Mr. Smith on March 14th, 2003 that Mr. Scott wanted to kill a prison guard?

A.    No, I didn't.

Q.   In fact, you specifically told him that Mr. Scott didn't want to hit a prison guard, didn't you?

A.   No, I can't believe I said that.

Q.   Did you tell him --

A.   Maybe they confused me as Scott not wanting to.

Q.   Did you tell Mr. Smith anything on March 14th, 2003 about Mr. Scott ordering you to make knives?

A.   Uh, I think in there it says that he told to go get the metal out of the law library.

Q.   What you told Mr. Smith was that you asked people to make a knife, and that there was a knife in the law library; right?

THE COURT:  We're not doing that, Counsel.  Please. That's not in evidence.

BY MS. JACKS:

Q.   Did you say that you --

THE COURT:  No, that's not in evidence, Counsel.

BY MS. JACKS:

Q.   On March 14th of 2003, did you write to Mr. Smith that you were telling other people to make knives at Springfield?

A.   Yes.  That -- that also happened as well.

Q.   Did you mention anything in your interview of March 14th, 2003 about John Gotti?

A.   I can't recall.

Q.   Does his name appear anywhere in that document before

you?

A.   Uh . . . if -- the way you're sighing, I'm gonna assume that it doesn't so --

Q.   I don't want you to assume.  Why don't you take a minute and look.

A.   That's gonna take more than a minute.

Q.   Did it appear anywhere in your discussions about Scott and Springfield?

A.   All -- all of the -- I wrote about was what they were specifically concerned with at the time.  Some things came up later on that they didn't realize I knew about or -- so . . .

Q.   That doesn't answer my question.

A.   No, it doesn't.

Q.   Does it appear -- does Mr. Gotti's name appear anywhere in your discussions about Mr. Scott and Springfield?

A.   I -- I'm assuming it would.

Q.   Well, take a minute and read it.

A.   Are you talkin about in this one paragraph right here?

Q.   In fact --

A.   It doesn't -- it doesn't appear in this paragraph right here, no.

Q.   And, in fact, there's nothing in that interview at all about Mr. Gotti --

THE COURT:  Counsel, that's your -- that's your opinion.  Don't --

BY MS. JACKS:

Q.    Was there anything -- did you tell Mr. Smith anything back on March 14th of 2003 about Mr. Gotti wanting somebody to kill this guy you've referred to as New York or Wakeel?

THE COURT:  Mr. Cupples, did you talk to Mr. Smith other than with your statement?

THE WITNESS:  Uh, at one point, but we didn't discuss any of this information cause I wasn't willing to --

THE COURT:  All right.  Did you talk to him besides the statement?

THE WITNESS:  Yes.

THE COURT:  All right.

BY MS. JACKS:

Q.    Mr. Cupples, did you tell Mr. Smith that Mr. Scott seemed to treat the Arian Brotherhood as a social club?

A.    Yes.

Q.    Now, today you've told us that, in fact, it was Mr. Gotti that said that Mr. Bond was to be hit; is that right?

A.    No.

Q.    Well, that Mr. Bond -- I'm sorry, that Mr. Gotti confirmed something about Mr. Bond?

A.    He just simply told Tiny who -- I look at this document, Patrick Mills.  He told Tiny that that was one of the guys who was one of the D.C.s that was just in a move in, uh,

Marion.  And you have to understand that not all D. C. Blacks even are in this war.  Barry's order was to hit the ones that were involved in the war that were making moves and so forth. So that was the importance of Gotti telling Patrick Mills, hey, that guy up there on your tier made a move on -- on a white dude that they thought was AB.  And so that's . . .

Q.    According your testimony today, how is it that Mr. Gotti was able to communicate with Tiny or Patrick Mills?

A.    Sign language through -- Tiny's window overlooked the cages, the exercise cages --

Q.    Okay, let's just slow down because we -- so that we get an understanding of what you're saying.  Your -- your testimony is that Tiny was inside?

