CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

1

1       UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA

3    HONORABLE DAVID O. CARTER, JUDGE PRESIDING

4              - - - - - - - -

5    UNITED STATES OF AMERICA,           )
                                         )
6              Plaintiff,                )
                                         )
7         vs.                            ) No. CR 02-938(E)-DOC
                                         )     Day 20 - Volume III
8    RONALD BOYD SLOCUM, WAYNE           )
     BRIDGEWATER, and HENRY MICHAEL      )
9    HOUSTON,                            )
                                         )
10             Defendants.               )     **ORIGINAL**
                                         )
     _____)

11

12

13

14

15         REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               Jury Trial

17            Santa Ana, California

18           Tuesday, April 24, 2007

19

20

21   Jane C.S. Rule, CSR 9316
22   Federal Official Court Reporter
     United States District Court
23   411 West 4th Street, Room 1-053
     Santa Ana, California 92701
24   (714) 558-7755

25   07-04-24 SABD20V3

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

2

```
 1   APPEARANCES OF COUNSEL:

 2   On behalf of the UNITED STATES OF AMERICA:

 3                         DEPARTMENT OF JUSTICE
                          OFFICE OF THE UNITED STATES ATTORNEY
 4                        BY:  TERRI FLYNN
                               BRETT SAGEL
 5                             Assistant United States Attorneys
                          411 W. Fourth Street
 6                        Suite 8000
                          Santa Ana, California 92701
 7                        (714) 338-3500

 8

 9   On behalf of DEFENDANT RONALD BOYD SLOCUM:

10                        LAW OFFICES OF MICHAEL R. BELTER
                          By:  MICHAEL R. BELTER
11                             Attorney at Law
                          65 North Raymond Avenue
12                        Suite 320
                          Pasadena, California 91103
13                        (626) 796-2599

14

15   On behalf of DEFENDANT WAYNE BRIDGEWATER:

16
                          LAW OFFICES OF MICHAEL V. WHITE
17                        BY:  MICHAEL V. WHITE
                               Attorney at Law
18                        1717 Fourth Street
                          Third Floor
19                        Santa Monica, California 90401
                          (310) 576-6242

20

21                        -AND-

22
                          STEWART & HARRIS
23                        BY:  WILLIAM S. HARRIS
                               Attorney at Law
24                        1499 Huntington Drive
                          Suite 403
25                        South Pasadena, California 91030
                          (626) 441-9300
```

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

3

1  **APPEARANCES (Continued):**

2  On behalf of DEFENDANT HENRY MICHAEL HOUSTON:

3

4                          LAW OFFICES OF MARK F. FLEMING
                           By:  MARK F. FLEMING
5                               Attorney at Law
                           433 "G" Street
6                          Suite 202
                           San Diego, California 92101
7                          (619) 652-9970

8                          -AND-

9

10                         ROTHSTEIN, DONATELLI, HUGHES,
                           DAHLSTROM & SCHOENBURG & FRYE, LLP
11                         BY:  MARK H. DONATELLI
                                Attorney at Law
12                         P.O. BOX 8180
                           Santa Fe, New Mexico 87504
13                         (505) 988-8004

14

15

16

17

18

19

20

21

22

23

24

25

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

4

1                              **I N D E X**

2


3


4                           **EXAMINATION**

5


6     <u>Witness Name</u>          <u>Direct</u>  <u>Cross</u>        <u>Redirect</u>        <u>Recross</u>

7     THOMPSON, LEROY B.

8        By Mr. Harris          5

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

5

```
 1          SANTA ANA, CALIFORNIA, TUESDAY, APIRL 24, 2007

 2                    DAY 20 - VOLUME III

 3                      (1:09 p.m.)

 4          (The following proceedings is taken in the

 5      presence of the jury.)

 6          THE COURT:  The jury and alternates are present,

 7  all counsel, the defendants, defense counsel and the

 8  government.

 9          Counsel, would you like to call your next witness?

10          MR. HARRIS:  Yes, your Honor.  Mr. Bridgewater

11  calls Leroy Thompson, if I could go get him.

12          THE COURT:  Thank you, if you would.

13          And ladies and gentlemen, I apologize.  I kept

14  referring to the last witness on more than one occasion as

15  Mr. Anderson.  It's obviously Mr. Jackson who testified.

16          Thank you, sir.  If you'd step forward, please,

17  between the double doors.

18          And now will you please raise your right hand.

19                    LEROY B. THOMPSON

20          THE WITNESS:  I do.

21          THE COURT:  Thank you, sir.

22          Would you please be seated in the witness box to

23  my left.

24          Now, sir, will you state your full name for the

25  jury.
```

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

6

1          THE WITNESS:  Leroy Bruce Thompson.

2          THE COURT:  And Mr. Thompson, will you spell your

3  last name for the jury, please.

