1              UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
2                   EASTERN DIVISION

3                       ---

4      **HONORABLE VIRGINIA A. PHILLIPS, JUDGE PRESIDING**

5                       ---

6   UNITED STATES OF AMERICA,        :
                                     :
7            PLAINTIFF,              :
                                     :
8        VS.                         :   NO. CR 02-938(A)-VAP
                                     :
9   DAVID MICHAEL SAHAKIAN,          :
                                     :
10           DEFENDANT.              :
    _____:

11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS
                  JURY TRIAL - DAY 30
15
                 RIVERSIDE, CALIFORNIA
16
               THURSDAY, OCTOBER 2, 2008
17

18

19

20

21

22
                     MARK SCHWEITZER, CSR, RPR, CRR
23                   OFFICIAL COURT REPORTER
                     UNITED STATES DISTRICT COURT
24                   181-H ROYBAL FEDERAL BUILDING
                     255 EAST TEMPLE STREET
25                   LOS ANGELES, CALIFORNIA 90012
                     (213) 663-3494

 1   **Appearances of Counsel:**

 2   For the Plaintiff:

 3        Office of the U.S. Attorney
         By Stephen G. Wolfe, AUSA
 4          Joseph N. Akrotirianakis, AUSA
         312 North Spring Street
 5       Suite 1504
         Los Angeles, California 90012
 6       (213) 894-2467

 7


 8   For the Defendant:

 9        Shostak & Shostak, LLC
         By Burton H. Shostak, AAL
10       8015 Forsyth Boulevard
         St. Louis, Missouri 63105
11       (314) 725-3200

12            -and-

13       Leritz, Plunkert & Bruning
         By Joseph L. Green, AAL
14       One City Centre
         Suite 2001
15       St. Louis, Missouri 63101
         (314) 231-9600

16

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2

3    **DAVID MICHAEL SAHAKIAN, PREVIOUSLY SWORN**................. 9

4    DIRECT EXAMINATION (CONTINUED) BY MR. GREEN:.............. 9

5    CROSS-EXAMINATION BY MR. WOLFE: ........................ 33

6    REDIRECT EXAMINATION BY MR. GREEN:..................... 114

7

8                          **E X H I B I T S**

9

10    (Exhibit 1459 received.)................................ 27

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **Riverside, California; Thursday, October 2, 2008**

2                                    **8:53 A.M.**

3          WHEREUPON THE CASE HAVING BEEN CALLED

4          AND APPEARANCES GIVEN, THE FOLLOWING

5          PROCEEDINGS WERE HELD:

6          MR. GREEN:  Judge, I asked for a little hearing

7    before we begin the testimony.  I think we kind of left off

8    with where the government had said that they may be in

9    possession of statements that came up through a -- my client's

10   California Department of Correction's C file or inmate file.

11   And the last I remember from the record, and I apologize, is

12   that there may have been an in camera review of those

13   statements to see?  No?  Okay.

14         THE COURT:  No, I think that you -- I think I

15   mentioned that I -- I think this was the day before yesterday.

16         MR. GREEN:  Yes, Judge.

17         THE COURT:  And at one point during the hearing, I

18   had said perhaps I should do an in camera review, and then we

19   discussed it further for a moment or two after that or a few

20   moments after that, and then we had the discussion about -- I

21   think it was after that we had a discussion about Rule 13.

22   But I did not do an in camera review based on what the

23   government's representations were about what the documents

24   were that they intended to use.

25         MR. GREEN:  Okay.  And again, my recollection with

1    what the government had said was that their position was that

2    the statements did come in if they were made to correctional

3    officers from the State of California because they were not

4    federal government personnel or agents.

5          I guess I would like to inquire as to how the

6    government obtained the file.  If they obtained it by

7    subpoena, I would at least kind of recognize that they got it

8    from an independent source, but if they got it from the

9    Sacramento intelligence unit, which is a multi-jurisdictional

10   entity that gets its information from both the federal and

11   state agencies, then I believe that those statements then

12   still fall under Rule 16 and should have been disclosed to us.

13         THE COURT:  Well, the representation that was made

14   by the government on the record on Tuesday was that there was

15   no joint -- that none of the documents were obtained in the

16   course of an investigation by a joint task force that included

17   federal agents.  And correct me if I've misstated that.

18         MR. WOLFE:  No, your Honor.  That's correct.

19         THE COURT:  So then the source could not have --

20   well, so Mr. Wolfe, then it seems to me that it logically

21   follows that your source for the documents could not have

22   been --

23         MR. GREEN:  From the Sacramento intelligence --

24         MR. WOLFE:  Your Honor, I think defense counsel is

25   confusing two points.  One question is how were the documents

1    created.  For instance, if the documents were created by a

2    joint federal state task force and then they just happened

3    five years later to be lying in a California office, they

4    might be discoverable in any event.  But if they were created

5    by a -- well, maybe I shouldn't talk about --

6              THE COURT:  The issue -- one issue under Rule 16 is

7    are they statements made to a government agent, because then

8    the government has the obligation to turn them over under Rule

9    16.  And the government has represented to the Court that the

10   statements it intends to use and that it did not turn over in

11   discovery are not statements made by the defendant to an agent

12   of the government, meaning the federal government.

13             MR. WOLFE:  Yes, your Honor.  That's true.

14             THE COURT:  All right.  So that's the issue under

15   Rule 16.

16             MR. GREEN:  And I believe there's a further issue

17   that if the statements came from the Sacramento intelligence

18   unit and that's how the government obtained them, then they

19   were still required to disclose them to us under Rule 16.

20   Because Sacramento intelligence unit, it's my understanding

21   and I could be wrong.  I've just going by what I read about

22   it.  Is that it's a multi jurisdictional kind of database

23   center for both the federal and state data collection on gang

24   activities.

25             THE COURT:  Well, before I let the government

1    respond to that, if the statements were not made -- if the

2    statements don't come under what I just described, which is

3    Rule 16 (a)(1)(B), when they were made, the fact that -- I

4    guess my question would be to you, why would the fact that

5    they -- let me make my question a little more concrete.

6           If the statement was made, the defendant's statement

7    was made to a California corrections officer, for example,

8    which is not an agent of the government under Rule 16, I know

9    you disagree with that, but then the fact that the sort of,

10   just for the sake of argument, the fact that that statement

11   later was collected by a joint task force of the type you're

12   describing, or came into its possession, why would that make

13   it discoverable?

14          MR. GREEN:  Two reasons, Judge.  The first is -- and

15   I'm going to go backwards for the Court.  If it's in the

16   possession of the government from the Sacramento intelligence

17   unit, I believe that's all we need for it to be discoverable

18   for us.  But going back even further, as to how it was

19   created, I'm kind of -- I don't know what statements, when

20   they were made, and who they were made to.

21          So assuming the worst, that the statements were made

22   while that joint investigation was going on back in the late

23   80's, and if it falls within that time period of when it was

24   made, I also believe that the Department of Corrections

25   officers for the State of California, when they are trained,

```
 1    they are -- they have a duty and responsibility to give gang
 2    intelligence to the Sacramento intelligence unit and that that
 3    started before then.
 4            So therefore, they are working in joint with a
 5    federal agency.
 6            But I'm kind of at a disadvantage because I don't
 7    know the time period of when the statements were made.
 8            THE COURT:  All right.
 9            Mr. Wolfe?
10            MR. WOLFE:  Your Honor, defense counsel is simply
11    mistaken about Rule 16.  And the documents were obtained by
12    subpoena from the California Department of Corrections in any
13    event, which defense counsel admitted at the very beginning
14    means they are not discoverable.
15            MR. GREEN:  I don't admit that they are not
16    discoverable because they got them by subpoena because I
17    believe once they were in the government's possession, we were
18    still entitled.  But I recognize the argument of the
19    government, that because of that, we're not entitled to it,
20    and the Court's acknowledgment of it.
21            THE COURT:  All right.  Anything further before we
22    bring the jury in?
23            MR. GREEN:  No, your Honor.
24            (Recess taken.)
25            (WHEREUPON THE JURY ENTERS.)
```

1           THE COURT:  Good morning, ladies and gentlemen.  Let

2     the record reflect the presence of all members of the jury.

3     You may continue your direct examination.

4           **DAVID MICHAEL SAHAKIAN, PREVIOUSLY SWORN.**

5                 **DIRECT EXAMINATION (CONTINUED)**

6     BY MR. GREEN:

7     Q.   Mr. Sahakian, we left off last night with me having some

8     technical difficulties with respect to Exhibit 1101, which is

9     the cell search video from October 22nd of 2002.  I now have

10    that disk and a laptop computer, and we're going to focus on

11    the time period of 9:03:49 through 9:03:57.  Okay?

12    A.   Okay.

13    Q.   And when I get to the point in the video where you saw

14    the things that you testified to about yesterday, tell me to

15    stop.  Touch your screen, and it will leave a mark there.

16    When we're done with that point, touch the bottom right-hand

17    corner of your screen, and it will erase and go on to the next

18    one.  Okay?

19    A.   Okay.  Stop.

20    Q.   Now, do you recognize this correctional officer?

21    A.   It's Mr. Ellett.

22    Q.   And at this point in time, do you see his hand with the

23    ring finger on it?

24           MR. WOLFE:  Objection, your Honor.  The video is

25    what it is.

1          THE COURT:  The objection is overruled.

2          THE WITNESS:  When I looked at it, at the beginning

3    I didn't even look at it for Mr. Ellett or anything, I was

4    looking at it for a photo album.  But as I kept on going

5    through it and I didn't see the photo album and I seen this,

6    when I got to thinking about what was going on here and I seen

7    what comes later, I went and looked at his hands.  You don't

8    have nothing in his hands starting right now.  And when you go

9    further, you see he don't have nothing in his hands.

10   Q.   BY MR. GREEN:  Okay.  I'm going to stop it right there

11   for a second.  The gentleman who is writing on the box that's

12   kind of squatted down with the glasses and the mustache, do

13   you recognize him?

14   A.   That's the correctional counselor, Mr. Tolson.

15   Q.   Okay.

16   A.   You went a little too far, but anyway, you can see one

17   more time when he's turning around, he don't have nothing in

18   that other hand.

19   Q.   Okay.

20   A.   Stop.  No.  Go a little further, a little further.  Stop.

21   Q.   Okay.  Now, if you look to the left part of the screen,

22   in between the grill itself --

23   A.   Right here.

24   Q.   Right there.

25   A.   That's the beginning of what you'll see right there.

1    Some white starts showing up.  I think the one before, the one

2    frame before, it will start a little bit smaller, but then it

3    keeps on getting bigger as it turns around.

4    Q.    Okay.  And this is at 9:03:57?

5    A.    Right.

6    Q.    At this point do you see what appears -- do you appear to

7    see what is in his left hand?

8    A.    His left hand?

9    Q.    Yes.

10   A.    You can just see part of it right here.

11   Q.    Can you touch the screen and show me?

12   A.    Right there.

13   Q.    It's not come up.  There it is.  Thank you.  Can you

14   erase that now?

15   A.    Click it one time.  Click it.  Click it again.

16   Q.    Okay.

17   A.    Again.  Okay.  It keeps on getting more -- now you can

18   see more --

19            THE COURT:  There has to be a question and an

20   answer.

21   Q.    BY MR. GREEN:  Now, with respect to -- what do you see on

22   the left side of the screen now?

23   A.    Well, back it up.

24   Q.    Okay.

25   A.    I put the yellow on top of it.

1    Q.   All right.  Let me try to back it up here.  Okay.  Let me

2    take it one frame at a time.

3    A.   You jumped.

4    Q.   I jumped?  Okay.  Let me back up.  All right.  I'm going

5    to go back one more time.  All right.  I'll take it one frame

6    at a time.

7    A.   Go again.

8    Q.   I'm going to stop.  Okay.  Now, I -- if you look to

9    the -- identify for me on the screen the two cross bars on the

10   cell door, the lower one and the top one.  Can you touch those

11   on your screen?

12   A.   Right here is where -- you are talking about where it's

13   at?

14   Q.   No.  I want you to identify for me on the screen the

15   cross bar for the cell.

16   A.   Right here.

17   Q.   And then the one below that?

18   A.   That's one.

19   Q.   Okay.  And the area that we're looking at is in between

20   that area?

21   A.   It's right here.  This is the only place that you'll see

22   his hand moving back like this.

23   Q.   All right.

24   A.   And you'll see something in his hand.  It looks like --

25              THE COURT:  You have to wait for a question.

```
1    Q.   BY MR. GREEN:  But that's the area that we're focusing in
2    on; correct?
3    A.   Yes.
4    Q.   All right.  Now, coming forward one frame at a time.
5    Now, look in between those two bars, and can you circle what
6    is in between those two bars that we now see that wasn't in
7    the frame before?
8    A.   I can't circle it.
9    Q.   Okay.  Well, just put a mark underneath it.  You touch
10   the screen -- there you go.  Okay.
11        All right.  Now, erase that.  Okay.  Now touch it
12   again.  In between.
13   A.   It's getting bigger there.
14   Q.   There you go.  Erase that.  Thank you.
15        Touch it again.  Touch the screen again, please.
16   A.   You are talking about where it's at?
17   Q.   Yes, I want you to touch the screen where it's at.  Thank
18   you.  Erase it.
19        Okay.  Touch the screen again.  Touch the screen at
20   the bottom of the second cross bar.  Okay.  Erase that.  I'm
21   going to go a few frames up.  I'm going to go forward.
22        Okay.  Now, at this point in time, have we seen
23   Mr. Ellett pick up anything of your personal property or your
24   legal materials from the cell?
25   A.   No.  What I seen, when I looked at the video, is he
```

1    had -- he looked out the door two ways, and you could see his

2    hand, and he went to his pocket, and he turned around and took

3    two steps in the cell.

4    Q.    But with respect to what we've been watching so far, he

5    has not picked up anything from the bed or from your cell to

6    place in the box.

7    A.    Not since he looked out the door.

8    Q.    All right.  Now I want you to mark that top bar where

9    we've been focusing our attention in between the two bars on

10   the screen, please.

11   A.    Right here?

12   Q.    Yeah.  Now, look above that on the screen, and can we

13   start seeing his hand coming in --

14   A.    You can't see his hand yet, no.

15   Q.    Above that.  Above that.

16   A.    You can see his arm going back.  He's putting his hand

17   back behind him.

18   Q.    Okay.  Now, touch the top bar again that we've been

19   identifying to focus our attention on.  Touch it, please.

20   2340, the top bar?

21   A.    You can see part of his arm, his hand right here.

22   Q.    Thank you.  Okay.  Now we see the arm coming forward;

23   correct?

24   A.    Yeah.

25   Q.    Now we see -- now you see where his walkie-talkie is on

1   his belt?

2   A.   Right.

3   Q.   And can you show us where his arm is in respect to his

4   walkie-talkie?  Touch the screen, please.

5   A.   His arm is right here.

6   Q.   Got it.  Okay.  Erase that, please.

7            Now, do you see the wristband on his watch above the

8   walkie-talkie?

9   A.   Right there.

10  Q.   Yes.  Okay.  Get rid of that, please.

11           Now, we see the hand starting to move down -- is

12  that correct? -- with the wristband on it?

13  A.   Right here.

14  Q.   Got it.

15  A.   Something in his hand right there.

16  Q.   Okay.  And we see the hand going in a down motion;

17  correct?

18  A.   Right.

19  Q.   And then the hand is disappearing into the box?

20  A.   Right.

21  Q.   All right.  Could you mark that on the screen, please?

22  It's in between the walkie-talkie and the --

23  A.   There's the top of the box.  There's his hand.

24  Q.   Okay.  Erase that, please.

25           And we can see the hand go deeper into the box?

1    A.    Um-hm.

2    Q.    See the wristband getting closer to the top of the box?

3    A.    Yes.

4    Q.    Okay.  And now it goes out -- it's hidden by the bar;

5    correct?

6    A.    Correct.

7    Q.    Okay.  Nothing was picked up.  Okay.  Now his hand's on

8    the box; correct?

9    A.    Right.

10   Q.    And he's not picked anything else up to place in the box?

11   A.    No.

12   Q.    All right.

13         Marva, can you switch that back over to the Elmo for

14   me, please.

15         How long did it take you to through the DVD when you

16   were looking for your photo album?

17   A.    Well, first -- well, you remember.  The tape wouldn't

18   work in the machine.  So I didn't get to look at it for a long

19   time.  And then there was a problem.  I couldn't do it.  It

20   wouldn't -- the program wouldn't run the DVD.  So -- or what I

21   could do frame at a time.  But to go through from the

22   beginning or from the parts where you could see people moving

23   stuff, I was just looking for the photo album one frame at a

24   time, probably took about two hours.

25   Q.    Okay.  And with respect to the documents, especially the

1    typewritten portion of Exhibit 1, that was a document that

2    when you got your photocopy materials back, you -- when you

3    were reorganizing it, you took it out and identified it months

4    before Julie Blackshaw ever sent you any documents that wasn't

5    part of your property; correct?

6    A.    I gave it to the attorneys.

7    Q.    All right.

8    A.    As soon as I found it.

9    Q.    Now, let's talk about -- you've heard testimony in this

10   trial about how the Bureau of Prisons monitors certain

11   individuals or certain groups; correct?

12   A.    Correct.

13   Q.    Okay.  And you were aware that, as a member of the Aryan

14   Brotherhood, you were in a designated threat group?

15   A.    Yes, I was aware.

16   Q.    And were you also aware that the -- the Bureau of Prisons

17   therefore monitored your mail and your telephone calls on a

18   regular and daily basis?

19   A.    I understood that everything in Marion, at least,

20   everything, if you write a letter, use the phone, have a

21   visit.  Visits, telephone, or tape recorder, and then they

22   look at it to make sure everything's okay, and your letters --

23   I don't know.  I don't do it, but I've been told by people in

24   SIS they copy them and put them in a file for a certain period

25   of time.

```
 1   Q.   Well, as an inmate, you're made aware of certain policies

 2   and regulations that the Bureau of Prisons implements on

 3   inmates, and if you break them, you get a shot; correct?

 4   A.   Yes.

 5   Q.   And if you violate their rules with respect to the mail

 6   or misuse of the telephone or anything like that, you can get

 7   a disciplinary action for that; is that correct?

 8   A.   Yes.

 9   Q.   And how many disciplinary actions, in all the years that

10   you've been at Marion, did you get for misuse of telephones or

11   misuse of the mail?

12   A.   I got a shot in, I don't know, maybe '94 or '95 for -- I

13   thought a friend of mine had paroled and went back to Canada.

14   As a matter of fact, he was in one of them pictures, the guy

15   he was asking whose neck Mike's hand was on, a guy named

16   Frenchy.  I thought he went home.

17           So I sent a letter to British Columbia to say hello,

18   see how he's doing out there.  And he didn't parole yet.  He

19   was still in a prison in -- back east somewhere.  So they said

20   that was the third party communication attempt, and they gave

21   me a shot for that, but in 19 years, that was the only time I

22   ever had a shot for an alleged misuse of mail.

23   Q.   Okay.  Now, and how are you -- does the Bureau of Prisons

24   regulate the people that you can contact by mail or who you

25   can receive letters from?
```

1  A.    Not really mail.   Telephones.   You have to have an

2  approved telephone list.

3  Q.    Okay.

4  A.    And they have to send the paper out and --

5  Q.    Tell me that procedure, how you are able to obtain

6  telephone privileges as an inmate at Marion.

7  A.    Well, first, when you first get to the institution, they

8  give you a paper you got to sign that says all your telephone

9  calls, you got to agree to allow them to listen to all your

10 telephone calls and read all your mail, and you got to sign

11 the paper.  If you don't sign it, then you -- then everything

12 that comes for you, they send it back home or wherever it

13 comes from, and so you -- they let you know right off that

14 they are watching you.

