1

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION AT RIVERSIDE**

HONORABLE VIRGINIA A. PHILLIPS, JUDGE PRESIDING

UNITED STATES OF AMERICA,          )
                                   )
                PLAINTIFF,         )
                                   )
        VS.                        ) CR NO. 02-938(A)-VAP
                                   )
DAVID MICHAEL SAHAKIAN,            )
                                   )
                DEFENDANT.         )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

FRIDAY, AUGUST 15, 2008

8:30 A.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(714) 542-8409**
**D.PARKER@IX.NETCOM.COM**

2

```
 1   APPEARANCES OF COUNSEL:

 2

 3        FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

 4                          THOMAS P. O'BRIEN
                           UNITED STATES ATTORNEY
 5
                           CHRISTINE C. EWELL
 6                          ASSISTANT UNITED STATES ATTORNEY
                           CHIEF, CRIMINAL DIVISION
 7
 8                          STEPHEN G. WOLFE
                           JOSEPH N. AKROTIRIANAKIS
 9                          ASSISTANT UNITED STATES ATTORNEYS
                           UNITED STATES DISTRICT COURT
10                          1500 UNITED STATES COURTHOUSE
                           312 NORTH SPRING STREET
11                          SUITE 1504
                           LOS ANGELES, CALIFORNIA 90012
12                          (213) 894-2467

13

14        FOR THE DEFENDANT, DAVID MICHAEL SAHAKIAN:

15                          JOSEPH L. GREEN
                           LERITZ PLUNKERT AND BRUNING
16                          ONE CITY CENTRE
                           SUITE 2001
17                          ST. LOUIS, MISSOURI 63101
                           (314) 231-9600
18
                           BURTON H. SHOSTAK
19                          MOLINE SHOSTAK AND MOHAN
                           8015 FORSYTH BOULEVARD
20                          ST. LOUIS, MISSOURI 63105
                           (314) 725-3200
21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

3

```
 1                          I N D E X

 2

 3   PLAINTIFF'S WITNESSES:   DIRECT  CROSS  REDIRECT  RECROSS

 4    GLEN WEST                  6     94      198
                                82    152
 5

 6

 7    TODD CARPENTER           217    226     236

 8

 9    CURTIS RUNGE             237    244     249

10

11

12                          E X H I B I T S

13   PLAINTIFF'S EXHIBITS:                IDENTIFICATION  EVIDENCE

14    1    DOCUMENT FOUND IN THE                             53
           PROPERTY OF DAVID SAHAKIAN
15
      13   PHOTOGRAPHS                                       18
16
      21, 23, AND 32 AUDIO RECORDINGS                       221
17         OF TELEPHONE CALLS

18    73   PHOTOS OF INJURIES TO                             75
           JOHN GOTTI
19
      99   INVENTORY OF                                     242
20         MICHAEL MC ELHINEY'S CELL

21    165  PHOTOGRAPHS OF                                   223
           LIGHT FIXTURE
22
      1035 PHOTOGRAPHS OF SECOND FLOOR                      182
23         LANDING, USP LEWISBURG

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

4

```
 1       RIVERSIDE, CALIFORNIA; FRIDAY, AUGUST 15, 2008; 8:42 A.M.

 2                              -OOO-

 3       (THE FOLLOWING PROCEEDINGS WERE HAD OUTSIDE THE

 4       PRESENCE OF THE JURY:)

 5            THE CLERK:  CR 02-938(A)-VAP, UNITED STATES OF

 6   AMERICA VERSUS DAVID MICHAEL SAHAKIAN.

 7            COUNSEL, PLEASE STATE YOUR APPEARANCES.

 8            MR. AKROTIRIANAKIS:  GOOD MORNING, YOUR HONOR.

 9            JOE AKROTIRIANAKIS AND STEPHEN WOLFE ON BEHALF OF

10   THE UNITED STATES.

11            MR. GREEN:  GOOD MORNING, YOUR HONOR.

12            JOE GREEN ON BEHALF OF MR. SAHAKIAN.

13            MR. SHOSTAK:  BURTON SHOSTAK ON BEHALF OF

14   MR. SAHAKIAN.

15            GOOD MORNING, YOUR HONOR.  MR. SAHAKIAN IS

16   PRESENT.

17            THE COURT:  GOOD MORNING.

18            ALL RIGHT.  COUNSEL HAD A MATTER TO TAKE UP BEFORE

19   WE BRING THE JURY IN?

20            MR. GREEN:  YES, JUDGE.  I'VE BEEN TALKING WITH

21   THE GOVERNMENT'S COUNSEL ABOUT SCHEDULING.  AND IF

22   MR. WEST'S DIRECT IS DONE BY 10:30 AND WE TAKE THE MORNING

23   BREAK, I DON'T ANTICIPATE MY CROSS TO BE MORE THAN TWO

24   HOURS.  AND SO I WAS WONDERING IF THE COURT WOULD BE SO

25   INCLINED TO INSTEAD OF BREAKING IN THE MIDDLE OF MY CROSS,
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1    MAYBE TAKE A BREAK AT 12:30.

 2                THE COURT:  SURE.

 3                MR. GREEN:  IS THAT OKAY?

 4                THE COURT:  OH, SURE.

 5                MR. GREEN:  OKAY.

 6                THE COURT:  SURE.  AND THEN WE -- BUT THEN WE'D

 7    STILL HAVE REDIRECT.  IT'S NOT LIKE WE'RE GOING TO BE DONE

 8    WITH HIM AT 12:30.

 9                MR. AKROTIRIANAKIS:  YEAH.  THERE ARE A FEW

10    MATTERS, YOUR HONOR, THAT I ANTICIPATE BEING BROUGHT UP ON

11    CROSS WHICH WOULD AT THAT POINT ALLOW US TO DO CERTAIN

12    THINGS WE WOULDN'T OTHERWISE BE ABLE TO DO ON DIRECT.

13                MR. GREEN:  AND I'M JUST BEING SELFISH.  I DIDN'T

14    WANT MY CROSS TO BE INTERRUPTED.

15                THE COURT:  OH, THAT'S FINE.

16                MR. GREEN:  OKAY.

17                THE COURT:  I WOULD PROBABLY, AT NOON, ASK YOU HOW

18    MUCH LONGER YOU HAVE, BUT THAT'S FINE.  THANKS FOR TELLING

19    ME.  THEN WE CAN PLAN AROUND THAT.

20                ALL RIGHT.  ANYTHING ELSE WE NEED TO TAKE UP?

21                MR. AKROTIRIANAKIS:  NOT ON BEHALF OF THE

22    GOVERNMENT, YOUR HONOR.

23                THE COURT:  ALL RIGHT.  THANK YOU.

24          (RECESS.)

25          ///
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1          (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT
 2          IN THE PRESENCE OF THE JURY:)
 3              THE CLERK:  CR 02-938(A)-VAP, UNITED STATES OF
 4     AMERICA VERSUS DAVID MICHAEL SAHAKIAN.
 5              COUNSEL, YOUR APPEARANCES PLEASE.
 6              MR. AKROTIRIANAKIS:  GOOD MORNING, YOUR HONOR.
 7     JOE AKROTIRIANAKIS AND STEPHEN WOLFE ON BEHALF OF THE
 8     UNITED STATES.
 9              MR. GREEN:  JOSEPH GREEN ON BEHALF OF
10     MR. SAHAKIAN.
11              MR. SHOSTAK:  BURTON SHOSTAK ON BEHALF OF
12     MR. SAHAKIAN.  MR. SAHAKIAN IS PRESENT.
13              THE COURT:  GOOD MORNING.
14              AND LET THE RECORD REFLECT THE PRESENCE OF ALL
15     MEMBERS OF THE JURY AND THE WITNESS BACK ON THE WITNESS
16     STAND.
17              SIR, YOU DO NOT NEED TO BE SWORN AS A WITNESS THIS
18     MORNING BECAUSE YOU WERE SWORN YESTERDAY, AND YOUR TESTIMONY
19     IS STILL BEING GIVEN UNDER PENALTY OF PERJURY.
20              DO YOU UNDERSTAND THAT?
21              THE WITNESS:  YES, MA'AM.
22              THE COURT:  THANK YOU.
23              YOU MAY CONTINUE YOUR DIRECT EXAMINATION.
24              MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.
25
```

```
 1                    DIRECT EXAMINATION

 2   BY MR. AKROTIRIANAKIS:

 3   Q.   MR. WEST, IN THE LATER PART OF YOUR TESTIMONY

 4   YESTERDAY, YOU WERE DISCUSSING BEING SUBPOENAED OUT TO

 5   TRIALS AT VARIOUS LOCATIONS OF OTHER ARYAN BROTHERHOOD

 6   MEMBERS WHO HAD BEEN CHARGED WITH CRIMINAL OFFENSES.

 7            DO YOU REMEMBER THAT TESTIMONY?

 8   A.   YES, SIR.

 9   Q.   AND ONE OF THOSE TRIALS WAS A TRIAL INVOLVING HOMER RAY

10   MATTHEWS, WAS IT?

11   A.   YES, SIR.

12   Q.   AND HE WAS AN ARYAN BROTHERHOOD MEMBER?

13   A.   AN ASSOCIATE.

14   Q.   AN ASSOCIATE.

15            ARE YOU FAMILIAR WITH AN ARYAN BROTHERHOOD MEMBER

16   NAMED NORMAN MATTHEWS?

17   A.   YES, SIR.

18   Q.   DO YOU KNOW IF THEY'RE OF ANY BLOOD RELATION TO ONE

19   ANOTHER?

20   A.   NO, THEY'RE NOT.

21   Q.   THANK YOU.

22            ANOTHER MATTER THAT I HAD ASKED ABOUT YESTERDAY

23   WERE THE PICTURES THAT WERE TAKEN OUT IN FRONT OF THE HOBBY

24   SHOP AREA OF THE LEAVENWORTH PENITENTIARY.

25            DO YOU RECALL THAT?
```

1    A.    YES, SIR.

2    Q.    AND YOU HAD TESTIFIED, I BELIEVE, THAT NOT JUST ANYONE

3    WOULD BE IN A PICTURE WITH YOU.  IS IT FAIR TO SAY THAT THE

4    PEOPLE WHO YOU WOULD TAKE PHOTOGRAPHS WITH WOULD BE EITHER

5    ARYAN BROTHERHOOD MEMBERS OR ARYAN BROTHERHOOD ASSOCIATES?

6    A.    FOR THE MOST PART, YES.

7    Q.    NOW, I WANT TO RETURN TO WHERE WE LEFT OFF YESTERDAY

8    CONCERNING THE DRUG TRAFFICKING INTO THE LEAVENWORTH

9    PENITENTIARY.

10            ONE MORE QUESTION BEFORE I DO THAT.  IN YOUR

11   EXPERIENCE IN ALMOST 30 YEARS AS A FEDERAL PRISONER, DO YOU

12   KNOW WHETHER THE BUREAU OF PRISONS DOES PERIODIC RANDOM CELL

13   SEARCHES OF INMATES' CELLS?

14   A.    YES, SIR, THEY DO.

15   Q.    AND OVER TIME, DID YOU BECOME AWARE OF DIFFERENT

16   STRATEGIES TO DEFEAT CELL SEARCHES?

17   A.    YES, SIR.

18   Q.    CAN YOU TELL US OF A COUPLE OF THEM?

19   A.    WELL, YOU GENERALLY KNEW WHEN YOU WERE GOING TO GET HIT

20   BECAUSE THEY ALMOST DID IT ON A SCHEDULE.  SO YOU'D HAVE

21   ANYTHING OUT OF THE CELL, HIDING PLACES IN THE CELL.

22   Q.    DID YOU HAVE OCCASION TO EVER HAVE LEGAL MATERIALS IN

23   YOUR CELL?

24   A.    YES, SIR.

25   Q.    HAVE YOU HEARD OF A STRATEGY OF INTERMIXING OTHER ITEMS

1    WITHIN YOUR LEGAL MATERIALS?

2    A.    YES, SIR.

3    Q.    IS THAT BECAUSE LEGAL MATERIALS WILL NOT BE SEARCHED SO

4    THOROUGHLY BY THE BOP STAFF IN CONDUCTED CELL SEARCHES?

5    A.    WELL, THEY CAN'T BE READ.  BY LAW, THE LEGAL MATERIALS

6    CAN'T BE READ IN YOUR CELL.  SO IF YOU WANT TO HIDE

7    SOMETHING, YOU'D PUT IN THERE BECAUSE THEY'RE NOT GOING TO

8    BE LOOKED AT SO CLOSE.

9    Q.    DID YOU FIND THAT TO BE EFFECTIVE STRATEGY TO DEFEAT

10   CELL SEARCHES?

11   A.    YES, SIR.

12   Q.    RETURNING, THEN, TO THE DRUG TRAFFICKING.  YOU

13   TESTIFIED ABOUT THE DRUGS BEING PACKAGED IN BALLOONS OR SOME

14   OTHER SUCH MEDIA WHEN THEY WERE BROUGHT INTO THE VISITING

15   ROOM.

16          DO YOU KNOW WHO, IN THE DRUG TRAFFICKING

17   CONSPIRACY YOU DESCRIBED YESTERDAY, WAS IN CHARGE OF THE

18   PACKAGING OF THE DRUGS?

19   A.    MOSTLY RONNIE SLOCUM.  SOMETIMES THE MULE WENT SOUTH,

20   WHOEVER'S VISITOR WAS COMING UP WOULD PACKAGE THEM, BUT

21   MOSTLY IT WAS RONNIE SLOCUM.

22   Q.    I SHOWED YOU A COUPLE OF PICTURES YESTERDAY OF YOU AND

23   SOME OF THE OTHER ARYAN BROTHERHOOD MEMBERS AND ASSOCIATES

24   AT LEAVENWORTH PENITENTIARY, ONE OF WHOM YOU IDENTIFIED AS

25   EUGENE BENTLEY.

1    A.    YES, SIR.

2    Q.    WAS EUGENE BENTLEY INVOLVED IN THE DRUG TRAFFICKING

3    CONSPIRACY?

4    A.    YES, SIR, HE WAS.

5    Q.    AND WHO WAS THE PERSON WHO WOULD BRING IN DRUGS FOR

6    EUGENE BENTLEY?

7    A.    HIS WIFE.

8    Q.    AND WHAT WAS HER NAME?

9    A.    I BELIEVE IT WAS MARY.

10   Q.    NOW -- MARY BENTLEY?

11   A.    YES.

12   Q.    WAS MARY BENTLEY -- WELL, DO YOU KNOW WHERE SHE LIVED

13   AT THE TIME THAT YOU AND MR. BENTLEY WERE INCARCERATED AT

14   USP LEAVENWORTH?  JUST WHAT STATE?

15   A.    MINNESOTA, I THINK.  ONE OF THE NORTHERN STATES.  I'M

16   NOT QUITE SURE, THOUGH.

17   Q.    SHE DIDN'T LIVE IN KANSAS?

18   A.    NO.

19   Q.    SO SHE WAS COMING FROM OUT OF STATE INTO KANSAS TO

20   BRING THE DRUGS?

21   A.    YES, SIR.

22   Q.    AND YOU ULTIMATELY WERE TRANSFERRED FROM LEAVENWORTH TO

23   MARION?

24   A.    YES, SIR.

25   Q.    WAS MR. BENTLEY TRANSFERRED FROM LEAVENWORTH TO MARION

1    AT OR ABOUT THE SAME TIME?

2    A.   I KNOW HE WAS TRANSFERRED UP THERE.  I'M NOT SURE IF IT

3    WAS AT THE SAME TIME.  I BELIEVE IT WAS CLOSE, THOUGH.

4    Q.   AT SOME POINT, YOU AND MR. BENTLEY BOTH WERE AT MARION

5    AND NO LONGER AT LEAVENWORTH?

6    A.   YES, SIR.

7    Q.   DO YOU KNOW WHETHER MARY BENTLEY CONTINUED TO ACT AS

8    PART OF THIS DRUG CONSPIRACY AFTER HER HUSBAND EUGENE

9    BENTLEY HAD BEEN TRANSFERRED?

10    A.   YES, SIR, SHE DID.

11    Q.   SO SHE CONTINUED TO VISIT THE LEAVENWORTH PENITENTIARY

12    EVEN AFTER EUGENE BENTLEY HAD LEFT?

13    A.   YES, SIR.

14    Q.   AND WHAT WAS THE PURPOSE OF THOSE VISITS?

15    A.   BRINGING IN DRUGS.

16    Q.   NOW OTHER THAN THE -- OTHER THAN THE MULING THROUGH THE

17    VISITING ROOM THAT YOU'VE DESCRIBED, WERE THERE OTHER

18    STRATEGIES THAT YOU KNEW OF AND EMPLOYED TO BRING NARCOTICS

19    INTO THE UNITED STATES PENITENTIARY AT LEAVENWORTH?

20    A.   YES, SIR.

21    Q.   WHAT WERE THOSE?

22    A.   SOME OF THEM WERE THE POLICE OFFICERS THEMSELVES.  AT

23    ONE POINT, WE HAD THEM BEING PLACED ON THE DUMP TRUCK OUT ON

24    THE STREET.  WHEN THE DUMP TRUCK WOULD COME IN, AN INMATE

25    WOULD PULL THEM OFF THE BACK OF THE DUMP TRUCK WHERE THEY'D

1    BEEN TAKEN.

2          WE GOT THEM IN THROUGH THE HOBBY SHOP AREA.  SENT

3    OUT A PAINTING WITH A PICTURE FRAME THAT WE MADE A LITTLE

4    HIDDEN HOLE IN THE FRAME.  THEY WOULD PACK IT FULL OF DRUGS,

5    GIVE IT BACK TO THE MAILMAN THE NEXT DAY.  TELL HIM, *NOBODY*

6    *BY THAT ADDRESS,* AND IT WOULD COME BACK TO US.

7    Q.    LET ME START WITH THE LAST ONE OF THOSE AND TAKE THEM

8    IN ORDER.

9          YOU WOULD MAKE A FRAME AS PART OF YOUR HOBBY

10   CRAFT?

11   A.    YES, SIR.

12   Q.    AND YOU WOULD MAKE A SECRET COMPARTMENT IN THE FRAME?

13   A.    IT WOULD BE THE STRETCHER OF THE CANVAS ITSELF, IN THE

14   WOOD STRETCHER OF THE CANVAS.

15   Q.    WOULD THE -- WOULD THE BUREAU OF PRISONS ALLOW YOU TO

16   SEND YOUR HOBBY CRAFT HOME?

17   A.    YES, SIR.

18   Q.    AND YOU WOULD DO THAT?

19   A.    YES, SIR.

20   Q.    BUT --

21   A.    AND YOU WOULD SEND IT TO THE ADDRESS.  THEY ALREADY

22   KNOW WHAT TO DO.  THEY WOULD PUT THE DRUGS INSIDE THE

23   STRETCHER FRAMES, GIVE IT BACK TO THE MAILMAN THE NEXT DAY,

24   TELL HIM, *NOBODY LIVES HERE BY THAT ADDRESS.*  SO IT WOULD BE

25   RETURNED TO THE PENITENTIARY WHERE THE STAFF AND THE REC

13

1    ROOM WOULD OPEN IT BACK UP AND GIVE IT BACK TO YOU.

2    Q.    NOW YOU HAVE DRUGS IN IT?

3    A.    YES, SIR.

4    Q.    AND YOU WOULD SELL THOSE DRUGS IN THE PRISON?

5    A.    YES, SIR.

6    Q.    YOU WOULD DISTRIBUTE THEM TO OTHER MEMBERS OF THE ARYAN

7    BROTHERHOOD FOR THEIR CONSUMPTION?

8    A.    YES, SIR.

9    Q.    THE DUMP TRUCK STRATEGY THAT YOU REFERRED TO, WERE

10   THOSE OTHER ARYAN BROTHERHOOD MEMBERS OR ASSOCIATES ON THE

11   OUTSIDE OF PRISON WHO WOULD HELP WITH THE DUMP TRUCK?

12   A.    I DON'T PERSONALLY KNOW WHO IT WAS DOING IT OUT ON THE

13   STREET.  I DON'T KNOW IF IT WAS -- IT WOULDN'T HAVE BEEN A

14   MEMBER.  AN ASSOCIATE MAYBE.

15   Q.    WHO WAS IN CHARGE OF THAT METHOD OF INTRODUCING DRUGS

16   INTO THE PRISON?

17   A.    MARK NYQUIST.

18          THE COURT:  COULD YOU REPEAT YOUR ANSWER, PLEASE?

19          MR. AKROTIRIANAKIS:  THE ANSWER WAS MARK NYQUIST,

20   I BELIEVE.

21   BY MR. AKROTIRIANAKIS:

22   Q.    N-I-Q-U-I-S-T, SIR?

23   A.    SOUNDS ABOUT RIGHT.

24   Q.    WAS MARK NYQUIST AN ARYAN BROTHERHOOD MEMBER?

25   A.    YES, SIR.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    Q.   AND FOR A TIME, WAS HE IN CHARGE, ESSENTIALLY, OF THE

2    DRUG TRAFFICKING CONSPIRACY?

3    A.   YES, SIR.

4    Q.   WAS THAT WHILE YOU WERE AT UNITED STATES PENITENTIARY

5    LEAVENWORTH?

6    A.   YES, SIR.

7    Q.   THE CORRECTIONS OFFICERS OR POLICE OFFICERS YOU

8    INDICATED WAS ANOTHER STRATEGY FOR BRINGING DRUGS INTO THE

9    PRISON?

10   A.   YES, SIR.

11   Q.   CAN YOU TELL US HOW THAT WORKED?

12   A.   YOU'D PAY THEM $500 TO BRING IN A PACKAGE, GENERALLY AN

13   OUNCE TO TWO OUNCES AT A TIME.

14   Q.   NOW, ARE YOU FAMILIAR WITH THE RELATIVE PRICE OF -- AND

15   WHEN WE SAY "AN OUNCE OR TWO OUNCES," WE'RE TALKING ABOUT

16   TAR HEROIN?

17   A.   YES, SIR.

18   Q.   ARE YOU FAMILIAR AT THAT TIME WITH THE RELATIVE PRICE

19   OF TAR HEROIN ON THE STREET VERSUS INSIDE THE PENITENTIARY?

20   A.   SOMEWHAT, YES.

21   Q.   AND HOW ARE YOU FAMILIAR?

22   A.   WELL, BECAUSE I PAID FOR IT.  I WOULD SEND RONNIE

23   SLOCUM THE MONEY FOR THE OUNCE, AND THEN I'D GET IT IN AND

24   SELL IT INSIDE.

25   Q.   APPROXIMATELY HOW MUCH WAS AN OUNCE OF HEROIN TO

1    PURCHASE ON THE STREET?

2    A.    IT DEPENDED ON HOW -- WHAT RONNIE COULD SET UP.  BUT

3    GENERALLY AROUND 1,500.

4    Q.    AND IN ADDITION TO THAT, YOU WOULD HAVE THE EXPENSE OF

5    BRINGING IT INTO THE PRISON?

6    A.    ANOTHER 500 IF YOU USED THE COP.  AND EVEN A MULE, WE

7    PAID THEIR TRANSPORTATION DOWN THERE AND USUALLY KICKED THEM

8    SOMETHING.

9    Q.    $2,000 TOTAL FOR THE OUNCE?

10   A.    PROBABLY.

11   Q.    HOW MUCH COULD YOU SELL AN OUNCE OF HEROIN FOR IN

12   PRISON?

13   A.    YOU CAN SELL A GRAM FOR 500.  YOU CAN BREAK THE GRAM

14   DOWN INTO PAPERS.  YOU HAD 15, 16 PAPERS OUT OF A GRAM FOR

15   $50 APIECE.

16   Q.    YOU USE THE TERM "PAPERS."  IS THAT LIKE A --

17   A.    ONE SHOT.

18   Q.    SLICE IT UP REALLY THIN?

19   A.    YES, SIR.

20   Q.    HENCE THE TERM "PAPER"?

21   A.    WELL, AND IT IS FOLDED UP IN A TINFOIL PAPER AND SOLD

22   IT FOR $50.

23   Q.    TINFOIL PAPER LIKE THE KIND OF MYLAR FILM THAT A BAG OF

24   CHIPS COMES IN, SOMETHING LIKE THAT?

25   A.    YEAH, IN PRETTY MUCH ANYTHING.  YEAH.

16

| | |
|---|---|
| 1 | Q.   NOW, WHO WOULD CUT UP THE DRUGS INSIDE THE PRISON? |
| 2 | A.   WHOEVER OWNED THEM, YOU KNOW, ME.  AL BENTON.  USUALLY |
| 3 | ON OURS, WE WOULD CUT THEM UP IN THE ART ROOM. |
| 4 | Q.   WHAT WOULD YOU USE IN THE ART ROOM? |
| 5 | A.   WELL, WE'D SET OUR PAINTINGS UP, BECAUSE WE HAD THE |
| 6 | BACK TWO TABLES, WE'D SET OUR PAINTINGS UP SO THE GUARD |
| 7 | COULDN'T SEE THROUGH HIS OFFICE WINDOW, AND SPREAD IT OUT |
| 8 | AND CUT IT UP WITH A RAZOR BLADE. |
| 9 | Q.   NOW, THE RAZOR BLADE WASN'T PART OF THE HOBBY CRAFT |
| 10 | MATERIALS, WAS IT? |
| 11 | A.   NO, SIR. |
| 12 | Q.   SOMETHING YOU SNUCK INTO THE ART ROOM? |
| 13 | A.   YES, SIR. |
| 14 | Q.   WOULD THAT BE YOUR SHAVING RAZOR? |
| 15 | A.   EVERYBODY HAD A RAZOR BLADE.  YOU HAD -- I DON'T EVEN |
| 16 | KNOW WHERE THEY ALL CAME FROM, BUT EVERYBODY HAD THEM. |
| 17 | Q.   NOW, BEFORE WE LEAVE RONNIE SLOCUM, YESTERDAY YOU |
| 18 | TESTIFIED THAT YOU COULD PASS MESSAGES TO OTHER ARYAN |
| 19 | BROTHERHOOD MEMBERS IN PRISON THROUGH SLOCUM. |
| 20 | A.   YES, SIR. |
| 21 | Q.   COULD YOU PASS MESSAGES THROUGH SLOCUM TO MEMBERS OF |
| 22 | THE CALIFORNIA ARYAN BROTHERHOOD? |
| 23 | A.   YES, SIR. |
| 24 | Q.   AND DID YOU DO THAT YOURSELF? |
| 25 | A.   I DIDN'T, NO. |

```
 1   Q.   WAS THAT BECAUSE YOU DIDN'T REALLY KNOW ANYBODY IN THE
 2   CALIFORNIA ARYAN BROTHERHOOD?
 3   A.   YES, SIR.
 4   Q.   YOU'RE NOT FROM CALIFORNIA YOURSELF?
 5   A.   NO, SIR.
 6   Q.   NOW, AS FAR AS THE PEOPLE WHO WERE IN -- I'M NOW
 7   REFERRING TO THE INMATES WHO WOULD BE BROUGHT DRUGS FROM THE
 8   OUTSIDE TO MULE BACK INTO THE PRISON, WERE THOSE INMATES AT
 9   SOME TIMES ARYAN BROTHERHOOD MEMBERS?
10   A.   YES, SIR.
11   Q.   SOMETIMES ARYAN BROTHERHOOD ASSOCIATES?
12   A.   YES, SIR.
13   Q.   SOMETIMES WAS THERE ONLY AN ASSOCIATION WITH THE ARYAN
14   BROTHERHOOD THAT THEY WOULD PERFORM THAT TASK?
15   A.   YES, SIR.
16   Q.   WHAT WAS THE REWARD THAT THEY WOULD RECEIVE FOR
17   PERFORMING THAT TASK?
18   A.   GENERALLY ONE THIRD OF THE DRUGS THAT CAME IN THEY
19   WOULD GET.
20   Q.   AND WERE THESE PEOPLE WHO WERE NOT ARYAN BROTHERHOOD
21   MEMBERS GENERALLY USING DRUGS THEMSELVES?
22   A.   YES, SIR.
23   Q.   COULD THEY ALSO DO IT FOR MONEY?
24   A.   YES, SIR.
25   Q.   NOW, DO YOU REMEMBER THE NAMES OF ANY OF THE PEOPLE WHO
```

```
 1   WERE BRINGING IN DRUGS THROUGH THE VISITING ROOM ON BEHALF
 2   OF THE ARYAN BROTHERHOOD?
 3   A.   BENTLEY, SHOCK.  A COUPLE OTHERS THAT I JUST CAN'T
 4   REMEMBER.
 5   Q.   CAN I ASK YOU TO TURN IN ONE OF THE FOLDERS BEFORE YOU
 6   TO NO. 52.  IT'S A COLLECTION OF PICTURES.
 7            MR. AKROTIRIANAKIS:  YOUR HONOR, WE HAVE A
 8   STIPULATION TO 52, AND THE GOVERNMENT WOULD OFFER IT.
 9            THE COURT:  EXHIBIT 52 IS?
10            MR. AKROTIRIANAKIS:  I BEG YOUR PARDON.  I
11   MISSPOKE ENTIRELY.  IT'S EXHIBIT 13.
12            THE COURT:  ALL RIGHT.  EXHIBIT 13 IS ORDERED
13   ADMITTED AND ORDERED PUBLISHED.
14       (PLAINTIFF'S EXHIBIT 13 RECEIVED IN EVIDENCE.)
15   BY MR. AKROTIRIANAKIS:
16   Q.   EXHIBIT 13 IS ANOTHER OF THE FOLDERS IN FRONT OF YOU.
17   IT'S A COLLECTION OF PICTURES.
18            THERE ARE TWO THAT ARE SORT OF THE BACK SIDE.
19   THEY'RE RIGHT IN FRONT PERHAPS.  THIS IS ONE OF THEM ON THE
20   SCREEN RIGHT NOW, MR. WEST.
21   A.   OKAY.
22   Q.   DO YOU HAVE THAT PICTURE BEFORE YOU?
23   A.   YES, SIR.
24   Q.   OKAY.  AND DID DO YOU RECOGNIZE THIS PERSON?
25   A.   YES, SIR.  THAT'S MARK NYQUIST.
```

19

```
1   Q.   FOR THE RECORD, IN THE MIDDLE ROW IN THE WHITE OR LIGHT
2   GRAY SWEATSHIRT.
3            AND THIS PERSON HERE?  THE PICTURE IS KIND OF
4   DARK.
5   A.   YEAH.  I CAN'T MAKE HIM OUT.
6   Q.   OKAY.  DO YOU RECOGNIZE ANYBODY ELSE IN THE PICTURE?
7   A.   YEAH.  RIGHT NEXT TO HIM, I DON'T REMEMBER HIS -- NO,
8   UP TOP.  NOW GO OVER.
9            THE COURT:  COULD YOU REPEAT YOUR ANSWER, PLEASE?
10  BY MR. AKROTIRIANAKIS:
11  Q.   YOU SAID RIGHT NEXT TO HIM UP TOP.
12  A.   OKAY.
13  Q.   SIR?
14  A.   NOW OVER.  SECOND FROM THE RIGHT.  YEAH.  HE WAS ONE OF
15  THEM THAT WAS BRINGING DRUGS IN FOR US, BUT I DON'T REMEMBER
16  HIS NAME.
17  Q.   DO YOU REMEMBER AN INMATE AT LEAVENWORTH NAMED CHARLES
18  LEGER OR BUBBA LEGER?
19  A.   I KNOW THE NAME.  I DON'T KNOW HIM TOO WELL.  I KNOW HE
20  BROUGHT SOME IN FOR US.
21  Q.   WOULD YOU RECOGNIZE HIS PICTURE?
22  A.   I DOUBT IT.
23  Q.   THIS WAS NYQUIST WHO WAS RUNNING THIS PART OF THE
24  OPERATION?
25  A.   YES, SIR.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
1    Q.   AT LEAST AT THE TIME YOU WERE AT LEAVENWORTH?

2    A.   YES, SIR.

3    Q.   NOW, WAS NYQUIST STILL RUNNING THE LEAVENWORTH DRUG

4    TRAFFICKING OPERATION AT THE TIME YOU TRANSFERRED FROM

5    LEAVENWORTH TO MARION?

6    A.   YES, SIR.

7    Q.   AND BASED ON YOUR CONVERSATIONS AND OTHER

8    COMMUNICATIONS WITH ARYAN BROTHERHOOD MEMBERS AT MARION AND

9    LEAVENWORTH OR WITH MR. SLOCUM, DID YOU LEARN WHO RAN THE

10   DRUG TRAFFICKING OPERATION AFTER NYQUIST LEFT LEAVENWORTH?

11   A.   YES, SIR.

12        MR. GREEN:  I'M GOING TO OBJECT TO LACK OF

13   FOUNDATION, HEARSAY, WITH RESPECT TO THIS LINE OF

14   QUESTIONING.

15        THE COURT:  THE OBJECTION IS SUSTAINED.

16   BY MR. AKROTIRIANAKIS:

17   Q.   OKAY.  WHO DID YOU SPEAK WITH ABOUT THE -- WELL, DID,

18   TO YOUR KNOWLEDGE, THE DRUG TRAFFICKING CONSPIRACY CONTINUE

19   AT LEAVENWORTH AFTER YOU LEFT?

20   A.   YES, SIR.

21        MR. GREEN:  JUDGE, I'M OBJECTING AS TO RELEVANCE

22   AS TO WHAT HIS KNOWLEDGE IS.  IT ALSO PROBABLY INCORPORATES

23   HEARSAY --

24        THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION ON

25   THE BASIS OF LACK OF FOUNDATION.
```

```
 1   BY MR. AKROTIRIANAKIS:

 2   Q.   DID YOU HAVE CONVERSATIONS WITH ARYAN BROTHERHOOD

 3   MEMBERS AT THE MARION PENITENTIARY AFTER YOU TRANSFERRED

 4   THERE?

 5   A.   YES, SIR.

 6   Q.   AND WHO WERE THE OTHER ARYAN BROTHERHOOD MEMBERS AT

 7   LEAVENWORTH -- AT MARION AT THAT TIME?

 8   A.   BARRY MILLS, T.D. BINGHAM, BENTLEY GOT UP THERE.  I

 9   DON'T REMEMBER THE OTHER.

10   Q.   WAS AL BENTON THERE?

11   A.   AL BENTON WAS THERE.

12   Q.   SO WE HAD THE THREE COMMISSIONERS, THEN, AT MARION?

13   A.   YES, SIR.

14   Q.   IN ADDITION, WERE THERE OTHER SENIOR MEMBERS OF THE

15   ARYAN BROTHERHOOD?

16   A.   YES, SIR.

17   Q.   SORT OF THE BOARD OF DIRECTORS?

18   A.   YES, SIR.

19   Q.   OKAY.  AMONGST YOURSELVES, DID YOU DISCUSS THE ONGOING

20   ACTIVITIES OF THE ARYAN BROTHERHOOD AT THE MARION

21   PENITENTIARY?

22   A.   YES, SIR.

23   Q.   AND DID YOU DISCUSS THE ONGOING ACTIVITIES OF THE ARYAN

24   BROTHERHOOD AT OTHER PENITENTIARIES OTHER THAN MARION?

25   A.   YES, SIR.
```

1    Q.    DID BARRY MILLS, FOR EXAMPLE, GIVE PERIODIC REPORTS, IF

2    YOU WILL, ABOUT WHAT WAS GOING ON AT THE DIFFERENT

3    PENITENTIARIES?

4    A.    YES, SIR, PRETTY MUCH.

5    Q.    DID HE TELL YOU HOW HE KNEW THE FACTS THAT HE WAS

6    REPORTING TO YOU?

7    A.    YES, SIR.

8    Q.    WHAT DID HE SAY IN THAT REGARD?

9              MR. GREEN:  JUDGE, LACK OF A FOUNDATION.  I WOULD

10    ALSO ASK FOR A TIME REFERENCE AS TO WHEN THESE STATEMENTS

11    TOOK PLACE.

12             THE COURT:  CAN YOU CLARIFY THE TIME?  THE

13    OBJECTION ON THAT BASIS IS SUSTAINED.

14             MR. AKROTIRIANAKIS:  YES.

15    BY MR. AKROTIRIANAKIS:

16    Q.    I'M GOING TO REFER YOU TO EXHIBIT 319, WHICH IS BEFORE

17    YOU.

18        (PAUSE.)

19        (CELL PHONE INTERRUPTION.)

20             THE COURT:  THIS WOULD BE A GOOD TIME FOR EVERYONE

21    TO CHECK.

22             MR. AKROTIRIANAKIS:  I'M PLACING -- THIS EXHIBIT

23    IS IN EVIDENCE, YOUR HONOR.  MAY I PUBLISH PAGE 5?

24             THE COURT:  GO AHEAD, YES.

25

1    BY MR. AKROTIRIANAKIS:

2    Q.   I'M PLACING PAGE 5 OF THE EXHIBIT ON THE DOCUMENT

3    CAMERA.

4             DO YOU RECOGNIZE THIS AS YOUR INMATE QUARTERS

5    HISTORY, MR. WEST?

6    A.   YES, SIR.

7    Q.   OKAY.  DO YOU SEE HERE ON PAGE 5 THAT ACCORDING TO THE

8    DOCUMENT, YOU TRANSFERRED OUT OF LEAVENWORTH ON JUNE 26 OF

9    1993?

10   A.   YES, SIR.

11   Q.   AND LIKEWISE, YOU ARRIVED AT MARION ON JUNE 26 OF 1993?

12   A.   YES, SIR.

13   Q.   NOW, IN THIS TIME PERIOD, DID YOU HAVE -- THAT IS

14   JUNE 26, 1993, AND THEREAFTER UNTIL YOU LEFT MARION,

15   WHICH -- AND I'LL REFER YOU TO THE PAGE RIGHT BEFORE THAT.

16   IN YOUR INMATE QUARTERS HISTORY, YOU LEFT MARION, ACCORDING

17   TO THE DOCUMENT, ON AUGUST 31 OF 1993.

18   A.   YES, SIR.

19   Q.   AND YOU TRANSFERRED TO LOMPOC [AT THAT POINT?

20   A.   YES, SIR.

21   Q.   AND YOU REMAINED AT LOMPOC UNTIL 1995?

22   A.   YES, SIR.

23   Q.   "OKL," IS THAT OKLAHOMA?

24   A.   WHICH ONE?  "OKL"?

25   Q.   YEAH.

24

1    A.    YES, SIR.

2    Q.    AND IS THAT THE FEDERAL TRANSFER CENTER?

3    A.    YES, SIR.

4    Q.    SORT OF LIKE A HUB, IF YOU GO FROM ONE PRISON TO

5    ANOTHER, YOU GO THROUGH OKLAHOMA?

6    A.    YES, SIR.

7    Q.    OKAY.  YOU RETURNED TO MARION FROM LOMPOC ON, ACCORDING

8    TO THE DOCUMENT, MAY 23, OF 1995.

9    A.    YES, SIR.

10   Q.    AND THEREAFTER YOU REMAINED AT MARION UNTIL THE TIME

11   THAT YOU WERE RELEASED IN 2000; IS THAT CORRECT?

12   A.    YES, SIR.

13   Q.    OKAY.  SO I WANT TO FOCUS ON THE FIRST OF THOSE TWO

14   PERIODS AT MARION.  SO YOU WENT LEAVENWORTH, MARION, LOMPOC,

15   MARION, RELEASED.  RIGHT?

16   A.    YES, SIR.

17   Q.    OKAY.  SO WE GO FROM LEAVENWORTH TO MARION.  OKAY.

18          DURING THAT STAY AT MARION, DID YOU HAVE

19   CONVERSATIONS WITH BARRY MILLS AND THE OTHER ARYAN

20   BROTHERHOOD MANAGEMENT, IF YOU WILL, ABOUT THE ONGOING

21   ACTIVITIES OF THE ARYAN BROTHERHOOD?

22   A.    YES, SIR.

23   Q.    DID THEY INCLUDE THE ARYAN BROTHERHOOD DRUG

24   TRAFFICKING?

25   A.    YES, SIR.

1  Q.   WAS THAT BOTH AT MARION AND OTHER PENITENTIARIES?

2  A.   YES, SIR.

3  Q.   DID THOSE OTHER PENITENTIARIES INCLUDE LEAVENWORTH?

4  A.   YES, SIR.

5  Q.   DID MR. MILLS OR THE OTHER -- WAS IT MR. MILLS WHO WAS

6  MAKING THE REPORTS?

7  A.   ALL OF US.  WE WERE ALL TALKING ABOUT IT.  I MEAN,

8  TALKING BARRY, AL BENTON, T.D.

9  Q.   WOULD YOU RECEIVE WORD THROUGH MR. SLOCUM OR OTHERWISE

10 FROM ARYAN BROTHERHOOD MEMBERS THEN INCARCERATED AT

11 LEAVENWORTH?

12 A.   YES, SIR.

13 Q.   AND WHO WOULD YOU HEAR FROM?

14 A.   WE MAINLY GOT THE INFORMATION FROM RONNIE SLOCUM AS TO

15 WHAT WAS GOING ON DOWN THERE.

16 Q.   WOULD MR. SLOCUM INDICATE WHO HE HAD SPOKEN WITH OR

17 HEARD FROM?

18 A.   YES, SIR.

19 Q.   WHO ARE THE NAMES THAT YOU RECALL?

20      MR. GREEN:  I WOULD JUST PROPOSE AN OBJECTION AS

21 TO HEARSAY AND CONFRONTATION.

22      THE COURT:  THE OBJECTION IS OVERRULED.

23 BY MR. AKROTIRIANAKIS:

24 Q.   WHO DO YOU RECALL, SIR, THAT SLOCUM WOULD TELL YOU THAT

25 HE HAD SPOKEN WITH OR HEARD FROM AT LEAVENWORTH?

1    A.    MC ELHINEY AND SAHAKIAN.

2    Q.    NOW, I'M TALKING ABOUT THE INITIAL TIME PERIOD WHERE

3    YOU WERE AT MARION IN THE 1993 TIME FRAME.    ARE YOU ABLE TO,

4    THIS MANY YEARS LATER, DISTINGUISH BETWEEN THE TWO TIME

5    PERIODS THAT YOU WERE AT MARION, AT LEAST 1993 VERSUS 1995?

6    A.    SOMEWHAT.    BUT IT DOES GET CONFUSING.

7    Q.    LET'S TAKE THEM COLLECTIVELY THEN.    OR MAYBE I CAN DO

8    IT THIS WAY:    WHEN YOU WERE AT LOMPOC, IN BETWEEN THOSE TWO

9    STINTS AT MARION, DID YOU CONTINUE TO RECEIVE REPORTS AND

10   OTHER COMMUNICATIONS FROM MR. SLOCUM?

11   A.    YES, SIR.

12   Q.    OKAY.    DID THOSE INCLUDE THE SAME TYPE OF REPORTS?

13   A.    YES, SIR.

14   Q.    OKAY.    AND WAS THAT LIKEWISE TRUE WHEN YOU WERE BACK AT

15   MARION?

16   A.    YES, SIR.

17   Q.    AND DID YOU DISCUSS ALL OF THOSE MATTERS WITH MILLS,

18   BINGHAM, BENTON, BENTLEY AND ALL OF THE OTHER ARYAN

19   BROTHERHOOD MEMBERS AT MARION?

20   A.    YES, SIR, I DID.

21   Q.    WHAT WAS THE PURPOSE OF HAVING THESE DISCUSSIONS ABOUT

22   WHAT WAS GOING ON AT OTHER PLACES?

23   A.    WELL, BECAUSE THE DRUG TRAFFICKING AT LEAVENWORTH HAD

24   RAN SO WELL FOR SO MANY YEARS WITH MARK NYQUIST THAT WHEN

25   MC ELHINEY AND SAHAKIAN TOOK IT OVER, IT ENDED UP BEING A

```
 1   LOT OF CONFUSION, BECAUSE THEY STARTED SHORT-SELLING THE
 2   DRUGS TO THE INMATES, PRESSURING THEM, NOT GIVING THEM
 3   BASICALLY WHAT THEY PAID FOR.  SO IT WAS CAUSING A LOT OF
 4   TROUBLE THAT WE NEVER HAD WHEN NYQUIST RAN IT.
 5   Q.   WAS THE DRUG TRAFFICKING CONSPIRACY AT LEAVENWORTH A
 6   HIGH PROFIT-MAKING ENTERPRISE FOR THE ARYAN BROTHERHOOD?
 7   A.   YES, SIR.
 8   Q.   WAS IT RIGHT UP THERE?
 9   A.   YES, SIR.
10   Q.   NOW, WHAT HAPPENED TO THE MONEY?
11   A.   IT WOULD GO BACK TO RONNIE SLOCUM.  BE DIVIDED EITHER
12   FOR MORE DRUGS.  BE SENT INTO A LOT OF US INTO MARION THAT
13   DIDN'T HAVE FUNDS SO TO MAKE SURE EVERYONE MADE CANTEEN.  SO
14   MOST OF THE MONEY WOULD GO BACK TO SLOCUM.
15   Q.   WAS THIS A CONCERN THEN -- LET ME BACK UP.  YOU SAID
16   "MADE CANTEEN."
17           WHAT IS CANTEEN?
18   A.   THE STORE ITEMS.
19   Q.   COMMISSARY?
20   A.   YES, SIR.
21   Q.   YOU HEARD OF THE PHRASE "CANTEEN DRAW"?
22   A.   YES, SIR.
23   Q.   WHAT IS A CANTEEN DRAW?
24   A.   IT'S THE AMOUNT OF MONEY THAT YOU ARE ALLOWED TO SPEND
25   AT THE CANTEEN PER MONTH.
```

1    Q.    WHAT WAS THE CANTEEN DRAW AT MARION?

2    A.    I THINK IT WAS 100.  I'M NOT SURE, THOUGH.

3    Q.    HAVE YOU HEARD THE PHRASE "FULL CANTEEN DRAW"?

4    A.    YES, SIR.

5    Q.    WAS ONE OF THE GOALS OF THE ARYAN BROTHERHOOD TO --

6    THROUGH THE PROFIT OF THE DRUG TRAFFICKING CONSPIRACY --

7    MAKE SURE THAT ALL THE BROTHERS WHO WEREN'T AT LEAVENWORTH

8    HAD A FULL CANTEEN DRAW?

9    A.    YES, SIR.

10   Q.    AND WAS THAT GENERALLY SOMETHING THAT WAS ACCOMPLISHED

11   FROM TIME TO TIME?

12   A.    YES, SIR.

13   Q.    WOULD THE INABILITY TO OBTAIN A FULL CANTEEN DRAW FROM

14   DRUG TRAFFICKING PROCEEDS BE A CONCERN TO YOU AS A MARION

15   INMATE?

16   A.    YES, CERTAINLY.

17   Q.    TO BARRY MILLS?

18   A.    YES.

19   Q.    T.D. BINGHAM?

20   A.    YES.

21   Q.    AL BENTON?

22   A.    YES.

23   Q.    THE OTHERS?

24   A.    EVERYONE, YES, SIR.

25   Q.    SO WAS THE BUMPS IN THE ROAD OF THE ONGOING DRUG

1    BUSINESS AT LEAVENWORTH OF CONCERN TO THE MANAGEMENT OF THE

2    ARYAN BROTHERHOOD?

3    A.    YES, SIR.

4    Q.    AND WAS IT A HOT TOPIC OF CONVERSATION?

5    A.    YES, SIR.

6    Q.    AND WAS THERE A CONCERN THAT THIS DRUG TRAFFICKING

7    CONSPIRACY AT LEAVENWORTH WAS BEING MISMANAGED?

8    A.    YES, SIR.

9    Q.    BY WHOM WAS IT BELIEVED THAT IT WAS BEING MISMANAGED?

10   A.    MC ELHINEY AND SAHAKIAN.

11   Q.    THE DEFENDANT, DAVID SAHAKIAN?

12   A.    YES, SIR.

13   Q.    HAVE YOU HEARD -- ARE YOU FAMILIAR WITH THE TERM TO

14   "STEP ON DRUGS"?

15   A.    YES, SIR.

16   Q.    WHAT DOES THAT MEAN?

17   A.    IT MEANS YOU CUT IT WITH SOMETHING ELSE.

18   Q.    YOU ADD AN ADULTERANT TO THE DRUGS?

19   A.    YES, SIR.

20   Q.    DOES THAT WEAKEN THE STRENGTH OF THE DRUGS?

21   A.    YES, SIR.

22   Q.    NOW AS SOMEONE WHO HAS USED HEROIN IN THE PAST, IS THAT

23   SOMETHING THAT YOU KNOW WHEN YOU'RE USING THE DRUGS?

24   A.    YEAH.  AS SOON AS YOU COOK IT UP, YOU CAN TELL.

25   Q.    AND ARE YOU FAMILIAR ALSO WITH THE TERM "SHORTING"?

1    A.    YES, SIR.

2    Q.    WHAT DOES SHORTING MEAN?

3    A.    IT MEANS INSTEAD OF GIVING IT -- WHEN YOU'RE MAKING UP

4    THE PAPER, INSTEAD OF 15, 16 PAPERS OUT OF THE GRAM, YOU'RE

5    MAKING 20, 25 OUT OF A GRAM.  SO YOU'RE GIVING THEM LITTLER

6    AMOUNTS FOR THE SAME MONEY.

7    Q.    AND YOU WERE SAYING A PAPER WAS SELLING FOR HOW MUCH?

8    A.    $50.

9    Q.    HOW MANY TIMES CAN YOU GET HIGH FROM A PAPER?

10    A.    ONE TIME.

11    Q.    SO YOU COULD MAKE AN EXTRA 200, 250 BUCKS OFF A GRAM?

12    A.    YES, SIR.

13    Q.    AND YOU HAVE HEARD FROM THE OTHER ARYAN BROTHERHOOD

14    MEMBERS AT MARION, INCLUDING MR. MILLS AND THE OTHERS YOU

15    REFERRED TO, THAT CUSTOMERS AT THE UNITED STATES

16    PENITENTIARY AT LEAVENWORTH WERE BEING SHORTED?

17    A.    YES, SIR.

18    Q.    I WANT TO TURN TO METHODS OF COMMUNICATION THAT YOU HAD

19    WHILE YOU WERE IN PRISON.

20         ACTUALLY, BEFORE I DO THAT, LET ME ASK YOU HOW YOU

21    ARRIVED IN THE PRISON IN THE FIRST PLACE.

22         DO YOU HAVE FELONY CONVICTIONS, SIR?

23    A.    YES, SIR.

24    Q.    DO YOU HAVE MORE THAN ONE?

25    A.    YES, SIR.

31

```
1   Q.   OKAY.  LET'S TALK ABOUT THE ONE THAT RESULTED IN YOUR
2   INCARCERATION IN FEDERAL PRISON.  WHAT WAS YOUR CRIME?
3   A.   BANK ROBBERY.
4   Q.   AND HOW MANY BANKS DID YOU ROB?
5   A.   I THINK IT WAS FOUR THAT I WAS CONVICTED, FOUR OR FIVE.
6   Q.   DID YOU GO TO TRIAL ON THAT?
7   A.   YES, SIR.
8   Q.   DID YOU TESTIFY IN YOUR DEFENSE?
9   A.   I DON'T THINK SO.  I DON'T THINK ON ANY OF THEM.
10  Q.   HAVE YOU EVER TESTIFIED IN YOUR DEFENSE?
11  A.   NO, SIR.  I DON'T THINK SO.
12  Q.   HAVE YOU TESTIFIED IN OTHER PROCEEDINGS UNRELATED TO
13  THE LEGAL PROCEEDINGS THAT INVOLVE THIS CASE?
14  A.   I DON'T BELIEVE SO, NO.
15  Q.   YESTERDAY I BELIEVE THAT YOU WERE DISCUSSING A TIME
16  WHEN YOU WERE SUBPOENAED BY JOHNNY CAMPBELL TO TENNESSEE?
17  A.   YES, SIR.
18  Q.   DO YOU -- AND I THINK YOUR TESTIMONY WAS THAT YOU WERE
19  UNABLE TO RECALL WHETHER MR. CAMPBELL ACTUALLY PUT YOU ON
20  THE STAND?
21  A.   YES, SIR.  HE TOLD US WHAT HE WANTED US TO SAY, BUT I
22  JUST CAN'T REMEMBER IF WE ACTUALLY WENT ON THE STAND DOWN
23  THERE OR NOT.  I DON'T THINK SO.
24  Q.   YOU WERE CONVICTED AT TRIAL OF THE BANK ROBBERIES?
25  A.   YES, SIR.
```

1    Q.    AND WHAT SENTENCE DID YOU RECEIVE?

2    A.    TWENTY-FIVE, 25, 20, AND THEN I FORGET WHAT THE OTHER

3    ONE WAS CALLED.  IT DIDN'T HAVE A TIME FRAME ON IT.  ALL

4    TOTAL I THINK IT ADDED UP TO ABOUT 75 YEARS.

5    Q.    AND WAS THAT A PAROLABLE SENTENCE?

6    A.    YES, SIR.

7    Q.    AND ULTIMATELY YOU WERE PAROLED?

8    A.    YES, SIR.

9    Q.    WAS THAT YOUR RELEASE IN PRISON IN 2000?

10   A.    YES, SIR.

11   Q.    YOUR RELEASE FROM PRISON, RATHER.  EXCUSE ME.

12            DID YOU -- DID YOU HAVE ANY OTHER CONVICTIONS

13   WHILE YOU WERE INCARCERATED?

14   A.    YES, SIR.

15   Q.    AND WHAT WERE THE NATURE OF THOSE CONVICTIONS?

16   A.    ATTEMPTED ESCAPE.  KIDNAPPING OF TWO POLICE OFFICERS.

17   WEAPONS POSSESSION.  A SECOND ATTEMPTED ESCAPE.

18   Q.    AND WERE THESE CASES THAT WENT TO TRIAL?

19   A.    YES, SIR.  MOST OF THEM.

20   Q.    AND YOU DIDN'T TESTIFY IN ANY OF THOSE?

21   A.    NO, SIR.

22   Q.    NOW, WHEN YOU WERE -- WHEN YOU WERE PAROLED IN 2000,

23   DID YOU HAVE CONDITIONS ON YOUR PAROLE?

24   A.    YES, SIR.

25   Q.    OKAY.  THAT MEANS THAT THERE'S CERTAIN THINGS YOU CAN'T

```
 1    DO THAT YOU WOULD OTHERWISE BE ABLE TO DO IF YOU WEREN'T ON
 2    PAROLE.  WHAT ARE THE TYPES OF RULES THAT WERE --
 3    A.   BASICALLY THE SAME AS ANY CITIZEN.  CAN'T VIOLATE THE
 4    LAW.  PRETTY MUCH JUST WHAT THE NORMAL RULES OF CIVILIZATION
 5    ARE.
 6    Q.   NOW, YOU HAD BEEN IN PRISON AT THIS POINT FOR ALMOST 30
 7    YEARS?
 8    A.   YES, SIR.
 9    Q.   WERE YOU RELEASED TO A COMMUNITY CORRECTION CENTER, A
10    SORT OF HALFWAY HOUSE?
11    A.   YES, SIR, I WAS.
12    Q.   AND WHAT'S THE PURPOSE OF THAT, IF YOU KNOW?
13    A.   TO LET ME ORIENTATE (SIC) BACK INTO SOCIETY.
14    Q.   DO THEY GIVE YOU VARIOUS EDUCATION CLASSES, OR AT LEAST
15    MAKE THAT AVAILABLE TO YOU?
16    A.   NO.  YOU WERE ABLE TO GO TO WORK.  AND I GOT A JOB THE
17    SECOND DAY I WAS THERE.
18    Q.   NOW, WAS ONE OF THE CONDITIONS OF YOUR PAROLE THAT YOU
19    WERE UNABLE TO -- THAT YOU WERE NOT PERMITTED TO ASSOCIATE
20    WITH KNOWN FELONS?
21    A.   YES, SIR.
22    Q.   OKAY.  DID YOU -- WERE YOU -- AND YOU WERE ARRESTED IN
23    THIS CASE IN 2002, OCTOBER?
24    A.   YES, SIR.
25    Q.   AT THE TIME THAT YOU WERE ARRESTED IN THIS CASE, WERE
```

1    YOU IN VIOLATION OF THAT CONDITION OF YOUR PAROLE?

2    A.    YES, SIR.

3    Q.    AND TELL THE JURY HOW IT IS THAT YOU VIOLATED THE

4    CONDITION OF YOUR PAROLE THAT PROHIBITED YOU FROM

5    ASSOCIATING WITH A KNOWN FELON?

6    A.    THE GIRL THAT I WAS LIVING WITH HAD A RECORD.

7    Q.    OKAY.  NOW LET ME THEN TURN TO COMMUNICATION METHODS IN

8    PRISON.

9            WHAT IS A KITE?

10   A.    WRITTEN NOTE.

11   Q.    AND HOW IS IT THAT YOU PASS KITES AROUND IN PRISON?

12   A.    MANY DIFFERENT WAYS.  THROUGH THE LEGAL BOOKS IN THE

13   LEGAL ROOM.  DIG A HOLE OUT IN THE YARD FOR WHEN THE NEXT

14   GROUP COMES OUT, THEY DIG IT UP FROM WHERE YOU PLANTED IT.

15   IN THE NET OF THE TENNIS COURT, THE TOP STRING PART OF THE

16   TENNIS COURT, YOU CAN STICK IT IN THERE.  IF YOU WANTED TO

17   GET IT INTO THE CONTROL UNIT, PUT IT INTO THE HANDBALL,

18   THROW IT OVER THE WALL INTO THE CONTROL UNIT'S YARD.  I MEAN

19   IT'S ENDLESS.

20   Q.    LET'S JUST TAKE THOSE FOR THE MOMENT.  YOU'RE TRYING TO

21   SEND A MESSAGE INTO THE CONTROL UNIT, YOU SAID.

22   A.    YES, SIR.

23   Q.    NOW, IS ONE OF THE ACTIVITIES THAT YOU CAN DO IN THE

24   REC YARD PLAY HANDBALL?

25   A.    PRIOR TO THE LOCKDOWN, YES.

35

1    Q.   WE'RE TALKING ABOUT AT MARION?

2    A.   YES.  PRIOR TO THE LOCKDOWN.

3    Q.   SO IN THE 1993 TIME FRAME, ACTUALLY?

4    A.   NO, YOU COULDN'T DO IT THEN.

5    Q.   WELL, AT WHAT POINT WHEN YOU WERE AT MARION WERE YOU

6    ABLE TO PLAY HANDBALL?

7    A.   JUST PRIOR TO THE LOCKDOWN AFTER SILVERSTEIN KILLED A

8    POLICE OFFICER THERE.  SO PRIOR TO THAT.

9    Q.   AND THAT WAS IN ABOUT 1983?

10   A.   '83, '84, SOMEWHERE IN THERE.

11   Q.   WE'RE TALKING ABOUT THE TIME THAT YOU WERE AT MARION

12   WHEN YOU WERE FIRST INITIATED AS AN ARYAN BROTHERHOOD

13   MEMBER?

14   A.   YES, SIR.

15   Q.   AND DESCRIBE WHAT YOU WOULD DO WITH THE HANDBALL IN

16   ORDER TO GET MESSAGES INTO THE CONTROL UNIT.

17   A.   WELL, YOU HAD A MAIN HALLWAY WHERE THE HANDBALL COURT'S

18   ON THE YARD.  WE'RE ON ONE SIDE OF THAT MAIN HALLWAY.  ON

19   THE OTHER SIDE OF THE MAIN HALLWAY WAS A YARD FOR THE

20   CONTROL UNIT.  SO ALL YOU'D HAVE TO DO IS PUT THE KITE,

21   DRUGS, OR WHATEVER IN THE HANDBALL, THROW IT OVER THE ROOF

22   OF THE MAIN HALLWAY, AND IT WOULD LAND IN THE RECREATION

23   YARD FOR THE CONTROL UNIT.  THEN WHEN THEY CAME OUT, THEY

24   WOULD PICK IT UP.

25   Q.   YOU CUT A HOLE IN THE HANDBALL?

36

1  A.  YES, SIR.

2  Q.  HOW DID YOU KNOW THAT SOMEBODY WASN'T GOING TO TAKE THE

3  DRUGS OR THE NOTE OR WHATEVER OTHER THAN THE INTENDED

4  RECIPIENT?

5  A.  BECAUSE WE HAD SOMEBODY ON THE BOTTOM FLOOR OF THE

6  CONTROL UNIT WATCHING IT.  THEY KNEW WHEN IT WAS COMING AND

7  WOULD KEEP THEIR EYE ON IT.

8  Q.  NOW, YOU REFERRED TO DIGGING A HOLE OR USING A --

9  HIDING A KITE IN THE TENNIS COURT NETTING?

10  A.  YES, SIR.

11  Q.  HAVE YOU EVER HEARD THE TERM "MAILBOX" --

12  A.  YES, SIR.

13  Q.  -- USED IN RELATION TO THESE THINGS?

14  A.  YES, SIR.  THAT'S BASICALLY WHAT THAT IS.

15  Q.  DID YOU HAVE A PERSONAL MAILBOX?

16  A.  YES, SIR.

17  Q.  WHERE WAS YOUR MAILBOX?

18  A.  ABOUT FIVE FEET OFF OF THE POLE OF THE TENNIS COURT IN

19  THE GROUND.  WE WOULD SIT THERE WATCHING THE TENNIS GAME.

20  HAVE TWO GUYS PLAYING.  DIG THE HOLE.  PUT IT IN THERE.

21  WHEN THEY CAME OUT OR WHEN THE NEXT UNIT CAME OUT TO REC,

22  I'D TELL THEM, *GO TO MY MAILBOX.*

23  Q.  AND THEN THEY WOULD DIG IT UP?

24  A.  YES, SIR.

25  Q.  DID I HEAR YOU TO MENTION SOMETHING ABOUT THE NETTING

1    OF THE TENNIS COURT?

2    A.   YES, SIR.   THE TOP WHITE PIECE THAT RUNS ACROSS THE NET

3    FOLDS OVER SO YOU CAN JUST SLIP IT IN THE END OF IT AND THEY

4    COME OUT AND PULL IT OUT OF THE END.

5    Q.   WAS THAT SOMEBODY ELSE'S MAILBOX?

6    A.   YES, SIR.

7    Q.   DO YOU REMEMBER WHOSE IT WAS?

8    A.   NO, I DON'T.

9    Q.   THE LEGAL BOOKS STRATEGY THAT YOU MENTIONED FOR PASSING

10   MESSAGES, HOW DOES THAT WORK?

11   A.   SEVERAL WAYS.   YOU CAN PUT IT IN THE BINDING OF THE

12   LEGAL BOOK.   YOU CAN ACTUALLY UNDERLINE CERTAIN WORDS

13   THROUGHOUT THE BOOK AND THEN YOU JUST SAY -- ONE UNIT COMES

14   OUT TO REC, YOU TELL THEM TO *TAKE OUT FED. 13 FROM THE LEGAL*

15   *LIBRARY,* AND HE CAN GO THROUGH THE BOOK, FIND ALL THE

16   UNDERLINED WORDS, OR IN THE BINDING OF THE BOOK, PULL THE

17   KITE OUT OF THERE.

18   Q.   HAVE YOU EVER HEARD OF THE TERM "FISHING" IN RELATION

19   TO PASSING KITES?

20   A.   YES, SIR.

21   Q.   WHAT IS FISHING?

22   A.   BASICALLY FROM ONE END OF THE RANGE TO THE OTHER, YOU

23   THROW A STRING DOWN, THE ONE CELL WILL FISH IT IN, TIE THE

24   KITE ONTO THE STRING, OR WHATEVER HE'S PASSING, AND THEN YOU

25   PULL THE STRING BACK.

1    Q.   HAVE YOU EVER HEARD THE TERM "MOAN AND GROAN"?

2    A.   YES, SIR.

3    Q.   WHAT'S MOAN AND GROAN?

4    A.   A PHONE.

5    Q.   OKAY.  AND I TAKE IT YOU DON'T HAVE A PHONE IN YOUR

6    CELL IN PRISON?

7    A.   NO.

8    Q.   OKAY.  THEN WHAT DO YOU MEAN BY "PHONE" THEN?

9    A.   TELEPHONE.  GETTING TO THE TELEPHONE.

10   Q.   THAT'S A TELEPHONE IN THE TELEPHONE AREA WHERE YOU CAN

11   MAKE CALLS OUT OF THE PRISON?

12   A.   YES, SIR.

13   Q.   HAVE YOU EVER HEARD OF MOAN AND GROAN OR TELEPHONE AS A

14   REFERENCE TO YOU TALKING THROUGH THE TOILET?

15   A.   YEAH, YOU CAN.

16   Q.   OKAY.  DESCRIBE HOW THAT STRATEGY WORKS.

17   A.   WELL, IF YOU WERE UPSTAIRS -- LIKE IN THE CONTROL UNIT,

18   IT WAS USED A LOT.  UPSTAIRS YOU WOULD EMPTY THE WATER OUT

19   OF YOUR TOILET.  THEY WOULD EMPTY THE WATER OUT OF THEIR

20   TOILET IN THE BOTTOM, AND YOU CAN BASICALLY TALK LIKE YOU

21   WERE RIGHT NEXT DOOR.

22   Q.   IS IT VERY CLEAR?

23   A.   YES, SIR.

24   Q.   HOW IS IT THAT YOU EMPTY THE WATER OUT OF THE TOILET,

25   INCIDENTALLY?

1    A.    YOU JUST PUMP IT OUT.

2    Q.    NOW YOU REFERRED MR. SILVERSTEIN, TOMMY SILVERSTEIN,

3    HAVING KILLED A PRISON GUARD AT --

4              MR. GREEN:  JUDGE, I'M GOING TO OBJECT TO THIS

5    TESTIMONY BEING IRRELEVANT.

6              MR. AKROTIRIANAKIS:  I'LL WITHDRAW THE QUESTION,

7    YOUR HONOR.

8              THE COURT:  THANK YOU.

9    BY MR. AKROTIRIANAKIS:

10   Q.    AT SOME POINT, WAS MR. SILVERSTEIN TRANSFERRED OUT OF

11   MARION TO A MORE SECURE CUSTODY?

12   A.    YES, SIR.

13   Q.    OKAY.  NOW WAS THAT IN THE EARLY '80S?

14   A.    YES, SIR.

15   Q.    WAS -- AT THE TIME MARION WAS THE CONTROL UNIT OR WAS

16   THE HIGHEST SECURITY FEDERAL PRISON?

17   A.    YES, SIR.

18   Q.    OKAY.  SO IF MR. SILVERSTEIN WAS TRANSFERRED OUT OF

19   MARION TO A MORE SECURE PLACE, HOW DID THAT HAPPEN?  HOW WAS

20   THAT ACCOMPLISHED?

21   A.    THEY FLEW HIM OUT ONE NIGHT TO -- I BELIEVE HE FIRST

22   WENT TO SPRINGFIELD.  THEY JUST WANTED TO GET HIM OUT OF

23   MARION.  AND THEY HELD HIM THERE FOR A WHILE.  THEN THEY

24   HELD HIM IN ATLANTA FOR A WHILE.  AND THEN THEY BUILT A CELL

25   FOR HIM UNDERNEATH THE HOLE IN LEAVENWORTH.

1    Q.    AND AFTER THAT STINT WHEN YOU WERE AT MARION, YOU

2    ULTIMATELY TRANSFERRED TO LEAVENWORTH?

3    A.    YES, SIR.

4    Q.    OKAY.  WERE YOU AWARE AT THE TIME YOU WERE AT

5    LEAVENWORTH OF THE LOCATION OF THIS SPECIAL CELL THAT YOU'RE

6    REFERRING TO?

7    A.    YES, SIR.

8    Q.    HOW IS IT THAT YOU WERE AWARE OF THAT?

9    A.    YOU COULD SEE IT.  WHEN YOU FIRST GET THERE, YOU GO TO

10   THE HOLE FOR A WHILE, AND YOU COULD SEE TOMMY ON THE SCREENS

11   IN THE CONTROL UNIT WHEN YOU WERE OUT REC'ING.

12   Q.    DID THEY HAVE A MONITOR IN THE -- IN THE SCREENS --

13   PARDON ME.

14          THE SCREENS IN THE CONTROL UNIT, ARE YOU -- YOU'RE

15   REFERRING TO A MONITOR?

16   A.    YES, SIR.

17   Q.    OKAY.  AND WHO WAS MONITORING HIM?

18   A.    THE POLICE OFFICER IN THE CENTRAL CONTROL AREA.

19   Q.    NOW, HAVE YOU LOOKED AT THOSE MONITORS YOURSELF?

20   A.    YES, SIR.

21   Q.    AND COULD YOU SEE WHAT THE CIRCUMSTANCES OF

22   MR. SILVERSTEIN'S INCARCERATION WERE?

23   A.    YES, FOR THE MOST PORT.

24   Q.    OKAY.  CAN YOU DESCRIBE THEM, PLEASE?

25   A.    WELL, HE HAD THREE SEPARATE CELLS, ONE TO SHOWER IN,

41

1    ONE TO SLEEP IN, ONE TO REC IN.

2    Q.    WAS THAT UNDERGROUND, YOU SAID?

3    A.    EXCUSE ME?

4    Q.    DID YOU SAY THAT THAT WAS ALL UNDERGROUND?

5    A.    IT WAS SOMEWHERE UNDERNEATH THE SHU.  I'M NOT QUITE

6    SURE HOW THEY BUILT THEIR -- HOW FAR DOWN IT WAS.  BUT IT

7    WAS UNDER THE SHU SOMEWHERE.

8    Q.    AND WAS THERE A MONITOR FOR ALL THREE OF THOSE CELLS?

9    A.    FOR TWO OF THEM.

10   Q.    DID YOU ACTUALLY YOURSELF PERSONALLY SEE TOMMY

11   SILVERSTEIN ON THE MONITOR?

12   A.    YES, SIR.

13   Q.    NOW, WERE ANY ARYAN BROTHERHOOD MEMBERS ALLOWED ANY

14   TYPE OF PHYSICAL CONTACT WITH TOMMY SILVERSTEIN DURING THE

15   TIME THAT HE WAS BEING HOUSED IN THIS SPECIAL CELL?

16   A.    NO, SIR.

17   Q.    WERE YOU NONETHELESS ABLE, AS AN ARYAN BROTHERHOOD

18   MEMBER, TO CONTINUE TO COMMUNICATE WITH TOMMY SILVERSTEIN?

19   A.    YES, SIR.

20   Q.    HOW WOULD YOU ACCOMPLISH THAT?

21   A.    A COUPLE WAYS.  ONE, THROUGH THE LAWYERS; THROUGH

22   PEANUT SHELLS FROM THE COMMISSARY; AND IN LETTERS THAT WERE

23   GOING OUT AND COMING BACK IN.

24   Q.    IS THE LETTERS GOING OUT AND COMING BACK IN THE SAME

25   TYPE OF THING THAT YOU DESCRIBED YESTERDAY USING SOMEONE

42

1    LIKE RONALD SLOCUM?

2    A.    YES, SIR.

3    Q.    OKAY.  TURNING THEN TO THE LAWYERS, WHAT DO YOU MEAN

4    YOU WOULD USE LAWYERS FOR THAT?

5    A.    WELL, WE -- WE HAD HIRED -- WE HAD HIRED SOME LAWYERS,

6    I THINK THREE DIFFERENT LAWYERS AT DIFFERENT TIMES, JUST TO

7    GO DOWN AND TALK TO HIM SO HE HAD SOME HUMAN CONTACT.  AND

8    THEN WE WOULD BE IN CONTACT WITH THE LAWYERS.

9    Q.    AND WHEN YOU SAY "WE," ARE YOU REFERRING TO THE ARYAN

10   BROTHERHOOD AS HAVING HIRED THE LAWYERS?

11   A.    YES, SIR.

12   Q.    NOW THE PEANUT SHELLS, DESCRIBE HOW THAT WORKS.

13   A.    WELL, WE HAD AN INMATE THAT WORKED IN THE COMMISSARY,

14   AND WE HAD IT WHERE TOMMY WOULD ORDER A BAG OF PEANUTS EVERY

15   COMMISSARY.  WE WOULD GET A BAG OF PEANUTS FROM THE

16   COMMISSARY, BRING IT UP TO THE ART ROOM, CUT THEM OPEN, PUT

17   DRUGS IN IT, PUT NOTES IN IT AND GLUE THEM BACK TOGETHER,

18   PUT THEM BACK IN THE BAG, GIVE THEM TO THE GUY THAT WORKED

19   THE COMMISSARY TO MAKE SURE THAT WHEN TOMMY'S ORDER CAME UP,

20   THAT BAG WENT IN HIS ORDER.

21   Q.    AND THAT PERSON WHO'S WORKING THE COMMISSARY, WAS THAT

22   AN INMATE?

23   A.    YES, SIR.

24   Q.    WAS IT AN AB MEMBER?

25   A.    NO, SIR.

1    Q.   WAS HE NONETHELESS WILLING TO ASSIST IN PASSING THESE

2    MESSAGES ALONG?

3    A.   YEAH.  WELL, HE DIDN'T EVEN KNOW WHAT HE WAS PASSING.

4    WE HAD TOLD HIM MAKE SURE THAT TOMMY GOT THAT BAG OF

5    PEANUTS.

6    Q.   I WANT TO TURN TO A DISCUSSION OF THE STRUCTURE OF THE

7    AB SYSTEM.

8         YOU TESTIFIED YESTERDAY THAT WHEN YOU FIRST CAME

9    INTO THE ARYAN BROTHERHOOD, IT WAS -- IT WAS UNSTRUCTURED

10   BUT THAT BARRY MILLS WAS IN CHARGE OF IT.

11   A.   YES, SIR.

12   Q.   OKAY.  DID THERE COME A POINT IN TIME WHEN THAT

13   CHANGED?

14   A.   YES, SIR.

15   Q.   WAS THAT IN THE TIME FRAME BEFORE MR. MILLS TRANSFERRED

16   FROM MARION TO THE ADX?

17   A.   YES, SIR.  JUST -- JUST IN THE TIME PRIOR TO THAT.

18   Q.   AND WERE YOU INCARCERATED WITH MR. MILLS AT OR ABOUT

19   THE TIME OF THIS RESTRUCTURE?

20   A.   YES, SIR.

21   Q.   AND AT WHAT INSTITUTION?

22   A.   MARION.

23   Q.   AND REFERRING BACK TO EXHIBIT 319 ON PAGE 5 OF THAT

24   DOCUMENT -- YOU DON'T NEED TO, SIR.  I'M JUST GOING TO PUT

25   IT ON THE SCREEN.

1          ARE YOU ABLE TO READ IT WHEN I PUT IT ON THE

2    SCREEN?

3    A.   YES, SIR.

4    Q.   WOULD THAT HAVE BEEN IN THIS TIME FRAME BEGINNING IN OR

5    ABOUT JUNE OF 1993 THAT YOU WERE AT MARION?

6    A.   YES, SIR.

7    Q.   NOW, YESTERDAY YOU TESTIFIED ABOUT TWO MEMBERS OF THE

8    EAST COAST MAFIA, FOR LACK OF A BETTER TERM, NICODEMO SCARFO

9    AND JOHN GOTTI.

10   A.   YES, SIR.

11   Q.   AND YOU TESTIFIED ABOUT DISCUSSIONS THAT BARRY MILLS

12   TOLD YOU ABOUT THAT HE HAD HAD WITH THESE TWO PEOPLE.

13   A.   YES, SIR.

14   Q.   AND SOME OF THOSE DISCUSSIONS YOU WERE PRESENT FOR?

15   A.   YES, SIR.

16   Q.   WAS THIS ALL IN OR ABOUT THE SAME TIME DURING THAT

17   STINT YOU HAD AT MARION?

18   A.   YES, SIR.

19   Q.   AND ONE OF THE THINGS YOU TESTIFIED ABOUT YESTERDAY WAS

20   THE INSTITUTION OF ARYAN BROTHERHOOD OATHS?

21   A.   YES, SIR.

22   Q.   DO YOU KNOW WHERE BARRY MILLS GOT THE IDEA TO INSTITUTE

23   ARYAN BROTHERHOOD OATHS?

24   A.   JOHN GOTTI.

25   Q.   DID BARRY MILLS TELL YOU THAT?

1    A.    YES, SIR.

2    Q.    WHAT DID HE TELL YOU?

3    A.    HE TOLD ME THAT THE MAFIA DID THAT AS A WAY TO BIND

4    THEM INTO THE FAMILY, AND HE THOUGHT IT WAS A GOOD IDEA FOR

5    US.

6    Q.    AND YESTERDAY YOU TESTIFIED ABOUT PLACING THE OATH IN

7    THEIR HAND AND SETTING IT ON FIRE?

8    A.    YES, SIR.

9    Q.    WAS THE OATH FIRST READ ALOUD EITHER BY THE NEW ARYAN

10   BROTHERHOOD MEMBER OR SOMEBODY?

11   A.    YES, SIR.  I BELIEVE SO.

12   Q.    WAS THERE SOME CEREMONY TO IT?

13   A.    I BELIEVE SO.

14   Q.    HAVE YOU BEEN PRESENT FOR THESE CEREMONIES?

15   A.    NO, SIR.

16   Q.    WAS THAT BECAUSE YOU OBJECTED TO THE OATH?

17   A.    YES, SIR.

18   Q.    CAN I TURN YOUR ATTENTION TO EXHIBIT 1 IN THE FOLDERS

19   BEFORE YOU.

20         NOW, IN CONNECTION WITH YOUR PRIOR TESTIMONY IN

21   PROCEEDINGS RELATED TO THIS CASE, HAVE YOU HAD THE

22   OPPORTUNITY TO REVIEW THAT DOCUMENT THAT'S BEFORE YOU?

23   A.    GIVE ME ONE MINUTE, PLEASE.

24         YES, SIR.

25   Q.    REFERRING BACK TO THE 1993 TIME FRAME AT MARION, DO YOU

1    REMEMBER HAVING ANY DISCUSSIONS WITH MR. MILLS CONCERNING

2    THE TOPICS RELATED IN THE DOCUMENT EXHIBIT 1?

3    A.    YES, SIR.    SEVERAL OF THEM.

4    Q.    DID YOU AND MR. MILLS DISCUSS A RESTRUCTURING OR

5    CHANGING OF THE STRUCTURE OF THE ARYAN BROTHERHOOD?

6    A.    YES, SIR.

7    Q.    WHAT WERE JUST THE VERY GENERAL NATURE OF THE

8    DISCUSSIONS YOU HAD WITH MR. MILLS CONCERNING RESTRUCTURING?

9    A.    WELL, HE WANTED TO MAKE IT MORE OF AN ORGANIZATION

10   INSTEAD OF JUST ALL OF US RUNNING OUR OWN SEPARATE WAYS, SO

11   THERE WOULD BE STRUCTURE IN IT.    EVERYBODY WAS RESPONSIBLE

12   FOR PRODUCING "X" AMOUNT OF DOLLARS OR TAKING CARE OF WHAT

13   THEY HAD TO TAKE CARE OF.

14   Q.    AND IN YOUR REVIEW OF EXHIBIT 1 BEFORE YOU, DO YOU FIND

15   AN EXPRESSION OF THE IDEAS THAT YOU WERE DISCUSSING WITH

16   MR. MILLS AT THE TIME?

17   A.    YES, SIR.

18   Q.    DID -- AT THE TIME, IN THE 1993 TIME FRAME, DID

19   MR. MILLS TELL YOU WHERE HE HAD -- OF HOW HE HAD CONCEIVED

20   OR HOW HE HAD COME UP WITH THESE DIFFERENT IDEAS?

21   A.    WELL, HE WAS IMPRESSED WITH HOW MUCH MONEY JOHN GOTTI

22   HAD MADE, AND HE SAID THAT WE WERE BETTER THAN THEM SO WE

23   SHOULD BE ABLE TO MAKE MORE.

24   Q.    AND WHEN YOU SAY, "WE WERE BETTER THAN THEM" --

25   A.    THE MAFIA.

1    Q.    THE "THEM" IS THE MAFIA?

2    A.    YEAH.

3    Q.    AND THE "WE" IS THE ARYAN BROTHERHOOD?

4    A.    YES, SIR.

5    Q.    DO YOU BELIEVE THAT YOU HAVE EVER SEEN THAT EXACT

6    DOCUMENT IN THE EARLY 1990S DURING THIS TIME THAT YOU'RE

7    TESTIFYING ABOUT?

8    A.    I CAN'T BE 100 PERCENT SURE THAT THIS IS THE EXACT

9    DOCUMENT BECAUSE I SAW SO MANY COPIES OF IT.  ONE EXTREMELY

10   SIMILAR, IF NOT THIS ONE.

11   Q.    NOW, WAS THIS A DOCUMENT THAT WAS SORT OF DEVELOPED --

12   AND I DON'T MEAN THIS DOCUMENT BEFORE YOU.  BUT THE DOCUMENT

13   THAT YOU HAVE NOW TESTIFIED THAT YOU SAW IN THAT TIME FRAME,

14   WAS THIS SOMETHING THAT WAS DEVELOPED OVER TIME?

15   A.    YES, SIR.

16   Q.    DID IT HAVE SEVERAL ITERATIONS?

17   A.    YES, SIR.

18   Q.    DIFFERENT DRAFTS?

19   A.    YES, SIR.

20   Q.    WHO PREPARED THE INITIAL DRAFTS?

21   A.    BARRY MILLS.

22   Q.    AND DID YOU SEE THE INITIAL DRAFTS?

23   A.    YES, SIR.

24   Q.    AND HOW WERE THEY?  WERE THEY TYPEWRITTEN IN THIS

25   DOCUMENT?

1    A.    NO, SIR.  THEY WERE HANDWRITTEN.

2    Q.    DID YOU EVER SEE TYPEWRITTEN DRAFTS?

3    A.    YES, SIR.

4    Q.    OKAY, HOW, IF YOU KNOW, WERE THE HANDWRITTEN DRAFTS --

5          LET ME FIRST ASK YOU:  IN WHOSE HANDWRITING WERE

6    THE DRAFTS?

7    A.    BARRY MILLS.

8    Q.    DID YOU ACTUALLY SEE HIM PHYSICALLY WRITING IT?

9    A.    NOT WRITING IT, NO.

10   Q.    ARE YOU FAMILIAR WITH HIS HANDWRITING?

11   A.    YES, SIR.

12   Q.    IS THAT BASED ON YOUR LONG RELATIONSHIP WITH MR. MILLS?

13   A.    YES, SIR.  AND HE'S GOT A REAL DISTINCTIVE HANDWRITING.

14   Q.    DID YOU -- DO YOU KNOW HOW IT WAS THAT THOSE

15   HANDWRITTEN DRAFTS WERE CONVERTED INTO TYPEWRITTEN DRAFTS?

16   A.    YES, SIR.

17   Q.    HOW IS IT?

18   A.    WELL, I KNOW SEVERAL TIMES I CARRIED THE HANDWRITTEN

19   DRAFTS FROM THE FIRST FLOOR UP TO THE SECOND FLOOR AND GAVE

20   THEM TO CLEO TO TYPE THEM UP IN THE LEGAL ROOM.

21   Q.    WHEN YOU SAY THE FIRST FLOOR AND THE SECOND FLOOR, THE

22   FIRST AND SECOND FLOOR OF WHAT?

23   A.    EXCUSE ME.  IN MARION, THE FIRST RANGE AND SECOND

24   RANGE, YOU COULD WALK FROM THE FIRST TO THE SECOND RANGE ON

25   ONE SIDE OF THE BLOCK.  BARRY WAS ON THE BOTTOM.  CLEO WAS

49

1    UPSTAIRS IN THE LEGAL ROOM.

2    Q.   AND ARE THERE VARIOUS UNITS WITHIN THE MARION PRISON?

3    A.   YES, SIR.

4    Q.   DO YOU REMEMBER WHAT UNIT YOU WERE IN, IN THE TIME WE

5    ARE TALKING ABOUT?

6    A.   MY BEST GUESS WOULD BE D UNIT.

7    Q.   "D" AS IN DOG?

8    A.   YES, SIR.

9    Q.   NOW, YOU WERE HOUSED IN SEVERAL OF THE UNITS AT MARION?

10   A.   ALL OF THEM AT ONE TIME OR ANOTHER.

11   Q.   ARE THEY ALL -- PUTTING ASIDE THE SHU, ARE THEY ALL, IN

12   GENERAL TERMS, SIMILAR IN THEIR STRUCTURE?

13   A.   YES, SIR.

14   Q.   AND DOES EACH UNIT HAVE A NUMBER OF RANGES ON IT?

15   A.   THERE'S FOUR RANGES, TWO ON EACH SIDE.

16   Q.   OKAY.  SO WHEN WE'RE TALKING ABOUT A UNIT IN A PRISON

17   AND AT MARION SPECIFICALLY, THERE ARE TWO SIDES TO THE UNIT?

18   A.   YES, SIR.

19   Q.   AND THERE IS A BOTTOM FLOOR AND TOP FLOOR?

20   A.   RIGHT.

21   Q.   OKAY.  NOW, THE UNIT ITSELF IS DENOMINATED BY A LETTER

22   SUCH AS D UNIT, AS IN DOG; RIGHT?

23   A.   YES, SIR.

24   Q.   AND THE INDIVIDUAL RANGES OF THE FLOORS AND SIDES OF

25   THE UNIT, DO THOSE TOO HAVE LETTERS?

1    A.    YES, SIR.  A, B, C, AND D.

2    Q.    SO YOU WOULD BE ON LIKE D UNIT, A RANGE?

3    A.    YES, SIR.

4    Q.    IS THAT THE WAY IT'S EXPRESSED?

5    A.    YEAH.

6    Q.    OKAY.  OR D UNIT, B RANGE OR WHATEVER THE CASE MAY BE?

7    A.    YEAH.  I FORGET WHICH WENT FIRST, BUT IT WAS LIKE DA18.

8    THAT WOULD BE YOUR RANGE, YOUR CELL, AND YOUR BLOCK.

9    Q.    OKAY.  AND THE NUMBER AT THE END, 18, THAT WOULD BE THE

10   REFERENCE TO THE CELL?

11   A.    THE CELL NUMBER.

12   Q.    AND IF I UNDERSTAND YOUR TESTIMONY, YOU WERE ABLE TO,

13   DURING THE TIME YOU WERE OUT OF YOUR CELL, FREELY TRAVEL

14   BETWEEN THE UPSTAIRS AND THE DOWNSTAIRS ON THE SIDE OF THE

15   RANGE THAT YOU WERE ON?

16   A.    YES, SIR.

17   Q.    OKAY.  AND IN TERMS OF RUNNING IT UPSTAIRS TO BE TYPED,

18   AT THAT TIME PERIOD MR. MILLS WAS IN A CELL ON THE LOWER

19   FLOOR?

20   A.    YES, SIR.  I THINK HE WAS IN CELL 3.

21   Q.    WHERE WAS YOUR CELL IN RELATION TO MR. MILLS' CELL?

22   A.    I WAS UPSTAIRS, I THINK, IN CELL 8.

23   Q.    WOULD THAT BE SPECIFICALLY INCLUDED IN THE DOCUMENT 319

24   THAT WE KEEP LOOKING AT?

25   A.    YES, SIR, IT WOULD BE.

1    Q.    I WON'T TAKE THE TIME NOW.

2              WHERE WAS CLEO ROY'S CELL IN RELATION TO

3    MR. MILLS' CELL?

4    A.    CLEO WAS UPSTAIRS PROBABLY AROUND, I WOULD SAY MAYBE

5    AROUND 10 OR 11.

6    Q.    CLEO ROY IS A MEMBER OF THE ARYAN BROTHERHOOD?

7    A.    YES, SIR.

8    Q.    IS HE SENIOR?

9    A.    YES, SIR.

10   Q.    NOW -- WELL, WAS HE TRUSTED BY MR. MILLS?

11   A.    YES, SIR.

12   Q.    CLEO ROY WOULD TYPE DIFFERENT DRAFTS OF THIS DOCUMENT?

13   A.    YES, SIR.

14   Q.    DID HE HAVE A TYPEWRITER IN HIS CELL?

15   A.    NO.  HE DID IT IN THE LEGAL ROOM.

16   Q.    TELL US ABOUT THE LEGAL ROOM.  WHERE WAS THAT?

17   A.    WELL, THE FIRST -- THE FIRST CELL ON THE TOP RANGE WAS

18   THE LEGAL ROOM.  IT HAD SOME LEGAL BOOKS, TYPEWRITER, TYPING

19   PAPER.

20   Q.    AND SO YOU WOULD HAVE OCCASION TO BE OUT OF YOUR CELL

21   ON THE TOP FLOOR AND GO DOWN TO THE BOTTOM FLOOR TO BARRY

22   MILLS' CELL?

23   A.    YES, SIR.

24   Q.    AND HAVE DISCUSSIONS WITH HIM IN HIS CELL ABOUT THE

25   TOPICS CONTAINED IN THIS DOCUMENT?

1   A.    ALMOST EVERY DAY.

2   Q.    ALMOST EVERY DAY?

3   A.    YES, SIR.

4   Q.    AND FROM TIME TO TIME, HE WOULD ASK YOU TO TAKE THE

5   HANDWRITTEN DRAFT TO HAVE CLEO TYPE IT?

6   A.    YES, SIR.

7   Q.    AND CLEO WOULD, MR. ROY?

8   A.    YES, SIR.

9   Q.    DO YOU KNOW WHETHER CLEO ROY TYPED THIS VERY VERSION

10  THAT YOU ARE LOOKING AT?

11  A.    THERE IS NO WAY I COULD -- I KNOW -- I KNOW THAT HE

12  TYPED ONE EXTREMELY SIMILAR.  I CAN'T SAY THAT IT WAS THIS

13  ONE.

14  Q.    NOW, ARE YOU FAMILIAR WITH ANOTHER METHOD OF HAVING A

15  DOCUMENT TYPED --

16         LET ME ASK YOU THIS:  DO YOU RECALL EVER BARRY

17  MILLS OR OTHER MEMBERS OF THE ARYAN BROTHERHOOD THEN

18  INCARCERATED AT MARION SENDING HANDWRITTEN DOCUMENTS OR

19  OTHER DOCUMENTS OUT OF THE PRISON TO HAVE THEM TYPED BY

20  SOMEONE ON THE STREET AND THEN SEND THEM BACK IN?

21  A.    YES, SIR.

22  Q.    DID MR. MILLS DO THAT ON OCCASION?

23  A.    FAIRLY REGULAR.

24  Q.    AND HAVE YOU HAD AN OPPORTUNITY TO REVIEW THOROUGHLY,

25  IF NOT TODAY, EITHER TODAY OR ON OTHER OCCASIONS, THE

53

1    DOCUMENT THAT IS BEFORE YOU, EXHIBIT 1?

2    A.    YES, SIR, I HAVE.

3    Q.    AND IS IT YOUR TESTIMONY THAT THE TOPICS WITHIN THAT

4    DOCUMENT, ONE AND ALL, YOU DISCUSSED WITH MR. MILLS DURING

5    THE TIME FRAME THAT WE ARE DISCUSSING?

6    A.    YES, SIR.

7            MR. AKROTIRIANAKIS:  GOVERNMENT CONDITIONALLY

8    OFFERS EXHIBIT 1.

9            MR. GREEN:  WE WOULD OBJECT ON THE GROUNDS OF

10   AUTHENTICITY AND CHAIN OF CUSTODY.

11           THE COURT:  THE EXHIBIT IS ORDERED ADMITTED AT

12   THIS TIME SUBJECT TO FURTHER FOUNDATION BEING LAID.  YOU MAY

13   PUBLISH.

14       *(PLAINTIFF'S EXHIBIT 1 RECEIVED IN EVIDENCE.)*

15           MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

16           I TESTED, YOUR HONOR, THE DOCUMENT ON THE CAMERA

17   THIS MORNING, AND IT'S STILL UNABLE TO BE MADE OUT.  SO I

18   WOULD LIKE, WITH THE COURT'S PERMISSION, TO GIVE INDIVIDUAL

19   COPIES TO THE JURY WHILE I QUESTION ABOUT THE DOCUMENT?

20           THE COURT:  YOU MAY DO THAT.  THE CLERK WILL HAND

21   THEM OUT.

22       *(PAUSE.)*

23   BY MR. AKROTIRIANAKIS:

24   Q.    MR. WEST, THE DOCUMENT EXHIBIT 1 BEGINS WITH THE

25   STATEMENT, *THE COMMISSION HAS COLLECTIVELY ARRIVED AT SOME*

1   *MAJOR DECISIONS AND WE WOULD LIKE TO RESPECTIVELY SUBMIT*

2   *THEM TO THE MAJORITY WHICH IS HERE AT MARION.*

3              AT THE TIME OF THE DISCUSSIONS THAT YOU ARE

4   TESTIFYING TO IN THE SECOND HALF OF 1993 AND THEREAFTER, WAS

5   THE MAJORITY OF THE ARYAN BROTHERHOOD MEMBERSHIP AT MARION?

6   A.   YES, SIR.

7   Q.   AT THAT TIME, THAT WAS THE HIGHEST SECURITY

8   PENITENTIARY IN THE FEDERAL PRISON SYSTEM?

9   A.   YES, SIR.

10  Q.   BEGINNING WITH THE FIFTH LINE OF THE DOCUMENT, IT

11  READS -- WELL, I'LL READ THE NEXT SENTENCE.

12             *WE HAVE ARRIVED AT THESE DECISIONS AT THE URGING*

13  *OF MANY INDIVIDUALS FOR US TO TAKE THE REINS AND ESTABLISH*

14  *SOME AUTHORITY AND DIRECT ACCOUNTABILITY AS A MEANS TOWARD A*

15  *MORE PRODUCTIVE FUTURE FOR US ALL, AS MANY FEEL WE'VE BEEN*

16  *FLOUNDERING AS A GROUP AND THAT IT IS TIME FOR US TO ELEVATE*

17  *OUR GOALS WITHIN A MORE ORGANIZED FASHION.*

18             IS THAT A MATTER THAT BARRY MILLS DISCUSSED WITH

19  YOU?

20  A.   YES, SIR.

21  Q.   WAS IT IMPORTANT TO HIM?

22  A.   YES, SIR.

23  Q.   IT CONTINUES:  *THEREFORE OUR PRIMARY GOAL IS TO*

24  *TRANSFORM US FROM A DYSFUNCTIONAL PRISON GANG INTO A VIABLE*

25  *AND PRODUCTIVE CRIMINAL ORGANIZATION INSIDE PRISON AND ON*

1    *THE STREETS.* AND THEN IN THE PARENTHETICAL *(FUNCTIONING ON*

2    *THE STREETS IS OUR PARAMOUNT OBJECTIVE.)*

3              IS THAT SOMETHING THAT YOU AND MR. MILLS

4    DISCUSSED?

5    A.    YES, SIR.

6    Q.    WAS THIS A VISION HE HAD FOR THE ARYAN BROTHERHOOD?

7    A.    YES, SIR.

8    Q.    AND WAS, IN PART, THIS BASED ON ---DID HE TELL YOU THAT

9    IN PART THIS WAS BASED ON HIS DISCUSSIONS WITH JOHN GOTTI?

10   A.    YES, SIR.

11   Q.    DID HE DISCUSS WITH YOU AT ANY TIME TRYING TO HAVE THE

12   ARYAN BROTHERHOOD MORE EMULATE THE MAFIA?

13   A.    NOT SO MUCH EMULATE THEM, BUT HE -- LIKE I SAID, HE

14   THOUGHT WE WERE BETTER THAN THEY WERE, THAT WE COULD PRODUCE

15   MORE MONEY, THAT WE HAD MORE HEART THAN THEY HAD.  SO

16   BASICALLY WE COULD DO BETTER THAN THEY DID.

17   Q.    THE DOCUMENT CONTINUES: *THE PURPOSE OF THIS*

18   *ORGANIZATION* -- IS HE REFERRING TO THE ARYAN BROTHERHOOD?

19   A.    YES, SIR.

20   Q.    *THE PURPOSE OF THIS ORGANIZATION IS TO PROVIDE US WITH*

21   *MATERIAL AND MONETARY ASSETS THROUGH ILLEGAL AND LEGAL*

22   *ACTIVITIES.*

23              IS THAT SOMETHING THAT YOU AND MR. MILLS

24   DISCUSSED?

25   A.    YES, SIR.

1    Q.    WHAT WERE THE ILLEGAL ACTIVITIES?

2    A.    BANK ROBBERIES, DRUG SALES, BASICALLY ANY WAY TO MAKE

3    MONEY.

4    Q.    *IN THE PAST, THERE HAS BEEN TOO MUCH INDIVIDUALISM AND*

5    *LACK OF PERSONAL ACCOUNTABILITY, HENCE NO ASSETS NOR*

6    *MATERIAL GAINS.*

7            DID MR. MILLS FEEL THAT THE ARYAN BROTHERHOOD WAS

8    NOT PRODUCING ENOUGH MONEY?

9    A.    YES, SIR.

10   Q.    *THEREFORE WE FEEL THAT THIS ORGANIZATION MUST GOVERN*

11   *FROM THE CENTER WITH A STRUCTURE THAT PROTECTS AND*

12   *FACILITATES ITS BUSINESS AND OVERALL ADVANCEMENT, YET*

13   *REMAINS INCLUSIVE TO THE WHOLE,* AND THEN A PARENTHETICAL,

14   *(IN THAT IT MOTIVATES EACH INDIVIDUAL TO FUNCTION AND*

15   *ADVANCE IN ACCORDANCE WITH THEIR ABILITY AND PROVEN*

16   *PERFORMANCE WHILE ASSURING EACH INDIVIDUAL THAT WE ARE ONE,*

17   WHICH IS UNDERSCORED, *YET IMPOSING THE WILL AND DISCIPLINE*

18   *OF THE GROUP OVER ANY INDIVIDUAL.*"

19            IS THAT SOMETHING THAT YOU AND MR. MILLS

20   DISCUSSED?

21   A.    YES, SIR.

22   Q.    *TO BECOME FUNCTIONING ORGANIZATION DEMANDS THAT WE*

23   *IMPLEMENT A STRUCTURE AND THAT WE FUNCTION WITHIN A*

24   *DEPARTMENTALIZED METHOD.*

25            HAD YOU DISCUSSED DIFFERENT DEPARTMENTALIZATION

1    WITH MR. MILLS?

2    A.    YES, SIR.

3    Q.    *BUT IT IS IMPERATIVE THAT WE, AS A WHOLE, EXERCISE*

4    *EXTREME CAUTION IN MAINTAINING THE UNITY OF THE WHOLE AS WE*

5    *ALL ARE ONLY REPRESENTATIVES OF THAT WHOLE.  OUR VISION FOR*

6    *THIS CRIMINAL ORGANIZATION ENCOMPASSES THE FOLLOWING*

7    *STRUCTURE:  COMMISSION, COUNCIL, BUSINESSMEN, AND ENFORCERS.*

8             DID MR. MILLS DISCUSS WITH YOU THESE FOUR

9    DIFFERENT POSITIONS OR LEVELS WITHIN THE ORGANIZATION?

10   A.    YES, SIR.

11   Q.    WERE THE COUNCIL LEVEL AND BUSINESSMEN LEVEL ADDITIONS

12   TO THE THEN STRUCTURE OF THE ARYAN BROTHERHOOD?

13   A.    YES, SIR.

14   Q.    *COMMISSION:  ITS DUTIES ARE TO OVERSEE THE ORGANIZATION*

15   *IN THAT IT KEEPS THE ORGANIZATION FOCUSED AND FUNCTIONING ON*

16   *AN EXPANDING LEVEL.  IT INTERACTS DIRECTLY WITH THE COUNCIL.*

17   *A COMMISSION MEMBER CAN ONLY BE REMOVED OR PLACED ON THE*

18   *COMMISSION BY A MAJORITY VOTE OF THE COMMISSION AND COUNCIL*

19   *COMBINED.*

20            WHEN THE DOCUMENT REFERENCES "COMMISSION," IS THAT

21   SOMETHING THAT YOU AND MR. MILLS DISCUSSED?

22   A.    YES, SIR.

23   Q.    AND THE COMMISSION AT THAT TIME, AS THAT TERM IS USED

24   IN THIS DOCUMENT, WAS MILLS, BINGHAM, AND BENTON.

25   A.    YES, SIR.

```
 1   Q.   NOW, COUNCIL:  IT IS SELECTED BY THE COMMISSION.  ITS

 2   DUTIES ARE PRIMARILY TO IMPLEMENT THE PROGRAMS OF THE

 3   COMMISSION AND TO OVERSEE THE GENERAL AFFAIRS OF THE

 4   ORGANIZATION.

 5           DID YOU DISCUSS THE ROLE OR DUTIES OF A COUNCIL

 6   MEMBER WITH MR. MILLS DURING THE TIME THAT HE WAS DRAFTING

 7   THIS DOCUMENT?

 8   A.   YES, SIR.

 9   Q.   HAD MR. MILLS DISCUSSED WITH YOU THE POSSIBILITY OF

10   YOURSELF BECOMING A MEMBER OF THE COUNCIL?

11   A.   YES, SIR.

12   Q.   WHAT WAS THE DISCUSSION?

13   A.   SINCE WE KNEW I WAS GOING OUT TO LOMPOC, THERE WAS SOME

14   MATTERS OUT THERE THAT THEY WERE CONCERNED ABOUT SO THEY

15   REPLACED EDGAR AND HAD ME TAKE OVER THE SPOT AS COUNCIL OUT

16   THERE.

17   Q.   AS THE COUNCILOR FOR THE LOMPOC PENITENTIARY, WOULD IT

18   BE YOUR RESPONSIBILITY TO RUN THAT PENITENTIARY?

19   A.   YES, SIR.

20   Q.   WOULD YOU REMAIN ACCOUNTABLE, IN YOUR UNDERSTANDING, TO

21   THE COMMISSION?

22   A.   YES, SIR.

23   Q.   BUSINESSMEN:  THESE INDIVIDUALS ARE IDENTIFIED AND

24   MANAGED BY THE COUNCIL.  THEIR DUTIES ARE TO OPERATE THE

25   ORGANIZATION'S BUSINESS AND TO EARN MONEY FOR THE
```

1    *ORGANIZATION.*

2          DID YOU DISCUSS THAT WITH MR. MILLS?

3    A.   YES, SIR.

4    Q.   WERE THERE INDIVIDUALS WITHIN THE ARYAN BROTHERHOOD WHO

5    MILLS HAD IDENTIFIED AS BUSINESSMEN?

6    A.   YES, SIR.

7    Q.   AND WHEN HE USES THE TERM "BUSINESS" OR "BUSINESSMEN"

8    HERE, ARE WE TALKING ABOUT LEGAL BUSINESSES OR ILLEGAL

9    BUSINESSES?

10   A.   ILLEGAL.

11   Q.   OKAY.  WHAT TYPES OF ILLEGAL BUSINESSES ARE YOU

12   REFERRING TO?

13   A.   DRUGS, GAMBLING, WHATEVER WE WERE RUNNING IN THE PENS.

14   HE WAS REFERRING TO THE PEOPLE THAT COULD MAKE THE MONEY AT

15   THOSE BUSINESSES.

16   Q.   NOW, EARLIER YOU TESTIFIED THAT MARK NYQUIST WAS, FOR A

17   TIME, RUNNING THE DRUG-TRAFFICKING CONSPIRACY AT

18   LEAVENWORTH.

19   A.   YES, SIR.

20   Q.   IS THAT THE TYPE OF BUSINESSMEN THAT HE WAS REFERRING

21   TO?

22   A.   YES, SIR.

23   Q.   WHEN I SAY "HE," I MEAN BARRY MILLS.

24   A.   YES, SIR.

25   Q.   *ENFORCERS:  THESE ARE THE PRIMARY SOLDIERS AND THEY ARE*

1    *ALSO IDENTIFIED AND MANAGED BY THE COUNCIL.  THEIR DUTY IS*

2    *TO ENFORCE THE WILL AND AUTHORITY OF THE ORGANIZATION.*

3           DID YOU DISCUSS THAT ROLE WITH MR. MILLS?

4    A.   YES, SIR.

5    Q.   DID ARYAN BROTHERHOOD HAVE ENFORCERS?

6    A.   THAT'S WHEN WE STARTED PICKING UP THE DIRTY WHITE BOYS

7    AND ALL THE RIFFRAFF.

8    Q.   WHAT WAS THE PURPOSE OF PICKING UP THE DIRTY WHITE BOYS

9    AND SO ON, AS YOU MENTIONED?

10   A.   IF SOMEBODY NEEDED TO BE HIT, WE WOULD USE THEM WHICH

11   DIDN'T JEOPARDIZE THE BUSINESSMEN OR THE COUNCIL OR THE

12   COMMISSION.  THEY WOULDN'T HAVE TO DO THE -- THEY COULD STAY

13   DOING THEIR BUSINESS AND NOT WORRY ABOUT GOING TO THE

14   CONTROL UNIT FOR TWO OR THREE YEARS.

15   Q.   LEAVING THEM FREE TO CONDUCT BUSINESS?

16   A.   YES, SIR.

17   Q.   ILLEGAL BUSINESS?

18   A.   YES, SIR.

19   Q.   NOW, THAT STATEMENT, *THEIR DUTY IS TO ENFORCE THE WILL*

20   *AND AUTHORITY OF THE ORGANIZATION,* IS THE ABILITY TO ENFORCE

21   THE ARYAN BROTHERHOOD'S WILL AND AUTHORITY SOMETHING THAT IS

22   IMPORTANT IN PRISON?

23   A.   OH, DEFINITELY.

24   Q.   CAN YOU TELL US WHY, PLEASE?

25   A.   BECAUSE WHEN THE REST OF THE POPULATION FEARS US, THEY

1    DO WHAT WE WANT.

2    Q.    HOW DOES THAT WORK OUT FOR THE ARYAN BROTHERHOOD?

3    A.    QUITE WELL.

4    Q.    NOW, WHEN HE WRITES HERE *ENFORCE THE WILL AND AUTHORITY*

5    *OF THE ORGANIZATION,* DID YOU DISCUSS SPECIFICALLY THAT TOPIC

6    WITH MR. MILLS?

7    A.    YES, SIR.

8    Q.    DID YOU DISCUSS WITH HIM WHETHER HE MEANT TO ENFORCE

9    THE WILL AND AUTHORITY OF THE ORGANIZATION THROUGH MURDER?

10   A.    YES, SIR.

11   Q.    THREATS OF MURDER?

12   A.    YES, SIR.

13   Q.    ASSAULT?

14   A.    YES, SIR.

15   Q.    OTHER ACTS OF VIOLENCE?

16   A.    YES, SIR.

17   Q.    IN THE DOCUMENT, MILLS GOES ON TO DESCRIBE THE RULES OF

18   THE COUNCIL AND SO ON.

19          IS THAT CONSISTENT WITH WHAT YOU HAVE ALREADY

20   TESTIFIED TO?

21   A.    YES, SIR.

22   Q.    ABOUT FOUR LINES DOWN FROM THE SECTION WHERE HE DEFINES

23   THE DIFFERENT ROLES, IN THE MIDDLE OF THE LINE THAT BEGINS,

24   *EACH PRISON WILL ESTABLISH AND MAINTAIN A FUNCTIONING BANK,*

25   WAS THAT SOMETHING THAT WAS IMPORTANT TO MILLS?

1    A.    YES, SIR.

2    Q.    WHY IS THAT?

3    A.    SO WE WOULD HAVE A CONSTANT FLOW OF MONEY, WHERE

4    ANYBODY GETTING OUT WOULD HAVE MONEY TO SET UP SO THEY COULD

5    GO STRAIGHT INTO BUSINESS.

6    Q.    *EACH PRISON WILL ESTABLISH AND MAINTAIN GAMBLING AND*

7    *DRUG SALES.  THIS IS TO BELONG TO THE ORGANIZATION.*

8            WAS THAT ALREADY ONGOING AT THE TIME?

9    A.    YES, SIR.

10   Q.    AND DID IT CONTINUE?

11   A.    YES, SIR.

12   Q.    DID IT CONTINUE AT LEAVENWORTH, TO YOUR KNOWLEDGE,

13   BASED ON YOUR DISCUSSIONS THAT YOU TESTIFIED TO?

14   A.    YES, SIR.

15   Q.    AND WHEN YOU WENT OUT TO LOMPOC, DID IT CONTINUE THERE

16   AS WELL?

17   A.    YES, SIR.

18   Q.    *EACH PRISON WILL ESTABLISH AND MAINTAIN A WELFARE FUND*

19   *FOR ALL FELLOW SLAM.*

20            WHAT DID MR. MILLS TELL YOU THAT THAT MEANT?

21   A.    IT MEANT ANYBODY THAT WAS IN THE HOLE IN ANY PRISON

22   WOULD GET A FULL CANTEEN DRAW.

23   Q.    AND WOULD THAT FULL CANTEEN DRAW BE BASED ON THE

24   POOLING OF THE RESOURCES ILLEGALLY OBTAINED THROUGH DRUG

25   TRAFFICKING AND THE OTHER ITEMS YOU HAVE TESTIFIED TO?

1    A.    YES, SIR.

2    Q.    OKAY.  FURTHER BELOW THERE IS A SECTION THAT BEGINS,

3    *NEW FELLAS.  IT'S ABOUT SLIGHTLY LOWER THAN HALFWAY DOWN THE*

4    PAGE.

5              DO YOU SEE THAT?

6    A.    YES, SIR.

7    Q.    *NEW FELLAS.  UP FOR A MINIMUM OF ONE YEAR.  MORE*

8    *EXTENSIVE HISTORY CHECKS.*

9              WHAT DOES "NEW FELLAS" REFER TO?

10   A.    ANYBODY THAT BEING PUT UP WOULD GET INTO THE BRAND.

11   Q.    AND THEN A FEW SENTENCES BEYOND THAT, ACTUALLY THE

12   FIFTH LINE OF THE "NEW FELLAS" SECTION:  *NO NEW FELLA CAN*

13   *BECOME A BROTHER EXCEPT THROUGH AN ADMINISTERED OATH BY*

14   *SOMEONE ON THE COMMISSION OR COUNCIL, BE IT ONE YEAR OR*

15   *10 YEARS THAT SOMEONE IS UP.  NO ONE CAN BECOME A BROTHER*

16   *UNTIL HE CROSSES PATHS WITH SOMEONE ON THE COMMISSION OR*

17   *COUNCIL AND AN OATH IS ADMINISTERED.*

18              IS THIS THE OATH THAT YOU WERE -- THE IDEA OF THE

19   OATH THAT WAS BEING DISCUSSED AT THE TIME?

20   A.    YES, SIR.

21   Q.    AND THAT WAS SOMETHING THAT WAS IMPORTANT TO MR. MILLS?

22   A.    YES, SIR.

23   Q.    *WHILE A NEW FELLA IS UP, INTERNAL AFFAIRS OR BUSINESS*

24   *IS NOT TO BE DISCUSSED OR DISCLOSED.*

25              DID YOU DISCUSS THAT WITH MR. MILLS?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1    A.    YES, SIR.

 2    Q.    DID THIS KEEPING -- OR NOT LETTING A PROBATIONARY

 3    MEMBER OF THE ARYAN BROTHERHOOD IN ON THE FULL STORY

 4    SOMETHING THAT WAS IMPORTANT TO HIM?

 5    A.    THE MAIN CONCERN WAS THAT THEY DIDN'T GET RONNIE

 6    SLOCUM'S NAME.

 7    Q.    AND WHY IS THAT?

 8    A.    BECAUSE HE WAS SO IMPORTANT TO US BEING ON THE STREET.

 9    Q.    AND WHY WOULD GIVING HIS NAME TO A PROBATIONARY MEMBER

10    OF THE ARYAN BROTHERHOOD BE A BAD THING?

11    A.    IF THEY DIDN'T WORK OUT, THEY'D CONTACT HIM WITHOUT

12    USING ANY PRECAUTION, JEOPARDIZING HIS FREEDOM.  BECAUSE HE

13    DID A LOT FOR US OUT THERE.

14    Q.    AND WOULD THE JEOPARDY OF HIS FREEDOM CREATE A PROBLEM

15    FOR THE ARYAN BROTHERHOOD?

16    A.    OH, DEFINITELY.

17    Q.    WOULD IT CUT OFF SOME OF THE MONEY FLOW THAT YOU

18    TESTIFIED TO?

19    A.    A GOOD DEAL OF IT.

20    Q.    ONCE A NEW FELLA HAS BECOME A BROTHER, HE CANNOT PUT

21    SOMEONE UP FOR A PERIOD OF THREE YEARS.  WE HAVE SHORTENED

22    THE OATH TO SIMPLY, 'THE AB ASKS FOR YOUR MIND, HEART, AND

23    LIFE.  DO YOU GIVE US THAT?' THE NEW FELLA SHOULD RESPOND

24    WITH, 'I PLEDGE MY MIND, HEART AND LIFE TO THE AB.'

25          AFTER SOMEONE BECOMES AN ARYAN BROTHERHOOD MEMBER,
```

65

```
1   ARE THEY ENTITLED TO THE PRIVILEGES AND THE ADVANTAGES THAT
2   YOU PREVIOUSLY TESTIFIED TO?
3   A.   YES, SIR.
4   Q.   HE SHOULD THEN BE WELCOMED AND EMBRACED AS A BROTHER
5   AND EVERYONE SHOULD BE INFORMED THAT HE IS NOW A BROTHER.
6         UPON THAT, WOULD THAT PERSON THEN OBTAIN THEIR --
7   A.   YES, SIR.
8   Q.   FURTHER DOWN, IT READS:  THE COMMISSION HAS DECIDED TO
9   INITIALLY SELECT A FIVE-MEMBER COUNCIL, THAT THIS COUNCIL
10  WILL EXPAND AS THE NEED ARISES AND AS THE INDIVIDUALS REVEAL
11  THEMSELVES AS MANAGERS AND MOTIVATORS.
12        DID YOU AND MR. MILLS DISCUSS THE TOPIC OF HOW
13  MANY PEOPLE SHOULD BE ON THE COUNCIL?
14  A.   YES, SIR.
15  Q.   HOW DID YOU ARRIVE AT THE NUMBER FIVE?  OR HOW DID HE
16  ARRIVE AT THE NUMBER FIVE?
17  A.   THAT'S ALL -- THAT WAS THE PEOPLE THAT HE COULD FIGURE
18  OUT AT THAT TIME FOR THE PENITENTIARIES THAT WE WERE IN.
19  Q.   THIS SELECTION PROCESS WILL BE CONDUCTED BY PUTTING
20  THESE INDIVIDUALS IN CHARGE ON A TRIAL BASIS AND THEN
21  JUDGING THEIR OVERALL PERFORMANCE AND ABILITY AS TO WHETHER
22  THEY MERIT A COUNCIL POSITION.  THESE FIVE INDIVIDUALS ARE
23  SLO, PHIL, SPEEDY, WAYNE, AND CLEO.
24        AND SLO IS SPELLED S-L-O.
25        SPEEDY, IS THAT YOU?
```

66

1    A.    YES, SIR.

2    Q.    *SPEEDY HAS BEEN PLACED IN CHARGE OF LOMPOC, AND CLEO IS*

3    *IN CHARGE OF MARION.*

4            WHO IS CLEO?

5    A.    CLEO ROY.

6    Q.    *WAYNE WILL BE GIVEN A SPOT WHEN HE LEAVES.*

7            WHO IS WAYNE?

8    A.    WAYNE BRIDGEWATER.

9    Q.    HE'S ANOTHER ARYAN BROTHERHOOD MEMBER?

10   A.    YES, SIR.

11   Q.    WAS HE ULTIMATELY GIVEN A SPOT?

12   A.    I BELIEVE SO, LEWISBURG.

13   Q.    *PHIL IN MASS AND SLO ON THE STREETS.*

14            WHO IS SLO?

15   A.    RONNIE SLOCUM.

16   Q.    AND WHO IS PHIL?

17   A.    PHIL MYERS.

18   Q.    WAS PHIL MYERS THEN INCARCERATED OR NOT INCARCERATED?

19   A.    THIS WAS RIGHT AROUND THE TIME THAT HE GOT OUT SO I'M

20   NOT SURE IF HE WAS STILL IN OR HAD JUST GOTTEN OUT.

21   Q.    DID YOU KNOW PHIL MYERS?

22   A.    YES, SIR.

23   Q.    WAS HE AN ARYAN BROTHERHOOD MEMBER?

24   A.    YES, SIR.

25   Q.    WAS HE FROM MASSACHUSETTS?

1    A.    YES, SIR.

2    Q.    *THERE WILL BE OTHERS AS WE MOVE FORWARD.*

3          WERE THERE ULTIMATELY ADDITIONAL MEMBERS ADDED TO

4    THE COUNCIL?

5    A.    IT WAS CHANGED.  YOU HAD ONE COUNCIL MEMBER FOR EACH

6    PENITENTIARY.  SO IF WE ENDED UP IN ANOTHER PENITENTIARY,

7    THEY WOULD MAKE SOMEONE THERE COUNCIL, YES.

8    Q.    *ALL POSITIONS OF AUTHORITY ARE ONLY REPRESENTATIVES OF*

9    *THE WHOLE, AND WHILE THEIR JOB AND RESPONSIBILITY IS TO*

10   *ADVANCE THE ORGANIZATION, WE ARE ONE.  IF WE ARE GOING TO BE*

11   *SUCCESSFUL, WE ALL ARE GOING TO HAVE TO FIND OUR OWN NICHE*

12   *AND WORK WITHIN IT.  IT IS NOT ABOUT EGOS.  IT IS ABOUT US*

13   *SETTING HIGHER GOALS AND ACHIEVING SOME SUBSTANTIVE TRUTH*

14   *FROM OUR COLLECTIVE LABOR.*

15         DID YOU DISCUSS THAT IDEA WITH MR. MILLS?

16   A.    YES, SIR.

17   Q.    WHAT DID HE SAY?

18   A.    WELL, BASICALLY HE WAS TIRED -- I MEAN, WE WERE ALL

19   RUNNING AROUND SHOOTING A LOT OF THE PROFITS INTO OUR OWN

20   ARMS INSTEAD OF FUNNELING MONEY BACK INTO IT, AND HE WANTED

21   TO STOP ALL THAT AND MAKE IT MORE OF A BUSINESS LINE.

22   Q.    *WE ARE DESERVING OF BEING MORE THAN JUST A BROKE*

23   *DYSFUNCTIONAL JAILHOUSE BULLIES.*

24         IS THAT SOMETHING THAT YOU AND MR. MILLS

25   DISCUSSED?

1    A.    YES, SIR.

2    Q.    *THIS IS ABOUT US BECOMING THE VERY BEST POSSIBLE*

3    *CRIMINAL ORGANIZATION.*

4    A.    YES, SIR.

5    Q.    IS THAT SOMETHING YOU DISCUSSED WITH HIM?

6    A.    YES, SIR.

7    Q.    WHAT DID HE SAY?

8    A.    LIKE I SAID BEFORE, THAT WE WERE BETTER THAN THE MAFIA

9    SO IF THEY COULD MANAGE TO GET WHAT THEY GOT, WE SHOULD BE

10   ABLE TO DOUBLE IT.

11   Q.    WAS THERE ANY AMBIGUITY AT ALL IN WHAT MR. MILLS WAS

12   TELLING YOU ABOUT THE CRIMINAL NATURE OF THE ORGANIZATION

13   THAT HE ENVISIONED?

14   A.    NO, SIR.

15   Q.    AND THEN AT THE VERY BOTTOM, IT SAYS, "THIS," AND THEN

16   THERE IS A HANDWRITTEN PART, *PROGRAM IS A MAJOR CHANGE AND*

17   *WE DO NOT MEAN TO SUGGEST THAT WE* ARE -- *THAT WE POSSESS ALL*

18   *THE ABSOLUTE ANSWERS AT THIS MOMENT.  SO IT MAY BE NECESSARY*

19   *TO MAKE CHANGES AS THE NEED REVEALS ITSELF.  BUT WE DO*

20   *ABSOLUTELY BELIEVE THAT THIS IS A* MORE -- *A MOVE IN THE*

21   *RIGHT DIRECTION AND THAT IT WILL BE MUCH MORE PRODUCTIVE, SO*

22   *WE RESPECTFULLY ASK THAT YOU EACH EMBRACE THIS AND ASSIST US*

23   *IN BRINGING IT ABOUT.*

24          THEN IT SAYS, *CA. HAS ALREADY MOVED IN THIS*

25   *DIRECTION.*

69

```
1              IS THAT SOMETHING YOU DISCUSSED WITH MR. MILLS?
2    A.    YES, SIR.
3    Q.    IS THE "CA." THERE A REFERENCE TO CALIFORNIA?
4    A.    YES, SIR.
5    Q.    IS THAT THE CALIFORNIA FACTION OF THE ARYAN
6    BROTHERHOOD?
7    A.    YES, SIR.
8    Q.    WHAT DID MR. MILLS SAYS ABOUT CALIFORNIA HAS ALREADY
9    MOVED IN THIS DIRECTION?
10   A.    HE SAID THEY WERE ALREADY -- THEY HAD ALREADY SET UP
11   THE COUNCIL AND THE COMMISSION AND THEY WERE HEADING TOWARDS
12   MORE ORGANIZATION, AND THAT'S WHY HE WANTED TO BRING US INTO
13   IT.
14   Q.    WE WOULD LIKE TO HEAR FROM EACH OF -- FROM YOU EACH
15   WHETHER YOU PERSONALLY CAN AND ARE WILLING TO GET BEHIND
16   THIS PROGRAM 100 PERCENT.
17             DID MR. MILLS DISCUSS THAT WITH YOU?
18   A.    YES, SIR.
19   Q.    AND DID HE ASK YOU OR OTHER ARYAN BROTHERHOOD MEMBERS
20   WHAT YOU THOUGHT OF THE IDEAS CONTAINED IN EXHIBIT 1?
21   A.    YES, SIR.
22   Q.    WAS EVERYBODY IN FAVOR OF IT?
23   A.    FOR THE MOST PART, YES, SIR.
24   Q.    WERE THEY IN FAVOR OF THE GOALS OF MAKING MORE MONEY?
25   A.    YES, SIR.
```

1    Q.    NOTWITHSTANDING THE IDEA OF BEING A CRIMINAL

2    ORGANIZATION?

3    A.    YES, SIR.

4    Q.    WAS THE GROUP COLLECTIVELY BEHIND THAT IDEA?

5    A.    YES, SIR.

6    Q.    AND BY "THAT IDEA," I MEAN BECOMING THE VERY BEST

7    POSSIBLE CRIMINAL ORGANIZATION?

8    A.    YES, SIR.

9    Q.    DURING THE TIME THAT YOU WERE AT MARION, WAS THERE ANY

10   AMBIGUITY IN THE MIND OF ANY OF THE ARYAN BROTHERHOOD

11   MEMBERS ABOUT THIS BEING A CRIMINAL ORGANIZATION?

12          MR. GREEN:  JUDGE, I OBJECT TO THE LACK OF

13   FOUNDATION.  SPECULATION.

14          THE COURT:  OVERRULED.  YOU MAY ANSWER.

15          THE WITNESS:  YES, SIR.

16   BY MR. AKROTIRIANAKIS:

17   Q.    THERE WAS AMBIGUITY?

18   A.    NO, NO, THERE WAS NONE.

19   Q.    NOW, I WANT TO MOVE ON TO SOME OF THE SPECIFIC CHARGES

20   IN THIS CASE.

21          DO YOU KNOW OR KNOW OF TWO FORMER MARION INMATES

22   NAMED JOEL BURKETT AND JIMMY LEE INMAN?

23   A.    YES, SIR.

24   Q.    ARE YOU AWARE WHETHER JOEL BURKETT WAS, IN THE 1992

25   TIME FRAME, ASSAULTED WHILE AT MARION?

1    A.    YES, SIR.

2    Q.    SAME QUESTION AS TO JIMMY LEE INMAN IN THE 1993 TIME

3    FRAME?

4    A.    YES, SIR.

5    Q.    HOW DO YOU KNOW OF THOSE ASSAULTS?

6    A.    WELL, WORD HAD COME DOWN FROM CALIFORNIA THAT THEY WERE

7    TO BE HIT.

8    Q.    EXCUSE ME, MR. WEST.  I HAVE TO ASK YOU A LEAD-UP

9    QUESTION.

10         HOW IS IT THAT YOU KNOW ABOUT THESE THINGS THAT

11    YOU ARE ABOUT TO TELL US?

12    A.    BARRY MILLS TOLD ME.

13    Q.    DID BARRY MILLS TELL YOU THIS IN THE SAME TIME FRAME

14    THAT YOU WERE HAVING THE DISCUSSIONS ABOUT EXHIBIT 1 THAT

15    YOU'VE ALREADY SHARED WITH US?

16    A.    I BELIEVE IT WAS A LITTLE BIT EARLIER.

17    Q.    AND YOU WERE HOUSED WITH MR. MILLS AT THAT TIME?

18    A.    YES, SIR.

19    Q.    AT MARION?

20    A.    YES, SIR.

21    Q.    AND WERE YOU HOUSED -- IN THE TIME THAT YOU'RE HAVING

22    THE DISCUSSIONS ABOUT INMAN AND BURKETT, WERE YOU ON THE

23    SAME UNIT WITH MR. MILLS AT THAT TIME?

24    A.    I DON'T RECALL.

25    Q.    DO YOU RECALL FROM YOUR TIME AT MARION WHETHER YOU

1    WOULD BE ABLE TO COMMUNICATE WITH MR. MILLS AN ORAL OR

2    VERBAL CONVERSATION EVEN IF YOU WERE NOT IN THE SAME UNIT

3    BUT IN THE UNIT NEXT DOOR?

4    A.    YES, SIR.

5    Q.    OKAY.  HOW WOULD YOU ACCOMPLISH THAT?

6    A.    WELL, I WAS IN B UNIT.  WHEN HE WOULD SAY HE WAS IN

7    B UNIT OR C UNIT, HE WOULD GO OUT TO THE YARD, AND FROM THE

8    YARD, YOU COULD TALK RIGHT INTO THE WINDOWS OF B UNIT WHERE

9    I WAS.

10   Q.    WHAT WAS THE DISTANCE FROM THE WINDOW WHERE YOU COULD

11   BE AND ON THE YARD WHERE HE WAS?

12   A.    MAYBE 20, 30 FEET.

13   Q.    SO ABOUT HOW WE ARE NOW?

14   A.    YES, SIR.

15   Q.    INDICATING THE DISTANCE, FOR THE RECORD, THE DISTANCE

16   BETWEEN THE LECTERN AND THE WITNESS STAND.

17        NOW, WHAT DID MR. MILLS TELL YOU ABOUT THE ASSAULT

18   UPON JOEL BURKETT AND THE -- IN 1992 AND THE 1993 ASSAULT

19   UPON JIMMY LEE INMAN?

20   A.    THAT THE CALIFORNIA FACTION HAD SENT WORD OVER THAT

21   THEY WANTED HIM HIT AND SO WE HAD TO TAKE CARE OF IT.

22   Q.    NOW, THIS WAS ACTUALLY BEFORE THE ASSAULTS THEMSELVES

23   OCCURRED; RIGHT?

24   A.    YES, SIR.

25   Q.    YOU WERE AT MARION AT THAT TIME?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    A.   YES, SIR.

2    Q.   AND THAT WAS IN 1990 AND 1991?

3    A.   SOMEWHERE AROUND THERE, YES, SIR.

4         MR. AKROTIRIANAKIS:  I PUT, WITH THE COURT'S

5    PERMISSION, PAGE 6 OF YOUR INMATE QUARTERS HISTORY,

6    EXHIBIT 319 ON THE DOCUMENT CAMERA.

7    BY MR. AKROTIRIANAKIS:

8    Q.   DO YOU SEE THE REFERENCE TO MARION HERE ON THE VERY

9    BOTTOM?

10   A.   YES, SIR.

11   Q.   AND IT SHOWS THAT YOU WERE INCARCERATED AT MARION IN

12   1990 AND 1991?

13   A.   YES, SIR.

14   Q.   LIKEWISE, TURNING TO THE NEXT PAGE, THAT YOU WERE

15   INCARCERATED AT MARION FROM ACTUALLY ABOUT THE MIDDLE OF

16   1989?

17   A.   YES, SIR.

18   Q.   OKAY.  SO WAS IT IN THIS TIME FRAME THAT YOU WERE

19   HAVING THE DISCUSSIONS WITH MR. MILLS ABOUT THE NEED TO

20   ASSAULT BURKETT AND INMAN?

21   A.   YES, SIR.

22   Q.   AND HE TOLD YOU THAT THE CALIFORNIA ARYAN BROTHERHOOD

23   HAD ORDERED THAT THEY BE HIT?

24   A.   YES, SIR.

25   Q.   WAS THAT SOMETHING THAT THE FEDERAL ARYAN BROTHERHOOD

1   WOULD TYPICALLY DO, CARRY OUT A HIT FOR THE CALIFORNIA ARYAN

2   BROTHERHOOD?

3   A.   DEFINITELY.

4   Q.   WHAT DID YOU DO, IF ANYTHING, WITH THE INFORMATION --

5        WELL, LET ME FIRST ASK YOU:  WAS ANYBODY ELSE

6   PRESENT DURING THESE DISCUSSIONS YOU WERE HAVING WITH MILLS?

7   A.   YEAH.  I BELIEVE IT WAS EDGAR HEVLE AND POSSIBLY DALLAS

8   SCOTT.

9   Q.   WHAT DID YOU DO WITH THE INFORMATION THAT MILLS GAVE

10  YOU?

11  A.   SPREAD IT AROUND.  EVERYBODY THAT CAME OUT TO REC, WE

12  INFORMED THEM OF WHAT WAS GOING ON.

13  Q.   ARE YOU FAMILIAR WITH AN ARYAN BROTHERHOOD MEMBER NAMED

14  LAWRENCE KLAKER?

15  A.   YES, SIR.

16  Q.   SOMETIMES GOES BY MIKE KLAKER?

17  A.   YES, SIR.

18  Q.   HOW DID YOU KNOW HIM, AS LAWRENCE OR MIKE?

19  A.   MIKE.

20  Q.   HIS NAME IS REALLY LAWRENCE, THOUGH?

21  A.   I GUESS.  I KNOW HIM AS MIKE KLAKER.

22  Q.   DID YOU TELL MIKE KLAKER?

23  A.   YES, SIR.

24  Q.   WERE HEVLE AND SCOTT PRESENT WITH YOU WHEN YOU TOLD

25  KLAKER?

```
 1   A.   I BELIEVE BOTH OF THEM WERE, YES, SIR.

 2          MR. AKROTIRIANAKIS:  I WANT TO MOVE ON TO A LITTLE

 3   BIT OF A DIFFERENT AREA.  IF I CAN -- YOUR HONOR, THE

 4   GOVERNMENT OFFERS EXHIBIT 73 UPON A STIPULATION WITH

 5   COUNSEL.

 6          THE COURT:  EXHIBIT 73 IS ORDERED ADMITTED.  YOU

 7   MAY PUBLISH.

 8     (PLAINTIFF'S EXHIBIT 73 RECEIVED IN EVIDENCE.)

 9          MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

10   BY MR. AKROTIRIANAKIS:

11   Q.   DO YOU RECOGNIZE THIS PERSON, MR. WEST?

12   A.   YES, SIR.

13   Q.   AND WHO IS IT?

14   A.   JOHN GOTTI.

15   Q.   WERE YOU INCARCERATED WITH JOHN GOTTI AT THE TIME THAT

16   YOU WERE AT MARION IN OR ABOUT 1996?

17   A.   YES, SIR.

18   Q.   WERE YOU ON THE SAME UNIT WITH HIM?

19   A.   YES, SIR.

20   Q.   SO BEING ON THE SAME UNIT WITH HIM, WOULD YOU GO OUT TO

21   OUTDOOR REC TOGETHER WITH MR. GOTTI AND EVERYBODY ELSE IN

22   THE UNIT?

23   A.   YES, SIR.

24   Q.   AND I BELIEVE YOU TESTIFIED YESTERDAY THAT OUTDOOR REC

25   WOULD BE ONE HOUR PER WEEK?
```

```
 1   A.   YES, SIR.

 2   Q.   DO YOU RECALL AN OCCASION AT OUTDOOR REC WHEN MR. GOTTI

 3   WAS ASSAULTED?

 4   A.   YES, SIR.

 5   Q.   DO YOU RECALL --

 6            WELL, LET ME ASK YOU THIS:  DO YOU RECALL EXACTLY

 7   WHEN THAT WAS IN 1996?

 8   A.   NO, I DON'T.

 9   Q.   DID YOU WITNESS PERSONALLY THE ASSAULT?

10   A.   NO, SIR, I DIDN'T.

11   Q.   DID YOU SEE MR. GOTTI IMMEDIATELY AFTER THE ASSAULT?

12   A.   YES, SIR.

13   Q.   AND DID HE LOOK LIKE IN EXHIBIT 73 HERE WITH THE BLOOD

14   ON THE FOREHEAD AND SO ON?

15   A.   YES, SIR.

16   Q.   NOW, DID YOU SEE MR. GOTTI RIGHT AFTER IT HAPPENED?

17   A.   YES, SIR.

18   Q.   LIKE HOW LONG, IF YOU KNOW?

19   A.   PROBABLY FIVE TO SIX MINUTES.

20   Q.   WAS, AT THAT TIME, MR. GOTTI STILL UNDER THE EXCITEMENT

21   OF HAVING BEEN IN A FIGHT OR AN ASSAULT?

22   A.   YES.  PRETTY MUCH.

23   Q.   DID HE SAY ANYTHING TO YOU?

24   A.   NO.  THEY JUST WALKED HIM BY.

25   Q.   DID YOU LATER HAVE CONVERSATION WITH MR. GOTTI --
```

```
 1   A.   YES, SIR.

 2   Q.   -- ABOUT THE ASSAULT?

 3   A.   YES, SIR.

 4   Q.   AND DID MR. GOTTI MAKE A REQUEST OF YOU ON BEHALF OF

 5   THE ARYAN BROTHERHOOD?

 6   A.   YES, SIR.

 7   Q.   WHAT DID HE ASK?

 8   A.   HE WANTED US TO KILL THE BLACK GUY THAT HAD HIT HIM.

 9   Q.   DO YOU KNOW WHO THE BLACK GUY WHO HAD HIT HIM WAS?

10   A.   I DON'T REMEMBER THE NAME OFFHAND.

11   Q.   AT THE TIME, DID GOTTI TELL YOU THE IDENTITY OF THIS

12   PERSON?

13   A.   YES, SIR.

14   Q.   AND WHAT IS IT THAT HE WANTED YOU TO DO TO HIM?

15   A.   KILL HIM.

16   Q.   WHAT WORDS -- WELL, DID HE OFFER ANY REWARD FOR KILLING

17   THIS PERSON?

18   A.   YES, SIR.

19   Q.   WAS IT SUBSTANTIAL?

20   A.   YES, SIR.

21   Q.   DO YOU REMEMBER THE AMOUNT?

22   A.   ONE MILLION DOLLARS.

23   Q.   DID IT SEEM LIKE A LOT OF MONEY TO DO A HIT?

24   A.   YES, SIR.

25   Q.   WAS HE -- DO YOU KNOW WHETHER HE WAS SERIOUS ABOUT THAT
```

1    PARTICULAR AMOUNT OF MONEY?

2    A.   HE WOULD HAVE HAD TO HAVE BEEN, BECAUSE IF WE'D DONE

3    IT, HE KNEW HE WOULD HAVE TO PAY IT.

4    Q.   NOW, IN THE 1995-1996 TIME FRAME, YOU WERE AT MARION?

5    A.   YES, SIR.

6    Q.   HOW MANY ARYAN BROTHERHOOD MEMBERS WERE AT MARION AT

7    THAT TIME?

8    A.   IN '95, '96?  I THINK THAT'S WHEN IT WAS DOWN TO JUST

9    THE THREE OF US.

10   Q.   AND THE THREE OF YOU BEING YOURSELF AND WHO ELSE?

11   A.   MC ELHINEY AND SAHAKIAN.

12   Q.   DID YOU HAVE ANY CONVERSATION EITHER WITH MICHAEL

13   MC ELHINEY OR THE DEFENDANT, DAVID SAHAKIAN, ABOUT THIS

14   CONVERSATION WITH GOTTI ABOUT KILLING THIS BLACK INMATE WHO

15   HAD ASSAULTED HIM?

16   A.   I GOT SEVERAL KITES FROM HIM.

17   Q.   FROM WHO?

18   A.   FROM -- I BELIEVE MC ELHINEY WROTE THEM.

19   Q.   AND AT THAT TIME, WERE YOU AND MC ELHINEY HOUSED IN THE

20   SAME UNIT?

21   A.   NO, SIR.

22   Q.   AT THAT TIME, WERE YOU AND THE DEFENDANT, DAVID

23   SAHAKIAN, HOUSED IN THE SAME UNIT?

24   A.   NO, SIR.

25   Q.   DO YOU KNOW WHETHER, AT THAT TIME, THE DEFENDANT, DAVID

```
 1   SAHAKIAN, AND MICHAEL MC ELHINEY WERE HOUSED TOGETHER ON THE
 2   SAME UNIT?
 3   A.   I BELIEVE THEY WERE.
 4           MR. GREEN:  JUDGE, I'M JUST GOING TO OBJECT,
 5   SPECULATION.
 6           THE COURT:  SUSTAINED.
 7           IS THAT A MOTION TO STRIKE?
 8           MR. GREEN:  YES, JUDGE.
 9           THE COURT:  THE MOTION TO STRIKE IS GRANTED.  THAT
10   MEANS, LADIES AND GENTLEMEN, THAT YOU ARE TO DISREGARD THE
11   WITNESS' ANSWER TO THE LAST QUESTION.
12   BY MR. AKROTIRIANAKIS:
13   Q.   IN THE -- YOU INDICATED THAT MICHAEL MC ELHINEY HAD
14   SENT YOU SEVERAL KITES.
15   A.   YES, SIR.
16   Q.   DID THOSE KITES DISCUSS ARYAN BROTHERHOOD BUSINESS?
17   A.   YES, SIR.
18   Q.   INCLUDING CRIMINAL ACTIVITY?
19   A.   YES, SIR.
20   Q.   OKAY.  DID THAT CRIMINAL ACTIVITY INCLUDE A
21   MURDER-FOR-HIRE CONTRACT BETWEEN THE ARYAN BROTHERHOOD AND
22   JOHN GOTTI?
23   A.   YES, SIR.
24   Q.   NOW, DID IT INCLUDE OTHER CRIMINAL ACTIVITY DISCUSSION?
25   A.   NOT REALLY.
```

Q.   WERE YOU ABLE TO, IN RELATION TO WHERE YOU WERE VERSUS

WHERE MC ELHINEY WAS, ABLE TO HAVE A VERBAL CONVERSATION IN

THE METHOD THAT YOU PREVIOUSLY DESCRIBED THAT YOU HAD HAD

WITH MR. MILLS?

A.   YEAH.  BUT IT WAS -- YOU HAD TO SCREAM.  IT WAS QUITE A

BIT FURTHER AWAY.

Q.   HOW MANY UNITS AWAY WAS IT?

A.   WE WERE ON THE YARD.  YOU HAD THE UNICOR UNIT, AND THEN

HE WAS IN THE NEXT UNIT OVER.

Q.   OKAY.  LET ME CONTINUE ON WHILE WE WILL LOOK FOR THIS.

         AND DID THE SCREAMING DISCUSSIONS THAT YOU HAD

WITH MC ELHINEY INCLUDE DISCUSSION OF THIS MURDER-FOR-HIRE

CONTRACT FOR JOHN GOTTI?

A.   NO.  THAT WAS MOSTLY THROUGH THE KITE.

Q.   OKAY.  WOULD YOU DISCUSS OTHER CRIMINAL ACTIVITY WITH

MC ELHINEY YELLING BACK AND FORTH?

A.   YEAH.  AT ONE TIME, HE WANTED ME TO KILL THE BLACK GUY

THAT WAS IN MY UNIT.

         THE COURT:  MR. AKROTIRIANAKIS, HOW MUCH LONGER DO

YOU THINK YOU HAVE I?

         MR. AKROTIRIANAKIS:  MAYBE 10 MORE MINUTES AT THE

MOST.

         THE COURT:  WELL, WE WILL RECESS.  WE WILL TAKE A

SHORT RECESS.  AND WE WILL BE IN RECESS FOR 15 MINUTES,

LADIES AND GENTLEMEN.  BY THE COURTROOM CLOCK, THAT WOULD

```
 1   MAKE IT JUST ABOUT FIVE MINUTES TO 11:00.

 2            REMEMBER, DON'T DISCUSS THE CASE OR ANYTHING

 3   RELATED TO THE CASE.  THAT MEANS THE TESTIMONY, ANYTHING

 4   THAT YOU HAVE HEARD IN THE COURTROOM, ANYTHING RELATED TO

 5   ANY OF THE PARTICIPANTS, THE WITNESSES, THE EVIDENCE AND SO

 6   FORTH.

 7            AND WE'RE PROBABLY GOING TO TAKE LUNCH A LITTLE

 8   BIT LATE TODAY, PROBABLY AROUND 12:30.  THERE'S REASONS.  SO

 9   YOU MIGHT WANT TO HAVE A SNACK DURING THE RECESS.

10            ALL RIGHT.  THANK YOU.  YOU ARE EXCUSED FOR

11   15 MINUTES.

12            THE WITNESS MAY STEP DOWN.  WE ARE IN RECESS.

13        (RECESS.)

14        (THE FOLLOWING PROCEEDINGS WERE HAD OUTSIDE THE

15         PRESENCE OF THE JURY:)

16            THE COURT:  ALL RIGHT.  WHILE MS. DILLARD BRINGS

17   THE JURY IN, DID YOU HAVE AN ISSUE?

18            MR. GREEN:  JUDGE, WHAT I HAD MENTIONED TO THE

19   COURT EARLIER DOESN'T SEEM TO BE APPLICABLE NOW.  SO I

20   DIDN'T KNOW.  I JUST WANTED TO LET THE COURT KNOW THAT.

21            THE COURT:  WELL, SINCE WE'RE STARTING, WE'LL

22   PROBABLY GO FOR AN HOUR AND A HALF ANYWAY, SO IT WILL

23   PROBABLY INTERRUPT YOUR --

24            MR. GREEN:  OKAY.  I KNOW.

25            THE COURT:  ALL RIGHT.
```

1              MR. GREEN:  OKAY.  THANK YOU.

2              THE COURT:  THANK YOU.

3         *(THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT*

4         *IN THE PRESENCE OF THE JURY:)*

5              THE COURT:  ALL RIGHT.  LET THE RECORD REFLECT THE

6    PRESENCE OF ALL MEMBERS OF THE JURY, COUNSEL FOR BOTH

7    PARTIES, THE DEFENDANT, AND THE WITNESS ON THE WITNESS

8    STAND.

9              AND YOU MAY RESUME.

10             MR. AKROTIRIANAKIS:  THANK YOU, YOUR HONOR.

11                        DIRECT EXAMINATION

12   BY MR. AKROTIRIANAKIS:

13   Q.   MR. WEST, DURING THE TIME IN THE 1996-1997 TIME FRAME

14   WHEN YOU, DAVID SAHAKIAN, AND MC ELHINEY WERE THE ONLY THREE

15   ARYAN BROTHERHOOD MEMBERS AT THE MARION PENITENTIARY, DID

16   YOU HAVE AN UNDERSTANDING OF THE CLOSENESS OR HOW CLOSE THE

17   RELATIONSHIP WAS BETWEEN MC ELHINEY AND SAHAKIAN?

18   A.   YES, SIR.

19             MR. GREEN:  LACK OF FOUNDATION.  SPECULATION.

20             THE COURT:  OVERRULED.

21             THE WITNESS:  YES, SIR.

22   BY MR. AKROTIRIANAKIS:

23   Q.   AND WHAT IS THAT UNDERSTANDING BASED UPON?

24   A.   THEY HAD BEEN ROAD DOGS FOR YEARS.

25   Q.   DID YOU DISCUSS THAT MATTER WITH MC ELHINEY, FOR

1   EXAMPLE?

2   A.   YES.

3   Q.   AND WHAT DID HE SAY?

4   A.   HE SAID THAT SAHAKIAN AND HIM WERE GOOD FRIENDS, THEY

5   WERE -- CALLED THEM ROAD DOGS.

6   Q.   WERE THEY CLOSER, WOULD YOU SAY, THAN THE ORDINARY

7   RELATIONSHIP BETWEEN ONE ARYAN BROTHERHOOD MEMBER AND

8   ANOTHER?

9           MR. GREEN:  OBJECTION.  VAGUE AND AMBIGUOUS.

10          THE COURT:  SUSTAINED.

11  BY MR. AKROTIRIANAKIS:

12  Q.   IN YOUR EXPERIENCE, 20 YEARS IN THE ARYAN BROTHERHOOD,

13  DO -- AT DIFFERENT TIMES, HAVE YOU KNOWN CERTAIN BROTHERS TO

14  BE CLOSER TO OTHER ARYAN BROTHERHOOD MEMBERS THAN THE LACK

15  OF THAT TYPE OF RELATIONSHIP, I SUPPOSE?

16          MR. GREEN:  JUDGE, LACK OF FOUNDATION.  CALLS FOR

17  AN OPINION.

18          THE COURT:  OVERRULED.

19          THE WITNESS:  YES, SIR.

20  BY MR. AKROTIRIANAKIS:

21  Q.   ARE THERE VARIOUS PAIRS OF ARYAN BROTHERHOOD MEMBERS

22  THROUGHOUT THE ORGANIZATION?

23  A.   YES, SIR.

24  Q.   THAT SORT OF GO TOGETHER LIKE PEAS AND CARROTS OR WHAT?

25  A.   YES.

84

1    Q.    CAN YOU NAME A FEW OF THOSE PAIRS?

2    A.    MYSELF AND DALLAS SCOTT.  AL BENTON AND PUPPET.

3    MC ELHINEY AND SAHAKIAN.  WAYNE BRIDGEWATER AND KENNY

4    AGTUCA.

5    Q.    THE -- AND SO DID YOU HAVE AN UNDERSTANDING -- WHAT WAS

6    YOUR UNDERSTANDING OF THE CLOSENESS OF THE RELATIONSHIP,

7    THEN, BETWEEN THE DEFENDANT AND MC ELHINEY?

8    A.    THEY WERE EXTREMELY GOOD FRIENDS.

9    Q.    WERE THEY AMONG THE CLOSEST, IN YOUR KNOWLEDGE, OF

10   ARYAN BROTHERHOOD MEMBERS?

11        MR. GREEN:  OBJECT TO THE LACK OF FOUNDATION

12   AGAIN.  CALLS FOR AN OPINION.

13        THE COURT:  OVERRULED.

14        THE WITNESS:  COULD YOU REPEAT IT, PLEASE?

15   BY MR. AKROTIRIANAKIS:

16   Q.    YOU NAMED OFF SEVERAL SORT OF SETS OF GOOD FRIENDS --

17   A.    RIGHT.

18   Q.    -- WITHIN THE ARYAN BROTHERHOOD.

19        WOULD YOU DESCRIBE THE RELATIONSHIP BETWEEN

20   MC ELHINEY AND THE DEFENDANT AS AMONG THE CLOSEST EVEN

21   WITHIN THE SET OF THOSE RELATIONSHIPS?

22   A.    NOT NECESSARILY.  THEY WERE JUST -- JUST LIKE DALLAS

23   AND I WERE -- WE GOT ALONG WELL.  WE LIKED THE SAME THINGS

24   SO WE RAN TOGETHER.  AL BENTON AND PUPPET, THE SAME WAY.

25   MC ELHINEY AND SAHAKIAN, THE SAME WAY.

85

1    Q.    NOW YOU HAD CONVERSATIONS, YOU TESTIFIED, WITH

2    MC ELHINEY ABOUT JOHN GOTTI AND JOHN GOTTI'S WISH THAT THE

3    AYRAN BROTHERHOOD KILL THIS PERSON THAT HAD ASSAULTED HIM?

4    A.    YES, SIR.

5    Q.    WHAT DID MC ELHINEY TELL YOU?

6    A.    HE TOLD ME GOTTI WANTED --

7            MR. GREEN:  I'M SORRY.  I'M GOING TO OBJECT TO

8    HEARSAY AND CONFRONTATION AT THIS POINT.

9            THE COURT:  THE OBJECTION IS OVERRULED.

10           THE WITNESS:  HE TOLD ME THAT GOTTI WANTED HIM

11   KILLED AND WOULD PAY A MILLION DOLLARS TO HAVE IT DONE.

12   BY MR. AKROTIRIANAKIS:

13   Q.    NOW, TURNING YOUR ATTENTION TO A DIFFERENT SET OF

14   EVENTS, DO YOU REMEMBER AN EVENT IN LATE 1996 WHERE A WHITE

15   INMATE AT MARION WAS HIT WITH A RADIO INSIDE A PILLOW CASE,

16   OR SOMETHING LIKE THAT?

17   A.    YES, SIR.

18   Q.    WHAT DID YOU HEAR ABOUT THE EVENT?

19   A.    BOTH OF THEM WERE KNUCKLEHEADS.  THE BLACK GUY THAT HIT

20   HIM, HALF INSANE.  I MEAN, BASICALLY BOTH OF THEM WERE

21   KNUCKLEHEADS.

22   Q.    DO YOU REMEMBER THE NAME OF THE WHITE INMATE INVOLVED

23   IN THAT?

24   A.    NO, I DON'T.

25   Q.    WAS HE AN ARYAN BROTHERHOOD MEMBER?

1    A.    NO.

2    Q.    WAS HE AN ASSOCIATE, IF YOU WILL?

3    A.    HE HUNG AROUND WITH A COUPLE OF GUYS, YEAH.

4    Q.    DO YOU KNOW ONE WAY OR OTHER WHETHER HE WAS A MEMBER OF

5    THE DIRTY WHITE BOY GANG?

6    A.    NO, I DON'T.

7    Q.    NOW DID THAT EVENT, THAT INMATE BEING HIT WITH THE

8    RADIO, DID THAT TOUCH OFF A SERIES OF EVENTS?

9    A.    YES, SIR.

10   Q.    JUST IN GENERAL TERMS, CAN YOU DESCRIBE THE NEXT SERIES

11   OF EVENTS, WHAT HAPPENED AS A RESULT?

12          MR. GREEN:  JUDGE, OBJECTION.  LACK OF PERSONAL

13   KNOWLEDGE.  LACK OF FOUNDATION.

14          THE COURT:  OVERRULED.

15          THE WITNESS:  THERE WERE SEVERAL ATTACKS ON WHITE

16   INMATES ON BLACKS.  SEVERAL ATTACKS ON BLACK INMATES ON

17   WHITES OVER THE NEXT FEW WEEKS.

18   BY MR. AKROTIRIANAKIS:

19   Q.    DID YOU HAVE CONVERSATION OR COMMUNICATION WITH MICHAEL

20   MC ELHINEY ABOUT THAT SITUATION?

21   A.    YES, SIR.

22   Q.    DID YOU HAVE CONVERSATION WITH THE DEFENDANT

23   PERSONALLY?

24   A.    NO.

25   Q.    OKAY.  BUT YOU DID HAVE CONVERSATION WITH MC ELHINEY?

1    A.    YES, SIR.

2    Q.    OKAY.  WHAT DID MC ELHINEY TELL YOU ABOUT THE SERIES OF

3    ALTERCATIONS BETWEEN WHITE AND BLACK INMATES AT MARION?

4            MR. GREEN:  CAN I RECOGNIZE A CONTINUING

5    OBJECTION?

6            THE COURT:  IT'S RECOGNIZED.  OVERRULED.

7            THE WITNESS:  HE TOLD ME WE WERE AT WAR WITH THE

8    DC BLACKS AND WE WERE TO KILL ALL DC BLACKS.

9    BY MR. AKROTIRIANAKIS:

10   Q.    WHAT IS A DC BLACK?

11   A.    DISTRICT OF COLUMBIA.

12   Q.    AND WERE THERE ANY DC BLACKS IN YOUR UNIT?

13   A.    ONE.

14   Q.    DID MC ELHINEY TELL YOU THAT YOU WERE TO KILL HIM?

15   A.    YES, SIR.

16   Q.    DESCRIBE THE DC BLACK THAT WAS IN YOUR UNIT THAT HE

17   WANTED YOU TO KILL.

18   A.    APPROXIMATELY 80 YEARS OLD.  COULDN'T HARDLY EVEN GET

19   OUT OF HIS OWN BED.

20   Q.    DID YOU KILL HIM?

21   A.    NO, SIR.

22   Q.    WHY NOT?

23   A.    THERE WAS ABSOLUTELY NO REASON TO.

24   Q.    DID YOU TELL MC ELHINEY THAT YOU REFUSED TO KILL THIS

25   80-YEAR-OLD MAN?

1    A.    I TOLD HIM, *I'M NOT KILLING ANYBODY.*  AND I DIDN'T GO

2    BACK TO THAT YARD ANYMORE.  I STAYED ON THE OTHER YARD FROM

3    THEN ON SO I WOULDN'T EVEN HAVE TO HEAR HIM.

4    Q.    WHAT WAS MC ELHINEY'S REACTION WHEN YOU TOLD HIM THAT

5    YOU WERE NOT GOING TO KILL THIS 80-YEAR-OLD MAN IN YOUR

6    UNIT?

7    A.    THAT I WOULD BE KILLED.

8    Q.    FOR FAILURE TO FOLLOW THE ORDER?

9    A.    YES, SIR.

10   Q.    SUBSEQUENT TO -- WELL, DO YOU RECALL AL BENTON DROPPING

11   FROM THE ARYAN BROTHERHOOD?

12   A.    YES, SIR.

13   Q.    OKAY.  NOW IMMEDIATELY PRECEDING AL BENTON DROPPING

14   FROM THE ARYAN BROTHERHOOD, DO YOU RECALL A SERIES OF EVENTS

15   INVOLVING BENTON AT THE LEWISBURG PENITENTIARY?

16   A.    YES, SIR.

17   Q.    DID YOU HEAR OF THESE EVENTS AFTER THE FACT?

18   A.    YES, SIR.

19   Q.    AND HOW DID YOU HEAR OF THE EVENTS?

20   A.    RONNIE SLOCUM SENT ME IN SOME INCIDENT REPORTS THAT

21   WERE WRITTEN ON.

22   Q.    WHAT'S AN INCIDENT REPORT?

23   A.    IF YOU VIOLATE A RULE IN THE PRISON AND THEY GIVE YOU

24   AN INCIDENT REPORT, IT WRITES IT UP SO AS TO WHAT HAPPENED,

25   WHEN IT HAPPENED, WHAT THEY SUSPECTED.

1  Q.   AND RONALD SLOCUM MAILED YOU INCIDENT REPORTS INTO THE

2  PRISON?

3  A.   I SAID RONALD SLOCUM.  I BELIEVE IT CAME FROM

4  RONNIE SLOCUM.

5  Q.   OKAY.  WHAT WERE THE INCIDENT REPORTS THAT YOU READ?

6  A.   I READ WAYNE BRIDGEWATER'S, AL BENTON'S, AND

7  JOHNNY CAMPBELL'S.

8  Q.   AND WHAT DID THOSE THREE INCIDENT REPORTS INDICATE?

9  A.   THAT --

10         MR. GREEN:  JUDGE, AT THIS TIME, I OBJECT TO

11  HEARSAY AND WITH RESPECT TO DOCUMENTATION.

12         THE COURT:  SUSTAINED.

13  BY MR. AKROTIRIANAKIS:

14  Q.   WHY -- WHAT WAS YOUR UNDERSTANDING OF WHY SLOCUM WAS

15  SENDING YOU INCIDENT REPORTS?

16  A.   TO LET ME -- TO LET ME KNOW WHAT WAS GOING ON.

17  Q.   DID YOU UNDERSTAND HIM TO BE ATTEMPTING TO KEEP YOU

18  APPRISED OF ONGOING ARYAN BROTHERHOOD BUSINESS?

19         MR. GREEN:  I WOULD LIKE TO OBJECT TO THE LEADING

20  FORM OF THE QUESTION.

21         THE COURT:  SUSTAINED.

22  BY MR. AKROTIRIANAKIS:

23  Q.   WAS IT COMMON THAT ARYAN BROTHERHOOD MEMBERS WOULD

24  CIRCULATE INCIDENT REPORTS AMONG THEM?

25  A.   YES, SIR.

1    Q.    OKAY.  WHAT'S THE PURPOSE, IN YOUR EXPERIENCE OF 20

2    YEARS OF BEING IN THE ARYAN BROTHERHOOD, OF CIRCULATING

3    INCIDENT REPORTS?

4    A.    JUST TO --

5              THE COURT:  YOU NEED TO REPEAT THAT --

6              MR. AKROTIRIANAKIS:  I BEG YOUR PARDON, YOUR

7    HONOR.  I THINK I'M STRAYING TOO FAR FROM THE MICROPHONE.

8    BY MR. AKROTIRIANAKIS:

9    Q.    WHAT WAS -- WHAT WAS THE PURPOSE, IN YOUR EXPERIENCE OF

10   20 YEARS OF BEING IN THE AYRAN BROTHERHOOD, OF CIRCULATING

11   INCIDENT REPORTS?

12   A.    JUST TO LET US KNOW WHAT WAS GOING ON WITH EACH OTHER,

13   WHAT KIND OF TROUBLE WAS COMING DOWN IN EACH PENITENTIARY SO

14   WE WOULD KNOW WHAT -- WHERE EVERYBODY WAS AT.

15   Q.    WAS THE CIRCULATION OF INCIDENT REPORTS A WAY FOR YOU,

16   AS A MEMBER OF THE ARYAN BROTHERHOOD, TO KEEP APPRISED OF

17   THE ONGOING BUSINESS OF THE ARYAN BROTHERHOOD?

18   A.    YES, SIR.

19   Q.    AS THAT BUSINESS RELATES TO ASSAULT OR MURDER?

20   A.    YES, SIR.

21   Q.    AND DID YOU HAVE -- WHAT WAS YOUR UNDERSTANDING AS TO

22   WHY MR. SLOCUM WOULD BE SENDING YOU INCIDENT REPORTS FROM

23   LEWISBURG PENITENTIARY?

24   A.    TO LET ME KNOW THAT THE WAR WITH THE DC BLACKS WAS ON.

25   Q.    DID YOU HAVE CONVERSATION WITH RONALD SLOCUM ABOUT THE

1   INCIDENT AT LEWISBURG PENITENTIARY?

2   A.   I DON'T BELIEVE SO.

3   Q.   DO YOU KNOW WHO JESSIE VAN~METER AND MICHAEL WAGNER

4   ARE?

5   A.   I KNOW MICHAEL WAGNER.  I CAN'T REMEMBER JESSIE.  I

6   KNOW THE NAME, BUT I CAN'T REMEMBER HIM.

7   Q.   THE INDICTMENT IN THIS CASE ALLEGES THAT THE ARYAN

8   BROTHERHOOD IS A RACKETEERING ENTERPRISE.

9            ARE YOU FAMILIAR WITH THE INDICTMENT?

10  A.   YES, SIR.

11  Q.   OKAY.  PRIOR TO THE RETURN OF THAT INDICTMENT, WITHIN

12  THE ARYAN BROTHERHOOD, WAS THERE DISCUSSION OF THE

13  POSSIBILITY OF BEING CHARGED WITH SUCH CRIMES?

14  A.   YES, SIR.

15  Q.   OKAY.  DID YOU PERSONALLY HEAR OR WERE PRESENT FOR THAT

16  DISCUSSION?

17  A.   YES, SIR.

18  Q.   WITH WHOM DID YOU HAVE DISCUSSIONS ABOUT THAT MATTER?

19  A.   I HAD IT WITH BARRY MILLS, WAYNE BRIDGEWATER,

20  AL BENTON.  I KNOW THERE'S SOMEONE ELSE, BUT I CAN'T

21  REMEMBER.

22  Q.   AND WHAT WAS THE NATURE OF THE DISCUSSION CONCERNING A

23  RACKETEERING INVESTIGATION OF THE ARYAN BROTHERHOOD?

24  A.   WELL, WE KNEW THEY WERE DOING A RICO INVESTIGATION ON

25  US, AND WE FIGURED IT WAS JUST TIME BEFORE THEY INDICTED IT.

```
 1   Q.   AND HOW DID YOU KNOW THAT THEY WERE DOING A RICO
 2   INVESTIGATION?
 3   A.   WE HAD COPIES OF -- SOME LAWYER SENT US IN COPIES OF
 4   SOME OF THE REPORTS THAT THE FBI HAD ORIGINALLY PUT
 5   TOGETHER.
 6   Q.   AND WHAT WAS THE REACTION OF BARRY MILLS, FOR EXAMPLE,
 7   TO THE PROSPECT OF BEING INDICTED FOR RACKETEERING?
 8   A.   TO HURRY UP AND GET THE THINGS ORGANIZED, BECAUSE WE
 9   KNEW ONCE THE INDICTMENT CAME DOWN, EVERYBODY WOULD BE
10   SLAMMED.
11   Q.   WHAT DOES THAT MEAN, TO "BE SLAMMED"?
12   A.   LOCKED DOWN.
13   Q.   AT THE TIME THAT YOU WERE HAVING THESE CONVERSATIONS
14   WITH BARRY MILLS, HAD HE -- WELL, LET ME BACK UP.
15        AT THE TIME THAT YOU ARE HAVING THESE
16   CONVERSATIONS WITH BARRY MILLS, IS THAT IN THE TIME FRAME
17   ALSO THAT HE'S HAVING DISCUSSIONS WITH YOU ABOUT EXHIBIT 1,
18   THAT TYPEWRITTEN DOCUMENT THAT WE DISCUSSED EARLIER?
19   A.   IT WAS A LITTLE EARLIER THAN THAT.
20   Q.   DID YOU KNOW WHY JOHN GOTTI WAS IN PRISON?
21   A.   YES, SIR.
22   Q.   WHAT WAS YOUR UNDERSTANDING?
23        MR. GREEN:  OBJECTION.  RELEVANCY.
24        THE COURT:  SUSTAINED.
25
```

DEBORAH D. PARKER, U.S. COURT REPORTER

```
 1    BY MR. AKROTIRIANAKIS:

 2    Q.   DID BARRY MILLS TELL YOU WHY HE THOUGHT THAT THE ARYAN

 3    BROTHERHOOD WAS A SUBJECT OF A RACKETEERING INVESTIGATION?

 4    A.   YES, SIR.

 5    Q.   WHAT DID HE TELL YOU?

 6    A.   THAT HE HAD JUST INDICTED THE TEXAS SYNDICATE MEXICANS

 7    ON A RICO, AND WE KNEW THEY WERE INVESTIGATING US AND THE

 8    MEXICAN MAFIA.  SO WE KNEW IT WAS COMING SOONER OR LATER.

 9    Q.   AND THE TEXAS SYNDICATE, IS THAT AN ORGANIZED CRIME

10    ORGANIZATION?

11         MR. GREEN:  OBJECTION.  CALLS FOR A LEGAL

12    CONCLUSION.

13         MR. AKROTIRIANAKIS:  I'LL WITHDRAW THE QUESTION,

14    YOUR HONOR.  I'M SORRY.

15    BY MR. AKROTIRIANAKIS:

16    Q.   WHAT IS THE TEXAS SYNDICATE?

17    A.   A PRISON GANG.

18    Q.   OKAY.  AND IS IT AN ETHNIC PRISON GANG?

19    A.   YEAH.  MEXICANS OUT OF TEXAS.

20    Q.   WAS IT A SURPRISE TO BARRY MILLS TO LEARN THAT THE

21    ARYAN BROTHERHOOD WAS A SUBJECT OF A RACKETEERING

22    INVESTIGATION?

23    A.   NO, SIR.

24    Q.   DID HE TELL YOU WHY HE WAS NOT SURPRISED AT THAT

25    PROSPECT?
```

```
 1   A.   NO.   WE KNEW IT WAS JUST A MATTER OF TIME.   THEY'D GONE

 2   AFTER THE HELL'S ANGELS.   WHEN THEY STARTED THE RICO ON THE

 3   HELL'S ANGELS, WE KNEW IT WAS A MATTER OF TIME BEFORE THEY

 4   GOT TO US.

 5          MR. AKROTIRIANAKIS:  MAY I HAVE JUST A MOMENT,

 6   YOUR HONOR?

 7      (PAUSE.)

 8          MR. AKROTIRIANAKIS:  NOTHING FURTHER, YOUR HONOR.

 9          THE COURT:  THANK YOU.

10          CROSS-EXAMINATION?

11          MR. GREEN:  YES, JUDGE.

12          THE COURT:  YOU MAY INQUIRE.

13          MR. GREEN:  THANK YOU, YOUR HONOR.

14                    CROSS-EXAMINATION

15   BY MR. GREEN:

16   Q.   MR. WEST, YOU'VE -- IN FACT HAVE BEEN SWORN UNDER OATH

17   AND LIED TO JURORS BEFORE; CORRECT?

18   A.   NO, SIR.

19          MR. GREEN:  JUDGE, I HAVE A BINDER FOR THE WITNESS

20   AND FOR THE COURT HERE.

21          THE COURT:  ALL RIGHT.  DO YOU WANT THE CLERK TO

22   HAND THAT UP TO THE WITNESS?

23          MR. GREEN:  MAY I APPROACH THE CLERK WITH IT?

24          THE COURT:  YES.  THANK YOU.

25      (PAUSE.)
```

95

1    BY MR. GREEN:

2    Q.   MR. WEST, I'VE PLACED IN FRONT OF YOU A BINDER OF

3    POTENTIAL EXHIBITS I THINK THAT MAY COME INTO OUR

4    DISCUSSIONS HERE ON MY CROSS-EXAMINATION OF YOU.

5             IN ONE OF THOSE I'VE INCLUDED A PROCEEDING THAT IS

6    MARKED WITH -- BEGINNING WITH 1037.  AND THERE'S FIVE

7    SUBPARTS.

8             DO YOU SEE THAT?  IT'S THE LAST PAGE OF 3 OF 3 FOR

9    THE INDEX?

10   A.   YES, SIR.

11   Q.   IF YOU WOULDN'T MIND TURNING TO THAT EXHIBIT 137 (SIC).

12   A.   (WITNESS SO COMPLIES.)

13   Q.   SPECIFICALLY IF YOU WILL TURN TO EXHIBIT 1037-D, AS IN

14   "DOG."

15   A.   (WITNESS SO COMPLIES.)

16   Q.   NOW, YOU'VE BEEN ASKED SOME QUESTIONS ABOUT TESTIMONY

17   THAT YOU'VE GIVEN IN OTHER PROCEEDINGS THAT MAY DEAL WITH

18   THESE INDICTMENTS, AND SPECIFICALLY YOU GAVE TESTIMONY ON

19   MARCH 15TH OF 2007.

20             DO YOU RECALL THAT?

21   A.   YES, SIR.

22   Q.   OKAY.  AND AT THAT TIME, YOU WERE ASKED BY AN ATTORNEY

23   UNDER OATH:  *YOU WERE TELLING US THAT YOU HAVE IN FACT BEEN*

24   *SWORN UNDER OATH AND LIED TO JURIES IN THE PAST.*

25             YOUR ANSWER WAS, *YES, SIR.*

96

1              WAS THAT YOUR STATEMENT THEN?

2  A.   YES, SIR.

3              MR. AKROTIRIANAKIS:  PAGE AND LINE?

4              MR. GREEN:  OH, I'M SORRY.  PAGE 24 BEGINNING WITH

5  LINE 21.

6     (PAUSE.)

7  BY MR. GREEN:

8  Q.   AGAIN, THAT'S ON PAGE 24 BEGINNING WITH LINE 21, YOU

9  WERE ASKED:  *ARE YOU TELLING US THAT YOU HAVE IN FACT BEEN*

10 *SWORN UNDER OATH AND LIED TO JURORS IN THE PAST?*

11             ANSWER:  *YES, SIR.*

12             THAT WAS YOUR STATEMENT UNDER OATH ON THAT

13 OCCASION; IS THAT CORRECT?

14 A.   YES, SIR.

15 Q.   ALSO, DURING THAT SAME PROCEEDING UNDER EXAMINATION BY

16 AN ATTORNEY, YOU GAVE TESTIMONY AT THAT TIME THAT IN FACT

17 WHEN YOU WERE RUNNING DRUGS AT LOMPOC, YOU WERE RUNNING

18 DRUGS WITH AN INDIVIDUAL BY THE NAME OF MICHAEL HOUSTON,

19 PHIL MYERS, AND HEVLE; IS THAT CORRECT?

20 A.   YES, SIR.

21 Q.   AND IT WAS DURING THESE PROCEEDINGS THAT IT WAS BROUGHT

22 OUT TO YOU ON CROSS-EXAMINATION THAT IN FACT MR. HOUSTON, IT

23 WAS PHYSICALLY IMPOSSIBLE FOR HIM TO BE RUNNING DRUGS WITH

24 YOU AND PHIL MYERS AND HEVLE AT THAT TIME.

25             DO YOU RECALL THAT?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    A.    YES, SIR.

2    Q.    THAT WAS BROUGHT TO YOUR ATTENTION AT THAT TRIAL; IS --

3    AT THAT PROCEEDING; IS THAT CORRECT?

4    A.    YES, SIR.

5    Q.    AND ONE OF THE WAYS IT WAS ESTABLISHED AT THAT TIME

6    THAT YOU WERE WRONG ABOUT MR. HOUSTON BEING INVOLVED IN THE

7    DRUG ACTIVITY AT LOMPOC WAS THROUGH THE HOUSING QUARTERS; IS

8    THAT CORRECT?

9    A.    YES, SIR.

10   Q.    YOU RECALL BEING CONFRONTED WITH THE HOUSING QUARTERS

11   AT THAT TIME WHICH CLEARLY DEMONSTRATED THAT YOU WERE IN

12   ERROR ABOUT WHAT YOU HAD TESTIFIED ABOUT PREVIOUSLY IN THAT

13   TRIAL; IS THAT CORRECT?

14   A.    YES, SIR.

15   Q.    NOW YOU'RE HERE TODAY BECAUSE YOU WERE IN FACT ARRESTED

16   UNDER THE SAME INDICTMENT FOR WHICH MR. SAHAKIAN WAS

17   ARRESTED; IS THAT CORRECT?

18   A.    YES, SIR.

19   Q.    THAT WAS BACK IN OCTOBER OF 2002?

20   A.    YES, SIR.

21   Q.    AT THAT POINT IN TIME, YOU WERE FREE OUT IN SOCIETY; IS

22   THAT CORRECT?

23   A.    YES, SIR.

24   Q.    IN THE STATE OF LOUISIANA?

25   A.    YES, SIR.

1    Q.    AND THEN ONE DAY SOME FBI AGENTS, ALONG WITH SOME OTHER

2    LAW ENFORCEMENT AGENTS, CAME TO YOUR HOME NOT ONLY TO ARREST

3    YOU BUT ALSO TO CONDUCT A SEARCH OF YOUR HOME; IS THAT

4    CORRECT?

5    A.    YES, SIR.

6    Q.    AND AT THAT TIME WHEN THEY SEARCHED YOUR HOME, THEY

7    ALSO SEIZED SOME ITEMS THAT REFERENCED YOUR ARYAN

8    BROTHERHOOD MEMBERS; IS THAT CORRECT?

9    A.    MY OLD PHOTO ALBUM, YES, SIR.

10   Q.    THIS IS IN 2002; IS THAT CORRECT?

11   A.    YES, SIR.

12   Q.    YOUR PREVIOUS TESTIMONY YESTERDAY WAS THAT IN 1997, YOU

13   HAD ALREADY STARTED THINKING ABOUT LEAVING THE ARYAN

14   BROTHERHOOD; IS THAT CORRECT?

15   A.    YES, SIR.

16   Q.    AND THAT IN FACT WHEN YOU LEFT MARION IN 2000, YOU

17   ALLEGEDLY TOLD ONE OF THE OFFICERS THAT IF THEY NEEDED YOUR

18   HELP, JUST TO GIVE YOU A CALL?

19   A.    YES, SIR.

20   Q.    IS THAT CORRECT?

21          YOU DIDN'T DEBRIEF AT THAT TIME; IS THAT CORRECT?

22   A.    YES, SIR.

23   Q.    OKAY.  AND THAT WAS YOUR INTENTION IN 1997 AS WELL AS

24   YOUR INTENTION IN THE YEAR 2000; IS THAT CORRECT?

25   A.    YES, SIR.

```
1    Q.   YET WHEN THE OFFICERS CAME TO YOUR HOME OCTOBER OF

2    2002, YOU STILL HAD A PHOTO ALBUM OF YOUR ARYAN BROTHERHOOD

3    MEMBERS; IS THAT CORRECT?

4    A.   NOT NECESSARILY, NO, SIR.

5    Q.   OKAY.  DID THEY, IN FACT, SEIZE PHOTOGRAPHS DEPICTING

6    YOU AND YOUR -- AND SOME OF YOUR ARYAN BROTHERHOOD MEMBERS?

7    A.   YES, SIR.  THEY WERE ALL TAKEN IN THE HOBBY SHOP OF

8    LOMPOC.  MOST OF THE PHOTOS WERE OF MY HOBBY ITEMS.

9              MR. GREEN:  OKAY.  JUDGE, MAY I PLACE AN EXHIBIT,

10   THE GOVERNMENT'S EXHIBIT 13, ON THE ELMO?

11             THE COURT:  HAS THAT BEEN ADMITTED?

12             MR. AKROTIRIANAKIS:  YES.

13             THE COURT:  OKAY.  GO RIGHT AHEAD.

14   BY MR. GREEN:

15   Q.   YOU ALREADY TESTIFIED ABOUT THIS EXHIBIT BEFORE; IS

16   THAT CORRECT?

17   A.   YES, SIR.

18   Q.   OKAY.  NOW THIS IS NOT A PHOTOGRAPH THAT WAS TAKEN IN

19   OCTOBER OF 2002 FROM YOUR HOME; IS THAT CORRECT?

20   A.   I DON'T KNOW IF THAT WAS IN MY ALBUM OR NOT.

21   Q.   OKAY.  ARE YOU ABLE TODAY TO IDENTIFY FOR ME EACH OF

22   THE INDIVIDUALS IN THIS PHOTOGRAPH?

23   A.   NO, SIR.

24   Q.   OKAY.  ARE THERE SOME INDIVIDUALS THAT YOU CAN

25   IDENTIFY?
```

1    A.    YES, SIR.

2    Q.    AT THIS TIME, WOULD YOU IDENTIFY THE INDIVIDUALS THAT

3    YOU CAN IDENTIFY FOR US?

4    A.    MARK NYQUIST.

5    Q.    CAN YOU POINT HIM OUT ON THE SCREEN FOR ME, PLEASE?

6    A.    HE'S MIDDLE ROW, WHITE SHIRT, TALL GUY ON THE LEFT-HAND

7    SIDE.

8    Q.    OKAY.

9    A.    TOP ROW, SECOND FROM THE RIGHT, MICHAEL HUNT.  AND I

10   CAN'T MAKE OUT THE REST OF THEM.

11   Q.    OKAY.  SO THOSE -- THERE'S ONLY TWO INDIVIDUALS THAT

12   YOU CAN NAME IN THIS ENTIRE PHOTOGRAPH; IS THAT CORRECT?

13   A.    YES, SIR.

14   Q.    OKAY.  AND YOU'RE NOT IN THIS PHOTOGRAPH?

15   A.    NO, SIR.

16   Q.    NOW, YOU WERE ARRESTED IN OCTOBER OF 2002 IN THE STATE

17   OF LOUISIANA FOR A SPECIFIC CHARGE OF CONSPIRACY TO COMMIT

18   MURDER; IS THAT CORRECT?

19   A.    YES, SIR.

20   Q.    AND MORE SPECIFICALLY, YOU WERE ARRESTED ON THE CHARGE

21   OF ON OR ABOUT AUGUST 9TH, 1989, IN SANTA BARBARA COUNTY,

22   WITHIN THE CENTRAL DISTRICT OF CALIFORNIA, AND WITHIN THE

23   TERRITORIAL JURISDICTION OF THE UNITED STATES, THAT IS, AT

24   THE UNITED STATES PENITENTIARY AT LOMPOC, CALIFORNIA,

25   DEFENDANTS BARRY BYRON MILLS, TYLER DAVIS BINGHAM, RONNIE

101

```
1    BOYD SLOCUM, EDGAR WESLEY HEVLE, AND GLEN ALAN WEST
2    WILLFULLY, DELIBERATELY, MALICIOUSLY AND WITH PREMEDITATION
3    AND MALICE AFORETHOUGHT KILLED AND AIDED IN THE ABETTING OF
4    ARVA LEE RAY; IS THAT CORRECT?
5    A.    YES, SIR.
6    Q.    NOW -- BUT YOU'VE ENTERED INTO A PLEA AGREEMENT WITH
7    THE GOVERNMENT WHERE IN FACT YOU ARE NOT PLEADING GUILTY TO
8    THAT CHARGE; CORRECT?
9    A.    YES, SIR.
10   Q.    AND AFTER YOU WERE ARRESTED IN OCTOBER OF 2002 IN
11   LOUISIANA, YOU HAD A DETENTION HEARING, WHICH IS BASICALLY A
12   BAIL HEARING TO TRY TO GET OUT ON BOND; IS THAT CORRECT?
13   A.    YES, SIR.
14   Q.    IS THAT CORRECT?
15   A.    YES, SIR.
16   Q.    AND YOU WERE WORKING AT THE TIME; IS THAT CORRECT?
17   A.    YES, SIR.
18   Q.    YOU HAD A GOOD RELATIONSHIP WITH YOUR EMPLOYER AT THE
19   TIME?
20   A.    YES, SIR.
21   Q.    AND IN FACT, YOUR EMPLOYER CAME TO TESTIFY FOR YOU AT
22   THAT BAIL HEARING; IS THAT CORRECT?
23   A.    YES, SIR.
24   Q.    AND YOU -- SO YOU HAD MEANS AT THAT TIME SHOULD THE
25   COURT WOULD BE SO INCLINED, THAT IF IT MADE REASONABLE BOND,
```

102

1    YOU COULD HAVE BONDED OUT ON THE CHARGE, AND THAT IS WHAT

2    YOU WERE TRYING TO ACCOMPLISH AT THAT TIME; IS THAT CORRECT?

3    A.    YES, SIR.

4    Q.    NOW THE GOVERNMENT DID NOT WANT YOU TO BOND OUT AT THAT

5    TIME; CORRECT?

6    A.    CORRECT.

7    Q.    AND IN FACT, THE GOVERNMENT BROUGHT EVIDENCE AT THAT

8    BOND HEARING AGAINST YOU AS TO WHY YOU SHOULD NOT BE BONDED

9    OUT; IS THAT CORRECT?

10    A.    YES, SIR.

11    Q.    AND YOU WERE PRESENT FOR THAT ENTIRE HEARING; CORRECT?

12    A.    YES, SIR.

13    Q.    AND AT THAT HEARING, THE GOVERNMENT HAD PROVIDED

14    EVIDENCE THAT YOU SHOULD NOT BE LET OUT ON BOND NOT ONLY

15    BECAUSE THAT YOU WERE INVOLVED IN THE CONSPIRACY TO MURDER

16    ARVA LEE RAY, WHO WAS IN FACT MURDERED; CORRECT?

17    A.    YES, SIR.

18    Q.    BUT THAT YOU WERE ALSO INVOLVED IN THE CONSPIRACIES TO

19    COMMIT ATTEMPTED MURDER ON JIMMY LEE INMAN.  THEY BROUGHT

20    THAT EVIDENCE; CORRECT?

21    A.    YES, SIR.

22    Q.    THEY ALSO BROUGHT EVIDENCE THAT YOU WERE INVOLVED IN

23    THE CONSPIRACY TO ATTEMPT THE MURDER OF JOEL BURKETT;

24    CORRECT?

25    A.    YES, SIR.

1    Q.    THEY ALSO BROUGHT EVIDENCE THAT YOU WERE INVOLVED IN

2    THE CONSPIRACY TO ATTEMPT TO MURDER DAVID NEWMAN; CORRECT?

3    A.    YES, SIR.

4    Q.    OKAY.  AND YOU CHALLENGED THE GOVERNMENT ON ALL THESE

5    ALLEGATIONS; IS THAT RIGHT?

6    A.    YES, SIR.

7    Q.    AND IN FACT, THE JUDGE DID ALLOW YOU TO GET BOND AT

8    THAT TIME; CORRECT?

9    A.    NO BOND.  JUST RELEASE.

10   Q.    OKAY.  BUT THE GOVERNMENT APPEALED THAT; IS THAT

11   CORRECT?

12   A.    YES, SIR.

13   Q.    AND THEN THEY BROUGHT YOU BACK TO CALIFORNIA WHERE YOU

14   HAD ANOTHER BOND HEARING; IS THAT CORRECT?

15   A.    YES, SIR.

16   Q.    AND AGAIN, THE GOVERNMENT PRESENTED EVIDENCE THAT THEY

17   HAD AT THAT TIME TO THE COURT ABOUT YOUR INVOLVEMENT IN

18   THESE MULTIPLE MURDERS AND ATTEMPTED MURDERS; CORRECT?

19   A.    YES, SIR.

20   Q.    OKAY.  AND YOU WERE -- THE GOVERNMENT WAS THEN

21   SUCCESSFUL IN THAT BOND HEARING SO YOU WOULD NOT BE ABLE TO

22   BE FREE AWAITING TRIAL; CORRECT?

23   A.    A BAIL WAS SET THAT I COULDN'T MAKE.

24   Q.    THAT YOU COULDN'T MAKE.  IT WAS SET TOO HIGH THAT YOU

25   COULDN'T MAKE IT?

1    A.    YES, SIR.

2    Q.    AND THEREFORE YOU WERE LOCKED UP AWAITING TRIAL IN THIS

3    CASE OUT OF THIS INDICTMENT?

4    A.    YES, SIR.

5    Q.    AND YOU WERE LOCKED UP FOR, WHAT, AT LEAST 11 MONTHS?

6    A.    I THINK IT WAS 10.

7    Q.    TEN?  AND DURING THAT PERIOD OF TIME, YOU HAD A CHANCE

8    TO LOOK AT SOME OF THE EVIDENCE AGAINST YOU WHILE YOU WERE

9    SITTING IN PRISON AT THAT TIME; IS THAT CORRECT?

10    A.    YES, SIR.

11    Q.    AND YOU WERE GIVEN APPROXIMATELY OVER 11,000 PAGES OF

12    DOCUMENTS REFERENCING YOU IN THESE CONSPIRACIES TO MURDER

13    AND ATTEMPT MURDER; IS THAT CORRECT?

14    A.    I DON'T THINK IT WAS ANYWHERE CLOSE TO THAT.  MY LAWYER

15    GAVE ME THE ONLY ONES THAT REFERRED TO ME.  I DON'T KNOW HOW

16    MANY HE GAVE ME.

17    Q.    DO YOU RECALL GIVING TESTIMONY IN A PREVIOUS PROCEEDING

18    THAT YOU HAD IN FACT RECEIVED 11,000 PAGES OF DISCOVERY?

19    A.    NO, I DON'T.  BUT I MAY HAVE.  I DON'T KNOW HOW MANY I

20    GOT.  I CAN'T TELL YOU NOW HOW MANY I GOT.

21    Q.    OKAY.  SO YOU'RE JUST SAYING NOW THAT YOU DON'T

22    REMEMBER HOW MANY PAGES YOU GOT AND SO YOU JUST CAN'T

23    CONFIRM OR DENY IF YOU GOT 11,000; IS THAT CORRECT?

24    A.    EXACTLY.

25    Q.    BUT THE SUBSTANCE OF WHAT YOU RECEIVED AT LEAST SHOWED

```
 1    YOU THAT THERE WAS AT LEAST SOME CONFIDENTIAL INFORMANTS WHO

 2    HAD GIVEN THE GOVERNMENT INFORMATION THAT IN FACT YOU WERE

 3    INVOLVED IN THESE CONSPIRACIES?

 4    A.    YES, SIR.

 5    Q.    OKAY.  BUT YOU WENT TO THE GOVERNMENT AND TOLD THEM

 6    THAT NONE OF THAT WAS TRUE; CORRECT?

 7    A.    YES, SIR.

 8    Q.    AND YOU TOLD THE GOVERNMENT IN FACT THAT YOU HAD

 9    NOTHING TO DO WITH THE MURDER OF ARVA LEE RAY; IS THAT

10    CORRECT?

11    A.    YES, SIR.

12    Q.    YOU WENT SO FAR AS TO TELL THE GOVERNMENT THAT YOU

13    DIDN'T EVEN PASS A MESSAGE OR A NOTE OR A HAND SIGNAL OR

14    ANYTHING; CORRECT?

15    A.    YES, SIR.

16    Q.    AND SO YOU BEGAN TO TRY TO WORK A DEAL WITH THE

17    GOVERNMENT WHERE YOU WOULD GET A BENEFIT IN EXCHANGE FOR

18    GIVING THEM SOME INFORMATION THAT YOU DID KNOW ABOUT THE

19    ARYAN BROTHERHOOD; IS THAT CORRECT?

20    A.    NO, SIR.

21    Q.    OKAY.  WELL, WITH THE COUNT OF CONSPIRACY TO COMMIT

22    MURDER OF ARVA LEE RAY, YOU WERE FACING A SENTENCE OF LIFE

23    WITHOUT THE POSSIBILITY OF PAROLE?

24    A.    YES, SIR.

25    Q.    AND YOU WERE OUT ON THE STREETS FOR A COUPLE OF YEARS
```

1    ALREADY AND YOU WANTED YOUR FREEDOM BACK; CORRECT?

2    A.    YES, SIR.

3    Q.    OKAY.  AND YOU WERE TELLING THE GOVERNMENT THAT YOU HAD

4    NOTHING TO DO WITH ARVA LEE RAY AND YOU FELT THAT THE

5    INFORMATION THAT THEY HAD WAS FALSE?

6    A.    YES, SIR.

7    Q.    AND THAT IF YOU WENT TO TRIAL, YOU WOULD BE SUCCESSFUL

8    AT TRIAL ON THAT CASE?

9    A.    YES, SIR.

10    Q.    IS THAT CORRECT?

11    A.    YES, SIR.

12    Q.    AND THROUGH YOUR DISCUSSIONS OR NEGOTIATIONS WITH THE

13    GOVERNMENT, THE GOVERNMENT GAVE YOU AN EAR.  THEY LISTENED

14    TO YOU; IS THAT CORRECT?

15    A.    THEY -- ALL THE CONVERSATIONS WERE BETWEEN THE

16    GOVERNMENT AND MY ATTORNEY.

17    Q.    OKAY.  BUT YOU WERE GIVING YOUR ATTORNEY PERMISSION TO

18    TELL THE GOVERNMENT WHAT YOUR POSITIONS WERE; IS THAT

19    CORRECT?

20    A.    YES, SIR.

21    Q.    AND OUT OF THIS ARRANGEMENT OR THESE DISCUSSIONS, A

22    PLEA AGREEMENT WAS AGREED TO?

23    A.    YES, SIR.

24    Q.    AND THAT PLEA AGREEMENT WAS THAT YOU IN FACT INSTEAD OF

25    PLEADING GUILTY TO THE ARVA LEE RAY MURDER, YOU WOULD PLEAD

1  GUILTY TO AN ATTEMPTED MURDER THAT OCCURRED BACK IN 1980; IS

2  THAT CORRECT?

3  A.   YES, SIR.

4  Q.   ALL RIGHT.  AND THAT WAS THE ATTEMPTED MURDER OF A

5  GENTLEMAN BY THE NAME OF ROBERT WILSON?

6  A.   YES, SIR.

7  Q.   AND THAT YOU HAD CONVEYED INFORMATION TO THE GOVERNMENT

8  AT THAT TIME WHEN YOU'RE WORKING YOUR DEAL WITH THE

9  GOVERNMENT THAT YOU IN FACT, ALONG WITH A GENTLEMAN BY THE

10  NAME OF HOMER MATTHEWS, DID IN FACT PHYSICALLY PARTAKE IN

11  THE ASSAULT --

12            MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.  608.

13            MR. GREEN:  THIS IS PROBATIVE ON THE ISSUE OF

14  LENIENCY AND THE PLEA AGREEMENT THAT HE ENTERED INTO WITH

15  THE GOVERNMENT.

16            THE COURT:  THE OBJECTION IS OVERRULED.

17  BY MR. GREEN:

18  Q.   THAT YOU PUSHED MR. WILSON INTO THE BARS SO THAT TOMMY

19  LEE -- TOMMY SILVERSTEIN COULD HOLD HIM THERE AND CHOKE HIM

20  WHILE MR. HOMER MATTHEWS STABBED MR. WILSON; IS THAT

21  CORRECT?

22  A.   YES, SIR.

23  Q.   OKAY.  NOW, ARVA LEE RAY, HE WAS KILLED IN 1989; RIGHT?

24  A.   SOUNDS ABOUT RIGHT.

25  Q.   OKAY.  WELL, ISN'T THAT -- THAT WAS SOMETHING THAT

```
 1   WOULD HAVE BEEN INFORMATION THAT YOU -- THAT YOUR ARYAN
 2   BROTHERHOOD MEMBERS WOULD HAVE SHARED WITH EACH OTHER?
 3   A.   YES, SIR.
 4   Q.   OKAY.  BUT JUST AS YOU SIT HERE TODAY, YOU CAN'T RECALL
 5   THE SPECIFICS ABOUT THAT?
 6   A.   NO, I CAN RECALL THE SPECIFICS.  I JUST CAN'T RECALL
 7   THE EXACT DATE.
 8   Q.   OKAY.  CAN'T RECALL THE EXACT DATE OR EVEN THE YEAR?
 9   A.   '89 SOUNDS RIGHT.
10   Q.   OKAY.  SO -- OKAY.
11        IN THE BINDER THAT'S BEFORE YOU, YOU'LL SEE WHAT I
12   PREVIOUSLY HAD MARKED AS EXHIBIT 1035 TO BE YOUR PLEA
13   AGREEMENT WITH THE GOVERNMENT.
14        WOULD YOU GO TO THAT, PLEASE?
15   A.   (WITNESS SO COMPLIES.)
16   Q.   HAVE YOU GOT IT IN FRONT OF YOU?
17   A.   YES, SIR.
18   Q.   AND THERE'S SOME BATES-STAMPED NUMBERS AT THE BOTTOM OF
19   IT.  DO YOU SEE THOSE?  AND IT BEGINS 106,236.  DO YOU SEE
20   THAT?
21   A.   YES, SIR.
22   Q.   OKAY.  AND IT SHOULD GO ALL THE WAY IN CHRONOLOGICAL
23   ORDER TO 106,244.
24   A.   YES, SIR.
25   Q.   ALL RIGHT.  NOW, THERE'S -- THIS IS -- THESE ARE
```

1    COPIES, BUT WOULD YOU RECOGNIZE YOUR OWN SIGNATURE?

2    A.    YES, SIR.

3    Q.    AND ON PAGE 8 OF THE -- OF THIS PLEA AGREEMENT, ISN'T

4    THAT YOUR SIGNATURE ON AUGUST 20TH, OF 2003?

5    A.    YES, SIR.

6    Q.    AND ALSO THAT IS THE -- BELOW THAT IS A PARAGRAPH BY

7    YOUR ATTORNEY AND YOUR ATTORNEY'S SIGNATURE OF AUGUST 20TH

8    OF 2003?

9    A.    YES, SIR.

10   Q.    AND IN FACT, YOUR ATTORNEY HAS SAID THAT HE'S NOT ONLY

11   YOUR ATTORNEY BUT THAT HE'S CAREFULLY DISCUSSED EVERY PART

12   OF THIS AGREEMENT WITH YOU.

13              WAS THAT TRUE?

14   A.    YES, SIR.

15   Q.    AND THAT YOU HAD -- HE HAD FULLY ADVISED YOU OF YOUR

16   RIGHTS AND POSSIBLE DEFENSES; IS THAT TRUE?

17   A.    YES.

18   Q.    AND THE RELEVANT SENTENCING CONSIDERATIONS AND

19   CONSEQUENCES OF ENTERING THIS AGREEMENT; CORRECT?

20   A.    YES, SIR.

21   Q.    OKAY.  NOW, THERE WERE SOME CONSEQUENCES TO ENTERING

22   INTO THIS AGREEMENT; CORRECT?

23   A.    YES, SIR.

24   Q.    AND AS YOU SIT HERE TODAY, DO YOU RECALL WHAT THOSE

25   CONSEQUENCES WERE?

110

1    A.    I HAVE A POSSIBLE LIFE SENTENCE TO WHAT I PLED GUILTY

2    TO.  I GIVE UP MY RIGHT -- GIVE UP SEVERAL RIGHTS TO APPEAL

3    THE AGREEMENT IF I BREAK IT.  AND THAT I WOULD HAVE TO

4    TESTIFY TRUTHFUL TO ANY COURT HEARINGS THAT THEY CALLED ME

5    TO.

6    Q.    OKAY.  SO THERE WERE CERTAIN CONDITIONS THAT WERE

7    PLACED ON THIS PLEA AGREEMENT, AND THAT IS THAT YOU HAD TO,

8    WHENEVER THE GOVERNMENT CALLED YOU, TESTIFY TRUTHFULLY

9    BEFORE ANY TRIBUNAL, WHETHER IT BE A JURY OR A COURT?

10   A.    YES, SIR.

11   Q.    IS THAT CORRECT?

12          OKAY.  AND IN FACT WHEN YOU ENTERED THIS PLEA

13   AGREEMENT BEFORE THE JUDGE WHO YOU PLED TO, YOU HAD TO

14   STIPULATE UNDER OATH TO THE FACTS OF WHAT YOU DID?

15   A.    YES, SIR.

16   Q.    IN ORDER FOR THAT PLEA AGREEMENT TO BE ACCEPTED, THE

17   JUDGE NEEDED A FACTUAL BASIS; IS THAT CORRECT?

18   A.    YES, SIR.

19   Q.    OKAY.  AND ATTACHED TO THIS PLEA AGREEMENT IS THE

20   STIPULATED FACTUAL SUMMARY WHICH IS ATTACHMENT A.  IT'S ON

21   PAGE 9.

22          DO YOU SEE THAT?

23   A.    YES, SIR.

24   Q.    AND WHEN YOU SIGNED THIS PLEA AGREEMENT, YOU WERE

25   SWEARING YOUR OATH TO THE JUDGE AT THAT TIME THAT THESE IN

1    FACT WERE THE UNDERLYING FACTS TO YOUR ASSAULT OF

2    MR. WILSON; IS THAT CORRECT?

3    A.   YES, SIR.

4    Q.   OKAY.  AND EVEN FURTHER THAN THAT, THE JUDGE PLACED YOU

5    UNDER OATH AND QUESTIONED YOU ABOUT THE FACTS OF THIS

6    ASSAULT TO MR. WILSON; IS THAT CORRECT?

7    A.   YES, SIR.

8    Q.   AND YOU TESTIFIED CONSISTENTLY WITH THESE STIPULATED

9    FACTS; IS THAT CORRECT?

10   A.   YES, SIR.

11   Q.   OKAY.  NOW THIS AGREEMENT REQUIRES YOU TO GIVE TRUTHFUL

12   TESTIMONY NO MATTER WHO'S ANSWERING -- ASKING YOU THE

13   QUESTIONS; IS THAT CORRECT?

14   A.   YES, SIR.

15   Q.   AND SO THAT YOU BELIEVE THAT APPLIES TO ME, THAT YOU

16   HAVE TO ANSWER MY QUESTIONS TRUTHFULLY?

17   A.   YES, SIR.

18   Q.   OKAY.  AND THAT IF YOU DO NOT ANSWER MY QUESTIONS

19   TRUTHFULLY, THAT YOU COULD BE SUBJECT TO HAVING YOUR PLEA

20   AGREEMENT BREACHED AND THE GOVERNMENT THEN PULLING THEIR

21   DEAL?

22   A.   YES, SIR.

23   Q.   OKAY.  AND THAT NOT ONLY GOES TRUE FOR ME BUT FOR ANY

24   ATTORNEY OR COURT THAT WOULD ASK YOU QUESTIONS; IS THAT

25   CORRECT?

112

1    A.    YES, SIR.

2    Q.    IN ANY SITUATION; IS THAT CORRECT?

3    A.    YES, SIR.

4    Q.    ALL RIGHT.  NOW, WHEN YOU HAD TESTIFIED BEFORE IN THE

5    PROCEEDING WE HAD TALKED ABOUT WHERE YOU HAD SAID THAT

6    MR. HOUSTON WAS WITH YOU IN LOMPOC AND HADN'T HELPED YOU RUN

7    DRUGS WITH PHIL MYERS AND MR. HEVLE, AND THEN YOU WERE

8    CONFRONTED THAT IN FACT WITH THE HOUSING QUARTERS, THAT WAS

9    A PHYSICAL IMPOSSIBILITY, YOU HAD IN FACT PREVIOUSLY

10   TESTIFIED TO SOMETHING THAT WASN'T TRUE; IS THAT CORRECT?

11   A.    IT WAS JUST A MISUNDERSTANDING OF WHICH TIME WE WERE

12   TALKING ABOUT WHEN I WAS THERE.

13   Q.    OKAY.  AND JUST SO WE UNDERSTAND, I'M NOT -- I'M NOT

14   SAYING THAT YOU PURPOSEFULLY LIED, WE'RE JUST TALKING ABOUT

15   WHETHER OR NOT YOUR TESTIMONY WAS TRUTHFUL OR UNTRUTHFUL;

16   CORRECT?

17   A.    IT WASN'T CORRECT.  I WON'T SAY UNTRUTHFUL.  I'LL SAY

18   IT WASN'T CORRECT BECAUSE I HAD MISTAKEN THE TIME.

19   Q.    IF YOU MAKE A MISTAKE ABOUT A FACT THAT PROVES TO BE

20   LATER NOT TRUE, IT'S UNTRUTHFUL; IS IT NOT?

21   A.    I GUESS.

22   Q.    OKAY.  NOW THIS PLEA AGREEMENT DIDN'T SAY THAT IF YOU

23   COMMITTED PERJURY THE AGREEMENT WOULD BE BREACHED, DID IT?

24   A.    NO, SIR.

25   Q.    IT SAID THAT YOU HAD TO GIVE TRUTHFUL TESTIMONY;

113

1    CORRECT?

2    A.   YES, SIR.

3    Q.   OKAY.  AND THAT IF YOU FAILED TO GIVE TRUTHFUL

4    TESTIMONY, IT COULD BE SUBJECT TO BEING BREACHED AND THE

5    WHOLE DEAL PULLED; CORRECT?

6    A.   YES, SIR.

7    Q.   ALL RIGHT.  NOW, DID IT CAUSE YOU PAUSE WHEN YOU WERE

8    CONFRONTED WITH THE FACT THAT THE INMATE HOUSING QUARTERS

9    PROVED THAT YOU WERE NOT -- THAT YOU WERE INACCURATE IN YOUR

10   TESTIMONY ABOUT MR. HOUSTON DOING DRUGS WITH YOU?

11   A.   NO, BECAUSE I JUST KNEW THAT IT WAS A MISTAKE ON WHICH

12   TIME I WAS THERE.

13   Q.   BUT IT WAS A MISTAKE AS TO WHETHER IN FACT THE FOUR OF

14   YOU, AS YOU HAD TESTIFIED, DISTRIBUTED DRUGS AT LOMPOC AT

15   THAT TIME?

16   A.   NO, SIR, IT WASN'T.

17   Q.   OKAY.

18   A.   THE FOUR OF US WERE, IT WAS JUST AT AN EARLIER TIME.

19   Q.   AND IF I SHOW YOU WITH HOUSING QUARTERS THAT THAT

20   STATEMENT IS UNTRUE NOW, WILL IT CAUSE YOU PAUSE?

21   A.   NO, SIR.

22   Q.   WILL IT NOT CAUSE YOU PAUSE BECAUSE YOU'RE OF THE STATE

23   OF MIND OR BELIEF YOU REALLY CAN TESTIFY ABOUT ANYTHING YOU

24   WANT AND NOTHING'S GOING TO HAPPEN TO YOU?

25   A.   NO, SIR.

1    Q.   IN THOSE PREVIOUS PROCEEDINGS, YOU HAD SAID THAT GLENN

2    FILKINS, PHIL MYERS, AND EDGAR HEVLE, ALONG WITH

3    MR. HOUSTON, WERE THE -- WORKED TOGETHER IN THE EARLY '90S

4    AT LOMPOC TO SELL DRUGS; CORRECT?

5    A.   YES, SIR.

6    Q.   THEN YOU LEARNED AT THOSE EARLIER PROCEEDINGS THAT

7    MR. HOUSTON DID IN FACT NOT COME TO LOMPOC UNTIL AFTER

8    MR. MYERS AND MR. HEVLE HAD ALREADY LEFT; IS THAT CORRECT?

9    A.   YES, SIR.

10   Q.   SO THAT WAS AN ERROR; IS THAT CORRECT?

11   A.   NO.  BECAUSE WE KEPT GOING BACK AND FORTH.  AT ONE

12   TIME, WE WERE ALL THERE TOGETHER.

13   Q.   YOU JUST TESTIFIED THAT MR. HOUSTON WAS ALSO THERE AT

14   LOMPOC WITH YOU AND THAT YOU HAD -- HE AND YOU HAD A

15   DISCUSSION WITH BABY RAY REGARDING DRUGS; IS THAT CORRECT?

16   A.   YES, SIR.

17   Q.   OKAY.  NOW, BABY RAY IS THE SAME ARVA LEE RAY WHO YOU

18   WERE CHARGED WITH BEING A CONSPIRACY TO KILL --

19   A.   YES, SIR.

20   Q.   -- CORRECT?

21        AND YOU HAD GIVEN TESTIMONY UNDER OATH THAT

22   MR. HOUSTON HAD A CONVERSATION WITH BABY RAY AT LOMPOC;

23   CORRECT?

24   A.   YES, SIR.

25   Q.   BUT IN FACT, BABY RAY HAD DIED IN 1989; CORRECT?

1    A.    YES, SIR.

2    Q.    AND MR. HOUSTON NEVER CAME TO LOMPOC UNTIL AFTER 1990;

3    CORRECT?

4    A.    I DON'T KNOW.  I DON'T KNOW WHEN HE GOT THERE.

5          *(PAUSE.)*

6    BY MR. GREEN:

7    Q.    DO YOU KNOW WHO MICHAEL HENRY HOUSTON IS?

8    A.    YES, SIR.

9    Q.    AND I THINK YOU PREVIOUSLY TESTIFIED THAT YOU'RE

10   FAMILIAR WITH HOW THESE INMATE HISTORY QUARTERS WORK; IS

11   THAT CORRECT?

12   A.    YES, SIR.

13   Q.    AND WE HAVE AN EXHIBIT, IT'S ALREADY BEEN ADMITTED INTO

14   EVIDENCE, THE INMATE HOUSING QUARTERS OF MR. HOUSTON.

15         *(PAUSE.)*

16   BY MR. GREEN:

17   Q.    SEE WHERE IT SAYS THAT -- YOU KNOW WHAT RECEIVING AND

18   DISCHARGE SECTION MEANS; IS THAT CORRECT?

19   A.    YES, SIR.

20   Q.    YOU KNOW WHAT "LCM" MEANS; CORRECT?

21   A.    YES, SIR.

22   Q.    THAT'S LOMPOC; IS THAT CORRECT?

23   A.    YES, SIR.

24   Q.    THAT HAS MR. HOUSTON BEING RECEIVED AT LOMPOC ON

25   MARCH 12, 1993; IS THAT CORRECT?

116

1    A.    YES, SIR.

2    Q.    ARVA LEE RAY HAD BEEN DEAD ALMOST FOUR YEARS BY THAT

3    TIME; IS THAT CORRECT?

4    A.    YES, SIR.

5    Q.    SO IT WAS A PHYSICAL IMPOSSIBILITY FOR HIM TO HAVE A

6    DISCUSSION WITH ARVA LEE RAY WHEN THE MAN WAS ALREADY DEAD.

7    A.    NOT IF HE WAS IN LOMPOC PRIOR TO '93.

8    Q.    ARE YOU SAYING THAT HE WAS IN LOMPOC PRIOR TO 1993?

9    A.    I DON'T RECALL THE DATES.  I DON'T KNOW.

10   Q.    YOU DON'T HAVE A MEMORY OF HIM HAVING A CONVERSATION

11   WITH ARVA LEE RAY; IS THAT CORRECT?

12   A.    YES, I DO.

13   Q.    OKAY.  AND -- BUT YOU MAY HAVE A FAULTY MEMORY; IS THAT

14   CORRECT?

15   A.    COULD BE.

16   Q.    BECAUSE YOU'VE DONE A LOT OF DRUGS IN YOUR LIFE; IS

17   THAT CORRECT?

18   A.    I'VE DONE A FAIR AMOUNT, YES, SIR.

19   Q.    OKAY.  AND YOUR MEMORY IS NOT GOOD FOR DATES?

20   A.    NO, IT'S NOT.

21   Q.    OKAY.  AND YOU MAY EVEN HAVE SOME FALSE MEMORIES ABOUT

22   WHETHER OR NOT CERTAIN INDIVIDUALS HAD CONVERSATIONS 10, 20

23   YEARS AGO?

24   A.    YEAH, I COULD.

25   Q.    OKAY.  DO YOU HAVE ANY EVIDENCE THAT IN FACT

117

1    MR. HOUSTON WAS IN LOMPOC IN 1989?

2    A.   NO, SIR, I DON'T.

3    Q.   OKAY.  ARE YOU WILLING TO CONCEDE THAT YOU MAY HAVE

4    BEEN IN ERROR ABOUT MR. HOUSTON HAVING A CONVERSATION WITH

5    ARVA LEE RAY IN 1989?

6    A.   YES, SIR.

7    Q.   AND THEREFORE THAT YOUR TESTIMONY THAT YOU GAVE UNDER

8    OATH MAY HAVE BEEN IN ERROR IN THAT PROCEEDING?

9    A.   YES, SIR.

10   Q.   NOW, IN ORDER TO WORK OUT YOUR PLEA AGREEMENT WITH THE

11   GOVERNMENT, YOU HAD ALSO INFORMED THEM THAT YOU WERE IN NO

12   WAY INVOLVED IN THE ATTEMPTED MURDER OF DAVID NEWMAN; IS

13   THAT CORRECT?

14   A.   YES, SIR.

15   Q.   OKAY.  AND EVEN THOUGH YOU KNEW FROM THE DISCOVERY THAT

16   THEY HAD THAT THERE WERE SOME CONFIDENTIAL INFORMANTS WHO

17   WERE SAYING OTHERWISE, YOU WERE SAYING THAT THEY WERE WRONG?

18   A.   YES, SIR.

19   Q.   IS THAT CORRECT?  THE SAME WAS TRUE -- WELL, FIRST OF

20   ALL, DO YOU KNOW RICHARD BERNARD?

21   A.   NO, SIR, I DON'T.

22   Q.   OKAY.  NEVER HEARD OF HIM?

23   A.   I HEARD THE NAME SEVERAL TIMES, BUT I DON'T KNOW HIM.

24   Q.   WERE YOU AWARE FROM YOUR REVIEW OF THE DISCOVERY THAT

25   YOU WERE GIVEN THAT HE WAS ONE OF THE INFORMANTS WHO HAD

1    SAID THAT YOU WERE INVOLVED --

2              MR. AKROTIRIANAKIS:  OBJECTION.  HEARSAY.

3              THE COURT:  OVERRULED.

4              THE WITNESS:  YES, SIR.

5    BY MR. GREEN:

6    Q.   OKAY.  BUT YOU HAD TOLD THE GOVERNMENT THAT HE WAS

7    WRONG?

8    A.   YES, SIR.

9    Q.   NOW, THE GOVERNMENT HAD ALSO PRESENTED EVIDENCE AT THE

10   DETENTION HEARING THAT YOU WERE INVOLVED IN THE CONSPIRACY

11   TO COMMIT MURDER AGAINST JIMMY LEE INMAN; CORRECT?

12   A.   YES, SIR.

13   Q.   YOU ALSO TOLD THE GOVERNMENT THAT THE INFORMATION THEY

14   HAD WAS WRONG; IS THAT CORRECT?

15   A.   YES, SIR.

16   Q.   YOU WERE ALSO -- THE GOVERNMENT ALSO PRESENTED EVIDENCE

17   THAT YOU WERE INVOLVED IN THE CONSPIRACY TO COMMIT MURDER

18   AGAINST JOEL BURKETT; CORRECT?

19   A.   YES, SIR.

20   Q.   AND YOU TOLD THE GOVERNMENT THAT THE INFORMATION THAT

21   THEY HAD WAS WRONG; IS THAT CORRECT?

22   A.   YES, SIR.

23   Q.   AND YOU WERE NOT CHARGED WITH ANY OF THOSE ACTS; IS

24   THAT CORRECT?

25   A.   YES, SIR.

1    Q.    IS THE CHARGE FOR CONSPIRACY TO COMMIT MURDER AGAINST

2    ARVA LEE RAY, IS THAT STILL PENDING?

3    A.    NO, SIR.

4    Q.    HAS THAT BEEN NOW DISMISSED?

5    A.    YES, SIR.

6    Q.    OKAY.  BUT YOU HAVE NOT YET BEEN SENTENCED ON THE CASE

7    FOR WHICH YOU DID ENTER A PLEA TO WHICH WAS THE ATTEMPTED

8    MURDER OF ROBERT WILSON; IS THAT CORRECT?

9    A.    YES, SIR.

10   Q.    NOW, THAT CHARGE WAS NOT PART OF THIS INDICTMENT;

11   CORRECT?

12   A.    CORRECT.

13   Q.    THAT WAS A NEW CHARGE THAT WAS INSTITUTED BASED UPON

14   YOUR AGREEMENT WITH THE GOVERNMENT?

15   A.    YES, SIR.

16   Q.    CORRECT?

17   A.    YES, SIR.

18   Q.    NOW, YOUR AGREEMENT WITH THE GOVERNMENT IS NOT ONLY

19   THAT THEY WOULD DISMISS THE ARVA LEE RAY COUNT AGAINST YOU

20   BUT THAT YOU WOULD NOT BE CHARGED WITH ANY OF THE ACTS

21   INVOLVED IN THIS INDICTMENT; CORRECT?

22   A.    NO, SIR.

23   Q.    HAVE YOU BEEN CHARGED WITH ANY OF THE DRUG TRAFFICKING

24   IN THIS INDICTMENT?

25   A.    NO, SIR.  THE STATUTE OF LIMITATIONS HAD RAN OUT ON ME.

1   Q.   OKAY.  SO YOU DON'T ANTICIPATE TO BE CHARGED WITH ANY

2   OF THE DRUG TRAFFICKING THAT YOU'VE TESTIFIED TO TODAY AND

3   YESTERDAY, TOO; IS THAT CORRECT?

4   A.   NO, SIR.

5   Q.   YOU HAVE NO EXPECTATION OF THAT; IS THAT CORRECT?

6   A.   NO, SIR.

7   Q.   OKAY.  DID THE STATUTE OF LIMITATIONS RUN ON THE

8   RACKETEERING ACTIVITY FOR YOU WITH RESPECT TO THE DRUG

9   BUSINESS THAT YOU WERE RUNNING?

10  A.   MY UNDERSTANDING IS THAT THE STATUTE HAD RAN OUT ON

11  EVERYTHING EXCEPT THE ONE CHARGE OF MURDER.

12  Q.   OKAY.  INCLUDING THE RACKETEERING ACT AND THE

13  CONSPIRACY TO COMMIT RACKETEERING; IS THAT CORRECT?

14  A.   YES, SIR.

15  Q.   OKAY.  NOW, IN ADDITION TO YOUR -- TO GETTING THE ONE

16  CHARGED DISMISSED AND BEING ABLE TO PLEAD TO THE LESSER

17  CHARGE, THAT CHARGE FOR THE ATTEMPTED MURDER OF MR. WILSON

18  IS UNDER SOME OLD LAWS; IS THAT CORRECT?

19  A.   I HAVE NO IDEA, SIR.

20  Q.   YOU HAVE NOT -- YOU HAVE NOT TESTIFIED BEFORE OR HAD

21  DISCUSSIONS WITH YOUR ATTORNEY THAT YOU'RE GOING TO GET THE

22  BENEFIT -- I'LL REPHRASE THE QUESTION.

23        HAVE YOU NOT TESTIFIED BEFORE THAT IN FACT YOU'RE

24  GETTING THE BENEFIT WITH BEING CHARGED WITH A 1980 CRIME SO

25  YOU HAVE A POSSIBILITY OF NOT HAVING TO DO ONE MORE DAY IN

1    JAIL?

2    A.    I SAID I HOPE I DON'T HAVE TO DO ONE MORE DAY.

3    Q.    THAT'S WHAT YOU'RE HOPING FOR; IS THAT CORRECT?

4    A.    YES, SIR.

5    Q.    AND PART OF THE ARRANGEMENT THAT YOU HAVE WITH THE

6    GOVERNMENT IS THAT AFTER THIS CASE IS DONE -- YOU PLED BACK

7    IN 2003, YOU HAVEN'T BEEN SENTENCED YET -- THAT THE

8    GOVERNMENT WILL GO FORWARD TO THE COURT AND TELL THEM OF

9    YOUR COOPERATION AND THAT LENIENCY WILL BE SHOWN TO YOU; IS

10   THAT CORRECT?

11   A.    YES, SIR.

12   Q.    AND YOU'VE BEEN OUT ON BOND -- ONCE YOU WENT TO THE

13   GOVERNMENT AND TOLD THEM THAT YOU WANTED TO WORK A DEAL AND

14   THAT YOU WANTED TO ENTER INTO THIS PLEA AGREEMENT, WITHIN 10

15   DAYS YOU WERE OUT ON BOND; IS THAT CORRECT?

16   A.    YES, SIR.

17   Q.    AND YOU'VE BEEN OUT ON BOND SINCE 2003, EVER SINCE?

18   A.    YES, SIR.

19   Q.    AND WHILE YOU'VE BEEN OUT ON BOND, THE GOVERNMENT HAS

20   ALSO PAID FOR SOME OF YOUR EXPENSES?

21   A.    YES, SIR.

22   Q.    IN FACT, FOR THE FIRST TWO YEARS, YOU DIDN'T WORK AND

23   THEY PROVIDED YOU $2,040 A MONTH; IS THAT CORRECT?

24   A.    YES, SIR.

25   Q.    OKAY.  SO YOU WERE GIVEN -- YOU WERE GIVEN MONIES

122

1    TOTALING OVER $24,000 A YEAR FOR AT LEAST TWO YEARS;

2    CORRECT?

3    A.    I DON'T KNOW IF IT WAS QUITE TWO YEARS OR NOT.

4    Q.    IT WAS OVER $48,000; IS THAT CORRECT?

5    A.    I HAVE NO IDEA.  YOU'RE RIGHT.  IT WAS $2,040 A MONTH

6    FOR HOWEVER LONG, UNTIL I GOT THE JOB.

7    Q.    THEY PAID FOR YOUR RENT?

8    A.    THAT CAME OUT OF THE 2,040.  THAT WAS FOR MY RENT, MY

9    FOOD, EVERYTHING.

10    Q.    EVERYTHING?

11    A.    YES, SIR.

12    Q.    OKAY.  DIDN'T -- IT WASN'T FOR YOUR CAR, THOUGH.  THEY

13    PAID EXTRA FOR YOUR CAR; IS THAT CORRECT?

14    A.    YES, SIR.

15    Q.    OKAY.  THEY GAVE YOU $10,000 SO YOU COULD BUY YOURSELF

16    A NEW CAR; CORRECT?

17    A.    YES, SIR.

18    Q.    OR A USED CAR?

19    A.    YES, SIR.

20    Q.    CORRECT?  OKAY.

21          AND ALL TOTAL, EXCLUDING YOUR MEDICAL BILLS, WHICH

22    ARE -- IS A LARGE AMOUNT; IS THAT CORRECT?

23    A.    YES, SIR.

24    Q.    EXCLUDING THE MEDICAL BILLS, WITH RESPECT TO YOUR CAR

25    AND THE OTHER STIPENDS YOU'VE GOTTEN FROM THE GOVERNMENT FOR

123

```
1   YOUR SUBSISTENCE, IT'S BEEN OVER $60,000; IS THAT CORRECT?
2   A.   YOU PROBABLY KNOW BETTER THAN I DO.
3   Q.   OKAY.  YOU DON'T DISPUTE THAT AMOUNT?
4   A.   NO, SIR.
5   Q.   ALL RIGHT.  BUT MORE IMPORTANT THAN JUST THE MONEY THAT
6   YOU RECEIVED AND THE DISMISSAL OF THE CHARGE FOR THE ARVA
7   LEE RAY CASE, YOU'VE ALSO BEEN GIVEN YOUR FREEDOM; CORRECT?
8   A.   YES, SIR.
9   Q.   CAN'T PUT A PRICE ON THAT, CAN YOU?
10  A.   NO, SIR.
11  Q.   OKAY.  AND BECAUSE YOU'RE IN THE WITNESS -- THE WITSEC
12  PROGRAM, YOU'VE BEEN GIVEN A NEW IDENTITY; CORRECT?
13  A.   YES, SIR.
14  Q.   AND ALL THOSE CRIMES THAT YOU DID ALL THOSE YEARS, EVEN
15  THE ONES YOU TALKED ABOUT WHERE YOU KIDNAPPED THE OFFICERS
16  AND YOU DID ALL THOSE THINGS, THOSE ARE ERASED; IS THAT
17  CORRECT?
18  A.   TO A DEGREE.
19  Q.   OKAY.  WHEN YOU GO AND APPLY FOR A JOB APPLICATION AND
20  THEY ASK TO RUN YOUR RECORD, AND NOTHING COMES UP; CORRECT?
21  A.   YES, SIR.
22  Q.   OKAY.  YOU GOT TO START A COMPLETELY NEW LIFE?
23  A.   YES, SIR.
24  Q.   NOW, YESTERDAY YOU TALKED ABOUT A LOT OF THREATS OF
25  KILLINGS AND KILLINGS ABOUT THE AB.
```

124

```
1              DO YOU RECALL THAT?

2    A.   YES, SIR.

3    Q.   AND THAT THAT IS HOW THE AB, THE ARYAN BROTHERHOOD,

4    SPREAD ITS REPUTATION; CORRECT?

5    A.   YES, SIR.

6    Q.   AND WOULD YOU AGREE WITH ME THAT IN THE PRISON CULTURE

7    ITSELF, THAT THERE'S A LOT OF BRAVADO?

8    A.   YES, SIR.

9    Q.   OKAY.  THAT THAT'S ONE WAY OF HOW YOU GET ALONG, IS

10   THAT IF YOU BOAST ABOUT HOW TOUGH YOU ARE?

11   A.   IT'S MORE ACTION THAN BOASTING.

12   Q.   MORE ACTION THAN BOASTING?

13   A.   YES, SIR.

14   Q.   OKAY.  BOASTING OCCURS?

15   A.   CERTAINLY.

16   Q.   AND YOU DON'T WANT TO APPEAR WEAK IN FRONT OF OTHER

17   INMATES; CORRECT?

18   A.   RIGHT.

19   Q.   YOU DON'T WANT TO APPEAR WEAK BECAUSE IF THERE'S A

20   PERCEPTION THAT YOU'RE WEAK, THEN SOMEBODY'S GOING TO TAKE

21   ADVANTAGE OF YOU?

22   A.   YES, SIR.

23   Q.   AND ON THE SPECTRUM OF THINGS, HOW YOU COULD BE TAKEN

24   ADVANTAGE OF IS UNMENTIONABLE TO MAYBE YOU HAVING TO GIVE UP

25   SOME OF YOUR COMMISSARY TO SOMEBODY; IS THAT CORRECT?
```

1    A.    YES, SIR.

2    Q.    THAT'S THE RANGE; CORRECT?

3    A.    YES, SIR.

4    Q.    SO ONE OF THE ADVANTAGES YOU FOUND IN BECOMING AN ARYAN

5    BROTHERHOOD MEMBER BACK IN 1980 WAS THAT YOU GOT SOME

6    INSTANT REPUTATION FOR BEING TOUGH?

7    A.    IT ADDED TO IT, YES, SIR.

8    Q.    IT ADDED TO IT; IS THAT CORRECT?

9    A.    YES, SIR.

10   Q.    OKAY.  NOW, YOU WERE ON PROBATION, YOU SAID, WITH THE

11   ARYAN BROTHERHOOD IN 1979?

12   A.    YES, SIR.

13   Q.    AND YOU DIDN'T LEAVE MARION UNTIL THE YEAR 2000;

14   CORRECT?

15   A.    WELL, THAT'S WHEN I WAS RELEASED.  I LEFT SEVERAL

16   TIMES.

17   Q.    I'M SORRY.  WHEN YOU WERE FINALLY RELEASED WHERE YOU

18   WENT OUT ON THE STREET WAS 2000?

19   A.    YES, SIR.

20   Q.    IS THAT CORRECT?

21         AND DURING THAT ENTIRE PERIOD OF TIME, YOU WERE AN

22   ARYAN BROTHERHOOD MEMBER?

23   A.    YES, SIR.

24   Q.    IS THAT CORRECT?

25   A.    YES, SIR.

1    Q.    OKAY.  FOR ALMOST 20 YEARS?

2    A.    YES, SIR.

3    Q.    OKAY.  NOW, DURING THAT TIME, DURING THAT 20-YEAR

4    PERIOD, THOUGH, YOU TAKE THE POSITION THAT YOU NEVER KILLED

5    ANYONE?

6    A.    YES, SIR.

7    Q.    IS THAT CORRECT?

8    A.    YES, SIR.

9    Q.    AND IN FACT THAT YOU DIDN'T COMMIT ANY ATTEMPTED

10   MURDERS; IS THAT CORRECT?

11   A.    YES, SIR.

12   Q.    AND THAT DURING THAT 20-YEAR PERIOD, YOU WEREN'T

13   INVOLVED IN ANY VIOLENT ACTS WHATSOEVER; IS THAT CORRECT?

14   A.    YES, SIR.

15   Q.    OKAY.  WELL, THAT DOESN'T COME INTO THE DOING PART THAT

16   YOU TALKED ABOUT BEFORE; WOULD YOU AGREE?

17   A.    WITH THE WHAT?

18   Q.    YOU HAD SAID IT'S MORE DOING THAN IT IS TALKING.

19   A.    YES, SIR.

20   Q.    I'M PARAPHRASING.

21   A.    YES, SIR.

22   Q.    THAT DOESN'T REALLY JIBE WITH WHAT YOU JUST TOLD ME,

23   DOES IT?

24   A.    WELL, THERE WAS OTHER THINGS THAT I ALREADY HAD A

25   REPUTATION FOR.

1    Q.   BUT YOU COULD GO FOR 20 YEARS IN THE ARYAN BROTHERHOOD

2    AND NOT COMMIT ONE VIOLENT ACT AND STILL HAVE YOUR

3    REPUTATION?

4    A.   YES, SIR.

5    Q.   OKAY.  AND THAT'S WHAT YOU'RE SAYING YOU DID; IS THAT

6    CORRECT?

7    A.   YES, SIR.

8    Q.   OKAY.  YOU ALSO SAID THAT YOU BECAME EVENTUALLY,

9    BECAUSE OF YOUR REPUTATION, ONE OF THE LEADERS IN THE ARYAN

10   BROTHERHOOD?

11   A.   I WAS ON THE COUNCIL, YES, SIR.

12   Q.   OKAY.  ONE OF FIVE PEOPLE ON THE COUNCIL?

13   A.   YES, SIR.

14   Q.   IS THAT CORRECT?

15   A.   YES, SIR.

16   Q.   ALSO A SHOT-CALLER AT LOMPOC?

17   A.   YES, SIR.

18   Q.   OKAY.  AND I BELIEVE YOUR TESTIMONY WAS THAT THE

19   LEADERS IN THE ARYAN BROTHERHOOD TRIED TO STRUCTURE THINGS

20   IN SUCH A WAY THAT THEY WOULDN'T HAVE TO GET THEIR, FOR LACK

21   OF A BETTER TERM, THEIR HANDS DIRTY; IS THAT CORRECT?

22   A.   YES, SIR.

23   Q.   THAT THEY WOULD SET THINGS UP SO THE MINIONS WOULD DO

24   THE VIOLENT ACTS?

25   A.   YES, SIR.

```
1   Q.    IS THAT CORRECT?

2         BUT THAT REALLY DIDN'T HAPPEN AT LEWISBURG, DID

3   IT?  AL BENTON WAS A COMMISSIONER AT THE TIME; RIGHT?

4   A.    YES, SIR.  THAT WAS A UNIQUE SITUATION.

5   Q.    SO THAT WAS AN ABERRATION; IS THAT CORRECT?

6   A.    YES, SIR.

7   Q.    OKAY.  AND YOU NOT KILLING ANYBODY OR ATTEMPTING TO

8   KILL ANYBODY OR DOING ANY VIOLENT ACTS IN A 20-YEAR PERIOD,

9   THAT WAS NOT AN ABERRATION?

10  A.    NO, SIR.

11  Q.    OKAY.  THAT COULD HAPPEN IN THE ARYAN BROTHERHOOD

12  SITUATION?

13  A.    YES, SIR.

14  Q.    CORRECT?  OKAY.

15        NOW, BESIDES JUST THE ARYAN BROTHERHOOD, YOU HAD

16  MENTIONED THINGS ABOUT PRISON LIFE.  THERE'S A -- THERE'S A

17  DIFFERENCE BETWEEN AN INMATE AND A CONVICT; IS THAT RIGHT?

18  A.    YES, SIR.

19  Q.    OKAY.  AND WHEN WE SAY THERE'S A DIFFERENCE BETWEEN AN

20  INMATE AND A CONVICT, WE'RE TALKING ABOUT THE FACT OF HOW

21  INMATES OR PRISONERS ARE PERCEIVED AMONGST THEMSELVES IN

22  THAT CLOSED ENVIRONMENT OF A PENITENTIARY; CORRECT?

23  A.    YES, SIR.

24  Q.    OKAY.  AND INMATES ARE PERCEIVED TO BE MORE WEAK, NOT

25  DOING THEIR TIME WELL; IS THAT CORRECT?
```

1   A.   YES, SIR.

2   Q.   AND THEN CONVICTS ARE PERCEIVED AS BEING STAND-UP GUYS?

3   A.   YES, SIR.

4   Q.   GUYS WHO WALK AROUND WITH PRIDE; CORRECT?

5   A.   YES, SIR.

6   Q.   GUYS WHO ARE TOUGH?

7   A.   YES, SIR.

8   Q.   GUYS WHO KNOW HOW TO GET ALONG WITHIN THE SYSTEM?

9   A.   YES, SIR.

10  Q.   AND IN ORDER TO HAVE THAT SENSE OR PERSONA OF BEING A

11  CONVICT, THERE ARE CERTAIN CODES THAT ONE MUST FOLLOW; WOULD

12  YOU AGREE?

13  A.   YES, SIR.

14  Q.   OKAY.  AND ONE OF THOSE CODES IS TO CREATE THE

15  APPEARANCE OF NOT BEING WEAK?

16  A.   YES, SIR.

17  Q.   OF BEING TOUGH?

18  A.   YES, SIR.

19  Q.   THAT IT'S NOT EASY FOR SOMEBODY TO GET UP ON YOU;

20  CORRECT?

21  A.   YES, SIR.

22  Q.   ALSO ONE OF THOSE CODES IS, IS THAT YOU DON'T TALK TO

23  THE MAN; CORRECT?  THAT'S A CONVICT CODE, IS IT?

24  A.   NOT NECESSARILY.  I MEAN, WHAT ARE YOU TALKING ABOUT

25  TALKING TO HIM?  BECAUSE YOU TALK TO OFFICERS EVERY DAY.

130

1    Q.   OKAY.  I GUESS WHAT I'M TALKING ABOUT IS THAT YOU DON'T

2    SNITCH --

3    A.   YES, SIR.

4    Q.   -- YOU DON'T RAT.

5             THAT'S A CONVICT CODE?

6    A.   YES, SIR.

7    Q.   IS THAT CORRECT?

8    A.   YES, SIR.

9    Q.   ALL RIGHT.  AND THE WAY CONVICTS COMMUNICATE WITH EACH

10   OTHER IS THROUGH KITES; CORRECT?

11   A.   YES, SIR.

12   Q.   THAT'S NOT UNIQUE TO THE ARYAN BROTHERHOOD?

13   A.   NO, SIR.

14   Q.   IN FACT, BEFORE YOU JOINED THE ARYAN BROTHERHOOD, YOU

15   HAD EXPERIENCE WITH PEOPLE'S USING KITES ALL THE TIME?

16   A.   YES, SIR.

17   Q.   THAT'S BEEN AROUND SINCE PRISONS HAVE BEEN AROUND?

18   A.   I WOULD IMAGINE.

19   Q.   OKAY.  AND WITH RESPECT TO WRITING STUFF IN THIS

20   INVISIBLE INK, THE "HIT OR MISS," THAT'S NOT UNIQUE TO THE

21   ARYAN BROTHERHOOD EITHER, IS IT?

22   A.   I WOULDN'T THINK SO.

23   Q.   OKAY.  THAT'S BEEN AROUND FOR AS LONG AS PRISONS HAVE

24   BEEN AROUND?

25   A.   YES, SIR.

1   Q.    OKAY.  WITH RESPECT TO BACKING YOUR BROTHER'S PLAY, YOU

2   MAKE FRIENDSHIPS IN THE PRISON WITH PEOPLE OUTSIDE THE ARYAN

3   BROTHERHOOD; IS THAT CORRECT?

4   A.    YES, SIR.

5   Q.    OKAY.  AND BEFORE YOU WERE AN ARYAN BROTHERHOOD MEMBER,

6   I WOULD ASSUME THAT YOU HAD SOME FRIENDS IN THE SYSTEM?

7   A.    YES, SIR.

8   Q.    AND THAT IN TRUE FRIENDSHIP IF THAT FRIEND WAS IN

9   TROUBLE, YOU WOULD BE THERE TO BACK THEIR PLAY; IS THAT

10  CORRECT?

11  A.    YES, SIR.

12  Q.    SO THAT'S NOT UNIQUE TO THE ARYAN BROTHERHOOD, IS IT?

13  A.    NO, SIR.

14  Q.    ALL RIGHT.  WHEN YOU FIRST CAME IN CONTACT WITH THE

15  ARYAN BROTHERHOOD, IT WAS THROUGH THIS GENTLEMAN BY THE NAME

16  OF TOMMY SILVERSTEIN; CORRECT?

17  A.    YES, SIR.

18  Q.    YOU WERE BOTH HOUSED AT THE SAME INSTITUTION?

19  A.    YES, SIR.

20  Q.    YOU WERE DOING YOUR OWN DRUG BUSINESS AT THAT TIME?

21  A.    YES, SIR.

22  Q.    OKAY.  AND THERE CAME A POINT WHERE YOU TOLD TOMMY

23  SILVERSTEIN TO SHUT UP?

24  A.    YES, SIR.

25  Q.    OKAY.  NOW THAT WASN'T A FORM OF DISRESPECT TO TOMMY

1    SILVERSTEIN?

2    A.    YEAH, IT WAS.

3    Q.    AND YOU'RE STILL HERE TODAY TO TALK ABOUT?

4    A.    WELL, HE TOOK IT -- HE LATER ON TOLD ME THAT IT SHOCKED

5    HIM SO MUCH THAT I WOULD SAY THAT TO HIM THAT, AFTER HE WAS

6    FIRST MAD, HE CALMED DOWN AND WE BECAME FRIENDS.

7    Q.    OKAY.  AND SO DISRESPECT CAN TAKE A NUMBER OF DIFFERENT

8    FORMS IN THE PRISON?

9    A.    YES, SIR.

10   Q.    AND WHETHER OR NOT AN INDIVIDUAL REACTS ON THAT

11   DISRESPECT CAN BE CONTROLLED BY THE INDIVIDUAL; IS THAT

12   CORRECT?

13   A.    YES, SIR.

14   Q.    NOW, YOU WEREN'T AFRAID OF TOMMY SILVERSTEIN, OF

15   TELLING HIM TO SHUT UP AT THAT TIME?

16   A.    NO, SIR.

17   Q.    YOU KNEW HIM TO BE A LEADER OF THE ARYAN BROTHERHOOD?

18   A.    YES, SIR.

19   Q.    YOU WERE DOING YOUR OWN DRUG BUSINESS AT THAT TIME?

20   A.    YES, SIR.

21   Q.    CORRECT?

22          SO THE PRISON IS A PLACE WHERE INDIVIDUAL INMATES

23   CAN BEHAVE INDEPENDENT OF ANY GROUP OR GANG; WOULD YOU

24   AGREE?

25   A.    CERTAIN ONES, YES.

133

1    Q.    OKAY.  YOU HAD BEEN ASKED BEFORE ABOUT WHETHER OR NOT

2    THE ARYAN BROTHERHOOD MEMBERSHIP WAS WHITE WHEN YOU JOINED,

3    BUT THAT KENNY AGTUCA WAS A PHILIPPINE; IS THAT CORRECT?

4    A.    YES, SIR.

5    Q.    BUT T.D. BINGHAM WAS JEWISH; CORRECT?

6    A.    I DON'T KNOW IF HE IS OR NOT.

7    Q.    IN ALL THE HISTORY AND YOUR ASSOCIATION WITH THE ARYAN

8    BROTHERHOOD, YOU DIDN'T KNOW THAT T.D. BINGHAM WAS JEWISH?

9    A.    NO, SIR.

10   Q.    HE'S ONE OF THE ALLEGED LEADERS OF THE ARYAN

11   BROTHERHOOD; CORRECT?

12   A.    YES, SIR.

13   Q.    AS FAR AS THE FEDERAL PENITENTIARY SYSTEM WENT WHEN YOU

14   WERE THERE, IT WAS BARRY MILLS AND T.D. BINGHAM, THEY WERE

15   KIND OF THE PAIR, WEREN'T THEY?

16   A.    YES, SIR.

17   Q.    YET YOU DIDN'T KNOW WHAT HIS ETHNIC BACKGROUND WAS?

18   A.    NO, SIR.

19   Q.    ALL RIGHT.  DID YOU -- BUT EVEN THOUGH YOU JOINED THE

20   ARYAN BROTHERHOOD, IT WAS CLEAR THAT IT WAS NOT A WHITE

21   SUPREMACIST GROUP; WOULD YOU AGREE?

22   A.    YES, SIR.

23   Q.    OKAY.  AND THAT IN FACT THERE WERE PERIODS OF TIME WHEN

24   THE ARYAN BROTHERHOOD SPECIFICALLY REJECTED PEOPLE WHO

25   WANTED TO BE MEMBERS BECAUSE OF THEIR RACIAL HATRED?

1    A.    YES, SIR.

2    Q.    SPECIFICALLY SKINHEADS BEING ONE GROUP; IS THAT

3    CORRECT?

4    A.    YES, SIR.

5    Q.    THE ARYAN BROTHERHOOD DIDN'T WANT MEMBERS WHO HAD SUCH

6    A RACIAL ANIMUS; CORRECT?

7    A.    YES, SIR, I WOULD SAY.

8    Q.    AND IN FACT, YOU HAD ALREADY DEVELOPED FRIENDSHIPS WITH

9    YOURSELF WITH INMATES OF OTHER COLORS AND OTHER CREEDS; IS

10   THAT CORRECT?

11   A.    YES, SIR.

12   Q.    ALL RIGHT.  AND THAT WASN'T FROWNED UPON WHEN YOU

13   JOINED THE ARYAN BROTHERHOOD?

14   A.    NO, SIR.

15   Q.    ALL RIGHT.  WHEN YOU WERE PUT UP, YOU SPENT YOUR

16   INITIAL PART OF THE TIME IN THE ARYAN BROTHERHOOD WITH TOMMY

17   SILVERSTEIN?

18   A.    YES, SIR.

19   Q.    AND TOMMY SILVERSTEIN IS THE ONE WHO EDUCATED YOU IN

20   THE HISTORY OF THE ARYAN BROTHERHOOD; CORRECT?

21   A.    NO.  BARRY MILLS MORE SO.

22   Q.    DO YOU RECALL TESTIFYING IN A PROCEEDING IN 2006 WHERE

23   YOU WERE ASKED A QUESTION OF HOW YOU LEARNED ABOUT THE ARYAN

24   BROTHERHOOD HISTORY AND YOU SAID FROM TOMMY SILVERSTEIN?

25   A.    YEAH, I DID FROM HIM AND BARRY MILLS.  MORE IN DEPTH

1    FROM BARRY THAN TOMMY.

2    Q.    WELL, IN THAT PROCEEDING WHEN YOU WERE ASKED A

3    QUESTION, YOU HAD GIVEN THE NAME TOMMY SILVERSTEIN AS

4    OPPOSED TO BARRY MILLS; AGREED?

5    A.    OKAY.

6    Q.    OKAY.  YOU DON'T DISPUTE THAT; IS THAT CORRECT?

7    A.    NO, SIR.

8    Q.    AND NOW YOU'RE TELLING ME THAT YOU LEARNED THE HISTORY

9    FROM BOTH TOMMY SILVERSTEIN AND BARRY MILLS; IS THAT

10   CORRECT?

11   A.    YES, SIR.

12   Q.    YET WHEN THE GOVERNMENT ASKED YOU THAT QUESTION, YOU

13   JUST GAVE THE NAME BARRY MILLS; IS THAT CORRECT?

14   A.    I GOT MORE IN DEPTH FROM BARRY.  I WAS WITH BARRY

15   LONGER.

16   Q.    IN THAT PROCEEDING, WHY DID YOU NOT SAY BARRY INSTEAD

17   OF TOMMY?

18   A.    I HAVE NO IDEA.  I DON'T KNOW HOW THE QUESTION WAS

19   ASKED.  I DON'T KNOW.

20   Q.    DOES IT MAKE A DIFFERENCE HOW THE QUESTION WAS ASKED OF

21   WHO YOU LEARNED THE HISTORY OF THE AB FROM?

22   A.    IF THEY ASKED ME DID I LEARN ANY HISTORY FROM TOMMY

23   SILVERSTEIN, AND I SAID *YES.*

24   Q.    AND WAS THERE --

25   A.    I HAD --

```
1   Q.   A REASON WHY --

2   A.   -- TRUTHFUL.

3   Q.   IS THERE A REASON WHY YOU WOULD -- IF THEY SAID, *DID*

4   *YOU LEARN ANY HISTORY FROM TOMMY SILVERSTEIN?* YOU SAY, *YES,*

5   YOU WOULDN'T SAY ALSO BARRY MILLS?

6   A.   NOT UNLESS IT WAS ASKED.

7   Q.   OKAY.  SO ARE YOU CAUTIOUS ABOUT HOW YOU ANSWER

8   QUESTIONS?

9   A.   NO, SIR.  I JUST ANSWERED WHAT YOU ASKED.

10  Q.   OKAY.  WHEN YOU WERE LEARNING ABOUT THE ARYAN

11  BROTHERHOOD, YOU WERE LEARNING ABOUT THAT THIS WAS JUST A

12  GROUP OF GOOD WHITE GUYS WHO WERE WATCHING EACH OTHER'S

13  BACKS; RIGHT?

14  A.   YES, SIR.

15  Q.   OKAY.  AND IT WASN'T A RACIST GROUP; CORRECT?

16  A.   YES, SIR.

17  Q.   OKAY.  AND THAT THE ARYAN BROTHERHOOD WAS A GANG AT

18  THAT TIME THAT LET YOU BE YOUR OWN MAN; IS THAT CORRECT?

19  A.   YES, SIR.

20  Q.   OKAY.  IN FACT, YOU THOUGHT OF EACH OTHER AS EQUALS?

21  A.   YES, SIR.

22  Q.   ALTHOUGH ADMITTEDLY, BARRY MILLS HAD SOME DEFERENCE

23  BECAUSE OF HIS SENIORITY AND HIS AGE IN THE INSTITUTION; IS

24  THAT CORRECT?

25  A.   YES.
```

137

1    Q.   ALL THAT'S TRUE; RIGHT?

2    A.   YES, SIR.

3    Q.   ALL RIGHT.  AND I THINK YOU HAD SAID YESTERDAY THAT

4    WHEN YOU WERE LEARNING THE HISTORY OF THE ARYAN BROTHERHOOD,

5    THAT IT ORIGINALLY STARTED OUT WITH A GROUP OF INMATES FROM

6    SAN QUENTIN WHO WERE CALLED THE BLUE BOYS?

7    A.   YES, SIR.

8    Q.   BUT IN FACT, THE GROUP WAS CALLED THE BLUE BIRDS;

9    CORRECT?

10   A.   YEAH, YOU'RE RIGHT.

11   Q.   BUT YOU JUST MADE A LITTLE MISTAKE THERE YESTERDAY; IS

12   THAT CORRECT?

13   A.   YES, SIR.

14   Q.   OKAY.  NOW, AS FROM 1980 TO 1989, THE ARYAN BROTHERHOOD

15   IS PROCEEDING IN THE MANNER WE JUST DESCRIBED.  YOU'RE ALL

16   EQUALS, YOU'RE ALL GETTING ALONG, YOU WATCH YOUR PLAY; IS

17   THAT CORRECT?

18   A.   PRETTY MUCH, YES, SIR.

19   Q.   OKAY.  BUT THERE COMES A TIME, THOUGH, IN THE EARLY

20   '90S WHEN THE NATURE OF THE PRISON SYSTEM ITSELF CHANGES;

21   WOULD YOU AGREE?

22   A.   NATURE OF THE PRISON SYSTEM?  I DON'T UNDERSTAND.

23   Q.   WELL, THE NATURE OF -- THE VIOLENT NATURE OF THE

24   FEDERAL BUREAU OF PRISONS HAD STARTED CHANGING?

25   A.   IT HAD ALWAYS BEEN VIOLENT.

138

```
 1   Q.   OKAY.  IT'S A VIOLENT CULTURE?

 2   A.   YES, SIR.

 3   Q.   OKAY.  YOU ALWAYS HAVE TO BE ON POINT?

 4   A.   YES, SIR.

 5   Q.   YOU ALWAYS HAVE TO WATCH YOUR BACK?

 6   A.   YES, SIR.

 7   Q.   AND THAT'S BECAUSE YOU DON'T KNOW WHO YOU'RE GOING TO

 8   BE HOUSED WITH BECAUSE THE BUREAU OF PRISONS MAKES THAT

 9   DECISION; CORRECT?

10   A.   FOR THE MOST PART, YES, SIR.

11   Q.   AND IN FACT, YOU HAVE WHAT'S CALLED A CENTRAL INMATE

12   FILE THAT THE BUREAU OF PRISONS KEEPS?

13   A.   YES, SIR.

14   Q.   AND IN THAT CENTRAL INMATE FILE, THEY ARE SUPPOSED TO

15   RECOGNIZE WHO YOUR POTENTIAL OR KNOWN ENEMIES ARE SO YOUR

16   SAFETY IS SECURED?

17   A.   YES, SIR.

18   Q.   CORRECT?  AND IF YOU GET INTO A FIGHT WITH AN

19   INDIVIDUAL OR YOU HAVE A CONFRONTATION WITH AN INDIVIDUAL OR

20   IT HAS BEEN DEEMED THAT THAT INDIVIDUAL IS IN A RIVAL GANG

21   OF YOURS, THEY ARE SUPPOSED TO KEEP YOU SEPARATED; IS THAT

22   CORRECT?

23   A.   I ASSUME SO.

24   Q.   OKAY.  ISN'T THAT YOUR UNDERSTANDING?

25   A.   FOR THE MOST PART IT WOULD BE, YES.
```

139

1    Q.    OKAY.  THE AB, THE ARYAN BROTHERHOOD, STARTED IN

2    CALIFORNIA; CORRECT?

3    A.    YES, SIR.

4    Q.    OKAY.  BUT GUYS LIKE AL BENTON, THEY WERE FROM THE EAST

5    COAST; CORRECT?

6    A.    YES, SIR.

7    Q.    PHIL MYERS WAS FROM THE EAST COAST; IS THAT CORRECT?

8    A.    YES, SIR.

9    Q.    AND RONNIE SLOCUM WAS FROM THE EAST COAST; IS THAT

10   CORRECT?

11   A.    I DON'T KNOW.  AS LONG AS I'VE KNOWN HIM, HE'S LIVED IN

12   CALIFORNIA.

13   Q.    I'M SORRY, KEVIN ROACH, HE WAS FROM THE EAST COAST.  I

14   GOT RONNIE SLOCUM AND KEVIN ROACH MIXED UP.

15          KEVIN ROACH WAS FROM THE EAST COAST; IS THAT

16   CORRECT?

17   A.    YES, SIR.

18   Q.    OKAY.  NOW DO YOU RECALL WHEN KEVIN ROACH BECAME A

19   MEMBER OF THE AB?

20   A.    I DON'T RECALL THE YEAR, NO, SIR.

21   Q.    OKAY.  WAS IT IN THE '80S OR THE '90S?

22   A.    I WOULD SAY THE '90S.

23   Q.    OKAY.  SO DURING THAT PERIOD OF TIME, IN THE 1980S WHEN

24   YOU GUYS WERE YOUR OWN MEN AND YOU WERE EQUALS, KEVIN ROACH

25   WASN'T IN THE ARYAN BROTHERHOOD; IS THAT YOUR RECOLLECTION?

140

1    A.    I'M GUESSING HE WAS IN THE '90S.

2    Q.    RIGHT.  OKAY.  SO HE WASN'T IN DURING THE '80S;

3    CORRECT?

4    A.    I DON'T THINK SO.

5    Q.    OKAY.  NOW, AL BENTON WAS IN THE ARYAN BROTHERHOOD IN

6    THE 1980S; IS THAT CORRECT?

7    A.    YES, SIR.

8    Q.    OKAY.  AND IN FACT, HE WAS AGAIN ONE OF THOSE SENIOR

9    MEMBERS BECAUSE OF HIS LONGEVITY THAT WAS LOOKED UP TO?

10   A.    MORE SO BECAUSE OF HIS RELATIONSHIP WITH BARRY MILLS.

11   Q.    OKAY.  BECAUSE HE HAD A CLOSE, TIGHT RELATIONSHIP WITH

12   BARRY MILLS, HE WAS LOOKED UP TO?

13   A.    YES, SIR.

14   Q.    OKAY.  NOW DURING THE '80S, HAD THE ARYAN BROTHERHOOD

15   HAD THIS THREE-MAN COMMISSION?

16   A.    NO, SIR.

17   Q.    OKAY.  DID YOU EVER HAVE ANY DISCUSSIONS WITH KEVIN

18   ROACH?

19   A.    YES, SIR.

20   Q.    DID YOU HAVE A DISCUSSION WITH A JON MC GINLEY?

21   A.    NAME SOUNDS FAMILIAR.

22   Q.    WERE YOU AND KEVIN HOUSED TOGETHER FOR SOME TIME?

23   A.    YES, SIR.

24   Q.    WHERE AT?

25   A.    I BELIEVE IT WAS IN B BLOCK.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

141

1    Q.    OKAY.  AND WERE YOU HOUSED WITH KEVIN ROACH AFTER THIS

2    TIME PERIOD WHEN YOU SAY THAT THE EXHIBIT 1 DOCUMENT WAS

3    ATTEMPTED BEING DRAFTED, IN 1993?

4    A.    I JUST DON'T REMEMBER.

5    Q.    OKAY.  IN THOSE CONVERSATIONS WITH -- YOU HAD WITH

6    KEVIN ROACH, DID HE EVER EXPRESS TO YOU HIS DISPLEASURE ON

7    HOW BARRY MILLS, IN HIS MIND, RAN THE ARYAN BROTHERHOOD?

8    A.    NOT THAT I CAN RECALL.

9    Q.    DID KEVIN ROACH EVER EXPRESS TO YOU HOW HE WANTED TO

10   TAKE THE ARYAN BROTHERHOOD INTO A DIFFERENT DIRECTION?

11   A.    NO, SIR.

12   Q.    WAS HE INVOLVED IN ANY OF THESE CONVERSATIONS ABOUT THE

13   REORGANIZATION OF THE ARYAN BROTHERHOOD THAT YOU DISCUSSED

14   EARLIER?

15   A.    NOT THAT I CAN RECALL, NO.

16   Q.    IN THE SCHEME OF THINGS, YOU HAD BEEN IN THE ARYAN

17   BROTHERHOOD LONGER THAN KEVIN ROACH; IS THAT CORRECT?

18   A.    YES, SIR.

19   Q.    OKAY.  AND AS YOU HAD SAID, YOU BECAME A COUNCILOR; IS

20   THAT CORRECT?

21   A.    YES, SIR.

22   Q.    OKAY.  AND YOU HAD THE REPUTATION OF BEING A GOOD AB

23   MEMBER; CORRECT?

24   A.    YES, SIR.

25   Q.    OKAY.  DID THERE COME A TIME WHEN KEVIN ROACH WAS MADE

142

1    HEAD COUNCILOR AND PUT IN A POSITION ABOVE YOU?

2    A.    HE WAS -- YEAH, AT SOME POINT, I DO RECALL HIM PUTTING

3    HIM AS HEAD COUNCILOR.  I DO RECALL THAT.

4    Q.    THAT COULDN'T HAVE BEEN EASY TO TAKE.  YOU HAD BEEN IN

5    THE AB FOR A LONG TIME.  HERE THIS SNOT-NOSED KID COMES UP

6    AND HE'S PUT IN FRONT OF YOU?

7    A.    DIDN'T MAKE ME A BIT OF DIFFERENCE.

8    Q.    DIDN'T MAKE YOU A BIT OF DIFFERENCE?

9          NOW, AT THE TIME THAT HE WAS MADE HEAD COUNCILOR,

10   BARRY MILLS HAD ALREADY BEEN SENT TO ADX, THE ALCATRAZ IN

11   COLORADO; CORRECT?

12   A.    I GUESS.  I DON'T KNOW THE DATE.

13   Q.    YOU DON'T RECALL?

14   A.    NO, I DON'T.

15   Q.    WELL, YOU DON'T HAVE TO RECALL THE DATE.

16         CAN YOU RECALL THE SEQUENCE OF EVENTS?

17   A.    NOT AS FAR KEVIN ROACH, BECAUSE I WASN'T REAL CLOSE

18   WITH KEVIN ROACH.

19   Q.    I CAN UNDERSTAND YOU NOT BEING REAL CLOSE WITH HIM, BUT

20   HE WAS THE HEAD COUNCILOR WHO YOU WERE SUPPOSED TO ANSWER

21   TO.

22   A.    NO, I ANSWERED TO THE COMMISSION.

23   Q.    YOU DIDN'T ANSWER TO THE HEAD COUNCILOR?

24   A.    NO, SIR.

25   Q.    YOU GOT TO SKIP OVER HIM AND JUST GO STRAIGHT TO BARRY?

1    A.    I ALWAYS DID.

2    Q.    OKAY.  AND SO THIS REORGANIZATION THAT HAPPENED REALLY

3    WASN'T BEING IMPLEMENTED?

4    A.    YES, IT WAS.

5    Q.    WELL, THEN -- BUT YOU SAID -- YOU JUST TOLD ME YOU

6    WOULDN'T GO TO KEVIN ROACH?

7    A.    KEVIN ROACH.  I DON'T BELIEVE KEVIN ROACH EVER LEFT

8    MARION, UNLESS HE WENT TO FLORENCE.

9    Q.    YOU WERE NEVER AT ADX; CORRECT?

10   A.    NO, SIR.

11   Q.    AND BARRY MILLS WAS AT ADX DURING THIS TIME PERIOD?

12   A.    YES, SIR.

13   Q.    AND YOU WERE AT MARION; IS THAT CORRECT?

14   A.    YES, SIR.

15   Q.    BUT YOU DON'T RECALL WHERE KEVIN ROACH WAS?

16   A.    NO, SIR.  I IMAGINE HE WENT OUT WITH THE REST OF THEM

17   TO FLORENCE.

18   Q.    WHAT ABOUT JON MC GINLEY?  IN THIS RESTRUCTURED

19   ORGANIZATION, IT SOUNDS TO ME LIKE YOU NEVER HAD A

20   CONVERSATION WITH JON MC GINLEY.

21   A.    I -- I DON'T -- I RECALL THE NAME.  BUT, NO, I DIDN'T

22   HAVE A CONVERSATION -- THAT I CAN RECALL, I DIDN'T HAVE A

23   CONVERSATION.

24   Q.    YOU DIDN'T GET A KITE FROM HIM?

25   A.    NOT THAT I RECALL.

144

```
 1    Q.   YOU DIDN'T GET ANY TYPE OF CONVERSATION FROM
 2    JON MC GINLEY AT ALL?
 3    A.   I DON'T -- I DON'T -- I VAGUELY KNOW THE NAME.
 4    Q.   AND THIS GUY IS SUPPOSED TO BE THE HEAD OF THE SECURITY
 5    UNIT FOR THE ARYAN BROTHERHOOD AFTER THE REORGANIZATION;
 6    CORRECT?
 7    A.   I DON'T KNOW.
 8    Q.   YOU'RE A COUNCILOR ON THE ARYAN BROTHERHOOD RE -- THE
 9    NEW ARYAN BROTHERHOOD AFTER THE NEW REORGANIZATION AND
10    JON MC GINLEY IS SUPPOSED TO BE THE NEW HEAD OF SECURITY FOR
11    THE NEW ORGANIZATION OF THE AB, AND YOU DON'T KNOW HIM?
12    A.   MEANING COUNCILOR, ALL I WAS COUNCILOR OF WAS LOMPOC,
13    CALIFORNIA.
14    Q.   I'M JUST ASKING, YOU DON'T KNOW HIM?
15    A.   NO.
16    Q.   NOW WHEN YOU STARTED WITH THE AB, THERE WAS NO "BLOOD
17    IN"; IS THAT CORRECT?
18    A.   YES.
19    Q.   THAT HAD ENDED; CORRECT?
20    A.   YES, SIR.
21    Q.   OKAY.  AND SO -- THAT'S GOING ALL THE WAY BACK TO 1980;
22    CORRECT?
23    A.   YES, SIR.
24    Q.   OKAY.  AND THERE WERE NO OATHS?
25    A.   NO, SIR.
```

1  Q.   CORRECT?

2          I'M GOING TO PUT UP ON THE SCREEN WHAT I BELIEVE

3  IS TENTATIVELY ADMITTED EXHIBIT 1.

4          MR. GREEN:  MAY I DISPLAY, JUDGE?

5          THE COURT:  GO AHEAD.

6  BY MR. GREEN:

7  Q.   LET ME SEE IF I CAN ZOOM IN ON THIS.  YOU REMEMBER YOUR

8  TESTIMONY WITH REGARD TO THIS DOCUMENT BEFORE; IS THAT

9  CORRECT?

10  A.   YES, SIR.

11  Q.   I'M PUTTING -- TRYING TO MAKE A LINE OF WHERE THIS

12  DOCUMENT REFERENCES THE OATH THAT BARRY MILLS WANTS THE NEW

13  MEMBERS TO TAKE.  LET ME SEE IF I CAN MOVE --

14      *(PAUSE.)*

15  BY MR. GREEN:

16  Q.   AND DO YOU SEE WHERE IT SAYS *NOW -- CAN BECOME A*

17  *BROTHER -- NO -- CAN BECOME A BROTHER EXCEPT THROUGH*

18  *ADMINISTERED OATH BY SOMEONE OF THE COMMISSION OR COUNCIL,*

19  *BE IT ONE YEAR OR 10 YEARS THAT SOMEONE IS UP.*

20          DO YOU SEE THAT PART OF IT?

21  A.   YES.

22  Q.   THERE'S SOME PARENTHESES.  DO YOU SEE THIS, THE LINE

23  ABOVE MY FINGER?

24  A.   YES, SIR.

25  Q.   *WHILE A NEW FELLA, INTERNAL AFFAIRS OR BUSINESS IS NOT*

1    *TO BE DISCUSSED OR DISCLOSED.  ONCE A NEW FELLA HAS BECOME A*

2    *BROTHER, HE CANNOT PUT SOMEONE UP FOR A PERIOD OF THREE*

3    *YEARS.  WE HAVE SHORTENED THE OATH TO SIMPLY, 'THE AB ASKS*

4    *FOR YOUR MIND, HEART, LIFE.  DO YOU GIVE US THAT?'*

5         THAT'S THE OATH THAT HE IS SAYING HE WANTS THE NEW

6    MEMBERS TO TAKE.

7    A.   YES, SIR.

8    Q.   CORRECT?

9    A.   YES, SIR.

10   Q.   OKAY.

11        MR. GREEN:  JUDGE, MAY I NOW PLAY --

12        THE COURT:  CERTAINLY.  IN FACT, COUNSEL, YOU CAN

13   PUBLISH WITHOUT SEEKING LEAVE ANY DOCUMENT THAT'S ALREADY

14   BEEN ADMITTED.  GO AHEAD.

15   BY MR. GREEN:

16   Q.   REMEMBER TALKING ABOUT EXHIBIT 2 ON YOUR DIRECT THIS

17   MORNING?

18   A.   YES, SIR.

19   Q.   OKAY.  THIS IS ALLEGEDLY TO BE AN OATH OF THE ARYAN

20   BROTHERHOOD; IS THAT CORRECT?

21   A.   YES, SIR.

22   Q.   OKAY.  IN FACT, I WANT TO SEE IF I CAN -- THERE'S THE

23   HANDWRITTEN PORTION ABOVE, AND THEN THERE'S THE TYPEWRITTEN

24   PORTION BELOW.  DO YOU SEE THAT?

25   A.   YES, SIR.

Q.   IT SAYS: *INTEGRITY, LOYALTY, SILENCE, COMPRISE,*
*PRINCIPLE, ETHIC, DESIGN, THESE VIRTUES I SHALL REVERE WHILE*
*PURSUING BOTH PERSONAL AND COMMON ENDEAVORS, MY STRENGTH,*
*WILL AND INTELLECT, DEVOTED MY EYES BEYOND TOMORROW'S*
*HORIZON. MY HEART TESTED AND TRUE. MY TONGUE INTERNALLY*
*SILENT. WITH THESE WORDS I PLEDGE BY LIFE.*

        THAT'S NOT THE OATH THAT'S IN THIS DOCUMENT IN
EXHIBIT 1; IS THAT CORRECT?

A.   THERE WERE -- WHEN HE WAS DRAWING THEM UP, HE MADE
SEVERAL DIFFERENT DRAFTS WHEN HE WAS TRYING TO COME UP WITH
IT.

Q.   RIGHT.  THIS IS BARRY MILLS' IDEA; RIGHT?

A.   YES, SIR.

Q.   AND HE HAD SOME TIME AND HE WAS TALKING TO GOTTI AND HE
WAS -- HE WAS -- ALL HE HAS WAS TIME ON HIS HANDS; RIGHT?

A.   YES, SIR.

Q.   AND SO HE'S -- HE'S THINKING OF THINGS OF HOW HE WOULD
LIKE THE WORLD TO BE; CORRECT?

A.   YES, SIR.

Q.   AND SOME OF THE THINGS THAT HE WAS THINKING ABOUT, YOU
WEREN'T TOO CRAZY ABOUT THEM; IS THAT CORRECT?

A.   YES, SIR.

Q.   AND IN FACT, YOU WERE ALLOWED TO TELL HIM ABOUT YOUR
DISPLEASURE ABOUT SOME OF THE THINGS HE WANTED TO DO WITHOUT
ANY REPERCUSSION; IS THAT CORRECT?

1    A.    YES, SIR.

2    Q.    OKAY.  WHAT WE DON'T HAVE HERE IS, WOULD YOU AGREE, A

3    FINAL DRAFT OF ANY ORGANIZATIONAL PAPERS FOR THE AB?  WOULD

4    YOU AGREE?

5    A.    THAT ONE EXHIBIT WAS BASICALLY THE FINAL DRAFT.

6    Q.    YOU MEAN EXHIBIT 1?

7    A.    YEAH.  I BELIEVE THAT'S IT.

8    Q.    OKAY.  LET'S PUT EXHIBIT 1 BACK UP.  EXHIBIT 1 IS

9    REALLY TWO DOCUMENTS IN ONE; CORRECT?

10   A.    YES, SIR.

11   Q.    YOU HAVE THE TYPEWRITTEN PORTION AND YOU HAVE THE

12   HANDWRITTEN PORTION AT THE BOTTOM.

13   A.    YES, SIR.

14   Q.    CORRECT?

15         AND EXHIBIT -- THE TYPEWRITTEN PORTION UP AT THE

16   TOP, IT ENDS IN MID SENTENCE.  IT DOESN'T END WITH A

17   COMPLETE THOUGHT, DOES IT?

18   A.    NO, SIR.

19   Q.    AND YOU HAD SAID THAT THIS -- SEE AT THE BOTTOM OF THE

20   HANDWRITTEN DOCUMENT, REPRESENTED CALIFORNIA.  DID IT NOT

21   REPRESENT CLEO ROY?

22         MR. AKROTIRIANAKIS:  I'M GOING TO OBJECT.  IT

23   MISSTATES THE TESTIMONY.

24         THE COURT:  THE OBJECTION IS SUSTAINED.

25

1    BY MR. GREEN:

2    Q.   WITH RESPECT TO THE HANDWRITTEN PORTION, YOU WERE ASKED

3    QUESTIONS ABOUT THE LETTER "C" AT THE END OF THE HANDWRITTEN

4    PORTION; IS THAT CORRECT?

5    A.   I DON'T BELIEVE SO.

6    Q.   OKAY.  YOU DON'T -- OKAY.  YOU HAVE NO MEMORY OF GIVING

7    ANY TESTIMONY ABOUT THE HANDWRITTEN PORTION OF THAT?

8    A.   YEAH, I DID.  SOMETHING WAS ASKED ME.  I DON'T THINK I

9    WAS ASKED WHAT THE "C" STOOD FOR.

10   Q.   OKAY.  WELL, THEN LET ME ASK YOU WHAT THE "C" STANDS

11   FOR.

12         WHAT DOES THE "C" STAND FOR?

13   A.   I BELIEVE IT WAS A NOTE THAT CLEO WROTE TO SEND OUT

14   WITH COPIES OF THE TYPEWRITTEN ONES TO EVERYBODY.

15   Q.   SO THE "C" ISN'T THERE TO REPRESENT THE -- MEANING

16   CALIFORNIA?

17   A.   I DON'T BELIEVE SO.  NO, SIR.

18   Q.   ALL RIGHT.

19       (PAUSE.)

20   BY MR. GREEN:

21   Q.   DO YOU KNOW WHO GENE BENTLEY IS?

22   A.   YES, SIR.

23   Q.   WHO'S GENE BENTLEY?

24   A.   EX-MEMBER OF THE ARYAN BROTHERHOOD.

25   Q.   OKAY.  AND GENE BENTLEY, AT ONE TIME, WAS ALLEGEDLY THE

1    HEAD COUNCILOR OF THE ARYAN BROTHERHOOD; IS THAT CORRECT?

2    A.    I THINK SO.

3    Q.    WAS HE HEAD COUNCILOR BEFORE OR AFTER KEVIN ROACH?

4    A.    I DON'T KNOW.

5    Q.    YOU CAN'T RECALL THE SEQUENCE, WHO WAS THE FIRST HEAD

6    COUNCILOR?

7    A.    NO, SIR.

8    Q.    ALL RIGHT.  AND AGAIN, WHEN -- YOU, AS A COUNCILMAN,

9    YOU WOULDN'T GO THROUGH GENE BENTLEY AS YOUR HEAD COUNCILOR,

10   YOU WOULD JUST GO DIRECTLY AND TALK TO BARRY MILLS?

11   A.    ALL THE COUNCIL WOULD GO DIRECTLY TO BARRY MILLS, NOT

12   JUST ME.

13   Q.    HEAD COUNCILOR DIDN'T MEAN ANYTHING?

14   A.    I HAVE NO IDEA.  BY THAT TIME, I WAS ALREADY BACKING

15   AWAY FROM THE AB SO I HAD NO IDEA.

16   Q.    WELL, WHAT ABOUT BACK IN 1985 WHEN YOU WEREN'T?

17   A.    I WAS ALREADY BACKING OUT FROM THEM.

18   Q.    I'M SORRY.  I THOUGHT YOU HAD SAID THIS MORNING THAT

19   YOU WERE BACKING AWAY FROM THE AB IN 1997?

20   A.    THEN TOO.  I HAD -- WHEN THEY STARTED TURNING IT, I

21   STARTED DISTANCING MYSELF FROM THEM.

22   Q.    AND YOU DON'T HAVE ANY MEMORY AS TO WHO WAS HEAD

23   COUNCILOR FIRST, EITHER KEVIN ROACH OR GENE BENTLEY?

24   A.    NO, SIR.

25   Q.    IN YOUR MIND, AT THAT TIME, IN THE MID '90S, YOU DIDN'T

```
1    EVEN CARE WHO THE HEAD COUNCILOR WAS?
2    A.    CORRECT.
3    Q.    OKAY.  AND SO IT WAS OF NO CONCERN OF YOURS?
4    A.    CORRECT.
5    Q.    AND YOU COULD IGNORE WHOEVER THE HEAD COUNCILOR WAS
6    WITHOUT ANY CONSEQUENCES?
7    A.    YES, SIR.
8              THE COURT:  IS NOW A GOOD BREAKING POINT?
9              MR. GREEN:  YES, JUDGE.
10             THE COURT:  ALL RIGHT.
11             ALL RIGHT, THANK YOU, LADIES AND GENTLEMEN.  WE'LL
12   BE IN RECESS FOR AN HOUR AND 15 MINUTES FOR LUNCH.
13             AND REMEMBER WHAT I'VE DIRECTED YOU BEFORE.  DON'T
14   DISCUSS THE CASE OR ANYTHING RELATED TO THE CASE IN THE
15   BROADEST POSSIBLE SENSE, THAT IS, ANY OF THE EVIDENCE THAT
16   YOU'VE HEARD THUS FAR OR ANY OF THE PARTICIPANTS IN THE
17   CASE, THE WITNESSES, THE ATTORNEYS, OR ANYONE ELSE THAT
18   YOU'VE SEEN IN THE COURTROOM.
19             DON'T MAKE UP YOUR MINDS ABOUT THE CASE OR ABOUT
20   ANY ASPECT OF THE CASE OR ANYTHING YOU'VE HEARD ABOUT THE
21   CASE.
22             AND THANK YOU.  WE'LL SEE YOU BACK AT, LET'S SAY,
23   1:45.
24             THANK YOU, LADIES AND GENTLEMEN.  YOU'RE EXCUSED.
25        (JURY OUT.)
```

152

```
 1          (THE FOLLOWING PROCEEDINGS WERE HAD OUTSIDE THE
 2          PRESENCE OF THE JURY:)
 3               THE COURT:  WE ARE IN RECESS.
 4               THE CLERK:  THIS COURT IS IN RECESS.
 5          (LUNCH RECESS.)
 6          (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT
 7          IN THE PRESENCE OF THE JURY:)
 8               THE COURT:  GOOD AFTERNOON.
 9               LET THE RECORD REFLECT THE PRESENCE OF ALL MEMBERS
10     OF THE JURY, ALL COUNSEL AND THE DEFENDANT AND THE WITNESS
11     BACK ON THE WITNESS STAND.
12               YOU MAY RESUME.
13               MR. GREEN:  THANK YOU, JUDGE.
14                         CROSS-EXAMINATION
15     BY MR. GREEN:
16     Q.   MR. WEST, IN YOUR EXPERIENCE AT THE -- IN DIFFERENT
17     FACILITIES AT THE FEDERAL BUREAU OF PRISONS, DID YOU FIND
18     THE GROUP FOR THE GANG OF THE DC BLACKS TO BE LOUDER THAN
19     MOST?
20     A.   GENERALLY, YES.
21     Q.   AND DID YOU ALSO FIND THEM TO BE MORE AGGRESSIVE THAN
22     MOST?
23     A.   YES, SIR.
24     Q.   YOU HAD GIVEN TESTIMONY ON DIRECT EXAMINATION EARLIER
25     TODAY ABOUT YOUR RELATIONSHIP WITH JOHN GOTTI.
```

1          DO YOU RECALL THAT?

2    A.   YES, SIR.

3    Q.   AND AS I UNDERSTAND IT, YOU AND MR. GOTTI WERE HOUSED

4    TOGETHER FOR SOME TIME?

5    A.   YES, SIR.

6    Q.   AND SOMETIMES YOU GUYS WOULD EVEN REC TOGETHER?

7    A.   YES, SIR.

8    Q.   SOMETIMES YOU WOULD EXERCISE TOGETHER.

9    A.   YES, SIR.

10   Q.   NOW, IS IT YOUR UNDERSTANDING THAT DURING THAT TIME

11   PERIOD WHEN YOU AND MR. GOTTI WERE HOUSED TOGETHER, YOU

12   WOULD REC TOGETHER, AND YOU WOULD WORK OUT TOGETHER, THAT HE

13   HAD HIRED THE ARYAN BROTHERHOOD FOR PROTECTION?

14   A.   NOT SO MUCH IN WORDS, BUT BASICALLY THAT'S THE TRUTH.

15   Q.   BASICALLY THAT WAS THE TRUTH?

16   A.   YES, SIR.

17   Q.   OKAY.  AND IT'S YOUR BELIEF THAT MR. GOTTI WAS PAYING

18   THE ARYAN BROTHERHOOD TO MAKE SURE THAT HE WASN'T HARMED?

19   A.   AS -- YES, SIR.

20   Q.   AND I WOULD ASSUME THAT HE KNEW THAT YOU WERE AN ARYAN

21   BROTHERHOOD MEMBER?

22   A.   YES, SIR.

23   Q.   AND ESPECIALLY IF YOU GUYS WERE ON THE SAME TIER

24   TOGETHER AND YOU'RE WORKING OUT TOGETHER, HE THEN WOULD HAVE

25   AN EXPECTATION THAT YOU WOULD BE THERE TO PROTECT HIM?

1    A.    YES, SIR.

2    Q.    AND YOU AND HIM WERE ON THE SAME TIER THE DAY THAT

3    INMATE WAHKIL JOHNSON HIT HIM; IS THAT CORRECT?

4    A.    I HAD JUST CAME INTO THE TIER.  HE WAS STILL OUTSIDE

5    AND IT HAPPENED RIGHT AS WE WERE COMING IN.

6    Q.    AND I UNDERSTAND THAT.  BUT YOU BOTH LIVED ON THE SAME

7    TIER?

8    A.    YES, SIR.

9    Q.    YOU BOTH REC'D AT THE SAME TIME?

10   A.    YES, SIR.

11   Q.    YOU WERE REC'ING -- YOU WERE IN THE RECREATION YARD THE

12   SAME TIME MR. GOTTI AND MR. WAHKIL JOHNSON WAS; IS THAT

13   CORRECT?

14   A.    YES, SIR.

15   Q.    YOU HAD AN OBLIGATION TO MAKE SURE THAT NOBODY WOULD

16   PUT THEIR HANDS ON MR. GOTTI, ACCORDING TO YOUR AGREEMENT

17   WITH HIM?

18   A.    NO.  BECAUSE THERE WAS NO SPOKEN AGREEMENT.  HE JUST --

19   HE BEFRIENDED US WHEN HE CAME IN.  GAVE US MONEY.  SO IT WAS

20   PRETTY MUCH UNSPOKEN.

21   Q.    SO THERE WAS --

22   A.    BUT HAD I BEEN OUT THERE, YES, I WOULD HAVE HELPED HIM.

23   Q.    YOU WERE THE ONLY ARYAN BROTHERHOOD ON THE TIER WITH

24   JOHN GOTTI AT THAT TIME?

25   A.    YES, I BELIEVE SO.

155

1    Q.    OKAY.  AND THIS AGREEMENT THAT YOU HAD TO GIVE HIM

2    PROTECTION, IT SOUNDS TO ME LIKE WHAT YOU'RE SAYING NOW IS,

3    IS THAT IT'S -- IT WAS MORE OF AN INFORMAL UNDERSTANDING?

4    A.    YES, SIR.

5    Q.    OKAY.  WOULD THIS BE ONE OF THOSE SITUATIONS WHERE YOU

6    AND MR. GOTTI HAD BECOME FRIENDS?

7    A.    YEAH, I LIKED HIM.

8    Q.    HE HAD BECOME FRIENDS WITH OTHER ARYAN BROTHERHOOD THAT

9    HE WAS HOUSED WITH?

10   A.    YES, SIR.

11   Q.    OKAY.  THAT'S ONE OF THE OBLIGATIONS OF BEING AN INMATE

12   OR A PRISONER IN THESE TYPE OF INSTITUTIONS, IF YOU WANT TO

13   WORK YOUR WAY DOWN IN THE SYSTEM AND GAIN MORE FREEDOMS, YOU

14   HAVE TO GET ALONG WITH THE OTHER INMATES; IS THAT CORRECT?

15   A.    YES, SIR.

16   Q.    OKAY.  AND IN THE EFFORT OF GETTING ALONG WITH THE

17   OTHER INMATES, YOU AND MR. GOTTI DEVELOPED A RELATIONSHIP?

18   A.    I MEAN, YEAH, WE BECAME FRIENDS.

19   Q.    OKAY.  DID YOU GET -- WAS YOUR FRIENDSHIP TO THE POINT

20   THAT AS WE HAD TALKED ABOUT BEFORE, THAT YOU WOULD BACK EACH

21   OTHER'S PLAY?

22   A.    YES, SIR.

23   Q.    OKAY.  AND SO YOU WERE OF THE POSITION THAT YOUR

24   RELATIONSHIP WITH MR. GOTTI WAS SUCH AT THAT TIME THAT YOU

25   HAD AN OBLIGATION TO WATCH HIS BACK?

1    A.    YES, SIR.

2    Q.    OKAY.  BUT AS FAR AS THERE BEING ANY FORMAL CONTRACT

3    WHERE HE WAS PAYING YOU OR YOU WERE EXTORTING MONEY FROM HIM

4    FOR PROTECTION, THAT DID NOT EXIST?

5    A.    NO, SIR.

6    Q.    IS THAT CORRECT?

7    A.    YES, SIR.

8    Q.    OKAY.  THIS WAS JUST -- THIS WAS JUST A RELATIONSHIP

9    THAT GREW OUT OF BEING HOUSED TOGETHER WITH MR. GOTTI?

10   A.    YES, SIR.

11   Q.    OKAY.  I WOULD ASSUME IF THERE WAS ANYTHING MORE FORMAL

12   AND THAT MR. GOTTI WAS ACTUALLY PAYING YOU MONEY

13   *QUID PRO QUO* IN RETURN FOR PROTECTION, HE WOULD HAVE

14   IMMEDIATELY BEEN UPSET WITH YOU FOR NOT HOLDING UP YOUR PART

15   OF THE DEAL.

16   A.    NO, BECAUSE I WASN'T OUT THERE.

17   Q.    OKAY.  BECAUSE YOU WEREN'T OUT THERE GIVING HIM

18   PROTECTION?

19   A.    NO.  BECAUSE I JUST CAME IN -- THEY WERE RUNNING US IN

20   WHEN THE GUY ASSAULTED HIM.  SEVERAL WHITE BOYS -- DIRTY

21   WHITE BOYS WERE OUT THERE AND THEY IMMEDIATELY HELPED HIM.

22   Q.    AND YOU DIDN'T WALK IN WITH MR. GOTTI?

23   A.    NO.  I WAS -- I WAS IN THE FRONT CROWD COMING IN.

24   Q.    YOU DIDN'T FEEL THE NEED TO NECESSARILY STAY IN CLOSE

25   PROXIMITY TO MR. GOTTI AND MAKE SURE NOTHING WOULD HAPPEN TO

157

1   HIM?

2   A.   NO.

3   Q.   OKAY.  THAT'S BECAUSE THERE WAS NO FORMAL ARRANGEMENT;

4   IS THAT CORRECT?

5   A.   I GUESS.  I MEAN, YOU'RE SPECULATING -- NO, I DID NOT

6   FEEL AN OBLIGATION TO STAND NEXT TO HIM.

7   Q.   AND OFFER HIM PROTECTION?

8   A.   NO.

9   Q.   OKAY.  NOW YOU HAD TESTIFIED EARLIER THAT AFTER THIS

10  HAPPENED, YOU WERE ABLE TO TALK TO MR. GOTTI; CORRECT?

11  A.   YES, SIR.

12  Q.   AND THAT WHEN YOU TALKED TO MR. GOTTI, HE TOLD YOU WHO

13  IN FACT HIT HIM?

14  A.   YEAH.  WELL, WE KNEW.

15  Q.   YOU KNEW.  THE WHOLE TIER KNEW; RIGHT?

16  A.   RIGHT.

17  Q.   AND YOU TALKED TO MR. GOTTI FROM YOUR CELL WHEN HE CAME

18  BACK IN?

19  A.   YES, SIR.

20  Q.   OKAY.  WAS IT AT THAT TIME THAT HE TOLD YOU THAT HE

21  WANTED WAHKIL JOHNSON DEAD AND THERE'S A CONTRACT FOR A

22  MILLION DOLLARS FOR HIM?

23  A.   I DON'T REMEMBER AT WHICH TIME I TALKED -- WHEN HE TOLD

24  ME THAT.

25  Q.   OKAY.  YOU DON'T REMEMBER WHEN, BUT YOU KNOW FOR A FACT

1    THAT HE ACTUALLY EXPRESSED THAT TO YOU?

2    A.    YES, SIR.

3    Q.    OKAY.  NOW WOULD YOU HAVE AN OBLIGATION AS AN ARYAN

4    BROTHERHOOD MEMBER TO THEN CONVEY SUCH A STATEMENT TO BARRY

5    MILLS OR ANYBODY ELSE?

6    A.    IT HAD ALREADY GONE AROUND.

7    Q.    BY THE TIME YOU HEARD ABOUT IT?

8    A.    YES, SIR.

9    Q.    OKAY.  SO IN THAT FIRST CONVERSATION WHEN WE CAME IN

10   AND HE TOLD YOU WHO HIT HIM AND YOU SAW HIM WITH HIS WOUND

11   ON HIS HEAD, HE DID NOT MAKE A DECLARATION AT THAT TIME THAT

12   HE WANTED WAHKIL JOHNSON HIT?

13   A.    NO, SIR.  HE JUST WALKED BY THE RANGE AND THEN THEY

14   BROUGHT JOHNSON BY.

15   Q.    OKAY.  I THOUGHT YOU TALKED TO HIM ABOUT WHAT HAD

16   HAPPENED?

17   A.    NO, SIR.  THEY TOOK HIM STRAIGHT TO THE HOLE.

18   Q.    NOW IT SEEMS LIKE IF -- WHEN YOU LEFT MARION IN 2000,

19   WAHKIL JOHNSON HAD NOT BEEN KILLED BY ANY ARYAN BROTHERHOOD

20   MEMBER; CORRECT?

21   A.    CORRECT.

22   Q.    OKAY.  NO MONEY HAD BEEN EXCHANGED BETWEEN MR. GOTTI

23   AND ANY ARYAN BROTHERHOOD MEMBER WITH RESPECT TO A CONTRACT

24   KILLING FOR WAHKIL JOHNSON; CORRECT?

25   A.    NOT THAT I KNOW OF.

159

1   Q.   OKAY.  THAT'S SOMETHING THAT IN YOUR WAYS OF

2   COMMUNICATION, YOU THINK YOU WOULD HAVE HEARD ABOUT; DON'T

3   YOU THINK?

4   A.   CERTAINLY.

5   Q.   OKAY.  AND IN FACT, IF IT HAD HAPPENED AS YOU SAID,

6   MR. GOTTI WOULD HAVE KNOWN HE WOULD HAVE TO PAY UP?

7   A.   YES, SIR.

8   Q.   CORRECT?

9        AB WOULD HAVE BEEN THERE WITH THEIR HANDS OUT;

10  CORRECT?

11  A.   YES, SIR.

12  Q.   AND THEN YOU WOULD HAVE BEEN THERE SAYING, *GIVE ME MY*

13  *SHARE*?

14  A.   YES, SIR.

15  Q.   OKAY.  BUT THAT NEVER HAPPENED; IS THAT CORRECT?

16  A.   NO, SIR.

17  Q.   NOW, THIS EVENT WITH MR. GOTTI HAPPENED IN 1996;

18  CORRECT?

19  A.   SOUNDS ABOUT RIGHT.

20  Q.   AND EVERYBODY KNEW THAT MR. GOTTI WAS ILL; CORRECT?

21  A.   YES.

22  Q.   THAT HE WAS SUFFERING FROM CANCER; RIGHT?

23  A.   YES.

24  Q.   OKAY.  IF THERE WAS A MILLION-DOLLAR CONTRACT OUT THERE

25  FOR -- FROM MR. GOTTI TO HAVE WAHKIL JOHNSON KILLED, YOU

1    GUYS WEREN'T ORGANIZED ENOUGH THAT FOUR-YEAR PERIOD OF TIME

2    TO GET IT DONE?

3    A.    WELL, IT ALL DEPENDS -- THEY -- THE ADMINISTRATION WAS

4    MAKING SURE TO KEEP HIM AWAY FROM EVERYBODY.

5    Q.    WELL, I -- BUT I THOUGHT YOU HAVE ALL THESE ASSOCIATES

6    THROUGHOUT THE NATION THAT COULD DO IT?

7    A.    IT DEPENDS IF THEY'RE IN THE PEN THAT HE GOES TO.

8    Q.    OKAY.  BECAUSE AS YOU SAID, THE HIGHER-UP GUYS, THE

9    LEADERS, THEY DON'T LIKE TO GET THEIR HANDS DIRTY?

10   A.    FOR THE MOST PART.

11   Q.    CORRECT?

12          AND A MILLION DOLLARS SEEMS LIKE A LOT OF

13   INCENTIVE TO -- ESPECIALLY FOR GUYS THAT ARE IN PRISON AND

14   WHEN VIOLENCE OCCURS ALL THE TIME AND ASSAULTS ARE HAPPENING

15   ALL THE TIME, THAT THAT WOULD BE SOMETHING THAT SHOULD BE

16   ABLE TO BE ACCOMPLISHED IN FOUR YEARS; DON'T YOU THINK?

17   A.    NO.  NOT IF YOU CAN'T GET NEXT TO HIM.  EVENTUALLY IT

18   WOULD HAVE BEEN.

19   Q.    OKAY.  SO THAT WAS THE PROBLEM, IS THAT NOBODY COULD

20   GET NEXT TO WAHKIL JOHNSON IN THAT FOUR-YEAR PERIOD OF TIME

21   WHEN YOU WERE IN THE SYSTEM?

22   A.    THAT'S JUST MY ASSUMPTION, YES.

23   Q.    OKAY.  TODAY DO YOU KNOW IF ANY ARYAN BROTHERHOOD

24   MEMBER HAS EVER GOTTEN CLOSE TO WAHKIL JOHNSON?

25   A.    NO, I DON'T.

161

1    Q.    OKAY.  NOW THE FACT OF THE MATTER IS, IS THAT JOHN

2    GOTTI NEVER OFFERED A MILLION DOLLARS FOR WAHKIL JOHNSON;

3    CORRECT?

4    A.    NO, SIR.  HE DID.

5    Q.    SIR, DO YOU RECALL TESTIFYING IN A PROCEEDING ON

6    SEPTEMBER 26, 2006, IN A PROCEEDING RELATING TO THIS CASE

7    WHERE YOU WERE ASKED SIMILAR QUESTIONS IN REGARDS TO THIS

8    ALLEGED CONTRACT WITH MR. GOTTI AND WAHKIL JOHNSON?

9    A.    YES, SIR.

10   Q.    AT THAT TIME -- OH, I'M SORRY.  THE PAGE IS 143 AND

11   144.  IT'S ALSO BATES STAMP 129354.

12         WE'RE GOING TO BEGIN WITH LINE 13.

13   A.    WHERE ARE WE AT?

14         MR. AKROTIRIANAKIS:  YOUR HONOR, MAY WE HAVE AN

15   EXHIBIT NUMBER, PLEASE?

16         MR. GREEN:  OH, I'M SORRY, JUDGE.

17         JUDGE, THIS IS SOMETHING THAT I OBTAINED OVER THE

18   BREAK AND THEREFORE I DON'T HAVE AN EXHIBIT STICKER ON IT

19   BUT I'D ASK THAT I BE ALLOWED TO MARK THIS AS EXHIBIT 1040

20   AT THIS TIME.

21     (PAUSE.)

22         THE COURT:  AND HAVE YOU GIVEN A COPY TO THE CLERK

23   FOR THE COURT?

24         MR. GREEN:  I DID, JUDGE.

25         THE COURT:  DOES THE WITNESS HAVE A COPY?

162

```
 1              MR. GREEN:  I HAVE A -- NOT AS LARGE OF ONE.
 2         (PAUSE.)
 3              MR. GREEN:  MAY I APPROACH?
 4              THE COURT:  YES, YOU MAY.
 5         (PAUSE.)
 6              MR. GREEN:  WITH THE COURT'S PERMISSION, CAN I
 7    IDENTIFY THIS AS EXHIBIT --
 8              THE COURT:  1040.
 9              MR. GREEN: YES.  THANK YOU.
10    BY MR. GREEN:
11    Q.   AGAIN, FOR THE RECORD, ON PAGE 143 OF THE PROCEEDINGS
12    THAT WERE HELD ON SEPTEMBER 26 OF 2006, BEGINNING WITH
13    LINE 13.
14              QUESTION:  THAT JOHN GOTTI WANTED WALTER JOHNSON
15    KILLED?
16              ANSWER:  YES, MA'AM.
17              QUESTION:  DID HE ASK THE ARYAN BROTHERHOOD TO
18    KILL WALTER JOHNSON?
19              ANSWER:  YES, MA'AM.
20              WAS HE GOING TO PAY YOU?
21              YES, MA'AM.
22              GOING ON TO PAGE 144, BEGINNING WITH LINE 19.
23              QUESTION:  HOW MUCH, DO YOU KNOW?
24              LINE 20.
25              ANSWER:  I BELIEVE THE FIGURE ON WALTER JOHNSON
```

1    *WAS $50,000.*

2    A.   YES, SIR.

3    Q.   THAT WAS YOUR STATEMENT UNDER OATH AT THAT TIME IN

4    REGARDS TO THESE MATTERS; IS THAT CORRECT?

5    A.   YES, SIR.   THERE WERE SEVERAL FIGURES BOUNCED AROUND

6    THE WHOLE TIME, BUT WHAT GOTTI TOLD ME WAS A MILLION.

7    Q.   WHAT GOTTI TOLD YOU WAS A MILLION.   BUT THIS IS THE

8    TESTIMONY YOU GAVE UNDER OATH ON SEPTEMBER 26 OF 2006?

9    A.   YES, SIR.

10   Q.   IS THAT CORRECT?

11   A.   THEY DIDN'T ASK HERE WHAT DID GOTTI TELL ME.

12   Q.   OKAY.   SO WHEN SHE ASKED THE QUESTION, *HOW MUCH, DO YOU*

13   *KNOW?* YOU SAID, *I BELIEVE THE FIGURE ON WALTER JOHNSON WAS*

14   *$50,000.*

15        YOU DID NOT SAY ONE MILLION.

16   A.   NO.   THAT'S -- THAT'S WHAT I PERSONALLY BELIEVED IT

17   WAS.

18   Q.   SO THE DIFFERENCE IS, IS WHAT HE TOLD YOU; IS THAT

19   CORRECT?

20   A.   YES.

21   Q.   OKAY.   SIR, DO YOU REMEMBER BEING ASKED QUESTIONS

22   BEFORE IF YOU'VE TESTIFIED IN ANY OTHER PROCEEDINGS OTHER

23   THAN THE PROCEEDINGS ORIGINATING OUT OF THIS INDICTMENT ON

24   DIRECT EXAMINATION?

25   A.   YES, SIR.

164

1    Q.    OKAY.  AND YOUR RESPONSE TO THE QUESTION ON DIRECT

2    EXAMINATION WAS "NO," THAT YOU'VE ONLY TESTIFIED IN TRIALS

3    ORIGINATING OUT OF THIS PROCEEDING; CORRECT?

4    A.    I DON'T UNDERSTAND THE QUESTION.

5    Q.    IN FACT, YOU HAVE TESTIFIED IN CASES OUTSIDE THESE

6    PROCEEDINGS ORIGINATING FROM THE INDICTMENT FOR WHICH YOU

7    WERE CHARGED AND MR. SAHAKIAN WAS CHARGED; IS THAT CORRECT?

8    A.    YES, SIR, ON ONE OCCASION.

9    Q.    JUST ONE OTHER ONE?

10   A.    YES, SIR, I THINK SO.

11   Q.    YOU'RE NOT SURE?

12   A.    YOU GUYS HAVE ME IN HERE SO OFTEN, NO, I'M NOT SURE.

13   Q.    OKAY.  DID YOU NOT TESTIFY IN A PROCEEDING IN NEW YORK,

14   NEW YORK?

15   A.    YES, SIR, THAT'S THE ONE I'M TALKING.

16   Q.    AND THAT WOULD BE A PROCEEDING THAT WAS HELD IN REGARDS

17   TO JOHN GOTTI, JR.?

18   A.    YES, SIR.

19   Q.    IN THE BINDER THAT'S IN FRONT OF YOU MARKED AS DEFENSE

20   EXHIBIT 10036 IS A TRANSCRIPT FROM THOSE PROCEEDINGS.  AND

21   YOU RECALL TESTIFYING IN IT; IS THAT CORRECT?

22   A.    YES, SIR.

23   Q.    AT THAT TIME, YOU WERE ASKED IF YOU HAD DISCUSSIONS

24   WITH MR. GOTTI; CORRECT?

25   A.    YES, SIR.

165

1   Q.   AND IN THAT PROCEEDING, YOU HAD TESTIFIED THAT

2   MR. GOTTI, IN YOUR DISCUSSIONS WITH HIM, TOLD YOU THAT HE

3   WANTED A CONTRACT OUT ON SALVADOR GRAVANO; CORRECT?

4   A.   YES, SIR.  SAMMY THE BULL.

5   Q.   SAMMY THE BULL.  AND AT THAT POINT IN TIME UNDER OATH,

6   YOUR TESTIMONY WAS THAT MR. GOTTI WAS WILLING TO PAY THE

7   ARYAN BROTHERHOOD A MILLION DOLLARS ON THE CONTRACT FOR

8   SAMMY THE BULL?

9   A.   THAT WAS STANDARD CONTRACT THAT HE HAD ON SAMMY THE

10  BULL I THINK FROM THE BEGINNING OF THE THING.

11  Q.   IN THE PROCEEDINGS ON SEPTEMBER 26, 2006, NOT ONCE

12  DURING YOUR ENTIRE TESTIMONY DID YOU EVER REFERENCE A

13  MILLION DOLLARS AS BEING THE CONTRACT ON WALTER JOHNSON; IS

14  THAT CORRECT?

15  A.   I DON'T KNOW.

16  Q.   THAT WAS JUST LESS THAN TWO YEARS AGO.  YOU DON'T HAVE

17  A MEMORY OF THAT?

18  A.   NO.  I HAVE BEEN IN MANY TRIALS.  WAS THE QUESTION

19  ASKED OF ME?

20  Q.   NOW, AS FAR AS YOU ARE AWARE WHEN YOU LEFT IN 2000, THE

21  ARYAN BROTHERHOOD NEVER HIT SAMMY THE BULL; CORRECT?

22  A.   NO, SIR.  NOBODY HAS.

23  Q.   OKAY.  THE DIFFERENCE IN THAT STATEMENT IN THE

24  PROCEEDINGS OF SEPTEMBER 26 OF 2006 WHERE YOU SAID THE

25  AMOUNT WAS $50,000 AND TODAY WHERE YOU'VE SAID THE AMOUNT

1  WAS A MILLION DOLLARS ON THE CONTRACT FOR WALTER JOHNSON,

2  THAT DIFFERENCE DOESN'T CAUSE YOU PAUSE?

3  A.   NO, SIR.   THERE WAS A NUMBER OF FIGURES THROWN AROUND

4  AT THE TIME.   $250,000.   A MILLION.   ALL I KNOW IS WHAT

5  GOTTI TOLD ME AT ONE TIME, THAT HE TOLD ME PERSONALLY.

6  Q.   AND WHEN ASKED IN THAT PROCEEDING IN 2006 OF WHAT THE

7  VALUE WAS, YOU JUST CHOSE TO STAY 50,000 INSTEAD OF A

8  MILLION --

9  A.   BECAUSE THAT'S WHAT I BELIEVE IT WAS GOING TO BE BY

10 THAT TIME.

11 Q.   DID YOU HAVE SUBSEQUENT CONVERSATIONS WITH JOHN GOTTI

12 WHERE HE SAID, *YOU KNOW WHAT, THAT MILLION-DOLLAR FIGURE'S*

13 *TOO MUCH.   I'M ONLY GOING TO DO IT FOR 50,000*?

14 A.   NO, SIR.

15 Q.   WAS JOHN GOTTI A PERSON WHO, WHEN YOU HAD A

16 CONVERSATION WITH HIM, YOU TOOK HIM AT HIS WORD?

17 A.   YES, SIR.

18 Q.   DO YOU HAVE REASON TO BELIEVE THAT IF HE TOLD YOU A

19 MILLION DOLLARS, THAT HE THEN WENT BACK ON HIS WORD?

20 A.   OVER TIME HE MIGHT HAVE THOUGHT BETTER OF IT.

21 Q.   THAT'S A GUESS ON YOUR PART; RIGHT?

22 A.   YES, SIR, IT IS.

23 Q.   ALL RIGHT.   THAT'S NOT -- THAT'S NOT WHAT YOU HEARD;

24 CORRECT?

25 A.   NO, SIR.

1   Q.   YOU'RE HERE TODAY TO TESTIFY ABOUT THINGS THAT YOU

2   PERSONALLY KNOW ABOUT; CORRECT?

3   A.   YES, SIR.

4   Q.   THE AMOUNT OF $50,000 THAT YOU TESTIFIED BACK TO IN

5   2006, THAT WASN'T SOMETHING YOU HAD PERSONAL KNOWLEDGE OF?

6   A.   THAT'S WHAT I BELIEVE MC ELHINEY HAD TOLD ME.

7   Q.   IN THE CONVERSATION WHEN YOU TALKED WITH MC ELHINEY

8   ABOUT THAT AMOUNT, DID YOU SAY, *WELL, HE TOLD ME A MILLION*?

9   A.   NO, BECAUSE I JUST GOT -- I GOT A BUNCH OF KITES FROM

10  MC ELHINEY --

11  Q.   OKAY.

12  A.   -- AT THAT TIME.

13  Q.   IN THESE PROCEEDINGS THAT YOU TESTIFIED TO WITH RESPECT

14  TO THIS INDICTMENT, YOU HAVE NEVER TESTIFIED THAT DAVID

15  SAHAKIAN WAS RUNNING THE DRUGS AT LEAVENWORTH AND THAT

16  BARRY MILLS WAS UPSET WITH HIM; IS THAT CORRECT?

17  A.   NO, SIR, IT'S NEVER BEEN ASKED.

18  Q.   OKAY.  THIS -- THIS IS THE FIRST TIME THAT YOU'VE EVER

19  SAID THAT?

20  A.   YES, SIR.  I BELIEVE SO.

21  Q.   AND IN ALL THESE PROCEEDINGS YOU'VE EVER TESTIFIED TO

22  BEFORE; CORRECT?

23  A.   YES, SIR.

24  Q.   NOW, NOT ONLY HAVE YOU TESTIFIED BEFORE UNDER OATH, BUT

25  YOU'VE ALSO BEEN INTERVIEWED AT LEAST A DOZEN TIMES BY LAW

168

1    ENFORCEMENT AGENTS?

2    A.    NO, SIR.

3    Q.    YOU'VE NOT INTERVIEWED 10 TIMES WITH AGENT HALUALANI?

4    A.    I DON'T KNOW, SIR.  I DON'T BELIEVE SO.

5    Q.    I'M INCLUDING TELEPHONE CALLS AS WELL AS PERSONAL

6    INTERVIEWS.

7    A.    YEAH.  OKAY.  YEAH.

8    Q.    OKAY.  AND ONE OF THE THINGS THAT YOU DO AS A

9    COOPERATING WITNESS OR A CONFIDENTIAL INFORMANT OR SNITCH,

10   WHATEVER WORD YOU WANT TO USE, IS BEFORE THE GOVERNMENT

11   MAKES A DEAL WITH YOU, YOU HAVE TO DEBRIEF WITH THEM;

12   CORRECT?

13   A.    YEAH.  YES.

14   Q.    OKAY.  AND IN THAT DEBRIEF, YOU'RE REQUIRED TO GIVE

15   THEM INFORMATION ON EVERYTHING THAT IS RELEVANT TO THE

16   TOPICS OF WHAT YOU'RE TALKING ABOUT; CORRECT?

17   A.    TO THE QUESTIONS THAT THEY ASK ME, YES.

18   Q.    YOU DON'T HAVE TO VOLUNTEER INFORMATION ON THE ARYAN

19   BROTHERHOOD AT ALL?

20   A.    I DON'T HAVE TO WHAT?

21   Q.    YOU DON'T HAVE TO VOLUNTEER ALL YOUR KNOWLEDGE ON THE

22   ARYAN BROTHERHOOD?

23   A.    NO, SIR.  I JUST ANSWER THE QUESTIONS.

24   Q.    IT'S YOUR UNDERSTANDING THAT WHEN YOU DEBRIEF AND YOU

25   ARE GIVING INFORMATION IN EXCHANGE FOR COOPERATION WITH THE

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
1    GOVERNMENT, THAT YOU ONLY HAVE TO ANSWER THE QUESTIONS THEY
2    PUT FORTH TO YOU?
3    A.   YEAH.  THEY ASK ME AND I TOLD THEM.
4    Q.   YOU DON'T HAVE TO BE FORTHCOMING IN KNOWLEDGE?  YOU
5    HAVE TO WAIT UNTIL THEY ASK FIRST?
6    A.   WELL, I MEAN, I CAN.
7    Q.   OKAY.  AND SO IT'S YOUR POSITION THAT IN ALL THE
8    INTERVIEWS THAT YOU'VE HAD IN ALL THE YEARS SINCE 2003, THAT
9    NOBODY'S ASKED THE QUESTION OF YOU BEFORE OF WHETHER OR NOT
10   BARRY MILLS WAS UPSET WITH DAVID SAHAKIAN AND THE WAY HE RAN
11   THE DRUGS AT LEAVENWORTH?
12   A.   NO, SIR.  NOBODY DID.
13   Q.   AND IT JUST CAME OUT TODAY FOR THE FIRST TIME?
14   A.   THE OTHER QUESTION WAS ASKED AND I ANSWERED IT.
15   Q.   OKAY.  NOW ALSO THE QUESTION WAS ASKED AS TO WHEN YOU
16   HAD THIS CONVERSATION WITH BARRY MILLS WHEN HE WAS UPSET
17   WITH DAVID FOR RUNNING THE DRUGS AT LEAVENWORTH.  DO YOU
18   RECALL THAT UNDER DIRECT EXAMINATION?
19   A.   YES, SIR.
20   Q.   IN FACT, THE QUESTION CAME AFTER SOME OF MY OBJECTIONS.
21   DO YOU RECALL THAT?
22   A.   YES, SIR.
23   Q.   AND THEN THE QUESTIONS WERE FURTHER ASKED AS TO THE
24   TIMING OF WHEN YOU HAD THIS CONVERSATION WITH BARRY MILLS.
25   DO YOU RECALL THAT?
```

1    A.    YES, SIR.

2    Q.    YOU HAD SAID THAT YOU HAD THIS CONVERSATION WITH

3    BARRY MILLS WHEN YOU AND BARRY MILLS WERE TOGETHER IN

4    MARION; CORRECT?

5    A.    YES, SIR.

6    Q.    AND THAT BARRY WAS TELLING YOU THAT TIME ALONE WITH

7    AL BENTON THAT THEY WERE GETTING INFORMATION BACK FROM

8    LEAVENWORTH THAT DAVID SAHAKIAN MAY HAVE BEEN PLAYING FUNNY

9    WITH THE MONEY OR DOING SOMETHING WITH THE DRUGS THAT WASN'T

10   LOOKED FAVORABLY UPON; CORRECT?

11   A.    YES, SIR.

12   Q.    AND THAT PERIOD OF TIME WOULD HAVE BEEN 1993; CORRECT?

13   A.    I THINK IT WAS LATER THAN THAT.

14   Q.    OKAY.  1994?

15   A.    I COULDN'T TELL YOU.

16   Q.    OKAY.  BUT YOU'RE SURE -- YOU CAN'T TELL ME ABOUT THE

17   TIME, BUT YOU'RE SURE THAT BARRY MILLS WAS COMPLAINING TO

18   YOU WHILE YOU AND HE WERE BOTH AT MARION ABOUT DAVID

19   SAHAKIAN AND THE PROBLEMS THAT HE PERCEIVED AT LEAVENWORTH

20   WITH DAVID RUNNING THE DRUGS?

21   A.    NO, I CAN'T EVEN SAY THAT FOR SURE.  IT MAY HAVE BEEN

22   THROUGH CORRESPONDENCE.

23   Q.    WELL, REMEMBER WHEN I DID ALL THE OBJECTIONS AND SAID

24   THERE WAS NO FOUNDATION, AND MR. AKROTIRIANAKIS, RIGHT HERE,

25   SPECIFICALLY ASKED YOU WHERE THOSE CONVERSATIONS TOOK PLACE,

171

1    AND UNDER OATH YOU TOLD HIM THEY TOOK PLACE AT MARION

2    PENITENTIARY?

3    A.   YES, SIR.

4    Q.   YOU TOLD HIM THAT THEY TOOK PLACE AT MARION

5    PENITENTIARY WHEN YOU WERE HOUSED WITH BARRY MILLS; CORRECT?

6    A.   YES, SIR.

7    Q.   WOULD YOU LOOK AT EXHIBIT 1039 IN THE BINDER WHICH IS

8    THE HOUSING QUARTERS OF DAVID SAHAKIAN.

9    A.   (WITNESS SO COMPLIES.)

10   Q.   THIS IS ONE OF THE HOUSING QUARTERS THAT IS ALREADY IN

11   EVIDENCE.

12           THE COURT:  MR. WEST, IF YOU WILL TAP THE LOWER

13   RIGHT-HAND CORNER OF YOUR SCREEN -- JUST TAP IT.  TRY AGAIN.

14   THE VERY LOWER RIGHT-HAND CORNER.  IT CLEARS EVERYTHING.

15   BY MR. GREEN:

16   Q.   SINCE MY COPIES ARE NOT YET IN EVIDENCE, I'M NOT GOING

17   TO DISPLAY IT FOR YOU, BUT YOU HAVE IT IN FRONT OF YOU?

18   A.   YES, SIR.

19   Q.   AND WOULD YOU -- IN 1993, THESE RECORDS SHOW THAT DAVID

20   SAHAKIAN WAS AT MARION PENITENTIARY; IS THAT CORRECT?

21   A.   NO, SIR.

22   Q.   IT DOES NOT?

23   A.   IT SHOWS HE WAS IN LEAVENWORTH.  LEAVENWORTH UP UNTIL

24   6/29 -- 6/26/93, AND THEN HE WENT TO MARION.

25   Q.   SHOW ME THE PAGE NUMBER THAT YOU'RE ON.

1    A.    085146.

2    Q.    EXCUSE ME?

3    A.    085146.

4    Q.    I BELIEVE YOU'RE LOOKING AT THE WRONG EXHIBIT.  YOU'RE

5    LOOKING AT YOUR EXHIBIT.

6    A.    YOU'RE RIGHT.  YOU'RE RIGHT.

7    Q.    LOOK AT THE NEXT ONE.

8    A.    OKAY.

9    Q.    CAN YOU FIND THE YEAR 1993?

10   A.    I'M GETTING THERE.

11   Q.    IT'S BATES STAMP 075823.

12   A.    I DON'T HAVE THAT PAGE.  THIS GOES TO 075822.

13   Q.    YOU DON'T HAVE THE PAGE AFTER IT?

14   A.    NO, SIR.

15           MR. GREEN:  JUDGE, MAY I APPROACH THE WITNESS?

16           THE COURT:  YES, YOU MAY.

17   BY MR. GREEN:

18   Q.    THAT HOUSING RECORD INDICATES THAT MR. SAHAKIAN WAS IN

19   MARION IN 1993?

20   A.    YES, SIR.  IF IT IS, I DON'T SEE A NAME ON IT.  BUT

21   YES, SIR.

22           MR. GREEN:  JUDGE, MAY I APPROACH THE WITNESS?

23           THE COURT:  YES, YOU MAY.

24   BY MR. GREEN:

25   Q.    JUST GIVE YOU HIS ENTIRE HOUSING QUARTER.

173

1          DO YOU SEE HIS NAME ON THE FIRST PAGE OF THAT

2    HOUSING QUARTER?

3    A.   YES, SIR.

4    Q.   DOES IT CORRESPOND WITH THE SUBSEQUENT PAGES THAT

5    FOLLOW IT?

6    A.   YES, SIR.

7    Q.   IN FACT, MR. SAHAKIAN WAS NOT IN LEAVENWORTH IN 1993;

8    CORRECT?

9    A.   YES, SIR.

10   Q.   AND WE ALREADY KNOW THAT BARRY MILLS HAD LEFT FOR ADX

11   IN 1994, CORRECT?

12   A.   YES, SIR.

13   Q.   SO -- AND IF YOU LOOK AT DAVID SAHAKIAN'S HOUSING

14   QUARTER IN FRONT OF YOU AGAIN, DAVID SAHAKIAN DOESN'T GET TO

15   LEAVENWORTH UNTIL 1995?

16   A.   YES, SIR.

17   Q.   CORRECT?

18          I BELIEVE HE GETS THERE AROUND FEBRUARY OF 1995?

19   A.   YES, SIR.

20   Q.   AND HE -- HE'S ONLY THERE FOR ABOUT A NINE-MONTH PERIOD

21   OF TIME?

22   A.   YES, SIR.

23   Q.   AND FOR -- I'M SORRY, FOR A SEVEN-MONTH PERIOD OF TIME.

24   HE LEAVES IN SEPTEMBER OF '95; IS THAT CORRECT?

25   A.   YES, SIR.

174

1    Q.   OKAY.  SO HE'S ONLY THERE FOR A SEVEN-MONTH PERIOD OF

2    TIME, CORRECT?

3    A.   YES, SIR.

4    Q.   AND TWO OF THOSE MONTHS THAT HE'S THERE, HE'S IN THE

5    SHU; IS THAT CORRECT?  ACCORDING TO THOSE RECORDS?

6    A.   YES, SIR.

7    Q.   OKAY.  SO WE KNOW THAT ANY CONVERSATION THAT YOU HAD

8    WITH BARRY MILLS IN 1993 ABOUT HOW DAVID SAHAKIAN WAS

9    SCREWING UP RUNNING DRUGS AT LEAVENWORTH COULDN'T HAVE

10   HAPPENED, FROM THESE DOCUMENTS; CORRECT?

11   A.   YES, SIR.

12   Q.   ALL RIGHT.  PART OF THE DEBRIEFING THAT YOU DID, WERE

13   YOU REQUIRED TO TELL THE LAW ENFORCEMENT AGENCIES WHERE ALL

14   THIS MONEY WAS THAT THE AB WAS MAKING?

15   A.   THEY ASKED WHERE IT WAS GOING, YES.

16   Q.   OKAY.  AND YOU SAID SLOCUM?

17   A.   FOR THE MOST PART, YES.

18   Q.   OKAY.  NOW, DID YOU GIVE THEM BANK ACCOUNTS?

19   A.   NO, SIR.

20   Q.   DID YOU GIVE THEM DEPOSIT BOXES?

21   A.   NO, SIR.

22   Q.   DID YOU GIVE THEM MONEY MARKETING ACCOUNTS?

23   A.   NO, SIR.

24   Q.   OKAY.  YOU JUST TOLD THEM THAT THE MONEY WENT TO

25   SLOCUM?

1    A.    SLOCUM, MARY BENTLEY, A FEW OTHER PLACES.

2    Q.    DID ANY OF THE OFFICERS THAT HAVE DEALT WITH YOU ON

3    THIS CASE FOR THE PAST FIVE YEARS COME TO YOU AND GET YOU TO

4    VERIFY ANY FINANCIAL DOCUMENTS THAT THIS WAS IN FACT AB

5    MONEY THAT WAS EARNED FROM DRUG TRAFFICKING AND FROM SOME

6    OTHER SOURCES?

7    A.    SOME THAT WENT TO MARK NYQUIST, YES.

8    Q.    OKAY.  AND MARK NYQUIST'S BANK ACCOUNTS?

9    A.    THEY WERE CHECKED -- THEY WERE COPIES OF CHECKS THAT

10    HAD BEEN SENT TO HIM.

11    Q.    YOU MEAN THE MONEY ORDERS THAT WERE SENT TO HIM?

12    A.    YES, SIR.

13    Q.    THE MONEY ORDERS THAT WERE SENT TO HIM WHILE HE WAS IN

14    THE PENITENTIARY?

15    A.    THAT WERE SENT TO HIS HOUSE --

16    Q.    OKAY.

17    A.    -- FROM THE PENITENTIARY.

18    Q.    AND THOSE WOULD BE THE ONES THAT WERE IN INCREMENTS OF

19    100-, $105; IS THAT CORRECT?

20    A.    YES, SIR.

21    Q.    OKAY.  BUT HAS ANYBODY BROUGHT TO YOU IN ALL THESE FIVE

22    YEARS A BANK ACCOUNT, A FINANCIAL ACCOUNT, A CD OR ANYTHING,

23    TENS OF THOUSAND, HUNDREDS OF THOUSANDS OF DOLLARS?

24    A.    NO, SIR.

25    Q.    ALL RIGHT.  DAVID SAHAKIAN IS SOMEBODY YOU DON'T KNOW;

176

1    CORRECT?

2    A.    YES, I KNOW HIM.

3    Q.    YOU KNOW OF HIM?

4    A.    YES.

5    Q.    OKAY.  YOU DON'T KNOW HIM?

6    A.    I JUST VAGUELY.  I MEAN, WE WEREN'T TOGETHER A LOT.

7    Q.    IN THOSE PHOTOGRAPHS THAT WERE SEIZED FROM YOUR HOME,

8    DAVID SAHAKIAN'S NOT IN ANY OF THE PHOTOGRAPHS WITH YOU; IS

9    THAT CORRECT?

10    A.    NO, SIR.

11    Q.    THAT'S BECAUSE YOU AND DAVID WERE NEVER HOUSED

12    TOGETHER; IS THAT CORRECT?

13    A.    NEVER WERE.

14    Q.    AND IN FACT, DAVID SAHAKIAN HOLDS NO POSITION OF

15    AUTHORITY THAT YOU'RE AWARE OF IN THE ARYAN BROTHERHOOD?

16    A.    OTHER THAN BEING A MEMBER, NO.

17    Q.    OKAY.  I WANT TO FOLLOW UP ON SOME QUESTIONS WITH

18    RESPECT TO GOVERNMENT'S EXHIBIT 1.  I WANT TO PLACE IT ON

19    THE ELMO AGAIN.

20            YOU HAD -- I'M SORRY.  WHEN YOU HAVE IT, LET ME

21    KNOW.

22            WITH RESPECT TO THAT DOCUMENT, AS I UNDERSTAND

23    YOUR TESTIMONY, THIS WAS SOMETHING THAT AGAIN WAS BEING

24    DRAFTED AND TALKED ABOUT WITH BARRY MILLS, SOMETHING THAT HE

25    WANTED; IS THAT CORRECT?

1    A.    YES, SIR.

2    Q.    AND I THINK I'M CLEAR IN THAT SOME OF THE THINGS YOU

3    DIDN'T WANT AND SOME OF THE OTHER MEMBERS DIDN'T WANT; IS

4    THAT CORRECT?

5    A.    YES, SIR.

6    Q.    OKAY.  AND IN THE PROCESS OF TALKING ABOUT THE THINGS

7    THAT ARE CONTAINED IN THIS DOCUMENT, YOU LIVED ON THE

8    SAME -- OR IN THE SAME UNIT, THE D UNIT WITH BARRY MILLS;

9    CORRECT?

10   A.    YES, SIR.

11   Q.    OKAY.  NOW, AL BENTON LIVED WITH YOU GUYS AT THAT TIME,

12   TOO; IS THAT CORRECT?

13   A.    YES, SIR.

14   Q.    NOW, AND I DIDN'T NOTE THAT YOU HAD MENTIONED THAT HE

15   WAS INVOLVED IN THE DISCUSSIONS WITH RESPECT TO THIS

16   PARTICULAR DOCUMENT.

17   A.    HE WAS.

18   Q.    OKAY.  THAT WAS JUST AN OVERSIGHT ON YOUR PART?

19   A.    I DON'T KNOW.  DID ANYBODY ASK ME?

20   Q.    OKAY.  I THINK THEY ASKED YOU WHO YOU -- YOU OFFERED

21   CLEO ROY, BUT YOU DIDN'T OFFER AL BENTON?

22   A.    NO.  THEY ASKED ME WHO WAS TYPING IT UP.

23   Q.    OKAY.  ALL RIGHT.  SO AS LONG AS PEOPLE ASKED YOU THE

24   QUESTION, YOU'LL DO YOUR BEST TO GIVE THEM THE ANSWER?

25   A.    YES, SIR.

1   Q.   BUT IF THEY DON'T ASK, YOU'RE NOT OFFERING ANY FREE

2   INFORMATION?

3   A.   I'M NOT SUPPOSED TO.

4   Q.   OKAY.  YOU'RE NOT SUPPOSED TO?

5   A.   I'M SUPPOSED TO JUST ANSWER YOUR QUESTIONS, AREN'T I?

6   Q.   OKAY.  ALL RIGHT.

7            NOW, WHEN YOU WERE TAKING THESE DRAFTS BACK AND

8   FORTH BETWEEN CLEO ROY AND BARRY MILLS, WERE THE THREE OF

9   YOU ACTUALLY SITTING DOWN AND DISCUSSING THE ITEMS IN THIS

10  DOCUMENT?

11  A.   NO, SIR.

12  Q.   OKAY.  WERE YOU JUST KIND OF THE COURIER FOR THOSE TWO?

13  A.   FOR THOSE TWO, ANYBODY ELSE THAT WAS ON THE RANGE.  I

14  DON'T REMEMBER EVERYBODY THAT WAS ON THE RANGE.  I KNOW

15  AL BENTON AND I HAD TALKED ABOUT IT.  I THINK WAYNE

16  BRIDGEWATER WAS THERE.

17  Q.   DID YOU EVER TAKE A TYPEWRITTEN COPY TO AL BENTON?

18  A.   I DON'T THINK SO.  I THINK BARRY GAVE THEM OUT.

19  Q.   OKAY.  DO YOU KNOW IF AL BENTON GOT A TYPED COPY FOR

20  HIS INPUT?

21  A.   I'M SURE HE DID.

22  Q.   YOU'RE SURE HE DID?

23  A.   YES, SIR.

24  Q.   OKAY.  NOW, THIS DOCUMENT, YOU WERE ASKED QUESTIONS

25  ABOUT DID BARRY SOMETIMES SEND STUFF OUT TO BE TYPED AND

179

1    BROUGHT BACK INTO THE INSTITUTION.

2         DO YOU REMEMBER THOSE QUESTIONS?

3    A.   YES, SIR.

4    Q.   IS THIS THE TYPE OF DOCUMENT THAT YOU WOULD EXPECT

5    BARRY MILLS TO SEND OUT OF THE INSTITUTION KNOWING THAT THE

6    PRISONS CHECK THE MAIL AND THAT IT WOULD COME BACK IN THIS

7    FORM?

8    A.   NO, BECAUSE WE SENT IT OUT -- STUFF LIKE THAT SO WE

9    WOULD SEND OUT TO A LAWYER IN LEGAL MAIL, WHICH THEY DON'T

10   LOOK IN.

11   Q.   OKAY.  SO IS THAT WHAT YOU'RE SAYING IS, IS THAT BARRY

12   SENT OUT A HANDWRITTEN COPY OF THIS DOCUMENT TO A LAWYER?

13   A.   NO, SIR, I'M NOT SAYING THAT.

14   Q.   OKAY.  YOU'RE JUST SAYING THAT'S -- THAT'S A

15   POSSIBILITY?

16   A.   YES, SIR.

17   Q.   SO YOU DON'T KNOW HOW THIS PARTICULAR DOCUMENT WAS EVER

18   EXECUTED OR DRAFTED; CORRECT?

19   A.   NO, SIR, I DON'T.

20   Q.   ALL RIGHT.  NOW, YOU NOTICE THAT THE TYPE AND THE PRINT

21   IS VERY SMALL?

22   A.   YES, SIR.

23   Q.   CORRECT?  ALL RIGHT.  NOW, YOU GUYS DID NOT HAVE ACCESS

24   TO A COPYING MACHINE OR A XEROX MACHINE; CORRECT?

25   PERSONALLY?

180

1   A.   NO, SIR.

2   Q.   OKAY.  IF YOU WANT SOMETHING COPIED, YOU WOULD HAVE TO

3   GIVE IT TO A CORRECTIONAL OFFICER AND THEY WOULD MAKE THE

4   COPIES FOR YOU?

5   A.   YES, SIR.

6   Q.   CORRECT?

7        ALL RIGHT.  AGAIN, IS THIS THE TYPE OF DOCUMENT

8   THAT YOU WOULD FEEL COMFORTABLE WITH GIVING TO A

9   CORRECTIONAL OFFICER TO MAKE A REDUCED COPY FOR YOU?

10  A.   NO, SIR.

11  Q.   ALL RIGHT.  WHEN YOU DEBRIEFED WITH AGENT HALUALANI AND

12  THE NUMBER OF COMMUNICATIONS YOU HAD WITH HIM, HE NEVER

13  PRESENTED THIS DOCUMENT TO YOU; IS THAT CORRECT?

14  A.   I CAN'T REMEMBER WHEN I FIRST SAW IT.

15  Q.   YOU NEVER HAD A DISCUSSION WITH AGENT HALUALANI PRIOR

16  TO YOUR FIRST TESTIMONY IN THESE PROCEEDINGS WITH RESPECT TO

17  THIS DOCUMENT; IS THAT CORRECT?

18  A.   I DON'T BELIEVE SO.

19  Q.   NOW WHEN YOU WERE DEBRIEFING, IF THIS DOCUMENT EXISTED,

20  ISN'T THIS ONE OF THE THINGS THAT THEY WERE ASKING YOU FOR

21  WITH RESPECT TO THE KNOWLEDGE YOU HAD WITH THE AB?

22  A.   YOU WOULD HAVE TO ASK THEM THAT QUESTION.

23  Q.   OKAY.

24  A.   I DON'T --

25  Q.   AND WHEN YOU SAW SIMILAR HANDWRITING AND TYPEWRITTEN

1    DOCUMENTS WITH SIMILAR RESPECTS TO EXHIBIT 1, THIS WAS ON

2    D UNIT IN MARION; CORRECT?

3    A.    I BELIEVE SO, YES.

4    Q.    AND DAVID SAHAKIAN WAS NOT WITH YOU GUYS ON D UNIT AT

5    THAT TIME; CORRECT?

6    A.    NO, SIR, HE WASN'T.

7    Q.    MR. WEST, WOULD YOU LOOK AT EXHIBIT NO. 1035 THAT WE

8    LOOKED AT BEFORE, WHICH IS YOUR PLEA AGREEMENT?

9    A.    (WITNESS SO COMPLIES.)

10   Q.    WOULD YOU -- WHEN YOU HAVE THAT, WOULD YOU LET ME KNOW?

11   A.    I GOT IT.

12   Q.    I WANT YOU TO JUST TAKE A FEW MOMENTS TO LOOK AT EACH

13   PAGE, AND THERE SHOULD BE NINE PAGES THAT ARE BATES-STAMPED

14   FROM 100,006 -- 106,236 THROUGH 106,244.  MAKE SURE YOU HAVE

15   ALL NINE PAGES.

16   A.    YES, I DO.

17   Q.    NOW -- AND I THINK WE TALKED -- BROUGHT UP WITH YOU

18   EARLIER THAT YOUR SIGNATURE IS ON PAGE 8 OF THIS DOCUMENT.

19   A.    YES, SIR.

20   Q.    IS THIS DOCUMENT A FAIR AND ACCURATE COPY OF THE

21   ORIGINAL THAT YOU SIGNED AND ENTERED WITH THE COURT ON

22   AUGUST 20TH OF 2003?

23   A.    YES, SIR.

24          MR. GREEN:  JUDGE, I JUST WOULD TENTATIVELY MOVE

25   FOR ADMISSION SO I COULD DISPLAY THIS TO THE JURY AT THIS

182

```
1    TIME.

2              THE COURT:  ANY OBJECTION?

3              MR. AKROTIRIANAKIS:  NO OBJECTION, YOUR HONOR.

4              THE COURT:  JUST ONE MOMENT.

5         (PAUSE.)

6              THE COURT:  ALL RIGHT.  ARE YOU MOVING FOR

7    ADMISSION OF THE ENTIRE AGREEMENT?

8              MR. GREEN:  I AM, YOUR HONOR.

9              THE COURT:  ALL RIGHT.  I'M SORRY.  WHAT'S THE

10   EXHIBIT NUMBER AGAIN?

11             MR. GREEN:  IT'S 1035.

12             THE COURT:  ALL RIGHT.  IT'S ORDERED ADMITTED AND

13   YOU MAY PUBLISH.

14             MR. GREEN:  THANK YOU.

15        (DEFENDANT'S EXHIBIT 1035 RECEIVED IN EVIDENCE.)

16   BY MR. GREEN:

17   Q.   I'M GOING TO CALL YOUR ATTENTION TO PAGE 3 OF YOUR PLEA

18   AGREEMENT WHERE IT STARTS WITH THE DEFENDANT'S OBLIGATIONS.

19   I'LL PUT A CHECK MARK BY -- IT BEGINS AT PARAGRAPH 10.

20             IT READS:  DEFENDANT AGREES TO COOPERATE FULLY

21   WITH THE USAO, BUREAU OF ALCOHOL, TOBACCO AND FIREARMS AND

22   AS DIRECTED BY THE USAO WITH ANY OTHER FEDERAL, STATE, LOCAL

23   LAW ENFORCEMENT AGENCY.  THIS COOPERATION REQUIRES THE

24   DEFENDANT TO:  (A), RESPOND TRUTHFULLY AND COMPLETELY TO ALL

25   QUESTIONS.
```

```
1              YOU UNDERSTOOD THAT.

2              AND IT GOES ON TO SAY, THAT MAY BE PUT TO THE

3    DEFENDANT -- TOP OF PAGE 4 -- WHETHER IN INTERVIEWS, BEFORE

4    A GRAND JURY OR ANY TRIAL OR OTHER COURT PROCEEDING.

5    A.   YES, SIR.

6    Q.   BEFORE YOU SIGNED THIS DOCUMENT, YOU READ THAT; IS THAT

7    CORRECT?

8    A.   YES, SIR.

9    Q.   YOU UNDERSTOOD THAT?

10   A.   YES, SIR.

11   Q.   YOU UNDERSTOOD THE OBLIGATION AND RESPONSIBILITIES

12   THAT --

13   A.   THAT'S CORRECT.

14   Q.   AND THAT SPECIFICALLY YOU WERE NOT ONLY TO RESPOND

15   TRUTHFULLY JUST TO QUESTIONS UNDER OATH, BUT IN ANY

16   INTERVIEW THAT MAY HAVE BEEN CONDUCTED; CORRECT?

17   A.   YES, SIR.

18   Q.   JUMPING TO PARAGRAPH (C), IT SAYS:  PRODUCE VOLUNTARILY

19   ALL DOCUMENTS, RECORDS OR OTHER TANGIBLE EVIDENCE RELATING

20   TO THE MATTERS ABOUT WHICH THE USAO OR ITS DESIGNEE

21   INQUIRES.

22   A.   YES, SIR.

23   Q.   AGAIN, YOU UNDERSTOOD YOUR OBLIGATIONS UNDER THAT TERM

24   OF THIS AGREEMENT?

25   A.   YES, SIR.
```

184

1    Q.    CORRECT?

2            FURTHERMORE, GOING DOWN (C) -- I'M SORRY.  I

3    ALREADY DID (C).

4            GOING TO 11(A), *DEFENDANT UNDERSTANDS THE*

5    *FOLLOWING:  ANY KNOWINGLY FALSE OR MISLEADING STATEMENT BY*

6    *THE DEFENDANT WILL SUBJECT DEFENDANT TO PROSECUTION FOR*

7    *FALSE STATEMENT, OBSTRUCTION OF JUSTICE, AND PERJURY AND*

8    *WILL CONSTITUTE A BREACH OF THIS AGREEMENT BY DEFENDANT.*

9    A.    YES, SIR.

10   Q.    OKAY.  YOU AGREED TO THOSE TERMS; CORRECT?

11   A.    YES, SIR.

12   Q.    *(B).  NOTHING IN THIS AGREEMENT REQUIRES THE USAO OR*

13   *ANY OTHER PROSECUTING OR LAW ENFORCEMENT AGENCY TO ACCEPT*

14   *ANY COOPERATION OR ASSISTANCE THAT THE DEFENDANT MAY OFFER,*

15   *OR TO USE IT IN ANY PARTICULAR WAY.*

16           CORRECT?

17   A.    YES, SIR.

18   Q.    I'M NOT GOING TO READ THE ENTIRE PARAGRAPH.  IF YOU

19   MOVE TO PAGE 5 FOR ME AND LOOK AT PARAGRAPH 14, WHERE IT

20   BEGINS*:  IF THE USAO DECLARES THE AGREEMENT BREACHED AND THE*

21   *COURT FINDS SUCH A BREACH TO HAVE OCCURRED, DEFENDANT WILL*

22   *NOT BE ABLE TO WITHDRAW DEFENDANT'S GUILTY PLEA AND THE USAO*

23   *WILL BE RELIEVED OF ALL OF ITS OBLIGATIONS UNDER THIS*

24   *AGREEMENT.*

25   A.    YES.

1    Q.    YOU AGREED TO THAT; RIGHT?

2    A.    YES, SIR.

3    Q.    YOU READ IT BEFORE YOU SIGNED IT; RIGHT?

4    A.    YES, SIR.

5    Q.    IN PARTICULAR, SUBPARAGRAPH (A):  *THE USAO WILL NO*

6    *LONGER BE BOUND BY ANY AGREEMENTS REGARDING CRIMINAL*

7    *PROSECUTION AND WILL BE FREE TO PROSECUTE DEFENDANT FOR ANY*

8    *CRIME, INCLUDING CHARGES THAT THE USAO WOULD OTHERWISE HAVE*

9    *BEEN OBLIGATED TO DISMISS PURSUANT TO THIS AGREEMENT.*

10   A.    YES, SIR.

11   Q.    OKAY.  NOW THAT WOULD PERTAIN IN YOUR PARTICULAR CASE

12   TO THE ARVA LEE RAY MURDER CHARGE; CORRECT?

13   A.    YES, SIR.

14   Q.    AND AS YOU HAVE ALREADY TESTIFIED TO, THEY DISMISSED

15   THAT; CORRECT?

16   A.    YES, SIR.

17   Q.    BUT IT'S YOUR UNDERSTANDING UNDER THIS AGREEMENT THAT

18   IF IT'S BEEN DETERMINED THAT YOU HAVE GIVEN UNTRUTHFUL

19   TESTIMONY, THAT THEY CAN RECHARGE YOU ON THAT CRIME?

20   A.    YES, SIR.

21   Q.    JUMPING DOWN TO PARAGRAPH (A) OF 15(A) ON PAGE 5, IT

22   READS:  *DEFENDANT AGREES THAT ANY APPLICABLE STATUTE OF*

23   *LIMITATIONS IS TOLLED BETWEEN THE DATE OF DEFENDANT'S*

24   *SIGNING OF THIS AGREEMENT AND THE USAO'S DISCOVERY OF ANY*

25   *KNOWING AND WILLFUL BREACH BY THE DEFENDANT.*

186

1    A.   YES, SIR.

2    Q.   OKAY.  NOW YOU HAD TALKED ABOUT THE STATUTE OF

3    LIMITATIONS BEFORE WHEN I WAS ASKING YOU QUESTIONS; CORRECT?

4    A.   YES, SIR.

5    Q.   AND YOU HAD SAID THAT IT WAS YOUR UNDERSTANDING THAT

6    THE STATUTE OF LIMITATIONS HAD RAN FOR YOU WITH RESPECT TO

7    YOUR PARTICIPATION IN DRUG TRAFFICKING WITH THE AB EVEN

8    UNDER THE RACKETEERING COUNTS; CORRECT?

9    A.   YES, SIR.

10   Q.   BUT IT'S YOUR UNDERSTANDING THAT IF IT'S BEEN DEEMED

11   THAT YOU HAVE GIVEN UNTRUTHFUL TESTIMONY IN ANY WAY, THAT

12   YOU'RE WAIVING THE STATUTE OF LIMITATIONS?

13   A.   NO, SIR, I DON'T THINK SO.

14   Q.   OKAY.

15   A.   I THINK THAT MEANS WAIVING ANY STATUTE OF LIMITATIONS

16   THAT MAY HAVE RAN OUT FROM THE TIME THAT I SIGNED THIS UNTIL

17   NOW.

18   Q.   OKAY.  ALL RIGHT.

19        NOW, BEFORE YOU SIGNED THIS AGREEMENT, AS WITH THE

20   ARVA LEE RAY CASE, WERE YOU GIVEN THE DISCOVERY IN YOUR CASE

21   FOR THE ATTEMPTED MURDER OF ROBERT WILSON?

22   A.   NO, SIR.

23   Q.   YOU DIDN'T LOOK AT ONE PIECE OF EVIDENCE?

24   A.   I DON'T BELIEVE SO.

25        (PAUSE.)

1    BY MR. GREEN:

2    Q.   IF YOU'LL PULL OUT PAGE 7.  AND SPECIFICALLY WE'RE

3    GOING TO TALK ABOUT PARAGRAPH 20.

4              OOPS, I'M SORRY.  WRONG PAGE.

5              PAGE 2, PARAGRAPH 7, WHERE IT SAYS *FACTUAL BASIS*

6    HEADING:  *DEFENDANT AND USAO AGREE AND STIPULATE TO THE*

7    *STATEMENT OF FACTS SET FORTH IN ATTACHMENT (A) TO THIS*

8    *AGREEMENT AND INCORPORATE HEREIN BY THIS REFERENCE*; CORRECT?

9    A.   YES, SIR.

10   Q.   AND YOU KNEW WHAT YOU WERE SIGNING WHEN YOU AGREED TO

11   THAT; RIGHT?

12   A.   YES, SIR.

13   Q.   YOU WERE SAYING UNDER OATH TO THE COURT THAT THE

14   STIPULATION OF FACTS AS TO YOUR PARTICIPATION IN ROBERT

15   WILSON'S CASE WERE IN FACT TRUE?

16   A.   YES, SIR.

17   Q.   AND IN FACT ATTACHMENT (A) READS:  *ON OR BEFORE*

18   *DECEMBER 25, 1980, DEFENDANT ENTERED INTO AN AGREEMENT WITH*

19   *THOMAS SILVERSTEIN, A HIGH RANKING MEMBER OF THE ARYAN*

20   *BROTHERHOOD, AND HOMER MATTHEWS TO MURDER ROBERT WILSON AT*

21   *THE UNITED STATES PENITENTIARY AT MARION, ILLINOIS.*

22             *ON DECEMBER 25, 1980, DEFENDANT AND HOMER MATTHEWS*

23   *SHOVED ROBERT WILSON SO THAT WILSON WAS IMMEDIATELY OUTSIDE*

24   *THE PRISON CELL OF THOMAS SILVERSTEIN.  SILVERSTEIN THEN*

25   *REACHED THROUGH THE BARS OF HIS CELL AND STRANGLED WILSON.*

1   *WHEN SILVERSTEIN WAS NOT ABLE TO MURDER WILSON BY STRANGLING*

2   *HIM, MATTHEWS STABBED WILSON WITH A PRISON KNIFE ALSO IN AN*

3   *ATTEMPT TO MURDER HIM.*

4   A.   YES, SIR.

5   Q.   YOU KNEW WHEN YOU SIGNED THIS AGREEMENT THAT YOU WERE

6   UNDER OATH TELLING THE COURT THAT IN FACT THOSE WERE THE

7   FACTS OF THE CASE?

8   A.   YES, SIR.

9   Q.   THE TRUTH OF THE MATTER IS, IS THAT IN 1980 ON

10  CHRISTMAS DAY WHEN ROBERT WILSON WAS ATTACKED, YOU WERE IN

11  CELL 5 AND NOT ON THE RANGE; CORRECT?

12  A.   NO, SIR.  I HAD GONE BACK INTO MY CELL AFTER WE PUSHED

13  HIM IN.

14  Q.   THE FACT OF THE MATTER IS, IS THAT ON DECEMBER -- ON

15  CHRISTMAS DAY, DECEMBER 1980, THAT YOU COULD ONLY HAVE THREE

16  PERSONS GO TO REC AT A TIME; CORRECT?

17  A.   I DON'T KNOW.  THEY CHANGED IT UP.  AT ONE TIME IT WAS

18  TWO.  AT ONE TIME IT WAS THREE.  AT ONE TIME IT WAS FIVE.

19  AND IT KEPT CHANGING BACK AND FORTH.  SO I DON'T KNOW.

20  Q.   AND IN FACT, YOU WERE NOT ON ---YOU WERE NOT AT REC AT

21  THAT TIME BUT LOCKED IN YOUR CELL?

22  A.   NO, SIR.  AFTER I SHOVED HIM IN, I WAS LOCKED IN MY

23  CELL.

24  Q.   AND THAT WHEN YOU WERE LOCKED IN YOUR CELL, YOU SAW A

25  GENTLEMAN BY THE NAME OF HUGH COLOMB STAB ROBERT WILSON?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    A.    NO, SIR.

2    Q.    THAT WHEN YOU WERE IN YOUR CELL, YOU SAW A MAN BY THE

3    NAME OF JAMES SILVIA TRY TO HELP YOU, COLOMB WITH ROBERT

4    WILSON?

5    A.    NO, SIR.

6    Q.    THAT AS A RESULT OF THAT ATTACK ON ROBERT WILSON ON

7    DECEMBER 25 OF 1980, A GUARD BY THE NAME OF ROBERT REYNOLDS

8    WAS INJURED; CORRECT?

9    A.    I DON'T KNOW.

10   Q.    THAT THE GUARD ROBERT REYNOLDS WAS INJURED TO THE

11   EXTENT THAT HE WAS STABBED BY HUGH COLOMB; CORRECT?

12   A.    NOT THAT I REMEMBER.

13   Q.    THAT IN FACT, HOMER MATTHEWS WAS NOT ON THE TIER AND

14   INVOLVED IN THIS ASSAULT ON ROBERT WILSON ON DECEMBER 25TH

15   OF 1990?

16   A.    YES, HE WAS.

17   Q.    IN FACT, HOMER MATTHEWS DID NOT STAB ROBERT WILSON ON

18   DECEMBER 5TH (SIC) OF 1998, BUT HE WAS IN FACT STABBED BY

19   HUGH COLOMB?

20   A.    NO, SIR.

21   Q.    IN FACT, NOT ONLY DID HUGH COLOMB STAB ROBERT WILSON,

22   BUT HE ALSO STABBED OFFICER ROBERT REYNOLDS?

23   A.    NOT TO MY KNOWLEDGE.

24   Q.    NOT TO YOUR KNOWLEDGE?

25         MR. AKROTIRIANAKIS:    OBJECTION.    ARGUMENTATIVE,

190

YOUR HONOR.

        MR. GREEN:  I'LL WITHDRAW THE QUESTION.  I MADE A
STATEMENT I SHOULDN'T HAVE MADE.

        THE COURT:  ALL RIGHT.  BUT ARGUMENTATIVE
QUESTIONS ARE ALLOWED ON CROSS-EXAMINATION, BUT NOT COMMENTS
BY COUNSEL.

        MR. GREEN:  THANK YOU, JUDGE.

BY MR. GREEN:

Q.    YOU IN FACT TESTIFIED IN 1981 IN THE CASE OF *UNITED
STATES VERSUS HUGH COLOMB* WHO WAS CHARGED WITH STABBING
OFFICER REYNOLDS IN THE ATTACK ON ROBERT WILSON; CORRECT?

A.    NOT THAT I REMEMBER.

Q.    WOULD YOU LOOK AT THE BINDER IN FRONT OF YOU AND
SPECIFICALLY LOOK AT EXHIBIT NO. 1032.

A.    YES, SIR.

Q.    BEGINNING WITH PAGE 197.  THIS IS IN REGARDS *UNITED
STATES OF AMERICA VERSUS HUGH THOMAS COLOMB*, THURSDAY,
OCTOBER 1ST, 1981; CORRECT?

A.    HOLD ON ONE SECOND HERE.  YES, SIR.

Q.    AND AT THAT TIME ON OCTOBER 1ST OF 1981, YOU GAVE
TESTIMONY IN THAT CASE?

A.    IS THIS BABY HUGHEY?  IS THAT HUGHEY COLOMB, BABY
HUGHEY?  IS THAT HIS NICKNAME?

Q.    I DON'T KNOW.  THEY'RE YOUR FRIENDS.  YOU CAN'T RECALL
GIVING TESTIMONY IN REGARDS TO --

A.    NO, SIR.

Q.    -- AN ASSAULT CASE WITH REYNOLDS?

         AT THAT TIME, YOU WERE ASKED A QUESTION:

         *AND YOU WERE A RESIDENT IN THE H UNIT IN THE PEN* -- I'M SORRY.

         ON PAGE 214, BEGINNING AT LINE 18.

         *AND YOU WERE A RESIDENT IN THE H UNIT IN THE PENITENTIARY ON CHRISTMAS DAY LAST YEAR?*

         *ANSWER:  YES, SIR, I WAS.*

         *QUESTION:  AND DID YOU KNOW WHAT RANGE YOU WERE ON?*

         *ANSWER:  YES, SIR.  D RANGE.*

         *QUESTION:  D RANGE.  AND WAS THE DEFENDANT, MR. COLOMB, AND PETE WILSON AND JAMES SILVIA ALSO RESIDENTS ON THE RANGE?*

         *ANSWER:  YES, SIR, THEY WERE.*

         *IN WHAT UNIT OR CELL WERE YOU DOWN IN -- WERE YOU IN DOWN THERE THAT DAY?*

         *ANSWER:  I WAS IN CELL 5.*

         THAT WAS YOUR SWORN TESTIMONY UNDER OATH ON THAT DAY; IS THAT CORRECT?

A.    YES, SIR.

Q.    *WOULD YOU SHOW* -- QUESTION -- BEGINNING AT LINE 5.

         *WOULD YOU SHOW US WHERE ON THIS CHART THERE?*

         *ANSWER:  OKAY.  THAT WOULD BE RIGHT HERE.*

1          *QUESTION:  ALL RIGHT.  YOU CAN SIT BACK DOWN.  DO*
2     *YOU RECALL THE AFTERNOON OF THAT DATE?*
3               *ANSWER:  YES, SIR.*
4               *DO YOU RECALL SEEING MR. COLOMB ON THAT AFTERNOON?*
5               *ANSWER:  YES, SIR.*
6               THE COURT:  THAT WAS YOUR TESTIMONY IN 1981 IN REGARDS TO THIS
7     MATTER; IS THAT CORRECT?
8     A.   YES, SIR.
9     Q.   AND IN FACT -- I'M SORRY.  LINE 14, STILL PAGE 215.
10              THE COURT:  BEFORE YOU READ IT INTO THE RECORD --
11              MR. GREEN:  OH, I'M SORRY.
12              THE COURT:  -- TELL COUNSEL PAGE AND LINE NUMBER
13    SO --
14              MR. GREEN:  PAGE 215, BEGINNING WITH LINE 14.
15              THE COURT:  ALL RIGHT.  TO WHAT POINT SO I CAN
16    LEARN IF THEY HAVE ANY OBJECTION BEFORE YOU READ IT IN?
17              MR. GREEN:  OKAY.  TO THE END OF LINE 19.
18              THE COURT:  ANY OBJECTION?
19              MR. AKROTIRIANAKIS:  NO, YOUR HONOR.
20              THE COURT:  GO AHEAD.
21    BY MR. GREEN:
22    Q.   *QUESTION:  AND, IN FACT, HE AND THE OTHER TWO INMATES*
23    *WERE TAKING RECREATION; IS THAT CORRECT?*
24              *ANSWER:  YES, SIR, THEY WERE.*
25              *QUESTION:  AND WHAT WERE YOU DOING IN YOUR CELL?*

1              *ANSWER:  I WAS UP AT THE BARS TALKING TO*

2    *TUMBLEWEED, WHO IS SILVIA, A LITTLE EARLIER BEFORE THE*

3    *SCUFFLE BROKE OUT.*

4              THAT WAS YOUR STATEMENT UNDER OATH BEFORE A JURY

5    AT THAT TIME?

6    A.   YES, SIR.

7              MR. GREEN:  BEGINNING WITH LINE 20, GOING THROUGH

8    LINE 24.  PAGE 215 STILL.

9              THE COURT:  ANY OBJECTION?

10             MR. AKROTIRIANAKIS:  BEG YOUR PARDON, YOUR HONOR.

11   NO OBJECTION.

12             THE COURT:  ALL RIGHT.  GO AHEAD.

13   BY MR. GREEN:

14   Q.   *QUESTION.  AND WHAT HAPPENED AFTER THAT?*

15             *ANSWER:  OKAY.  I HEARD THE SCUFFLE DOWN THE*

16   *RANGE, RIGHT, AND I LOOKED DOWN, AND WEED HAD ALREADY --*

17   *WHEN THE SCUFFLE STARTED WHEN I HEARD THE NOISE, WEED HAD*

18   *GONE DOWN THERE, AND RAN TO THE OTHER END.*

19             THAT WAS YOUR STATEMENT AT THAT POINT IN TIME;

20   CORRECT?

21   A.   YES, SIR.

22             MR. GREEN:  THEN BEGINNING AT LINE 25 ON PAGE 215,

23   GOING TO -- AND THIS IS KIND OF A LONG NARRATIVE -- IT GOES

24   ALL THE WAY TO PAGE 217 ON LINE 1.

25             MR. AKROTIRIANAKIS:  NO OBJECTION.

1              THE COURT:  GO AHEAD.

2    BY MR. GREEN:

3    Q.    *YOU MEAN MR. SILVIA?*

4              *ANSWER:  YEAH, SILVIA, I'M USED TO CALLING HIM*

5    *WEED.  HE RAN DOWN TO THE OTHER WHERE HUGHEY AND WILSON WERE*

6    *WRESTLING; AND I LOOKED OUT THE CORNER OF MY WINDOW BECAUSE*

7    *YOU GOT A WINDOW GOING ALL THE WAY ACROSS YOUR CELL BECAUSE*

8    *YOU'VE GOT BARS HERE AND LIKE A WINDOW.  OKAY.  I SAW ALL*

9    *THREE OF THEM FALL TO THE GROUND THROUGH MY WINDOW; AND BABY*

10   *HUGHEY WAS ON THE GROUND -- I MEAN HUGHEY COLOMB WAS ON THE*

11   *GROUND, WAS ON THE GROUND, WILSON WAS FEELING OVER HIM ON*

12   *TOP OF HIM, AND TUMBLEWEED WAS KIND OF -- I MEAN SILVIA WAS*

13   *KIND OF OFF TO THE SIDE OF WILSON WITH HIS ARMS AROUND*

14   *WILSON.*

15             *OKAY.  THEY HAD -- THEN I SAW A KNIFE, AND THEN*

16   *THE KNIFE -- ALL THREE OF THEM HAD AHOLD OF THE KNIFE, AND*

17   *THE KNIFE WAS LIKE COMING OUT OF THERE SIDEWAYS.  NOW, ABOUT*

18   *THIS TIME OFFICER REYNOLDS AND A FEW OTHERS RAN TO THE*

19   *RANGE, BUT REYNOLDS CAME FIRST.  REYNOLDS REACHED AROUND*

20   *TUMBLEWEED LIKE HE WAS GOING TO PULL TUMBLEWEED OFF.  WHEN*

21   *HE REACHED AROUND, HE JUMPED BACK; AND THEN SOMEONE ELSE,*

22   *ANOTHER GUARD I THINK -- I KNOW IT WASN'T REYNOLDS BECAUSE I*

23   *WAS LOOKING AT REYNOLDS -- SAID, 'THERE'S A KNIFE.'*

24   *REYNOLDS AND THE REST OF THE COPS RAN OFF; AND AT THE SAME*

25   *TIME, WILSON JUMPED UP AND RAN OUT OF THE THING.*

1          *NOW, AT THE TIME BABY HUGHEY, I MEAN COLOMB, GOT*

2     *UP, AND I SAW HE HAD THE KNIFE AT THIS TIME.  HE GOT UP HAD*

3     *THE KNIFE, AND HIM AND WEED WALKED BACK TOWARDS THE END OF*

4     *D RANGE.*

5          WAS THAT YOUR STATEMENT UNDER OATH BEFORE A JURY

6     AT THAT TIME?

7     A.   YES, SIR.

8     Q.   ALL RIGHT.

9          MR. GREEN:  I'M SORRY.  NEXT LINE WOULD BE ON

10    PAGE 217, BEGINNING ON PAGE 2 AND GOING TO THE END OF

11    LINE 9.

12         THE COURT:  ANY OBJECTION?

13         MR. AKROTIRIANAKIS:  NO, YOUR HONOR.

14         THE COURT:  GO AHEAD.

15    BY MR. GREEN:

16    Q.   *QUESTION:  ALL RIGHT.  AT ANY TIME DID YOU SEE*

17    *MR. COLOMB STRIKE AT OFFICER REYNOLDS WITH THAT KNIFE?*

18          *ANSWER:  NO,* BECAUSE -- I'M SORRY.  *NO, CAUSE BY*

19    *THE TIME, BY THE TIME HUGHEY GOT UP OFF THE FLOOR -- WILSON*

20    *WAS ON TOP OF HIM.  NOW, WHEN REYNOLDS JUMPED BACK, AND THE*

21    *OTHER COPS SAID THERE'S A KNIFE, REYNOLDS WAS ALREADY OFF*

22    *THE RANGE LOOKING (SIC) BEFORE COLOMB EVEN GOT OFF THE FLOOR*

23    *BECAUSE COLOMB WAS ON HIS BACK WITH TWO MORE PEOPLE ON TOP*

24    *OF HIM.*

25          THAT WAS YOUR STATEMENT AT THIS TIME; IS THAT

1    CORRECT?

2    A.   YES, SIR.

3              MR. GREEN:  GOING TO PAGE 218, BEGINNING AT

4    LINE 18 THROUGH LINE 21.

5              MR. AKROTIRIANAKIS:  NO OBJECTION.

6              THE COURT:  THANK YOU.

7    BY MR. GREEN:

8    Q.   *AND THAT'S HOW YOU SAW EVERYTHING THAT HAPPENED?*

9              *ANSWER:  YEAH, EITHER ONE OF THE TWO.  I CAN'T*

10   *REALLY REMEMBER WHICH I SAW OUT OF WHICH, BUT I SAW EITHER*

11   *LOOKING DIRECTLY THROUGH HERE OR THROUGH MY MIRROR.*

12             THAT WAS YOUR TESTIMONY AT THAT TIME; IS THAT

13   CORRECT?

14   A.   YES, SIR.

15   Q.   OKAY.  NOW, DOES THIS HELP REFRESH YOUR MEMORY ABOUT

16   THE FACT THAT YOU WERE ACTUALLY -- WERE CALLED TO THAT

17   TRIAL?

18   A.   YES, SIR.

19   Q.   AND IN FACT, WERE YOU AWARE THAT OFFICER REYNOLDS WAS

20   ALSO CALLED AND GAVE TESTIMONY IN THAT TRIAL?

21   A.   NO, SIR.

22   Q.   OKAY.  YOU WERE NOT AWARE THAT -- OF WHAT HIS -- THE

23   SUBSTANCE OF HIS TESTIMONY WAS?

24   A.   NO, SIR.

25   Q.   YOU WEREN'T AWARE THAT THERE WAS EVIDENCE IN THAT CASE

197

1    THAT WAS CONSISTENT WITH --

2            MR. AKROTIRIANAKIS:  OBJECTION, YOUR HONOR.

3    THAT'S IMPROPER CROSS-EXAMINATION.

4            THE COURT:  LET HIM FINISH THE QUESTION.

5    BY MR. GREEN:

6    Q.    MY QUESTION WOULD BE THAT IT WOULD OFFER INNOCENCE FOR

7    YOU WITH RESPECT TO THE CHARGE OF ATTEMPTING TO KILL ROBERT

8    WILSON.

9            THE COURT:  WHAT'S THE BASIS FOR YOUR OBJECTION?

10           MR. AKROTIRIANAKIS:  I BELIEVE THAT THE WITNESS

11   JUST SAID HE WASN'T AWARE OF THESE THINGS, AND NOW HE'S

12   EXPANDING ON IT JUST TESTIFYING HIMSELF.

13           THE COURT:  THE OBJECTION IS SUSTAINED.

14           MR. GREEN:  OKAY.

15   BY MR. GREEN:

16   Q.    YOU MADE NO ATTEMPT TO TRY TO GET YOUR DISCOVERY WITH

17   RESPECT TO THE CHARGE YOU'RE NOW -- THAT YOU'VE PLED GUILTY

18   TO WITH RESPECT TO ROBERT WILSON; IS THAT CORRECT?

19   A.    NO, SIR.

20   Q.    ALL RIGHT.  AND THE TESTIMONY THAT YOU GAVE IN THAT

21   CASE IS INCONSISTENT AND COMPLETELY DIFFERENT THAN THE

22   TESTIMONY YOU GAVE BACK IN 1991 BEFORE A COURT AND A JUDGE;

23   IS THAT CORRECT?

24   A.    YES, SIR.

25       (PAUSE.)

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    BY MR. GREEN:

2    Q.    DOES THAT CAUSE YOU PAUSE AT ALL?

3    A.    NO, SIR.

4    Q.    BECAUSE ANYTHING THAT YOU SAY, YOU FEEL LIKE YOU'RE

5    UNTOUCHABLE; CORRECT?

6    A.    NO, SIR.

7            MR. GREEN:  I DON'T HAVE ANYTHING FURTHER.

8            THE COURT:  ALL RIGHT.  REDIRECT EXAMINATION?

9            MR. AKROTIRIANAKIS:  MAY I HAVE JUST ONE BRIEF

10   MOMENT, YOUR HONOR?

11           THE COURT:  ALL RIGHT.

12       *(PAUSE.)*

13                    REDIRECT EXAMINATION

14   BY MR. AKROTIRIANAKIS:

15   Q.    MR. WEST, YOU TESTIFIED -- YOU WERE JUST ASKED A SERIES

16   OF QUESTIONS ABOUT TESTIMONY YOU GAVE IN 1981.

17   A.    YES, SIR.

18   Q.    IF I CAN REFER YOU TO THE VERY SECOND PAGE OF THE

19   EXHIBIT YOU'VE JUST BEEN LOOKING AT WHICH IS DEFENSE

20   EXHIBIT 232.

21   A.    (WITNESS SO COMPLIES.)

22   Q.    AND THE THIRD PAGE AS WELL.

23   A.    YES, SIR.

24   Q.    A NUMBER OF ARYAN BROTHERHOOD WITNESSES -- OR ARYAN

25   BROTHERHOOD MEMBERS WERE CALLED TO TESTIFY AT THIS TRIAL?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

199

1    A.    WHAT PAGE ARE WE ON?

2    Q.    I'M SORRY, THE SECOND AND THIRD PAGES OF EXHIBIT 1032

3    WHICH YOU WERE JUST SHOWN.

4         MR. GREEN:  JUDGE, I WOULD OBJECT TO LACK OF

5    FOUNDATION.  PERSONAL KNOWLEDGE.

6         THE COURT:  THE OBJECTION IS OVERRULED.

7         THE WITNESS:  OKAY.  I THINK I'M THERE.  OKAY.  IS

8    THAT THE TRANSCRIPTS?

9    BY MR. AKROTIRIANAKIS:

10   Q.    IT'S THE TRANSCRIPT -- THE FIRST PAGE OF IT IS -- WELL,

11   IT'S BEHIND THE TAB THAT SAYS EXHIBIT 1032.

12   A.    OKAY.

13   Q.    AND THEN IF YOU TURN TO THE SECOND PAGE AND THE THIRD

14   PAGE, YOU SEE A LISTING OF THE WITNESSES FROM THAT TRIAL,

15   YOURSELF AMONG THEM?

16   A.    I DON'T SEE THAT.  THIS ONE GOES STRAIGHT INTO THE

17   TRANSCRIPTS.

18        MR. AKROTIRIANAKIS:  PERHAPS MY COPY IS DIFFERENT

19   FROM THE WITNESS', YOUR HONOR.  MAY I APPROACH?

20        THE COURT:  YOU MAY.

21     (PAUSE.)

22        MR. AKROTIRIANAKIS:  THE WITNESS' COPY IS

23   DIFFERENT FROM MINE, YOUR HONOR.  MAY I --

24        THE COURT:  DO YOU WANT TO SHOW HIM THE COPY THAT

25   YOU HAVE?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1          MR. AKROTIRIANAKIS:  IF I MAY.

2          THE COURT:  CERTAINLY.

3          MR. AKROTIRIANAKIS:  I'M SHOWING THE WITNESS NOW

4    THE COPY PROVIDED BY DEFENSE COUNSEL TO GOVERNMENT COUNSEL,

5    DEFENSE EXHIBIT 1032.

6    BY MR. AKROTIRIANAKIS:

7    Q.   AND ON THE FIRST PAGE, IT'S THE SAME AS WHAT YOU HAVE

8    IN THE TRIAL TRANSCRIPT; IS THAT CORRECT, SIR?

9    A.   YES, SIR.

10   Q.   OKAY.  NOW I'M TURNING THE PAGE.  AND THE SECOND PAGE

11   SAYS "INDEX" AND THERE'S A LISTING THERE OF NAMES OF PEOPLE

12   WHO WERE CALLED AS WITNESSES.

13          DO YOU SEE THAT?

14   A.   YES, SIR.

15   Q.   AND IT GOES ON TO THE THIRD PAGE.  OKAY.

16          SO I ASK YOU, SIR, TO LOOK AT THAT LIST AND TELL

17   ME IF THIS WAS A NUMBER OF TRIALS WHERE A NUMBER OF ARYAN

18   BROTHERHOOD MEMBERS WERE CALLED AS WITNESSES?

19          MR. GREEN:  JUDGE, AGAIN, LACK OF OBJECTION,

20   PERSONAL KNOWLEDGE, IF HE HAS TO RELY UPON A LIST, IF HE

21   DOESN'T HAVE INDEPENDENT RECOLLECTION.

22          THE COURT:  WELL, THE WAY QUESTION IS WORDED THIS

23   TIME, I'M GOING TO SUSTAIN THE OBJECTION.

24   BY MR. AKROTIRIANAKIS:

25   Q.   YOU TESTIFIED AT A TRIAL IN 1981 WHICH YOU HAVE BEEN

1   SHOWN THE TESTIMONY.

2   A.   YES, SIR.

3   Q.   OKAY.  DO YOU RECALL WHO THE OTHER ARYAN BROTHERHOOD

4   WITNESSES -- DO YOU RECALL WHO THE OTHER WITNESSES IN THE

5   TRIAL WERE?

6   A.   YES, SIR, SOME OF THEM.

7   Q.   WELL, PRIOR TO READING THE TESTIMONY, WOULD YOU HAVE --

8   DO YOU RECALL?

9   A.   YES, SEVERAL OF THEM.

10  Q.   DO YOU RECALL ALL OF THEM?

11  A.   NO, SIR.

12  Q.   LET ME HAVE BACK THE EXHIBIT, PLEASE.  I'M TAKING BACK

13  THE EXHIBIT.

14          WHO ARE THE WITNESSES YOU DO RECALL?

15  A.   SILVERSTEIN AND CLAY FOUNTAIN.  THOSE ARE THE TWO THAT

16  I MAINLY REMEMBER.

17          MR. AKROTIRIANAKIS:  YOUR HONOR, MAY I REFRESH THE

18  WITNESS' RECOLLECTION?

19          THE COURT:  YOU MAY ATTEMPT TO, CERTAINLY.

20  BY MR. AKROTIRIANAKIS:

21  Q.   I HAND YOU BACK THE TRANSCRIPT AND I ASK YOU TO REVIEW

22  PAGES 2 AND 3.  AND MY QUESTION TO YOU, SIR, IS WHETHER

23  REVIEWING THOSE PAGES REFRESHES AT ALL YOUR RECOLLECTION,

24  INCLUDING THAT QUESTION, AS TO WHO THE OTHER WITNESSES WERE

25  CALLED AT TRIAL?

1    A.   YES, SIR.

2    Q.   YOU CAN HAND IT BACK TO ME, PLEASE.

3         HAVING REVIEWED THE EXHIBIT AND HAVING YOUR MEMORY

4    REFRESHED BY IT, SIR, I ASK YOU THE QUESTION IN ADDITION TO

5    MR. FOUNTAIN AND MR. SILVERSTEIN, WHAT OTHER ARYAN

6    BROTHERHOOD WERE CALLED TO TESTIFY IN THIS TRIAL?

7    A.   NORMAN MATTHEWS.  HOMER RAY.  CLAY FOUNTAIN.  THAT'S

8    THE ARYAN BROTHERHOOD THAT'S ON THERE.

9    Q.   DOES REVIEWING THIS LIST REFRESH YOUR MEMORY AS TO THE

10   FACTS AND CIRCUMSTANCES SURROUNDING YOUR TESTIMONY?

11   A.   NOT REALLY.  I KNOW WE JUST SAID WHATEVER WE WERE TOLD

12   TO SAY.

13   Q.   WHO IS IT THAT WOULD HAVE TOLD YOU WHAT TO SAY IN THOSE

14   CIRCUMSTANCES?

15   A.   WHOEVER WAS ON TRIAL.

16   Q.   OKAY.

17   A.   AND I NOW REMEMBER.  HE IS -- I KNEW HIM AS TUMBLEWEED

18   AND BABY HUGHEY.

19   Q.   AND WHO'S BABY HUGHEY?

20   A.   THAT WOULD BE HOLCOMB (SIC).

21   Q.   I'M SORRY, COLOMB?

22   A.   COLOMB, YEAH.

23   Q.   THE DEFENDANT?

24   A.   YES, SIR.

25   Q.   OKAY.  SO YOUR TESTIMONY IS WHAT YOU WERE TOLD TO SAY?

1    A.   YES, SIR.

2    Q.   NOW LET ME ASK YOU -- I'M PLACING THE LAST PAGE OF 635

3    IN EVIDENCE ON THE OVERHEAD CAMERA.   YOU RECALL MOMENTS AGO

4    BEING ASKED BY DEFENSE ABOUT THIS DOCUMENT?

5    A.   YES, SIR.

6    Q.   THE STIPULATED FACTUAL SUMMARY TO YOUR PLEA AGREEMENT.

7    A.   YES, SIR.

8    Q.   DID YOU FALSELY ADMIT TO HAVING CONSPIRED WITH

9    SILVERSTEIN AND MATTHEWS TO ATTEMPT TO MURDER ROBERT WILSON?

10   A.   NO, SIR.

11   Q.   OKAY.   NOW YOU UNDERSTAND -- YOU'VE BEEN CONVICTED OF

12   THIS CRIME?

13   A.   YES, SIR.

14   Q.   AND YOU'RE AWAITING SENTENCE ON THIS?

15   A.   YES, SIR.

16   Q.   AND I'LL REFER TO PAGES IN YOUR PLEA AGREEMENT.   YOU

17   UNDERSTAND, PAGE 2, THAT THE MAXIMUM SENTENCE THAT YOU CAN

18   RECEIVE IS A SENTENCE OF LIFE IMPRISONMENT.

19           DO YOU SEE THAT?

20   A.   YES, SIR.

21   Q.   IS THAT YOUR UNDERSTANDING?

22   A.   YES, SIR.

23   Q.   PAGE 7, NO ONE, NOT THE PROSECUTOR, DEFENDANT'S

24   ATTORNEY OR THE COURT CAN MAKE A BINDING PREDICTION OR

25   PROMISE REGARDING THE SENTENCE THE DEFENDANT WILL RECEIVE.

1          THE DEFENDANT, THAT'S YOU; RIGHT?

2    A.    YES, SIR.

3    Q.    EXCEPT THAT IT WILL BE WITHIN THE STATUTORY MAXIMUM?

4    A.    YES, SIR.

5    Q.    YOU MAY BE SENTENCED UP TO A SENTENCE OF LIFE

6    IMPRISONMENT FOR THE MURDER -- RATHER THE CONSPIRACY IN

7    REGARD TO ROBERT WILSON?

8    A.    YES, SIR.

9    Q.    AND IS IT YOUR FURTHER UNDERSTANDING THAT YOU'VE GIVEN

10   UP ANY RIGHT TO APPEAL ANY SENTENCE THAT YOU MAY RECEIVE FOR

11   THAT --

12   A.    YES, SIR.

13   Q.    -- AS LONG AS IT'S WITHIN THE STATUTORY MAXIMUM?

14   A.    YES, SIR.

15   Q.    WHICH IS A LIFE SENTENCE?

16   A.    YES, SIR.

17   Q.    AND IF YOU BREACH YOUR PLEA AGREEMENT, THEN IS IT YOUR

18   UNDERSTANDING THAT THE UNITED STATES ATTORNEY'S OFFICE, MY

19   OFFICE, GETS OUT OF ALL OF ITS OBLIGATIONS?

20   A.    YES, SIR.

21   Q.    AND WHAT WILL YOU BE ABLE TO DO?

22   A.    NOT NOTHING.

23   Q.    OKAY.  PAGE 5.  *THE DEFENDANT WILL NOT BE ABLE TO*

24   *WITHDRAW DEFENDANT'S GUILTY PLEA, AND THE UNITED STATES*

25   *ATTORNEY'S OFFICE,* OR USAO, *WILL BE RELIEVED OF ITS*

1    *OBLIGATIONS UNDER THIS AGREEMENT.*

2        IS THAT YOUR UNDERSTANDING?

3    A.   YES, SIR.

4    Q.   NOW, THE UNITED STATES ATTORNEY'S OFFICE OR THE USAO

5    OBLIGATIONS UNDER THIS AGREEMENT, ARE TO -- AT THE TIME OF

6    SENTENCING, TO MOVE TO DISMISS THE UNDERLYING INDICTMENT

7    AGAINST DEFENDANT.

8        THAT'S THE INDICTMENT IN THIS CASE; RIGHT?

9    A.   YES, SIR.

10   Q.   IT CHARGES YOU WITH THE MURDER OF ARVA LEE RAY?

11   A.   YES, SIR.

12   Q.   AND THE SECOND OBLIGATION FOR THE U.S. ATTORNEY'S

13   OFFICE IS AT OR BEFORE THE TIME OF SENTENCING TO BRING TO

14   THE ATTENTION OF THE COURT THAT'S GOING TO SENTENCE YOU, THE

15   NATURE AND EXTENT OF ANY COOPERATION THAT YOU'VE GIVEN THE

16   UNITED STATES ATTORNEY'S OFFICE?

17   A.   YES, SIR.

18   Q.   AND THAT'S PAGE 4.

19       I'LL JUST SHOW YOU THE TOP OF PAGE 5 TO MAKE CLEAR

20   THAT THIS IS THE END OF THE SENTENCE OF THE U.S. ATTORNEY'S

21   OFFICE OBLIGATIONS; RIGHT?

22   A.   YES, SIR.

23   Q.   SO IT'S JUST (A) AND (B) AND THAT'S IT?

24   A.   YES, SIR.

25   Q.   ALL RIGHT.  SO IN ADDITION, IF YOU WERE TO BREACH YOUR

1    PLEA AGREEMENT, NOT ONLY DO YOU NEED -- DO YOU NEED A

2    MOMENT?

3    A.    NO.

4    Q.    IN ADDITION, IF YOU WERE TO BREACH YOUR PLEA AGREEMENT,

5    NOT ONLY WOULD YOU BE SUBJECT TO A LIFE SENTENCE FOR THIS

6    CONSPIRACY IN REGARD TO WILSON, BUT ALSO YOU COULD BE

7    CONVICTED OF THE CONSPIRACY ALLEGED IN THE INDICTMENT IN

8    THIS CASE?

9    A.    YES, SIR.

10   Q.    ARVA LEE RAY?

11   A.    YES, SIR.

12   Q.    AND THE SENTENCE POTENTIALLY FOR THAT CRIME?

13   A.    LIFE.

14   Q.    WITHOUT PAROLE?

15   A.    YES, SIR.

16   Q.    AND IN ADDITION, YOU WOULD BE SUBJECT TO PROSECUTION

17   FOR PERJURY?

18   A.    YES, SIR.

19   Q.    OKAY.  AND DO YOU KNOW WHAT THE SENTENCE IS?

20   A.    NO, I DON'T.

21   Q.    SOMETHING MORE THAN NOTHING AND LESS THAN LIFE?

22   A.    (NO AUDIBLE RESPONSE.)

23   Q.    IS THAT YOUR UNDERSTANDING?

24   A.    YEAH, I -- YES, SIR.

25   Q.    NOW YOUR OBLIGATION, SIR, IS TO RESPOND TRUTHFULLY AND

1    COMPLETELY TO ALL QUESTIONS PUT TO YOU, INCLUDING TESTIMONY

2    BEFORE TRIAL JURIES?

3    A.   YES, SIR.

4    Q.   AND YOU'VE TESTIFIED IN A NUMBER OF PROCEEDINGS IN

5    RELATION TO THIS INDICTMENT?

6    A.   YES, SIR.

7    Q.   AND YOU TESTIFIED TODAY?

8    A.   YES, SIR.

9    Q.   HAVE YOU BEEN TRUTHFUL AND FORTHRIGHT WITH THIS JURY?

10          MR. GREEN:  OBJECTION.  SELF-SERVING.

11          THE COURT:  SUSTAINED.

12   BY MR. AKROTIRIANAKIS:

13   Q.   PARAGRAPH 11 OF THE PLEA AGREEMENT INDICATES THAT YOU

14   UNDERSTAND THAT ANY KNOWINGLY FALSE OR MISLEADING STATEMENT

15   WOULD SUBJECT YOU TO PROSECUTION FOR PERJURY.

16          IS THAT YOUR UNDERSTANDING?

17   A.   YES, SIR.

18   Q.   IS IT FAIR TO SAY, MR. WEST, THAT REMEMBERING PRECISE

19   DATES IS NOT YOUR STRONGEST --

20   A.   YES, SIR.

21       (PAUSE.)

22   BY MR. AKROTIRIANAKIS:

23   Q.   YOU WERE ASKED ON CROSS-EXAMINATION ABOUT YOUR

24   INTERVIEWS WITH ATF SPECIAL AGENT MIKE HALUALANI.

25   A.   YES, SIR.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    Q.   AND YOU HAD SEVERAL?

2    A.   I TALKED TO HIM SEVERAL TIMES ON THE PHONE.  I THINK IN

3    PERSON WE ONLY TALKED TWICE.

4    Q.   OKAY.  DID YOU TALK TO HIM ON DIFFERENT SUBJECTS AT

5    DIFFERENT TIMES?

6    A.   YES, SIR.

7    Q.   AND YOU WERE ASKED WHETHER YOU HAD EVER TOLD AGENT

8    HALUALANI THAT THERE WAS DISCUSSION AMONGST THE LEADERSHIP

9    OF THE ARYAN BROTHERHOOD OF A DISSATISFACTION WITH THE WAY

10   IN WHICH THE DEFENDANT AND MICHAEL MC ELHINEY WERE RUNNING

11   THE DRUG TRAFFICKING CONSPIRACY AT LEAVENWORTH.

12         DO YOU RECALL THAT QUESTIONING?

13   A.   YES, SIR.

14   Q.   OKAY.  AND YOUR ANSWER WAS THAT YOU HAD NOT BEEN ASKED

15   THAT SPECIFIC QUESTION BY AGENT HALUALANI?

16   A.   YES, SIR.

17   Q.   OKAY.  DID AGENT HALUALANI ASK YOU QUESTIONS ABOUT THE

18   DEFENDANT'S INVOLVEMENT AND THE INVOLVEMENT OF MICHAEL

19   MC ELHINEY IN RUNNING THE DRUG TRAFFICKING CONSPIRACY AT

20   LEAVENWORTH?

21   A.   YES, SIR.

22   Q.   AND DID YOU ANSWER THOSE QUESTIONS?

23   A.   YES, SIR.

24   Q.   DO YOU RECALL WHAT YOU TOLD AGENT HALUALANI AT THAT

25   TIME?

1    A.   NO, I DON'T.

2         MR. AKROTIRIANAKIS:  MAY I APPROACH?

3         THE COURT:  YES.

4    (PAUSE.)

5         THE WITNESS:  YES, SIR.

6    BY MR. AKROTIRIANAKIS:

7    Q.   MR. WEST, HAS REVIEW OF THAT DOCUMENT REFRESHED YOUR

8    RECOLLECTION AS TO WHAT IT WAS THAT YOU DISCUSSED WITH AGENT

9    HALUALANI IN REGARD TO THE DRUG TRAFFICKING CONSPIRACY OF

10   THE UNITED STATES PENITENTIARY LEAVENWORTH AND THE

11   DEFENDANT'S INVOLVEMENT IN IT?

12   A.   YES, SIR.  BASICALLY EXACTLY WHAT I SAID TODAY.

13   Q.   THAT WAS SEVERAL YEARS AGO THAT YOU HAD THAT

14   CONVERSATION WITH AGENT HALUALANI?

15   A.   YES, SIR.

16   Q.   WAS IT BEFORE YOU'D GIVEN ANY TESTIMONY IN ANY

17   PROCEEDING RELATED TO THIS INDICTMENT?

18   A.   YES, SIR.

19   Q.   YOU WERE ASKED ABOUT EXHIBIT 1, THE TYPEWRITTEN

20   DOCUMENT?

21   A.   YES, SIR.

22   Q.   AND A SLASH OR A SWIPE OR SOMETHING THAT'S AT THE END

23   THAT MAY BE A "C"?

24   A.   YES, SIR.

25   Q.   OKAY.  YOU WERE NOT SUGGESTING -- WELL, DO YOU KNOW AT

```
1    ALL WHAT THAT "C" OR WHATEVER IT IS, IS?

2    A.    I'M ASSUMING IT'S CLEO'S SIGNATURE.

3    Q.    OKAY.  ARE YOU SUGGESTING THAT YOU RECOGNIZE THAT AS

4    CLEO ROY'S HANDWRITING?

5    A.    NO, SIR.

6    Q.    IN OTHER WORDS, THE TESTIMONY THAT YOU GAVE ON

7    CROSS-EXAMINATION WITH REGARD TO THAT, WHAT YOU CHARACTERIZE

8    AS A LETTER "C" BASED ON YOUR KNOWLEDGE OF CLEO ROY'S

9    INVOLVEMENT IN THE TYPING OF THAT DOCUMENT?

10   A.    YES, SIR.

11   Q.    OR, NOT THAT DOCUMENT, BUT IN DRAFTS OF THAT DOCUMENT?

12   A.    YES, SIR.

13   Q.    YOU WERE ASKED BEFORE THE BREAK, BEFORE THE LUNCH

14   BREAK, ABOUT BEING AN INMATE VERSUS BEING A CONVICT.

15          DO YOU RECALL THAT TESTIMONY?

16   A.    YES, SIR.

17   Q.    AND YOU WERE ASKED WHETHER THE USE OF KITES WAS LIMITED

18   TO THE ARYAN BROTHERHOOD?

19   A.    YES, SIR.

20   Q.    YOU WERE ASKED ABOUT WHETHER THE USE OF HIT-AND-MISS

21   MESSAGE WAS LIMITED TO THE ARYAN BROTHERHOOD?

22   A.    YES, SIR.

23   Q.    OR THE IDEA OF NOT COOPERATING BEING LIMITED TO THE

24   ARYAN BROTHERHOOD?

25   A.    YES, SIR.
```

```
 1    Q.   AND OTHER QUESTIONS SUGGESTING SIMILARITIES BETWEEN
 2    BEING A MEMBER OF THE ARYAN BROTHERHOOD AND BEING A CONVICT,
 3    GENERALLY?
 4    A.   YES, SIR.
 5    Q.   MR. WEST, IS BEING A MEMBER OF THE ARYAN BROTHERHOOD
 6    DIFFERENT FROM JUST BEING A CONVICT, GENERALLY?
 7    A.   YES, SIR.
 8    Q.   NOW, WITH OTHER -- WITH BEING A CONVICT, GENERALLY,
 9    WOULD YOU, AS A RULE, BE KILLED FOR TALKING TO THE MAN, AS
10    THE QUESTION WAS PUT TO YOU EARLIER?
11    A.   NO, SIR.
12    Q.   AS A CONVICT, GENERALLY, WOULD YOU, AS A SINGLE PERSON
13    OR WITH ONE OR TWO OTHER PEOPLE, BE ABLE TO TAKE OVER
14    RUNNING A PENITENTIARY?
15    A.   NO, SIR.
16    Q.   YOU WERE A FEDERAL PRISONER ALMOST 30 YEARS AND A
17    MEMBER OF THE ARYAN BROTHERHOOD FOR 20?
18    A.   YES, SIR.
19    Q.   IN THAT TIME, DID YOU STAY APPRISED OF THE NEWS OF THE
20    ARYAN BROTHERHOOD?
21    A.   YES, SIR.
22    Q.   WOULD YOU HAVE KNOWN IF A MEMBER OF THE ARYAN
23    BROTHERHOOD HAD BEEN KILLED BY A RIVAL GANG MEMBER OR
24    ANOTHER CONVICT?
25    A.   YES, SIR.  CERTAINLY.
```

1    Q.    BASED ON ALL THAT YOU KNOW, HAS ANY MEMBER OF THE ARYAN

2    BROTHERHOOD EVER BEEN KILLED BY A RIVAL GANG MEMBER OR

3    ANOTHER CONVICT EXCEPT SOMEBODY PLACED IN THE HAT BY THE

4    ARYAN BROTHERHOOD?

5    A.    NO, SIR.

6              THE COURT:  ARE YOU ABOUT DONE, OR SHOULD WE

7    RECESS?

8              MR. AKROTIRIANAKIS:  IF I COULD HAVE JUST A

9    SECOND, YOUR HONOR.  I THINK I MAY BE DONE.

10        *(PAUSE.)*

11   BY MR. AKROTIRIANAKIS:

12   Q.    LAST COUPLE OF QUESTIONS.

13             YOU WERE ASKED ON CROSS-EXAMINATION ABOUT THE

14   CONVERSATIONS YOU HAD WITH GOTTI --

15   A.    YES, SIR.

16   Q.    -- ABOUT HIS DESIRE THAT WAHKIL JOHNSON BE KILLED?

17   A.    YES, SIR.

18   Q.    WERE THOSE DISCUSSIONS JUST BETWEEN YOURSELF AND GOTTI?

19   A.    YES, SIR.

20   Q.    AND WHEN YOU SPOKE TO -- AND THAT WAS IMMEDIATELY

21   AFTER --

22   A.    NO, SIR.  IT WAS A SHORT TIME -- A WHILE AFTERWARDS.

23   Q.    OKAY.  AND THEN YOU HAD FURTHER CONVERSATION WITH

24   MICHAEL MC ELHINEY?

25   A.    YES, SIR.

1    Q.    AND THIS WAS IN THE TIME PERIOD WHEN YOU, MC ELHINEY

2    AND THE DEFENDANT, DAVID SAHAKIAN, WERE THE ONLY ARYAN

3    BROTHERHOOD MEMBERS AT THE MARION PENITENTIARY?

4    A.    YES, SIR.

5    Q.    AND MC ELHINEY TOLD YOU THAT BASED ON HIS CONVERSATION

6    WITH GOTTI, THAT 50,000 WAS THE AMOUNT FOR THE CONTRACT?

7    A.    YEAH.  THERE WERE -- I MEAN, THERE WAS SO MANY NUMBERS

8    THROWN AROUND THAT I BELIEVE MC ELHINEY TOLD ME 50,000.  AND

9    AT THAT TIME, HE WAS CLOSER TO GOTTI THAN I WAS.

10   Q.    IN WHAT SENSE?

11   A.    IN RELATION TO BEING ABLE TO COMMUNICATE WITH HIM.

12   Q.    WHY IS THAT?

13   A.    THEY WERE IN -- I THINK THEY WERE IN THE SAME BLOCK AT

14   THAT TIME.

15   Q.    DO YOU REMEMBER WHICH BLOCK THAT WAS?

16   A.    IT WOULD HAVE BEEN (B).  I'M NOT SURE, THOUGH.  HE

17   COULD HAVE BEEN IN THE HOLE WITH -- I -- I JUST REALLY DON'T

18   KNOW.

19   Q.    DO YOU REMEMBER WHAT UNIT WAS THE HOLE OR THE SHU AT

20   THAT TIME?

21   A.    I BELIEVE IT WAS (I).

22   Q.    AND DO YOU RECALL WHETHER IN THE 1996-1997 TIME FRAME,

23   MICHAEL MC ELHINEY WAS SPENDING A CONSIDERABLE AMOUNT OF

24   TIME IN THE SHU?

25   A.    I DON'T KNOW FOR SURE.  BUT I WOULD IMAGINE.

214

1          MR. GREEN:  OBJECT TO HIS IMAGINATION.  I'M

2     SORRY -- TO THE SPECULATION.

3          THE COURT:  IS THAT A MOTION TO STRIKE?

4          MR. GREEN:  MOTION TO STRIKE, JUDGE.  I APOLOGIZE.

5          THE COURT:  MOTION TO STRIKE IS GRANTED.  AND THAT

6     MEANS THAT YOU ARE TO DISREGARD THE WITNESS' ANSWER TO THE

7     LAST QUESTION.

8          MR. AKROTIRIANAKIS:  YOUR HONOR, I PLACE

9     EXHIBIT 289 ON THE DOCUMENT CAMERA.

10    BY MR. AKROTIRIANAKIS:

11    Q.   MR. WEST, ARE YOU ABLE TO SEE THAT?

12    A.   YES, SIR.

13    Q.   CAN YOU SEE THAT THESE ARE THE INMATE QUARTERS HISTORY

14    FOR MICHAEL PATRICK MC ELHINEY?

15    A.   YES, SIR.

16    Q.   AND RIGHT HERE WE SEE THAT HE WAS AT MARION?

17    A.   YES, SIR.

18    Q.   AND THE DATES ARE FROM THE BEGINNING OF 1996 THROUGH

19    MARCH 1997 ON THIS PAGE?

20    A.   YES, SIR.

21    Q.   I'M SORRY.  THROUGH APRIL 11, 1997?

22    A.   YES, SIR.

23    Q.   OKAY.  AND I HAVE HIGHLIGHTED A NUMBER OF INSTANCES

24    WHEN HE WAS IN I UNIT.  DO YOU SEE THAT?

25    A.   YES, SIR.

1    Q.   OKAY.  I PLACE EXHIBIT 303, INMATE QUARTERS HISTORY FOR

2    THE DEFENDANT SAHAKIAN ON THE OVERHEAD CAMERA ON PAGE 2.

3              I DIRECT YOUR ATTENTION TO THE LINE THAT READS

4    *MARION --*

5              MR. GREEN:  JUDGE, AT THIS TIME, I OBJECT THAT

6    THIS IS GOING BEYOND THE SCOPE OF CROSS-EXAMINATION.

7              THE COURT:  LET'S WAIT FOR THE QUESTION.

8              MR. GREEN:  OKAY.

9    BY MR. AKROTIRIANAKIS:

10   Q.   JANUARY 3, 1996, AND UPWARD FROM THERE, THE DEFENDANT'S

11   HOUSING ASSIGNMENTS IN I UNIT CONTINUING TO APRIL OF 1997.

12             DO YOU SEE THAT, SIR?

13   A.   YES, SIR.

14             MR. AKROTIRIANAKIS:  I HAVE NOTHING FURTHER.

15             THE COURT:  ALL RIGHT.  WE'LL TAKE OUR AFTERNOON

16   RECESS FOR 15 MINUTES, LADIES AND GENTLEMEN.

17             AND AGAIN, PLEASE REMEMBER, DON'T DISCUSS THE CASE

18   IN ANY FASHION WITH ANYONE, AMONGST YOURSELVES OR WITH

19   ANYONE ELSE.

20             AND DON'T MAKE UP YOUR MINDS ABOUT THE CASE OR

21   ANYTHING RELATED TO IT.  THANK YOU.  WE'RE IN RECESS.

22        *(JURY OUT.)*

23             THE COURT:  THE WITNESS IS EXCUSED.  THANK YOU.

24   YOU MAY STEP DOWN.  WE ARE ON THE RECORD OUTSIDE THE

25   PRESENCE THE JURY.

216

```
 1              JUST REAL QUICKLY I WANTED TO SAY -- AND BECAUSE
 2   THIS APPLIES TO BOTH SIDES, IF YOU'RE READING IN TESTIMONY
 3   FROM ANOTHER PROCEEDING, IT'S HEARSAY UNLESS IT'S A PRIOR
 4   INCONSISTENT STATEMENT.  SO THAT'S WHY I REQUIRE THAT YOU
 5   TELL THE OTHER SIDE PAGE AND LINE NUMBER SO IF THEY HAVE AN
 6   OBJECTION THAT IT'S NOT INCONSISTENT, I CAN RULE ON IT.
 7              MR. GREEN:  I UNDERSTAND, JUDGE.  I JUST GOT
 8   CAUGHT UP IN THE MOMENT.
 9              THE COURT:  WE'RE IN RECESS.
10              THE CLERK:  THIS COURT IS IN RECESS.
11        (RECESS.)
12        (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT
13         IN THE PRESENCE OF THE JURY:)
14              THE COURT:  LET THE RECORD REFLECT THE PRESENCE OF
15   ALL MEMBERS OF THE JURY, ALL COUNSEL AND DEFENDANT PRESENT.
16              AND THE GOVERNMENT MAY CALL ITS NEXT WITNESS.
17              MR. WOLFE:  YOUR HONOR, THE GOVERNMENT CALLS TODD
18   CARPENTER.
19              THE CLERK:  PLEASE STAND.  PLEASE RAISE YOUR RIGHT
20   HAND.
21         TODD CARPENTER, PLAINTIFF'S WITNESS, SWORN
22              THE WITNESS:  YES.
23              THE COURT:  PLEASE BE SEATED.
24              PLEASE STATE YOUR FULL NAME AND SPELL IT FOR THE
25   RECORD.
```

```
 1              THE WITNESS:  TODD CARPENTER, C-A-R-P-E-N-T-E-R.

 2              THE COURT:  THANK YOU.

 3              AND WHAT WAS YOUR FIRST NAME?

 4              THE WITNESS:  TODD, T-O-D-D.

 5              THE COURT:  THANK YOU.

 6              YOU MAY INQUIRE, MR. WOLFE.

 7              MR. WOLFE:  THANK YOU.

 8                     DIRECT EXAMINATION

 9    BY MR. WOLFE:

10    Q.   MR. CARPENTER, WHO DO YOU WORK FOR?

11    A.   I WORK FOR THE BUREAU OF PRISONS.

12    Q.   HOW LONG HAVE YOU WORKED FOR THE BUREAU OF PRISONS,

13    SIR?

14    A.   FOR APPROXIMATELY 21 YEARS.

15    Q.   DO YOU HAVE A -- WHAT'S THE TITLE OF THE JOB THAT YOU

16    OCCUPY CURRENTLY WITH THE BUREAU OF PRISONS?

17    A.   SPECIAL INVESTIGATIVE SPECIALIST.

18    Q.   AND DO YOU HAVE A RANK IN THAT JOB?  ARE YOU A

19    SERGEANT, CORRECTIONS OFFICER, LIEUTENANT OR ANYTHING OF THE

20    SORT THAT I SHOULD CALL YOU BY?

21    A.   NO, SIR.  IT'S JUST SPECIAL INVESTIGATIVE SPECIALIST.

22    Q.   WILL YOU PLEASE TELL THE JURY BRIEFLY YOUR EMPLOYMENT

23    HISTORY DURING THOSE 21 YEARS WITH THE BUREAU OF PRISONS,

24    WHAT POSITIONS YOU'VE OCCUPIED.

25    A.   OKAY.  STARTED OUT AS A CORRECTIONAL OFFICER IN 1987.
```

```
1    WENT UP THROUGH THE RANKS TO SENIOR OFFICER SPECIALIST AND
2    ALSO TO A LIEUTENANT.  THEN WENT TO COUNSELOR, CORRECTIONAL
3    COUNSELOR.  AND FROM THERE I ENDED UP BECOMING A SPECIAL
4    INVESTIGATIVE SPECIALIST.
5    Q.   MR. CARPENTER, WILL YOU TELL THE JURY WHAT IT MEANS TO
6    BE A SPECIAL INVESTIGATIVE SPECIALIST?
7    A.   WHAT IT IS, IS I'M INVOLVED IN MONITORING MAIL, PHONE
8    CALLS, DOING INVESTIGATIONS CONCERNING ADMINISTRATIVE
9    VIOLATIONS AT THE INSTITUTION, FULFILLING SUBPOENAS.  IF
10   THERE IS SOME TYPE OF VIOLATION OF LAW, WE'LL REFER THAT OUT
11   TO THE FBI.
12   Q.   MR. CARPENTER, DO YOU WORK AS A SPECIAL INVESTIGATIVE
13   SPECIALIST NOW?
14   A.   AT THE CURRENT TIME, I'M ASSIGNED TO THE MINIMUM
15   SECURITY IN FLORENCE, COLORADO WHICH IS ALSO UNDER THE
16   ADMINISTRATIVE MAXIMUM SECURITY PENITENTIARY.
17   Q.   MR. CARPENTER, HOW MANY INSTITUTIONS ARE THERE IN THE
18   CORRECTIONAL COMPLEX AT FLORENCE, COLORADO?
19   A.   THERE ARE FOUR, MINIMUM SECURITY, MEDIUM SECURITY, HIGH
20   SECURITY, AND THEN THERE'S THE ADMINISTRATIVE MAXIMUM
21   SECURITY.
22   Q.   SIR, IS THE HIGH SECURITY INSTITUTION IN THE FLORENCE
23   COMPLEX A UNITED STATES PENITENTIARY?
24   A.   YES, IT IS.
25   Q.   AND THE -- DID I UNDERSTAND YOU TO SAY THAT THE
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    ADMINISTRATIVE MAXIMUM FACILITY IS STILL MORE SECURE THAN

2    THE PENITENTIARY?

3    A.    YES.

4    Q.    AND YOU PRESENTLY WORK AT THE MINIMUM SECURITY

5    INSTITUTION?

6    A.    MINIMUM SECURITY IS WHERE I'M ASSIGNED.

7    Q.    IS THAT THE SORT OF INSTITUTION IN THE BUREAU OF

8    PRISONS THAT'S USUALLY CALLED CAMP?

9    A.    YES, IT IS.

10   Q.    SIR, HAVE YOU EVER WORKED AT THE ADMINISTRATIVE MAXIMUM

11   FACILITY IN FLORENCE?

12   A.    YES, I HAVE.

13   Q.    WHAT PERIOD OF TIME WAS THAT?

14   A.    FROM MARCH 31 OF 1996 UNTIL FEBRUARY 5TH OF 2006.

15   Q.    WILL YOU PLEASE TELL THE JURY BRIEFLY WHAT YOUR DUTIES

16   WERE DURING THAT MORE-OR-LESS 10-YEAR PERIOD THAT YOU WERE

17   AT THE ADX.

18   A.    MONITORING MAIL AND PHONE CALLS, DOING INVESTIGATIONS

19   CONCERNING ADMINISTRATIVE VIOLATIONS.  IF THERE WAS A

20   VIOLATION OF FEDERAL LAW, WE REFER THAT OUT TO THE FBI.

21   FULFILLING SUBPOENAS.

22   Q.    MR. CARPENTER, AS A RESULT OF THE WORK YOU'VE JUST

23   DESCRIBED DURING THAT PERIOD OF TIME AT THE ADX, ARE YOU

24   FAMILIAR WITH THE SYSTEM -- WITH WHETHER ANY SYSTEM EXISTED

25   AT THE ADX BETWEEN 1996 AND, SAY, THE YEAR 2000 TO RECORD

1    INMATE PHONE CALLS THAT WERE NOT LEGAL CALLS?

2    A.   YES.  AS FAR AS THE SOCIAL CALLS, THERE WAS A SYSTEM IN

3    PLACE.  AN INMATE WAS ABLE TO USE THE TELEPHONE, CALL THE

4    PHONE NUMBER THAT HE REQUESTED ON HIS LIST.  HE WENT THROUGH

5    A THING CALLED THE DICTAPHONE MACHINE, WHICH WAS A MASTER

6    REEL-TO-REEL TAPE.  ALL THE TELEPHONE CALLS WERE RECORDED ON

7    THERE.

8    Q.   AND WERE LEGAL CALLS RECORDED DURING THAT PERIOD OF

9    TIME?

10   A.   NO, LEGAL CALLS ARE NONRECORDED.

11   Q.   WHEN THE SOCIAL CALLS WERE RECORDED IN THE SYSTEM THAT

12   YOU JUST DESCRIBED, DID IT RECORD EVERY SOCIAL CALL THAT WAS

13   MADE BY AN INMATE?

14   A.   AT THAT FACILITY.  YES.

15   Q.   AND WERE THOSE CALLS KEPT FOREVER OR FOR SOME LESSER

16   PERIOD OF TIME?

17   A.   THE TAPE WAS MAINTAINED FOR 180 DAYS UNLESS IT WAS

18   UNDER SUBPOENA OR PULLED AS EVIDENCE.

19   Q.   AND IF A CALL IS MADE ON DAY ONE, NO ONE SHOWS ANY

20   INTEREST IN IT, THERE'S NO REASON TO PRESERVE IT, WHAT

21   HAPPENED TO IT ON THE 181ST DAY?

22   A.   IT WAS REUSED, PLACED BACK ON THE DICTAPHONE MACHINE.

23   Q.   IF A CALL BECAME OF INTEREST TO YOU OR TO SOMEONE ELSE

24   OR IF YOU RECEIVED A SUBPOENA FOR THE CALL DURING THE 180

25   DAYS, WHAT HAPPENED TO IT THEN?

1    A.    ONCE WE RECEIVED THE SUBPOENA, WE WOULD TAKE IT OVER TO

2    THE LEGAL DEPARTMENT, HAVE THEM VERIFY THE INFORMATION.

3    ONCE THAT INFORMATION IS VERIFIED, WE WOULD BRING IT BACK

4    OVER.  WE WOULD PULL ALL THE TELEPHONE CALLS CONCERNING THAT

5    SUBPOENA.  WE PULL ALL THE TAPES OFF THE SHELVES, COPY THEM

6    TO A SMALL CASSETTE TAPE.  AND THEN WE TAKE THE MASTER

7    REEL-TO-REEL TAPE AND PLACE THAT INTO EVIDENCE.

8    Q.    MR. CARPENTER, YOU DESCRIBED THIS PROCESS BY WHICH A

9    CALL MIGHT BE SUBPOENAED AND RECORDED TO A SMALL CASSETTE.

10   DID YOU EVER DO THAT PERSONALLY AS PART OF YOUR JOB?

11   A.    I ASSISTED SIS TECHNICIANS WITH IT.  YES, I DID.

12   Q.    MR. CARPENTER, WAS THERE A TIME WHEN YOU RECEIVED

13   SUBPOENAS FOR SEVERAL SPECIFIC TELEPHONE CALLS HAVING TO DO

14   WITH THIS CASE?

15   A.    YES, THERE WAS.

16   Q.    AND WERE INDIVIDUAL CASSETTES PREPARED IN RESPONSE TO

17   THOSE REQUESTS IN THE SAME SYSTEM THAT YOU JUST DESCRIBED TO

18   THE JURY?

19   A.    YES.

20        MR. WOLFE:  YOUR HONOR, I BELIEVE THAT THE PARTIES

21   HAVE A STIPULATION FOR THE ADMISSION INTO EVIDENCE OF

22   EXHIBITS 21, 23, AND 32.

23        MR. GREEN:  THAT'S CORRECT, YOUR HONOR.

24        THE COURT:  SO STIPULATED.  ALL RIGHT.  THEN

25   EXHIBITS 21, 23 AND 32 ARE ORDERED ADMITTED.

1          *(PLAINTIFF'S EXHIBITS 21, 23, AND 32 RECEIVED IN*

2          *EVIDENCE.)*

3    BY MR. WOLFE:

4    Q.    MR. CARPENTER, IN THE INTEREST OF SAVING TIME, I WON'T

5    SHOW YOU THOSE EXHIBITS NOW.  I'D LIKE TO TURN TO ANOTHER

6    SUBJECT.

7          I WANT TO DRAW YOUR ATTENTION TO MAY 5, 1997.

8    WERE YOU WORKING AT THE ADMINISTRATIVE MAXIMUM FACILITY ON

9    MAY 5TH, 1997?

10   A.    YES, I WAS.

11   Q.    DID YOU HAVE AN OCCASION THAT DAY TO GO TO THE CELL OF

12   INMATE BARRY MILLS AND TAKE SOME PHOTOGRAPHS?

13   A.    YES, I DID.

14   Q.    WILL YOU PLEASE DESCRIBE BRIEFLY TO THE JURY HOW YOU

15   CAME TO GO TO MR. MILLS' CELL TO TAKE PHOTOGRAPHS.

16   A.    STAFF RECEIVED THE INFORMATION.  I BELIEVE THAT THERE

17   IS INFORMATION ABOUT INMATES MAKING WEAPONS.  BARRY MILLS

18   WAS ONE OF THEM.  WE WENT DOWN AND SEARCHED HIS CELL AND

19   FOUND A CUT IN HIS LIGHT FIXTURE IN HIS CELL.

20   Q.    MR. CARPENTER, WILL YOU LOOK AT EXHIBIT 165 FOR

21   IDENTIFICATION, WHICH I BELIEVE IS IN THE FOLDER IN FRONT OF

22   YOU ON THE STAND.

23   A.    YES.

24   Q.    DO YOU RECOGNIZE THE THREE PAGES THAT MAKE UP

25   EXHIBIT 165 FOR IDENTIFICATION?

1    A.    YES, I RECOGNIZE ALL THREE OF THEM.

2    Q.    WHAT DO YOU RECOGNIZE THEM AS, MR. CARPENTER?

3    A.    THESE ARE PHOTOS THAT I'D TAKEN ON A HANDHELD POLAROID

4    CAMERA CONCERNING THE LIGHT FIXTURE THAT WAS CUT IN

5    MR. MILLS' CELL.

6    Q.    AND THAT'S THE INSTANCE THAT I DREW YOUR ATTENTION TO

7    ON MAY 5TH, 1997?

8    A.    YES.

9         MR. WOLFE:  YOUR HONOR, I'LL OFFER EXHIBIT 165.

10        MR. GREEN:  NO OBJECTION.

11        THE COURT:  ANY OBJECTION?  THANK YOU.  165 IS

12   ORDERED ADMITTED.  YOU MAY PUBLISH.

13        (PLAINTIFF'S EXHIBIT 165 RECEIVED IN EVIDENCE.)

14   BY MR. WOLFE:

15   Q.    NOW, LOOKING AT THE FIRST PAGE OF EXHIBIT 165 WHICH

16   I'VE DISPLAYED, IT'S ALSO ON YOUR MONITOR, IF THAT HAPPENS

17   TO BE A CLEARER VERSION, WILL YOU TELL THE JURY BRIEFLY WHAT

18   THIS PHOTOGRAPH SHOWS, MR. CARPENTER?

19   A.    THIS IS A PHOTOGRAPH OF THE LIGHT FIXTURE THAT'S STILL

20   ON THE WALL IN MR. MILLS' CELL.  OFF TO THE LEFT WHERE THE

21   PERSON IS POINTING TO IS WHERE IT APPEARS THAT THE METAL HAD

22   BEEN CUT INTO A FASHION THAT IT APPEARS TO BE MAKING A

23   WEAPON AT THAT POINT.

24   Q.    AND THE DARKER LINE THAT IS -- THE FINGER IS POINTING

25   AT, IS THAT A CUT IN THE METAL FRAME OF THE FIXTURE?

224

1    A.    YES, IT IS.

2    Q.    SIR, DO YOU KNOW WHAT KIND OF METAL THAT FIXTURE WAS

3    MADE OF?

4    A.    NO, SIR.  IT'S JUST METAL.

5    Q.    HAVE YOU EVER SEEN A WEAPON MADE FROM A LIGHT FIXTURE

6    AT THE ADX DURING THE 10 YEARS THAT YOU DESCRIBED WORKING

7    THERE AS AN INVESTIGATIVE SPECIALIST?

8    A.    FROM THE LIGHT FIXTURE, I DO NOT RECALL ONE THAT I

9    REMEMBER SEEING.

10   Q.    WHAT MADE YOU BELIEVE THAT THIS CUT REPRESENTED AN

11   EFFORT TO MAKE A WEAPON, AS YOU DESCRIBED IT?

12   A.    BECAUSE, NUMBER ONE, IT WAS A STRAIGHT CUT FROM THE TOP

13   OF THE LIGHT TO THE BOTTOM OF THE LIGHT.  IT WAS ONE SOLID

14   PIECE OF METAL THAT WOULD HAVE BEEN REMOVED FROM THAT.  THE

15   ONLY THING THAT I CAN THINK IT WOULD BE USED FOR WOULD BE TO

16   FASHION INTO A WEAPON AND BE USED.

17   Q.    MR. CARPENTER, LET'S -- LET ME STEP BACK JUST A BIT AND

18   ASK SOME BACKGROUND QUESTIONS THAT MAY MAKE THIS -- THE JURY

19   ABLE TO ENVISION THIS BETTER.

20         WILL YOU PLEASE DESCRIBE WHAT THIS CELL,

21   BARRY MILLS' CELL, ON MAY 5TH, 1997, LOOKED LIKE IN A

22   GENERAL WAY?

23   A.    AS YOU WALK IN, YOU WILL HAVE A SLIDING METAL DOOR ON

24   THE FRONT OF THE CELL.  THEN YOU WALK INTO WHAT WE CALL THE

25   SALLY PORT AREA.  AND THERE'S A SLIDING INSIDE GRILLE AT

1    THAT POINT.  ONCE YOU WALK PAST THAT SECOND GRILLE, YOU WILL

2    NOW HAVE ENTERED THE ACTUAL CELL AREA.

3              I'M TRYING TO THINK.  IT'S BEEN A WHILE SINCE I'VE

4    BEEN TO ECHO UNIT C-20A.  BUT THE LIGHT FIXTURE IS ABOUT

5    SEVEN-FOOT OFF THE GROUND.  YOU HAVE A TABLE THAT THE TV

6    RESTS ON.  THEN YOU HAVE A DESK.  THEN YOU HAVE A STOOL FOR

7    THE DESK.  THIS IS RIGHT INSIDE ABOUT FOUR FEET.

8              IN THIS AREA RIGHT HERE, PRIOR TO GETTING TO THAT,

9    THERE IS THE SINK AND THE TOILET AREA.  AT THE END OF THE

10   BACK OF THE CELL, THERE'S A SHOWER.  AND THEN RIGHT ACROSS

11   FROM THAT, YOU'LL HAVE THE BED LENGTH THIS WAY, WHICH IS A

12   CONCRETE BED, AND A SMALL WINDOW ABOUT LIKE PROBABLY

13   THREE-FOOT BY SIX INCHES AT THE BACK OF THE CELL.

14   Q.   MR. CARPENTER, WAS THIS -- YOU SAID, I BELIEVE, THAT

15   THIS LIGHT FIXTURE WAS ABOUT SEVEN FEET OFF THE GROUND.  DO

16   I HAVE THAT RIGHT?

17   A.   YES, I BELIEVE IT WAS.

18   Q.   ON WHICH SIDE -- TOP, BOTTOM OR SIDE OF THE LIGHT

19   FIXTURE WAS THE CUT THAT YOU PHOTOGRAPHED?

20   A.   IT'S ON THE TOP OF THE LIGHT.

21   Q.   SO IS IT VISIBLE TO A PERSON OF SIX FEET IN HEIGHT WHO

22   JUST WALKS INTO THE CELL?

23   A.   YOU HAVE TO REALLY BE LOOKING FOR IT, BECAUSE IT SITS

24   UP.  IT DOES SLOPE DOWN A LITTLE BIT, BUT YOU WOULD HAVE TO

25   REALLY BE PAYING ATTENTION TO SEE THAT.

226

1   Q.   MR. CARPENTER, DOES THE BUREAU OF PRISONS MAINTAIN

2   RECORDS THAT WOULD TELL US EXACTLY HOW LONG BARRY MILLS HAD

3   BEEN IN THAT CELL BEFORE THE DAY WHEN YOU TOOK THESE

4   PHOTOGRAPHS ON MAY 5TH?

5   A.   YES.   THERE WOULD HAVE BEEN SOME RECORD OF WHEN HE WENT

6   INTO THAT CELL.

7   Q.   DO YOU RECALL NOW, 11 YEARS LATER, HOW LONG HE HAD BEEN

8   IN THE CELL?

9   A.   NO, I SURE DON'T.  I COULDN'T TELL YOU.  I WANT TO SAY

10  HE WENT IN FEBRUARY, BUT I COULD BE MISTAKEN WITHOUT LOOKING

11  IT UP.

12  Q.   DOES THE BUREAU OF PRISONS HAVE ANY PRACTICE ABOUT

13  SEARCHING OR EXAMINING THE CONDITION OF A CELL BEFORE AN

14  INMATE IS MOVED INTO A NEW CELL?

15  A.   ONCE AN INMATE IS -- PRIOR TO THE INMATE MOVING IN, THE

16  STAFF WOULD GO DOWN, CHECK TO MAKE SURE THAT EVERYTHING IS

17  WORKING IN THAT CELL.  AND THEN ALSO TO MAKE SURE -- THEY

18  WOULD SEARCH THE CELL TO MAKE SURE THERE IS NO CONTRABAND

19  BEING PASSED FROM ONE INMATE TO ANOTHER.

20        MR. WOLFE:  YOUR HONOR, I HAVE NOTHING FURTHER FOR

21  MR CARPENTER.

22        THE COURT:  THANK YOU.

23        CROSS-EXAMINATION?

24        MR. GREEN:  THANK YOU, JUDGE.

25

227

1      CROSS-EXAMINATION

2    BY MR. GREEN:

3    Q.    MR. CARPENTER, HAVE YOU BEEN EMPLOYED AT ANY OTHER

4    INSTITUTIONS OTHER THAN IN FLORENCE, COLORADO?

5    A.    YES, I HAVE.

6    Q.    HAVE YOU BEEN TO LEWISBURG?

7    A.    NO, I HAVE NOT.

8    Q.    HAVE YOU BEEN TO MARION?

9    A.    NO, I HAVE NOT.

10   Q.    WHAT ARE THE OTHER INSTITUTIONS THAT YOU'VE BEEN

11   EMPLOYED AT?

12   A.    BEEN TO FCI ENGLEWOOD, COLORADO.

13   Q.    IS THAT IN FLORIDA?

14   A.    NO, COLORADO.

15   Q.    OH, I'M SORRY, COLORADO.  SORRY.  GO AHEAD.

16   A.    FCI SHERIDAN IN OREGON.  BACK TO FCI ENGLEWOOD IN

17   COLORADO, AND THEN AT THE FLORENCE COMPLEX.  I'VE BEEN AT

18   THE FCI THERE, THE ADMINISTRATIVE MAX, AND THEN ALSO THE

19   MINIMUM SECURITY CAMP.

20   Q.    AND WOULD YOU MIND TELLING THE COURT THE LEVEL OF

21   SECURITY AT EACH INSTITUTION?  WHEN YOU SAY -- IF YOU CAN

22   DEFINE FOR US WHAT AN FCI IS, WHAT A PRISON IS, AND WHAT A

23   CAMP IS AND THOSE KIND OF THINGS.

24   A.    CAMP IS MINIMUM SECURITY.  MAINLY IT DOES NOT HAVE A

25   FENCE AROUND IT, OR IF IT DOES, IT'S A SMALL FENCE.

1          WE'RE TALKING, IF YOU GO TO A MEDIUM FACILITY,

2    THERE ARE DIFFERENT GUIDELINES CONCERNING THE INMATES AS FAR

3    AS CRIMES COMMITTED AND HOW MUCH TIME THEY HAVE, AND THERE

4    WOULD BE OTHER SECURITY OPTIONS INVOLVED IN THAT.

5          AND ONCE YOU GO TO THE UNITED STATES PENITENTIARY,

6    IT HAS OTHER SECURITY FEATURES IN IT.  AND AGAIN, IT GOES

7    BACK TO THE CRIME AND TIME THAT WAS -- THAT THEY RECEIVED

8    FOR DOING THAT CRIME.

9          AND THEN THE ADMINISTRATIVE MAXIMUM, THAT IS A

10   FACILITY THAT IS MAXIMUM SECURITY.

11   Q.   AND IT'S MY UNDERSTANDING THAT ADX IS THE ONLY MAXIMUM

12   SECURITY FACILITY IN THE UNITED STATES TODAY; IS THAT

13   CORRECT?

14   A.   AS FAR AS THE FEDERAL SYSTEM, YES.

15   Q.   I'M SORRY.  AS FAR AS THE FEDERAL SYSTEM.  AND THAT

16   MARION, ILLINOIS, THAT THAT INSTITUTION, ALTHOUGH IT USED TO

17   BE A MAXIMUM ONE, HAS NOW BEEN CHANGED INTO AN FCI; IS THAT

18   CORRECT?

19   A.   YES.

20   Q.   NOW, AT A MAXIMUM -- OR AT A PENITENTIARY, WHEN YOU --

21   IT'S NOT MAXIMUM SECURITY, WHAT KIND OF SECURITY IS THAT?

22   A.   IT WOULD BE CALLED A HIGH SECURITY.

23   Q.   HIGH SECURITY?

24   A.   YES.

25   Q.   DO THOSE INSTITUTIONS TYPICALLY HAVE INMATES IN SINGLE

1    CELLS, OR ARE THEY DOUBLED UP?

2    A.    IN A HIGH SECURITY?

3    Q.    RIGHT.

4    A.    EVEN THOUGH I HAVE NOT WORKED AT ONE, BUT MORE THAN

5    LIKELY IT WOULD BE TWO INMATES IN A CELL AT THE HIGH

6    SECURITY IN GENERAL POPULATION.

7    Q.    OKAY.  SO WORKING AT A PENITENTIARY, YOUR ROLE HAS BEEN

8    IN THE -- HAS BEEN AS AN SIS OFFICER?

9    A.    YES, AT THE ADMINISTRATIVE MAX.

10   Q.    OKAY.  AND HOW LONG HAVE YOU BEEN AN SIS OFFICER?

11   A.    AT ADMINISTRATIVE MAX OR --

12   Q.    JUST IN YOUR CAREER.  TEN YEARS OR?

13   A.    POSSIBLY LONGER THAN THAT.  I WENT TO THE ADX, AS FAR

14   AS SIS, MARCH 31ST OF '96.  AT ANOTHER INSTITUTION -- TWO

15   OTHER INSTITUTIONS I WORKED IN SIS ON A -- A SHORT TIME, I'M

16   GUESSING PROBABLY YEAR AND A HALF TO TWO YEARS.

17   Q.    NOW AS AN SIS OFFICER FOR THE BUREAU OF PRISONS, YOU

18   GATHER INTELLIGENCE, IS MY UNDERSTANDING; IS THAT CORRECT?

19   A.    YES.  THAT'S ONE OF THE DUTIES.

20   Q.    OKAY.  AND IS THERE AN AUTOMATIC INTELLIGENCE

21   MANAGEMENT SYSTEM?  IS IT CALLED AIMS?  IS THERE A SYSTEM

22   THAT YOU USE CALLED AIMS?

23   A.    YES.

24   Q.    OKAY.  CAN YOU DESCRIBE FOR US WHAT THAT IS.

25   A.    IT'S A COMPUTER PROGRAM THAT YOU CAN LOAD INFORMATION

230

1    ONTO.

2    Q.   OKAY.  AND IS THAT -- AND IT'S A DATABASE FOR THE

3    INTELLIGENCE THAT YOU GATHER; IS THAT CORRECT?

4    A.   YES.

5    Q.   OKAY.  AND THAT DATABASE AND THE INTELLIGENCE THAT YOU

6    GATHER IS AVAILABLE FOR ANY SIS OFFICER THROUGHOUT THE

7    BUREAU OF PRISONS?

8    A.   NO.  IT SHOULD BE FOR THE INSTITUTION ALONE.  IT'S NOT

9    BUREAU-WIDE THAT I'M AWARE OF.

10   Q.   WHEN YOU GATHER INTELLIGENCE AS AN SIS OFFICER, DO YOU

11   OCCASIONALLY GIVE YOUR INTELLIGENCE TO ANOTHER AGENCY SUCH

12   AS THE SACRAMENTO INTELLIGENCE UNIT?

13   A.   WELL, SACRAMENTO INTELLIGENCE UNIT ALSO FALLS UNDER THE

14   BUREAU OF PRISONS.

15   Q.   OKAY.  I'M USING THE TERMS INCORRECTLY, I APOLOGIZE.

16        YOU, AS AN SIS OFFICER AT A PARTICULAR

17   PENITENTIARY, IF YOU GATHER INTELLIGENCE AT THAT PARTICULAR

18   PENITENTIARY, THEN ARE THERE OCCASIONS WHEN YOU SEND THAT

19   INFORMATION OUTSIDE THE PENITENTIARY TO OTHER AGENT -- TO

20   OTHER PENITENTIARIES OR OTHER AGENCIES WITHIN THE BUREAU OF

21   PRISONS?

22   A.   YES, WE WOULD.

23   Q.   OKAY.

24   A.   YES.

25   Q.   DO YOU DO THAT ON A REGULAR BASIS?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    A.   IT DEPENDS IF IT HAS SOMETHING DO WITH THAT FACILITY.

2    IF IT DOESN'T HAVE SOMETHING TO DO WITH THAT FACILITY, NO,

3    WE JUST WOULDN'T PASS IT ON, I MEAN --

4    Q.   DO YOU GATHER INTELLIGENCE ON GANGS WITHIN THE PRISON?

5    A.   USED TO, YES.

6    Q.   OKAY.  AND WHEN YOU SAY "USED TO," WOULD THAT -- CAN

7    YOU GIVE ME A TIME PERIOD?

8    A.   WELL, I MEAN, BACK '96 TO WHEN I WENT TO THE CAMP.  AT

9    THE CAMP, BECAUSE WE'RE MINIMUM SECURITY, WE DON'T HAVE A

10   LOT OF GANG INVOLVEMENT THERE.

11   Q.   BUT IN 1996 YOU DID?

12   A.   YES.

13   Q.   OKAY.  ARE YOU FAMILIAR WITH ANY SIS -- AN SIS OFFICER

14   BY THE NAME OF NELSON APONTE FROM LEWISBURG?

15   A.   YES, I'M AWARE OF HIM.

16   Q.   OKAY.  HAVE YOU HAD OCCASIONS TO EITHER SHARE

17   INFORMATION WITH HIM OR TALK TO HIM?

18   A.   I WANT TO SAY YES, BUT I DO NOT RECALL.  I MEAN, I

19   MIGHT HAVE TALKED TO HIM ON TWO OR THREE OCCASIONS, BUT I

20   DON'T -- I MEAN, '96 IS A LONG TIME AGO.  I DON'T --

21   Q.   I UNDERSTAND.

22   A.   -- I CAN'T REALLY SAY.

23   Q.   WHAT ABOUT AN SIS AGENT OR OFFICER BY THE NAME OF

24   JOSEPH YONKMAN OUT OF MARION?

25   A.   YES, I KNEW JOE YONKMAN.  WE WORKED AT ANOTHER

1   INSTITUTION TOGETHER.

2   Q.   OKAY.  NOW IN 1996, IS IT FAIR TO CHARACTERIZE THAT THE

3   INSTITUTIONS WERE SUFFERING FROM A LOT OF VIOLENT ACTS

4   DURING THAT TIME PERIOD?

5   A.   A LOT OF VIOLENT ACTS?  YES, WE -- I MEAN, WE HAD

6   OUR -- WE HAD QUITE A FEW THERE AT THE ADX.

7   Q.   OKAY.

8   A.   SURE DID.

9   Q.   AND THE ADX HAD ONLY BEEN OPENED UP FOR ABOUT TWO YEARS

10  AT THAT TIME; IS THAT CORRECT?

11  A.   YES.  I WANT TO SAY IT OPENED IN '94.

12  Q.   OKAY.  AND DO YOU RECALL IF YOU GATHERED ANY

13  INTELLIGENCE WITH REGARDS TO A THREAT GROUP CALLED THE

14  DC BLACKS?

15  A.   YES, SIR.  THERE WAS INTELLIGENCE THAT WAS RECEIVED.

16  Q.   AND THAT WAS DEVELOPED DURING THAT TIME PERIOD?

17  A.   YES.

18  Q.   OKAY.  NOW, WHEN YOU MONITOR -- AND NOT ONLY ADX, BUT

19  IS IT YOUR UNDERSTANDING THAT ALSO AT A PENITENTIARY THAT

20  IT'S ONE OF THE DUTIES OF THAT PENITENTIARY NOT ONLY TO

21  MONITOR THE TELEPHONE CALLS BUT ALSO THE MAIL OF THE

22  INMATES?

23  A.   WELL, YES.  WE DO MONITOR PHONE CALLS AND MAIL.  I

24  CAN'T REALLY TALK FOR AN OPEN POPULATION IN UNITED STATES

25  PENITENTIARY BECAUSE I NEVER HAVE WORKED AT ONE.  THE ADX,

1    YES, WE DID DO MAIL AND PHONE MONITORING THERE.

2    Q.   OKAY.  AND SO IF MR. MILLS WOULD HAVE BEEN AN INMATE

3    AT -- IN 1996 AT ADX WHEN YOU WERE THERE, THERE WOULD HAVE

4    BEEN MONITORING OF HIS MAIL AT THAT TIME; IS THAT CORRECT?

5    A.   YES.

6    Q.   OKAY.

7    A.   THERE WOULD HAVE BEEN SOME TECHNICIAN, SIS TECHNICIAN,

8    THAT WOULD HAVE MONITORED THE MAIL AND PHONES AT THAT POINT

9    IN TIME.

10   Q.   AND IF THERE WERE ANY DC BLACK MEMBERS AT ADX AT THAT

11   TIME, THEIR MAIL WOULD HAVE BEEN MONITORED ALSO?

12   A.   YES.  DEPENDING ON WHO THE INDIVIDUALS ARE AND THEIR

13   CRIMES AND OTHER INTELLIGENCE THAT WE WOULD RECEIVE.

14   THERE'S A GOOD POSSIBILITY THERE'S SOMEBODY OUT THERE THAT

15   MAY NOT HAVE BEEN ON MAIL AND PHONE MONITORING.  FOR THE

16   MOST PART, YES, MOST OF MAILS -- AND OTHER INMATES WERE, BUT

17   THERE'S A POSSIBILITY NOT EVERYONE WAS.

18   Q.   AS AN SIS OFFICER, WOULD YOU, ON OCCASIONS, BE GIVEN

19   WHAT ARE CALLED THREAT ASSESSMENT REPORTS OF PARTICULAR

20   GROUPS?

21   A.   THROUGH THE BUREAU OF PRISONS, YES.

22   Q.   OKAY.  AND AGAIN, SOME OF THE INTELLIGENCE THAT YOU

23   WOULD BE -- GATHER WOULD THEN ALSO BE GIVEN TO THE

24   SACRAMENTO INTELLIGENCE UNIT; IS THAT CORRECT?

25   A.   YES.  WE WOULD SEND IT TO SACRAMENTO INTELLIGENCE UNIT

1    OR CENTRAL OFFICE IN WASHINGTON, D.C. FOR THEIR INTELLIGENCE

2    SECTION.

3    Q.    OKAY.  NOW WITH RESPECT TO THE CELL SEARCHES -- I'M

4    CHANGING SUBJECTS ON YOU.

5    A.    OKAY.

6    Q.    WHEN YOU'RE TALKING ABOUT MOVING AN INMATE INTO A CELL,

7    REGULARLY THAT CELL IS CHECKED BY STAFF BEFORE THAT INMATE

8    IS MOVED IN; IS THAT CORRECT?

9    A.    YES.  THE HOUSING UNIT OFFICERS.

10   Q.    AND BEING THE BUREAU OF PRISONS OR BEING ANY GOVERNMENT

11   AGENCY, A DOCUMENT IS GENERATED WITH REGARDS TO THAT SEARCH;

12   IS THAT CORRECT?

13   A.    THERE SHOULD BE.  I WAS TRYING TO THINK BACK AT THAT

14   TIME.  THERE SHOULD HAVE BEEN A FORM.

15   Q.    AND IN THAT FORM, IF THERE WAS ANY IRREGULARITIES IN

16   THAT CELL, THOSE -- THAT FORM WOULD BE CHECKED OR NOTED AS

17   TO THOSE IRREGULARITIES?

18   A.    YES.  IT SHOULD BE NOTED ON THERE.

19   Q.    AND THE BUREAU OF PRISONS, IT'S MY UNDERSTANDING, HAS

20   THEIR OWN RULES AND REGULATIONS FOR INMATES THAT ARE CALLED

21   VIOLATIONS THAT RANGE IN CATEGORIES LIKE THE 100 CATEGORIES,

22   200 CATEGORIES; IS THAT CORRECT?

23   A.    YES.  ADMINISTRATIVE VIOLATIONS.

24   Q.    ADMINISTRATIVE VIOLATIONS.

25   A.    YES.

1   Q.    AND IF AN INMATE HAS DESTROYED HIS CELL AND IT'S

2   DISCOVERED IN THAT CELL SEARCH, THEN AN INCIDENT REPORT

3   WOULD BE WRITTEN UP AND THEY COULD BE CHARGED WITH A

4   VIOLATION OF DESTRUCTION OF GOVERNMENT PROPERTY?

5   A.    YES, SIR.

6   Q.    OKAY.  AND THEN THERE WOULD ESSENTIALLY BE A HEARING.

7   AND IF THEY WERE FOUND GUILTY OF THAT, SOME DISCIPLINARY

8   ACTION WOULD BE TAKEN AGAINST THAT INMATE?

9   A.    YES, SIR.

10  Q.    THAT WOULD HOLD -- THAT SAME PROCESS WOULD HOLD TRUE IF

11  THAT INMATE WAS INVOLVED IN ASSAULT; CORRECT?  IF THERE WAS

12  AN ASSAULT, A REPORT WOULD BE MADE, A HEARING WOULD BE HELD

13  AND THEN DISCIPLINARY ACTION WOULD BE TAKEN AGAINST THAT

14  INMATE?

15  A.    YES.

16  Q.    AND THAT ALL OCCURS WITHIN THE WALLS OF THE

17  PENITENTIARY; IS THAT CORRECT?

18  A.    YES.  ADMINISTRATIVELY.  UNLESS WE DECIDE THAT WE'RE

19  GOING TO REFER IT OUT TO THE FBI BECAUSE WE BELIEVE THERE IS

20  A VIOLATION OF THE FEDERAL LAW.

21  Q.    OKAY.

22  A.    WHICH ASSAULT, VERY GOOD POSSIBILITY WE MIGHT HAVE

23  REFERRED THAT OUT.

24  Q.    OKAY.  AND THERE STILL WOULD BE AN INCIDENT REPORT

25  GENERATED FOR THAT ASSAULT, THOUGH; IS THAT CORRECT?

236

1   A.   YES.  IF THEY WERE THE PERPETRATOR, YES.

2   Q.   OKAY.

3   A.   IF THEY WERE THE VICTIM, POSSIBLY NOT, BECAUSE THEY

4   WERE THE VICTIM OF AN ASSAULT.

5            MR. GREEN:  THAT'S ALL I HAVE.

6            THE COURT:  THANK YOU.

7            REDIRECT EXAMINATION, MR. WOLFE?

8                      REDIRECT EXAMINATION

9   BY MR. WOLFE:

10  Q.   MR. CARPENTER, WAS BARRY MILLS CELLED ALONE OR WITH A

11  CELLMATE AT THE ADX IN MAY OF 1997?

12  A.   THEY'RE SINGLE CELLS, SINGLE OCCUPANCY CELLS, SO HE

13  WOULD HAVE BEEN BY HIMSELF.

14  Q.   YOU WERE ASKED ABOUT THE AIMS COMPUTER PROGRAM.  FOR

15  HOW LONG HAS THAT PROGRAM BEEN IN USE?

16  A.   QUITE A WHILE.  I DON'T KNOW WHEN IT WAS IMPLEMENTED BY

17  THE BUREAU OF PRISONS, BUT IT'S BEEN QUITE A WHILE.

18  Q.   SO COVERING ALL THE TIMES YOU WERE AT THE ADX FROM '96

19  TO 2006?

20  A.   YES.  I WANT TO SAY THAT IT WAS THERE -- I WANT TO SAY

21  IT WAS '96.

22           MR. WOLFE:  NOTHING FURTHER, YOUR HONOR.

23           THE COURT:  THANK YOU.  YOU ARE EXCUSED.  YOU MAY

24  STEP DOWN.

25           IS YOUR NEXT WITNESS --

```
 1            MR. WOLFE:  JUST OUTSIDE.  IF I MAY FETCH HIM,

 2   YOUR HONOR.

 3            THE COURT:  GO AHEAD.

 4       (PAUSE.)

 5            MR. WOLFE:  YOUR HONOR, THE GOVERNMENT CALLS

 6   CURTIS RUNGE.

 7            THE COURT:  ALL RIGHT.  PLEASE COME FORWARD.

 8            CURTIS RUNGE, PLAINTIFF'S WITNESS, SWORN

 9            THE WITNESS:  YES, I DO.

10            THE CLERK:  PLEASE BE SEATED.

11            PLEASE STATE YOUR FULL NAME AND SPELL IT FOR THE

12   RECORD.

13            THE WITNESS:  CURTIS RUNGE, C-U-R-T-I-S,

14   R-U-N-G-E.

15            THE COURT:  THANK YOU.

16            YOU MAY INQUIRE.

17            MR. WOLFE:  THANK YOU, YOUR HONOR.

18                      DIRECT EXAMINATION

19   BY MR. WOLFE:

20   Q.   MR. RUNGE, WHO DO YOU WORK FOR?

21   A.   I WORK AT THE UNITED STATES PENITENTIARY IN MARION,

22   ILLINOIS.

23   Q.   AND FOR HOW LONG HAVE YOU WORKED AT THE PENITENTIARY AT

24   MARION?

25   A.   I STARTED ON DECEMBER 7TH OF 1986.
```

238

| | |
|---|---|
| 1 | Q.   DID YOU EVER WORK ANYWHERE IN THE BUREAU OF PRISONS |
| 2 | PRIOR TO MARION? |
| 3 | A.   NO, SIR. |
| 4 | Q.   I'M SORRY? |
| 5 | A.   NO, SIR. |
| 6 | Q.   WILL YOU PLEASE TELL THE JURY VERY BRIEFLY WHAT |
| 7 | POSITIONS YOU OCCUPIED DURING THE LAST 21-1/2 YEARS AT THE |
| 8 | INSTITUTION AT MARION? |
| 9 | A.   I STARTED AS A CORRECTIONAL OFFICER, AND THEN I WENT |
| 10 | INTO THE RECORDS OFFICE WHICH IS AS A LEGAL TECHNICIAN. |
| 11 | THEN I WAS A LEGAL INSTRUMENT EXAMINER, STILL IN THE RECORDS |
| 12 | OFFICE, IN THE INMATE SYSTEMS MANAGEMENT DEPARTMENT -- I'M |
| 13 | SORRY.  THE INMATE SYSTEMS MANAGEMENT IS THE DEPARTMENT THAT |
| 14 | THAT IS UNDER.  AND THEN I BECAME A SUPERVISOR IN THAT SAME |
| 15 | DEPARTMENT. |
| 16 | Q.   AND IS THAT THE POSITION YOU OCCUPY TODAY, A SUPERVISOR |
| 17 | IN THE INMATE SYSTEMS MANAGEMENT DEPARTMENT AT MARION? |
| 18 | A.   YES, SIR. |
| 19 | Q.   SIR, I'D LIKE TO ASK YOU PARTICULARLY ABOUT SOME EVENTS |
| 20 | ON OCTOBER 17TH, 2002. |
| 21 |         DID YOU TAKE PART IN THE SEARCH OF A CELL AT |
| 22 | MARION THAT DAY? |
| 23 | A.   YES, I DID. |
| 24 | Q.   WILL YOU TELL THE JURY VERY BRIEFLY HOW YOU LEARNED |
| 25 | THAT YOU WERE TO WORK IN THAT CELL SEARCH, WHEN AND WHAT YOU |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1   WERE TOLD ABOUT IT?

2   A.   WE WERE BROUGHT INTO A ROOM AND BRIEFED ON WHAT WE WERE

3   TO DO THAT DAY.  AND I WAS GIVEN A CERTAIN CELL TO -- THAT I

4   WAS TO INVENTORY ALL THE PROPERTY IN THAT CELL.

5   Q.   AND MR. RUNGE, WHOSE CELL WAS THAT YOU WERE GOING TO

6   INVENTORY ON OCTOBER 17TH, 2002?

7   A.   MICHAEL MC ELHINEY.

8   Q.   WERE YOU TOLD DURING THE -- ACTUALLY, LET ME ASK A

9   DIFFERENT QUESTION.

10          YOU SAID THAT "WE WERE BROUGHT INTO A ROOM AND

11  BRIEFED ON WHAT WE WERE TO DO"?

12  A.   UH-HUH.

13  Q.   HOW MANY PEOPLE WERE BRIEFED IN THE ROOM THAT DAY?

14  A.   I REALLY DON'T KNOW THE EXACT NUMBER.  THERE WAS QUITE

15  A FEW OF US.

16  Q.   OKAY.  IS IT TWO OR 22?

17  A.   I WOULD SAY THERE WAS CLOSER TO 20.

18  Q.   AND WERE THERE OTHER CELLS THAN MR. MC ELHINEY'S WHICH

19  WERE BEING SEARCHED THAT DAY?

20  A.   YES.

21  Q.   WERE YOU ASSIGNED TO ANY CELL EXCEPT MR. MC ELHINEY'S?

22  A.   NO.

23  Q.   WAS ANYONE ELSE ASSIGNED TO THE SEARCH OR THE

24  INVENTORY, AS YOU DESCRIBED IT, OF MR. MC ELHINEY'S CELL?

25  A.   THERE WAS ONE OTHER STAFF MEMBER THAT ASSISTED ME.

240

```
1    Q.    DO YOU RECALL WHO THAT WAS?

2    A.    MR. WEST.

3    Q.    DO YOU REMEMBER HIS FIRST NAME?

4    A.    DANNY.

5    Q.    WHAT WERE YOU TOLD ABOUT HOW YOU WERE TO INVENTORY THE

6    PROPERTY?

7    A.    JUST PUT EVERYTHING IN A BOX AND INVENTORY EACH BOX

8    SEPARATELY AND WHAT WAS IN EACH BOX AS FAR AS WHATEVER

9    MATERIAL WE PUT IN THERE.

10   Q.    MR. RUNGE, DID YOU TREAT -- WERE YOU GIVEN ANY

11   INSTRUCTION ABOUT LEGAL MATERIALS OR POTENTIAL LEGAL

12   MATERIALS, WHAT TO DO WITH THEM IF YOU ENCOUNTERED THEM IN

13   MR. MC ELHINEY'S CELL?

14   A.    WE WOULD JUST PUT THEM IN A BOX AND LIST IT AS LEGAL.

15   Q.    DID YOU TREAT LEGAL MATERIALS AND NONLEGAL MATERIALS

16   DIFFERENTLY?

17   A.    NO.

18   Q.    YOU BOXED THEM ALL AND INVENTORIED THEM ALL, LEGAL AND

19   NONLEGAL?

20   A.    YES.

21   Q.    DID YOU PUT LEGAL AND NONLEGAL MATERIALS IN THE SAME

22   BOX?

23   A.    IF WE DID, IT WOULD BE ON THE PROPERTY FORMS AS

24   DIFFERENT -- PERSONAL PAPERS OR LEGAL.  WHAT WE FELT WAS

25   LEGAL WE JUST INVENTORIED IT AS LEGAL.
```

1    Q.    MR. RUNGE, WILL YOU LOOK AT EXHIBIT 99 FOR

2    IDENTIFICATION, WHICH IS I BELIEVE IN A FOLDER ON THE SHELF

3    IN FRONT OF YOU.

4    A.    OKAY.

5    Q.    MR. RUNGE, DO YOU RECOGNIZE THE EIGHT PAGES OF

6    EXHIBIT 99 FOR IDENTIFICATION?

7    A.    CAN I TAKE THEM OUT OF HERE?

8    Q.    PLEASE DO, SIR.  I'M SORRY.

9    A.    OKAY.

10         YES, I DO.

11   Q.    WHAT DO YOU RECOGNIZE THEM AS?

12   A.    THEY ARE PROPERTY FORMS.

13   Q.    AND WILL YOU TELL THE JURY BRIEFLY WHAT A PROPERTY FORM

14   IS?

15   A.    A PROPERTY FORM, WHEN YOU START AT THE TOP OF IT, HAS

16   THE INDIVIDUAL'S NAME, NEXT BOX IS HIS NUMBER, THE CELL

17   LOCATION, AND THE TIME AND DATE THAT THE PROPERTY IS

18   INVENTORIED.  ANOTHER BOX WHICH IS, ON THIS ONE, "OTHER" AS

19   EVIDENCE.  AND THEN IT SAYS WHAT IS IN EACH BOX.

20         THAT'S THE FIRST ONE, THEN, I'M HOLDING UP, SAYS,

21   "ONE BOX LEGAL MATERIAL, 16 BY 16 BY 16," WHICH IS THE SIZE

22   OF THE BOX, AND ITS DISPOSITION IS "E" FOR EVIDENCE.  DOWN

23   BELOW IT HAS MY NAME PRINTED AND SIGNED AND MR. WEST'S NAME

24   PRINTED AND SIGNED AND THE DATE AND THE TIME AND THAT WE

25   FINISHED THE INVENTORY ON THAT SPECIFIC BOX.

242

1              AND THEN -- OH, I'M SORRY.

2    Q.    DON'T LET ME INTERRUPT YOU.  PLEASE FINISH.

3    A.    OKAY.  AND THEN BELOW IT SAYS "INA" WHICH THAT MEANS

4    INMATE NOT AVAILABLE TO SIGN.

5    Q.    MR. RUNGE, IS THIS FORM WHICH HAS A NUMBER AT THE

6    BOTTOM BP383 PARENTHESES 58, IS THIS -- IS THE BLANK FORM

7    USED FOR MANY OCCASIONS WHEN AN INMATE'S PROPERTY IS

8    INVENTORIED?

9    A.    YES, IT IS.

10   Q.    AND WERE THESE FORMS, THE EIGHT PAGES OF EXHIBIT 99,

11   WERE THEY USED FOR THE SEARCH YOU DID ON OCTOBER 17TH OF

12   2002 OF MR. MC ELHINEY'S CELL?

13   A.    YES, IT IS.

14   Q.    DID YOU FILL OUT AND SIGN EACH OF THESE?

15   A.    YES, I DID.

16          MR. WOLFE:  YOUR HONOR, I OFFER EXHIBIT 99 INTO

17   EVIDENCE.

18          MR. GREEN:  NO OBJECTION, YOUR HONOR.

19          THE COURT:  THANK YOU.  EXHIBIT 99 IS ORDERED

20   ADMITTED.

21     (PLAINTIFF'S EXHIBIT 99 RECEIVED IN EVIDENCE.)

22   BY MR. WOLFE:

23   Q.    MR. RUNGE, I THINK I ASKED YOU THIS, BUT I CAN'T

24   REMEMBER FOR SURE.  DID YOU SEARCH ANY CELL BUT

25   MR. MC ELHINEY'S THAT DAY?

```
 1   A.   I'M NOT SURE.  IF I GOT DONE WITH THAT CELL, I MIGHT

 2   HAVE MOVED ON TO ANOTHER ONE.  I REALLY DO NOT RECALL.

 3   Q.   DID YOU PUT ANYTHING IN THE BOXES FROM MR. MC ELHINEY'S

 4   CELL EXCEPT THINGS THAT CAME OUT OF MR. MC ELHINEY'S CELL?

 5   A.   NO.

 6   Q.   WHAT -- WHO WAS IN THE CELL DURING THE INVENTORY, THE

 7   BOXING AND INVENTORY OF THE MATERIAL?

 8   A.   MR. WEST AND I.

 9   Q.   AND HAD MR. MC ELHINEY BEEN REMOVED EARLIER?

10   A.   YES.

11   Q.   WAS A VIDEOTAPE MADE OF THE PROCESS OF YOU AND OFFICER

12   WEST --

13   A.   YES.

14   Q.   -- PERFORMING THE INVENTORY?

15   A.   YES.

16   Q.   AFTER YOU BOXED THE MATERIALS AND FILLED OUT THE

17   INVENTORY FORMS, EXHIBIT 99, WHAT HAPPENED TO THE BOXES

18   NEXT?

19   A.   AFTER WE FILLED OUT THE FORMS, ONE FORM GOES INTO THE

20   BOX WITH IT.  THEN THE BOX IS TAPED UP.  AND THE INMATE'S

21   NAME AND NUMBER IS WRITTEN ON THE BOX AND WHAT BOX NUMBER IT

22   IS.

23   Q.   AND WHEN YOU SAY "TAPED UP," CAN YOU TELL THE JURY

24   ANYMORE ABOUT HOW IT'S TAPED UP?

25   A.   JUST BOXING TAPE.  I WOULD BOX EACH ONE ACROSS TO KEEP
```

1    THE FOLDS TOGETHER AND THEN ONE ALONG THE SEAM OF THE FOLD.

2    Q.   MR. RUNGE, AFTER YOU PUT THE MATERIAL IN THE BOXES,

3    FILLED OUT THE INVENTORIES, PUT ONE COPY OF THE INVENTORY IN

4    THE BOX, TAPED UP THE BOX, LABELED IT WITH THE INMATE'S NAME

5    AND NUMBER, DO YOU RECALL WHAT WAS DONE WITH THE BOXES?

6    A.   BECAUSE OF THE SIZE OF THE CELLS, WE GOT ONE BOX, WE'D

7    TAKE IT OUTSIDE OF THE CELLS SO WE COULD HAVE THE ROOM TO

8    INVENTORY THE REST OF THE BOXES IN THAT CELL.  ONCE IT WAS

9    OUTSIDE, I REALLY DON'T, YOU KNOW, KNOW.

10   Q.   WHEN -- DO YOU RECALL, AFTER YOU'D FINISHED ALL THE

11   INVENTORY, YOU HAD ALL THE EIGHT BOXES THAT ARE REPRESENTED

12   BY THE EIGHT PAGES OF EXHIBIT 99, DO YOU RECALL WHAT WAS

13   DONE WITH THE BOXES AFTERWARD?

14   A.   TO MY RECOLLECTION, I'M PRETTY SURE SOMEBODY JUST CAME

15   AND GOT IT FOR CHAIN OF EVIDENCE AND MOVED IT ON.  IT WAS

16   TAKEN OFF THE RANGE.

17   Q.   AND DO YOU KNOW WHERE IT WAS TAKEN?

18   A.   NO.

19          MR. WOLFE:  YOUR HONOR, I HAVE NOTHING FURTHER FOR

20   MR. RUNGE.

21          THE COURT:  THANK YOU.

22          CROSS-EXAMINATION?

23                   CROSS-EXAMINATION

24   BY MR. GREEN:

25   Q.   MR. RUNGE, WHEN YOU HAD THE MEETING PRIOR TO THE SEARCH

1    OF MR. MC ELHINEY'S CELL AT MARION, WERE YOU GIVEN ANY

2    SPECIFIC INSTRUCTIONS ON HOW TO CONDUCT THE SEARCH?

3    A.    NO.   JUST TO INVENTORY WHAT WE PUT IN THERE, AND WHAT

4    WE FELT WAS LEGAL OR WHATEVER, WE JUST PUT IT IN THERE.   I

5    DIDN'T GO THROUGH EACH PAGE, PAGE BY PAGE.

6    Q.    AND YOU WERE PHYSICALLY PRESENTED WITH A SUBPOENA FROM

7    MR. MC ELHINEY'S CELL; IS THAT CORRECT?

8    A.    A SEARCH WARRANT?

9    Q.    I MEAN A SEARCH WARRANT, I'M SORRY.   A SEARCH WARRANT;

10   IS THAT CORRECT?

11   A.    YES.

12   Q.    AND AS -- PURSUANT TO THAT SEARCH WARRANT, ONCE YOU

13   BOXED EVERYTHING UP, YOU HAD TO CREATE A DOCUMENT SAYING

14   WHAT YOU HAD BOXED UP?

15   A.    YES.

16   Q.    WHICH IS THE INVENTORY SHEETS; CORRECT?

17   A.    UH-HUH.

18   Q.    WITH RESPECT TO THAT SEARCH WARRANT THAT YOU WERE

19   GIVEN, WERE THERE ANY ADDITIONAL REQUIREMENTS FROM A

20   JUDGE -- FEDERAL JUDGE GILBERT WITH RESPECT TO

21   MR. MC ELHINEY'S SUBPOENA -- SEARCH WARRANT?

22   A.    NOT THAT I'M AWARE OF.

23   Q.    OKAY.   I WAS JUST WONDERING IF THERE WAS.

24         NOW, AT THAT MEETING THAT YOU HAD THAT MORNING,

25   WAS THERE AN ATF AGENT THERE BY THE NAME OF JOSHUA KNAPP?

246

```
1    A.    IT BEING SIX YEARS AGO, I REALLY DON'T RECALL.

2    Q.    OKAY.

3    A.    OKAY.

4    Q.    WHAT ABOUT CORRECTIONAL OFFICER BY THE NAME OF RICK

5    ELLET?

6    A.    I DON'T REMEMBER IF HE WAS IN THERE OR NOT.

7    Q.    OKAY.  AFTER -- AND I APOLOGIZE IF I'M REPEATING THIS.

8    AFTER YOU HAD BOXED AND TAPED UP ALL THE ITEMS FROM

9    MR. MC ELHINEY'S CELL, PHYSICALLY WHERE DID YOU PLACE THOSE

10   BOXES?

11   A.    JUST OUTSIDE HIS CELL AGAINST THE WALL.

12   Q.    AND IS THAT THE LAST CONTACT THAT YOU HAD WITH THOSE

13   BOXES?

14   A.    TO MY RECOLLECTION, YES.

15   Q.    OKAY.  NOW, ARE YOU FAMILIAR WITH A LADY BY THE NAME OF

16   CARMEN RANILLA THAT WORKED AT MARION PENITENTIARY DURING

17   THIS TIME?

18   A.    YES.

19   Q.    ARE YOU FAMILIAR WITH A LADY BY THE NAME OF MARTY SKUTA

20   WHO WORKED AT MARION PENITENTIARY AT THAT TIME?

21   A.    YES.

22   Q.    OKAY.  THEY WORK IN THE -- EITHER THE WARDEN'S OFFICE

23   OR THE LEGAL DEPARTMENT OF MARION; IS THAT CORRECT?

24   A.    LEGAL DEPARTMENT.

25   Q.    OKAY.  NOW DURING THE TIME FROM WHEN YOU CONDUCTED THE
```

1    SEARCH OF MR. MC ELHINEY'S FILE, DID YOU EVER SEE HIS BOXES

2    AGAIN IN THE MARION INSTITUTION?

3    A.    NO.

4    Q.    OKAY.  DID YOU DIRECT ON WHERE THOSE BOXES WERE

5    SUPPOSED TO GO AFTER YOU COLLECTED THEM?

6    A.    EXCUSE ME?

7    Q.    DID YOU DIRECT WHERE THEY WERE SUPPOSED TO BE SHIPPED

8    OUT TO?

9    A.    NO.

10   Q.    OKAY.  WHO DID YOU LEAVE THAT UP TO?

11   A.    WHOEVER HAD THE SEARCH WARRANTS AND STUFF.

12   Q.    WHO DID -- WHEN YOU MADE THE INVENTORY AND YOU WERE

13   DONE WITH YOUR SEARCH OF HIS CELL, WHO DID YOU TURN THE

14   INVENTORY AND THE SEARCH WARRANT OVER TO?

15   A.    SIS.

16   Q.    OKAY.  AND WHO WAS THAT?

17   A.    MR. NULL.

18   Q.    MR. NULL.  AND THAT'S N-U-L-L?

19   A.    YES.

20   Q.    OKAY.  NOW, FOR -- ARE YOU FAMILIAR WITH AN AREA IN

21   THE -- WELL, IS THERE AN AREA IN MARION PENITENTIARY THAT IS

22   A BASEMENT AREA WHERE THE SIS OFFICES ARE AT?

23   A.    IT'S IN THE BASEMENT -- CALL IT BASEMENT, IT'S GOT

24   WINDOWS.  IT'S IN THE LOWER PART OF THE ADMINISTRATION

25   BUILDING.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

248

1    Q.   OKAY.  AND DURING THAT DAY OR THE WEEK OR TWO FOLLOWING

2    THAT, HAD YOU EVER HAD OCCASION TO BE IN THAT AREA?

3    A.   PRIOR TO THAT?

4    Q.   NO.  FROM THE DAY OF THE SEARCH WARRANT, WHICH IS

5    OCTOBER OF 2002, AND THE DAYS FOLLOWING JUST FOR A WEEK OR

6    TWO AFTER, HAD YOU OCCASION TO BE IN THAT AREA?

7    A.   NOT IN THEIR -- NOT IN THEIR OFFICES OR ANYTHING.

8    THERE ARE OTHER OFFICES DOWN IN THAT AREA, LIKE BUSINESS

9    OFFICES SO --

10   Q.   ARE THERE ANY COPYING MACHINES IN THE ADMINISTRATION

11   BUILDING OF THE MARION PENITENTIARY DURING THIS TIME PERIOD

12   OF OCTOBER 2002?

13   A.   YES.

14   Q.   OKAY.  WERE YOU AWARE OF ANY COPYING GOING ON EITHER ON

15   THAT DAY OR THE WEEK OR TWO AFTER THE SEARCH WITH RESPECT TO

16   THOSE COPYING MACHINES?

17          MR. WOLFE:  OBJECTION, YOUR HONOR.  RELEVANCE.

18          THE COURT:  SUSTAINED.

19   BY MR. GREEN:

20   Q.   DO YOU KNOW WHAT THE REASON WAS FOR THE BOX TO BE TAPED

21   UP?

22   A.   NO.

23   Q.   YOU WERE JUST FOLLOWING ORDERS?

24   A.   YES.

25   Q.   NOBODY TOLD YOU WHY THOSE ORDERS WERE GIVEN?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    A.    HUH-UH.

2    Q.    YOU HAVE TO SAY "YES" OR "NO," I'M SORRY.

3    A.    NO.  I'M SORRY.  NO.

4    Q.    OKAY.  WITH RESPECT TO -- I THINK YOU SAID WHAT YOU DO

5    IS YOU TAKE CARE OF THE INFORMATION SYSTEM AT MARION.  I

6    DON'T UNDERSTAND YOUR JOB, I'M SORRY.  WHAT IS IT?

7    A.    INMATE SYSTEMS MANAGEMENT DEPARTMENT.

8    Q.    AND WHAT DOES THAT DO?

9    A.    THAT IS -- THAT'S A DEPARTMENT THAT IS OVER THE RECORDS

10   OFFICE, WHICH IS -- PRINTS COMPUTATIONS FOR INMATES, THE

11   RECEIVING AND DISCHARGE OF INMATES, AND THE MAIL ROOM.

12   Q.    OKAY.

13   A.    THAT'S THE DEPARTMENT.

14   Q.    OKAY.  AND DOES THAT DEPARTMENT HAVE RESPONSIBILITY

15   OVER WHAT'S CALLED A CENTRAL INMATE FILE FOR AN INMATE?

16   A.    NO.  THAT'S UNIT TEAM.

17   Q.    THAT'S UNIT TEAM?  OKAY.

18         THE -- ARE YOU CUSTODIAN OF ANY RECORDS FOR

19   INMATES AT MARION PENITENTIARY?

20   A.    WHEN THEY LEAVE, THEY GO HOME, OR THEIR SENTENCE HAS

21   EXPIRED OR WHATEVER.  THEN THE -- MY DEPARTMENT IS THE

22   CUSTODIAN OF THE RECORDS AND WHICH IS CALLED LIKE A DEAD

23   FILE, AND WE FILE THOSE.

24   Q.    OKAY.  ALL RIGHT.

25         MR. GREEN:  THANK YOU.  NOTHING FURTHER.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1              THE COURT:  ANY REDIRECT?

 2              MR. WOLFE:  YES, YOUR HONOR.

 3                      REDIRECT EXAMINATION

 4   BY MR. WOLFE:

 5   Q.   MR. RUNGE, YOU SAID THAT IN THE LOWER PART OF THE

 6   ADMINISTRATION BUILDING WHERE THE SIS OFFICES ARE, THERE ARE

 7   OTHER OFFICES IN THE AREA?

 8   A.   UH-HUH.

 9   Q.   CAN YOU TELL US BRIEFLY WHAT OTHER OFFICES ARE DOWN

10   THERE.

11   A.   THE BUSINESS OFFICES AND COMPUTER SERVICES.

12   Q.   ARE THERE ANY STORAGE ROOMS IN THE LOWER PART OF THE

13   ADMINISTRATION BUILDING?

14   A.   I DO NOT KNOW.

15              MR. WOLFE:  NOTHING FURTHER, YOUR HONOR.

16              THE COURT:  THANK YOU.  YOU'RE EXCUSED.  YOU MAY

17   STEP DOWN.  DON'T WORRY, I'M NOT GOING TO ASK IF THE

18   GOVERNMENT WANTS TO CALL ANOTHER WITNESS.  THANK YOU FOR

19   YOUR PATIENCE AND ATTENTION THIS WEEK, LADIES AND GENTLEMEN.

20              AND AS YOU KNOW, I HEAR OTHER CASES ON MONDAYS, SO

21   WE'LL SEE YOU BACK ON TUESDAY MORNING TO BEGIN AT

22   9:00 O'CLOCK.  AND WE THANK YOU FOR YOUR PUNCTUALITY THIS

23   WEEK.

24              REMEMBER OVER THE WEEKEND NOT TO DISCUSS THE CASE

25   WITH ANYONE, NOT TO DO ANY RESEARCH ABOUT THE CASE OR
```

1    ANYTHING CONNECTED WITH THE CASE IN THE BROADEST POSSIBLE

2    SENSE.  DON'T MAKE UP YOUR MINDS ABOUT THE CASE OR ANY

3    ASPECT OF THE CASE OR ANY OF THE EVIDENCE THAT YOU'VE HEARD.

4            AND WE WILL SEE YOU BACK ON TUESDAY MORNING.

5    THANK YOU VERY MUCH.  YOU ARE EXCUSED.

6        (*JURY OUT.*)

7            THE COURT:  YOU MAY BE SEATED.  WE ARE ON THE

8    RECORD OUTSIDE THE PRESENCE OF THE MEMBERS OF THE JURY.

9            AND THE LATEST WORD ON THE SCHEDULE OF WITNESSES

10   FOR TUESDAY?

11           MR. WOLFE:  YOUR HONOR, I WOULD LIKE TO START WITH

12   BYRON TOLSON WHO HAS BEEN HERE FOR SOME LITTLE WHILE.  THEN

13   THE ATF AGENT, JOSHUA KNAPP.  AFTER THAT I INTENDED TO CALL

14   BYRON HEALY.  BUT WE HAVE SOME CIVILIAN WITNESSES WHO WERE

15   SUBPOENAED FOR TUESDAY.  THAT'S CHARLES WELCH, JULIE

16   BLACKSHAW.  I BELIEVE THAT I'LL DELAY MS. BLACKSHAW SINCE

17   SHE LIVES IN THE AREA, BUT I'LL PROBABLY CALL MR. WELCH IN

18   ORDER TO GET HIM ON AND OFF THE STAND.  AND THEN BYRON

19   HEALY, GENE BENTLEY.  I INTENDED DANNY SHOFF AND LESLIE

20   SMITH AND TO BE FOLLOWED BY JIMMY LEE INMAN AND CHRIS RISK.

21           I'M SO BACKED UP I'M UNCERTAIN WHETHER I MIGHT NOT

22   PREFER TO DELAY SHOFF AND SMITH SO THEY DON'T HAVE TO

23   TRAVEL.

24           NO, ACTUALLY, I GUESS -- I'M SORRY.  I THINK I OWE

25   THE COURT AND THE PARTIES A LITTLE MORE CERTAINTY.

1          WE'LL CALL BRYAN TOLSON, JOSHUA KNAPP, CHARLES

2    WELCH, BRIAN HEALY, GENE BENTLEY AND THEN SHOFF, SMITH,

3    INMAN AND RISK.  AS MANY AS WE ARE ABLE TO GET ON NEXT WEEK.

4          THE COURT:  SHOFF, SMITH.

5          MR. WOLFE:  INMAN.

6          THE COURT:  INMAN.

7          MR. WOLFE:  AND RISK.  ACTUALLY, I SHOULD -- I

8    GUESS I OUGHT TO -- MS. BLACKSHAW TO GET HER ON AN OFF, TOO.

9    AT SOME UNCERTAIN POINT BETWEEN SHOFF AND RISK, I WOULD

10   EXPECT TO CALL MS. BLACKSHAW TOWARDS THE END OF THE WEEK.

11         THE COURT:  ALL RIGHT.  THANK YOU ALL VERY MUCH.

12         MR. WOLFE:  YOUR HONOR, MAY I RAISE A QUESTION?  I

13   THINK THAT SOMETHING MR. GREEN ASKED REMINDED ME ABOUT THE

14   CONDITIONS IMPOSED BY JUDGE GILBERT FOR THE SEARCH OF THE

15   CELLS AT MARION.  I BELIEVE THAT THERE MAY BE AN ISSUE ABOUT

16   THE EXTENT TO WHICH THEY'RE RELEVANT.  AND THIS IS THE WAY I

17   THINK IT'S LIKELY TO COME UP.

18         I BELIEVE THAT WHAT WAS DONE IS RELEVANT, THAT IS,

19   IF THINGS WERE BOXED FOR THAT REASON OR COPIED FOR THAT

20   REASON, WHATEVER HAPPENED I THINK IS RELEVANT, BUT I DON'T

21   BELIEVE THAT COMPLIANCE WITH THE COURT'S INSTRUCTIONS IS FOR

22   THE JURY.  I THINK THAT'S A LEGAL SUPPRESSION ISSUE WHICH IS

23   FOR THE COURT.  AND SO I DON'T BELIEVE THE QUESTION, *DID YOU*

24   *DO WHAT JUDGE GILBERT SAID YOU SHOULD DO ABOUT 'X'?* IS AN

25   APPROPRIATE QUESTION TO A WITNESS.

```
1          THE COURT:  WELL, IF I UNDERSTAND YOUR COMMENTS

2   CORRECTLY, YOU THINK IT'S APPROPRIATE FOR THE JURY TO HEAR

3   THAT THEY DID THINGS IN A CERTAIN WAY BECAUSE THEY WERE

4   ORDERED TO.

5          MR. WOLFE:  EVEN JUST -- I THINK THE JURY IS

6   CERTAINLY ENTITLED TO HEAR WHAT WAS DONE IN ORDER TO DECIDE

7   WHETHER THE DOCUMENTS ARE -- WHETHER THIS FOUNDATION AND

8   AUTHENTICITY AND THE LIKE.  BUT WHETHER THEY DID IT TO

9   COMPLY WITH THE COURT'S ORDER OR PARTICULARLY IF THEY DIDN'T

10  COMPLY WITH THE COURT'S ORDER, I THINK IS NEITHER HERE NOR

11  THERE IN TERMS OF THE JURY'S RESPONSIBILITY.

12         THE COURT:  ALL RIGHT.  WELL, I THINK --

13         I'LL LET YOU BE HEARD.  I THINK THAT IF -- FIRST

14  OF ALL, I GUESS THIS PARTICULAR PERTAINS TO THE SEARCH AS TO

15  MR. SAHAKIAN'S CELL, BECAUSE THAT'S THE ISSUE AS TO

16  EXHIBIT 1.

17         MR. GREEN:  THAT'S CORRECT, JUDGE.

18         THE COURT:  ALL RIGHT.  AND THE ISSUE, AS I SEE

19  IT, AS TO EXHIBIT 1 THAT THE DEFENSE IS RAISING IS A CHAIN

20  OF CUSTODY OBJECTION; CORRECT?

21         MR. GREEN:  AUTHENTICITY AND CHAIN OF CUSTODY,

22  YES.

23         THE COURT:  AND WHAT THE CASE LAW SAYS, AND I'LL

24  BE HAPPY TO GIVE YOU THE CITES, ALTHOUGH I'M SURE YOU'RE

25  AWARE OF THEM TOO, IS THAT AS LONG AS THERE IS SOME EVIDENCE
```

1    OF CHAIN OF CUSTODY, IF THERE IS A QUESTION RAISED AS TO IT,

2    THAT GOES TO THE WEIGHT OF THE EVIDENCE.

3            SO I THINK THAT WHAT THAT -- THE UPSHOT OF THAT

4    LEGALLY IS THAT IF THE DEFENSE IS GOING TO ARGUE THAT THERE

5    IS A CHAIN OF CUSTODY OR THAT -- THERE'S A CHAIN OF

6    CUSTODY -- THERE'S A MISSING LINK IN THE CHAIN OF CUSTODY

7    AND EXHIBIT 1 WAS -- BECAUSE OF THAT, PLACED IN THE

8    DEFENDANT'S BELONGINGS, THAT'S AN ARGUMENT THAT CAN BE MADE

9    TO THE JURY.

10           MR. WOLFE:  NO.  I AGREE WITH THAT ENTIRELY.

11           THE COURT:  SO THAT'S A SEPARATE ARGUMENT.  THAT'S

12   AN ARGUMENT PROPERLY MADE TO THE JURY, AND THAT'S DIFFERENT

13   FROM AN ARGUMENT THAT THE EVIDENCE SHOULD BE SUPPRESSED

14   WHICH IS PROPERLY MADE TO THE COURT.

15           MR. GREEN:  JUDGE, I MISUNDERSTOOD -- I UNDERSTOOD

16   MR. WOLFE TO BE SAYING THAT THE SCOPE OF MY EXAMINATION

17   SHOULD -- IN THIS CASE IT SHOULD BE SHOSTAK'S EXAMINATION

18   SHOULD BE LIMITED TO NOT INQUIRE INTO THE AREA THAT JUDGE

19   GILBERT PUT RESTRICTIONS ON HOW THE SEARCH BE DONE.

20           THE COURT:  AND WHETHER THEY WERE COMPLIED WITH.

21           MR. GREEN:  RIGHT.  AND I OBVIOUSLY DISAGREED AND

22   I WOULD LIKE ARGUMENT ON THAT.

23           THE COURT:  WELL, I GUESS WHAT I'M TRYING TO SAY

24   IN TERMS OF YOUR ARGUMENT IS TO FOCUS ON -- YOU CAN ARGUE

25   THAT -- BECAUSE YOU CAN ARGUE THAT THERE'S A PROBLEM WITH

1    THE CHAIN OF CUSTODY, BECAUSE YOU'RE ALLOWED TO ARGUE THAT

2    TO THE JURY AND SAYING THAT, "THIS DOCUMENT WAS PLACED IN

3    HIS BELONGINGS" -- I MEAN, YOU WOULD SAY PLANTED, I'M TRYING

4    TO JUST BE NEUTRAL.

5            MR. GREEN:  I UNDERSTAND.

6            THE COURT:  I'M NOT TAKING A POSITION.  THAT'S

7    YOUR ARGUMENT.  AND SO THAT'S THE WAY YOU WOULD ARGUE IT.

8    AND YOU'RE ENTITLED TO ARGUE THAT, AS LONG AS THERE'S ANY --

9    YOU'RE ENTITLED TO MAKE THAT ARGUMENT.  BUT WHAT YOU

10   CAN'T -- SO I GUESS THE QUESTION IS AT WHAT POINT DOES

11   THAT -- AT WHAT POINT DOES THAT BECOME AN ARGUMENT TO

12   SUPPRESS THE EVIDENCE WHICH IS NOT -- THAT HAS TO BE MADE TO

13   THE COURT, AND WHAT POINT IS IT SOLIDLY WITHIN THE

14   AUTHORITIES THAT SAY THAT YOU CAN ARGUE THAT THERE'S A WEAK

15   LINK IN THE CHAIN OF CUSTODY, WHICH IS AN ARGUMENT THAT CAN

16   BE PUT TO THE JURY.  I THINK THAT'S THE QUESTION.

17           MR. GREEN:  OKAY.

18           THE COURT:  SO THAT'S THE QUESTION I POST TO YOU.

19           MR. GREEN:  OH, THAT'S THE QUESTION YOU POSE TO

20   ME?  IT'S LATE IN THE HOUR AND I'M HAVING A LITTLE CONFUSION

21   HERE.  IS THAT -- AS THE COURT HAS ALREADY POINTED OUT,

22   WE'RE ALLOWED TO ATTACK THE WEIGHT OF THAT EVIDENCE AND HOW

23   IT'S BROUGHT IT.  AND I DON'T SEE JUDGE GILBERT'S ADDITIONAL

24   INSTRUCTION -- A SEARCH WARRANT IS A COURT ORDER.  AND

25   WHEN -- AND INQUIRY CAN BE MADE BEFORE THE JURY ON WHETHER

1    OR NOT THE PARAMETERS OF THAT SEARCH WARRANT WERE ADHERED TO

2    WHEN THE EVIDENCE WAS SEIZED.  IT'S NO DIFFERENT THAN THE

3    PARAMETERS THAT JUDGE GILBERT PUT ON WITH HOW THAT SEARCH

4    WARRANT WAS SUPPOSED TO BE EXECUTED.

5           AND THEREFORE, I THINK THOSE -- THE QUESTIONS AND

6    INQUIRIES INTO THOSE AREAS ARE PROBATIVE ON THE -- WHETHER

7    THE LINKS IN THE CHAIN ARE ALL THERE AND SO TO WHAT EXTENT

8    THEY'VE BEEN BROKEN AND CAN'T HELP THE JURY IN WHAT WEIGHT

9    THEY SHOULD GIVE THIS DOCUMENT.

10          THE COURT:  BUT IT IS -- IN OTHER WORDS, IT SEEMS

11   TO ME THAT WITHOUT INQUIRING TO WHAT JUDGE GILBERT ORDERED,

12   I DON'T KNOW THAT THAT'S PARTICULARLY RELEVANT, BECAUSE THE

13   REAL QUESTION IS JUST LIKE ANY OTHER -- JUST LIKE ANY OTHER

14   EVIDENCE, WHETHER OR NOT THERE ARE SPECIAL CONDITIONS PUT ON

15   IT, WHAT YOU'RE INQUIRING INTO AND WHAT YOU'RE ARGUING TO

16   THE JURY IS WHAT WAS THE CHAIN OF CUSTODY, WHAT HAPPENED TO

17   THE EVIDENCE THAT WAS SEIZED, AND THEN IT WENT HERE AND THEN

18   IT WENT THERE, AND HOW DID IT END UP IN THE COURTROOM.

19          MR. GREEN:  WELL --

20          THE COURT:  THAT'S THE -- I MEAN, THAT'S THE CHAIN

21   OF CUSTODY.  THAT'S WHAT THE QUESTIONING IS ALWAYS ALLOWED

22   TO BE ADDRESSED TO, AND THAT'S WHAT ARGUMENT IS ALLOWED TO

23   BE ADDRESSED TO.  WHETHER OR NOT THERE'S ANYTHING SPECIAL

24   ABOUT IT -- BECAUSE IN THIS CASE, I MEAN, IT DOESN'T REALLY

25   MATTER THAT JUDGE GILBERT SAID YOU HAVE TO DO THIS AND YOU

257

1    HAVE TO DO THAT.  IT'S JUST A MATTER OF WHAT -- WHERE --

2    WHAT HAPPENED TO THE EVIDENCE BETWEEN WHEN IT WAS SEIZED AND

3    WHEN IT GOT HERE.

4              MR. SHOSTAK?

5              MR. SHOSTAK:  I'M SORRY.

6              THE COURT:  THAT'S ALL RIGHT.  THIS IS YOUR ISSUE,

7    I TAKE IT, OR YOUR WITNESS?

8              MR. SHOSTAK:  YOU'RE IN A POSITION WHERE YOU'RE

9    OBVIOUSLY DOING THIS FROM A VACUUM UNLESS YOU'VE SEEN THE

10   ORDER.

11             THE COURT:  I DID SEE THE ORDER IN CONNECTION WITH

12   THE -- IT WAS A WHILE AGO, BUT I HAVE SEEN THAT ORDER.

13             MR. SHOSTAK:  OKAY.  THE QUESTION THAT WE REALLY

14   HAVE IS, BASED UPON WHAT YOU'RE TELLING US, UNDER JUDGE

15   GILBERT'S ORDER, HE CLEARLY DELINEATES WHO IS TO MAKE THE

16   SEARCH AND WHY THEY ARE TO MAKE IT.  AND --

17             THE COURT:  AND IT'S BECAUSE OF THE LEGAL --

18             MR. SHOSTAK:  IT'S BECAUSE --

19             THE COURT:  -- DOCUMENTS.

20             MR. SHOSTAK:  -- OF LEGAL ISSUES THAT ARE PENDING

21   IN ILLINOIS AS WELL AS LEGAL DOCUMENTS.  AND WE THINK THAT

22   WE OUGHT TO BE ENTITLED TO CROSS-EXAMINE THAT BECAUSE IT'S

23   CLEAR HE DIDN'T WANT THE BOP TO SEARCH THOSE CELLS.  HE

24   WANTED IT DONE BY A DIFFERENT AGENCY FOR A SPECIFIC PURPOSE.

25   AND THOSE ORDERS OF A FEDERAL JUDGE WERE NOT FOLLOWED.  AND

```
 1   I THINK THAT UNDER THE CIRCUMSTANCES, WE WOULD HAVE A RIGHT
 2   TO INQUIRE ABOUT THAT.
 3            THE COURT:  WELL, YOU WOULD, BUT NOT -- THAT'S NOT
 4   AN ISSUE THAT A JURY RULES ON.  THAT'S AN ARGUMENT THAT THE
 5   EVIDENCE SHOULD NOT COME IN.  RIGHT?  IT'S NOT AN ARGUMENT
 6   THAT WOULD BE MADE IN FRONT OF THE JURY.
 7            MR. SHOSTAK:  WELL, THEN, IF THAT'S THE CASE, WE
 8   WOULD MOVE AGAIN FOR A MOTION TO SUPPRESS.
 9            THE COURT:  WELL, YOU CAN BRING SUCH A MOTION, BUT
10   YOU HAVEN'T DONE SO YET PROPERLY BECAUSE THE FIRST MOTION
11   HAD A FLAW IN IT.  SO IF YOU WISH TO RENEW THAT MOTION, YOU
12   CAN DO SO, BUT YOU'RE GOING TO HAVE TO DO SO FORTHWITH.
13            BUT THAT'S NOT AN ARGUMENT THAT I'LL ALLOW TO BE
14   MADE IN FRONT OF THE JURY, AS I UNDERSTAND YOU'RE TRYING TO
15   PRESENT IT.  IF YOU'RE TRYING TO SUPPRESS THE EVIDENCE,
16   THAT'S NOT -- THAT'S A DECISION THE JUDGE MAKES.  IF YOU'RE
17   ASKING ME TO DO THAT, THAT'S GOT TO BE DONE BEFORE -- THAT'S
18   GOT TO BE DONE TO THE COURT.
19            AND IF YOUR ARGUMENT IS THAT THAT SHOULD BE DONE
20   BECAUSE JUDGE GILBERT'S ORDERS WERE NOT COMPLIED WITH, THEN
21   WE HAVE TO TAKE THAT UP WITH THE RIGHT WITNESSES OUTSIDE THE
22   PRESENCE OF THE JURY.
23            SO I THINK YOU SHOULD CONFER WITH COUNSEL.  I
24   DON'T KNOW EXACTLY WHAT WITNESS THAT IS, OR WITNESSES.  BUT
25   YOU WOULD HAVE TO CONFER WITH COUNSEL, AND WE'D HAVE TO KIND
```

1    OF TRY TO SCHEDULE THAT BEFORE THE WITNESSES TAKE THE STAND

2    IN FRONT OF THE JURY.

3            MR. WOLFE:  WELL, IT WOULD BE THE FIRST TWO, I

4    THINK, THAT YOU MENTIONED.

5            MR. AKROTIRIANAKIS:  I BELIEVE THAT -- I MEAN, I

6    DON'T KNOW WHAT'S IN MR. SHOSTAK'S MIND, BUT MY

7    UNDERSTANDING WOULD BE, AS HE JUST STATED, THAT IF IT WOULD

8    COME UP WITH LIEUTENANT TOLSON WHO WAS SEARCHED --

9    LIEUTENANT TOLSON AND SPECIAL AGENT KNAPP.

10           THE COURT:  AND THEY ARE ALREADY IN CALIFORNIA?

11           MR. AKROTIRIANAKIS:  TOLSON IS, YOUR HONOR.

12   KNAPP, I TOLD HIM YESTERDAY THAT SINCE HE WOULD NEVER GET ON

13   BEFORE TUESDAY, THAT HE WAS FREE TO LEAVE.  AND I DON'T KNOW

14   WHETHER HE DID.

15           THE COURT:  ALL RIGHT.  THE REASON I ASK THAT IS

16   IF WE COULD DO THIS MONDAY AFTERNOON, AT LEAST WITH

17   MR. TOLSON, IF ANY OF YOU ARE AVAILABLE OR SOMETIME ON

18   MONDAY WHEN THE CALENDAR -- THERE IS SOME LIFE IN IT.  OR

19   THEN THE OTHER WITNESS WE CAN PUT ON FIRST THING MONDAY --

20   TUESDAY MORNING BEFORE WE GET STARTED WITH THE JURY.

21           MR. WOLFE:  YOUR HONOR, LIEUTENANT TOLSON WILL BE

22   ON THE WITNESS STAND 20 MINUTES.  I'M NOT SURE THAT HE STILL

23   IS.  BUT I THINK HE IS INTENDING TO STAY AT THE MISSION INN.

24   SO I EXPECT THAT I CAN REACH HIM AND DIRECT HIM TO BE HERE

25   ON MONDAY AT YOUR HONOR'S CONVENIENCE.

```
 1            THE COURT:  ALL RIGHT.  WE'LL SAY 3:00 ON MONDAY.

 2   I HAVE A 1:30 CALENDAR.  IT SHOULD BE DONE BY 3:00.  IF THE

 3   OTHER WITNESS IS HERE, THEN THAT'S FINE, WE CAN DO HIM AT

 4   THE SAME TIME.  IF HE'S NOT, WE'LL DO HIM FIRST THING

 5   TUESDAY MORNING.

 6            MR. WOLFE:  I HAVE A CELL PHONE NUMBER HERE.  I'LL

 7   MAKE AN EFFORT TO HAVE HIM HERE ALSO MONDAY AT 3:00.

 8            THE COURT:  ALL RIGHT.  AND IF NOT, WE'LL JUST

 9   START A LITTLE EARLY TUESDAY MORNING WITHOUT THE JURY.

10            ALL RIGHT.  WE'LL SEE YOU AT 3:00 O'CLOCK ON

11   MONDAY.

12            MR. SHOSTAK:  WILL YOU WANT ANOTHER MOTION IN

13   WRITING, OR WILL THIS -- CAN WE JUST CONTINUE --

14            THE COURT:  I MEAN, I'D PREFER TO HAVE SOME

15   BRIEFING ON IT, BUT IF YOU MAKE IT ORALLY, I'LL ACCEPT THAT.

16            MR. SHOSTAK:  ALL RIGHT.

17            THE COURT:  I THINK YOU HAVE TO HAVE A DECLARATION

18   FROM YOUR CLIENT, THOUGH.  THAT'S WHAT WAS MISSING LAST

19   TIME.  AND THAT'S REQUIRED UNDER THE LOCAL RULES -- I MEAN,

20   UNDER THE FEDERAL RULES, I BELIEVE.  SO YOU HAVE TO HAVE

21   THAT AT LEAST, IF YOU CAN FILE THAT ON MONDAY MORNING.

22            MR. SHOSTAK:  ALL RIGHT.  THANK YOU.

23            THE COURT:  THANK YOU.  WE'RE IN RECESS OR

24   ADJOURNED.

25            THE CLERK:  THIS COURT IS ADJOURNED.
```

```
 1        (PAUSE.)

 2        (THE FOLLOWING PROCEEDINGS WERE HAD OUTSIDE THE

 3        PRESENCE OF THE JURY:)

 4             THE COURT:  PLEASE BE SEATED.

 5             MR. GREEN:  SORRY TO BRING YOU BACK, JUDGE.

 6             DURING THE BREAK, IT CAME UP -- I HAD A

 7   CONVERSATION WITH MY CLIENT AND WE WOULD ASK IF IT'S OKAY IF

 8   WE WAIVE HIS APPEARANCE FOR MONDAY.

 9             THE COURT:  AND YOU WISH TO DO SO?

10             DEFENDANT SAHAKIAN:  I'LL DO SO.

11             THE COURT:  YES.  MR. WOLFE?

12             MR. WOLFE:  I DON'T MEAN TO BURST OUT LIKE THAT.

13             THE COURT:  DO YOU HAVE AN OBJECTION TO THE

14   DEFENDANT WAIVING HIS APPEARANCE?

15             MR. WOLFE:  ABSOLUTELY YOUR HONOR.

16             DEFENDANT SAHAKIAN:  I'LL COME.

17             MR. WOLFE:  IF HE IS FILING A DECLARATION, THEN WE

18   ARE CROSSING ON THE DECLARATION.

19             THE COURT:  YOU'RE RIGHT.  THAT'S CORRECT.

20             HE HAS TO BE HERE.  BECAUSE HE CAN BE

21   CROSS-EXAMINED ON HIS DECLARATION, SO HE CAN'T WAIVE HIS

22   APPEARANCE.

23             MR. GREEN:  JUDGE, I GUESS THIS IS THE -- IT'S

24   ALWAYS BEEN KIND OF THE CRUX.  HE DOESN'T HAVE PERSONAL

25   KNOWLEDGE OF JUDGE GILBERT'S ORDER.  HE CAN'T GIVE A
```

1    DECLARATION AS TO WHAT JUDGE GILBERT SAID.  THE COURT CAN

2    TAKE JUDICIAL NOTICE OF JUDGE GILBERT'S ORDER THAT HE

3    ENTERED AND THE DOCUMENT, SO HE CAN'T -- THERE IS NOTHING TO

4    CROSS-EXAMINE HIM ON.

5          HE DIDN'T HAVE ANY INPUT INTO WHAT JUDGE

6    GILBERT -- THE ISSUE OF SUPPRESSION HAS TO DEAL WITH WHETHER

7    OR NOT JUDGE GILBERT'S ORDER WAS FILED.  THERE'S NOTHING THE

8    DEFENDANT CAN ADD.

9          THE COURT:  I CAN'T GIVE YOU WHAT I THINK HAS TO

10   BE IN THE DECLARATION.  I CAN'T TELL YOU THAT.

11         MR. GREEN:  I KNOW.  I UNDERSTAND.

12         THE COURT:  BUT LIKE I SAY, I THINK THERE HAS TO

13   BE A DECLARATION FROM THE DEFENDANT.  AND I CAN SEE WHAT --

14   IN MY MIND, THERE MAY NOT HAVE TO BE MUCH IN IT, BUT

15   THERE -- THERE HAS TO BE A DECLARATION FROM THE DEFENDANT IN

16   ORDER FOR THERE TO BE A BASIS FOR A MOTION TO SUPPRESS.

17         HE WILL HAVE TO APPEAR.

18         MR. GREEN:  OKAY.

19         THE COURT:  THANK YOU.

20         THE CLERK:  THIS COURT IS ADJOURNED.

21     *(AT 5:13 P.M., PROCEEDINGS WERE ADJOURNED.)*

22

23                      -OOO-

24

25

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1                          CERTIFICATE

 2          I HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

 3   TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

 4   CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

 5   PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

 6   TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

 7   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

 8

 9   DATE:  AUGUST 17, 2008

10

11

12                       _____

13                       DEBORAH D. PARKER, OFFICIAL REPORTER

14

15

16

17

18

19

20

21

22

23

24

25
```