**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION AT RIVERSIDE**

HONORABLE VIRGINIA A. PHILLIPS, JUDGE PRESIDING

UNITED STATES OF AMERICA,      )
                               )
            PLAINTIFF,         )
                               )
      VS.                      ) CR NO. 02-938(A)-VAP
                               ) VOLUME II
DAVID MICHAEL SAHAKIAN,        )
                               )
            DEFENDANT.         )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

TUESDAY, AUGUST 19, 2008

10:45 A.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(714) 542-8409**
**D.PARKER@IX.NETCOM.COM**

2

```
 1    APPEARANCES OF COUNSEL:

 2

 3        FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

 4                            THOMAS P. O'BRIEN
                             UNITED STATES ATTORNEY
 5
                             CHRISTINE C. EWELL
 6                            ASSISTANT UNITED STATES ATTORNEY
                             CHIEF, CRIMINAL DIVISION
 7

 8                            STEPHEN G. WOLFE
                             JOSEPH N. AKROTIRIANAKIS
 9                            ASSISTANT UNITED STATES ATTORNEYS
                             UNITED STATES DISTRICT COURT
10                            1500 UNITED STATES COURTHOUSE
                             312 NORTH SPRING STREET
11                            SUITE 1504
                             LOS ANGELES, CALIFORNIA 90012
12                            (213) 894-2467

13

14        FOR THE DEFENDANT, DAVID MICHAEL SAHAKIAN:

15                            JOSEPH L. GREEN
                             LERITZ PLUNKERT AND BRUNING
16                            ONE CITY CENTRE
                             SUITE 2001
17                            ST. LOUIS, MISSOURI 63101
                             (314) 231-9600
18
                             BURTON H. SHOSTAK
19                            MOLINE SHOSTAK AND MOHAN
                             8015 FORSYTH BOULEVARD
20                            ST. LOUIS, MISSOURI 63105
                             (314) 725-3200
21

22

23

24

25
```

3

```
 1                         I N D E X

 2

 3   PLAINTIFF'S WITNESSES:    DIRECT  CROSS  REDIRECT  RECROSS

 4    JOSHUA GEORGE KNAPP        4     20      46
                                       54
 5

 6    BYRON TOLSON                     49

 7

      CHARLES WILLARD WELCH    79     97
 8

 9    BRIAN DEVLIN HEALY       111
                              127
10

11

12                       E X H I B I T S

13   DEFENDANT'S EXHIBITS:             IDENTIFICATION  EVIDENCE

14    1052-A, -B and -C DOCUMENT                        181

15

16

17

18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1    RIVERSIDE, CALIFORNIA; TUESDAY, AUGUST 19, 2008; 10:45 A.M.

 2                              -OOO-

 3         (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT

 4         IN THE PRESENCE OF THE JURY:)

 5             THE COURT:  LET THE RECORD REFLECT THE PRESENCE OF

 6    ALL MEMBERS OF THE JURY, COUNSEL ALSO PRESENT.

 7             AND REDIRECT EXAMINATION?

 8             MR. WOLFE:  NO REDIRECT, YOUR HONOR.

 9             THE COURT:  THANK YOU.

10             YOU MAY STEP DOWN.

11             AND THE GOVERNMENT MAY CALL ITS NEXT WITNESS.

12             MR. WOLFE:  YOUR HONOR, THE GOVERNMENT CALLS

13    JOSHUA KNAPP.

14             THE COURT:  OKAY.  PLEASE COME FORWARD.

15             THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

16        JOSHUA GEORGE KNAPP, PLAINTIFF'S WITNESS, SWORN

17             THE WITNESS:  I DO.

18             THE CLERK:  PLEASE BE SEATED.

19             PLEASE STATE YOUR FULL NAME AND SPELL IT FOR THE

20    RECORD.

21             THE WITNESS:  JOSHUA GEORGE KNAPP, K-N-A-P-P.

22             THE COURT:  THANK YOU.

23             YOU MAY INQUIRE.

24             MR. WOLFE:  THANK YOU, YOUR HONOR.

25
```

5

1           DIRECT EXAMINATION

2    BY MR. WOLFE:

3    Q.    MR. KNAPP, WHO DO YOU WORK FOR?

4    A.    THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND

5    EXPLOSIVES.

6    Q.    AND HOW LONG HAVE YOU WORKED FOR THE ATF?

7    A.    SINCE AUGUST OF 2001.

8    Q.    SIR, WHAT'S YOUR DUTY STATION NOW?

9    A.    I WORK FOR -- IN OUR SPECIAL OPERATIONS DIVISION IN

10   WASHINGTON, D.C.

11   Q.    AND WHERE WERE YOU -- WHAT WAS YOUR DUTY STATION FOR

12   THE ATF IN OCTOBER OF 2002?

13   A.    I WAS ASSIGNED TO THE FAIRVIEW HEIGHTS, ILLINOIS FIELD

14   OFFICE.

15   Q.    SIR --

16   A.    I JUST WANT TO BE READY.

17   Q.    I'LL CALL YOUR ATTENTION -- LET ME ASK THE QUESTION

18   FIRST:  WERE YOU A -- WHAT WERE YOUR DUTIES IN THE FAIRVIEW

19   HEIGHTS FIELD OFFICE OF THE ATF IN OCTOBER OF 2002?

20   A.    I WAS ASSIGNED AS A REGULAR FIELD AGENT INVOLVED WITH

21   JUST INVESTIGATING CRIMES THAT CAME UNDER ATF'S

22   JURISDICTION.

23   Q.    AGENT KNAPP, DID THERE COME A TIME IN OCTOBER OF 2002,

24   WHEN YOU WORKED ON EXECUTION OF A NUMBER OF SEARCH WARRANTS

25   AT THE UNITED STATES PENITENTIARY AT MARION, ILLINOIS?

6

1    A.    YES, I DID.

2    Q.    IS THE PENITENTIARY AT MARION, ILLINOIS WITHIN THE AREA

3    OF RESPONSIBILITY OF THAT FAIRVIEW HEIGHTS, ILLINOIS FIELD

4    OFFICE OF THE ATF?

5    A.    YES, IT IS.

6    Q.    WHAT DID YOU DO WITH RESPECT TO THE SEARCH WARRANTS

7    THAT WERE TO BE EXECUTED AT THE PENITENTIARY AT MARION?

8    A.    WELL, INITIALLY I WAS INSTRUCTED TO PROCEED TO THE U.S.

9    ATTORNEY'S OFFICE THAT COVERED THE BENTON -- THE MARION AREA

10   AND SWEAR OUT THE WARRANTS BEFORE ONE OF THE U.S.

11   MAGISTRATES.

12            AFTER THAT, I WAS -- I BROUGHT THEM TO THE

13   PENITENTIARY AND COORDINATED WITH THE PENITENTIARY PERSONNEL

14   IN PREPARATION JUST TO BEGIN THOSE SEARCH WARRANTS.

15   Q.    AND APPROXIMATELY HOW MANY WARRANTS WERE SERVED AT THE

16   PENITENTIARY AT MARION IN OCTOBER OF 2002?

17   A.    I THINK -- I BELIEVE THERE WERE 18.

18   Q.    YOU SAID THAT YOU BROUGHT THE EXECUTED WARRANTS TO THE

19   PENITENTIARY.  WHAT -- OR MEETINGS.  WHAT KIND OF MEETINGS

20   DID YOU HAVE AT THE PRISON TO ARRANGE FOR THE EXECUTION OF

21   THE WARRANTS?

22   A.    INITIALLY I HAD MEETINGS WITH THE WARDEN OF THE

23   PENITENTIARY, ALONG WITH HIS DEPUTIES AND I BELIEVE SOME OF

24   HIS CAPTAINS, JUST TO DISCUSS THE CASE.  THEY ACTUALLY KNEW

25   MORE ABOUT IT THAN I DID.  THEY UNDERSTOOD THAT THERE WAS AN

1    ONGOING CASE.

2          AND THEN WE -- WE JUST -- INITIALLY JUST DISCUSSED

3    HOW WE WOULD EXECUTE THE WARRANTS.  THE TARGET DATE WAS -- I

4    BELIEVE IT WAS OCTOBER 17TH, I BELIEVE IT WAS, OF 2002.

5          THESE SEARCH WARRANTS WERE GOING TO BE EXECUTED AS

6    PART OF A NATIONWIDE CASE.  AND THEY -- THE CASE AGENT HERE

7    IN LOS ANGELES WANTED ALL THE SEARCH WARRANTS TO AT LEAST

8    BEGIN TO BE EXECUTED ON THE SAME DAY.

9    Q.   AND AGENT KNAPP, YOU MENTIONED THE CASE AGENT HERE IN

10   LOS ANGELES.  DO YOU KNOW WHO THAT WAS?

11   A.   MIKE HALUALANI.

12   Q.   AND IS AGENT HALUALANI ALSO AN AGENT OF THE ATF?

13   A.   YES, HE IS.

14   Q.   DID YOU HAVE ANY INSTRUCTIONS TO GIVE TO THE

15   SEARCHING -- WELL, LET ME ASK A DIFFERENT QUESTION.

16         DID YOU PERFORM THE SEARCHES YOURSELF, ALL 18 OF

17   THEM?

18   A.   NO, I DID NOT.

19   Q.   DID YOU PERFORM ANY OF THE 18 SEARCHES YOURSELF?

20   A.   NO, I DID NOT.

21   Q.   AND WHAT ARRANGEMENTS DID YOU MAKE WITH THE PRISON

22   OFFICIALS FOR THE EXECUTION OF THE WARRANTS?

23   A.   THE PRISON WAS ASSIGNED A NUMBER OF OFFICERS TO ME TO

24   ASSIST WITH THE SEARCHES.  WE PROCEEDED BLOCK BY BLOCK, AND

25   FOR THE CELLS THAT WERE ON EACH BLOCK, THE PRISON OFFICERS

8

1   WOULD CONDUCT THE SEARCH AND I WOULD BE PRESENT ON THE BLOCK

2   JUST TO HELP SUPERVISE, AND THEN TAKE THE EVIDENCE INTO MY

3   CUSTODY.

4   Q.   WERE ANY -- WHAT WERE THE OBJECTS OF THE SEARCH?  WHAT

5   THINGS WERE YOU SEARCHING FOR UNDER THE SEARCH WARRANTS?

6   A.   WE WERE LOOKING FOR CORRESPONDENCE, NAMES, ADDRESSES,

7   PHONE NUMBERS, PHOTOS.  IN ADDITION TO THAT, WE WERE LOOKING

8   FOR THE LEGAL MATERIAL THAT EACH OF THESE INMATES HAD.

9   Q.   WAS THE LEGAL MATERIAL TO BE TREATED DIFFERENTLY --

10  EXCUSE ME -- DIFFERENTLY IN ANY WAY FROM THE OTHER THINGS

11  YOU MENTIONED, CORRESPONDENCE, NAMES, ADDRESSES, PHONE

12  NUMBERS, PHOTOS?

13  A.   YES, IT WAS.

14  Q.   HOW WAS THE LEGAL MATERIAL TO BE TREATED DIFFERENTLY

15  FROM THE -- IF I MAY CALL IT THAT, THE NONLEGAL MATERIAL?

16  A.   ANYTHING THAT WAS DEEMED TO BE LEGAL MATERIAL WAS

17  SUPPOSED TO BE PLACED IN A SEPARATE BOX WITH "POTENTIALLY

18  PRIVILEGED LEGAL MATERIAL" WRITTEN PROMINENTLY ON THE BOX.

19  ANY OF THOSE BOXES THAT HAD THIS POTENTIALLY PRIVILEGED

20  LEGAL MATERIAL WAS TO BE KEPT SEPARATE FROM THE OTHER

21  EVIDENCE AND THEN SHIPPED TO LOS ANGELES TO A

22  COURT-APPOINTED SPECIAL MASTER.

23  Q.   AND DO YOU KNOW WHO THE SPECIAL MASTER WAS IN

24  LOS ANGELES?

25  A.   I DON'T RECALL HER NAME.  NO.

9

1    Q.    DO YOU KNOW JUST IN A GENERAL WAY WHAT THE SPECIAL

2    MASTER WAS SUPPOSED TO DO WITH THE BOXES LABELED

3    "POTENTIALLY PRIVILEGED LEGAL MATERIAL" THAT WERE SENT TO

4    LOS ANGELES?

5    A.    YES.  IT WAS HER JOB TO REVIEW ALL THIS POTENTIALLY

6    PRIVILEGED LEGAL MATERIAL IN THE AFFIDAVIT FOR THE SEARCH

7    WARRANT.  THE ALLEGATION WAS THAT THESE INMATES WERE USING

8    THEIR LEGAL MATERIAL AS A WAY TO COMMUNICATE WITH EACH OTHER

9    AND NOT HAVE IT INTERCEPTED BY PRISON OFFICIALS.

10            THIS SPECIAL MASTER WAS SUPPOSED TO REVIEW THIS

11   POTENTIALLY PRIVILEGED LEGAL MATERIAL.  IF SHE FOUND ANY OF

12   THIS SORT OF -- ANY SORT OF COMMUNICATIONS OR SUCH THAT WERE

13   NOT CLEARLY LEGAL MATERIAL, SHE WAS THEN SUPPOSED TO REMOVE

14   THAT FROM THOSE BOXES OF POTENTIALLY PRIVILEGED LEGAL

15   MATERIAL.  ANYTHING THAT TRULY WAS LEGAL MATERIAL WAS

16   SUPPOSED TO THEN BE RETURNED TO THE INMATE AT THE

17   INSTITUTION.  ANYTHING ELSE WOULD THEN BE KEPT IN A -- TAKEN

18   INTO EVIDENCE HERE IN LOS ANGELES.

19   Q.    AND DID YOU GIVE THE INSTRUCTIONS TO THE SEARCHERS

20   ALONG THE LINES THAT YOU'VE JUST DESCRIBED FOR THE

21   SEPARATION OF LEGAL AND NONLEGAL MATERIALS?

22   A.    YES, I DID.

23   Q.    WERE THEY INSTRUCTED TO LABEL -- LET ME BE MORE

24   ORDERLY.  WERE THEY INSTRUCTED TO SEPARATELY BOX LEGAL AND

25   NONLEGAL MATERIALS?

1    A.    YES, THEY WERE.

2    Q.    AND TO USE THE LABEL THAT YOU MENTIONED, "POTENTIALLY

3    PRIVILEGED LEGAL MATERIAL," ON THE BOXES THAT HAD SUCH

4    MATERIAL?

5    A.    YES, THEY WERE.

6    Q.    I'D LIKE TO DRAW YOUR ATTENTION TO ONE CELL SEARCH IN

7    PARTICULAR, THAT OF THE DEFENDANT, DAVID SAHAKIAN.

8    A.    YES.

9    Q.    WAS IT -- WAS THE WARRANT FOR THAT CELL ANY DIFFERENT

10    FROM THE OTHER 18?

11    A.    NO, IT WAS NOT.  WELL, ACTUALLY IF I COULD -- THERE WAS

12    SOME ADDITIONAL INSTRUCTIONS FOR HIS CELL THAT WERE -- THAT

13    DID NOT APPLY TO ALL -- TO HIS CELL AND I BELIEVE TWO OTHER

14    INMATES, THAT DID NOT APPLY TO THE -- TO THE OTHER INMATES.

15    Q.    WHAT WAS THE DIFFERENCE FOR THE DEFENDANT'S CELL AND

16    THE OTHER TWO FROM THE REMAINDER?

17    A.    THE DEFENDANT AND TWO OTHERS WAS -- AT THAT TIME WAS

18    SCHEDULED TO GO ON TRIAL FOR A DEATH PENALTY CASE IN OUR

19    DISTRICT.  THE TRIAL JUDGE, AS A CONDITION TO ALLOWING THE

20    SEARCH WARRANTS TO BE EXECUTED, PROHIBITED ANY OF

21    MR. SAHAKIAN'S LEGAL MATERIAL FROM LEAVING THE DISTRICT

22    UNTIL IT WAS ALL PHOTOCOPIED.

23          THE PHOTOCOPIES WOULD BE LEFT WITH MR. SAHAKIAN SO

24    HE COULD CONTINUE TO PREPARE FOR HIS DEFENSE.  AND THEN THE

25    SAME THING APPLIED TO HIS TWO CO-DEFENDANTS.  SO THAT WAS

1   THE EXTRA INSTRUCTIONS FOR HIS CELL, PLUS TWO OTHERS.

2   Q.   APART FROM THE --

3           MR. SHOSTAK:  YOUR HONOR, THE TIME THE WITNESS

4   SPOKE OF, I WANTED TO OBJECT RELATIVE TO ANOTHER TRIAL

5   ELSEWHERE AS BEING IMMATERIAL TO THIS MATTER AND MOVE THAT

6   IT BE STRICKEN.

7           MR. GREEN JUMPED UP, AND I THOUGHT FRANKLY HE WAS

8   GOING TO MAKE THE OBJECTION SO IT KEPT ME FROM -- KEPT MY

9   MOUTH SHUT FOR A WHILE.

10          THE COURT:  ALL RIGHT.  WELL, LADIES AND

11  GENTLEMEN, YOU'VE HEARD REFERENCES A COUPLE OF TIMES TO --

12  FROM THIS WITNESS, I THINK, THIS MORNING AND MAYBE FROM

13  THE -- I THINK THEY WERE ALL FROM THIS WITNESS OR FROM

14  ANOTHER WITNESS -- TO A NATIONWIDE PROCEEDING OR A

15  NATIONWIDE CASE, AND THAT IS IMMATERIAL.  BECAUSE AS YOU

16  KNOW, YOU'RE ONLY HERE TO CONSIDER ONE DEFENDANT IN THIS

17  CASE.

18          SO TO THE EXTENT THAT THERE HAVE BEEN SUCH

19  REFERENCES, THE OBJECTION IS SUSTAINED AND YOU SHOULD

20  DISREGARD THOSE REFERENCES.

21  BY MR. WOLFE:

22  Q.   APART FROM THE MAKING A COPY FOR DEFENDANT, WAS HIS

23  MATERIAL TO BE TREATED ANY DIFFERENTLY THAN THE OTHER

24  SEARCHES?

25  A.   NO, THAT WAS IT.

1   Q.   DO YOU KNOW WHETHER VIDEOTAPES WERE MADE OF ANY OF THE

2   SEARCHES DONE AT THE MARION PENITENTIARY?

3   A.   YES, THERE WERE.

4   Q.   AND DO YOU KNOW SPECIFICALLY ABOUT THE DEFENDANT'S

5   CELL?

6   A.   YES, THERE WAS.

7   Q.   DO YOU KNOW WHO PERFORMED THE SEARCH OF THE DEFENDANT'S

8   CELL PURSUANT TO THE SEARCH WARRANT?

9   A.   I BELIEVE IT WAS BYRON TOLSON FROM THE BUREAU OF

10   PRISONS.

11   Q.   AND SIR, WHAT ROLE, IF ANY, DID YOU HAVE IN THE SEARCH

12   OF DEFENDANT'S CELL?

13   A.   JUST MY ROLE AS TO BE ON THE UNIT. IF THERE WERE ANY

14   QUESTIONS AS TO WHAT THE INSTRUCTIONS -- OR IN TERMS OF HOW

15   THE INSTRUCTIONS WERE TO BE INTERPRETED, THEY WERE -- THEY

16   WERE REFERRED TO ME. HOWEVER, SINCE IT WAS A BUREAU OF

17   PRISONS' FACILITY, THE BUREAU OF PRISONS OFFICERS CONDUCTED

18   THE SEARCH, THE ACTUAL HANDS-ON SEARCH.

19   Q.   DO YOU KNOW WHETHER MR. TOLSON ACTUALLY SEPARATELY

20   BOXED LEGAL AND NONLEGAL MATERIALS IN THE SEARCH OF

21   DEFENDANT'S CELL?

22   A.   WELL, I KNOW THAT WE ENDED UP WITH NINE BOXES OF

23   POTENTIALLY PRIVILEGED LEGAL MATERIAL FROM THE DEFENDANT'S

24   CELL, SO...

25   Q.   DO YOU RECALL ANY BOXES FROM THE DEFENDANT'S CELL THAT

13

1    WERE NOT POTENTIALLY PRIVILEGED?

2    A.    NO.   ALL THESE YEARS LATER, THAT NUMBER STILL STICKS

3    OUT TO ME BECAUSE OF THE -- BECAUSE OF THE VOLUME OF LEGAL

4    MATERIAL THAT HE HAD IN HIS CELL.   I DON'T RECALL HOW MANY

5    BOXES EACH INMATE MAY OR MAY NOT HAVE HAD.

6    Q.    I KNOW YOU SAID THERE WERE A NUMBER OF -- I THINK YOU

7    SAID NINE JUST NOW, NINE BOXES OF POTENTIALLY PRIVILEGED

8    MATERIAL FROM THE DEFENDANT'S CELL.

9             DO YOU REMEMBER ANY BOXES WHICH WERE NOT LEGAL

10   MATERIAL?

11   A.    FROM HIS SPECIFICALLY, NO, I DON'T.

12   Q.    AND IN ADDITION TO THE LABELING, HOW WERE THE BOXES TO

13   BE TREATED AFTER THEY HAD BEEN FILLED WITH THE MATERIAL?

14   A.    THEY WERE SEALED WITH PACKING TAPE AND THEN JUST TO BE

15   PREPARED FOR EVENTUAL TRANSPORT TO LOS ANGELES.

16   Q.    AND WHERE WERE THEY STORED IN THE MEANTIME?

17   A.    THEY WERE SOMEWHERE IN THE BASEMENT SECTION OF THE

18   PRISON.   I AM NOT QUITE SURE -- IT HAD BEEN THE FIRST TIME

19   THAT I -- THAT WEEK THAT I WAS THERE WAS THE FIRST TIME I

20   HAD EVER BEEN AT THAT PRISON FACILITY.   I HONESTLY DON'T

21   KNOW WHERE EXACTLY WE TOOK THEM TO.

22   Q.    AND WHAT KIND OF ROOM WERE THEY PLACED IN, IN THE

23   BASEMENT OF THE PRISON?

24   A.    ACTUALLY, I JUST REMEMBER IT WAS A ROOM WITH A LOCK ON

25   IT.   THAT'S ALL I RECALL ABOUT THAT.

1    Q.    DID YOU TAKE THE BOXES -- APART FROM THE NINE BOXES

2    THAT YOU MENTIONED THAT CAME FROM THE DEFENDANT'S CELL, HOW

3    MANY OTHER BOXES WERE GENERATED BY ALL THE SEARCH WARRANTS

4    THAT YOU HAD EXECUTED AT THE PRISON IN --

5    A.    I THINK WE HAD OVER 100 BOXES BY THE TIME WE WERE DONE

6    BETWEEN BOTH POTENTIALLY PRIVILEGED LEGAL MATERIAL AND JUST

7    GENERAL EVIDENCE.

8    Q.    AND WERE ALL THE BOXES, BOTH GENERAL EVIDENCE AND LEGAL

9    MATERIAL, STORED IN THAT SAME LOCKED ROOM THAT YOU

10   DESCRIBED?

11   A.    YES.

12   Q.    SO YOU DIDN'T TAKE THEM WITH YOU WHEN YOU LEFT THE

13   PRISON EACH DAY?

14   A.    NO, I DID NOT.

15   Q.    DID THERE COME A TIME WHEN SPECIAL AGENT HALUALANI CAME

16   TO THE PRISON TO LOOK AT SOME OF THE MATERIAL THAT HAD BEEN

17   COLLECTED DURING THE EXECUTION OF THE SEARCH WARRANTS?

18   A.    YES, HE DID.

19   Q.    DO YOU RECALL WHEN THAT WAS?

20   A.    IT WAS WITHIN -- I'D SAY IT WAS WITHIN -- WITHIN TWO

21   WEEKS OF THE BEGINNING OF THE EXECUTION OF THE SEARCH

22   WARRANTS.

23   Q.    AND WHAT WAS -- WHAT DID HE DO WHEN HE CAME TO MARION?

24   A.    WHEN HE ARRIVED, HE AND ANOTHER AGENT, WHOSE NAME I

25   DON'T RECALL, INSPECTED THE GENERAL EVIDENCE BOXES.  THEY

1    WANTED TO ENSURE THAT THEY WEREN'T TAKING THINGS FROM THE

2    INMATES THAT REALLY WEREN'T PERTINENT TO THE CASE AT HAND.

3    Q.    SO THEY -- I TAKE IT THEY MUST THEN HAVE OPENED THOSE

4    BOXES AND LOOKED IN THEM?

5    A.    YES, THEY DID.

6    Q.    DO YOU KNOW WHETHER THEY DID THE SAME THING TO THE

7    LEGAL MATERIAL BOXES?

8    A.    NO, THEY DID NOT.

9         (PAUSE.)

10            MR. WOLFE:  YOUR HONOR, NOTHING FURTHER FOR AGENT

11    KNAPP.

12            THE COURT:  THANK YOU.

13            CROSS-EXAMINATION?

14            MR. SHOSTAK:  YOUR HONOR, I WOULD LIKE A SIDEBAR,

15    IF THE COURT PLEASE.

16            THE COURT:  ALL RIGHT.  COUNSEL MAY APPROACH.

17       (SIDEBAR CONFERENCE REPORTED AS FOLLOWS.)

18            MR. SHOSTAK:  IF THE COURT PLEASE, IN VIEW OF THE

19    QUESTIONS MR. WOLFE ASKED AS TO THE DIFFERENCE IN THE WAY

20    MR. SAHAKIAN CELL'S WAS SEARCHED AND TREATED AS COMPARED TO

21    THE OTHERS AND WITH REGARD TO INSTRUCTIONS RELATIVE TO

22    MR. SAHAKIAN'S CELL, AND NOT TO THE OTHERS, I WOULD LIKE TO

23    BE ABLE TO INQUIRE OF THIS WITNESS CONCERNING JUDGE GILBERT

24    AND HIS ORDERS.

25            THE COURT:  ANY OBJECTION?

1              MR. WOLFE:  WELL, YOUR HONOR, THE ONLY INQUIRY OF

2     THIS WITNESS ABOUT ORDER WAS TO ACCOUNT FOR THE FACT THAT

3     THOSE BOXES WERE COPIED AND THE OTHERS WEREN'T.  I BELIEVE

4     YOUR HONOR MADE CLEAR THAT THE CHAIN OF CUSTODY INVOLVED

5     WHETHER THE BOXES WERE OPENED AND THEY WERE, OF COURSE, IN

6     ORDER TO BE COPIED.  THAT'S THE ONLY INQUIRY THAT HAS BEEN

7     MADE ABOUT THE ORDER AND IT'S THE ONLY ONE THAT I BELIEVE

8     APPROPRIATE.

9              MR. SHOSTAK:  MY UNDERSTANDING WAS THAT THE

10    QUESTION RELATED TO THE OTHER SEARCH WAS DIFFERENT THAN HOW

11    THE SEARCH ONE WAS DIFFERENT.  AND I THINK --

12             THE COURT:  WELL, LET ME ASK THIS:  WHAT IS IT

13    THAT YOU WANT TO ASK?

14             MR. SHOSTAK:  WELL, I WANT TO INTERROGATE HIM

15    RELATIVE TO HIS KNOWLEDGE OF WHAT JUDGE GILBERT DID, JUDGE

16    GILBERT'S ORDER.  I WANT TO INQUIRE OF ALL OF THE THINGS

17    THAT YOU TOLD US NOT TO INQUIRE ABOUT YESTERDAY.

18             THE COURT:  WELL, YOU'RE LIMITED IN ANY WAY TO THE

19    SCOPE OF DIRECT.

20             MR. SHOSTAK:  I UNDERSTAND.

21             THE COURT:  ALL THAT WAS ASKED ON DIRECT -- YOU

22    COULD ASK -- YOU CAN CROSS-EXAMINE, OF COURSE, TO THE EXTENT

23    THAT HE WAS EXAMINED ON DIRECT ABOUT THE WAY THE PRODUCT OF

24    THIS SEARCH WAS TREATED, BECAUSE THAT'S WHAT HE KNOWS ABOUT.

25    HE KNOWS WHO -- HE KNOWS THAT TOLSON WAS ONE OF THE PEOPLE

```
 1    WHO DID THE SEARCH AND HE HAS SOME KNOWLEDGE.  HE TESTIFIED

 2    ABOUT WHAT KNOWLEDGE HE HAS ABOUT WHAT HAPPENED AFTER THE

 3    SEARCH.  YOU CAN EXAMINE HIM ABOUT THAT.

 4            TO THE EXTENT THAT HE TESTIFIED ABOUT WHY THINGS

 5    WERE DONE THAT WAY TO THE THINGS HE TESTIFIED ABOUT, YOU CAN

 6    EXAMINE HIM ABOUT THAT BUT YOU CAN'T GO BEYOND THE SCOPE OF

 7    DIRECT.  SO WHAT HE SAID ABOUT -- WHAT HE DID TESTIFY TO, TO

 8    MY RECOLLECTION IS THAT THE CONTENTS OF MR. SAHAKIAN'S CELL

 9    WERE TREATED DIFFERENTLY FROM THE OTHER DEFENDANTS WHOSE

10    CELLS WERE SEARCHED PURSUANT TO THE SAME SEARCH WARRANT;

11    RIGHT?

12            THAT'S ONE OF THE THINGS HE TESTIFIED TO.  YOU

13    DISAGREE.

14            MR. GREEN:  IT'S NOT MY WITNESS.

15            JUDGE, IF I CAN COMMENT.  HE SPECIFICALLY WAS

16    ASKED A QUESTION:  HOW WAS MR. SAHAKIAN'S SEARCH WARRANT

17    DIFFERENT THAN THE OTHER 18?  AND THEN HE WENT INTO HIS

18    ANSWER AS TO WHY IT WAS DIFFERENT, WHICH I DIDN'T OBJECT AT

19    THE TIME BECAUSE IT WASN'T MY WITNESS AND I WOULD HAVE ASKED

20    FOR A MISTRIAL, BECAUSE THERE WAS A CAPITAL CASE PENDING AT

21    THE TIME.  BUT HE SPECIFICALLY WAS ASKED HOW WAS

22    MR. SAHAKIAN'S SEARCH WARRANT DIFFERENT THAN ALL THE OTHER

23    18 THAT YOU WERE SERVING AT MARION.

24            THEN, HE WENT ON TO GIVE AN ANSWER AS TO HOW IT

25    WAS DIFFERENT, AND I THINK MR. SHOSTAK SHOULD BE ABLE TO
```

```
 1   FOLLOW UP.  IT'S APPROPRIATE ON CROSS-EXAMINATION AS TO WHY

 2   IT WAS DIFFERENT IN THAT IT WAS JUDGE GILBERT -- HE TALKED

 3   ABOUT HOW IT WAS DIFFERENT BUT HE GAVE ONLY WHAT THE

 4   GOVERNMENT ELICITED AS TO WHAT IT WAS DIFFERENT.  THAT OPENS

 5   UP THE DOOR FOR MR. SHOSTAK TO SAY IT WAS DIFFERENT IN OTHER

 6   WAYS ALSO.  IT WAS DIFFERENT IN THE WAYS BECAUSE

 7   JUDGE GILBERT -- BECAUSE OF THAT CASE THAT WAS PENDING AT

 8   THE TIME -- WANTED JUST THE ATF AGENTS TO DO THE SEARCH AND

 9   THAT WASN'T DONE.  THAT DOOR HAS BEEN OPENED.

10        MR. WOLFE:  WELL, YOUR HONOR, I DON'T BELIEVE THAT

11   HAS BEEN OPENED.  THE DIFFERENCE HE STATED WAS THAT THE

12   DEFENDANT'S MATERIAL WAS COPIED.  IT'S THE ONLY DIFFERENCE.

13   HE DID SAY IT WAS COPIED BECAUSE THE JUDGE ORDERED IT TO BE

14   COPIED.  IN FACT, THE DIFFERENCE THAT DEFENSE COUNSEL

15   ARTICULATES THAT THE SEARCH WAS TO MADE BY ATF AGENTS IS NOT

16   ANY DIFFERENT.  SCHEDULE ONE THAT WAS ATTACHED TO THE

17   JUDGE'S ORDER WAS THE SAME ONE FOR ALL 18.

18        THE COURT:  RIGHT.

19        MR. GREEN:  ONCE THE GOVERNMENT ASKED HOW THAT

20   SEARCH WARRANT WAS DIFFERENT, THEY CAN'T SAY THAT, WELL, WE

21   JUST WANT TO TALK ABOUT PART OF IT THAT WAS DIFFERENT; AND

22   THEN, YOU HAD THE TOTALITARIAN DOCUMENT THAT WAS OUT THERE

23   AND HE COMMENTED ON THE SEARCH WARRANT.

24        THE COURT:  YOU MEAN THE DOCTRINE OF COMPLETENESS.

25        MR. GREEN:  I'M SORRY.  SO MR. SHOSTAK SHOULD BE
```

```
 1   ALLOWED TO INQUIRE FURTHER AS TO THE TOTAL CIRCUMSTANCES OF

 2   HOW THAT SEARCH WARRANT WAS DIFFERENT.  THERE WAS NO

 3   REASON --

 4            I'M KIND OF PERPLEXED AFTER WE HAD THE HEARING

 5   THAT THEN IT WAS ASKED HOW IT WAS DIFFERENT AND NOW WE ARE

 6   PUT IN THIS SITUATION.  YOU CAN'T OPEN THE DOOR A LITTLE.

 7   THE DOOR IS ALL THE WAY OPEN.

 8            MR. WOLFE:  YOUR HONOR, THE COURT'S ORDER WAS THAT

 9   THE WAY THE MATERIAL WAS PHYSICALLY HANDLED, WHICH GOES TO

10   THE CHAIN OF CUSTODY, COULD BE TESTIFIED ABOUT AND IT WAS.

11   IT WAS COPIED.  IT WAS PHYSICALLY HANDLED DIFFERENTLY.

12   THAT'S ALL THAT'S BEING DESCRIBED.

13            MR. GREEN:  BUT MORE THAN THAT, IT'S IN FRONT OF

14   THE JURY.  IT WAS SPECIFICALLY ASKED HOW THE SEARCH WARRANT

15   WAS DIFFERENT AND THEN HE PROCEEDED TO TELL US HOW IT WAS

16   DIFFERENT ONLY PARTIALLY.

17            THE COURT:  I DISAGREE WITH MR. GREEN.  I DON'T

18   THINK HE -- I DON'T THINK HE TESTIFIED THAT THE -- WELL, I

19   DON'T THINK HE TESTIFIED THAT THE SEARCH WARRANT WAS

20   DIFFERENT.  I THINK HIS TESTIMONY WAS A LITTLE MORE

21   TECHNICAL THAN THAT AND -- OR MAYBE A LITTLE MORE AMBIGUOUS

22   THAN THAT.  WHAT HE REALLY WAS TESTIFYING ABOUT IS THE WAY

23   THE SEARCH WAS CONDUCTED.

24            SO YOU CAN EXAMINE HIM ABOUT THE WAY THE SEARCH

25   WAS CONDUCTED, BUT YOU CANNOT QUESTION HIM ABOUT THE --
```

1          WELL, LET ME JUST SAY, MY ORDER FROM YESTERDAY

2    REMAINS IN PLACE.  I DON'T THINK THE DOOR HAS BEEN OPENED.

3          THANK YOU.

4       *(END OF SIDEBAR.)*

5          MR. SHOSTAK:  THANK YOU, YOUR HONOR.

6                    CROSS-EXAMINATION

7    BY MR. SHOSTAK:

8    Q.   AGENT KNAPP, INSOFAR AS YOUR BEING AN ATF AGENT, I

9    UNDERSTAND THAT BEGAN IN 2001; CORRECT?

10   A.   YES, IT DID.

11   Q.   AND YOU WERE ASSIGNED TO THE FAIRVIEW HEIGHTS, ILLINOIS

12   OFFICE?

13   A.   YES, I WAS.

14   Q.   SO THAT THE JURY UNDERSTANDS, FAIRVIEW HEIGHTS,

15   ILLINOIS IS IN THE SOUTHERN -- WHAT WE CALL THE SOUTHERN

16   PART OF ILLINOIS; IS IT NOT?

17   A.   YES, IT IS.

18   Q.   IT'S APPROXIMATELY 25 MILES EAST OF ST. LOUIS?

19   A.   ACTUALLY FAIRVIEW IS -- BY INTERSTATE MARKER, BECAUSE I

20   DID IT SO MANY TIMES, IT'S ACTUALLY 12 MILES.

21   Q.   TWELVE MILES.  OKAY.  ALL RIGHT.  AND NOW, TO GET FROM

22   FAIRVIEW TO MARION PENITENTIARY, YOU HAVE TO GO SOUTH; DO

23   YOU NOT?

24   A.   YES.  YES.  IT'S ABOUT 100 MILES DRIVING FROM THE

25   FAIRVIEW HEIGHTS OFFICE.

21

1    Q.    OKAY.  AND IT'S THE SOUTHERN DISTRICT OF ILLINOIS WHICH

2    YOUR OFFICE OF THE ATF COVERED AT THE TIME; CORRECT?

3    A.    YES.

4    Q.    OKAY.  AND THAT WOULD RUN PRIMARILY FROM THE BOTTOM OF

5    ILLINOIS, THE VERY BOTTOM, TO ABOUT SPRINGFIELD?

6    A.    IT -- THE SOUTHERN DISTRICT COVERED THE SOUTHERN 38

7    COUNTIES OF ILLINOIS.  THE CENTRAL DISTRICT OF ILLINOIS

8    COVERED ESSENTIALLY, FOR A QUICK GEOGRAPHY LESSON, HALFWAY

9    BETWEEN MY OFFICE AND SPRINGFIELD AND THEN TOWARD CHICAGO

10   FROM THERE SO...

11   Q.    OKAY.  INSOFAR AS THE SEARCH IN THIS CASE IN OCTOBER OF

12   2002, I WANT TO TALK TO YOU ABOUT THAT; OKAY?

13   A.    I FIGURED.

14   Q.    YOU PARTICIPATED IN THAT SEARCH IN WHICH WARRANTS WERE

15   EXECUTED ON OR ABOUT, WHAT, THE 17TH OF OCTOBER, 2002?

16   A.    YES.  THAT WAS THE DAY WE STARTED.

17   Q.    OKAY.  THAT WAS THE DAY YOU STARTED.

18          NOW, BEFORE THAT, YOU HAD BEEN IN THE ATF, WHAT,

19   14 MONTHS --

20   A.    YES.

21   Q.    -- BEFORE YOU GOT THIS ASSIGNMENT?

22   A.    YES.

23   Q.    AND WHILE YOU HAD AN ANNIVERSARY THIS MONTH SOMETIME,

24   OKAY, FOR SIX OR SEVEN YEARS, YOU WERE ONLY IN THE ATF FOR

25   ABOUT 14 MONTHS; RIGHT?

1    A.    YES.

2    Q.    OKAY.  AND IF I UNDERSTAND FROM THE MATERIAL THAT WE'VE

3    BEEN GIVEN, YOU WERE TOLD BY YOUR SUPERIORS TO CALL THE ATF

4    OFFICE IN LOS ANGELES RELATIVE TO A MATTER; CORRECT?

5    A.    CORRECT.  YES.

6    Q.    AND OF COURSE YOU DO THAT; RIGHT?

7    A.    YES.

8    Q.    AND WHEN YOU DO THAT, YOU TALK TO WHOM?

9    A.    I ASSUME IT WAS MIKE HALUALANI.  I HONESTLY CAN'T

10   RECALL AT THIS POINT.

11   Q.    THAT'S ALL RIGHT.  YOUR BEST JUDGMENT IS IT WAS AGENT

12   HALUALANI?

13   A.    YES.

14   Q.    OKAY.  AND YOU WERE TOLD AT THAT TIME THAT THERE IS AN

15   INVESTIGATION OF A MATTER GOING ON IN LOS ANGELES; RIGHT?

16   A.    YES.

17   Q.    AND YOU'RE TOLD ALSO THAT 17 SEARCH WARRANTS ARE COMING

18   YOUR WAY; RIGHT?

19   A.    YES.

20   Q.    OKAY.  YOU INDICATED 18, BUT I'M NOT GOING TO QUIBBLE

21   WITH OVER A SEARCH WARRANT, OKAY.  IT'S 17 OR 18, WHATEVER

22   IT IS.

23   A.    I APPRECIATE THAT.

24   Q.    OKAY.  HOW DO ALL THE SEARCH WARRANTS GET TO YOU?  DO

25   THEY COME IN THE MAIL?  DO THEY FEDEX THEM?  HOW DO THEY DO

1    THAT?

2              MR. WOLFE:  OBJECTION.  RELEVANCE, YOUR HONOR.

3              THE COURT:  I'M NOT SURE I SEE THE RELEVANCE.

4    I'LL OVERRULE THE OBJECTION TO THIS QUESTION.  BUT YOU NEED

5    TO TIE IT UP.

6    BY MR. SHOSTAK:

7    Q.   AT ANY RATE, YOU GET THEM; CORRECT?

8    A.   I RECALL THEM BEING ACTUALLY AT THE U.S. ATTORNEY'S

9    OFFICE IN BENTON, ILLINOIS, WHICH IS THE CLOSEST U.S.

10   ATTORNEY'S OFFICE TO MARION.  THAT'S WHERE I BELIEVE I FIRST

11   SAW THEM.

12   Q.   OKAY.  SO WHAT I'M SAYING TO YOU IS, WHILE THEY SAY

13   THAT THEY'RE COMING TO YOU, THEY DON'T COME TO YOU DIRECTLY.

14   THEY GO TO THE U.S. ATTORNEY'S OFFICE IN BENTON, ILLINOIS;

15   RIGHT?

16   A.   YES, THAT'S WHAT I RECALL.

17   Q.   OKAY.  AND YOU GO TO BENTON, ILLINOIS AND YOU GET THE

18   WARRANTS; RIGHT?

19   A.   YES.

20   Q.   OKAY.  AND THEN YOU HAVE TO TAKE THEM ACROSS THE STREET

21   TO JUDGE -- MAGISTRATE JUDGE FRAZIER; RIGHT?

22   A.   YES.

23   Q.   AND YOU GO TO JUDGE FRAZIER'S OFFICE, WHICH IS ON THE

24   SECOND FLOOR OF THAT BUILDING; RIGHT?

25   A.   YES.

1   Q.   OKAY.  AND YOU PRESENT TO HIM THESE WARRANTS RELATIVE

2   TO A SEARCH OF SOME 17 OR 18 CELLS AT THE MARION

3   PENITENTIARY; RIGHT?

4   A.   YES.

5   Q.   ONE OF THE THINGS THAT YOU HAVE TO DO IS, IS THAT YOU

6   HAVE TO SIGN AN AFFIDAVIT FOR THE WARRANTS IN HIS PRESENCE;

7   CORRECT?

8   A.   YES.

9   Q.   AND YOU DO THAT?

10  A.   YES.

11  Q.   AND YOU SIGN THEM UNDER OATH.  AND AS I UNDERSTAND IT,

12  YOU'VE INDICATED IT'S KIND OF LIKE COMPLETING THE PAPERWORK

13  TO GET THESE WARRANTS, YOU HAVE TO SIGN OFF ON THESE

14  WARRANTS; RIGHT?

15  A.   YES.

16  Q.   INSOFAR AS THE FACTS THAT YOU ATTESTED TO IN THOSE

17  WARRANTS ARE CONCERNED, YOU HAD NO PERSONAL KNOWLEDGE OF

18  THOSE FACTS; CORRECT?

19  A.   CORRECT.

20  Q.   THOSE FACTS WERE SIMPLY FACTS WHICH YOU READ WHICH HAD

21  BEEN PREPARED BY SOMEBODY ELSE TO WHICH YOU SIGNED TO;

22  RIGHT?

23  A.   YES.

24  Q.   OKAY.  AND THEN JUDGE FRAZIER HAS TO SIGN THOSE

25  WARRANTS; RIGHT?

1    A.    YES.

2    Q.    AND HE DOES THAT?

3    A.    YES.

4    Q.    OKAY.  HOW LONG ARE YOU WITH JUDGE FRAZIER?

5          MR. WOLFE:  OBJECTION.  RELEVANCE, YOUR HONOR.

6          THE COURT:  SUSTAINED.

7    BY MR. SHOSTAK:

8    Q.    SO IF I UNDERSTAND, THEN, IN ORDER TO DO THIS SEARCH,

9    YOU HAVE THE SEARCH WARRANT AND THE AFFIDAVIT APPROVED BY

10   JUDGE FRAZIER; CORRECT?

11   A.    YES.

12   Q.    AND THAT'S FOR ALL OF THE CELLS, 17 OR 18 OF THEM, THAT

13   YOU'RE GOING TO DO; RIGHT?

14   A.    YES.

15   Q.    OKAY.  AND THEN AFTER YOU GET THEM, WHAT DO YOU DO WITH

16   THEM?  WHERE DO YOU GO?  WHAT DO YOU DO?  JUDGE FRAZIER HAS

17   JUST SIGNED THEM.  TELL ME WHAT YOU DO.

18   A.    AT SOME POINT, THEN, I WENT TO THE MARION PRISON.  I

19   DON'T RECALL WHAT DAY I HAD THEM SIGNED VERSUS WHAT DAY WAS

20   THE MEETING, HOW MANY DAYS BEFORE I HAD THEM SIGNED WHERE I

21   ACTUALLY MET WITH THE PRISON OFFICIALS TO PREPARE FOR THE

22   SEARCH WARRANTS.

23   Q.    OKAY.  LET ME ASK YOU THIS:  DO YOU RECALL HOW MUCH

24   TIME THERE WAS BETWEEN THE TIME YOU GOT THE WARRANTS AND

25   BETWEEN THE TIME YOU WENT TO THE PENITENTIARY?

1    A.    NO, I DON'T.

2    Q.    OKAY.  BUT AT ANY RATE, YOU TAKE ALL OF THE WARRANTS

3    AND YOU GO TO MARION PENITENTIARY?

4    A.    YES.

5    Q.    RIGHT.  OKAY.  AND TO WHOM DO YOU GIVE THE WARRANTS AT

6    THE PENITENTIARY?

7    A.    I DON'T BELIEVE I GAVE THEM TO ANYBODY.  MY FIRST

8    MEETING WAS WITH THE WARDEN AND HIS DEPUTIES AND HIS STAFF

9    TO -- I MAY HAVE SHOWN THEM TO THEM.  THEY MAY HAVE READ

10   THEM OVER.  BUT I WOULD HAVE TO THINK AGAIN -- I DON'T KNOW

11   SPECIFICALLY, BUT EVERY SEARCH WARRANT I'VE EVER DONE THAT

12   WAS MINE AND -- I GUESS TECHNICALLY THESE WERE MY SEARCH

13   WARRANTS -- I KEPT THEM IN MY POSSESSION UNTIL THE DAY OF

14   THE WARRANT.

15   Q.    INSOFAR AS SEARCH WARRANTS ARE CONCERNED AND YOU'RE

16   USING SEARCH WARRANTS IN THE 14 MONTHS BEFORE OCTOBER THE

17   20TH OF 2002, WOULD IT BE FAIR TO SAY THAT FOR THE ATF YOU

18   HAD, ONE, NEVER DONE THIS KIND OF A SEARCH AT A

19   PENITENTIARY?

20   A.    NEVER BEFORE AND NEVER SINCE.

21   Q.    OKAY.  AND WOULD IT BE FAIR TO SAY THAT IN THAT 14

22   MONTHS, YOU HAD NOT BEEN IN A GREAT NUMBER OF SEARCHES?

23   A.    THAT'S CORRECT.

24   Q.    OKAY.  NOW, YOU INDICATE THAT YOU TALKED TO THE WARDEN,

25   THE ASSISTANT WARDEN AND SOME OF HIS DEPUTIES AT MORE OR

1    LESS A BRIEFING; CORRECT?

2    A.    YES.

3    Q.    OKAY.  AND YOU TELL THEM WHO YOU ARE; RIGHT?

4    A.    YES.

5    Q.    WHY YOU'RE THERE; CORRECT?

6    A.    YES.

7    Q.    AND YOU EITHER SHOW THEM OR DISCUSS WITH THEM THE

8    WARRANTS THAT YOU HAVE?

9    A.    YES.  THEY ALSO -- ONE OF THEIR INVESTIGATORS WAS ALSO

10   INVOLVED WITH THIS CASE.  SO THEY -- THIS WAS NOT A SURPRISE

11   TO THEM THAT THIS WAS COMING.

12   Q.    OKAY.  AND YOU DO THAT.  AND YOU KNOW THAT IN THE

13   MEANTIME, THEY HAVE TO GET READY TO HAVE 17 CELLS IN THIS

14   INSTITUTION SEARCHED --

15   A.    YES.

16   Q.    -- RIGHT?  OR 18 CELLS?

17   A.    YES.

18   Q.    OKAY.  NOW, YOU DON'T SEARCH ANY OF THE CELLS YOURSELF.

19   DO I UNDERSTAND THAT CORRECTLY?

20   A.    YES, THAT'S CORRECT.

21   Q.    OKAY.  AND YOU HAVE NO PERSONAL KNOWLEDGE REGARDING THE

22   CELL SEARCH OF MR. SAHAKIAN; CORRECT?

23   A.    OTHER THAN THAT IT WAS COMPLETED, NO.

24   Q.    OTHER THAN THAT IT STARTED AND IT ENDED?

25   A.    YES.

1    Q.    OKAY.

2    A.    AND THAT THERE WERE BOXES AFTER THE FACT.

3    Q.    ALL RIGHT.  NOW YOU INDICATED THAT YOU SUPERVISED THE

4    SEARCH; RIGHT?

5    A.    YES.

6    Q.    INSOFAR AS YOUR SUPERVISION IS CONCERNED, AND YOU

7    DIDN'T DO ANY OF THE SEARCHING YOURSELF, DID YOU TELL ANY OF

8    THE BUREAU OF PRISONS PEOPLE HOW TO DO A SEARCH OF A CELL IN

9    THIS INSTANCE?

10   A.    I'M NOT QUITE SURE WHAT YOU'RE ASKING.

11   Q.    OKAY.  I'M ASKING YOU IF AS A SUPERVISOR YOU TOLD OR

12   INSTRUCTED ANY OF THE BUREAU OF PRISONS PEOPLE WHO WERE

13   GOING TO DO THE SEARCH HOW TO GO ABOUT SEARCHING A CELL?

14   A.    PHYSICALLY LOOKING FOR THINGS IN A CELL, NO, I DID NOT.

15   Q.    OKAY.  NOW, OF THE CELLS THAT WERE SEARCHED, ALL OF THE

16   CELLS WERE NOT INHABITED BY MEMBERS OF THE ARYAN

17   BROTHERHOOD, WERE THEY?

18   A.    I BELIEVE THEY WERE, ACTUALLY.

19   Q.    YOU THINK THEY WERE?

20   A.    I THINK -- IT WAS MY UNDERSTANDING THAT THIS CASE

21   INVOLVED SPECIFICALLY THE ARYAN BROTHERHOOD.

22   Q.    I UNDERSTAND THAT.  BUT MY QUESTION IS ARE YOU TELLING

23   ME THAT AT MARION PENITENTIARY ON OCTOBER 20TH, 2002, THERE

24   WERE 17 MEMBERS OF THE ARYAN BROTHERHOOD THERE?

25   A.    THAT WAS MY IMPRESSION, THAT WE WERE SEARCHING CELLS OF

1  MEMBERS OF THE ARYAN BROTHERHOOD.

2  Q.  I UNDERSTAND THAT.  AND THAT WAS YOUR IMPRESSION.  MY

3  QUESTION IS:  DO YOU KNOW?

4  A.  AGAIN, THAT WAS THE INFORMATION THAT I HAD.  I DON'T --

5  Q.  FROM WHOM DID YOU GET THAT INFORMATION?

6  A.  I ASSUME -- I DON'T RECALL WHOM IT WAS FROM, WHETHER IT

7  WAS FROM THE AFFIDAVIT OR WHETHER IT WAS FROM THE BUREAU OF

8  PRISONS PERSONNEL.  BUT THAT'S MY RECOLLECTION, THAT WE WERE

9  SEARCHING THE ARYAN BROTHERHOOD MEMBERS' CELLS.

10  Q.  NOW, INSOFAR AS THE CELLS WERE CONCERNED, HAD YOU EVER

11  BEEN TO MARION PENITENTIARY BEFORE OCTOBER THE 17TH, 2002?

12  A.  YES.  I HAD BEEN THERE FOR MEETINGS -- FOR MEETINGS IN

13  PREPARATION FOR THE SEARCH, YES.

14  Q.  OKAY.  AND WHEN WAS THE FIRST TIME, THEN, THAT YOU WERE

15  THERE IN PREPARATION FOR THE SEARCH?

16  A.  I WOULD ASSUME A DAY OR TWO BEFORE WE ACTUALLY STARTED

17  THE SEARCHES.

18  Q.  OKAY.  SO YOU KNOW, THEN, THAT THE PENITENTIARY IS

19  DIVIDED INTO DIFFERENT UNITS; CORRECT?

20  A.  YES.

21  Q.  THAT HAVE DIFFERENT RANGES?

22  A.  YES.

23  Q.  TWO RANGES ON THE BOTTOM, TWO RANGES ON THE TOP;

24  CORRECT?

25  A.  I DON'T KNOW THE LAYOUT OF THE PRISON.  I JUST KNOW

1    THAT THEY LED ME FROM ONE RANGE TO THE NEXT TO CONDUCT THE

2    SEARCHES AND -- BUT I DON'T KNOW THE LAYOUT PER SE.

3    Q.    DID YOU HAVE TO GO FROM ONE BUILDING TO A DIFFERENT

4    BUILDING IN ORDER TO SUPERVISE THE SEARCH?

5    A.    IN TERMS -- YOU MEAN STEP OUTSIDE AND WALK TO A

6    DIFFERENT BUILDING?

7    Q.    YEAH.  I MEAN -- AND I'M ASSUMING THAT SOMEBODY IS WITH

8    YOU --

9    A.    YES.

10   Q.    -- AGAIN, I'M NOT BEING FACETIOUS WHEN I SAY THAT.

11   SOMEBODY FROM THE INSTITUTION IS WITH YOU WHO IS LEADING YOU

12   OR TAKING YOU FROM ONE PLACE TO ANOTHER WHENEVER YOU WANT TO

13   GO.

14         DO YOU HAVE TO GO FROM ONE UNIT TO ANOTHER UNIT

15   THEREBY GOING INTO DIFFERENT BUILDINGS IN THE INSTITUTION?

16   A.    I OBVIOUSLY DON'T KNOW WHAT YOU CALL THEM.  I'M NOT

17   SURE WHAT YOU'RE REFERRING TO.  I WAS ALL UNDER THE SAME

18   ROOF.  I NEVER WENT OUTSIDE BETWEEN SEARCHES.  WE WENT FROM

19   ONE SECTION TO ANOTHER, THROUGH A SERIES OF GATES, DOORS,

20   AND WE ARRIVED AT A NEW PLACE AND THEY TOLD ME THIS IS WHERE

21   DEFENDANT X'S CELL WAS OR CELLS WERE --

22   Q.    OKAY.

23   A.    -- AND WE WERE GOING TO CONDUCT THE SEARCH THERE.

24   Q.    WHEN YOU HAD THE MEETING, AS YOU INDICATED THE

25   BRIEFING, DO YOU READ TO THE PEOPLE THERE THE AFFIDAVIT

1    WHICH YOU SIGNED IN FRONT OF JUDGE FRAZIER?

2    A.   NO, I DID NOT.

3    Q.   WERE YOU INVOLVED IN THE SELECTION OF THE PEOPLE OF THE

4    BOP WHO WORKED AT MARION TO PERFORM SEARCHES IN CERTAIN

5    CELLS?

6    A.   NO, I WAS NOT.

7    Q.   NOW, IF WHAT I UNDERSTAND IS CORRECT -- AND I WANT YOU

8    TO CORRECT ME IF I'M WRONG --

9    A.   OKAY.

10   Q.   -- THIS SEARCH GOES ON FOR SEVERAL DAYS.

11   A.   YES, IT DID.

12   Q.   OKAY.  IT'S LIKE FROM THE 17TH TO THE 20TH; RIGHT?

13   A.   I REMEMBER IT WAS SEVERAL DAYS.  I DON'T REMEMBER THE

14   ACTUAL COMPLETION DAY.

15   Q.   SEVERAL DAYS BEFORE THE 20TH, ALL RIGHT.  WHETHER IT'S

16   TWO OR THREE, I'M NOT GOING TO QUIBBLE WITH YOU, OKAY?

17   A.   OKAY.

18   Q.   AND AT THE TIME THAT THIS IS GOING ON, THE CELL

19   SEARCHES ARE BEING TAPED; CORRECT?

20   A.   YES.

21   Q.   FOR EACH CELL SEARCH?

22   A.   I DON'T RECALL IF EVERY CELL WAS TAPED.  BUT I KNOW THE

23   DEFENDANT'S CELL WAS TAPED.

24   Q.   BUT INSOFAR AS MR. SAHAKIAN IS CONCERNED, THE CELL

25   SEARCH WAS TAPED --

1    A.    YES.

2    Q.    -- CORRECT?    OKAY.

3          AT ANY TIME DURING THAT DAY, DID YOU TALK TO

4    MR. SAHAKIAN RELATIVE TO THE SEARCH?

5    A.    I DON'T RECALL THAT, NO.

6    Q.    WAS IT YOUR POLICY TO DISCUSS THE CELL SEARCH AT MARION

7    WITH ANY OF THE PRISONERS WHOSE CELLS WERE SEARCHED?

8    A.    I DID NOT, NO.

9    Q.    NOW THE CELL SEARCH IS SOMEWHAT UNIQUE FROM OTHER KINDS

10   OF SEARCHES, ISN'T IT?

11   A.    YES.

12   Q.    OKAY.    YOU ARE LOOKING FOR POTENTIALLY PRIVILEGED LEGAL

13   MATERIAL; RIGHT?

14   A.    YES.

15   Q.    AND AT THE SAME TIME, YOU ARE LOOKING FOR OTHER

16   MATERIALS SUCH AS PHOTOS AND LETTERS AND NAMES AND

17   ADDRESSES; RIGHT?

18   A.    YES.

19   Q.    ALONG WITH, THIRDLY, CONTRABAND; CORRECT?

20   A.    I THINK THE CONTRABAND PART -- I DON'T REMEMBER IF --

21   THAT WAS PROBABLY NOT IN THE AFFIDAVIT.    I THINK AS THE

22   OFFICERS SEARCHED THESE CELLS, IF THEY WERE TO COME ACROSS

23   CONTRABAND THAT WOULD BE PROHIBITED IN A PRISON FOR -- DUE

24   TO PRISON RULES, THEY WOULD HAVE CONFISCATED THAT

25   SEPARATELY.

1   Q.   NOW IN DOING THE SEARCH, IN ORDER TO DETERMINE WHETHER

2   SOMETHING IS POTENTIALLY PRIVILEGED, THAT WOULD MEAN THAT

3   THE PERSON DOING THE SEARCH, I TAKE IT, WOULD HAVE TO AT

4   LEAST LOOK AT THE DOCUMENT TO MAKE A DETERMINATION WHETHER

5   THIS IS POTENTIALLY PRIVILEGED OR IT'S *TIME* MAGAZINE?

6   A.   THAT WAS NOT THE INSTRUCTIONS I GAVE THE OFFICERS.

7   Q.   SO INSOFAR AS YOUR INSTRUCTIONS THEN, AM I GLEANING

8   FROM WHAT YOU'RE TELLING ME THAT IN THE INSTRUCTION WAS TO

9   GO IN, PACK UP EVERYTHING THAT THEY GOT INTO BOXES AND GET

10  OUT?

11  A.   NO, THAT WAS NOT IT EITHER.

12  Q.   WHAT WERE THE INSTRUCTIONS?

13  A.   BECAUSE OF THE UNIQUE NATURE OF THE WARRANT, ASKING --

14  WHETHER IT BE MYSELF OR THE OFFICERS -- TO DETERMINE WHAT

15  MIGHT BE POTENTIALLY PRIVILEGED OR NOT, I KNEW THAT IN THE

16  END, WE HAD THIS COURT-APPOINTED SPECIAL MASTER IN

17  LOS ANGELES TO MAKE THE FINAL DETERMINATION.  OBVIOUSLY

18  SOMETHING LIKE *TIME* MAGAZINE WOULD NOT END UP IN THE

19  POTENTIALLY PRIVILEGED LEGAL MATERIAL.

20        HOWEVER, I INSTRUCTED THE OFFICERS TO USE THEIR

21  JUDGMENT, BUT ERR ON THE SIDE OF CAUTION.  IF THEY HAD ANY

22  QUESTION AT ALL IN THEIR MIND THAT SOMETHING MIGHT EVEN BE

23  REMOTELY POTENTIALLY PRIVILEGED LEGAL MATERIAL, THEY SHOULD

24  PUT IT INTO THOSE -- THOSE SPECIALLY MARKED BOXES, BECAUSE

25  AGAIN, I REASSURED THEM THAT SOMEONE ELSE WOULD MAKE THE

```
 1    FINAL DETERMINATION OF WHAT WAS POTENTIALLY PRIVILEGED AND
 2    WHAT WAS NOT.
 3           SO THAT'S WHY -- THAT'S HOW I INSTRUCTED THEM.  SO
 4    THAT WAY THE BURD -- THEY WOULDN'T FEEL THE BURDEN WAS ON
 5    THEM TO HAVE TO SIFT THROUGH PAGE AFTER PAGE AND THEN TRY TO
 6    DECIDE WHAT WAS PRIVILEGED AND WHAT WAS NOT.
 7    Q.   ON THE OTHER HAND, THEY WOULD HAVE TO LOOK AT DOCUMENTS
 8    IN SOME FASHION, NO MATTER HOW QUICKLY, IN ORDER TO AT LEAST
 9    MAKE SOME DETERMINATION WHETHER IT WAS POTENTIALLY
10    PRIVILEGED; CORRECT?
11    A.   I WOULD GUESS SO.  MY SUSPICION IS THAT PROBABLY SOME
12    OF THEM TOOK THE EASY WAY OUT AND SIMPLY PICKED UP SHEAFS OF
13    DOCUMENTS AND PUT THEM IN THE BOX BECAUSE THEY KNEW SOMEONE
14    ELSE COULD MAKE THAT DETERMINATION.
15    Q.   SO THE CORRECT WAY OF DOING IT WOULD BE NOT TO JUST
16    GRAB A HANDFUL OF PAPERS AND STICK IT IN A BOX, BUT AT
17    LEAST, IF NOTHING MORE, THUMB THROUGH THE PAPERS TO
18    DETERMINE WHETHER OR NOT THERE WAS ANYTHING IN THERE THAT
19    WAS POTENTIALLY OF A PRIVILEGED NATURE; CORRECT?
20    A.   WELL, I GUESS THE CORRECT WAY WOULD BE TO PROBABLY
21    APPOINT 500 SPECIAL MASTERS AND HAVE THEM COME OUT TO -- AND
22    SIT DAYS ON END AND GO THROUGH, I GUESS, 500 COURT-APPOINTED
23    ATTORNEYS THAT COULD HAVE GONE THROUGH AND LOOKED AT IT
24    RIGHT THERE ON-SITE.  I DON'T THINK THE MONEY WOULD HAVE
25    BEEN THERE TO DO SOMETHING LIKE THAT.
```

1    Q.    WELL, I UNDERSTAND THAT, AND I APPRECIATE THE HUMOR AND

2    THE SUGGESTION, OKAY?  HOWEVER, THE FACT OF THE MATTER IS

3    THAT SOMEBODY WHO'S SEARCHING THE CELL HAS TO MAKE A

4    DETERMINATION AS TO WHETHER OR NOT A CERTAIN DOCUMENT OR

5    DOCUMENTS IS A POTENTIALLY PRIVILEGED LEGAL MATTER.  AND IN

6    ORDER TO DO THAT, THEY AT LEAST HAVE TO LOOK AT THAT

7    DOCUMENT, DON'T THEY?

8            MR. WOLFE:  OBJECTION, YOUR HONOR.

9            THE WITNESS INSTRUCTED -- HE SAID PREVIOUSLY

10   DIDN'T SEARCH.

11           THE COURT:  THE OBJECTION IS OVERRULED.

12           YOU MAY ANSWER.

13           THE WITNESS:  COULD YOU PLEASE REPEAT THAT

14   QUESTION THEN?

15   BY MR. SHOSTAK:

16   Q.    SURE.  IN ORDER FOR SOMEONE TO MAKE A JUDGMENT -- AND I

17   DON'T CARE WHO IN LOS ANGELES MONTHS FROM NOW IS GOING TO

18   MAKE A -- SUPPOSEDLY A JUDGMENT -- IN ORDER FOR THAT PERSON

19   WHO'S SEARCHING THE CELL TO MAKE A JUDGMENT AS TO WHETHER A

20   DOCUMENT IS A POTENTIALLY PRIVILEGED LEGAL PAPER, HE WOULD

21   HAVE TO LOOK AT IT, WOULDN'T HE?

22   A.    YES, THEY WOULD HAVE TO LOOK AT IT.

23   Q.    OKAY.  AND JUST TO BE PUTTING DOCUMENTS BY REACHING

24   DOWN AND TAKING DOCUMENTS AND PUTTING THEM IN A BOX, THAT'S

25   NOT WHAT HE'S SUPPOSED TO DO, IS IT, IN ORDER TO DETERMINE

1    WHETHER A MATTER IS A POTENTIALLY PRIVILEGED LEGAL PIECE OF

2    MATERIAL; RIGHT?

3    A.    WELL, I SUSPECT THEY PICKED THEM UP, LOOKED AT THEM AND

4    SAID, *THIS MIGHT BE POTENTIALLY PRIVILEGED*.    HOW LONG THEY

5    LOOKED AT THEM, YOU WOULD HAVE TO ASK THE OFFICER THAT

6    SEARCHED.    BUT THEY JUST SAID, *YEP, POTENTIALLY PRIVILEGED.*

7    *IN THE BOX.*

8    Q.    AND YOU DON'T KNOW THAT ANY OF THOSE PEOPLE DID ANY OF

9    THAT, DO YOU?

10    A.    WELL, I KNOW THAT WE ENDED UP WITH NINE BOXES FROM THE

11    DEFENDANT'S CELL.

12    Q.    I UNDERSTAND THAT.    I UNDERSTAND THAT.    OKAY.    ONE OF

13    THE BOXES WAS A BOX OF PERSONAL BELONGINGS, WAS IT NOT, FROM

14    MR. SAHAKIAN?

15    A.    I DON'T RECALL.    AS I THINK I ANSWERED EARLIER, WE HAD

16    WELL OVER -- CLOSE -- SOMEWHERE AROUND 100 BOXES BETWEEN

17    PERSONAL MATERIAL OR PERSONAL -- GENERAL EVIDENCE BOXES,

18    POTENTIALLY PRIVILEGED BOXES FROM ALL THE DEFENDANTS.    I

19    DON'T RECALL HOW MANY BOXES MR. SAHAKIAN HAD.

20    Q.    OKAY.    DO YOU RECALL SIGNING AN AFFIDAVIT INDICATING

21    THAT THERE WAS SEVEN BOXES OF LEGAL MATERIAL TAKEN FROM

22    MR. SAHAKIAN ON 10/25/02?

23    A.    NO, I DON'T.    FOR SOME REASON, THE NUMBER "9" STICKS

24    OUT IN MY HEAD.    I HAVEN'T REVIEWED MY AFFIDAVITS FROM

25    EARLIER.

37

1   Q.   BUT YOU'RE NOT DENYING THAT YOU SIGNED SUCH AN

2   AFFIDAVIT; CORRECT?

3   A.   NO.

4   Q.   OKAY.  NOW, AFTER, BY SOME MANNER, IT'S -- THE

5   MATERIALS ARE SEGREGATED FROM THE POTENTIALLY PRIVILEGED TO

6   NONPOTENTIALLY PRIVILEGED, THEY'RE PUT IN BOXES AND SEALED;

7   CORRECT?

8   A.   YES.

9   Q.   ARE YOU PRESENT WHEN THE SEALING GOES ON FOR

10  MR. SAHAKIAN?

11  A.   NO.  BEFORE WE LEFT THE RANGE OR THE CELL AREAS, THE

12  BOXES WERE SEALED.

13  Q.   OKAY.  AND YOU'RE NOT PRESENT WHEN THAT HAPPENS?

14  A.   I WAS ON THE RANGE.  AGAIN, THERE WAS SOME CELLS

15  THAT -- SOME UNITS THAT HAD MULTIPLE CELLS BEING SEARCHED,

16  SOME ONLY ONE.  AND I DON'T RECALL IF I ACTUALLY SAW

17  MR. SAHAKIAN'S BOX WAS SEALED IN FRONT OF ME OR IF THEY

18  SEALED THEM IN THE CELL AND I WAS BACK IN A DIFFERENT PART

19  OF THE RANGE.

20  Q.   OKAY.  SUFFICE IT TO SAY, THE BOXES GET SEALED AND

21  THEY'RE STORED IN THE BASEMENT OF THE PENITENTIARY; CORRECT?

22  A.   YES.

23  Q.   OKAY.  IN WHAT YOU CALL A SECURED AREA; RIGHT?

24  A.   YES.

25  Q.   SECURED LOCATION; IS THAT RIGHT?

```
1    A.    YES.

2    Q.    AND A SECURED LOCATION IS A ROOM WITH A LOCK ON THE

3    DOOR; RIGHT?

4    A.    YES.

5    Q.    OKAY.  WERE YOU GIVEN A KEY TO THAT ROOM?

6    A.    NO, I WAS NOT.

7    Q.    DO YOU KNOW WHO HAD KEYS TO THAT ROOM?

8    A.    NO, I DON'T.

9    Q.    DO YOU KNOW INSOFAR AS THAT ROOM IS CONCERNED ITS

10   PROXIMITY TO THE SIS AT MARION?

11   A.    NO, I DON'T.  I KNOW THE SIS IS IN THE BASEMENT AS

12   WELL, BUT I DON'T RECALL HOW CLOSE WE WERE TO THEIR OFFICES.

13   Q.    DO YOU KNOW OR HAVE YOU LEARNED SINCE THEN WHETHER OR

14   NOT ANY MEMBER OF THE SIS STAFF AT MARION PENITENTIARY ON

15   AUGUST THE 20TH, 2002, HAD A KEY TO THAT ROOM?

16   A.    I DON'T RECALL.  NO, I DON'T KNOW.

17   Q.    NOW, I TAKE IT AFTER ALL OF THESE, AS I THINK YOU

18   INDICATED, 100, I'M NOT GOING TO HOLD YOU TO THAT NUMBER --

19   A.    OKAY.

20   Q.    LET'S JUST SAY 100.

21   A.    THANK YOU.

22   Q.    A HUNDRED BOXES ARE PUT IN THIS ROOM WITH A LOCK ON THE

23   DOOR.

24           I TAKE IT YOU LEAVE?

25   A.    YES.
```

1    Q.    YOU GO BACK TO FAIRVIEW HEIGHTS TO YOUR OFFICE THERE?

2    A.    I BELIEVE I STAYED IN A HOTEL EACH NIGHT UNTIL THE

3    SEARCHES WERE DONE AND THEN RETURNED TO FAIRVIEW AFTER THAT.

4    Q.    RIGHT.  AND THAT'S WHAT I AM TALKING ABOUT.

5    A.    YES.  YEP.

6    Q.    OKAY.  AND THEN, AT SOME POINT, ABOUT TWO WEEKS LATER,

7    TWO AGENTS FROM THE ATF FROM THE LOS ANGELES OFFICE COME TO

8    MARION --

9    A.    YES.

10   Q.    -- RIGHT?

11            AND I TAKE IT ONE OF THEM IS AGENT HALUALANI?

12   A.    YES.

13   Q.    AND WHO'S THE OTHER ONE?

14   A.    I DON'T RECALL HIS NAME.

15   Q.    HAD YOU EVER DEALT WITH EITHER OF THOSE TWO AGENTS

16   BEFORE?

17   A.    NO.  JUST ON THE TELEPHONE WITH -- I BELIEVE PROBABLY

18   WITH MR. HALUALANI, BUT OTHERWISE, NO.

19   Q.    OKAY.  AND THEY NOW, THE TWO OF THEM, GO INTO THAT

20   LOCKED ROOM AND BEGIN TO GO THROUGH THE BOXES?

21   A.    NO.

22   Q.    WHERE IS IT THAT THEY GO THROUGH THE BOXES?

23   A.    THEY -- THERE WAS A PLACE SET UP FOR US CLOSE TO THAT

24   ROOM.  I WOULD BRING THE BOXES OUT THAT THEY WERE ALLOWED TO

25   LOOK AT.  THEY OPENED THOSE.  LOOKED THROUGH THE GENERAL

```
 1  EVIDENCE FOR EACH BOX.  KEPT WHAT THEY -- THEY ESSENTIALLY
 2  MADE TWO PILES:  ONE PILE THAT WOULD BE SHIPPED TO
 3  LOS ANGELES, THE OTHER PILE THAT WOULD BE RETURNED TO THE
 4  INMATES.  AND THEN PROCEEDED TO GO THROUGH ALL OF THOSE
 5  GENERAL EVIDENCE BOXES.
 6  Q.   OKAY.  SO ALL OF THOSE BOXES THAT HAD BEEN SEALED AND
 7  EVIDENCE STICKERS PUT ON THEM WERE THEN OPENED?
 8          MR. WOLFE:  OBJECTION, YOUR HONOR.
 9  BY MR. SHOSTAK:
10  Q.   -- IS THAT RIGHT?
11          MR. WOLFE:  CONTRARY TO THE TESTIMONY.
12          THE COURT:  THE OBJECTION IS OVERRULED.
13          YOU MAY ANSWER THE QUESTION.
14  BY MR. SHOSTAK:
15  Q.   IS THAT CORRECT?
16  A.   WHICH BOXES ARE YOU TALKING ABOUT?
17  Q.   COULD BE ME.  I DON'T THINK IT'S YOU.
18          AFTER YOU'RE GONE, THE BOXES, ALL 100 OR SO, ARE
19  IN A ROOM, TWO AGENTS FROM LOS ANGELES COME OUT TO ST. LOUIS
20  AND GO DOWN TO MARION WITH YOU; RIGHT?
21  A.   YES.
22  Q.   AND THEIR PURPOSE IS TO GO THROUGH ALL OF THE BOXES OR
23  SOME OF THE BOXES?
24  A.   THE GENERAL EVIDENCE.  THE NON -- THEY WERE NOT
25  PERMITTED TO LOOK THROUGH THE POTENTIALLY PRIVILEGED LEGAL
```

1    MATERIAL BOXES.  THEY WOULD LOOK THROUGH THE GENERAL

2    EVIDENCE BOXES ONLY.

3    Q.    OKAY.  INSOFAR AS MR. SAHAKIAN'S BOXES WERE CONCERNED,

4    DO YOU KNOW HOW MANY OF THEM WERE MARKED THAT THEY CONTAINED

5    POTENTIALLY LEGAL MATERIAL?

6    A.    POTENTIALLY PRIVILEGED.  WELL, I THOUGHT ALL THESE

7    YEARS IT WAS NINE.  FOR SOME REASON, THAT STUCK OUT IN MY

8    HEAD.  YOU JUST REFRESHED MY MEMORY TO SAY THAT THERE WERE

9    SEVEN SO...

10    Q.    OKAY.  ALL RIGHT.  NOW, THEY THEN, I TAKE IT, WENT

11    THROUGH ALL OF THE BOXES THAT WEREN'T POTENTIALLY PRIVILEGED

12    MATERIALS IN THEM; RIGHT?

13    A.    YES.

14    Q.    AND THE SEALS ON ALL OF THOSE BOXES HAD TO BE BROKEN?

15    A.    YES.

16    Q.    AND THEY WENT THROUGH THEM; CORRECT?

17    A.    YES.

18    Q.    AND IN GOING THROUGH THEM, DID THEY FIND ANY

19    POTENTIALLY PRIVILEGED LEGAL MATERIALS?

20    A.    I DO RECALL OCCASIONALLY IN THE BOX HERE AND THERE THAT

21    THEY DID FIND WHAT THEY THOUGHT SHOULD BE PLACED IN

22    SOMEONE'S POTENTIALLY PRIVILEGED LEGAL MATERIAL BOX.  I

23    DON'T RECALL WHICH DEFENDANT IT MIGHT HAVE BEEN OR MIGHT NOT

24    HAVE BEEN, BUT I REMEMBER IN ONE OR TWO INSTANCES, MAYBE

25    THREE INSTANCES WHERE THEY STARTED READING SOMETHING AND

1    SAID, *THIS SHOULDN'T BE HERE, THIS SHOULD BE SOMEWHERE ELSE.*

2    Q.    WHAT HAPPENED TO THAT DOCUMENT?

3    A.    THOSE WERE THEN ADDED TO THAT PARTICULAR DEFENDANT'S

4    BOXES.  SO UNFORTUNATELY, I DON'T RECALL WHICH DEFENDANT IT

5    MIGHT HAVE BEEN, MIGHT NOT HAVE BEEN, THAT KIND OF THING.

6    Q.    LET'S YOU AND I JUST SUPPOSE HIS NAME IS JONES --

7    A.    OKAY.

8    Q.    -- OKAY?

9          AND THEY FIND OUT THAT IN GOING THROUGH A BOX

10   WHICH IS NOT MARKED "POTENTIALLY PRIVILEGED," THEY FIND

11   THREE PLACES OF PAPER AND THEY SAY*, NO, THIS IS PRIVILEGED*

12   *INFORMATION*; OKAY?

13   A.    UH-HUH.

14   Q.    NOW, JONES HAS GOT THESE THREE PIECES OF PAPER IN

15   THERE, THEY PULLED THEM OUT.  WHAT HAPPENS TO THEM?

16   A.    THEY WOULD HAVE BEEN ADDED TO DEFENDANT JONES'

17   POTENTIALLY PRIVILEGED BOX.

18   Q.    OKAY.  SO THEN DO THEY GET ONE OF JONES' BOXES AND

19   ACTUALLY OPEN IT AND PUT IT IN THERE?

20   A.    I THINK I RECALL MYSELF GOING IN AND CUTTING ONE OPEN

21   AND PUTTING IT IN, AND THERE YOU GO.

22   Q.    AND THEN RESEALING IT?

23   A.    YES.

24   Q.    OKAY.  NOW, INSOFAR AS MR. SAHAKIAN'S MATERIALS WERE

25   CONCERNED, HIS POTENTIALLY PRIVILEGED LEGAL DOCUMENTS WERE

1    TO BE PHOTOCOPIED; CORRECT?

2    A.    YES.

3    Q.    AND THEY WERE PHOTOCOPIED; RIGHT?

4    A.    YES.

5    Q.    TO THE TUNE OF ABOUT 50,000 OF THEM; RIGHT?

6    A.    I KNOW IT WAS A TREMENDOUS AMOUNT.  I FELT SORRY FOR

7    THE PERSON ASSIGNED TO HAVE TO PHOTOCOPY THEM, BECAUSE IT

8    LOOKED LIKE AN AWFUL LOT OF WORK.

9    Q.    OKAY.  WERE YOU PRESENT WHEN THOSE BOXES OF

10   MR. SAHAKIAN'S MARKED WITH PRIVILEGED DOCUMENTS WERE OPENED

11   FOR PURPOSES OF PHOTOCOPYING?

12   A.    NO, I WASN'T.

13   Q.    NOW, DID YOU LEARN THAT TWO WOMEN, MS. RANILLA AND

14   MS. SKUTA, DID THE PHOTOCOPYING AT THE JAIL -- AT THE

15   PENITENTIARY?

16   A.    LATER ON, THIS IS JUST -- LONG AFTER THIS WAS ALL

17   COMPLETED, AT DIFFERENT PROCEEDINGS, I THOUGHT THERE WAS

18   ONLY ONE PERSON THAT WAS STUCK PHOTOCOPYING.

19   Q.    OKAY.  BUT YOU LEARNED THERE WERE TWO; RIGHT?

20   A.    WELL, TODAY I HAVE LEARNED THERE WERE TWO.

21   Q.    OKAY.  AND YOU WERE NOT PRESENT WHEN ANY OF THE

22   PHOTOCOPYING WAS --

23              THE COURT:  JUST A SECOND.

24        (PAUSE.)

25              THE COURT:  GO AHEAD, MR. SHOSTAK.

44

BY MR. SHOSTAK:

Q.    INSOFAR AS THE PHOTOCOPYING WAS CONCERNED, DO YOU KNOW

WHO UNSEALED THE BOXES OF MR. SAHAKIAN THAT WERE MARKED

LEGAL DOCUMENTS?

A.    NO, I DO NOT.

Q.    AND YOU WERE NOT PRESENT WHEN THEY WERE OPENED?

A.    NO, I WAS NOT.

Q.    OKAY.  SO LIKEWISE, EITHER DURING THE CELL SEARCH OR

THE TIME WHEN THE PHOTOCOPYING IS GOING ON, YOU CAN'T TELL

US WHETHER SOMEBODY TOOK SOMETHING OUT OF THE BOXES OR PUT

SOMETHING IN, CAN YOU?

A.    DURING THE PHOTOCOPYING, NO.  DURING THE SEARCHES, I

ASSUMED PEOPLE WERE -- SINCE THE BOXES STARTED OUT EMPTY

DURING THE SEARCHES, I ASSUMED PEOPLE SIMPLY PUT THINGS INTO

THEM.

Q.    NOW, WHEN THE PHOTOCOPYING IS DONE, OKAY, ALL -- MANY

THOUSANDS OF PAPERS THERE ARE, OKAY, IT'S ALL DONE.  THOSE

BOXES GET SHIPPED OUT OF THE PENITENTIARY AT MARION; DO THEY

NOT?

A.    YES, THEY DID.

Q.    TO LOS ANGELES; CORRECT?

A.    YES.

Q.    AND THOSE BOXES WHICH CONTAIN THE POTENTIALLY

PRIVILEGED DOCUMENTS GET SENT TO THE UNITED STATES

ATTORNEY'S OFFICE IN LOS ANGELES; CORRECT?

1    A.    THEY WERE ADDRESSED TO A -- TO A U.S. ATTORNEY.  I

2    BELIEVE IT WAS A U.S. ATTORNEY, AND THEN AT THE OFFICE

3    THERE, AT ONE OF THE LOS ANGELES OFFICES.

4    Q.    OKAY.  NOW, WHO WAS IT THAT INSTRUCTED YOU TO SHIP

5    THOSE BOXES TO THE U.S. ATTORNEY?

6    A.    I THINK IT WAS IN THE AFFIDAVIT IN TERMS OF WHERE

7    THE -- WHERE THE POTENTIALLY PRIVILEGED LEGAL MATERIAL --

8    LEGAL -- SHALL I SAY THAT TEN TIMES -- POTENTIALLY

9    PRIVILEGED LEGAL MATERIAL WOULD BE -- I BELIEVE THE ADDRESS

10   WAS IN THE AFFIDAVIT FOR THE SEARCH WARRANTS.

11   Q.    OKAY.  AND SO THEY'RE SHIPPED TO THE U.S. ATTORNEY'S

12   OFFICE; RIGHT?

13   A.    YES.

14   Q.    OKAY.  AND THAT WOULD HAVE BEEN YOUR LAST HANDLING, SO

15   TO SPEAK, OF THAT SEARCH; CORRECT?

16   A.    YES.

17   Q.    AND WHEN THEY ARE SHIPPED, ARE THEY IN THE SAME BOXES

18   THAT THEY -- THAT THE MATERIALS HAD ORIGINALLY BEEN PUT IN?

19   A.    THAT, I DON'T KNOW.  I LEFT THE FEDEX ACCOUNTS WITH THE

20   PRISON OFFICIALS I BELIEVE AT THE TIME THE DEFENDANT'S

21   PHOTOCOPYING PROCESS WAS ONGOING.  SO THE INSTRUCTIONS WERE

22   AS SOON AS THEY WERE COMPLETED TO USE THE PROVIDED FEDEX

23   ACCOUNT TO ARRANGE FOR PICK UP, AND THEN OFF THEY WENT.

24   Q.    OKAY.  BUT WHAT YOU DON'T KNOW IS WHETHER OR NOT

25   SOMEBODY IN SOME FASHION CHANGED BOXES?

46

1    A.   NO, I DON'T.

2          MR. SHOSTAK:  I DON'T HAVE ANYTHING FURTHER,

3    JUDGE.

4          THE COURT:  THANK YOU.

5          REDIRECT EXAMINATION?

6          MR. WOLFE:  IF YOU GIVE ME A MOMENT, YOUR HONOR, I

7    MIGHT HAVE SOMETHING, BUT VERY BRIEF.

8          THE COURT:  ALL RIGHT.

9      *(PAUSE.)*

10                    REDIRECT EXAMINATION

11   BY MR. WOLFE:

12   Q.   AGENT KNAPP, DO YOU REMEMBER WHETHER THERE WERE ANY

13   NONLEGAL BOXES FOR DEFENDANT SAHAKIAN?

14   A.   NO, I DON'T.

15          MR. WOLFE:  NOTHING FURTHER, YOUR HONOR.

16          THE COURT:  THANK YOU.

17          ALL RIGHT, LADIES AND GENTLEMEN, WE'LL TAKE A

18   LUNCH RECESS UNTIL 1:15 THIS AFTERNOON.  REMEMBER, DON'T

19   DISCUSS THE CASE, ANYTHING RELATED TO THE CASE.

20          AND DON'T MAKE UP YOUR MINDS ABOUT ANYTHING

21   RELATED TO THE CASE, ANY OF THE EVIDENCE THAT YOU'VE HEARD,

22   ANY OF THE ISSUES IN THE CASE.  DON'T DISCUSS THE

23   PARTICIPANTS, THE EVIDENCE, ANYTHING ELSE RELATED TO THE

24   CASE.

25          THANK YOU VERY MUCH FOR YOUR ATTENTION THIS

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1  MORNING.  AND WE'LL SEE YOU AT 1:15.

2         YOU'RE EXCUSED.

3      (*JURY OUT.*)

4      (*THE FOLLOWING PROCEEDINGS WERE HAD OUTSIDE THE*

5      *PRESENCE OF THE JURY:*)

6         THE COURT:  THANK YOU.

7         WE ARE ON THE RECORD OUTSIDE THE PRESENCE OF THE

8  MEMBERS OF THE JURY.

9         DID YOU WISH TO INQUIRE ANY FURTHER OF THIS

10 WITNESS OUTSIDE THE PRESENCE OF THE JURY?

11        MR. SHOSTAK:  I WOULD, YOUR HONOR, BUT I WAS

12 WONDERING IF MR. TOLSON COULD TAKE THE STAND.  IT'S MY

13 UNDERSTANDING WE ARE MAKING THAT REQUEST BECAUSE HE HAS A

14 FLIGHT TO CATCH.

15        THE COURT:  OH, IS THAT CORRECT?

16        MR. SHOSTAK:  AND TO THE EXTENT THAT I CAN

17 ACCOMMODATE HIM, I WOULD LIKE TO DO IT.

18        MR. WOLFE:  I BELIEVE THAT'S SO.  THE GOVERNMENT

19 WOULD REQUEST THAT MR. TOLSON GO FIRST.

20        THE COURT:  CERTAINLY.  ALL RIGHT.  IF YOU WOULD

21 STEP DOWN AND WAIT OUTSIDE.

22        AND WE'LL BRING MR. TOLSON IN.

23        AND THEN THE OTHER THING I'M GOING TO ASK -- WE

24 CAN TAKE THIS UP AFTER MR. TOLSON, I JUST DON'T WANT TO

25 FORGET.  AND THAT IS WHETHER THERE IS A REQUEST FOR A

1   FURTHER CURATIVE INSTRUCTION TO THE JURY WITH RESPECT TO THE

2   TESTIMONY -- I THINK IT WAS FROM THIS LAST WITNESS.  I JUST

3   DON'T WANT TO FORGET THAT.  WE'LL COME BACK TO THAT.

4            THANK YOU.  YOU MAY BE SEATED.

5            IS THIS IS AN EXHIBIT FOR THIS WITNESS?

6            MR. SHOSTAK:  YES.

7            THE COURT:  WHAT DO YOU WISH TO HAVE THIS MARKED

8   AS?

9            MR. SHOSTAK:  I THINK IT'S MARKED AS 1052-A, YOUR

10  HONOR.  MAY I JUST -- DO YOU HAVE A COPY, YOUR HONOR?

11           THE COURT:  IS IT ONE THAT IS IN THE NOTEBOOKS?

12           MR. SHOSTAK:  I DON'T KNOW THAT IT'S IN OUR

13  NOTEBOOK YET.

14           THE COURT:  THAT'S ALL RIGHT.  AND YOU'RE GOING TO

15  SHOW IT TO THE -- WAS THAT A COPY FOR THE WITNESS?

16           MR. SHOSTAK:  IT WAS YOURS.  I WAS GOING TO

17  GIVE -- THAT WAS THE ORIGINAL.

18           THE COURT:  WHY DON'T YOU GIVE THIS COPY TO THE

19  CLERK THEN.  AND I'LL LOOK AT THIS ONE.  SHE GAVE THAT TO

20  THE WITNESS.

21           MR. SHOSTAK:  IF IT PLEASE THE COURT, MAY I

22  PROCEED?

23           THE COURT:  YOU MAY.

24           MR. SHOSTAK:  THANK YOU.

25

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1        BYRON TOLSON, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

2                          CROSS-EXAMINATION

3    BY MR. SHOSTAK:

4    Q.   MR. TOLSON, WITH REGARD TO THE SEARCH IN QUESTION, DID

5    YOU AT ANY TIME BEFORE YOU DID THE SEARCH READ THE SEARCH

6    WARRANT?

7    A.   NO.

8    Q.   DID YOU AT ANY TIME BEFORE THE SEARCH SIGN ANY KIND OF

9    A DOCUMENT TO INDICATE -- AND YOU CAN LOOK AT THE SECOND TO

10   LAST PAGE OF THE PACKET THAT YOU HAVE WHICH IS CALLED

11   "STATEMENT OF PARTICIPATING AGENTS," DECLARING THAT YOU READ

12   THE DOCUMENTS AND ARE FAMILIAR WITH THE CONTENTS.

13          DID YOU EVER SIGN THAT DOCUMENT BEFORE YOU STARTED

14   THE SEARCH OF MR. SAHAKIAN'S CELL?

15   A.   I DON'T RECALL DOING SO.

16   Q.   OKAY.  LET ME ASK YOU THIS.  DID YOU EVER SEE THIS

17   DOCUMENT BEFORE?

18   A.   I DON'T RECALL.

19   Q.   OKAY.  HAD YOU BEEN INSTRUCTED THAT JUDGE GILBERT, WHO

20   YOU KNOW TO BE A FEDERAL JUDGE, HAD ISSUED ANY ORDERS

21   REGARDING THE SEARCH?

22   A.   NOT AT THAT TIME, I DIDN'T, NO.

23   Q.   AND WERE YOU EVER TOLD THAT JUDGE GILBERT HAD GIVEN ANY

24   SPECIAL INSTRUCTIONS AS TO THE SEARCHES IN -- AT MARION

25   RELATIVE NOT ONLY TO MR. SAHAKIAN BUT ALSO TO MR. KNORR AND

1    MR. MCINTOSH?

2    A.    AFTER THE FACT, YES.

3    Q.    AFTER THE FACT?

4    A.    YES.

5    Q.    BUT INSOFAR AS A BRIEFING IS CONCERNED THAT YOU

6    INDICATED THAT YOU WENT TO, NOBODY SAID *HERE'S THE WAY THE*

7    *SEARCH IS SUPPOSED TO BE DONE AND HERE'S WHO'S SUPPOSED TO*

8    *DO IT*; CORRECT?

9    A.    I DON'T RECALL THAT, NO.

10   Q.    IF, I TAKE IT, THAT HAD BEEN DONE FOR YOU, THAT WOULD

11   BE SOMETHING THAT YOU WOULD HAVE RECALLED?

12   A.    PROBABLY.

13   Q.    BECAUSE THIS SEARCH CELL WAS A LITTLE DIFFERENT FROM

14   THE GENERAL KIND THAT YOU DID WHEN GUYS ARE OUT IN THE

15   REC YARD OR ELSEWHERE; CORRECT?

16   A.    YES.

17   Q.    YES.    OKAY.

18           THE COURT:  WELL, EXCUSE ME, BUT I'M PUZZLED BY

19   THAT LAST QUESTION.  SO LET ME ASK.  YOU SAID YOU WENT TO A

20   BRIEFING?

21           THE WITNESS:  YES, MA'AM.

22           THE COURT:  DID YOU USUALLY GO TO A BRIEFING

23   BEFORE A SEARCH WAS DONE OF AN INMATE CELL?

24           THE WITNESS:  NO.

25           THE COURT:  SO YOU WENT TO THAT BRIEFING BECAUSE

1    THIS WAS TO BE DONE DIFFERENTLY?

2          THE WITNESS:  YES.

3          THE COURT:  ALL RIGHT.

4    BY MR. SHOSTAK:

5    Q.   LET'S GO A STEP FURTHER.  WHAT WAS TO BE DONE

6    DIFFERENTLY IN THIS SEARCH THAN PREVIOUS SEARCHES THAT YOU

7    DID?

8    A.   WELL, WE WERE ACTUALLY TAKING PROPERTY OUT OF THE CELL,

9    REMOVING IT FROM THE CELL.

10   Q.   OKAY.

11   A.   AND THE ONLY TIME WE DID THAT BEFORE WOULD BE IF IT WAS

12   CONTRABAND.

13   Q.   AND TO YOUR KNOWLEDGE, WAS THAT THE ONLY DIFFERENCE

14   BETWEEN THE SEARCH THAT HAPPENED ON OCTOBER THE 20TH, 2002,

15   AND THE MANY SEARCHES THAT YOU HAD DONE BEFORE?

16   A.    I'D NEVER BEEN INVOLVED IN A SEARCH THAT THERE WAS A

17   SEARCH WARRANT ISSUED, NO.

18   Q.   OKAY.

19          THE COURT:  WELL, EXCUSE ME.  WHAT DO YOU REMEMBER

20   YOU WERE TOLD AT THAT BRIEFING?

21          THE WITNESS:  I KNEW THERE HAD BEEN A SEARCH

22   WARRANT ISSUED, AND THEN EXACTLY WHAT WE WERE SUPPOSED TO

23   PACK UP AND INVENTORY.

24          THE COURT:  WHAT DO YOU REMEMBER YOU WERE TOLD AT

25   THAT BRIEFING?

```
 1          THE WITNESS:  THAT SEARCH WARRANT, OF COURSE, HAD
 2   BEEN ISSUED AND THAT WE WERE TO PACK ANY WRITTEN
 3   DOCUMENTATION TO INCLUDE THE LEGAL MATERIALS, BOOKS,
 4   ANYTHING THE INMATE MIGHT HAVE WRITTEN ON.  NOTES, BOOKS,
 5   PHOTOS, AND ALL THAT.  THAT'S BASICALLY IT.  I MEAN, THERE
 6   WASN'T MUCH AT THE BRIEFING.
 7          THE COURT:  WERE YOU TOLD TO LOOK AT THINGS BEFORE
 8   YOU PACKED THEM AWAY?
 9          THE WITNESS:  NO, MA'AM.  OTHER THAN TO TRY TO
10   IDENTIFY IF THEY WERE LEGAL MATERIAL.  BUT AS YOU SAW IN THE
11   VIDEO, WE DID IT RATHER QUICKLY --
12          THE COURT:  YOU SPOKE TOO FAST.  I COULDN'T
13   UNDERSTAND YOUR ANSWER.
14          WOULD YOU REPEAT IT?
15          THE WITNESS:  NO.  WE WEREN'T TOLD TO LOOK AT
16   ANYTHING.  BUT WE BRIEFLY TRIED TO LOOK AT IT SO WE COULD
17   IDENTIFY IT CORRECTLY ON THE INVENTORY FORM.
18          THE COURT:  ALL RIGHT.  THANK YOU.
19          DO YOU REMEMBER ANYTHING ELSE THAT YOU WERE TOLD
20   AT THE BRIEFING ABOUT HOW TO CONDUCT THE SEARCH?
21          THE WITNESS:  NO.
22          THE COURT:  DO YOU REMEMBER ANYTHING ELSE AT ALL
23   THAT YOU WERE TOLD DURING THE BRIEFING?
24          THE WITNESS:  THAT'S BASICALLY IT.
25          THE COURT:  WHEN YOU SAY "BASICALLY," IS THERE
```

1    ANYTHING AT ALL YOU REMEMBER?

2          THE WITNESS:  NO, MA'AM.

3    BY MR. SHOSTAK:

4    Q.   WE WANT TO WRING YOU OUT, YOU UNDERSTAND.

5    A.   ABSOLUTELY.

6    Q.   WE WANT EVERYTHING THAT YOU KNOW THAT YOU WERE TOLD AT

7    THAT BRIEFING RELATIVE TO THIS SEARCH.

8    A.   I UNDERSTAND.

9    Q.   AND HAVE YOU TOLD US EVERYTHING THAT YOU WERE TOLD BY

10   ANYONE AS TO HOW YOU WERE TO CONDUCT A SEARCH AT THAT TIME?

11   A.   AS FAR AS I CAN REMEMBER, I HAVE, SIR.

12          MR. SHOSTAK:  I DON'T HAVE ANYTHING FURTHER,

13   JUDGE.

14          THE COURT:  THANK YOU.

15          MR. WOLFE?

16          MR. WOLFE:  NOTHING, YOUR HONOR.

17          THE COURT:  THANK YOU.  YOU MAY STEP DOWN.

18          MR. WOLFE:  YOUR HONOR, IS LIEUTENANT TOLSON NOW

19   EXCUSED?

20          THE COURT:  YOU ARE EXCUSED.

21          ALL RIGHT.  THE NEXT -- LET'S BRING THE OTHER

22   WITNESS BACK IN, WHICH IS OFFICER KNAPP.

23      (PAUSE.)

24          THE COURT:  GO AHEAD.

25          MR. SHOSTAK:  THANK YOU.

```
 1    JOSHUA GEORGE KNAPP, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN
 2                         CROSS-EXAMINATION
 3    BY MR. SHOSTAK:
 4    Q.   AGENT KNAPP, I WANT TO ASK YOU SOME QUESTIONS RELATIVE
 5    TO THE SEARCH THAT OBVIOUSLY I WANTED TO ASK OF YOU BEFORE.
 6         YOU GET THE SEARCH WARRANT SIGNED.  YOU TAKE THEM
 7    TO THE INSTITUTION; CORRECT?
 8    A.   YES.
 9    Q.   OKAY.  NOW, YOU HAVE IN FRONT OF YOU WHAT'S BEEN MARKED
10    AS DEFENDANT'S EXHIBITS 1052-A, -B AND -C.
11         DO YOU SEE THEM THERE?
12    A.   OKAY.  I SEE THE A'S.  OKAY, HERE WE GO.  YES, I SEE
13    THEM.  I SEE THE STAMPS.
14    Q.   CAN YOU TELL US WHEN YOU FIRST SAW THOSE DOCUMENTS?
15    A.   I'M SORRY.  WHEN?
16    Q.   YES.
17    A.   OKAY.  I SAW THEM -- I BELIEVE I SAW THEM FIRST AT THE
18    U.S. ATTORNEY'S OFFICE IN BENTON, ILLINOIS.
19    Q.   WAS THAT BEFORE YOU WENT ACROSS THE STREET TO JUDGE
20    FRAZIER TO GET THE SEARCH WARRANT SIGNED?
21    A.   YES.
22    Q.   OKAY.  AND WHEN YOU SAW THEM AT THE U.S. ATTORNEY'S
23    OFFICE IN BENTON, ILLINOIS, WHAT, IF ANYTHING, WAS TOLD TO
24    YOU ABOUT THESE THREE DOCUMENTS?
25    A.   I'M -- I'M NOT QUITE SURE WHAT YOU'RE LOOKING FOR
```

```
 1   THERE.  JUST --

 2   Q.   JUST TELL ME -- WELL, FIRST OF ALL, LET ME DO IT THIS

 3   WAY.

 4   A.   OKAY.

 5   Q.   WHO WAS THE AUSA THAT HANDED YOU THESE DOCUMENTS; DO

 6   YOU REMEMBER?

 7   A.   NO, I DON'T.

 8   Q.   BUT SOMEBODY WHO IS A LAWYER IN THAT OFFICE, AN

 9   ASSISTANT U.S. ATTORNEY, GAVE YOU THOSE THREE DOCUMENTS --

10   A.   YES.

11   Q.   -- RIGHT?

12           THE COURT:  DO YOU KNOW IF HE WAS FROM THAT

13   OFFICE, OR WAS HE FROM LOS ANGELES?

14           THE WITNESS:  NO.  HE WAS DEFINITELY FROM THAT

15   OFFICE.

16           THE COURT:  ALL RIGHT.

17   BY MR. SHOSTAK:

18   Q.   OKAY.  NOW, WHEN YOU'RE GIVEN -- WAS IT A MAN OR A

19   WOMAN WHO GAVE YOU --

20   A.   I THINK I'M FAIRLY CERTAIN IT WAS A MAN.  THERE'S ONLY

21   ONE -- ONE WOMAN WHO WORKS OUT THERE.  AND I USED TO WORK

22   WITH HER VERY FREQUENTLY.  IT DEFINITELY WAS NOT HER.

23   Q.   WHEN HE GAVE YOU THESE DOCUMENTS, DID HE GO OVER THE

24   SUBSTANCE -- THE SUBJECT MATTER OF EACH OF THESE DOCUMENTS?

25   A.   I THINK I RECALL READING THEM, AND THEN JUST WITH
```

```
 1   THE -- WITH THE ADDED CIRCUMSTANCES SURROUNDING MR. SAHAKIAN
 2   AND TWO OTHERS WITH OTHER -- WITH HIS CURRENT -- WITH HIS
 3   CURRENT COURT CASE AT THE TIME THAT WAS GOING ON IN THE
 4   DISTRICT, THERE WERE SOME ADDITIONAL INSTRUCTIONS THAT HAD
 5   TO BE ADHERED TO.
 6   Q.   OKAY.  LET'S TAKE A LOOK, THEN, AT I BELIEVE IT'S
 7   1052-C.  OR AT LEAST THE ONE THAT HAS THE 645 NUMBER AT THE
 8   BOTTOM.
 9        DO YOU SEE IT?
10   A.   YES, I DO.  SORRY.
11   Q.   OKAY.  THAT'S ALL RIGHT.
12        NOW, THAT'S AN AMENDED ORDER; CORRECT?  SIGNED BY
13   JUDGE GILBERT ON PAGE 2?
14   A.   YES.
15   Q.   OKAY.  AND THEN THERE IS A PROCEDURE FOR SEARCH OF
16   INMATES' LEGAL MATERIAL ATTACHED TO IT, SCHEDULE 1?
17   A.   YES.
18   Q.   DO YOU SEE THAT?
19   A.   (NO AUDIBLE RESPONSE.)
20   Q.   OKAY.  NOW, DID YOU GO OVER THIS PROCEDURE FOR SEARCH
21   OF INMATES' LEGAL MATERIAL AT THE TIME YOU WERE AT THE
22   U.S. ATTORNEY'S OFFICE?  DID YOU READ THROUGH IT?
23   A.   I ASSUME I WOULD HAVE READ THROUGH IT, YES.  I DON'T
24   RECALL SPECIFICALLY HAVING READ THROUGH IT AT THAT TIME, NO.
25   BUT I ASSUME I WOULD HAVE READ THROUGH IT.
```

1    Q.    OKAY.  DID YOU READ THROUGH IT AT ANY TIME AFTER YOU

2    LEFT THE U.S. ATTORNEY'S OFFICE IN BENTON, ILLINOIS?

3    A.    I'M SURE I READ ALL THE STUFF SEVERAL TIMES BECAUSE OF

4    THE COMPLEXITY OF THE WARRANT AND THE RULES ATTACHED TO IT.

5    Q.    OKAY.  CAN YOU TURN TO PAGE 3 OF THAT DOCUMENT, THE

6    INSTRUCTIONS.

7    A.    YES.

8    Q.    DO YOU SEE ON LINE 8 --

9    A.    YES.

10   Q.    *THE SEARCH WILL BE CONDUCTED BY AGENTS OR OTHER*

11   *PERSONNEL OF THE BUREAU OF ALCOHOL, TOBACCO AND FIREARMS*?

12   A.    YES.

13   Q.    THE SEARCHES OF THE CELLS WERE CONDUCTED BY BOP

14   PERSONNEL, WERE THEY NOT?

15   A.    YES, THEY WERE.

16   Q.    THE BUREAU OF ALCOHOL, TOBACCO AND FIREARMS DID NOT

17   SEND DOWN TO MARION, ILLINOIS FOR THIS SEARCH A SUFFICIENT

18   AMOUNT OF AGENTS TO PERFORM THE SEARCH; CORRECT?

19   A.    CORRECT.

20   Q.    INSOFAR AS THE ATF IS CONCERNED, YOU WERE THE ONLY

21   PERSON ON THE PREMISES DURING THE ENTIRE SEARCH; RIGHT?

22   A.    YES.

23   Q.    OKAY.  AND YOU ALSO READ, THEN, THE FOLLOWING SENTENCE

24   THAT *THE SEARCHING AGENTS HAVE BEEN SELECTED IN PART BECAUSE*

25   *THEY WILL HAVE NO FURTHER ROLE IN THE INVESTIGATION OF THIS*

1  *MATTER.*

2        YOU READ THAT AT THE TIME EVEN BEFORE YOU WENT

3  ACROSS THE STREET TO JUDGE FRAZIER TO GET THE WARRANT

4  SIGNED; CORRECT?

5  A.   YES.

6  Q.   AND*, IN NO CIRCUMSTANCES SHOULD THE CASE AGENTS VIEW*

7  *ANY DOCUMENTS THAT MAY CONTAIN PRIVILEGED INFORMATION SEIZED*

8  *DURING THE EXECUTION OF THE WARRANT*; CORRECT?

9  A.   YES.

10 Q.   AND YOU MENTIONED THAT THERE MIGHT HAVE BEEN A COUPLE

11 THAT WERE DONE BUT THEY WERE JUST TAKEN AND TOLD TO YOU THAT

12 THEY WERE PERHAPS PRIVILEGED AND PUT BACK IN THE PRISONER'S

13 BOX OF LEGAL MATERIAL; RIGHT?

14 A.   YES.

15 Q.   NOW, WHEN YOU WENT TO THE BRIEFING SESSION, DID IT SEEM

16 TO YOU THAT YOU COULDN'T GO ON WITH THIS SEARCH BECAUSE YOU

17 DIDN'T HAVE PEOPLE FROM THE ATF TO DO THE SEARCH?

18 A.   I JUST ASSUMED THAT I COULD -- THAT THE BUREAU OF

19 PRISONS PERSONNEL WOULD BE -- WOULD BE JUST AS ADEQUATE TO

20 BE ABLE TO DO IT WITH JUST ORDINARY OFFICERS THERE.

21 Q.   WELL, WHETHER THEY WOULD BE JUST AS GOOD, BETTER, OR

22 WORSE, THEY WEREN'T ATF, WERE THEY?

23 A.   NO, THEY WERE NOT.

24 Q.   AND YOU KNEW BEFORE YOU CONDUCTED THIS SEARCH THAT ATF

25 PEOPLE WERE SPECIFICALLY SUPPOSED TO CONDUCT IT; CORRECT?

1    A.    AGAIN, I ASSUMED THAT ME BEING ON THE RANGE WOULD BE

2    SUFFICIENT AND HAVING THE BUREAU OF PRISONS PERSONNEL.

3    Q.    I'M NOT ASKING YOU WHAT YOU ASSUMED.  YOU KNEW FROM

4    READING THIS DOCUMENT, 1052-C, THE INSTRUCTIONS PART, THAT

5    THE ATF WAS TO DO THIS SEARCH FOR REASONS SET OUT IN THAT

6    DOCUMENT; CORRECT?

7    A.    YES.

8    Q.    OKAY.  NEVERTHELESS, IN SPITE OF HAVING THAT KNOWLEDGE

9    AND KNOWING THAT THE ATF WAS TO DO THIS SEARCH OF THESE

10   CELLS, YOU WENT AHEAD AND ALLOWED PEOPLE FROM THE BUREAU OF

11   PRISONS TO DO THE SEARCH; CORRECT?

12   A.    UNDER MY SUPERVISION, YES.

13   Q.    WELL, WHEN YOU SAY UNDER YOUR SUPERVISION, IF I -- AND

14   I'M NOT TRYING TO QUARREL WITH YOU, BELIEVE ME.  AS I

15   UNDERSTAND IT, YOU'RE ON THE PREMISES.  YOU HAVEN'T SEARCHED

16   ANY CELLS YOURSELF; CORRECT?

17   A.    YES.

18   Q.    YOU DIDN'T -- AND YOU DIDN'T ALL THROUGH THE DAYS THAT

19   YOU WERE THERE TO MAKE THE SEARCH; CORRECT?

20   A.    YES.

21   Q.    OKAY.  AND SO YOU'RE WALKING AROUND AT MARION

22   PENITENTIARY WHILE ALL OF THE PEOPLE FROM THE BUREAU OF

23   PRISONS ARE SEARCHING THE CELLS FOR WHICH YOU HAD SEARCH

24   WARRANTS; RIGHT?

25   A.    YES.

```
 1   Q.   AND IF SOMEBODY ASKED YOU A QUESTION, YOU WOULD HAVE
 2   ANSWERED IT; RIGHT?
 3   A.   YES.
 4   Q.   AND IF THEY DIDN'T ASK YOU A QUESTION, YOU WOULDN'T GO
 5   UP AND SAY TO SOMEBODY, OH, WAIT A MINUTE, YOU'RE NOT
 6   SUPPOSED TO DO IT THIS WAY, OR, YOU SHOULD DO SOMETHING
 7   ANOTHER WAY.   THE BUREAU OF PRISONS PEOPLE JUST WENT AHEAD
 8   AND SEARCHED THE CELLS, BOXED THE STUFF UP, AND TOOK IT
 9   DOWNSTAIRS; RIGHT?
10   A.   YES.
11   Q.   SO INSOFAR AS YOU'RE TELLING US THAT YOU WERE
12   SUPERVISING, YOU WERE WALKING AROUND HAVING GIVEN THE SEARCH
13   WARRANTS TO THE WARDEN OR TO WHOMEVER YOU GAVE THEM, AND IF
14   ANYBODY HAD A QUESTION, YOU WOULD HAVE ANSWERED, AND IF THEY
15   DIDN'T, YOU DIDN'T VOLUNTEER ANYTHING; CORRECT?
16   A.   YES.
17   Q.   AND WHEN YOU GO INTO THE BRIEFING SESSION, YOU GO IN
18   AND YOU TELL THE PEOPLE AT THE BRIEFING SESSION THAT YOU'RE
19   HERE TO HAVE THE 17 OR 18 CELLS SEARCHED AND BASICALLY TO GO
20   AHEAD AND SEARCH THE CELLS; RIGHT?
21   A.   I DEFERRED TO THE WARDEN IN TERMS OF HOW THE CELLS
22   WOULD BE -- WHAT ORDER THAT THEY WOULD BE SEARCHED IN AND
23   THAT KIND OF THING.   WE MOVED METHODICALLY FROM ONE RANGE OR
24   UNIT, OR WHATEVER TERM YOU WANT TO USE, TO THE NEXT.   AND
25   THAT'S HOW THE SEARCHES WERE CONDUCTED.   I WAS ON EACH RANGE
```

1  WHILE THE SEARCHES WERE BEING CONDUCTED.

2  Q.   SO THE ATF DIDN'T PICK WHAT CELLS WERE TO BE SEARCHED

3  WHEN YOU GOT THERE, THE ORDER IN WHICH THE CELLS WERE TO BE

4  SEARCHED?

5  A.   NO.

6  Q.   RIGHT?

7       AND SO FAR AS YOU'VE TOLD US, YOU HAD NOTHING TO

8  DO YOURSELF PERSONALLY WITH THE SEARCH.  YOU HAD -- AM I

9  CORRECT?

10 A.   OTHER THAN BEING ON THE UNITS WHEN THEY WERE BEING

11 CONDUCTED, YES.

12 Q.   OTHER THAN BEING ON THE FLOOR OR ON THE RANGE, YOU HAVE

13 NO PERSONAL KNOWLEDGE AS TO THE SEARCH OF MR. SAHAKIAN'S

14 CELL AND HOW IT WAS CONDUCTED; CORRECT?

15       MR. WOLFE:  ASKED AND ANSWERED, YOUR HONOR.

16       THE COURT:  SUSTAINED.

17 BY MR. SHOSTAK:

18 Q.   AND SO AT THE BRIEFING SESSION, ALL YOU DO BASICALLY IS

19 TELL THEM, *GO OUT AND SEARCH THE CELLS.*

20       MR. WOLFE:  ASKED AND ANSWERED, YOUR HONOR.

21 BY MR. SHOSTAK:

22 Q.   RIGHT?

23       THE COURT:  SUSTAINED.

24 BY MR. SHOSTAK:

25 Q.   LET ME ASK YOU THIS:  INSOFAR AS MR. SAHAKIAN IS

```
1    CONCERNED, WHEN DID YOU FIRST LEARN THAT HE WAS INVOLVED IN

2    A CAPITAL CASE IN THE SOUTHERN DISTRICT OF ILLINOIS?

3    A.    WHEN I WAS GETTING READY TO SWEAR THESE WARRANTS OUT.

4    Q.    WHO TOLD YOU THAT?

5    A.    THE U.S. ATTORNEY.

6    Q.    INSOFAR AS THAT WAS CONCERNED, CAN YOU TELL ME WHAT IT

7    WAS THAT COMPELLED YOU TO INDICATE TO THIS JURY THAT

8    MR. SAHAKIAN HAD BEEN INVOLVED OR WAS TO BE INVOLVED IN A

9    CAPITAL CASE?

10              THE WITNESS:  DO I ANSWER?

11              THE COURT:  YES.

12              THE WITNESS:  YOU ASKED A QUESTION AS TO --

13   ABOUT -- I BELIEVE YOU ASKED A QUESTION REFERRING TO THE

14   UNIQUE INSTRUCTIONS ATTACHED TO THIS CASE -- OR ATTACHED TO

15   HIS SEARCH WARRANT.  AND THE ONLY REASON WHY THOSE

16   INSTRUCTIONS WERE IN PLACE IN TERMS OF THE PHOTOCOPYING AND

17   ALL THAT KIND OF STUFF WAS BECAUSE OF HIS CASE AT THE TIME.

18   BY MR. SHOSTAK:

19   Q.    YOU RECALL NOW, I TAKE IT, THAT MR. WOLFE WAS THE ONE

20   WHO ASKED YOU THAT QUESTION, NOT ME?

21   A.    I'M SORRY.

22   Q.    NO, THAT'S ALL RIGHT.  NOTHING TO BE SORRY ABOUT.  I

23   JUST WANT YOU TO BE CORRECT.

24   A.    I APOLOGIZE.  MR. WOLFE ASKED ME A QUESTION AS TO --

25   ABOUT THE UNIQUE CIRCUMSTANCES OF THIS WARRANT.
```

```
 1   Q.   AND YOU FELT THAT BECAUSE THAT QUESTION WAS ASKED, IT

 2   WAS NECESSARY FOR YOU TO TELL THIS JURY THAT MR. SAHAKIAN

 3   WAS IN A CAPITAL CASE IN BENTON, ILLINOIS?

 4            MR. WOLFE:  OBJECTION YOUR HONOR.  ARGUMENTATIVE

 5   AND IRRELEVANT.

 6            THE COURT:  ARGUMENTATIVE QUESTIONS ARE PERMITTED

 7   ON CROSS-EXAMINATION, BUT I'LL SUSTAIN THE OBJECTION.  YOU

 8   MAY -- WE'LL DISCUSS HOW TO DEAL WITH THE ANSWER.  THAT'S A

 9   SEPARATE ISSUE FROM QUESTIONING THE WITNESS ABOUT IT.

10   BY MR. SHOSTAK:

11   Q.   WERE YOU TOLD OF ANY OTHER CASES IN WHICH MR. SAHAKIAN

12   WAS INVOLVED?

13            MR. WOLFE:  OBJECTION.  RELEVANCE.

14            THE COURT:  SUSTAINED.

15   BY MR. SHOSTAK:

16   Q.   HAD YOU, BEFORE TAKING THE STAND TODAY, BEEN INSTRUCTED

17   BY ANYONE TO REFER TO MR. SAHAKIAN'S OTHER CASES, OTHER THAN

18   THE ONE IN QUESTION HERE, AS "OTHER PROCEEDINGS"?

19   A.   I'M SORRY.  WHAT ARE YOU ASKING, SIR?

20   Q.   I'M ASKING YOU IF ANYONE TOLD YOU BEFORE YOU TOOK THE

21   STAND TODAY TO REFER TO OTHER PROCEEDINGS IN WHICH

22   MR. SAHAKIAN WAS INVOLVED?

23   A.   NO.

24   Q.   HAD YOU BEEN TOLD BY ANYONE THAT INSOFAR AS YOUR

25   TESTIMONY WAS CONCERNED THAT IF YOU WERE GOING TO TALK ABOUT
```

1    SOME OTHER CASE THAT MR. SAHAKIAN WAS INVOLVED IN, YOU WERE

2    SIMPLY TO REFER TO IT AS "OTHER PROCEEDINGS"?

3    A.    NO.

4            MR. SHOSTAK:  I DON'T HAVE ANYTHING ELSE.  THANK

5    YOU.

6            THE COURT:  DID YOU HAVE ANY FURTHER QUESTIONS?

7            MR. WOLFE:  NO, YOUR HONOR.

8            THE COURT:  THANK YOU.  YOU MAY STEP DOWN.

9            THE WITNESS:  DO YOU REQUIRE ME TO -- AM I GOING

10   TO TESTIFY AFTER LUNCH FOR THE JURY, OR AM I COMPLETED?

11           THE COURT:  YOU FINISHED YOUR REDIRECT?

12           MR. WOLFE:  YES, YOUR HONOR.

13           THE COURT:  YOU ARE EXCUSED.

14           THE WITNESS:  THANK YOU.

15       *(PAUSE.)*

16           THE COURT:  ALL RIGHT.  THE WITNESS TESTIFIED ON

17   DIRECT EXAMINATION THAT -- THIS GOES PARTLY TO THE ISSUE AT

18   SIDEBAR -- WELL, IT GOES TO TWO OF -- THERE WERE TWO ISSUES

19   RAISED AT SIDEBAR.

20           ONE WAS THAT THIS LAST WITNESS, MR. KNAPP, HAD

21   STATED IN FRONT OF THE JURY THAT THE DEFENDANT,

22   MR. SAHAKIAN, HAD PREVIOUSLY STOOD TRIAL IN A CAPITAL CASE;

23   AND SECOND, THE REQUEST BY DEFENSE COUNSEL TO INQUIRE MORE

24   EXTENSIVELY ON CROSS-EXAMINATION ABOUT JUDGE GILBERT'S ORDER

25   AS TO THE CONDITIONS OF THE CELL SEARCH ON THE GROUNDS THAT

1    ON DIRECT EXAMINATION THE DOOR HAD BEEN OPENED TO PERMIT

2    SUCH CROSS-EXAMINATION.  SO THOSE ARE THE TWO ISSUES.

3         ON THE SECOND ISSUE, I DON'T NEED TO HEAR ANY

4    FURTHER ARGUMENT.  I JUST WANT TO POINT OUT THAT THE ACTUAL

5    TESTIMONY -- FIRST OF ALL, THE ACTUAL QUESTION BY GOVERNMENT

6    COUNSEL WAS THAT -- ABOUT THE ADDITIONAL INSTRUCTIONS AND

7    THE DIFFERENT INSTRUCTIONS FOR THE DEFENDANT'S CELL.

8         AND THE ANSWER WAS THAT -- ABOUT THE COPYING OF

9    THE LEGAL MATERIALS SO THAT HE COULD -- SO THAT MR. SAHAKIAN

10   COULD CONTINUE TO PREPARE FOR HIS DEFENSE.  I DON'T THINK

11   THAT OPENS THE DOOR, AS I SAID AT THE SIDEBAR.

12        THE OTHER ISSUE WAS THAT THE WITNESS STATED AT THE

13   BEGINNING OF HIS ANSWER THAT THE DEFENDANT AND TWO OTHERS

14   WERE SCHEDULED TO GO ON TRIAL FOR A DEATH PENALTY CASE IN

15   THAT DISTRICT.  AND THERE WASN'T AN OBJECTION AT THE TIME,

16   ALTHOUGH ONE OR BOTH OF DEFENSE COUNSEL STOOD UP AT SOME

17   POINT DURING THE ANSWER, AND, AFTER THE ANSWER, AN OBJECTION

18   WAS MADE.

19        AND I GAVE A CURATIVE INSTRUCTION OF A SORT TO THE

20   JURY, AND THE INSTRUCTION I GAVE DIDN'T SPECIFICALLY --

21   WELL, I TRIED TO MAKE IT SORT OF GENERAL, NOT TO DRAW MORE

22   ATTENTION TO THE FACT THAT A DEATH PENALTY TRIAL HAD BEEN

23   MENTIONED, BECAUSE IN TESTIMONY THROUGHOUT THE MORNING,

24   THERE HAD BEEN REFERENCE MADE TO OTHER CASES.  BECAUSE, OF

25   COURSE, THE SEARCH WARRANTS -- THERE WERE MULTIPLE SEARCH

1    WARRANTS BEING SERVED, WHICH REALLY WAS A REFERENCE TO

2    CO-DEFENDANTS IN THIS CASE.

3            AND SO MY INSTRUCTION TO THE JURY AT THAT TIME WAS

4    THAT THEY WERE TO DISREGARD ALL REFERENCES TO ALL OTHER

5    CASES AND REMEMBER THAT THEY WERE ONLY HERE TO DECIDE THIS

6    CASE AGAINST THIS DEFENDANT, MY THOUGHT BEING THAT RATHER

7    THAN DRAW MORE ATTENTION TO THAT PART OF THE WITNESS' ANSWER

8    AT THAT TIME, I WOULD SIMPLY REMIND THEM THAT THEY SHOULD

9    REALLY ONLY PAY -- REALLY REMIND THEM THAT THEY WERE HERE TO

10   DECIDE THIS CASE AND THIS CASE ONLY.

11           HOWEVER, IF THERE IS ANOTHER REQUEST FOR -- IF

12   THERE IS A REQUEST AT THIS TIME FOR A CURATIVE INSTRUCTION,

13   A FURTHER CURATIVE INSTRUCTION, I WOULD BE HAPPY TO

14   ENTERTAIN IT.

15           MR. GREEN:  JUDGE, FOR ABOUT THE LAST 45 MINUTES,

16   I'VE BEEN TRYING TO THINK OF A WAY THAT WE COULD POSSIBLY

17   CURE THIS SITUATION WITH THE JURORS SO IT'S NOT PREJUDICIAL

18   TO MY CLIENT.

19           I UNDERSTAND THAT THERE WAS REFERENCE TO OTHER

20   CASES, BUT THE JURORS ALREADY KNOW THERE WERE 40 OTHER

21   CO-DEFENDANTS IN THIS CASE AND THERE HAVE BEEN TRIALS.

22           THE COURT:  WELL, I'M NOT -- DO THEY KNOW THAT?

23           MR. GREEN:  I THINK THAT REASONABLE INFERENCES

24   COULD BE MADE FROM THE EVIDENCE THAT'S BEEN GIVEN SO FAR AS

25   WELL AS OPENING STATEMENT THAT THAT'S WHAT'S GONE ON.  AND

1    UP UNTIL THIS POINT, THERE WAS NO DIRECT STATEMENT BY EITHER

2    THE GOVERNMENT OR THE DEFENSE THAT ANY OF THE PRIOR

3    PROCEEDINGS SPECIFICALLY PERTAIN TO MR. SAHAKIAN AND

4    SPECIFICALLY PERTAIN TO A CAPITAL DEATH PENALTY CASE FOR

5    MR. SAHAKIAN.

6           THE COURT:  OF COURSE, THERE WAS NOTHING -- EXCUSE

7    ME FOR INTERRUPTING.  BUT THERE ALSO WAS NOTHING IN WHAT THE

8    WITNESS SAID THAT WOULD HAVE LED THE JURY TO THINK THAT THE

9    TRIAL THAT HE MENTIONED HAD ANYTHING TO DO WITH THIS CASE.

10   IT COULD HAVE BEEN A COMPLETELY UNRELATED CASE.

11          MR. GREEN:  RIGHT.  THEREFORE EVIDENCE OF OTHER

12   CRIMES THAT IS PREJUDICIAL TO MY CLIENT, AND NOW THE JURORS

13   ARE LEFT WITH THE IMPRESSION THAT MY CLIENT WAS ACTUALLY

14   CHARGED WITH A MURDER SO SEVERE THAT THE CAPITAL PUNISHMENT

15   WAS PURSUED BY THE GOVERNMENT IN THAT MATTER, AND LEFT TO

16   SPECULATE AS TO WHETHER OR NOT HE WAS CONVICTED ON THAT

17   CHARGE.

18          AND THAT'S WHY WE HAVE RULES THAT PRECLUDE

19   EVIDENCE OF OTHER CRIMES.  AND NOW IT'S OUT THERE FOR THE

20   JURORS WITH NO GUIDANCE AS TO WHAT THEY'RE SUPPOSED TO DO

21   WITH IT.

22          AND I REALIZE -- AND I DID -- I MOTIONED FIRST TO

23   GET UP.  AND I REALIZED THAT IT WASN'T MY WITNESS, AND

24   THEREFORE I REFRAINED FROM OBJECTING.  IN KEEPING WITH THE

25   COURT'S ORDER ON HOW THE PROCEDURE SHOULD GO IN THIS COURT,

1    IT'S MY UNDERSTANDING THAT ATTORNEYS WHO HAVE WITNESSES ONLY

2    OBJECT -- PLACE OBJECTIONS WITH RESPECT TO THEIR WITNESSES.

3            SO I'M TAKING THE ARGUMENT AT THIS TIME BECAUSE I

4    THINK THIS IS GOING TO DOVETAIL INTO ANOTHER AREA LATER ON,

5    AS I'VE REVIEWED THE GOVERNMENT'S EXHIBITS, THAT I THOUGHT

6    WAS NOT AT ISSUE ANYMORE, AND IT LOOKS LIKE IT MAY BE AT

7    ISSUE, AND THAT IS THE WALKER HOMICIDE.

8            AND SO MY COMMENTS HERE ARE GOING TO BE NOT ONLY

9    FOR RELIEF BUT ALSO END WITH WHERE WE ARE GOING TO STAND --

10   HOW FAR ARE WE GOING TO GET INTO THE WALKER HOMICIDE AT

11   MARION.

12           AND UP UNTIL THIS TIME, BECAUSE THE GOVERNMENT

13   DISMISSED COUNT 8 AND THEY DISMISSED WALKER WITH RESPECT TO

14   COUNT 1 IN THE RACKETEERING ACTIVITY, WE HAVE BEEN CHANGING

15   OUR APPROACH TO HOW WE DEAL WITH THIS CASE BECAUSE WE WERE

16   TOLD THAT WE WERE NOT GOING TO GET INTO --

17           THE COURT:  WELL, LET'S DEAL WITH THIS RIGHT NOW.

18   AND WE'LL GET INTO WALKER LATER.

19           MR. GREEN:  OKAY.  SO I REALIZE AT THIS POINT IN

20   TIME THAT IT COMES LATE, AND BECAUSE OF ITS UNTIMELINESS,

21   THE COURT MAY OVERRULE IT.  BUT I CAN ONLY THINK OF ONE OF

22   TWO POSSIBLE SOLUTIONS THAT WOULD KEEP MY CLIENT FROM

23   SUFFERING THE PREJUDICE FROM THAT COMMENT BEING MADE.

24           THE FIRST ONE IS A MOTION FOR A MISTRIAL.  AND IN

25   THE ALTERNATIVE, SHOULD THE COURT DENY THAT AS BEING

1   UNTIMELY AT THIS TIME, IT WOULD BE THAT THE JURY WOULD BE

2   GIVEN A CURATIVE INSTRUCTION THAT NOT ONLY ARE THEY NOT

3   TO -- I THINK THE JURORS SHOULD BE TOLD THAT THE COMMENT

4   MADE BY OFFICER KNAPP WAS INAPPROPRIATE AND SO THAT THE

5   JURORS WOULD NOT SPECULATE AS TO ANY EVIDENCE OF ANY OTHER

6   CRIMES FOR MR. SAHAKIAN, BUT THEY BE INFORMED THAT HE WAS

7   NOT CONVICTED OF ANY HOMICIDES THAT -- AS TO MR. KNAPP'S

8   REFERENCE AS TO THIS CAPITAL PUNISHMENT CASES, THAT -- AND

9   LEAVE IT AT THAT.

10          I THINK THE JURORS NEED TO UNDERSTAND SO THEY'RE

11  NOT SPECULATING AS TO WHETHER OR NOT HE, IN FACT, COMMITTED

12  A HOMICIDE SO EGREGIOUS THAT THE GOVERNMENT SOUGHT THE DEATH

13  PENALTY AGAINST HIM, THAT THEY SHOULD BE TOLD THAT IN FACT

14  OUT OF THAT PROCEEDING THAT MR. KNAPP REFERRED, MR. SAHAKIAN

15  WAS NOT CONVICTED OF ANY HOMICIDES.

16          THE COURT:  ALL RIGHT.  MR. WOLFE.

17          MR. WOLFE:  YOUR HONOR, AS TO THE -- AS TO

18  MISTRIAL, IT DOES NOT APPEAR TO ME THAT THE GLANCING

19  REFERENCE IS SUCH THAT NO CURATIVE INSTRUCTION IS POSSIBLE.

20          AS TO THE PROPOSED CURATIVE INSTRUCTION, I THINK

21  THAT IT'S WITHIN THE COURT'S DISCRETION TO DECIDE WHETHER

22  OFFERING THAT INSTRUCTION, AN INSTRUCTION I GUESS ALONG THE

23  LINES AGENT KNAPP MENTIONED THAT THERE WAS A TRIAL

24  PROCEEDING IN THE SOUTHERN DISTRICT OF ILLINOIS AND THE

25  DEFENDANT WAS NOT CONVICTED AS A RESULT OF THAT CASE, I

1    THINK IT'S WITHIN THE COURT'S DISCRETION TO DECIDE WHETHER

2    THAT UNDULY EMPHASIZES IT.

3         THE DEFENDANT WAS QUESTIONED -- AND I STILL THINK

4    IT'S UP TO THE COURT -- WHETHER MORE IS BETTER OR LESS THAN.

5    I DON'T THINK IT'S IMPORTANT ENOUGH THAT THE GOVERNMENT

6    PARTICULARLY OBJECTS WHICHEVER WAY YOUR HONOR DECIDES.

7         THE COURT:  WELL, LET ME CONSIDER -- I'M INCLINED

8    TO GIVE ANOTHER INSTRUCTION.  LET ME CONSIDER THE WORDING OF

9    THAT.

10        AND IN THE MEANTIME, I REITERATE THAT THE

11   GOVERNMENT -- WELL, BOTH SIDES, BUT RIGHT NOW WE'RE IN THE

12   GOVERNMENT'S CASE -- IT'S DIRECTED TO INSTRUCT ITS WITNESSES

13   THAT THEY ARE TO REFER TO ANY OTHER CASE AS "ANOTHER

14   PROCEEDING," SO THEY DON'T HAVE THIS PROBLEM AGAIN.

15        MR. WOLFE:  VERY WELL, YOUR HONOR.

16        THE COURT:  ALL RIGHT.  THANK YOU.

17        MR. GREEN:  JUDGE, I'M SORRY.  I HATE TO -- I KNOW

18   THIS IS EVERYBODY'S LUNCHTIME, BUT I ANTICIPATE TWO ISSUES

19   COMING UP WHEN WE COME BACK.

20        AND THE SECOND ONE I'M GOING TO REFER TO

21   MR. SHOSTAK ON IT BECAUSE IT OCCURS WITH A WITNESS FOR HIM.

22        AND THE FIRST ONE I'M BRINGING UP IS THAT I WAS

23   UNDER THE IMPRESSION, AND MAYBE I ASSUMED TOO MUCH IN MY

24   CONVERSATIONS WITH THE GOVERNMENT, THAT THE WALKER HOMICIDE

25   WAS NOT GOING TO BE AN ISSUE IN THIS CASE.

1          AND I LOOKED AT THE EXHIBITS THAT HAVE BEEN

2    PROPOSED SO FAR BY THE GOVERNMENT, AND BEGINNING WITH

3    EXHIBITS 172 THROUGH ABOUT 183, THEY ARE PHOTOGRAPHS OF THE

4    HOMICIDE SCENE OF WALKER.

5          THE COURT:  IS THIS GOING TO BE USED WITH THE NEXT

6    WITNESS?

7          MR. GREEN:  I'M NOT SURE.

8          THE COURT:  IS IT, MR. WOLFE?

9          MR. WOLFE:  NO.

10          THE COURT:  ARE YOU GOING TO USE THOSE EXHIBITS

11    DURING THE TRIAL?

12          MR. WOLFE:  I DON'T HAVE THEM IN FRONT OF ME, BUT

13    I DON'T BELIEVE SO, YOUR HONOR.

14          MR. GREEN:  IT'S MY UNDERSTANDING THAT THE NEXT

15    TWO WITNESSES THAT THE GOVERNMENT WILL CALL THIS AFTERNOON

16    WILL BE A GENTLEMAN BY THE NAME OF BRIAN HEALY AND GENE

17    BENTLEY.  MR. HEALY IS MR. SHOSTAK'S WITNESS, BUT I HAVEN'T

18    READ THE DISCOVERY WITH RESPECT TO HIM.  HE VAGUELY

19    REFERENCES THE HOMICIDE OF WALKER.

20          BUT MR. BENTLEY, SPECIFICALLY IN PREVIOUS TRIAL

21    TESTIMONY AND GRAND JURY TESTIMONY, SPECIFICALLY REFERENCES

22    THAT THE -- EVEN THOUGH HE WAS LEAVING THE AB AT THAT TIME,

23    THAT DAVID SAHAKIAN PUT UP TWO GUYS BECAUSE OF THAT HOMICIDE

24    THAT HAPPENED IN -- AT MARION.

25          SO AS LONG AS THE GOVERNMENT IS REPRESENTING WE'RE

1    NOT GOING TO GET INTO IT, THEN I'M FINE.  I JUST WANT TO

2    MAKE SURE I'M CLEAR.

3            THE COURT:  IS THE GOVERNMENT GOING TO INQUIRE OF

4    THOSE TWO WITNESSES ABOUT THE WALKER HOMICIDE?

5            MR. WOLFE:  YOUR HONOR, THE GOVERNMENT DOESN'T

6    INTEND TO PROVE UP THE WALKER HOMICIDE AND DOESN'T HAVE IN

7    MIND ANY SPECIFIC QUESTIONS ABOUT IT.

8            BUT THERE WILL CERTAINLY BE QUESTIONS ABOUT THE

9    RUN-UP TO THE LEWISBURG MURDERS THAT TOOK PLACE DURING 1997.

10   AND THE EXAMPLE DEFENSE COUNSEL USES THAT DEFENDANT SAHAKIAN

11   PUT UP TWO GUYS FOR THE AB AS A RESULT OF THE WALKER MURDER,

12   I SUPPOSE THAT IT'S POSSIBLE THAT SOME QUESTION ABOUT A

13   WITNESS' KNOWLEDGE OF DEFENDANT SAHAKIAN MIGHT PRODUCE THAT.

14   BUT THE GOVERNMENT DOESN'T INTEND TO PROVE IT UP.

15           I DON'T BELIEVE THAT THERE'S ANY KIND OF

16   PRECLUSIVE ORDER ABOUT IT.  IT WAS PART OF THE CONSPIRACY.

17   THINGS THAT TOOK PLACE IN 1997 THAT LED TO THAT MURDER LED

18   TO THE LEWISBURG MURDERS.  THE GOVERNMENT DOESN'T INTEND TO

19   PROVE IT, BUT I DON'T BELIEVE IT'S APPROPRIATE TO SOMEHOW

20   PRECLUDE A CASUAL MENTION OF IT.

21           THE COURT:  ALL RIGHT.  I TEND TO AGREE WITH THAT.

22           MR. SHOSTAK:  MAY IT PLEASE THE COURT.

23           THE COURT:  GO AHEAD.

24           MR. SHOSTAK:  IT'S MY UNDERSTANDING, YOUR HONOR,

25   THAT WITH REGARD TO WITNESS BRIAN HEALY, WHO WILL BE CALLED

1    THIS AFTERNOON, THE GOVERNMENT SEEKS TO -- OR WILL QUESTION

2    HIM REGARDING CERTAIN EVENTS AT THE PENITENTIARY, STATE

3    PENITENTIARY, RELATIVE TO AN ALLEGED BOMBING WHICH WAS OF A

4    BUILDING WHICH WAS SUPPOSED TO BE UNDERTAKEN BY MR. SAHAKIAN

5    AND OTHERS.

6            I CALL TO THE COURT'S ATTENTION OUR RULE 4 -- OUR

7    REQUEST FOR RULE 404(B) AND PARTICULARLY TO DOCUMENT 6041,

8    THE GOVERNMENT'S RESPONSE, IN WHICH IT INDICATES UNDER

9    RULE 404(B) THAT AS TO MR. SAHAKIAN, THAT THERE WOULD BE

10    EVIDENCE OF POSSESSION, INTRODUCTION OF NARCOTICS AT

11    LEAVENWORTH, POSSESSION OF NARCOTIC PARAPHERNALIA AT

12    LEAVENWORTH ON OR ABOUT A CERTAIN DATE, JULY 20TH, AND

13    DAMAGING GOVERNMENT PROPERTY, CUTTING A CELL DOOR GUIDE AT

14    THE U.S. PENITENTIARY AT MARION ON OR ABOUT FEBRUARY 28,

15    1997.

16            NOW, UNDER THE CIRCUMSTANCES, THE EVIDENCE

17    RELATIVE TO THE ALLEGED BOMBING OF -- OR THE UNDERTAKING OF

18    A BOMBING OR AN ATTEMPTED BOMBING OF A BUILDING IN A STATE

19    PENITENTIARY MANY YEARS AGO IS BEYOND THE SCOPE OF WHAT THE

20    GOVERNMENT INDICATES WOULD BE RULE 404(B), AND I WANT TO

21    CALL THAT TO THE COURT'S ATTENTION AND OBJECT TO IT.

22            THE COURT:  ALL RIGHT.  MR. WOLFE.

23            MR. WOLFE:  YOUR HONOR, I DON'T BELIEVE THAT IT IS

24    404(B) EVIDENCE.  IT'S PART OF THE GOVERNMENT'S PROOF OF THE

25    AB CONSPIRACY.

1           THE TESTIMONY WOULD BE THAT BRIAN HEALY, WHEN HE

2    WAS AN ASSOCIATE OF THE ARYAN BROTHERHOOD, KNEW THE

3    DEFENDANT AS AN AB MEMBER IN THE CALIFORNIA SYSTEM; THAT

4    DEFENDANT HEALY -- OR WITNESS HEALY HELPED TRANSPORT PLASTIC

5    EXPLOSIVES WITHIN THE PRISON THAT THE DEFENDANT AND OTHER

6    MEMBERS OF THE CALIFORNIA AB INTENDED TO USE TO TRY TO BLOW

7    UP A BUILDING ON THE PRISON IN AN EFFORT TO MAKE THE

8    CALIFORNIA AB LEADERS BE RELEASED FROM SPECIAL HOUSING.

9           IT'S PERSONAL CONTACT BETWEEN THE WITNESS AND

10   DEFENDANT, AND IT WAS FIRST DISCLOSED TO THIS DEFENDANT BY

11   THE WITNESS HEALY'S TESTIMONY IN AN ILLINOIS GRAND JURY IN

12   2001.  I DON'T BELIEVE THAT IT'S ANOTHER CRIME.

13          THE COURT:  WELL, I THINK THE APPROPRIATE

14   RESOLUTION OF THIS IS A LIMITING INSTRUCTION TO THE JURY

15   THAT THEY ARE NOT TO CONSIDER IT -- I DON'T WANT TO SAY

16   TYPICAL, BUT A TYPICAL 404(B) INSTRUCTION THAT THEY ARE NOT

17   TO CONSIDER THIS EVIDENCE FOR ANY PURPOSE BUT THE PURPOSE

18   FOR WHICH IT'S -- YOU KNOW, AS CHARACTER OR THAT THE

19   DEFENDANT IS MORE LIKELY TO COMMIT THE CRIME THAT HE IS

20   CHARGED WITH BECAUSE THERE IS EVIDENCE COMING IN ABOUT

21   ANOTHER CRIME, BUT THAT THE GOVERNMENT IS OFFERING THIS

22   EVIDENCE AS EVIDENCE OF THE ALLEGED RACKETEERING ENTERPRISE

23   OR, I GUESS, THE ALLEGED CONSPIRACY.

24          MR. WOLFE:  BOTH, YOUR HONOR.  IT'S PROOF OF THE

25   ENTERPRISE, PROOF OF THE CONSPIRACY, AND PROOF OF THE

1  DEFENDANT'S PARTICIPATION IN THE ENTERPRISE AND IN THE

2  CONSPIRACY.

3          MR. SHOSTAK:  BUT IT HASN'T BEEN PLED, YOUR HONOR.

4  IT'S NOT IN THE INDICTMENT, IT'S NOT IN 404(B), AND IT'S NOT

5  IN 609.

6          THE COURT:  WELL, THEY'RE NOT OFFERING IT AS

7  404(B) EVIDENCE.

8          MR. SHOSTAK:  WELL, FOR WHATEVER REASON THEY'RE

9  OFFERING IT, IT'S CLEARLY -- IT'S NOT PLED AND IT'S --

10         THE COURT:  YOU'RE SAYING IT'S NOT PLED AS ONE OF

11  THE RACKETEERING ACTS.

12         MR. SHOSTAK:  YES.

13         THE COURT:  BUT I DON'T THINK IT HAS TO BE PLED AS

14  A RACKETEERING ACT TO BE OFFERED AS EVIDENCE OF

15  PARTICIPATION IN THE CONSPIRACY WHICH IS PLED.  I MEAN, THE

16  CONSPIRACY IS PLED.  THEY DON'T HAVE TO PLEAD EVERY ACT IN

17  THE CONSPIRACY TO OFFER EVIDENCE.

18         SO IF YOU WISH TO PROPOSE A LIMITING INSTRUCTION,

19  WHICH I THINK IT WOULD BE APPROPRIATE, EITHER OR BOTH SIDES

20  MAY OFFER A LIMITING INSTRUCTION, AND I WILL GIVE THAT TO

21  THE JURY.

22         NOW, ALSO, THE FIRST WITNESS AFTER LUNCH IS?

23         MR. WOLFE:  CHARLES WELCH, PHYSICIAN'S ASSISTANT,

24  WHO WOULD TESTIFY ABOUT INJURIES TO JOEL BURKETT AND JIMMY

25  INMAN.

```
 1            THE COURT:  AND THEN THE NEXT WITNESS IS AN INMATE
 2  WITNESS?
 3            MR. WOLFE:  YES, YOUR HONOR.  IT'S BRIAN HEALY.
 4            THE COURT:  ALL RIGHT.  THEN PROBABLY THE BEST
 5  TIME WOULD BE BEFORE HE TESTIFIES, I'M GOING TO GIVE THE
 6  JURY THE INSTRUCTION THAT WOULD APPLY TO THE TESTIMONY
 7  THEY'VE ALREADY HEARD FROM MR. WEST, AND IT WOULD APPLY TO
 8  MR. HEALY.
 9            AND WILL MR. HEALY'S TESTIMONY TAKE ALL AFTERNOON?
10            MR. WOLFE:  I BELIEVE SO, YOUR HONOR.
11            THE COURT:  WELL, AND THAT'S THE ADAPTATION OF THE
12  MODEL INSTRUCTION ABOUT, YOU'RE GOING TO HEAR -- YOU HAVE
13  HEARD OR YOU'RE GOING TO HEAR TESTIMONY FROM WITNESSES WHO
14  HAVE RECEIVED OR MAY RECEIVE BENEFITS FROM THE GOVERNMENT,
15  AND YOU SHOULD USE SUCH TESTIMONY WITH ADDED CAUTION.
16            IT'S THAT MODEL INSTRUCTION.  I'M GOING TO READ
17  THAT TO THE JURY.
18            MR. WOLFE:  VERY WELL, YOUR HONOR.
19            MR. AKROTIRIANAKIS:  WHEN THE COURT JUST ASKED
20  THAT QUESTION NOW ABOUT WHETHER MR. HEALY'S TESTIMONY WOULD
21  TAKE THE REMAINDER OF THE AFTERNOON, I HEARD A "YES" FROM
22  DEFENSE COUNSEL TABLE.  BUT I DON'T KNOW THAT IT GOT ON THE
23  RECORD, BUT BASED ON --
24            MR. GREEN:  YOU ARE CORRECT.
25            MR. AKROTIRIANAKIS:  I'M ONLY DOING THIS FOR
```

1  SCHEDULING FOR THE SAKE OF THE MARSHAL'S SERVICE, YOUR

2  HONOR.  I'M GOING TO ASK THEM NOT TO THEN BRING THE NEXT

3  WITNESS UNTIL FIRST THING TOMORROW MORNING.  UNLESS WE'RE --

4  WELL, NOT DONE WITH MR. HEALY EVEN AT THE END OF THE DAY

5  TODAY, IN WHICH CASE I'LL TAKE IT UP WITH MR. GREEN THEN.

6        MR. GREEN:  JUDGE, AND I'M THE ONE WHO SAID "YES."

7  I'M ANTICIPATING THAT IF THE GOVERNMENT IS GOING TO GO INTO

8  ALL THOSE ALLEGATIONS IN CALIFORNIA, THAT THEIR DIRECT IS

9  GOING TO BE --I WAS ASSUMING THAT THEIR DIRECT WAS GOING TO

10  BE --

11        THE COURT:  WHO IS DOING THE DIRECT?

12        MR. WOLFE:  I AM, YOUR HONOR.

13        THE COURT:  HOW LONG DO YOU THINK YOUR DIRECT OF

14  MR. HEALY WILL BE?

15        MR. WOLFE:  WELL, CERTAINLY MORE THAN AN HOUR AND

16  COULD BE AS MUCH AS TWO.

17        THE COURT:  IF IT'S TWO, THAT WOULD PUT US AT

18  3:15.

19        MR. AKROTIRIANAKIS:  THERE'S MR. WELCH FIRST.

20        THE COURT:  ALL RIGHT.  MR. WELCH, HOW LONG WILL

21  HE BE?

22        MR. GREEN:  TWENTY MINUTES, HALF HOUR.

23        THE COURT:  NOT VERY LONG ON CROSS?

24        MR. GREEN:  NO, NOT VERY LONG.

25        THE COURT:  LET'S SAY 3:30.  YOU MAY NOT BE TWO

1    HOURS WITH MR. HEALY.  YOU SAID ONE OR TWO HOURS.

2           MR. WOLFE:  NOT CERTAINLY, BUT IT COULD BE.  ONE

3    OR TWO HOURS.

4           THE COURT:  AND YOUR CROSS?

5           MR. SHOSTAK:  THE SAME.  AT LEAST ONE OR TWO

6    HOURS.

7           THE COURT:  WHY DON'T YOU ASK THE MARSHALS TO KEEP

8    THE OTHER WITNESS HERE UNTIL WE TAKE OUR MID-AFTERNOON

9    BREAK.

10          MR. AKROTIRIANAKIS:  HE NEEDS TO BE BROUGHT HERE

11   TO THE COURTHOUSE.  ALTHOUGH I SUPPOSE --

12          THE COURT:  BUT AT THE MID-AFTERNOON BREAK, WE

13   COULD GET -- I DON'T KNOW.

14          MR. AKROTIRIANAKIS:  HE'S NOT PROXIMATE, YOUR

15   HONOR.  HE WOULD NEED TO BE BROUGHT HERE.  IT WOULD PROBABLY

16   TAKE SOME TIME.

17          THE COURT:  TAKE SOME TIME TO GET HIM HERE.

18          I DON'T THINK WE'LL NEED HIM THIS AFTERNOON.

19          ALL RIGHT.  THANK YOU.  WE'RE IN RECESS.

20      (*LUNCH RECESS.*)

21      (*THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT*

22       *IN THE PRESENCE OF THE JURY:*)

23          THE COURT:  GOOD AFTERNOON.

24          LET THE RECORD REFLECT THE PRESENCE OF ALL MEMBERS

25   OF THE JURY.  ALL COUNSEL AND THE DEFENDANT PRESENT.

```
 1              AND THE GOVERNMENT MAY CALL ITS NEXT WITNESS.

 2              MR. WOLFE:  YOUR HONOR, THE GOVERNMENT CALLS

 3    CHARLES WELCH.

 4              THE COURT:  THANK YOU.  YOU MAY SWEAR THE WITNESS,

 5    PLEASE.

 6              THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

 7              CHARLES WELCH, PLAINTIFF'S WITNESS, SWORN

 8              THE WITNESS:  I DO.

 9              THE CLERK:  PLEASE BE SEATED.

10              PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST

11    NAME FOR THE RECORD.

12              THE WITNESS:  CHARLES WILLARD WELCH, W-E-L-C-H.

13              THE COURT:  THANK YOU.  YOU MAY INQUIRE.

14              MR. WOLFE:  THANK YOU, YOUR HONOR.

15                        DIRECT EXAMINATION

16    BY MR. WOLFE:

17    Q.   MR. WELCH, HAVE YOU EVER WORKED FOR THE FEDERAL BUREAU

18    OF PRISONS?

19    A.   YES, SIR.

20    Q.   AND FOR HOW LONG HAVE YOU WORKED FOR THE BUREAU OF

21    PRISONS?

22    A.   I WORKED FOR THE BUREAU OF PRISONS FROM APRIL OF '78

23    TILL DECEMBER OF 2007.

24    Q.   AND, SIR, WHAT WERE YOUR DUTIES WITH THE FEDERAL BUREAU

25    OF PRISONS DURING THAT NEARLY 30 YEARS?
```

1    A.    MEDICAL CARE, P.A.

2    Q.    SIR, WOULD YOU TELL THE JURY WHAT YOU MEAN WHEN YOU SAY

3    P.A.?

4    A.    PHYSICIAN ASSISTANT.  ORIGINALLY WHEN HIRED IN, THEY

5    WERE CALLED MEDICAL TECHNICAL ASSISTANTS.  AND THEN THEY

6    TOOK A CONVERSION BOARD IN '81, AND FROM THAT POINT ON THEY

7    WERE CALLED PHYSICIAN ASSISTANTS.

8    Q.    SIR, BEFORE YOU WENT TO WORK FOR THE BUREAU OF PRISONS,

9    DID YOU HAVE ANY OTHER EMPLOYMENT OR TRAINING IN A MEDICAL

10   FIELD?

11   A.    YES, SIR.  I WAS IN THE NAVY MEDICAL CORPS FROM

12   FEBRUARY OF '68 UNTIL JANUARY OF '76.

13   Q.    CAN YOU DESCRIBE VERY BRIEFLY THE KIND OF DUTY, MEDICAL

14   TRAINING AND EXPERIENCE YOU HAD IN THE NAVY MEDICAL CORPS?

15   A.    I WAS TRAINED AS A GENERAL SERVICE FIELD CORPSMAN,

16   CLINICAL NURSING AREA.  I ALSO TRAINED AS AN X-RAY TECH AND

17   TRAINED AS AN INDEPENDENT DUTY NUCLEAR SUBMARINE CORPSMAN.

18   Q.    WILL YOU TELL THE JURY VERY BRIEFLY WHAT IT MEANS TO BE

19   TRAINED AS AN INDEPENDENT DUTY NUCLEAR SUBMARINE CORPSMAN?

20   A.    AT THAT TIME, THEY ONLY HAD ONE CORPSMAN ON THE

21   SUBMARINES, SO YOU WERE TRAINED IN EMERGENCY MEDICINE,

22   CLINICAL MEDICINE, DIVING SAFETY, AND RADIATION HEALTH.

23   Q.    DID YOU RECEIVE ANY OTHER TRAINING IN THE MEDICAL FIELD

24   WHILE YOU WERE IN THE BUREAU OF PRISONS, OR DID YOU JUST

25   EMBARK ON THE JOB AND DO IT?

1    A.    AS MUCH AS PHYSICALLY POSSIBLE WITH THE OPERATIONAL

2    COMMITMENTS, THERE WAS CONTINUING MEDICAL EDUCATION,

3    INCLUDING ONE SEMINAR, A FOUR-DAY SEMINAR ON WOUND

4    MANAGEMENT AT ATLANTA.  IT WAS OFFERED BY THE AMERICAN

5    MEDICAL ASSOCIATION.

6    Q.    MR. WELCH, WHERE WERE YOU -- WELL, LET ME ASK A

7    DIFFERENT QUESTION.  DURING YOUR WORK WITH THE BUREAU OF

8    PRISONS, WERE YOU EVER ASSIGNED TO THE UNITED STATES

9    PENITENTIARY AT MARION?

10   A.    YES, SIR.  I WAS STATIONED AT USP MARION FROM JANUARY

11   '86 UNTIL I RETIRED IN SEPTEMBER OF 2007.

12   Q.    AND WERE YOUR DUTIES AS A PHYSICIAN'S ASSISTANT DURING

13   ALL THIS TIME AT MARION?

14   A.    FOR THE FIRST 21 YEARS, I WAS THE SUPERVISORY PHYSICIAN

15   ASSISTANT, AND THE LAST YEAR I DROPPED DOWN TO JUST A

16   REGULAR LINE PHYSICIAN ASSISTANT MAINTAINING MEDICAL

17   COVERAGE.

18   Q.    MR. WELCH, DID YOUR -- PLEASE TELL THE JURY VERY

19   BRIEFLY WHAT YOUR DUTIES WERE AS A PHYSICIAN'S ASSISTANT AT

20   MARION FROM 1986 TO 2007.

21   A.    CLINICAL EVALUATION OF THE INMATES HOUSED AT MARION FOR

22   SICK CALL, EMERGENCY EVALUATION IN CASES OF INJURIES, X-RAYS

23   AS NEEDED WHEN THE CONTRACT X-RAY TECH WAS NOT AVAILABLE,

24   EMERGENCY MEDICAL CARE, I.V. THERAPY, PHARMACY MANAGEMENT,

25   EQUIPMENT AND ORDERING OF SUPPLIES AND OTHER ADMINISTRATIVE

1    DUTIES AS ASSIGNED.

2    Q.    DID YOU EVER HAVE OCCASIONS TO RESPOND TO EMERGENCIES

3    BECAUSE INMATES HAD BEEN ASSAULTED BY ONE ANOTHER?

4    A.    TOO MANY TIMES TO COUNT.

5    Q.    SIR, I'D LIKE TO CALL YOUR ATTENTION TO ONE PARTICULAR

6    INSTANCE.  DID YOU RESPOND TO AN ASSAULT ON MARCH 1ST, 1992?

7    A.    YES, SIR, I DID.

8    Q.    THE VICTIM WAS AN INMATE NAMED JOEL BURKETT.  DO YOU

9    RECALL THAT?

10   A.    YES, I DO.

11   Q.    PLEASE DESCRIBE VERY BRIEFLY HOW YOU BECAME AWARE OF

12   THE NEED TO RESPOND AND WHAT YOU FIRST DID?

13   A.    WELL, THAT PARTICULAR DAY WAS A SUNDAY, SO I WOULD HAVE

14   BEEN A RELIEF SHIFT OR COVERING FOR SOMEBODY THAT WAS NOT

15   THERE.  I WAS IN ANOTHER PART OF THE INSTITUTION WHEN THE

16   RADIO MESSAGE CAME THROUGH THAT THEY HAD A FIGHT OR ASSAULT,

17   AND I RESPONDED TO SITE.

18   Q.    AND DO YOU RECALL WHERE THE SITE WAS?

19   A.    F UNIT.

20   Q.    AND WAS IT IN A CELL, IN A REC YARD?  WHERE WITHIN

21   F UNIT?

22   A.    IT WOULD BE IN THE RANGE AREA OF THAT UNIT.

23   Q.    AND WHEN YOU SAY A RANGE, YOU MEAN THE -- A CORRIDOR

24   OUTSIDE THE ROW OF CELL DOORS?

25   A.    WELL, THE CELL BLOCK HAS THE CELL HOUSES SET UP IN

| | |
|---|---|
| 1 | UPPER TIER, LOWER TIER, CENTER AISLE WITH AN OUTSIDE AREA |
| 2 | GOING TO THE WALL TO WALK UP AND DOWN. |
| 3 | Q.   AND WHEN YOU FIRST GOT THE RADIO CALL, WENT TO THE |
| 4 | SCENE, WHAT DID YOU SEE? |
| 5 | A.   MAY I REFER TO THE NOTES IN THE HEALTH RECORD, SIR? |
| 6 | Q.   WHY DON'T YOU -- LET ME ASK YOU A QUESTION OR TWO ABOUT |
| 7 | THAT. |
| 8 |          DO YOU HAVE A RECOLLECTION, AS YOU SIT HERE, OF |
| 9 | WHERE YOU WENT THAT DAY AND WHAT YOU SAW? |
| 10 | A.   ON WHAT PARTICULAR TIER, NO, I DO NOT. |
| 11 | Q.   DO YOU BELIEVE THAT LOOKING AT THE -- DID YOU WRITE |
| 12 | SOME NOTES ABOUT MEDICAL CARE OR A MEMORANDUM ABOUT YOUR |
| 13 | RESPONSE ON THAT DAY? |
| 14 | A.   YES.  I DID A MEMORANDUM AND I ALSO DID WHAT THEY CALL |
| 15 | A CHRONOLOGICAL HEALTH HISTORY OF MEDICAL CARE AND AN INJURY |
| 16 | REPORT AND I -- ANATOMICAL DIAGRAM ON THE VICTIM, OR THE |
| 17 | PERSON THAT WAS ASSAULTED. |
| 18 | Q.   DO YOU BELIEVE THAT REFERRING TO SOME OF THOSE |
| 19 | DOCUMENTS WOULD REFRESH YOUR RECOLLECTION ABOUT WHAT YOU |
| 20 | FIRST SAW WHEN YOU ARRIVED AT THE SCENE? |
| 21 | A.   YES, IT WOULD. |
| 22 |          THE COURT:  ALL RIGHT.  EXCUSE ME. |
| 23 |          SIR, COULD YOU ADJUST THAT MICROPHONE SO THAT IT |
| 24 | IS CLOSER TO YOU AND PICKS UP YOUR VOICE. |
| 25 |          THE WITNESS:  IS THIS BETTER? |

```
 1              THE COURT:  THAT'S BETTER.  AND YOU MIGHT NEED TO

 2    SCOOT THE CHAIR UP A BIT, TOO.  THANKS A LOT.

 3    BY MR. WOLFE:

 4    Q.   MR. WELCH, WILL YOU LOOK AT THOSE PAPERS AND READ THEM

 5    QUIETLY TO YOURSELF AND TELL ME, WHEN YOU'VE READ ENOUGH, IF

 6    IT DOES REFRESH YOUR RECOLLECTION ABOUT WHAT YOU SAW WHEN

 7    YOU RETURNED TO THE -- OR RESPONDED TO THE SCENE OF THE

 8    RADIO CALL OF AN ASSAULT THAT DAY.

 9    A.   YEAH.  IT WAS ON B RANGE OF F UNIT.  THE PATIENT WAS

10    BLEEDING WITH MULTIPLE WOUNDS AND WHAT LOOKS LIKE HE WAS

11    GOING INTO SHOCK.

12    Q.   WHEN YOU SAY THE PATIENT WAS BLEEDING, CAN YOU

13    CHARACTERIZE TO THE JURY HOW MUCH BLOOD YOU SAW ON INMATE

14    BURKETT WHEN YOU GOT THERE?

15    A.   HIS SHIRT WAS COVERED WITH IT, AND THERE, OF COURSE,

16    WAS SOME ON THE RANGE.  AT APPROXIMATE -- I BELIEVE I

17    APPROXIMATED ONE UNIT WHICH IS ABOUT A PINT OR 480 CC'S, IS

18    A ROUGH GUESS.

19    Q.   SO YOUR ESTIMATE WAS THAT HE HAD LOST A PINT OF BLOOD

20    DURING THE INCIDENT?

21    A.   YEAH, ONE UNIT, ABOUT THAT, YES.

22    Q.   AND YOU HAD SAID, I BELIEVE, THERE WERE SIGNS OF SHOCK.

23    WHAT DID YOU OBSERVE ABOUT THAT AND WHAT DID YOU DO, IF

24    ANYTHING, ABOUT IT?

25    A.   PUPILS WERE DILATING.  HE WAS TURNING PALE.  HIS PULSE
```

1  WAS WEAK AND RAPID AND HE WAS GETTING A LITTLE BIT LETHARGIC

2  OR -- A LITTLE BIT LETHARGIC.  JUST SORT OF A LITTLE BIT

3  WAVERY, IF YOU WILL.

4         WE DID DIRECT PRESSURE ON THE MAJOR WOUND ON THE

5  NECK AND PUT HIM IN A STOKES LITTER, WHICH IS A WIRE BASKET

6  FOR TRANSPORTING PEOPLE, AND MOVED HIM FROM THERE TO THE

7  HEALTH SERVICES UNIT.

8  Q.   SIR, YOU SAID IN AN EARLIER ANSWER THAT INMATE BURKETT

9  HAD SUFFERED MULTIPLE WOUNDS.  CAN YOU TELL THE JURY IN A

10 SUMMARY FASHION WHAT WOUNDS HE SUFFERED?

11 A.   I'D HAVE TO REFER TO THE ANATOMICAL DIAGRAM TO GET ALL

12 OF THEM.  HE HAD A LACERATION UP HERE IN THE CHEEKBONE.

13 LACERATION INSIDE HIS LIP GOING TO THE GUM DOWN TO ABOUT

14 HERE ON THE INSIDE.  A LARGE STRIATED OR MULTI-EDGED

15 LACERATION GOING IN TOWARD HIS NECK WHICH IS WHERE HE WAS

16 BLEEDING MOSTLY FROM.  A LOT OF SWELLING IN THIS AREA WHERE

17 HE WAS HIT.  LACERATION OUT BY THE COLLAR -- OVER THE

18 COLLARBONE.  A LACERATION OUT IN HERE ON HIS ARM.  AND I

19 THINK THAT'S A TOTAL OF ABOUT SEVEN HOLES IN HIM.

20 Q.   YOU SAID THAT HE HAD A MULTI-EDGED LACERATION TO HIS

21 NECK.  CAN YOU EXPLAIN IN LAYMEN'S TERMS WHAT YOU MEAN BY

22 THE MULTI-EDGED LACERATION TO THE NECK?

23 A.   SOME CUTS ARE STRAIGHT AND LINEAR AND SOME ARE SORT OF

24 POOCHED TOGETHER AND SOME WILL HAVE THE SKIN TEARING AS IT

25 GOES IN.  A WIDER OBJECT WOULD LEAVE A TEAR AS WELL AS A

1    LACERATION AS IT PENETRATED THE SKIN.  AND IN HIS CASE, IT

2    WAS SORT OF LIKE A Y AND BRUISED ON THE BORDERS.

3    Q.    AND THAT WAS ON THE -- I SEE YOU GESTURING.  WAS THAT

4    WOUND, THE Y-SHAPED, MULTI-EDGED LACERATION ON THE LEFT SIDE

5    OF --

6    A.    LEFT SIDE OF THE NECK.  RIGHT IN HERE (INDICATING).

7    Q.    AND I BELIEVE YOU CALLED THAT EARLIER THE MAJOR WOUND?

8    A.    YEAH.  THAT WAS THE ONE THAT WAS LIFE-THREATENING.  I

9    HAD TO SECURE THE BLEEDING AND LOOK FOR OTHER SECONDARY

10   INJURIES, SECONDARY PROBLEMS.

11   Q.    SIR, COULD YOU EXPLAIN TO THE JURY WHY YOU CALLED THAT

12   Y-SHAPED WOUND TO THE LEFT SIDE OF THE NECK

13   LIFE-THREATENING?

14   A.    THE AREA THAT IT'S IN IS DIRECTLY OVER THE CAROTID

15   ARTERY THAT GOES TO THE BRAIN, A LARGE ARTERY.  IT'S ALSO --

16   IN THAT AREA IS THE INTERNAL JUGULAR.  AND CROSSING THAT

17   AREA FROM THE TOP IS THE EXTERNAL JUGULAR AND IS ALSO

18   ADJACENT TO THE WINDPIPE.  OKAY.

19        THERE WAS A POSSIBILITY IT MAY HAVE PENETRATED AND

20   NICKED THE SAC AROUND THE LUNG GOING DOWN THIS WAY ON ITS

21   WAY THROUGH, BECAUSE THE AREA HAD SOME -- WHAT THEY CALL

22   SUBCUTANEOUS EMPHYSEMA, OR IT FELT LIKE BUBBLE PACK, FREE

23   AIR IN THE TISSUE, WHICH RAISED THE QUESTION IF HE GOT THE

24   AIR IN FROM THE TRACHEA, LUNGS, OR WAS PACKED IN THERE BY

25   THE OBJECT THAT MADE THE HOLE.

1    Q.    MR. WELCH, YOU USED THE TERM "SUBCUTANEOUS EMPHYSEMA"

2    JUST THEN.  ARE YOU ABLE TO EXPLAIN IN LAYMAN'S TERMS --

3    A.    FREE AIR UNDERNEATH THE SKIN.  FEELS SORT OF LIKE

4    BUBBLE PACK.  YOU FEEL IT WHEN YOU --

5            THE COURT:  PLEASE WAIT UNTIL HE FINISHES HIS

6    QUESTION BEFORE YOU BEGIN.  THANK YOU.

7    BY MR. WOLFE:

8    Q.  SO YOU SAID "FREE AIR UNDER THE SKIN," MEANING IN THIS

9    AREA AROUND THE NECK WOUND THERE WAS AIR IN THE -- IN THE

10   DEFENDANT'S -- INMATE'S BODY?

11   A.    UNDERNEATH THE SKIN.  YES, SIR.

12   Q.    IN YOUR EXPERIENCE, WHAT ARE THE POSSIBLE SOURCES FOR

13   AIR UNDER THE SKIN IN A WOUND LIKE THAT?

14   A.    PENETRATION OF THE TRACHEA, WHICH IS THIS TUBE RUNNING

15   HERE.  PENETRATION OF THE UPPER CORNER OF THE LUNG FIELD UP

16   BEHIND THE SHOULDER BLADE OR THE CLAVICLE -- NOT SHOULDER

17   BLADE, THE CLAVICLE, COLLARBONE.  ALSO IF IT'S PACKED IN BY

18   A LARGE HOLLOW THING OR SOURCE CAN POSSIBLY PUT IT IN THERE.

19   Q.    WHEN YOU SAID "TRACHEA" IN YOUR LAST ANSWER, SIR, DO

20   YOU MEAN THE --

21   A.    THE WINDPIPE.

22   Q.    -- WINDPIPE?

23   A.    YES.  I'M SORRY.

24   Q.    AND SIR, I BELIEVE YOU SAID THAT IN AN EARLIER ANSWER

25   THAT THERE WAS SWELLING IN THIS AREA.  WHEN YOU SAID "THIS

1   AREA," YOU WERE POINTING ALSO TO THE LEFT SIDE OF THE NECK?

2   A.   YES, SIR.

3   Q.   AND WAS THAT SWELLING BECAUSE OF THE AIR WITHIN THE

4   SKIN THAT YOU'VE TALKED ABOUT OR OTHER REASONS?

5   A.   THAT WOULD BE MORE FROM BLEEDING INTO THE TISSUE AND

6   TISSUE SPACES.

7   Q.   DOES THAT MEAN THAT IN ADDITION TO THE BLOOD THAT YOU

8   SAID COVERED THE VICTIM'S SHIRT, THAT HE WAS BLEEDING INSIDE

9   HIS BODY IN THAT AREA?

10  A.   HE BLED INTO THE TISSUE.  YES, SIR.

11  Q.   SIR, YOU SAID I BELIEVE THAT THE VICTIM WAS PLACED ON A

12  STOKES LITTER.  WOULD YOU TAKE UP FROM THAT POINT AND

13  DESCRIBE FOR THE JURY WHAT YOU DID TO TREAT THE VICTIM.

14  A.   WELL, WE MOVED HIM BACK TO HEALTH SERVICES.  PUT

15  PRESSURE ON THE WOUNDS TO REDUCE OR STOP ANY FURTHER

16  BLEEDING FROM THAT POINT.  STARTED AN I.V. OF WHAT THEY CALL

17  RINGER'S LACTATE WHICH IS BASICALLY BODY SALTS, BLOOD SALTS,

18  IN WATER TO REPLACE THE VOLUME THAT HE LOST TO BRING HIS

19  BLOOD PRESSURE UP, TO KEEP HIS BLOOD PRESSURE UP.  SO WE

20  STARTED AN I.V. IN HIS LEFT ARM.

21        ALSO WE -- WHEN HE FIRST CAME TO THE DOOR, WE

22  SUMMONED THE DUTY MEDICAL OFFICER OR THE ACTING CLINICAL

23  DIRECTOR FOR HIM TO COME IN ALSO AND HAVE A LOOK AT THIS

24  GENTLEMAN.  AND WE MONITORED HIM UNTIL THE PHYSICIAN GOT IN.

25  Q.   SIR, IN THAT ANSWER WHEN YOU SAID YOU STARTED AN I.V.

1  OF BODY SALTS TO REPLACE THE VOLUME HE LOST, DO YOU MEAN BY

2  THAT THE VOLUME OF BLOOD THAT THE VICTIM HAD LOST?

3  A.    FOR ANY BLOOD LOSS.  ALSO TO PREPARE THE AREA TO HAVE

4  ACCESS TO THE VENOUS SYSTEM IN CASE HE TURNED REALLY, REALLY

5  SOUR REAL QUICK, SO YOU WOULDN'T BE TRYING TO START AN I.V.

6  ON A COLLAPSED CIRCULATORY SYSTEM.  IF YOU HAVEN'T GOT

7  ENOUGH BLOOD IN THE VEINS, THEY FLATTEN OUT.  VERY HARD TO

8  START AN I.V. AFTER THAT.  SO YOU TRY TO GET IT STARTED AS

9  EARLY AS YOU CAN AND REPLACE THE FLUIDS.

10  Q.    SIR, DID YOU SAY IN THAT ANSWER, "IN CASE THE VICTIM

11  TURNED REALLY, REALLY SOUR"?

12  A.    YES, SIR.  IMMINENT DEATH.

13  Q.    OKAY.  PLEASE TELL US WHAT YOU MEAN BY "REALLY SOUR" IN

14  THAT CONTEXT.  MR. WELCH, WILL YOU TELL THE JURY WHAT YOU

15  MEANT BY *IN CASE THE VICTIM TURNED REALLY SOUR*?

16  A.    YOU TRY TO PLAN FOR THE FUTURE AND PROTECT THE THINGS

17  FROM GETTING WORSE.  ONCE THEY TURN REAL BAD, YOU MAY NOT BE

18  ABLE TO GET AN I.V. STARTED.  SO WHEN YOU GOT A PERSON THAT

19  YOU STILL HAVE REASONABLE CIRCULATION, YOU WANT TO GET YOUR

20  I.V. IN FIRST SO IT DOESN'T COLLAPSE ON YOU AND YOU'RE

21  UNABLE TO GET AN I.V. GOING.

22  Q.    MR. WELCH, DID YOU ASK THE VICTIM ANYTHING ABOUT -- NOT

23  TELLING ME WHAT -- JUST WHETHER -- I WOULD LIKE YOU TO TELL

24  US WHETHER YOU ASKED THE VICTIM ANYTHING ABOUT WHAT HAPPENED

25  TO HIM.

1    A.    I ASKED HIM, I BELIEVE, ABOUT THE SIZE OF THE WEAPON,

2    RELATIVE SIZE OF IT.

3    Q.    SIR, WHY DID YOU ASK HIM ABOUT THE RELATIVE SIZE OF THE

4    WEAPON?

5    A.    IT GIVES YOU AN IDEA HOW FAR IT CAN PENETRATE INTO THE

6    BODY, WHAT AREAS CAN BE HIT, HOW DEEP IT CAN GO.

7    Q.    AND I TAKE IT, THEN, THAT YOU ASKED THAT IN ORDER TO

8    DETERMINE WHAT KIND OF INJURIES YOU MIGHT BE FACING?

9    A.    YES, SIR.  OR THE RADIUS OF THE AREA OF HIS TISSUE OR

10   THE ORGAN -- THE TISSUE OR ORGANS THAT ARE IN THAT AREA,

11   WHAT POSSIBLY COULD BE HIT OR DAMAGED OR COMPROMISED.  IF

12   YOU HAVE A BLADE THIS LONG, IT CAN ONLY PENETRATE SO FAR.

13   IF THEY HAVE ONE THIS LONG, YOU TAKE IN YOUR RADIUS FROM THE

14   ENTRANCE POINT, YOU HAVE A FAIR IDEA WHAT ALL CAN BE

15   COMPROMISED, INSULTED, OR OTHERWISE DAMAGED.

16   Q.    MR. WELCH, WAS IT YOUR PRACTICE TO ASK VICTIMS WHO

17   COULD RESPOND THAT QUESTION ABOUT THE SIZE OF THE WEAPON

18   USED ON THEM WHENEVER YOU TREATED AN ASSAULT VICTIM?

19   A.    YES.  I ALSO WOULD ASK CUSTODY IF ANYBODY HAD SEEN THE

20   WEAPON AND KNEW WHAT IT LOOKED LIKE OR APPROXIMATE LENGTH,

21   IF THEY HAD BEEN ABLE TO RETRIEVE IT.

22   Q.    MR. WELCH, AFTER INMATE BURKETT HAD BEEN BROUGHT TO

23   HEALTH SERVICES, YOU STARTED THE I.V., THE OTHER THINGS THAT

24   YOU DESCRIBED, WHAT ELSE, IN SUMMARY, WAS DONE TO TREAT

25   INMATE BURKETT?

1    A.    WE ALSO TOOK A CHEST X-RAY ON HIM TO SEE IF WE COULD

2    DETECT A LARGE PNEUMOTHORAX OR COLLAPSING OF THE LUNG.  I

3    BELIEVE ONE OR TWO VIEWS.

4    Q.    DID INMATE BURKETT REMAIN IN THE HEALTH SERVICES UNIT

5    AT THE PENITENTIARY THEN?

6    A.    YES.  WE GOT HIM STABILIZED.  WE KEPT HIM THERE UNTIL

7    ARRANGEMENTS WERE MADE FOR A SURGICAL EVALUATION AND

8    EXPLORATION OF THE AREA.

9    Q.    ARRANGEMENTS FOR SURGICAL EVALUATION AND EXPLORATION OF

10   WHICH AREA?

11   A.    THE WOUND UP IN HERE (INDICATING.)

12   Q.    AND WHERE WAS -- DID THE PENITENTIARY AT MARION HAVE

13   PERSONNEL OR EQUIPMENT TO PERFORM A SURGICAL EVALUATION AND

14   EXPLORATION OF THE NECK WOUND THAT INMATE BURKETT SUSTAINED?

15   A.    NO, THEY DID NOT.  AND THE VASCULAR SURGEON IN THE AREA

16   WAS NOT AVAILABLE, SO ARRANGEMENTS WERE MADE TO SEND HIM TO

17   THE MEDICAL CENTER FOR FEDERAL PRISONERS BY AIR AMBULANCE

18   FOR EVALUATION.

19   Q.    CAN YOU TELL THE JURY WHERE THE MEDICAL CENTER FOR

20   FEDERAL PRISONERS IS LOCATED.

21   A.    SPRINGFIELD, MISSOURI.

22   Q.    AND YOU MENTIONED A VASCULAR SURGEON NOT BEING

23   AVAILABLE.  WILL YOU EXPLAIN TO THE JURY WHAT YOU MEAN BY

24   "VASCULAR SURGEON"?

25   A.    A VASCULAR SURGEON IS A PHYSICIAN THAT SPECIALIZES IN

1    ARTERIES AND VEINS REPAIR AND -- REPAIR, REPLACEMENT, YOU

2    KNOW, WITH THOSE SYSTEMS.  THEY DO LIKE REPLACING ARTERIES

3    THAT HAD BEEN SEVERED OR TORN.  VASCULAR LESIONS ON THE

4    ARTERIES TO ANY PORTION OF THE BODY, INTERNAL EXTREMITIES,

5    NECK, UP UNTIL YOU GET TO ABOUT THAT POINT, AND THAT GOES TO

6    NEUROSURGEONS.

7    Q.   AND, SIR, CAN YOU EXPLAIN VERY BRIEFLY TO THE JURY WHY

8    YOU WANTED TO HAVE A VASCULAR SURGEON DO AN EVALUATION AND

9    EXPLORATION OF THE NECK WOUND.

10   A.   THE INDICATIONS TO WEAPON USED WAS LONG ENOUGH TO HIT

11   IMPORTANT VASCULAR STRUCTURES IN THAT AREA, LOSS OF BLOOD

12   BOTH EXTERNALLY AND THE SWELLING IN THAT AREA INDICATED

13   THERE COULD BE SIGNIFICANT COMPROMISE OF THE CAROTID ARTERY

14   GOING ON THIS SIDE GOING TO THE BRAIN IN THE FACE.

15   Q.   AND DID THERE COME A TIME IN THE END WHEN INMATE

16   BURKETT WAS SENT TO THE MEDICAL CENTER FOR FEDERAL PRISONERS

17   BY AIR AMBULANCE?

18   A.   THESE RECORDS STOP AT THAT POINT.  AND ALSO THE COMMENT

19   OR EVALUATION MADE BY THE ACTING CLINICAL DIRECTOR AT THAT

20   TIME, WHICH WAS DR. HERMAN O. LYLE.

21   Q.   I'D LIKE TO -- DID YOU ALSO LOOK AT THE INMATE WHO HAD

22   ATTACKED INMATE BURKETT?

23   A.   INMATE KLAKER WAS BROUGHT TO HEALTH SERVICES UNIT AS

24   THE SECOND PARTICIPANT IN THIS INCIDENT, AND I DID LOOK AT

25   HIM AFTER WE GET THIS GENTLEMAN STABILIZED.

1    Q.    AND DID INMATE KLAKER HAVE ANY INJURIES?

2    A.    ON THESE TWO KNUCKLES RIGHT HERE, THE HIDE WAS PEELED

3    BACK BUT NOT A FULL SKIN THICKNESS, AND HE HAD LIKE TWO

4    LITTLE PARALLEL LINES, LIKE THERE WAS A HIGH POINT AND FLAT

5    POINT AND GOT THIS KNUCKLE ON THIS ONE.

6              AND JUST BASICALLY YOU JUST PEELED OFF -- OR

7    KNOCKED OFF THE HIGH END OF YOUR KNUCKLE CATCHING IT ON

8    SOMETHING LIKE THAT.  THE HIDE WAS PEELED OFF HERE AND HERE,

9    BUT NOT FULL SKIN THICKNESS.  I'D SAY ABOUT A QUARTER SKIN

10   THICKNESS, JUST ENOUGH TO MAKE IT BLEED, BUT NOT ENOUGH TO

11   DO ANYTHING IMPORTANT TO THE KNUCKLE OR ANY UNDERLYING

12   STRUCTURES.

13   Q.    AND DID INMATE KLAKER HAVE ANY OTHER INJURIES THAN

14   THOSE TWO PLACES WHERE THE HIDE WAS PEELED BACK?

15   A.    NONE THAT I NOTICED.

16   Q.    SIR, I'D LIKE TO CALL YOUR ATTENTION TO ANOTHER

17   INCIDENT THAT TOOK PLACE SEPTEMBER 30TH -- ACTUALLY

18   SEPTEMBER 30TH, 1993.

19              DID YOU TREAT A VICTIM OF ANOTHER ASSAULT WHOSE

20   NAME WAS JIMMY LEE INMAN?

21   A.    YES, SIR.

22   Q.    WILL YOU PLEASE DESCRIBE FOR THE JURY HOW YOU LEARNED

23   ABOUT THAT INCIDENT, HOW YOU CAME TO BE THERE.

24   A.    ONCE AGAIN, THERE WAS A RADIO MESSAGE COMING FROM

25   CONTROL THAT THERE WAS AN ALTERCATION OR FIGHT IN THE

1    RECREATION YARD.

2    Q.    WHAT DID YOU SEE WHEN YOU GOT TO THE RECREATION YARD?

3    A.    WELL, THE OFFICERS WERE STILL TRYING TO CONTROL AND

4    SEPARATE THE PARTICIPANTS.  INMAN HAD BLOOD ON HIS CLOTHES

5    AND SEVERAL OBVIOUS PUNCTURE MARKS ON HIS BODY WHICH WE

6    COULD SEE AT A QUICK GLANCE, AND WE PACKAGED HIM UP AND

7    MOVED HIM TO HEALTH SERVICES.

8    Q.    WHAT WOUNDS DID INMATE INMAN HAVE ON HIS BODY?

9    A.    I WOULD HAVE TO REFER BACK TO THE DIAGRAM TO GET THEM

10   ALL.  HE HAD A LACERATION THROUGH THIS PART OF HIS EAR ON

11   THE LEFT-HAND SIDE.  A LACERATION BACK SIDE OF HIS ELBOW.

12   PUNCTURE WOUNDS UP UNDERNEATH THE CORNER OF THE SHOULDER

13   BLADE.  PUNCTURE WOUND ON HIS LOWER BACK CLOSE TO THE

14   CENTERLINE ABOUT IN THE MIDDLE, THE VERTEBRAE THERE.  A

15   PUNCTURE WOUND ON HIS LEFT LOWER FLANK OR RIGHT DOWN IN

16   HERE, AND HE HAD SOME ECCHYMOTIC PATCHES OR BRUISING PATCHES

17   THAT RESEMBLED TEETH MARK OVER HERE.  AND HE HAD A PUNCTURE

18   WOUND OVER THE TOP OF HIS DISTAL OR OUT ON THE CORNER OF HIS

19   COLLARBONE.

20   Q.    MR. WELCH, YOU REFERRED TO LEFT AND RIGHT IN SOME THAT

21   ANSWER, BUT YOU POINTED TO A PUNCTURE WOUND IN THE CORNER OF

22   THE COLLARBONE.  WAS THAT THE LEFT COLLARBONE?

23   A.    LEFT COLLARBONE, YES.

24   Q.    SIR, DID I UNDERSTAND YOU TO SAY THAT THERE WERE TEETH

25   MARKS ON INMAN'S BODY?

1   A.    YEAH.  HE HAD A BRUISING PATTERN THAT RESEMBLED A

2   PINCHED STYLE AND ONE THAT RESEMBLED -- HAD THE DOUBLE

3   CURVATURE OF TEETH GOING DOWN HERE LIKE THAT, LEAVING A

4   LARGER AREA.  A NARROW PINCH AND A WIDER TEETH MARK PATTERN

5   RIGHT DOWN IN THIS AREA OVER HERE (INDICATING).

6   Q.    SIR, CAN YOU DESCRIBE SO THAT IT WILL BE REFLECTED ON

7   THE RECORD.  YOU SAID THE TEETH MARKS WERE RIGHT OVER HERE?

8   A.    THE NARROW PINCH ONE WAS HERE AND THE WIDE PINCH WAS A

9   LITTLE BIT TO THE SIDE OF IT.  OKAY.

10  Q.    AND IS IT A FAIR DESCRIPTION TO SAY YOU'RE INDICATING

11  THAT THE TEETH MARKS WERE OVER THE LOWER RIGHT RIBS OF THE

12  VICTIM?

13  A.    YEAH.  LOWER RIBS DOWN HERE JUST BELOW THE NIPPLE LINE

14  BY ABOUT AN INCH OR TWO, BALLPARK GUESS.

15  Q.    SIR, ARE YOU ABLE TO SAY WHETHER THE INJURIES TO THIS

16  VICTIM, TO JIMMY INMAN, WERE LIFE-THREATENING OR WHETHER YOU

17  SUSPECTED THAT?

18  A.    THE WOUNDS OR THE PUNCTURE MARKS THAT CONCERNED ME FROM

19  A LIFE-THREATENING POINT OF VIEW WERE THE TWO UNDERNEATH THE

20  SHOULDER BLADE HERE IN THE BACK.  IF YOU LOOK AT THE WEAPON

21  USED, IF IT'S ANY LONGER NECK, IN THAT AREA, IF THE ARM IS

22  ELEVATED, THE SHOULDER BLADE WILL BE NEAR UP CLEAR OF IT AND

23  IT WILL LEAVE A VERY NARROW AREA OF SKIN BETWEEN IT AND THE

24  CHEST CAVITY ITSELF.  AND THAT'S WHAT WOULD CONCERN ME,

25  POSSIBILITY OF PUNCTURING THROUGH ALLOWING -- OR FORCING

1    THAT LUNG TO COLLAPSE.

2    Q.   SIR, YOU INDICATED A LENGTH.   YOU SAID IF THE WEAPON IS

3    ANY LONGER THAN THAT.   CAN YOU STATE --

4    A.    THAT WOULD BE ABOUT AN INCH AND A HALF, OKAY?

5    Q.   CAN YOU DESCRIBE, PLEASE, VERY GENERALLY THE TREATMENT

6    THAT YOU PROVIDED TO THE VICTIM INMAN WHEN HE CAME TO HEALTH

7    SERVICES.

8    A.    WE TOOK AN A.P., INSPIRATION/EXPIRATION CHEST X-RAY,

9    DEEP BREATH IN, DEEP BREATH OUT, TO SEE IF WE COULD DETECT

10   ANY COLLAPSING OF THE LUNG AT THAT POINT.   WE STARTED AN

11   I.V. ON HIM ONCE AGAIN TO MAKE SURE THAT WE HAD I.V. ACCESS

12   SO IF HE WENT INTO ACUTE DISTRESS, WE WOULD BE ABLE TO

13   SUPPORT HIM BETTER, MAINTAIN HIM BETTER.

14            PUT HIM ON THE MONITORS, AND THEN WE MOVED HIM TO

15   MARION MEMORIAL HOSPITAL FOR FURTHER EVALUATION, BECAUSE THE

16   POSSIBILITY IN HIS SYMPTOMS AND THE SIZE OF THE WEAPON

17   INDICATED -- LED US TO BELIEVE THAT IT HAD ACCESS TO THE

18   LUNG SPACE, AND WE DIDN'T WANT IT TO -- HIM TO GO

19   UNSUPERVISED AND UNMONITORED AND HAVE THAT LUNG COLLAPSE AND

20   PUT HIM IN IMMEDIATE LIFE-THREATENING DISTRESS.   WE DID NOT

21   HAVE 24-HOUR COVERAGE OF PEOPLE THERE AT THE INSTITUTION TO

22   MONITOR HIM 24-7.

23            MR. WOLFE:  YOUR HONOR, I HAVE NOTHING FURTHER FOR

24   MR. WELCH.

25            THE COURT:  THANK YOU.

1          CROSS-EXAMINATION?

2          MR. GREEN:  THANK YOU, YOUR HONOR.

3                    CROSS-EXAMINATION

4    BY MR. GREEN:

5    Q.   MR. WELCH, YOU'VE BEEN AT THE MARION INSTITUTION SINCE

6    1986; IS THAT CORRECT?  OR WAS IT '84?

7    A.   '86.  JANUARY '86 TO DECEMBER '07.  I'M RETIRED.

8    Q.   OKAY.  AND DURING THAT TIME PERIOD, YOU WORKED AT NO

9    OTHER FEDERAL PENITENTIARY AS A PHYSICIAN ASSISTANT; IS THAT

10   CORRECT?

11   A.   THAT WAS MY THIRD INSTITUTION, SIR.

12   Q.   RIGHT.  BUT DURING THE TIME PERIOD FROM WHEN YOU

13   STARTED TO WHEN YOU RETIRED AT MARION, YOU DID NOT GO TO ANY

14   OTHER INSTITUTION AND WORK AS A PHYSICIAN ASSISTANT; IS THAT

15   CORRECT?

16   A.   I HAD A COUPLE OF TEMPORARY DUTY ASSIGNMENTS TO GO TO

17   LIKE FCI OXFORD TO HELP THEM WITH THEIR MEDICAL COVERAGE FOR

18   A COUPLE OF WEEKS TO A MONTH.

19   Q.   OKAY.  AND HOW DID THOSE OCCASIONS ARISE WHERE YOU GET

20   ASKED TO GO TO ANOTHER FACILITY WHEN YOU'RE ASSIGNED TO

21   MARION?

22   A.   GENERALLY THAT'S MADE BETWEEN THE WARDEN TO WARDEN.

23   Q.   IS THAT -- I'M SORRY.  GO AHEAD.

24   A.   ONE WARDEN WOULD SAY, *I'M EXTREMELY SHORT.  I NEED SOME*

25   *HELP FOR A SHORT PERIOD OF TIME*.  AND THEY MAKE ARRANGEMENTS

1   TO THE REGIONAL OFFICE ON WHICH INSTITUTION TO BEST HELP OUT

2   THEIR NEEDS OR HAVE AN ALLOWABLE SPACE TO LEND OUT ONE

3   PERSON FOR A SHORT PERIOD OF TIME.

4   Q.    OKAY.  ARE YOU FAMILIAR WITH THE TIME PERIOD WHEN THERE

5   WERE CRACK RIOTS IN A NUMBER OF DIFFERENT FEDERAL

6   INSTITUTIONS IN THE MID '90S?

7   A.    YES.  THERE WERE SEVERAL DISTURBANCES OVER THE YEARS.

8   Q.    AND SPECIFICALLY, WERE YOU CALLED UPON FOR YOUR

9   SERVICES AT THOSE OTHER INSTITUTIONS DURING THAT TIME?

10  A.    NO, SIR.

11  Q.    OKAY.  NOW, AS I UNDERSTAND IT, WITH RESPECT TO YOUR

12  POSITION, YOU NOT ONLY TREAT PEOPLE IMMEDIATELY WHO SUFFERED

13  AN INJURY BUT ALSO TAKE CARE OF PEOPLE WHO SUFFER FROM

14  ILLNESSES; IS THAT CORRECT?

15  A.    ROUTINE SICK CALL, YES, SIR.

16  Q.    OKAY.  AND IN ADDITION, NOT ONLY DO YOU TREAT AN

17  INMATE'S INJURIES OR AN OFFICER'S INJURIES BUT IF THEIR

18  INJURIES ARE SO GREAT THAT YOU'LL GIVE THEM ONGOING CARE;

19  CORRECT?

20  A.    THAT WOULD BE HANDLED THROUGH ROUTINE SICK CALL, YES,

21  SIR.

22  Q.    OKAY.  AND ROUTINE SICK CALL IS A DUTY THAT YOU

23  PERFORMED?

24  A.    AS NEEDED.

25  Q.    AS NEEDED; CORRECT?

1    A.    YEAH.

2    Q.    OKAY.  NOW, YOU'RE FAMILIAR WITH THE TERM "DEUCES"; IS

3    THAT CORRECT?

4    A.    YES.

5    Q.    OKAY.  CAN YOU TELL THE JURY WHAT "DEUCES" MEANS?

6    A.    THEY HAVE SEVERAL DIFFERENT MEANS OF ALERTING THE STAFF

7    THAT THERE'S TROUBLE AT A PARTICULAR AREA.  THE TERM

8    "DEUCES" COMES FROM THE USE OF THE TELEPHONE AS A MEANS OF

9    NOTIFYING CONTROL THAT YOU HAVE TROUBLE, IN WHICH CASE YOU

10   PICK UP A PHONE, DIAL THREE 2S, OR DEUCES.  THAT WILL

11   ACTIVATE A LIGHT IN CONTROL SO HE KNOWS WHERE THEY NEED HELP

12   AT.

13          AND OVER THE YEARS WHEN THEY STARTED USING THE

14   RADIOS, THEY USED THE TERM "DEUCES" BECAUSE IT MADE IT BY

15   EVERYBODY'S EARS PERK UP, OKAY, TO INDICATE THAT THERE WAS A

16   PROBLEM IN A PARTICULAR AREA AND STAFF NEEDED ASSISTANCE OR

17   SOMEBODY NEEDED ASSISTANCE RIGHT THEN AND THERE.

18          IT'S NOT LIKE A REGULAR TELEPHONE CALL, *COULD YOU*

19   *COME OVER?*  THAT GOES DOWN, THAT'S A WARNING SIGN THERE'S

20   SOME REAL BAD TROUBLE THERE OR STAFF IN DANGER AND THEY NEED

21   SOME HELP AT THAT SITE.

22   Q.    AND THAT'S A SPECIFIC PROCEDURE PROTOCOL WITHIN THE

23   BUREAU OF PRISONS; IS THAT CORRECT?  THAT WHEN DEUCES GO

24   OFF, THEN STAFF COMES AND ARRIVES AT THAT POINT?

25   A.    PRETTY MUCH.

```
1    Q.    NOW AS A PHYSICIAN ASSISTANT, WOULD YOU BE ONE OF THE

2    RESPONDING INDIVIDUALS WHEN THE DEUCES GO OFF.

3    A.    YES, SIR.  I'M THERE.

4    Q.    OKAY.  ARE YOU THERE TO ASSIST IN QUASHING THE

5    INCIDENT, OR ARE YOU THERE TO GIVE MEDICAL ASSISTANCE OR

6    BOTH?

7    A.    ACTUALLY BOTH.

8    Q.    OKAY.  ALL RIGHT.  AND SO --

9    A.    SO YOU CAN'T TREAT ANYBODY IF THEY'RE BUSY FIGHTING.

10   Q.    OKAY.  FAIR ENOUGH.  SO YOU'RE THERE TO HELP IN WHAT

11   ANY WAY YOU CAN WHEN THAT DEUCES GOES OFF; IS THAT CORRECT?

12   A.    YES, SIR.

13   Q.    OKAY.  AND I WOULD ASSUME AT THAT POINT IN TIME WHEN

14   THAT DEUCES GOES OFF AND YOU ARRIVE AT AN INCIDENT THAT HAS

15   CAUSED THAT DEUCES TO GO OFF, THAT THE PARAMOUNT IMPORTANCE

16   IS TO MAKE SURE THAT THE STAFF IS SECURE; CORRECT?  THAT

17   THEY'RE SAFE?

18   A.    WELL, IT'S TO MAKE SURE THE WHOLE AREA IS SECURE.

19   Q.    OKAY.  AND YOU GO IN THERE IN HUGE NUMBERS TO OUTNUMBER

20   THE INMATES ON THAT SPECIFIC TIER; IS THAT A FAIR STATEMENT?

21   A.    WELL, EVERYBODY THAT IS AVAILABLE AND CAN RESPOND DOES

22   RESPOND.

23   Q.    OKAY.  AND HAVE YOU EVER RESPONDED ON -- IN DEUCES WHEN

24   THE NUMBERS HAVE BEEN LESS THAN THE NUMBER OF INMATES

25   INVOLVED IN THE INCIDENT?
```

1    A.    YES, SIR.

2    Q.    OKAY.  AND WHAT WAS THAT NUMBER?  HAVE YOU RESPONDED TO

3    A DEUCES --

4    A.    IT WAS EVENING WATCH.  THERE WAS ONLY LIKE FOUR OR FIVE

5    OF US AVAILABLE TO RESPOND.

6    Q.    AND WHAT INCIDENT WAS THAT?

7    A.    I DON'T KNOW.  THIS HAPPENED -- THIS HAPPENED SEVERAL

8    TIMES.  I DIDN'T KEEP A LOG OF IT.

9    Q.    IN THAT INCIDENT WHERE ONLY FOUR OR FIVE OF YOU

10   RESPONDED FROM THE MARION -- WAS IT AT MARION?

11   A.    SOME AT MARION.  SOME AT USP TERRA HAUTE.

12   Q.    HOW MANY WERE INMATES WERE INVOLVED IN A QUARREL AT

13   THAT TIME WHEN ONLY FOUR OR FIVE OF YOU RESPONDED?

14            MR. WOLFE:  OBJECTION, RELEVANCE.

15            THE COURT:  WHERE ARE YOU GOING WITH THIS?  WHAT

16   IS THE RELEVANCE?

17            MR. GREEN:  JUDGE, HE HAD RESPONDED THAT THERE WAS

18   TOO MANY INCIDENTS TO COUNT, AND IT GOES TO THE ENVIRONMENT

19   OF MARION AT THE TIME RELATIVE TO THE CHARGES IN THIS

20   INDICTMENT.

21            THE COURT:  THE LAST QUESTION DIDN'T REALLY GO TO

22   THAT.  I MEAN, YOU'RE GOING --

23            MR. GREEN:  WELL, THE LAST QUESTION WAS A -- I'M

24   SORRY, JUDGE.  THE LAST QUESTION WAS A FOLLOW-UP TO HIS

25   RESPONSE THAT ONLY FOUR OR FIVE STAFF MEMBERS SHOWED UP ON A

1   DEUCES CALL.

2           THE COURT:  ALL RIGHT.  BUT YOU'VE GONE FAR BEYOND

3   THE -- THE STARTING -- YOU'VE GONE FAR BEYOND HIS INITIAL

4   RESPONSE, THE TESTIMONY HE GAVE ON DIRECT, WHICH WAS SIMPLY

5   AS TO THE NUMBER OF TIMES THAT HE RESPONDED TO AN INMATE

6   DISTURBANCE OR AN INMATE FIGHT.  SO THE OBJECTION IS

7   SUSTAINED.

8           MR. GREEN:  OKAY, JUDGE.  THEN I WOULD JUST ASK

9   THAT THIS WITNESS NOT BE EXCUSED SO WE COULD CALL HIM IN OUR

10  CASE IN CHIEF IF WE'RE LIMITED ON THAT GROUND.  OKAY?

11          THE COURT:  THAT'S FINE.

12  BY MR. GREEN:

13  Q.  WITH RESPECT TO THE ASSAULTS THAT YOU WERE TESTIFYING

14  TO TODAY, JUST WITH RESPECT TO MR. BURKETT AND MR. INMAN,

15  THE OTHER INDIVIDUALS THAT WERE TREATED, FOR EXAMPLE, FOR

16  MR. BURKETT, WAS A GENTLEMAN BY THE NAME OF MR. KLAKER; IS

17  THAT CORRECT?

18  A.  THAT'S CORRECT.

19  Q.  OKAY.  WERE THERE ANY OTHER INMATES THAT YOU TREATED

20  WITH RESPECT TO THOSE PARTICULAR -- I MEAN, TO THAT

21  PARTICULAR INCIDENT?

22  A.  NOT THAT I KNOW OF OR CAN RECALL.

23  Q.  OKAY.  AND I UNDERSTAND THAT THIS WAS A LONG TIME AGO

24  AND THAT YOU CAN'T RECALL, BUT YOU BROUGHT SOME OF THOSE

25  DOCUMENTS WITH YOU HERE TODAY; IS THAT CORRECT?

1   A.   I HAVE LIMITED PIECES OF THE MEDICAL RECORDS ON

2   MR. BURKETT AND MR. KLAKER.  I HAVE LIMITED PIECES OF THE

3   MEDICAL RECORD ON MR. INMAN.  AND I WAS ALSO GIVEN COPIES OF

4   LIMITED INJURY -- LIMITED MEDICAL RECORD ENTRIES ON KING,

5   KURT KING, AND ROGER MAYNARD.

6   Q.   OKAY.  RIGHT NOW I'M JUST TALKING ABOUT MR. BURKETT.

7   A.   OKAY.

8   Q.   AND I'M TRYING TO ASCERTAIN WHETHER OR NOT YOU HAVE AN

9   INDEPENDENT MEMORY OF ANY OTHER INMATE INVOLVED IN THAT

10  INCIDENT THAT REQUIRED MEDICAL TREATMENT?

11  A.   NO, I DON'T.  NOT AT ALL.  NOT OFF THE TOP OF MY HEAD.

12  Q.   DOES IT HELP REFERRING TO THOSE LIMITED MEDICAL RECORDS

13  THAT YOU HAVE BEFORE YOU, WOULD THAT HELP ASSIST YOU WITH

14  ANY OTHER -- WOULD THAT HELP ASSIST YOUR MEMORY AS TO

15  WHETHER ANY OTHER INMATE WAS TREATED AS A RESULT OF THE

16  INCIDENT WITH MR. BURKETT?

17  A.   IN -- NO, IT DOESN'T.  IT JUST REFERENCES THESE TWO

18  INDIVIDUALS.

19  Q.   OKAY.  AND THOSE -- I DIDN'T PROVIDE YOU THOSE REPORTS;

20  IS THAT CORRECT?

21  A.   NO.

22  Q.   DID YOU BRING THOSE REPORTS WITH YOU HERE TODAY?

23  A.   YES.

24  Q.   OKAY.  ARE THESE REPORTS THAT YOU BROUGHT FROM MARION,

25  ILLINOIS?

1    A.    THEY WERE PROVIDED ME BY THE U.S. ATTORNEY.

2    Q.    OKAY.  SO YOU DIDN'T BRING THEM WITH YOU FROM MARION,

3    ILLINOIS?

4    A.    NO, I DID NOT.

5    Q.    IS THAT CORRECT?

6            OKAY.  ALL RIGHT.

7            NOW GOING TO THE INCIDENT WITH JIMMY LEE INMAN,

8    THERE WERE TWO OTHER INMATES THAT WERE TREATED AS A RESULT

9    OF THAT INCIDENT BY YOU; IS THAT CORRECT?

10   A.    THEY WERE TREATED BUT NOT BY ME.

11   Q.    OKAY.  DID YOU HELP ASSIST IN THEIR TREATMENT?

12   A.    NOT THAT I KNOW OF.

13   Q.    OKAY.  DO YOU KNOW IF THERE WERE OTHER INMATES THAT

14   WERE MEDICALLY TREATED AT YOUR FACILITY ON SEPTEMBER 30 OF

15   1993 WITH RESPECT TO THE JIMMY LEE INMAN INCIDENT?

16   A.    NO, I DON'T.

17   Q.    WOULD REFERRING TO THE MEDICAL REPORT THAT YOU HAVE IN

18   FRONT OF YOU HELP REFRESH YOUR MEMORY AS TO WHETHER THERE

19   WERE ANY OTHER INMATES TREATED AS A RESULT OF THAT INCIDENT?

20   A.    NO, IT WOULD NOT.

21   Q.    OKAY.  AND THAT IS BECAUSE YOU DIDN'T TREAT THOSE

22   INDIVIDUALS; IS THAT CORRECT?

23   A.    THAT IS CORRECT.  AND ALSO THE ENTRIES ARE LIMITED TO

24   THE PERSON AT HAND, OKAY, OR IN THE ENTRY.

25   Q.    WHAT DOES THAT MEAN, "AT HAND"?

1    A.    WELL, IT WAS IN THAT PARTICULAR INMATE'S MEDICAL

2    RECORD, OKAY?

3    Q.    AND WHO MADE THOSE ENTRIES INTO THAT INMATE'S

4    PARTICULAR MEDICAL RECORD?

5    A.    IN INMAN'S CASE, IT WAS MYSELF.

6    Q.    OKAY.  AND ROGER MAYNARD'S CASE, WHO WAS IT, IF YOU

7    KNOW?

8    A.    I WOULD HAVE TO LOOK AT IT HERE --

9    Q.    OKAY.

10   A.    -- SEE IF I CAN RECOGNIZE HIS SIGNATURE.

11          THAT WAS MADE BY KITCHIE DILLOW, HIS P.A.

12   Q.    OKAY.  AND KURT KING'S ENTRIES WERE MADE BY WHO?

13   A.    FREEMAN W. BARGER, P.A.

14   Q.    OKAY.  NOW ARE THOSE TWO OTHER PHYSICIAN ASSISTANTS

15   THAT WORKED AT MARION AT THE TIME?

16   A.    YES, SIR.

17   Q.    OKAY.  FROM 1990 TO THE YEAR 2000, CAN YOU JUST GIVE ME

18   AN AVERAGE OF HOW MANY PHYSICIAN ASSISTANTS WERE EMPLOYED BY

19   THE MARION INSTITUTION?

20   A.    LET'S SEE HERE.  AT THE HIGH POINT, THERE WAS EIGHT OF

21   US.

22   Q.    AND THE HIGH POINT WOULD HAVE BEEN WHAT PERIOD OF TIME?

23   A.    SOMEWHERE AROUND '88.

24   Q.    SOMEWHERE AROUND '88?

25   A.    YES.  AND THEN WE STARTED LOSING PEOPLE.

106

1    Q.    AND THEN WHEN YOU SAY YOU "STARTED LOSING PEOPLE," IS

2    THAT BECAUSE THE POPULATION OF MARION WITH RESPECT TO

3    INMATES WENT DOWN SIGNIFICANTLY WITH THE OPENING OF ADX IN

4    FLORENCE IN COLORADO?

5    A.    NO.  IT WAS BY ATTRITION.  PEOPLE RETIRING.  PEOPLE

6    BEING TRANSFERRED.  PEOPLE COMPLETED THEIR OBLIGATION TO THE

7    GOVERNMENT.

8    Q.    DO YOU HAVE AN ESTIMATE OF WHAT THE PRISON POPULATION

9    OF MARION WAS AROUND 1990?

10   A.    NOT ACCURATELY.  I THINK WE HAD ABOUT 320 AT THE CAMP

11   AND SOMEWHERE AROUND 500 AND SOME, 5-, 600 STICKS IN MY

12   HEAD, BUT I DON'T KNOW IF THAT'S ACCURATE AT ALL.

13   Q.    AT THE PENITENTIARY ITSELF?

14   A.    INSIDE THE FENCE.

15   Q.    NOW IN 1995, DO YOU HAVE AN ESTIMATE?  WAS THAT

16   ESTIMATE PRETTY MUCH THE SAME AS IT WAS IN 1990?

17   A.    PRETTY CLOSE.  UP UNTIL THE TIME THEY STARTED

18   TRANSFERRING PEOPLE TO THE ADX AND OTHER PLACES.

19   Q.    OKAY.  SO YOU RECALL A PARTICULAR TIME WHERE THEY

20   STARTED TAKING THE INMATES FROM MARION INSTITUTION AND

21   TRANSFERRING THEM TO ADX WHICH BROUGHT THE INMATE POPULATION

22   DOWN; IS THAT CORRECT?

23   A.    YEAH.  THE ONES THAT HAD BEEN TRANSFERRED OUT TO OPEN

24   POPULATIONS AND ADX, THEY STARTED MOVING THEM IN '95.

25   Q.    OKAY.  ON DIRECT EXAMINATION IN RESPONSE TO A QUESTION,

1    YOU HAD MADE THE COMMENT *THERE WAS TOO MANY TO RECALL.* DO

2    YOU RECALL MAKING THAT STATEMENT WITH RESPECT --

3    A.    YES.

4    Q.    OKAY.  MARION WAS A -- WAS A VIOLENT INSTITUTION AT

5    THAT -- DURING THE 1990S; IS THAT A FAIR STATEMENT?

6    A.    THE '80S AND THE '90S AND UP UNTIL THE TIME THEY

7    SWITCHED OUT ITS MISSION.

8    Q.    AND MADE IT AN FCI; IS THAT CORRECT?

9    A.    YEAH, THAT IS CORRECT.

10   Q.    OKAY.  WEAPONS WERE PREVALENT AT THE INSTITUTION?

11   A.    IN MY ESTIMATION.

12   Q.    OKAY.  YOU MAY NOT KNOW THAT WEAPONS WERE PREVALENT,

13   BUT YOU KNOW THAT YOU TREATED MANY A WOUND THAT WERE CREATED

14   BY WEAPONS?

15   A.    OVER MY 22-YEAR COURSE AT MARION, YES.

16   Q.    THOUSANDS; IS THAT A FAIR ESTIMATE?

17   A.    I WOULDN'T SAY THAT HIGH.

18   Q.    WELL, DOES -- DOESN'T -- DURING YOUR TENURE AT MARION,

19   DIDN'T MARION KEEP STATISTICS ON THE NUMBER OF ASSAULTS THAT

20   WOULD OCCUR ON ANY GIVEN YEAR?

21   A.    NOT IN HEALTH SERVICES.

22   Q.    NOT IN HEALTH SERVICES.  OKAY.  WITH RESPECT TO

23   TREATING VICTIMS FOR ASSAULT, IS IT FAIR TO SAY THAT FROM

24   1995 THROUGH 1998, THAT YOU TREATED OVER 50 ASSAULTS IN THAT

25   THREE-YEAR PERIOD OF TIME?  WHEN I SAY "YOU," I MEAN ALL THE

1    PHYSICIANS AND YOURSELF AT MARION PENITENTIARY.

2              DOES THAT SOUND LIKE A FAIR ESTIMATE?

3    A.    I REALLY DON'T KNOW.

4    Q.    OKAY.

5              MR. GREEN:  NOTHING AT THIS TIME, JUDGE.  BUT I'D

6    ASK THAT HE BE SUBJECT TO RECALL.

7              THE COURT:  REDIRECT EXAMINATION?

8              MR. WOLFE:  NO REDIRECT, YOUR HONOR.

9              THE COURT:  THANK YOU.  YOU MAY STEP DOWN.

10             THE GOVERNMENT MAY CALL ITS NEXT WITNESS.

11             MR. WOLFE:  YOUR HONOR, THE GOVERNMENT CALLS BRIAN

12   HEALY.

13             THE COURT:  LADIES AND GENTLEMEN, YOU CAN TAKE A

14   STRETCH BREAK.  AND THE CLERK WILL HAVE YOU JUST WAIT OUT IN

15   THE HALLWAY FOR ONE MOMENT.

16             THE CLERK:  ALL RISE.

17        *(JURY OUT.)*

18        *(THE FOLLOWING PROCEEDINGS WERE HAD OUTSIDE THE*

19        *PRESENCE OF THE JURY:)*

20             THE COURT:  YOU CAN BRING THE WITNESS IN.

21        *(PAUSE.)*

22             THE COURT:  DO COUNSEL HAVE PROPOSED INSTRUCTIONS

23   FOR ME TO READ TO THE JURY AS -- ON THE EVIDENCE THAT WE

24   DISCUSSED DURING THE LUNCH BREAK?

25             MR. WOLFE:  IS YOUR HONOR REFERRING TO THE

1    INSTRUCTION ABOUT WITNESSES WHO RECEIVE BENEFITS?

2            THE COURT:  NO, I HAVE THAT ONE.  I'VE ALREADY

3    DONE THAT ONE.  WHAT ABOUT THE 404(B) EVIDENCE?  DO YOU HAVE

4    SOMETHING?

5            MR. SHOSTAK:  I CAN READ IT INTO THE RECORD.

6            THE COURT:  EVEN IF IT'S HANDWRITTEN, I CAN READ

7    IT.

8            MR. SHOSTAK:  I DON'T KNOW IF I --

9            THE COURT:  GO AHEAD AND READ IT INTO THE RECORD.

10           MR. SHOSTAK:  *TO THE EXTENT THAT THERE IS ANY*

11   *TRUTH OF THE ALLEGATION OF A PLOT TO BOMB FOLSOM PRISON, YOU*

12   *ARE TO CONSIDER THE EVIDENCE ONLY ON THE ISSUE OF THE*

13   *EXISTENCE OF AN ARYAN BROTHERHOOD CONSPIRACY AND NOT AGAINST*

14   *DEFENDANT SAHAKIAN PERSONALLY.*

15           THE COURT:  WELL, I WOULD CHANGE THE FIRST PART OF

16   THAT AND SAY --

17           OH, AND IS THE WITNESS BEING BROUGHT?

18           UNIDENTIFIED MARSHAL:  YES, HE IS.

19           THE COURT:  I WOULD CHANGE THE FIRST PART OF THAT

20   TO SAY -- TO READ THAT *IF YOU FIND -- IF YOU FIND THAT --*

21   SOMETHING TO THE EFFECT*, IF YOU FIND CREDIBLE THE EVIDENCE*

22   *OF THE PLOT OR CONSPIRACY TO BOMB FOLSOM PRISON, YOU ARE TO*

23   *CONSIDER THAT EVIDENCE FOR A LIMITED PURPOSE ONLY AND FOR NO*

24   *OTHER PURPOSE, THAT IS, AS IT BEARS ON THE EXISTENCE OF A*

25   *CONSPIRACY AMONG MEMBERS OF THE ARYAN BROTHERHOOD.*

1          NOW THE REST OF IT THAT MR. SHOSTAK SAID, I WOULD

2     NOT READ, AND THAT WAS THAT HE SAID *NOT AGAINST THE*

3     *DEFENDANT SAHAKIAN PERSONALLY.*

4          MR. WOLFE:  YOUR HONOR, MAY I ADD THAT I BELIEVE

5     IT'S ADMISSIBLE NOT ONLY ON THE QUESTION OF WHETHER THERE IS

6     A CONSPIRACY, BUT WHETHER DEFENDANT SAHAKIAN WAS A MEMBER.

7          MR. GREEN:  JUDGE, IF IT MAKES IT EASIER, WE'RE

8     STIPULATING THAT MR. SAHAKIAN'S A MEMBER OF THE ARYAN

9     BROTHERHOOD.  IF THAT'S NOT CLEAR, WE'RE STIPULATING TO

10    THAT.  I THOUGHT I SAID THAT IN MY OPENING STATEMENT BUT --

11         MR. WOLFE:  THE ALLEGATION IS NOT THAT HE'S A

12    MEMBER OF THE ARYAN BROTHERHOOD, YOUR HONOR, IT IS THAT

13    THERE IS A CRIMINAL CONSPIRACY IN COUNT 2 AND THAT HE'S A

14    MEMBER OF COUNT 2, THERE'S A CRIMINAL ORGANIZATION IN

15    COUNT 1 AND THAT HE'S A MEMBER OF THE ORGANIZATION.

16         THE COURT:  BUT THE ARYAN BROTHERHOOD IS A

17    CRIMINAL CONSPIRACY AS ALLEGED IN COUNT -- WAS IT 1 OR 2?

18         MR. WOLFE:  THE ENTERPRISE IS COUNT 1.  THE

19    CONSPIRACY IS COUNT 2.

20         THE COURT:  ALL RIGHT.  AS OF -- *THAT THE ARYAN*

21    *BROTHERHOOD IS A CRIMINAL -- IS A RACKETEERING ENTERPRISE AS*

22    *ALLEGED IN COUNT 1 AND A CRIMINAL CONSPIRACY AS ALLEGED IN*

23    *COUNT 2, AND THAT MR. SAHAKIAN IS A MEMBER OF THE*

24    *CONSPIRACY.*

25         MR. WOLFE:  AND THE ENTERPRISE, YOUR HONOR.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1              THE COURT:  ALL RIGHT.  I WILL PATCH THAT TOGETHER
 2   WHEN WE GET TO THAT EVIDENCE.
 3              MR. WOLFE:  VERY WELL, YOUR HONOR.
 4        (PAUSE.)
 5        (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT
 6        IN THE PRESENCE OF THE JURY:)
 7              THE CLERK:  PLEASE BE SEATED.
 8              LET THE RECORD REFLECT THE PRESENCE OF ALL MEMBERS
 9   OF THE JURY AGAIN PRESENT IN THE COURTROOM.
10              THE GOVERNMENT MAY CALL ITS NEXT WITNESS.
11              MR. WOLFE:  YOUR HONOR, THE GOVERNMENT CALLS BRIAN
12   HEALY.
13              THE COURT:  THANK YOU.
14              THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.
15               BRIAN HEALY, PLAINTIFF'S WITNESS, SWORN
16              THE WITNESS:  I DO.
17              THE CLERK:  PLEASE STATE YOUR FULL NAME AND SPELL
18   YOUR LAST NAME FOR THE RECORD.
19              THE WITNESS:  BRIAN DEVLIN HEALY, H-E-A-L-Y.
20              THE COURT:  THANK YOU.  YOU MAY INQUIRE.
21              MR. WOLFE:  THANK YOU, YOUR HONOR.
22                       DIRECT EXAMINATION
23   BY MR. WOLFE:
24   Q.   MR. HEALY, HAVE YOU EVER BEEN IN FEDERAL PRISON?
25   A.   YES.
```

112

1    Q.    ARE YOU IN CUSTODY NOW?

2    A.    YES.

3    Q.    WHEN WERE YOU LAST ON THE STREETS, MR. HEALY?

4    A.    1990.

5    Q.    WHEN DID YOU FIRST COME INTO PRISON CUSTODY?

6    A.    1984.

7    Q.    WAS THAT INSTANCE IN 1984 IN A FEDERAL PRISON OR A

8    STATE PRISON?

9    A.    STATE PRISON.

10    Q.    AND WHICH STATE WAS THAT, SIR?

11    A.    CALIFORNIA.

12    Q.    AND HOW MANY OCCASIONS HAVE YOU BEEN OUT OF PRISON

13    BETWEEN 1984 AND TODAY?

14    A.    PROBABLY ABOUT THREE OR FOUR.

15    Q.    WOULD YOU TELL THE JURY VERY BRIEFLY WHAT CRIMES YOU'VE

16    BEEN CONVICTED OF.

17    A.    WEAPON POSSESSIONS, ASSAULT ON PEACE OFFICERS,

18    ATTEMPTED MURDER ON A CORRECTIONAL GUARD, MURDER.  I BELIEVE

19    THAT'S IT.  I DON'T KNOW.  THERE MIGHT BE SOME MORE.

20    Q.    MR. HEALY, HAVE YOU EVER BEEN A MEMBER OF THE ARYAN

21    BROTHERHOOD?

22    A.    YES.

23    Q.    AND WHEN DID YOU BECOME A MEMBER?

24    A.    IN 1993.

25    Q.    WAS THAT -- SINCE YOU SAID YOU WERE LAST OUT OF PRISON

1   IN 1990, I TAKE IT THAT WAS WHILE YOU WERE IN CUSTODY?

2   A.   WHEN I BECAME A MEMBER?

3   Q.   YES, SIR.

4   A.   YES.

5   Q.   AND WHERE DID THAT TAKE PLACE?

6   A.   WHERE WAS I AT?

7   Q.   YES, SIR.

8   A.   PELICAN BAY, I BELIEVE.  STATE PRISON.

9   Q.   IS THAT A CALIFORNIA PRISON?

10  A.   YEAH.

11  Q.   MR. HEALY, WERE YOU EVER AN ASSOCIATE OF THE ARYAN

12  BROTHERHOOD PRISON GANG BEFORE YOU BECAME A MEMBER?

13  A.   YES.

14  Q.   WHEN WOULD YOU SAY YOU BECAME AN ASSOCIATE OF THE ARYAN

15  BROTHERHOOD?

16  A.   SOON AS I GOT TO PRISON, IN '84 UNTIL THE TIME I BECAME

17  A MEMBER.

18  Q.   WHAT WAS YOUR FIRST CONTACT WITH THE ARYAN BROTHERHOOD

19  WHEN YOU WENT TO PRISON IN CALIFORNIA IN 1984?

20  A.   IT WAS CHINO PRISON WHICH IS IN CHINO, CALIFORNIA.  IT

21  WAS A RECEPTION CENTER BACK THEN.  THERE WAS AN AB OVER

22  THERE NAMED RIVERSIDE.  HE WAS IN THE HOLE.  AND HE HAD SENT

23  WORD OUT TO GET PACKAGES FOR HIM, AND WE USED TO SEND

24  PACKAGES IN TO HIM, AND ALL.

25  Q.   AND YOU SAID THE AB MEMBER RIVERSIDE SENT A MESSAGE OUT

1    TO SEND PACKAGES TO HIM.

2    A.    UH-HUH.

3    Q.    WHAT KIND OF PACKAGES?

4    A.    FOOD AND ALL THAT.  COMMISSARY.

5    Q.    AND DID YOU DO THAT?

6    A.    YES.  I WASN'T THE ONLY ONE.  THERE WAS A LOT OF WHITE

7    GUYS THAT DID IT.

8    Q.    WHY DID YOU SEND FOOD AND COMMISSARY ITEMS TO AN ARYAN

9    BROTHERHOOD MEMBER WHO WAS IN THE HOLE AT CHINO?

10   A.    BECAUSE HE'S A WHITE GUY IN PRISON.  ARYAN BROTHERHOOD,

11   WHEN THEY'RE LOCKED DOWN, IF YOU CAN HELP THEM OUT, YOU DO

12   IT BECAUSE THERE'S A LOT OF TIMES IN THE HOLE THEY DON'T

13   HAVE A LOT OF STUFF, SO YOU TRY TO SEND STUFF BACK IN TO

14   THEM.

15   Q.    MR. HEALY, I UNDERSTAND WHY RIVERSIDE WOULD WANT TO BE

16   HELPED OUT WHEN HE'S IN THE HOLE.  WHY DID YOU WANT TO HELP

17   OUT AN AB MEMBER WHO WAS IN THE HOLE?

18   A.    BECAUSE I LOOKED UP TO HIM.  I WANTED TO BE PART OF

19   THAT GANG.  I IDENTIFIED WITH THEIR IDEOLOGIES AND

20   REPRESENTING THE WHITE CAUSE.

21   Q.    WHY DID YOU LOOK UP TO MEMBERS OF THE ARYAN BROTHERHOOD

22   IN 1984 WHEN YOU FIRST WENT TO PRISON?

23   A.    BECAUSE THEY WERE THE EPITOME OF EVERYTHING I STOOD

24   FOR, WHAT I BELIEVED IN.  THEY REPRESENTED THE WHITE RACE.

25   THEY DID EVERYTHING TO BENEFIT THE WHITE RACE, AND THAT'S

1    WHAT I WANTED TO BE PART OF.

2    Q.    TELL THE JURY A LITTLE MORE WHAT YOU MEAN ABOUT THEY

3    WERE THE EPITOME OF ALL YOU STOOD FOR WITH RESPECT TO THE

4    WHITE RACE.

5    A.    RESPECT, NOT LETTING NO OTHER RACES PUSH ON US

6    PERSONALLY OR ANYONE THAT'S PART OF THE WHITE RACE, OUTSIDE

7    THE RACE OR WITHIN THE RACE.  IF THERE'S CHILD MOLESTERS,

8    RAPISTS WITHIN OUR YARD, KILL THEM OR TRY TO KILL THEM, TAKE

9    THEM OFF THE YARD.

10          ANYONE OUTSIDE OUR RACE WOULD DO ANYTHING TO

11   ANOTHER WHITE MEMBER OR A WHITE PERSON, WE WOULD RESPOND

12   VICIOUSLY, VIOLENTLY WITH FORCE AND VIOLENCE, WEAPONS,

13   WHATEVER IT TOOK TO GET EVEN WITH THAT.  THAT'S BASICALLY

14   REPRESENTING THE WHITE CAUSE, WHAT I WAS TRYING TO DO.

15   Q.    AND YOU UNDERSTOOD THAT THE ARYAN BROTHERHOOD WAS THE

16   EPITOME OF THOSE THINGS; IS THAT RIGHT?

17   A.    YES.  GOOD, STRONG, STANDUP WHITE MEN.

18   Q.    DID THERE COME A TIME WHEN YOU LEFT THE ARYAN

19   BROTHERHOOD, MR. HEALY?

20   A.    I DON'T KNOW WHAT YOU MEAN, I LEFT THEM.

21   Q.    DID -- DID YOU EVER DROP OUT OF THE ARYAN BROTHERHOOD.

22   A.    OH, YES.

23   Q.    WHEN WAS THAT?

24   A.    I THINK LATE '97 OR EARLY '98.

25   Q.    WHY DID YOU DROP OUT?

1    A.    BECAUSE -- WELL, THERE'S MANY REASONS.  BUT ONE OF

2    THEM -- THE CATALYST FOR ME DROPPING OUT WAS REALIZING THAT

3    I KILLED ANOTHER MEMBER OF THE ARYAN BROTHERHOOD FOR THE

4    COMMISSION IN CALIFORNIA.  AND LATER ON THROUGH DISCOVERY I

5    FOUND OUT THAT THE REASONS I WAS GIVEN FOR MURDERING HIM

6    WEREN'T WHAT THE COMMISSION TOLD ME.  SO I FIGURED THEY LIED

7    TO ME, PUT ME OUT THERE AND USED ME.  SO I DECIDED TO ROLL.

8    Q.    IN ADDITION TO THE MURDER THAT YOU JUST DESCRIBED THAT

9    YOU COMMITTED FOR THE ARYAN BROTHERHOOD, WILL YOU TELL THE

10   JURY VERY BRIEFLY WHAT OTHER KIND OF CRIMES YOU'VE COMMITTED

11   FOR THE ARYAN BROTHERHOOD, IF THERE ARE ANY.

12   A.    ASSAULTS, TRANSPORTING OF WEAPONS AND DRUGS.  C-4,

13   MESSAGES.  I GUESS THAT'S ABOUT IT.  COULD BE OTHER THINGS,

14   I DON'T KNOW.  THAT'S PRETTY MUCH WHAT WE DID, THOUGH.

15   Q.    HAVE YOU KILLED ANYONE ELSE BESIDES THE ONE MURDER FOR

16   THE AB THAT YOU DESCRIBED?

17   A.    NO.  BUT I HAVE HAD TWO PEOPLE KILLED FOR THE ARYAN

18   BROTHERHOOD.

19   Q.    WHAT TWO OTHER PEOPLE HAVE YOU HAD KILLED FOR THE ARYAN

20   BROTHERHOOD?

21   A.    WELL, ONE WAS IN 1990.  ME AND ANOTHER FELLOW MEMBER

22   ARYAN BROTHERHOOD, EDDIE BURNETT, WAS IN CHINO IN THE HOLE.

23   AND EDDIE DECIDED THAT A GUY HAD TO GO AND TOLD ME TO TAKE

24   CARE OF IT.  AND I TALKED TO SOME GUY AND HAD HIM BEAT A

25   FELLOW TO DEATH IN HIS CELL AND KILL HIM.

1        AND THE OTHER ONE WAS A MEMBER OF THE ARYAN

2   BROTHERHOOD -- THAT GUY WASN'T A MEMBER, THE ONE THAT GOT

3   KILLED IN CHINO.  THE OTHER WAS ANOTHER MEMBER OF THE ARYAN

4   BROTHERHOOD, A GUY NAMED AARON MARSH.  AND I GOT WORD FROM A

5   COMMISSIONER TO TAKE HIM DOWN, AND I SENT A MESSAGE TO

6   ANOTHER BROTHER THAT HE WAS LIVING WITH, TOLD HIM THAT I HAD

7   WORD FROM THE COMMISSION TO KILL HIM, AND GO AHEAD AND KILL

8   HIM.  AND THEY KILLED HIM.

9   Q.   WHEN YOU BECAME ASSOCIATED WITH THE ARYAN BROTHERHOOD,

10  MR. HEALY, IN 1984, WERE YOU AWARE THAT YOU WERE GOING TO,

11  IF YOU CONTINUED THE ASSOCIATION, HAVE TO COMMIT CRIMES OF

12  THE SORT YOU JUST DESCRIBED?

13  A.   YES.  AND I LOOKED FORWARD TO IT.

14  Q.   WHY DID YOU LOOK FORWARD TO IT, MR. HEALY?

15  A.   BECAUSE I FELT LIKE THAT THE ONLY DIFFERENCE BETWEEN ME

16  AND THE MEMBERS OF THE ARYAN BROTHERHOOD AT THAT POINT WAS

17  THAT THEY HAD MORE EXPERIENCE AND MORE OPPORTUNITIES THAN I

18  HAD.  I BELIEVED I WAS VERY WILLING TO DO ANYTHING THAT

19  THEY'D DONE, AND I WAS WILLING TO PROVE IT.

20  Q.   AT THAT TIME, MR. HEALY, DID THE FACT THAT -- THE FACT

21  THAT YOU WERE WILLING TO PROVE THAT YOU COULD DO ANYTHING

22  THAT THE ARYAN BROTHERHOOD COULD DO MEANT COMMITTING CRIMES

23  REGULARLY, DID THAT BOTHER YOU AT ALL?

24  A.   NO.

25        DID YOU SAY DID IT BOTHER ME THAT I WAS GOING TO

1    COMMIT CRIMES?

2    Q.    YES.

3    A.    NO.

4    Q.    HAS YOUR ATTITUDE ON THAT POINT CHANGED AT ANY TIME

5    SINCE YOU BECAME AN ASSOCIATE OF THE ARYAN BROTHERHOOD?

6    A.    YES.

7    Q.    HOW DO YOU FEEL ABOUT COMMITTING CRIMES NOW?

8    A.    WELL, SINCE I'VE WALKED AWAY FROM THE ARYAN

9    BROTHERHOOD, I HAVEN'T BEEN IN ANY TROUBLE.  NONE.  I

10   JUST -- I REFUSE TO GET IN TROUBLE.  MY PRIORITIES ARE

11   DIFFERENT.  I DON'T HAVE AN INTEREST IN BREAKING THE LAW NO

12   MORE OR THE RULES OF THE PRISON.  I NOW PRIDE MYSELF ON NOT

13   HAVING ANY WRITEUPS OR BEING IN ANY TROUBLE.

14   Q.    EVEN THOUGH YOU SAID THAT YOU DROPPED OUT OF THE ARYAN

15   BROTHERHOOD, DO YOU REGARD YOURSELF AS A MEMBER OF THE AB

16   TODAY DESPITE HAVING DROPPED OUT, MEMBER NOT IN GOOD

17   STANDING OR SOMETHING OF THE SORT?

18   A.    I MEAN, I DON'T CONSIDER MYSELF A MEMBER OF NO ARYAN

19   BROTHERHOOD.  I MEAN, ONCE YOU'RE A MEMBER, YOU'RE ALWAYS A

20   MEMBER UNTIL YOU DIE.  BUT I MEAN, I DON'T CONSIDER MYSELF A

21   MEMBER.  I DON'T APPLY TO THEIR BYLAWS AND CODES AND

22   EVERYTHING THAT THEY STAND BY NOW.  IN FACT, I'M UP HERE

23   TESTIFYING AGAINST THEM.

24   Q.    DOES THE ARYAN BROTHERHOOD STILL REGARD YOU AS A

25   MEMBER?

```
1    A.    I DON'T KNOW.  YOU WOULD HAVE TO ASK THEM.  I DON'T

2    KNOW WHAT THEY WOULD REGARD ME AS.  PROBABLY A RAT.

3    Q.    AND PLEASE TELL THE JURY WHAT YOU MEAN WHEN YOU SAY THE

4    ARYAN BROTHERHOOD PROBABLY REGARDS YOU AS A RAT.

5    A.    IN ITS STRICTEST SENSE, YOU WOULD SAY A RAT IS SOMEBODY

6    THAT'S DOING WHAT I'M DOING TODAY, TESTIFYING AGAINST A

7    FELLOW MEMBER OF THE ARYAN BROTHERHOOD.

8          THERE ARE ALSO OTHER LESSER DEGREES OF A RAT.  YOU

9    KNOW, YOU CAN TELL AN OFFICER SOMETHING ON SOMEONE ELSE

10   WITHOUT ACTUALLY TESTIFYING, OR GIVE INFORMATION THAT

11   COMPROMISES SOME TYPE OF CRIMINAL ACTIVITY THAT YOU

12   SHOULDN'T DO.  I MEAN, THAT'S A LESSER DEGREE OF A RAT.

13         PUTTING SOMEBODY IN A POSITION AND THEN TELLING ON

14   SOMETHING, LETTING OFFICERS OR PRISON STAFF OR SOMEONE KNOW

15   SOMETHING IS GOING TO HAPPEN CONFIDENTIALLY, THAT'S A RAT.

16   THERE'S A WHOLE SLEW OF DIFFERENT LEVELS OF RAT.  BUT WHAT

17   I'M DOING HERE IS THE TOP OF THE LINE.  YOU CAN'T GET ANY

18   WORSE THAN WHAT I'M DOING.

19   Q.    MR. HEALY, YOU SAID IN AN ANSWER A MOMENT AGO THAT YOU

20   DON'T BELIEVE IN THE BYLAWS AND CODES OF THE ARYAN

21   BROTHERHOOD ANYMORE.  WHAT ARE SOME OF THE TENETS OF THE

22   BYLAWS AND CODES OF THE ARYAN BROTHERHOOD?

23         ACTUALLY, I WANT TO ASK YOU AN INTRODUCTORY

24   QUESTION.  WHEN YOU BECAME A MEMBER OF THE ARYAN

25   BROTHERHOOD, WAS IT THE CALIFORNIA ARYAN BROTHERHOOD OR THE
```

1    FEDERAL FACTION?

2    A.    CALIFORNIA STATE.

3    Q.    AM I CORRECT THAT THERE ARE TWO DIFFERENT FACTIONS OF

4    THE ARYAN BROTHERHOOD, ONE IN THE CALIFORNIA STATE PRISON

5    SYSTEM AND ONE IN THE FEDERAL PRISON SYSTEM?

6    A.    YES.  BUT THEY'RE BOTH THE SAME GANG.  JUST ONE WILL

7    MICROMANAGE FOR THE OTHER BECAUSE YOU HAVE TWO COMMISSIONS,

8    ONE IN THE FEDERAL AB AND THEN YOU HAVE ONE IN THE

9    CALIFORNIA AB.  WE DON'T DICTATE TO THEM, AND THEY DIDN'T

10   DICTATE TO US, BUT WE ALL COMMUNICATED AND STAYED IN LINE

11   WITH ONE ANOTHER AND WHAT WAS GOING ON.

12   Q.    PLEASE TELL THE JURY SOME OF THE BYLAWS AND CODES OF

13   THE CALIFORNIA FACTION OF THE ARYAN BROTHERHOOD THAT YOU

14   LEARNED WHILE YOU WERE AN ASSOCIATE AND A MEMBER.

15   A.    OH, A HIGH DEMAND OF RESPECT, LEADERSHIP QUALITIES,

16   RESPECT FOR A MAGNANIMOUS KILLER, NEVER COWARDICE IN BATTLE.

17   THAT'S PRETTY MUCH IT.  IT'S ALL I CAN THINK OF RIGHT NOW.

18   Q.    SIR, WILL YOU TELL THE JURY WHAT YOU MEAN BY SAYING

19   THAT IT'S A BYLAW OF THE ARYAN BROTHERHOOD, THE CALIFORNIA

20   ARYAN BROTHERHOOD, THAT MEMBERS DEMAND RESPECT?

21   A.    WELL, WE HAVE A HIGH DEGREE THAT WE DEMAND OF RESPECT

22   FROM EVERYONE, COPS, INMATES, WHITE, BLACK, BROWN.

23   EVERYONE, YOU HAVE TO RESPECT US.  AND OUR LINES ARE DRAWN

24   IN THE SAND ALL THE TIME, AND IF YOU CROSS THEM, WE WILL TRY

25   TO KILL YOU OR KILL YOU.

1          RESPECT IS VERY HIGH OVER THERE WITH THE ARYAN

2    BROTHERHOOD.  IT'S VERY DEMANDING.  VERY STRESSFUL.

3    ANYTHING CAN BE DISRESPECT.  IF YOU TALK OUT OF LINE TO

4    SOMEONE, YOU LOUD TALK THEM, YOU KNOW, THEY'LL GIVE YOU A

5    CHANCE, THEY'LL TELL YOU -- THEY'LL TRY TO CORRECT YOU, BUT

6    IF YOU DON'T -- YOU DO IT AGAIN, THEN THEY'RE GOING TO TRY

7    TO KILL YOU.

8    Q.   YOU SAY IF YOU LOUD TALK SOMEONE, THEY WILL TRY TO

9    CORRECT YOU ONCE, AND IF YOU DO IT AGAIN, THEY'LL TRY TO

10   KILL YOU.  CAN YOU EXPLAIN TO THE JURY WHAT YOU MEAN BY

11   THAT.

12   A.   LOUD TALKING WOULD BE LIKE IF I HAD AN ARGUMENT WITH

13   YOU, IF WE HAD A DISAGREEMENT AND I SAID SOMETHING THAT WAS

14   OUT OF LINE AND DISRESPECTFUL AND I STARTED GETTING LIKE

15   LOUD AND PUSHY AND ANGRY, THE BROTHER WOULD GENERALLY

16   PROBABLY TELL YOU*, HEY, LIGHTEN UP*, AND EXPLAIN TO YOU WHAT

17   YOU DID.  AND IF YOU DONE IT AGAIN, YOU'RE IN TROUBLE.

18          IT WOULD DEPEND ALSO, YOU KNOW, THE PATIENCE OF

19   THE PERSON THAT YOU'RE DOING IT WITH.  WHATEVER THE AB --

20   WHOEVER THE AB IS.  AND WOULD ALSO DEPEND ON THE PERSON THAT

21   HE'S DEALING WITH.

22          I MEAN, THERE'S DIFFERENT RELATIONSHIPS ARE GOING

23   TO GIVE MORE LEEWAY TO CERTAIN PEOPLE BECAUSE THEY BENEFIT

24   THE ARYAN BROTHERHOOD A LITTLE BIT MORE THAN OTHERS.  OTHER

25   GUYS, THEY'RE JUST LOOKING FOR A REASON TO KILL, SOME TARGET

1  PRACTICE.  OTHER GUYS JUST DO IT BECAUSE IT'S DISRESPECTFUL.

2  Q.    YOU SAID THAT SOME PERSONS WHO BENEFIT THE ARYAN

3  BROTHERHOOD MIGHT GET A LITTLE MORE SLACK.  CAN YOU EXPLAIN

4  WHAT YOU MEAN BY SOMEONE WHO MIGHT GET A LITTLE MORE SLACK

5  BECAUSE HE BENEFITS THE ARYAN BROTHERHOOD.

6  A.    WOULD BE LIKE IF I'M NOT A MEMBER OF THE ARYAN

7  BROTHERHOOD YET, BUT I'M AN ASSOCIATE AND I'VE PUT IN WORK

8  FOR SAHAKIAN, AND OTHER MEMBERS OF THE ARYAN BROTHERHOOD

9  KNOW THAT I PUT WORK IN FOR HIM BEFORE, WELL ME BEING AN

10  ASSOCIATE, I MAY HAVE MADE SOME MISTAKES AND GOT LOUD OR

11  SOMETHING, PEOPLE WOULD BE MORE LENIENT TOWARDS MY

12  SHORTCOMINGS AND TRY TO CORRECT THEM BECAUSE THEY KNOW I PUT

13  IN WORK FOR ANOTHER BROTHER ONE TIME, BUT I'M NOT A BROTHER

14  YET.

15        SOMEONE THAT DOESN'T HAVE THAT BEHIND HIM AND

16  STARTS ACTING UP IS NOT GOING TO GET THE SAME LEEWAY,

17  POLITICAL CLOUT THAT YOU'RE NOT GOING TO GET BECAUSE YOU

18  HAVEN'T PUT YOUR WORK IN AND DEMONSTRATED YET, *I'M A WORTHY*

19  *CAUSE, YOU CAN COUNT ON ME*, *BUT I GOT SOME PROBLEMS AND JUST*

20  *WORK WITH ME*.  AND SLOWLY THEY'LL WORK IT OUT, AND YOU WON'T

21  BE DOING IT NO MORE.  THAT'S WHAT THEY HOPE FOR.  BUT IF

22  NOT, THEN THEY'LL KILL YOU.

23  Q.    MR. HEALY, YOU USED THE PHRASE "PUT IN WORK" IN THAT

24  LAST ANSWER.  WILL YOU TELL THE JURY WHAT YOU MEAN BY SAYING

25  IN YOUR HYPOTHETICAL, SAY, *I'VE PUT IN WORK FOR ANOTHER*

1    *BROTHER*?

2    A.    PUTTING IN WORK CAN BE ANY NUMBER OF THINGS.  IT CAN BE

3    FROM KILLING TO TAKING CARE OF SOMEONE'S FAMILY ON THE

4    STREETS THROUGH FINANCIAL ASSISTANCE, SENDING MONEY IN,

5    MOVING MESSAGES, HITTING SOMEONE FOR ANOTHER BROTHER,

6    STANDING BESIDE A BROTHER IN THE TIME OF NEED.

7         THERE'S A LOT OF DIFFERENT THINGS THAT YOU COULD

8    DO TO PUT IN WORK.  BUT MOSTLY WHEN PEOPLE SAY "PUT IN

9    WORK," THEY'RE TALKING ABOUT GRABBING A KNIFE OR SOMETHING

10   AND TRYING TO KILL SOMEBODY.

11   Q.    MR. HEALY, YOU SAID THAT SOME PEOPLE WHO BENEFIT THE

12   ARYAN BROTHERHOOD WILL GET -- MIGHT GET A LITTLE SLACK.  I

13   THINK YOU SAID, *OTHER PEOPLE, YOU'RE JUST LOOKING FOR A*

14   *REASON TO KILL.*

15        WHY -- WHO ARE THE KINDS OF PEOPLE THAT AN ARYAN

16   BROTHERHOOD MEMBER MIGHT BE SIMPLY LOOKING FOR A REASON TO

17   KILL?

18   A.    THERE'S MANY SITUATIONS, BUT IF YOU GOT SOME YOUNGER

19   GUYS THAT ARE AROUND THAT ARE TRYING TO PROVE THEMSELVES TO

20   THE ARYAN BROTHERHOOD AND THERE'S NOT ENOUGH TARGETS AROUND,

21   THEN YOU WOULD WAIT AND THEN SEE IF SOMETHING WOULD COME UP,

22   YOU COULD SEND SOMEONE OUT AND DO TARGET PRACTICE ON THAT

23   GUY TO SEE HOW GOOD THIS GUY WAS, IF HE WAS A REAL KILLER OR

24   IF HE WAS JUST FAKING.  THAT WOULD BE ONE PERSON THAT

25   WOULDN'T HAVE MUCH CLOUT TO THEM.

1    Q.    DOES STATUS AS A BROTHER MAKE A DIFFERENCE IN WHETHER

2    SOMEONE CAN BE KILLED?

3    A.    I DON'T KNOW WHAT YOU MEAN.   STATUS AS A BROTHER?

4    Q.    ARE THE RULES DIFFERENT FOR KILLING SOMEBODY WHO IS OR

5    IS NOT AN ARYAN BROTHERHOOD MEMBER?

6    A.    YES.

7    Q.    WHAT ARE -- HOW DO THE RULES DIFFER FOR KILLING A

8    BROTHER AS OPPOSED TO SOMEONE WHO'S NOT A BROTHER?

9    A.    WELL, ONCE YOU BECOME A MEMBER OF THE ARYAN

10   BROTHERHOOD, YOU BASICALLY HAVE CARTE BLANCHE TO CALL ANY

11   SHOTS WHEREVER YOU GO REGARDING THE WHITE INMATES.   SO IF

12   I'M A MEMBER OF THE ARYAN BROTHERHOOD AND I GO TO FOLSOM

13   STATE PRISON AND THERE'S NO OTHER AB MEMBERS THERE BUT ME,

14   I'M GOING TO RUN THAT.   I'M GOING TO DRIVE IT THE BEST WAY I

15   KNOW HOW.   SOMEBODY NEEDS TO BE KILLED THAT'S WHITE, I'M

16   GOING TO MAKE SURE THAT THAT'S TAKEN CARE OF.   I'LL INSTRUCT

17   GUYS, WHO TO DO IT, HOW TO DO IT.

18         IF THERE'S A RACIAL TENSION, I CAN ALSO CALL THAT.

19   AS A NORMAL WHITE GUY, GENERALLY THEY WON'T DO THAT.

20   THEY'LL WAIT TILL THEY GET AUTHORIZATION FROM A MEMBER OF

21   THE ARYAN BROTHERHOOD.   AND IF IT GOES TOWARDS A MEMBER OF

22   THE ARYAN BROTHERHOOD, THE ONLY TIME YOU CAN KILL A FELLOW

23   MEMBER OF THE ARYAN BROTHERHOOD IS IF THE COMMISSION

24   AUTHORIZES IT.

25         AND IT'S VERY DANGEROUS TO GET OUT AND POLITIC

1    AGAINST ANOTHER BROTHER.  YOU GOT TO LET THE COMMISSION COME

2    TO YOU AND PRETTY MUCH INQUIRE OR MAKE THE DECISION ALREADY

3    AND THEN SAY, *YEAH, YOU KNOW WHAT, THIS GUYS'S IN POSITION.*

4    *GO AHEAD AND KILL HIM.*

5           YOU ARE NOT -- NO ONE IS ALLOWED TO PUT THEIR

6    HANDS ON A MEMBER OF THE ARYAN BROTHERHOOD.  NO ONE.  IF YOU

7    HAVE ONE BROTHER TO ANOTHER BROTHER THROUGH A FIGHT, AN

8    ARGUMENT, WHATEVER, IT JUST CAN'T HAPPEN.

9    Q.    MR. HEALY, YOU SAID NO ONE CAN PUT HIS HANDS ON A

10   MEMBER OF THE ARYAN BROTHERHOOD.  YOU MEAN THAT LITERALLY?

11   A.    WHEN I -- YEAH.  PUT HANDS ON HIM, I MEAN, FORCEFULLY,

12   AGGRESSIVELY.  YEAH, LITERALLY, YOU CANNOT DO THAT, NOT

13   WITHOUT SOME REPERCUSSIONS.

14   Q.    AND WHAT WOULD BE THE REPERCUSSIONS?

15   A.    VIOLENCE.  THE AB'S GOING TO TRY TO KILL YOU.

16   Q.    SINCE YOU'VE BEEN AN ASSOCIATE AND A MEMBER OF THE

17   ARYAN BROTHERHOOD, ARE YOU AWARE OF ANY OCCASION WHEN ANY

18   BROTHER WAS KILLED BY SOMEONE WHO WASN'T A --

19           THE COURT:  I'M SORRY.

20           THE WITNESS:  I DIDN'T HEAR THE LAST PART.

21   BY MR. WOLFE:

22   Q.    SINCE YOU'VE BEEN AN ASSOCIATE AND A MEMBER, ARE YOU

23   AWARE OF ANY OCCASION WHEN A MEMBER OF THE ARYAN BROTHERHOOD

24   WAS KILLED BY SOMEONE WHO WASN'T ALSO A MEMBER?

25   A.    NO.

```
 1        (PAUSE.)

 2   BY MR. WOLFE:

 3   Q.   WOULD THE RULE YOU JUST DESCRIBED ABOUT LAYING HANDS ON

 4   A BROTHER, IF A NONMEMBER PUNCHED A MEMBER OF THE ARYAN

 5   BROTHERHOOD, YOU'RE SAYING THAT YOU CAN'T DO THAT WITHOUT

 6   REPERCUSSIONS?

 7   A.   YES, THAT'S WHAT I'M SAYING.

 8   Q.   AND THE REPERCUSSIONS ARE THAT THE AB WILL TRY TO KILL

 9   YOU?

10   A.   YEAH.  THEY'LL SEND SHOOTERS OUT, PEOPLE THAT ARE

11   EITHER ASSOCIATES OF THE ARYAN BROTHERHOOD OR A MEMBER WHO

12   WILL ACTUALLY TRY TO KILL THAT PERSON FIRST CHANCE THEY GET,

13   IF THEY'RE ON A YARD OR SOMETHING.

14        THEY'RE NOT GOING TO TRY TO SMACK HIM OR KICK HIM

15   IF THEY'RE IN HANDCUFFS OR, YOU KNOW, SPIT ON HIM OR

16   SOMETHING.  THEY'RE GOING TO BIDE THEIR TIME, WAIT TO GET

17   INTO A POSITION, AND THEN EXECUTE THE PLAN AND TRY TO KILL

18   THE GUY.

19   Q.   MR. HEALY, DO YOU KNOW --

20        THE COURT:  IS NOW A GOOD BREAKING POINT?

21        MR. WOLFE:  YES, YOUR HONOR.

22        THE COURT:  WE'LL TAKE OUR AFTERNOON RECESS NOW,

23   LADIES AND GENTLEMEN.  AND WE'LL BE IN RECESS FOR 15

24   MINUTES.

25        AND AGAIN, PLEASE REMEMBER THAT YOU'RE NOT TO
```

1    DISCUSS THE CASE, ANYTHING RELATED TO THE CASE, ANY OF THE

2    WITNESSES, PARTICIPANTS, ANY OF THE EVIDENCE.  AND DON'T

3    FORM ANY OPINIONS ABOUT ANY OF THOSE THINGS AS WELL.

4        (*JURY OUT.*)

5        (*THE FOLLOWING PROCEEDINGS WERE HAD OUTSIDE THE*

6        *PRESENCE OF THE JURY:*)

7            THE COURT:  I APOLOGIZE FOR THAT, BUT MR. KIM WAS

8    HELPING ME PUT INTO WRITING THIS PROPOSED JURY INSTRUCTION

9    FOR YOUR REVIEW BEFORE I GIVE IT TO THE JURY.

10           THANK YOU.  WE ARE IN RECESS.

11       (*RECESS.*)

12       (*THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT*

13       *IN THE PRESENCE OF THE JURY:*)

14           THE COURT:  LET THE REFLECT THE PRESENCE OF ALL

15   MEMBERS OF THE JURY, OF ALL COUNSEL, THE DEFENDANT ALSO

16   PRESENT, THE WITNESS ON THE WITNESS STAND.

17           YOU MAY CONTINUE.

18           MR. WOLFE:  THANK YOU, YOUR HONOR.

19                       DIRECT EXAMINATION

20   BY MR. WOLFE:

21   Q.  MR. HEALY, JUST BEFORE THE BREAK, YOU TESTIFIED ABOUT

22   THE FACT THAT NO ONE CAN PUT HANDS ON AN AB MEMBER WITHOUT

23   THERE BEING REPERCUSSIONS.

24           DO YOU RECALL THAT TOPIC?

25   A.  YES.

1    Q.    DO YOU KNOW OF A MAN NAMED JIMMY LEE INMAN?

2    A.    YES.

3    Q.    HAVE YOU EVER MET JIMMY INMAN?

4    A.    NO.

5    Q.    HOW HAVE YOU HEARD OF JIMMY LEE INMAN?

6    A.    THROUGH OTHER BROTHERS.

7    Q.    AND IS JIMMY LEE INMAN, AS YOU LEARNED ABOUT HIM

8    THROUGH OTHER ARYAN BROTHERHOOD MEMBERS, IS HE AN INSTANCE

9    OF WHAT HAPPENS WHEN YOU LAY HANDS ON A BROTHER?

10          MR. SHOSTAK:  I'M GOING TO OBJECT TO THAT, YOUR

11   HONOR, TO THE FORM OF QUESTION.  I DON'T UNDERSTAND THAT

12   THERE WAS A CONNECTION BETWEEN MR. INMAN AND A BROTHER OF

13   THE ARYAN BROTHERHOOD, FIRST OFF; BUT, SECONDLY, IT CALLS

14   FOR HEARSAY.

15          THE COURT:  THE OBJECTION IS OVERRULED.

16          YOU MAY ANSWER.

17          THE WITNESS:  CAN YOU REPEAT THE QUESTION?

18   BY MR. WOLFE:

19   Q.    IS JIMMY LEE INMAN, AS YOU KNOW ABOUT IT, IS MR. INMAN

20   AN EXAMPLE OF WHAT HAPPENS TO SOMEBODY WHO LAYS HANDS ON A

21   BROTHER?

22   A.    I DON'T KNOW WHAT HAPPENED TO HIM.

23   Q.    WELL, YOU KNOW WHAT THE AB WANTED TO HAPPEN TO HIM,

24   DON'T YOU?

25   A.    YES.

1    Q.    AND WHAT DID THE ARYAN BROTHERHOOD DECIDE THEY WANTED

2    TO HAPPEN TO JIMMY INMAN?

3    A.    THEY WANTED HIM KILLED.

4    Q.    AND WHY DID THE AB -- LET ME BACK UP A HAIR.

5          THIS IS THE CALIFORNIA ARYAN BROTHERHOOD THAT

6    WANTED JIMMY INMAN KILLED; IS THAT RIGHT?

7    A.    YES.  BUT AGAIN FED AND STATE IS ONE AND THE SAME.  BUT

8    THE INCIDENT TOOK PLACE IN CALIFORNIA, DEPARTMENT OF

9    CORRECTIONS.

10   Q.    WHAT WAS THE INCIDENT THAT TOOK PLACE THAT CAUSED THE

11   AB TO DECIDE THEY WANTED JIMMY INMAN KILLED?

12   A.    THERE WAS AN OLD AB MEMBER BY THE NAME OF PHIL FORTMAN.

13   HIM AND DOC, WHICH IS INMAN'S -- I USED TO CALL HIM DOC.

14   THEY WERE ON THE YARD TOGETHER.  HE GOT IN AN ARGUMENT WITH

15   PHIL.  SUPPOSEDLY HIT PHIL.  SUCKER PUNCHED HIM, AND HE GOT

16   INTO A FIGHT.  SINCE THEN THEY HAVE BEEN CHASING HIM DOWN,

17   TRYING TO KILL HIM.

18          THE COURT:  MR. HEALY, I'M GOING TO ASK YOU TO

19   MOVE A LITTLE CLOSER TO THE MIKE, OR YOU CAN CAREFULLY

20   ADJUST IT.  IT'S A LITTLE FRAGILE.  BUT MAKE SURE IT'S

21   PICKING UP YOUR VOICE, ALL RIGHT?

22          THANK YOU.

23   BY MR. WOLFE:

24   Q.    WHAT'S INVOLVED IN THE AB TRYING TO KILL JIMMY INMAN?

25   HOW DO THEY DO IT?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    A.   IT WOULD DEPEND ON WHERE HE'S AT, WHO'S PRIVY OF THE

2    CONSPIRACY, WHICH CHANNELS THEY ARE GOING HAVE TO USE TO

3    COMMUNICATE IT.   THERE'S A WHOLE BUNCH OF STUFF THAT COME

4    INTO PLAY.

5    Q.   HOW DID YOU LEARN THAT ARYAN BROTHERHOOD WANTED TO KILL

6    JIMMY INMAN?

7    A.   THROUGH AN AB MEMBER NAMED EDDIE BURNETT.

8    Q.   AND WHEN DID YOU LEARN FROM EDDIE BURNETT THAT THE

9    CALIFORNIA AB WANTED TO KILL JIMMY INMAN?

10   A.   IN 1990.

11   Q.   AND WHERE WERE YOU WHEN YOU LEARNED FROM THAT, FROM

12   MR. BURNETT?

13   A.   IN CHINO PRISON.

14   Q.   WHAT WAS THE OCCASION FOR MR. BURNETT TELLING YOU THAT

15   THE ARYAN BROTHERHOOD WANTED JIMMY INMAN KILLED?

16   A.   I DON'T KNOW.  ME AND EDDIE WAS JUST TALKING.  HE'S ONE

17   OF MY SPONSORS THAT PUT ME UP FOR SPONSORSHIP IN THE ARYAN

18   BROTHERHOOD.

19        AS I RECALL IT, I THINK HE WAS JUST GIVING ME

20   EXAMPLES AND EXPLAINING SOME OF THE INNER WORKINGS OF HOW

21   THE AB WORKED.  I WAS INQUIRING ABOUT SOME THINGS BECAUSE I

22   HADN'T SEEN EDDIE FOR A WHILE AND I DIDN'T KNOW WHAT WAS

23   GOING ON WITH THE AB AT THE TIME, SO WE STARTED TALKING AND

24   THAT CAME UP THROUGH CONVERSATION.

25   Q.   TELL THE JURY, PLEASE, WHAT IT MEANS WITHIN THE ARYAN

```
 1   BROTHERHOOD THAT EDDIE BURNETT WAS ONE OF YOUR SPONSORS?
 2   A.   WHEN YOU ARE BEING PUT UP FOR MEMBERSHIP WITH THE ARYAN
 3   BROTHERHOOD, WHAT HAPPENS IS YOU WILL HAVE A PRIMARY SPONSOR
 4   AND THEN YOU WILL HAVE A SECONDARY SPONSOR.  YOU CALL IT
 5   "RAISING YOUR HAND FOR SOMEONE."  BASICALLY WHAT IT IS IS
 6   ONE BROTHER HAS TO PUT YOUR NAME UP AND LET OTHER BROTHERS
 7   KNOW THAT HE WANTS TO MAKE YOU A MEMBER.  THERE HAS TO BE
 8   ANOTHER GUY THAT WILL RAISE HIS HAND AS WELL, SO YOU HAVE
 9   TWO ACTUAL MEMBERS OF THE ARYAN BROTHERHOOD THAT ARE GOING
10   TO SPONSOR YOU.
11          ONCE YOU ARE SPONSORED, THEN YOUR NAME IS GIVEN TO
12   THE COMMISSION.  THIS IS CALIFORNIA.  THIS IS HOW CALIFORNIA
13   RUNS IT.  AND THEN YOUR NAME IS GIVEN TO THE COMMISSION.  IF
14   THE COMMISSION AUTHORIZES YOU OR YOUR SPONSORSHIP TO START,
15   THEN YOU WILL START AND YOU HAVE A TWO-YEAR WAITING PERIOD
16   TO BECOME A MEMBER.  THERE'S THINGS THAT YOU'LL HAVE TO DO
17   DURING THAT TWO-YEAR PERIOD.
18   Q.   EDDIE BURNETT, WAS HE YOUR PRIMARY OR YOUR SECONDARY
19   SPONSOR IN CALIFORNIA AB?
20   A.   PRIMARY SPONSOR.
21   Q.   SIR, I THINK YOU SAID THAT MR. BURNETT WAS TELLING YOU
22   ABOUT THINGS IN THE AB WHEN HE TOLD YOU THIS ABOUT JIMMY
23   INMAN.  WHAT WAS THE PURPOSE OF HIM TELLING YOU ABOUT JIMMY
24   INMAN AND THE OTHER THINGS THAT YOU DISCUSSED IN CHINO
25   PRISON THEN?
```

```
 1   A.   ME AND EDDIE GOT PRETTY TIGHT THERE IN CHINO.  I KNEW

 2   HIM IN OLD FOLSOM.  DIDN'T KNOW HIM WELL THERE.  HE WAS ONE

 3   OF THE HIGHER RANKING AB MEMBERS.  BUT HE HAD SEEN ME AROUND

 4   IN FOLSOM.  SO WHEN WE GOT TO CHINO PRISON THERE IN THE

 5   HOLE, WE STARTED TALKING AND I STARTED ASKING HIM ABOUT

 6   CERTAIN PEOPLE, WHAT HAPPENED TO THEM.  BECAUSE I HADN'T

 7   BEEN AROUND FOLSOM AND THEM GUYS BECAUSE A LOT OF STUFF WAS

 8   HAPPENING AT THAT POINT, WHICH I'M SURE WE'LL GET INTO.

 9          SO HE STARTED GIVING ME UPDATES ON THINGS.  HE

10   LIKED WHAT HE SEEN WITH ME.  AND I DID A HIT FOR HIM OUT

11   THERE ON THE MAINLINE WHEN I FIRST GOT BUSTED, SO HE JUST

12   LIKED WHAT HE SEEN.  AND THEN, I HAD THAT OTHER DUDE KILLED

13   FOR HIM, SO HE JUST -- WE STARTED TALKING AND THAT'S HOW IT

14   CAME UP.

15   Q.   WHY DID YOU ASK EDDIE BURNETT FOR UPDATES ABOUT WHAT

16   HAD HAPPENED TO PEOPLE?  JUST IDLE CURIOSITY, OR DID IT HAVE

17   SOMETHING TO DO WITH AB?

18   A.   NO.  EDDIE ASKED ME WHAT HAPPENED TO ME.  I MEAN, I WAS

19   STILL DOING THINGS FOR THE WHITES.  BUT I KIND OF STEPPED

20   BACK A LITTLE BIT FROM THE AB, BECAUSE DURING THAT TIME FROM

21   ABOUT '87 UNTIL ABOUT '92, THERE WAS A LOT OF CONFLICT

22   WITHIN THE ARYAN BROTHERHOOD IN THE STATE.

23          AND DURING MY LAST MONTH THERE IN FOLSOM, THERE

24   WAS THIS -- IN OLD FOLSOM, THERE WAS A LOT OF THINGS THAT

25   WAS GOING ON THAT I DIDN'T REALLY CARE MUCH FOR AND I DIDN'T
```

1    KNOW WHAT WAS HAPPENING AND IT WAS WITHIN THE ARYAN

2    BROTHERHOOD, AND I WASN'T A MEMBER OF THE ARYAN BROTHERHOOD

3    AT THAT POINT.

4              SO I ERR ON THE SIDE OF CAUTION.  I MEAN, I JUST

5    DIDN'T JUST WALK AWAY FROM THE WHITE CAUSE.  I WAS STILL

6    PUTTING WORK IN, BUT I JUST -- I WASN'T INTIMATELY

7    ASSOCIATING WITH THE ARYAN BROTHERHOOD AT THAT TIME UNTIL

8    THEY WORKED OUT THEIR DIFFERENCES.  BECAUSE YOU HAD TWO

9    DIFFERENT TEAMS AND ALL OF THEM WERE KILLERS, AND I DIDN'T

10   WANT TO FALL IN THE MIDDLE OF IT UNTIL THEY GOT THEIR

11   PROBLEMS RESOLVED.

12             SO WHEN I GOT WITH EDDIE, THERE WAS CERTAIN GUYS

13   THAT I KNEW IN FOLSOM THAT I WAS WONDERING, YOU KNOW, I

14   HADN'T SEEN THEM FOR A WHILE AND WE WERE INQUIRING ABOUT

15   WHAT WAS GOING ON.  AND HE WAS ASKING ME WHAT HAPPENED TO

16   ME.  AND THROUGH THAT CONVERSATION, THAT'S HOW THAT CAME UP.

17   A BUNCH OF OTHER STUFF CAME UP AS WELL.

18   Q.   WHEN EDDIE BURNETT TOLD YOU ABOUT JIMMY INMAN HAD AN

19   ARGUMENT WITH PHIL FORTMAN, DID EDDIE BURNETT HAVE IN MIND

20   THAT YOU WERE GOING TO DO SOMETHING WITH THE INFORMATION?

21   A.   I DON'T KNOW THAT HE DID.  I THINK IT WAS MORE

22   INSTRUCTIVE BECAUSE THAT WAS AT A POINT WHEN WE WERE -- HE

23   HAD ALREADY TALKED ABOUT PUTTING ME UP.  AND WHEN HE GOT

24   BACK TO PELICAN BAY -- HIS CELLY WAS ROBERT GRIFFIN, ALSO

25   KNOWN AS "BLINKY," ONE OF THE COMMISSIONERS OF THE ARYAN

1    BROTHERHOOD, AND HE WAS GOING TO PUT ME UP.

2         SO HE STARTED EXPLAINING SOME OF THE INNER

3    WORKINGS OF THE ARYAN BROTHERHOOD, AND HE WAS TALKING ABOUT

4    NOBODY PUTS THEIR HANDS ON A BROTHER, EVER.  THAT WAS ONE OF

5    THE EXAMPLES HE EXPLAINED, AND THERE WAS ANOTHER ONE THAT HE

6    EXPLAINED, TOO.  A GUY NAME JAMES REDDENBAUGH WAS ANOTHER

7    SITUATION WHERE A DUDE GOT IN A FIGHT WITH JAMES REDDENBAUGH

8    IN THE YARD AND JAMES REDDENBAUGH ACTUALLY GOT SHOT.  IT WAS

9    OVER A HANDBALL GAME.  AND THAT GUY WAS A GOOD DUDE, BUT HE

10   NEVER -- HE NEVER CAME TO THE YARD WITH THE AB'S AGAIN OR

11   ANYTHING, BECAUSE HE WAS IN --

12        THE COURT:  WOULD YOU REPEAT THE LAST PART OF YOUR

13   ANSWER:  BECAUSE HE WAS --

14        THE WITNESS:  I'M SORRY.  IN THE HAT.  IN OTHER

15   WORDS, HE WAS ON THE HIT LIST WITH THE ARYAN BROTHERHOOD.

16   THEY WERE GOING TO KILL HIM, IF THEY GOT TO HIM.

17   BY MR. WOLFE:

18   Q.   AND JIMMY INMAN WAS ANOTHER EXAMPLE OF SOMEONE WHO WAS

19   IN THE HAT FOR LAYING HANDS ON A BROTHER?

20   A.   YES, SIR.

21   Q.   MR. HEALY, DID YOU EVER ASK SOMEONE TO SPONSOR YOU FOR

22   MEMBERSHIP IN THE ARYAN BROTHERHOOD?

23   A.   NO.  MY EXPERIENCE, YOU ARE NOT ALLOWED TO DO THAT.

24   Q.   WHY ARE YOU NOT ALLOWED TO ASK SOMEBODY TO SPONSOR YOU

25   FOR THE AB?

1    A.   BECAUSE WHOEVER YOU WOULD BE ASKING TO DO THAT WOULD

2    INSTANTLY BE SUSPICIOUS OF YOU AS TO YOUR MOTIVES TO GET IN.

3    IF SOMEONE INQUIRES ABOUT HAVE YOU EVER CONSIDERED BECOMING

4    A BROTHER, THEN YOU TALK ABOUT IT.  BUT YOU CAN'T JUST GO UP

5    TO AN AB MEMBER AND START TALKING ABOUT IT.  *HEY, BY THE*

6    *WAY, I WAS WONDERING WHAT THE CHANCE OF ME GETTING IN THE*

7    *AB?*

8         THAT JUST DON'T HAPPEN.  THEY WILL NEVER DO IT.

9    Q.   THEY HAVE TO ASK YOU FIRST?

10   A.   IT'S INVITATION ONLY.

11   Q.   AFTER EDDIE BURNETT AGREED TO SPONSOR YOU, TOLD YOU

12   THAT HE WOULD SPONSOR YOU, DID YOU BECOME A MEMBER OF THE

13   ARYAN BROTHERHOOD IN THE END?

14   A.   YES.

15   Q.   WHAT KIND OF PROCESS DID YOU GO THROUGH IN YOUR

16   PROBATIONARY PERIOD?

17   A.   WELL, DEPENDS ON WHERE YOU ARE AT AND WHAT THE

18   SITUATION IS THAT YOU ARE IN.  I MEAN, IT WOULD VARY FROM

19   PLACE TO PLACE.

20   Q.   IN WHAT WAY DOES IT VARY?  WHAT THINGS HAVE TO HAPPEN

21   DURING THE PROBATIONARY PERIOD?

22   A.   OKAY.  DURING YOUR PROBATION PERIOD, IF ME AND ANOTHER

23   MEMBER PUT A GUY UP, IT GOES TO THE COMMISSION.  THE

24   COMMISSION AGREES THAT HIS TWO-YEAR PROBATION PERIOD IS

25   GOING TO START.  DURING THAT TIME, IDEALLY, YOU WOULD WANT

1    THE POTENTIAL BROTHER TO BE WITH OTHER AB MEMBERS SO THEY

2    CAN GET A GAUGE ON HOW HE CONDUCTS HIMSELF, WHAT KIND OF

3    THINGS HE DOES, HOW HE REPRESENTS THE ARYAN BROTHERHOOD.

4            AT THAT POINT, YOU ALSO HAVE A LITTLE BIT MORE

5    SENIORITY.  WHEREAS, IF YOU GO TO A YARD OR SOMETHING AND

6    THERE'S NO AB MEMBERS, YOU ARE THE LEADER OF THAT YARD.  YOU

7    ARE SPEAKING FOR THE AB AT THAT POINT.  YOU LEARN ABOUT, YOU

8    KNOW, CONCEALING WEAPONS, MAKING WEAPONS, JUST DIFFERENT

9    THINGS LIKE THAT.

10           AT THE END OF THAT TWO-YEAR PROBATION PERIOD, IF

11   ANY BROTHER, PART OF THE ARYAN BROTHERHOOD, IF ANYONE

12   OBJECTS TO YOUR MEMBERSHIP, YOU WON'T GET IN.  IF NO ONE

13   OBJECTS TO YOUR MEMBERSHIP, NO MEMBERS, THEN IT WOULD GO TO

14   THE COMMISSION.  IF THE COMMISSION FINALLY DECIDES TO MAKE

15   YOU A BROTHER, THEN YOU BECOME A BROTHER OF THE ARYAN

16   BROTHERHOOD.  AGAIN, THAT'S THE STATE.  THAT'S HOW THE STATE

17   RUNS IT.

18   Q.   AND WHAT HAPPENS IF ONE BROTHER OBJECTS?

19   A.   YOU DON'T GET MEMBERSHIP.  SOMEONE WILL TELL YOU, *HEY,*

20   *LOOK.  THEY SHOT YOU DOWN.*

21           IT'S NOT UP FOR DEBATE.  THEY WON'T DISCUSS IT.

22   NO ONE WILL TRY TO INFLUENCE THE BROTHER THAT OBJECTED TO

23   YOUR MEMBERSHIP.  THEY WON'T TRY TO INFLUENCE HIS VOTE.

24   THEY'LL SAY HE SAID "NO," AND THEY WON'T EVEN TELL YOU WHO

25   SAID IT.  THEY WILL JUST SAY, *RIGHT NOW, THEY ARE GOING TO*

1  *GIVE YOU ANOTHER SIX MONTHS OR A YEAR, WHATEVER.  WE'LL GET*

2  *BACK AT YOU.  JUST HANG OUT AND IT WILL WORK OUT.*

3  Q.   SO YOU SAID THAT EVEN A PROBATIONARY MEMBER, IF HE WENT

4  TO A YARD WHERE THERE WAS NO OTHER ARYAN BROTHERHOOD MEMBER,

5  COULD LEAD THAT YARD.

6       DO YOU REMEMBER THAT?

7  A.   YES.  I DIDN'T SAY "PROBATIONARY MEMBER."  I SAID

8  "POTENTIAL."

9  Q.   I'M SORRY.  WHAT IS IT ABOUT THE ARYAN BROTHERHOOD THAT

10 WOULD ALLOW A POTENTIAL MEMBER TO LEAD A YARD IN THE

11 CALIFORNIA STATE PRISON SYSTEM?

12 A.   SAY THAT AGAIN.  WHAT WOULD WHAT?

13 Q.   WHY WOULD OTHER INMATES ALLOW A POTENTIAL ARYAN

14 BROTHERHOOD MEMBER TO LEAD A YARD IN A CALIFORNIA STATE

15 PRISON?

16 A.   WELL, BECAUSE A LOT OF TIMES YOU CAN GO TO A YARD WITH

17 WHITE GUYS THAT DON'T HAVE ACTUAL CONTACT WITH THE ARYAN

18 BROTHERHOOD AND IF THEY DON'T HAVE CONTACT WITH AN ACTUAL

19 MEMBER, SOMETIMES THEY ARE RELUCTANT TO RESPOND TO THINGS

20 BECAUSE THEY DON'T WANT TO CROSS A LINE AND GET CROSSED UP

21 WITH THE AB AS FAR AS BUSINESS GOES.

22       BUT IF YOU HAVE SOMEONE THAT'S A POTENTIAL MEMBER,

23 YOU DON'T GO TO THE YARD AND SAY, *LOOK, I'M PUT UP FOR*

24 *MEMBERSHIP IN THE ARYAN BROTHERHOOD.*  YOU JUST GO THERE AND

25 START DRIVING.  ANYBODY SAYS ANYTHING, YOU TELL THEM, *LOOK,*

1    *I'M DRIVING.* AND THEY GENERALLY SAY, *OKAY. WELL, WHAT DO*

2    *WE DO?*

3         BECAUSE THEN THEY HAVE SOMEONE TO DEFER TO TO MAKE

4    THESE CRITICAL DECISIONS RATHER THAN THEMSELVES AND THEN

5    POSSIBLY CROSS A LINE AND GET CROSSED UP.  THAT'S HOW GUYS

6    WILL LET YOU RUN THE YARD.

7    Q.   SIR, WHAT DO YOU MEAN WHEN YOU SAY, "YOU JUST GO THERE

8    AND START DRIVING"?

9    A.    IN OTHER WORDS, YOU GOT THE KEYS TO THE YARD.  AS SOON

10   AS YOU --

11        IF I WAS IN PELICAN BAY AND I WENT DOWN TO FOLSOM,

12   WHEN I GOT THERE, GENERALLY, MY REPUTATION, EVERYBODY WOULD

13   ALREADY KNOW ME.  SO I'M COMING FROM PELICAN BAY.  SO AS

14   SOON AS I COME IN, ALL THE WHITE DUDES WILL START GETTING AT

15   ME WITH KITES AND STUFF, TELLING ME WHAT'S GOING ON OR,

16   GENERALLY, YOU ARE GOING TO KNOW SOMEONE FROM THAT YARD BUT

17   YOU ARE IN THE HOLE THERE SO YOU ARE NOT ACTUALLY ON THE

18   GENERAL POPULATION YARD BECAUSE YOU'RE AB, SO YOU'RE LOCKED

19   DOWN.

20        BUT YOU HAVE CONTACTS WITH OTHER PEOPLE THAT'S ON

21   THE YARD.  SO WHEN YOU GET THERE, PEOPLE JUST START

22   COMMUNICATING ALL THE THINGS THAT'S GOING ON ON THE YARD

23   WITH YOU.  AND THEN WHEN YOU'RE DRIVING, YOU ARE BASICALLY

24   TELLING THEM WHAT DECISIONS TO MAKE, HOW TO DO IT AND HOW TO

25   RESOLVE THE PROBLEMS.  AND THAT'S DRIVING.

1   Q.   AND WHAT KIND OF DECISIONS ARE INVOLVED IN DRIVING THE

2   YARD IN THE WAY YOU JUST DESCRIBED IT?

3   A.   WELL, AS A MEMBER -- IF I WENT SOMEWHERE, I WOULD FIND

4   OUT NOT WHO HAD THE KNIVES BUT THAT ALL THE WHITE GUYS HAD

5   KNIVES; THAT THEY WERE IN POSITIONS THAT -- I WOULD WANT TO

6   KNOW WHO WAS RUNNING ALL THE YARD ON WHICH YARD.  YOU GOT A

7   YARD, B YARD AND C YARD.  I WOULD WANT TO KNOW WAS ON THOSE

8   YARDS AND WHAT WHITE GUYS WERE ACTUALLY RUNNING THE YARD.

9        I WOULD FIND OUT WHO'S DOING WHAT, WHO'S MAKING

10  MONEY, WHO'S NOT MAKING MONEY, WHAT THEIR RELATIONSHIP IS

11  WITH THE BLACKS AND THE MEXICANS.  IT WOULD DEPEND ON WHAT'S

12  GOING ON IS WHAT MY RESPONSE WOULD BE.  I WOULDN'T GO IN

13  THERE AND JUST START CREATING PROBLEMS FOR THE WHITE GUYS.

14  I MEAN, I WOULD TRY TO SEE WHAT WAS GOING ON IN THERE.

15  Q.   THAT'S TRUE IF YOU ALONE -- THAT IS YOU, OR ONE OTHER

16  AB MEMBER -- WENT TO A YARD WHERE THERE WERE NO OTHER AB

17  MEMBERS.  THAT'S THE PROCESS THAT WOULD HAPPEN, EVEN THOUGH

18  IT'S JUST ONE AB MEMBER?

19  A.   IF THERE'S ONE.  IF THERE'S TWO THEN, BASICALLY, YOU

20  ARE GOING TO HAVE -- ANY MAJOR DECISIONS ARE GOING TO GO TO

21  THE SENIOR BROTHER, WHOEVER WHO HAS BEEN A MEMBER LONGER IS

22  GOING TO BE THE ONE THAT'S THE SENIOR BROTHER ON THE YARD.

23  BUT, BASICALLY, IT'S GOING TO BE THE SAME THING, BECAUSE

24  EVERYBODY PRETTY MUCH THINKS THE SAME WAY, AS FAR AS LIKE

25  THE VIOLENCE GOES.  THERE'S CERTAIN THINGS THAT ARE

1    ABSOLUTES.

2           I MEAN, IF A BLACK DUDE SMACKS A WHITE GUY AND

3    NOBODY DID ANYTHING, WELL, THEN, SOMEBODY IS GOING TO DO

4    SOMETHING.  IF MEAN, IF THERE'S PEOPLE BEING -- THEIR STUFF

5    IS BEING TAKEN FROM --

6           MR. SHOSTAK:  YOUR HONOR, I'M GOING TO OBJECT TO

7    THAT.

8           IT'S BEEN ANSWERED SOMETIME AGO AND IT'S A

9    RAMBLING ANSWER.

10          THE COURT:  WELL, I'M GOING TO CONSTRUE THAT AS AN

11   OBJECTION, NARRATIVE AND SUSTAIN IT.

12          MR. SHOSTAK:  YES.  THANK YOU.

13   BY MR. WOLFE:

14   Q.   IF THERE AREN'T TWO AB MEMBERS ON THE YARD, JUST ONE,

15   HOW IS IT THAT THE ARYAN BROTHERHOOD RUNS THE YARD WITH ONE

16   MEMBER PRESENT?

17   A.   BECAUSE THEY HAVE A LOT OF ASSOCIATES THAT WANT TO BE

18   PART OF THE ARYAN BROTHERHOOD.

19   Q.   MR. HEALY, WHILE YOU WERE -- YOU SAID YOU WERE AN

20   ASSOCIATE OF THE ARYAN BROTHERHOOD, THE STATE AB, FROM ABOUT

21   1984.  BECAME A MEMBER IN '93.  DROPPED OUT IN LATE '97 OR

22   EARLY '98.  DURING THAT PERIOD OF TIME, WHAT IS YOUR

23   RECOLLECTION OF THE APPROXIMATE NUMBER OF ARYAN BROTHERHOOD

24   MEMBERS IN THE CALIFORNIA STATE PRISON SYSTEM?

25   A.   ACTUAL MEMBERS, I WOULD SAY PROBABLY -- YOU MEAN WHILE

1    I WAS ACTIVE?

2    Q.   YES, SIR.

3    A.   MAYBE 35.  50.  SOMEWHERE LIKE THAT.

4    Q.   AND YOU SAID A MOMENT AGO THAT AB CAN RUN YARDS DESPITE

5    THEIR SMALL NUMBERS BECAUSE THERE'S A LOT OF ASSOCIATES.

6           CAN YOU ESTIMATE HOW MANY ASSOCIATES THERE WERE OF

7    THE STATE AB WHEN YOU WERE ACTIVE?

8    A.   NO, BECAUSE THAT'S A LARGE NUMBER.  YOU HAVE A BUNCH OF

9    PEOPLE THAT WOULD BE ON LEVEL THREE YARDS WHICH IS A LESSER

10   LEVEL YARD OF SECURITY.  YOU HAVE GUYS THAT'S ON MAINLINES

11   AND MAXIMUM SECURITIES THAT WANT TO BE PART OF THE ARYAN

12   BROTHERHOOD.  I MEAN, EVERY BROTHER HAS CONNECTIONS WITH

13   WHITE GUYS IN OTHER PLACES, AND THEY ARE GOING TO HAVE

14   CONNECTIONS WITH OTHER WHITE GUYS.  THERE'S NO WAY TO NAIL

15   DOWN HOW MANY ASSOCIATES THERE ARE.

16   Q.   WELL, IS IT TWO TIMES THE 35 TO 50 MEMBERS?  OR 10

17   TIMES, OR --

18   A.   I DON'T KNOW.  IT'S A LOT.  I COULDN'T PUT A NUMBER ON

19   IT.  I CAN'T EVEN BALLPARK A NUMBER.  THERE'S A LOT OF WHITE

20   GUYS.  ANYWHERE I GO WHEN I WAS ACTIVE, THERE WAS WHITE GUYS

21   STANDING THERE TRYING TO DO SOMETHING FOR ME WHATEVER IT WAS

22   THAT I NEEDED TO BE DONE.

23          WHEN I LEFT, I WOULD LEAVE THE KEYS AND SOMEBODY

24   ELSE MAY DO THEIR THING.

25   Q.   YOU SAID THAT ONE OF THE KINDS OF DECISIONS YOU WOULD

1  HAVE TO MAKE IF YOU WERE DRIVING A YARD IS ABOUT

2  RELATIONSHIPS BETWEEN WHITE INMATES AND BLACKS AND MEXICANS.

3  I'M GOING TO ASK YOU A LITTLE BIT ABOUT THAT.

4         WHAT KINDS OF RELATIONSHIPS DID THE ARYAN

5  BROTHERHOOD HAVE WITH OTHER PRISON GANGS IN THE CALIFORNIA

6  STATE SYSTEM WHEN YOU WERE ACTIVE?

7  A.   WELL, AGAIN, IT WOULD DEPEND ON THE SITUATION INVOLVED.

8  PRETTY MUCH EVERYONE WAS GETTING ALONG WHEN I WAS ACTIVE.  I

9  MEAN, WHEN I SAY "GETTING ALONG," WE WEREN'T WARRING.  NO

10 ONE WAS WARRING IN CALIFORNIA.  WE NEVER GOT ALONG WITH THE

11 NF.  BUT AS FAR AS THE MEXICAN MAFIA WENT, THE BLACK

12 GUERILLA FAMILY, WE DIDN'T HAVE NO PROBLEMS WITH THEM.

13 Q.   YOU SAID YOU DIDN'T GET ALONG WITH THE "NF."

14        WHAT DO YOU MEAN BY "NF"?

15 A.   *NUESTRO FAMILIA.*  THE NORTHERN FAMILY WHICH IS MEXICANS

16 FROM NORTHERN CALIFORNIA.

17 Q.   BUT YOU SAID YOU GOT ALONG PRETTY WELL WITH THE BLACK

18 GUERILLA FAMILY AND THE MEXICAN MAFIA?

19 A.   WELL, I MEAN, IT DEPENDS.  GET ALONG.  WELL, I MEAN, WE

20 WEREN'T WARRING.  I MEAN, CERTAIN BROTHERS THAT KNOWN

21 CERTAIN OTHER MEMBERS OF THE BLACK GUERILLA FAMILY OR

22 MEXICAN MAFIA FOR YEARS.  AND SO BY THEIR ASSOCIATION AND

23 THEIR FRIENDSHIP, WHATEVER YOU WANT TO CALL IT, EVERYONE

24 WAS, YOU KNOW, LAID BACK.  THERE WAS NO PROBLEMS.

25 Q.   WHAT KIND OF RELATIONSHIPS DID THE ARYAN BROTHERHOOD

1    MAINTAIN WITH CORRECTIONS OFFICERS?  PRISON GUARDS?

2    A.   DISTANT BUT RESPECTFUL.  WE DIDN'T DISRESPECT THEM;

3    THEY DIDN'T DISRESPECT US.  THAT'S ABOUT IT.  I MEAN, AS FAR

4    AS MY INTERACTION WENT, I NEVER REALLY MESSED WITH THEM

5    MUCH.

6    Q.   AND YOU SPOKE ABOUT THE DEGREES OF A RAT, PRIOR TO THE

7    BREAK IN YOUR TESTIMONY I THINK.  YOU SAID THAT WHAT YOU'RE

8    DOING, TESTIFYING IN COURT AGAINST ANOTHER ARYAN BROTHERHOOD

9    MEMBER, IS THE HIGHEST DEGREE OF A RAT.

10   A.   YES.

11   Q.   BUT THERE ARE LESSER DEGREES OF RAT INVOLVING TELLING

12   SOMETHING TO THE COPS?

13   A.   YES.

14   Q.   COULD YOU EXPLAIN WHAT KIND OF THINGS AMOUNT TO A

15   LESSER DEGREE OF BEING A RAT IN TERMS OF TELLING THINGS TO

16   COPS?

17   A.   HERE'S AN EXAMPLE.  IT'S AN ACTUAL EXAMPLE OF MY

18   EXPERIENCE.  I WAS INFORMED -- I TOLD YOU EARLIER ABOUT A

19   MURDER THAT I DID, AN AB MEMBER NAMED RAFFO.  I WAS INFORMED

20   THAT HE WAS A RAT AND THEY PUT THE LABEL "RAT" ON HIM

21   BECAUSE IN THIS CONTEXT, HE SUPPOSEDLY --

22           DURING THE LITTLE SPLIT THAT I WAS TELLING YOU

23   THAT WAS HAPPENING WITH THE ARYAN BROTHERHOOD, LATE 80S OR

24   THE EARLY '90S, HE SUPPOSEDLY TOLD HIS COUNCILOR OR SOMEONE

25   THAT HE COULD NOT BE ON THE YARD WITH ROBERT GRIFFIN WHO WAS

1  ONE OF THE COMMISSIONERS OF THE ARYAN BROTHERHOOD.  WELL,

2  RAFFO JUST SO HAPPENED TO FALL DOWN ON WENDELL NORRIS WHICH

3  IS ANOTHER COMMISSIONER THAT WENT ASTRAY.  RAFFO WAS ON HIS

4  SIDE.  WELL, THEY SAID THAT RAFFO WAS A RAT BECAUSE HE SAID

5  HE DIDN'T GET ALONG WITH GRIFFIN.  YOU CANNOT SAY THAT.  YOU

6  CAN'T SAY THAT YOU DON'T GET ALONG WITH ANYBODY.  THAT IS A

7  RAT.  I MEAN, MOST PEOPLE WOULD THINK, WELL, IF I DON'T GET

8  ALONG WITH SOMEBODY, I'M GOING TO AVOID THAT.  WELL, IT

9  DOESN'T WORK THAT WAY IN THE AB.  THAT'S ONE OF THE LESSER

10  DEGREES OF RATING.  IS TELLING SOMEBODY -- IF A COP ASKS

11  YOU, *DO YOU GET ALONG WITH THAT GUY?*, IF YOU SAY *NO,* WELL,

12  YOU JUST SNITCHED.THEY ASK YOU, *CAN YOU GO TO THAT YARD?* AND

13  YOU SAY *NO,* YOU JUST SWITCHED.  THAT'S LESSER DEGREES OF

14  RATTING.

15  Q.   AND WHAT'S THE PUNISHMENT FOR THE KIND OF SNITCHING YOU

16  JUST DESCRIBED?

17  A.   WITH THE AB, ANY SNITCH IS MURDER.  I DON'T CARE WHAT

18  IT IS.  THEY'LL KILL YOU.

19  Q.   MR. HEALY, HAVE YOU EVER HEARD OF AN INMATE NAMED JOEL

20  BURKETT?

21  A.   YES.

22  Q.   HAVE YOU EVER MET JOEL BURKETT?

23  A.   YES.

24  Q.   IS JOEL BURKETT AN EXAMPLE OF SNITCHING, THE WAY YOU

25  JUST DESCRIBED IT?

1    A.    NO.  JOEL BURKETT IS A LITTLE BIT DIFFERENT.

2    Q.    DO YOU UNDERSTAND JOEL BURKETT TO BE A SNITCH IN THE --

3    A.    YES.

4    Q.    -- TERMS OF THE AB?

5    A.    YES.

6    Q.    HOW DID THAT -- HOW DID HE ACQUIRE THAT STATUS?

7    A.    OKAY.  IN FOLSOM, I DON'T REMEMBER WHAT YEAR IT WAS.

8    IT WAS PROBABLY '85, MAYBE EARLY '86.  HE HAD SOME BULLETS,

9    AS I UNDERSTAND IT, AND TURNED THEM OVER TO LAW ENFORCEMENT

10   AND THE BULLETS BELONGED TO WENDELL NORRIS, BLUE, ONE OF THE

11   GUYS I JUST TOLD YOU ABOUT WAS A COMMISSIONER OF THE ARYAN

12   BROTHERHOOD.  AND THE REASON HE DONE IT WAS BECAUSE HE WAS A

13   RAPIST THAT HAD KILLED SOMEONE.AND AT THAT TIME, WE HAD --

14   WELL, NOT "WE," BECAUSE I WASN'T AB.  BUT THE AB HAD

15   SOMEONE -- AN OFFICER OR SOMEONE THAT WORKED IN CUSTODY THAT

16   WAS BRINGING OUT LISTS OF INMATES THAT HAD R'S ON THEIR

17   JACKET AND "R" IN CDC ON YOUR JACKET STANDS FOR RESTRICTED.

18   "RESTRICTED" MEANS YOU ARE A SEX OFFENDER OF SOME SORT.

19   EITHER YOU ARE A PEDOPHILE, OR YOU'VE RAPED A WOMAN.  YOU

20   HAVE SOME TYPE OF SEX STUFF ON YOUR JACKET.  THE AB DOESN'T

21   PLAY THAT SO THEY'LL KILL YOU FOR IT.

22         AT THAT TIME THEY WERE DOING A LOT OF CLEANING UP

23   ON THE YARD, BECAUSE THEY HAD ALL THESE LISTS COMING OUT

24   WITH ALL THESE SEX OFFENDERS.WELL, BURKETT OBVIOUSLY GOT

25   PARANOID BECAUSE HE KNEW HE HAD A RAPE ON HIS JACKET.  SO NO

1   ONE KNEW ABOUT IT.  HE WASN'T AB.  BUT NOBODY ACTUALLY KNEW

2   ABOUT IT, AND HE ASSOCIATED WITH THE ARYAN BROTHERHOOD.  AND

3   HE HAD THE BULLETS AND TURNED THEM OVER AND DISAPPEARED AND

4   CAME OVER TO THE FEDS SOMEWHERE.  AND HE TOLD ABOUT A BUNCH

5   OF OTHER STUFF, TOO, FROM MY UNDERSTANDING.

6   Q.   YOU SAID THERE WAS A CORRECTIONS OFFICER WHO WAS

7   BRINGING OUT INFORMATION ABOUT WHO HAD AN "R" ON YOUR

8   JACKET?

9   A.   YES.  SUPPOSEDLY, KIRK SMYTHE, AN AB MEMBER NAMED

10  SPANKY, HAD SOMEONE -- HE WAS IN FIVE BUILDING AT THE TIME,

11  AND HE HAD A STAFF MEMBER THAT WAS WORKING IN CUSTODY.  AND

12  THEY DON'T HAVE THAT NO MORE IN CDC.  IT'S MORE CONTROLLED.

13  BUT SOMEONE LIKED HIM AND WAS SUPPOSEDLY BRINGING OUT LISTS

14  OF NAMES --

15           MR. SHOSTAK:  JUDGE, I'M GOING TO OBJECT TO THAT

16  AS "SUPPOSEDLY."

17           THE COURT:  SUSTAINED.

18  BY MR. WOLFE:

19  Q.   MR. HEALY, WERE YOU INFORMED OF THIS BY OTHER AB

20  MEMBERS AND ASSOCIATES AS AN EXPLANATION FOR THE AB'S

21  ATTITUDE ABOUT JOEL BURKETT?

22  A.   YES.

23  Q.   WHAT WERE YOU TOLD ABOUT LEARNING THAT -- OF THESE "R"

24  JACKETS?

25  A.   SAY THAT AGAIN.

1  Q.   WHAT WERE YOU TOLD ABOUT AB MEMBERS, SPANKY'S ABILITY

2  TO LEARN WHO HAD AN "R" NOTATION ON HIS JACKET?

3  A.   AT THAT TIME, EVERY WHITE GUY ON THE YARD PRETTY MUCH

4  KNEW WHAT WAS HAPPENING.  THERE WAS NO BIG SECRET.  I MEAN,

5  IT'S PRETTY MUCH COMMON KNOWLEDGE.  WHEN I SAY "WHITE

6  GUYS,".  I MEAN THE GUYS THAT ARE IN THE LOOPS.  THE GUYS

7  THAT WERE AB ASSOCIATES.

8  Q.   AND WHEN YOU SAY THEY KNEW WHAT WAS HAPPENING, IS THAT

9  THE CLEANING UP ON THE YARD THAT YOU SAID A MOMENT AGO WAS

10 TAKING PLACE AT THAT TIME?

11 A.   NO.  SPANKY ACTUALLY HAD SOMEONE.  THEY DIDN'T KNOW

12 WHO.  I MEAN, I HAD CONVERSATIONS WITH WHITE GUYS.  SPANKY

13 HAD SOMEONE IN CUSTODY THAT WAS BRINGING OUT A LIST OF ALL

14 THE PEOPLE THAT HAD "R'S" ON THEIR JACKET.  AND THE WORD WAS

15 OUT.  YOU HAD A LOT OF WHITE GUYS THAT WERE DROPPING --

16 LOCKING UP AT THAT TIME.WHAT WAS THE FATE OF SOMEONE THAT

17 THE AB LEARNED HAD AN "R" FOR SEX OFFENDER ON HIS JACKET?

18 A.   MURDER.

19 Q.   DID I UNDERSTAND YOU TO SAY THAT AFTER JOEL BURKETT

20 DEVELOPED THIS FEAR THAT IT WOULD BE LEARNED HE HAD AN "R"

21 ON HIS JACKET, HE GAVE UP INFORMATION ABOUT SOME BULLETS?

22       .DID YOU SAY THAT HE THEN WENT TO THE FEDS?

23 A.   YES.  SUPPOSEDLY THAT'S WHAT I HEARD.  HE CAME OVER

24 HERE TO THE FEDS.  THAT'S WHAT I HEARD THEN.  AND THEN I

25 HEARD LATER HE WAS OVER HERE AS WELL.

1    Q.    AND YOU HEARD THAT FROM OTHER AB MEMBERS WHO WERE

2    TRYING TO FIND HIM, ESSENTIALLY?

3    A.    YEAH.

4    Q.    IF SOMEONE LIKE JOEL BURKETT OR JIMMY INMAN IS TO BE

5    KILLED BY THE ARYAN BROTHERHOOD -- CALIFORNIA ARYAN

6    BROTHERHOOD AND THEY ARE TRANSFERRED TO A FEDERAL PRISON,

7    DOES THE CALIFORNIA AB TAKE ANY STEPS TO HAVE THEM KILLED

8    ANYWAY?

9    A.    YES.

10    Q.    WHAT DO THEY DO?

11    A.    THEY HAVE CONNECTIONS WITH OTHER BROTHERS AND PEOPLE ON

12    THE STREETS THAT COMMUNICATE WITH OTHER AB MEMBERS IN THE

13    FEDS AND THEY WILL GET A MESSAGE OUT TO THEM.  THAT MESSAGE

14    WILL GO IN TO THE AB GUYS IN THE FEDS AND THEY WILL HANDLE

15    THEIR BUSINESS.  WITH NO QUESTIONS ASKED.

16    Q.    IS THERE ANYONE IN PARTICULAR THAT YOU KNEW WHEN YOU

17    WERE ACTIVE WHO WAS ON THE STREETS WHO PASSED MESSAGES

18    BETWEEN THE CALIFORNIA AB AND THE FEDERAL FACTION OF THE AB?

19    A.    YES.

20    Q.    WHO WAS THAT?

21    A.    SLOCUM.  RONALD SLOCUM.

22    Q.    PLEASE DESCRIBE FOR THE JURY WHO RONALD SLOCUM IS?

23    A.    RONALD SLOCUM IS -- THEY CALL HIM "SLO."  HE'S A

24    CALIFORNIA AB.  HE'S AN OLD TIMER.  HE WENT IN THE -- WAS IN

25    THE STATE FOR YEARS AND THEN DISCHARGED FROM THE STATE AND

1    WENT INTO THE FEDS AND WAS IN FEDS FOR A FEW YEARS.  I DON'T

2    KNOW HOW MUCH TIME HE DID OVER HERE.  AND THEN HE PAROLED

3    AND THEN STAYED IN COMMUNICATION WITH THE COMMISSIONERS IN

4    CALIFORNIA AND THE COMMISSIONERS IN THE FEDS, BECAUSE HE

5    KNEW ALL OF THEM.  ALL OF THEM WERE FRIENDS.

6    Q.   IF A MEMBER OF THE CALIFORNIA AB WHO KNEW WHO WAS TO BE

7    KILLED WAS PAROLED AND LATER CONVICTED OF A FEDERAL CRIME

8    AND WENT TO FEDERAL CUSTODY, WHAT WOULD BE THE STATUS OF THE

9    CALIFORNIA MEMBER WHO CAME TO BE IN FEDERAL CUSTODY?

10   A.   HE'S STILL A MEMBER OF THE ARYAN BROTHERHOOD.

11   Q.   WOULD HE HAVE THE SAME OBLIGATIONS TO THE AB IN THE

12   FEDERAL SYSTEM AS IN THE STATE SYSTEM?

13   A.   YES.  STILL HAVE THE SAME SENIORITY.  SAME CLOUT.

14   EVERYTHING.  SAME INFLUENCE.

15   Q.   ARE TRANSFERS LIKE THAT A USEFUL SOURCE OF INFORMATION

16   IN THE TWO FACTIONS?

17   A.   YES.

18   Q.   MR. HEALY, ARE THERE -- APART FROM THE FACT THAT YOU

19   SAID IN YOUR MIND THE STATE AB EPITOMIZED THE THINGS YOU

20   BELIEVED IN AT THE TIME YOU BECAME ASSOCIATED WITH THEM, ARE

21   THERE BENEFITS TO AN INMATE WHO BECOMES AN ASSOCIATE OR A

22   MEMBER OF THE AB?

23   A.   YES.

24   Q.   WHAT ARE THEY?

25   A.   ONCE YOU BECOME AN ASSOCIATE OF THE ARYAN BROTHERHOOD,

```
 1   YOU HAVE A CERTAIN AMOUNT OF RESPECT WHEREVER YOU GO.  IF
 2   I'M ASSOCIATING WITH THREE AB MEMBERS IN FOLSOM AND THEN I
 3   GO TO LA COUNTY, WELL, IN LA COUNTY SOME PEOPLE KNOW THAT I
 4   WAS KICKING IT WITH THOSE GUYS UP THERE.  WELL, PEOPLE ARE
 5   GOING TO HAVE A DIFFERENT -- THEY ARE GOING TO HOLD YOU IN A
 6   DIFFERENT LIGHT, BECAUSE THEY KNOW YOU HAVE CONTACTS WITH AB
 7   GUYS.  YOU CAN START MAKING MONEY EASIER, YOU KNOW.
 8            AS AN ASSOCIATE, YOU SAID; RIGHT?
 9   Q.   YES.
10   A.   YOU START MAKING MONEY.  YOU JUST -- IT'S JUST
11   DIFFERENT.  YOU HAVE A DIFFERENT -- EVERYONE PERCEIVES YOU
12   DIFFERENT.  THE WHOLE THING IS DIFFERENT NOW.
13   Q.   IS THAT TRUE OF SOMEONE WHO NOT ONLY BECOMES AN
14   ASSOCIATE BUT BECOMES A FULL MEMBER?
15   A.   OH, ABSOLUTELY.  WHEN YOU BECOME A FULL MEMBER, THEN
16   YOU'RE REALLY HELD IN HIGH REGARD FROM EVERYONE.
17   Q.   ARE THERE OBLIGATIONS OF AN AB ASSOCIATE?  THINGS THAT
18   IN RETURN FOR THE RESPECT, THE BENEFIT YOU JUST DESCRIBED,
19   ARE THERE THINGS THAT YOU ARE REQUIRED TO DO?
20   A.   YES.
21   Q.   WHAT IS AN ASSOCIATE OF THE STATE AB REQUIRED TO DO
22   BECAUSE OF HIS ASSOCIATION?
23   A.   ANYTHING THAT A MEMBER ASKS YOU TO DO.  BECAUSE A
24   MEMBER IS NOT GOING TO ASK YOU TO DO ANYTHING THAT HE
25   WOULDN'T DO, IN THEORY.
```

1   Q.    IT'S JUST AS BLANKET AS THAT?  ANYTHING A MEMBER ASKS

2   YOU TO DO YOU ARE OBLIGED TO DO?

3   A.    PRETTY MUCH, YEAH.

4   Q.    REGARDLESS OF WHETHER IT'S CRIMINAL?

5   A.    IT'S CRIMINAL, OR WHATEVER.  YOU GET CAUGHT, NO MATTER

6   WHAT IT IS.  WHEN YOU ARE TRYING TO MAKE A NAME FOR YOURSELF

7   WITH THE ARYAN BROTHERHOOD, YOU HAVE TO HAVE TUNNEL VISION.

8   YOU HAVE TO SEE NOTHING BUT THE SHAMROCK.  THE SHAMROCK

9   REPRESENTS THE ARYAN BROTHERHOOD.  YOU HAVE TO BE TOTALLY

10  FOCUSED AND DEDICATED TO THAT AND THAT ALONE.  YOU SACRIFICE

11  YOUR INDIVIDUALITY NOW FOR THE ARYAN BROTHERHOOD.  THAT'S

12  WHAT IT BECOMES AND EVERYTHING IS FOR THE CAUSE AND THE

13  ARYAN BROTHERHOOD.  THE TERM THEY LIKE TO USE IS "POLISHING

14  THE ROCK."

15  Q.    THAT'S TRUE EVEN IF IT'S DANGEROUS WHAT YOU'RE TOLD TO

16  DO?

17  A.    ABSOLUTELY.

18  Q.    EVEN IF IT'S GOING TO MEAN YOU SPEND MORE TIME IN

19  PRISON?

20  A.    IT'S BETTER THAT WAY.  IT'S MORE DANGEROUS.  AND YOU

21  GET CAUGHT, LEAVE A MARK.  IT'S DANGEROUS, BECAUSE IT LEAVES

22  AN IMPACT ALL THE OTHER PEOPLE IN PRISON, ALL POTENTIAL

23  VICTIMS, ANYONE THAT IS CONSIDERING CROSSING THE AB.  THE

24  MORE OUTLANDISH YOU CAN BE, THE MORE CRAZY YOU CAN BE,

25  THAT'S WHAT THEY WANT.

```
 1   Q.   MR. HEALY, IN TALKING ABOUT CRIMES THAT YOU COMMITTED

 2   FOR THE AB, YOU USED THE TERM C-4.  AT THE BEGINNING OF YOUR

 3   TESTIMONY.  WHEN YOU MENTIONED THAT, WHAT DID YOU MEAN BY

 4   THE PHRASE C-4?

 5   A.   IT'S SOME FORM OF PLASTIC EXPLOSIVE.  THAT'S ALL I

 6   KNOW.  I'M NO EXPLOSIVE EXPERT, BUT THAT'S ALL I KNOW ABOUT

 7   IT.

 8   Q.   WHAT DID YOU DO FOR THE ARYAN BROTHERHOOD THAT INVOLVED

 9   A PLASTIC EXPLOSIVE?

10   A.   I SMUGGLED --

11          MR. SHOSTAK:  I'M GOING TO OBJECT TO IT FOR THE

12   REASONS THAT WE PREVIOUSLY STATED.

13          THE COURT:  YOU MEAN AT THE LAST RECESS?

14          MR. SHOSTAK:  YES.

15          THE COURT:  THE OBJECTION IS OVERRULED.ARE YOU

16   ABOUT TO GET INTO THAT TOPIC AT THIS TIME?

17          MR. WOLFE:  YES, YOUR HONOR.

18          THE COURT:  ALL RIGHT.  BEFORE YOU DO THAT, LET ME

19   INSTRUCT THE JURY.ACTUALLY, BY THE WAY, LADIES AND

20   GENTLEMEN, THIS GIVES ME THE CHANCE TO EXPLAIN SOMETHING TO

21   YOU.  SOMETIMES -- MOST NOTABLY EARLIER TODAY WHEN I MADE

22   THAT BIG CLATTER BY DROPPING THE NOTEBOOK SO YOU COULDN'T

23   EVEN HEAR THE WITNESS' ANSWER TO THE QUESTION -- I APOLOGIZE

24   FOR THAT.  BUT SOMETIMES YOU SEE ME HANDING DOCUMENTS OR

25   TYPING SOMETHING AND HANDING SOMETHING TO MR. YOUNG, THE LAW
```

1    CLERK ON THIS CASE.  YOU ARE ABOUT TO SEE THE FRUITS OF

2    THAT.  SOMETIMES I'M PREPARING A --

3         USUALLY WHAT I AM DOING IS DOING SOME RESEARCH ON

4    SOMETHING THAT HAS COME UP IN A CASE, OR ABOUT TO COME UP,

5    OR PREPARING AN INSTRUCTION LIKE THE ONE I'M ABOUT TO READ

6    YOU.  SO I TRY NOT TO MAKE IT DISTRACTING, BUT I FAILED IN

7    THAT A FEW MOMENTS AGO AND I APOLOGIZE.

8         I'M GOING TO GIVE YOU A LIMITING INSTRUCTION THAT

9    YOU ARE TO CONSIDER:  IN CONSIDERING SOME OF THE TESTIMONY

10   YOU ARE ABOUT TO HEAR, YOU MAY REMEMBER THAT AT THE

11   BEGINNING OF THE CASE WHEN I WAS GIVING YOU A NUMBER OF

12   INSTRUCTIONS, ONE OF THOSE WAS THAT AT TIMES YOU MAY HEAR

13   EVIDENCE THAT YOU ARE TO CONSIDER ONLY FOR A LIMITED PURPOSE

14   AND FOR NO OTHER PURPOSE.  THIS IS ONE OF THOSE TIMES.SO YOU

15   ARE TO CONSIDER THE EVIDENCE YOU ARE ABOUT TO HEAR FOR THE

16   FOLLOWING LIMITED PURPOSE AND FOR NO OTHER PURPOSE.  IF YOU

17   FIND CREDIBLE, BELIEVABLE, THE EVIDENCE OR TESTIMONY THAT

18   YOU ARE ABOUT TO HEAR REGARDING A PLOT TO BOMB, SET OFF A

19   BOMB AT FOLSOM PRISON, THEN YOU ARE TO CONSIDER SUCH

20   EVIDENCE FOR THE FOLLOWING LIMITED PURPOSE AND FOR NO OTHER;

21   THAT IS, INSOFAR AS IT BEARS ON WHETHER OR NOT:  ONE, THE

22   ARYAN BROTHERHOOD EXISTED AS A RACKETEERING ENTERPRISE AS

23   ALLEGED IN COUNT 1 THE INDICTMENT AND DEFENDANT DAVID

24   SAHAKIAN PARTICIPATED IN THE RACKETEERING ENTERPRISE; AND

25   TWO, YOU CAN CONSIDER IT FOR THE LIMITED PURPOSE OF WHETHER

154

1    IT BEARS ON THE ISSUE OF WHETHER THE ARYAN BROTHERHOOD

2    EXISTED AS A CRIMINAL CONSPIRACY AS ALLEGED IN COUNT 2 OF

3    THE INDICTMENT.  AND THREE, WHETHER OR NOT DEFENDANT DAVID

4    SAHAKIAN WAS A MEMBER OF THE CONSPIRACY.THANK YOU.  GO

5    AHEAD.

6    BY MR. WOLFE:

7    Q.   MR. HEALY, WE ARE BACK TO WHAT DID YOU DO FOR THE ARYAN

8    BROTHERHOOD THAT INVOLVED THIS PLASTIC EXPLOSIVE CALLED C-4.

9    A.   I RECEIVED CIGAR TUBES -- PLASTIC CIGAR TUBES WRAPPED

10   UP.  I WOULD INSERT THEM IN MY RECTUM AND CARRY THEM UP TO

11   THE HILL, LICENSE PLATE FACTORY, IN FOLSOM STATE PRISON.

12   Q.   AND WHEN DID THIS TAKE PLACE?

13   A.   '85-'86.  I DON'T KNOW.  SOMEWHERE AROUND.  THERE.

14   LATE '85, EARLY '86.

15   Q.   AND WHAT DID YOU UNDERSTAND FROM THE ARYAN BROTHERHOOD

16   WAS IN THE CIGAR TUBES THAT YOU WERE CARRYING UP THE HILL?

17   A.   FROM THE ARYAN BROTHERHOOD?

18   Q.   YES.  I'M SORRY.  DIDN'T YOU SAY THAT YOU ENGAGED IN

19   THIS CONDUCT ON BEHALF OF THE AB?

20   A.   YES.

21   Q.   AND WHAT DID YOU UNDERSTAND YOU WERE CARRYING UP THE

22   HILL IN THE CIGAR TUBES?

23   A.   C-4.

24   Q.   IS THAT PLASTIC EXPLOSIVE?

25   A.   YES.

1    Q.    HOW DID THE PLASTIC EXPLOSIVE COME TO YOU?

2    A.    IN A CIGAR TUBE FROM MY CELLMATE.

3    Q.    AND WHO WAS YOUR CELLMATE?

4    A.    JOE THURS.

5    Q.    AND WAS JOE THURS A MEMBER OF THE ARYAN BROTHERHOOD?

6    A.    HE WAS AN ASSOCIATE OF THE ARYAN BROTHERHOOD.

7    Q.    DID YOU KNOW FROM MR. THURS WHAT -- YOU KNEW THAT HE

8    WAS GIVING YOU C-4 IN THE CIGAR TUBES?

9    A.    YES.

10   Q.    AND YOU CONCEALED THEM WITHIN YOUR BODY?

11   A.    YES.

12   Q.    AND TOOK THEM TO THE LICENSE PLATE FACTORY, YOU SAY?

13   A.    YES, SIR.

14   Q.    HOW WERE YOU ABLE TO GO TO THE LICENSE PLATE FACTORY AT

15   THAT TIME?

16   A.    AT THAT TIME, I WORKED UP THERE.

17   Q.    SO YOU WERE MAKING LICENSE PLATES?

18   A.    YES, SIR, I WAS.

19   Q.    WHY DID THE AB WANT TO MOVE THIS PLASTIC EXPLOSIVE TO

20   THE LICENSE PLATE FACTORY AT FOLSOM PRISON IN THIS PERIOD OF

21   TIME?

22   A.    THEY WANTED TO DESTROY THE LICENSE PLATE FACTORY TO

23   CAUSE AN ECONOMIC HIT ON THE GOVERNMENT, BECAUSE THAT'S THE

24   ONLY PLACE WHERE LICENSE PLATES ARE MADE AND THEY WANTED TO

25   SEND A MESSAGE TO THE ADMINISTRATION.

1    Q.    WHAT WAS THE MESSAGE TO THE ADMINISTRATION ABOUT?

2    A.    THEY WERE TRYING TO GET SOME AB'S OUT OF THE HOLE

3    BECAUSE THEY HAD BEEN HOLDING MEMBERS OF THE ARYAN

4    BROTHERHOOD ILLEGALLY IN THE HOLE AND SO THEY WERE TRYING TO

5    GET SOME OUT OF THE HOLE AND THAT WAS ONE OF THE WAY THEY

6    HAD DECIDED TO DO IT.

7    Q.    AND WHEN YOU SAY "IN THE HOLE," YOU MEAN IN SPECIAL

8    HOUSING?

9    A.    YES, SPECIAL HOUSING.  CALIFORNIA, THEY CALL IT

10   SECURITY HOUSING.

11   Q.    AFTER YOU CARRIED THE CIGAR TUBES UP TO THE LICENSE

12   PLATE FACTORY IN YOUR BODY, WHAT DID YOU DO WITH THEM NEXT?

13   A.    THEY HAD A BATHROOM UP THERE.  I WOULD GO INTO THE

14   BATHROOM, PULL IT OUT, TAKE IT OVER TO THE SINK, WASH IT UP.

15   AND, GENERALLY, MY CELLY, HE USED TO WORK MAINTENANCE.  HE

16   USED TO DO THE WORK ON THE DIES AND THE -- WHAT DO THEY CALL

17   THEM? -- THE PRESSES THAT THEY USED TO MAKE THE LICENSE

18   PLATES.  SO HE HAD FREE REIN TO RUN AROUND THE LICENSE PLATE

19   FACTORY.SO ONCE I GOT IT OUT, INTO MY POCKET AND CLEANED UP,

20   HE WOULD GENERALLY STOP BY AND PICK IT UP AND TAKE IT IN THE

21   BACK.

22   Q.    AND WHEN YOU SAY YOUR "CELLY," YOU MEAN JOE THURS?

23   A.    JOE THURS, YES.

24   Q.    AND WHEN HE TOOK IT IN THE BACK, WHAT PART OF THE

25   LICENSE PLATE FACTORY WAS HE TAKING IT BACK TO?

1    A.    BACK TO THE PAINT SHOP.

2    Q.    AND WHAT WAS THE -- WHAT WAS TO BE DONE WITH THE

3    PLASTIC EXPLOSIVE BACK IN THE PAINT SHOP?

4    A.    THE C-4, ONCE THERE WAS ENOUGH OF IT, IT WAS GOING TO

5    BE GATHERED AND PLACED ON THE -- WHERE THE PAINT STUFF WAS

6    AT BECAUSE IT WAS SUPPOSED TO HAVE BEEN VERY FLAMMABLE.  SO

7    THEY WERE GOING TO PLACE IT THERE AND THEN BLOW IT UP.  BLOW

8    THE WHOLE HILL UP.

9    Q.    WHAT OTHER MEMBERS OR ASSOCIATES OF THE ARYAN

10   BROTHERHOOD TOOK PART IN THIS BESIDES YOU AND JOE THURS?

11   A.    ME, JOE THURS, DAVID SAHAKIAN, JOE TOKASH AND JOE

12   MONACO.  THOSE ARE THE ONLY ONES THAT I KNEW ABOUT THAT

13   WAS -- THAT I HAD ANY KNOWLEDGE OF THAT WAS INVOLVED.

14   Q.    DID YOU KNOW DEFENDANT SAHAKIAN AT THAT TIME?

15   A.    YES.

16   Q.    HOW DID YOU KNOW THE DEFENDANT SAHAKIAN AT FOLSOM

17   PRISON AT THIS PERIOD OF TIME?

18   A.    BECAUSE I WAS WORKING UP ON THE HILL, AND HE WAS THE

19   ONLY AB MEMBER THAT WAS ACTUALLY UP THERE WHEN HE FIRST GOT

20   OUT OF THE HOLE.  I INTRODUCED MYSELF TO HIM.

21   Q.    WHY DID YOU DO THAT?

22   A.    BECAUSE HE'S A MEMBER OF THE ARYAN BROTHERHOOD.

23   Q.    WHY WOULD YOU INTRODUCE YOURSELF TO -- WHEN YOU MET A

24   NEW MEMBER OF THE ARYAN BROTHERHOOD?

25   A.    BECAUSE, LIKE I SAID, AT THAT POINT I WAS PROBABLY 19,

1    20 YEARS OLD, SO I'M A YOUNGSTER AND HE'S AN ACTUALLY MADE

2    MAN AT THAT TIME.  SO BY ME INTRODUCING MYSELF, I'M

3    BASICALLY LETTING HIM KNOW, YOU KNOW, I'M HERE IF YOU NEED

4    ANYTHING.  THAT WAS, WITHOUT ACTUALLY SAYING THAT, ME

5    INITIATING THE CONTACT WITH HIM AND SHAKING HIS HAND AND LET

6    HIM KNOW MY NAME AND STUFF LET'S HIM KNOW THAT I AM THERE

7    WITHOUT ACTUALLY SAYING IT.

8    Q.   AFTER YOU INTRODUCED YOURSELF TO THE DEFENDANT TO LET

9    HIM KNOW THAT YOU WERE THERE IF HE NEEDED SOMETHING, DID YOU

10   HAVE ANY FURTHER CONTACT WITH HIM?

11   A.   YEAH.  WE USED TO ACKNOWLEDGE EACH OTHER.  I WASN'T

12   OVERLY FRIENDLY.  WITH HIM.  I MEAN, THEY HAVE TO PULL YOU

13   IN.  YOU CAN'T PUSH TO GET IN WITH THOSE GUYS.  THEY PULL

14   YOU IN AS THEY DEEM FIT.  SO WE WOULD ACKNOWLEDGE EACH OTHER

15   IN THE MORNING WHEN HE WOULD WALK BY THE PRESS.  SOMETIMES

16   IF I WOULD BE BACK THERE TALKING TO JOE TOKASH OR JOE

17   MONACO, HE WOULD BE THERE AND WE WOULD TALK AND MESS AROUND

18   A LITTLE BIT.  AND THAT WAS IT.  SOMETIMES I ATE LUNCH BACK

19   THERE.WHEN YOU SAY "YOU ATE LUNCH BACK THERE," WHAT DO YOU

20   MEAN BY "BACK THERE"?

21   A.   WELL, THE PAINT SHOP, YOU HAD -- IT'S A LONG BUILDING.

22   IT'S A LONG BUILDING.  YOU HAD THE FRONT WAS WHERE ALL THE

23   PRESSES WERE AT.  THE FURTHER BACK YOU WENT, THAT'S WHERE

24   ALL THE PAINTING AND STUFF WAS AT.  THEN, IF YOU WENT ALL

25   THE WAY TO THE BACK -- THEN, THERE'S ENOUGH STAIRS -- THAT'S

1    WHERE THE BOXING WOULD BE WHERE THEY BOXED ALL THE LICENSE

2    PLATES BEFORE THEY SENT THEM TO DMV.  ACTUALLY, THAT'S WHERE

3    JOE MONACO WORKED.

4              JOE TOKASH WORKED IN THE PAINT -- WITH DAVE, I

5    BELIEVE.  DAVE WORKED EITHER IN PAINT OR BOXING, BUT HE WAS

6    BACK IN ONE OF THOSE SPOTS.  AND SO WHEN I SAY "IN THE

7    BACK," THERE WAS A LITTLE SPOT BACK THERE THAT JOE AND DAVE

8    AND THEM HAD THAT WE USED TO GO BACK AND EAT LUNCH.  IT'S

9    JUST A LITTLE SPOT OVER IN THE CORNER WHERE NOBODY ELSE WAS

10   AT.

11   Q.   SO YOU ATE LUNCH WITH THE DEFENDANT.  WHEN YOU SAY

12   "JOE", DO YOU MEAN JOE TOKASH, OR JOE MONACO?

13   A.   THERE'S THREE:  JOE TOKASH, JOE MONACO AND JOE THURS.

14   BUT AT THAT POINT, IT WOULD BE LIKE JOE TOKASH AND JOE

15   MONACO.

16   Q.   OVER HOW LONG A PERIOD OF TIME, APPROXIMATELY, DID YOU

17   WORK IN THE LICENSE PLATE FACTORY AND HAVE THESE OCCASIONAL

18   LUNCHES WITH DEFENDANT?

19   A.   DAVE WASN'T UP THERE LONG.  I WOULD SAY, PROBABLY, I

20   HAD LUNCH BACK THERE PROBABLY THREE OR FOUR TIMES.  IT WAS

21   PROBABLY OVER A MONTH..  PERIOD.  MAYBE A LITTLE LONGER.  I

22   DON'T KNOW.  I'M TERRIBLE WITH TIME.

23   Q.   RETURNING TO THE PLASTIC EXPLOSIVE, AFTER IT WAS -- YOU

24   SAID THAT WHEN THERE WAS ENOUGH OF THE PLASTIC EXPLOSIVES,

25   IT WAS TO BE PLACED NEAR THE PAINT SHOP AND NEAR THE PAINT

160

1   MATERIALS THAT WERE FLAMMABLE AND BLOW IT UP?

2   A.   YES.

3   Q.   WHAT WAS GOING TO HAPPEN TO THE PEOPLE WHO WORKED IN

4   THE PAINT SHOP WHEN THAT HAPPENED?

5   A.   WELL, THE PLAN WAS THAT WHEN THEY HAD EVERYTHING IN

6   PLACE, "THEY" BEING SAHAKIAN -- DAVE SAHAKIAN, JOE TOKASH

7   AND JOE MONACO.  WHEN THEY HAD EVERYTHING IN PLACE AND READY

8   TO GO, THEY WERE GOING TO WALK BY THE PRESSES WHERE THE

9   WHITE GUYS WERE AT.  THAT WERE, YOU KNOW, GOOD GUYS -- WE

10  CALL THEM "WOODS" -- AND LET THEM KNOW JUST TO WALK OUT OF

11  THE BUILDING.EVERYONE WAS GOING TO WALK OUT OF THE BUILDING.

12  THERE WAS GOING TO BE TIMER SET ON IT.  AND WHEN IT BLEW UP,

13  WE WOULD HAVE BEEN OUT AND EVERYBODY ELSE HOPEFULLY WOULD

14  HAVE BEEN DEAD IN THERE.

15  Q.   WHO TOLD YOU ABOUT THE -- THAT YOU WOULD BE GIVEN

16  NOTICE OF WHEN TO WALK OUT?

17  A.   MY CELLMATE.

18  Q.   THAT'S JOE THURS?

19  A.   JOE THURS, YES.

20  Q.   DID THERE EVER COME A TIME WHEN THE AB BLEW UP THE

21  PAINT SHOP?

22  A.   NO, IT GOT -- SOMEONE TOLD ON IT.

23  Q.   SOMEONE TOLD ON THEM?

24  A.   YEAH.

25  Q.   WHO WAS IT WHO TOLD ON THEM AND PREVENTED IT?

1   A.   MY CELLY, JOE THURS.

2   Q.   WHAT PROMPTED YOUR CELLMATE, JOE THURS -- HE'S AN ARYAN

3   BROTHERHOOD ASSOCIATE, ISN'T HE?

4   A.   YES.

5   Q.   YOU SAY -- WELL, LET ME ASK YOU:  YOU SAID THAT HE TOLD

6   ON THEM.WHO DID HE TELL?  WHAT DID HE TELL?

7   A.   HE EXPOSED THE CONSPIRACY TO LAW ENFORCEMENT TO -- I

8   DON'T KNOW EXACTLY WHO.  BUT THERE WAS OUTSIDE LAW

9   ENFORCEMENT AGENCIES, OR IF IT WAS INNER DEPARTMENT

10  INVESTIGATORS.  I DON'T KNOW WHO HE TOLD.  BUT HE BASICALLY

11  WENT TO THEM AND GAVE THEM THE INFORMATION.

12  Q.   AND WHY DID HE DO THAT?

13  A.   BECAUSE HE WAS STABBED.  AND HE LIVED.

14  Q.   DO YOU KNOW WHY JOE THURS WAS STABBED?

15  A.   YES.

16  Q.   WHY?

17  A.   JOE THURS WAS LIKE AN OLDER GUY.  HE WAS PROBABLY 30 AT

18  THAT TIME.  MAYBE A LITTLE BIT YOUNGER.  MAYBE 28.  SO HE

19  WAS OLDER AT THAT TIME.  HE HAD A LOUD MOUTH.  HE USED TO

20  TALK -- GET IN THESE LITTLE ARGUMENTS WITH THIS GUY, STEVE.

21  I DON'T KNOW WHAT HIS LAST NAME WAS; I'M NOT SURE ON IT.

22        .AND WE ALL USED TO SIT AT THESE TABLES AND WE

23  USED TO EAT OUR SUPPER TOGETHER.  WELL, A COUPLE TIMES THEY

24  GOT IN ARGUMENTS.  AND STEVE WENT TO SPANKY, WHO WAS

25  WORKING -- KIRK SMYTHE, THE AB MEMBER, WHO WAS RUNNING FIVE

1    BUILDING AT THE TIME -- WENT TO HIM LOOKING FOR A GREEN

2    LIGHT.  A "GREEN LIGHT" IS BASICALLY AUTHORIZATION,

3    PERMISSION FROM THE AB TO HIT SOMEONE.  STAB THEM.SPANKY

4    EXPLAINED TO HIM WHAT WAS GOING ON.  HE ASKED HIM WHY, WHAT

5    WAS HAPPENING.  STEVE EXPLAINED TO HIM WHAT WAS HAPPENING.

6    AND SPANKY TOLD HIM, *NAH, DON'T DO THAT.  JUST GO AHEAD AND*

7    *GET IN THE RING AND SETTLE YOUR DIFFERENCES.*SO THEY GOT IN

8    THE RING.  FOLSOM AT THAT TIME HAD A BOXING RING.  SO THEY

9    GOT IN THE RING.  STEVE BEAT UP JOE.  KNOCKED HIM OUT.  IT

10   WAS SUPPOSED TO HAVE BEEN OVER.  WELL, IT WASN'T.  HE STILL

11   CONTINUED TO TALK GARBAGE TO STEVE.WELL, AT THAT -- WHEN

12   THAT WAS GOING ON, BLINKY -- ANOTHER GUY I MENTIONED

13   EARLIER, ROBERT GRIFFIN -- AND A COUPLE OF OTHER AB MEMBERS,

14   WHICH WAS LIKE THE SHOT-CALLERS AT FOLSOM.  AT THAT TIME --

15        CDC HAD TAKEN US AND SENT US TO OTHER PRISONS.

16   WELL, MY CELLY WAS GETTING MARIJUANA THAT HE HAD SMUGGLED IN

17   FROM VISITING.  AND HE USED TO PAY HIS TAXES TO THE ARYAN

18   BROTHERHOOD.

19        MR. SHOSTAK:  EXCUSE ME.  TO THE NARRATIVE FORM OF

20   THE QUESTION.

21        THE COURT:  SUSTAINED.

22   BY MR. WOLFE:

23   Q.  MR. HEALY, LET'S TAKE IT IN SMALLER PIECES.  YOU WERE

24   SAYING THAT YOUR CELLMATE, JOE THURS, WAS SMUGGLING

25   MARIJUANA INTO FOLSOM?

1    A.    YES, SIR.  HE WASN'T SMUGGLING.  BUT HE WAS HAVING

2    SOMEONE ELSE DO IT.  HE WAS GETTING MARIJUANA, YES.

3    Q.    SO MARIJUANA WAS SMUGGLED IN TO JOE THURS?

4    A.    YES.

5    Q.    AND WHAT'S THAT TO THE ARYAN BROTHERHOOD?

6    A.    MONEY.

7    Q.    WHY IS -- WAS JOE THURS SMUGGLING MARIJUANA INTO FOLSOM

8    FOR THE AB?

9    A.    NO.

10   Q.    THEN WHAT'S THAT TO THE AB?

11   A.    ANY YARD THAT THE AB IS ON, IF IN STATE -- IF YOU, IF

12   YOU ARE A WHITE GUY THAT'S GETTING DRUGS IN THROUGH THE

13   VISITING OR HOWEVER YOU ARE GETTING THEM IN, YOU HAVE TO

14   GIVE THEM A PERCENTAGE, A TAX THEY CALL IT AND IT WAS A

15   THIRD.SO HE WAS GETTING MARIJUANA SMUGGLED IN, AND HE WAS

16   GIVING A THIRD TO THE AB.  WELL, THE THIRD THAT HE WAS

17   GIVING WAS GOING TO BLINKY.  AND THAT'S THE INTEREST OF THE

18   AB.  ALL WHITE GUYS KICK IN THE AB.  IT'S MONEY.

19   Q.    SO JOE THURS IS KICKING IN A THIRD OF HIS MARIJUANA TO

20   THE ARYAN BROTHERHOOD.WHY DID THAT LEAD TO HIS BEING

21   STABBED?

22   A.    BECAUSE HE WAS SELLING HIS MARIJUANA -- WELL, BLINKY

23   LEFT, AS I SAID.  SO THE OTHER THING WITH STEVE, THE

24   ARGUMENT AND TALKING ALL THE GARBAGE; AND THEN, BLINKY

25   LEAVING THE PRISON, HIM STARTING TO SAY HE WASN'T GIVING HIS

1   TAX THEN.  HE SAID HE WASN'T PAYING NOBODY NOTHING.  HE USED

2   TO TELL ME THAT:  HE WASN'T PAYING NOBODY.  HE ONLY PAID

3   BLINKY.  BLINKY GAVE HIM A GREEN LIGHT AND TOLD HIM HE

4   DIDN'T HAVE TO PAY ANYBODY AFTER HE LEFT, SO HE QUIT PAYING

5   PEOPLE:  THE AB.

6   Q.   SO JOE THURS STOPPED PAYING HIS THIRD TO THE AB?

7   A.   YES.  AND HE WAS ALSO SELLING HIS MARIJUANA FOR CASH.

8   AND THAT'S ONE OF THE THINGS.  THE AB, IF THEY ARE ON THE

9   YARD, THEY DON'T LET YOU SELL ANY OF YOUR DOPE OR ANYTHING

10  FOR CASH.  YOU CAN SELL IT FOR A MAIL-OUT TO GET YOUR MONEY

11  BACK AND YOU CAN SELL IT FOR COMMISSARY, BUT YOU CAN'T SELL

12  IT FOR CASH ON THE YARD.  BECAUSE THAT'S THEIR MONEY.  THEY

13  WANT THAT.

14  Q.   AND HOW DID -- SO THE FACT THAT JOE THURS STOPPED

15  PAYING HIS THIRD TO THE AB AND SOLD MARIJUANA IN THE PRISON

16  FOR CASH GOT HIM IN HOT WATER WITH THE AB?

17  A.   YES.

18  Q.   AND WHAT CAME OF THAT?

19  A.   WELL, I GUESS SPANKY HAD ALREADY BEEN INQUIRING ABOUT

20  IT AND HE HAD BEEN HEARING SOME THINGS THAT JOE WAS GETTING

21  DOPE IN.  SO HE CAME TO ME ONE DAY AND SAID, *HEY, IS YOUR*

22  *CELLY GETTING DOPE?*

23            AND.  I SAID, *YEAH.*

24            HE SAID, *WHAT IS HE GETTING?*

25            I SAID, *HE'S GETTING POT.*

1        HE SAID, *WELL, HOW MUCH IS HE GETTING?*

2        I SAID, *HE GETS A PRETTY GOOD LUMP.  ABOUT AN*

3    *OUNCE.*

4        HE SAYS, *IS HE GIVING IT TO ANYBODY?*

5        AND I SAID, *NAH, NOT THAT I KNOW OF*.HE SAID, *ALL*

6    *RIGHT*.AND THAT WAS IT.  THEN ABOUT -- I DON'T KNOW -- A DAY

7    OR TWO LATER, HE PULLED ME UP ON THE YARD AND HE SAID, *HEY,*

8    *CAN YOU GET YOUR CELLY TO GO IN ON THE EARLY YARD?*

9        WE WERE ON THE YARD.  IT WAS ON A WEEKEND, I

10   BELIEVE.AND HE SAID, *LOOK, THIS AIN'T GOT NOTHING TO DO WITH*

11   *YOU.  YOU ARE NOT GOING TO GET HIT.  YOU'RE NOT IN NO*

12   *TROUBLE, BUT WE'RE GOING TO TAKE YOUR CELLY DOWN RIGHT NOW.*

13   *BUT WE NEED YOU TO TRY TO GET HIM TO COME IN ON THE EARLY*

14   *YARD*.I SAID, *YEAH.  NO PROBLEM*.SO I WENT OVER TO HIM AND

15   TOLD HIM, *LET'S GO IN.*  I DON'T REMEMBER WHAT I TOLD HIM.  I

16   SAID, *LET'S GO IN TO WATCH A GAME,* OR SOMETHING.HE SAID, *ALL*

17   *RIGHT*.SO I BRUNG (SIC) HIM IN.  WE WALKED ON THE TIER.  I

18   SEEN STEVE WAS STANDING THERE, AND I WOULD WALKED UP.  I PUT

19   MY ARM AROUND HIM.  I STARTED TALKING TO HIM SO HIS BACK.

20   WOULD BE TO STEVE.  STEVE WENT UP AND GRABBED HIM AROUND THE

21   NECK.  PULLED HIM UP OFF THE GROUND, JUST STARTED BURYING A

22   KNIFE IN HIS CHEST.  STABBED HIM I DON'T KNOW HOW MANY

23   TIMES.  THREW HIM TO THE GROUND.  THOUGHT HE WAS DEAD.

24        HAND ME THE KNIFE.  I THREW IT OVER THE TIER ON

25   THE OTHER SPOT -- THIS WAS IN FIVE BUILDING.  THERE'S A

166

1   BUILDING AND THEN THEY GOT LONG CELL BLOCKS THAT ARE INSIDE.

2   THEY'RE NOT HOOKED TO THE CEILING OR ANYTHING.  IT'S LIKE AN

3   OLD ANCIENT CELLBLOCK.

4        IT THREW IT OVER TO THE OTHER SIDE.  JOE WENT

5   WALKING DOWN THE TIER AND FELL.  THEY PUSHED THE ALARMS AND

6   FROZE THE BUILDING AND TOOK HIM AWAY.AND THAT'S HOW HE CAME

7   TO GET STABBED.

8   Q.   SO WHEN SPANKY -- KIRK SMYTHE, YOU SAID HE'S THE AB

9   MEMBER WHO'S RUNNING FIVE BUILDING; IS THAT RIGHT?

10  A.   YES.  HE WAS AT THAT POINT, YEAH.

11  Q.   HE ASKED YOU WHAT YOUR CELLMATE WAS DOING ABOUT

12  MARIJUANA AND SELLING IT FOR CASH AND YOU TOLD HIM?

13  A.   YEAH.

14  Q.   AND THEN HE SAID, *WE ARE GOING TO TAKE YOUR CELLMATE*

15  *DOWN*; IS THAT RIGHT?

16  A.   SOMETHING TO THAT EFFECT.  I MEAN, I DON'T KNOW IF THAT

17  WAS HIS EXACT WORDS.  BASICALLY, HE WAS LETTING ME KNOW THAT

18  THEY WERE GETTING READY TO KILL HIM.

19  Q.   AND HE ASKED YOU TO HELP THEM?

20  A.   YEAH.

21  Q.   AND YOU DID?

22  A.   I DID, YEAH.

23  Q.   WHY?

24  A.   BECAUSE IT WAS THE AB.  THAT'S WHAT YOU DO.  IF HE'S

25  CROSSING THE LINE WITH THE AB, YOU TRUST THEIR JUDGMENT.

1    THEY KNOW WHAT THEY ARE DOING.  SO WHATEVER THEY SAY.  IF

2    THEY SAY SOMEONE HAS CROSSED THE LINE, YOU DON'T QUESTION

3    IT.  YOU SAY *ALL RIGHT.*

4    Q.    BUT MR. THURS LIVED?

5    A.    YES, HE DID.  BARELY FROM MY UNDERSTANDING.

6    Q.    AND AFTER THAT, HE TOLD THE POLICE -- TOLD THE

7    CORRECTION OFFICERS WHAT HE KNEW?

8    A.    IT WAS A WHILE.  BECAUSE THEY DIDN'T EVEN SLAM THE

9    PRISON DOWN FOR A COUPLE TWO OR THREE DAYS, SO I GUESS HE

10   WAS IN SURGERY.  THEY WERE TRYING TO REVIVE HIM.  FINALLY,

11   WHEN HE CAME TO, HE GAVE UP THE DRAWINGS ON THE C-4 AND THE

12   HILL AND EVERYTHING ELSE THAT HE KNEW.

13   Q.    ANYTHING HAPPEN TO YOU EITHER BECAUSE OF THE C-4 PLOT

14   BEING EXPOSED OR BECAUSE YOU HELPED THE AB TRY TO KILL

15   JOE THURS?

16   A.    NO.  ALL THE WHITE GUYS LOST THEIR JOBS ON THE HILL;

17   OTHER GUYS WENT TO THE HOLE.  I SKATED.  NOTHING HAPPENED TO

18   ME.  I JUST LOST MY JOB.  I WAS NO LONGER WORKING AT THE

19   LICENSE PLATE FACTORY.

20   Q.    MR. HEALY, YOU MENTIONED SOMETHING ELSE A LITTLE WHILE

21   AGO I WANT TO COME BACK.  YOU SAID SOMETHING ABOUT -- LET ME

22   SEE IF I CAN FIND IT.YOU WERE TALKING ABOUT LEADING A YARD

23   AND YOU SAID THAT ONE OF THE THINGS YOU DO IS MANAGE

24   CONCEALING WEAPONS AND MAKING WEAPONS.DOES THAT SOUND RIGHT?

25   DO YOU REMEMBER THAT?

1    A.    UH-HUH.

2    Q.    HOW DID YOU -- PLEASE TELL THE JURY, BRIEFLY, WHAT YOU

3    LEARNED ABOUT MAKING WEAPONS IN YOUR EARLY ASSOCIATION WITH

4    THE AB?

5    A.    WELL, ONE OF THE THINGS I LEARNED FROM DAVE WHEN WE

6    WOULD BE TALKING WOULD BE -- BECAUSE I WAS -- AT THAT POINT,

7    I WAS MAKING KNIVES, HOLDING KNIVES IN MY CELL AND A LOT

8    WHITE GUYS DID THAT BACK THEN.  THAT'S JUST WHAT EVERYBODY

9    DID.SAHAKIAN EXPLAINED TO ME HOW TO CUT A KNIFE WITH A

10   RAZOR -- NOT A RAZOR BLADE BUT FINGERNAIL CLIPPERS.  AND,

11   BASICALLY, BROKE DOWN HOW, YOU KNOW, STAINLESS STEEL IS A

12   STRONGER METAL.  AND MOST METAL IN PRISON, IF YOU PUT THE

13   STAINLESS STEEL ON SOMETHING SOFTER, THAT SOFTER METAL IS

14   GOING TO GIVE WHICH IS GOING TO CAUSE FRICTION AND THE

15   SOFTER METAL WILL GIVE.  YOU DON'T ACTUALLY NEED A HACKSAW

16   BLADE.  HE EXPLAINED THAT TO ME IN CASE I EVER WENT TO THE

17   HOLE.  THAT WAS JUST THROUGH CONVERSATION.  IT WASN'T LIKE

18   SITTING DOWN.  AND IT WAS EDUCATION TIME.  IT WAS JUST

19   CONVERSATING.

20   Q.    WHAT DID THE DEFENDANT TELL YOU ABOUT HOW YOU COULD CUT

21   A KNIFE WITH FINGERNAIL CLIPPERS?

22   A.    WELL, HE EXPLAINED THE PROCESS THAT YOU USE.

23   Q.    PLEASE TELL THE JURY WHAT THAT PROCESS IS.

24   A.    OH, THE PROCESS IS YOU GET YOU A SET OF FINGERNAIL

25   CLIPPERS.  I HAVE LEARNED THIS LATER, TOO.  YOU CAN ALSO USE

169

1  A RAZOR BLADE, OR ANYTHING.  YOU JUST NEED MORE OF THEM.

2  YOU GET A FINGERNAIL CLIPPER.  YOU BREAK ONE OF THE PIECES

3  OFF, BASICALLY, THE HANDLE THAT MOVES DOWN.  YOU CAN BUST

4  THAT OFF.  YOU TAKE ONE POINT AND PUT A JAGGED EDGE ON THE

5  POINT OF IT.  YOU TAKE PAPER, ROLL IT UP REAL TIGHT AND IT

6  BECOMES LIKE A PIECE OF WOOD.  YOU KEEP ON ROLLING IT.  AND

7  YOU GET ANOTHER PIECE AND YOU ROLL IT.  ANOTHER PIECE AND

8  YOU ROLL IT UNTIL YOU HAVE A HANDLE ABOUT LIKE THAT

9  (INDICATING).  THE MORE THAT YOU ROLL IT OUT, THE TIGHTER --

10 BECAUSE IT SQUEEZES ALL THE AIR OUT, THE TIGHTER THE PAPER

11 BECOMES.  IT ALMOST BECOMES LIKE WOOD.

12         AND YOU TAKE SHEET OR T-SHIRT MATERIAL AND YOU

13 WRAP IT AROUND THERE TO KEEP IT ROLLED TIGHT.  AND YOU TAKE

14 THE END -- THE FINGERNAIL CLIPPERS AND YOU STICK IT DOWN IN

15 THE POINT -- THE CENTER OF IT WHERE IT'S TIGHT AND THEN YOU

16 YOKE IT DOWN WITH YOUR SHIRT.  IT'S MATERIAL.

17         AND YOU TAKE WHEREVER YOUR MARK IS WHERE YOU ARE

18 GOING TO MAKE YOUR WEAPON, YOU TAKE IT AND YOU DON'T JAG IT

19 LIKE THIS (INDICATING).  YOU JUST TAKE IT FROM THE TOP AND

20 YOU DRAG IT DOWN, NORTH AND SOUTH, NORTH AND SOUTH.  YOU

21 JUST GO TO THE TOP AND DRAG THE DOWN.  YOU DON'T GO BACK UP.

22 YOU TAKE IT OFF THE STEEL.  YOU GOT TO DO IT SLOW AND

23 STEADY, SO IT BUILDS UP A FRICTION AND THE HEAT AND THE

24 STAINLESS STEEL ENDS UP CUTTING WHATEVER THE OTHER METAL IS.

25 AND YOU HAVE YOUR WEAPON.

1  Q.    HOW LONG DOES IT TAKE TO CUT ORDINARY STEEL WITH A

2  STAINLESS STEEL NAIL CLIPPER?

3  A.    IT WOULD DEPEND ON WHAT KIND YOU'RE USING.  IF YOU ARE

4  CUTTING OFF A LOCKER, OR A SHELF IN THE CELL, THAT CAN BE

5  LIKE AN HOUR, HOUR AND A HALF, TWO HOURS.  IF YOU ARE

6  CUTTING OFF A DOOR, THE DOOR FRAME, THE LITTLE LIP, OR THE

7  SEAL, WHATEVER YOU CALL IT, THE TRACK.  THE TRACK THAT CAN

8  TAKE LONGER BECAUSE THE METAL IS A LITTLE BIT HARDER AND

9  IT'S A LITTLE BIT THICKER. IF YOU ARE CUTTING OFF LIKE A

10  WINDOW IN NEW FOLSOM, IT TAKES LIKE EIGHT HOURS, SIX HOURS.

11  IT ALL DEPENDS ON THE LENGTH OF THE WEAPON, WHETHER OR NOT

12  YOU'RE GOING TO DO A CROSSCUT.  A LOT OF PEOPLE WON'T DO

13  CROSSCUTS BECAUSE THAT'S A LITTLE SMALL CUT, AND YOU HAVE --

14  SO YOU GOT TO SIT THERE AND TRY TO BUILD UP THE FRICTION

15  WITH JUST A LITTLE SMALL LINE, SO YOU ARE GOING THE SAME WAY

16  AS A LONG ONE.  SO WHAT PEOPLE WILL DO IS, GENERALLY, JUST

17  GO LIKE THIS (INDICATING).  START IT FROM A POINT AND JUST

18  RUN IT DOWN.  ONCE IT BREAKS THROUGH, THEN YOU TAKE A

19  T-SHIRT AND BUST OFF THE TIP AND THEN GO LIKE THIS

20  (INDICATING) AND JUST BREAK IT OFF.  IT'S A LOT QUICKER THAN

21  DOING YOUR CROSSCUT BECAUSE YOUR CROSSCUT IS WHAT CAUSES ALL

22  THE TIME.

23          MR. SHOSTAK:  NARRATIVE, YOUR HONOR.

24          THE COURT:  SUSTAINED.

25          MR. SHOSTAK:  AND MOVE THAT THE JURY BE INSTRUCTED

1    TO DISREGARD.

2           THE COURT:  THE MOTION TO STRIKE IS DENIED.

3    BY MR. WOLFE:

4    Q.   AND YOU LEARNED OF THE PROCESS THAT YOU JUST DESCRIBED

5    FROM DEFENDANT SAHAKIAN AT FOLSOM?

6    A.   YES.

7    Q.   IS THAT AT THE SAME PERIOD OF TIME YOU WERE EATING

8    LUNCH WITH HIM IN THE BACK?

9    A.   YEAH.  DURING THAT TIME, YES.

10   Q.   MR. HEALY, YOU MENTIONED IN DISCUSSING OR DESCRIBING

11   THE AB MEMBERS AND ASSOCIATES WHO WORKED ON THE PLASTIC

12   EXPLOSIVE PLAN, YOU MENTIONED JOE TOKASH?

13   A.   YES.

14   Q.   CAN YOU TELL THE JURY BRIEFLY WHO JOE TOKASH IS AND

15   WHAT HIS RELATIONSHIP WAS WITH THE STATE AB?

16   A.   JOE TOKASH IS NOT AN AB MEMBER.  HE WAS AN ASSOCIATE.

17   HE'S AN OLDER GUY.  A BIKER.  I THINK HE'S OUT OF

18   SACRAMENTO, ONE OF THE NORTHERN AREAS UP THERE.  HE USED TO

19   BE A COOK, SUPPOSEDLY.  HE WAS RUNNING A LOT OF DOPE --

20   CRANK.  SPEED.  HE WAS REAL TIGHT WITH THE ARYAN

21   BROTHERHOOD.

22           MR. SHOSTAK:  OBJECT TO THE "SUPPOSEDLY" RUNNING.

23           THE COURT:  SUSTAINED.

24   BY MR. WOLFE:

25   Q.   MR. HEALY, IS THIS INFORMATION THAT YOU RECEIVED FROM

1  ARYAN BROTHERHOOD MEMBERS AND ASSOCIATES TO KEEP YOU ABREAST

2  OF THE CAPACITY OF THE AB AND ITS MEMBERS AND ASSOCIATES AT

3  FOLSOM AT THIS PERIOD OF TIME?

4  A.    NO.  I GOT THAT FROM JOE.  ME AND JOE WERE PRETTY

5  TIGHT.

6  Q.    DID HE TELL YOU THIS JUST BECAUSE YOU WERE INTERESTED?

7  OR WAS IT PART OF YOUR EDUCATION OF THE ARYAN BROTHERHOOD TO

8  KNOW ABOUT HIM?

9  A.    NO, IT WAS JUST LIKE IN CONVERSATION, YOU KNOW WHAT I

10 MEAN.  HE WASN'T NO AB, SO HE WASN'T -- HE WASN'T

11 INSTRUCTING ME ON ANYTHING.

12 Q.    THEN WHAT WAS MR. TOKASH'S POSITION WITH THE ARYAN

13 BROTHERHOOD AT THIS TIME?

14 A.    VERY CLOSE.  HE WAS AN ASSOCIATE.  THE AB LIKED HIM A

15 LOT.  LIKE I SAY, HE WASN'T A MEMBER.  HE WAS A BIKER THAT

16 WAS CLOSELY ASSOCIATED WITH THE ARYAN BROTHERHOOD.  HE WAS A

17 SOURCE OF MONEY.  A SOURCE OF DOPE.

18 Q.    AND HE'S ONE OF THE PEOPLE THAT YOU DESCRIBED EARLIER

19 AS SOMEONE WHO IS -- PROVIDES BENEFITS TO THE ARYAN

20 BROTHERHOOD?

21 A.    AND RECEIVES BENEFITS FROM THE ARYAN BROTHERHOOD, YES.

22 Q.    YOU SAID HE IS "A SOURCE OF MONEY"?

23 A.    YES.

24 Q.    YOU SAID IN ONE OF YOUR EARLIER ANSWERS:  USED TO BE A

25 COOK.DID YOU MEAN A CHEF?  OR A DIFFERENT KIND OF COOK?

1  A.   NO.  HE USED TO COOK METHAMPHETAMINE.

2  Q.   LET ME ASK YOU ABOUT ASSOCIATES.  HAVING IN MIND

3  MR. TOKASH AND YOURSELF AT THIS TIME, YOU WERE AN ARYAN

4  BROTHERHOOD ASSOCIATE AT ABOUT THE SAME TIME THAT YOU KNEW

5  MR. TOKASH AT FOLSOM?

6  A.   YES.

7  Q.   AND HE WAS AN AB ASSOCIATE AS WELL?

8  A.   YES.

9  Q.   WHAT WERE THE -- WHAT WAS THE AB'S ATTITUDE ABOUT

10 LAYING HANDS ON AN AB ASSOCIATE?

11        .YOU TOLD US ABOUT LAYING HANDS ON A BROTHER.

12 A.   IT WOULD DEPEND ON THE SITUATION.

13 Q.   I'M SORRY.  WHAT WERE THE RULES ABOUT LAYING HANDS ON

14 AB ASSOCIATES?

15 A.   IT WOULD DEPEND ON THE SITUATION:  WHO IT WAS.  YOU ARE

16 NOT GOING TO GET THE WHOLE AB GOING AFTER ANOTHER RACE, OR

17 PEOPLE, OR WHATEVER, KILLING PEOPLE, BECAUSE OF JUST SOME

18 GUY, UNLESS HE'S REALLY CLOSE.  TO THEM.  LIKE I SAID, IT

19 DEPENDS ON WHO YOU KNOW AND HOW CLOSE YOU ARE.  AND WHAT'S

20 THE BENEFIT.

21        THE COURT:  IS THIS NOW A GOOD LOGICAL STOPPING

22 POINT?

23        MR. WOLFE:  YES, YOUR HONOR.  I'M ABOUT TO MOVE TO

24 A NEW TOPIC, IF YOUR HONOR WANTS TO STOP.

25        THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, WE

```
 1   WILL BE IN RECESS FOR THE JURY UNTIL 9:00 O'CLOCK TOMORROW

 2   MORNING.  AGAIN, PLEASE REMEMBER, DON'T DISCUSS ANYTHING

 3   YOU'VE HEARD, ANY OF THE EVIDENCE, ANY OF THE PARTICIPANTS,

 4   WITNESSES, ANYONE, ANYTHING RELATED TO THE CASE.  DON'T DO

 5   ANY INVESTIGATION ABOUT THE CASE.  OR ANYTHING RELATED TO

 6   THE CASE, OR ANYONE RELATED TO THE CASE.  DON'T MAKE UP YOUR

 7   MINDS ABOUT ANYTHING RELATED TO THE CASE, ANY OF THE

 8   EVIDENCE, ISSUES, ANYTHING LIKE THAT.THANK YOU VERY MUCH.

 9   WE WILL SEE YOU TOMORROW MORNING, NO LATER THAN

10   9:00 O'CLOCK.

11        (JURY OUT.)

12        (THE FOLLOWING PROCEEDINGS WERE HAD OUTSIDE THE

13        PRESENCE OF THE JURY:)

14             THE CLERK:  PLEASE BE SEATED.

15             THE COURT:  THE WITNESS IS EXCUSED.  THANK YOU.

16        (WITNESS EXCUSED.)

17             THE COURT:  WE ARE ON THE RECORD OUTSIDE THE

18   PRESENCE OF THE MEMBERS OF THE JURY.HOW MUCH LONGER DO YOU

19   THINK YOU HAVE, MR. WOLFE?

20             MR. WOLFE:  YOUR HONOR, NOT SO VERY LONG.  I'M

21   ABOUT TO BEGIN ASKING HIM ABOUT HIS LEAVING THE ARYAN

22   BROTHERHOOD.  I THINK 20 MINUTES, MAYBE.

23             THE COURT:  ARE YOU DOING THE CROSS-EXAMINATION?

24             MR. GREEN:  NO.

25             THE COURT:  I'M SORRY.  I CAN'T REMEMBER.DO YOU
```

1    HAVE A REVISED ESTIMATE FOR YOUR CROSS-EXAMINATION?

2          MR. SHOSTAK:  NO.  I THINK, BASED ON WHAT I HEARD

3    TODAY, I GAVE YOU A CORRECT ESTIMATE.

4          THE COURT:  WHO IS THE NEXT WITNESS UP FOR

5    TOMORROW?

6          MR. AKROTIRIANAKIS:  AFTER MR. HEALY, IT WILL BE

7    EUGENE BENTLEY, YOUR HONOR.

8          THE COURT:  AFTER THAT?

9          MR. AKROTIRIANAKIS:  MAY I HAVE JUST A MOMENT,

10   YOUR HONOR?

11         THE COURT:  YES.

12      (PAUSE.)

13         MR. AKROTIRIANAKIS:  YOUR HONOR, I WOULD EXPECT

14   THAT MR. BENTLEY'S TESTIMONY, IN ADDITION TO THE

15   CROSS-EXAMINATION OF MR. HEALY WOULD CONSUME THE ENTIRETY OF

16   TOMORROW.

17         MR. GREEN:  JUDGE, WITH THE COURT'S PERMISSION,

18   INSTEAD OF MAKING THE RECORD WITH RESPECT TO MR. BENTLEY

19   TOMORROW MORNING, IF I CAN MAKE IT NOW WITH RESPECT TO OUR

20   CRAWFORD AND OUR CONFRONTATION OBJECTIONS TO WHAT I

21   ANTICIPATE HIS TESTIMONY WILL BE?

22         .IS THAT OKAY WITH THE COURT?

23         THE COURT:  THAT'S FINE.  I'M SORRY.  I WAS DOING

24   THAT BECAUSE I JUST REMEMBERED SOMETHING ELSE I MEANT TO DO

25   BEFORE I EXCUSED THE JURY, AND I FORGOT.BUT GO AHEAD.

```
 1              MR. GREEN:  WITH RESPECT TO MR. BENTLEY, I BELIEVE
 2   THAT HE WILL TESTIFY AS TO HEARSAY STATEMENTS OR
 3   CO-CONSPIRATOR STATEMENTS THAT ARE NOT DIRECTLY ATTRIBUTABLE
 4   TO MR. SAHAKIAN ON THE FOLLOWING AREAS WITH RESPECT TO JIMMY
 5   LEE INMAN; THE ATTEMPTED MURDER OF JIMMY LEE INMAN; ALSO,
 6   THE ATTEMPTED MURDER OF MR. BURKETT AND ALSO THE LEWISBURG
 7   INCIDENT.  I BELIEVE THAT HE RECEIVED SOME OF HIS
 8   INFORMATION -- I KNOW THERE'S AT LEAST ONE TAPE-RECORDED
 9   TELEPHONE CONVERSATION WITH MR. SLOCUM IN REGARDS TO
10   LEWISBURG.  HE HAD NUMEROUS CONVERSATIONS WITH -- WHICH I
11   BELIEVE IS GOING TO BE A WITNESS THAT'S GOING TO TESTIFY BY
12   THE NAME OF MICHAEL WAGNER.
13              THE COURT:  CAN I ASK YOU TO SLOW DOWN?  REPEAT
14   THAT LAST --
15              MR. GREEN:  HE HAD TAPE-RECORDED TELEPHONE
16   CONVERSATION WITH MR. SLOCUM IN REGARDS TO THE LEWISBURG
17   INCIDENT AND ALSO THAT I BELIEVE IS GOING TO REFERENCE
18   STATEMENTS FROM MR. BENTON.
19              WITH RESPECT TO JOEL BURKETT AND JIMMY LEE INMAN,
20   I BELIEVE HE WILL MAKE REFERENCE TO INFORMATION THAT HE
21   LEARNED FROM MR. MILLS.DEPENDING ON WHAT -- HOW FAR THE
22   GOVERNMENT GOES IN THE EVENTS THAT WERE OCCURRING AT MARION,
23   I KNOW HE WILL TALK ABOUT MR. GOTTI AND MR. TOKASH AND THAT
24   THAT INFORMATION WILL BE LEARNED FROM A NUMBER OF DIFFERENT
25   SOURCES.  HE ATTRIBUTES IT TO BUT MOSTLY TO MR. WAGNER AND
```

1  MR. MC ELHINEY.  AND GIVEN THE GOVERNMENT'S POSITION THAT

2  THEY ARE NOT GOING TO BRING UP THE WALKER HOMICIDE, I THINK

3  THAT COVERS THEM ALL.THEREFORE, I WOULD ASK THE COURT TO

4  RECOGNIZE OUR CONTINUING OBJECTION TO SUCH STATEMENTS

5  SPECIFICALLY WHERE THEY ARE NOT DIRECT STATEMENTS FROM OUR

6  CLIENT, MR. SAHAKIAN, AND IT RECOGNIZE THAT OBJECTION BE

7  ONGOING THROUGHOUT.I RECOGNIZE ALSO THAT THE COURT AT THE

8  END OF IT, IF I FEEL THAT THEY HAVEN'T MADE THEIR

9  FOUNDATION, THEN I MOVE TO STRIKE.

10      THE COURT:  YOU MAY HAVE A CONTINUING OBJECTION

11  WITHOUT THE NEED TO REPEAT IT AS TO ALL THE TESTIMONY THAT

12  YOU'VE OUTLINED.OBJECTION IS OVERRULED.  THANK YOU.ALL

13  RIGHT.  THE OUTSTANDING MATTER WAS THE MOTION -- I DON'T

14  THINK I EXPLICITLY RULED ON THE MOTION FOR A MISTRIAL.  I'M

15  GOING TO DENY THE MOTION FOR MISTRIAL, BASED ON THE ISOLATED

16  STATEMENT BY THE WITNESS, AGENT -- IT WAS -- I'M SORRY.

17      MR. WOLFE:  AGENT KNAPP I BELIEVE, YOUR HONOR.

18      THE COURT:  AGENT KNAPP I BELIEVE EARLIER TODAY TO

19  THE EFFECT THAT AT THE TIME THAT THE SEARCH WARRANTS THAT

20  WERE THE SUBJECT OF HIS TESTIMONY WERE BEING EXECUTED, THE

21  DEFENDANT WAS ABOUT TO GO ON TRIAL IN THE SOUTHERN DISTRICT

22  OF ILLINOIS ON, AS HE PHRASED IT, A DEATH PENALTY CASE.  BUT

23  THAT -- IT WAS A GLANCING REFERENCE.  AT THE BEGINNING OF

24  RATHER A LONG ANSWER TO A QUESTION AND WHEN HE FINISHED HIS

25  RATHER LENGTHY ANSWER, IN WHICH THIS REALLY WAS A GLANCING

```
1    REFERENCE, DEFENSE COUNSEL OBJECTED.  THERE HAD BEEN OTHER
2    REFERENCES IN, I BELIEVE, THAT ANSWER BUT ALSO OTHER ANSWERS
3    TO QUESTIONS THAT HE HAD GIVEN DURING HIS TESTIMONY ABOUT
4    MANY OTHER CASES.  SO I INSTRUCTED THE JURY AT THAT TIME
5    THAT THEY WERE TO DISREGARD ALL REFERENCES TO OTHER CASES.
6    AND ONLY FOCUS ON THE CHARGES AGAINST THE DEFENDANT FOR
7    WHICH HE WAS ON TRIAL IN THIS CASE.I DON'T THINK THAT THE
8    REFERENCE, ALTHOUGH IT SHOULD NOT HAVE BEEN MADE BY
9    MR. KNAPP, WAS OF THE TYPE OF PREJUDICE THAT CAN'T BE CURED
10   BY THE SORT OF INSTRUCTION THAT I GAVE AT THE TIME, AND I'M
11   GOING TO FOLLOW IT UP FIRST THING IN THE MORNING WITH A
12   FURTHER INSTRUCTION AS REQUESTED BY THE DEFENSE THAT THE
13   DEFENDANT, MR. SAHAKIAN, WAS NOT CONVICTED OF ANY CHARGE IN
14   THE CASE THAT OFFICER KNAPP REFERRED TO.  BUT UNDER THE CASE
15   LAW, THAT'S NOT THE SORT OF PREJUDICE TO THE DEFENDANT THAT
16   CAN'T BE CURED IS GROUNDS FOR A MISTRIAL IN THIS CASE.
17            MR. GREEN:  JUDGE --
18            THE COURT:  YES.
19            MR. GREEN:  -- IF I MAY, WITH RESPECT TO THAT
20   INSTRUCTION, I JUST WANT TO KIND OF BE ACCURATE.  HE WAS
21   CONVICTED OF POSSESSION OF WEAPON OUT OF THAT CASE.
22            THE COURT:  THAT'S WHY YOU SAID "ANY HOMICIDE"?
23            MR. GREEN:  THAT'S WHY I SAID "ANY HOMICIDE,"
24   BECAUSE HE WAS CONVICTED OF A POSSESSION OF WEAPON OUT OF
25   THAT CASE.
```

1          THE COURT:  THEN I WILL CORRECT THAT.ALL RIGHT.

2   ANYTHING ELSE THAT WE NEED TO TAKE UP THIS AFTERNOON?

3          MR. SHOSTAK:  YES.

4          MR. AKROTIRIANAKIS:  THERE IS ONE MATTER, YOUR

5   HONOR.

6          MR. SHOSTAK:  I DIDN'T SEE YOU STANDING THERE.

7   MR. GREEN WAS BETWEEN US.

8          THE COURT:  ALL RIGHT.  WE'LL GO ALPHABETICALLY.

9   MR. AKROTIRIANAKIS.

10         MR. AKROTIRIANAKIS:  MAYBE REVERSE ALPHABETICAL.

11         THE COURT:  IT WILL BE -- "S" IS FIRST NEXT TIME.

12         MR. AKROTIRIANAKIS:  I JUST DON'T WANT TO LET THIS

13  GET TOO FAR AWAY.

14         I HAD IN AN ERROR YESTERDAY DURING THE --

15  YESTERDAY -- MONDAY, YESTERDAY, DURING THE SUPPRESSION

16  HEARING -- MARKED AS EXHIBIT 170, THE CARL KNORR BIRTHDAY

17  CARD.  I REALIZED AFTER I WENT TO GO PLACE THE EXHIBIT IN

18  THE BOX THAT THERE IS AN EXHIBIT 170, AND IT WASN'T ON THE

19  LIST THAT I HAD A COPY OF.I WILL COME UP, WITH THE COURT'S

20  PERMISSION, WITH A NEW NUMBER AND THEN ON THE RECORD WE CAN

21  RE-MARK IT.

22         THE COURT:  ALL RIGHT.  SO THE EXHIBIT THAT WAS

23  ORDERED ADMITTED YESTERDAY AS 170 IS ORDERED STRICKEN, AND

24  IT WILL BE RE-ADMITTED WITH A NEW NUMBER.

25         MR. AKROTIRIANAKIS:  THANK YOU.

1          THE COURT:  ALL RIGHT.  MR. SHOSTAK.

2          MR. SHOSTAK:  ONLY, YOUR HONOR, THAT I WOULD LIKE

3   TO ASK THAT EXHIBIT 1052-A, -B AND -C, THAT WE USED AT

4   LUNCHTIME FOR MR. KNAPP, I WOULD MOVE ITS ADMISSION FOR THE

5   PURPOSE OF THAT HEARING.

6          THE COURT:  FOR THE PURPOSE OF THAT HEARING, IT'S

7   ORDERED ADMITTED.  IF THAT HASN'T ALREADY BEEN DONE, IT'S

8   ORDERED ADMITTED.

9       *(DEFENDANT'S EXHIBIT 1052-A, -B AND -C RECEIVED IN*

10      *EVIDENCE.)*

11          ALL RIGHT.  ANYTHING ELSE?

12          THANK YOU VERY MUCH.  SEE YOU TOMORROW MORNING.

13      *(AT 4:39 P.M., PROCEEDINGS WERE ADJOURNED.)*

14

15                              -OOO-

16

17

18

19

20

21

22

23

24

25

*DEBORAH D. PARKER, U.S. COURT REPORTER*

181

1                              CERTIFICATE

2            I HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

3      TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

4      CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

5      PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

6      TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

7      REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

8

9      DATE:  AUGUST 20, 2008

10

11

12                         _____

13                         DEBORAH D. PARKER, OFFICIAL REPORTER

14

15

16

17

18

19

20

21

22

23

24

25

*DEBORAH D. PARKER, U.S. COURT REPORTER*