A.    Tiny was on the tier.

Q.    He was in his cell?

A.    In his cell.

Q.    And Mr. Gotti was taken out to recreation?

A.    Yes.

Q.    When was this in relation to the day that Mr. Bond got stabbed?  According to you.

A.    I couldn't tell you an exact date, but I'll tell you it would have been within a week, 2 weeks at the most.

Q.    Okay.  In fact, you are -- you moved onto that unit sometime in November of 2000; correct?

A.    Um, I have no idea about all these dates.

Q.    Um, but you're saying that Tiny was in his -- in his cell, and his cell overlooked the recreation cages.

A.    Tiny -- Tiny was the one that was talkin to Gotti or signing with him or talkin both, whatever, but on the cage side.  I didn't know.

Q.    All right.  So Mr. Gotti came through Unit 21-E and was placed in the recreation cages?

A.    Yes.

Q.    And your testimony is that he was able to communicate by using sign language to Mr. Mills?

A.    And yelling, too, probably.  They yell through the windows, and they do sign language.

Q.    Okay.  And -- and then how did Mr. Mills communicate with you or with Mr. Scott about what you're saying Mr. Gotti was saying?

A.    During showers and during rec.

Q.    Okay.  Have you previously said that while Mr. Mills was talking in sign language to Mr. Gotti at rec, he was then yelling things down the tier?

A.    He may have been doing that as well.  I mean, they did that every day.  But as far as this specific thing, I don't think he would have yelled it down the tier what he yelled. He would have talked to one of us in the showers, um, which is on the tier as well.  You understand what I'm sayin?  The showers are on the tier, and then you're able to talk right

there with each other.

Q.    In the showers?

A.    Right.

Q.    Um, but my question is, um, you said that Mr. Gotti is coming back through the hallway from recreation --

A.    Yeah.

Q.    -- and you were able to actually communicate with him?

A.    Yes.

Q.    And that communication took place after this supposed sign language conversation between Mr. Mills and Mr. Gotti?

A.    Yeah.  It may not have been the same day, but it would have been afterwards.

Q.    Well, the purpose of that conversation according to you is to confirm what Mr. Mills had been saying Mr. Gotti was saying through sign language?

A.    To make sure we had the right cell.  There were several blacks on the tier, I belive, and what me and Scotty wanted to know, is he talkin about the one in that's in Cell 1?  And he just simply -- I mean, when we talk about a conversation, we're not talkin about a whole -- like me and you are havin right now.  There was no dialogue.  Simply me doing this and then holding up my finger and him noddin.  It was simple as that.

Q.    So you're pulling on your lip and then holding up your finger?

A.    Yeah.   Cell 1.   Means Cell 1.

Q.    And, um, when is the -- today's not the first time you've told this story, is it?

A.    No.

Q.    Um, you told this story back in what, sometime this Spring, didn't you?

A.    Are you talkin about the last time I testified?

Q.    Yeah, May I think it was 9th, 2006?

A.    Yes.

Q.    And that's when you testified to essentially what you're saying here today; right?

A.    Yes.

Q.    So between February -- I'm sorry, March 14th of 2003 and May 9th of 2006, you hadn't said any of this about Mr. Gotti being -- somehow transmitting a message to Mr. Mills?

A.    Um, I -- I don't know if we -- if it was discussed.   I mean, I talked about whoever it was they were askin me about at the time.   They -- there were some of these things that came out on the stand that I'm sure surprised Ms. Blanch and them because they didn't even know I knew it.   I'm not sure if that's one of 'em.   I don't know if we had conversations about all these things.   To be perfectly honest, I don't remember.   Uh, I answered whatever questions were asked of me, and I may not have gave every little detail, some of the things that you're askin, but I -- I covered each of these

many incidents.

Q.   Now, Mr. Scott, for at least a few weeks -- I'm sorry, Mr. Cupples, at least for a few weeks, you were housed with Mr. Scott at Springfield; correct?