4          THE WITNESS:  T-h-o-m-p-s-o-n.

5          THE COURT:  All right.  Thank you.

6          Now, you've got a quiet voice.  Can I have you

7  move forward a little bit or --

8          THE WITNESS:  Oh, boy.

9          THE COURT:  -- bring that microphone back.

10          THE WITNESS:  Okay.  Is this better?

11          THE COURT:  That's much better.

12          This is Mr. Harris on direct examination for

13  Mr. Bridgewater.

14                    **DIRECT EXAMINATION**

15  BY MR. HARRIS:

16  Q    Good afternoon, Mr. Thompson.

17  A    How are you?

18  Q    Good.

19       How old are you, sir?

20  A    I'm 60 years old.

21  Q    And where did you grow up?

22  A    In Los Angeles.

23  Q    What part of L.A.?

24  A    Southwest side.

25  Q    Do you have a nickname that you go by?

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

7

1   A    Yes, I go by "Kid."

2   Q    Have you spent some time in prison, state and federal

3   prison during your 60 years?

4   A    Yes, I have.

5   Q    Do you have an estimate of how many of those 60 years

6   were in prison?

7   A    Oh, I'd say 46, 47, something like that.

8   Q    Did you start out in the California system?

9   A    Yes, I did, as a juvenile.

10  Q    Juvenile hall?

11  A    Yes.

12  Q    Youth authority?

13  A    Yes.

14  Q    And then state prison system?

15  A    Yes.

16  Q    And have you spent any time in the federal prison

17  system?

18  A    Yes, I have.

19  Q    So you are pretty familiar with how prisons work?

20  A    Yes, being state raised.

21  Q    Are you in custody now?

22  A    No, I'm not.

23  Q    Are you on parole?

24  A    Yes.

25  Q    Federal parole?

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

8

1   A      Yes.

2   Q      When did you parole out?

3   A      December of 205 (sic).

4   Q      What is your educational background?

5   A      I completed high school.  I received my AA degree in

6   1973 or '70- -- '73, and I received my bachelor's in 1977.

7   Q      Where did you get the AA degree?

8   A      Tacoma Community College.

9   Q      And your bachelor's?

10  A      Washington State University.

11  Q      Where were you when you got those degrees?

12  A      I was incarcerated in McNeil Island Federal

13  Penitentiary.

14  Q      Is that in the State of Washington?

15  A      Yes, it is.

16  Q      So you did that sort of correspondence courses?

17  A      No.  The professors were coming in at that time into

18  the institution, and they had regular classes.

19  Q      Are you taking any classes now?

20  A      Yes, I am.

21  Q      What are you studying?

22  A      Psychology.

23  Q      Towards what?  What do you want to do with that

24  education?

25  A      I'm going into what they call a human services area,

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

9

1   and that would be drug rehabilitation, alcohol thing,

2   homeless and all that kind of gang prevention; the whole

3   nine.

4   Q    Growing up in Los Angeles, were you a member of any

5   street gang?

6   A    Yes, I was.

7   Q    What gang was that?

8   A    I was a Gladiator, still is, still are, or whatever I

9   am, or whatever.

10  Q    And would you describe to the jury what the Gladiators

11  are?

12  A    Maybe -- this may sound a little ambiguous to some of

13  you, but the gang that I was in at that time is not like the

14  gangs that you hear about today, like the Crips and the

15  Bloods, and so forth and so on.  I was in a gang in the

16  '50s, and it went on to the '60s.  But my gang, or the gang

17  I was in, we were more or less -- we considered ourselves

18  family because we grew up together, we were -- everybody in

19  my gang, the ones that are still around, knows my entire

20  family just like I knew their entire family.  We did

21  everything together.  We were one for all and all for one.

22  Q    And you say you are still a member of that gang?

23  A    Yes.

24  Q    What did you mean by that?

25  A    We -- we still have our meetings.  We still have -- as

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

10

1   a matter of fact, we have a dance planned that's coming up

2   this -- not this next but next week, we are putting on a

3   dance.  We rent halls and do a lot of social stuff in trying

4   to give back to the -- basically the neighborhood because we

5   were a very destructive force growing up, and we realize

6   that, and, you know, we are trying to make some amends and

7   make things better for the people coming in after us.