15 Q.    Okay.  And then in order to get telephone privileges,

16 what do you have to go through to be able to contact people

17 outside the penitentiary?

18 A.    You have to -- like if you want to call somebody, you

19 have to send -- like Tolson was my counselor.  He gives you a

20 form.  You got to fill it out, put their name on there and

21 their address, and then he'll send it to them, and they will

22 write back and say well, I do want that person to call.  It's

23 okay.  And they send it back, and then in about a week, he'll

24 give you a piece of paper that says that person has been

25 placed on your approved telephone list.

1    Q.   Okay.  And after you get that approval, what other

2    additional monitoring steps are done with respect to telephone

3    privileges?

4    A.   Well, every phone call, from what I heard, is

5    tape-recorded and kept for a certain period of time.

6    Q.   Especially for individuals who are identified being

7    members of a disruptive group; is that correct?

8    A.   That's what I've been told.

9    Q.   And again, have you been reprimanded or given shots for

10   any misuse of your telephone privileges?

11   A.   Not that I can remember.  I don't think I ever had a bad

12   telephone call.

13   Q.   There's been talk of an inmate by the name of John Gotti.

14   Are you familiar with him?

15   A.   Yes.

16   Q.   How are you familiar with him?

17   A.   He was at Marion.

18   Q.   Okay.  And when he was at Marion, were you ever in a

19   situation to have contact with John Gotti?

20   A.   I lived in the same block with him several times.

21   Q.   And when you say you lived in the same block with him for

22   several times, do you recall which blocks you lived in with

23   him?

24   A.   E, I.  He was on I on the bottom, and I was upstairs, and

25   we were on the same tier.  I don't know if we were in F block

1   together or not.

2   Q.   But --

3   A.   Over the years, different times we were in different

4   blocks.  When he'd go out sometimes, when he was sick and

5   they'd bring him back, they'd put him in another block.

6   Q.   Over the years, did you develop a relationship with him?

7   A.   Yeah.

8   Q.   What was that relationship?

9   A.   I would say we were friendly, good friends.

10  Q.   Okay.  And did you ever have occasions to be in a

11  visiting room when he was also visiting with his family?

12  A.   Well, he got a lot of visits.  So most of the time, he'd

13  be out there when I would get my visits.  He'd be out there

14  often.

15  Q.   How would you describe the extent of your relationship

16  with John Gotti?

17  A.   God.  Extent?

18  Q.   Yeah.

19  A.   For how long, you mean?

20  Q.   I mean how long -- I mean to --

21  A.   He was a good guy.  I known him the whole time when he

22  first got there through the time until they took him to

23  Springfield and he died.

24  Q.   The friendship that you and he had was a strong

25  friendship?

1    A.    Yes.

2    Q.    Okay.  You've heard testimony in this trial that you may

3    have had a relationship with John Gotti in the capacity as --

4    only as an Aryan Brotherhood member who offered him protection

5    or did contract killings for him.

6    A.    Right.

7    Q.    How do you respond to those allegations?

8    A.    They are shameful that they would say that about that guy

9    after he's dead.  Nobody knows him, but they use the

10   flamboyance of the name to draw attention.  That's what all of

11   these guys who went to the government, all they had to do was

12   say John Gotti, and the ears perked up.  John wouldn't pay

13   nobody a plugged nickel for nothing.  His whole life was

14   different than that.

15          He -- whether it's right or wrong, he lived his life

16   one way.  And it's like spitting on somebody's grave.  He

17   lived that way, and then they turned him over after he's dead.

18   He would never pay anybody any money to do anything like that.

19   I mean, for one, if you were shaking down John Gotti, what

20   address would you give him?  Would you give him your home

21   address?  I mean, that's -- when I heard it the first time, I

22   couldn't believe it.  And they know -- I mean, Marion knew

23   everything about John especially.  They took videos and sold

24   them to Inside Edition of him talking to his grandchildren.

25   So they know that he's not paying anybody anything for

1  anything.  They know what he said about the whole situation.

2  We were in the visiting room when he told me what happened.

3  Q.   What happened about him getting hit by Johnson?

4  A.   Yeah, I think it was one or two days later we had a

5  visit, and I had heard something had happened.  But I mean

6  there's a camera right behind you, and there's a camera right

7  in front of you.  They got everything taped.  They know

8  exactly what he said happened.  They know exactly how mad he

9  was about it and, you know, all of this other stuff, they pump

10 it up for the name.

11 Q.   Now, when you -- well, you've heard testimony that John

12 Gotti would buy commissary for other inmates.

13 A.   He was a generous person.  I mean -- and he was a

14 generous guy, but if you went up to him and tried to tell him

15 something smart, he'd also tell you in that Brooklyn way, "Get

16 the hell out of here."  You know, but -- and it didn't matter

17 who you was.  What that guy said up here, said he'd buy coffee

18 in commissary, he'd do that for people he didn't even know.

19 He had money.  So he'd pass it out.  He could only spend so

20 much of it.

21 Q.   Were you a recipient of any of that?

22 A.   I didn't need none.

23 Q.   Because you had your own?

24 A.   Right.

25 Q.   Okay.  But while you were on the tier with him, you were

1    able to witness him buy commissary for other inmates?

2    A.    Sure.

3    Q.    Now, did your friendship expand to the point that it

4    involved your family at the time?

5    A.    When we get visits, when they come in two, three days in

6    a row because they are traveling from long distances, when

7    they would leave, like his daughter Victoria, when they would

8    leave, my wife and them would go stay at the same motel or go

9    to eat, or would know, you know, close relationship, but he

10   used to write my wife to say hello and stuff.  Like when he

11   was in Springfield, to let me know and let everybody else that

12   knows him how he was doing and, you know, he's telling us in

13   the letters, told my wife, told me strong, he's hanging in

14   there.

15           They told him he only had a year to live.  And I sit

16   up here, and I hear these people disrespect the dead man, you

17   know, I don't care what his reputation in the world was.  To

18   me it's shameful to do that just for the name.

19   Q.    Now, you had said that the visits would last a couple of

20   days at Marion because people would come from all across the

21   country to visit you guys.  Tell me how that worked, how the

22   visitation worked.

23   A.    Well, they come to the front of the prison, and you got

24   to go to the visiting room.

25   Q.    And the visiting room, is it contact or noncontact?

```
 1   A.   No, through the glass.
 2   Q.   So at the time that you would visit with your family
 3   through the glass, you and Gotti would be on one side of the
 4   glass, and your family members would be on the other side?
 5   A.   Right.
 6   Q.   And you would be talking through a phone?
 7   A.   On the telephone, a monitored telephone.
 8   Q.   And again, those telephones -- or those visiting days
 9   when you're talking through the glass with your family members
10   are on a phone, and those phones are also monitored; correct?
11   A.   Correct.  And there's a camera in front of you and a
12   camera right up above your head.
13   Q.   Okay.  And you said that your family came a couple days
14   in a row.  And why was that?
15   A.   Because it's a long way from California to Illinois.  And
16   so they would wait a long time, and then they would come for a
17   few days.  So, you know, they could visit for a few days.
18   Q.   Now, do you recognize John Gotti's handwriting?
19   A.   Yes.
20   Q.   Okay.  I have in front of you what's been previously
21   marked as Exhibit 1459, which are letters and cards addressed
22   to a certain individual and appear to be signed by John Gotti.
23        Would you look at those exhibits, please.
24   A.   I got them.
25   Q.   Would you take some time and look at each one of them and
```

1    tell me if you recognize the handwriting on these copies.

2    A.    I know it's his handwriting because of the way he does

3    his big D's.

4    Q.    Okay.  With respect to the name that's addressed on these

5    letters, do you see the name Fannie Mae Sweet?

6    A.    That's my wife.  My ex-wife.

7    Q.    Your ex-wife.  Okay.  Was that her legal name?

8    A.    No, that was a term of affection from me to her over the

9    years.

10    Q.    Did you let John Gotti know that was your term of

11    affection for her?

12    A.    Yes.

13    Q.    In those visits you would have at Marion with your wife

14    and your family members, did you ever have an occasion to

15    introduce her to John Gotti?

16    A.    Yes.

17    Q.    Okay.  Tell me how that went down or how that happened.

18    A.    She came over to the window and said hello to him.  He

19    said tell her to come over here.  Tell her to come over here.

20    So she came over to the window and said how you doing.  He was

21    a very sociable person, very easy to get along with guy.

22    Q.    And the address that's on there, do you recognize that

23    address?

24    A.    That's when she lived in Kingsburg.

25    Q.    Fresno, California?

27

```
 1   A.   No, that's right outside of Fresno.

 2   Q.   And Fresno is your hometown?

 3   A.   Yes.

 4   Q.   Do you recognize each and every one of these in this

 5   packet of Defense Exhibit 1459 as writings that John Gotti

 6   sent to your wife?

 7   A.   Yes.

 8   Q.   At the time?

 9   A.   Yes.

10   Q.   All right.  And they are a fair and accurate duplication

11   of the originals that were sent to your ex-wife?

12   A.   This one here is after she moved back to Fresno.  There's

13   two different addresses on there after she moved.  One is in

14   Kingsburg, and one is back in Fresno.

15   Q.   So we have different addresses on some of these.

16   A.   Right.

17   Q.   They are fair and accurate xerox copies of the originals?

18   A.   Yes.

19        MR. GREEN:  Judge, I would offer into evidence

20   Defendant's Exhibits 1459.

21        THE COURT:  Any objection?

22        MR. WOLFE:  No objection.

23        THE COURT:  Thank you.  1459 is ordered admitted.

24        You may publish.

25        (Exhibit 1459 received.)
```

1          MR. GREEN:  I'm not going to publish all of them; I

2     just want to pick out a few here.

3     Q.   The one you had mentioned in Kingsburg, California, there

4     was a card, and I'm putting the third page of the card on.

5          I'm having technical difficulties again,

6     Mr. Sahakian.  So I'm not going to display them at this time.

7     We might be able to later on do that.

8          With the Court's permission, I would just like to

9     read from parts of the exhibit, if that's okay?

10         THE COURT:  Go ahead.

11    Q.   BY MR. GREEN:  And I'm reading that third page that I

12    wanted to display.

13         "Fannie Mae, I hope this finds you well and with

14    clear mindset.  I received your wonderful Saint Pat's Day

15    card.  Sorry I couldn't get one to send you.  I wish I knew

16    you were making that."  And I can't read that next, and then

17    "one, day trip.  No, nothing ever does change in here.  As far

18    as my health, I am fine.  I'm scheduled for a bimonthly test

19    for the next three years.  My last tests were good.  And you

20    are right again.  This year hasn't started well.  But we will

21    just be fine.  And we will stay strong.  We don't know any

22    other way.  Until next time, be well.  And my very best to

23    all, Johnny."

24         And you had that up in front of you; is that

25    correct?

1   A.    Right.

2   Q.    Was this an unusual event, or did communication happen a

3   lot between your wife and John Gotti in regards -- with

4   respect to his health and just the day-to-day living that was

5   going on?

6   A.    Was it unusual?

7   Q.    Right.

8   A.    The reason he was writing my wife is because he was going

9   back and forth to Springfield for cancer treatment.   And when

10  he'd go over there, he'd write her, and she would tell me how

11  he was doing.

12  Q.    Okay.   Let me get another example.   These are not all the

13  letters that your ex-wife received while John Gotti was alive.

14  Is that a fair statement?

15  A.    Oh, I don't think so.

16  Q.    Okay.   I'm going to put another one on the screen.   This

17  one says:   "Fannie Mae, I hope this finds the two of you well

18  and with clear mindset.   Fannie, I'm sending this note in lieu

19  of a proper Christmas card, to wish the two of you and family

20  a very healthy and special holiday season filled with smiles.

21  As for myself, according to these folks, I should have been

22  gone long ago.   Given all my setbacks, I feel great.   So we'll

23  see.   The doctors told me last week that these should be my

24  last round of holidays.   Again, we'll see you.   I'm going to

25  close for now.   Again, the best of holidays to all.   Stay

 1    strong.  Love, Johnny."

 2              Now, are there any hidden codes in these messages

 3    or --

 4    A.    I don't think so.

 5    Q.    Are these letters anything other than wishes and

 6    correspondence between friends and family?

 7    A.    It's just correspondence from a guy letting somebody know

 8    he's a friend.  You know, you do that with friends, I guess;

 9    right?

10    Q.    Did you ever receive a dime from Mr. Gotti?

11    A.    Never.

12    Q.    For protecting him?

13    A.    No.

14    Q.    And did you ever have a conversation with John Gotti

15    about a contract to have Wakeel Johnson killed because he

16    assaulted John Gotti?

17    A.    No.  I mean, John Gotti wouldn't go to nobody to do

18    anything to anybody.  His pride wouldn't allow him to do that.

19    I mean, that's not -- you have to take him into how he was,

20    what his life, whether it was good or bad, that was the man

21    until the day he died.  He would not go to a prison guy and

22    say hey, I want you to go kill somebody.  It ain't gonna

23    happen.  I mean you seen the video.  He's the type of guy that

24    will run down the tier when they just took half his tongue and

25    throat out, jump in a fight to save another guy that he didn't

1    even know, just on the strength that he thought that guy was a

2    friendly guy.

3    Q.    And the video that you're talking about is the one where

4    David Neville was attacked on May 5th of 2000 by a bunch of

5    black inmates on the tier?

6    A.    Right.

7    Q.    If we played that video, would you be able to identify

8    John Gotti, where he's at in that video?

9    A.    Sure.

10   Q.    I am placing in the DVD player Defendant's Exhibit 1458,

11   which is the video of the assault on David Neville on May 5th

12   of 2000.  When you think you see John Gotti at all in here,

13   just tell me to stop.

14   A.    You went through the whole thing.

15   Q.    Sorry about that.  I'll get it back here.

16   A.    Stop.

17   Q.    Can you make a line of where you believe Gotti is?

18   A.    Go to the front and start from the beginning.  I'll show

19   you when they come out of the cell.

20   Q.    I'm going to stop it and hit play and pause it.

21   A.    Stop.

22   Q.    Okay.  I'll go back.

23   A.    Stop.  Stop right there.  That's John walking away.  This

24   is when it first started right here.  That's him walking down

25   the tier the opposite direction right here.  That's him right

1  there.  He put a book on the tier right there.  That's --

2  that's that fellow that -- Neville, when he first got hit,

3  there's a guy stabbing him right there.  Go further.

4  Q.    Get rid of your mark.  I'm going too fast.

5  A.    Okay.  Stop.  He just turned a couple of seconds before

6  that, you can see right here where this guy is still here, he

7  just turned around and was seeing what's going on.  That's him

8  right there.  And he's hollering and --

9        THE COURT:  Question and answer.

10 Q.    BY MR. GREEN:  You just put a mark over his face; is that

11 correct?

12 A.    Yes.

13 Q.    Could you put a mark below his head?

14 A.    He's right there.

15 Q.    Thank you.  Okay.  All right.  And so he's coming back to

16 help in this assault?

17 A.    And that's Vito here, and he's helping, too.

18 Q.    Vito's last name is?

19 A.    He's one of John's friends from New York.

20 Q.    Do you see John standing there with a group of white guys

21 facing a group of black guys?

22 A.    If you played it at regular speed, you could see, I think

23 maybe -- the way the tape's made, there's a second jump in the

24 middle.  But you'll see him run in, and there will be a little

25 fight.  Vito, you'll see him fight.  That guy Neville is down

1  on ground.  They fight -- that's John right there.  But when

2  he turned around and started saying something to him, that

3  directed their attention away from that guy that's laying on

4  the ground right here now.

5        So they start fighting the other way.  Because at

6  the end, you'll see the CO's come running in and pick this

7  fellow up down here.  He's all tore up.

8  Q.  Can you get rid of the marks, please.  With respect to

9  this video, this shows what you were talking about earlier,

10  that John Gotti is his own man?

11  A.   Correct.  That's the type of person he was.  He's not

12  going to ask anybody to do nothing for him, and if it comes to

13  a situation, he'll take care of it hisself.  And he'll even do

14  that for other people.  All of this about contracts, it sounds

15  good.

16  Q.  But is it true?

17  A.   No.

18        MR. GREEN:  That's all I have.

19        THE COURT:  Thank you.

20        Mr. Wolfe, cross-examination.

21        MR. WOLFE:  Your Honor, may we have the DVD player

22  switched back to the display device?

23                    **CROSS-EXAMINATION**

24  BY MR. WOLFE:

25  Q.   Mr. Sahakian, what's the attitude of the Aryan

1  Brotherhood to members of the AB who cooperate with the

2  government?

3  A.    Say that again.

4  Q.    What's the attitude of the Aryan Brotherhood to members

5  of the AB who cooperate with the government?

6  A.    I think it's probably frowned upon.

7  Q.    And how much is it frowned upon?

8  A.    Well, I can't speak for anybody else, but I don't like

9  tattletales.

10  Q.    Well, you say you can't speak for anybody else, but

11  you're a member of the Aryan Brotherhood, aren't you?

12  A.    I've been made that.

13  Q.    And you know what the attitude of the Aryan Brotherhood

14  is to members who cooperate with the government, don't you?

15  A.    I just told you, it's probably frowned upon.

16  Q.    It's a killing offense, isn't it?

17  A.    A killing offense?

18  Q.    Yes.

19  A.    Probably.  I don't know.  I'm not going to kill nobody

20  for it.

21  Q.    You didn't order Bubba Leger killed for it?

22  A.    No, I didn't.

23  Q.    Isn't it true that the Aryan Brotherhood does everything

24  it can to kill any member who cooperates with the government?

25  A.    Tell me who they have killed.  What members of the Aryan

35

```
 1   Brotherhood --
 2   Q.   Mr. Sahakian, you are obliged --
 3   A.   I don't know.  I don't know anybody that's been killed.
 4   Q.   Isn't it true that the policy of the Aryan Brotherhood is
 5   to kill any member who cooperates with the government?
 6   A.   That's not my policy.
 7   Q.   Please answer the question, Mr. Sahakian.  Isn't it true
 8   that it's the policy of the Aryan Brotherhood to kill any
 9   member who cooperates with the government?
10   A.   No.
11   Q.   It's not?
12   A.   No.
13   Q.   From whom did you learn that it is not the policy of the
14   Aryan Brotherhood to kill any member who cooperates with the
15   government?
16   A.   Can I answer the question?
17   Q.   Yes, you may answer that question.  From whom did you
18   learn that?
19   A.   The policy to kill stool pigeons.  Tell me the question
20   again.
21   Q.   Isn't it the policy of the Aryan Brotherhood to kill any
22   member who cooperates with the government?
23   A.   No.
24   Q.   Really?
25   A.   Can I explain?
```

1  Q.   Sure.

2  A.   Nobody has ever come to me and told me this is the policy

3  of the Aryan Brotherhood.  Any stool pigeon, you got to kill

4  him.  There's no policy wrote down on a book.  Nobody has ever

5  come to me and told me that.  I know that not just with Aryan

6  Brotherhood but with everybody across the line in prison,

7  nobody likes stool pigeons, and everybody says kill the rats.

8          But not many of them get killed.  They given to

9  protective custody, and they go away.  Nobody has ever came to

10  me, David Sahakian, and said kill that stool pigeon.  And if

11  they did, I wouldn't do it just because somebody was coming to

12  me to tell me to do it.  I'll make the decision for myself.

13  Q.   So I understand you to say that it is the policy to kill

14  stool pigeons, but you've never been asked to do it

15  personally; isn't that right?

16  A.   That's not what I said.  I said I don't know of any

17  policy -- see, the way you're saying it, like there's a rigid

18  policy that this is -- you have to do this, things aren't like

19  that.  It's not -- it's not like that.

20  Q.   We'll go back to the first question.  What's the attitude

21  of the Aryan Brotherhood about members of the AB who cooperate

22  with the government?