A.   Yes.

Q.   And, um, was there anything -- had you known Mr. Scott from before?

A.   Uh, yes.

Q.   And was there anything different about Mr. Scott's either -- either physical or mental appearance when you saw him at Springfield in November of 2002?

A.   Both.

Q.   Can you explain to what you observed?

A.   Scotty was on Interferon for hepatitis, and he was pretty irritable, and -- and that was one of the ways I had talked him out of the original move on Henry.  I told him, look, Brother, they got you strung out on this shit.  You're actin kind of, you know -- and he growled at me one time, but he don't weigh but a Buck 20 at that point.  He doesn't look like he does right now.  He was pretty sickly lookin.

Q.   You said he don't weigh but a Buck 20?

A.   I mean, that was an exaggeration.  He was kind of small. He had lost weight.  He was -- he didn't look exactly healthy.

Q.   Okay.  And so he -- he physical deteriorated?

THE COURT:  Counsel, he answered the question.

BY MS. JACKS:

Q.    Did you also notice a mental deterioration?

A.    In as far as his attitude and his demeanor, yes.

Q.    And in communicating with him in the -- in the few occasions that you were able to, did he express that he thought he was losing his mind?

A.    No.  I don't know.  I don't recall him saying he lost --

MS. BLANCH:  Objection.  Calls for hearsay.

THE COURT:  Objection is sustained.

MS. JACKS:  It goes to his state of mind and his existing physical condition.

THE COURT:  No.  This is not state of mind.

BY MS. JACKS:

Q.    Mr. Cupples, since I can't ask you about that, I want to ask you about the guards at Springfield.  Were the security procedures at Springfield followed with -- with respect to movement of inmates?

A.    Generally, what happens is one or two officers come down, and they cuff up four guys.  They open their doors, and the other guys are expected to wait there until the last guy's cuffed.  And then they're escorted to the cage together, and then each one is put into a rec cage, and their cuffs are taken off through what we call a bean slot or a hole where the tray would normally go through or . . .

Q.   Was there something that caused you any sort of concern of the fact there were four maximum custody inmates being moved in the hall at the same time?

A.   Me?

Q.   Yeah.

A.   Was it any concern for me?

Q.   Yeah.  I mean, does that create a danger, potential danger for if enemies are present?

A.   At that time, I'm lookin for enemies.  It's not a danger to me.  I'm -- I'm lookin -- I was a soldier in the AB.  I was hopin to find an enemy in the hallway.

Q.   But would you agree with me that those are not the security procedures that were followed at the ADX in Florence, Colorado?

A.   Oh, no.  Definitely not.

Q.   And I think you mentioned earlier that there were times when guards would open up your cell without cuffing you?

A.   That's correct.

Q.   And given -- and I understand that you were in good shape, but given the situation, is that potentially -- does that potentially pose a danger to inmates?

          MS. BLANCH:  Objection.

          THE WITNESS:  Sure.

          THE COURT:  Objection is sustained.

          Move on.

UNITED STATES DISTRICT COURT

BY MS. JACKS:

Q.   And during the shower procedures in the morning at Springfield, did guards runs -- did guards escort maximum custody inmates to the showers with two guards and one inmate?

A.   Not at that time.

Q.   Um, how did they do it?

A.   A lot of times, they did it the same way as they did a rec.  They would just, uh, get a bunch of guys out of cell, as many as four, I think, and then move them as a little herd, if you will, a -- just a small group.

Q.   Run four people to the shower at the same time?

A.   I think it was four.  I think there was four showers. But yeah, in a group.

Q.   Uh, the morning that, uh, Mr. Scott stabbed Mr. Bond, did you see if Mr. Scott slipped his cuffs or not?

A.   No.  To this day, I don't know exactly what happened.  I never had a chance to talk to Scott.

Q.   Are you familiar with an individual known as Raphael Valasqez?

A.   The name sounds familiar.  Is he -- is he a Cuban? Was -- if he was a Cuban guy that was on our tier, then yeah. I think, uh, that's who you're referring to.