8   Q    So these are young men that you grew up with in your

9   neighborhood?

10  A    Yes, right.

11  Q    Were you a member of any gangs within the prison

12  system --

13  A    I --

14  Q    -- or groups within the prison system?

15  A    Well, yes.

16  Q    Describe for the jury what group you were a member of

17  within the prison system.

18  A    Okay.  Well, this -- this is, again, kind of a

19  complicated question to answer because the administration in

20  jail, the guards and the staff, classify just about

21  everything as a gang.  I mean, they have what they call

22  Christian gangs, and these are just the guys that go to

23  church and make their whole thing about church, you know,

24  they -- they -- they are very serious and basically good

25  guys, but you have some bad eggs like you do in every group.

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

11

1        My religious affiliation is Islam.  I am a Muslim by

2    choice, and they put us down as a gang also.  And I think

3    the reason that they do that is because anytime there's a

4    group of people that commune together, regardless of what

5    reason you use, it's termed as a gang because you have

6    numbers, and in numbers there is strength.  And in

7    actuality, basically you could call it that because if

8    somebody did something to a Muslim or a Christian, or

9    whatever, this is the group that he would get his backing

10   from.  Not from the staff.  He would get his backing from

11   his fellow members, his help, his soccer, or whatever you

12   want to call it, but you couldn't go to the staff.

13       In other words, if I'm a Muslim, and a guy took my

14   canteen, or whatever, sure, I could go and tell the officer,

15   "Hey, this guy took my canteen.  He took my stuff.  He

16   pulled a knife on me and took my shoes and Fritos," or

17   whatever it was I had.  You could do that.  You could do

18   that, but you wouldn't live very comfortably after that, if

19   you live at all, because you'd be termed as a "rat," a

20   "snitch," a "weakling" and all that, and the inmates --

21   well, I don't subscribe to the "inmate" thing.  I consider

22   myself is a convict, and there is a subtle difference in

23   there, which might take a whole lot of time to explain, but

24   it's a dichotomy.  It's a dichotomy.

25   Q    Well, let me ask you this, Mr. Thompson.  What is the

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

12

1    United Front?

2    A    The United Front was a group that we started, and when

3    I say "we," myself and other black convicts started in

4    San Quentin.  It was a group of young black convicts that

5    were tired of the conditions and the things that were

6    happening in the institution that we were in, and in order

7    to address some of the issues and some of the things that

8    were happening, we decided to step forward and make

9    ourselves known as a force and as a presence in the

10   institution.

11        Basically, out of the group that I was a member of,

12   another thing came out later on, and that was the BGF.

13   Q    This was a predecessor group to the --

14   A    Black Guerilla Family, yes.

15   Q    -- BGF, the Black Guerilla Family?

16   A    Yes.

17   Q    And during what time frame was this, the United Front?

18   A    Oh, this was in the '60s.  I would say -- let's see.  I

19   got to San Quentin in 1965 or '66.  I know I was 19 years

20   old, and so from 19 to, like, 25, 26, something like that,

21   in that area.

22   Q    Were you convicted in California of a number of crimes?

23   A    Yes.

24   Q    Which crimes were you convicted of in California?

25   A    Armed robbery, strong arm robbery, attempted murder,

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

13

1    just about anything you can name, except rape and those old

2    weird crimes that I consider.

3    Q    Did you do -- did you do time in some California

4    institutions?

5    A    All of them.

6    Q    Which -- you mentioned San Quentin.  Were there any

7    others that you did time in?

8    A    Yes.  At the time they were talking about -- the time

9    frame we are talking about, in that period, there were only

10   14 institutions in California, 14 facilities, and I had been

11   to -- let's see.  I started at Soledad, Soledad, Tracy,

12   San Quentin, Folsom, Susanville -- let's see.  Soledad --

13   Soledad, Tracy, Quentin, Folsom, Susanville, back to

14   Susanville, back to Folsom, South CC, Camp -- Camp 20, or

15   Camp something -- they had numbers -- and Chino.  Then from

16   Chino, back to Palm Hall, and from Palm Hall, I went home

17   from Palm Hall, which was the maximum security institution

18   in the state.