23  A.   They don't like them.  I don't like them neither.

24  Q.   And isn't it the case that if that happens, the Aryan

25  Brotherhood does all that it can to tell them?

A.   You're asking me a question of whether or not somebody is

going to do something to somebody.  I don't know what somebody

else was going to do.  I can only tell you what I would do.

Q.   Wouldn't you do everything you could to kill an Aryan

Brotherhood member who cooperated with the government against

the gang?

A.   No, no.

Q.   When did you join the Aryan Brotherhood, Mr. Sahakian?

A.   About 1980.  Can I qualify that?  Can I answer?  I didn't

really join.  I mean, as far as like you are seeing here where

somebody says they take an oath and all that.  Aryan

Brotherhood, the brand, what people use the name, the Aryan

Brotherhood, people don't even call it that anymore.  But when

I -- when I went to San Quentin at about 20, they had problems

going on, and the guys that was there, there wasn't no --

there was fighting going on all the time.

        I came from another prison.  They put me on a tier

with a bunch of guys that were brand, and that's the tier I

stayed on for the rest of my time in prison then and every

time I went back.  And nobody never gave me an oath.  They

said do you want to come with us?  I said yeah.  That's where

they put me.  I liked the fellows there.  When I got out, when

I came back, they were all gone.

        But, you know, I hear they say oaths.  But when I

went in, there was no -- I never took an oath.  I never gave

1    an oath.

2    Q.    Who are the people who asked you if you wanted to come

3    with them and you said yes?

4    A.    Spots, Fred Mendrin, and Donny parish.  Ronny Harper.

5    There were some more guys there.  I can't remember all their

6    names.

7    Q.    And what did you understand the purposes of the Aryan

8    Brotherhood to be when you joined it?

9    A.    Well, I knew what it was at that time when I first got

10   there.  When the doors would open up and we would go outside,

11   somebody would come and burn your cell up, and when -- you

12   know, there was fighting going on.  There was madness in that

13   prison at that time.  And, you know, when I got there, I

14   never -- all I'd ever heard of was I was 20 years old, and I

15   heard of San Quentin, and I thought it was the big house, you

16   know.  Like anybody else, I was looking for a place to fit in.

17   Q.    And what did you understand the purposes of the AB to be

18   when you decided they were a place you could fit in?

19   A.    We protected ourselves.

20   Q.    And how would you do that?

21   A.    If somebody come after us, burned our cells up, we'd burn

22   their cell up.  I mean, it was fighting going on over there.

23   Q.    Did the Aryan Brotherhood have any rules when you joined

24   it in 1980 at San Quentin?

25   A.    No.  I mean, like I hear you guys talking about rules and

1    stuff, and I never heard those rules.  But back then, nobody

2    never -- oh, there's rules that you can't be a stool pigeon.

3    You know, homosexual.  You know, there was -- basically you

4    got to be a decent stand-up guy.  You can't do things that

5    make the rest of the fellows ashamed.  There was nothing

6    written down, no code book or nothing like that.

7    Q.    So you couldn't be a stool pigeon.  You couldn't be a

8    homosexual.  You had to be a decent stand-up guy.  And you

9    couldn't do things that would make the rest of the fellows

10   ashamed.

11   A.    I just say that off the top of my head as being, you

12   know, just standard things.  There wasn't nothing wrote down.

13   It wasn't wrote down or nothing saying you couldn't do those

14   things, but that would be fairly understood, that you would

15   get in -- they wouldn't want you if you done that kind of

16   stuff.

17   Q.    The -- I don't understand rules to be necessarily written

18   down, Mr. Sahakian.  That's not what I'm asking about, but

19   things that you fairly understood as you described.  Were

20   there any rules about -- were there any changes in those rules

21   that you just described since 1980 when you joined AB?  Are

22   they any different today?

23   A.    Is it any different today?

24   Q.    Are the rules any different today?

25   A.    From back then?

```
1    Q.    Yes, sir.

2    A.    Can I explain that?

3    Q.    Sure.

4    A.    I'll give you an example.  Like I told you a minute ago.

5    When I first went to San Quentin, when I got out on that one,

6    all the guys that I knew that was there, when I came back,

7    they were all gone.  And there was guys who was saying we

8    don't even know if you were a brother.  Because they all --

9    the whole bunch of them either got shipped out or flipped over

10   for the government on a couple of guys.  So the whole thing

11   changed.

12         And then they -- some guys came, and they said we're

13   going to put in some rules like this.  But one thing about the

14   guys, as I seen them over my time, they are hard heads.  They

15   don't listen to people.  They don't -- somebody comes and

16   starts telling them this is a rule.  You can't use drugs.

17   They say okay.  They shake their head, and then they go and

18   use the drugs.  But as it changed, I see the same thing over

19   and over.  It's like Groundhog Day.  Somebody will come up

20   with a new idea, and it will go by the wayside.

21         I mean, what I've heard in this trial is all -- it's

22   strange to me.  It's like being in Bizarro world, where they

23   say rules, you got to do this.  I mean, you -- how you going

24   to enforce that?  You have to kill everybody.  It's made up.

25   These guys sat in a cell and made this story up.
```

1  Q.   How does the AB enforce the rules that you've described?

2  A.   Which rules are you speaking of that I described?

3  Q.   You said you can't be a stool pigeon.  You can't be

4  homosexual.  You have to be a decent, stand-up guy.  And you

5  can't do things that make the rest of the fellows ashamed.

6            How does the AB enforce those rules?

7  A.   Well, you talking about to the extreme?

8  Q.   Sure.

9  A.   Somebody probably would kill somebody over some of them

10 things.  But I don't have it down as a rule.  You know, it

11 might -- you know, some people are a little bit more serious

12 than the next.  But I'm not saying that they are steadfast

13 rules neither.

14 Q.   What was the Aryan Brotherhood's attitude about obeying

15 the law?

16 A.   Obeying the law?

17 Q.   Yes.

18 A.   I obey the law, but I also break the law.  When I get in

19 trouble, I pay for what I do.  People that say hey, we got to

20 break the law or we ain't AB, no.  But there's guys in the AB

21 that do all manner of things.  But that doesn't mean that it's

22 the brand doing it.  You know, I'm not responsible for what

23 everybody does.  It's just like they are not responsible for

24 what I do.  But breaking the law, you know, everybody that is

25 in prison is a criminal.  They are in there for breaking the

42

1   law.

2   Q.   After Aryan Brotherhood members are sent to prison for

3   breaking the law, is there any rule against breaking the law

4   in prison?

5   A.   No, there's no rule against it.

6   Q.   Is there any rule against selling drugs in prison?

7   A.   People have tried to do that, too.  But is there a rule

8   now about selling drugs in prison?

9   Q.   Is there an Aryan Brotherhood rule against selling drugs

10  in prison?

11  A.   Probably no.  No.

12  Q.   An Aryan Brotherhood rule against assaulting other

13  inmates in prison?

14  A.   That's what I'm trying to explain to you.  There's no

15  rules to somebody saying there's a rule that you got to

16  assault somebody in prison.  There's nobody telling people you

17  have to do these things.  You don't have to sell drugs.  You

18  don't have to do these things.  If you want to, there's no

19  rule against it.  But, you know, people don't want somebody

20  doing something that is going to cause heat on everybody else.

21          You see, I really don't understand your questions

22  about the -- you keep throwing me off with the rules, like

23  there's steadfast --

24  Q.   Well, call them guidelines if you like.

25  A.   Okay.  Guidelines.

1   Q.   Does the Aryan Brotherhood in prison make any effort to

2   make money?

3   A.   Are you asking me, as an Aryan Brotherhood member, do I

4   make any effort to make money?  Because everything I do in

5   this life, even though I am an Aryan Brotherhood member, I do

6   it as an individual.  Nobody tells me what to do.  You know,

7   and I take that back.

8           The guards running the prison, they tell me what to

9   do.  They tell me when to sleep and all of that stuff, but as

10  far as any criminal activity, nobody tells me that I have to

11  do anything.  If I choose to do it, then I choose to do it on

12  my own.

13          There's no guys coming up and saying hey, you know

14  what?  I read that paper.  They say we're going to put

15  together a criminal organization next to none.  Show me one

16  red penny, man.  These guys been doing this.  They did it in

17  San Quentin when I was there.  They come up with these ideas

18  about all of this stuff.  I never heard of it.  And it

19  wouldn't fly anyway because somebody telling somebody else you

20  got to do this, you got to do that, they are not going to do

21  it.  It's unenforceable because they are hard heads.

22          I'm not going to do it.  Nobody's going to tell me

23  what to do.  And I'm not that well liked by a lot of these

24  guys in the feds because I don't let them tell me what to do.

25  Or I don't buy into the nonsense.

1    Q.    I presume, though, that you consider what the Aryan

2    Brotherhood wants when you are deciding individually what

3    you'll do, don't you?

4    A.    Say that again.  I'm not being smart when I say say it

5    again.  I'm just looking for a tricky question because I don't

6    want to make the wrong answer.

7    Q.    Well, let me look around, and we'll see if we can find

8    one you can answer.

9    A.    I'll answer them all, Mr. Wolfe.

10   Q.    Okay.  You said if you choose to do something, you choose

11   to do it on your own.

12   A.    Right.

13   Q.    And you must consider various facts and circumstances

14   when you decide what to do.  Isn't that so?

15   A.    If I decided to do something, I would consider if

16   something that I did was going to affect anybody else, yeah.

17   Q.    And you'd consider what the Aryan Brotherhood wants when

18   you are deciding what to do, don't you?

19   A.    I'll put it like this.  If I was in the same sense how I

20   would consider something, if I was at home, and I was selling

21   drugs, I wouldn't sell drugs out of my mother's house.

22   Because that would get her in trouble.  So if I was doing

23   something, I wouldn't do something what's going to get

24   somebody else in trouble unless they was doing it with me.

25          Somebody -- nobody -- nobody's gonna tell me, you

1    know, I -- to answer your question, I would make sure that I

2    wouldn't get nobody else in trouble if I was doing something.

3    Q.    And if you were doing something that was good for the

4    Aryan Brotherhood, you would want to do that, wouldn't you?

5    A.    To do -- to make sure nobody got in trouble?

6    Q.    Well, no, no.  I understand you to be saying you are

7    trying not to do anything bad for the AB.

8    A.    Right.

9    Q.    Is that right?

10   A.    Right.

11   Q.    The other side of that coin, I presume you try to do

12   things that are good for the AB, don't you?

13   A.    I try to do things inside that prison that make people

14   say the AB is a good thing.  I don't do things that -- I don't

15   bully people.  I don't disrespect people.  You know, there's a

16   flip side to the horror that you see from the AB.

17            Not every person -- one of the most shameful things

18   that I've ever felt about the AB is when I watch Al Benton sit

19   up here on this stand and say what he said to me.  That was a

20   shameful testimony that he said he went in there and killed

21   that guy for a mercy killing.

22            I wouldn't do that.  I wouldn't order nobody else to

23   do that.  Nobody would follow my direction if I told somebody

24   to do that.  And if somebody told me to do it, I wouldn't do

25   it.

1    Q.    So if I understood that directly --

2    A.    You want me to say it again?

3    Q.    No.  I'm trying to understand it.  Let me ask you another

4    question.

5              You're saying that you try to do things that will

6    make the Aryan Brotherhood respected in prison.

7    A.    Correct.

8    Q.    So that --

9    A.    That's just me personally.  I'm talking about how I carry

10   myself as an individual member of the Aryan Brotherhood.  I

11   can only be responsible for me.

12   Q.    Well, that must be a tenet of the AB generally, isn't it?

13   A.    Attentive?

14   Q.    A tenet.  A guideline.

15   A.    Yeah, it's supposed to be, but not everybody follows that

16   because some people, they blow up.  They want to be kingpins

17   and stuff.  They want a lot of money.  I don't operate like

18   that.  I never have in prison.

19   Q.    And so I presume that what earns respect for the AB in

20   prison depends on the circumstances.

21   A.    Depends on the people, really.  The people that are in

22   the institution at the time.

23   Q.    Well, it must depend on the events and the surrounding

24   circumstances, too, doesn't it?

25   A.    Oh, absolutely.  Like if there's stuff going on in the

1    prison, you mean?

2    Q.    Yes.

3    A.    Absolutely.  Everything is interrelated.

4    Q.    What it means to be a decent, stand-up guy varies with

5    the circumstances, too, doesn't it?

6    A.    No.  I mean, to be a decent, stand-up guy is a moral --

7    not a moral, but a -- well, that's a decision you make for

8    yourself, I think.  I'm pretty sure.  Nobody can make you try

9    to be -- tell the truth when you are telling somebody

10   something.  Those are decisions you make for yourself.  How

11   you're going to interact with other people.

12   Q.    Yes, but what I'm asking is isn't it true that what a

13   decent, stand-up guy would do changes depending on the

14   circumstances?

15   A.    Give me an example.

16   Q.    Well, let's see.  If you walk up to another inmate on the

17   tier and punch him in the face, that's either a good thing or

18   a bad thing, depending on the circumstances; isn't that right?

19   A.    Right.  If you walk up and punch somebody in the face for

20   no reason, that's a bad thing.  If you walk up and punch

21   somebody in the face because he said something to you or he

22   punched you in the face, that's a -- that's something that

23   might be supposed to happen.

24   Q.    Okay.  And that's true about almost anything you can

25   think of, isn't it?  That whether it's a good thing or a bad

1    thing, from the point of view of the AB, depends on the

2    circumstances.

3    A.    But see, you put everything through the prism of the AB.

4    I don't look at life like that.  I don't look at the world as

5    an AB -- I got to be AB.  I'm AB due to circumstances, and

6    because I am, I try to make it what I want it to be for me and

7    the people who are like me.  Some guys I don't even talk to

8    that are AB.  They are on their own trip.  But it's not --

9    there's not no lock set rules.  They tried to institute that

10   stuff, but nobody listens to them.  It comes and goes.  I know

11   three different errors where they tried that stuff.

12   Q.    Mr. Sahakian, I'm asking about the AB because that's the

13   subject matter of the case.

14   A.    I know.

15   Q.    There are other things in life.

16   A.    Right.

17   Q.    For everyone, including you.  I understand.  But I did

18   say, I did understand you to say that one of the things you

19   consider in making your own decisions in life is is it good or

20   bad for the AB; right?  Didn't you say that a minute ago?

21   A.    Yeah, but I'll expand upon that.  I don't look at that at

22   first, is it good or bad for the AB.  Is it good or bad for my

23   reputation amongst the people that I live with because AB is a

24   label.  That's a group.  That's not me.  I mean, you follow

25   what I'm saying?

1          I don't look at it first, hey, AB, I got to do this.

2     But I take that into consideration just like I take my

3     reputation into consideration.  I don't want to do nothing

4     that's going to make somebody else say man, that guy is an AB

5     guy, and he's a dirty person.  Everybody's gonna have the same

6     label on him.

7     Q.    Okay.  So you said you take the AB into consideration

8     just like you take your reputation into consideration; is that

9     right?

10    A.    Yeah.

11    Q.    Okay.  And now I want to talk about -- I understood you

12    to say that whether something is good or bad, either for the

13    AB or for your reputation, depends on the circumstances.

14    Didn't you just say that?

15    A.    You said that.  You said something about a guy -- go

16    ahead.

17    Q.    I understood you to say punishing somebody in the face

18    for no reason is a bad thing; right?

19    A.    I was talking as an example.

20    Q.    Okay.  As an example.

21    A.    Right.

22    Q.    And as an example, punching somebody in the face for

23    having insulted you might be the right thing.  Isn't that so?

24    A.    Probably, yeah, it's the right thing.  It all depends on

25    what the insult is.  But yeah, it's more right than hitting

1    somebody for no reason, for sure.

2    Q.    And that's true no matter how violent the act that we're

3    talking about, isn't it?

4    A.    What do you mean?  What?

5    Q.    I mean if punching someone in the face can be good or

6    bad, depending on the circumstances, isn't it also true that

7    in prison killing someone is either good or bad, depending on

8    the circumstances?

9    A.    No.

10   Q.    No?

11   A.    Because you want to know how I look at things?

12   Q.    Sure.

13   A.    It's never good to kill nobody because there's too much

14   problem with it, whether it's good of bad.  The first thing

15   you want to do is avoid having to kill anybody if you can

16   figure out a way to do that.  But people do get killed in

17   prison.  I was in Marion for 20 years.  I never killed nobody.

18   Q.    So if you can figure out a way to avoid killing somebody,

19   you should.

20   A.    I try all the time to figure out a way how to avoid doing

21   that when the situation comes up.  Because most of the

22   killings that happen in prison are over nothing.  If you --

23   it's over people doing -- over stuff that -- it's not -- if

24   you look at it, there's no reason for it.  For people -- they

25   get mad, and things blow up.  People in prison got short

 1    tempers.

 2            So I don't want to get killed.  And I don't want to

 3    do something to make somebody kill me.  I don't want to do

 4    nothing to make anybody in the AB kill me.  So I try to live

 5    my life in a compartmentalized way.  And if I can help the

 6    image of the AB by interacting with people, I'll do that.  But

 7    when you asked me is it a good thing to kill nobody?  I don't

 8    every believe that it's a good thing to kill nobody.

 9    Q.   On the other hand --

10    A.   But it happens.

11    Q.   And it's possible for it to happen and be a good thing,

12    too, isn't it?

13    A.   A good thing?

14    Q.   Yes.

15    A.   I just told you it's probably never a good thing.

16    Q.   You said avoid killing if you can figure out a way to do

17    it; right?

18    A.   I didn't say that.

19    Q.   Well --

20    A.   I said avoid killing unless you can figure out a way to

21    do it?  I didn't say that.

22    Q.   Gee, I thought you did.

23    A.   No.

24    Q.   Didn't you just say that you try at all times to avoid

25    killing people?

A.   Not me.  I said that -- I mean, every day I'm not worried
about killing somebody.  I said that if anything happens, the
first thing in my mind is don't kill somebody or don't assault
them.  That's what other people are saying.  That's what I sit
here and hear, the first thing is kill, kill, kill.  Ain't
that many people getting killed, man.  You got the papers.
You can go look it up.  There's not people getting killed all
the time.  It's a lot of people getting assaulted.  But I'm
not assaulting them.  I'm responsible for me, Mr. Wolfe.  I
may be -- I've been AB for a long time.  I mean, I can say I
can come to work for you, but I can't live with myself to do
that.

            So I'm stuck in a thing where I got to worry about
me.  I got to live in that parameter.  And that's how it is.
If you took at what I said, that I'm looking to kill somebody
every day, that don't happen.
Q.   Actually, I took you to say that you just said you don't
think about killing every day.  Mostly it doesn't come up;
right?
A.   Yeah.  Well, there's no --
Q.   But once in a while it comes up?
A.   Sometimes it comes up, and sometimes it's every day for a
while these things are happening and you don't know what's
going to happen.
Q.   Okay.

1    A.    And it's good to avoid those days.

2    Q.    When it comes up --

3    A.    It's still not a good thing to kill somebody.

4    Q.    Okay.  When it comes up, it's not a good thing to kill

5    somebody, but every once in a while it has to be done in the

6    circumstances.  Isn't that so?

7    A.    Somebody else can make that decision to kill somebody.

8    I'm not making it.  I'm not telling nobody to do it.  And I'm

9    not doing it myself.

10   Q.    Okay.  But I gather that you agree there are

11   circumstances in prison, no matter how you try to avoid it,

12   that sometimes somebody has to be killed.  Not your decision.

13   A.    You want me to say it's okay to kill.  I'm not going to

14   say it's okay to kill, man.  That's what I feel that you're

15   trying to get me to say.  I'm not going to say that it's okay

16   to kill people.  I don't believe that.  People get killed.

17   People I know have killed people.  You know, I'm not going to

18   say it's okay.