Q.   He's a male nicknamed Raffa.  And I think you've referred to him in the past as an individual that --

MS. BLANCH:  Objection.  Is counsel testifying?

THE COURT:  Objection sustained.

BY MS. JACKS:

Q.  Was there a gentlemen who was in the big shower at the time Mr. Scott stabbed Mr. Bond?

A.  There may -- there may have been.  There was someone next to me on the right-hand side.  I don't know if it was this guy, though.

Q.  Did you ever tell anybody that Mr. Bond ran to the back of the unit towards the rec cage after Mr. Scott stabbed him?

A.  No.  I don't know what happened out there.

MS. JACKS:  Your Honor, I ask this witness remain on call so we can discuss the letter to Angel on February 3rd outside the presence of the jury.

THE COURT:  No.

MS. JACKS:  If I may, I have nothing further right now other than that Angel letter.

THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MS. BLANCH:

Q.  Mr. Cupples, as member of the Arian Brotherhood, did you need money on your books in order to get things in prison?

A.  No.  Not at all.

Q.  Why not?

A.  Because you get what's called an issue, usually $100 for

a soldier, and so whatever I wanted, I just told whoever had money. There was several members that had tens of thousands of dollars on 'em on several of the tiers. And we just gave them our order, and they'd buy us shoes or sweat suits or food or whatever it was we needed.

Q. Regarding the attack on Irving Bond, prior to getting to Springfield before Mr. Scott was ever taking the Interferon, had you conversations with him about killing members of the D.C. Blacks?

A. Yes.

Q. And when you talked to Mr. Scott at Springfield prior to his stabbing Irving Bond, was the substance of the conversation the same?

A. It was definitely the same. The only thing I would say was a little bit different was now he was talkin about stabbing officers, and I attributed that to the interferon. But as far as Irving Bond, that had nothing to do with Interferon.

Q. In your opinion. You're not an expert in Interferon; right?

A. I'm an expert in the AB and what was goin on at that time. So I would have to say that once he gave me a hit list and told me I gotta hit any one of these D.C. Blacks on sight, I'm assuming he's gonna do the same thing.

Q. And when he gave you that hit list and told you to hit

any AB on sight, was that at Springfield or was that earlier at the ADX?

A.    Long before that at ADX.

MS. BLANCH:  I have no further questions, Your Honor.

THE COURT:  Recross.

MS. JACKS:  Briefly.

RECROSS-EXAMINATION

BY MS. JACKS:

Q.    Mr. Cupples, do you have Government's Exhibit 6 up there before you?  I'm going to put it on the TV screen as well. You have the whole list up in front of you as Exhibit 6, don't you?

A.    Yes.

Q.    Can you show me where Irving Bond's name appears on that list?

A.    I already looked for it.  I don't see it on there.

Q.    It's not on there, is it?

A.    No.

MS. JACKS:  I have nothing further.

THE COURT:  All right, ladies and gentlemen, we'll take our recess until tomorrow morning at 9:30.  And I would remind you that you are not to converse or otherwise communicate among yourselves or with anyone upon any subject touching on the merits of the cause on trial.  You're not to

form or express any opinion until the case is submitted to you for your verdict.  You're excused until 9:00 tomorrow morning.

(Jury not present.)

THE COURT:  9:00 tomorrow morning.

THE CLERK:  This court stands adjourned.

(Proceedings were concluded at 12:35 p.m.)

UNITED STATES DISTRICT COURT

CERTIFICATE OF REPORTER


COUNTY OF LOS ANGELES        )

                             )  SS.

STATE OF CALIFORNIA          )


I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

OF MY STENOGRAPHIC NOTES.



DATE: _Jan. 12, 2007_

_____

LAURA MILLER ELIAS, CSR 10019

FEDERAL OFFICIAL COURT REPORTER


UNITED STATES DISTRICT COURT