19   Q    Have you been convicted of any federal crimes?

20   A    Yes, I have.

21   Q    How many?

22   A    Just two.

23   Q    What was the first conviction?

24   A    Armed bank robbery.

25   Q    And what year was that conviction?

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

14

1   A    1972.

2   Q    What was your sentence on that one?

3   A    Twenty years.

4   Q    And how many years did you serve on that first one?

5   A    I think about five, five and some change.

6   Q    Did you have another federal conviction?

7   A    Another armed bank robbery.

8   Q    What year was that conviction?

9   A    1979.

10  Q    What was your sentence on that one?

11  A    Actually, 50 years, but I had it reduced later on.

12  Later on, they reduced it to 30 years.

13  Q    And how much of that 30 years did you actually serve?

14  A    Two-thirds, which is mandatory by law that you can only

15  do two-thirds, and then by Congress, they have to release

16  you or parole you, or something, so I did that.

17  Q    So you did 20 out of 30?

18  A    Actually, I did 25 years, 8 months and some days.

19  Q    And is that because your second conviction was a

20  violation of your parole on the first conviction, and so you

21  got some time tacked on?

22  A    Yes, somewhat, yeah.  Well, after I -- after -- after I

23  did my mandatory release, which is a 20-year sentence, I

24  thought I was going to be released home because I had done

25  so much time, but they said no, I still owed them time from

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

15

1   1972, so they had me do close to six more years for a parole

2   violation.

3   Q    Going back to the first conviction, you did a -- where

4   did you your federal time on that first one?

5   A    At McNeil Island.

6   Q    And that's when you got your degrees?

7   A    Yes.

8   Q    And what years was that, approximately?

9   A    I got my -- I think I got my BA --

10  Q    Oh, no, I'm sorry.  What years -- the first stretch,

11  from when to when?

12  A    '72 until '77.

13  Q    Okay.  And then you did, for the second bank robbery,

14  your second stretch, about from when to when?

15  A    '79 until 2005.

16  Q    Were you in a number of BOP institutions during that

17  second stretch?

18  A    Yes, I was.

19  Q    Describe for the jury, if you could, or identify which

20  BOP institutions you were in for this second stretch.

21  A    Okay.  I went -- when I was arrested -- I'm not trying

22  to be flippant or anything.  It's just that I have a weird

23  sense of humor.  But when I was arrested, I was arrested for

24  armed bank robbery, but I had a shootout with the police in

25  which an officer of the court was shot, and they couldn't

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

16

1    convicted me of it because of his past, so they didn't --

2    they let that go, but it became what they call, or what we

3    call a "silent beef." In other words, you'll still be

4    judged for it, even though you are not convicted of it.

5         So I went from the county jail to Marion, which is a

6    level six institution, and at the time, it was the only

7    level six institution in the country. I had no idea that I

8    was going to Marion because all I had was a bank robbery,

9    but I think because the D.A. got shot, they sent me to

10   Marion.

11        So I was in Marion from '79 until '82. I was

12   transferred from Marion to Lompoc Federal Penitentiary. I

13   was in Lompoc from '82 until '88, or maybe late '87, and I

14   became a part of what they call a federal boarders program.

15   At that point in time, what happened is the federal

16   institutions were becoming overcrowded because they had

17   passed, what they call, the crack law, and they were

18   bringing a lot of people into the federal system, so it

19   became crowded. And what they did was found state

20   institutions that didn't have that many inmates, like

21   Wyoming, state of penitentiary in Wyoming. They may have

22   built the institution to house 2,000 people, and they may

23   have had, like, 400 people in it. They had bed space, so

24   what the federal government did was rent their bed space and

25   transferred some of their inmates there, and you'd get the

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

17

1    privileges that whatever the state was doing, the federal

2    inmates would get the same privileges that they had.

3        So after I was transferred from Lompoc to Walawala -- I

4    stayed at Walawala 20-something months -- I went back to

5    Lompoc, and then from Lompoc to Lewisburg; from Lewisburg to

6    Terre Haute; from Terre Haute to Florence, Colorado; from

7    Florence, Colorado, to Allenwood, Pennsylvania; from

8    Allenwood, Pennsylvania, back to Lompoc.  From Lompoc, I

9    finally hit an FCI, which is a medium or minimum

10   institution.  I went to Sheridon, Oregon, which is an FCI,

11   the first one I went to.  From Sheridon FCI, I went to

12   Victorville, FCI, and from Victorville FCI, I ended back up

13   in the penitentiary, which was Atwater Federal Penitentiary,

14   and I finally got paroled from Atwater.

15   Q    You got paroled from Atwater in 2005?

16   A    Yes.

17   Q    What years were you at Lewisburg?

18   A    From '90 to '94.

19   Q    Mr. Thompson, do you know Wayne Bridgewater?

20   A    Yes, I do.

21   Q    When did you first meet him?

22   A    I think it was in Lompoc or Walawala, one of the

23   state -- Washington or Lompoc, but I remember him well.