19   Q.    You don't believe there are any circumstances in which in

20   prison it's okay to kill?

21   A.    Personally?

22   Q.    Yes.

23   A.    No.  But you'd have to give me a circumstance.  I mean,

24   if somebody came at me with a knife and I had a knife, I would

25   protect myself to the utmost.  If I knew somebody was going to

1    kill me the next morning, and he said he was going to do it,

2    and I believed him that he was going to do it, I would have to

3    think about what I was going to do the next day.  And then in

4    that situation, if -- I'd say well, you know what?  It's do or

5    die.

6          But as far as, you know, it being okay?  It still

7    wouldn't be okay there because I'd be right here in the

8    courtroom.

9          I mean --

10   Q.   And is it okay to kill a stool pigeon?

11   A.   Me, personally?  No.  Other people would tell you it's

12   okay.

13   Q.   Are any of the people who would tell me that it's okay

14   other AB members?

15   A.   Do I -- do I know other AB members that would say kill

16   all rats?

17   Q.   No.  That's a different question.

18   A.   There's people that I know that would kill a rat in the

19   drop of a hat.  Ain't no doubt about it.  But to make your own

20   decisions in this life.  I'm not killing a rat.  I hope when

21   they decide to rat, you get them, and you take them away so

22   nobody will kill them.  But I'm not killing them.

23         But there's people, probably people in the AB, who

24   would say -- they probably have told me before, "I hate them

25   rats.  They ought to kill them all."  Know what I mean?

1    Probably people that ain't in the AB have said that.  Probably

2    people that sat right up here on this stand and said rats

3    should be killed in prison.  Nobody likes them.

4            But there's a difference between saying it and doing

5    it.  You got to make that personal choice to kill.  And I'm

6    not making it.

7    Q.   And what's the Aryan Brotherhood's attitude about loyalty

8    to other brothers?

9    A.   I mean, you're supposed to be loyal.  You're supposed to

10   be loyal to your friends and your brothers.  Your brothers and

11   your friends.  Your family.  Your loyalty is a good thing.

12   Q.   And what are some of the ways that loyalty to other

13   members of the AB is expressed?

14   A.   Well, you've been showing them here in the courtroom,

15   making it look like a bad thing.  The birthday cards.  That's

16   one of the ways -- everybody gets a birthday card, and people

17   say love, loyalty, respect.  They put a little saying on there

18   with a name.  You make it like there's all kind of hidden

19   messages in birthday cards.  It's just a birthday card.  I

20   mean, everybody gets them.  And that's the way you express

21   your affection for a guy that you've been living on a tier

22   with for 10, 12 years with every year.

23           If he drinks, you make him a batch of wine.  You

24   give him a birthday card.  That's one of the ways.  You know,

25   there's no set -- I mean, how do you -- you know, loyalty, to

1    me, is a good thing.

2    Q.    Okay.  That's why I've asked.  You say one of the --

3    among the ways that loyalty to other brothers is expressed is

4    by writing up and giving birthday cards.

5    A.    That's just one way.

6    Q.    Making somebody a batch of wine.

7    A.    You know, that's just one of the ways.  There's all kind

8    of ways you can express loyalty to an individual.

9    Q.    I presume that defending somebody in a fight.

10   A.    Absolutely.

11   Q.    You see -- I believe -- if you saw another Aryan

12   Brotherhood member jumped on the yard, and he's knocked out,

13   incapacitated in the first moments of the fight, I presume

14   that it's a tenet of loyalty to the AB to go and defend him.

15   A.    A tenet of the AB?

16   Q.    Yes.

17   A.    Can I explain an example about that?

18   Q.    Sure.

19   A.    I got sucker punched in Marion, and a guy jumped in and

20   got a hold of the guy while I was groggy.  You heard about it

21   over here.  Because he did that for me on the spur of the

22   moment, I expressed loyalty to him because he -- when I was

23   almost out on my feet, I could have went down in one more

24   shot, and I would have probably been knocked out.  I would do

25   the same thing for him.  Because he did it for me.  If that's

1    loyalty, because you back somebody up in a fight, I'd do that.

2    I have done that.

3    Q.    And you would do that for any AB member, wouldn't you?

4    A.    I would do it for any friend.  Anybody who is my friend.

5    I would do it for an AB member, yes.

6    Q.    Okay.  I mean, in the same way that not everything is

7    about the AB, not everything is personal either, is it,

8    Mr. Sahakian?

9    A.    No, not everything is personal.

10   Q.    Okay.

11   A.    I mean, everything is personal when you make decisions

12   that are going to affect your life.  You have to think first

13   about yourself.  That's how I made it to this day.  At least I

14   tried.  I didn't always succeed, but I always say how's it

15   going to affect me.  Because too many people try to use other

16   people to do their dirty work or as suckers or something.

17              So you always got to watch out because people try to

18   get you to do something that they don't want to do themselves.

19   So I always take it that there's good people that try to get

20   you to do something, even AB guys, and bad people.  So you

21   always got to make the personal choice first, though.

22   Q.    And you owe loyalty to your friends, don't you?

23   A.    Absolutely.

24   Q.    And an Aryan Brotherhood member equally owes loyalty to

25   other Aryan Brotherhood members, doesn't he?

1   A.   I know Aryan Brotherhood members that I'm not loyal to,

2   that I don't care about.  That might be hard to believe, but

3   it's a fact.  I mean, not everybody in the AB, just because

4   he's in the AB, he's a -- he's somebody I like.  There's guys

5   in there I don't like, I can't stand.  I don't have to be

6   loyal to him.

7   Q.   Even if --

8   A.   A good guy, I'll be loyal to him.  That's what

9   brotherhood's about.

10  Q.   So you're saying that if you and one other AB member whom

11  you didn't like were on the yard together, members of another

12  gang jump on him from behind, whack him over the head, he

13  falls to the ground, they are stomping him on the face, you'd

14  just let them do it?

15  A.   I would jump in for sure, even if I didn't like him.

16  Q.   Because you owe a certain loyalty obligation to all AB

17  members even if you don't like him.  Isn't that so?

18  A.   If he was getting beat up, yeah, I'd probably jump in and

19  help him, because I don't want to be somebody else to say that

20  I was a coward, that I was standing there and yellow while

21  somebody was beating the hell out of a guy.  I would probably

22  jump in.  That's your personal reputation involved in that.  I

23  mean, the situation you just described, yeah, I owe that to

24  him.

25          THE COURT:  Mr. Wolfe, is now a convenient breaking

 1   time?

 2           MR. WOLFE:  Any time, your Honor.

 3           THE COURT:  All right, ladies and gentlemen.  We'll

 4   take our 15-minute morning recess now.  Please do not discuss

 5   the case with anyone, amongst yourselves or with anyone else,

 6   and that includes anything related to the case, the evidence,

 7   the testimony, anything relating to any of the participants in

 8   the case.  Don't make up your minds about the case.  You

 9   haven't yet heard all of the evidence.  Don't do any

10   investigation about the case or anything related to it.  Thank

11   you.  You are excused.

12           All right.  We're in recess.

13           (Recess taken.)

14           THE COURT:  Let the record reflect the presence of

15   all members of the jury, all counsel, and the defendant on the

16   witness stand again.

17           Mr. Sahakian, I forgot to give you the routine

18   reminder that I give witnesses after they have been sworn the

19   day before.  You weren't sworn again this morning because you

20   were previously sworn, and your testimony remains given under

21   penalty of perjury.

22           Do you understand that?

23           THE WITNESS:  Yes, I do.

24           THE COURT:  Thank you.

25           Go ahead, Mr. Wolfe.  You may resume.

60

1    Q.    BY MR. WOLFE:  Mr. Sahakian, how long have you known

2    Michael McElhiney?

3    A.    Since we were kids.  About 17.  In California.

4    Q.    Did you meet him on the streets or in prison?

5    A.    In jail.  I met him in a jail first, and I seen him again

6    in San Quentin.

7    Q.    Was Michael McElhiney one of the AB members when you

8    joined in San Quentin in 1980?

9    A.    No.

10   Q.    When did he join?

11   A.    In the feds.  I don't know the exact date.

12   Q.    When you were --

13   A.    In the feds.

14   Q.    When he was in the feds?

15   A.    Yeah.

16   Q.    Was that after you had also come to the federal prison

17   system?

18   A.    It might have been before.  It might have been before.

19   We always hung around with them guys.

20   Q.    And how close a friendship do you have with Michael

21   McElhiney?

22   A.    That's one of them tricky questions you're asking there.

23   Because I seen what's being said in here, that we're two peas

24   in a pod and all of that.  He's a good friend of mine.  And

25   he's a good guy, and we're good friends, have been for a long

```
 1   time.  But he's not my twin.  We weren't separated at birth.

 2   As a matter of fact, I hadn't seen him until I came back to

 3   the feds all them years.  Or until I came to the feds.  I

 4   hadn't seen him in a long time.

 5   Q.   And, sir, how long have you known Joe Tokash?

 6   A.   I knew Joe in Folsom.

 7   Q.   That's in the early 1980's?  Mid-1980's?

 8   A.   When I was there, '83 to -- no, '82, '83, '84, '85, '86.

 9   '86.

10   Q.   And did you meet Joe Tokash in Folsom?

11   A.   I met him in prison, yeah.

12   Q.   Do you know where Joe Tokash is from?

13   A.   He's from Sacramento.

14   Q.   Mr. Sahakian, when did you get the shamrock tattoo that

15   you have on your chest?

16   A.   Not too long after I got in.

17   Q.   Not too long after you got in the AB?

18   A.   Right.  It used to be a common thing.

19   Q.   Why was it a common thing, Mr. Sahakian?

20   A.   Because everybody was proud of it.  You know, if you like

21   a tattoo, you put a tattoo on because you like it.

22   Q.   You said it used to be a common thing.  Did there come a

23   time when it wasn't a common thing anymore?

24   A.   You know, because people get locked up for just being

25   called an associate of the AB, and if somebody's got -- a
```

1    tattoo now will put you in the SHU unit.  I know Irish guys

2    being put in the SHU unit just for having a tattoo on, but

3    they don't do it no more because it's got problems attached to

4    it.

5    Q.    And the problems it has attached to it is that the BOP

6    will identify you as AB and look you up for it?

7    A.    Not me.  I've been identified for a long time.

8    Q.    That's why someone joining these days wouldn't do it?

9    A.    Yeah.  I guess.  I mean, I don't know what other people

10    do, but I would guess that would be a reason.

11    Q.    Mr. Sahakian, when you came to the federal system, did

12    the federal Aryan Brotherhood have a commission then?

13    A.    See, I got -- that's another thing.  I got a problem with

14    the word "commission," because I never called it no

15    commission.  I've heard -- don't get me wrong.  I've heard

16    commission and stuff like that.  But I always looked at the

17    guys up there as being the older guys.  They are the guys who

18    have been around the longest.  And it wasn't commission

19    members.

20            They said I'm a commission member on this stand.  No

21    way.  I mean T.D. and Barry, they been around forever.  Barry

22    been in -- was in the same unit in Marion for 15 years.  He --

23    that's -- I guess you want to call it seniority.  But as far

24    as commission member, I have never called him a commission

25    member, and he never identified himself to me as being a

1    member of the commission.

2            What that guy said up here, they all voted on me for

3    the commission and sent it to everybody.  Nobody ever sent --

4    I was right there in B unit, and nobody ever asked me if they

5    wanted to make me no commission.  I never heard of that.  So

6    there's things that could be happening in prison and you

7    wouldn't hear of.

8    Q.   You said, however, that you've heard of the people using

9    the term commission.

10   A.   I've heard guys in the AB say Barry and T.D. are

11   commission members.  But I never identified them as that

12   because I'm from the -- I look at myself as from California

13   days.

14           Before all of this, three man making decisions and

15   all of that kind of stuff.  I never seen it that way.  Them

16   guys, the whole time I was in that prison before '95, they

17   never told me to do nothing.  They never said hey, go, as a

18   commission member, I'm telling you.  That don't happen.  I

19   mean, there's nothing going on in that prison.  There was no

20   visiting.  There was nothing going on.  Who are they going to

21   commission over?  They never asked me to do nothing or give me

22   a commission.

23           But it makes for good press and makes for good

24   story.  It makes it seem big, like, you know, it's not like

25   that.  I don't know how to say it any different.  And I think

1    some people know that it's not like that, but it sounds better

2    if you say commission member rather than old-timer.  You could

3    call them old-timers because they have been in prison their

4    whole life, in the same spot.  And they still ain't got a red

5    penny.

6            So they ain't making no money.  If they got a racket

7    going on, they need to find a new one because that one ain't

8    working.

9    Q.   And that was one of the ideas that Barry and T.D.

10   discussed at Marion in '93 and '94, is --

11   A.   Excuse me.  I'm sorry.

12   Q.   Isn't that one of the ideas that was discussed at Marion

13   in '93 and '94, whether there were ways to make more money in

14   the AB?

15   A.   That has always been discussed about ways to make more

16   money.  But in '93 -- I'll answer your question.  In '93 and

17   '94, you got to remember, in '94 I was in B unit.  So if they

18   was having discussions in D unit, couldn't be part of them.

19   And nobody ever sent me no word about -- that's what I was

20   telling you just a minute ago.

21           Benton said they made a vote on him.  There was

22   three of us over there.  Nobody asked for my vote, and nobody

23   sent me no paper like you got right there saying they going to

24   have a security squad and, I mean, it's -- it didn't happen.

25   And I'm not -- if it did happen, I would know about it because

1    I was in the prison.  If they were talking about it, it never

2    went nowhere.

3            And you got to realize guys like Roach and them,

4    they had an agenda to talk about those kinds of things when

5    they had ears listening to them.  And that's what they did.

6    They pumped it all up because I was there, and nobody ever

7    told me that there was a reorganization to vote on it.  It

8    didn't happen.

9    Q.   You said at the beginning there that you were going to

10   answer the question eventually.

11   A.   I didn't answer it?  Go ahead.  Tell me.

12   Q.   Wasn't one of the ideas that was discussed then how to

13   make more money through the AB?  Didn't Barry and T.D. discuss

14   that at Marion in '93 and '94?

15   A.   I was with them in '93.  They didn't discuss about how to

16   make no money in '93.  I think it was in '93.  You have the

17   papers.  I was in D block.  But they never told me how you

18   going to make money?  What are you going to do?  I mean,

19   there's no visiting.  There's no -- the only people you get

20   out on the tier with is 18 guys on the range.  And I couldn't

21   have talked to them when I was in B unit because B unit is the

22   pretransfer release program.

23           When them guys went to ADX, I went to Leavenworth.

24   I didn't go to ADX with them.  So if they talked about it in

25   '94 or they talked about it in ADX, I never was -- I never

1    heard about it because I wasn't there.

2    Q.   You never heard about it if it happened in '94, and you

3    never heard about it if it happened in the ADX.  When you were

4    together with them in '93 --

5    A.   I never heard -- I'm sorry.  I know.

6    Q.   Didn't they discuss efforts to make more money through

7    the AB?

8    A.   Mr. Wolfe, I'm telling you, they always discuss how to

9    make more money.  You got four guys in a cell.  They see a

10   commissary cart go by.  They got pride, and they don't have

11   nobody sending no money.  You have the books.  You know that

12   these guys was poor.  Because they wanted to get more money.

13   That's a whole lot different.  You asked me.  They talked

14   about making more money.  They have schemes and plots.  You

15   can talk about building an Empire State Building.  But if you

16   don't have no bricks or guys that do it, it ain't going up.

17   Q.   So leaving aside what happened, the question is did they

18   discuss ways to make more money at Marion in '93 when you were

19   with them?  And I understood your answer to be yes.

20   A.   No.  They did not.  Not with me.  But I heard that they

21   wanted to make more money.  And that's not the only time.  I

22   heard it over and over and over.  Not with them guys, but in

23   20 years, I always hear people coming up with plans to make

24   money.

25   Q.   And Barry and T.D. discussed ways to reorganize the AB in

1   order to make more money?

2   A.   I never heard that.  The reorganizing the AB.  That's

3   where when you were saying commission, the commission members?

4   I never called them commission members.  They were, you know,

5   they were -- when these guys say there was three guys on a

6   commission and the reorganization, you're going to have

7   counselor members and all of that, I never heard that.  I

8   mean, you have guys sit right up here saying I was a council

9   member, and then you had somebody come up here and say I was a

10  commission member.

11       When did they make me a commission member?  When was

12  I made a council member?  Even on your own paper my name ain't

13  on there.  Al Benton sat up here and told you that's your guy.

14  He told you I don't like that guy.  I passed him over.  A lot

15  of guys didn't like me because I don't -- I don't pay -- you

16  know, they talk a lot, and that's how it is, man.

17  Q.   So you're not saying that those things didn't happen.

18  All you can say is you never heard of them.

19  A.   Not with me.  They didn't talk with me about it.

20  Q.   You know who Steve Scott is, don't you, Mr. Sahakian?

21  A.   Yes, I do.

22  Q.   Who is Steve Scott?

23  A.   Who is he?

24  Q.   Yeah.

25  A.   He's a guy that was in Marion and ADX.  From California.

1   Q.   He's an AB member, isn't he?

2   A.   Huh?

3   Q.   Steve Scott is an AB member, isn't he?

4   A.   I think so.  Pretty sure.

5   Q.   You know Mike Clacker?

6   A.   He was in Marion.  I don't know him, though.  I never met

7   him.  I heard about him.  The more I know about him is from

8   this case.

9   Q.   Mike Clacker was an AB member, too, or was before he

10  died, wasn't he?

11  A.   I don't think so.

12  Q.   Pardon me?

13  A.   I don't think so.

14  Q.   No?

15  A.   I don't think so.

16  Q.   Displaying Exhibit 152 in evidence.  This is a kite from

17  Steve Scott to Mike Clacker that Clacker turned over to the

18  SIS in the ADX.  And he received it on Christmas day in 1997.

19  Where were you housed Christmas in 1997, Mr. Sahakian?

20  A.   It had to be Marion.

21  Q.   And this document is from the ADX.

22  A.   They might have made him an AB member in the ADX.

23  Because I never heard of him being AB in Marion.

24  Q.   Just look at -- there's a list here that reads Kevin,

25  head counselor; Jon, counselor security; Glen, counselor;

1    Gato, counselor.

2            I take it, from what you've been saying, that none

3    of that means anything to you; is that right?

4    A.   That -- if they was doing it there, it wasn't happening

5    in Marion.  Because there was only three of us in Marion, four

6    of us in Marion.  I mean, there was only -- if they was doing

7    that, I read all of these papers.  I read all of these papers.

8    You know, these papers right here?  I read them already.  But

9    they wasn't doing that in Marion.

10   Q.   So you did not create the council in 1997 at Marion?

11   A.   Did I create this?

12   Q.   You did not have anything to do with creating a council

13   with the Aryan Brotherhood in 1997 at Marion?

14   A.   No, no.  Who are we going to counsel?

15   Q.   Mr. Sahakian, you need to start paying more attention to

16   the questions and answering them, because we can spend a week

17   here at this rate.

18   A.   I don't want to do that.

19   Q.   Me either.

20   A.   You want me to answer?

21   Q.   Actually, I'd like you to answer the questions now for a

22   while.  The explanations, there will be redirect.  And you

23   have an opportunity to explain that all you want.

24           MR. GREEN:  I have an objection about the last

25   statement that was made by the government.  He's allowed to

1   give a complete answer to the question.  I understand if it

2   calls for an affirmative or a "yes" or "no" answer, but then

3   he's allowed to explain his answer.

4           THE COURT:  Well, that's a call for the Court to

5   make.

6           Question.

7   Q.  BY MR. WOLFE:  You are saying that you didn't have

8   anything to do with creating a council for the Aryan

9   Brotherhood; isn't that right?

10  A.   I've got to answer it "yes" or "no"?

11          THE COURT:  Well, first that calls for a "yes" or

12  "no" answer.