24   Q    How long do you think you've known him?

25   A    Oh, man, 20-plus years.

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

18

1    Q    Do you see him in the courtroom today?

2    A    Yes, I do.

3    Q    Where is he, if you can point him out?

4    A    Right there (indicating).

5              THE COURT:  Let the record --

6              MR. WHITE:  So stipulated.

7              THE COURT:  Okay.

8              MR. WHITE:  Mr. Bridgewater.

9              THE WITNESS:  Yes.

10             THE COURT:  All right.  Thank you.

11             There is a stipulation, and the record has

12   identified Mr. Bridgewater.

13   BY MR. HARRIS:

14   Q    How would you describe for the jury your relationship

15   with Mr. Bridgewater?

16   A    As a friend, yeah.

17   Q    I'd like to ask you some questions about your time in

18   prison.

19             During -- during your time in prison, did you become --

20   did you observe that inmates would tend to join groups, they

21   would group up in prison?

22   A    Yes, that's a fact of prison life.

23   Q    And why -- from your observation, why would inmates

24   group up in prison?

25   A    It's several reasons.  The main one would be not just

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

19

1    comradery and companionship and like-minds joining, but it's

2    a need, it's a need in the institutions to affiliate

3    yourself with someone of a like mind just for

4    self-preservation.  You have -- I mean, it's -- I don't know

5    if the jury or the Court, in general, understands that it's

6    a totally different circumstance and situation.  It's a

7    totally different world, and you have totally different

8    rules.  Accept or unaccepted, the fact of the matter is that

9    they are there, when they are implemented or whatever, but

10   they still hold today.

11       And if you are not a member of a group, you are -- you

12   are like a sheep outside of the heard, and the institution

13   is full of predators, not just -- they come in bunches

14   because they affiliate, too.  They've got people with like

15   minds, and they will do something bad to you, real bad.

16   Q    When you say the institutions are full of predators,

17   what kind of predators?  Describe that.

18   A    The best way I could define it is to give you an

19   example, if the Court has time, and it's like -- I know guys

20   that are not just sexual deviants, but are psychopathic

21   sexual deviants.  I mean, dangerous that will actually kill

22   you, kill you because you look feminine to them.  You look

23   like a woman or -- I know a guy that said this other guy had

24   his woman's eyes, and he wanted to have sex with this man,

25   and this man was not of that persuasion, but he was going to

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

20

1   have sex with him, and he told me face-to-face that "I'm

2   going to have him as a woman, or I'm going to kill him, and

3   that's that," and this is the type of people that are in

4   there.  I mean, you've got people that need specialized

5   treatment that don't get it; I'll put it like that.

6   Q    During your time in prison, did you ever come into

7   contact with a group called the Aryan Brotherhood?

8   A    Yes.

9   Q    When was your first awareness or contact with the Aryan

10  Brotherhood?

11  A    At their inception.  I knew -- as the Court has

12  probably surmised, I'm a state-raised guy.  I started going

13  to jail as a youth, 12 years old.  I went to jail when I was

14  12, and I didn't get out until I was 16 because of my

15  behavior.  I only had a 90-day sentence, but I was one of

16  those young, independent, rebellious type of nuts, and

17  nobody could tell me nothing.  I did what I wanted to do

18  when I wanted to do it, and whatever the consequences were,

19  come on with it, because I was an outlaw, and that's how I

20  viewed myself.

21       I didn't live by conventional law.  I didn't care

22  anything about it.  I didn't even know people that had jobs.

23  I'm 60 years old.  I've had one job in my life, and it

24  wasn't a job, it was a business.  I was the boss, and that

25  was probably the only reason I got to do anything

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

21

1    legitimate.

2        Other than that, my upbringing -- my father was a pimp,

3    a dope dealer, a murderer, a robber, and all that.  He's

4    been in the same jails.  Me and my father were cellmates on

5    several occasions, and that was how I viewed life coming up,

6    and that's where my judgment came from a lot of times,

7    because people that I would see, I would automatically

8    categorize them, or he's a -- he's a square.  He's not --

9    you know, he's outside of my circle, and my circle was the

10   thugs, the hoodlums, the crooks, you know, the guys that

11   stole, that sold women, that sold drugs, burglarized,

12   whatever.  Those were the people that I grew up with, and

13   that's what we did.  That's how we lived.  That's not

14   everybody, but, I mean, you know, there's exceptions to

15   every rule.  But the knuckleheads like myself that didn't

16   understand what was going on or why it was happening, that's

17   what we turned to.  And at first, it was just recreation.