13          THE WITNESS:  Did I have anything to do with the --

14  Q.  BY MR. WOLFE:  Isn't it right that you had nothing to do

15  with it?

16  A.   I didn't have nothing to do with it.  No.  No.

17  Q.   Isn't it correct that you had nothing to do with it?

18  A.   Yes.  You got me confused.

19          THE COURT:  The question has a double negative,

20  Mr. Wolfe.  Rephrase the question, please.

21  Q.  BY MR. WOLFE:  You had nothing to do with creating a

22  council for the Aryan Brotherhood.  Isn't that true?

23  A.   Yes.

24  Q.   And you never heard about a council being created for the

25  Aryan Brotherhood.  Isn't that true?

1    A.    That's not a "yes" or "no" answer.  I can't give you a

2    "yes" or "no" answer for that because there's times.  Tell me

3    a time.  Give me a time when you want that I heard about it.

4    I heard about it.

5    Q.    You've never heard about it before the year 2000?

6    A.    About this?

7    Q.    Yes.

8    A.    No.  I never heard about it.

9    Q.    And --

10   A.    I want to be straight with you.

11          THE COURT:  Okay.  Wait.  Ask another question.

12   Q.    BY MR. WOLFE:  Please explain, if you want to.

13   A.    I heard of councils.  I heard them talking about they

14   wanted to have counselors.  They wanted to have people, if

15   people went to other places, they wanted to have counselors.

16   That's the only thing that I heard in Marion.  But that didn't

17   go nowhere because they came and they snatched them all up,

18   and they took them to the ADX, and I was in B unit.

19          So I didn't really get to talk to them before they

20   left.  I don't know if they was talking about that then, but I

21   had heard counselor, but head counselor?  Counselor of

22   security?  All of that?  No.  I have never -- that didn't

23   happen in Marion, and when I was there, nobody tried to do

24   that.

25   Q.    And you said just a moment ago that they talked about

1  making a council, and it was -- that you went to the step-down

2  unit and left.  So that's before you were in the step-down

3  unit at Marion?

4  A.   When they talked about it?

5  Q.   Yes?

6  A.   No, I heard about it when I was in the step-down unit.

7  When I was in B unit is when I heard council.  They wanted to

8  have counselors.

9  Q.   All right.  So you did hear about a discussion taking

10  place at Marion while you were in the step-down unit.  The

11  discussion was outside the step-down unit, though; is that

12  right?

13  A.   Yeah, somebody outside in the yard told somebody inside

14  the B unit that there was some talk going on that they wanted

15  counselors.  And that person who got told that told me.  So as

16  far as hearing about counselors, that's where I heard about

17  that.

18  Q.   And was one of the things you heard that there would be a

19  council member in charge at each prison where the AB was

20  represented?

21  A.   No, I didn't hear that.  But really, it might have been

22  that.  I'm not going to say that that wasn't it.  They -- they

23  wanted to have somebody going to different places to make

24  money.  That's what I heard, but I heard that not from anybody

25  in that unit.  I heard that from somebody that got told that.

1    As a matter of fact, I believe it was Kevin Roach that told

2    them in the window, because, you know, when -- but I don't

3    want to make a long answer.

4    Q.    That one seems to be on point.

5    A.    Okay.

6    Q.    You're saying that --

7    A.    You know, that --

8          THE COURT:  Wait.  Ask the next question.

9    Q.    BY MR. WOLFE:  You did hear about the council for the AB

10   wanting to send people to other institutions to make money for

11   the AB.

12   A.    Something like that.  Yeah.  Something like that.  But I

13   didn't hear who.  I didn't hear of Kevin, John, Glen.  You

14   want me to finish answering the other thing?  You know in the

15   D unit, D unit goes to the yard, they had a big yard outside

16   of B unit.  That's when them guys could go out there just for

17   a short time in the morning before we went to work.  And

18   sometimes them guys would yell back in.  That's where I heard

19   it from.  Nobody came and told me.

20         Somebody in the unit came and told me afterwards

21   that something about they was going to send counselors

22   somewhere.  And it might have been.  I don't know for sure.

23   But it might have been about, you know, but this ain't nothing

24   new, man.  They always trying to send somebody to make some

25   money somewhere.  The guys ain't got no money.

74

1    Q.    Mr. Sahakian, I want to talk about December of 1996.  You

2    said in your direct testimony that there was a time when you

3    went to the hole, and you were placed between two members of

4    the DC Blacks, and Joe Tokash was also on the range.

5    A.    I believe so.

6    Q.    You remember that?

7    A.    Yes.

8    Q.    And I think you said you had some conversations with them

9    about Butch Johnson whacking Joe Tokash.

10                You remember that?

11   A.    That's what I believe Joe was in the hole for.

12   Q.    What conversations did you have with the DC Blacks about

13   that?

14   A.    Joe was this cell 10.  I was up in the front in

15   between -- you want to hear the conversation?

16   Q.    Sure.  Yes.

17   A.    The -- Joe was in cell 10, and one of the guys that we

18   got locked up for refusing to stand count was the guy from

19   D.C., Shake Dog.  He was there, and I got put in between them.

20   And I asked, "Now, what happened, man," and he said, "Oh, you

21   know, Joe don't talk too good.  He's on medication and stuff."

22   Q.    Did you talk with the two -- did you talk with either of

23   the DC Blacks about it?

24   A.    I talked to D, yes.

25   Q.    What did you say to him?  What did he say to you?

1  A.   I told him -- he heard what Joe was telling me.  So he

2  was right there.  And I'm like, "Deon, is that your homeboy?"

3  He says, "Yeah, I know."  He said, "Why did he do that?"  He

4  goes, "Man, I don't know."  They said they were going to go

5  down there and talk to them.  Shake Dog was the one said he

6  was going to go down there and talk to him.  And he ended up

7  doing that.

8  Q.   And they did talk to him.

9  A.   Yes.  I know they did, because I heard them.

10  Q.   And what did they say to Butch Johnson?

11  A.   Shake Dog told him, "Hey, Homie," something like that,

12  "what happened with you and dude up here?"  And I was down on

13  the tier, and Butch was up this way a little bit from me, and

14  they said a few more things back and forth.  And then Butch

15  Johnson spun out on Shake Dog, and Deon walked away.

16       He told him he was playing the 50 on him just for

17  bringing a message.  Because I think Deon said that he had

18  talked to me and Butch, already knew I was down on that here.

19  Q.   You said that Butch Johnson spun out.

20  A.   On Shake Dog.  Not on me.

21  Q.   Well, will you explain to the jury and to me what it

22  means to spin out on somebody?  What did you mean?

23  A.   He started hollering at Shake for bringing anything from

24  me about what he had done to Joe.  He didn't like it.  He

25  said -- you know, I forget the exact words, but the thing was

1   he thought Shake Dog was playing the 50 by listening to what I

2   had to say about Joe Tokash.  And that means playing on the

3   other side.  You know, that he was playing on my side by

4   bringing that to him.

5   Q.   So Butch Johnson thought that by D.C. Blacks speaking to

6   him about what you had said, they were taking your side

7   against Butch Johnson?

8   A.   Yeah.  But really I think there might have been a little

9   bit more to it.  Because Shake Dog and Butch were in the same

10  unit that we came from.  And he had got moved -- we were all

11  on the same tier -- Butch Johnson, me, Mike Wagner -- before

12  that.  And he had got moved to -- I don't know -- the E unit

13  or the D unit.  I think it was F unit we were in.  And I don't

14  think they had a very good relationship in that unit.  That's

15  just my opinion.

16  Q.   When the DC Blacks spoke to Butch Johnson --

17  A.   Just Shake.

18  Q.   When Shake Dog spoke to Butch Johnson, did it have any

19  apparent effect on him?

20  A.   He spun out.  I told him what I just told you.

21  Q.   He didn't say I'm sorry?

22  A.   No.

23  Q.   He didn't say I'd like to make it right?

24  A.   Make it right?

25  Q.   He didn't say he wanted to make it up to Joe Tokash

1    somehow?

2    A.    No.

3    Q.    He didn't give any indication that he had changed his

4    behavior, did he?

5    A.    No, he was mad at Jim for talking to him about it.  He

6    was mad at the guy for bridging it to him.

7    Q.    So the D.C. Blacks were not able to do anything about Joe

8    Tokash being hit over the head with a radio?

9    A.    There was really nothing they could do.  The only thing I

10    was asking him to do was go and talk to the guy and calm him

11    down, because that was the second guy he had already jumped on

12    for no reason.

13          So when I had the opportunity, and Joe was there,

14    the door got opened, and Deon is an old-timer from that, I

15    know Deon from, you know, that place is small.  You get -- I

16    never had no trouble with them guys.  And I had a rapport with

17    a lot of them.

18          Just like I told you, I got locked up for refusing

19    to stand for count with Shake Dog.  He was part of the

20    so-called demonstration about the standing for count.  All of

21    this would happen with Joe was just, you know, something that

22    Butch Johnson decided he wanted to do on his own.

23          So when I had the opportunity, I told Deon and Shake

24    Dog was right there on the other side of me, "Why don't you go

25    and say something to Butch Johnson?"  That's what was wrong

1   with this guy.  He's jumping on people in a way to tell me who

2   this guy is, mean.  He causing turmoil here.  I didn't tell

3   him to do nothing to him.  They figured that out on their own.

4   But you got to tell them something.

5   Q.    And it didn't help with Butch Johnson, did it?

6   A.    It didn't help with him?  He didn't like being told that.

7   He didn't want his own homeboys to tell him nothing.  He

8   didn't make no secret.  He started screaming at him through

9   the window.  There were guys out on the rec, and they -- and

10  Deon just turned around and walked away.  Shake Dog tried to

11  argue with him.

12  Q.    So in short, it did not help teach Butch Johnson the

13  error of his ways.

14  A.    I don't know.  No.  I mean, I don't know if he jumped on

15  anybody since.  Is that what you're talking about?  Has he

16  continued doing that?  I don't know what they did to him or

17  nothing.  I don't know.

18  Q.    He didn't, as I said, he didn't apologize.

19  A.    Nobody was looking for an apology from Butch Johnson.

20  Somebody was looking for me.  I was looking for an entree into

21  their mindset with him, and if they had any control over them,

22  please exercise control over that guy because he's hurting

23  people for no reason.

24        Joe Tokash didn't do nothing but go out to get his

25  tray, and he got smashed in the head with a radio.  The other

1    kid out on the yard, he didn't do nothing, and they just

2    jumped on him for no reason.  Them guys was out of control.

3    It ain't my job to do nothing to them.  All I can do, if I

4    know these guys, is tell them hey, man, say something to your

5    homie.  Just like if they came to me and said somebody, one of

6    my friends is doing something wrong, I go and tell him, say,

7    if he's doing something wrong like that, hey, knock that off.

8    If I had any say-so over it.  Because, well, I mean you see

9    what happened.

10   Q.    What do you mean, sir?  "You see what happened."

11   A.    All of this stuff started over a Dirty White Boys telling

12   somebody get off a bench.  That's how I look at it.  All of

13   this nonsense in Marion started over something that kept on

14   going, and there was incidents on -- just if people would tell

15   each other, would listen sometimes, it might not happen.  I

16   don't know.

17   Q.    Shortly, or sometime after you had the conversation with

18   Deon and Shake Dog, Mike Wagner whacked Butch Johnson on the

19   rec ward in the HSU?

20   A.    Real quickly after that.  You want to hear about that?

21   Q.    Sure.

22   A.    They both pulled the cuffs off.  They knew when they went

23   in that cage, and the police that put them in that cage knew

24   what was going on.  Everybody in Marion knew that they was

25   going to fight if they went in that cage.  They are all on the

1    same tier.  You know, they knew Mike's a dirty white boy.  So

2    you know, they put the guy in the thing.  They both -- they

3    got two bean holes in the thing.  They tried to take the cuffs

4    off at the same time.  They both pulled out of the cuffs and

5    got to beating on each other.

6    Q.    Mr. Sahakian, on February 14th, 1997, you were sent to I

7    unit and D range with Terry Wright and Wayne Becker after the

8    fight with --

9    A.    Right.

10   Q.    And you said that when you got there, you learned about

11   plans for retaliation that were going on between January 2nd

12   and the day you arrived back on I unit.

13         You remember that?

14   A.    Yes.

15   Q.    What did you learn?

16   A.    Like specifically?

17   Q.    Sure.

18   A.    What we were wanting to do.  They was wanting to

19   retaliate against everybody.  I mean, they were mad.  I don't

20   know how to explain it.  You know, you got a bunch of guys who

21   just got attacked by another group of guys, and they want

22   revenge.  They want -- they got humiliated, and they had to do

23   something about it to uphold their respect.  Not me.  I didn't

24   get attacked.  The Dirty White Boys got attacked.  They were

25   out on that yard, And they were mad about it.

1    Q.    And you learned that they had made some metal knives?

2    A.    Did I learn that?

3    Q.    Yes.

4    A.    At some point, yes.

5    Q.    Well, you learned it right there on the unit, didn't you?

6    A.    I said at some point.  It had to be on that unit.  But at

7    some point I did hear about the knives, yeah.  I never seen

8    them, but I heard about them.

9    Q.    And you learned that they were making lists of people to

10    be retaliated against.

11    A.    That's what I just said.  They had lists that were a mile

12    long.

13    Q.    And the lists were of targets.

14    A.    Guys who they said were connected with that little

15    beating that they got out there.

16    Q.    Yes.  The targets were people that they believed were

17    connected to the January 2nd incident.

18    A.    I believe that's what they thought.  They were making

19    lists.  They were saying that this guy's friends with this

20    guy, this guy.  You know, it was -- they were very upset.  I

21    don't know how to explain it any better than that.

22    Q.    But you --

23    A.    You want to know what I did?

24    Q.    Yes.

25    A.    Okay.

82

1   Q.   We're coming to that actually.

2            THE COURT:  Wait, wait.  Do not speak over one

3   another.  Thank you.

4   Q.   BY MR. WOLFE:  You learned that Ray Oechsle had been sent

5   out of the I unit with one of the knives before you got there.

6   A.   I don't know when I heard that, though, but I heard it

7   pretty soon after I got there.

8   Q.   Who did you hear those things from, Mr. Sahakian?

9   A.   Somebody on D range.  It had to be somebody in the Dirty

10  White Boys.  Jessie, Wagner, Ritter -- it wouldn't have been

11  Ritter.  It would either be Jessie or Mike.

12  Q.   Michael McElhiney was there, wasn't he?

13  A.   Yes, but he wasn't the one telling me what they were

14  going to do.

15  Q.   Didn't he know about all of those things, too?

16  A.   Yeah, he was up there.  He was up there with them.  He

17  was up there with them a couple months before or soon after it

18  happened.

19  Q.   And what did you do, Mr. Sahakian?

20  A.   When I got there?

21  Q.   Yes.

22  A.   Sat there and listened to what was going on for about two

23  days.

24  Q.   Anything else?

25  A.   Then I told him you guys are going to kill all these

1    people?  You gonna kill the El Rukns?  What did they do?  And

2    then I started talking to Jessie Van Meter because he was one

3    cell away from me, and I had never met that guy before, and he

4    was putting on the show like he was the big shot for the Dirty

5    White Boys.

6              So I said, "You gonna kill The BGF, too?"  This guy

7    came from Memphis, and he's talking about killing all these

8    people.  And I said you know, that's a lot of killing you got

9    to do right there.  And my conversation with them guys was are

10   you really serious about it?  And they were serious.  In their

11   minds they were serious.  They wanted some revenge.

12             But I took it as my -- for my personal situation is

13   let's calm this down and see if we could not be causing a

14   bloodbath here.  Because that's a very small place.  You get

15   put on tiers with people, and administration moves you into

16   the wrong spot, you're dead.

17             So, you know, that's -- you know, they had a long

18   list, and I was trying to tell them tone it down a little bit.

19   Q.   So you told them take the BGF off the list, essentially.

20   A.   Well, see, I don't want to explain it like that, like I

21   told them.  But I did.  I said explain to me what The BGF did

22   to you.  And these guys were youngsters.  They are Dirty White

23   Boys.  They just came to the institution.  They don't know

24   none of these guys.  I know them.  I been there the whole

25   time.  I know these guys.  Some of them I know from

1    California.  And they are saying they are going to kill them.

2            And I said, "Tell me what The BGF did to you.  Tell

3    me what Tony did to you."  They didn't have no answer.  They

4    was just making paper.  They were saying -- they wanted to

5    go -- because they wanted to be sure whatever unit they went

6    into, that they would be able to get somebody.  And they

7    wanted -- you know, when I said before people talk and there's

8    no basis to it, it's just talk?  These guys were serious that

9    they wanted to hurt people.  They wanted to kill people.

10           So I told them, you know, explain to me about the

11   BGF.  And I know Doc.  I didn't know David Jackson, but I had

12   heard real soon afterward that Dave Jackson was hooked up with

13   Doc.  And then shortly thereafter, somebody talked to Doc.

14   Q.   So I take it that the BGF got taken off the list.

15   A.   A whole bunch of people got took off the list.  But I

16   want you to be -- I want to be clear.  You asking me about the

17   list?  I'll answer you.  Or if you want a yes or no question,

18   I'll tell.

19   Q.   You -- how about a couple yes's or no's, and then you can

20   explain.  The BGF was taken off the list after you spoke of

21   it?

22   A.   Not by me.

23   Q.   The BGF was taken off list after you spoke up?

24   A.   Correct.

25   Q.   The El Rukns were taken off the list after you spoke up;

1    right?

2    A.    Not right away.

3    Q.    But eventually.

4    A.    But not because I spoke.  Well, because I was explaining

5    to them -- I mean, I don't want to get it outside of the

6    context of the conversation that was occurring on the tier.  I

7    mean, you have to be in a position to understand, when you go

8    in -- I didn't know exactly what happened yet.  Only what I

9    heard.  Because I left the hole when they brought everybody

10   in.

11          I knew Joe, Jessie, and all them guys that got

12   stabbed, because they put them upstairs.  When I got out there

13   to F unit, everybody that was involved was locked up.  So the

14   true thing I hadn't came to know yet, when I went in there, it

15   took a couple days to know what's going on.  But you got to

16   understand, once I found out what the anger with these guys

17   was, now I'm in a position I can say I don't want nothing to

18   do with it.  You know, that's Dirty White Boy shit.  Excuse

19   me.

20          You know, I can take a standoff, hands off

21   situation, and these guys don't know nothing.  They don't know

22   these guys.  They are new to the institution.  And it's going

23   to get to me sooner or later because if they hit the wrong

24   guy, the guys that they hit, somebody that's got somebody in

25   my block, I'm going to have to fight with them.

1          So I got a choice.  I can say something to these

2    guys who I'm housed with on the tier, and the administration

3    put all the white guys, all the DWB and all the AB on that

4    tier for that purpose.  They didn't tell me that.

5          But if you have two groups that are going after each

6    other, why do you put one on one tier -- take it for granted,

7    you know, what you're doing when you're running a prison.  You

8    put them all together up here, and you put them all together

9    down there.  If they are mad --

10          THE COURT:  Mr. Sahakian, do you remember what the

11    question was?

12          THE WITNESS:  No.

13          THE COURT:  Answer just the question that you're

14    being asked.

15          Ask the question again, please, Mr. Wolfe.

16    Q.   BY MR. WOLFE:  You told me that The BGF was taken off the

17    list, not by you, after you spoke up; correct?  Is that

18    correct?