18   It was just fun.

19   Q    Let me ask you this.  Getting back to the Aryan

20   Brotherhood, from your observation, was it formed in

21   response to something?

22   A    Yes.

23   Q    What was it a response to?

24   A    This -- I don't think this -- this probably isn't the

25   main reason, but it's one of the key reasons, I think,

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

22

1   because I had a lot of feelings as a youngster, I mean, 12,

2   13, 14, 15, 17, growing up.  At that time, the prison

3   population was -- it was a lot of black people in there, and

4   a lot of the black people that were in there really deserved

5   to be there, or dead, because there were some sick people.

6   I mean, really sick, socially and mentally.  I mean, they

7   were people that didn't -- they would rape you, they would

8   beat you, take whatever they wanted from you, and that was

9   that.  If you went and told on them, you were going to get

10  it later on, you know, you -- they could -- I mean, it

11  was --

12      So consequently, a lot of people, especially little

13  people -- this is why I had so many different friends

14  because I didn't get in any sides until I got to San

15  Quentin.  But prior to that I was a little guy, and being a

16  little guy, I was subjected to a lot of stuff from the

17  bigger guys with the muscles and the will and the strength,

18  and all of that, and my mentally was, "Okay.  I can't whoop

19  you.  I'm going to stab you.  I'm going to sneak up on you.

20  I'm going to hit you in your head while you sleep.  If you

21  do something to me, believe it, one way or another, some

22  kind of way, I'm going to get you one day," and I didn't

23  care if you were on the toilet or asleep or whatever.

24      But out of that, we formed -- a lot of people my size

25  and my age, we got together, "Hey, man, those guys over

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

23

```
 1    there, they want to have so and so," and we would -- and

 2    consequently, the same thing happened with the whites and

 3    the Mexicans, because it was a lot of predatory people in

 4    there that were taking advantage of people.  And then you

 5    had a lot of racial stuff that was going on, and I grew up

 6    during the civil rights movement.  I was like a teenager in

 7    the '60s and the '50s, and all of that, and so I'm seeing a

 8    lot of stuff --

 9              MS. FLYNN:  Your Honor, I'm going to object as

10    nonresponsive at this point.

11              THE WITNESS:  No, it's not.  I'm sorry.

12              THE COURT:  Just restate the question.

13    BY MR. HARRIS:

14    Q    The Aryan Brotherhood was formed in response to these

15    pressures from other groups?

16    A    I -- I would say so.

17    Q    And was it for protection, basically, self-protection?

18    A    Well, that's what I'm saying, some of it, in one part,

19    yes, in another part, no.

20    Q    But at the inception, it was --

21    A    At the inception, I think everything is formed as a

22    defense mechanism.

23    Q    Did you know some of the early leaders of the Aryan

24    Brotherhood in the state system?

25    A    Yes, I did.
```

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

24

1    Q    Who did you know?

2    A    I knew Danny Dawg.  I know Jackass, Charlie.  I know

3    T.D., Snail, Danny Dawg, Monster, and who else --

4    Q    T.D., was that T.D. Bingham?

5    A    Yes.

6    Q    And did you know Barry Mills?

7    A    Yeah.  I knew Barry Silverstein (sic), I -- I mean,

8    I knew -- I was raised in the state institution, so if they

9    came through there, 9 times out of 10, I knew them, and a

10   lot of times we grew up together through the institutions.

11   Q    And did you observe the AB in the federal system also?

12   A    Yes.

13   Q    Mr. Thompson, could you describe for the jury -- well,

14   let me ask you, are federal prisons a violent place?

15   A    Yes, they are.

16   Q    Describe for the jury how federal prisons are violent

17   places.

18   A    They are violent in that you have a number of people

19   that you've put together, and out of those different

20   mentalities and all of that, you know, you've got animals,

21   man, that are in jail, and they don't mind being an animal

22   because they are not ever going to get out.  And some of

23   them that are going to get out, they figure, "Well, I'm

24   going to be so old that it don't make no difference, so I'm

25   going to do what I want to do when I want to do it, and to

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

25

1   hell with it.  They can't do nothing to me but kill me, and

2   I'm going to die of old age anyway, so I don't have anything

3   to lose."

4   Q    In federal prison, are guards able to protect the

5   inmates?

6   A    The guards can't protect themselves; I'll put it like

7   that.  I mean, they have their little whistle.  All they

8   have is a walkie-talkie, a radio, that's all.