19    A.   Correct?  No.  That's not correct.  I don't know when he

20    got took off.  But he got took off based upon the

21    conversations that were had on D range.  The Dirty White Boys

22    decided they didn't want to fight with The BGF.  Whether that

23    was because of what I said, I don't know.  But I would say

24    that it probably was.  You know, I don't want to take

25    responsibility for something --

```
 1            THE COURT:  Just listen to the question and answer
 2   only the question.  You've answered the question.
 3            Next question.
 4   Q.   BY MR. WOLFE:  Similarly, the El Rukns were taken off the
 5   list, not by you, but after you spoke up.
 6   A.   After we had conversations -- well, I think there was
 7   only one.  When they sent the list to me and I seen it, there
 8   was only one guy from the El Rukns on there.  But that was
 9   like half of them all.
10   Q.   And you had a conversation about what did the El Rukns do
11   to you.  Isn't that right?
12   A.   To me?  They didn't do nothing to me.
13   Q.   Didn't you ask --
14   A.   Oh, yeah.
15   Q.   You asked them to explain to you what did the El Rukns do
16   to you.
17   A.   Yes.  I asked them that.
18   Q.   And after you asked that question, the El Rukns were
19   taken off the list; isn't that right?
20   A.   I don't know.  Not right then.  They had some -- they had
21   some reason for leaving them on there.
22   Q.   But evidently --
23   A.   But they took them off.  But they had other guys on
24   there, too.
25   Q.   Did you ever tell them don't retaliate against anybody?
```

1    A.    It wouldn't have worked.

2    Q.    Leaving aside whether it would work, did you ever do it?

3    A.    I thought about it.

4    Q.    Did you ever do it?

5    A.    I got to tell you, I didn't tell them -- I didn't tell --

6    I didn't put it like the way you -- that's a yes or no

7    question?

8    Q.    Yes.

9    A.    No, I didn't do it.

10   Q.    Mr. Sahakian, you gave some testimony about the

11   protective custody hearings.  Do you remember that?

12   A.    Yes.

13   Q.    And you said that Captain Medders wanted some things

14   stopped.  And that's why he had the meeting with you and

15   suggested the possibility of putting you in protective

16   custody.  You remember that?

17   A.    That's where this paper came from.  Yes, I remember that.

18   Q.    And what did he want stopped?

19   A.    This stuff that we're talking about.  He wanted the same

20   thing I wanted.

21   Q.    He wanted -- you said yesterday that he wanted the race

22   baiting stopped.  Do you remember that?

23   A.    The screaming back and forth.  He wanted that stopped.

24   Q.    Explain what that was.  What was happening that the

25   captain wanted stopped?

1    A.   Well, when everybody got -- when everybody was in the

2    hole, I just told you they had white guys upstairs, and they

3    had the black guys on the tier right below.  So they are

4    hollering back and forth at the end of each one of those

5    ranges there's a big giant vent.  So the guys from the back of

6    the range, they could scream up to the guys up front.  You

7    know, not scream, but holler.  It's a big vent.  You could

8    almost just talk and hear five cells on each, you know, from

9    the bottom to the top.  And all that cut in the doors and all

10   of that kind of stuff.

11        He said he wanted the situation -- you know, he

12   wanted it toned down, turn down the volume.  Put out the fire.

13   You know what I mean?  Everybody in the institution knew there

14   was something that happened bad.  People were getting bam,

15   bam, bam, getting hit in the head.  And he said he wanted it

16   stopped or he was going to put everybody in PC.

17   Q.   Had you heard any of the yelling, the hollering that you

18   talked about?

19   A.   I was right on the tier.

20   Q.   And who was hollering?

21   A.   Michael Wagner, for one.  Steve Ritter, for one.  And

22   believe me, when they did it, I was on them immediately.  But

23   you got to look at things, at the concept of the time.  You

24   know, I can't be the policeman when these guys are that mad or

25   I won't get nothing done.  So I would tell them hey, hey, it

1   really got bad when they would start drinking because they was

2   like drinking every night.  And I was drinking, too.  Anyway.

3   Q.   And the PC hearings were held for you; right?

4   A.   Well, they were supposed to be held for everybody.

5   Q.   But there was actually one for you.

6   A.   Well, I think they held three of them.

7   Q.   Okay.  And who were the -- you were one.

8   A.   And I think -- I forget the name.  A black dude

9   downstairs and McElhiney in I block.  Because they had moved

10  all the black guys from I unit to H unit on B range.  So they

11  got McElhiney from over there and me in H unit.

12  Q.   And you agreed to do something about it, I think you

13  said; right?

14  A.   Yeah, well, with the captain, I told him I definitely

15  will give that message to dudes on the tier.  He didn't just

16  want it to the Dirty White Boys.  He wanted the Dirty White

17  Boys and everybody who was backing their play.  Everybody that

18  they had put on that range and anybody who wasn't on that

19  range that I thought should get that message.

20           And the only thing I could tell them was I can't be

21  telling nobody that because half of the guys are over in I

22  unit.  He said don't worry about that.  They will all be over

23  here tonight.  And he moved everybody from I unit to H unit

24  that night with their property.  He wanted to get -- I don't

25  think he wanted to have everybody in PC anyway.  He was just

1    using that as like a threat.

2            THE COURT:  Mr. Wolfe, is now a good breaking point?

3            MR. WOLFE:  Actually, it's a perfect time, your

4    Honor.

5            THE COURT:  All right, ladies and gentlemen, we'll

6    take our lunch recess until 1:15.  Remember, don't discuss the

7    case with anyone.  Don't make up your minds about the case or

8    any of the issues.  Don't do any investigation.  And we'll see

9    you back at 1:15.

10           **(WHEREUPON THE JURY WITHDRAWS.)**

11           THE COURT:  On the record outside the presence of

12   the jury.  How much longer do you think your cross-examination

13   is going to go?

14           MR. WOLFE:  Your Honor, not as long as I thought.

15           THE COURT:  Another half hour?

16           MR. WOLFE:  Certainly less than an hour.  And it

17   could be just a half hour.

18           THE COURT:  All right.  Do you have an estimate for

19   your redirect examination?

20           MR. GREEN:  Based on that, probably about 15

21   minutes.

22           THE COURT:  Okay.  Now, when I tell the jury, we

23   need them back next Wednesday?

24           MR. GREEN:  Yes, Judge.

25           THE COURT:  All right.  Thank you very much.

1                    (Lunch recess taken at 12:05 P.M.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2              **Riverside, California; Thursday, October 2, 2008**

3                              **1:25 P.M.**

4

5              THE COURT:  Let the record reflect the presence of

6      all members of the jury, counsel, the defendant on the witness

7      stand.

8                   You may resume, Mr. Wolfe.

9                   MR. WOLFE:  Thank you, your Honor.

10     Q.   Mr. Sahakian, when you went to Leavenworth in 1995, were

11     there any other AB members or associates there?

12     A.   McElhiney was there, and Mark Nyquist was there.

13     Q.   Were there any AB associates at Leavenworth when you went

14     there in '95?

15     A.   You mean people that ran around with people, us?

16     Q.   Sure.

17     A.   Because I been hearing an associate -- I know you can't

18     tell me, but you want to know what I think an associate is?

19     Q.   Yes.

20     A.   Somebody that comes out there and drives weights, that's

21     an associate.  But he's not AB.  He's associating with us.

22     Q.   Let me ask you, right before lunch, in talking about the

23     protective custody hearings and what Captain Medders wanted

24     you to do, you remember that discussion right before the lunch

25     break?

```
 1   A.    Correct.
 2   Q.    You used the phrase everybody backing their play.  You
 3   said that you told Mr. -- Captain Medders that you give the
 4   message about no race baiting, no cutting the security
 5   measures, calm things down.  That you give that message to
 6   people on the tier, the Dirty White Boys, and everybody
 7   backing their play.
 8              Let's use that as a definition of an associate.  Was
 9   there anybody at Leavenworth in '95, when you went there, who
10   was backing the AB's play of you and the other members?
11   A.    I don't know how to answer that question.  I mean, you
12   say backing the play, it's got to be a situation.  You got to
13   know what the situation is before you know somebody is going
14   to back your play.  I mean, what happened.  Tell me what
15   happened, and I'll tell you who they are or who would.  Are
16   you talking about just people that would back your play on
17   anything?
18   Q.    Were there people like that?
19   A.    There probably was, yeah.  I mean --
20   Q.    Who were they?
21   A.    It's supposed to be -- the AB is supposed to back their
22   play on anything; right?
23   Q.    What I'm getting at --
24   A.    You want associate names.
25   Q.    Not just the members.  You told us the members already.
```

1     What about associates of the AB?

2     A.   I mean, there's guys there, but what I hear here about

3     associates, I don't have that -- it don't register in my brain

4     like that.  I see guys when I go out there and they are there.

5     If something happens and we're fighting with somebody, whether

6     they are going to come and help, that -- they don't have an

7     obligation to do that because you might think they are an

8     associate.  I mean, they hang around.

9     Q.   You said, I think, on direct that drug use was common at

10    Leavenworth when you were there; right?

11    A.   With a lot of people, yeah.

12    Q.   So I presume that drug sales were just as common.

13    A.   Yeah, there was drugs there.

14    Q.   Was the AB involved in drug sales at Leavenworth when you

15    were there?

16    A.   Me as an AB member?  No, I wasn't involved in drugs.

17    Q.   Was any AB member involved in selling drugs at

18    Leavenworth when you were there?

19    A.   Probably.

20    Q.   Who?

21    A.   I wasn't.

22    Q.   Who was?

23    A.   I mean, why I got to tell on somebody else for?

24    Q.   Well, because you took an oath.  You are obliged to

25    answer the question.

1    A.    What I done; right?  I took an oath to say the truth

2    about what I done.

3              THE COURT:  Mr. Sahakian, answer the question.

4              THE WITNESS:  There was drugs being sold there.

5    Q.    BY MR. WOLFE:  By the AB?

6    A.    Not by this AB.

7    Q.    Who was selling drugs at Leavenworth while you --

8    A.    They took Michael McElhiney to trial for it.

9    Q.    And he was convicted of it.

10   A.    Correct.

11   Q.    So you're saying McElhiney was selling drugs for the AB

12   there, but you don't want to talk about it; is that right?

13   A.    I mean, I don't want to talk about -- you know, you can

14   ask me questions about other people if you want.  Whatever.

15   Q.    All right.  So McElhiney was selling drugs for the AB at

16   Leavenworth while you were there, wasn't he?

17   A.    I'm AB.  He wasn't selling drugs for me.  He was

18   selling -- McElhiney, if he was selling drugs, he was selling

19   drugs for hisself.  And that is a common thing.  I told you

20   earlier today, people that go out there and do separate

21   things, they do it on their own, and they just need to do it

22   to where it's not bad.  He didn't give me no money.  I didn't

23   get no money from anything he was doing.

24   Q.    That's because you didn't need any money.

25   A.    But I didn't -- I mean, he could do whatever he wanted.

1    He didn't even -- I mean, I didn't have nothing to do with it.

2    I didn't want nothing to do with it.  When I went to

3    Leavenworth, all I wanted to do was go to Lompoc.  And I told

4    them that when I went there.

5    Q.    McElhiney was selling drugs for the AB when you were at

6    Leavenworth.  Isn't that true?

7    A.    Not for me.  The problem, when you say AB, he wasn't

8    selling drugs for the AB because I'm AB.  I didn't take no

9    money.  I didn't want no money.  I mean, I don't have nothing

10   to do with --

11   Q.    But there were people -- there were people in the AB who

12   wanted money and needed it damn bad.  You said so yourself.

13   Isn't that true?

14   A.    Correct.

15   Q.    And those are the people he was selling drugs for.  Isn't

16   that true?

17   A.    I mean, why you want me to tell on McElhiney?

18   Q.    Because you are obliged to tell the truth.

19   A.    He was selling drugs.

20   Q.    He was selling drugs for the AB; isn't that so?

21   A.    Not me.  I didn't take no money.

22   Q.    He was selling drugs for the AB; isn't that so?

23   A.    He was selling drugs for Michael McElhiney.

24   Q.    And he was giving a share to the AB?

25   A.    Mr. Wolfe, you don't have to holler.  I can hear you,

1    man.

2    Q.    Okay.  Sorry.  You're not answering the question.

3    A.    I'll answer the question.  What is the question?

4    Q.    The question is Michael McElhiney was selling drugs for

5    the AB at Leavenworth when you were there; isn't that true?

6    A.    He was selling drugs for Michael McElhiney.  If he sent

7    money to them guys, which he did, he was doing it for Michael

8    McElhiney.  He didn't do it for me, and I didn't send no money

9    to nobody.

10   Q.    So he did sell drugs for the AB, and he did use the money

11   to send it to the brothers who were slammed; isn't that true?

12   A.    Can I explain something?

13   Q.    You answer the question directly, and then I'll ask you

14   for your explanation.  How about that?

15   A.    Okay.

16   Q.    Isn't it true that Michael McElhiney sold the drugs for

17   the AB while you were at Leavenworth in 1995 and sent money

18   from the drug proceeds to other members of the AB who were

19   slammed in the ADX?

20   A.    Do I know that for sure?  I never seen the money.  But I

21   heard that.  I heard that the money went over there.  But I

22   never seen it.  I never sent it.  But I heard that.  And then

23   I seen it in the papers in this trial.

24   Q.    After all, he owed an obligation to his brothers to

25   share, didn't he?

```
 1   A.   That's what it's all about, man, is the share.  They

 2   ain't got nothing -- can I explain it?  You told me I could

 3   explain something --

 4            THE COURT:  Mr. Sahakian, wait.

 5   Q.   BY MR. WOLFE:  I'm sorry.  I thought you had explained.

 6   If you didn't, go ahead.

 7   A.   You're talking about sending money.  When I worked in

 8   unit 4 in Marion, I sent my whole check to a brother that

 9   didn't have nothing.  Because I had my money.  So he could buy

10   stuff for the guys that were over in D.  You're supposed to do

11   that for people that are your friends.  I didn't need the

12   money.  I had money.  So I had my stuff.  So I gave it to

13   somebody else.

14            If McElhiney was selling drugs there, I didn't take

15   none of the money.  I told them I want to go to Lompoc.  I

16   didn't want to get involved in nothing.  If he was doing it,

17   hey, if he sent it to the guys in ADX, they probably needed

18   money over there.  They don't have no jobs.  They don't have

19   nothing.  But I wasn't involved in it.  I never seen nothing

20   until I heard about it, and then when I seen in the papers, I

21   seen the money order, $105.  $105, man.

22   Q.   What you heard was that Michael McElhiney was selling

23   drugs to the AB and sharing the money around with his

24   brothers; isn't that true?

25   A.   That's what I heard.
```

```
 1  Q.    The AB had other illegal money making operations at

 2  Leavenworth when you were there, didn't they, besides drugs?

 3  A.    Like what?  You asking me.

 4  Q.    Gambling.

 5  A.    Gambling?

 6  Q.    Yes.

 7  A.    Do you want to know what I know to be the case, or you

 8  want me to -- no, the AB did not have gambling operations in

 9  Leavenworth.

10  Q.    Well, that's not so.  The AB did have gambling

11  operations, didn't they?  You maintain that they were

12  permitted by the BOP; right?

13  A.    Do I maintain that?

14  Q.    Yes.

15  A.    I can tell you what I was told about it.  But I didn't

16  run gambling in Leavenworth.

17  Q.    You didn't have poker tables at --

18  A.    They had poker tables there.

19  Q.    Didn't you have poker tables at Leavenworth?

20  A.    No.  I played at a poker table there.

21  Q.    Didn't you testify at one of Mr. McElhiney's trials that

22  you had poker tables at Leavenworth?

23  A.    That I had them in?

24  Q.    Yes.

25  A.    No, I don't think I said I have them.  I said I got money
```

1    from a poker table.

2    Q.    Didn't you say that you had a poker game at Leavenworth

3    at one of Mr. McElhiney's trials?

4    A.    Did I have one?

5    Q.    Yes.

6    A.    I played at one, and I got some money from one, but I

7    didn't have one.  I didn't sit there and deal the cards and

8    get the money.

9           Mr. Wolfe, can I explain to you what the poker is?

10   Q.    Sure.

11   A.    The administration -- and this wasn't told to me.  This

12   was told to -- I mean, this wasn't told to me by the people

13   who did it.

14          But it was told to me how it went on, why there was

15   poker tables there and nobody never come in and cracked them

16   or took them down.  They said that they wanted somebody to

17   stop from -- there was so much gambling, that if they didn't

18   have somebody that was doing the gambling to where people

19   wouldn't be getting hurt, it was easier for them to have the

20   games run, and they know who was doing it, and they would have

21   somebody that was a payoff.

22          They would have somebody like if the CMS people or

23   something lost a screwdriver or their tools or they needed

24   somebody to go talk to, they could go and talk to them, and

25   that was a way for no exchange of currency or paying somebody,

1    they said okay, that's good for you, that's good for us.

2            So they said go ahead and you -- because the poker

3    game ran night and day.  But I didn't run it.  I played at it.

4    And sometimes I would get some money from it.

5    Q.    And didn't the AB run some of the poker tables?

6    A.    None of the guys dealt the cards.  The poker games --

7    see, you're making it sound like it's a crooked thing.  It

8    wasn't a crooked thing.  It's not a crooked thing, because

9    the -- when the -- let me -- maybe -- well, you want me to

10   tell you about the -- okay.

11           You know, they took me down to the shakedown room

12   one time when Mark Nyquist was leaving, and they asked me who

13   is going to take over from Nyquist, and they told me, I said

14   take over what?  They said the games.  I said man, I don't

15   play.  And they said well, we seen you in there playing.  I

16   said I -- because I didn't want no money.  Because I thought

17   it was a trick.  That they was going to tag me when I was

18   leaving go down there and do them poker games, and they was

19   going to use that to stop me from going to Lompoc.

20           So it was from there that I found out that Ching and

21   Pierce, the lieutenant of the SIS is the one who made the

22   decision that it was all right to have the poker game.  So it

23   wasn't like nobody never got hurt from it.  Nobody never got

24   pressed from it.  People had to have something to do, and when

25   it wasn't -- and it was controlled by the -- I mean, people in

1    the administration was controlling it.  Not me.  Not the AB.

2    Because at any moment, they could say no poker game.  It's

3    gone.  You go to the hole.  They take your cards.  No chips,

4    no nothing.  So it was a payoff to them guys for

5    communication.

6    Q.    And the money flowed through Mark Nyquist to the AB.

7    Isn't that what you just said?

8    A.    I didn't say it went through Mark Nyquist.

9    Q.    You talked about who's taking over the games for Mark

10   Nyquist when he leaves; right?

11   A.    That's -- that's who was -- that's who they gave the

12   games to.  Or not the games.  I should say.  You know, they

13   had -- they had games not just for white guys.  They had games

14   for all the races.  They wanted everybody that wanted to

15   gamble to not get hit in the head because they couldn't pay

16   their debts.

17   Q.    And if you have it that the BOP gave the games, the BOP

18   gave the games for the white inmates to Mark Nyquist, and the

19   AB.  Isn't that so?

20   A.    Not the AB.  They gave to Mark Nyquist, and then they

21   tried to give it to me.  I thought it was a trick.  And I

22   don't think McElhiney never had nothing to do with it because

23   by the time Mark went home, I was already in the hole.  So I

24   never had an opportunity, if I wanted to, to run the games.

25   But it's not a crooked thing.  They wanted it that way.

1  Q.   Let's go back to drugs at Leavenworth.  McElhiney was

2  selling drugs and sending the money to brothers who were

3  slammed elsewhere; right?  That's what you heard.

4  A.   That's what I heard.

5  Q.   You had nothing to do with it.

6  A.   I didn't get no money.  They didn't send me no money.

7  Q.   You had nothing to do with it.

8  A.   I had nothing to do with it.  I used some drugs.  I've

9  used them.

10  Q.   And among the people that McElhiney used to sell the

11  drugs for the AB were Allan Hawley and Greg Storey, among

12  others; isn't that right?