9   Q    So who takes responsibility for protecting the inmates

10  in prison?

11  A    You and whoever you are with.  If you don't protect

12  yourself, you are not protected.

13  Q    Now, during the time you were in prison, did you

14  ever -- did there ever come a time where it was told to you

15  that one group was at war with another group?

16  A    Plenty of times.

17  Q    When you -- when you heard that, what, to you, does the

18  word "war" mean?  If somebody tells you you are at war, what

19  does that mean to you?

20  A    That means that my life is on the line.  I have to do

21  what I have to do to survive, and that includes, killing,

22  stabbing, getting hit in the head or getting killed, or

23  whatever.  I mean, "war," by definition, is -- leads to

24  death.

25  Q    It's a life and death situation at that point?

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

26

1   A    Exactly.  Every day, that's what you got.

2   Q    Now, during your time at Lewisburg in 1990 through

3   1994 -- you remember that period, right?

4   A    Yes.

5   Q    Did you have a job during that time?

6   A    Yes.  I worked in the -- what they call UNICOR.

7   Q    And we've heard testimony in this case about a metal

8   factory at Lewisburg; is this what we're talking about?

9   A    Yeah, I worked in the metal factory.  I was a welder.

10  Q    Okay.  Describe for the jury what your job was at the

11  UNICOR metal factory.

12  A    Well, you -- they get contracts.  The government hires

13  out inmate labor, convict labor, and they underbid or get

14  the right bid on certain jobs.  And I worked in what they

15  call the metal shop, and our job was to fashion any type of

16  artifact that they were making out of metal that they bid

17  on.  So in my particular job, I remember we were doing

18  panels, and the panels were for some type of insulation,

19  refrigeration, or something like that.  But it was like a

20  metal-based frame, and you dropped a fiberglass in it and

21  you tacked on the screen on both sides, but we would have

22  all types of access to metal.

23  Q    Would it be your job as a welder to cut the metal into

24  sections?

25  A    Yes.

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

27

1    Q    And what would you use to cut the metal?

2    A    A cutting torch or saw.  They have all of the milling

3    machines, lathe, whatever.  They had all of the machines and

4    everything, so it's no problem, stamping out stuff,

5    whatever.

6    Q    When you would -- and you would cut sections of metal

7    for -- per some specifications?

8    A    Yes.  For instance, if you wanted to panel 22 inches by

9    36 inches, and you gave me, like, 4 feet of material to work

10   with, I'm going to have a foot or more left over, and they

11   don't check it.  You just cut out what you want.  If you've

12   got this much (indicating) metal left over, about that long

13   (indicating), hey, that's five or six knives, and it's a

14   good hustle.

15   Q    Were those leftover pieces ever made into knives?

16   A    Yes, more often than not.

17   Q    And how can that happen in the metal factory?  Wouldn't

18   somebody catch you?

19   A    Well, you had one instructor, and he may have one

20   assistant or maybe one guard walking around, so you have 2

21   people trying to watch 60 or 70 guys, and it's very easy for

22   them to be distracted or to be involved with a group over

23   here (indicating) that's making fenders, but this group over

24   here (indicating) is making light fixtures.  So he may be

25   over there (indicating) instructing them on what to do, and

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

28

1    the other guard is over there (indicating) watching

2    somebody, and you have a half an hour at your post to

3    complete what you are doing unsupervised, really, so you can

4    cut our your metal and shape it and sharpen it and stash it,

5    whatever.

6    Q    What sort of machines would you use to sharpen the

7    metal?

8    A    They have -- they have all of the modern convenience

9    now in the store.  They have sanders.  They have grinders.

10   They have lathes, milling machines, pipe.  They have

11   everything, everything you would need to really make a

12   custom-fitted knife, gun, or whatever.  It's right there at

13   your fingerprints, and if you don't have any supervision and

14   you have the knowledge, you could do that.

15   Q    And while you were working at Lewisburg, were there a

16   lot of weapons made that you observed?

17   A    Yes.  I used to make them myself.

18   Q    And how would you get the weapons out of the metal

19   factory and into the rest of the institution?  How would

20   that happen?