13  A.   No.  I don't think so.  Greg Storey, I don't think so.

14  Hawley, I think Hawley was like a go-fer for him or something.

15  I don't know, but Hawley got punched in the mouth, and nobody

16  talked to him no more.

17  Q.   Didn't McElhiney use Allan Hawley to sell drugs all the

18  Leavenworth in 1995 when you were there?

19  A.   I wouldn't know.  I wouldn't know what he used or how he

20  did it.  Like I told you, I didn't have nothing to do with it,

21  and I told them that going in.

22  Q.   But you also said that you heard about it.  If you heard

23  about it, you therefore knew about it.  Didn't you know that

24  Michael McElhiney used Allan Hawley to sell drugs for the AB

25  at Leavenworth when you were there in '95?

1   A.   Do I know that?

2   Q.   Yes.

3   A.   I don't know that for sure.  I heard it just like you

4   did.  I heard one guy say it.  But I really don't believe it.

5   Q.   No.  You heard it then.

6   A.   But -- what?

7   Q.   You heard it in 1995, too, didn't you?

8   A.   That's what I said.  I heard it, and then I heard it

9   here, and I really don't believe it.  Most of Hawley's

10  testimony is nonsense.  He said he sent $500,000 out of

11  Leavenworth.  That's nonsense.  Didn't he say that?  You're

12  looking at me like that.

13  Q.   I'm trying to get you to answer the questions,

14  Mr. Sahakian.

15        THE COURT:  Mr. Sahakian, wait until he finishes

16  speaking, and after he's done speaking, wait another couple

17  seconds; all right?  Thank you.

18  Q.   BY MR. WOLFE:  Didn't you know, when you were there, that

19  McElhiney was selling drugs at Leavenworth and that Allan

20  Hawley was doing it with him?

21  A.   Mr. Wolfe, he was convicted of that in court.  I wasn't.

22  I didn't have nothing to do with it.  You want me to sit over

23  here and talk about McElhiney, what he done?  I mean, I don't

24  have nothing to do with what McElhiney done.  He wasn't

25  selling it for me.  And I told him I didn't want no money

1   because I didn't want to have nothing involved in it.  Because

2   I wanted to go to Lompoc.  And I only stayed there a short

3   period of time, and I was back in Marion.

4               MR. WOLFE:  Your Honor, will your Honor direct the

5   witness to answer the question even if it's about Michael

6   McElhiney?

7               THE COURT:  Yes.  You remember what the question

8   was?

9               THE WITNESS:  What was the question?

10              THE COURT:  Did you know, when you were there,

11  whether Mr. McElhiney was selling drugs at Leavenworth and

12  that Allan Hawley was also selling drugs?  Did you know at

13  that time?  That's the question.

14              THE WITNESS:  I heard that.  I mean, did I see it?

15  I didn't see it.  Did I see any money?  No.  I heard it.

16  You're there.  You -- I mean, I heard it.

17  Q.   BY MR. WOLFE:  You're there.  You heard it.  You believed

18  it; isn't that true?

19  A.   Did I believe it?

20  Q.   Yeah.

21  A.   Not what Hawley said over here, no.

22  Q.   When you were there, you heard and you believed that

23  Michael McElhiney and Allan Hawley were selling drugs at

24  Leavenworth in 1995; isn't that true?

25  A.   Did I believe it?  I heard it.  I heard it.  And I

1    believed it.  Okay.  I believed it.  But he wasn't selling it

2    for me.  And I didn't take a nickel for it.

3    Q.   Didn't you also hear that Greg Storey was smuggling drugs

4    into Leavenworth for McElhiney while you were there?

5    A.   No, I didn't hear that.  I didn't hear that.

6    Q.   Wasn't that true?

7    A.   No.  Because he was in the hole early when I got there.

8    He only was out there driving with us a couple times, and then

9    he went to the hole from a strip cell.  He went to -- he got

10   in trouble on a visit, and then he went to the hole.  And he

11   stayed in the hole the rest of the time.

12   Q.   And he got in trouble for a visit because he had a visit

13   with a woman who smuggled drugs into Leavenworth through him

14   for the AB; isn't that so?

15   A.   Well, you want to know what I heard?  Because I don't

16   know what he done.  I wasn't there.  But I could tell you what

17   I heard there.  That was his stuff.  And he didn't even get

18   it.  That's what I heard.  And then you heard the same thing

19   over here.  And then you heard another story.

20            I didn't see it.  I wasn't in the visiting room.

21   But I'll tell you this.  McElhiney had nothing to do with it

22   because I would have heard that for sure.

23   Q.   You were asked on direct about the kites that you wrote

24   to Allan Hawley and that he gave to the Bureau of Prisons.

25   You remember that?

1    A.    Yes.

2    Q.    And you said that you didn't actually throw somebody off

3    the fourth tier for playing his radio too late at night.

4    A.    Right.

5    Q.    But when you wrote that to Allan Hawley, you expected it

6    to scare him a little, didn't you?

7    A.    I said that on the stand, yes.  I wanted to spook him to

8    send me another shot.

9    Q.    And you expected him to be scared by it because he'd

10   believe it of you, wouldn't he?

11   A.    That's why I put it down there, because I wanted him to

12   send me another shot of dope.

13   Q.    And didn't you write to him because he owed an issue of

14   drugs to the AB?

15   A.    No.

16   Q.    Which was you?

17   A.    I didn't say that AB.  I said he owed me.  He owed me an

18   issue from what I did for him out there.  I said don't you

19   remember what you did for me?  You got the kite.  I read the

20   kite.  I wrote the kite.

21   Q.    This is Exhibit 62.  The kite reads:  "Skinny, why was

22   this kite from Ed delivered opened?  And this morning, rather

23   than last night when it should have been?  You just handed a

24   hot kite to someone and told them to deliver it whenever, not

25   even in an envelope?  Let me tell you something here and now.

1    You better start using your motherfuckin' head.  'Cause I

2    ain't puttin' up with brand biz being put on Broadway.  You

3    see how I sent you kites.  They are fuckin' sealed.  This dude

4    Tony brought your kite, and Ed's kite, unsealed, not even in

5    an envelope, to Mac this afternoon at 1:31.  Who sent in Ed's

6    kite?  How did it come?  You sit your fuckin' goofy ass down

7    and write me a goddamn explanation right now.  Seal it up, and

8    have it brought over here by Pit Bull, and you tell him it's

9    hot.  And to bring it now."

10          That's what the kite reads.  Did I get any of it

11    wrong?

12    A.   I like the way you emphasized that.

13    Q.   The language you used there is of a supervisor to an

14    employee, isn't it?

15    A.   Are you asking me?  Can I answer?

16    Q.   Yes.

17    A.   Or yes or no?  You want a yes or no?  No.

18    Q.   The kite goes on.  "This shit ain't no fucking joke,

19    Slim.  If motherfuckers are opening brand mail looking for

20    dope or giving the shit to the cops to look at overnight or

21    whatever they are doing, someone is going to get stabbed in

22    the fuckin' nut sack through that tray slot.  You better wise

23    up, Folie.  This ain't the time for goofy ass behavior."

24    Signed D.

25          That's you, isn't it?

1    A.    Yes.

2    Q.    Isn't this the letter of a supervisor to an employee in a

3    drug business run by the Aryan Brotherhood at Leavenworth in

4    1995?

5    A.    No.

6    Q.    Mr. Sahakian, in that kite I just read, there's a

7    reference to a kite from Ed.

8    A.    Yes.

9    Q.    Is that Ed McCord or some other Ed?

10   A.    It's Eddie McCord from Texas.  You want to know what I

11   was saying in that kite?  Or are you just going to say that's

12   what it is?

13   Q.    No.  I don't want to know.

14   A.    Okay.

15   Q.    You can do it on redirect.

16          Sir, we never seem to have gotten around to whether

17   there was anybody at Leavenworth backing the play of the Aryan

18   Brotherhood in the dope business when you were there.  Was

19   there anybody?

20   A.    Backing the play of the dope business?

21   Q.    Yes.

22   A.    I wasn't in the dope business.

23          MR. WOLFE:  Pardon me, your Honor.  I'm having

24   trouble managing my documents.

25   Q.    Wasn't Michael Hunt an AB associate when you were at

1  Leavenworth?

2  A.   No.  Not to me.

3  Q.   No.  To the AB.

4  A.   Well, I am AB.  He wasn't associated -- I mean, he

5  associated with us, but he wasn't associating the way you are

6  describing it.

7  Q.   Wasn't Steve Ritter an associate of the AB when you were

8  at --

9  A.   Steve Ritter was a Dirty White Boy.

10 Q.   And an AB associate?

11 A.   No.

12 Q.   Wasn't Charles Mooreman, Beaver, an AB associate when you

13 were at Leavenworth?

14 A.   I never talked to that man one time in my whole life.

15 Q.   Wasn't Charles Mooreman, Beaver, an AB associate when you

16 were at Leavenworth?

17 A.   No.

18 Q.   Wasn't Ronald Dennis an AB associate when you were at

19 Leavenworth?

20 A.   That fella that was just here yesterday?

21 Q.   Yes.

22 A.   No.

23 Q.   Wasn't Mike Eyselle, Whitey, an AB associate when you

24 were at Leavenworth?

25 A.   No.

1    Q.   Wasn't Allan Hawley an AB associate when you were at

2    Leavenworth in 1995?

3    A.   No, out of all them names that you named, he probably

4    would be the only one that came close to fitting into an

5    associate in your thing to the AB.  And that was only for a

6    short period of time.  But not from me.

7    Q.   And wasn't Greg Storey an associate of the AB?

8    A.   No.  At that time, no.

9    Q.   Greg Storey became an AB associate, didn't he?

10   A.   In a way.

11   Q.   Explain, Mr. Sahakian.

12   A.   I'm going to say no.

13   Q.   Well, Greg Storey became an AB member eventually, didn't

14   he?

15   A.   No.

16   Q.   Wasn't Greg Storey a member of the AB by 1999 when he and

17   you and Barry Mills and T.D. Bingham and the other AB members

18   were together at building 63 waiting to give testimony for

19   Michael McElhiney at his trial?

20   A.   He was there.

21   Q.   He was there because he was an AB member like the rest of

22   you?

23   A.   Mr. McElhiney's trial?

24   Q.   Yes.

25   A.   I think he was called over there for McElhiney's trial,

1  not because he was an AB member.  I was called over there for

2  his trial, too.

3  Q.    And all the people that were called over there for the

4  trial were AB members, weren't they?

5  A.    No.

6  Q.    You, T.D. Bingham, Barry Mills, Greg Storey, Jessie Van

7  Meter, all these people were AB members, weren't they?

8  A.    Jessie Van Meter was a Dirty White Boy.

9  Q.    And Jessie Van Meter was an AB member by 1999, wasn't he?

10  A.    Mr. Wolfe, you're only giving half of the list of the

11  people that was in 63 building.  Keep on going.  There was AB

12  members there.  I'm not disputing that, but he called the

13  whole list of people for his trial, and they all testified at

14  his trial.  He called me.  I went over there.  You said I said

15  that at the trial.  I don't dispute I said I had a poker game

16  at McElhiney's trial.  I read them kites for McElhiney at his

17  trial.  I wrote those kites.  I wasn't a drug supervisor of

18  nobody.  I was hollering at somebody because he sent my mail

19  opened up with a rat.  And I told him what are you doing?  Are

20  you crazy?  You know -- sorry about that.

21            MR. WOLFE:  Nothing more, your Honor.

22            THE COURT:  Redirect examination.

23                      **REDIRECT EXAMINATION**

24  BY MR. GREEN:

25  Q.    Mr. Sahakian, do you know the government's definition for

1    associate?

2    A.    I still don't know.

3    Q.    Does the word associate have a definition for you?

4    A.    Somebody that hangs around with you, I guess.

5    Q.    You've heard the testimony of Doc Holiday, James Holiday,

6    and Lesester McDaugherty, also known as Duck.

7              With respect to the definition that you believe an

8    associate is, do you consider them associates of yours?

9    A.    I associate with them.

10   Q.    Do you consider Doc an associate of yours?

11   A.    I associate with him.  But that's not what he's talking

12   about.

13   Q.    I'm not asking about what he's talking about.  Just my

14   question.  Do you consider Doc Holiday an associate of yours?

15   A.    Yes.

16   Q.    Does that make Doc Holiday an associate of the AB?

17   A.    He associates with me.

18   Q.    But does that necessarily follow that he then is an

19   associate --

20   A.    No, he's not an associate of the AB, no.

21   Q.    Duck, do you associate with him?

22   A.    Yes.

23   Q.    And does that necessarily follow that Duck is an

24   associate of the AB?

25   A.    No.

1    Q.    You were asked questions about Mr. Holly.  I'm going to

2    put on the Elmo Government's Exhibit No. 60.  Which is a

3    letter from Weston to Kevin Roach.  And the content of that

4    letter read:  "Dear Kevin, here's a little something for you

5    from Hawley and Wilbur.  Hope everything is okay for you.  Is

6    there anything you -- if there's anything you need, let me

7    know.  Christine Weston, Allan's cousin."

8             Now, that letter doesn't reference you at all, does

9    it?

10   A.    No.

11   Q.    It doesn't give you credit for anything that they are

12   giving, does it?

13   A.    No.

14   Q.    Is it fair to say that Allan Hawley was by your

15   definition an associate of McElhiney?

16   A.    He didn't associate with me.

17   Q.    That wasn't my question.  My question was is it fair to

18   say that he was an associate of McElhiney's by your

19   definition?

20   A.    Yes.

21   Q.    Okay.  I'm going to put on Government's Exhibit No. 59.

22   Again, a letter to Al Benton from Weston.  This is kind of a

23   poor copy, but again, it says, paraphrasing, from Allan Hawley

24   and Wilbur.  Again, this is a government document that

25   doesn't -- well, this is Hawley's document from his cousin

1    that doesn't give you credit for anything that they are

2    sending Roach or Benton; correct?

3    A.   I didn't want nothing to do with it.

4    Q.   I understand.  The question is that those letters, those

5    government documents don't reference you getting credit for

6    whatever they are giving Roach and Benton; correct?

7    A.   Right.

8    Q.   Okay.  All right.  Now, in evidence is Defendant's

9    Exhibit 11100.  It was admitted during Mr. Hawley's testimony

10   and is a letter or a kite that he gave to Danny McPheeters.

11   A.   Right.

12   Q.   In this letter, he is asking Danny McPheeters to sell all

13   his drugs.

14   A.   Um-hm.

15   Q.   Correct?

16   A.   Um-hm.

17   Q.   In his letter to Danny McPheeters, he's calling the drugs

18   his drugs; right?

19   A.   He's doing more than that in that letter.

20   Q.   Well, I understand that.  But is he -- he's referring --

21   A.   He's telling Danny McPheeters thanks for getting all the

22   money and sending it, and he's telling Danny McPheeters

23   that -- because the person that he went into with PC, that

24   they are going to be more for them, and this is a letter that

25   turned up missing and didn't show up until after McElhiney's

1    trial.

2    Q.    But this is a letter that Allan Hawley sends to Danny

3    McPheeters even after he has flipped and told the government

4    about the Storey stuff; right?

5    A.    Yes.

6    Q.    And he's still asking Danny McPheeters to give him the

7    proceeds of his drug sales; right?  Nowhere in this letter is

8    he referencing that what he's doing is on behalf of the Aryan

9    Brotherhood.

10   A.    On the contrary.  In that letter he's saying what he

11   wants to do with his dope.  And he's going to have more

12   because the guy who he went in with checked in.

13   Q.    But this is his doing, not the Aryan Brotherhood's doing,

14   and surely nothing that involves you.

15   A.    On its face that's what the letter said.

16   Q.    Does being a member of the AB mean that you lose your

17   free will?

18   A.    No.

19   Q.    Does it mean that you can no longer act independent on

20   your own?

21   A.    It's hard sometimes, but you could do it if you want.

22   Q.    Have you done it?

23   A.    I done it.

24   Q.    Has McElhiney done it?

25   A.    Sometimes.

1   Q.    Now, you were asked on cross-examination about AB rules,

2   guidelines, and tenets, and some of them were don't snitch,

3   loyalty, be a stand-up guy.  These were just some that were

4   referenced; correct?  You remember being asked that on

5   cross-examination?

6   A.    But those aren't -- yes, I remember.

7   Q.    And those tenets or guidelines or rules that you were

8   asked about, are they exclusive to the Aryan Brotherhood?

9   A.    I would think they'd be exclusive to everybody.

10  Especially everybody in prison.

11  Q.    Okay.  Especially everybody in prison.

12  A.    Right.

13  Q.    Because as you were asked on cross-examination, the

14  context in which something occurs, or the circumstances

15  surrounding an event can make all the difference in the world

16  as to its meaning.

17  A.    Right.

18  Q.    Correct?

19  A.    Right.

20  Q.    Okay.  And those tenets, guidelines, rules that you

21  discussed with Mr. Wolfe on cross-examination are equally

22  applicable to every inmate in every institution?

23          MR. WOLFE:  Objection, your Honor.  Leading.

24          THE COURT:  Sustained.

25  Q.    BY MR. GREEN:  Well, is it equally applicable to every

1  inmate in every institution?

2  A.    Probably.

3  Q.    You remember Mark Anderson testifying?

4  A.    Yes.

5  Q.    Okay.  He testified to himself being a stand-up guy?

6  A.    An independent guy, yes.

7  Q.    Do you see him as a stand-up guy?

8         MR. WOLFE:  Objection, your Honor, to the relevance

9  of this question.

10         THE COURT:  Overruled.

11         THE WITNESS:  I was with him over there.  He was a

12  good guy.  He was on his own.

13  Q.    BY MR. GREEN:  Is he an example of somebody who can act

14  independent and be a stand-up guy and still follow those rules

15  and guidelines and tenets?

16  A.    He had a good reputation.

17  Q.    Okay.  And he's not AB; right?

18  A.    No.

19  Q.    Definitely not an AB associate; right?

20  A.    No.

21  Q.    You were asked on cross-examination, or you spent some

22  time on cross-examination about the PC hearings.  By the time

23  the PC hearings were being held in March of 1997, how long had

24  you been at the Marion institution?

25  A.    In '97?

1   Q.   Yes?

2   A.   About seven years.

3   Q.   Except for the stint that you were at Leavenworth.

4   A.   Nine months.

5   Q.   Okay.  But other than that, had you been there for that

6   long?

7   A.   Yes.

8   Q.   Were you one of the oldest inmates in that institution at

9   that time?

10  A.   You talking about agewise?

11  Q.   Both.  Age or the length of time that you spent in that

12  institution?

13  A.   A couple guys older than me, though.

14  Q.   Older agewise.  What about the amount of time that you

15  spent at Marion?

16  A.   Well, they took everybody else out and left me there.

17  Well, they didn't leave me there.  I went to Leavenworth and

18  came back, everybody was gone.

19  Q.   Okay.  And so were you one of the more senior inmates at

20  Marion institution in 1997 as far as the time that you served

21  at Marion?

22  A.   Yeah, probably.

23  Q.   Were there any that you can think of that had spent more

24  time in Marion during those past seven years in March of 1997

25  than you?

1    A.    That was there when I went back?

2    Q.    Yes.  That was there.

3    A.    No.  When I went back, it was only about 60 people there.

4    Q.    All right.  So you were one of the more senior inmates in

5    Marion in March of 1997.

6    A.    Maybe.  Probably.

7    Q.    Okay.  And the administration saw you as such.

8    A.    Probably.

9    Q.    Okay.  And so you had more experience with the

10   administration at Marion in March of 1997 than any other

11   inmate that you can think of.

12   A.    Captain Medders knew that he could talk to me.  Some

13   people don't want to talk to him.  I talked to him.  I hear

14   what he wants to say.  You know what I mean?  I never took

15   that hard line that the convict don't talk to the guard.  I

16   mean, you don't know what they are going to do if you do that.

17   Q.    And the PC hearing that you went to, was it actually a PC

18   hearing?

19   A.    Well, it could have been probably.  But I don't think

20   that's what it was meant to be.  I think it was a tool.

21   Q.    My question is did a hearing really occur?  Were there

22   witnesses?  Was there testimony?  Or did it turn into

23   something else?

24   A.    It turned into something else.

25   Q.    What did it turn into?

A.   What he wanted.  What he wanted me to go -- it turned

into him expressing exactly what he thought was going on in

that institution and what he wanted to get done for the

security of the institution.  And he said that he wanted

somebody to pass that message on to people that was acting

like idiots.

Q.   And by that -- the guys that were acting like idiots were

much younger and newer to the institution than you were.

A.   They had all just come from other places, from them riots

and other places like that.  There wasn't nobody.  The older

guys had already left in '95.

Q.   So you were one of the older guys that Medders looked to

to try to calm the younger guys down?

      MR. WOLFE:  Objection, your Honor.  Leading.

      MR. GREEN:  I'll withdraw the question.

      THE COURT:  Thank you.

Q.   BY MR. GREEN:  Do you know why Medders turned to you?

A.   Probably because he could talk to me and knew that I

would go and tell them guys that.

Q.   And why would you go and tell those guys that?

A.   For one, I don't want the place to burn down.  I don't

want a life sentence because of something that I could have

stopped in the first place.  I -- nobody wants their house on

fire.  I mean, I didn't -- I'm not a Dirty White Boy.  I

didn't care what they was doing, but they was burning down the

1   neighborhood.

2         So he came to -- I didn't like it.  But you got to

3   realize this is a hard situation, go and tell somebody that is

4   enraged what to do.  They are not going to listen to you, for

5   one, unless you -- I look at time heals all wounds.  If there

6   could be a time from the incidents to something else, then

7   tempers could have cooled off, and they did.  Everybody got

8   out of the hole.  Nobody was getting hurt anymore.

9   Q.   You used terms like house burning down.  Is that how you

10   looked at Marion, as your house?

11   A.   I lived there for 19 years.  It wasn't my house, but it

12   was where I lived at for a long time.

13   Q.   You considered it your home?

14   A.   No, it's not my home.  But I lived there.  I couldn't go

15   nowhere else.

16   Q.   And you used a term called neighborhood.

17   A.   Yeah.

18   Q.   Did you use that term with respect to the people that you

19   were living with in Marion?

20   A.   I had 18 neighbors on every tier I went to.  So it's a

21   neighborhood.

22   Q.   The stuff that you talked about that you had knowledge

23   of, all of that comes through hearsay from others; is that

24   correct?

25   A.   What I had knowledge of?

1    Q.    Yes.

2    A.    Like what?

3    Q.    The things that were talked about on cross-examination.

4    A.    The things I said I didn't see but I heard?

5    Q.    Yes.

6    A.    Yeah.  You know, you're with people, you hear things.

7    You know, they will tell you things.

8    Q.    And does there exist a grapevine for information to flow

9    in an institution?

10   A.    Fast, and sometimes it's bad information.

11   Q.    Okay.  It's not always accurate information, is it?

12   A.    No.

13   Q.    Okay.  Now, sometimes from institution to institution, is

14   that information -- do you get it real time, like if something

15   kicks off, 24 hours later you get the news, or does it take a

16   while?  How does that communication go from institution to

17   institution?

18   A.    There's got to be somebody that gets transferred or

19   something like that, or somebody comes from that place to the

20   other place.  It could take a long time.

21   Q.    Okay.  And so do you always get fresh information through

22   the grapevine from institution to institution?

23   A.    No.  I'll give you an example.

24   Q.    The language in the Hawley letters that you used, by your

25   own admission, it's strong language?

1    A.    Gutter language.

2    Q.    Okay.  How far do you get with communicating with other

3    inmates who are at these institutions for serious crimes and

4    for their own behavior if you ask pretty please?

5    A.    I wasn't talking to him to get nowhere.  I was talking to

6    him to let him know he sent my letter unopened from somebody

7    else, and you don't do that because the people that are

8    working out there are reading the mail.  And I put it in that

9    language so he would understand I wouldn't do that to him.  I

10   wouldn't do that to nobody.  If you're going to send somebody,

11   you pick it up and send it to someone, it didn't have anything

12   to do with the brand.  The letter from Ed on the main line.

13           I mean -- so, you know, I was trying to -- I used

14   gutter language because I was hoping he would respond to it.

15   Q.    Why didn't you just say -- why didn't you use nice

16   language like pretty please don't do this again?

17   A.    Because he'll respond better to that language.

18   Q.    Why do you say that?  Why will he respond better to that

19   language than with pretty please?

20   A.    I don't know.  He's in jail.  I don't know.  Some people

21   are -- need to be talked to like that.  That's common

22   knowledge that you don't do something like that.  So if he

23   don't know it that way, you have to tell him how to do it.

24   And that's what I was trying to do.  It wasn't no drug czar

25   telling a worker to do something.  There wasn't nothing about

1    no drugs in there.

2    Q.    And in your entire federal Bureau of Prisons time that

3    you've done since 1990, when you wanted another inmate to

4    recognize something or do something for you or to respect your

5    mail, have you ever asked them, and I'm quoting, pretty

6    please?

7    A.    No, but I don't talk to people like that all the time

8    neither.

9    Q.    Why wouldn't you use pretty please?

10   A.    What you going to get with that?

11   Q.    What kind of reaction do you think you would get by using

12   pretty please?

13   A.    Stupid reaction.

14   Q.    With respect to your house and your neighborhood, living

15   in that type of environment, what is your ultimate goal?

16   A.    My ultimate goal?  Get home with my family.  That's what

17   I've been trying to do.

18   Q.    What is your ultimate goal as you are doing your time?

19   A.    To make it to the next day.

20   Q.    Okay.  And how do you do that?

21   A.    By minding your own business.

22   Q.    And does living in turmoil or living in disarray

23   accomplish that goal?

24   A.    No.

25   Q.    Okay.  The rules and tenets and guidelines that were

1    brought up on cross-examination, are they part of the culture

2    in which you live in, or are they exclusively AB?

3    A.    Which ones?

4    Q.    All of them.  Is any one of them exclusively AB?

5    A.    No.

6    Q.    Are they part of the culture of the prison environment in

7    which you live?

8    A.    Yes.

9    Q.    Are independent guys like Mark Anderson, do they follow

10   those type of tenets, guidelines, and rules?

11   A.    Yes.

12            MR. GREEN:  Nothing further.

13            THE COURT:  All right.

14            MR. GREEN:  Judge, at this time can we have an early

15   afternoon break?  Is that okay?

16            THE COURT:  Do you have any more witnesses for

17   today?

18            MR. GREEN:  I don't know yet.  That's why I wanted

19   to have a break.

20            THE COURT:  All right.  Well, do you want to just go

21   check and come back?

22            MR. GREEN:  I would like to have --

23            THE COURT:  A sidebar?

24            MR. GREEN:  A sidebar, yes.

25            THE COURT:  All right.  You may approach.

1              **(SIDEBAR CONFERENCE HELD.)**

2              MR. GREEN:  Over the lunch hour, Mr. Shostak and I,

3    as counsel for David Sahakian, talked about a lot of things on

4    how we want to proceed with the rest of this trial.  One of

5    them being that, after Mr. Sahakian was done today, is to --

6    that it's our desire at this time, as his attorneys, to say

7    that the defense rests.  Now, we have not had a conversation

8    with Mr. Sahakian about that.  So --

9              THE COURT:  So you want to have a break so you can

10   discuss it with him; right?

11             MR. GREEN:  Instead of letting the jury go and

12   coming back later.

13             THE COURT:  All right.  That's fine.  We'll take a

14   recess.

15             **(CONCLUSION OF SIDEBAR CONFERENCE.)**

16             THE COURT:  All right, ladies and gentlemen.  We're

17   going to take an afternoon recess for 15 minutes.

18             Remember, don't discuss the case with anyone,

19   amongst yourselves or with anyone else.  I know you've heard

20   this many times, but it's really important.  Don't investigate

21   anything relating to the case.  Don't make up your minds about

22   the evidence.  Thank you.  You are excused for 15 minutes.

23             (Recess taken.)

24             THE COURT:  We're on the record outside the presence

25   of the jury.  Mr. Green.

1          MR. GREEN:  I wanted to give the Court notice,

2     before the jury came back, that the defense rests at this

3     time.  Although I would -- I think we have a couple of

4     exhibits that have been misnumbered that I'd like to come back

5     later with and correct that with the Court.

6          THE COURT:  All right.  We'll go over all of the

7     exhibits.  I'll have counsel meet with Ms. Dillard to make

8     sure that everything you thought was in got moved in and so

9     forth.

10          Is the government going to call any rebuttal

11     witnesses?

12          MR. AKROTIRIANAKIS:  No, your Honor.

13          THE COURT:  All right.  Before we call the jury back

14     in, because I'm going to call them in to tell them what the

15     schedule is.  Let's talk about -- I've been talking to Mr. Kim

16     about the logistics of jury instructions and the jury

17     instruction conference and what the state of the proposed jury

18     instructions are, and then how we can accomplish instructing

19     the jury on a day that's separate from when you do your

20     arguments.  Unless you think you can do your arguments and do

21     the instructions in one day.

22          MR. AKROTIRIANAKIS:  I don't think that, your Honor,

23     but I would propose, on the matter of jury instructions --

24     with, I'll address that.  I would propose that the jury be

25     charged in the morning, say, of the day.  The government

1    argue, then the defense argue in the morning, and the

2    government do rebuttal after defense argument, and then the

3    jury can get started with picking a foreperson and so on with

4    the preliminaries after instructions on that day, and then

5    come back and begin their deliberations on the third day.

6            THE COURT:  Well, that's pretty close to what I was

7    going to propose.  I was going to propose -- what day is Yom

8    Kippur?  Is it Monday?  That was Rosh Hashanah.

9            MR. AKROTIRIANAKIS:  I think it's one week after

10   that.

11           THE COURT:  Well, what I was going to propose, and

12   let me know if this works with your schedules, is that you

13   come back on Monday afternoon for the charging conference.

14   Because I don't think it's going to take that long unless you

15   feel differently.

16           MR. WOLFE:  No.

17           THE COURT:  We could -- I could charge the jury

18   beginning Monday morning.  We could -- Tuesday morning.  I'm

19   sorry.  Charge the jury in the beginning on Tuesday morning.

20   Argue as much as we get done, and then finish the arguments on

21   Wednesday, which I guess is what you are suggesting?

22           MR. AKROTIRIANAKIS:  That would have been my

23   suggestion exactly, your Honor, but that instead of Tuesday,

24   Wednesday.  We thought we'd be arguing on Friday.

25           THE COURT:  But why give the jury --

1          MR. AKROTIRIANAKIS:  It's not for the convenience of

2    the jury.  It's for the convenience of counsel, your Honor.

3    That's all.

4          THE COURT:  All right.  So you would suggest that we

5    come back to start not on Tuesday, but on Wednesday?

6          MR. AKROTIRIANAKIS:  The jury would be instructed

7    Wednesday morning.  The government would argue Wednesday

8    afternoon, and if -- whatever we could get into, if they

9    wanted to begin with the defense argument, finish on Thursday,

10   and the jury would be deliberating Thursday for the remainder

11   and Friday and however long after.

12         MR. WOLFE:  If it please the Court, insofar as the

13   defense argument is concerned, I would like to do it all at

14   one time and be done with it so that it's not broken

15   overnight.

16         THE COURT:  Well, I suspect -- let me put it this

17   way.  I suspect that you would be starting fresh in the

18   morning on the next day.  Because I think it's going to take

19   most of the morning for me to instruct.  The instructions that

20   I -- when I gave instructions before at the beginning, it took

21   two hours.  I remember it was grueling.  It took a long time.

22   And I don't think that's all the ones we're going to give this

23   time.  So that took two hours.

24         So I think it may take three hours to instruct, and

25   then we break for lunch, and then the government is going to

1    take -- I'm not going to have you start arguing for half an

2    hour.

3                MR. WOLFE:  Yes.  Just I would like not to be --

4                THE COURT:  On the other hand, if it's an hour,

5    that's why my preference would be to do the instructions on

6    the day before and have all the argument on one day.  So maybe

7    I could, you know, if we were going to do that, I could have

8    the jury come back on Tuesday afternoon, and you could start

9    your arguments on Wednesday.

10               MR. WOLFE:  That's fine.

11               THE COURT:  Or does that not -- I mean, your request

12   is based on having not being here on Tuesday at all?

13               MR. WOLFE:  Your Honor, the drawback to having all

14   the arguments on one day is that the government's rebuttal, if

15   any little thing goes wrong about the electronics, if anyone's

16   estimate is off by 20 or 30 minutes, the government gets to do

17   its rebuttal between 5:00 and 6:00 P.M. when everybody is

18   tired and with the consequent lack of attention.

19               THE COURT:  So you are thinking it's better if the

20   government starts in the afternoon.  They get to start fresh

21   in the morning.  And you've got the afternoon.

22               MR. WOLFE:  That's why we proposed the sort of

23   two-day schedule.  Instruction, government's opening, defense

24   summation, government's rebuttal on two separate days.  And if

25   it means that Mr. --

```
 1            THE COURT:  Well, that's fine.  We may just end
 2   up -- well, the defense is estimating about three hours.  You
 3   wanted three and a half hours.  And I think I gave you, each
 4   side, three hours.  So it's unlikely that -- I see that it's
 5   unlikely that you're going to finish at -- well, actually, I'm
 6   sorry.  I'm not thinking this through well, because the
 7   problem is really that the government is not -- you have a
 8   total amount of time.
 9            So you are going first, and you're not going to use
10   all of your time.  Why don't we start at 10:00 instead of at
11   9:00 in the morning.  I'll instruct.  We'll go to lunch.  And
12   then you'll do your argument.
13            And yours is not going to be broken up because by
14   the time they finish, it's going to be late in the afternoon,
15   and then you'll start in the morning.
16            MR. WOLFE:  Fine.
17            MR. SHOSTAK:  That's fine.
18            THE COURT:  And that makes sense because if we do
19   our charging conference on Monday afternoon and we have any
20   glitches about the form of the instructions, that gives us a
21   little breathing time in the morning.
22            MR. AKROTIRIANAKIS:  So it will be Tuesday morning?
23            THE COURT:  It will be Tuesday morning.
24            MR. AKROTIRIANAKIS:  On the matter of instructions,
25   we have one additional special instruction I gave to counsel a
```

1    couple days ago and now have given it to him again.  And we

2    have yet to discuss the matter.  I can hand up a copy to the

3    Court, or we can formally file it and all of that.

4          THE COURT:  Well, if you have an extra copy, you can

5    hand it up and then file it as well.

6          Hand it to Ms. Dillard.

7          This is your last opportunity to tell me why we

8    should start on Wednesday rather than Tuesday.

9          MR. AKROTIRIANAKIS:  It's because I have one hearing

10   which is likely to be extended in addition to going through

11   the calendar next door, and I would have gotten out of it if I

12   thought that I would be helping Mr. Wolfe prepare the closing

13   argument for Tuesday morning.  I would have asked another

14   assistant to do it, or I would have asked that it be continued

15   or something of that sort.

16         THE COURT:  Well, if you want me to intercede with

17   Judge Larson for a continuance, I would be happy to do so.

18         MR. AKROTIRIANAKIS:  Your Honor, I'll ask

19   Mr. Bernal.  I don't think it will be a problem.  If it came

20   to that, I would just ask -- I'll figure it out.

21         THE COURT:  Okay.

22         MR. AKROTIRIANAKIS:  I've asked a lot of favors in

23   the course of this trial.  That's all.

24         THE COURT:  Judge Larson and I have a very

25   adversarial relationship.  And I like to pull rank on him at

1    all opportunities.  So if you give me the say-so, I will be

2    happy to do my best to make his life miserable.

3         Did you get all of that down?  Because I'm going to

4    give him that page.

5         **(WHEREUPON THE JURY ENTERS.)**

6         THE COURT:  Let the record reflect the presence of

7    all members of the jury.

8         Mr. Green?

9         MR. GREEN:  Your Honor, at this time the defense

10   rests.

11        THE COURT:  Thank you.

12        Does the government have any rebuttal?

13        MR. AKROTIRIANAKIS:  It does not, your Honor.

14        THE COURT:  Thank you.  All right.  The evidence is

15   closed with the exception of the housekeeping matters that we

16   mentioned a moment ago.

17        All right, ladies and gentlemen, I apologize for the

18   long recess, but we were discussing the issues about jury

19   instructions and so forth, since the defense has rested and

20   the evidence is now closed.  I'm going to tell you a little

21   bit about the scheduling.

22        First of all, you won't be needed here tomorrow.

23   I'm always happy when I'm able to say this, although I can't

24   really claim the credit for it.  But we are ahead of schedule.

25   You are going to come back on Tuesday, and when you come back

1    on Tuesday, that's when we'll -- you'll hear first the

2    instructions, and then you'll hear argument from all counsel.

3            So originally I told you we'd get the case to you by

4    the end of next week, and now definitely it's going to be

5    earlier than that.  So in order to get the instructions on all

6    the law that applies to the case in final form, we won't need

7    you here tomorrow.  And we'll see you on Tuesday at 10:00.

8    All right?  And again, don't discuss the case.  It's just as

9    important as the first time I told you that a long time ago

10   now, it seems like.  Don't discuss the case or any of the

11   evidence, the testimony, the witnesses, anything.

12           Don't do any investigation about the case or

13   anything related to the case.  Don't make up your minds about

14   the case.  You haven't heard the instructions or the argument.

15   You can't make up your minds about the case or discuss the

16   case until you go back into the jury room to deliberate and

17   listen to the views of the other jurors.

18           I know that some of you have some timing issues, and

19   I hope that -- and some other things that you have to attend

20   to.  And so I hope that this break in the schedule and over

21   the weekend will make that possible for you.  All right.

22   Thank you so much for all your hard work, and we'll see you

23   back Tuesday morning at 10:00.

24           **(WHEREUPON THE JURY WITHDRAWS.)**

25           THE COURT:  If you'll wait just a few moments,

1    unless either side has anything else to discuss with me, and

2    maybe you don't need them.  If we need them, we can print out

3    for you copies of the preliminary instructions that I gave.

4    Unless you kept them, the copies that we gave you earlier.

5            But if you need those, because those are the ones I

6    understand that you haven't submitted anything else with this

7    one exception.  So please read them carefully and see if

8    there's any changes that you want other than, of course, the

9    model Ninth Circuit Instructions that you give at the end of

10   the case rather than instead of saying you're about to hear

11   evidence.

12           MR. SHOSTAK:  I would like a copy.

13           MR. AKROTIRIANAKIS:  Please, your Honor.

14           THE COURT:  All right.  We will get those to you in

15   just a moment.

16           Anything else?  And the one other thing is that I'll

17   see you at 3:30 on Monday.

18           MR. SHOSTAK:  Your Honor, pardon me.  Do you want

19   Mr. Sahakian here for that?

20           THE COURT:  He can waive his presence.  It's up to

21   him.  He can be here or not.

22           MR. SHOSTAK:  All right.

23           THE COURT:  Thank you.

24

25           (Proceedings concluded at 3:10 P.M.)

1

2                          **C E R T I F I C A T E**

3

4

5               I hereby certify that pursuant to Title 28,

6      Section 753 United States Code, the foregoing is a true and

7      correct transcript of the stenographically reported

8      proceedings in the above matter.

9               Certified on October 2, 2008.

10

11

                      _____
12                    **MARK SCHWEITZER, CSR, RPR, CRR**
                      Official Court Reporter
13                    License No. 10514

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25