21            THE COURT:  Let me say, also, however that is,

22   however it's transported, if it's a body part or whatever,

23   just tell it just like its.  We are not dressing anything up

24   for the jury --

25            THE WITNESS:  Wonderful.

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

29

1          THE COURT:   -- okay?

2          THE WITNESS:   Okay.

3          Well, you have many ways you could do it.  For

4    instance, like the Judge said, if you were very desperate or

5    you didn't trust the thing, you could wrap it up in some

6    insulation and insert it in your anus and take it out, just

7    take your knives, or whatever, to the bathroom and manually

8    put them in your anus and be uncomfortable and take them out

9    and give them back to the -- or you could -- it's a lot of

10   variables involved, because they would have what they call a

11   metal detector, or a detection thing that you're supposed to

12   go through, and you do go through it, even though sometimes

13   you could go around it.  It depends on the officers that are

14   working that particular post.

15          You could beat the metal detector all day long, or

16   on the way from the factory back to your unit, or your

17   housing unit, you'd have to go down this particular walkway

18   (indicating), which is separated from the yard.  And the

19   yard is, like, right there (indicating), so you can see --

20   when you are on your way in, people are coming into the yard

21   for recreation, and you can have it pre-arranged, like,

22   "Man, at 3:00, man, make sure you come to the yard, I'm

23   going to have something for you."  He's like, "All right."

24   And on the way, he's on his way out, and you're on your way

25   in, and you look, "Hey, man, yeah, I got you this.  Stow

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

30

1  it," and he'll catch it or slide it under or slip it through

2  the fence or -- that's one method.  You could put it in your

3  shoe, or if you wanted to be real creative, like a lot of

4  people are, they sold photo albums with metal in them.  You

5  could disassemble your photo album, put knives in it, glue

6  it back together, and on your way to the metal detector,

7  give your photo album to the officer that's doing the

8  shaking down.  He'd look through it and put it on the side

9  because he knows it's already metal in there, so he'd put it

10  on the side not knowing you have -- he'll just let you get

11  away with 10 knives, or whatever, and, you know, you could

12  beat them.

13  BY MR. HARRIS:

14  Q    Is it difficult to get weapons out of UNICOR and into

15  the institution?

16  A    No, no.  I never got caught, and I did it for a number

17  of years.

18  Q    The people that you knew at Lewisburg, how many of them

19  would you say had weapons, knives?

20  A    I knew quite a few people, and I didn't know anyone

21  without a knife.  You had to have a knife for your own

22  protection.  If you weren't going to use it, you could at

23  least bluff somebody with it, but it was better to -- this

24  is what we used to say, "I'd rather be caught with it than

25  be caught without it."

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

31

| | |
|---|---|
| 1 | Q    So pretty much everybody you knew at Lewisburg during |
| 2 | 1990 through 1994 was armed with a knife? |
| 3 | A    Or a pipe or better or both, or whatever, yes. |
| 4 | Q    Thank you. |
| 5 | No further questions. |
| 6 | THE COURT:  Direct examination, Mr. Fleming? |
| 7 | MR. FLEMING:  No questions. |
| 8 | THE COURT:  Direct examination, Mr. Belter? |
| 9 | MR. BELTER:  No, thank you. |
| 10 | THE COURT:  Cross-examination, Ms. Flynn? |
| 11 | MS. FLYNN:  Nothing, your Honor. |
| 12 | THE COURT:  Mr. Thompson, we are asking all of the |
| 13 | witnesses to remain available until Friday of this week. |
| 14 | THE WITNESS:  Okay. |
| 15 | THE COURT:  So if we need you -- |
| 16 | THE WITNESS:  No problem.  Okay. |
| 17 | THE COURT:  -- we'll find you, trust me. |
| 18 | THE WITNESS:  I know.  Thank you. |
| 19 | THE COURT:  Counsel, you're next witness. |
| 20 | We'll need a recess, I think. |
| 21 | We'll be as short as possible, but I'm going to |
| 22 | ask you to take a recess.  You are admonished not to discuss |
| 23 | this matter amongst yourselves, nor form or express any |
| 24 | opinion concerning this case.  We will come and get you as |
| 25 | soon as we possibly can. |

CR 02-938(E)-DOC - 04/24/2007 - Day 20 - Vol. III

32

1        (Recess.)

2                        -oOo-

3                    **CERTIFICATE**

4

5        I hereby certify that pursuant to Section 753,

6   Title 28, United States Code, the foregoing is a true and

7   correct transcript of the stenographically reported

8   proceedings held in the above-entitled matter and that the

9   transcript page format is in conformance with the

10  regulations of the Judicial Conference of the United States.

11

12  Date:  April 25, 2007

13

14

15                    _____
                       JANE C.S. RULE, U.S. COURT REPORTER
16                    CSR NO. 9316

17

18

19

20

21

22

23

24

25

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER